Expert Report of

Donald R. Deere, Ph.D.

Welch Consulting
1716 Briarcrest Dr., #700
Bryan, Texas 77802

in the Matter of

Evdokia Nikolova,
Plaintiff

v.

University of Texas at Austin,
Defendant

Case No. 1:19-cv-00877-RP
In the United States District Court
Western District of Texas, Austin Division

May 24, 2021

_____
Donald R. Deere

**Qualifications, Billing Information, and Information Considered**

I spent 24 years on the faculty in the Department of Economics at Texas A&M University, the last 17 with tenure. I retired from Texas A&M University in 2007. I also am a senior economist for Welch Consulting, a firm that provides expert services in economics and statistics to the legal community as well as general consulting in economics and statistics. I received training in economics and statistics at the Massachusetts Institute of Technology, where I earned a Ph.D. in Economics in 1983. I have taught at the University of California, Santa Barbara and Texas A&M University. My curriculum vitae, including a list of publications in the past 10 years, is attached as Appendix 1. A list of my trial and deposition expert testimony in the past four years is attached as Appendix 2. The documents that include the facts and data that I considered in forming my opinions are listed in Appendix 3. My billing rate for work on this case is $300 per hour and hourly billing rates of other Welch Consulting employees who have worked on this case range between $75 and $250.

**Assignment and Summary of Opinions**

I have been retained to respond to the Expert Report of Shane Thompson, Ph.D. dated April 19, 2021 and to the report of Thomas W. Glass, Ph.D., CPA dated April 19, 2021 in this matter. My opinions are that:

- There are numerous flaws in Dr. Thompson's statistical calculations that result in inapt or incorrect conclusions. These flaws include:
    - Failing to account for the fact that accelerated (early) tenure reviews depend at least in part on a request by the assistant professor and, thus, are not "treatment" by UT Austin;
    - Incorrectly identifying those assistant professors who were considered for accelerated tenure;
    - Inaptly comparing the supposed, and incorrectly identified, "disparity in opportunity" for accelerated tenure review with the fact that Dr. Nikolova *was* reviewed for accelerated tenure;

1

- o Focusing on differences between the tenure decision and the votes by the Department and College committees instead of between the tenure decision and the tenure recommendations of the Department and College committees;
  - o Failing to examine the relationship between tenure decisions and gender.
- As a result of these flaws, Dr. Thompson's opinions are neither valid nor reliable. Specifically,
  - o Dr. Thompson identifies no evidence of "different treatment" towards female assistant professors with regard to accelerated tenure review;
  - o Dr. Thompson identifies no evidence of "different impact" towards female assistant professors who take probationary extensions and are reviewed for accelerated tenure;
  - o Dr. Thompson identifies no evidence that differences between tenure decisions and the Department or College Committees' tenure recommendations were related to gender.
- Based on my analysis of the available data, there is no statistical evidence that gender is related to tenure decisions in the Cockrell School of Engineering at UT Austin.
- There are numerous flaws in Dr. Glass' report that result in incorrect overstatements in his calculation of alleged damages. These flaws include:
  - o In Scenario 1, including earnings losses to age 70, which is beyond Dr. Nikolova's estimated work life, using discount rates that are too low and not based on current market interest rates, and assuming that Dr. Nikolova's earnings never catch up;
  - o In Scenario 2, assuming that Dr. Nikolova continues indefinitely in an untenured position at UT Austin despite this being counter to UT Austin policy[1];
  - o In Scenario 3, assuming that Dr. Nikolova has no earnings beyond August 31, 2023 despite admitting that this is "unlikely" [Glass Report, p. 2, fn 3];
  - o Comparing, without foundation, Dr. Nikolova's compensation to that of the two highest-paid assistant professors in the ECE department for his calculation of Equal Pay Act damages;

---

[1] Dr. Glass alternately indicates this untenured position is associate professor [Glass Report, p. 2] and assistant professor [Glass Report, p. 3 and Attachments 3(1), 3(2), and 3(3)]. In any event, UT Austin policy states that an assistant professor denied tenure during the sixth probationary year is to receive a terminal appointment for the next year. [UT Austin_00737]

    o   Comparing Dr. Nikolova's compensation to the compensation of an associate professor for his calculation of Equal Pay Act damages.

- As a result of these flaws, Dr. Glass' calculations of alleged damages for the denied tenure claim and also for the Equal Pay Act claim are overstated and neither valid nor reliable.

- Adopting Dr. Glass' general approach, I calculate damages from the alleged discriminatory denial of tenure to be $72,001 and for the alleged unequal pay to be $13,155 for three years and $7,414 for two years.

These opinions could change if new information about Dr. Nikolova's earnings or activities is made available. I also reserve the right to render additional opinions if Dr. Thompson or Dr. Glass provides any additional information, analysis, or opinions. In what follows, I provide details of each of the flaws listed above.

**Dr. Thompson's Statistical Calculations**

Dr. Thompson provides three opinions: one is invalid and inapt, one is wrong, and one misses the point. I discuss the details of each.

<u>Different Treatment by Gender: Early Tenure Reviews</u>

Dr. Thompson concludes, "that male assistant professors are beneficiaries of different treatment in early tenure reviews." [Thompson Report, par. 18]  It is my understanding that consideration for accelerated tenure is based at least in part on whether the assistant professor requests consideration.[2]  Thus, Dr. Thompson's analysis conflates decisions by assistant professors with decisions by the Department Budget Committees and, therefore, cannot and does not provide useful information on the "treatment" of assistant professors.  As a result, Dr. Thompson's conclusion about "different treatment in early tenure reviews" is invalid.

Even if Dr. Thompson's conclusion were correct, however, it is irrelevant to Dr. Nikolova's claims.  She *was* considered for accelerated tenure.  If anything, given Dr. Thompson's (invalid) conclusion, the fact that Dr. Nikolova was considered for accelerated tenure suggests that she

---

[2] See Ahmed Tewfik Dep 77:4 – 78:5.

received the same "treatment" as did previous male assistant professors. In addition, as I detail in the next section, Dr. Thompson incorrectly identifies accelerated tenure reviews.

Different Impact by Gender: Early Tenure Reviews after Probationary Extensions

Dr. Thompson states, "From 2009 to 2018, there were only three assistant professor who had taken probationary extensions that went up early for tenure reviews.  All three were male, and all three received promotions." [Thompson Report, par. 19]  Based on this, Dr. Thompson concludes that, "Dr. Nikolova's promotion denial [is] peculiar."[3]  But, none of the three male assistant professors that Dr. Thompson identifies were considered for accelerated tenure review.  Table 1 provides the relevant data for these three men as well as for Dr. Nikolova.

The three men all started their probationary service in the 2011-2012 year.[4]  Each of the men took an extension year, which does not count towards probationary service.[5]  The men were reviewed for tenure in the 2016-2017 year, which was during their fifth year of probationary service, and they each had at least six years in rank at UT Austin at the end of the year.[6]  Dr. Nikolova started her probationary service in the 2014-2015 year, took an extension year, and was considered for tenure in the 2018-2019 year.  When she was considered for tenure, Dr. Nikolova was in her fourth year of probationary service, one less than any of the men, and, unlike any of the men, had fewer than six years in rank at UT Austin at the end of the year.  Per the General Guidelines for Promotion and Tenure of All Faculty Ranks [UT Austin_00735-0055], "Cases considered before the sixth year in rank are accelerated" and "An assistant professor must be reviewed no later than the sixth year of the probationary period."  Further, "A year in which a faculty member has … claimed an extension in accordance with HOP 2-2020 does not count toward the probationary period."[7]  Thus, accelerated tenure depends on years in rank whereas the "up or out" year depends on the probationary period (as adjusted by any extension).  In this group of four assistant professors, Dr.

---

[3] See Thompson Report, par. 9.  In addition, Dr. Thompson references a "Different Impact by Gender" for accelerated tenure reviews after probationary extensions, but he identifies no facially neutral policy that has this alleged impact.

[4] Probationary service does not include the first (spring) semester for faculty who begin an appointment midway through the academic year and does not include service at other institutions. See UT Austin_00762-00763 and UT Austin_00803-00807.

[5] See UT Austin_00764-00765 and UT Austin_00737.

[6] See UT Austin_00762-00763.

[7] Also see UT Austin_00762-00763.

Nikolova's "most obvious differentiating trait[s]" were, to borrow Dr. Thompson's phrase, her consideration for accelerated tenure as well as having one less year of probationary service. [Thompson Report, par. 23]

In the data Dr. Thompson received, there were 20 assistant professors who took an extension year and who were either considered for tenure or left UT Austin prior to being considered for tenure. Nine of these assistant professors were women and 11 were men.  Eight of the women (88.9%) received tenure and were promoted to associate professor.  Six of the 11 men (54.5%) received tenure and were promoted to associate professor.  Four of the five men who were not promoted left UT Austin before being considered for tenure.  Thus, six of the seven men (85.7%) considered for tenure were promoted.  The only man in this group considered for but denied tenure was not considered for accelerated tenure.[8]  Dr. Nikolova was the only woman in this group not to receive tenure (yet), but she was the only person considered for accelerated tenure and had at least one less year of probationary service.  Again, the primary relevant distinguishing features of Dr. Nikolova's experience in this group are that she was the only person considered for accelerated tenure and had fewer years of probationary service.  There is no evidence in these data for the faculty who took an extension year that gender played a role in the tenure outcomes.

### Dr. Nikolova's Probability of Promotion: Committee Voting

Dr. Thompson concludes that Dr. Nikolova, "suffered a statistically unexplainable promotion denial." [Thompson Report, par. 12]  This is based on his assessment of the relationship between votes by the department and/or college committees and promotion outcomes.  The issue here is how the tenure decision compares to the recommendations from the department and college committees, particularly in those cases where the decision differs from a recommendation.[9]  Table 2 examines this directly by comparing these differences for women and men.

---

[8] This person, ID wg2589, was given a terminal appointment for the 2015-2016 year and left UT Austin effective August 31, 2016.

[9] In addition to the votes for and against recommending tenure, there are tabulations of absences, abstentions, and ineligible votes that make interpretation of the voting outcomes more complicated than the overall recommendation.  Relying on vote counts also ignores any issues related to "follow-on" voting despite this being "not endorsed."  See UT Austin_00741.

The first pair of rows compares the outcomes for tenure decisions in the years prior to Dr. Nikolova's review.[10]  There were 83 department recommendations for tenure, 20 women and 63 men.[11]  Of these, 2 women (10.0%) and 7 men (11.1%) were denied tenure.  There were 75 college recommendations for tenure, 17 women and 58 men.  Of these, 1 woman (5.9%) and 4 men (6.9%) were denied tenure.  There also were 9 college recommendations against tenure, 3 women and 6 men.  Of these, 2 women (66.7%) and 2 men (33.3%) were granted tenure.  None of these differences are statistically significant.[12]  These comparisons provide no evidence that gender played a role in the tenure decision given the department or college recommendation.  If anything, the decisions to grant tenure despite a "No" recommendation from the college favored women, but this is a small group (9) and the difference is not statistically significant.

The remaining two pairs of rows in Table 2 provide the analogous comparisons for all of the tenure decisions excluding Dr. Nikolova's and then for all of the tenure decisions including hers.[13]  Again, none of the differences are statistically significant.  These comparisons also provide no evidence that gender played a role in the tenure decision given the department or college recommendation.

Although this case is about tenure, Dr. Thompson does not directly examine the relationship between gender and being granted tenure.  I do.  Table 3 compares all of the tenure decisions by gender.  The first comparison is for tenure decisions prior to 2018-2019.  UT Austin granted tenure to 18 of 21 women (85.7%) and 56 of 66 men (84.8%).[14]  The second comparison includes all of the decisions except for Dr. Nikolova's review.  For this group, UT Austin granted tenure to 22 of

---

[10] This population includes 1 assistant professor who was granted tenure September 1, 2009 but was excluded from Dr. Thompson's analysis.  This additional case, initials PW, was present on the "Engineering assist profs" tab of the Probationary, Tenure Data.xlsx file, but was not on the "Engineering tenure decisions" tab of that file.

[11] There were four department recommendations against tenure and all four were denied tenure.

[12] In the social sciences, statistical significance typically means that the chances of the observed data occurring if there were in fact no relationship with gender are no greater than 5%.  This is roughly equivalent to a difference of "two standard deviations" between the observed data and the data expected from a gender-neutral process.  The Supreme Court has indicted that a difference of "two or three standard deviations" would cast suspicion on the hypothesis of a gender-neutral process, see Hazelwood Sch. Dist. v. United States, 433 U.S. 299, 308 n.14 (1977).

[13] The rationale for analyzing all decisions except for Dr. Nikolova's is to assess whether there is a relationship with gender absent the tenure decision at issue.

[14] This population matches the group Dr. Thompson analyzes in his Table 1 plus the one additional tenure case referenced above in footnote 10.

25 women (88.0%) and 66 of 76 men (86.8%). Including Dr. Nikolova's case gives 22 of 26 women (84.6%) granted tenure. None of these differences are statistically significant and, as a result, these comparisons provide no evidence that gender is related to the tenure decision.

The last columns in Table 3 provide one additional comparison that includes all of the 102 cases where there was a tenure decision effective in 2009-2020 as well as 18 assistant professors (4 women and 14 men) who left UT Austin prior to being reviewed for tenure. The rationale for including assistant professors who left prior to tenure review is to assess whether there might be differences in tenure outcomes for the full population of assistant professors. If, say, women were more likely to be "pushed out" at the 3rd-year review this would not be apparent from looking only at the cases reviewed for tenure. In this expanded group, UT Austin granted tenure to 22 of 30 women (73.3%) and 66 of 90 men (73.3%). Thus, including those assistant professors who left for whatever reason prior to being reviewed for tenure, there is no evidence that gender is related to the tenure decision.

In sum, Dr. Thompson's flawed calculations and erroneous conclusions notwithstanding, the available data provide no statistical evidence that gender is related to tenure decisions in the Cockrell School of Engineering at UT Austin.

**Dr. Glass' Calculations of Alleged Damages**

Dr. Glass provides calculations of alleged damages from the denial of tenure for three scenarios. His first scenario overstates any alleged damages, his second scenario is contrary to UT Austin policy, and the third scenario is "unlikely" by his own admission. I discuss the details of each below. In addition, Dr. Glass provides calculations of alleged damages from unequal pay. I also explain the flaws in these calculations that result in the overstatement of any alleged damages.

Dr. Glass' Scenario 1 – Dr. Nikolova is granted tenure on September 1, 2023

Dr. Glass calculates earnings losses for Dr. Nikolova to age 70, for which he provides no foundation, and which exceeds her estimated remaining work life. Dr. Glass also assumes that Dr. Nikolova's earnings never catch up to where they would have been had she received tenure on September 1, 2019, and, further, that the earnings loss actually grows over time. Dr. Glass does

not use current market interest rates to calculate discount rates.  Each of these flaws results in an overstatement of Dr. Glass's calculations of alleged damages.

I adopt Dr. Glass's assumption that Dr. Nikolova will be tenured effective Septermber 1, 2023.[15] Table 4 provides my calculation of the difference between the earnings Dr. Nikolova is projected to have received had she been tenured and promoted on September 1, 2019 and the earnings Dr. Nikolova is projected to receive if she is tenured and promoted on September 1, 2023.  With this approach, I project the present value of the lost compensation from delayed tenure to be $72,001.[16]

Dr. Glass' Scenario 2 – Dr. Nikolova continues in non-tenured position at UT Austin

Were Dr. Nikolova denied tenure in her projected "up or out" review, the General Guidelines for Promotion and Tenure state that she would receive a terminal appointment for the next year. [UT Austin_00737]  Further, even if Dr. Nikolova could continue at UT Austin after being denied tenure in 2023, it seems likely that her earnings would be higher from a tenured position at another university than from a non-tenured position at UT Austin.[17]

Dr. Glass' Scenario 3 – Dr. Nikolova leaves UT Austin August 31, 2023 and has zero earnings thereafter

In addition to being unlikely, as Dr. Glass admits [Glass Report, p. 2, fn 3], if Dr. Nikolova did not have *any* future earnings beyond August 31, 2023 that would presumably constitute a failure to mitigate her damages.

Dr. Glass' Alleged Calculation of Equal Pay Act Damages

In an attempt to estimate damages for an Equal Pay Act claim, Dr. Glass compares the

---

[15] I also adopt Dr. Glass's academic-year based approach as well as his assumption that the employer contribution to retirement is 7.5%.

[16] I use 4.86% as the projected typical annual increase in salaries within rank and 16.35% for Dr. Nikolova's promotion increase based on the prior annual increases and promotion increases in salaries in the ECE department.  I use market prices of U.S. Treasury Stripped Interest Payment securities downloaded from Fidelity.com on May 23, 2021 to calculate present values of future amounts.  I project that Dr. Nikolova's earnings given tenure effective 9/1/2023 catch up to her projected earnings given tenure effective 9/1/2019 within three years, see U.S. Bureau of Labor Statistics, USDL-20-1620.

[17] Dr. Nikolova's failure to seek higher paying employment elsewhere would presumably constitute a failure to mitigate her damages.

compensation of Dr. Nikolova to the compensation of the two highest-paid assistant professors in the ECE department.  He makes these comparisons for three years, 2017-2018, 2018-2019, and 2019-2020.  One of these supposed comparators, Mohit Tiwari, was promoted to associate professor on September 1, 2019 and is thus no longer comparable to Dr. Nikolova.  According to his report, which is in the form of a letter to Counsel for the Plaintiff, Dr. Glass states, "I have compared the 9-month salaries of Dr. Nikolova compared to the two colleagues that *you have identified* as being closely situated to Dr. Nikolova." (emphasis added)  Dr. Glass identifies no evidence that these two are similarly situated to Dr. Nikolova.

In Table 5, I provide an alternative comparison of Dr. Nikolova's salary to the average salary of all male assistant professors in the ECE department.  The comparisons to the average male salary ignore characteristics such as publications and their impact, research funding, teaching, and service that are likely to be related to salary.  This information is not available, hence a salary comparison between Dr. Nikolova and a statistically "similarly situated" male assistant professor cannot be made.  The difference between Dr. Nikolova's salary and that of the average male assistant professor, including the same allowance for retirement contributions as Dr. Glass, totals $13,155 for all three years and $7,414 for the two most recent years.

9

**Table 1. Dr. Thompson's Claimed Probationary Extensions and Accelerated Tenure Review is Wrong**

| ID | Gender | Date Joined Faculty | Extension Year | First Prob. Year | Second Prob. Year | Third Prob. Year | Fourth Prob. Year | Fifth Prob. Year | Years in Rank | Accelerated Tenure Review? |
|---|---|---|---|---|---|---|---|---|---|---|
| ns22375 | Male | 1/16/2011 | 2015 | 2011-2012 | 2012-2013 | 2013-2014 | 2014-2015 | **2016-2017*,** ** | 6.5 | **No** |
| ad32385 | Male | 7/1/2011 | 2014 | 2011-2012 | 2012-2013 | 2013-2014 | **2015-2016*** | 2016-2017** | 6 | **No** |
| vj239 | Male | 9/1/2011 | 2015 | 2011-2012 | 2012-2013 | 2013-2014 | 2014-2015 | **2016-2017*,** ** | 6 | **No** |
| Dr. Nikolova | Female | 1/1/2014 | 2015 | 2014-2015 | **2016-2017*** | 2017-2018 | 2018-2019** | | 5.5 | **Yes** |

**\* Previous year does not count for probationary period because of extension**

\*\* Year considered for tenure

**Table 2. There is No Relationship between Gender and Tenure Decisions given Department or College Recommendations**

| Population | Gender | Department Committee Recommends For Tenure | | | College Committee Recommends For Tenure | | | College Committee Recommends Against Tenure | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Total | Denied Tenure | % Denied Tenure | Total | Denied Tenure | % Denied Tenure | Total | Granted Tenure | % Granted Tenure |
| Decisions prior to | Women | 20 | 2 | 10.0% | 17 | 1 | 5.9% | 3 | 2 | 66.7% |
| 2018-2019 | Men | 63 | 7 | 11.1% | 58 | 4 | 6.9% | 6 | 2 | 33.3% |
| All Decisions, except | Women | 24 | 2 | 8.3% | 21 | 1 | 4.8% | 3 | 2 | 66.7% |
| Dr. Nikolova | Men | 73 | 7 | 9.6% | 68 | 4 | 5.9% | 6 | 2 | 33.3% |
| All Decisions | Women | 25 | 3 | 12.0% | 22 | 2 | 9.1% | 3 | 2 | 66.7% |
| | Men | 73 | 7 | 9.6% | 68 | 4 | 5.9% | 6 | 2 | 33.3% |

Notes:

1) There are a total of 102 cases for which the Department and College recommendations were provided, 87 of these were prior to 2018-2019.

2) The Department Commmittees recommended denying tenure in four cases, all prior to 2018-2019 and all were denied tenure.

3) The College Committee recommended a "Tie" in three cases, all prior to 2018-2019 and all were denied tenure.

**Table 3. There is No Relationship between Gender and Tenure Decisions**

| Gender | Decisions prior to 2018-2019 | | | All Decisions, except Dr. Nikolova | | | All Decisions | | | All Decisions + Those Who Left Prior to Tenure Review | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total | Tenured | % Granted Tenure | Total | Tenured | % Granted Tenure | Total | Tenured | % Granted Tenure | Total | Tenured | % Granted Tenure |
| Women | 21 | 18 | 85.7% | 25 | 22 | 88.0% | 26 | 22 | 84.6% | 30 | 22 | 73.3% |
| Men | 66 | 56 | 84.8% | 76 | 66 | 86.8% | 76 | 66 | 86.8% | 90 | 66 | 73.3% |

**Table 4. Projected Compensation Loss from Delayed Tenure for Evdokia Nikolova**

| | | |
|---|---|---|
| Date of Tenure Denial | 9/1/2019 | |
| Date of Tenure | 9/1/2023 | |
| Employer Contribution to Retirment | 7.5% | |

| Expected Future Salaries as of: | 9/1/2019 | 9/1/2023 |
|---|---|---|
| Base Case: Tenured on 9/1/2019 | $129,500 | $149,314 |
| Scenario 1: Tenured on 9/1/2023 | $114,639 | $146,665 |

| | |
|---|---|
| Promotion increase | 16.35% |
| Within-Rank Growth | 4.86% |
| Catch-up growth | 0.63% |

| Year Starting | Growth/ Expected Growth | Base Case | Scenario 1 | Loss | Retirement Contribution | Total Loss | Discount Factor | Present Value |
|---|---|---|---|---|---|---|---|---|
| 9/1/2019 | | $129,500 | $114,639 | ($14,861) | ($1,115) | ($15,976) | 100.00% | ($15,976) |
| 9/1/2020 | 0.00% | $129,500 | $114,639 | ($14,861) | ($1,115) | ($15,976) | 100.00% | ($15,976) |
| 9/1/2021 | 4.86% | $135,794 | $120,210 | ($15,583) | ($1,169) | ($16,752) | 99.98% | ($16,748) |
| 9/1/2022 | 4.86% | $142,393 | $126,053 | ($16,341) | ($1,226) | ($17,566) | 99.76% | ($17,524) |
| 9/1/2023 | 4.86% | $149,314 | $146,665 | ($2,649) | ($199) | ($2,847) | 99.06% | ($2,820) |
| 9/1/2024 | 4.86% | $156,570 | $154,713 | ($1,857) | ($139) | ($1,996) | 97.75% | ($1,951) |
| 9/1/2025 | 4.86% | $164,180 | $163,203 | ($977) | ($73) | ($1,050) | 95.83% | ($1,006) |
| 9/1/2026 | 4.86% | $172,159 | $172,159 | $0 | $0 | $0 | 93.55% | $0 |
| | | | | | | **Total Lost Compensation** | | **($72,001)** |

**Table 5. Difference in Compensation Between Evdokia Nikolova and the Average Compensation of Assistant Professors in ECE**

Employer Contribution to Retirment                7.5%

| Year Starting | Avg. for Male Asst. Profs. | Dr. Nikolova | Difference | Retirement Contribution | Total Loss |
|---|---|---|---|---|---|
| 9/1/2017 | $111,340 | $106,000 | ($5,340) | ($401) | ($5,741) |
| 9/1/2018 | $115,030 | $111,300 | ($3,730) | ($280) | ($4,010) |
| 9/1/2019 | $117,806 | $114,639 | ($3,167) | ($238) | ($3,405) |
| | | | | **Total 2 years** | **($7,414)** |
| | | | | **Total 3 years** | **($13,155)** |

**Appendix 1**



# Donald R. Deere, Ph.D.

**WELCH CONSULTING**
1716 Briarcrest Drive, Suite 700
Bryan, TX 77802
979.691.0704
DDeere@welchcon.com

## EDUCATION

Ph.D., Economics
Massachusetts Institute of Technology
Cambridge, Massachusetts
1983

B.S., Economics
Texas A&M University
College Station, Texas
1978

## PROFESSIONAL EXPERIENCE

Senior Managing Director
Welch Consulting
Bryan, Texas
2018 – Present

Senior Economist
Welch Consulting
Bryan, Texas
2005 – 2018

Senior Economist
Unicon Research Corporation
Bryan, Texas
2001 – 2016

Adjunct Associate Professor of Economics
Texas A&M University
College Station, Texas
2007 – 2009
2010 – Present

Visiting Faculty
George Bush School of Government
and Public Service
Texas A&M University
College Station, Texas
2008

Associate Professor of Economics
Texas A&M University
College Station, Texas
1990 – 2007

Senior Consultant
Welch Consulting
Bryan, Texas
1991 – 2005

Donald R. Deere is a Senior Managing Director in the Bryan, Texas office of Welch Consulting. Dr. Deere's work has included statistical and economic analysis in cases involving claims of discrimination in employment, housing, transportation and insurance, in cases involving wage and hour violations, and in cases involving lost earnings or commercial damages. He also has conducted analyses of compensation practices for internal and OFCCP audit purposes. Dr. Deere has provided testimony in cases in both state and federal courts.

Dr. Deere has a Ph.D. in economics from the Massachusetts Institute of Technology. In 2007, Dr. Deere retired from the tenured faculty of the Department of Economics at Texas A&M University, where he taught courses in labor economics, economic principles and public finance. While at Texas A&M University, he also taught graduate statistics in, and was Associate Director of the George Bush School of Government and Public Service. Dr. Deere also is Senior Economist for Unicon Research Corporation, where he served as Vice President from 2001-2004. Dr. Deere's research has concentrated primarily on labor markets and public policy affecting wages and employment. His research has been published in numerous professional peer-reviewed journals, including the *American Economic Review*, the *Journal of Political Economy*, the *Quarterly Journal of Economics*, and the *Journal of Labor Economics*.

## PUBLICATIONS

"Analyzing Reductions in Force and Other Termination Decisions," with James E. Pearce in Adverse Impact Analysis:  Understanding Data, Statistics, and Risk, edited by Scott B. Morris and Eric M. Dunleavy, Routledge Taylor & Francis Group, (2017): 239-257.

"Minimum Sense," NBIZ Magazine, (Winter 2006):8-10.  Also found on NBIZMag.com.

"Educational Wage Premia and the U.S. Income Distribution: A Survey," with Jelena Vesovic in Handbook of the Economics of Education, edited by E. Hanushek and F. Welch, Elsevier Science, (2006):255-306.

"Inequality, Incentives, and Opportunity," with F. Welch.  Social Philosophy & Policy, 19, no. 1, (Winter 2002).  Also in Should Differences in Income and Wealth Matter? edited by E.F. Paul, F.D. Miller, Jr. and J. Paul. Cambridge University Press (2002):84-109.

"Trends in Wage Inequality in the United States," in Increasing Inequality in America: The Facts, Causes, and Consequences, edited by F. Welch. University of Chicago Press, (2001):9-35.

"Don't Raise the Minimum Wage - The Bar is Already Too High," Brief Analysis No. 270, NCPA, (June 1998).

"Evidence on Minimum Wages and Employment Following the 1990/91 Increase in the Federal Minimum Wage," with K. Murphy and F. Welch.  In Effects of the Minimum Wage, edited by M. Kosters.  AEI Press, (1996).

"Minimum Sense: Raising Wages from $4.25 to $5.15 an Hour Will Cause Lower Skilled Workers to Lose Their Jobs," Texas Business, (September 1996).

"Employment and the 1990/91 Minimum Wage Hike," with K. Murphy and F. Welch.  American Economic Review, 85, no. 2, (May 1995):232-37.

"Sense and Nonsense on the Minimum Wage," with K. Murphy and F. Welch.  Regulation, 18, no.1, (1995):47-56.



# Donald R. Deere, Ph.D.

WELCH CONSULTING
1716 Briarcrest Drive, Suite 700
Bryan, TX 77802
979.691.0704
DDeere@welchcon.com

## PROFESSIONAL EXPERIENCE
### (continued)

Associate Director for Academic Programs
George Bush School of Government
and Public Service
Texas A&M University
College Station, Texas
1996 – 1999

Visiting Assistant Professor of Economics
University of California
Santa Barbara, California, 1988 – 1989

Assistant Professor of Economics
Texas A&M University
College Station, Texas
1983 –1990

## PUBLICATIONS (continued)

"Home Equity: Texas Should Unlock This Asset," The Dallas Morning News, April 23, 1995.

"Unionization and Profitability: Evidence of Spillover Effects," with S.G. Bronars,  Journal of Political Economy, (December 1994):1281-87.

"The Effects of Unions on Firm Behavior: An Empirical Analysis using Firm-Level Data," with S.G. Bronars and J.S. Tracy, Industrial Relations, (October 1994):426-51.

"A Study of Nonsubscription to the Texas Workers' Compensation System: The Employee Perspective," (July 1994) Texas Workers' Compensation Research Center.

"A Study of Nonsubscription to the Texas Workers' Compensation System," Texas Workers' Compensation Research Center, (August 1993).

"Union Organizing Activity, Firm Growth, and the Business Cycle," with S.G. Bronars. American Economic Review, (March 1993):203-20.

"Unionization, Incomplete Contracting, and Capital Investment," with S.G. Bronars. The Journal of Business, (January 1993):117-32.

Review of "Labor Unions and the Economic Performance of Firms," Industrial and Labor Relations Review, (July 1993):732-33.

"Unemployment Insurance and Employment." Journal of Labor Economics, (October 1991):307-24.

"The Threat of Unionization, the Use of Debt, and the Preservation of Shareholder Wealth," with S.G. Bronars.  Quarterly Journal of Economics, (February 1991):231-54.

"Union Representation Elections and Firm Profitability," with S.G. Bronars.  Industrial Relations, (Winter 1990):15-37.

"On the Potential for Private Insurers to Reduce the Inefficiencies of Moral Hazard."  International Review of Law and Economics, (December 1989):219-22.

"Internal Labor Markets, Large Personnel Systems, and the Military."  Economics of Defense Manpower Conference Final Report, United States Air Force Academy, (June 1988).

"Bilateral Trading as an Efficient Auction Over Time."  Journal of Political Economy, (February 1988):100-15.

"Labor Turnover, Job-Specific Skills, and Efficiency in a Search Model."  Quarterly Journal of Economics, (November 1987):815-33.

## SELECTED WORKING PAPERS

"Plant Closings, Large Layoffs, and Advance Notice Provision," with S.N. Wiggins.

"Tax Rates, Tax Complexity, and the Usage of Paid Tax Return Preparers," with C. Wolfe.

"Subscription to Workers' Compensation in Texas."

"Heads I Win, Tails You Lose:  The Economic Impact of the Texas Lottery on Demographic Groups," with J. Dyer.



**WELCH CONSULTING**
1716 Briarcrest Drive, Suite 700
Bryan, TX 77802
979.691.0704
DDeere@welchcon.com

# Donald R. Deere, Ph.D.

## SELECTED WORKING PAPERS (continued)

"The Cross Sectional Impact of Unemployment Insurance on Layoffs, Employment, and Wages," with J.A. Miron.

"Part-Time Employment," with S.G. Bronars.

"Union Organizing Activity and Union Membership 1973-1988," with S.G. Bronars.

"Union Membership, Union Organizing Activity, and the Union Wage Differential 1973-1988," with S.G. Bronars.

"Competitive Incentives: School Accountability and Student Outcomes in Texas," with W.E. Strayer.

"Climbing the Economic Ladder," with A.J. Rettenmaier.

## HONORS AND AWARDS

**Fellowships:**
National Science Foundation Graduate Fellowship.
Rotary Foundation Graduate Fellowship.
Sloan Foundation Dissertation Research Fellowship.

**Research Grants/Contracts:**
Grant from the Smith Richardson Foundation, "Social Security, Wages and Retirement," 1995.

Four Contracts with the Texas Workers' Compensation Research Center, "Nonsubscription to the Texas Workers' Compensation System," 1992-1995.

Grant from the Texas Advanced Research Program, "Unionization, Profitability, and Firm Behavior," 1988.

Grant from the U.S. Department of Health and Human Services, "Demand Variability, Structural Changes in the Labor Market and the Growth of Part-Time Employment," with S.G. Bronars, 1984.

**Peer Review:**

Professional Journals:
American Economic Review
Journal of Political Economy
Quarterly Journal of Economics
Journal of Labor Economics
Review of Economic Studies
Rand Journal of Economics
Review of Economics and Statistics
Economic Journal
Industrial Relations
Economic Inquiry
Industrial and Labor Relations Review
Industrial Relations
Journal of Labor Research

Grants Competition:
National Science Foundation

**ABOUT WELCH CONSULTING**

Welch Consulting has more than 30 years experience assisting clients of every size in matters involving employment issues and complex business litigation across a broad spectrum of industries and public sector entities. Our track record in producing rigorous analyses meeting the highest standards of accuracy, clarity and punctuality makes Welch Consulting a consistent choice for industry leading companies and the nation's preeminent law firms.

Welch Consulting has offices in Los Angeles, Texas and Washington DC.

For more information about our professionals and services visit us online at www.welchcon.com

# Appendix 2

**Testimony Given in Last 4 Years by Donald Deere**

AJP Oil Company, LLC, D/B/A Grapeland Fuel and BBQ v. Velvin Oil Company, Inc.
Trial Testimony:  06/05/19
Deposition: 07/12/16
In the 3rd District Court of Houston County, Texas
Civil Action No. 14-0217

State of Texas, et al., vs. United States of America, et al., and Karla Perez, et al.
Deposition:  06/28/18
In the United States District Court for the Southern District of Texas Brownsville Division
Case No. 1:18-CV-68

**Appendix 3**

**Documents Considered**

20201110_BD Letter to RS, RN.pdf
AsstProf_ECE_FacultySalaries (2013-20).xlsx
Probationary, Tenure Data.xlsx
19-20 ECE FAC MERIT FINAL.xlsx
20-21 ECE FAC Merit Final.XLSX
DOC_0001667.xlsx
DOC_0003618.xlsx
UT Austin_0007422.pdf
UT Austin_0007784.pdf
UT Austin_0007981.pdf
20210129_Ps ROG Ans.pdf
DOC_0002632.xlsx
Email to Glass from opposing counsel.pdf
P001912 - P001924_Redacted.pdf
Pages from Fifth Circuit Pattern Jury Instructions 2020 civil.pdf
Sellers v Delgado College.doc
UT Austin_0007422 Salary Info Other Top Schools.xlsx
UT Austin_0007981 Salary Info through 2019.xlsx
UT Austin_0026887.xlsx
UT Austin_0027055.xlsx
Deposition Transcript Wood, Sharon L - condensed
SW031821 Exhibit 1, Wood, Sharon L, Ph.D., P.E. - 03-18-21.pdf
SW031821 Exhibit 2, Wood, Sharon L, Ph.D., P.E. - 03-18-21.pdf
SW031821 Exhibit 3, Wood, Sharon L, Ph.D., P.E. - 03-18-21.pdf
SW031821 Exhibit 4, Wood, Sharon L, Ph.D., P.E. - 03-18-21.pdf
SW031821 Exhibit 5, Wood, Sharon L, Ph.D., P.E. - 03-18-21.pdf
SW031821 Exhibit 6, Wood, Sharon L, Ph.D., P.E. - 03-18-21.pdf
SW031821 Exhibit 7, Wood, Sharon L, Ph.D., P.E. - 03-18-21.pdf
SW031821 Exhibit 8, Wood, Sharon L, Ph.D., P.E. - 03-18-21.pdf
SW031821 Exhibit 10, Wood, Sharon L, Ph.D., P.E. - 03-18-21.pdf
SW031821 Exhibit 10, Wood, Sharon L, Ph.D., P.E. - 03-18-21.xls
SW031821 Exhibit 11, Wood, Sharon L, Ph.D., P.E. - 03-18-21.pdf
SW031821 Exhibit 11, Wood, Sharon L, Ph.D., P.E. - 03-18-21.xlsx
SW031821_EX09.pdf
Deposition Transcript of Ahmed Tewfik - condensed
20200702_021.0_Ps 1st Am Cmplnt.pdf
20201218_033.0_Ds Ans to 1st Am Cmplnt.pdf
20210129_Ps ROG Ans.pdf
20210420_34.0_Ps Designation of Testifying Expert Witness (002).pdf
Exhibit A - Tom Glass report.pdf
Exhibit B - Peter Glick report.pdf
Exhibit C - Shane Thompson report.pdf
Exhibit D - Attorneys.pdf
Nikolova_Thompson Report_20210419 Revised.pdf

UT Austin_00735-55 Prom and Tenure.pdf
UT Austin_00756-810 HOPs and RRs.pdf
Recommendation for Change in Academic Rank/Status for Preston S. Wilson dated 9/5/2008.

Fidelity_FixedIncome_SearchResults downloaded from Fidelity.com May 23, 2021
(https://fixedincome.fidelity.com/ftgw/fi/FILanding#tbindividual-bonds|treasury)

Worker Displacement News Release USDL-20-2610 downloaded from
https://www.bls.gov/bls/newsrels.htm#OEUS

Skoog, Gary R., James E. Ciecka and Kurt V. Krueger, "The Markov Process Model of Labor Force Activity: Extended Tables of Central Tendency, Shape, Percentile Points, and Bootstrap Standard Errors," *Journal of Forensic Economics* 22(2), 2011, pp.165-229