IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| EVDOKIA NIKOLOVA,<br>　　　*Plaintiff,* | § § § | |
| v. | § § | Civil Action No.: 1:19-CV-00877 |
| UNIVERSITY OF TEXAS AT AUSTIN,<br>　　　*Defendant.* | § § § | |

## DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

TO THE HONORABLE JUDGE ROBERT PITMAN:

Defendant The University of Texas at Austin ("UT") respectfully asks the Court to dismiss the claims brought by Plaintiff, Dr. Evdokia Nikolova, under Title VII of the Civil Rights Act of 1964. Nikolova's Title VII claims stem from an unsuccessful tenure application. Nikolova went up for tenure in her fourth probationary year at UT, two years early. Reviewing her dossier, then-President Dr. Greg Fenves found that her research funding and publications record presented concerns and did not merit promotion at that time. Fenves denied the promotion without prejudice, meaning that her case could still be reviewed at the normal time.

Based on this early tenure decision, Nikolova accuses UT of engaging in gender and pregnancy discrimination. She raises these claims under both disparate treatment and disparate impact theories. Nikolova also accuses UT of retaliating against her after she complained about the tenure denial based on an unflattering teaching assessment, a "meets expectations" annual faculty evaluation, and a withdrawn request that she continue supervising a senior design team. UT respectfully asks the Court to dismiss all these claims because the evidence is insufficient to present a triable issue of fact on any of Nikolova's Title VII claims.[1]

---

[1] Recognizing that material fact disputes would prevent resolution at this stage, UT does not move for summary judgment on Nikolova's Equal Pay Act claim.

## INTRODUCTION

Although UT allows an assistant professor to seek an early promotion to a tenured position, it applies a stricter standard of promotion to early tenure candidates. Under the leadership of former UT President Gregory Fenves, the essential question for any early-promotion candidate was: "why now?" Fenves believed that UT should generally postpone the decision of whether to grant lifetime tenure until a professor is approaching their "up-or-out" year, the year in which they are required to be reviewed. At that point, candidates would have a longer track record for UT to evaluate, including their record of obtaining grant funding, the lifeblood of every university. Nikolova chose to seek early promotion at UT despite her modest grant funding and average teaching record. Although supportive of her candidacy, her own department chair recognized that Nikolova was a marginal candidate for early promotion, as did the Dean of the Cockrell School of Engineering, who recommended against promoting her at that time. Fenves denied Nikolova's application for early promotion, while allowing her to apply again in her up-or-out year.

Nikolova contends that Fenves denied her early promotion based on gender or pregnancy bias, but there is no evidence that he acted with the illegal motive she attributes to him. Nikolova's challenge to several facially-neutral policies is unsupported by the applicable data. And her proposed solution—adopt policies that treat the sexes differently by providing more childcare-related benefits to women than men—would itself violate Title VII. Finally, Nikolova's claims of retaliation stem from minor grievances that are not actionable as adverse employment actions. And there is no evidence that, but for her discrimination complaints, UT would have acted differently.

## SUMMARY JUDGMENT EVIDENCE

The best way to understand the events surrounding UT's decision not to award tenure to Nikolova in February 2019 is to start with an overview of UT's tenure policies and processes more generally.

## A.     UT's Tenure Policies

### 1.     Defining Tenure

Tenure at UT denotes a status of "continuing appointment" as a member of the faculty. Appx.004. As explained in UT's general guidelines for promotion and tenure: "The granting of tenure has consequences of great magnitude and long life and must be considered especially carefully." Appx.011. Granting tenure marks a significant commitment by UT—among other things, it confers a constitutionally protected interest in the faculty member's employment. *See Perry v. Sindermann*, 408 U.S. 593, 599 (1972). As such, "[t]enure should be awarded only when there is a clear case that the best interest of the university is served by doing so." Appx.011.

### 2.     The Tenure Timeline

At UT, tenure is granted when an assistant professor is promoted to associate professor. Appx.004; Appx.012. A faculty member at UT cannot serve as an assistant professor indefinitely; instead, "[t]he maximum probationary period that may be served as an assistant professor is seven years." Appx.005. The sixth year of probationary service is often called the "up-or-out year" because the assistant professor is either promoted ("up") or placed on a terminal appointment ("out"). *Id*; Appx.006; Appx.538 (Shockley 25:5–13).

In calculating years of probationary service ("probationary years"), UT does *not* count academic service at other institutions. Appx.004. If an assistant professor transfers to UT, they will have the benefit of six probationary years at UT before reaching their up-or-out year. *See id.* UT also does not count probationary years in semester increments—to count as a probation year, the faculty member must have held a 100% appointment at UT for both the fall and spring semesters of the academic year and be in full compliance with minimum faculty teaching requirements. *Id.* For example, if an assistant professor started at UT in the spring, that semester would *not* count as half a

probationary year. *See id.* Faculty generally view this as a benefit because delaying the time until the required tenure decision gives them more options. Appx.378 (Fenves 37:1–23).

There are situations where an assistant professor member is permitted to extend their probationary period. "An extension of the probationary period is never automatic," but UT recognizes that "personal circumstances may impede [a tenure-track faculty member's] progress" toward achieving tenure. Appx.006. "Personal circumstances that may justify the extension include, but are not restricted to: disability or illness of the faculty member; status of the faculty member as the principal caregiver of a preschool child; or, status of the faculty member as a principal caregiver of a disabled, elderly, or ill member of the family of the faculty member." *Id.* If a faculty member can substantiate why those circumstances "place[] an unreasonable burden upon the ability of the faculty member to meet progress expectations," they may be entitled to extend the probationary period, or "stop the clock." *Id.* If a probationary extension is granted, then that year as an assistant professor— that "year in rank"—will *not* count as a probationary year. *Id.* The "option by a faculty member to elect to stop the [tenure] clock" is "generally viewed as a benefit to the faculty [and is] highly supported by the faculty." Appx.373 (Fenves 16:17–17:22).

### 3.   Early Tenure

UT also permits tenure consideration before the up-or-out year. In such cases, UT has a third option in addition to either "promote" or "terminal appointment": "do not promote at this time, without prejudice" to reapplying later. Appx.380 (Fenves 44:1–12). Cases considered before the faculty member's sixth year in rank—meaning they have not yet served as an assistant professor at UT for six years—are considered "accelerated and must be explained in the department chair's and dean's statements."[2] Appx.012. As President Greg Fenves explained: "The question is: Why now? Why

---

[2] A faculty member could be in their sixth year in rank but not in their up-or-out year if, for example, they went up for tenure after being an assistant professor at UT for six years but obtained a probationary extension for one of those years. While UT's guidelines do not *require* an explanation for such persons, "it's often provided."

should we consider the case now? . . . Given the record in teaching, research, service, award—all the categories we look at in a promotion case—why is this case ripe for an affirmative decision to promote at this time? Whereas, on an up-and-out year, we don't ask 'why should we be considering it now?' We have to consider it now." Appx.380 (Fenves 42:1–6).

## B.   UT's Tenure Process – Going Up Before Up-Or-Out Year

The tenure evaluation process "comprises an independent review at multiple levels: budget council/executive committee, department chair, college/school, dean, and central administration." Appx.011. "The recommendations at each level reflect the professional judgment of each of those involved, with the president making the final decision." *Id.*

### 1.   Initiating the Process (first Budget Council vote)

The decision to go up before the up-or-out year starts with the assistant professor. Appx.606–07 (Tewfik 71:22–72:1; 77:20–25). Having decided to seek promotion before the up-or-out year, the assistant professor must obtain approval from their Department Chair and Budget Council. Appx.379 (Fenves 38:14–39:2); Appx.607–08, 638 (Tewfik 77:20–78:5, 200:10–201:1); Appx.710 (Wood 147:11–24). The Budget Council consists of all full professors in the department. Appx.383 (Fenves 54:10–11). It "is the only body within UT that can decide whether [to] put someone forward for promotion or not, the exception being that if the person is in their up-or-out-year" they *must* be put up for promotion. Appx.593 (Tewfik. 20:17–21:5); *see also* Appx.607–08 (Tewfik 77:20–78:5); Appx.711 (Wood 151:13–16).

### 2.   Assembling the Candidate's Dossier

Assuming the Budget Council assents, the next step is dossier assembly. Appx.593 (Tewfik 20:17–21:5); Appx.018–25. The dossier must contain specific documents in a particular order, the details of which are set forth in the general guidelines for promotion and tenure published for that

---

Appx.0539 (Shockley 26:25–27:21).

particular year. *Id.*; *see also* Appx.031–41. Candidates are responsible for familiarizing themselves with the guidelines and consulting with the department chair (or designee) about the candidate's responsibilities for compiling the information. Appx.014–15. The candidates are responsible for "check[ing] the materials in the promotion dossier before the department committee considers a case" to "ensure that all candidate materials are enclosed in the dossier as submitted by the candidate." Appx.015. "Candidates have the discretion to include any materials that they believe are relevant to the promotion or tenure decision." *Id.*

### 3.      Department level advisory (second Budget Council vote and Chair's letter)

After the dossier is submitted, the Budget Council assesses the candidate's record and prepares a separate statement for each area of contribution applicable. Appx.016. The areas of contribution are teaching, research, scholarly effort, advising and student mentoring, university and professional service, and other evidence of merit or recognition. *See* Appx.011. The Budget Council votes on whether to support the tenure candidacy. Appx.016. The votes and written comments are anonymous. Appx.614–15, 623 (Tewfik 105:12–106:23; 140:9–17). The department chair is also "to provide his or her own assessment of the candidate's teaching, research/scholarly activity, and service." Appx.016. "The department chair's statement should identify the candidate's strength[s] and weaknesses, provide context as needed, and address whether and how the candidate's promotion would improve the quality of the department." *Id.*

### 4.      College level advisory (P&T Committee's vote and Dean's letter)

Next, the college advisory committee—the Promotion & Tenure ("P&T Committee")—reviews the candidate's dossier. Appx.016–16. The P&T Committee is composed of representatives from each department within the college. Appx.383 (Fenves 55:9–15). The P&T Committee meets, takes a vote, and discusses the case with the Dean.[3] Appx.395 (Fenves 104:20–25). The Dean then

---

[3] When Greg Fenves was Dean of the Cockrell School of Engineering, the P&T Committee would submit a

submits a letter containing his or her professional evaluation and recommendation on the case—informed by the P&T discussion, vote, and significant factors raised during the P&T deliberation. Appx.384 (Fenves 60:22–61:1). The Dean's letter should not attempt to summarize everything in the candidate's dossier but should instead contain a concise statement to support their recommendation. Appx.397 (Fenves 112:21–24).

### 5.     Presidential level advisory (President's Committee)

From there, the Dean presents the candidate's tenure case to the President's Committee. Appx.384 (Fenves 61:5–9). The President's Committee is made up of the President, the Provost, the Vice President of Research, the Dean of the Undergraduate Studies, and the Dean of the Graduate School. Appx.383 (Fenves 57:3–10). The Dean answers the questions of the President's Committee and provides clarifications. Appx.741 (Wood 271:21–272:11). After the Dean's presentation, a discussion with the President's Committee follows. Appx. 385 (Fenves 65:19–25); *see also* Appx.544 (Shockley 49:5–12). The President typically polls the committee members for their recommendations.[4] Appx.385 (Fenves 65:19–25). This poll is advisory only. Appx.386 (Fenves 66:1–6); Appx.741 (Wood 272:18–273:13).

### 6.     Outcomes

Ultimately, the President decides whether to grant tenure. Appx.385 (Fenves 65:2–11). In a typical tenure case, the choice is binary: "up" (granting tenure) or "out" (terminal appointment). *See* Appx.379 (Fenves 40:23–41:2). When the candidate is not in their up-or-out year, a third option is available: do not promote but allow the candidate to go up for tenure again later. *Id.* (Fenves 41:11–

---

written assessment that he used as the first draft of his letter. Appx.0395 (Fenves 105:1–8). Dean Sharon Wood initially adopted this practice as well. Appx.0722 (Wood 194:19–195:23). But she switched over to writing her assessment from scratch. *Id.* In 2018–19, the academic year when Nikolova's case went up for tenure, the P&T Committee submitted feedback to the Dean using a list of topics upon which the Dean particularly wanted input. *Id.* (Wood 195:24–196:6).

[4] At the time Nikolova's case went up, Wood was present for the poll. Appx.0741 (Wood 272:18–273:16).

19). After the decision is made, the Office of the President formally notifies deans of the results. Appx.025. The President's Committee revisits all pending terminal-appointment cases approximately two months later. *Id.* "A candidate whose case is Terminal Appointment Pending may present further arguments to the president before the case is decided." Appx.026; *see also* Appx.389 (Fenves 80:13–19); Appx.553 (Shockley 82:11–84:21). But candidates who are denied promotion but are not given a terminal appointment may not present final arguments because their tenure denial is not "final" and therefore is not reconsidered. *See id.*

"The candidate or the president may [also] request a review of the case by the Committee of Counsel on Academic Freedom and Responsibility (CCAFR)," a committee elected by the Faculty Council. Appx.026; Appx.555 (Shockley 93:8–13). "Such a review is limited to one or both of the following: 1) to determine whether, in its judgment, the procedures followed in the candidate's case accorded with both the university's and commonly accepted professional standards for promotion and tenure; and 2) whether the decision was based upon a violation of the faculty member's academic freedom." *Id.*

## C.   Events Culminating in Nikolova's Tenure Decision

### 1.   Beginning of employment with UT Austin

In 2011, Nikolova completed a postdoctoral position and started as an assistant professor with Texas A&M University ("A&M"). Appx.478–79 [Nikolova 25:17–26:17]. While Nikolova worked at A&M, a professor at UT (Dr. Constantine Caramanis) invited her to apply to a position in UT's Electrical and Computer Engineering ("ECE") Department. Appx.480–81 [Nikolova 33:15–34:12]. Following her application, Nikolova went through several interviews. Appx.481 [Nikolova 34:19–35:9]. Nikolova also met with then-ECE Department Chair Dr. Ahmed Tewfik and discussed when she could go up for tenure at UT. *Id.* [Nikolova 35:5–36:11]. Tewfik told her that UT's standard was to conduct the tenure evaluation after five years at UT. *Id.* [Nikolova 35:10–36:11]. But the ECE

Department would support putting Nikolova up for tenure at five years calculated as though her time at A&M counted, if she chose to seek early promotion. *Id.* That way, "if [she] need[ed] more time for whatever reason, it [would] give[] [her] more flexibility." *Id.*

Caramanis summed up the hiring committee's thoughts with a list of pros and cons. Appx.044–45. While there were "concerns about area and productivity thus far, the feeling [was] that she definitely has the potential to do extremely well." *Id.* "In summary, the feeling was that, acknowledging that [UT's] tenure bar is only getting higher and that she will have to change her trajectory in order to clear it, we should give her a chance, because there is a good reason to think that she has great potential." *Id.* Another committee member characterized Nikolova as "high risk, high reward" and noted that "not every single person [UT] hire[s] should probably be tenured." Appx.044. He went on to express general misgivings about whether "the ECE faculty are capable of voting against anybody for tenure, regardless of how weak their record is, or how little support they have from their area." *Id.*

Despite these concerns, 77% of the committee voted to make an offer to Nikolova. Appx.048. After this vote, Tewfik sought authorization from the then-Dean of the Cockrell School of Engineering, Greg Fenves. Appx.047–48. Then-Dean Fenves authorized Tewfik to begin negotiating an offer with Nikolova. *Id.* Tewfik sent an offer to Nikolova, enclosing UT's tenure policy (HOP 2-2010), and Nikolova accepted. Appx.049–52.

### 2. Nikolova's start at UT

Nikolova started at UT in January 2014, halfway through the academic year. Appx.479 (Nikolova 28:1–3). Thus, her first probationary year at UT—the first year that counted towards her up-or-out year—began in Academic Year ("AY") 2014–15. *See* Appx.717 (Wood 174:24–176:17). She taught classes for three semesters. Appx.481–82 (Nikolova 37:14–39:7). In fall 2015, she was a visiting researcher at the Simons Institute for the Theory of Computation ("Simons Institute") at the

University of California at Berkeley, and thus did not teach at UT. Appx.482, 485 (Nikolova 39:8–14, 51:9–52:9). In October 2015, Nikolova applied for Modified Instruction Duty ("MID") so she would not have to teach classes during the spring 2016 semester. Appx.482 (Nikolova 39:18–23); *see also* Appx.053–56.

UT's MID policy, Handbook of Operating Procedures ("HOP") 2-2240, applies to faculty members "who are a principal caregiver of a healthy pre-school child (or children), or who are required to care for or assist a member or members of their immediate family, who although not ill or disabled, needs the help and attention of the faculty member." Appx.008. The MID policy allows an approved faculty member to replace their classroom teaching responsibilities with other duties more commensurate with their personal needs. *Id.* The faculty member is not on leave and is still expected "to fulfill all of their other duties as members of the faculty during the period of modification." *Id.*

In Nikolova's case, her October 2015 application explained that she was "expecting a baby on March 17, 2016 and [wanted] to have modified duty in the Spring 2016 semester." Appx.053. Tewfik and Associate Dean Dr. Gerald ("Jerry") Speitel, Jr. supported Nikolova's request, and her request not to teach classes in spring 2016 was approved. *Id.*; Appx.485 (Nikolova 52:20–23). Also in October 2015, Nikolova sought an extension of her probationary period for reason of childbirth, seeking to apply the extension to AY 2015–16. Appx.060; *see also* Appx.488 (Nikolova 63:9–65:12). As explained in the correspondence, this extension would give Nikolova additional time to conduct research, publish papers, and otherwise improve her eligibility for tenure by delaying the projected year of her up-or-out review. App.0060. The letter also explained that Nikolova could rescind the extension until February 1 prior to the fall of the academic year of her up-or-out review. *Id.*; Appx.488 (Nikolova 65:2–12). Nikolova signed the letter agreeing that she understood, and her request for a probationary extension was approved. Appx.060–62. Nikolova's first child was born on March 10, 2016. Appx.480 (Nikolova 30:9–11).

**3.     The decision to go up early, the first Budget Council vote, and Nikolova's Third Year Review**

During the three semesters that followed (fall 2016, spring 2017, and fall 2017), Nikolova taught ECE classes at UT. Appx.482 (Nikolova 39:25–40:8). In September 2017, Nikolova met with a career mentor and ECE colleague, Dr. Sanjay Shakkottai. Appx.494 [Nikolova 88:21–91:24]. Shakkottai advised that he thought she was ready to go up for tenure. *Id.* Although her tenure case would be early under UT's tenure policy, he opined that she was "technically early," not "truly early," and that the timing was good because it was Tewfik's last scheduled year as Department Chair. *Id.* Thereafter, she met with several others, including Tewfik and Dr. Christine Julien, who provided information about the process. Appx.496 (Nikolova 94:7–95:12). Nikolova did not speak with the Dean of Cockrell School of Engineering, Dr. Sharon Wood, but Tewfik did speak to her prior to Nikolova officially starting the tenure process, as is typical. Appx.501 (Nikolova 115:24–116:5); *see also* Appx.710 (Wood 147:11–24). Wood asked about Nikolova's publications and asked for documentation regarding Nikolova's funding. Appx.501 (Nikolova 116:6–17). Tewfik described Wood as "neutral" regarding Nikolova's case, which Nikolova dismissed as the result of Wood's ignorance regarding Nikolova's publications. *See id.* (Nikolova 116:19–117:8).

The following semester (Spring 2018), Nikolova returned to the Simons Institute at UC Berkley to conduct research. Appx.491 (Nikolova 76:3–17). In May 2018, Shakkottai presented Nikolova's case to the Budget Council to determine whether she would be allowed to go up for tenure in AY 2018–19. Appx.496 (Nikolova 95:19–96:6). On May 6, 2018, the Budget Council approved putting Nikololova up for tenure, despite misgivings expressed in the comments by a faculty member who saw "several areas of potential concern." Appx.072–74.

Around this time, Nikolova underwent her third-year review, a performance review that is typically performed in the middle of a faculty's probationary period "in order to inform [the] candidate how they're doing and help them make suggestions, if they need to, to make sure they're successful

during the tenure [process]." Appx.492 (Nikolova 81:17–23). Here, Nikolova's early tenure application deprived her of "runway time" to implement any suggestions. Appx.075. Thus, after the review committee members learned Nikolova was going up for tenure, they removed all suggestions for improvement so the review would be purely positive. *Id.* On June 13, 2018, Nikolova's second child was born. Appx.480 (Nikolova 30:12–17).

    **4.**    **Dossier assembly**

As the professor seeking tenure, Nikolova was responsible for assembling her dossier and ensuring it included all the information she wanted included. Appx.644 (Tewfik 224:25–225:15). The dossier-assembly process is critical because the dossier's contents are considered at all levels of review, and everyone involved in the recommendation (and decision-making) process is obligated to read the entire dossier. Appx.622 (Tewfik 136:2–20); *see also* Appx.713 (Wood 159:12–18); Appx.394, 397 (Fenves 99:2–8, 112:15–20). Nikolova needed to submit documents, as well as draft statements on the various areas in which she would be evaluated (research, teaching, service, and so forth). Appx.498 (Nikolova 105:10–25).

The ECE Department offers assistance to professors going up for promotion. Appx.644 (Tewfik 224:25–225:15). On July 28, 2018, an administrative assistant sent Nikolova an email noting that she had sent Nikolova several requests to update her dossier over the summer, but never received a response. Appx.629–30 (Tewfik 165:17–166:5); Appx.079–80. Nikolova again did not respond; instead, her fiancé (not a UT employee) sent an email to a UT student instructing that student to work on Nikolova's dossier, "cc"ing the assistant. Appx.080.

The assistant responded by emailing Shakkottai and Tewfik, noting that Nikolova's request was "totally inappropriate," and expressing frustration at having spent two months unsuccessfully trying to get Nikolova to "finish the work she needs to do on her promotion dossier." Appx.081. Eventually, Tewfik responded and instructed Nikolova to finish her dossier without having her fiancé

or students work on it. Appx.084–85. In her deposition, Nikolova explained she had two students work on her dossier, completing "very time consuming" tasks such as formatting her resume. Appx.477, 498 (Nikolova 20:8–21:15; 102:1–103:5).

5.    The Second Budget Council vote, and Tewfik's letter

On September 10, 2018, the Budget Council voted to approve the promotion of Nikolova. Appx.086–88. This support was unsurprising because, as Tewfik explained in his deposition, "Departments tend to support their own members." Appx.602 (Tewfik 54:16–55:24). This support-our-own sentiment was particularly strong in 2018. *Id.* An ECE faculty member had recently received a positive-but-weak vote from the Budget Council, which led her to withdraw her case and eventually leave UT altogether. Appx.593 (Tewfik 18:1–20:14). According to Tewfik, this caused the ECE Department to "learn[] a lesson": "if we were going to support someone, then we were going to vote strongly in favor of that person." Appx.602 (Tewfik 54:16–55:24). And while Nikolova received few negative votes, there were concerns about her expressed in the comments. Appx.091. One person described her early promotion case as "difficult" because, among other things, Nikolova's "research ha[d] not developed much beyond her original directions she was pursuing prior to joining to UT" and "[her] publication record [was] weak." *Id.*

After the Budget Council's vote, Tewfik began working on his own letter. Tewfik "wanted to make sure Dr. Nikolova stay[ed] as a productive member of the department; and so the way he wrote [his] letter, [his] communication with various people, was to say [he] would like to see her in the department, which essentially meant that he [wanted] to see her promoted." Appx.615 (Tewfik 109:8–16). Tewfik felt Nikolova had not greatly exceeded the bar for obtaining tenure—she was closer to the bar than any other candidates that had gone up for promotion under his tenure as Chair. Appx.616 (Tewfik 110:4–10). But he was a proponent of having her promoted because he felt that she had potential and wanted her to stay in the ECE Department. Appx.615–16 (Tewfik 109:17–110:15). After

Tewfik finished an initial version of his letter supporting Nikolova's promotion, he sent it to the P&T Committee. Appx.637 (Tewfik 196:11–19).

After receiving Tewfik's letter, Shakkottai[5] emailed Speitel on behalf of the P&T Committee "request[ing] that the ECE chair provide additional justification for the timing of the promotion application," noting that her "case [was] still considered technically early at UT Austin." Appx.093. After Speitel forwarded the request to Tewfik, Tewfik responded by criticizing the need to provide additional justification for faculty who had come to UT from elsewhere, arguing that it would harm UT's ability to recruit. Appx.096. Five minutes later, he followed up with a second email raising the rhetorical concern hoping that the question raised by Nikolova's mentor, Shakkottai, was not "a reflection of gender biases." Appx.092. In his deposition, Tewfik explained that he made the gender bias comment because when Alex Dimakis, another faculty member, went up for tenure, the P&T Committee did not request additional justification. Appx.640 (Tewfik 206:1–17). But Tewfik also acknowledged that Alex Dimakis was a "superstar" to whom Nikolova could not compare. *Id.*; Appx.639 (Tewfik 203:23–204:12). Indeed, Tewfik opined, if Dimakis set the tenure standard, Nikolova "would not make it." Appx.639 (Tewfik 204:4–9).

Responding to Tewfik's email, Speitel explained that while time spent at another institution was a "mitigating factor," it was "not itself justification for promoting her now," and he expressed concern that Nikolova was not "well above the bar in all categories" as normally expected for early promotions. Appx.095. He also noted that Tewfik needed to explain why Nikolova got two semesters off from teaching for childbirth when one is the norm. Appx.095–96. Speitel later explained that he wanted to improve Nikolova's chances of getting tenure by getting Tewfik to provide more explanation for why the case ought to go up early. Appx.575–76 (Speitel 36:8–23, 37:11–14; 39:5–11).

---

[5] Shakkottai was the chair of the P&T Committee at that time. Appx.0575 (Speitel 36:9–23).

Tewfik responded to the email by explaining that Nikolova had been given an unbalanced teaching load in Fall 2015 to attend a program at the Simons Institute and was given the Spring 2016 semester off from teaching. *Id.* He also compared Nikolova to another faculty member four years earlier for whom no additional explanation has been requested, but acknowledged that then-President Bill Powers and then-Dean Greg Fenves had both separately told him that this other faculty member (Dr. Alex Dimakis) was one of the strongest tenure cases across all of UT (not just ECE or the Cockrell School) that year. *Id.* Eventually, Tewfik added a few sentences to his letter to provide further justification for putting Nikolova up for tenure two years before her "up-or-out" year. *See* Appx.640 (Tewfik 209:14–25); Appx.538 (Shockley 25:5–13).

### 6. The P&T Committee and Wood's letter

The seven members of the P&T Committee voted in favor of promotion. Appx.723 (Wood 200:1–4); Appx.243. After Wood independently reviewed Nikolova's entire dossier, she met with the P&T Committee members to hear their thoughts and obtain their written evaluation. Appx.723, 725 (Wood 200:5–203:18, 206:15–23); *see also* Appx.042–43; Appx.102–06. Wood had a long discussion with the P&T Committee about the "bar" for obtaining early promotion. Appx.725 (Wood 207:22–208:5). Like the Budget Council, the P&T Committee felt that Nikolova's 5.5 years in rank was sufficient justification to support early promotion. Appx.725 (Wood 208:6–209:4); *see also* Appx.092. By contrast, Wood believed that an early promotion triggered a higher "bar" Appx.726 (Wood 211:3–8)), that probationary service is what counted when determining whether that higher bar applied (Appx.725 (Wood 208:14–21)), and that Nikolova's four probationary years meant that she was an early-promotion applicant who needed to pass the higher bar (Appx.726 (Wood 211:13–212:4)).

Wood based this belief on meetings with the President's Committee when Greg Fenves was President, Maurie McInnis was Provost, and Dan Jaffe was Vice President for Research, in which the Committee communicated its expectations about early tenure. Appx.725–26 (Wood 209:11–212:4).

After every promotion cycle, the President's Committee had a meeting with the Deans and Department Chairs to discuss the last cycle and their expectations going forward. Appx.703 (Wood 119:3–11). From these meetings, Wood understood that a person considered at the normal time for promotion could have some weaknesses in their application—some "flat spots"—and still be promoted. Appx.703, 715, 725–26 (Wood 118:13–119:11; 168:5–11, 208:6–210:9). But if a case was early, the candidate could not have *any* flat spots—they needed to be above the bar in all areas to be promoted. Appx.703, 715 (Wood 118:11–20; 168:12–18).

Based on her understanding of the expectations for an early promotion case, Wood concluded that Nikolova's tenure case lacked sufficient justification for an early promotion. Appx.726 (Wood 210:14–212:4). As explained in her assessment letter, Wood had misgivings about Nikolova's teaching and funding. Regarding the teaching, Wood noted that "Nikolova did not teach during the 2015-16 academic year[6], and since then her instructor ratings have fallen." Appx.109. Nikolova's teaching statement also seemed to blame teaching assistants for the decline, which Wood interpreted as a "direct deflection of taking responsibility." *Id.*; Appx.729 (Wood 223:24–224:15). Wood also had "concerns about the sustainability of Nikolova's research funding, noting that "approximately 70% of her funding was awarded during her first three years in rank" and "[o]nly one grant ha[d] been awarded in the past four academic years." Appx.110–11; *see also* Appx.730–32 (Wood 229:16–236:18).

Wood's assessment concluded that if it "were an up-or-out case, [she] would likely agree with the recommendation of the Promotion and Tenure committee." Appx.111. "However, Dr. Nikolova is being considered for promotion at UT Austin two years early." *Id.* "As such, [Wood] [did] not

---

[6] Wood's letter explained in a footnote: "[Nikolova] participated in the Economics and Computation workshop at the Simons Institute for the Theory of Computing at UC Berkeley during the 2015 fall semester, and was scheduled to teach two classes in the 2016 spring semester. However, she became pregnant during the 2015 fall semester and was assigned modified instructional duties during the 2016 spring semester."

believe that Dr. Nikolova's performance [met] expectations for early promotion to associate professor." *Id.*

Wood informed Tewfik that she was going to recommend that Nikolova not be promoted and asked him to speak with Nikolova. Appx.642 (Tewfik 217:12–22). Wood explained that she did not want to lose Nikolova and that, were Nikolova's case to go up, the President's Committee could deny tenure and give Nikolova a terminal appointment. Appx.643 (Tewfik 218:24–219:7); *see also* Appx.729 (Wood 224:22–225:11). Wood recommended that Nikolova consider withdrawing her case to avoid that risk. Appx.643 (Tewfik 219:1–7). Tewfik relayed this to Nikolova. *Id.* (Tewfik 219:12–21); *see also* Appx.112–13. He also explained that she could instead submit a rebuttal to Wood's assessment. Appx.502 (Nikolova 120:20–121:14). Nikolova opted to submit a rebuttal, which was due December 15, 2018.[7] *Id.*

### 7. The President's Decision

Wood presented Nikolova's case with the President's Committee, including President Fenves. Appx.740 (Wood 269:1–8). The Committee's discussion focused "primarily on Dr. Nikolova's research funding record, trajectory . . . and then, also, the publication record." Appx.398 (Fenves 117:18–24). Eventually, the Committee members voted on whether they advised promoting Nikolova at that time. Appx.741 (Wood 273:4–13). There were zero votes in favor of promotion and five against promotion. *Id.* (Wood 273:7–9).

According to one observer, the Committee discussed Nikolova's strengths but had concerns about her record and concluded that there was "just not a clear case" for early promotion. Appx.537 (Shockley 20:3–15). As Fenves put it, "we did not feel the performance, particularly in research,

---

[7] On January 8, 2019, an unsolicited reference letter was received by email from an external (non-UT) professor. Appx.0121–23. It was not included in Nikolova's dossier because it was not part of the required materials and—by UT policy and standard practice—while "candidates have the discretion to include <u>any</u> materials that they believe are relevant," Nikolova had not requested its inclusion. Appx.0025 (emphasis in original); Appx.0549–50, 552 (Shockley 68:11–22; 70:10–15; 71:4–72:7; 81:7–12).

funding, and trajectory and publications was ready to make that affirmative decision to promote to tenure." Appx.399 (Fenves 118:21–119:4). Had it been an up-or-out year, Fenves "would have had to make a decision to promote or a terminal appointment." *Id.* (Fenves 119:5–8). But, as it was, there were still two years "to give more confidence that the standards have been met; and particularly in this case, research funding will be sustainable and have a positive trajectory." *Id.* (Fenves 119:9–22). The case "wasn't ready for a promotion decision or a terminal-appointment decision." Appx.400 (Fenves 122:4–7).

Sustainability of Research Funding.

Fenves's first major concern regarding Nikolova's case was the sustainability and trajectory of her research funding. Appx.394, 401–03 (Fenves 99:2–19, 129:23–135:21). In engineering, "research funding from external sponsors . . . is a very important criterion" because "[t]he funding is needed to sustain a faculty member's research program, especially to be able to recruit and support graduate students." Appx.402 (Fenves 130:3–15). As it relates to consideration of promotion to tenure, "we like to see a positive trajectory, meaning that over the time of the probationary period," (1) the candidate "has demonstrated ability to be successful in competitive peer-review grants from federal funding agencies" and (2) that this funding is sufficient to support a faculty member's strong research efforts. *Id.* (Fenves 130:16–24). The record should provide "confidence that after approval of promotion and tenure that [funding] will continue through evidence of submitting proposals and successful grants for a number of years past the promotion case." *Id.* (Fenves 130:24–131:3).

Nikolova's dossier contained a table "listing [her] [three] current external grants . . . from funding agents and contracts awarded." Appx.402 (Fenves 131:5–9). The first grant had effectively ended by the time of the review. *Id.* (Fenves 131:11–13). The second had been received when Nikolova was at A&M and was also set to expire before Nikolova's promotion would have become effective. *Id.* (Fenves 131:14–22). The third grant was set to last from October 1, 2017 to September 30, 2021,

but it provided only "a very modest level of funding." *Id.* (Fenves 131:23–132:6). Nikolova's list of pending external grants and contracts did nothing to alleviate Fenves's concern: it only contained a single pending grant, which had many coinvestigators and, if funded, would not have been based out of UT Austin. *Id.* (Fenves 132:10–133:15).

Publications Record.

Fenves's second major concern was Nikolova's publication record. Appx.394 (Fenves 99:2–19). She published only three papers in time and rank—meaning while an assistant professor at both UT and A&M. Appx.403 (Fenves 137:6–14). Her peer-reviewed conference proceedings, again in time in rank, was a total of 18. *Id.* Fenves believed that three journal publications was a "very low number; and in combination with 18 referee conference papers is a . . . modest number." *Id.* (Fenves 137:24–138:5). He felt this was not a strong publication record, and reviewing the number of citations to Nikolova's publications did nothing to change this opinion. Appx.404 (Fenves 138:10–139:4). While not "mediocre," the number was "not acceptable for tenure." *Id.* (Fenves 139:23–140:7).

**D.   Events After Tenure Decision**

**1.   Immediate Aftermath**

In mid-February 2019, Nikolova learned from Tewfik that Fenves had decided not to promote her. Appx.506 (Nikolova 137:8–24). Nikolova declined the opportunity to meet with the Dean to discuss the decision. Appx.116. Instead, she spoke with CCAFR Chair Dr. Brian Evans to discuss what procedures were available to contest the outcome. Appx.507 (Nikolova 139:1–14). Based on that discussion, she decided on two simultaneous approaches: to submit a request to CCAFR and a final argument to the President. *Id.* She worked with Tewfik and Evans to prepare those documents. Appx.507 (Nikolova 140:7–143:5); Appx.117–120. On March 26, 2019, Nikolova submitted her request for reconsideration and request for CCAFR review. Appx.124–64.

In her 21-page final-argument letter, Nikolova raised a concern "of pregnancy discrimination if undue emphasis is given to my single lower EE360C score." Appx.155–56. She hypothesized that her student evaluation score could have been affected by students bias against her based on pregnancy.[8] *Id.* Nikolova also stated that the denial of her tenure raised concerns of gender and pregnancy bias. Appx.158–62. Nikolova's final argument letter was not reviewed, however, because tenure guidelines authorize final arguments only in terminal appointment cases. Appx.026; Appx.389 (Fenves 80:13–19); Appx.553 (Shockley 82:11–84:21). In her letter to CCAFR, which was mislabeled as an "appeal" of the tenure decision, Nikolova argued that she should have received early promotion. *See generally* Appx.124–141. Nikolova said that the denial of tenure in her case "raise[d] questions of equity and different treatment based on gender and pregnancy." Appx.125, 136–37. She also claimed that her probationary extension for pregnancy and childbirth had been used against her, based primarily on Wood's statement that "[i]f this were an up-or-out case," Wood likely would have agreed with the P&T Committee's recommendation to promote.[9] Appx.131–32.

On April 28, 2019, a CCAFR subcommittee issued an advisory report. Appx.169–87. The report did not make any finding about pregnancy bias, and while it expressed "concerned about statistics regarding gender equity, diversity, and inclusion," it did not find any procedural violations. Appx.174. On May 10, 2019, Nikolova submitted her charge to the EEOC. Appx.203–05. Three days later, Fenves responded to the advisory report's findings, agreeing with some and rejecting others. Appx.206–10. On June 13, 2019, the EEOC issued a right to sue letter without a finding. Apx.0211. On September 9, 2019, Nikolova filed this lawsuit. Dkt. #1. On July 2, 2020, Nikolova sought and

---

[8] Dr, Nikolova did not give birth until mid-June 2018, and it is unclear if any students knew she was pregnant in fall 2017. *See* Appx.0480 (Nikolova 30:12–17).

[9] In her deposition, Nikolova conceded that she would not have been in her up-or-out year even if she had rescinded her probationary extension. Appx.0497 (Nikolova 101:6–16). And Fenves likewise testified that, had Nikolova rescinded her probationary year, she still would not have been in her up-or-out year and "the concerns would have been the same." Appx.0400 (Fenves 123:4–19).

later received leave to amend her complaint to add, *inter alia*, claims of retaliation. Dkts. #20, #20-1. The events related these allegations are addressed below.

### 2.  Teaching Assessment

As described in Evans' sample form for peer evaluation of teaching for Spring 2019, "Peer teaching evaluation is intended to be part of an on-going constructive dialogue about teaching with faculty colleagues." Appx.192. "The evaluation encourages time for reflection and action." *Id.* Peer teaching evaluations involve (1) a pre-observation meeting between the evaluator and the course instructor, (2) classroom observation, (3) a post-observation meeting, and (4) a reflective summary by the course instructor. *Id.*

On April 24, 2019, Dr. Sujay Sanghavi, an ECE faculty member, was notified that his peer teaching evaluation due April 15, 2019, had not been submitted. Appx.165–66. He acknowledged this but suggested not evaluating her teaching that semester because, at this point, Nikolova's class now "ha[d] students giving project presentations and answering questions." *Id.* The next day, Tewfik informed Nikolova that he had asked Julien "to do [her] teaching evaluation instead of [Sanghavi] who was initially assigned to do it." Appx.167–68. Tewfik asked Nikolova to arrange a time when Julien could visit one of her classes to conduct a peer teaching evaluation in the coming week. *Id.*

On May 2, 2019, Julien sent Nikolova her completed peer teaching evaluation. Appx.190–91. Three days later, Nikolova sent an email to Julien indicating that she "fe[lt] there is nothing positive in [the evaluation]" and asked Julien to "add some positive things and tone down some of the negative," which Nikolova surmised was attributable to Julien being "overworked and tired" and not "[having] eaten at the end of the lecture." Appx.190. Julien responded by sending a revised evaluation that attempted to address Nikolova's concerns. Appx.189–90. Nikolova then requested additional changes. Appx.188–89. Julien made some of the requested changes and advised that the rest were "best suited for the pre-observation information and the instructor reflection." Appx.188. Nikolova

sent Julien a completed form, including her reflective summary. Appx.188, 192–200. In this response, Nikolova expressed concern that the evaluation "should not be completed in the last weeks of class" when "everyone is tired" and "students are extremely preoccupied with their final projects and exams." Appx.188, 192–200. Evans responded to Nikolova's timing concern by noting he had "sent the initial assignments to the ECE faculty on Feb[ruary] 26th." Appx.201. "In this particular case, there was a late change in the peer teaching evaluator after Spring Break" and Julien "graciously volunteered." *Id.*

### 3.   Annual Faculty Evaluation

In addition to peer teaching evaluations of faculty members' classroom instruction, faculty also undergo Faculty Annual Reviews ("FARs"). Appx.461 (Julien 145:22–146:2). In spring 2020, Julien was Chair of the FAR Committee. *Id.* (Julien 145:13-19). The spring 2020 cycle of FARs evaluated teaching during the previous academic year—September 2018 through August 2019. Appx.461, 466 [Julien 147:20–24, 168:14–19]. Faculty members submit their own FARs, which are then evaluated by two independent reviewers from the Committee. *See* Appx.237–239; Appx.461 (Julien 147:5–12).

Beginning in September 2019, multiple emails were sent to faculty members reminding them to submit their FARs, but as of May 13, 2020, Nikolova had not submitted hers. Appx.237. When Nikolova eventually submitted her FAR, two of her ECE colleagues were assigned to review it, Drs. Caramanis and Michael Orshansky. Appx.240–41; Appx.461 (Julien 147:5–12). Julien then merged their comments and "may have added connector words, semicolons, that sort of thing" but added nothing of substance to the review. *Id.* (Julien 147:5–12, 147:25–148:5). Caramanis and Orshansky assigned Nikolova a rating of "Meets Expectations" for AY 2018–19. *Id.* (Julien 147:13-16); Appx.780.

### 4.   Senior Design Incident

"The normal teaching load for well-funded research-active faculty members in the ECE department is two courses per academic year, in addition to supervision of a senior design team."

Appx.486 (Nikolova 54:24–55:9). "Supervising senior design team[s] is typically done in two consecutive semesters, which may be both in the same academic year; or they may be across two academic years, depending on when they start." *Id.* (Nikolova 56:25–57:6).

On September 3, 2019, Tewfik advised Nikolova that she and another ECE faculty member would "need to supervise/continue supervising senior design teams" while on Modified Instructional Duties that semester. Appx.213–16. When Nikolova questioned this requirement, Tewfik escalated the issue to Wood and Speitel, who agreed with Nikolova. Appx.219, 212, 224. Speitel informed Tewfik that, based on the circumstances Nikolova raised, they "need[ed] to re-visit the decision that we made in our meeting to ask her to continue with her senior design group." Appx.219. "I realize that this may be disruptive to the group, but please assign her senior design group to another faculty member." *Id.* On September 6, Tewfik emailed Nikolova: "I emailed the dean and associate dean and they agreed to my request to relieve you from senior design supervision." Appx.217. Less than 72 hours transpired between Tewfik's initial email and his email relieving her from senior design supervision.

## STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute is "genuine" when the evidence is "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "A fact issue is 'material' if its resolution could affect the outcome of the action." *Levy Gardens Partners 2007, L.P. v. Commonwealth Land Title Ins. Co.*, 706 F.3d 622, 628 (5th Cir. 2013). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citation omitted). Once the movant bears its initial burden, the non-movant must identify admissible evidence that

creates a fact issue. *Ramsey v. Henderson*, 286 F.3d 264, 269 (5th Cir. 2002). This burden is not satisfied by "conclusory allegations, speculation, and unsubstantiated assertions." *Id.*

**ARGUMENTS & AUTHORITIES**

**A.      Sex/Pregnancy Discrimination Claims**

**1.      Disparate Impact**

"[T]he necessary premise of the disparate impact approach is that some employment practices, adopted without a deliberately discriminatory motive, may in operation be functionally equivalent to intentional discrimination." *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 987 (1988). Here, Nikolova's disparate-impact claim contends that UT's "probationary extension [policy], the MID policy and other policies and practices applied by UT have the effect of discriminating against female assistant professors and/or those who become pregnant during their tenure review time period compared with other assistant professors." Dkt. #21, ¶¶ 45, 64. Nikolova's interrogatory response articulates two disparate-impact theories. Appx.770–71. Neither theory meets the *prima facie* elements nor presents a triable issue of fact.

UT's MID and Probationary Extension Policy

Nikolova's first disparate-impact theory is that UT's MID policy (HOP 2-2240)—which allows both male and female professors to "modify the[ir] classroom instructional responsibilities" to "allow for equivalent academic service when certain personal circumstances prevent them from being able to perform their classroom teaching duties"—discriminates against women. Appx.008. The policy applies equally to both men and women "who are a principal caregiver of a healthy pre-school child (or children), or who are required to care for or assist a member or members of their immediate family, who although not ill or disabled, needs the help and attention of the faculty member." *Id.* Nikolova postulates that this neutral policy discriminates against women because treating men and women the same "effectively allows male professor more time to perform research and all faculty other duties

relative to female professors who have children" based on the physical effects of childbirth and its aftermath on women. Appx.770. Nikolova takes issue with UT's probationary extension policy (HOP 2-2020) for the same reason—in her view, treating men and women equally discriminates against women because women "actually give[] birth and [are] the primary caregiver of the child." *Id.*

UT's Policy of Reviewing Student Evaluations in Tenure Decisions

Nikolova second disparate-impact theory is that UT's practice and policy of considering student teaching evaluation scores disparately impacts female professors due to students' gender biases against women and pregnant women. Appx.771. Nikolova hypothesizes that women receive lower scores while pregnant and nursing and that this impacted her student teaching scores, which UT considered in her application for early promotion. *Id.*

> a. **Nikolova cannot meet the *prima facie* elements of her disparate-impact claim because there is no evidence that UT's policies cause a disparate effect on women generally or pregnant women specifically.**

"To establish a prima facie case of discrimination under a disparate-impact theory, a plaintiff must show: (1) an identifiable, facially neutral personnel policy or practice; (2) a disparate effect on members of a protected class; and (3) a causal connection between the two." *McClain v. Lufkin Indus., Inc.,* 519 F.3d 264, 275 (5th Cir. 2008). A disparate impact plaintiff "must begin by identifying the specific employment practice that is challenged," such that "the plaintiff is . . . responsible for isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities." *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 995 (1988) (citing *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971)); *see also Meacham v. Knolls Atomic Power Lab.*, 554 U.S. 84, 100–101 (2008). "Once the employment practice at issue has been identified, causation must be proved; that is, the plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group." *Id.* Courts are not obligated to assume that plaintiffs' statistical evidence is

reliable; defects such as "small or incomplete data sets and inadequate statistical techniques" may negate the evidence. *Id.* at 996–97.

UT's MID and Probationary Extension Policy

Here, Nikolova cannot meet her burden to demonstrate that the MID or Probationary extension policies have a disparate impact on women generally or pregnant women specifically. Between 2009 and 2020, there were 20 assistant professors who took an extension year and who were either considered for tenure or left UT prior to being considered for tenure in the Cockrell School of Engineering.[10] Appx.774; Dkt. #31-1, 6. Nine of these assistant professors were women and 11 were

---

[10]

| FirstName | LastName | Gender | First extension year | Reason for first extension | Date left UT Austin | Action President |
|---|---|---|---|---|---|---|
| Efstathios | Bakolas | Male | 2016 | Expecting child | | Promote to Associate Professor |
| Marcelo | Behar | Male | 2015 | Expecting child | 8/31/2017 | N/A |
| Michael | Blackhurst | Male | 2013 | Expecting child | 8/31/2014 | N/A |
| Amy | Brock | Female | 2013 | Expecting child | | Promote to Associate Professor |
| Michael | Cullinan | Male | 2015 | Health reasons | | Promote to Associate Professor |
| Ashish | Deshpande | Male | 2014 | Expecting child | | Promote to Associate Professor |
| Ned | Dimitrov | Male | 2016 | Expecting child | 8/31/2017 | N/A |
| Chadi | El Mohtar | Male | 2012 | Expecting child | | Promote to Associate Professor |
| Raissa | Ferron | Female | 2010 | Expecting child | | Promote to Associate Professor |
| Wassim | Ghannoum | Male | 2011 | Expecting child | | Terminal Appointment |
| Lea | Hildebrandt Ruiz | Female | 2013 | Expecting child | | Promote to Associate Professor |
| Trevor | Hrynyk | Male | 2015 | Expecting child | Resigned tenure-track position 04/30/2019 | N/A |
| Vijay | Janapa Reddi | Male | 2015 | Expecting child | | Promote to Associate Professor |
| Mary Jo | Kirisits | Female | 2009 | Principal caregiver of a preschool child | | Promote to Associate Professor |
| Evdokia | Nikolova | Female | 2015 | Expecting child | | Promotion Denied |

men. *Id.* Eight of the women (88.9%) received tenure and were promoted to associate professor. *Id.* Six of the 11 men (54.5%) received tenure and were promoted to associate professor. *Id.* Four of the five men who were not promoted were never considered for tenure, because they left either UT or their tenure-track position. Six of the seven men (85.7%) considered for tenure were promoted. *Id.* The only man in this group who was considered for but denied tenure was not considered for early promotion and, unlike Nikolova, received a terminal appointment. *Id.* Nikolova was the only woman in this group not to receive tenure (yet), but she was the only person of the 20 who was considered for early promotion[11] and had at least one fewer year of probationary service. *Id.*

Assuming *arguendo* that there is enough data for this Court to draw conclusions,[12] the disparity observed is insufficient to establish a *prima facie* case of disparate impact—indeed, there effectively *is* no disparity. *Compare supra*, 2 n.10, *with Bunch v. Bullard*, 795 F.2d 384, 396 (5th Cir. 1986). And while UT does not collect this type of statistical data regarding the MID policy, there is no reason to believe Nikolova can meet her burden to demonstrate that UT's MID policy has a disparate impact on women or pregnant women. As such, Nikolova cannot meet her *prima facie* burden to demonstrate that either

| Carolyn | Seepersad | Female | 2008 | Expecting child | | Promote to Associate Professor |
|---|---|---|---|---|---|---|
| Nan | Sun | Male | 2015 | Expecting child | | Promote to Associate Professor |
| Yaguo | Wang | Female | 2017 | Expecting child | | Promote to Associate Professor |
| Ying | Xu | Female | 2011 | Expecting child | | Promote to Associate Professor |
| Janeta | Zoldan | Female | 2013 | Expecting child | | Promote to Associate Professor |

[11] Three of the men who were promoted were not in their up-or-out year when the tenure decision was made, but accelerated tenure is calculated by looking at years in rank and, regardless, three people is far too small of a sample size to draw any conclusions.

[12] Expanding the dataset to include all assistant professors who went up for tenure in the Cockrell School of Engineering—without regard to probationary extensions—does nothing to advance a gender discrimination claim. In the years between 2009 and 2018, UT Austin granted tenure to 18 of 21 women (85.7%) and 56 of 66 men (84.8%). Appx.0774; Dkt. #31-1, 6–7. Adding 2018–19 but excluding Nikolova, UT Austin granted tenure to 22 of 25 women (88.0%) and 66 of 76 men (86.8%). *Id.* Including Nikolova's case gives 22 of 26 women (84.6%) granted tenure. *Id.* These comparisons provide no evidence that gender is related to the tenure decision.

policy caused UT not to grant tenure to female faculty because of their gender or pregnancy status. *See Watson*, 487 U.S. at 995.

UT's Policy of Reviewing Student Evaluations in Tenure Decisions

Nikolova cannot demonstrate that UT's practice of including student evaluation scores as part of its holistic assessment of faculty teaching causes a disparate impact in the number of female faculty who are given tenure. Teaching is only one of five areas of contribution assessed in the tenure decision. *See* Appx.011. And student evaluation scores are only one part of UT's consideration of faculty teaching—for example, UT also looks at peer teaching evaluations, a committee evaluation, and the candidate's own teaching statement. There is simply no statistical evidence that this factor-of-a-factor has caused a statistically significant disparity in the number of women (or pregnant women) to obtain tenure at UT. And UT takes measures to control for the risk of student bias, including in the context of pregnancy. Nikolova cannot meet her *prima facie* burden to demonstrate that UT's consideration of student evaluation scores caused UT not to grant tenure to female faculty because of their gender or pregnancy status. *See Watson*, 487 U.S. at 995.

b.   **UT's policies are both related to the position and consistent with business necessity**

If the plaintiff establishes a prima facie case of disparate impact, the burden shifts to the defendant to "demonstrate that the challenged practice is job related for the position in question and consistent with business necessity." 42 U.S.C. § 2000e-2(k)(1)(A)(i). Here, to the extent Nikolova can meet her *prima facie* burden, she will be unable to create a triable issue of fact on whether the policies she challenges are related to the position of tenured faculty and consistent with business necessity.

UT's MID and Probationary Extension Policy

The purpose of the probationary extension policy is "to recognize that faculty have family responsibilities, generally related to a child, either birth or adoption of a child, whether they're male or female, and that it was in the long-term benefit of the faculty member and of the University to

recognize that in assessing their performance in the probationary period by extending . . . the period." Appx.373 (Fenves 16:17–17:1). The ability to take a probationary extension is "generally viewed as a benefit to the faculty, highly supported by the faculty" and is "not a requirement." *Id.* (Fenves 17:18– 22). Nikolova herself acknowledged that probationary extensions can be useful because young children make productivity difficult and an extension gives faculty an additional year to complete the work expected for a grant of tenure. Appx.487–88, 490 [Nikolova 61:19–62:9; 70:5–71:7]. Nikolova likewise acknowledged the value of UT's MID policy to faculty, stating that its use by faculty of both genders is "very critical." Appx.505 (Nikolova 136:2–20).

Nikolova does not *really* challenge whether UT's policies are job related and consistent with business necessity. Rather, she contends that women and men experience pregnancy differently and that men are less likely to be the primary caregiver of the child. *See* Appx.770–71; Appx.504–06 (Nikolova 128:24–131:15; 136:2–20). As a result of these biological and societal differences, she proposes that UT's policies should treat men and women differently; for example, that UT should offer women two semesters of MID while allowing men to take only one semester. *See* Appx.770–71; Appx.506 (Nikolova 136:2–20). But to adopt this approach would be to "focus on differential treatment between the two sexes as groups," and Title VII "focus[es] on individuals rather than groups." *Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1731, 1741 (2020). Almost fifty years ago, the Supreme Court held that an employer cannot force female employees to make larger contributions to their pension fund even if "on the average, [female employees] will live a few year longer than . . . male employees." *City of Los Angeles, Dep't of Water & Power v. Manhart*, 435 U.S. 702, 705, 710–11 (1978). Likewise, UT cannot adopt MID or probationary extension policies that treat men and women differently even if, on the average, women are less productive during their use, which is an assumption not reflected in the data.

UT's Policy of Reviewing Student Evaluations in Tenure Decisions

UT's use of student scoring of faculty teaching as part of the holistic review during the tenure process is related for the position of tenured faculty and consistent with business necessity. But UT is not blind to the potential biases involved in student scoring. *See* Appx.716 (Wood 170:5–172:23). As Julien explained: "The scores should be placed in context because there's a lot of different reasons why they are not perfect measures of teaching performance and outcomes, learning outcomes, and all kinds of different things, not just gender. Gender is one piece. Race is a piece. Difficulty of course is a piece. Whether or not the course is required is a piece. These all play into under scoring or over scoring an instructor for a particular course." Appx.439 (Julien 60:9–20). But just because student evaluations of teaching are "not the be-all, end-all evaluation of teaching," does not lead to the conclusion that they have no value. *See id.* (Julien 59:22–60:8). When analyzing course instructor surveys, UT looks at many metrics, including averages for all courses, averages for just graduate versus undergraduate, comparisons across required courses, courses based on size, and all of these provide useful information of teaching performance. Appx.459 (Julien 139:6–20). "Course Instructor Surveys' quantitative value are just one dramatically imperfect measure of a course; but they are one measure we have. They're a measure of the students' satisfaction with the course." *Id.* (Julien 140:4–9).

In addition to utilizing other metrics when considering teaching and comparing scores between different professors and different years, UT also tends to "look at the trend of the teaching evaluations in individual classes" for an individual instructor. Appx.716 (Wood 170:5–172:23). "[T]he first time that a faculty member teaches a class . . . the students might say it's disorganized because [the faculty member is] just developing their notes, but then by the second of third time they're teaching a class . . . you wouldn't [expect to] see those comments"; rather, "you'd [expect to] see an upward trend in the teaching evaluations." *Id.* If a faculty member has circumstances in their personal life that might affect their teaching—including a difficult pregnancy or young child—the faculty

member can put such information in their teaching statement. *Id.* (Wood 171:13–24). For example, Wood described a situation where an assistant professor had a baby who "wasn't sleeping well" and it affected her teaching in an 8 a.m. class, so she put that in her teaching statement to give context to that semester's teaching evaluations. *Id.* (Wood 171:25–172:7).

Even assuming Nikolova met the *prima facie* burden for her disparate impact claim, she has not demonstrated a triable issue of fact on whether the challenged policies are job-related for a tenured faculty position and consistent with business necessity. As the Second Circuit put it in a case with a much stronger statistical disparity between male and female tenure cases (42% of women and 65% of men): "[The] selection criteria [used by a university to award tenure], however difficult to apply and however much disagreement they generate in particular cases, are job related." *Zahorik v. Cornell Univ.*, 729 F.2d 85, 96 (2d Cir. 1984). "Accomplishments and skills in scholarship and teaching are obviously relevant to employment in tenured professorships." *Id.* "It would be a most radical interpretation of Title VII for a court to enjoin use of an historically settled process and plainly relevant criteria largely because they lead to decisions which are difficult for a court to review." *Id.* (quoted approvingly in *Watson*, 487 U.S. at 999).

### 2.    Disparate Treatment

"Title VII discrimination can be established through either direct or circumstantial evidence." *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003). Where, as here, the plaintiff lacks direct evidence, courts employ the *McDonnell Douglas* framework when considering an employer's summary judgment motion. *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). "*McDonnell Douglas* and subsequent decisions have established an allocation of the burden of production and an order for the presentation of proof" whereby a "plaintiff must [first] establish a prima facie case of discrimination." *Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133, 142 (2000) (internal quotations omitted). If the plaintiff meets her prima facie burden, "[t]he burden shift[s] to [the defendant] to produce evidence

that the plaintiff was rejected . . . for a legitimate, nondiscriminatory reason." *Id.* "[O]nce the employer produces sufficient evidence to support a nondiscriminatory explanation for its decision," the burden shifts back to the plaintiff. *Id.* at 143. The plaintiff must identify evidence that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Id.*

> ### a.   UT assumes, without conceding, that Nikolova will be able to meet the "not onerous" *prima facie* elements for disparate treatment.

Without conceding that Nikolova meets the *prima facie* elements, UT recognizes that the burden of establishing a prima facie case of disparate treatment is "not onerous," *see Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981), and thus welcomes the opportunity to meet its burden of production on its legitimate, non-discriminatory reasons.

> ### b.   UT has met its burden of production in support of its legitimate, non-discriminatory reasons for not granting tenure in AY 2018–19, namely concerns over sustainable funding and publications.

In his deposition, Fenves described UT's legitimate, non-discriminatory reasons for not awarding early tenure to Nikolova in AY 2018–19, referencing the specific sections of her dossier that he found wanting. *See* Appx.394, 401–04 [Fenves 99:2–19, 129:23–140:7). As summarized above in the section entitled "The President's Decision," Fenves had two primary concerns with Nikolova's proposed early tenure: (1) the sustainability and trajectory of her research funding, and (2) her publications record. *Id.* "With the facts presented, the timing of this particular case, it wasn't ready for [either] a promotion decision or a terminal-appointment decision." Appx.400 (Fenves 122:4–7). Thus, Fenves decided not to promote Nikolova *at that time*, a decision made "without prejudice," meaning that her case would be reviewed again before her up-or-out-year. *Id.*; Appx.379 (Fenves 41:11–19).

> ### c.   Nikolova cannot meet her burden to demonstrate a triable issue of fact regarding whether UT's stated reasons are pretextual and the real reasons discriminatory.

As UT has carried its burden of production, "the factual inquiry proceeds to a new level of specificity." *See Tex. Dep't of Cmty. Affairs*, 450 U.S. at 255. Nikolova must now "demonstrate that the

proffered reason was not the true reason for the employment decision" by "either directly by persuading that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 256. Ultimately, "[t]he question is not whether an employer made an erroneous decision; it is whether the decision was made with discriminatory motive." *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1091 (5th Cir. 1995). Here, Nikolova lacks evidence that Fenves's decision not to award her early tenure in AY 2018–19 was based on her gender or pregnancies.

## B.   Retaliation Claims

The *McDonald Douglas* burden-shifting framework applies to retaliation claims. *See Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 407–08 (5th Cir. 1999). In her First Amended Complaint, Nikolova alleges that "after [she] opposed UT Austin's discriminatory practices internally and filed a charge of discrimination and this lawsuit, UT Austin began retaliating against Dr. Nikolova." Dkt. #1, ¶74. Specifically, she identifies three would-be adverse employment actions in the context of her retaliation claim: a teaching assessment, an annual faculty evaluation, and her assignment to supervise a senior design class, which assignment Nikolova was promptly excused from upon her request. *See* Dkt. #21, ¶¶74–84. None of these retaliation actions should survive summary judgment.

For Title VII retaliation claims, "the initial burden rests with the employee to produce evidence: (1) that [s]he participated in an activity protected by Title VII, (2) that [her] employer took an adverse employment action against [her], and (3) that there is a causal connection between the adverse employment action and the protected activity." *Alkhawaldeh*, 851 F.3d at 427. If the plaintiff meets her *prima facie* burden, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the adverse employment action(s). *Alkhawaldeh v. Dow Chem. Co.*, 851 F.3d 425, 426–27 (5th Cir. 2017). "After the employer states its reason [for its adverse employment action], the burden shifts back to the employee to demonstrate that the employer's reason is actually a pretext for

retaliation, which the employee accomplishes by showing that the adverse action would not have occurred 'but for' the employer's retaliatory motive." *Feist v. La., Dep't of Justice*, 730 F.3d 450, 454 (5th Cir. 2013) (internal citations omitted). "The 'but for' standard represents a 'high burden.'" *Alkhawaldeh*, 851 F.3d at 430. The ultimate question is "whether a reasonable fact-finder could conclude that the employer would not have fired the employee 'but for' the employee's decision to engage in an activity protected by Title VII." *Id.* at 428.

### 1.     Teaching Assessment

#### a.     Nikolova cannot meet the *prima facie* elements for her retaliatory teaching assessment claim.

Nikolova's contention that she received an "unflattering teaching evaluation" is not actionable because it does not meet the second or third *prima facie* elements. Receiving a "lower-than-expected job performance review" is not an adverse employment action even in the context of retaliation. Dkt. #21 at ¶82; *Mitchell v. Snow*, 326 F. App'x 852, 856 (5th Cir. 2009). In the context of retaliation, an adverse employment action is one that "a reasonable employee would have found . . . [to be] materially adverse, which in this context means it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 68 (2006). The action must be "materially adverse" "because . . . it is important to separate significant from trivial harms." *Id.* "Title VII's anti-retaliation provisions do not protect employees from petty slights, minor annoyances, and simple lack of good manners." *Welsh v. Fort Bend Indep. Sch. Dist.*, 941 F.3d 818, 827 (5th Cir. 2019) (internal quotations omitted).

Here, even assuming the evaluation was "unflattering," a single teaching evaluation, which is "intended to be part of an on-going constructive dialogue about teaching with faculty colleagues" (Appx.192) is not materially adverse. *See Mitchell*, 326 F. App'x at 856 ("The district court's finding— that an employment review lower than Mitchell expected would not have dissuaded a reasonable employee from asserting discrimination—is correct."); *Jackson v. Honeywell Int'l, Inc.*, 601 F. App'x 280,

286 (5th Cir. 2015) (noting that "unfavorable performance reviews are not adverse employment actions where colorable grounds exist for disciplinary action or where the employee continues to engage in protected activity"); *Brooks v. Houston Indep. Sch. Dist.*, 86 F. Supp.3d 577, 586 (S.D. Tex. 2015) (noting, in the context of retaliation, that "[w]ritten reprimands or warnings . . . generally are not adverse employment actions").

Moreover, Nikolova cannot meet the third *prima facie* element because she lacks evidence that her participation in a protected activity resulted in an "unflattering teaching evaluation." Dkt. #20 at ¶82. There is no evidence that Julien was involved in the tenure decision or would have any reason to retaliate against Nikolova for raising concerns about sex or pregnancy discrimination. Indeed, Julien herself gave birth to her oldest child while an assistant professor at UT, before obtaining tenure in 2010. Appx.426 (Julien 7:12–22). Julien is the Associate Dean for Diversity, Equity, and Inclusion who works to prevent bias in personnel processes at the Cockrell School of Engineering. Appx.428, 432 [Julien 14:16–14:4; 32:7–33:16]. Julien testified that promoting women in computing and broadening women's participation is "a passion of [hers]" for which she is "known within [the ECE] department." Appx.429 [Julien 21:6–11]. "Mere knowledge [of a protected activity] is not sufficient alone to establish a prima facie case for retaliation." *See Standley v. Rogers*, 202 F. Supp. 3d 655, 670 (W.D. Tex. 2016). Likewise, Nikolova's subjective belief that Julien's peer teaching evaluation was motivated by Nikolova's complaints about sex or pregnancy discrimination cannot create a material fact dispute. *See id.* at 666–67. This is particularly true here, where Julien modified her assessment at Nikolova's request before finalizing it. *See supra.*

For these reasons, Nikolova's retaliatory teaching assessment claim should be dismissed.

### b. UT has met its burden of production for its legitimate, non-retaliatory reasons for Julien's assessment of Nikolova's teaching.

Even if her retaliatory teaching assessment claim were actionable and Nikolova were able to meet the *prima facie* causation standard, Julien's observations of Nikolova's class themselves reflect

legitimate, non-retaliatory reasons for the assessment. The review includes suggestions for improvement such as "limiting the time . . . of a conference presentation" and consider engaging "non-lecture based formats." Appx.197. And Julien revised Nikolova's evaluation upon her request, which undermines Nikolova's assertion that her motivations were retaliatory rather than constructive. Far from producing a negative reaction in Evans, he described the dialogue "on ideas and practices for effective teaching" and found them "[v]ery interesting and informative"—hardly an adverse reaction. *See* Appx.201–02.

> c. **Nikolova cannot demonstrate a triable issue of fact on whether but for her complaints of discrimination, Julien would have assessed her teaching more positively.**

To demonstrate that Julien would not have given Nikolova a purportedly unflattering teaching evaluation "'but for' [her] retaliatory motive," Nikolova must show a "conflict in substantial evidence." *Feist*, 730 F.3d at 454. "Evidence is 'substantial' if it is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 658 (5th Cir. 2012) (quoting *Long v. Eastfield Coll.*, 88 F.3d 300, 308 (5th Cir. 1996)). Temporal proximity between the employee's protected activity and the employer's allegedly retaliatory act is insufficient to establish a fact issue on pretext. *Garcia v. Prof'l Contract Servs., Inc.*, 938 F.3d 236, 243 (5th Cir. 2019). Even taking the evidence in the light most favorable to her, Nikolova cannot demonstrate that, but for her complaint, Julien would have omitted her constructive comments. Nikolova lacks the requisite evidence to meet the "high burden" of but-for cause. *See Alkhawaldeh*, 851 F.3d at 430.

> 2. **Annual faculty evaluation**

> a. **Nikolova cannot meet the *prima facie* elements for her retaliatory faculty evaluation claim.**

Nikolova also complains that she received a retaliatory faculty evaluation review of "Meets Expectations." But, like the peer teaching evaluation, a "meets expectations" review is not an adverse

employment action because, at most, it amounts to the type of "minor annoyance" that is insufficient to dissuade a reasonable person from engaging in a protected activity. *See Welsh*, 941 F.3d at 827. Although Nikolova testified "it seemed to be the norm for the majority of the faculty to receive an annual review of exceeds expectations," (Appx.511 (Nikolova 154:11–21)), it is not an adverse employment action to receive a "lower-than-expected job performance review," *Mitchell*, 326 F. App'x at 854–55. Moreover, Tewfik testified that these annual ratings are "typically not given a lot of weight." Appx.649 (Tewfik 242:9–14).

Nikolova also cannot meet her *prima facie* burden to demonstrate causation. The undisputed evidence shows that the faculty members who gave Nikolova a rating of "Meets Expectations" were Caramanis and Orshanksy. Appx.240–41. Julien's role in assigning a rating to Nikolova's annual review was to "look[] over and kind of check[] what the two deep divers did"—"in this particular case that was Constantine and Michael." Appx.426 (Julien 152:15–21). There is no evidence that Caramanis or Orshansky were motivated to retaliate against Nikolova for any protected activity. Nikolova cannot demonstrate that her participation in a protected activity had a causal relationship with her performance review.

> **b.** **UT has met its burden of production for its legitimate, non-retaliatory reasons for the committee's annual assessment.**

UT's legitimate, non-retaliatory reason for the committee's annual assessment is that the assessment honestly reflects the committee members' evaluations of Nikolova's performance in AY 2018–19. Caramanis and Orshansky write: "Nikolova was on Modified Instructional Duty in Fall 2018; this review is for Spring 2019 activity only." Appx.780. "Nikolova has a reasonable publication and teaching record." "She maintains a modestly funded research group." *Id.* "During this period, her service to the department was relatively low, but this is also reasonable, given the semester of leave." *Id.* Thus, the legitimate non-retaliatory reason for this assessment is that Nikolova's publication and

teaching record were "reasonable," her research group is "modestly funded," and "her service to the department was relatively low" but that her low service was reasonable given her MID. *See id.*

> ### c.   Nikolova cannot demonstrate a triable issue of fact on whether but for her complaints of discrimination, the committee would have evaluated her contributions as "excellent."

Assuming that Nikolova is able to meet her *prima facie* burden, she still cannot demonstrate a triable issue of fact in the context of pretext. There is simply not enough evidence for a reasonable jury to conclude that the Faculty Annual Review Committee would have rated her performance as "Excellent" but for her complaints of discrimination.

### 3.   Senior Design Incident

> ### a.   The claim that UT retaliated against Nikolova by asking her to supervise a senior design team on September 3 before withdrawing the request on September 6 does not meet the *prima facie* elements.

The incident in which Tewfik initially asked Nikolova to continue supervising a senior design team before quickly withdrawing the request amounts to the type of "minor annoyance" or "trivial harm" that is not actionable under Title VII. *See Welsh*, 941 F.3d at 827; *Burlington Northern & Santa Fe Railway Co.*, 548 U.S. at 68. Less than 72 hours transpired between Tewfik's email instructing Nikolova to supervise her senior design team while on MID and the email relieving her of that responsibility. *Compare* Appx.215, *with* Appx.217. This brief assignment is insufficient as a matter of law to constitute an adverse employment action.

Here, Nikolova cannot meet the second *prima facie* element because a quickly-withdrawn request would not have dissuaded a reasonable worker from making a charge of discrimination. Moreover, Nikolova cannot demonstrate a material fact dispute regarding whether Tewfik's request that she supervise a senior design team was causally connected to her participation in a protected activity. Here, Tewfik advised that both Nikolova and another faculty member on MID would be

required to supervise a senior design team—belying any contention that this short-lived assignment was related to Nikolova's complaints of discrimination. Appx.214–15.

### b. UT had legitimate, non-retaliatory reasons to ask Nikolova to continue supervising her senior design team while on MID.

UT had legitimate and non-retaliatory reasons to ask Nikolova to continue supervising a senior design team. *See Alkhawaldeh*, 851 F.3d at 426–27. The reason that Nikolova was initially asked to continue to supervise her senior design team is that supervising a design team is a normal job expectation. *See* Appx.486 [Nikolova 54:24–55:9]. Moreover, there were concerns that reassigning another faculty member could be "disruptive to the group." Appx.217. Ultimately the concerns that Nikolova raised were sufficient to excuse her from this responsibility. But nevertheless, UT has met its burden to identify its legitimate, non-retaliatory reasons for making the request.

### c. Nikolova cannot demonstrate a triable issue of fact on whether but for her complaints of discrimination, UT would not have asked her to supervise a senior design team.

There is no evidence that, but for Nikolova's complaints of discrimination, UT would not have asked her to supervise a senior design team. The undisputed evidence shows that (1) supervising a senior design team was a standard expectation for research-active faculty members in the ECE department (Appx.486 (Nikolova 54:24–55:9)); she and another professor also on MID were both asked to supervise a senior design team in September 2019 (Appx.214–15); UT had concerns that withdrawing her from the design team's supervision might be "disruptive to the group" (Appx.219); but when Nikolova raised concerns based on her personal situation, UT reconsidered (*id*.). Nikolova simply lacks evidence, beyond her subjective belief, that complaints of discrimination were the "but-for" cause of the retracted assignment.

## CONCLUSION

The Court should grant summary judgment in UT's favor on Nikolova's disparate-treatment, disparate-impact, and retaliation claims under Title VII.

Respectfully submitted,

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**GRANT DORFMAN**
Deputy First Assistant Attorney General

**SHAWN COWLES**
Deputy Attorney General for Civil Litigation

**THOMAS A. ALBRIGHT**
Chief for General Litigation Division

*/s/ Benjamin L. Dower*
**BENJAMIN L. DOWER**
Assistant Attorney General
Texas State Bar No. 24082931
benjamin.dower@oag.texas.gov

**AMY S. HILTON**
Assistant Attorney General
Texas State Bar No. 24097834
amy.hilton@oag.texas.gov

Office of the Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2120 / Fax (512) 320-0667

**COUNSEL FOR UT AUSTIN**

**CERTIFICATE OF SERVICE**

I hereby certify that on September 21, 2021, a true and correct copy of the foregoing

document was served via the Court's ECF system to all counsel of record.

*/s/ Benjamin L. Dower*
**BENJAMIN L. DOWER**
Assistant Attorney General

Defendant's Motion for Partial Summary Judgment                                    40