IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| EVDOKIA NIKOLOVA, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Civil Action No.: 1:19-CV-00877 |
| | § | |
| UNIVERSITY OF TEXAS AT AUSTIN, | § | |
| | § | |
| *Defendant.* | § | |

## DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**GRANT DORFMAN**
Deputy First Assistant Attorney General

**SHAWN COWLES**
Deputy Attorney General for Civil Litigation

**THOMAS A. ALBRIGHT**
Chief for General Litigation Division

**BENJAMIN L. DOWER**
Deputy Chief for General Litigation Division
Texas State Bar No. 24082931
benjamin.dower@oag.texas.gov

**AMY S. HILTON**
Assistant Attorney General
Texas State Bar No. 24097834
amy.hilton@oag.texas.gov

Office of the Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2120 / Fax (512) 320-0667

**COUNSEL FOR DEFENDANT
THE UNIVERSITY OF TEXAS AT
AUSTIN**

T<small>O THE</small> H<small>ONORABLE</small> J<small>UDGE</small> R<small>OBERT</small> P<small>ITMAN</small>:

Defendant The University of Texas at Austin ("UT") respectfully asks the Court to dismiss the claims brought by Plaintiff, Dr. Evdokia Nikolova, under Title VII of the Civil Rights Act of 1964. Nikolova's Title VII claims stem from an unsuccessful tenure application when she went up for tenure two years early. Then-President Dr. Gregory Fenves believed that UT should generally postpone the decision of whether to grant lifetime tenure until a professor is approaching their "up-or-out" year, the year in which they are required to be reviewed. At that point, candidates have a longer track record to evaluate, including their record of obtaining grant funding, the lifeblood of every university. The essential question for any early-promotion candidate is: "why now?" Nikolova's record at that time did not provide an affirmative answer. Indeed, although supportive of her candidacy, her own department chair recognized that Nikolova was a marginal candidate for early promotion, as did the Dean of the Cockrell School of Engineering, who recommended against promoting her at that time. Based on concerns about her performance, particularly in grant funding and publications, Fenves denied the promotion without prejudice—meaning that her case could still be reviewed at the normal time.

Nikolova accuses UT of engaging in gender and pregnancy discrimination under both disparate treatment and disparate impact theories. But there is no evidence that Fenves acted with an illegal motive. And Nikolova's challenge to several facially neutral policies is unsupported by the applicable statistical data. Her proposed solution—to adopt policies that treat the sexes differently—would itself violate Title VII. Nikolova also accuses UT of retaliating against her after she complained about the tenure denial based on a purportedly unflattering teaching assessment, a "meets expectations" annual faculty evaluation, and a withdrawn request that she continue supervising a design team. But these minor grievances are not actionable and there is no evidence that UT would have acted differently, but for her discrimination complaints. In sum, the Court should grant summary judgment because the evidence is insufficient to raise a triable issue of fact on any of Nikolova's Title VII claims.[1]

---

[1] UT does not seek summary judgment on the EPA claim due to the existence of material fact disputes.

## SUMMARY JUDGMENT EVIDENCE

### A.  UT's Tenure Policies

"The granting of tenure has consequences of great magnitude and long life and must be considered especially carefully[,]" and it "should be awarded only when there is a clear case that the best interest of the university is served by doing so." Appx.011. Tenure marks a significant commitment by UT because, among other things, it confers a constitutionally protected interest in the faculty member's employment. *See Perry v. Sindermann*, 408 U.S. 593, 599 (1972). At UT, tenure denotes a status of "continuing appointment" and is granted when an assistant professor is promoted to associate professor. Appx.004, 12. A faculty member at UT cannot serve as an assistant professor indefinitely; instead, "[t]he maximum probationary period that may be served as an assistant professor is seven years." Appx.005. The sixth year of probationary service is often called the "up-or-out year" because the assistant professor is either promoted ("up") or placed on a terminal appointment ("out"). Appx.005-06, 538.

In calculating years of probationary service ("probationary years"), UT does *not* count academic service at other institutions or standalone semesters at UT—to count as a probationary year, the faculty member must have held a 100% appointment at UT for both the fall and spring semesters of the academic year in full compliance with minimum teaching requirements. Appx.004. Faculty generally view this as a benefit because delaying the required tenure decision gives them more options. Appx.378. In some instances, an assistant professor member may be permitted to extend their probationary period in instances where UT recognizes that "personal circumstances may impede [a tenure-track faculty member's] progress" toward achieving tenure. Appx.006. If a probationary extension is granted, then that year as an assistant professor will not count as a probationary year. *Id.*

UT also permits tenure consideration before the up-or-out year. In such cases, UT has three options: "up," "out," or "do not promote at this time, without prejudice" to reapplying later. Appx.379-80. Such cases are considered "accelerated and must be explained in the department chair's and dean's statements." Appx.012. As Fenves explained, "The question is: Why now? . . . Given the record in

teaching, research, service, award—all the categories we look at in a promotion case—why is this case ripe for an affirmative decision to promote at this time? Whereas, on an up-and-out year, we don't ask 'why should we be considering it now?' We have to consider it now." Appx.380.

## B.  UT's Tenure Process – Going Up Before Up-Or-Out Year

The tenure evaluation process "comprises an independent review at multiple levels: budget council/executive committee, department chair, college/school, dean, and central administration." Appx.011. "The recommendations at each level reflect the professional judgment of each of those involved, with the president making the final decision." *Id.* The decision to go up before the up-or-out year starts with the assistant professor, who must obtain approval from their Department Chair and Budget Council. Appx.379, 606-08, 638, 710. The Budget Council, which consists of all full professors in the department, "is the only body within UT that can decide whether [to] put someone forward for promotion or not, the exception being that if the person is in their up-or-out-year" they *must* be put up for promotion. Appx.383, 593; *see also* Appx.607-08, 711.

Assuming the Budget Council assents, the next step is assembly of the tenure dossier. Appx.018-25, 593. The dossier must contain specific documents, as set forth in the general guidelines for promotion and tenure published for that year. *Id.*; *see also* Appx.031-41. Candidates are responsible for reviewing the guidelines, consulting with the department chair (or designee) on the candidate's responsibilities for compiling the information, and "check[ing] the materials in the promotion dossier before the department committee considers a case." Appx.014-15. After the dossier is submitted, the Budget Council assesses the candidate's record and prepares a separate statement for each applicable area of contribution. Appx.016. The areas of contribution are teaching, research, scholarly effort, advising and student mentoring, university and professional service, and other evidence of merit or recognition. *See* Appx.011. The Budget Council conducts an anonymous vote on whether to support the tenure candidacy. Also, the department chair provides a written assessment, which identifies "the

candidate's strength[s] and weaknesses, provide[s] context as needed, and address[es] whether and how the candidate's promotion would improve the quality of the department." Appx.016, 614-15, 623.

Next, the college advisory committee—the Promotion & Tenure Committee ("P&T Committee"), composed of representatives from each academic department within the college—reviews the dossier. Appx.016, 383. The P&T Committee meets, votes, and discusses the case with the Dean. Appx.395. The Dean writes a letter summarizing his or her professional evaluation and recommendation—informed by the P&T discussion and vote. Appx.384, 397. From there, the Dean presents the candidate's tenure case, answering questions and providing clarification, to the President's Committee, which is made up of the President, the Provost, the Vice President of Research, the Dean of the Undergraduate Studies, and the Dean of the Graduate School. Appx.383-85, 544, 741. The President typically then conducts an advisory poll for committee members' recommendations. Appx.385-86, 741.

Ultimately, the President decides whether to grant tenure. Appx.385. "A candidate whose case is Terminal Appointment Pending may present further arguments to the president before the case is decided." Appx.026; *see also* Appx.389, 553. But early-tenure candidates who are denied promotion but are not given a terminal appointment may not present final arguments because their tenure denial is not "final" and therefore is not reconsidered. *Id.* "The candidate or the president may [also] request a review of the case by the Committee of Counsel on Academic Freedom and Responsibility (CCAFR)," a committee elected by the Faculty Council. Appx.026, 555. Such review is limited to procedural violations and whether the decision was based upon a violation of the faculty member's academic freedom. *Id.*

**C. Events Culminating in Nikolova's Tenure Decision**

**1. Beginning of employment with UT**

In 2011, Nikolova completed a postdoctoral position and started as an assistant professor with Texas A&M University ("A&M"). Appx.478-79. While Nikolova worked at A&M, a professor at UT (Dr. Constantine Caramanis) invited her to apply to a position in UT's Electrical and Computer

Engineering ("ECE") Department. Appx.480-81. Following her application, Nikolova attended several interviews. Appx.481. Nikolova also met with then-ECE Department Chair Dr. Ahmed Tewfik and discussed when she could go up for tenure at UT if hired. *Id.* Tewfik told Nikolova that UT's standard was to conduct the tenure evaluation after five years at UT, but that the ECE Department would support putting her up for tenure after five years including her time at A&M, if she so chose. *Id.* That way, "if [she] need[ed] more time for whatever reason, it [would] give[] [her] more flexibility." *Id.*

Caramanis summed up the hiring committee's thoughts with a list of pros and cons. Appx.044-45. While there were "concerns about area and productivity thus far, the feeling [was] that she definitely has the potential to do extremely well." *Id.* "In summary, the feeling was that, acknowledging that [UT's] tenure bar is only getting higher and that she will have to change her trajectory in order to clear it, we should give her a chance, because there is a good reason to think that she has great potential." *Id.* Another committee member characterized Nikolova as "high risk, high reward" and noted that "not every single person [UT] hire[s] should probably be tenured." Appx.044. He went on to express general misgivings about whether "the ECE faculty are capable of voting against anybody for tenure, regardless of how weak their record is, or how little support they have from their area." *Id.* Despite these concerns, 77% of the committee voted to make an offer to Nikolova. Appx.048. After this vote, Tewfik sought authorization from the then-Dean of the Cockrell School of Engineering, Greg Fenves. Appx.047-48. Then-Dean Fenves authorized Tewfik to begin negotiating an offer with Nikolova. *Id.* Tewfik sent an offer to Nikolova, enclosing UT's tenure policy (HOP 2-2010), and Nikolova accepted. Appx.049-52.

Nikolova started at UT in January 2014, halfway through the academic year. Appx.479. Thus, her first probationary year at UT—the first year that counted towards her up-or-out year—began in Academic Year ("AY") 2014-15. *See* Appx.717. She taught classes for three semesters. Appx.481-82. In fall 2015, she was a visiting researcher at the Simons Institute for the Theory of Computation ("Simons Institute") at the University of California at Berkeley, and thus did not teach at UT. Appx.482, 485. In

October 2015, Nikolova applied for Modified Instruction Duty ("MID")[2] so she would not have to teach classes during the spring 2016 semester. Appx.482; *see also* Appx.053-56.

Nikolova's October 2015 application explained that she was "expecting a baby on March 17, 2016 and [wanted] to have modified duty in the Spring 2016 semester." Appx.053. Tewfik and Associate Dean Dr. Gerald ("Jerry") Speitel, Jr. supported Nikolova's request, and her request not to teach classes in spring 2016 was approved. *Id.*; Appx.485. Also in October 2015, Nikolova sought an extension of her probationary period for reason of childbirth, seeking to apply the extension to AY 2015-16. Appx.060; *see also* Appx.488. As the correspondence explained, this would give Nikolova additional time to improve her eligibility for tenure by delaying the projected year of her up-or-out review, but Nikolova could rescind the extension up to February 1 before the fall of the academic year of her up-or-out review. Appx.060; Appx.488. Nikolova signed the letter and her probationary extension request was approved. Appx.060-62. Nikolova's first child was born on March 10, 2016. Appx.480.

### 2. Deciding to go up early, the first Budget Council vote, and the Third-Year Review

During the three semesters that followed (fall 2016, spring 2017, and fall 2017), Nikolova taught ECE classes at UT. Appx.482. In September 2017, Nikolova met with a career mentor and ECE colleague, Dr. Sanjay Shakkottai, who opined that she was ready to go up for tenure. Appx.494. Thereafter, she met with several others, including Tewfik and Dr. Christine Julien, regarding the process. Appx.496. Nikolova did not speak with the Dean of Cockrell School of Engineering, Dr. Sharon Wood, but Tewfik spoke to Wood before Nikolova started the process. Appx.501; Appx.710. Wood asked about Nikolova's publications and funding, and was described as "neutral" regarding the case. Appx.501.

The following semester (Spring 2018), Nikolova returned to the Simons Institute to conduct research. Appx.491. In May 2018, Shakkottai presented Nikolova's case to the Budget Council to

---

[2] UT's MID policy, Handbook of Operating Procedures ("HOP") 2-2240, applies to faculty members "who are a principal caregiver of a healthy pre-school child (or children)," or who are required to care for or assist an immediate family member, who although not ill or disabled, needs the help and attention. Appx.008. The policy allows a faculty member to replace teaching responsibilities with duties more aligned with their personal needs. *Id.*

determine whether she could go up for tenure in AY 2018-19. Appx.496. On May 6, 2018, the Budget Council approved the candidacy, despite misgivings expressed in comments made by a faculty member who saw "several areas of potential concern." Appx.072-74. Around this time, Nikolova underwent her third-year review, a performance review that is typically done in the middle of the probationary period "in order to inform [the] candidate how they're doing and help them make suggestions, if they need to, to make sure they're successful during the tenure [process]." Appx.492. Here, Nikolova's early tenure application deprived her of "runway time" to implement suggestions so the review committee removed all suggestions for improvement after its members learned Nikolova was going up for tenure early. Appx.075. On June 13, 2018, Nikolova's second child was born. Appx.480.

### 3. Dossier assembly

As the professor seeking tenure, Nikolova was responsible for assembling her dossier and ensuring it included all the information she wanted included. Appx.644, *see also* Appx.498. The dossier-assembly process is critical because the dossier's contents are considered at all levels of review, and everyone involved in the recommendation and decision-making process is obligated to read the entire dossier. Appx.622, 394, 397, 713. On July 28, 2018, an administrative assistant sent Nikolova an email noting that she had sent Nikolova several requests to update her dossier over the summer, but never received a response. Appx. 079-80, 629-30. Nikolova again did not respond; instead, her fiancé sent an email instructing a UT student to work on Nikolova's dossier, "cc"ing the assistant. Appx.080. The assistant responded by emailing Shakkottai and Tewfik, noting that Nikolova's request was "totally inappropriate," and expressing frustration about Nikolova not finishing her dossier or responding to the assistant's requests. Appx.081. Eventually, Tewfik instructed Nikolova to finish her dossier without having her fiancé or students work on it. Appx.084-85.

### 4. The Second Budget Council vote, and Tewfik's letter

On September 10, 2018, the Budget Council voted to approve Nikolova's early promotion to associate professor. Appx.086-88. This was unsurprising because, as Tewfik explained in his deposition,

"Departments tend to support their own members," and this sentiment was particularly strong in 2018. Appx.602. An ECE faculty member had recently received a positive-but-weak vote from the Budget Council, which led her to withdraw her tenure application and eventually leave UT altogether. Appx.593. According to Tewfik, this caused the ECE Department to "learn[] a lesson": "if we were going to support someone, then we were going to vote strongly in favor of that person." Appx.602.

While Nikolova received few negative votes, concerns were expressed in the comments. Appx.091. One person described her early promotion case as "difficult" because, *inter alia*, Nikolova's "research ha[d] not developed much beyond her original directions she was pursuing prior to joining to UT" and "[her] publication record [was] weak." *Id.* After the Budget Council's vote, Tewfik began working on his letter of support "to make sure Dr. Nikolova stay[ed] as a productive member of the department[.]" Appx.615. Tewfik felt Nikolova was closer to the bar for obtaining tenure than any other candidates who had gone up for promotion recently, but he was a proponent of promoting Nikolova because he felt that she had potential and wanted her to stay in the ECE Department. Appx.615-16.

Tewfik sent an initial version of his letter supporting Nikolova's promotion to the P&T Committee. Appx.637. After receiving Tewfik's letter, then-P&T Committee chair Shakkottai emailed Speitel on behalf of the P&T Committee "request[ing] that the ECE chair provide additional justification for the timing of the promotion application," noting that her "case [was] still considered technically early at UT Austin." Appx.093. Tewfik balked at this request, arguing that having to provide additional justification for faculty members with teaching experience at other institutions would harm UT's ability to recruit such faculty. Appx.096. Five minutes later, he followed up with a second email rhetorically hoping that Shakkottai's question was not "a reflection of gender biases." Appx.092. In his deposition, Tewfik explained that he made this comment because when Alex Dimakis, another faculty member, had gone up for tenure, the P&T Committee did not request additional justification. Appx.640. But Tewfik also acknowledged that Dimakis was a "superstar" to whom Nikolova could not compare. *Id.*; Appx.639. Indeed, Tewfik opined, if Dimakis set the tenure standard, Nikolova "would not make it." Appx.639.

Responding to Tewfik's email, Speitel explained that while Nikolova's time at A&M was a "mitigating factor," it was "not itself justification for promoting her now," and he expressed concern that Nikolova was not "well above the bar in all categories" as normally expected for early promotion. Appx.095. He also noted that Tewfik needed to explain why Nikolova got two semesters off from teaching for childbirth when one is the norm. Appx.095-96. Speitel later explained that he wanted to improve Nikolova's chances of receiving early promotion by having Tewfik provide more explanation. Appx.575-76. Tewfik replied by explaining that Nikolova had been given an unbalanced teaching load in Fall 2015 to attend a program at the Simons Institute and was given the Spring 2016 semester off from teaching. *Id.* Eventually, Tewfik added a few sentences to his letter to provide additional explanation. *See* Appx.538, 640.

**5. The P&T Committee and Wood's letter**

The seven members of the P&T Committee voted in favor of promotion. Appx.243, 723. After Wood independently reviewed Nikolova's dossier, she met with the P&T Committee members to hear their thoughts and obtain their written evaluation. Appx.723, 725; *see also* Appx.042-43, 102-06. Wood had a long discussion with the P&T Committee about the "bar" for obtaining early promotion. Appx.725. Like the Budget Council, the P&T Committee felt that Nikolova's 5.5 years in rank was sufficient justification to support early promotion. Appx.725; *see also* Appx.092. By contrast, Wood believed that an early promotion required a higher "bar," that probationary service is what determines whether that higher bar applied, and that Nikolova's four probationary years meant that she needed to pass the higher bar. Appx.725-26).

Wood based this belief on meetings with the President's Committee when Fenves was President, Maurie McInnis was Provost, and Daniel Jaffe was Vice President for Research, in which the Committee communicated its expectations about early tenure. Appx.725-26. From these meetings, Wood took away that a person considered at the normal time for promotion could have some weaknesses in their

application—some "flat spots"—and still be promoted. Appx.703, 715, 725-26. But if a case was early, the candidate could not have *any* flat spots—they needed to be above the bar in all areas. Appx.703, 715.

Wood concluded that Nikolova's case lacked sufficient justification for an early promotion based on concerns about Nikolova's teaching and funding. Appx.726. Wood noted that "Nikolova did not teach during the 2015-16 academic year[3], and since then her instructor ratings have fallen." Appx.109. Nikolova's teaching statement also seemed to blame teaching assistants for the decline, which Wood interpreted as a "direct deflection of taking responsibility." *Id.*; Appx.729. Wood also had "concerns about the sustainability of Nikolova's research funding," noting that "approximately 70% of her funding was awarded during her first three years in rank" and "[o]nly one grant ha[d] been awarded in the past four academic years." Appx.110-11; *see also* Appx.730-32. Wood concluded that if it "were an up-or-out case, [she] would likely agree with the recommendation of the Promotion and Tenure committee." Appx.111. "However, Dr. Nikolova is being considered for promotion at UT Austin two years early." *Id.* "As such, [Wood] [did] not believe that Dr. Nikolova's performance [met] expectations for early promotion to associate professor." *Id.*

Wood informed Tewfik that she would not recommend promotion and asked him to speak with Nikolova. Appx.642. Wood explained that she did not want to lose Nikolova and that, were Nikolova's case to go up, the President's Committee could deny tenure and give Nikolova a terminal appointment. Appx.643; Appx.729. Wood recommended that Nikolova consider withdrawing her case to avoid that risk. Appx.643. Tewfik relayed this to Nikolova. *Id.*; Appx.112-13. He also explained that she could instead submit a rebuttal to Wood's assessment. Appx.502. Nikolova opted to submit a rebuttal.[4] *Id.*

---

[3] Wood's letter explained in a footnote: "[Nikolova] participated in the Economics and Computation workshop at the [Simons Institute] during the 2015 fall semester and was scheduled to teach two classes in the 2016 spring semester. However, she became pregnant during the 2015 fall semester and was assigned modified instructional duties during the 2016 spring semester." Appx.109.

[4] On January 8, 2019, an unsolicited reference letter was received by email from an external (non-UT) professor. Appx.0121-23. It was not included in Nikolova's dossier because it was not required and—by UT policy and practice—while "candidates have the discretion to include any materials that they believe are relevant," Nikolova had not requested its inclusion. Appx.0025, 549-50, 552.

### 6.  The President's Decision

Wood presented Nikolova's case to the President's Committee, and the committee's discussion focused "primarily on Dr. Nikolova's research funding record, trajectory [and] also, the publication record." Appx.398, 740. Eventually, the Committee voted on whether they advised promoting Nikolova at that time: there were zero votes in favor of promotion and five votes against. Appx.741. The Committee discussed Nikolova's strengths but had concerns about her record and concluded that there was "just not a clear case" for early promotion. Appx.537. As Fenves put it, "we did not feel the performance, particularly in research, funding, and trajectory and publications was ready to make that affirmative decision to promote to tenure." Appx.399. Had it been Nikolova's up-or-out year, Fenves "would have had to make a decision to promote or a terminal appointment." *Id.* But there were still two years "to give more confidence that the standards have been met; and particularly in this case, research funding will be sustainable and have a positive trajectory." *Id.* The case "wasn't ready for a promotion decision or a terminal-appointment decision." Appx.400.

Fenves's first major concern regarding Nikolova's case was the sustainability and trajectory of her research funding. Appx.394, 401-03. In engineering, "research funding from external sponsors . . . is a very important criterion" because "[t]he funding is needed to sustain a faculty member's research program, especially to be able to recruit and support graduate students," and candidates should show a "positive trajectory" over the time of their probationary period. Appx.402. The record should provide "confidence that after approval of promotion and tenure that [funding] will continue through evidence of submitting proposals and successful grants for a number of years past the promotion case." *Id.* Nikolova's dossier contained a table "listing [her] [three] current external grants . . . from funding agents and contracts awarded." Appx.402. The first grant had effectively ended by the time of the review. *Id.* The second had been received when Nikolova was at A&M and was also set to expire before Nikolova's promotion would have become effective. *Id.* The third grant was set to last from October 1, 2017 to September 30, 2021, but it provided only "a very modest level of funding." *Id.* Nikolova's list of pending

external grants and contracts did not alleviate Fenves's concern: it contained only one pending grant, which had many coinvestigators and, if funded, would not have been based out of UT. *Id.*

Fenves's second major concern was Nikolova's publication record. Appx.394. She published only three papers and had only 18 peer-reviewed conference proceedings while she an assistant professor at both UT and A&M. Appx.403. Fenves believed that three journal publications was a "very low number; and in combination with 18 referee conference papers is a . . . modest number." *Id.* Reviewing the number of citations to Nikolova's publications did nothing to change his opinion that, while not "mediocre," the number was "not acceptable for tenure." Appx.404.

## D. Events After Tenure Decision

### 1. Immediate Aftermath

In mid-February 2019, Nikolova learned from Tewfik that Fenves had decided not to promote her. Appx.506. Nikolova declined the opportunity to meet with the Dean to discuss the decision. Appx.116. Instead, she spoke with CCAFR Chair Dr. Brian Evans to discuss how she could contest the decision. Appx.507. Based on that discussion, she worked with Tewfik and Evans and on March 26, 2019, submitted both a final argument to the President and a request to CCAFR. *Id.*; Appx.; 117-20, 124-64, 507. In her final-argument letter, Nikolova raised a concern "of pregnancy discrimination if undue emphasis is given to my single lower EE360C score," hypothesized that student bias based on pregnancy could have affected her student evaluation score, and stated that the denial of her tenure raised concerns of gender and pregnancy bias. Appx.155-56, 158-62. Nikolova's letter was not reviewed, however, because final arguments are authorized only in terminal appointment cases. Appx.026, 389, 553. In her letter to CCAFR, Nikolova argued that she should have received early promotion; that the denial of tenure in her case "raise[d] questions of equity and different treatment based on gender and pregnancy;" and that her probationary extension for pregnancy and childbirth had been used against

her, based on Wood's statement that "[i]f this were an up-or-out case," Wood likely would have recommended promotion.[5] Appx.124-41.

On April 28, 2019, a CCAFR subcommittee issued an advisory report that expressed "concern[s] about statistics regarding gender equity, diversity, and inclusion," but made no finding about pregnancy bias. Appx.169-87. On May 10, Nikolova filed her EEOC charge. Appx.203-05. On May 13, Fenves responded to CCAFR's findings, agreeing with some and rejecting others. Appx.206-10. On June 13, the EEOC issued a right to sue letter without a finding. Apx.0211. On September 9, Nikolova filed this lawsuit. Dkt. 1. On July 2, 2020, Nikolova amended her complaint to add claims of retaliation. Dkts. 20, 20-1. The events related Nikolova's retaliation claims are described below.

## 2. Teaching Assessment

"Peer teaching evaluation is intended to be part of an on-going constructive dialogue about teaching with faculty colleagues[,]" and involves (1) a pre-observation meeting between the evaluator and the course instructor, (2) classroom observation, (3) a post-observation meeting, and (4) a reflective summary by the course instructor. Appx.192. On April 24, 2019, Dr. Sujay Sanghavi, an ECE faculty member, was notified that his peer teaching evaluation of Nikolova, due April 15, 2019, had not been submitted. Appx.165-66. He acknowledged this but suggested not evaluating her teaching that semester because, at that point, Nikolova's class "ha[d] students giving project presentations and answering questions." *Id.* The next day, Tewfik informed Nikolova that he had asked Christine Julien "to do [her] teaching evaluation instead of [Sanghavi] who was initially assigned to do it." Appx.167-68. Tewfik asked Nikolova to arrange a time when Julien could visit one of her classes to conduct a peer teaching evaluation in the coming week. *Id.*

On May 2, 2019, Julien sent Nikolova her completed peer teaching evaluation. Appx.190-91. Three days later, Nikolova emailed Julien indicating that she "fe[lt] there is nothing positive in [the

---

[5] In her deposition, Nikolova conceded that she would not have been in her up-or-out year even if she had rescinded her probationary extension. Appx.0497. Fenves testified similarly, adding that, even if Nikolova had rescinded her extension, "the concerns would have been the same." Appx.0400.

evaluation]" and asked Julien to "add some positive things and tone down some of the negative," which Nikolova surmised was attributable to Julien being "overworked and tired" and not "[having] eaten at the end of the lecture." Appx.190. Julien then revised her evaluation, but Nikolova requested additional changes. Appx.188-90. Julien made some of the requested changes and advised that the rest were "best suited for the pre-observation information and the instructor reflection." Appx.188. Nikolova sent Julien a completed form and, in it, expressed that the evaluation "should not be completed in the last weeks of class" when "everyone is tired" and "students are extremely preoccupied with their final projects and exams." Appx.188, 192-200. Evans responded to Nikolova's concern by noting he had "sent the initial assignments to the ECE faculty on Feb[ruary] 26th." Appx.201. "In this particular case, there was a late change in the peer teaching evaluator after Spring Break" and Julien "graciously volunteered." *Id.*

### 3. Annual Faculty Evaluation

In addition to peer teaching evaluations of classroom instruction, faculty members also undergo Faculty Annual Reviews ("FARs"). Appx.461. The spring 2020 cycle of FARs evaluated teaching during the previous academic year—2018-19. Appx.461, 466. Faculty members submit their own FARs, which are then evaluated by two independent reviewers. *See* Appx.237-239, 461. Beginning in September 2019, multiple emails were sent to faculty members reminding them to submit their FARs, but as of May 13, 2020, Nikolova had not submitted hers. Appx.237. When Nikolova eventually submitted her FAR, two of her ECE colleagues were assigned to review it, Drs. Caramanis and Orshansky. Appx.240-41, 461. They assigned Nikolova a rating of "Meets Expectations" for AY 2018-19. *Id.*

### 4. Senior Design Incident

"The normal teaching load for well-funded research-active faculty members in the ECE department is two courses per academic year, in addition to supervision of a senior design team." Appx.486. "Supervising senior design team[s] is typically done in two consecutive semesters, which may be both in the same academic year; or they may be across two academic years, depending on when they start." *Id.* On September 3, 2019, Tewfik advised Nikolova that she and another ECE faculty member

would "need to supervise/continue supervising senior design teams" while on MID. Appx.213-16. When Nikolova questioned this requirement, Tewfik escalated the issue to Wood and Speitel, who agreed with Nikolova. Appx.219, 212, 219, 224. On September 6, Tewfik emailed Nikolova: "I emailed the dean and associate dean and they agreed to my request to relieve you from senior design supervision." Appx.217. Less than 72 hours transpired between the request and its rescission.

## STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A "genuine" dispute requires evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "A fact issue is 'material' if its resolution could affect the outcome of the action." *Levy Gardens Partners 2007, L.P. v. Commonwealth Land Title Ins. Co.*, 706 F.3d 622, 628 (5th Cir. 2013). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citation omitted). Once this burden is satisfied, the non-movant must identify admissible evidence that creates a fact issue. *Id.*

## ARGUMENTS & AUTHORITIES

**A. Sex/Pregnancy Discrimination Claims**

**1. Disparate Impact**

"[T]he necessary premise of the disparate impact approach is that some employment practices, adopted without a deliberately discriminatory motive, may in operation be functionally equivalent to intentional discrimination." *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 987 (1988). Here, Nikolova's disparate-impact claim contends that UT's "probationary extension [policy], the MID policy and other policies and practices applied by UT have the effect of discriminating against female assistant professors and/or those who become pregnant during their tenure review time period compared with

other assistant professors." Dkt. 21, ¶¶ 45, 64. Nikolova's interrogatory response states two disparate-impact theories (Appx.770-71); neither satisfies her *prima facie* burden or presents a triable issue of fact.

<u>UT's MID and Probationary Extension Policy</u>

Nikolova's first disparate-impact theory is that UT's MID policy (HOP 2-2240)—which allows both male and female professors to "modify the[ir] classroom instructional responsibilities" to "allow for equivalent academic service when certain personal circumstances prevent them from being able to perform their classroom teaching duties"—discriminates against women. Appx.008. Nikolova postulates that treating men and women the same discriminates against women because it "effectively allows male professor more time to perform research and all faculty other duties relative to female professors who have children" based on the physical effects of childbirth and its aftermath on women. Appx.770. Nikolova takes issue with UT's probationary extension policy (HOP 2-2020) for the same reason—in her view, treating men and women equally discriminates against women because women "actually give[] birth and [are] the primary caregiver of the child." *Id.*

<u>UT's Policy of Reviewing Student Evaluations in Tenure Decisions</u>

Nikolova's second disparate-impact theory is that UT's practice and policy of considering student teaching evaluation scores disparately impacts female professors due to students' gender biases. Appx.771. Nikolova theorizes that students score women lower while pregnant or nursing and that this impacted her student teaching scores, which UT considered in her application for early promotion. *Id.*

**a. There is no evidence that UT's policies cause a disparate effect on women generally or pregnant women specifically.**

"To establish a prima facie case of discrimination under a disparate-impact theory, a plaintiff must show: (1) an identifiable, facially neutral personnel policy or practice; (2) a disparate effect on members of a protected class; and (3) a causal connection between the two." *McClain v. Lufkin Indus., Inc.,* 519 F.3d 264, 275 (5th Cir. 2008). A disparate impact plaintiff must first "isolate[e] and identify[] the specific employment practices that are allegedly responsible for any observed statistical disparities." *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 995 (1988). "Once the employment practice at issue

has been identified, causation must be proved; that is, the plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group." *Id.* Defects such as "small or incomplete data sets and inadequate statistical techniques" may negate that evidence. *Id.* at 996-97.

UT's MID and Probationary Extension Policy

Here, Nikolova cannot meet her burden to demonstrate that the MID or probationary-extension policies have a disparate impact on women generally or pregnant women specifically. Between 2009 and 2020, there were 20 assistant professors in the Cockrell School of Engineering who took an extension year and who were either considered for tenure or left UT prior to being considered for tenure. Appx.774; Appx.785; Dkt. 31-1, 6. Nine were women and 11 were men. *Id.* Eight of the women (88.9%) received tenure and were promoted to associate professor. *Id.* Six of the 11 men (54.5%) received tenure and were promoted to associate professor. *Id.* Four of the five men who were not promoted were never considered for tenure, because they left either UT or their tenure-track position. Six of the seven men (85.7%) considered for tenure were promoted. *Id.* The only man in this group who was considered for but denied tenure was not considered for early promotion and, unlike Nikolova, received a terminal appointment. *Id.* Nikolova was the only woman in this group not to receive tenure (yet), but she was the only person of the 20 who was considered for early promotion and had at least one fewer year of probationary service. *Id.*

Assuming *arguendo* that there is enough data for the Court to draw conclusions,[6] the disparity observed is insufficient to establish a *prima facie* case of disparate impact—indeed, there effectively *is* no disparity. *Compare* Appx.785, *with Bunch v. Bullard*, 795 F.2d 384, 396 (5th Cir. 1986). And there is no evidence that UT's MID policy has a disparate impact on women or pregnant women. As such, Nikolova

---

[6] Expanding the dataset does nothing to advance a gender discrimination claim. In the years between 2009 and 2018, UT granted tenure to 18 of 21 women (85.7%) and 56 of 66 men (84.8%) at the Cockrell School of Engineering. Appx.0774; Dkt. 31-1, 6-7. Adding 2018-19, including Nikolova, UT granted tenure to 22 of 26 women (84.6%) and 66 of 76 men (86.8%). *Id.*

cannot meet her *prima facie* burden to demonstrate that either policy caused UT not to grant tenure to female faculty because of their gender or pregnancy status. *See Watson*, 487 U.S. at 995.

UT's Policy of Reviewing Student Evaluations in Tenure Decisions

Nikolova cannot demonstrate that UT's practice of including student evaluation scores as part of its assessment of faculty teaching causes a disparate impact in the number of female faculty who are given tenure. Teaching is only one of five areas of contribution assessed in the tenure decision. *See* Appx.011. And student evaluation scores are only one part of UT's consideration of teaching—UT also looks at peer teaching evaluations, a committee evaluation, and the candidate's own teaching statement. There is simply no evidence that this sub-factor has caused a statistically significant disparity in the number of women (or pregnant women) to obtain tenure at UT. And UT takes measures to control for the risk of student bias, including in the context of pregnancy. Nikolova cannot meet her *prima facie* burden to show that UT's consideration of student evaluation scores caused UT not to grant tenure to female faculty because of their gender or pregnancy status. *See Watson*, 487 U.S. at 995.

**b. UT's policies are both related to the position and consistent with business necessity.**

If the plaintiff establishes a prima facie case of disparate impact, the burden shifts to the defendant to "demonstrate that the challenged practice is job related for the position in question and consistent with business necessity." 42 U.S.C. § 2000e-2(k)(1)(A)(i). Here, to the extent Nikolova can meet her *prima facie* burden, she will be unable to create a triable issue of fact on whether the policies she challenges are related to the position of tenured faculty and consistent with business necessity.

UT's MID and Probationary Extension Policy

The purpose of the probationary extension policy is "to recognize that faculty have family responsibilities, generally related to a child, either birth or adoption of a child, whether they're male or female, and that it was in the long-term benefit of the faculty member and of the University to recognize that in assessing their performance in the probationary period by extending . . . the period." Appx.373. The ability to take a probationary extension is "generally viewed as a benefit to the faculty, highly

supported by the faculty" and is "not a requirement." *Id.* Nikolova herself acknowledged that probationary extensions can be useful because an extension gives faculty an additional year to complete the work expected for a grant of tenure. Appx.487-88, 490. Nikolova likewise acknowledged the value of UT's MID policy to faculty, stating that its use by faculty of both genders is "very critical." Appx.505.

Nikolova argues that because women and men experience pregnancy differently and that men are less likely to be the primary caregiver of the child, UT's policies should treat men and women differently. Appx. 504-06, 770-71. In her view, UT should offer women two semesters of MID while allowing men to take only one semester. *See id.* But to adopt this approach would be to "focus on differential treatment between the two sexes as groups," and Title VII "focus[es] on individuals rather than groups." *Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1731, 1741 (2020). Almost fifty years ago, the Supreme Court held that an employer cannot force female employees to make larger contributions to their pension fund even if "on the average, [female employees] will live a few year longer than . . . male employees." *City of Los Angeles, Dep't of Water & Power v. Manhart*, 435 U.S. 702, 705, 710-11 (1978). Likewise, UT cannot adopt MID or probationary extension policies that treat men and women differently even if the data showed that women are less productive during their use—and Nikolova has presented no such data.

UT's Policy of Reviewing Student Evaluations in Tenure Decisions

UT's use of student scoring of faculty teaching as part of the holistic review during the tenure process is consistent with business necessity. But UT is not blind to the potential biases involved in student scoring. *See* Appx.716. As Julien explained:

> The scores should be placed in context because there's a lot of different reasons why they are not perfect measures of teaching performance and outcomes, learning outcomes, and all kinds of different things, not just gender. Gender is one piece. Race is a piece. Difficulty of course is a piece. Whether or not the course is required is a piece. These all play into under scoring or over scoring an instructor for a particular course.

Appx.439. But just because student evaluations of teaching are "not the be-all, end-all evaluation of teaching" does not mean they have no value. *See id.* When analyzing course instructor surveys, UT looks

at many metrics, including averages for all courses, averages for graduate versus undergraduate students, comparisons across required courses, and course size, and all of these provide useful information of teaching performance. Appx.459. UT also "look[s] at the trend of the teaching evaluations in individual classes" for an individual instructor. Appx.716. Some initial disorganization is expected, but over time "you'd [expect to] see an upward trend in the teaching evaluations." *Id.* If a faculty member has circumstances in their personal life that might affect their teaching—including a difficult pregnancy or young child—the faculty member can include such information in their teaching statement. *Id.* For example, Wood described a situation where an assistant professor had a baby who "wasn't sleeping well" and it affected her teaching in an 8 a.m. class, so she put that in her teaching statement to give context to that semester's teaching evaluations. *Id.*.

Even assuming Nikolova met the *prima facie* burden for her disparate impact claim, she has not shown a triable issue of fact to negate UT's evidence that the challenged policies are job-related for a tenured faculty position and consistent with business needs. "[The] selection criteria [used by a university to award tenure], however difficult to apply and however much disagreement they generate in particular cases, are job related." *Zahorik v. Cornell Univ.*, 729 F.2d 85, 96 (2d Cir. 1984). "Accomplishments and skills in scholarship and teaching are obviously relevant to employment in tenured professorships." *Id.* "It would be a most radical interpretation of Title VII for a court to enjoin use of an historically settled process and plainly relevant criteria largely because they lead to decisions which are difficult for a court to review." *Id.*

## 2. Disparate Treatment

"Title VII discrimination can be established through either direct or circumstantial evidence." *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003). Where, as here, the plaintiff lacks direct evidence, courts employ the *McDonnell Douglas* framework when considering an employer's summary judgment motion. *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). "*McDonnell Douglas* and subsequent decisions have established an allocation of the burden of production and an order for the

presentation of proof" whereby a "plaintiff must [first] establish a prima facie case of discrimination." *Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133, 142 (2000) (internal quotations omitted). If the plaintiff meets her prima facie burden, "[t]he burden shift[s] to [the defendant] to produce evidence that the plaintiff was rejected . . . for a legitimate, nondiscriminatory reason." *Id.* "[O]nce the employer produces sufficient evidence to support a nondiscriminatory explanation for its decision," the burden shifts back to the plaintiff. *Id.* at 143. The plaintiff must identify evidence that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Id.*

Without conceding that Nikolova meets the *prima facie* elements, UT recognizes that the burden of establishing a prima facie case of disparate treatment is "not onerous," *see Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981), and thus provides its legitimate, non-discriminatory reasons. As summarized in the section entitled "The President's Decision," Fenves had two primary concerns with Nikolova's proposed early tenure: (1) her research funding, and (2) her publications record. *See* Appx.394, 401-04. "With the facts presented, the timing of this particular case, it wasn't ready for [either] a promotion decision or a terminal-appointment decision." Appx.400. Thus, Fenves decided not to promote Nikolova *at that time*, and "without prejudice," allowing for another review before her up-or-out-year. *Id.*; Appx.379.

Because UT has carried its burden of production, Nikolova must now demonstrate that the proffered reason was pretextual, "either directly by persuading that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *See Tex. Dep't of Cmty. Affairs*, 450 U.S. at 256. Ultimately, "[t]he question is not whether an employer made an erroneous decision; it is whether the decision was made with discriminatory motive." *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1091 (5th Cir. 1995). Here, Nikolova lacks evidence that Fenves's decision not to award her early tenure in AY 2018-19 was based on her gender or pregnancies, as opposed to legitimate concerns about her funding and publications.

## B.  Retaliation Claims

Under the "Title VII retaliation framework, the initial burden rests with the employee to produce evidence: (1) that [s]he participated in an activity protected by Title VII, (2) that [her] employer took an adverse employment action against [her], and (3) that there is a causal connection between the adverse employment action and the protected activity." *Alkhawaldeh v. Dow Chem. Co.*, 851 F.3d 425, 426-27 (5th Cir. 2017). If the plaintiff meets this burden, the defendant must articulate a legitimate, non-retaliatory reason for the adverse employment action(s). *Id.* Finally, the burden "shifts back to the employee to demonstrate that the employer's reason is actually a pretext for retaliation, which the employee accomplishes by showing that the adverse action would not have occurred 'but for' the employer's retaliatory motive." *Feist v. La., Dep't of Justice*, 730 F.3d 450, 454 (5th Cir. 2013). "The 'but for' standard represents a 'high burden.'" *Alkhawaldeh*, 851 F.3d at 430. Here, Nikolova alleges that "after [she] opposed UT Austin's discriminatory practices internally and filed a charge of discrimination and this lawsuit, UT Austin began retaliating" in three ways: in her teaching assessment, in her annual faculty evaluation, and in her assignment to supervise a senior design class, which was promptly rescinded at her request. *See* Dkt. 21, ¶¶ 74-84. None of these claims should survive summary judgment.

### 1.  Teaching Assessment

Nikolova's contention that she received an "unflattering teaching evaluation" is not actionable because receiving a "lower-than-expected job performance review" is not an adverse employment action, even in the context of retaliation. Dkt. 21, ¶ 82; *Mitchell v. Snow*, 326 F. App'x 852, 856 (5th Cir. 2009). In the context of retaliation, an adverse employment action is one that "a reasonable employee would have found . . . [to be] materially adverse, which in this context means it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 68 (2006). "Title VII's anti-retaliation provisions do not protect employees from petty slights, minor annoyances, and simple lack of good manners." *Welsh v. Fort Bend Indep. Sch. Dist.*, 941 F.3d 818, 827 (5th Cir. 2019) (internal quotations omitted).

Here, even assuming the evaluation was "unflattering," a single teaching evaluation, "intended

to be part of an on-going constructive dialogue about teaching with faculty colleagues" (Appx.192) is not materially adverse. *See Mitchell*, 326 F. App'x at 856 ("The district court's finding—that an employment review lower than Mitchell expected would not have dissuaded a reasonable employee from asserting discrimination—is correct."); *Jackson v. Honeywell Int'l, Inc.*, 601 F. App'x 280, 286 (5th Cir. 2015) (noting that "unfavorable performance reviews are not adverse employment actions where colorable grounds exist for disciplinary action or where the employee continues to engage in protected activity"); *Brooks v. Houston Indep. Sch. Dist.*, 86 F. Supp.3d 577, 586 (S.D. Tex. 2015) (noting, in the retaliation context, that "[w]ritten reprimands or warnings . . . generally are not adverse employment actions"). While Nikolova complains that her evaluation included "ideas and practices for effective teaching," Evans found them "[v]ery interesting and informative"—hardly an adverse reaction. *See* Appx.201-02.

Moreover, Nikolova cannot meet the third *prima facie* element because she lacks evidence that her protected activity resulted in an "unflattering teaching evaluation." Dkt. 20, ¶ 82. As the Associate Dean for Diversity, Equity, and Inclusion, Julien testified that promoting women in computing and broadening women's participation is "a passion of [hers]" for which she is "known within [the ECE] department." Appx.429; *see also* Appx.426, 428, 432. "Mere knowledge [of a protected activity] is not sufficient alone to establish a prima facie case for retaliation." *See Standley v. Rogers*, 202 F. Supp. 3d 655, 670 (W.D. Tex. 2016). Likewise, Nikolova's subjective belief that Julien's peer teaching evaluation was motivated by Nikolova's complaints about discrimination cannot create a material fact dispute. *See id.* at 666-67. For these reasons, Nikolova's retaliatory teaching assessment claim should be dismissed.

Even if Nikolova were able to meet the *prima facie* elements, Julien's observations of Nikolova's class themselves reflect her legitimate, non-retaliatory reasons for the assessment. The review includes suggestions for improvement such as "limiting the time . . . of a conference presentation" and consider engaging "non-lecture based formats." Appx.197. There is no evidence that these observations are anything other than a bona fide assessment. And Nikolova cannot demonstrate an issue of material fact regarding whether, but for her complaint, Julien would have omitted her constructive comments. *See*

*Alkhawaldeh*, 851 F.3d at 430. Temporal proximity is insufficient to establish a causation fact issue at the pretext stage. *Garcia v. Prof'l Contract Servs., Inc.*, 938 F.3d 236, 243 (5th Cir. 2019). And there is no evidence that Julien's assessments are a cover-up for intent to retaliate.

### 2. Annual faculty evaluation

Nikolova also complains that she received a faculty evaluation of "Meets Expectations." But a "meets expectations" review is not an adverse employment action because, at most, it amounts to the type of "minor annoyance" that is insufficient to dissuade a reasonable person from engaging in a protected activity. *See Welsh*, 941 F.3d at 827; *Mitchell*, 326 F. App'x at 854-55. Tewfik testified that these annual ratings are "typically not given a lot of weight." Appx.649. Nikolova also cannot meet her *prima facie* burden to demonstrate causation. The faculty members who gave Nikolova a rating of "Meets Expectations" were Caramanis and Orshanksy. Appx.240-41. Julien's role was to "look[] over and kind of check[] what the two deep divers did"—"in this particular case that was Constantine [Caramanis] and Michael [Orshanksy]." Appx.426. Nikolova cannot demonstrate that her participation in a protected activity had a causal relationship with her annual faculty evaluation.

The committee's annual assessment is legitimate and non-retaliatory because it is an honest reflection of Nikolova's performance in AY 2018-19. Caramanis and Orshansky wrote the following:

- "Nikolova was on [MID] in Fall 2018; this review is for Spring 2019 activity only."
- "Nikolova has a reasonable publication and teaching record."
- "She maintains a modestly funded research group."
- "During this period, her service to the department was relatively low, but this is also reasonable, given the semester of leave."

Appx.780. Nikolova cannot demonstrate a triable issue of fact in the context of pretext. There is simply not enough evidence for a reasonable jury to conclude that the committee would have rated her performance as "Excellent" but for her complaints of discrimination.

### 3. Senior Design Incident

The incident in which Tewfik initially asked Nikolova to continue supervising a senior design team before quickly withdrawing the request is insufficient as a matter of law to constitute an adverse

employment action. Less than 72 hours transpired between Tewfik's email instructing Nikolova to supervise her senior design team while on MID and the email relieving her of that responsibility. *Compare* Appx.215, *with* Appx.217. As such, it amounts to the type of "minor annoyance" or "trivial harm" that is not actionable under Title VII even in the context of retaliation. *See Welsh*, 941 F.3d at 827; *Burlington Northern & Santa Fe Railway Co.*, 548 U.S. at 68. Moreover, Nikolova cannot demonstrate a material fact dispute regarding whether Tewfik's supervision request was causally connected to her participation in a protected activity because Tewfik advised that both Nikolova and another faculty member on MID would be required to supervise a senior design team. Appx.214-15.

Moreover, UT had legitimate and non-retaliatory reasons to ask Nikolova to continue supervising a senior design team: such supervision is a normal job expectation, and there were concerns that reassigning another faculty member could be "disruptive to the group." *See Alkhawaldeh*, 851 F.3d at 426-27.; *See* Appx.217, 486. Finally, there is no evidence that, but for Nikolova's complaints of discrimination, UT would not have asked her to supervise a senior design team. The undisputed evidence shows that (1) supervising a senior design team was a standard expectation for research-active faculty members in the ECE department (Appx.486); (2) Nikolova and another professor on MID were both asked to supervise a senior design team in September 2019 (Appx.214-15); (3) UT had concerns that withdrawing her from the design team's supervision might be "disruptive to the group" (Appx.219); and (4) when Nikolova raised concerns based on her personal situation, UT reconsidered (*id.*). She cannot meet her burden on pretext.

<u>CONCLUSION</u>

The Court should grant summary judgment in UT's favor on Nikolova's disparate-treatment, disparate-impact, and retaliation claims under Title VII.

Respectfully submitted,

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**GRANT DORFMAN**
Deputy First Assistant Attorney General

**SHAWN COWLES**
Deputy Attorney General for Civil Litigation

**THOMAS A. ALBRIGHT**
Chief for General Litigation Division

*/s/ Benjamin L. Dower*
**BENJAMIN L. DOWER**
Deputy Chief for General Litigation Division
Texas State Bar No. 24082931
benjamin.dower@oag.texas.gov

**AMY S. HILTON**
Assistant Attorney General
Texas State Bar No. 24097834
amy.hilton@oag.texas.gov

Office of the Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2120 / Fax (512) 320-0667

**COUNSEL FOR UT AUSTIN**

## CERTIFICATE OF SERVICE

I hereby certify that on September 29, 2021, a true and correct copy of the foregoing

document was served via the Court's ECF system to all counsel of record.

*/s/ Benjamin L. Dower*
**BENJAMIN L. DOWER**
Assistant Attorney General