IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| EVDOKIA NIKOLOVA, | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Civil Action No.: 1:19-CV-00877 |
| | § | |
| UNIVERSITY OF TEXAS AT AUSTIN, | § | |
| *Defendant.* | § | |

## APPENDIX TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT PART II OF II

| DESCRIPTION | APPX. |
|---|---|
| Nikolova's Tenure Dossier (Depo. Ex. 39) | 0243–0368 |
| Deposition Transcripts: | |
| Greg Fenves Deposition Transcript | 0369–0423 |
| Christine Julien Deposition Transcript | 0424–0471 |
| Jerry Speitel Deposition Transcript | 0472–0531 |
| Evdokia Nikolova Deposition Transcript | 0532–0565 |
| Carmen Shockley Deposition Transcript | 0566–0587 |
| Ahmed Tewfik Deposition Transcript | 0588–0658 |
| Shane Thompson Deposition Transcript | 0659–0672 |
| Sharon Wood Deposition Transcript | 0673–0767 |
| Additional Evidence: | |
| Plaintiff's Response to Defendant's Interrogatory Request No. 4 | 0768–0773 |
| Probationary, Tenure Data.xlsx placeholder page; file submitted on flash drive | 0774 |
| 2019–20 ECE Faculty Annual Performance Rankings | 0775–0784 |
| Excerpt from Probationary, Tenure Data.xlsx (Appx.0774) | 0785 |

THE UNIVERSITY OF TEXAS AT AUSTIN

**RECOMMENDATION FOR CHANGE IN ACADEMIC RANK/STATUS**

Name:___Nikolova, Evdokia____ EID:___en4762___ Present Rank:__Assistant Professor___

Years of Academic Service *(Include AY 2018-19 in each count)*:

At UT Austin since:_1/1/2014__(month/day/year) Total Years at UT Austin:__5.5___

In Present Rank since:_1/1/2014_(month/day/year) Total Years in Present Rank:__5.5___

*Tenure-track only:*
Number of Years in Probationary Status:__4_

Additional information:___Accelerated; Probationary Extension 2015-16___

Primary Department:_Electrical and Computer Engineering___

College/School:_Engineering, Cockrell School of_

Joint Department:_N/A__

College/School:_N/A__

Other Department(s):_N/A__

---

Recommendation actions[1]:

    By Budget Council/Executive Committee:___Promote_____

    Vote[2] for promotion_32;  Against_1; Abstain_2; Absent_0__; Ineligible to vote_2

    By Department Chair:___Promote_____

    By College/School Advisory Committee:___Promote_____

    Vote[2] for promotion_7_;  Against_0_; Abstain_0_; Absent_0_; Ineligible to vote_0_

    By Dean:__Do Not Promote_____

---

Administrative Action:_____**Promotion Denied**_____

Date Action Effective:_September 1, 2019_____
(To be submitted to the Board of Regents as part of the annual budget.)

By:_____ Date:___February 15, 2019____
              For the President

---

[1]See "Chart of Recommended Actions" for eligible recommended actions applicable to specific conditions and administrative levels.
[2]Record all votes for and against promotion, abstentions by eligible voting members, and the number of absent eligible voting members. The number of committee members ineligible to vote should also be recorded. Enter zero where it would otherwise be blank.

EVPP/4.15

**Exhibit
Gregory Fenves**

**39**

05/27/2021 DC

Appx.0243

UT Austin_0016304



The University of Texas at Austin
**Cockrell School of Engineering**

**Dean's Assessment**
**Evdokia V. Nikolova**
Department of Electrical and Computer Engineering
Cockrell School of Engineering

Dr. Evdokia Nikolova received her BA in applied mathematics with economics from Harvard University in 2002, an MS in computer science from Harvard in 2002, an MS in mathematics from Cambridge University in 2003, and a PhD in electrical engineering and computer science from the Massachusetts Institute of Technology in 2009. She was a post-doc at MIT for two years before joining the faculty in the Department of Computer Science and Engineering at Texas A&M University in September 2011.

In January 2014, she joined the faculty in the Department of Electrical and Computer Engineering (ECE) at UT Austin as an assistant professor. If promoted to associate professor in September 2019, she will have accumulated four years of probationary service at UT Austin. However, Dr. Nikolova will have served a total of eight years in rank as an assistant professor (2.5 years at Texas A&M and 5.5 years at UT Austin). The budget council in the Department of Electrical and Computer Engineering felt that her total time in rank was sufficient to warrant consideration for promotion this year. The Cockrell School's promotion and tenure committee agreed with this assessment.

| 2011-12 | Texas A&M | |
|---------|-----------|-----------|
| 2012-13 | Texas A&M | |
| 2013-14 | Texas A&M | UT Austin |
| 2014-15 | UT Austin | |
| 2015-16 | Simons Institute (UC Berkeley) | Modified Instructional Duties |
| 2016-17 | UT Austin | |
| 2017-18 | UT Austin | |

Dr. Nikolova's research is at the intersection of operations research, theoretical computer science, and computer engineering. Her recent work has led to refinement of network routing algorithms to include uncertainty and risk aversion, with application to transportation networks and smart grids. Her work is directly related to one of the Cockrell School's crosscutting themes: modeling and simulation of complex systems and networks.

Nine external letters were submitted as part of the promotion dossier, with five letter writers selected by the budget council. All letter writers are current or former faculty members at peer universities in the US. One reviewer is a member of the National Academy of Engineering (NAE). One additional letter was requested, but the individual did not respond.

<u>Teaching</u>
While in rank, Dr. Nikolova taught one core undergraduate course and two graduate electives. During her first three semesters teaching, Dr. Nikolova's instructor ratings were 4.1 and 4.3 at the graduate level and 4.0 at the undergraduate level. These are quite strong for a new assistant professor, and indicated that she has the ability to engage her students in the classroom.

CONFIDENTIAL

Dr. Nikolova did not teach during the 2015-16 academic year,[1] and since then her instructor ratings have fallen.  In her three most recent courses, her instructor ratings have ranged from 3.7 to 3.9.[2] Dr. Nikolova attributed her reduced scores to the quality of her teaching assistants.  Of particular note, Dr. Nikolova indicated that the teaching assistants are responsible for "creating and grading the homework and programming assignments."  Dr. Nikolova's statement contradicts the philosophy within the Cockrell School that the faculty member is responsible for all aspects of the course, and critical aspects, such as developing assignments, should not be delegated to teaching assistants.

In their comments, the students did complain about grading of the programming assignments, but they also provided extensive comments about how the classes could be improved.  One undergraduate student even provided a comprehensive recommendation for revising the syllabus for EE 360C.  Dr. Nikolova did not address these comments in her teaching statement.

Research

Key metrics documenting Dr. Nikolova's publication and external funding record are summarized below:

- 12 peer-reviewed proceedings at conferences in rank at UT (6 in rank at Texas A&M, 30 total).[3]  She published 10 conference papers with her students/post-docs at UT.
- 3 archival journal publications in rank at UT (4 total).  She published one journal paper with her post-docs at UT.
- She has published papers in highly selective conferences related to algorithmic game theory and artificial intelligence, including ACM Conference on Economics and Computation (ACM EC) and International Joint Conference on Artificial Intelligence (IJCAI).
- She also published in high impact journals related to operations research, most notably *Operations Research* (IF=2.26).
- An h-index of 17 (Google Scholar) and 994 citations.[4]

While in rank at UT Austin, Dr. Nikolova secured two research grants totaling $1.2 million in external funding (her share is $0.9 million) from the National Science Foundation (NSF).  As an assistant professor at Texas A&M, Dr. Nikolova secured three research grants ($1.4 million total, $0.7 million her share) from NSF and industry.

Dr. Nikolova is the sole PI on two grants from NSF and a Faculty Research Award from Google.  Both of the other two awards from NSF include multiple investigators.  Dr. Nikolova is the PI on one, and co-PI on the other.  One of her current awards from NSF extends beyond the end of the 2018-19 academic year.

---

[1] She participated in the Economics and Computation workshop at the Simons Institute for the Theory of Computing at UC Berkeley during the 2015 fall semester, and was scheduled to teach two classes in the 2016 spring semester.  However, she became pregnant during the 2015 fall semester and was assigned modified instructional duties during the 2016 spring semester.

[2] 16.5% of the instructor ratings for T/TT faculty in the Cockrell School are 3.7 or below.

[3] Refereed conference papers in highly selective conferences are the primary mechanism for disseminating research results in the field of computer science.

[4] Dr. Nikolova's most highly cited paper has 132 citations and is based on work completed during her graduate studies at MIT.  Her most highly cited paper based on work conducted at UT Austin has 42 citations.

CONFIDENTIAL

UT Austin_0016306

While Dr. Nikolova's external funding has come from highly competitive sources, approximately 70% of her funding was awarded during her first three years in rank.  Only one grant has been awarded in the past four academic years.  This raises questions about the sustainability of her research funding.

The letters from the external reviewers were uniformly positive and addressed technical quality of Dr. Nikolova's work, which is described as being rigorous and mathematically sound.  Several referred to her leadership role in organizing the Real-Time Decision Making workshop at the Simons Institute for the Theory of Computing at UC Berkeley during the 2018 spring semester.

<u>Advising and Student Mentoring</u>
Dr. Nikolova graduated one PhD in rank at UT Austin[5] and she mentored one postdoctoral fellow. She is currently advising six PhD students (two are co-supervised) and one postdoctoral fellow.

<u>University Service</u>
Dr. Nikolova's service to the university has primarily been related to faculty recruiting and graduate student recruiting.

<u>Professional Service</u>
Dr. Nikolova was one of five organizers for the semester-long workshop on real-time decision making at the Simons Institute for the Theory of Computing at UC Berkeley during the 2018 spring semester.[6]  She also was the lead organizer for a week-long program, "Mathematical and Computational Challenges in Real-Time Decision Making," which was part of the workshop.

Dr. Nikolova has also served on thirteen technical program committees for conferences in algorithmic game theory, theoretical computer science, and artificial intelligence.

<u>Other Evidence of Merit or Recognition</u>
Dr. Nikolova received a CAREER award from the National Science Foundation in 2014 and a Faculty Research Award from Google in 2013.[7]  She and a graduate student were recognized with a best paper award at the IEEE International Conference on Acoustics, Speech and Signal Processing in 2018.

<u>Overall Assessment</u>
Dr. Nikolova has a strong publication record, she has received two prestigious awards, and she is actively engaged with the Simons Institute for the Theory of Computing at UC Berkeley.[8]  However, her teaching record is modest and the budget council expressed concerns about her relatively weak engagement in the department.

As noted previously, the Promotion and Tenure committee strongly supported Dr. Nikolova's case. They noted the uniform support for her innovative research, and felt that her teaching was a minor concern.

---

[5] She did not graduate any PhD or MS students at Texas A&M.
[6] The other four organizers were tenured faculty members at Caltech, Stanford, and UC Berkeley.
[7] Approximately 15% of the proposals are funded by Google.
[8] As noted on their website, "The Simons Institute for the Theory of Computing is the world's leading venue for collaborative research in theoretical computer science."

3

CONFIDENTIAL

UT Austin_0016307

If this were an up-or-out case, I would likely agree with the recommendation of the Promotion and Tenure committee.  However, Dr. Nikolova is being considered for promotion at UT Austin two years early.  I do not believe that she has taken responsibility for improving her teaching, and I have concerns about the sustainability of her research program.  These concerns are compounded by the fact that both her teaching and her external funding have dropped since she spent the 2015 fall semester at UC Berkeley.

As such, I do not believe that Dr. Nikolova's performance meets expectations for early promotion to associate professor.

_____
Sharon L. Wood, Dean
20 November 2018

Appx.0247

CONFIDENTIAL                                                                                       UT Austin_0016308



**ELECTRICAL AND COMPUTER ENGINEERING DEPARTMENT**
Cockrell School of Engineering

*2501 Speedway · EER Building · Austin, Texas 78712-0240   (512) 471-6179   Fax (512) 471-3652*
*http://www.ece.utexas.edu*

October 29, 2018

**Chair's letter in support of the promotion of Prof. Evdokia Nikolova to the rank of associate professor with tenure**

Prof. Nikolova joined the Department of Electrical and Computer Engineering in January 2014. If promoted to associate professor in September of 2019, she will have served as an assistant professor at the University of Texas at Austin for five years. This is therefore technically an early promotion case—particularly because she has received an extension of her probationary period. However, she began her academic career at Texas A&M University as an assistant professor in August 2011. Her case would not be early if these two years of service are considered. I also note that when we recruited her, Evdokia requested to be considered for promotion at UT around the time that she would have been eligible for promotion at Texas A&M University. She has also asked to be considered for promotion in the last couple of years and may be seeking opportunities outside UT.

Evdokia is an emerging pioneer studying optimization and game theory applications that involve the human element and risk aversion. The Budget Council recognized her strong accomplishments and potential and determined that she meets all expectations for promotion at the premier departments of Electrical and Computer Engineering in the nation by a vote of 32 YES, 1 NO, 2 ABSTAIN and 2 INELIGIBLE TO VOTE. The ineligible votes are Prof. Mark Smith's and mine. Our associate professors voted 10 YES, 0 NO and 0 ABSTAIN in support of promotion. My colleagues expressed support for Evdokia during the promotion discussion and in the anonymous comments submitted with the vote. A couple of professors raised concerns about her relatively weak engagement in the department and the wireless communications and networking center (WNCG) to which she belongs. I attribute the negative vote and abstentions to these concerns.

**Third Year Review**

Prof. Nikolova's third year review was conducted last year (2017-2018 academic year) because of the extensions to her probationary period. The committee that conducted the review said that she has "a solid research program in game theory, distributed optimization, and algorithms. She has achieved notable success in funding and has the expected productivity in terms of papers and students. Her teaching is valuable to the department and well-rated at both the undergraduate and graduate levels. Her service record is appropriate for an Assistant Professor. For her promotion case to be as strong as possible, it would be good to graduate a PhD student and slightly increase her publication output. Post-tenure, it would be good for her to become more actively involved in leadership activities internally and externally."

Given that the third-year evaluation was so close to the submission of her promotion case, it's unrealistic to expect that Evdokia would have addressed some of the suggestions in the third-year review by this time. However, I do note that one of Evdokia's graduate students did successfully

CONFIDENTIAL

defend his PhD thesis in the spring of 2018 and graduated last month. Three of her conference papers in selective conferences were also accepted for publication after the review.

**Teaching Load of Assistant Professors**

The normal teaching load for a tenure-track assistant professor is two courses per academic year plus supervision of a senior design team for two semesters. One of the courses must be an undergraduate course. This requirement is waived only under exceptional circumstances if the department has unmet needs at the graduate level. Faculty in the department are routinely given modified instructional duties upon the birth of a child.

Evdokia was given an unbalanced teaching load in the academic year 2015-2016 to attend the workshop on Economics and Computation at the Simons Institute for the Theory of Computing at UC Berkeley in the fall of 2015. The workshop raised her visibility in the research community and helped her broaden her research portfolio. The workshop also provided her with the experience needed to organize a follow-up workshop on real-time decision-making at the same institute in the spring semester of 2018. Several reference letter writers refer to one or both workshops in their letters. Evdokia became pregnant during the fall of 2015 and was given modified instructional duties in the spring semester of 2016. She therefore didn't teach during the academic year 2015 – 2016.

**Teaching**

Evdokia's instructor course evaluation scores don't paint a complete picture of her passion for teaching. Her scores in EE360C: algorithms, an upper division course that roughly 60% of our undergraduate students take, range from a low of 3.7 to a high of 4.0. While these scores are below the median ratings for assistant professors in general, they are in line with the average instructor scores for this course, clearly indicating a need to continue to improve delivery of the material in the course. Evdokia uses a combination of PowerPoint presentations and whiteboard to present topics in the class. She also alternates between presenting theoretical material and problem solving. Students praise her for being a "good teacher," "easily reachable," and "enthusiastic." Yet other students wished that "she had more office hours" and complained about the lectures not being exciting, ineffective teaching assistants and her whiteboard writing.

It's important to note that Evdokia made some transformative changes to the delivery of EE360C that have had a positive effect on the students that she has taught and those who have had the course from other instructors as these instructors adopted Evdokia's innovations. For example, Evdokia pioneered the use of team teaching in this course, a technique that is used in several of our courses and in which all sections of a given course are delivered in synchrony with the same problem sets and exams. Together with our colleague David Soloveichik, she introduced optional recitation sections that help the students master the material. Furthermore, she introduced the concept of "Lunch with the professors" to break the barrier between students and instructors.

Her graduate courses instructor scores also range from a low of 3.9 to a high of 4.1, again below the median ratings for assistant professors in graduate courses. She earned these scores in two graduate courses that she introduced, which were much needed across all of UT. One of these courses is an advanced algorithm course that covers approximation algorithms. The second course is a game theory course. It's noteworthy that Evdokia made a concerted effort to integrate real-world applications into these two courses that cover extensive abstract topics. It's also interesting to note that student comments in the two courses are somewhat similar to the comments that she has received in EE360C, with many students praising her energy level and

CONFIDENTIAL

UT Austin_0016310

enthusiasm and others complaining about boring classes and solutions to homework not being provided in a timely manner.

I also note that Evdokia has lectured in our Edison lecture series and camp Texas.  The Edison Lecture Series is a program for middle and high school students funded by the department that showcases potential careers in electrical and computer engineering. Through interactive lectures, students learn how electrical and computer engineers make a difference in the world. Since we established this program in 2005, we have reached over 26,000 young people.

As mentioned earlier, Evdokia graduated one PhD student in rank. She has also supervised one post-doctoral researcher while in rank. That researcher is now a lecturer at the National Technical University of Athens.

## Research

Evdokia's research is unique in that it incorporates human risk aversion into complex optimization problems with deep societal and policy-making impacts. This is an emerging area of research in operations research, electrical and computer engineering and computer science that is gaining importance as more sensors are embedded in infrastructures, mobile devices, humans and means of transportation. Evdokia's research provides alternatives to the solutions provided, for example, by Google maps, Apple maps or Waze to the problem of finding the best path between one's home and the airport. Her solutions take into account the risk tolerance or aversion of the user. For example, her algorithms can provide a suggested route that will guarantee that the user arrives at her destination at a given time as opposed to the solution provided by Google maps which may involve an expected shorter travel time but with a high degree of variability that in a worst-case may lead to the user missing her flight.

Evdokia's work stands out because, unlike most research in optimization and game theory that focuses on computational efficiency issues, she studies how to incorporate risk in deriving the optimal solutions to a given problem, and the impact of risk and incentives on the answer to a given policy question, and on algorithms and their performance.

Evdokia is perhaps best known for her pioneering works on finding shortest paths under uncertainty and with random model parameters and on characterizing the loss of performance in a route network when risk affects the decision-making of individual users of the network. Prof. Goel (Stanford) notes that the work had "the largest influence on" his "own thinking." The work showed how to correctly incorporate risk into an analysis of the algorithms, and in particular incentives. Most importantly, it also quantified the effect of risk on the performance of any network in which individual users independently select their routes in the presence of risk. The work achieved considerable visibility as measured by citation standards in the subarea. Prof. Shmoys (Cornell) states that the work "is technically non-trivial and provides clear insights into the trade-offs exposed by this elegant framing of the question." He also notes that "the modeling aspects and mathematical structure results combined to provide clear insights into a central problem in routing control, and with the rise of at least traffic routing, the importance of these results is ever-increasing."

Her more recent work on setting tolls on road segments has also attracted considerable attention despite its young age. Specifically, Evdokia studied the problem of having multiple independent operators set tolls on the segments they own to maximize their profit. Users select their routes to minimize travel time and costs. Travel times, of course, depend on segment congestion, i.e., utilization by other users. She then proceeds to identify an optimal solution in which no toll operator can gain from changing the toll on a segment it owns given that users try to minimize travel time and cost. The work led to a surprising conclusion: imposing an upper bound on how

CONFIDENTIAL

much a toll operator can charge on a given link leads to an optimal traffic assignment such that any change in the toll on any given segment will lead to a higher travel time plus cost for at least one user. In fact, with no caps on tolls, the route network will inevitably be utilized in a sub-optimal manner. The work appears to be the first to study this problem in its full generality. Prof. Yannakakis (Columbia) describes the work as "very nice." Prof. Schultz (TU München) notes that the work "shows how proper mathematical analysis may influence policy making."

I also note that Evdokia has begun to investigate the efficiency of the electric distribution grid. This line of work is very timely as more customers install solar panels or generate electricity from renewable sources. She has already produced interesting results on the use of incentives to balance supply and demand, the use of electric vehicles to store energy and rebalance the grid and strategies for upgrading distribution networks. Given her track record, experts expect her to have a deep impact on the field as exemplified by the following statement from Prof. Van Hentenryck (Georgia Tech), "her skills may bring some fundamentally new insights that will help shape the future of electricity networks."

Prof. Nikolova is well funded by highly competitive peer-reviewed grants and industry.

Our department has adopted the practice of comparing each colleague with her or his most prominent peers at the first-tier departments in Electrical and Computer Engineering, such as MIT, Stanford, the University of California Berkeley, the University of Illinois Urbana-Champaign (UIUC), Georgia Tech, Caltech and Princeton. I selected Associate Profs. Seth Pettie (U. Michigan), Anup Rao (U. Washington) and Vineet Goyal (Columbia) to be the peer comparison group for Evdokia. Pettie, Rao and Goyal were promoted to the rank of associate professor with tenure in 2012, 2016 and 2017 respectively. Evdokia compares very favorably to all three associate professors at the time of their promotion. Indeed, we estimate the Google h-indices of all three associate professors at the time of their promotion to be in the 15-16 range. The citation counts for Pettie and Rao at the time of promotion are estimated to be slightly lower than Evdokia's while that of Goyal is substantially lower. All letter writers explicitly mention the high quality of her work. Prof. Van Hentenryck notes that she has "pioneered new concepts and developed their foundations with fundamentally new insights," bridging "different areas of the field." Prof. Jaillet (MIT) summarizes the sentiment of the letter writers when he states that "her record is on par with recently tenured cases that I have been asked to review (at Georgia Tech, USC, MIT and Northwestern.)"

|  | PhD | Promoted | Publications in top venues at promotion | H Index | Citations |
|---|---|---|---|---|---|
| Seth Pettie (Michigan) | 2004 | 2012 | 15 | 24 | 2259 |
| Vineet Goyal (Columbia) | 2008 | 2017 | 14 | 17 | 737 |

CONFIDENTIAL

UT Austin_0016312

| | | | | | |
|---|---|---|---|---|---|
| Anup Rao (MIT) | 2007 | 2016 | 14 | 19 | 1490 |
| Evdokia Nikolova (UT Austin) | 2009 | | 16 (in rank) | 17 | 970 |

## Service

Evdokia has provided reasonable service to the department. As noted by some of my colleagues during the BC discussions, her level of involvement in the department has been lower than average. However, this is not a concern as it's mainly due to her personal circumstances at this stage of her life.

## Summary

Evdokia is a good teacher who cares about the students and an accomplished researcher who as noted by Prof. Van Hentenryck "is a remarkable scientist with a strong case for tenure and promotion. She would certainly have received tenure at all the institutions I have been affiliated with [Brown, Michigan, Georgia Tech]." I strongly endorse her promotion to associate professor with tenure.

Sincerely,

Prof. Ahmed H. Tewfik
Cockrell Family Regents Chair in Engineering
Chairman, Department of Electrical and Computer Engineering

CONFIDENTIAL

UT Austin_0016313

UT CONFIDENTIAL

# Third-Year Review of
# Dr. Evdokia Nikolova
# Assistant Professor of Electrical and Computer Engineering
### May 30, 2018

This third-year review for Prof. Nikolova covers her research, teaching, and service to The University of Texas at Austin during the three academic years from Jan. 2014 to present, inclusive. Prof. Nikolova joined UT Austin as an Assistant Professor of Electrical and Computer Engineering (ECE) in Jan. 2014. Before that, from Aug 2011 – Jan. 2014 she was an Assistant Professor in Computer Science and Engineering at Texas A&M University. Before that she was a postdoc at MIT from 2009-11. Her PhD was from MIT with Prof. David Karger serving as her Advisor.

**Teaching**

Prof. Nikolova has taught the following courses at UT Austin while in rank:

| Semester | Course | # Surveys / Enrollment | Overall Instr. Rating | Overall Course Rating |
|---|---|---|---|---|
| Spr 2014 | EE381V Game Theory | 14/16 (paper) | 4.1 | 4.1 |
| Fall 2014 | EE360C Algorithms | 42/61 (paper) | 4.0 | 3.7 |
| Spr 2015 | EE381V Advanced Algorithms | 19/22 (paper) | 4.3 | 4.1 |
| Fall 2016 | EE360C Algorithms | 38/82 (paper) | 3.9 | 3.4 |
| Spr 2017 | EE381V Advanced Algorithms | 16/26 (paper) | 3.9 | 3.5 |

Prof. Nikolova has introduced two new graduate courses thus far, both with the placeholder number of EE381V. These are a class on Game Theory, and another on Advanced Algorithms. Her 2017 Advanced Algorithms class had a peer review performed by Prof. Caramanis, that found the class to be taught at a high and challenging level, with effective instruction. The enrollment of 26 students is quite strong for an advanced graduate class of this type.

Prof. Nikolova has been teaching EE360C Algorithms at the undergraduate level, which is a required class for many ECE majors. Her ratings are right around 4.0 which is strong for a required undergraduate class.

She has also supervised Senior Design teams each year, including one team that achieved 3rd place in the annual design competition.

**Research**

Two important measures of an ECE professor's research output are (1) quality and impact of peer-reviewed publications, and (2) quality and impact of PhD students graduated.

UT CONFIDENTIAL

CONFIDENTIAL                                                                      UT Austin_0016314

UT CONFIDENTIAL

At UT Austin, since 2014 Prof. Nikolova has published two peer-reviewed journal papers; an additional one is accepted for publication and forthcoming. However, in her research area (algorithms, game theory, etc.), a much bigger emphasis is placed on conference papers; while at UT, she has published ten such conference papers at venues such as ACM EC'15 (33% acceptance rate), IJCAI'16 (24% acceptance rate), AAAI'16 (26% acceptance rage), AAAI'15 (27% acceptance rate) and MobiHoc'18 (17% acceptance rate). Since her PhD in 2009, Prof. Nikolova has three published journal papers[1] and seventeen conference papers. While at UT (Fall 2014-Fall 2017), she has given 23 invited talks and seminars at top universities and research institutes around the world, including 3 keynote talks. Considering her time as an assistant professor at Texas A&M University (Fall 2011-Fall 2017), this total rises to 37 invited talks as an assistant professor.

Once an ECE faculty member has built his/her research group, he/she is expected to graduate about one PhD student each year on average. The table below shows the status of the graduate student pipeline for Prof. Nikolova. She has a full pipeline of PhD-bound students, and appears ready to graduate one or more PhD students per year starting 2018. In addition, she supports one post-doctoral researcher.

| Name | Status | Highest Degree | Years UT | PhD Qual Exam | Co-Advisor (if any) |
|---|---|---|---|---|---|
| Ger Yang | Full-Time | BS | 3 | | |
| Soumya Basu | Full-Time | MS | 3 | | Yes S. Shakkottai |
| Ali Khodabakhsh | Full-Time | MS | 2 | | |
| Eirini Asteri | Full-Time | BS | 1 | | Yes C. Caramanis A. Dimakis |

Research funding enables support of graduate students to conduct research. Prof. Nikolova received the NSF CAREER award in May of 2014. She has also been the PI on two additional NSF awards and the co-PI on yet another. In her time as an assistant professor (since Fall 2011, which includes three years at Texas A&M University), Prof. Nikolova has contributed to the acquisition of $1,526,379 in external research funding; of this her "share" is $1,169,379. This includes three grants from NSF and one from Google Research, all of which are highly competitive.[2]

**Service**

Prof. Nikolova has a solid service record both externally and internally for someone pre-tenure at UT Austin.   Externally, she has served on the program committees for the ACM conference on Economics and Computation as well as the Conference on Artificial Intelligence, amongst several other conferences.  She has been an NSF Panelist 3 times, and helped organize several workshops on real-time decision making and algorithmic game theory.

Within UT, she has co-taught the Edison Lecture on "Computing for Green", as well as serving on several internal committees such as the Junior Faculty Hiring Committee (2015-17), the DICE Admissions Committee (every year), and the Women in Engineering Faculty Committee (2015-17).

UT CONFIDENTIAL

CONFIDENTIAL

UT CONFIDENTIAL

**Summary**

Dr. Nikolova has established a solid research program in game theory, network optimization, and algorithms. She has achieved notable success at funding, and has the expected productivity in terms of papers and students. Her teaching is valuable to the department and well-rated at both the undergraduatge and graduate levels. Her service record is appropriate for an Assistant Professor. Post-tenure, it would be good for her to become more actively involved in leadership activities internally and externally.

[1] Including her forthcoming paper in Mathematics of Operations Research.
[2] This excludes a new NSF award with a 10/1/17 start date.

Signed on behalf of the 2017-8 ECE Department Peer Evaluation Committee:

Prof. Ananth Dodabalapur (Chair)

Committee:

Jeffrey Andrews, Ray Chen, Lizy John, Christine Julien, Dean Neikirk, Michael Orshansky, Surya Santoso

UT CONFIDENTIAL

CONFIDENTIAL

**THE UNIVERSITY OF TEXAS AT AUSTIN**
**Cockrell School of Engineering**
**Standard Resume**

**FULL NAME:**    Evdokia V. Nikolova    **TITLE:**    Assistant Professor

**DEPARTMENT:**  Electrical and Computer Engineering

**EDUCATION:**

| | | | |
|---|---|---|---|
| Massachusetts Institute of Technology | Electrical Engineering and Computer Science | Ph.D. | 2009 |
| Cambridge University | Mathematics | M.S. | 2003 |
| Harvard University | Computer Science | M.S. | 2002 |
| Harvard University | Applied Mathematics with Economics | B.A. | 2002 |

**PROFESSIONAL REGISTRATION, LICENSURES, CERTIFICATIONS:** N/A

**CURRENT AND PREVIOUS ACADEMIC POSITIONS:**

| | | |
|---|---|---|
| University of Texas at Austin | Asst. Professor | 2014-present |
| Texas A&M University | Asst. Professor | 2011-2013 |
| Massachusetts Institute of Technology | Postdoctoral Associate | 2009-2011 |

**OTHER PROFESSIONAL EXPERIENCE:**

| | | |
|---|---|---|
| IBM Research | Visiting Professor | June 2012-Aug 2012 |
| Google Research | Research Intern | July 2007-Aug 2007 |
| Yahoo! Research | Research Intern | May 2006-Aug 2006 |
| Mitsubishi Electric Research Labs | Research Intern | May 2005-Aug 2005 |
| Mitsubishi Electric Research Labs | Research Intern | May 2004-Aug 2004 |
| National Bureau of Economics Research | Research Assistant | Jan 1999-Jan 2001 |

**CONSULTING:** N/A

**HONORS AND AWARDS:**

In rank - UT Austin

- NSF CAREER, 2014

In rank - Texas A&M

- Google Faculty Research Award, 2013.

In previous rank (prior to UT Austin and Texas A&M)

- Doctoral Fellowship in the Mathematical Sciences, American Foundation for Bulgaria (2006-2007)
- Presidential Fellowship, MIT (2003-2004)
- Herchel Smith Harvard Fellowship for 1 year study at Cambridge University, England (2002-2003)
- John Harvard and Elizabeth Cary Agassiz Scholarship, Harvard University (1998-2002)
- Flora Burt Fellowship, Harvard University (for travel in Argentina) (Aug-Sep. 2001)
- Detur Book Prize, Harvard University (1999)

**Appx.0256**

CONFIDENTIAL

UT Austin_0016317

- Third place, Euclid Mathematical Contest, British Columbia, Canada (1997)
- Fifth place nationwide, Bulgarian National Mathematics Olympiad (1996)
- First place, Journal "Matematika" national tournament, Bulgaria (1991)

**MEMBERSHIPS IN PROFESSIONAL AND HONORARY SOCIETIES:**

- Association for Computing Machinery (ACM) Member (2011-present)

**UNIVERSITY COMMITTEE ASSIGNMENTS:**

| | | |
|---|---|---|
| Departmental- | ECE Junior Faculty Hiring Committee | 2016-2017 |
| | ECE Junior Faculty Hiring Committee | 2015-2016 |
| | ORIE Junior Faculty Hiring Committee | 2015-2016 |
| | DICE PhD Admissions Committee | 2014-present |

**PROFESSIONAL SOCIETY AND MAJOR GOVERNMENTAL COMMITTEES:**

- Conference program committees:
    1. European Symposium of Algorithms (ESA) 2017.
    2. ACM Conference on Economics and Computation (EC) 2018, 2017, 2014, 2013, 2012, 2010.
    3. Conference on Artificial Intelligence (AAAI) 2017, 2016, 2013.
    4. International World Wide Web Conference (WWW) 2017, 2012.
    5. Conference on Web and Internet Economics (WINE) 2015.
- Federal funding agency review panels:
    1. NSF Panelist (April 2015, January 2014, April 2012).
    2. NSF STC (Science and Technology Centers) Competition, October 2012
- International funding agency reviewer:
    1. FONDECYT (NSF equivalent in Chile), November 2011.
- Paper reviewer:
    1. **Journals:** SIAM Journal of Computing, Theoretical Computer Science, Algorithmica, ACM Transactions on Economics and Computation (TEAC), Journal of Autonomous Agents and Multi-Agent Systems (JAAMAS), Operations Research, Operations Research Letters, Mathematical Programming, Mathematics of Operations Research, Transportation Science, IEEE Transactions on Automatic Control.
    2. **Conferences:** ACM Symposium on Theory of Computing (STOC), ACM-SIAM Symposium on Discrete Algorithms (SODA), ACM Conference on Economics and Computation (EC), Conference on Web and Internet Economics (WINE), International Symposium on Algorithmic Game Theory (SAGT), International Colloquium on Automata, Languages and Programming (ICALP), International Symposium on Theoretical Aspects of Computer Science (STACS), ACM Symposium on Parallel Algorithms and Architectures (SPAA), Conference on Decision and Control (CDC), MIT Oxygen Student Conference.
- Workshop Co-organizer:
    1. Simons semester on "Real-time Decision Making," Spring 2018, Simons Institute for the Theory of Computing, Berkeley CA.
    2. Workshop on "Mathematical and Computational Challenges in Real-Time Decision Making," Apr. 30—May 4, 2018, Simons Institute for the Theory of Computing, Berkeley CA.
    3. Workshop on "Real-Time Decision Making," June 27—July 1, 2016, Simons Institute for the Theory of Computing, Berkeley CA.
    4. Winedale workshop on "Algorithmic Game Theory," Winedale, TX, October 17, 2014.
    5. "Workshop on Risk Aversion in Algorithmic Game Theory and Mechanism Design" in conjunction with the ACM Conference on Electronic Commerce (EC), Valencia, Spain, June 7, 2012.

2

**Appx.0257**

UT Austin_0016318

**COMMUNITY ACTIVITIES:**

- Co-taught the Edison Lecture Series to over 1000 middle-school and high-school students on February 11-12, 2016, Austin, TX.
- Speaker at Camp Texas (for incoming UT freshmen), Camp Balcones Springs, Texas, August 17, 2014; August 18, 2015; August 16, 2016.

**PUBLICATIONS:** (Student co-authors listed in **bold.**)

A.  Refereed Archival Journal Publications

   In previous rank (prior to UT Austin and Texas A&M)

J1.   A. Hall, E. Nikolova, and C. Papadimitriou. "Incentive-Compatible Interdomain Routing with Linear Utilities," in Internet Mathematics, vol. 5(4), pp. 395-410, January 2008. https://doi.org/10.1080/15427951.2008.10129169

   In rank – UT Austin

J2.   E. Nikolova, N.E. Stier-Moses. "A Mean-Risk Model for the Traffic Assignment Problem with Stochastic Travel Times," in Operations Research, vol. 62(2), pp. 366-382, April 2014. https://doi.org/10.1287/opre.2013.1246

J3.   G. Piliouras, E. Nikolova, and J. S. Shamma. "Risk Sensitivity of Price of Anarchy under Uncertainty," in ACM Transactions on Economics and Computation (TEAC), vol. 5(1), pp. 5:1-5:27, November 2016. https://doi.org/10.1145/2930956

J4.   **T. Lianeas**, E. Nikolova, N. E. Stier-Moses. "Risk-averse selfish routing," Forthcoming in Mathematics of Operations Research.    (Accepted September 2017)

B.  Refereed Conference Proceedings

   In previous rank (prior to UT Austin and Texas A&M)

C1.   D. Karger and E. Nikolova. "Brief Announcement: On the Expected Overpayment of VCG Mechanisms in Large Networks," Invited paper in Conference on Decision and Control (CDC), 2006. Brief Announcement in PODC 2005, pp. 126-126, Las Vegas, NV, July 17-20, 2005. Accepted presentation to DIMACS Workshop on Computational Issues in Auction Design, October 2004. https://doi.org/10.1145/1073814.1073836

C2.   N. Immorlica, D. Karger, E. Nikolova, and R. Sami. "First-Price Path Auctions," In Proceedings of ACM Conference on Electronic Commerce (ACM EC), pp. 203-212, Vancouver, BC, Canada, June 5-8, 2005. **(Acceptance Rate: 28%)** https://doi.org/10.1145/1064009.1064031

C3.   E. Nikolova, J. Kelner, M. Brand, M. Mitzenmacher. "Stochastic Shortest Paths via Quasi-convex Maximization," In Proceedings of 2006 European Symposium of Algorithms (ESA), pp. 552-563, Zurich, Switzerland, September 11-13, 2006. **(Acceptance Rate: 24%)** https://doi.org/10.1007/11841036_50

3

CONFIDENTIAL                                                    UT Austin_0016319

C4.   E. Nikolova, M. Brand, and D. Karger. "Optimal Route Planning under Uncertainty," In Proceedings of 2006 International Conference on Automated Planning & Scheduling (ICAPS), pp. 131-140, Cumbria, UK, June 6-10, 2006. **(Acceptance Rate: 33%)**
https://www.aaai.org/Papers/ICAPS/2006/ICAPS06-014.pdf

C5.   Hall, E. Nikolova, and C. Papadimitriou. "Incentive-Compatible Interdomain Routing with Linear Utilities," In Proceedings of the 3rd International Workshop on Internet and Network Economics (WINE), pp. 232-244, San Diego, California, December 12-14, 2007.
https://doi.org/10.1007/978-3-540-77105-0_23

C6.   E. Nikolova and R. Sami. "A Strategic Model for Information Markets," In Proceedings of the Eighth ACM Conference on Electronic Commerce (ACM EC), pp. 316-325, San Diego, California, June 11-15, 2007. **(Acceptance Rate: 27%)**
https://doi.org/10.1145/1250910.1250956

C7.   Y. Chen, L. Fortnow, E. Nikolova, and D. Pennock. "Betting on Permutations," In Proceedings of the Eighth ACM Conference on Electronic Commerce (ACM EC), pp. 326-335, San Diego, California, June 11-15, 2007. **(Acceptance Rate: 27%)**
https://doi.org/10.1145/1250910.1250957

C8.   J.A. Kelner and E. Nikolova. "On the Hardness and Smoothed Complexity of Quasi-concave Minimization," In Proceedings of 48th Annual IEEE Symposium on Foundations of Computer Science (FOCS), pp. 472-482, Providence, RI, October 21-23, 2007. **(Acceptance Rate: 22%)**
https://doi.org/10.1109/FOCS.2007.68

C9.   E. Nikolova and D.R. Karger. "Route Planning under Uncertainty: the Canadian Traveler Problem," In Proceedings of the Twenty-Third Conference on Artificial Intelligence (AAAI), pp. 969-974, Chicago, Illinois, July 13-17, 2008. **(Acceptance Rate: 24%)**
http://www.aaai.org/Papers/AAAI/2008/AAAI08-154.pdf

C10.  J. Feldman, S. Muthukrishnan, E. Nikolova, M. Pal. "A Truthful Mechanism for Offline Ad Slot Scheduling," In Proceedings of the First International Symposium on Algorithmic Game Theory (SAGT), pp. 182-193, Paderborn, Germany, April 30-May 2, 2008.
https://doi.org/10.1007/978-3-540-79309-0_17

C11.  E. Nikolova. "High-performance Heuristics for Optimization in Stochastic Traffic Engineering Problems," In Proceedings of the Seventh International Conference on Large-Scale Scientific Computing (LSSC), pp. 352-360, Sozopol, Bulgaria, June 4-8, 2009.
https://doi.org/10.1007/978-3-642-12535-5_41

C12.  E. Nikolova. "Approximation Algorithms for Reliable Stochastic Combinatorial Optimization," In Proceedings of 13th Intl. Workshop on Approximation Randomization, and Combinatorial Optimization, Algorithms and Techniques (APPROX), pp. 338-351, Barcelona, Spain, September 1-3, 2010. **(Acceptance Rate: 42%)**
https://doi.org/10.1007/978-3-642-15369-3_26

In rank – Texas A&M

C13.  E. Nikolova and N. E. Stier-Moses. "Stochastic Selfish Routing," In Proceedings of the Fourth Symposium on Algorithmic Game Theory (SAGT '11), pp. 314-325, Salerno, Lecture Notes in Computer Science, Springer, Berlin, 2011. **(Acceptance Rate: 48%)**
https://doi.org/10.1007/978-3-642-24829-0_28

CONFIDENTIAL                                                                 UT Austin_0016320

C14. S. Lim, C. Sommer, E. Nikolova, and D. Rus. "Practical Route Planning Under Delay Uncertainty: Stochastic Shortest Path Queries," In RSS - Robotics: Science and Systems VIII, vol. 8(32), pp. 249-256, Sydney, Australia, July 9-13, 2012. **(Acceptance Rate: 33%)**
http://roboticsproceedings.org/rss08/p32.pdf

C15. A. Botea, E. Nikolova, M. Berlingerio. "Multi-Modal Journey Planning in the Presence of Uncertainty," In Proceedings of the International Conference on Automated Planning and Scheduling (ICAPS), pp. 20-28, Rome, Italy, June 10-14, 2013. **(Acceptance Rate: 28%)**
https://www.aaai.org/ocs/index.php/ICAPS/ICAPS13/paper/viewPaper/6023

C16. H. Chenji, L. Smith, R. Stoleru, E. Nikolova. "Raven: Energy Aware QoS Control for DRNs," In IEEE 9th International Conference on Wireless and Mobile Computing, Networking and Communications (WiMob), Lyon, France, October 7-9, 2013. **(Acceptance Rate: 29%)**
https://doi.org/10.1109/WiMOB.2013.6673400

C17. G. Piliouras, E. Nikolova and J. S. Shamma. "Risk Sensitivity of Price of Anarchy under Uncertainty," In Proceedings of the 14th ACM Conference on Electronic Commerce (ACM EC), pp. 715-732, Philadelphia, Pennsylvania, June 16-20, 2013. **(Acceptance Rate: 32%)**
http://people.sutd.edu.sg/~georgios/papers/ec13-piliouras.pdf

C18. J. Y. Yu and E. Nikolova. "Sample Complexity of Risk-averse Bandit-Arm Selection," In Proceedings of the International Joint Conferences on Artificial Intelligence (IJCAI), pp. 2576-2582, Beijing, China, August 3-9, 2013. **(Acceptance Rate: 28%)**
http://ijcai.org/papers13/Papers/IJCAI13-379.pdf

In rank – UT Austin

C19. D. Hoy, E. Nikolova. "Approximately Optimal Risk-Averse Routing Policies via Adaptive Discretization," In Proceedings of the Twenty-Ninth AAAI Conference on Artificial Intelligence (AAAI-15). Austin, TX, January 25-29, 2015. **(Acceptance Rate: 27%)**
https://www.aaai.org/ocs/index.php/AAAI/AAAI15/paper/viewPaper/9996

C20. E. Nikolova, N. E. Stier-Moses. "The Burden of Risk Aversion in Mean-Risk Selfish Routing," In Proceedings of the Sixteenth ACM Conference on Economics and Computation (ACM EC), pp. 489-506, Portland, OR, June 15-19, 2015. **(Acceptance Rate: 33%)**
https://doi.org/10.1145/2764468.2764485

C21. **S. Basu, T. Lianeas**, E. Nikolova. "New Complexity Results and Algorithms for the Minimum Tollbooth Problem," In Proceedings of the 2015 Conference on Web and Internet Economics (WINE'15), pp. 89-103, Amsterdam, The Netherlands, December 9-12, 2015. **(Acceptance Rate: 27%)**
https://doi.org/10.1007/978-3-662-48995-6_7

C22. **G. Yang**, E. Nikolova. "Approximation Algorithms for Route Planning with Nonlinear Objectives," In Proceedings of the Thirtieth AAAI Conference on Artificial Intelligence (AAAI 2016), pp. 3209-3215, Phoenix, Arizona, February 12-17, 2016. **(Acceptance Rate: 26%)**
https://www.aaai.org/ocs/index.php/AAAI/AAAI16/paper/viewPaper/11967

C23. **T. Lianeas**, E. Nikolova, N. E. Stier Moses. "Asymptotically Tight Bounds for Inefficiency in Risk-averse Selfish Routing," In Proceedings of the 25th International Joint Conference on Artificial Intelligence (IJCAI 2016), pp. 338-344, New York, NY, USA, July 9-15, 2016. **(Acceptance Rate: 24%)**
https://www.ijcai.org/Proceedings/16/Papers/055.pdf

5

CONFIDENTIAL

C24. **S. Basu, G. Yang, T. Lianeas**, E. Nikolova, and **Y. Chen**. "Reconciling Selfish Routing with Social Good," In Proceedings of the 10th International Symposium on Algorithmic Game Theory (SAGT), pp. 147-159, L'Aquila, Italy, September 12-14, 2017. **(Acceptance Rate: 45%)**
https://doi.org/10.1007/978-3-319-66700-3_12

C25. R. Shafipour, **A. Khodabakhsh**, G. Mateos, and E. Nikolova. "A Digraph Fourier Transform with Spread Frequency Components," In Proceedings of IEEE Global Conference on Signal and Information Processing (GlobalSIP 2017), pp. 583-587, Montreal, Canada, November 14-16, 2017.
https://doi.org/10.1109/GlobalSIP.2017.8309026

C26. **A. Khodabakhsh, G. Yang, S. Basu**, E. Nikolova, M. Caramanis, **T. Lianeas, E. Pountourakis**. "A Submodular Approach for Electricity Distribution Network Reconfiguration," In 51st Hawaii International Conference on System Sciences (HICSS), Hawaii, USA, January 3-6, 2018. **Nominated for Best Paper award. Only 24 papers in Energy track accepted each year, top venue in Power Systems.**
http://doi.org/10.24251/HICSS.2018.344

C27. R. Shafipour, **A. Khodabakhsh**, G. Mateos, and E. Nikolova. "Digraph Fourier Transform via Spectral Dispersion Minimization," In Proceedings of IEEE International Conference on Acoustics, Speech and Signal Processing (ICASSP 2018), Calgary, Alberta, Canada, April 15-20, 2018. **Best student paper award**.

C28. J. Correa, C. Guzman, **T. Lianeas**, E, Nikolova, M. Schroeder.  "Network Pricing: How to Induce Optimal Flows Under Strategic Link Operators," In Proceedings of the Nineteenth ACM Conference on Economics and Computation (EC 2018), Ithaca, NY, June 19-21, 2018. **(Acceptance Rate: 25%)**

C29. D. Applegate, A. Archer, D. S. Johnson, E. Nikolova, M. Thorup, **G. Yang**. "Wireless Coverage Prediction via Parametric Shortest Paths," In Proceedings of the Nineteenth International Symposium on Mobile Ad Hoc Networking and Computing (MobiHoc 2018), Los Angeles, USA, June 26-29, 2018. **(Acceptance Rate: 17%)**

C30. R. Cole, **T. Lianeas**, E. Nikolova. "When Does Diversity of Agent Preferences Improve Outcomes in Selfish Routing?" In Proceedings of the 27th International Joint Conference on Artificial Intelligence (IJCAI), 2018. **(Acceptance Rate: 20%)**

D. Other Major Publications

In previous rank (prior to UT Austin and Texas A&M)

S1.  Y. Chen, L. Fortnow, E. Nikolova, and D. M. Pennock. Combinatorial betting. ACM SIGecom Exchanges, vol. 7(1), pp. 61-64, December 2007. Invited Survey.
https://doi.org/10.1145/1345037.1345053

**ORAL PRESENTATIONS:**

In previous rank (prior to UT Austin and Texas A&M)

O1.    From Stochastic Shortest paths to Quasi-concave Minimization, University of California, San Diego. Seminar on Theory and Algorithms Research, CA, December 2006.

O2.    From Stochastic Shortest paths to Quasi-concave Minimization, MIT Algorithms and Complexity Seminar, Cambridge, MA, December 2006.

O3.    From Stochastic Shortest paths to Quasi-concave Minimization, Rensselaer Polytechnic Institute CS Theory Colloquium, Troy, NY, October 2007.

O4.    From Stochastic Shortest paths to Quasi-concave Minimization, Dartmouth University CS Theory Colloquium, Hanover, NH, October 2007.

6

**Appx.0261**

O5.   Design & Computation in Prediction Markets, Dartmouth University, Computer Science Colloquium, Hanover, NH, October 2007.

O6.   From Stochastic Shortest paths to Quasi-concave Minimization, University of Wisconsin-Madison, Theory Colloquium, Madison, WI, November 2007.

O7.   Design & Computation in Prediction Markets, Microsoft Research, Redmond, WA, November 2007.

O8.   From Stochastic Shortest paths to Quasi-concave Minimization, IBM Almaden, San Jose, CA, December 2007.

O9.   Design & Computation in Prediction Markets, Microsoft Research, Mountain View, CA, December 2007.

O10.  From Stochastic Shortest paths to Quasi-concave Minimization, Stanford University Algorithms Seminar, Stanford, CA, December 2007.

O11.  Strategic algorithms, Microsoft Research, Seattle, WA, January 2008.

O12.  Strategic algorithms, Duke University, Durham, NC, March 2008.

O13.  Design & Computation in Prediction Markets, GAMES–Third World Congress of the Game Theory Society, Chicago, IL, July 2008.

O14.  Strategic algorithms, Georgia Institute of Technology, Atlanta, GA, February 2009.

O15.  Design & Computation in Prediction Markets, Cornell University, Ithaca, NY, April 2009.

O16.  From Stochastic Shortest paths to Quasi-concave Minimization, State University of New York at Stony Brook, Stony Brook, NY, May 2009.

O17.  Design & Computation in Prediction Markets, University of Girona, Girona, Spain, July 2009.

O18.  From Stochastic Shortest paths to Quasi-concave Minimization, Massachusetts Institute of Technology, Cambridge, MA, April 2010.

O19.  Algorithms for Risk-averse Combinatorial Optimization, Georgetown University, Washington, DC, February 2011.

O20.  Algorithms for Risk-averse Combinatorial Optimization, Northwestern University, Evanston, IL, February 2011.

O21.  Algorithms for Risk-averse Combinatorial Optimization, Carnegie Mellon University, Pittsburgh, PA, February 2011.

O22.  Algorithms for Risk-averse Combinatorial Optimization, Google, Zurich, Switzerland, March 2011.

O23.  Algorithms for Risk-averse Combinatorial Optimization, IBM, Zurich, Switzerland, March 2011.

O24.  Design & Computation in Prediction Markets, ETH, Zurich, Switzerland, March 2011.

O25.  Algorithms for Risk-averse Combinatorial Optimization, ETH, Zurich, Switzerland, March 2011.

O26.  Algorithms for Risk-averse Combinatorial Optimization, EPFL, Lausanne, Switzerland, March 2011.

In rank – Texas A&M

O27.  Risk in network games, Texas A&M University, Dept. of Economics, College Station, TX, February 2012.

O28.  Risk in network games, Rice University, Dept. of Economics, Houston, TX, March 2012.

O29.  Algorithms for Risk-averse Combinatorial Optimization, Rice University, Dept. of Computational and Applied Math., Houston, TX, April 2012.

O30.  Algorithms for Risk-averse Combinatorial Optimization, UT Austin, Austin, TX, April 2012.

O31.  Risk in network games, Summer School on Algorithmic Game Theory, Samos, Greece, July 2012.

O32.  Introduction to network congestion games, Summer School on Algorithmic Game Theory, Samos, Greece, July 2012.

O33.  Risk in network routing, IBM Research, Dublin, Ireland, July 2012.

Appx.0262

CONFIDENTIAL                                                                              UT Austin_0016323

O34.   Risk in network games, Texas Economic Theory Day, Dallas, TX, October 2012.

O35.   Risk in routing and games, University of Buenos Aires, Argentina, March 8, 2013.

O36.   Risk in routing and games, UNICAMP, Campinas, Brazil, March 20, 2013.

O37.   Risk in network games, Transportation seminar, Dept. of Civil Engineering, Texas A&M University, Austin, TX, March 26, 2013.

O38.   Risk in network routing games, UT Austin, Austin, TX, April 1, 2013.

O39.   Risk in network games, University of Maryland-College Park, April 19, 2013.

O40.   Risk in network routing, IBM-Almaden, San Jose, CA, June 5, 2013.

<u>In rank – UT Austin</u>

O41.   Risk-mitigation in route planning, Keynote talk at Workshop on Eco-friendly mobility, Zurich, Switzerland, January 22, 2014.

O42.   Risk-mitigation in route planning, ORIE Seminar, UT Austin, Austin, TX, January 31, 2014.

O43.   Approximation algorithms for risk-averse combinatorial optimization, London School of Economics, London, UK, July 2, 2014.

O44.   Approximation algorithms for risk-averse combinatorial optimization, 7th work- shop on Flexible Network Design, Lugano, Switzerland, July 31, 2014.

O45.   The burden of risk aversion in mean-risk selfish routing, Random Structures Seminar, Dept. of Mathematics, UT Austin, Austin, TX, December 3, 2014.

O46.   The burden of risk aversion in mean-risk selfish routing, Combinatorial Optimization and Graph Algorithms (COGA) Seminar, Technical University of Berlin, Berlin, Germany, January 15, 2015.

O47.   The burden of risk aversion in mean-risk selfish routing, Technical University of Munich, Munich, Germany, January 20, 2015.

O48.   The burden of risk aversion in mean-risk selfish routing, Conference on Information Theory and Applications (ITA) 2015, San Diego, CA, February 5, 2015.

O49.   The burden of risk aversion in mean-risk selfish routing, The University of Chile, Santiago, Chile, March 18, 2015.

O50.   The burden of risk aversion in mean-risk selfish routing, Algorithms Seminar, The University of Texas at Austin, Austin, TX, April 17, 2015.

O51.   Approximation algorithms for offline risk-averse combinatorial optimization, The University of Chile, Santiago, Chile, May 27, 2015.

O52.   The burden of risk aversion in mean-risk selfish routing, Transportation Seminar, EECS Department, UC Berkeley, Berkeley, CA, August 28, 2015.

O53.   Algorithms and algorithmic game theory for risk mitigation in networks, Simons Institute, Berkeley, CA, September 29, 2015.

O54.   The burden of risk aversion in mean-risk selfish routing, Theory seminar, Department of Computer Science, University of Southern California, Los Angeles, CA, October 2, 2015.

O55.   Algorithms for risk-averse routing, Google Research, Mountain View, CA, October 29, 2015.

O56.   Algorithms for risk mitigation in networks, Simons Institute for the Theory of Computing, Berkeley, CA, June 28, 2016.

O57.   Risk-averse selfish routing, Conference on Information Theory and Applications (ITA) 2015, San Diego, CA, February 16, 2017.

8

CONFIDENTIAL

O58.  Risk-averse selfish routing, Dagstuhl Seminar on Game Theory in AI, Logic, and Algorithms (17111), Schloss Dagstuhl, Germany, March 14, 2017.

O59.  Network Pricing: How to Induce Optimal Flows Under Strategic Link Operators, Simons Institute for the Theory of Computing, Berkeley, CA, April 20, 2017.

O60.  Risk-averse selfish routing, 6th Workshop on Stochastic Methods in Game Theory, Erice, Italy, May 10, 2017.

O61.  Network Pricing: How to Induce Optimal Flows Under Strategic Link Operators, Microsoft Research, New England, Cambridge, MA, June 21, 2017.

O62.  Network Pricing: How to Induce Optimal Flows Under Strategic Link Operators, Keynote Talk at the 12th Athens Colloquium on Algorithms and Complexity (ACAC'17), Athens, Greece, August 24, 2017.

O63.  Network Pricing: How to Induce Optimal Flows Under Strategic Link Operators, Keynote Talk at the Ninth Workshop on Dynamic Games in Management Science, HEC Montreal, Montreal, Canada, October 13, 2017.

O64.  A Brief Introduction to Algorithms, Game Theory and Risk-averse Decision Making, Simons Institute, Berkeley, CA, January 24, 2018.

O65.  Risk-averse Selfish Routing, Simons Institute, Berkeley, CA, March 28, 2018.

O66.  When Does Diversity of Agent Preferences Improve Outcomes in Selfish Routing, Mathematical and Computational Challenges in Real-Time Decision Making Workshop, Simons Institute, April 30th, 2018.


**DISCLOSURES, PATENTS PENDING, AND PATENTS AWARDED (work conducted in previous rank, prior to UT Austin and Texas A&M)**

P1.  E. Nikolova, M. Brand. Method for finding minimal cost paths under uncertainty. U.S. Application. Pub No. US20080025222. Filed: 07/26/2006. Published: 01/31/2008.

P2.  Y. Chen, E. Nikolova, D. Pennock. System and method for permutation betting. U.S. Application. Pub No. 20080220855. Published: 9/11/2008.

P3.  E. Nikolova, M. Brand, M. Mitzenmacher. Method for finding optimal paths using a stochastic network model, US Patent No. 7,573,866. Filed: Aug. 30, 2006. Issued: 08/11/2009.

P4.  J. Feldman, S. Muthukrishnan, M. Pal, Evdokia V. Nikolova. Content Item Slot Scheduling. U.S. Application. Pub No. 20100049644. Published: 2/25/2010.


**GRANTS AND CONTRACTS:**

| Co-PI | Title | Agency/Sponsor | Grant Total | Candidate Share | Grant Period | Status |
|---|---|---|---|---|---|---|
| **Granted in rank at Texas A&M** | | | | | | |
| --- | **ICES: Small: Risk Aversion in Algorithmic Game Theory and Mechanism Design** | NSF: Division of Computing and Communication Foundations | $370,000 | $370,000 | 8/1/12-8/31/17 | funded |
| --- | **Maps Directions under Deadlines** | Google Faculty Research Award | $41,000 | $41,000 | 2013 | funded |

CONFIDENTIAL

UT Austin_0016325

| | | | | | | |
|---|---|---|---|---|---|---|
| PI: Le Xie (Texas A&M) Co-PI: Pravin Varaiya (UC Berkeley) | **Collaborative Research: CyberSEES: Coupon Incentive-based Risk Aware Demand Response in Smart Grid** | NSF: Division of Computing and Communication Foundations | $1,000,000 | $311,000 | 10/1/13-9/30/18 | funded |
| **Granted in rank at UT Austin** | | | | | | |
| --- | **CAREER: Algorithms for Risk Mitigation in Networks** | NSF: Division of Computing and Communication Foundations | $448,123 | $448,123 | 5/15/14-4/30/19 | funded |
| Co-PI: Michael C. Caramanis (Boston University) | **AitF: Collaborative Research: Algorithms and Mechanisms for the Distribution Grid** | NSF: Division of Computing and Communication Foundations | $800,000 | $479,985 | 10/1/17-9/30/21 | funded |
| PI: Georgios B. Giannakis (University of Minnesota) Co-PI: Sairaj Dhople (University of Minnesota), Mingyi Hong (University of Minnesota), Yousef Saad (University of Minnesota), Hao Zhu (UT ECE), Ross Baldick (UT ECE), Constantine Caramanis (UT ECE), Lang Tong (Cornell), David Bindel (Cornell), Eilyan Bitar (Cornell), Ari Juels (Cornell), Vassilis Kekatos (Virginia Tech), Walid Saad (Virginia Tech), Nikolas D. Sidiropoulos (University of Virginia), Zongli Lin (University of Virginia), Emiliano Dall'Anese (University of Colorado Boulder), Lucy Pao (University of Colorado Boulder) | **DNS4CES: Data- and Network-driven Science for Complex Energy Systems** | Department of Energy (DOE) Office of Science Program Office | $10,000,000 | $400,000 | 10/1/18-9/30/22 | Submitted (pending) |

| | |
|---|---|
| Career Total | $2,659,123 |
| Career Candidate Share | $1,650,108 |
| In Rank Total | $2,659,123 |
| In Rank Candidate Share | $1,650,108 |

10

Appx.0265

CONFIDENTIAL

UT Austin_0016326

**M.S. STUDENTS:**
none

**PH.D. IN PROGRESS:**

A.  Students defended

  Yang, Ger (Nov 2017); passed, expected graduation Aug. 2018

B.  Students admitted to candidacy
  N/A

C.  Post M.S. students preparing to take Ph.D. qualifying exam

  Basu, Soumya (Spring 2018, co-supervisor: Sanjay Shakkottai)
  Khodabakhsh, Ali (Fall 2018)
  Orestis Papadigenopoulos (Fall 2019)
  Giotis, Isidoros (Fall 2020)
  Ramesan, Nithin (Fall 2020, co-supervisor: Francois Baccelli)
  Vakaliou, Eftychia (Fall 2021)

**POSTDOCS:**

Pountourakis, Emmanouil (April 2017-present)
Lianeas, Thanasis (April 2015-Dec.2017)

**OTHER ADVISING AND RELATED STUDENT SERVICE:**

  In previous rank (prior to UT Austin and Texas A&M)

Research Science Institute (RSI) [in collaboration with MIT to promote research among talented high school students worldwide] Research Mentor to:
Yifei Chen for his paper "Overpayment in Strategyproof Payment Schemes." (Summer 2004)
Fatima-Ezzahra Izma for her paper "Independent Sets in Special Types of Graphs." (Summer 2005)

  In rank – UT Austin

Sofya Vorotnikova – Simons Fellow and official mentee for the duration of the research program "Real-time Decision Making", Spring 2018 at the Simons Institute for the Theory of Computing, Berkeley, CA.

**TEACHING:**

| Course | Name | Semester | Enrollment | Instructor | Course |
|--------|------|----------|------------|------------|--------|
| EE360C | **Algorithms** | Fall 2017 | 69 | 3.9 | 3.7 |
| EE360C | **Algorithms** | Fall 2017 | 65 | 3.7 | 3.3 |
| EE381V | **Advanced Algorithms** | Spring 2017 | 26 | 3.9 | 3.5 |
| EE360C | **Algorithms** | Fall 2016 | 82 | 3.9 | 3.4 |
| EE381V | **Advanced Algorithms** | Spring 2015 | 22 | 4.3 | 4.1 |
| EE360C | **Algorithms** | Fall 2014 | 61 | 4.0 | 3.7 |
| EE381V | **Game Theory** | Spring 2014 | 16 | 4.1 | 4.1 |

11

**Appx.0266**

UT Austin_0016327

| Previous Teaching at Texas A&M University | | |
|---|---|---|
| CSCE489 | Special Topics in Algorithmic Game Theory | Fall 2013 |
| CSCE411H | Design and Analysis of Algorithms | Spring 2013 |
| CSCE629 | Analysis of Algorithms | Fall 2012 |
| CSCE689 | Special Topics in Algorithmic Game Theory | Spring 2012 |
| CSCE689 | Special Topics in Stochastic Optimization | Fall 2011 |

**VITA:**

Evdokia Nikolova is an Assistant Professor in the Department of Electrical and Computer Engineering at the University of Texas at Austin, where she is a member of the Wireless Networking & Communications Group and Decision, Information, and Communication Engineering (DICE). She graduated with a BA in Applied Mathematics with Economics from Harvard University, MS in Mathematics from Cambridge University, U.K. and Ph.D. in Computer Science from MIT.

Evdokia Nikolova's research aims to improve the design and efficiency of complex systems (such as infrastructure networks and electronic markets), by integrating stochastic, dynamic and economic analysis. Her recent work examines how human risk aversion transforms traditional computational models and solutions. One of her algorithms has been adapted in the MIT CarTel project for traffic-aware routing. She currently focuses on developing algorithms for risk mitigation in networks, with applications to transportation and energy. She is a recipient of an NSF CAREER award.

12

Appx.0267

CONFIDENTIAL

UT Austin_0016328

# Candidate's Summary of Activities

## Evdokia Nikolova

| Metric | Value |
|---|---|
| Peer-reviewed journal publications (in rank and total) | 3/4 |
| Peer-reviewed conference proceedings (in rank and total) | 18/30 |
| *Number of journal papers in rank with supervised student(s) and/or post-docs from UT as co-author(s)* | 1 |
| Number of journal papers in rank with supervised student(s) from UT as co-author* | 0 |
| Total citations of all publications (career) from ISI Web of Knowledge | 79 |
| *Largest number of citations for a single paper based on work at UT (ISI Web of Knowledge)* | *11* |
| h-index (career) from ISI Web of Knowledge | 4 |
| Total citations of all publications (career) from Google Scholar | 923 |
| *Largest number of citations for a single paper based on work at UT (Google Scholar)* | 40 |
| h-index (career) from Google Scholar | 17 |
| Total external research funding raised in rank | $2,659,123 |
| Total external research funding raised in rank (candidate's share) | $1,650,108 |
| Total number of external grants/contracts awarded in rank | 5 |
| Number of external grants/contracts awarded in rank as PI | 4 |
|  |  |
| PhD students completed (*sole supervisions and co-supervisions*)† (1 expected graduation Aug. 2018) | 0 |
| MS students completed (*sole supervisions and co-supervisions*)† | 0 |
| PhD students in pipeline (*sole supervisions and co-supervisions* as of *8/31/2018*) † | 4/2 |
| MS students in pipeline (*sole supervisions and co-supervisions* as of *8/31/2018*) † | 0 |
|  |  |
| Number of courses taught | 7 |
| Total number of students taught in organized courses | 341 |
| Average instructor rating for undergraduate courses | 3.9 |
| Average instructor rating for graduate courses | 4.1 |
| Average course rating for undergraduate courses | 3.5 |
| Average course rating for graduate courses | 3.9 |
| Number of teaching awards | 0 |
|  |  |
| Student organizations advised | 0 |
| Undergraduate researchers supervised | 19 |
| Service on journal editorial boards | 0 |
| Number of symposia organized | 4 |

CONFIDENTIAL

**Complete reverse chronological list of publications and scholarly/creative works**
**Evdokia Nikolova**

Candidate's dissertation title: Strategic Algorithms
Candidate's dissertation advisor: David Karger

**Section 1.** Works published (or in an equivalent status), in press, accepted, or under contract while in current rank at UT Austin.

Note: my group members are highlighted in Italic.

**Refereed archival journal publications in rank**

1. *T. Lianeas*, E. Nikolova, N. E. Stier-Moses. "Risk-averse selfish routing," Mathematics of Operations Research, forthcoming.   (Accepted September 2017)
   - Co-authors: T. Lianeas, postdoctoral fellow in my group; N.E. Stier-Moses, research scientist manager at Facebook (Menlo Park, CA).
   - Qualitative statement of contribution: Equally with Stier Moses, I initiated the research project and contributed to the problem definition, upper bound proofs and writing of the paper.   My postdoc Thanasis Lianeas derived the lower bound proofs and writing of that part of the paper, as well as the overall writing and revisions of the paper.

2. G. Piliouras, E. Nikolova and J. S. Shamma. "Risk Sensitivity of Price of Anarchy under Uncertainty." in ACM Transactions on Economics and Computation (TEAC), vol. 5(1), pp. 5:1-5:27, November 2016. https://doi.org/10.1145/2930956
   - Co-authors: G. Piliouras, faculty peer in Singapore University of Technology and Design (Singapore); J. S. Shamma, faculty peer in King Abdullah University of Science and Technology (Saudi Arabia).
   - Qualitative statement of contribution: I initiated the project with (then postdoc) Georgios Piliouras, and contributed to formalizing the problem definition, different models of risk-aversion and some of the analysis and writing.

3. E. Nikolova, N. Stier-Moses. "A Mean-Risk Model for the Traffic Assignment Problem with Stochastic Travel Times," in Operations Research, vol. 62(2), pp. 366-382, April 2014. https://doi.org/10.1287/opre.2013.1246
   - Co-authors: N.E. Stier-Moses, research scientist manager at Facebook (Menlo Park, CA).
   - Qualitative statement of contribution: This work was an equal 50% contribution of all aspects of this work, both intellectual and writing. All aspects of the research were developed in collaboration between myself and Stier-Moses over many joint discussions.

1

Appx.0269

CONFIDENTIAL                                                                                                    UT Austin_0016330

**Refereed conference proceedings in rank**

1.  R. Cole, *T. Lianeas*, E. Nikolova. "When Does Diversity of Agent Preferences Improve Outcomes in Selfish Routing?" in Proceedings of the 27th International Joint Conference on Artificial Intelligence (IJCAI 2018), Stockholm, Sweden, July 13-19, 2018. **(Acceptance Rate: 20%)**
    - Co-authors: R. Cole, faculty peer in New York University; T. Lianeas, postdoctoral fellow in my group.
    - Qualitative statement of contribution: I and Richard Cole in several joint discussions came up with the project idea based on an earlier paper of mine, formalized the mathematical model and performed some of the initial analysis.  Later, I invited my postdoc Thanasis Lianeas to join the project and, through multiple joint discussions and additional technical work by Lianeas, we developed the rest of the intellectual content and writing.

2.  D. Applegate, A. Archer, D. S. Johnson, E. Nikolova, M. Thorup, *G. Yang*. "Wireless Coverage Prediction via Parametric Shortest Paths," in Proceedings of the Nineteenth International Symposium on Mobile Ad Hoc Networking and Computing (MobiHoc 2018), Los Angeles, USA, June 26-29, 2018. **(Acceptance Rate: 17%)**
    - Co-authors: D. Applegate, research scientist at Google (New York City, NY); A. Archer, research scientist at Google (New York City, NY); D. S. Johnson, deceased; M. Thorup, faculty peer in University of Copenhagen (Netherlands); G. Yang, doctoral student in my group.
    - Qualitative statement of contribution: The four non-UT authors (other than myself and Ger Yang) had started and done preliminary theoretical work on this project and it was in hiatus when, in a discussion with Aaron Archer I discovered that some of their preliminary work was subsumed by some of my earlier work on stochastic shortest paths. I invited my student Ger Yang to join the project and, under my direction, perform experimental results for the project, as well as some additional technical analysis, building on my previous work. I also contributed to the framing and writing of the paper.

3.  J. Correa, C. Guzman, *T. Lianeas*, E, Nikolova, M. Schroeder.   "Network Pricing: How to Induce Optimal Flows Under Strategic Link Operators," in Proceedings of the Nineteenth ACM Conference on Economics and Computation (EC 2018), Ithaca, NY, June 19-21, 2018. **(Acceptance Rate: 25%)**
    - Co-authors: J. Correa, faculty peer in Universidad de Chile (Chile); C. Guzman, faculty peer in Universidad Católica de Chile (Chile); T. Lianeas, postdoctoral fellow in my group; M. Schroeder, faculty peer in RWTH Aachen University (Germany).
    - Qualitative statement of contribution: I gave the idea for the project and formalized the problem statement with Jose Correa. The two of us in 50-50 collaboration performed some of the initial analysis.  Jose then invited his then-postdocs Cristobal Guzman and Marc Schroeder, and I invited my postdoc Thanasis Lianeas to join the project, and the five of us over multiple joint discussions developed the rest of the intellectual content and writing.

2

CONFIDENTIAL

4.  R. Shafipour, *A. Khodabakhsh*, G. Mateos, and E. Nikolova. "Digraph Fourier Transform via Spectral Dispersion Minimization," in Proceedings of IEEE International Conference on Acoustics, Speech and Signal Processing (ICASSP 2018), Calgary, Alberta, Canada, April 15-20, 2018. **Best student paper award**.
    - Co-authors: R. Shafipour, doctoral student in Prof. Mateos's group, University of Rochester; A. Khodabakhsh, doctoral student in my group; G. Mateos, faculty peer in University of Rochester.
    - Qualitative statement of contribution:   This is part of my student Ali Khodabakhsh's Ph.D. research; the student and fellow PhD student Rasoul Shafipour at the University of Rochester performed the majority of the work, with my assistance as Ali's advisor both on the intellectual content and of the written work.

5.  *A. Khodabakhsh, G. Yang, S. Basu*, E. Nikolova, M. C. Caramanis, *T. Lianeas, M. Pountourakis*. "A Submodular Approach for Electricity Distribution Network Reconfiguration," in 51st Hawaii International Conference on System Sciences (HICSS), Hawaii, USA, January 3-6, 2018. **Nominated for Best Paper award.   Only 24 papers in Energy track accepted each year, top prestigious conference in Power Systems.**
    - Co-authors: A. Khodabakhsh, doctoral student in my group; G. Yang, doctoral student in my group; S. Basu, doctoral student in my group; M. C. Caramanis, faculty peer in Boston University; T. Lianeas, postdoctoral fellow in my group; M. Pountourakis, postdoctoral fellow in my group.
    - Qualitative statement of contribution: I initiated this project and together with my student Ali Khodabakhsh, formalized the mathematical model. This is part of Ali's Ph.D. research; the student performed the majority of the work, with some collaboration with my other students Ger Yang and Soumya Basu, and my postdoc Thanasis Lianeas on the hardness proof, and with my assistance as Ali's advisor both on the intellectual content and of the written work.

6.  R. Shafipour, *A. Khodabakhsh*, G. Mateos, and E. Nikolova. "A Digraph Fourier Transform with Spread Frequency Components," in Proceedings of IEEE Global Conference on Signal and Information Processing (GlobalSIP 2017), pp. 583-587, Montreal, Canada, November 14-16, 2017. https://doi.org/10.1109/GlobalSIP.2017.8309026
    - Co-authors: R. Shafipour, doctoral student in Prof. Mateos's group, University of Rochester; A. Khodabakhsh, doctoral student in my group; G. Mateos, faculty peer in University of Rochester.
    - Qualitative statement of contribution: This is part of my student Ali Khodabakhsh's Ph.D. research; the student and fellow PhD student Rasoul Shafipour at the University of Rochester performed the majority of the work, with my assistance as Ali's advisor both on the intellectual content and of the written work.

7.  *S. Basu, G. Yang, T. Lianeas,* E. Nikolova, and *Y. Chen.* "Reconciling Selfish Routing with Social Good," in Proceedings of the 10th International Symposium on Algorithmic Game

3

CONFIDENTIAL

Theory (SAGT), pp. 147-159, L'Aquila, Italy, September 12-14, 2017. **(Acceptance Rate: 45%)** https://doi.org/10.1007/978-3-319-66700-3_12
- Co-authors: S. Basu, doctoral student in my group; G. Yang, doctoral student in my group; T. Lianeas, postdoctoral fellow in my group; Y. Chen, doctoral student in my group at the time.
- Qualitative statement of contribution: I initiated the project and developed a formal mathematical model with technical questions. I then directed the other co-authors – all members of my research group, in developing the intellectual content and writing of the paper. As a lead contributor, my PhD student Soumya Basu will include this project in his dissertation.

8. *T. Lianeas*, E. Nikolova, N. E. Stier Moses. "Asymptotically Tight Bounds for Inefficiency in Risk-averse Selfish Routing," in Proceedings of the 25th International Joint Conference on Artificial Intelligence (IJCAI 2016), pp. 338-344, New York, NY, USA, July 9-15, 2016. **(Acceptance Rate: 24%)** https://www.ijcai.org/Proceedings/16/Papers/055.pdf
- Co-authors: T. Lianeas, postdoctoral fellow in my group; N.E. Stier-Moses, research scientist manager at Facebook (Menlo Park, CA).
- Qualitative statement of contribution: This paper builds on my paper #11 below with Nicolas Stier Moses, where we defined the concept of "Price of Risk Aversion" and proved an upper bound for that concept.   Under my suggestion to my postdoc Thanasis Lianeas to consider this problem, he developed the lower bound for that concept, which is in the current paper, and all three of us contributed to the remaining intellectual content and the overall writing of the paper.

9. *G. Yang*, E. Nikolova. "Approximation Algorithms for Route Planning with Nonlinear Objectives," in Proceedings of the Thirtieth AAAI Conference on Artificial Intelligence (AAAI 2016), pp. 3209-3215, Phoenix, Arizona, February 12-17, 2016. **(Acceptance Rate: 26%)**   https://www.aaai.org/ocs/index.php/AAAI/AAAI16/paper/viewPaper/11967
- Co-authors: G. Yang, doctoral student in my group.
- Qualitative statement of contribution:   This is part of my student Ger Yang's Ph.D. research; the student performed the majority of the work, with my assistance as advisor both on the intellectual content and of the written work.

10. *S. Basu, T. Lianeas*, E. Nikolova. "New Complexity Results and Algorithms for the Minimum Tollbooth Problem," in Proceedings of the 2015 Conference on Web and Internet Economics (WINE'15), pp.89-103, Amsterdam, The Netherlands, December 9-12, 2015. **(Acceptance Rate: 27%)** https://doi.org/10.1007/978-3-662-48995-6_7
- Co-authors: S. Basu, doctoral student in my group; T. Lianeas, postdoctoral fellow in my group.
- Qualitative statement of contribution: This is part of my student Soumya Basu's Ph.D. research; the student performed the majority of the work, with my assistance as advisor both on the intellectual content and of the written work. I proposed the problem to study and the student was also assisted by my postdoc Thanasis Lianeas in some of the

4

CONFIDENTIAL

intellectual contributions (theorem proofs and algorithm design).

11. E. Nikolova, N. Stier-Moses. "The Burden of Risk Aversion in Mean-Risk Selfish Routing," in Proceedings of the Sixteenth ACM Conference on Economics and Computation (ACM EC), pp.489-506, Portland, OR, June 15-19, 2015. **(Acceptance Rate: 33%)** https://doi.org/10.1145/2764468.2764485
    - Co-authors: N.E. Stier-Moses, research scientist manager at Facebook (Menlo Park, CA).
    - Qualitative statement of contribution: All aspects of this research were developed in collaboration between myself and Stier-Moses over many joint discussions. This work was an equal 50-50 contribution of all aspects, both intellectual and writing.

12. D. Hoy, E. Nikolova. "Approximately Optimal Risk-averse Routing Policies via Adaptive Discretization," in Proceedings of the Twenty-Ninth AAAI Conference on Artificial Intelligence (AAAI-15). Austin, TX, January 25-30, 2015. **(Acceptance Rate: 27%)** https://www.aaai.org/ocs/index.php/AAAI/AAAI15/paper/viewPaper/9996
    - Co-authors: D. Hoy, CTO at Tremor Technologies.
    - Qualitative statement of contribution: I developed the initial idea and formal mathematical model and main technical question for this project. I then directed Darrell Hoy who was at the time a PhD student at Northwestern University, in developing the technical solution and writing of the paper.

**Section 2.** Works published (or in equivalent status) while in current rank at other institutions (if applicable)

**Refereed conference proceedings in rank**

1. H. Chenji, L. Smith, R. Stoleru, E. Nikolova. "Raven: Energy Aware QoS Control for DRNs," in IEEE 9th International Conference on Wireless and Mobile Computing, Networking and Communications (WiMob), Lyon, France, October 7-9, 2013. **(Acceptance Rate: 29%)** https://doi.org/10.1109/WiMOB.2013.6673400
    - Co-authors: H. Chenji, faculty peer in the EECS department, Ohio University; L. Smith, faculty peer in Blinn College; R. Stoleru, faculty peer in the CSE department, Texas A&M University.
    - Qualitative statement of contribution: This is part of Radu Stoleru's PhD student Chengji's Ph.D. research; the student and Stoleru's postdoc Smith performed the majority of the work, with my assistance as co-advising them (jointly with Stoleru) on the intellectual content and the written work, as the models built on my prior work on risk-averse shortest paths.

2. J. Y. Yu and E. Nikolova. "Sample Complexity of Risk-averse Bandit-arm Selection," in Proceedings of the International Joint Conferences on Artificial Intelligence (IJCAI), pp. 2576-2582, Beijing, China, August 3-9, 2013. **(Acceptance Rate: 28%)** http://ijcai.org/papers13/Papers/IJCAI13-379.pdf

5

CONFIDENTIAL

- Co-authors: J. Y. Yu, currently faculty peer in Concordia Institute of Information System Engineering (Canada).
- Qualitative statement of contribution: I initiated the project idea and together with Yu (a research scientist at IBM Research at the time, which I was a visiting professor at) formalized it into several mathematical models of study.    Yu and I had multiple meetings discussing the research directions and deciding on what to analyze; he developed most of the technical analysis and I contributed to the writing and revisions of the paper.

3.  G. Piliouras, E. Nikolova and J. S. Shamma. "Risk Sensitivity of Price of Anarchy under Uncertainty," in Proceedings of the 14th ACM Conference on Electronic Commerce (ACM EC), pp. 715-732, Philadelphia, Pennsylvania, June 16-20, 2013. **(Acceptance Rate: 32%)** https://doi.org/10.1145/2482540.2482578
    - Co-authors: G. Piliouras, faculty peer in Singapore University of Technology and Design (Singapore); J. S. Shamma, faculty peer in King Abdullah University of Science and Technology (Saudi Arabia).
    - Qualitative statement of contribution: I initiated the project with Georgios Piliouras (then postdoc, advised by Jeff Shamma at Georgia Tech), and I contributed to formalizing the problem definition, different models of risk-aversion and some of the analysis and writing.

4.  A. Botea, E. Nikolova, M. Berlingerio. "Multi-Modal Journey Planning in the Presence of Uncertainty," in Proceedings of the International Conference on Automated Planning and Scheduling (ICAPS), pp. 20-28, Rome, Italy, June 10-14, 2013. **(Acceptance Rate: 28%)** https://www.aaai.org/ocs/index.php/ICAPS/ICAPS13/paper/viewPaper/6023
    - Co-authors: A. Botea, researcher at IBM (Dublin, Ireland); M. Berlingerio, research staff member at IBM (Dublin, Ireland).
    - Qualitative statement of contribution: I developed and wrote the theoretical analysis in this paper.

5.  S. Lim, C. Sommer, E. Nikolova, and D. Rus. "Practical Route Planning Under Delay Uncertainty: Stochastic Shortest Path Queries," in RSS - Robotics: Science and Systems VIII, vol. 8(32), pp. 249-256, Sydney, Australia, July 9-13, 2012. **(Acceptance Rate: 33%)** http://roboticsproceedings.org/rss08/p32.pdf
    - Co-authors: S. Lim, faculty peer in Kookmin University (Korea); C. Sommer, Engineering Manager at Apple (Cupertino, CA); D. Rus, faculty peer in MIT.
    - Qualitative statement of contribution: This paper built on my prior work on stochastic shortest paths, which I and Christian Sommer extended to a query model. Rus's PhD student Sejoon Lim, under Rus's direction, performed experimental analysis while I assisted with the theoretical analysis and wrote the corresponding theoretical part of the paper.

6.  E. Nikolova and N. Stier-Moses. "Stochastic Selfish Routing," in Proceedings of the Fourth Symposium on Algorithmic Game Theory (SAGT '11), Salerno, Lecture Notes in Computer Science, Springer, Berlin, 2011. **(Acceptance Rate: 48%)** https://doi.org/10.1007/978-3-

6

CONFIDENTIAL                                                                              UT Austin_0016335

642-24829-0_28
- Co-authors: N.E. Stier-Moses, research scientist manager at Facebook (Menlo Park, CA).
- Qualitative statement of contribution: All aspects of this research were developed in equal collaboration between myself and Stier-Moses over many joint discussions. This paper was an equal 50-50 contribution of all aspects, both intellectual and writing.

**Section 3.** Works published (or in equivalent status) while in previous rank(s) at UT Austin (if applicable)

Not applicable.

**Section 4.** Works published (or in equivalent status) while in previous rank(s) at other institutions (if applicable)

**Refereed journal publications in previous rank**

1. A. Hall, E. Nikolova, and C. Papadimitriou. "Incentive-Compatible Interdomain Routing with Linear Utilities," in Internet Mathematics, vol. 5(4), pp. 395-410, January 2008. https://doi.org/10.1080/15427951.2008.10129169

**Refereed conference proceedings in previous rank**

1. E. Nikolova. "Approximation Algorithms for Reliable Stochastic Combinatorial Optimization," in Proceedings of 13th Intl. Workshop on Approximation Algorithms for Combinatorial Optimization Problems (APPROX), pp.338-351, Barcelona, Spain, September 1-3, 2010. **(Acceptance Rate: 42%)**   https://doi.org/10.1007/978-3-642-15369-3_26
2. E. Nikolova. "High-performance heuristics for optimization in stochastic traffic engineering problems," in Proceedings of the Seventh International Conference on Large-Scale Scientific Computing (LSSC), pp.352-360, Sozopol, Bulgaria, June 4-8, 2009. https://doi.org/10.1007/978-3-642-12535-5_41
3. E. Nikolova and D. Karger. "Route Planning under Uncertainty: the Canadian Traveler Problem," in Proceedings of the Twenty-Third Conference on Artificial Intelligence (AAAI), pp. 969-974, Chicago, Illinois, July 13–17, 2008. **(Acceptance Rate: 24%)** http://www.aaai.org/Papers/AAAI/2008/AAAI08-154.pdf
4. J. Feldman, S. Muthukrishnan, E. Nikolova, M. Pal. "A Truthful Mechanism for Offline Ad Slot Scheduling," in Proceedings of the First International Symposium on Algorithmic Game Theory (SAGT), pp. 182-193, Paderborn, Germany, April 30-May 2, 2008. https://doi.org/10.1007/978-3-540-79309-0_17
5. Hall, E. Nikolova, and C. Papadimitriou. "Incentive-Compatible Interdomain Routing with Linear Utilities," in Proceedings of the 3rd International Workshop on Internet and Network Economics (WINE), pp.232-244, San Diego, California, December 12-14, 2007.

Appx.0275

CONFIDENTIAL                                                                                                    UT Austin_0016336

https://doi.org/10.1007/978-3-540-77105-0_23

6. J. Kelner and E. Nikolova. "On the Hardness and Smoothed Complexity of Quasi-concave Minimization," in Proceedings of 48th Annual IEEE Symposium on Foundations of Computer Science (FOCS), pp. 472-482, Providence, RI, October 21-23, 2007. **(Acceptance Rate: 22%)** https://doi.org/10.1109/FOCS.2007.68

7. Y. Chen, L. Fortnow, E. Nikolova, and D. Pennock. "Betting on Permutations," in Proceedings of the Eighth ACM Conference on Electronic Commerce (ACM EC), pp. 326-335, San Diego, California, June 11-15, 2007. **(Acceptance Rate: 27%)** https://doi.org/10.1145/1250910.1250957

8. E. Nikolova and R. Sami. "A Strategic Model for Information Markets," in Proceedings of the Eighth ACM Conference on Electronic Commerce (ACM EC), pp. 316-325, San Diego, California, June 11-15, 2007. **(Acceptance Rate: 27%)** https://doi.org/10.1145/1250910.1250956

9. E. Nikolova, J. Kelner, M. Brand, M. Mitzenmacher. "Stochastic Shortest Paths via Quasi-convex Maximization," in Proceedings of 2006 European Symposium of Algorithms (ESA), pp. 552-563, Zurich, Switzerland, September 11-13, 2006. **(Acceptance Rate: 24%)** https://doi.org/10.1007/11841036_50

10. E. Nikolova, M. Brand, and D. Karger. "Optimal Route Planning under Uncertainty," in Proceedings of 2006 International Conference on Automated Planning & Scheduling (ICAPS), pp. 131-140, Cumbria, UK, June 6-10, 2006. **(Acceptance Rate: 33%)** https://www.aaai.org/Papers/ICAPS/2006/ICAPS06-014.pdf

11. D. Karger and E. Nikolova. "On the Expected Overpayment of VCG Mechanisms in Large Networks," Invited paper in Conference on Decision and Control (CDC), 2006. Brief Announcement in PODC 2005, pp. 126-126, Las Vegas, NV, July 17-20, 2005. Accepted presentation to DIMACS Workshop on Computational Issues in Auction Design, October 2004. https://doi.org/10.1145/1073814.1073836

12. N. Immorlica, D. Karger, E. Nikolova, and R. Sami. "First-Price Path Auctions," in Proceedings of ACM Conference on Electronic Commerce (ACM EC), pp. 203-212, Vancouver, BC, Canada, June 5-8, 2005. **(Acceptance Rate: 28%)** https://doi.org/10.1145/1064009.1064031

**Other major publications in previous rank**

1. Y. Chen, L. Fortnow, E. Nikolova, and D. Pennock. Combinatorial betting. ACM SIGecom Exchanges, vol. 7(1), pp. 61-64, December 2007. Invited Survey. https://doi.org/10.1145/1345037.1345053

8

CONFIDENTIAL                                                                    UT Austin_0016337

From: Mathematics of Operations Research
<onbehalfof+jimdaimor+gmail.com@manuscriptcentral.com>
Date: Fri, Sep 29, 2017 at 11:51 AM
Subject: Mathematics of Operations Research - Decision on Manuscript ID MOR-2016-214.R2
To: nstier@utdt.edu
Cc: jimdaimor@gmail.com, bvonstengel@gmail.com, sdean@informs.org

29-Sep-2017

Dear Prof. Nicolas Stier-Moses:

The review process for your paper Manuscript ID MOR-2016-214.R2 titled "Risk-averse selfish routing" is now complete. I am delighted to accept your manuscript for publication in Mathematics of Operations Research. Congratulations!

You will receive a letter from the Mathematics of Operations Research editorial office with instructions for preparing your files for production.

On behalf of the editors of Mathematics of Operations Research, we look forward to your continued contributions to the journal.

Sincerely,

Jim Dai
Editor-in-Chief, Mathematics of Operations Research Professor of Operations Research, Cornell University
+1-607-255-4223
http://pubsonline.informs.org/journal/moor

*************
Comments to Author:

Area Editor: 1
Comments to the Author:
Many thanks for our careful revision. Happy to accept.

Associate Editor: 2
Comments to the Author:
(There are no comments.)

Reviewers' Comments to Author:

CONFIDENTIAL

UT Austin_0016338

## Table 1. Research Summary

| Metric | Value |
|---|---|
| Peer-reviewed journal publications (in rank and total) | 3 / 4 |
| Peer-reviewed conference proceedings (in rank and total) | 18 / 30 |
| *Number of journal papers in rank with supervised student(s) and/or post-docs from UT as co-author(s)* | 1 |
| *Number of journal papers in rank with supervised student(s) from UT as co-author\** | 0 |
| Total citations of all publications (career) from ISI Web of Knowledge | 79 |
| *Largest number of citations for a single paper based on work at UT (ISI Web of Knowledge)* | 5 |
| h-index (career) from ISI Web of Knowledge | 4 |
| Total citations of all publications (career) from Google Scholar | 923 |
| *Largest number of citations for a single paper based on work at UT (Google Scholar)* | 36 |
| h-index (career) from Google Scholar | 17 |
| Total external research funding raised in rank | $2,659,123 |

## Table 2. Current External Grants and Contracts Awarded

| Role of Candidate and Co-Investigators | Title | Agency | Project Total | Candidate's Share | Grant Period |
|---|---|---|---|---|---|
| Co-PI<br>Le Xie (PI), Texas A&M<br>Pravin Varaiya (Co-PI), UC Berkeley | Collaborative Research: CyberSEES: Coupon Incentive-based Risk Aware Demand Response in Smart Grid | NSF: Division of Computing and Communication Foundations | $1,000,000 | $311,000 | 10/1/13-9/30/18 |
| PI | CAREER: Algorithms for Risk Mitigation in Networks | NSF: Division of Computing and Communication Foundations | $448,123 | $448,123 | 5/15/14-4/30/19 |
| PI<br>Michael C. Caramanis (Co-PI), Boston University | AitF: Collaborative Research: Algorithms and Mechanisms for the Distribution Grid | NSF: Division of Computing and Communication Foundations | $800,000 | $479,985 | 10/1/17-9/30/21 |

9

CONFIDENTIAL

**Table 3. External Grants and Contracts Awarded in Rank and Completed**

| Role of Candidate and Co-Investigators | Title | Agency | Project Total | Candidate's Share | Grant Period |
|---|---|---|---|---|---|
| PI | ICES: Small: Risk Aversion in Algorithmic Game Theory and Mechanism Design | NSF: Division of Computing and Communication Foundations | $370,000 | $370,000 | 8/1/12-8/31/17 |
| PI | Maps Directions under Deadlines | Google Faculty Research Award | $41,000 | $41,000 | 2013 |

**Table 4. Pending External Grants and Contracts**

| Role of Candidate and Co-Investigators | Title | Agency | Project Total | Candidate's Share | Grant Period |
|---|---|---|---|---|---|
| Co-PI<br><br>PI: Georgios B. Giannakis (University of Minnesota)<br>Co-PI: Sairaj Dhople (University of Minnesota), Mingyi Hong (University of Minnesota), Yousef Saad (University of Minnesota), Hao Zhu (UT ECE), Ross Baldick (UT ECE), Constantine Caramanis (UT ECE), Lang Tong (Cornell), David Bindel (Cornell), Eilyan Bitar (Cornell), Ari Juels (Cornell), Vassilis Kekatos (Virginia Tech), Walid Saad (Virginia Tech), Nikolas D. Sidiropoulos (University of Virginia), Zongli Lin (University of Virginia), Emiliano Dall'Anese (University of Colorado Boulder), Lucy Pao (University of Colorado Boulder) | DNS4CES: Data- and Network-driven Science for Complex Energy Systems | Department of Energy (DOE) Office of Science Program Office | $10,000,000 | $400,000 | 10/1/18-9/30/22 |

10

CONFIDENTIAL

Appx.0279

UT Austin_0016340

**Budget Council Assessment on Teaching Performance for Faculty Promotion Candidate
Evdokia Nikolova**

This report was prepared by Budget Council Members Professor Christine Julien and Professor
Jon Valvano and is their evaluation of Dr. Nikolova's teaching record.

Evaluation Procedure: The evaluation procedure includes reviewing (a) Dr. Nikolova's teaching
portfolio; (b) course evaluations by peers as well as students; (c) graduate research supervision
activities; (d) peer assessments of her classroom performance; and (e) her performance in
comparison to other Assistant Professors in the department.

**Teaching Statement and Philosophy:**

Dr. Nikolova values teaching at all levels: from graduate research advising, to graduate teaching,
undergraduate teaching, and even fostering the next generation of engineering students. Her
philosophy balances the formal and fundamentals with practical examples, even in the most
advanced abstract graduate courses. She also has a history of meaningfully weaving research
exposure and experience into the classroom, even in undergraduate courses.

While at UT, Dr. Nikolova has introduced two new graduate courses and stepped in to fill a much
needed role in a high-demand undergraduate course. The latter course is a course with a long
history in the ECE department, but Dr. Nikolova has worked to put her own stamp on the course
while also contributing to a team effort to unify the sections of the course. She has contributed in
many other ways to the department's teaching mission, including reaching newly enrolling
students though Camp Texas and teaching future students through the Edison Lecture Series.

**Course Evaluation:**

While in rank as an Assistant Professor in the UT ECE department, Dr. Nikolova has taught one
undergraduate course multiple times and introduced two much-needed graduate courses. At the
undergraduate level, she has taught EE360C: an upper division course that is nonetheless
required for a very large fraction of ECE undergraduate students. Dr. Nikolova has taught this
course four times, and she was among the first instructors to "team teach" the course, keeping
multiple sections offered in the same semester "in step" with the same assignments, lecture
material, TAs, etc. This innovation has since transferred across the many instructors of the
course. Dr. Nikolova (along with her teammate Dr. Soloveichik) also noticed that the students in
EE360C would greatly benefit from more individualized instruction. To address this, the pair
initiated voluntary recitation sections, which the students have greatly appreciated. This practice
has since also been adopted by other instructors of the course. Across the four sections of this

CONFIDENTIAL

course Dr. Nikolova has taught while at UT, she has maintained an average instructor rating of 3.9 and an average course rating of 3.5, both of which are in line with the averages of all other instructors of the course at 3.8 and 3.7. Students comment on her willingness to engage with the class and to spontaneously try examples from the students. The students also explicitly noted the usefulness of the weekly problem-solving sessions that Dr. Nikolova introduced to this course.

*Typical positive comments from her CIS (undergrad EE360C)*
"good teacher" "learned a lot"
"easily reachable" "awesome"
"engaging" "patient"
"dedicated and enthusiastic"
"passion for teaching"
"knowledgeable"
"The professor is great" "super helpful" "cares about students"

*Example negative comments from her CIS (undergrad EE360C)*
"wish she had more office hours"
"explained poorly, went too fast"
"good class, great material, boring lectures"
"write bigger on the board" "handwriting is too small"

At the graduate level, Dr. Nikolova has introduced two new courses to the curriculum, filling a much-needed gap in formal algorithm instruction in the ECE department. She has offered an Advanced Algorithms course that focuses on approximation algorithms. Even with the difficult abstract material, Dr. Nikolova makes an extensive effort to integrate real-world application examples to make the material more accessible to students from wide-ranging backgrounds. In two offerings of this course, Dr. Nikolova's average instructor rating and course rating are 4.1 and 3.8, respectively. The second graduate course Dr. Nikolova has offered at UT is a graduate course in Game Theory. This is also new to the curriculum and covers an advanced topic; Dr. Nikolova's ratings for this course are similarly high at 4.1 for both the instructor and course ratings. In the limited available written comments for her graduate courses, students do highlight Dr. Nikolova's obvious motivation and enthusiasm for the material.

Typical positive comments from her CIS (grad EE381V)
"high level of energy"
"difficult, but I learned a lot"
"great course"

Example negative comments from her CIS (grad EE381V)

CONFIDENTIAL

"no enthusiasm makes most classes boring"
"have solutions for homework"

**Peer Evaluations:**

Our faculty's peer evaluations of Dr. Nikolova's teaching repeatedly identify her interactive teaching style and use of the board for lectures as substantially contributing to her effectiveness as a teacher. Further, Dr. Nikolova has stepped into the rotation of a high demand undergraduate course (EE360C) that comes with many inherent challenges. While reaching all of the students in this large lecture class format is very difficult, the peer observations highlight multiple strategies that Dr. Nikolova has employed (e.g., frequent quizzes, lecture style, etc.) that aim to increase student engagement and improve her already high effectiveness.

*Quotes from her peer evaluations:*
"Overall, EE381V is an excellent class, well run and well taught by an outstanding young professor" (4/2/2015 EE381V – Advanced Algorithms, Professor Chase)

"I found her approach, blending intuition, motivation and also rigorous derivation, to be very effective." (3/31/2017 EE381V – Advanced Algorithms, Professor Caramanis)

"I generally found her teaching style, board work, and broader teaching techniques (like the quizzes) to be effective. Evdokia has a very clear teaching style. She is well prepared and organized. And she appeared to try hard to engage the class" (12/7/2017 EE360C Algorithms, Professor Caramanis)

**Graduate Research Supervision:**

Dr. Nikolova's research supervisions have been at or above expectations for an assistant professor in the ECE department. She makes a conscious effort to focus on building a *team* while also developing individual skills in her students that go beyond just basic research execution. While in rank, Dr. Nikolova has one PhD student who will graduate in August, successfully advised one post-doctoral researcher, and grown a vibrant group of six graduate researchers.

**Summary:**

Dr. Nikolova takes her teaching obligations very seriously and has strived to improve her teaching effectiveness while still addressing the needs of the ECE department and its students. Along with Dr. Soloveichik, she has added a "Lunch with the Professors" component of EE360C

CONFIDENTIAL

to give the students more access to informal mentoring and advising. In closing, Dr. Nikolova is passionate about teaching, which comes across to her students and results in a highly effective style. Her teaching record clearly exceeds the expectation for an Assistant Professor in the Department of Electrical and Computer Engineering.

Statement prepared by Budget Council Members Professors Christine Julien and Jonathan Valvano

CONFIDENTIAL

UT Austin_0016344

**Evdokia Nikolova**
Assistant Professor
University of Texas at Austin

**TEACHING STATEMENT**

## 1.  Teaching Philosophy

**Motivation and challenges.** As the daughter of a life-long high-school teacher of mathematics, my first professional aspirations were to become a teacher. I was fortunate to discover my love for teaching very early on—while tutoring mathematics to fellow students in middle-school and high-school. During this first formal experience in teaching, I developed an understanding of the differences in learning styles among students and I felt very rewarded as I was able to tailor my teaching style to every individual student.

As a college and PhD student, I served as a teaching assistant for several undergraduate courses, including "Introduction to Algorithms" and a mathematics course on "Functions and Graphs" at Harvard, and a graduate course "Game Theory" at MIT EECS. My students ranged from undergraduates to adults with very diverse mathematical backgrounds. The transition from my earlier experience with one-on-one tutoring to teaching a roomful of students was challenging: because in a classroom, I have to address the class as a whole, unable to adapt my explanations of concepts and proofs to the individual levels that were best fitted for each student. This is inevitably a challenge for every teacher addressing a roomful of students with diverse backgrounds and aptitudes for learning—and there is no easy solution. I have continued looking for ways to address these challenges as a course instructor at Texas A&M and at UT Austin—in the undergraduate courses on algorithms and the graduate courses "Risk-averse and Stochastic Optimization" and "Algorithmic Game Theory" that I developed and taught, and especially the graduate course "Advanced Algorithms," which I taught in Fall 2012 to more than 50 students from multiple departments (Computer Science, Electrical, Mechanical and Civil Engineering, and Economics). I revisit my undergraduate and graduate teaching in more detail in the subsequent sections.

**Teaching style.** While lecturing, my style is to pay close attention to the (often silent) reactions of students to what I say: I look for cues and facial expressions, as well as answers to my frequent prompts for questions, as a way of testing whether I am successful in connecting with my audience. Grading assignments, exams, as well as soliciting direct feedback is also an invaluable way of being on top of the needs of individual students and my overall teaching effectiveness. The undergraduate and graduate courses have been rewarding in distinct ways: teaching fundamental material offers an exciting opportunity time and again to develop the appreciation of "newcomers" for scientific concepts that our research profession as well as a number of real-life applications build on. An advanced course, on the other hand, presents an opportunity for a dialogue and mutual learning experience that also gives me, the lecturer, an exciting new look at the corresponding material.

Some of my first role-models were my own high-school and college teachers of mathematics. I admired the clarity of their lecture style, the detailed writing and beautiful organization of the material on the blackboard, the carefully chosen problems to spark the students' attention while also conveying the course material. For theoretical material, I believe that it is crucial for every student to learn to construct and write proofs, and the best way to teach this is by example. However, I recognize that I would also be teaching students with more applied interests: for those I try to motivate and spark the interest in theoretical concepts with relevant practical applications. I will continue following a similar teaching style as my role-model teachers, by carefully combining detailed presentation of concepts with higher-level overview of their importance.

1

**Appx.0284**

CONFIDENTIAL

UT Austin_0016345

## 2. Undergraduate Teaching

**Honors Undergraduate Algorithms with Novel Research Component at TAMU.** My first undergraduate teaching course was an Honors Algorithms course that I taught at Texas A&M University (TAMU). I had around eleven very highly motivated students in the class, and I started out with an ambitious innovation to interweave a semester-long research project and teach them about research. My goal was to motivate them with the material I taught in class and spark their passion for the unknown. It was a research project on shortest paths, one of the core problems with multiple algorithms covered in standard undergraduate algorithms courses, the research novelty being that each network edge had two weights rather than one (corresponding to two criteria users care about, say travel time and travel cost). The goal was to find all possible shortest paths that minimize some linear combination of the two weights—specifically, I wanted them to implement a computer program searching for the maximum number of such paths in planar graphs or give some theoretical analysis on what they thought the maximum number was. I figured it was a very easy problem to explain while still being an open research problem that I am actively interested in.

The research component was a great success since, on the one hand, it had clear deliverables that I used as part of the homework and programming assignments I designed. On the other hand, it left room for creativity on the part of the students for trying to find methods of generating more and more paths, and culminated in a friendly competition among different teams who showcased the graphs and edge weights with maximum number of paths in final project papers and presentations they gave at the end of the semester. During the course of the semester, I had set milestones and was regularly meeting with and closely mentoring the students with their research progress. At the end of the semester, I encouraged the best student to engage in undergraduate research, which he did with me for the subsequent semester. I believe this was a special experience for all students in the course, as it was for me, which I would love to repeat at UT Austin once the inaugural honors undergraduate EE program takes off.

**Algorithms EE 360C at UT.** At UT Austin, I have been teaching the undergraduate algorithms class EE 360C, which is a required course for many EE majors and my sections have had enrollments ranging from 61 to 82 students. This is one of the most demanding courses in the EE curriculum, taken predominantly by juniors and seniors. It is especially challenging to teach due to its demanding mathematical material and the inexperience of many students with writing mathematical proofs (a skill that takes years to develop, like good writing, and unfortunately the prerequisite course "Discrete Mathematics" offered by the Math department is not enough to teach them that skill). I developed several new lectures for EE 360C on the topics of shortest paths and NP-Completeness, as well as new homeworks and exams, while also building on teaching material developed by Prof. Julien from prior iterations of the course.

The difference of my current teaching style over my own experience of learning as a student, is that I use a combination of slides and white-board teaching. Alternating between the two breaks the monotonicity of either style and seems to better engage the students' attention. The slides, made available to the students, are useful for them to focus on understanding what I say in real-time rather than worrying about writing down every word I say (as was my own learning experience as a student). The white-board on the other hand is essential for practice in rigorous mathematical writing and naturally slows down the pace so more difficult mathematical concepts have time to be absorbed. I also alternate teaching new material with problem solving on the board in lecture. Something that greatly enhanced my own learning and experience as an undergraduate at Harvard University was the recitation/problem-solving sections accompanying each course, taught by teaching assistants to at most 10-15 students in the course assigned to the corresponding section.

My fellow instructor, Prof. David Soloveichik, and I experimented with that method for the first time in EE 360C in Fall 2017 at UT Austin, introducing two recitation sections per week, which the TAs alternated teaching. Our idea was then also adopted by Prof. Julien who taught 360C in Spring 2018. It would be

2

CONFIDENTIAL

UT Austin_0016346

invaluable to have more TA help to lead (mandatory or voluntary) problem solving sessions in smaller student groups since those would allow for much greater interaction and an enhanced learning experience for the students. Additionally, we held an event outside the classroom, "Lunch with the professors," to show our personal sides during an informal dialogue driven by the student questions to us. All students across the three sections taught that semester were welcome to join, and we heard very positive student feedback (including on my teaching evaluations) and encouragement to repeat the event on a regular basis in future semesters.

**Comments from student evaluations.** The difficulty of the course has also made it hard to find qualified teaching assistants. In two of the semesters I taught the course (Fall 2016 and Fall 2017), the available TA candidate pool was especially limited. That issue was coupled with even worse performance than we expected from the appointed TAs, which we diligently tried to improve through increased communication and weekly staff meetings. I believe that was the key factor for lowering my instructor and course evaluations. Most handwritten comments on the student evaluations are very positive on my quality of teaching and care for the students[1]; the negative comments are directed mainly toward the TAs and their responsibilities (creating and grading homework and programming assignments).[2] I have tried hard to learn from my experience and the advice of my colleagues that I continuously solicit, and I will keep working on developing better techniques for recruiting and selecting highly qualified TAs, as well as becoming better at TA management in future semesters.

## 3. Graduate Teaching

**Advanced algorithms.** At TAMU, I developed a new graduate class on advanced algorithms. At the time, I was criticized for making the course too hard. At UT, on the contrary, I recognized the much more advanced theoretical graduate student body and was encouraged by colleagues to teach harder material. So I developed an entirely different and much more advanced version that focuses on "approximation algorithms," which is a rigorous mathematical field of algorithmic techniques for hard problems that have no known efficient algorithms. (Examples from real-life include how a courier service like UPS can most efficiently visit multiple addresses to complete deliveries in the shortest amount of time or distance driven—the theoretical equivalent is known as the "Traveling Salesman Problem", a notoriously hard theoretical problem for which there is still great research interest for improving existing algorithm designs and performance.)

**Game theory.** There is no regularly offered class on Algorithmic Game Theory at UT, and it has been a challenge for the students here to be educated or engage in research in the interface at Electrical Engineering & Computer Science, and Economics departments. I developed and taught a new course on "Algorithmic Game Theory" in Spring 2012, and will continue incorporating new state-of-the-art material into the course in subsequent years. Due to the high practical relevance of this field and its lack in the curriculum so far, I anticipate student interest at both the undergraduate and graduate levels and multiple disciplines (electrical engineering, computer science, operations research, mathematics, civil engineering, aero-astro), and in the future I might try offering a combined graduate-undergraduate version.

**Risk-averse Optimization (TAMU).** This was the first graduate class that I taught at Texas A&M, in a seminar style where students alternated giving presentations on research papers, followed by discussion of the papers by the entire class. The course drew a diverse audience of students from civil engineering, industrial

---

1 Example of positive student comment: "Dr Nikolova you were Awesome! You presented material and walked through problems in a patient way that made concepts easy-to-understand. Overall, extremely glad I had you for this course! Also, loved how excited about the material you were!"

2 Example of negative student comment: "The programming assignments were disorganized and graded too hastily by TAs."

3

CONFIDENTIAL

UT Austin_0016347

engineering, mathematics and computer science.

## 4.  Individual Instruction

I care deeply about each member of my research group, which has rapidly grown to 6 students (two of them co-advised) and 2 postdocs (one postdoc finished in December 2017 and is now a lecturer at the National Technical University of Athens, while my first PhD student, Ger Yang, successfully defended his PhD thesis in May 2018 and is graduating in August 2018). My motto with my PhD students and postdocs is that *each of them should feel special!* I truly believe that encouragement brings out the best in a human being, and maybe a tiny dose of friendly competition (but not too much to discourage them!). I operate my group as a team. I encourage every group member to feel responsible for the well-being of the other group members and to learn from them and appreciate the others' unique strengths and talents. I try hard to help each of my students/postdocs discover and develop their unique strengths and talents, while nurturing them to grow into a balanced and well-rounded human being in both research and life. I also try gently to help them improve on weaknesses, social and academic alike. I feel deeply rewarded as an advisor when I manage to help them reach personal and professional fulfillment.

## 5.  Outreach, increasing diversity and future plans

**Teaching for a broad audience outside the classroom.** I believe that down-to-earth accessible teaching is essential for inspiring young people to pursue research for the advancement of research itself and, even more critical, the advancement of interdisciplinary research. In an effort to bridge the gap between theoretical computer science and other disciplines, I gave an introductory lecture "A Brief Introduction to Algorithms, Game Theory and Risk-Averse Decision Making", recorded at the Simons Institute in Berkeley, CA. In the following months, I received several compliments that the lecture was very clear and helped them to better understand the field of algorithms, from both students and faculty members from other research disciplines (A UC Berkeley EECS professor and a UT colleague working in power systems). I expended a great deal of time preparing the lecture, rehearsing and reworking it to ensure its broad accessibility so their unsolicited comments were extremely rewarding. This lecture now has over 700 views on YouTube and a link is available on my website.

**Outreach and community building.** I believe that the highest impact on increasing diversity in engineering and STEM disciplines in general will be achieved through role models and building communities so underrepresented students do not feel isolated. Hoping to become a role model, I gave four lectures on "Computing for Green" to over 1000 K-12 students of diverse backgrounds from Austin and Central Texas, in Feb. 2016, as part of the annual "Edison Lecture Series" at UT Austin. I have also spoken for three consecutive years at Camp Texas to incoming UT freshmen on topics including how to succeed in college, choosing a major and a career, and research. Additionally, to encourage the entry of underrepresented students into STEM disciplines, my dream is to help build communities through novel initiatives by combining STEM and non-STEM disciplines, such as mathematics and dance, in one-day events and summer programs. In the past, I organized a belly-dancing class for electrical engineering majors that was attended by about 30 undergraduates from UT Austin (including two brave male students!). I also plan to run one-day pilot programs that combine research lectures by faculty and dance classes (possibly also by faculty) for undergraduates before expanding to math-dance summer camps for middle and high-school students.

**Additional mentoring.** As a graduate student at MIT, I had the opportunity to mentor several high-school students in research (from the very competitive "Research Science Institute" (RSI) program for high-school students that takes place every summer at MIT). At the Spring 2018 Simons Research Program on "Real-time Decision Making" that I co-organized, I served as official mentor for Sofya Vorotnikova, a Simons fellow and PhD student from UMass-Amherst. Both formal and informal mentoring is critical to nurture progress,

4

CONFIDENTIAL                                                      UT Austin_0016348

motivation and fulfillment at all levels of one's career. I have myself benefited enormously from my mentors and advisors, and I look forward to counseling and guiding my students/mentees to ensure they reach their full potential and find rewarding and fulfilling career paths.

## Summary Tables

### Table 1. Summary of Course-Instructor Ratings

| Metric | Value |
|---|---|
| Total # of students taught in organized courses | 341 |
| Average instructor evaluation for UG courses | 3.9 |
| Average instructor evaluation for Grad courses | 4.1 |
| Average course evaluation for UG courses | 3.5 |
| Average course evaluation for Grad courses | 3.9 |

### Table 2. Course Schedule by Semester with Number of Students Indicated

| Semester | | Enrollment | Instructor Score | Course Score |
|---|---|---|---|---|
| Spring 2018 | Taught double load in Fall 2017 | | | |
| Fall 2017 | EE 360C: Algorithms | 69 | 3.9 | 3.7 |
| | EE 360C: Algorithms | 65 | 3.7 | 3.3 |
| Spring 2017 | EE 381V: Advanced Algorithms | 26 | 3.9 | 3.5 |
| Fall 2016 | EE 360C: Algorithms | 82 | 3.9 | 3.4 |
| Spring 2016 | On teaching relief | | | |
| Fall 2015 | On teaching relief | | | |
| Spring 2015 | EE 381V: Advanced Algorithms | 22 | 4.3 | 4.1 |
| Fall 2014 | EE 360C: Algorithms | 61 | 4.0 | 3.7 |
| Spring 2014 | EE 381V: Game Theory | 16 | 4.1 | 4.1 |

### Table 3. Summary of Graduate Students Currently Supervised at UT Austin

| Student Name | Co-Supervisor | Degree | Start Date | Date Reached Candidacy | Date Expected to Reach Candidacy | Expected Graduation (end) Date |
|---|---|---|---|---|---|---|
| Ger Yang | | PhD | 08/2014 | 11/2017 | | Summer 2018 |
| Soumya Basu | Sanjay Shakkottai | PhD | 08/2014 | | Spring 2018 | Spring 2019 |
| Ali Khodabakhsh | | PhD | 08/2015 | | Fall 2018 | Fall 2019 |
| Orestis Papadigenopoulos | | PhD | 08/2016 | | Fall 2019 | Fall 2020 |
| Isidoros Giotis | | PhD | 08/2017 | | Fall 2020 | Fall 2021 |
| Nithin Ramesan | Francois Baccelli | PhD | 08/2017 | | Fall 2020 | Fall 2021 |
| Eftychia Vakaliou | | PhD | 08/2018 | | Fall 2021 | Fall 2022 |

5

Appx.0288

CONFIDENTIAL

Evdokia Nikolova
Department of Electrical and Computer Engineering
Course Rating Averages

What source was used to complete this chart? My CIS

**EE 360C: Algorithms**

| Semester | Class Size | Number of Responses | Instructor Rating | Course Rating |
|---|---|---|---|---|
| F14 | 61 | 42 | 4.0 | 3.7 |
| F16 | 82 | 38 | 3.9 | 3.4 |
| F17 | 65 | 46 | 3.7 | 3.3 |
| F17 | 69 | 46 | 3.9 | 3.7 |
| **Mean** | **69** | **43** | **3.9** | **3.5** |

**EE 381V: Advanced Algorithms**

| Semester | Class Size | Number of Responses | Instructor Rating | Course Rating |
|---|---|---|---|---|
| Sp15 | 22 | 19 | 4.3 | 4.1 |
| Sp17 | 26 | 16 | 3.9 | 3.5 |
| **Mean** | **24** | **17.5** | **4.1** | **3.8** |

**EE 381V: Game Theory**

| Semester | Class Size | Number of Responses | Instructor Rating | Course Rating |
|---|---|---|---|---|
| Sp14 | 16 | 14 | 4.1 | 4.1 |
| **Mean** | **16** | **14** | **4.1** | **4.1** |

CONFIDENTIAL

UT Austin_0016350

Course Instructor Survey Results

Name/EID: NIKOLOVA, EVDOKIA (en4762)
Department: Elec & Computer Engr
Report Date: 07-10-2018

| Semester | Unique # | Course # | Course Title | Instruction Type | Enroll-ment | # of Surveys Returned | Avg. Overall Instruct. Rating | Avg. Overall Course Rating |
|----------|----------|----------|--------------|------------------|-------------|----------------------|-------------------------------|----------------------------|
| Spring 2014 | 17259 | E E 381V | GAME THEORY | Organized | 16 | 14 | 4.1 | 4.1 |
| Fall 2014 | 17070 | E E 360C | ALGORITHMS | Organized | 61 | 42 | 4 | 3.7 |
| Spring 2015 | 16535 | E E 381V | ADVANCED ALGORITHMS | Organized | 22 | 19 | 4.3 | 4.1 |
| Fall 2016 | 16685 | E E 360C | ALGORITHMS | Organized | 82 | 38 | 3.9 | 3.4 |
| Spring 2017 | 16785 | E E 381V | ADVANCED ALGORITHMS | Organized | 26 | 16 | 3.9 | 3.5 |
| Fall 2017 | 16495 | E E 360C | ALGORITHMS | Organized | 69 | 46 | 3.9 | 3.7 |
| Fall 2017 | 16500 | E E 360C | ALGORITHMS | Organized | 65 | 46 | 3.7 | 3.3 |

CONFIDENTIAL

UT Austin_0016351

# Teaching Evaluation of Evdokia Nikolova

*Peer review by Craig Chase – April 2, 2015*

I attended Evdokia (Eddie) Nikolova's lecture of EE381V, "Advanced Algorithms" on April 2, 2015. There were approximately fifteen graduate students in attendance.

## Overall Evaluation

Professor Nikolova quite obviously cares deeply about teaching and has a profound understanding of her discipline. I attended one of Eddie's lectures for her graduate course, EE381V "Advanced Algorithms" in Spring 2015 and met with Eddie afterwards to discuss her approach to teaching generally and her work with EE381V specifically. I came away from this experience very impressed with Eddie's teaching.

## Clarity and effectiveness of presentation:

On the day of my observations, Eddie presented material on algorithms for constraint satisfaction problems. She began the class by summarizing (briefly) the results from the previous lecture, which had introduced the Unique Games Conjecture, an important recent research result in the area of constraint-satisfaction problems. The Unique Games Conjecture suggests that in important general cases efficient algorithms for constraint-satisfaction problems cannot exist. Eddie used her summary of this result to both motivate and place into context her current lecture, which revolved around efficient algorithms for constraint-satisfaction problems where most (but not all) constraints are satisfied. This complex technical tightrope (between the intractable variations of the problem and the solvable variations) can be very difficult to understand, and the subtleties of the distinctions are easily lost upon non-experts. Nevertheless, even as an outsider to the field, I felt I was able to follow the "big picture" ideas regarding what Eddie was trying to explain, why it was important, as well as how the algorithm itself was developed.

Eddie used hand-written notes on the document camera for her presentation. She derived methodically the algorithm that she was presenting, using the notes to capture the step-by-step elements of the algorithm as well as the proofs that the algorithm was correct. The notes themselves were extremely well organized and very neatly written. I confirmed after the lecture with Eddie that she distributed those notes to her students. For the topic she was presenting, I find this combination of real-time derivations of the algorithm/proofs along with the distributed lecture notes to be much preferable to power-point.

## Observations of Students:

Eddie's students were attentive and asked several questions during the lecture. The students appeared to be very familiar with the algorithm background (much more so than I was), related to the current lecture and fully aware of the significance of the approximation algorithm that Eddie presented. I noted

CONFIDENTIAL

that one of the students attending the class was a previous teaching assistant of mine, and I asked that student informally for his feedback. While only a single anecdote and not necessarily reflective of the experience of every student, my previous TA had very positive comments for Eddie and her class.

One suggestion that I had for Eddie (and I provided this suggestion to her during our meeting) was that she repeat student questions aloud to the class as a whole. Some of her students spoke somewhat quietly while asking their questions, and while Eddie could hear the question, I (and I presume several other students) could not hear the question, only Eddie's response. Beyond this minor issue, I found that Eddie managed the classroom experience extremely well and created a learning environment that is entirely appropriate for a graduate course.

## Summary

Eddie is supremely competent in her field and an excellent lecturer and teacher. If I were a student, I would certainly seek out her classes. She provides good context for the material she is presenting, is well organized in her approach and methodology, and she creates excellent materials for her students to use in their out-of-classroom study. I provided Eddie with two small suggestions for improvement; before responding to student questions, she should try to restate the question so that the entire class can hear and understand the question. I also encouraged Eddie to communicate, as part of her lecture summaries, her expectations of exactly what the students should take away from the lecture. In the context of a deeply-technical discussion of approximation algorithms to constraint-satisfaction problems, should the students know the algorithm(s) she derived, the proof techniques for the algorithm, or the framework within which the constraint-satisfaction problem is relaxed so that the problem becomes tractable, or all of the above? I note that, based on my anecdotal conversations with the student I knew in her class, the students do feel they understand what is expected of them (in part through the homework assignments), so my suggestion addresses a very minor concern. Overall, EE381V is an excellent class, well run and well taught by an outstanding young professor.

I met with Eddie and provided feedback from this review on April 2, 2015.

Craig M. Chase, Ph.D.  Associate Professor
Raytheon Faculty Fellow in Engineering
Electrical and Computer Engineering
The University of Texas at Austin

CONFIDENTIAL



**ELECTRICAL AND COMPUTER ENGINEERING DEPARTMENT**
Cockrell School of Engineering

*1616 Guadalupe St. • UTA Building, 7th Floor • Austin, Texas 78701*
*http://www.ece.utexas.edu/*

March 31, 2017

Constantine Caramanis
Associate Professor
Fluor Centennial Teaching Fellowship
Dept. of Electrical and Computer Engineering
The University of Texas at Austin
Tel. (512) 471-9269
constantine@utexas.edu

Teaching Evaluation for Evdokia Nikolova:

On Monday, March 27th, 2017, I observed Evdokia Nikolova teach EE381V – Advanced Algorithms. This course develops advanced concepts from algorithms, complexity, approximation and algorithms and randomized algorithms. It is a highly technical class, aimed at developing both techniques and also their rigorous analysis. The course requires using technical material from many areas, including probability/stochastic processes, algorithms, optimization and combinatorics.

In the class I attended, Evdokia began the discussion of the Unique Games Conjecture and its implications. Briefly this is an assumption that has largely become a complexity primitive similar to the concept of NP completeness. In fact, it is in many interesting settings largely complementary to NP completeness.

In the class, Evdokia explained the Unique Games Conjecture, first at a higher level, aiming to convey the key intuition of what it means and what its implications might be, and then in more full technical details. In between doing these two things, she also gave a strong motivation for why we might care. She linked back to work she had done in a previous class, discussing the approximability of MAXCUT. MAXCUT is a celebrated problem in randomized algorithms because of the Goemans-Williamson SDP relaxation and rounding approach, which gives a guarantee of a 0.878… approximation. It is known that unless P = NP, MAXCUT cannot be approximated to better than a 0.94… however, under the Unique Games Conjecture, the MAXCUT approximation ratio is unimprovable.

I found her approach, blending intuition, motivation and also rigorous derivation, to be very effective.

CONFIDENTIAL                                          UT Austin_0016354



**ELECTRICAL AND COMPUTER ENGINEERING DEPARTMENT**
Cockrell School of Engineering

*1616 Guadalupe St. • UTA Building, 7th Floor • Austin, Texas 78701*
*http://www.ece.utexas.edu/*

Evdokia has a very clear teaching style. She lectures on the board. She has a very organized and therefore effective style, particularly considering the highly technical/theoretical nature of the material.

There was some interaction with the class, though not too much. The students seemed fairly engaged.

These are the main elements of her teaching that I observed in class, and they all gave me the clear sense that Evdokia is an effective classroom teacher.

Sincerely,

Constantine Caramanis

CONFIDENTIAL



**DEPARTMENT OF ELECTRICAL AND COMPUTER ENGINEERING**
COCKRELL SCHOOL OF ENGINEERING
_____

*2501 Speedway • EER Building, 6.804 • Austin, Texas 78712 • (512) 471-6500 • FAX (512) 471-6512*

Prof. Constantine Caramanis                                     May 31, 2018
Associate Professor
Fluor Centennial Teaching Fellowship
Dept. Of Electrical and Computer Engineering
The University of Texas at Austin
E-mail: constantine@utexas.edu
Phone: (512) 471-9269

Teaching Evaluation for Evdokia Nikolova:

On Thursday, December 7th, 2017, I observed Evdokia Nikolova teach the undergraduate class EE360C – Algorithms. This course develops fundamental ideas from algorithm design and analysis, studies computational complexity and computational complexity classes and reductions, and is also one of our curriculum's classes that emphasize proof writing. It is a highly technical class, aimed at developing both techniques and also their rigorous analysis. The course requires using technical material from many areas, and is also a key required course for the Software Engineering and also Data Science technical cores – two of the most populated technical cores.

In the class I attended, there was an in-class quiz. As Evdokia explained to me when we discussed the class and her ideas for overcoming some of the challenges she faces, she uses fairly frequent in-class quizzes as a technique for encouraging engagement and continues focus on the course material. This quiz was to be on a topic related NP-completeness and the subset-sum problem. Accordingly, in the first party of the class, Evdokia went over several example problems relating to the challenge of demonstrating via complexity-preserving reductions, that a problem is NP-complete. She discussed the problem of answering whether a graph has a Advanced problem solving methods; algorithm design principles; complexity analysis; study of the nature, impact, and handling of intractability; study of common algorithmic classes and their applications.
Feedback vertex set of $k$ or fewer vertices. Then she similarly led a discussion on approximate subset sum, and on the knapsack problem.

The notion of NP-completeness is difficult to grasp and abstract. Moreover, deriving reductions from one problem to another requires technical mastery combined with careful – sometimes even creative – intuition. Therefore, this is a challenging topic to teach. Evdokia's class was very large, and as undergraduates are often wont to do, many of the students sat as far in the back as the room seating would allow. This sets up a challenging environment, particularly for teaching very technical matter. Evdokia's style, at least for this portion of the class, is to lecture on the board. This allows her to attempt to engage with the students and take suggestions from the audience on how to proceed. While the classroom is quite big, Evdokia's board-style was fairly effective in

Appx.0295

CONFIDENTIAL                                                              UT Austin_0016356

**DEPARTMENT OF ELECTRICAL AND COMPUTER ENGINEERING**
COCKRELL SCHOOL OF ENGINEERING

---

*2501 Speedway • EER Building, 6.804 • Austin, Texas 78712 • (512) 471-6500 • FAX (512) 471-6512*

encouraging some number of students to participate, to offer suggestions on how to proceed, and to ask questions as well. Certainly, a large number of students appeared checked out, from my vantage point at the back of the room. And drawing those students in is a central challenge that Evdokia faces. She says that her interactive style, and also use of in-class quizzes on material that is being discussed at least in part during class, is in part of her attempt to address the significant challenge of keeping large numbers of undergraduate students engaged throughout the discussion of highly technical material.

I generally found her teaching style, board work, and broader teaching techniques (like the quizzes) to be effective. Evdokia has a very clear teaching style. She is well prepared and organized. And she appeared to try hard to engage the class.

These are the main elements of her teaching that I observed in class, and they all gave me the clear sense that Evdokia is an effective classroom teacher.

Evdokia and I discussed the overall class, her goals in the class, and her strategies in the class on numerous occasions. Most recently, we discussed my observations in the class I attended.

Sincerely,

Constantine Caramanis

CONFIDENTIAL

```
09/06/18                              THE UNIVERSITY OF TEXAS AT AUSTIN           PAGE:      1
PROGRAM AFPDFGC2                            OFFICE OF THE PROVOST
                                   COMMITTEE REPORT, MASTERS AND DOCTORAL
                                   FOR NIKOLOVA, EVDOKIA
```

| STUDENT NAME | EID | LAST CCYYS ENRL | COMM POSITION | MAST OR DOCT | 1ST DEGREE | FIELD | CCYYS | 2ND DEGREE | FIELD | CCYYS |
|---|---|---|---|---|---|---|---|---|---|---|
| ALKHATEEB, AHMED A. N. Y. | aaa4325 | 2O169 | MEMBER | D | PH.D. | ELECTRICAL AND COM | 2O169 | | | |
| CHAUHAN, HIMANSHU | hc8445 | 2O176 | MEMBER | D | PH.D. | ELECTRICAL AND COM | 2O176 | | | |
| DOMANIC, NEVZAT ONUR | nod67 | 2O176 | MEMBER | D | PH.D. | COMPUTER SCIENCE | 2O176 | | | |
| NARAYANA PRASAD, M. | mn9599 | 2O189 | MEMBER | D | | | | | | |
| PADULLAPARTI, HARSHA VARD | hp6868 | 2O186 | MEMBER | D | PH.D. | ELECTRICAL AND COM | 2O186 | | | |
| RAMBHA, TARUN | tr7544 | 2O166 | MEMBER | D | PH.D. | CIVIL ENGINEERING | 2O166 | | | |
| SHIN, HUNYOUNG | hs9576 | 2O179 | MEMBER | D | PH.D. | ELECTRICAL AND COM | 2O179 | | | |
| YANG, GER | gy2362 | 2O186 | CHAIR | D | PH.D. | ELECTRICAL AND COM | 2O186 | | | |

**Appx.0297**

CONFIDENTIAL                                                                              UT Austin_0016358

# List of Postdoctoral Fellows Supervised
(in rank)

Evdokia Nikolova

Department of Electrical and Computer Engineering, The University of Texas at Austin

nikolova@austin.utexas.edu

**Athanasios (Thanasis) Lianeas** (Ph.D., National Technical University of Athens, 2014)
      Postdoctoral years: 2015-2017
      First employment: Lecturer, National Technical University of Athens

**Emmanouil (Manolis) Pountourakis** (Ph.D., Northwestern University, 2017)
      Postdoctoral years: 2017-present

**Appx.0298**

CONFIDENTIAL

UT Austin_0016359

# Budget Council Assessment on Research for Faculty Promotion Candidate Dr. Evdokia V. Nikolova

## Summary

Assistant Professor Evdokia Nikolova leads a world-class research program in decision-making, specifically in the context of risk, with an emphasis on rigorous theoretical foundations and important applications that have a wide range of societal impacts. Dr. Nikolova has made foundational contributions in understanding the resulting equilibria, with important implications in many areas, e.g., the design of road tolls. She has a solid publication record, with 30 conference papers and 4 journal papers. Her work has received high recognition in academia (e.g., NSF CAREER Award 2014) and industry (e.g., Google Faculty Research Award 2013). Dr. Nikolova's research accomplishments clearly support her promotion to Associate Professor with tenure.

## Research Area and Contributions

Dr. Evdokia Nikolova's research concerns decision-making in network contexts, simultaneously representing the effects of risks and multiple decision makers. Risk has been recognized in recent decades as being very important to decision making, having perhaps first been studied in the context of financial decision-making. Risks arise because of uncertainty about various parameters that determine outcomes, and therefore uncertainty is present in essentially all systems. Consequently, the implications of risk is pervasive. Important examples where risk has a significant role in decisions include transportation and energy, where there is an underlying network. In these domains, and indeed in most areas of societal interaction, there are also multiple entities that make decisions based on their own priorities that may interact and conflict with each other. Congestion on roads is a canonical network example where the resulting decisions, or equilibrium, may result in over-utilization of road resources compared to a notionally optimal utilization of the road network. The deviation of outcomes in equilibrium from the notionally optimal utilization, and the resulting efficiency loss compared to optimal, is a useful way to evaluate the implications of decision-making.

An important insight by Dr. Nikolova is that risk can greatly affect decision-making, with a resulting further efficiency loss compared to optimal utilization due to incorporation of risk into the objectives of decision-makers. Dr. Nikolova's key contributions are in recognizing and analyzing the effect of risk on equilibrium. Her work has specific application in models of transportation and energy networks and more general applications in other network equilibrium settings, including energy and telecommunications.

Dr. Nikolova takes a mathematically rigorous approach to her analysis of risk in decision-making. Her work has systematically added consideration of risk into the computational determination of the equilibrium resulting from the interaction of decision-makers that have differing objectives. Her research has explored the modeling issues in representing risk and the way in which risk affects the game-theoretic performance of the system, defining the notion of the "price of risk aversion," which measures the worsening of equilibrium outcomes due to the risk-aversion of decision-makers. The paragraphs below discuss her intellectual and methodological contributions in three interrelated areas.

First, Dr. Nikolova's research has made significant contributions in **decision-making under risk**, including modeling risk in network routing with the mean-standard deviation risk model. This work recognizes that an objective that considers not just expected travel time, but also includes a multiple of the

Appx.0299

CONFIDENTIAL

UT Austin_0016360

standard deviation of travel time, can represent practical decision-making by realistic users through adding a "buffer." A careful and clear model is developed in several contexts to provide rigorous results on the price of risk aversion. By developing the analysis in an abstracted format, Dr. Nikolova provides several new results that are applicable to a variety of network contexts, including but not limited to road congestion, collectively constituting a unified analysis of the implications of the risk model on the efficiency of the resulting equilibrium. Her work also helps in understanding the sensitivity of the efficiency of the resulting equilibrium to risk averseness. This has important implications in models of a variety of human endeavors, from road and telecom congestion to electricity markets. She has also considered other risk-related objectives, including a mean-variance risk model.

Dr. Nikolova's second line of research considers the **interaction of users of tolled facilities and the owners** who set tolls. Road networks are a canonical example of this model. This work develops an important insight that by setting maximum prices caps on tolls, the network regulator can induce an equilibrium that maximizes the efficient use of the system. As in the analysis of risk, this work is characterized by a rigorous derivation of the equilibrium conditions, including analysis of various alternative arrangements that clarify the tradeoffs and implications of various detailed alternative arrangements and of the diversity of users. A compelling topological analysis is part of the overall development. Since certain topological structures (series-parallel networks and the Braess network) are also common in other networks, including electric power systems, some of the insights have even broader implications.

The third area is another network setting, namely in the **reconfiguration of electric distribution systems**. This area has received recent attention in part because the revolution of increased telemetry and control as part of the so-called "smart grid" can greatly enhance the ability to rearrange connections in the electric distribution system to achieve certain objectives such as minimizing losses or maximizing reliability. This work concerns a novel formulation of the loss minimization problem that allows for better understanding of algorithms applied to this problem.

## Publications and Impact

Dr. Nikolova's publication record is very strong. Her research has resulted in 30 conference papers (12 since joining UT). All of these conferences are peer-reviewed conferences with archived proceedings, and most are highly selective with acceptance rates of 30% or less. She has also published 4 journal papers, including one in *Operations Research* and another in *Mathematics of Operations Research*, which are extremely selective high-impact journals. Her publications include several papers at ACM and IEEE conferences, spanning computer science, networking, computational economics, and power systems. Her h-index on Google Scholar is 17, and the h-index since 2013 is 14, which are strong numbers for a researcher developing new theoretical and algorithmic tools.

## Research Funding

Dr. Nikolova has received an NSF Career Award and a Google Faculty Research Award. The Google Faculty Research Award is indicative of the value of her research to industry.

CONFIDENTIAL

UT Austin_0016361

**Peer Comparisons**

| Name/Area | Institution | Title | Dates (PhD / start of current rank) | Pubs in top venues (in rank /total) | Cites current / Cites when promoted | H-index now/when promoted | Awards |
|---|---|---|---|---|---|---|---|
| <u>Evdokia Nikolova</u> | UT Austin | <u>Assist Prof</u> | 2009 / <u>2011</u> | <u>16</u> / 26 | 955 / <u>955</u> | 17 / <u>17</u> | **NSF Career 14,** Google Faculty 13, Fell: 06, 03, 02, 01<br><br>Patents: 10, 09, 08<br><br>Student Best Pr: 18 |
| **Shaddin Dughmi** | USC | Assoc Prof | 2011 / 2017 | 14 / 29 | 934 / 803 | 17 / 16 | **NSF Career 14,**<br><br>Best Paper 11,<br><br>Best Thesis 11 |
| **Vineet Goyal** | Columbia | Assoc Prof | 2008 / 2017 | 14 / 19 | 737 / 668 | 17 / 15 | **NSF Career 14,**<br><br>IBM Faculty 14,<br><br>Google Faculty 13,<br><br>Fellow: 03 |
| **Anup Rao** | Univ of Washington | Assoc Prof | 2007 / 2016 | 14 / 26 | 1490 / 942 | 19 / 15 | **NSF Career 12,**<br><br>Best Paper 06, 16<br><br>Fellow: 03, 09 |

CONFIDENTIAL

| Seth Pettie | Univ of Michigan | Assoc Prof | 2004 / 2012 | 15 / 27 | 2259 / 832 | 24 / 16 | NSF Career 08, Outst Dissert 04 |

## Conclusion

To summarize, Professor has established an accomplished research program specializing in the implications of risk, with applications in multiple areas. Her publications and awards amply demonstrate that she is deserving of promotion.

## Basis for Evaluation

This statement on the research of Assistant Professor Dr. Evdokia Nikolova was prepared by Budget Council Members Professors Ross Baldick and Sarfraz Khurshid. This statement was prepared following a review of her vita, her research papers, her external letters, and knowledge of her research.

*Ross Baldick*

*[signature]*

Ross Baldick                                    Sarfraz Khurshid

CONFIDENTIAL

## Five Most Significant Publications in Rank

(Students and Post-Docs I supervised appear in bold)

1. **Thanasis Lianeas**, Evdokia Nikolova, Nicolas E. Stier Moses. Risk-averse selfish routing. Forthcoming in Mathematics of Operations Research (Accepted Sep. 2017).

2. Evdokia Nikolova, Nicolas E. Stier Moses. A Mean-Risk Model for the Traffic Assignment Problem with Stochastic Travel Times. Operations Research, 62:2, 366.382, 2014.

3. Georgios Piliouras, Evdokia Nikolova and Jeff S. Shamma. Risk Sensitivity of Price of Anarchy under Uncertainty. ACM Transactions on Economics and Computation (TEAC), Volume 5, Issue 1, November 2016, Article No. 5.

4. Jose Correa, Cristobal Guzman, **Thanasis Lianeas**, Evdokia Nikolova and Marc Schroeder. Network Pricing: How to Induce Optimal Flows Under Strategic Link Operators. In Proceedings of the Nineteenth ACM Conference on Economics and Computation (EC'18). Ithaca, NY, June 19-21, 2018.

5. **Ger Yang** and Evdokia Nikolova. Approximation Algorithms for Route Planning with Non-linear Objectives. In Proceedings of the Thirtieth AAAI Conference on Artificial Intelligence (AAAI'16). Phoenix, Arizona, February 12-17, 2016.

CONFIDENTIAL

UT Austin_0016364

**Evdokia Nikolova**
Assistant Professor, University of Texas at Austin
**RESEARCH STATEMENT**

## 1. Research Goals

My research is driven by applications in societal networks such as transportation and energy. The challenges in these complex systems are that different parties interact at multiple levels (such as network users, central planners, network operators) and there is a great degree of uncertainty. Thus, despite the explosive growth of connectedness and availability of data, these systems suffer from inefficiency and tremendous losses. For example, despite the increased availability of GPS and sensor traffic data, the cost of road traffic congestion was over $160 Billion in 2014 in the U.S. alone and is expected to grow.

*My research goal* is to improve the design and efficiency of complex systems, via novel analytic tools that integrate *game theory, risk analysis and computation*. Specifically, my research develops novel mathematical models and provides rigorous theoretical analysis and solutions with optimality guarantees. In algorithmic game theory, my work on risk-averse selfish routing is among the first to consider the effect of risk on the efficiency of the system and the first to provide theoretical bounds on the level of inefficiency caused by how risk-averse users are.

## 2. Risk-averse Decision-Making

A large-scale system typically operates under a variety of uncertain parameters. When one wants robust and reliable solutions, modeling risk is key. For example, in transportation networks, travel times are uncertain and routing decisions are affected by the risk aversion of users. Moreover, the decision of each user is affected by the decisions of other users in the system: even with the best computing ability, my optimal route might well become the worst if everyone else chooses to take it. In a series of three papers [13, 15, 9], my coauthors and I aim to systematically understand (i) the key modeling question: How should we incorporate risk and uncertainty into an analysis of incentives? and (ii) the key technical question: How does risk affect the performance of a system? We do this in the context of network routing, a fundamental problem at the core of the development of the field of algorithmic game theory.

*Impact.* The above three papers happen to be my three most highly cited papers published since 2014, with 57, 26, 29 citations respectively on Google Scholar (including the citations to the corresponding conference papers), and for this line of work I was awarded the single PI NSF grant titled "Risk Aversion in Algorithmic Game Theory and Mechanism Design," which was my first submitted NSF proposal. Additionally, this research inspired a workshop with the same title that I co-organized in 2012, under the umbrella of the leading conference in the field, the ACM Conference on Economics and Computation.

**Mean-standard deviation risk model in routing games** The beginning of this line of work was inspired by a conversation with colleague Nicolas Stier-Moses, who had read earlier papers of mine on risk-averse routing and risk-averse optimization for a single user [12, 11] and asked: what would happen in the corresponding game where multiple users in the network try to find risk-minimizing routes? In [13], we combined the model of uncertainty and risk-aversion from my earlier papers with the classic model of a congestion game that he had worked on. Specifically, we postulated that each link in the network has expected travel time (latency) that is a nondecreasing function of the number of users or amount of traffic on that link, plus additional noise with zero mean and standard deviation that may or may not depend on the traffic. In terms of risk modeling, we decided to start with what we thought would be a relatively simple and natural first objective function, to minimize the mean plus standard deviation (abbreviated to mean-stdev) along a path, where the standard deviation is weighted by a parameter capturing the degree of risk-aversion.

The mean-stdev model was complicated to analyze, resulting in an exponentially large convex program for the user equilibrium in the simplest setting of traffic-independent uncertainty and non-atomic users

1

CONFIDENTIAL                                          UT Austin_0016365

(namely, traffic modeled as a flow). In fact, with atomic (namely, finitely many discrete) users and traffic-dependent uncertainty, equilibrium was not even guaranteed to exist. An additional challenge was our realization that just describing the equilibrium, when it existed, may require exponential space since it was dependent on how much flow was routed along each of (potentially) exponentially many paths and not just on how much flow was routed along each of the polynomially many links in the network as in classic congestion games without uncertainty.

**Risk sensitivity of price of anarchy** The price of anarchy is a concept that quantifies the worst case efficiency loss in a system due to the decentralized decision making of multiple users, each optimizing their individual benefit, as opposed to a centralized optimization of the system performance. It has become a mainstream topic of study in algorithmic game theory, and is heavily relied on as a predictor of system behavior. For example, the price of anarchy has been shown to be 4/3 in congestion games with linear delay functions, namely decentralized and individually optimal decision making leads to at most 33% performance loss compared to a centrally coordinated solution. In [15], we asked how the price of anarchy would change depending on the model of risk considered. For six different models of risk, we showed that the price of anarchy can vary dramatically from a small constant (4/3) to infinity, the latter occurring under a mean-var objective (similar to the mean-stdev objective discussed above, with variance replacing the standard-deviation of the path delay) and also under an objective that we call "win-or-go-home", inspired by competitive optimization settings under uncertainty where the optimizers do not care about their actual performance but about outperforming their opponents. The main message of this paper is that uncertainty and risk critically affect the prediction of system performance and thus need to be carefully modeled and integrated into the system analysis to obtain informative results. As we conclude in the paper, we prompt "algorithmic game theory research to move beyond merely addressing the computational tractability of old game theoretic concepts but also help lay the foundational work for a more scalable, robust and realistic theory of socioeconomic systems."

**Efficiency loss due to risk** The price of anarchy concept described above was defined in an effort to understand efficiency loss due to decentralized and individually-optimal user behavior. Incorporating risk may lead to further efficiency loss, which our work above [15] did not explicitly detangle. In an effort to separately measure how much efficiency loss is due to the risk-averse behavior of users alone, in [9] we define a new notion of *price of risk aversion* as the worst-case ratio of the equilibrium cost of risk-averse users to the equilibrium cost of risk-neutral users, where the cost of equilibrium is the expected total delay of users in the system (motivated by the perspective of a central planner who cares about long-term averages). We analyze this ratio for users who minimize a mean-var objective, namely mean plus a parameter $r$ times the variance of a path delay, where $r$ captures the degree of risk-aversion. Risk-averse users have $r > 0$ while risk-neutral users have $r = 0$, namely they only care to minimize their expected delay.

In addition to this new concept for analyzing efficiency loss due to risk, our technical contribution is a tight bound on the price of risk-aversion in terms of the network topology. We show that in the worst case, it grows linearly in the size of the graph, namely risk-averse users may end up incurring significantly higher delays compared to risk-neutral users on average (multiplied by a factor of the graph size). We show a matching lower bound through an iterative embedding of Braess graphs and a careful choice of mean and variance latency functions. The main insight in the proof of the upper bound is identifying what we call an alternating path—a path of forward and backward edges, such that the equilibrium for risk-neutral users carries more flow on the forward edges and less flow on the backward edges compared to the equilibrium for the risk-averse users. We then bound the equilibrium cost with respect to the cost of the alternating path, to get the final result. We give a different interpretation of this work, and its meaning and impact on transportation, in the next section.

## 3. Applications in Transportation

**Strategic toll operators.** The phenomenon of congestion in a transportation network can be analyzed via the classic model of "congestion games" from game theory, which demonstrates travel times increase as the number of users on these links increases. This model also informs us how to *alleviate congestion*: by setting

2

CONFIDENTIAL

UT Austin_0016366

appropriate tolls on each link or road segment, users who minimize their individual travel times plus tolls, will end up minimizing the global objective of total travel time of all users—ending up in what is called a "socially optimal" traffic assignment. Such so called "optimal tolls" can be implemented by a central planner who cares to optimize the global system performance. However, in reality (as is the case of the highway network in Santiago de Chile) tolls may be set by private toll operators who care to maximize their own profit. In this case, what would be the resulting traffic assignment and level of congestion?

In [6], we consider this game theory model where strategic toll operators set tolls on the links they own (we assume that each toll operator owns exactly one link) and users then choose their routes to minimize travel time plus tolls. An equilibrium for the toll operators is a set of tolls such that no toll operator can gain from unilaterally changing their toll. Although more realistic than the congestion game model, this network pricing model had received little attention due to its complexity—in general, equilibria may not exist; might not be unique and might be arbitrarily inefficient. It had been studied only in the very special cases of parallel link networks and also networks with special travel time functions all equal to zero up to the link capacity, and infinity afterwards. Ours is the first work to study the model in full generality, for both general networks and general link travel time functions, and to give an insight on how to eliminate the poor equilibrium properties and reach a "good equilibrium" instead. We do this by setting "toll caps," namely upper bounds on how much toll operators can charge for their links. With appropriate toll caps, we show that the equilibrium for the toll operators induces the socially optimal traffic assignment.

*Impact.* Toll caps are currently used for the Santiago de Chile highways and our work can be seen as informing what caps should be used in any setting of private toll operators so as to minimize congestion, namely induce the socially optimal traffic assignment all the while toll operators are setting their profit-maximizing tolls. On the contrary, if arbitrary tolls are allowed, the resulting traffic assignment might have a significantly higher cost (namely, be associated with significantly higher travel times for users) compared to the traffic assignment without tolls. This follows from my work [9] described in the previous section in the context of efficiency loss due to risk, which can in fact be equivalently interpreted as efficiency loss due to tolls, with the toll term replacing the variance term in our model. Indeed, following up on my work, Kleer and Schaefer recognize that it can be interpreted in these more general terms (not just efficiency loss due to risk aversion but also tolls, etc.), renaming our concept of "Price of Risk Aversion" to "Deviation Ratio" and generalizing our results to multi-commodity networks [8]. Additional work by my group on tolls and improving the cost of traffic equilibria with my PhD students Soumya Basu, Yitao Chen, Gery Yang and postdoc Thanasis Lianeas includes [2, 3].

**Heterogeneous users.** In our models above, users tradeoff between two criteria, such as travel time and cost (tolls paid), or mean and variance, and all users are assumed to have the same tradeoff preference. In reality, they might place different weights on the two criteria. This diversity of user preferences can be intuitively seen as helping to alleviate congestion: different preferences lead to different route choices and consequently, less crowding of specific routes so that the resulting traffic assignment has lower cost. In a surprising result [5] we show that this intuition is not necessarily true. We give a sharp characterization for when diversity helps, which depends on the network topology: it always helps (in the sense that the traffic assignment resulting from heterogeneous user choices has lower cost than the traffic assignment from a corresponding averaged homogeneous user population) if and only if the network is series-parallel, in the setting when all users share the same source and destination. When multiple sources and destinations are present, diversity always helps when the network takes the form of a certain interweaving of series-parallel networks, which we call "block-matching." We see this work as a first step in understanding the effect of user diversity in large networked systems and specifically in the context of transportation and resulting congestion.

**Optimal routing for single users** All game theory models build on the ability for users to compute their individually optimal routes, as a best response to the decisions of other users. With my Ph.D. student Ger Yang, we investigate this problem of finding the optimal route for a single user, for a general (monotone or non-monotone) objective function depending on two or more criteria [16]. We give hardness results and

3

CONFIDENTIAL                                                                                  UT Austin_0016367

efficient (fully polynomial approximation) algorithms to find near-optimal solutions. When the user has a monotone objective function and can make adaptive routing decisions, namely change their route while traveling, Darrell Hoy and I show that the optimal policy might require exponential space to just write down, however we can efficiently compute and output a near optimal policy that results in a routing solution with an arbitrarily small additive error. Darrell was a PhD student at Northwestern University who I was mentoring at the time. Implementations of risk-averse route planning schemes with potential practical impact can be found in my papers [4, 10]. The former paper, joint with colleagues from IBM Research, implements a route-planner for multi-modal transport that provides robust plans in the presence of uncertainty and shows good performance on real historical traffic data from Dublin, Ireland. An unexpected connection of my earlier work on risk-averse routing algorithms [12, 11] to wireless networking has also found an application on wireless coverage prediction [1].

## 4.  Future Research Directions: Power Systems

In addition to pursuing natural questions left open by my research above—such as a deeper exploration of dynamic decision making in game theoretic contexts, and different types of risk-averse models, in the next 5-10 years I plan to actively immerse myself in the area of power systems. I have already started work, supported by a recent NSF grant on the topic, on developing novel algorithms and incentive mechanisms for improving the efficiency of the distribution grid— the set of low-voltage line networks that distribute power from substations to end consumers. That part of the grid is about to undergo a major transformation due to increased electricity generation on the customer side, and its progress is hindered by challenges to the existing wire and transformer capacities, designed to handle electricity flow in one direction (towards the customer), as well as higher uncertainty in demand forecasts that may prove unsustainable and threaten the economic viability of utility companies. For this reason, the grid urges and holds great promise for the *impact of computational methods and economic incentives* on its design and operation. Specific research thrusts that we plan to address are:

- **Distribution network operation and upgrades.** An example question here is: How can we minimize losses and asset degradation in distribution grids? In graph theoretic terms, this corresponds to minimizing a non-convex high-dimensional objective over dynamically reconfigurable feasible spanning trees. Limited theory (in an algorithms context) is devoted to this problem. Published work, as well as the state of the art in practice, relies on heuristics with unknown performance guarantees. To tackle this problem, we plan to develop algorithms with provable guarantees using techniques from submodular optimization and non-convex network optimization. For a first step in this direction, see my recent paper with my PhD students Ali Khodabakhsh, Ger Yang, Soumya Basu, my postdocs Thanasis Lianeas and Manolis Pountourakis and colleague Michael Caramanis [7].
- **Incentives for efficient supply-demand balancing in the grid.** While transmission grid congestion is managed by dynamic locational marginal prices (LMPs) discovered in today's wholesale markets, the practice of flat retail pricing does not provide similar efficient options in the distribution grid. A short-term practical solution is for utility companies to offer incentives (e.g., coupons) to consumers for scaling back demand in peak times—known as demand response. An example question in this context is: What is a pricing (coupon) structure that elicits appropriate demand response? To address this problem, we will pursue the largely open research area of mechanism design with risk-loving agents. Our initial steps in analyzing optimal mechanism design, for a special case of risk-loving preferences given by an exponential utility, are in a working paper with my PhD student Ger Yang and my postdoc Manolis Pountourakis [14].
- **Utilizing electric vehicles (EVs) as dynamic storage to rebalance the grid.** The growing penetration of EVs might place additional burden on already congested residential power lines, when EVs are charged in the owners' homes. At the same time, it provides a wonderful opportunity of using EVs as storage to rebalance the grid, shifting load from congested to uncongested lines, thus reducing the need for expensive line updates. We will explore both novel algorithmic and mechanism design approaches to incentivize efficient use of EVs that helps rather than hurts the power grid.

4

CONFIDENTIAL                                                                      UT Austin_0016368

# References

[1]     D. Applegate, A. Archer, D. Johnson, E. Nikolova, M. Thorup, and **G. Yang**. Wireless coverage prediction via parametric shortest paths. In Proceedings of *International Symposium on Mobile Ad Hoc Networking and Computing (MobiHoc)*, Los Angeles, USA, June 26-29, 2018, 2018.

[2]     **S. Basu**, **T. Lianeas**, and E. Nikolova. New complexity results and algorithms for the minimum tollbooth problem. In *Web and Internet Economics – 11th International Conference, WINE 2015*, Amsterdam, The Netherlands, December 9-12, 2015, Proceedings, pages 89–103, 2015.

[3]     **S. Basu**, **G. Yang**, **T. Lianeas**, E. Nikolova, and **Y. Chen**. Reconciling selfish routing with social good. In *Algorithmic Game Theory: 10th International Symposium, SAGT 2017*, L'Aquila, Italy, September 12–14, 2017, Proceedings, volume 10504, pages 147–159. Springer, 2017.

[4]     A. Botea, E. Nikolova, and M. Berlingerio. Multi-modal journey planning in the presence of uncertainty. In Proceedings of the *Twenty-Third International Conference on Automated Planning and Scheduling, ICAPS 2013*, Rome, Italy, June 10-14, 2013.

[5]     R. Cole, **T. Lianeas**, and E. Nikolova. When does diversity of user preferences improve outcomes in selfish routing? In Proceedings of the *Twenty-Seventh International Joint Conference on Artificial Intelligence, IJCAI 2018*, Stockholm, Sweden, 13-19 July 2018, 2018.

[6]     J. Correa, C. Guzman, **T. Lianeas**, E. Nikolova, and M. Schroeder. Network pricing: How to induce optimal flows under strategic link operators. In Proceedings of the *Nineteenth ACM Conference on Economics and Computation (EC'18)*. Ithaca, NY, June 19-21, 2018.

[7]     **A. Khodabakhsh**, **G. Yang**, **S. Basu**, E. Nikolova, M. C. Caramanis, **T. Lianeas**, and **E. Pountourakis**. A submodular approach for electricity distribution network reconfiguration. In *51st Hawaii International Conference on System Sciences (HICSS)*, Hawaii, USA, Jan. 3-6, 2018.

[8]     P. Kleer, and G. Schäfer. The impact of worst-case deviations in non-atomic network routing games. *International Symposium on Algorithmic Game Theory*. Springer, Berlin, Heidelberg, 2016.

[9]     **T. Lianeas**, E. Nikolova, and N. E. Stier Moses. Risk-averse selfish routing. *Mathematics of Operations Research*, 2018.

[10]    S. Lim, C. Sommer, E. Nikolova, and D. Rus. Practical route planning under delay uncertainty: Stochastic shortest path queries. In *Robotics: Science and Systems VIII*, University of Sydney, Sydney, NSW, Australia, July 9-13, 2012, 2012.

[11]    E. Nikolova. Approximation algorithms for reliable stochastic combinatorial optimization. In *Approximation, Randomization, and Combinatorial Optimization. Algorithms and Techniques, 13th International Workshop, APPROX 2010*, and *14th International Workshop, RANDOM 2010*, Barcelona, Spain, September 1-3, 2010. Proceedings, pages 338–351, 2010.

[12]    E. Nikolova, J. A. Kelner, M. Brand, and M. Mitzenmacher. Stochastic shortest paths via quasi-convex maximization. In *Algorithms - ESA 2006, 14th Annual European Symposium*, Zurich, Switzerland, September 11-13, 2006, Proceedings, pages 552–563, 2006.

CONFIDENTIAL                                                                                    UT Austin_0016369

[13]   E. Nikolova and N. E. Stier Moses. A mean-risk model for the traffic assignment problem with stochastic travel times. *Operations Research*, 62(2):366–382, 2014.

[14]   E. Nikolova, **E. Pountourakis**, and **G. Yang**. Optimal mechanism design with risk-loving agents. Working paper, 2018.

[15]   G. Piliouras, E. Nikolova, and J. S. Shamma. Risk sensitivity of price of anarchy under uncertainty. *ACM Trans. Econ. Comput.*, 5(1):5:1–5:27, Oct. 2016.

**G. Yang** and E. Nikolova. Approximation algorithms for route planning with nonlinear objectives. In Proceedings of the *Thirtieth AAAI Conference on Artificial Intelligence*, February 12-17, 2016, Phoenix, Arizona, USA., pages 3209–3217, 2016.

CONFIDENTIAL

UT Austin_0016370

## Table 1. Research Summary

| Metric | Value |
|---|---|
| Peer-reviewed journal publications (in rank and total) | 3 / 4 |
| Peer-reviewed conference proceedings (in rank and total) | 18 / 30 |
| *Number of journal papers in rank with supervised student(s) and/or post-docs from UT as co-author(s)* | 1 |
| *Number of journal papers in rank with supervised student(s) from UT as co-author** | 0 |
| Total citations of all publications (career) from ISI Web of Knowledge | 79 |
| *Largest number of citations for a single paper based on work at UT (ISI Web of Knowledge)* | 5 |
| h-index (career) from ISI Web of Knowledge | 4 |
| Total citations of all publications (career) from Google Scholar | 923 |
| *Largest number of citations for a single paper based on work at UT (Google Scholar)* | 36 |
| h-index (career) from Google Scholar | 17 |
| Total external research funding raised in rank | $2,659,123 |

## Table 2. Current External Grants and Contracts Awarded

| Role of Candidate and Co-Investigators | Title | Agency | Project Total | Candidate's Share | Grant Period |
|---|---|---|---|---|---|
| Co-PI<br>Le Xie (PI), Texas A&M<br>Pravin Varaiya (Co-PI), UC Berkeley | Collaborative Research: CyberSEES: Coupon Incentive-based Risk Aware Demand Response in Smart Grid | NSF: Division of Computing and Communication Foundations | $1,000,000 | $311,000 | 10/1/13-9/30/18 |
| PI | CAREER: Algorithms for Risk Mitigation in Networks | NSF: Division of Computing and Communication Foundations | $448,123 | $448,123 | 5/15/14-4/30/19 |
| PI<br>Michael C. Caramanis (Co-PI), Boston University | AitF: Collaborative Research: Algorithms and Mechanisms for the Distribution Grid | NSF: Division of Computing and Communication Foundations | $800,000 | $479,985 | 10/1/17-9/30/21 |

CONFIDENTIAL

**Table 3. External Grants and Contracts Awarded in Rank and Completed**

| Role of Candidate and Co-Investigators | Title | Agency | Project Total | Candidate's Share | Grant Period |
|---|---|---|---|---|---|
| PI | ICES: Small: Risk Aversion in Algorithmic Game Theory and Mechanism Design | NSF: Division of Computing and Communication Foundations | $370,000 | $370,000 | 8/1/12-8/31/17 |
| PI | Maps Directions under Deadlines | Google Faculty Research Award | $41,000 | $41,000 | 2013 |

**Table 4. Pending External Grants and Contracts**

| Role of Candidate and Co-Investigators | Title | Agency | Project Total | Candidate's Share | Grant Period |
|---|---|---|---|---|---|
| Co-PI<br><br>PI: Georgios B. Giannakis (University of Minnesota)<br>Co-PI: Sairaj Dhople (University of Minnesota), Mingyi Hong (University of Minnesota), Yousef Saad (University of Minnesota), Hao Zhu (UT ECE), Ross Baldick (UT ECE), Constantine Caramanis (UT ECE), Lang Tong (Cornell), David Bindel (Cornell), Eilyan Bitar (Cornell), Ari Juels (Cornell), Vassilis Kekatos (Virginia Tech), Walid Saad (Virginia Tech), Nikolas D. Sidiropoulos (University of Virginia), Zongli Lin (University of Virginia), Emiliano Dall'Anese (University of Colorado Boulder), Lucy Pao (University of Colorado Boulder) | DNS4CES: Data- and Network-driven Science for Complex Energy Systems | Department of Energy (DOE) Office of Science Program Office | $10,000,000 | $400,000 | 10/1/18-9/30/22 |

Appx.0311

CONFIDENTIAL

# Web of Science

## Web of Science

Search    Search Results

My Tools ▾   Search History   Marked List

Clarivate
Analytics

### Citation report for 11 results from Web of Science Core Collection between 2000 ▾ and 2018 ▾ [Go]

You searched for: AUTHOR: (nikollova evdokia) ...More

This report reflects citations to source items indexed within Web of Science Core Collection. Perform a Cited Reference Search to include citations to items not indexed within Web of Science Core Collection.

Export Data:   Save to Excel File

| | | |
|---|---|---|
| **Total Publications** | **h-index** | **Sum of Times Cited** | **Citing articles** |
| 11 | 4 | 79 | 67 |
| | **Average citations per item** | **Without self citations** | **Without self citations** |
| | 7.18 | 74 | 63 |



Sum of Times Cited per Year

**Appx.0312**

UT Austin_0016373

# Google Scholar

## https://scholar.google.com/citations?user=YMmzWH7gT-oC&hl=en

### Evdokia Nikolova

University of Texas at Austin
Verified email at utexas.edu - Homepage

Algorithms   Game Theory

[FOLLOW]

**Cited by**                                          VIEW ALL

|           | All | Since 2013 |
|-----------|-----|------------|
| Citations | 923 | 601        |
| h-index   | 17  | 14         |
| i10-index | 22  | 18         |

| TITLE | CITED BY | YEAR |
|-------|----------|------|
| Stochastic shortest paths via quasi-convex maximization<br>E Nikolova, JA Kelner, M Brand, M Mitzenmacher<br>European Symposium on Algorithms, 552-563 | 123 | 2006 |
| Optimal Route Planning under Uncertainty.<br>E Nikolova, M Brand, DR Karger<br>ICAPS 6, 131-141 | 110 | 2006 |
| Route Planning under Uncertainty: The Canadian Traveller Problem.<br>E Nikolova, DR Karger<br>AAAI, 969-974 | 76 * | 2008 |
| Approximation algorithms for reliable stochastic combinatorial optimization<br>E Nikolova<br>Approximation, Randomization, and Combinatorial Optimization. Algorithms and ... | 73 | 2010 |
| Approximation algorithms for reliable stochastic combinatorial optimization<br>E Nikolova<br>Approximation. Randomization, and Combinatorial Optimization. Algorithms and ... | 73 | 2010 |
| First-price path auctions<br>N Immorlica, D Karger, E Nikolova, R Sami<br>Proceedings of the 8th ACM conference on Electronic commerce, 203-212 | 63 | 2005 |
| A truthful mechanism for offline ad slot scheduling<br>J Feldman, S Muthukrishnan, E Nikolova, M Pál<br>International Symposium on Algorithmic Game Theory, 182-193 | 38 | 2008 |

Citations per year (2011–2018): 140, 105, 70, 35, 0

**Co-authors**                                        VIEW ALL

David Karger
Professor of Computer Science...

Nicolas E. Stier-Moses
Facebook Core Data Science

Nicole Immorlica
Microsoft Research

Jon Feldman
Researcher, Google

Michael Mitzenmacher
Professor of Computer Science...

Appx.0313

CONFIDENTIAL                                          UT Austin_0016374

**Budget Council Assessment on Academic Advising, Counseling, and other Student Services for Faculty Promotion Candidate Dr. Evdokia Nikolova**

Prepared by Budget Council member Joydeep Ghosh

## Introduction

In preparing this assessment, we have used source material from the candidate's resume and statement on advising. Based on the review of this data we conclude that Dr. Evdokia Nikolova's solid advising record as an Assistant Professor meets the ECE departmental norm and expectations of quantity and quality. Below we provide highlights of both her undergraduate and graduate student advising records.

## Undergraduate Student Advising and Mentoring

This review focuses on Dr. Nikolova's contributions to several aspects of undergraduate advising: the advising of students in terms of their career choices and course selection, the supervision of undergraduate research projects, and the supervision of undergraduate senior design projects.

Every ECE faculty member is expected to supervise a team of students working on their senior-design project. In rank, Evdokia has supervised three teams that included 18 undergraduate students. This is consistent with the expected load. One of the teams worked on a smartphone app based on the stable marriage problem–a mix of theory and implementation - and won 3rd place in the Senior Design Competition. She also interacted with and advised undergraduate students at Texas A&M before she joined UT. Moreover, she participated for 3 consecutive years (2014, 2015, 2016) in Camp Texas, speaking to incoming UT freshmen about succeeding in college, choosing future careers, and research. Dr. Nikolova is also very active in mentoring the ECE undergraduate women's organization. Another notable service is the co-teaching of the Edison Lecture Series to over 1000 middle-school and high-school students on Feb. 11-12, 2016, Austin, TX.

## Advising of Graduate Students

Dr. Nikolova is currently supervising 6 PhD students (two are co-advised), which is a commendable load for algorithmic research. All her graduate students are financially supported by research assistantships, teaching assistantships, or fellowships. Her first PhD student successfully defended in May 2018. She has also supervised one Post-doc, who is now a lecturer at the National Technical University of Athens, and is currently supervising another Post-doc, who has been awarded the very competitive Simons Fellowship for Spring 2018, and is being prepared for a career in academia.

*Joydeep Ghosh*

Joydeep Ghosh

Appx.0314

UT Austin_0016375

**Statement of Academic Advising**
**Evdokia Nikolova**

ECE Department, UT Austin
nikolova@austin.utexas.edu

## 1. Undergraduate Advising

At UT Austin, I have supervised three senior design teams with a total of 18 ECE undergraduate students:

- Fall 2015 – Spring 2016: (6 students) Nick Burrin, Whitney Glick, Kevin Sy, Alaap Patel, Ryan Templin, Kevin Tsai.  Honors Project Title "DanceWithMe." This team won **3rd place in the Senior Design Competition** in Spring 2016.
- Fall 2016 – Spring 2017: (5 students) John Starich, Josué Alfaro, Jeremy Castillo, César Gonzalez, Jacob Ingalls. Project Title "Accelerating Containers over RDMA," industry project sponsored by the company Mellanox with industry contact/co-advisor Yevgeny Petrilin.
- Fall 2017 – Spring 2018: (7 students) Pranav Harathi, Shashank Kambhapati, Eric Wang, Joshua Richardson, Jonah Harris, Kevin Wu, Rohan Kondetim Manahalli. Honors Project Title: "Electric Vehicle Charger Placement"

I held weekly or biweekly meetings with the students in each team, guiding them through their projects and keeping them on track. The first team designed a smart phone app based on an extension of an algorithm design problem called "Stable Marriage" that is covered in EE 360C.  The project was a mix of theoretical algorithms research and implementation, and the resulting app facilitated matching partners in a dance hall, saving the embarrassment from directly asking a partner to dance and potentially facing a rejection. It was very well received and won 3rd place in the Senior Design Competition that year. The second team worked on an industry-specified project and I mostly guided the students at a high-level, making sure they are on track with their goals.  The third team worked on a problem that I plan to evolve into a research project on Optimal Placement of Electric Vehicle Charging stations to help reduce powerline congestion and balance the power grid. Again, it was a mix of theory and implementation: the students studied an advanced algorithm on "Facility Location" normally taught to graduate students, then implemented it and ran simulations showing that after shifting charging of EV vehicles from specific residential neighborhoods to designated charging stations nearby, congestion in the power lines was alleviated on average and, in some cases, eliminated.

At Texas A&M, I taught an honors undergraduate class on algorithms to about 10-11 students in Spring 2013, which allowed me to more directly interact with all the students and work with them on a research project (see my teaching statement for more detail on the novel research component I included in the class).  Subsequently, I also advised one of these undergraduates for a semester on a transportation research project.

1

Appx.0315

CONFIDENTIAL

Outside of formal advising, I participated for 3 consecutive years (2014, 2015, 2016) in Camp Texas, speaking to incoming UT freshmen about succeeding in college, choosing future careers, and research.  In an effort to help with diversity and create a community for diverse students, I organized a belly-dancing class for ECE undergraduate students at UT, which was attended by about 30 undergraduates.  This is something that I plan to evolve in the future into research-dance days at UT and/or summer programs, for both undergraduates and K12 students.  I have also met on multiple occasions and spoken with the ECE undergraduate women's organization.

## 2. Graduate and Post-Graduate Advising

I am currently supervising six PhD students (4 on my own and 2 co-advised) and one postdoc.  My first PhD student, Ger Yang, already successfully defended his PhD thesis on May 8, 2018 and is planning to graduate in August 2018.  Ger is currently interviewing for industry positions with software companies such as Google, Dell, etc.

I spend a significant amount of time with each student and postdoc in my group, and I closely monitor their progress and research results.  I typically hold regular weekly meetings with each group member and spend significant additional time when deadlines approach.  In addition, during the semester I hold 1.5 hour weekly group meetings where members of my research group take turns presenting either their work or teach us classic or recent research results by others that pertains to the interests of my group.  I use these meetings not only to enhance learning, but also foster team spirit, rapport, and appreciation among each group member and promote comradery within the group. I also encourage my students to interact and collaborate with each other and with other students and faculty at the department.

All my graduate students are financially supported by research assistantships, teaching assistantships, or fellowships.

## PhD Supervisions Ongoing:

- Ger Yang (joined UT in Fall 2014) – successfully defended his PhD thesis on May 8, 2018 and planning to graduate in August 2018.
- Soumya Basu (joined UT in Fall 2014; co-advised with Sanjay Shakkottai)
- Ali Khodabakhsh (joined UT in Fall 2015)
- Orestis Papadigenopoulos (joined UT in Fall 2016)
- Isidoros Giotis (joined UT in Fall 2017)
- Nithin Ramesan (joined UT in Fall 2017; co-advised with Francois Baccelli)
- Eftychia Vakaliou (will be joining UT in Fall 2018)

2

CONFIDENTIAL                                                      UT Austin_0016377

**Postdoctoral Advising**

- Thanasis Lianeas (April 2015 - December 2017).  Thanasis joined my group at UT after receiving his PhD from the National Technical University of Athens (NTUA), Greece.  He is now back at NTUA as a lecturer.
- Emmanouil (Manolis) Pountourakis (April 2017 - present).  Manolis joined my group at UT after receiving his PhD from Northwestern University.  He won a prestigious and very competitive Simons Fellowship for Spring 2018.  He is preparing to pursue an academic career in the next academic year.


# Candidate's Statement on Advising, Counseling and Other Student Services


**Table 1. Summary of Academic Advising**

| Metric | Value |
|---|---|
| Student Organizations Advised | 0 |
| Undergraduates Supervised | 19 (excluding my Honors undergraduate class at TAMU) |
| PhD Students Completed | 0 (1 expected by Aug. 2018) |
| MS Students Completed | 0 |
| PhD Students in Pipeline (as of 08/2018) | 4/2 |
| MS Students in Pipeline (as of 08/2018) | 0 |


**Table 2. List of Completed Graduate Students under My Supervision**

None

3

CONFIDENTIAL

UT Austin_0016378

## Budget Council Assessment on Service to the University and to the Nation, State and Community
## for the Promotion Candidate Evdokia Nikolova

This statement on service to the university, the nation, state and the community of Professor Evdokia Nikolova was prepared by the Budget Council Member Professor Vijay K. Garg. It makes an assessment of services performed by Prof. Nikolova in rank as an Assistant Professor.

### Service to the University

Prof. Nikolova has made immense contributions to the Department and the University serving in various roles.

In the department, she has served as a member of the junior faculty hiring committee multiple times. This committee screens all the candidates, makes a presentation to the department for approval to interview them, hosts the candidates for interviews, collects the feedback from various faculty members and then makes recommendations to the department. Having served on this committee numerous times, I can attest to the time commitment the membership on this committee entails. Prof. Nikolova has represented the DICE area on this committee. The DICE area has interviewed excellent candidates during the time when Prof. Nikolova was representing DICE.

In addition to serving on the ECE faculty hiring committee, Prof. Nikolova has served as an external member of the ORIE junior faculty hiring committee. Typically, a department invites only the most well-known and renowned faculty members from other departments to serve on their faculty hiring committee. Prof. Nikolova has contributed to the mission of the University by serving on this committee.

Prof. Nikolova has continuously served as a member of the Admissions Committee for the DICE area since 2014. The admissions committee requires an inordinate amount of work because of a large volume of applications to the DICE area. All aspects of the student application must be considered, with students from many countries and universities of varying quality and different grading systems. Prof. Nikolova has made significant contributions to the department by serving on this committee.

Prof. Nikolova has taken a leadership role in organizing workshops. Of particular note is the 2014 Winedale workshop for which she served as the program chair. The invitation to be the program chair is given to only the most well-regarded researchers in the area. The program chair's duties require significant commitment but bring recognition to the PC chair and the associated University. The Winedale workshop was a great success with more than 200 attendees from Texas region.

### External Service

Prof. Nikolova has been extraordinarily engaged in professional service to the international academic community via organization of many prestigious workshops. She has organized or

1

CONFIDENTIAL

co-organized workshops at Simons Institute, and ACM Conference on Electronic Commerce. Simons Institute for the Theory of Computing at Berkeley is one of the most prestigious institutes for Theoretical Computer Science and some of the most famous scientists and mathematicians regularly visit the institute. It is quite remarkable that Prof. Nikolova was invited to organize a workshop there at her stage of career. The ACM Conference on Electronic Commerce is a premier conference on issues related to algorithmic game theory, economics and computation.

Prof. Nikolova has also been a great mentor for the next generation of scientists. She gave lectures at Samos Summer School on Algorithmic Game Theory. She has also been involved in community service. Specifically, she has participated in the immensely popular Edison Lecture Series at UT Austin.

Prof. Nikolova has also served in various US National Science Foundation (NSF) review panels and served as a member of the panel to review projects for FONDECYT, which is NSF equivalent for Chile.

In summary, Prof. Nikolova has performed service to the University and the professional community that is significantly above the level of an assistant professor.

Summary prepared by the Budget Council Member Professor Vijay K. Garg.

Vijay Kumar Garg

2

Appx.0319

UT Austin_0016380

**Service to the University and to the Nation, State and Community**

Evdokia Nikolova
ECE Department, UT Austin
nikolova@austin.utexas.edu

I have been involved in a number of service activities at UT Austin and Texas A&M University and also at the national and international level.

**1. Service to the University of Texas at Austin**

Service to the University has been a central aspect of my academic role in achieving and strengthening the University's mission. My service activities are enumerated below:

UNIVERSITY COMMITTEE ASSIGNMENTS:

| | | |
|---|---|---|
| Departmental- | **ECE Junior Faculty Hiring Committee** | 2016-2017 |
| | **ECE Junior Faculty Hiring Committee** | 2015-2016 |
| | **ORIE Junior Faculty Hiring Committee** | 2015-2016 |
| | **DICE PhD Admissions Committee** | 2014-present |

Additionally, I was a co-organizer of the Wireless Networking and Communications Group (WNCG) seminar series (together with Prof. Alex Dimakis) in 2014-2015.

I also served as the program chair of the 2014 Winedale workshop, which focused on algorithmic game theory. Winedale is a one-day event co-organized by UT Austin, Rice University and Texas A&M. The mission of the event is to facilitate interaction between Texas researchers in the area of signals, systems and communications. The main task of the program chair is to select and invite two distinguished speakers for the event. I invited Robert Kleinberg (Cornell University, Sloan Fellow, Microsoft Research New Faculty Fellow) and Tim Roughgarden (Stanford, PECASE Winner, Mathematical Programming Society's Tucker Prize, and the EATCS-SIGACT Gödel Prize). The event had more than 200 attendees from UT Austin, Rice University and Texas A&M.

**2. Service to the Nation, State and Community**

I have served on 13 technical program committees (listed below), for conferences in algorithmic game theory, theoretical computer science and artificial intelligence.

Member of technical program committees:
1. European Symposium of Algorithms (ESA) 2017.
2. ACM Conference on Economics and Computation (EC) 2018, 2017, 2014, 2013, 2012, 2010.
3. Conference on Artificial Intelligence (AAAI) 2017, 2016, 2013.
4. International World Wide Web Conference (WWW) 2017, 2012.
5. Conference on Web and Internet Economics (WINE) 2015.

Furthermore, I have been very active in organizing interdisciplinary workshops (listed below), bridging researchers in computer science, economics, operations research and electrical

CONFIDENTIAL

engineering.  The highlight of my organizational activities was as co-organizer for the Spring 2018 semester-long research program "Real-time Decision Making" at the Simons Institute in Berkeley, CA, along with Richard Karp (UC Berkeley, Turing award), Balaji Prabhakar (Stanford, Sloan Fellow, IEEE Fellow, ACM Fellow), Steven Low (Caltech, IEEE Fellow) and Josh Bloom (UC Berkeley Astronomy, Sloan Fellow).   The program included 49 invited researchers from leading universities and across theoretical and applied disciplines.  It also had 8 Simons Research Fellows (junior researchers mainly at the postdoc level, who were selected competitively from a large pool of applicants) and visiting graduate students and postdocs.  The purpose of the program was to develop and apply algorithmic methods for the control of systems characterized by the need to make real-time decisions based on data arriving in high volume. To this end, the program created collaborations between two groups of experts: researchers in domains of physical science, engineering and societal systems involving real-time discovery and inference, and mathematical and computational scientists with the tools required to attack the decision-theoretic problems arising in these domains. The program focused in particular on astronomical observation, earthquake early warning, transportation networks, online matching markets and smart energy grids.  My duties as co-organizer were proposing program participants, selecting the Simons Research Fellows, organizing and giving an introductory lecture on algorithms at the Bootcamp. In addition, I was lead organizer for the third week-long workshop of the program, "Mathematical and Computational Challenges in Real-Time Decision Making", Apr. 30—May 4, 2018.  For that, I had to co-select and invite around 30 speakers, create the workshop schedule, chair multiple sessions, write a workshop report, and overall ensure the smooth running of the workshop.

Program or Workshop Co-organizer:

6.  Simons semester on "Real-time Decision Making", Spring 2018, Simons Institute for the Theory of Computing, Berkeley CA.
7.  Workshop on "Mathematical and Computational Challenges in Real-Time Decision Making", Apr. 30—May 4, 2018, Simons Institute for the Theory of Computing, Berkeley CA.
8.  Workshop on "Real-Time Decision Making", Jun. 27—Jul. 1, 2016, Simons Institute for the Theory of Computing, Berkeley CA.
9.  Winedale workshop on "Algorithmic Game Theory", Winedale, TX, Oct. 17, 2014.
10. "Workshop on Risk Aversion in Algorithmic Game Theory and Mechanism Design" in conjunction with the ACM Conference on Electronic Commerce (EC), Valencia, Spain, June 7, 2012.

In addition to the program and workshop organization above, I participated and gave lectures at the Samos Summer School on Algorithmic Game Theory in Samos, Greece in July 2012.  The school included in its audience undergraduates and high-school students from several Balkan countries, as well as graduate students from these countries and the United States.  I have also been an invited session chair organizer for several major conferences (International Symposium on Mathematical Programming (ISMP)— July 2015, August 2012, August 2009 and INFORMS Buenos Aires, Argentina, June 2010).

I have been on the review panels for 3 NSF programs, and was part of the reviewing committee of an NSF Science and Technology Center Competition, performing a 2-day onsite review of a participating team from Caltech.  I have also served as an international funding agency reviewer once, and have subsequently received multiple invitations to review international proposals from different countries, which I did not have time to accommodate.

CONFIDENTIAL                                                                    UT Austin_0016382

U.S. Federal funding agency review panels:
- NSF Panelist (April 2015, January 2014, April 2012).
- NSF STC (Science and Technology Centers) Competition, October 2012

International funding agency reviewer:
- FONDECYT (NSF equivalent in Chile), November 2011.

I regularly provide peer reviews for the leading journals and conferences in my area, listed below:

**Journals:** SIAM Journal of Computing, Theoretical Computer Science, Algorithmica, ACM Transactions on Economics and Computation (TEAC), Journal of Autonomous Agents and Multi-Agent Systems (JAAMAS), Operations Research, Operations Research Letters, Mathematical Programming, Mathematics of Operations Research, Transportation Science, IEEE Transactions on Automatic Control.

**Conferences:** ACM Symposium on Theory of Computing (STOC), ACM-SIAM Symposium on Discrete Algorithms (SODA), ACM Conference on Economics and Computation (EC), Conference on Web and Internet Economics (WINE), International Symposium on Algorithmic Game Theory (SAGT), International Colloquium on Automata, Languages and Programming (ICALP), International Symposium on Theoretical Aspects of Computer Science (STACS), ACM Symposium on Parallel Algorithms and Architectures (SPAA), Conference on Decision and Control (CDC), MIT Oxygen Student Conference.

Regarding **community service**, I co-taught the Edison Lecture Series at UT Austin to over 1000 middle-school and high-school students on Feb. 11-12, 2016, Austin, TX (with Prof. Alex Dimakis and Prof. Deji Akinwande). I have also been a speaker at Camp Texas (for incoming UT freshmen) for three consecutive years 2014-2016.

CONFIDENTIAL

**Budget Council Assessment of Honors and Other Evidence of Merit or Recognition, Including Contracts and Grants for Promotion Candidate Evdokia Nikolova**

Prepared by Lizy K. John, Budget Council Member

This assessment is based on Dr. Nikolova's promotion statements and her resume. It represents my evaluation/interpretation of the various honors, and honorific grants that she has received. The assessment concludes with a summary statement placing these details in perspective. Some information about these awards has been obtained from the official websites of several organizations/UT and reproduced in the write up below in italics.

**I. Honors and Awards:**

Dr. Nikolova has received several competitive awards. The various awards won by Evdokia are:

(i) NSF CAREER 2014

Dr. Nikolova won the NSF CAREER award in 2014. According to the National Science Foundation website, *The Faculty Early Career Development (CAREER) Program is a Foundation-wide activity that offers the National Science Foundation's most prestigious awards in support of early-career faculty who have the potential to serve as academic role models in research and education and to lead advances in the mission of their department or organization.*

(ii) Google faculty award 2013

Dr. Nikolova won the Google faculty award in 2013. These awards are decided based on an international competition. According to Google's website, these awards are structured to *provide unrestricted gifts as support for research at institutions around the world. The program is focused on funding world-class technical research in Computer Science, Engineering, and related fields. The award is highly competitive - only 15% of applicants receive funding - and each proposal goes through a rigorous Google-wide review process.*

(iii) Best Paper awards

A paper coauthored by Dr. Nikolova and her student won the best student paper award at the IEEE International Conference on Acoustics, Speech and Signal Processing (ICASSP) 2018. ICASSP is a very competitive conference in the field of Acoustics and Signal Processing. Best student paper award at this event is a very coveted honor.

Additionally, another paper from Dr. Nikolova's group was one of the two finalists for the best paper award at the Hawaii International Conference on Systems Sciences 2018. Evdokia's paper eventually finished as the runner up.

1

Appx.0323

CONFIDENTIAL                                                                        UT Austin_0016384

(iv) Supervisor of the award winning senior design (3rd place)

The ECE department has approximately 50 senior designs each year.  Supervising the 3rd place winning team is an honor.

(v) Keynotes:

Dr. Nikolova has given 3 keynote speeches. She has also given seminars at various US and international Universities. These are tremendous achievements considering the early stage in her career.

(vi) Proposal Review Panelist Invitation

Evdokia is highly regarded by her peer research community as evidenced by multiple invitations to NSF panels and invitations to panels in Chile, the Netherlands, and Israel.

## II. External Research Funding:

Dr. Evdokia Nikolova has received competitive funding from the National Science Foundation and Google totaling approximately $2.6 million. Four NSF awards and one Google awards are listed in the candidate's documents. With the candidate's share of more than $1.6 million, Nikolova's fund-raising in competitive external grants meets the standards for promotion and tenure.

## III. Summary Statement

Dr. Evdokia Nikolova has received several awards including the NSF CAREER award and the Google faculty award. These along with the IEEE ICASSP best paper award place her in a good position within her peer group, as does her external research funding totaling $2.6 million ($1.6 million as her share) which is a very healthy figure.

Based on the above evidence, Dr. Evdokia Nikolova clearly meets the standards for promotion to Associate Professor with tenure in the category of honors and recognition.

Prepared by Electrical and Computer Engineering Budget Council Member

Lizy Kurian John   30 July 2018

2

CONFIDENTIAL

# Honors and other Evidence of Merit or Recognition, Including Contracts & Grants

Evdokia Nikolova

ECE Department, UT Austin

nikolova@austin.utexas.edu

## 1. Awards

I received the **NSF CAREER** Award in 2014 for my proposal titled "CAREER: Algorithms for Risk Mitigation in Networks".

One of the **ECE undergraduate senior design** teams that I advised received **3rd place** in the Annual Senior Design Competition for writing a smart phone app "DanceWithMe" for matching dance partners in a dance hall, based on an extension of an algorithm for the so-called stable marriage problem.

One of my research papers, coauthored with my student Ali Khodabakhsh, another PhD student Rasoul Shafipour and his advisor Gonzalo Mateos from the University of Rochester [C27], received the 2018 **Best Student Paper Award** at the IEEE International Conference on Acoustics, Speech and Signal Processing.

Another one of my research papers with my student Ali Khodabakhsh as lead author and four other members of my group, along with colleague Michael Caramanis from Boston University [C26], was **nominated for best paper** at the Hawaii International Conference on System Sciences in 2018.  Since only two papers were nominated and one won the best paper award, ours was essentially considered the second best paper in that top venue in power systems.

## 2. Research Funding

My research has been supported by a combination of funds from federal agencies and industry gifts. Four of my grants are from the NSF – 1 am the sole PI on two of them, and the lead PI on another one (a four-year award).  One of these grants is the NSF CAREER, which I was awarded in 2014 for my research on "Algorithms for Risk Mitigation in Networks." This is a five-year award.  In 2013, I was awarded a Google Faculty Research Award for research on "Maps Directions under Deadlines."  The Google Faculty Research Awards are one-year awards structured as unrestricted gifts to universities to support the work of world-class full-time faculty members at top universities around the world and are funded based on competition.  These awards were given for different aspects of my research program and notably on very different research topics ranging from algorithms (NSF CAREER) and computational economics (awarded by the interdisciplinary program NSF Interface between Computer Science and Economics & Social Sciences, abbreviated ICES) to power systems (awarded by the interdisciplinary program NSF Algorithms in the Field).

In addition to these grants, I was awarded industrial affiliate support as a core member of the Wireless Networking and Communications Group (WNCG). More details on these grants can be found in my CV.

CONFIDENTIAL

### 3.   Invited, Keynote, and Plenary Conference Talks

In rank at UT, I have been invited to give three keynote talks, organize invited sessions at leading conferences in my area, and give seminars at universities and industrial research labs. My resume contains a detailed list of these activities and dates. The following are some examples:

I was a keynote speaker at the Ninth Workshop on Dynamic Games in Management Science, HEC Montreal in Montreal, Canada; the 12th Athens Colloquium on Algorithms and Complexity (ACAC'17) in Athens, Greece, and at a Workshop on Eco-friendly mobility at the ETH Zurich in Zurich, Switzerland. I gave a tutorial on Algorithms, Game Theory and Risk-averse Decision Making as part of the boot camp for the Simons Research Program ``Real-time Decision Making" that took place in Spring 2018 at the Simons Institute for the Theory of Computation in Berkeley, CA. The tutorial was streamed live, a recording is available on YouTube, and as of May 31, 2018 it has been viewed more than 700 times. The audience included senior and junior researchers, as well as graduate students, across multiple top universities and academic disciplines ranging from theoretical to applied (power systems, the natural sciences and transportation)

I have presented invited departmental colloquia and seminars at numerous universities and companies both nationally and internationally, including UC Berkeley, USC, Rice University, the University of Santiago de Chile in Santiago, Chile, the Technical University of Munich in Munich, Germany, the Technical University of Berlin in Berlin, Germany, ETH Zurich in Zurich, Switzerland, UNICAMP in Campinas, Brazil, the University of Buenos Aires in Buenos Aires, Argentina, Microsoft Research, IBM Research and Google, among others. A full list of my invited seminars is included in my CV. I have also been invited to give talks at top multidisciplinary venues such as the Information Theory and Applications (ITA) workshop in San Diego, and the Allerton Conference in UIUC.

### 4.   High-impact publications

While in rank, many of our research results have been accepted to the most selective journals and conferences in my field, including journal publications in Operations Research (2014), Mathematics of Operations Research (accepted 2017, forthcoming), ACM Transactions on Economics and Computation (2016), and conference publications in the ACM Conference on Economics and Computation (EC), the AAAI Conference on Artificial Intelligence (AAAI), International Joint Conference on Artificial Intelligence (IJCAI) and others. The full list of publications is available in my CV.

### Other Honors

Program managers and funding agencies recognize the importance of my group's work, and I have been invited to several workshops, panels and review meetings both in the US and abroad. Specifically, I have served on three NSF panels and one NSF Science and Technology Center Competition as an on-site reviewer. Furthermore, I have been an external reviewer for funding proposals submitted to the Chilean science foundation and have been invited to serve on proposals submitted to Israeli and Dutch science foundations.

CONFIDENTIAL

**Evdokia Nikolova**
**LETTERS REQUESTED/RECEIVED**

| Name of reviewer, rank or title, department, university | Alper Atamturk, Professor, Industrial Engineering and Operations Research University of California, Berkeley |
|---|---|
| Brief statement of expertise and reason for selection | Optimization under uncertainty, networks and risk |
| COI | No |
| Other relevant information | N/A |
| Nominated by | Department |
| Date letter received | August 16, 2018 |

| Name of reviewer, rank or title, department, university | Vincent Conitzer, Kimberly J. Jenkins University Professor of New Technologies Professor of Computer Science, Professor of Economics, Professor of Philosophy Duke University |
|---|---|
| Brief statement of expertise and reason for selection | Game theory and artificial intelligence (multi-agent systems) PECASE, Guggenheim Fellow, Kavli Fellow, Bass Fellow, Sloan Fellow |
| COI | No |
| Other relevant information | N/A |
| Nominated by | Candidate |
| Date letter received | July 27, 2018 |

| Name of reviewer, rank or title, department, university | Ashish Goel, Professor of Management Science and Engineering Professor of Computer Science (by courtesy) Stanford University |
|---|---|
| Brief statement of expertise and reason for selection | Design, analysis, and applications of algorithms Sloan Fellow, Terman Faculty Fellow (Stanford), Edelman Laureate (2014) |
| COI | No |
| Other relevant information | N/A |
| Nominated by | Candidate |
| Date letter received | August 19, 2018 |

| Name of reviewer, rank or title, department, university | Patrick Jaillet, Dugald C. Jackson Professor Department of Electrical Engineering and Computer Science Massachusetts Institute of Technology |
|---|---|
| Brief statement of expertise and reason for selection | Online optimization and learning; real-time, dynamic, and data-driven problems; and networks INFORMS Fellow |
| COI | No |
| Other relevant information | N/A |
| Nominated by | Candidate |
| Date letter received | August 5, 2018 |

CONFIDENTIAL

| Name of reviewer, rank or title, department, university | Sampath Kannan, Henry Salvatori Professor, Computer and Information Science Department University of Pennsylvania |
|---|---|
| Brief statement of expertise and reason for selection | Algorithms and applications ACM Fellow |
| COI | No |
| Other relevant information | N/A |
| Nominated by | Candidate |
| Date letter received | August 5, 2018 |

| Name of reviewer, rank or title, department, university | Andreas Schulz, Alexander von Humboldt-Professor, formerly MIT Professor of Mathematics of Operations Research and Holder of the Patrick J. McGovern (1959) Chair Department of Mathematics and School of Management, Technical University of Munich (formerly MIT Operations Research) |
|---|---|
| Brief statement of expertise and reason for selection | Algorithms, Equilibria in traffic networks Humboldt Research Award for lifetime achievement in research (2010) |
| COI | No |
| Other relevant information | N/A |
| Nominated by | Budget Council |
| Date letter received | August 20, 2018 |

| Name of reviewer, rank or title, department, university | David Shmoys, Laibe/Acheson Professor of Business Management & Leadership Studies, Department of Computer Science; Associate Director of Institute for Computational Sustainability Cornell University |
|---|---|
| Brief statement of expertise and reason for selection | Algorithms, optimization and applications to transportation ACM Fellow, INFORMS Fellow, SIAM Fellow |
| Email | david.shmoys@cornell.edu |
| COI | No |
| Other relevant information | N/A |
| Nominated by | Department |
| Date letter received | August 18, 2018 |

| Name of reviewer, rank or title, department, university | Pascal Van Hentenryck A. Russell Chandler III Chair and Professor, H. Milton Stewart School of Industrial and Systems Engineering Center for Machine Learning, Georgia Institute of Technology |
|---|---|
| Brief statement of expertise and reason for selection | Fellow of AAAI, INFORMS Expertise in Optimization under uncertainty, applications to transportation |
| Email | pvanhent@umich.edu |
| COI | No |
| Other relevant information | N/A |
| Nominated by | Department |
| Date letter received | August 19, 2018 |

**Appx.0328**

CONFIDENTIAL

UT Austin_0016389

| Name of reviewer, rank or title, department, university | Mihailis Yannakakis, Percy K. and Vida L. W. Hudson Professor of Computer Science, Columbia University |
|---|---|
| Brief statement of expertise and reason for selection | NAS, NAE member<br>Expertise in Algorithms, Optimization |
| Email | mihalis@cs.columbia.edu |
| Other relevant information | N/A |
| Nominated by | Department |
| Date letter received | August 10, 2018 |

CONFIDENTIAL

UT Austin_0016390

No Response

| Name of reviewer, rank or title, department, university | Balaji Prabhakar, VMWare Founders Professor of Computer Science, EE and CS, Stanford |
|---|---|
| Brief statement of expertise and reason for selection | Network theory & algorithms, applications to societal networks and transportation Terman Fellow, Sloan Fellow, IEEE Fellow, ACM Fellow |
| COI | No |
| Other relevant information | N/A |
| Nominated by | Budget Council |
| Date letter received | No response |

CONFIDENTIAL



**DEPARTMENT OF ELECTRICAL AND COMPUTER ENGINEERING**
Cockrell School of Engineering

*Engineering Education & Research Center (EER), 2501 Speedway, Room 2.864, C0803 • Austin, Texas 78712*

June 12, 2018

The Department of Electrical and Computer Engineering sincerely appreciates that you have agreed to serve as Formal Reviewer in the University of Texas at Austin's Tenure and Rank Advancement Promotion case of Dr. Evdokia Nikolova.

You are being asked to provide a candid assessment in the area of Scholarly Distinction to assist our decision-making process. Specifically, you will be submitting a Letter of Review assessing major engineering and/or scientific contributions.

Instructions:

1. Access candidate materials here: <u>Nikolova Materials</u>

2. Your Letter of Review should address the following:
   a. Do you know the candidate, and if so, for how long and under what circumstances?
   b. What are the original, innovative, and/or important contributions that the candidate has made in his/her field of research? Have the candidate's publications influenced the thinking of, or the methods used by, others in the field?
   c. How would you assess the candidate's development compared with cohorts in research-intensive universities?
   d. What is your perspective on the candidate's promise for further professional growth and leadership?
   e. We would welcome any additional comments you might have. The more specific you can be in your comments, the more helpful your evaluation will be.

   Please note: Under the laws of the State of Texas, the candidate has the right to view any materials in his/her personnel file, including your letter. Members of our faculty and internal review committees who see your letter as part of the promotion process will hold the comments you make in confidence.

3. Submit the following by end of day July 27, 2018, in order for your assessment to receive full consideration:
   Your Letter of Review, on institutional letterhead, including the URL for your website containing your short Curriculum Vitae (or an attachment of your short-version CV), submitted via scan to: http://www.ece.utexas.edu/upload

Thank you for your assistance with this important matter. As faculty members, we realize that the amount of time required to do a thoughtful review is considerable.

Sincerely,

Dr. Ahmed Tewfik
Cockrell Family Regents Chair in Engineering
Chairman, Department of Electrical and Computer Engineering

CONFIDENTIAL

# EVDOKIA NIKOLOVA – MATERIALS SENT TO REFEREES

1) Curriculum Vita

2) Teaching Statement

3) Research Statement

4) Five Most Significant Publications

**Five Most Significant Publications in Rank** (Students and Post Docs I supervised appear in bold)

1. [J4] **Thanasis Lianeas**, Evdokia Nikolova, Nicolas E. Stier Moses. Risk-averse selfish routing. Forthcoming in Mathematics of Operations Research (Accepted September 2017).

2. [J2] Evdokia Nikolova, Nicolas E. Stier Moses. A Mean-Risk Model for the Traffic Assignment Problem with Stochastic Travel Times. Operations Research, 62:2, 366.382, 2014.

3. [J3] Georgios Piliouras, Evdokia Nikolova and Jeff S. Shamma. Risk Sensitivity of Price of Anarchy under Uncertainty. ACM Transactions on Economics and Computation (TEAC), Volume 5, Issue 1, November 2016, Article No. 5.

4. [C30] Jose Correa, Cristobal Guzman, **Thanasis Lianeas**, Evdokia Nikolova and Marc Schroeder. Network Pricing: How to Induce Optimal Flows Under Strategic Link Operators. In Proceedings of the Nineteenth ACM Conference on Economics and Computation (EC'18). Ithaca, NY, June 19-21, 2018.

5. [C22] **Ger Yang** and Evdokia Nikolova. Approximation Algorithms for Route Planning with Non-linear Objectives. In Proceedings of the Thirtieth AAAI Conference on Artificial Intelligence (AAAI'16). Phoenix, Arizona, February 12-17, 2016.

CONFIDENTIAL

BC

# UNIVERSITY OF CALIFORNIA, BERKELEY



BERKELEY · DAVIS · IRVINE · LOS ANGELES · MERCED · RIVERSIDE · SAN DIEGO · SAN FRANCISCO                    SANTA BARBARA · SANTA CRUZ

INDUSTRIAL ENGINEERING AND OPERATIONS RESEARCH                                                      +1 (510) 642-5484
4135 ETCHEVERRY HALL #1777                                                                          FAX +1 (510) 642-1403
BERKELEY, CALIFORNIA 94720-1777

PHONE: +1 (510) 642 4559
EMAIL: atamturk@berkeley.edu
August 16, 2018

Dr. Ahmed Tewfik
Cockrell Family Regents Chair in Engineering
Chairman, Department of Electrical and Computer Engineering
Cockrell School of Engineering
University of Texas, Austin

**Re: Confidential letter of evaluation for Dr. Evdokia Nikolova**

Dear Professor Tewfik:

I am happy to write a recommendation letter for Dr. Evdokia Nikolova, who is considered for promotion to the rank of Associate Professor with tenure at UT Austin.

I have known and followed Professor Nikolova's research since she was a postdoc fellow at MIT, where she also received her PhD degree. Over the years, we met in several conferences, when she visited UC Berkeley and when I visited UT Austin. I have not collaborated with her on a research project or proposal.

Dr. Pachamanova has 4 refereed journal papers, two of which appeared or accepted for publication in top journals in the field of Operations Research. They are *Operations Research* and *Mathematics of Operations Research*. Dr. Nikolova has 30 conference papers, which clearly shows that she is a quite active researcher.

Evdokia has been a leader in algorithmic research in risk averse discrete optimization problems, in particular risk averse routing and equilibrium in networks. These are challenging problems, not adequately addressed by the research community. She has strong, original theoretical contributions. She has raised many new questions and put forth conjectures that have raised the interest in the research community.

**Appx.0333**

CONFIDENTIAL                                                                                          UT Austin_0016394

2

Dr. Nikolova has been quite successful in securing research funding. She has been either a PI or co-PI of five research grants, including a very competitive NSF Career Award. The variety of projects, including the applied ones in collaboration with different colleagues, indicates Dr. Nikolova's ability to engage in collaborative research. She is also valuable mentor to graduate students. She supervises/has supervised 7 PhD students and 2 postdoctoral fellows.

Professor Nikolova is a well-respected member of the academic community. I have relied on her expertise when she served as a referee for several manuscripts. She has co-organized a successful research workshop on real-time decision making at the Simons Institute at UC Berkeley.

I am confident that she will continue to make strong contributions in the future. She has recently started to work on problems in power grids. The application of her theoretical and algorithmic expertise in this domain seems to be a promising growth area for her.

I am pleased to recommend Dr. Evdokia Nikolova's promotion to Associate Professor rank with tenure at UT Austin.

Sincerely yours,

Alper Atamtürk
Professor
IEOR, UC Berkeley

CONFIDENTIAL

**From:** Alper ATAMTURK <atamturk@berkeley.edu>
**Sent:** Thursday, August 16, 2018 2:18 PM
**To:** Erengil, Jac <jac.erengil@utexas.edu>
**Cc:** Tewfik, Ahmed H <tewfik@austin.utexas.edu>
**Subject:** Re: UT Faculty Promotion Letter Overdue

Dear Prof. Tawfik,

I am sorry for the delay. Attached, please find my letter for Dr. Evdokia Nikolova.

Best regards,
Alper

CONFIDENTIAL                                                            UT Austin_0016396

## Alper Atamturk, Professor

Industrial Engineering and Operations Research

University of California, Berkeley

Current research interests are in integer programming (conic, mixed, combinatorial), optimization under uncertainty with applications to power systems, portfolio/network design, logistics of production, distribution, transportation systems and treatment of cancer. He serves as a co-editor for Mathematical Programming A, area editor for Mathematical Programming C, and associate editor for Operations Research, Discrete Optimization, Journal of Risk, and Networks; and has in the past served on the editorial board of Management Science. Dr. Atamturk is a National Security Science & Engineering Faculty Fellow of the US Department of Defense.

Research

- Integer Optimization (Conic, Mixed, Combinatorial)
- Optimization under Uncertainty
- Power Systems
- Logistics of Production, Distribution, Transportation, Telecommunication Systems
- Portfolio/Network Design
- Treatments for Cancer

**Appx.0336**

UT Austin_0016397

c

𝔇uke 𝔘niversity
DURHAM
NORTH CAROLINA
27708·0129
USA

VINCENT CONITZER
DEPARTMENT OF COMPUTER SCIENCE
LEVINE SCIENCE RESEARCH CENTER
BOX 90129

TELEPHONE (919) 660·6503
FAX (919) 660·6519
WWW.CS.DUKE.EDU/~CONITZER
CONITZER@CS.DUKE.EDU

Dear promotion committee:

It is my great pleasure to very strongly recommend the promotion of **Dr. Evdokia (Eddie) Nikolova** to the rank of Associate Professor with tenure in the Department of Electrical and Computer Engineering at the University of Texas at Austin. I apologize that I have to keep this letter somewhat short due to overwhelming other commitments, but this should not at all be considered to reflect badly on the candidate; I imagine this will be an easy case.

Simply put, Dr. Nikolova is one of the world's leading junior researchers working in the intersection of fields including operations research and theoretical computer science and ECE. She publishes in top conferences and journals, including some particularly high-profile venues recently.

I have known Dr. Nikolova for many years now from seeing her work and talking with her at scientific conferences. She and I also both participated in the UC Berkeley Simons Institute's program on Economics and Computation in the fall of 2015.

In my mind, Dr. Nikolova's most notable contributions and those that are most unique to her, in the sense that I'm not sure anyone else would have made them (but I am very glad that she did!), concern the introduction of uncertainty and risk aversion among users into certain theoretical models, especially routing games. She then proceeds to extend analyses that were done in less realistic (deterministic or risk-neutral) models to these extended models, which often requires a great deal of technical insight and produces surprising new results. This work has already had significant impact but I think it will have much more impact yet in the future.

Let me discuss a few of her papers in greater detail.

One of Dr. Nikolova's most notable contributions is her work on risk-averse selfish routing. There is a large body of literature on the selfish routing problem, where each agent chooses a path that minimizes her own latency, which may have the effect that the overall solution is actually worse from the perspective of global welfare of the agents. The standard models assume that latencies are deterministic or that agents care only about expected latency. Quick reflection reveals this to be unrealistic in many cases. For example, suppose I leave for work at 8:40am. I have a choice between a long quiet route that will take 18 minutes for sure, or a shorter busier route that takes 10 minutes 50% of the time and 25 minutes otherwise. Which will I prefer? The latter route has shorter expected latency (17.5 minutes), but I may well prefer the predictability of the former route, especially if I need to get to work by 9am. While it is easy to make the case for the importance of modeling such aspects, from a mathematical/technical perspective it creates all kinds of difficulties. Dr. Nikolova and her co-authors cut through these difficulties, analyzing in detail what they term the *price of risk aversion*, i.e., the worst-case loss to the system due to the combination of uncertainty and agent risk aversion. This

CONFIDENTIAL

work (with Lianeas and Stier-Moses) appears in *Mathematics of Operations Research*, one of the top OR journals. It builds on Dr. Nikolova's earlier paper (with Stier-Moses) in *Operations Research*, another top OR journal, in which she characterizes equilibrium traffic and shows when such equilibria exist in this context.

In the routing games described above, the cost of traversing an edge is exogenously determined. But in some cases, this cost is the result of a strategic agent imposing a toll on users traversing the edge. This is the setting that Dr. Nikolova (together with Correa, Guzman, Lianeas, and Schroder) studies in a 2018 ACM EC paper. (Incidentally, this EC conference is the top conference for interdisciplinary work between economic theory and computer science. As you may be aware, conference proceedings are the main method of publication in computer science, and top conferences such as EC have rigorous and extremely competitive refereeing.) Thus, these toll-imposing agents should also be considered players in the game. Dr. Nikolova and her co-authors give an impressive result: while in general these games may have no equilibria, multiple equilibria, or highly inefficient equilibria, if it is the case that an authority can set caps on the tolls that are charged, then all these problems go away.

As I noted at the beginning of this letter, Dr. Nikolova has a set of topics in which she is uniquely expert and that fit her interests and disciplines extremely well. If she wants to expand beyond them, great, but I don't see this as necessary. I would encourage her to seek more leadership roles in the community post-tenure. To be clear, I don't think that there's a problem here so far at all – she has been serving on program committees and funding agency panels, and her recent organizational roles at the Simons Institute are a great starting point for taking further leadership roles. And it can be risky for pre-tenure faculty to take on certain leadership roles. But tenure should allow her to take on even more visible roles. As for teaching, you know more about her teaching record than I do, but from what I can see there doesn't seem to be any reason to be concerned there. (I'm not surprised, given that I know her to be a clear lecturer.)

In summary, again, I very strongly recommend Dr. Nikolova's promotion to Associate Professor with tenure, and that you do your best to keep her in this competitive market. Thank you for your service and for reading my letter.

Sincerely,

Vincent Conitzer

Vincent Conitzer
Kimberly J. Jenkins University Professor of New Technologies
Professor of Computer Science (primary), Professor of Economics, and Professor of Philosophy
Duke University

*About the letter writer:*[1] *Vincent Conitzer is the Kimberly J. Jenkins University Professor of New Technologies and Professor of Computer Science, Professor of Economics, and Professor of Philosophy at Duke University. He received Ph.D. (2006) and M.S. (2003) degrees in Computer Science from Carnegie Mellon University, and an A.B. (2001) degree in Applied Mathematics from Harvard University. His research focuses on computational aspects of microeconomics, in particular game theory, mechanism design, voting/social choice, and auctions. This work uses techniques from, and includes applications to, artificial intelligence and multiagent systems. Conitzer has received the Social Choice and Welfare Prize (2014), a Presidential Early Career Award for Scientists and Engineers (PECASE), the IJCAI Computers and Thought Award, an NSF CAREER award, the inaugural Victor Lesser dissertation*

---

[1] This is helpful for some universities' procedures; please feel free to ignore it.

CONFIDENTIAL

*award, an honorable mention for the ACM dissertation award, and several awards for papers and service at the AAAI and AAMAS conferences. He has also been named a Guggenheim Fellow, a Kavli Fellow, a Bass Fellow, a Sloan Fellow, and one of AI's Ten to Watch. Conitzer and Preston McAfee were the founding Editors-in-Chief of the ACM Transactions on Economics and Computation (TEAC).*

CONFIDENTIAL UT Austin_0016400

Letter-Submissions | Powered By Box

File Properties                                                 ✕

**Name**
Nikolova.Connitzer.pdf

**Description**

**Owner**
Andrew Carr

**Enterprise Owner**
The University of Texas at Austin

**Last Updated By**
conitzer@cs.duke.edu

**Size**
225.2 KB

**Created**
Jul 27, 2018, 1:56 PM

**Modified**
Jul 27, 2018, 1:56 PM

Close

**Appx.0340**

CONFIDENTIAL                                         UT Austin_0016401

C



**STANFORD**

SCHOOL OF ENGINEERING

**MS&E** | DEPARTMENT OF MANAGEMENT
SCIENCE AND ENGINEERING

**Ashish Goel**
Professor,
Departments of Management Science & Engineering,
                 and, by courtesy, Computer Science,
Stanford University.
HEC 359, Stanford CA 94305-4026
Cell: (650)814-1478. Email: ashishg@stanford.edu.
Web: http://www.stanford.edu/~ashishg

August 19, 2018

To,

Dr. Ahmed Tewfik
Cockrell Family Regents Chair in Engineering
Chairman, Department of Electrical and Computer Engineering

Dear Professor Tewfik,

It is a pleasure to write a letter of reference for Dr. Evdokia Nikolova as you are considering her for promotion and tenure. I think highly of her, but am severely time constrained so while my opinion is very positive, this letter will be brief.

You specifically asked for my opinion on five related issues.

1. *Do you know the candidate, and if so, for how long and under what circumstances?*

    I have known Professor Nikolova for over a decade, and her work for a little longer. She visited Stanford when she was still a PhD student, and we had a long conversation about her work on Pareto-optimal shortest paths. We have since kept in professional contact, primarily at conferences.

2. *What are the original, innovative, and/or important contributions that the candidate has made in his/her field of research? Have the candidates publications influenced the thinking of, or the methods used by, others in the field?*

    Professor Nikolova describes these in detail in her research statement, and her description is both accurate and impressive. I would like to offer a broader perspective on her work. When she graduated, she was working on hard-core algorithmic problems. I was particularly delighted to see her work on multi-objective shortest paths. She had the ability and the training to keep pushing in that direction, and would no doubt have had success. But she chose a somewhat different path, which has been productive from a research view point, and also impactful. She started to use her algorithmic background to model and solve real world problems in transportation networks. She brought her own taste and flavor to this research, in that her primary focus has been not on issues of computational efficiency (though her work speaks to that as well) but issues of risk and incentive. Her work is rooted both in a deep understanding of graph algorithms and game theory on the one hand, and a careful modeling of real-life network interactions on the other. Her work on toll pricing is considered quite

1

CONFIDENTIAL

UT Austin_0016402

influential in the EC community. And her new research direction regarding power grids is timely and well thought out.

Since our research areas have diverged somewhat, I still find her original thesis work on route planning under uncertainty and her work shortly thereafter on stochastic shortest paths to be the ones that had the largest influence on my own thinking. Her work introduced new techniques by going beyond the confines of polynomial time, and showing that the shortest path problem has interesting computational structure beyond this boundary.

3. *How would you assess the candidates development compared with cohorts in research-intensive universities?*

Professor Nikolova compares very well to the cohort of tenured Associate Professors in major research Universities. She provides academic leadership to her field, as evidenced by the high volume of her publications, and her service work is evident in the numerous committees she has served on.

4. *What is your perspective on the candidates promise for further professional growth and leadership?*

Professor Nikolova has a high potential for future professional growth and leadership. One sure sign of this is her mentor-ship of strong PhD students. I was very pleased to note that one of her students received a best student paper award for work co-authored with her at a competitive and prestigious conference.

5. *We would welcome any additional comments you might have. The more specific you can be in your comments, the more helpful your evaluation will be.*

This is a strong tenure case, and I very much hope this succeeds. Please don't hesitate to contact me for additional information.

Sincerely,

Ashish Goel.

**Brief Bio:** Ashish Goel is a Professor of Management Science and Engineering and (by courtesy) Computer Science at Stanford University, and a member of Stanford's Institute for Computational and Mathematical Engineering. He received his PhD in Computer Science from Stanford in 1999, and was an Assistant Professor of Computer Science at the University of Southern California from 1999 to 2002. His research interests lie in the design, analysis, and applications of algorithms; current application areas of interest include social networks, participatory democracy, Internet commerce, and large scale data processing. Professor Goel is a recipient of an Alfred P. Sloan faculty fellowship (2004-06), a Terman faculty fellowship from Stanford, an NSF Career Award (2002-07), and a Rajeev Motwani mentorship award (2010). He was a co-author on the paper that won the best paper award at WWW 2009, an Edelman Laureate in 2014, and a co-winner of the SigEcom Test of Time Award in 2018.

2

CONFIDENTIAL                                                           UT Austin_0016403

**From:** Ashish Goel <ashishg@stanford.edu>
**Sent:** Sunday, August 19, 2018 6:38 PM
**To:** Erengil, Jac <jac.erengil@utexas.edu>
**Subject:** Re: Nikolova Promotion Letter

Attached.

Many thanks for your patience,
Ashish.

Appx.0343

CONFIDENTIAL                                                                UT Austin_0016404

C

**Massachusetts Institute of Technology**

**Dr. Patrick Jaillet**
Dugald C. Jackson Professor

77 Massachusetts Avenue
Cambridge, MA 02139

**Department of Electrical**
**Engineering and Computer Science**
**(EECS), LIDS, IDSS, and**
**Operations Research Center (ORC)**

Room  32-D624
Phone  617–452–3379
Email  jaillet@mit.edu

August 5, 2018

Professor Ahmed Tewfik
Cockrell Family Regents Chair in Engineering
Chairman, Department of Electrical and Computer Engineering

Dear Professor Tewfik,

I have prepared an evaluation of Dr. Edvokia Nikolova's scholarly qualifications as requested in your letter of June 12, 2018. I understand that she is being considered for promotion to the rank of Associate Professor with Tenure.



<u>Background:</u> I have been aware of Professor Nikolova's work in some details for about 9 years now, since we first met upon her finishing her PhD with David Karger and then working as a post-doc with Hari Balakrishnan. We have met several times during this period to talk about research. We have however never collaborated on a common research project, nor written a joint publication. I believe that I am in a reasonable position to provide input on some aspects of her scholarly contributions.

<u>Overall Comments:</u> I consider Prof Nikolova's overall record to be a strong one. Her publication record is very good and contains solid papers with methodological depth. She has good taste and vision for interesting problems to tackle, as well as with the needed personal skills to collaborate with other top researchers. She also has a good track record with respect to research funding (grants) and seems to be a talented mentor. I won't say much about the teaching and service portfolios as these can usually be best evaluated internally. Let me simply mention that this aspect of the portfolio looks very favorable compare to all the cases I have been looking (at MIT and elsewhere).

Let me now expand a bit on the scholarly aspect.

I am quite familiar with some of her research contributions, notably (due to my own research group's interests) those related to network routing problems under uncertainty, and risk-averse decision making. For example, referring to the numbering provided in the references of her personal research statement, I have been quite aware of the publications [9], [10], [12], [13], [15] and [16], knowing the detailed content of these papers quite well. I consider these papers to be first-rate and typical of the work published by Prof. Nikolova: rigorous and mathematically sound, introducing novel ideas to some classical problems, with the aim to understanding fundamental properties. This is very high-quality work.

Motivated by this tenure evaluation request, I have read the other (more recent) paper submitted in her package (Correa et al., EC, 2018). Again, I found this publication to be of high quality, consistent with what I came to expect from Prof. Nikolova. Overall, I would say that the novelty, precision, and depth shown in her written documents to be impressive.

Let me briefly turn to comparisons with her peers. Restricting myself to the last few years, I can say that her record is in par with the recently tenured cases that I have been asked to review (at

CONFIDENTIAL

UT Austin_0016405

Georgia Tech, USC, MIT, and Northwestern). Over a fifteen-year period, I would put her in the top 20% of all those I have evaluated and subsequently received tenure.

It is my view that her trajectory is very good and her work will continue to receive increased recognition world-wide.

As obvious from my comments, I offer my full support in favor of this promotion. If you need additional information, details or precision, please do not hesitate to contact me at jaillet@mit.edu.

Sincerely yours,

Patrick Jaillet
Dugald C. Jackson Professor, EECS
Co-Director, Operations Research Center

2

Appx.0345

CONFIDENTIAL

UT Austin_0016406

**From:** Patrick Jaillet <jaillet@mit.edu>
**Sent:** Sunday, August 5, 2018 11:56 PM
**To:** Tewfik, Ahmed H <tewfik@austin.utexas.edu>
**Cc:** Erengil, Jac <jac.erengil@utexas.edu>
**Subject:** Re: Response needed by Friday 6/22: would you be able to provide a letter of reference in support of the promotion of Prof. Nikolova to associate professor by July 27?

Dear Ahmed,
Attached please find my letter. Again thank you for your patience. Best regards,
—Patrick

CONFIDENTIAL

UT Austin_0016407

# Patrick Jaillet - biographical sketch

Dr. Patrick Jaillet is the Dugald C. Jackson Professor in the Department of Electrical Engineering and Computer Science and a member of the Laboratory for Information and Decision Systems at MIT. He is also co-Director of the MIT Operations Research Center and the Faculty Director of the MIT-France program. He was Head of Civil and Environmental Engineering at MIT from 2002 to 2009, where he currently holds a courtesy appointment. From 1991 to 2002 he was a professor at the University of Texas in Austin, the last five years as the Chair of the Department of Management Science and Information Systems within the McCombs School of Business School. He co-founded and was Director of UT Austin's Center for Computational Finance. Before his appointment in Austin, he was a faculty and a member of the Center for Applied Mathematics at the Ecole Nationale des Ponts et Chaussée in Paris. He received a Diplôme d'Ingénieur from France (1981), and then came to MIT where he received an SM in Transportation (1982) followed by a PhD in Operations Research (1985).

Dr. Jaillet's research interests include online optimization and learning; real-time, dynamic, and data-driven problems; and networks. His research is funded by US federal sources such as NSF, ONR, and internationally by Singapore. Professor Jaillet's teaching covers subjects such as algorithms; mathematical programming; network science and models; and probability. Dr. Jaillet's consulting activities primarily focus on the development of optimization-based analytic solutions in various industries, including defense, financial, electronic marketplace, and information technology.

Dr. Jaillet was a Fulbright scholar in 1990 and the recipient of many research and teaching awards. He is a Fellow of the Institute for Operations Research and Management Science Society (INFORMS), a member of the Mathematical Optimization Society (MOS), and a member of the Society for Industrial and Applied Mathematics (SIAM). He is currently an Associate Editor for INFORMS Journal on Optimization, Networks, and Naval Research Logistics, and has been an Associate Editor for Operations Research from 1994 until 2005 and for Transportation Science from 2002 until 2017.

Appx.0347



 **Penn**
Engineering

c

School of Engineering and Applied Science                    July 11, 2018
Computer and Information Science Department
3330 Walnut Street
Levine Hall
Philadelphia, PA 19104-6309

Prof. Ahmed Tewfik
Cockrell Family Regents Chair in Engineering
Chairman, Department of Electrical and Computer Engineering

Dear Prof. Tewfik,

I am happy to write in support of Prof. Evdokia Nikolova's tenure and promotion to the rank of Associate Professor in your department. I have known of Prof. Nikolova's work for a few years now, but met her for the first time about 2 years ago at a planning meeting at the Simons Institute in Berkeley, for a program on Real Time Decision Making that she was co-organizing. Since then I have interacted with her significantly on a couple of occasions and have enjoyed my interactions each time.

Evdokia's core technical expertise lies squarely in theoretical computer science. But it would not be appropriate to evaluate her by the yardsticks used to evaluate researchers in this field. Theoretical computer science has a rich tradition of bringing its rigor and analytic tools to many other disciplines and societal problems with great success, for example, in resource optimization, computational biology, cybersecurity, privacy, and fairness. Evdokia's work follows this great tradition: Her main contributions are in modeling and understanding the behavior of risk-averse selfish agents in congestion games and specifically in selfish routing. Over the last few years, she has also been trying to model and understand smart grids with collaborators from this application domain. I will describe her work in some detail below.

In selfish routing we have a network (of roads, say) and each agent starts at some node and wants to end up at another. (In the non-atomic version there are not individual agents, but amounts of flow that want to go from point A to point B.) The delay that an agent encounters on any link in the network is a (linear) function of the number of people (amount of flow) using that link. The standard version of the problem is to seek an equilibrium where each agent is minimizing their expected delay (assuming probabilistic behavior by all agents).

Evdokia's key insight was that risk-averse agents do not want to simply minimize the expected delay. It may be unacceptable to them if the delay has high variance. Instead she defined the notion of agents minimizing either the sum of the mean and some multiple of the standard deviation. The larger the multiple, the more risk-averse the agent is. (It is always possible to model risk using arbitrary utility functions for agents, but at this level of generality no positive algorithmic result could be hoped for.) The resulting mathematics is completely different from that of the standard model. Evdokia initially showed how a single risk-averse agent would behave in a quiescent network; she next wrote several excellent papers considering situations where all agents are risk-averse to the same extent. Finally, she considered the situation where there is diversity among the agents' level of risk aversion, and asked whether such diversity could contribute to a more socially optimal equilibrium. Her answer was that in general this would not be the case: only in networks with special structure would diversity help.

UNIVERSITY *of* PENNSYLVANIA

**Appx.0348**

CONFIDENTIAL                                                                    UT Austin_0016409

I am a fan of this main line of Evdokia's research for a number of reasons: 1) She breaks new conceptual ground in her problem choice. 2) She models a very real situation and does so without oversimplifying the model for the sake of computational tractability. 3) At the same time, her models are elegant and admit analytical tools. 4) She often has an empirical component to her work and has very successful evaluations of her results. In addition, I have been working for several months now on whether and when  diversity of goals helps in achieving better equilibria, and I can particularly appreciate Evdokia's way of classifying networks into those on which diversity helps and those on which it doesn't. Evdokia's papers and presentations are also eloquent and clear, laying out the case for the modeling choices she makes with persuasive arguments. I am less familiar with Evdokia's work on smart grids, but I have seen that some of the top researchers in smart grids (in addition to her coauthors) seek her out for technical discussions on problems.

It is customary in letters of this kind to make comparative statements. Unfortunately I will not be able to do that here. It would not be appropriate to compare Evdokia to a pool of theoretical computer scientists. While I am familiar with the work of various theorists doing applied work, I do not know a sufficient number of young theorists whose work is exactly in the areas that Evdokia works on. I can say that Evdokia publishes in a broad range of venues. EC and WINE are still young conferences, but they are very well-regarded, and I send some of my own favorite results to these conferences. IJCAI is the top AI conference and it is laudable that Evdokia got the AI community interested in risk-averse routing problems by publishing several of her papers there.

Overall, I am confident Evdokia will continue to be very successful -- she has great taste in problem choice and modeling, and she continues to do the empirical evaluation necessary to validate (and possibly modify) her models. Her rising citation count is a clear signal that her body of work on risk aversion is having a big impact. I strongly recommend her for tenure.

Sincerely,

Sampath K. Kannan
Henry Salvatori Professor
Computer and Information Science Department
University of Pennsylvania

UNIVERSITY of PENNSYLVANIA

Appx.0349

CONFIDENTIAL

UT Austin_0016410

**From:** kannan <kannan@cis.upenn.edu>
**Sent:** Sunday, August 5, 2018 4:51 AM
**To:** Erengil, Jac <jac.erengil@utexas.edu>
**Cc:** Tewfik, Ahmed H <tewfik@austin.utexas.edu>
**Subject:** Re: Promotion Consideration, Dr. Nikolova

Hi Jac,

Please find attached my letter for Evdokia.

Best,
Sampath

CONFIDENTIAL

UT Austin_0016411

## Sampath Kannan

Henry Salvatori Professor

Computer and Information Science (CIS)

Sampath Kannan is the Henry Salvatori Professor and Department Chair in the Department of Computer and Information Science at the University of Pennsylvania. Sampath's research spans several subfields in algorithms. In his work on massive data set algorithms, Sampath explores what can be computed efficiently, and what is not computable. He is also interested in program checking, a paradigm for ensuring the correctness of a program by observing its behavior at run-time, and in algorithmic problems in computational biology, particularly the problem of reconstructing the evolutionary history of a set of species from phenotypic and molecular sequence observations.

**Honors and Awards:** Outstanding Faculty Advising Award - 2005

**Research Expertise:** Algorithms and Complexity
Sampath's research spans several subfields in algorithms. In his work on massive data set algorithms, Sampath explores what can be computed efficiently, and what is not computable. He is also interested in program checking, a paradigm for ensuring the correctness of a program by observing its behavior at run-time, and in algorithmic problems in computational biology, particularly the problem of reconstructing the evolutionary history of a set of species from phenotypic and molecular sequence observations.

**Member of:**
- Institute for Research in Cognitive Science (IRCS)
- Penn Center for Bioinformatics
  (PCBi)

Appx.0351

CONFIDENTIAL                                                                 UT Austin_0016412

BC



Technische Universität München ǀ Lehrstuhl für Operations Research
Arcisstraße 21 ǀ 80333 München

Professor Ahmed Tewfik
Chair, Dept. of Electrical and Computer
Engineering
Cockrell School of Engineering
The University of Texas at Austin

August 20, 2018

**Evaluation of Dr. Evdokia Nikolova for possible promotion to Associate Professor with Tenure**

Dear Professor Tewfik,

I am responding to your request to evaluate Dr. Evdokia Nikolova in support of the upcoming deliberations on promoting her to Tenured Associate Professor. By background, I have met Dr. Nikolova at MIT where she did her PhD and spent some time as a postdoc. Apart from her former advisor (David Karger), she has published most often with Nicolas Stier-Moses, who was one of my PhD students at MIT. He graduated in 2004.

Dr. Nikolova is a theoretical computer scientist by training, but has taken interest in models that may better reflect certain real-world phenomena. Most prominently, she has studied stochastic variants of combinatorial optimization problems (especially the shortest path problem), and she has analyzed the effects of risk aversion in game-theoretic settings, particularly in the context of selfish routing.

Classic combinatorial optimization theory concerns deterministic settings. For instance. it is assumed that the lengths of origin-destination paths in networks is known with certainty. Similarly, most selfish-routing/traffic assignment models assume risk-neutral agents, while in practice most users may be risk-averse (i.e., all else being equal, prefer low-variance outcomes to high-variance ones). Risk aversion leads to challenges in the mathematical analysis of the resulting models, and often to different insights compared to the case of risk-neutral players.

Prior to your request, I had not been familiar with the five publications that Dr. Nikolova has identified as her most significant ones. I have read them with interest, especially because they are scholarly and eloquently written. Moreover, they identify a number of intriguing open problems. However, let me rather review some of the results therein that I find most relevant.

Technische Universität München
Fakultäten für Mathematik & für
Wirtschaftswissenschaften
Lehrstuhl für Operations Research

Prof. Dr. rer. nat.
Andreas S. Schulz
Alexander von Humboldt-Professor
Ordinarius

Tel. +49 89 289 268 89
Fax +49 89 289 268 92

andreas.s.schulz@tum.de

Arcisstraße 21
80333 München

www.or.tum.de

**Appx.0352**



Let me start by discussing a paper that was recently accepted for presentation at the premier conference in the relatively new field of algorithmic game theory, ACM EC 2018.[1] In a network in which different profit-maximizing providers compete by setting a fee for the link they own[2] (and where subsequently selfish agents experience costs comprised of latencies and tolls and otherwise behave as in selfish routing), Dr. Nikolova and her coauthors note that price equilibria may not exist. However, they show that when fees are capped appropriately, a unique equilibrium exists. It even is immune to coalitions. While the theory for proving this result had been in place, it is a nice example in that it shows how proper mathematical analysis may influence policy making.

Paper #2, which appeared in the top journal of the field of Operations Research, represents a rather systematic study of how including uncertain latencies in the standard selfish routing model leads to changes in the existence and characterization of equilibria and how it may influence the loss of efficiency due to selfish behavior. This requires a sound knowledge of tools and techniques from a variety of fields, including network flows, convex analysis, equilibrium theory, and stochastic shortest paths. Technically most demanding is the case in which the standard deviation of the latency of a link depends on the flow on that link. However, a drawback is that the loss of efficiency (nowadays commonly known as the price of anarchy) is measured as in the case with deterministic latencies, making it hard to separate the effects of selfishness and risk.

This has been addressed in Paper #1, which is apparently set to appear in another top journal of the field (and which I like best from this set). The authors introduce a new concept, which they call "price of risk aversion." It relates the cost of a risk-averse equilibrium to that of a risk-neutral equilibrium, where the cost is measured in terms of expected latencies. This notion now captures properly how much society pays for the risk-aversion of users. Unfortunately, it turns out that this measure is unbounded in general. (Put differently, it depends linearly on the variance). The authors therefore assume that the variance-to-mean ratio is bounded to begin with. Under this assumption, they show that the price of risk-aversion is bounded above by an expression that depends linearly on the product of the parameter capturing the risk aversion and a parameter characterizing the network topology. In general, the latter parameter may be as large as half the number of nodes in the network. However, the authors show that this bound is, indeed, tight. Inspired by follow-up work of Meir and Parkes, they also derive an alternative bound that depends on risk-aversion and the price of anarchy of the corresponding deterministic game only. They also argue that the assumption of homogeneous users (all players have the same attitude towards risk) does in general not influence their results.

In my view, it is fair to claim that Dr. Nikolova has been at the forefront of researchers trying to

---

[1] Paper #4 on the list of five.
[2] The assumption that each owns only one link seems a bit unrealistic.

2/4

Appx.0353

CONFIDENTIAL                                                                                      UT Austin_0016414



incorporate important stochastic aspects into network optimization and equilibrium models. She may not have had what one may typically consider a home-run paper, but with meticulous work she has certainly helped to bring this research direction forward.

Dr. Nikolova has only four journal publications, which would be very few in any environment in which this would be the main measure of success. However, three of the four papers are in top journals. Moreover, in theoretical computer science, the community generally cares more about refereed conference publications, of which she has many more. I am not sufficiently knowledgeable to speak to the AI proceedings in which she has published, but her stream of papers in ACM EC is good, with acceptances in 2018, 2015, 2013, 2007 (2), and 2005. As mentioned before, ACM EC is the top conference in algorithmic game theory, if one does not choose to submit or get into general theory conferences such as STOC, FOCS or SODA.

I have not recently had a chance to attend a lecture or talk by Dr. Nikolova, but from what I remember, I can easily imagine that she has become a very good teacher and advisor.

My bottom line for the decision at hand: Dr. Nikolova is a talented, widely knowledgeable scholar who is working on a diverse set of topics and who has produced an interesting body of work, which I have enjoyed reading. All in all, I would encourage you to seriously consider promoting Dr. Nikolova to Associate Professor with Tenure.

Sincerely,

Andreas S. Schulz
Alexander von Humboldt-Professor


P.S. As per your request, a biographical sketch of myself is included below.

Appx.0354



Biographical sketch:

Andreas S. Schulz is endowed chaired full professor at TU Munich. He holds a joint appointment in the Department of Mathematics and in the School of Management. He is also an Honorary Fellow of the Institute of Advanced Study as well as a Research Affiliate of the Massachusetts Institute of Technology (MIT), where he previously was the Patrick J. McGovern Professor of Mathematics of Operations Research. In 2015, with the help of an Alexander von Humboldt-Professorship— the most highly-endowed research award in Germany — Professor Schulz founded the Research Group for Operations Research at TU Munich.  From 1998 to 2015, Professor Schulz was a member of the faculty at MIT in Cambridge, Massachusetts. He held visiting positions at the Sauder School of Business of the University of British Columbia, at the Faculty of Economics and Business Administration of Maastricht University, at the Institute of Theoretical Computer Science at ETH Zurich, and at the Department of Mathematics of TU Berlin, from which he obtained his PhD in 1996. Professor Schulz has published more than 80 peer-reviewed articles, and he has received several awards for his research, including the Humboldt Research Award in recognition of his lifetime achievements in research and membership in the Junge Akademie of the Berlin-Brandenburg Academy of Sciences and Humanities and the German National Academy of Sciences Leopoldina. He has served on the editorial boards of several leading journals, including ACM Transactions on Algorithms, Discrete Optimization, INFORMS Journal on Computing, Journal of Scheduling, and Operations Research. His research interests include algorithmic game theory, approximation algorithms, combinatorial optimization, computational complexity, integer programming, network flows, polyhedral combinatorics, and scheduling theory.

Appx.0355

CONFIDENTIAL                                                                                                    UT Austin_0016416

## File Properties

&times;

**Name**

Nikolova.Schulz.pdf

**Description**

Letter of review for Dr. Nikolova

**Owner**

Andrew Carr

**Enterprise Owner**

The University of Texas at Austin

**Last Updated By**

andreas.s.schulz@tum.de

**Size**

41 KB

**Created**

Aug 20, 2018, 2:47 PM

**Modified**

Aug 20, 2018, 2:47 PM

Close

**Appx.0356**

CONFIDENTIAL                                    UT Austin_0016417

BC



Frank H. T. Rhodes Hall
Ithaca, New York 14853-3801
t. 607.255.4856
f. 607.255.9129

**David Shmoys**
*Laibe/Acheson Professor*
231 Rhodes Hall
607-255-9146
shmoys@orie.cornell.edu
https://
people.orie.cornell.edu/shmoys/

August 18, 2018

Dr. Ahmed Tewfik
Cockrell Family Regents Chair in Eingeering
Chairman
Department of Electrical and Computer Engineering
Cockrell School of Engineering
Engineering Education & Research Center ((ER)
2501 Speedway, Room 2,864,C0803
Austin, TX 78712

Dear Professor Tewfik:

I am writing in response to your request that I evaluate the work and promise of Evdokia
Nikolova, who is being considered for promotion to Associate Professor with indefinite
tenure in the Department of Electrical and Computer Engineering at the University of
Texas at Austin.

I have known Evdokia since her graduate school and postdoctoral years – at the time we
were both focused on emerging theoretical algorithmic approaches to studying stochastic
optimization problems in networks, and her doctoral work included several interesting
results along those lines. In spite of this early contact, perhaps largely due to the fact that
my own work has moved in a rather different direction, focusing on more application-
driven issues, I have not followed her work closely in the intervening years; my most
extended interactions with her recently were facilitated by the fact that I was a long-term
visitor in the semester-long program on real-time decision-making at the Simons Institute
for Theory of Computing at the University of California at Berkeley, for which she was
one of the 5 program organizers. In fact, it was clear that she had matured professionally
to the point that she had taken on the role of *the* main organizer, in spite of the fact that
the others of this group were an extremely distinguished, senior, and extraordinarily
broad cohort.

The main thrust of Nikolova's work has been to develop algorithmic solutions to capture
the interplay between stochastic models of demand in a network (primarily for traffic
routing, but more recently in the context of energy networks), with multiple agents
competing for these resources, and hence viewed in a game-theoretic context. Her work
has also focused on a variety of models to capture notions of risk in these settings. For
example, with the traffic routing setting, results that have stimulated tremendous activity
have been the study of the price of anarchy – what is the worst-case (or Bayesian worst-
case) cost of having decision-making by selfish agents, rather than by a social-good-

CONFIDENTIAL                                                                        UT Austin_0016418

coordinating entity? Instead, Nikolova has approached the question of the price of risk-aversion, modeling this in numerous ways throughout her work. This is a fundamentally important line of work, which really came into sharp focus in her recent paper with Lianeas and Stier-Moses. In reading through the packet of papers sent for reviewing her case, it was this paper that provides an excellent point of reference in her explorations in this domain. It is technically non-trivial, and provides clear insights into the tradeoffs exposed by this elegant framing of the question. It appears that her collaboration with Stier-Moses has been extremely fruitful, because I also found their *Operations Research* paper on a mean-risk model for the traffic assignment problem with stochastic travel times to be a very strong piece of work – the modeling aspects and the mathematical structural results combine to provide clear insights into a central problem in  routing control, and with the rise of app-based traffic routing, the importance of these results is ever-increasing.

The impact of Nikolova's body of research is starting to really gain in traction. I expect that the two papers mentioned above, which are quite recent, will generate quite a bit of follow-up work by a cross-section of researchers. Her paper from the 2016 ACM EC conference has also been influential, with over 30 citations to date in this short period since its appearance. I believe that the body of work is comparable in breadth and depth to her peers approaching tenure decisions at their respective research-oriented universities, and that a tenure case of these merits would have strong proponents at most top-10 departments. She has been a good mentor for PhD students and has now developed what seems to be a good pipeline of both doctoral and postdoctoral mentees, along with obtaining the research support to maintain it. Her research agenda is a good one – I think that she is moving towards not just attacking stylized models, but rather trying to capture settings in which her work can have real-world impact, and I strongly support this transition. She is an articulate expositor, and I can well imagine that she can be highly effective in the classroom (though I have no first-hand basis on which to make any definite conclusions). Her role in the Simons semester bodes well for her future leadership in the algorithms community, and her research agenda is well-positioned to be an area of increasing importance.

I believe that her record is roughly consistent with the expected achievements required for tenure.

David Shmoys
Laibe/Acheson Professor

CONFIDENTIAL

8/20/2018                                     Letter-Submissions | Powered By Box

File Properties                                                          ✕

**Name**
Nikolova - Tenure Letter.pdf

**Description**
Shmoys letter for Nikolova tenure case

**Owner**
Andrew Carr

**Enterprise Owner**
The University of Texas at Austin

**Last Updated By**
david.shmoys@cornell.edu

**Size**
115.8 KB

**Created**
Aug 18, 2018, 9:19 PM

**Modified**
Aug 18, 2018, 9:19 PM

Close

**Appx.0359**

CONFIDENTIAL                                                    UT Austin_0016420

**David B. Shmoys**
**Laibe/Acheson Professor of Business Management & Leadership Studies**
**Associate Director, Institute for Computational Sustainability**
**School of Operations Research and Information Engineering**
**Department of Computer Science**
**Cornell University**

Research
The primary focus of my research is on the design and analysis of efficient algorithms for discrete optimization problems, and in particular, on approximation algorithms for NP-hard and other computationally intractable problems. Linear programming relaxations have played a fundamental role in obtaining good solutions to hard optimization problems, and we continue to study their application to a range of problems in clustering, sequencing and scheduling, and inventory problems, in both deterministic and stochastic optimization settings. In addition to studying these problems with a theoretical lens, we have been involved in the practical application of these techniques in settings ranging from genomics to medical aircraft scheduling to the long-term planning for the preservation of the red-cockaded woodpecker to the operational logistics and design of bike-sharing systems.

Research Areas
Sequencing and Scheduling Problems
Stochastic Optimization Problems
Deterministic Inventory Models
Clustering and Facility Location Problems
Computational Sustainability

Brief Bio
David Shmoys obtained his Ph.D. in Computer Science from the University of California at Berkeley in 1984 and held postdoctoral positions at MSRI in Berkeley and Harvard University, and a faculty position at MIT before joining the Cornell faculty. He is Co-Chair of the Academic Planning Committee for Cornell Tech and Associate Director of the Institute of Computational Sustainability at Cornell University.

He is a Fellow of the ACM, INFORMS, and of SIAM, was an NSF Presidential Young Investigator, and has served on numerous editorial boards, including Mathematics of Operations Research (for which he is currently an Associate Editor), Operations Research, ORSA Journal on Computing, Mathematical Programming, and the SIAM Journals of both Computing and Discrete Mathematics, where for the latter he also served as Editor-in-Chief. He has been the advisor for 21 graduated Ph.D. students, and his former students are currently on the faculties of many leading universities and research labs, including MIT, Waterloo, Brown, Maryland, Georgetown, and D-Wave.

Shmoys' research has focused on the design and analysis of efficient algorithms for discrete optimization problems, with applications including scheduling, inventory theory, computational biology, and most recently, computational sustainability. His work has highlighted the central role that linear programming plays in the design of approximation algorithms for NP-hard problems; his recent book, co-authored with David Williamson), The Design of Approximation Algorithms, was awarded the 2013 Lanchester Prize by INFORMS.

CONFIDENTIAL

BC

# Georgia Tech | H. Milton Stewart School of Industrial and Systems Engineering

August 19, 2018

Dear Colleagues,

It is with great pleasure that I am writing this letter as part of the promotion and tenure of Prof. Evdokia Nikolova (Evdokia).

Let me start with a high-level summary. Evdokia has a remarkable profile. She pioneered the concept of risk aversion and its application to complex systems/networks and established its foundation in a number of outstanding and insightful papers. Her funding record is excellent, especially for a junior faculty in a more theoretical part of the field. She is highly visible in the field and beyond, which is unusual for someone at this stage of her career. I believe that she would have awarded tenure and promotion easily in all institutions I have been part of. This includes Computer Science at Brown University where I was a professor for 20 years, the IOE and EECS departments of the University of Michigan, and the school of Industrial and Systems Engineering at Georgia Tech.

As I mentioned, Evdokia pioneered the concept of risk aversion in networks and studied the impact of risk aversion on network routing, producing a series of important articles. She then tried to generalize these early results to multiple users with the framework of algorithmic game theory. She showed how difficult this was even for very simple and natural risk measure, providing another key insight in the nature of risk aversion in networks. Perhaps one of her key insights was related to the price of anarchy, i.e., the cost of letting agents act selfishly instead of optimizing a system globally (which may not be even possible in practice). She showed that, depending on how risk is modeled, the price of anarchy could vary widely, from simple constant factors (which means that there is limited to selfishness) to infinity, which means that selfish behavior is highly detrimental. The consequence of these results is that risk modeling is critical and should be considered very carefully, an area that, Evdokia argued, needs much more attention. This obviously goes well beyond computer science and algorithmic game theory. Finally, as was to be expected, Evdokia then worked on characterizing the price of risk aversion per se, concluding a research program that has been impressive in its depth and breadth.

In the way she approaches her research, Evdokia reminds me of Katrina Liggett who was an undergraduate student at Brown University, went to CMU for her PhD thesis (under A. Blum), was an assistant professor at Caltech for many years before moving as an associate professor at the Hebrew University (for family reasons). Both have pioneered new concepts and developed their foundations with fundamentally new insights, and their work bridges different areas of the field. It is also important to emphasize Evdokia's co-authors, which is a group of exceptional scientists. This, in my opinion, is further indication of her stature in the field and how she is regarded by senior faculty in the field.

Atlanta, GA 30332-0205 U.S.A.                                    Phone: 404-894-2300
https://www.isye.gatech.edu                                      Fax: 404-894-2301

*A Unit of the University System of Georgia*          *An Equal Education and Employment Opportunity Institution*

**Appx.0361**

CONFIDENTIAL                                                     UT Austin_0016422

August 19, 2018

Evdokia's publication record is very strong. Her conference papers are published in a variety of highly selective, premier venues in artificial intelligence, electronic commerce, theoretical computer science, networking, and power systems. Her last three journal papers are in the best journals in operations research and electronic commerce. Her funding record, building on her NSF career award, is very strong for someone working in the more theoretical part of the field, and indicates the practical relevance of her results and insights.

Evdokia has now moved to electrical distribution systems, a field that faces fundamental challenges and opportunities with the emergence of distributed generation. I will be following Evdokia's work closely in the coming years, since her skills may bring some fundamentally new insights that will help shape the future of electricity networks.

As should be clear from this letter, I believe that Evdokia is a remarkable scientist with a strong case for tenure and promotion. She would certainly have received tenure easily at all the institutions I have been affiliated with and I believe that she will be an asset to your university for many years to come.

Please do not hesitate to contact me if you have additional questions,

Best regards,

Pascal Van Hentenryck

A. Russell Chandler III Chair and Professor
H. Milton Stewart School of Industrial and Systems Engineering
Center for Machine Learning (ML@GT)
Georgia Institute of Technology
755 Ferst Drive, NW, Atlanta, GA 30332
Phone: 404.385.5538
Email: pvh@isye.gatech.edu

CONFIDENTIAL

From: Van Hentenryck, Pascal <pascal.vanhentenryck@isye.gatech.edu>
Sent: Sunday, August 19, 2018 11:35 AM
To: Erengil, Jac <jac.erengil@utexas.edu>
Subject: Nikolova's Promotion Letter

Dear Jac,

Please find in attachment my letter for the promotion and tenure of Professor E. Nikolova.

I would like to apologize for having created some unnecessary stress on your side. I recently moved to Georgia Tech and we had a series of unfortunate events happen during the move (those are now resolved fortunately).

I was very pleased to write these letters and do not hesitate to contact me, would you need more information.

Many thanks and best regards,

Pascal

Appx.0363

CONFIDENTIAL

Pascal Van Hentenryck
Professor, Industrial and Operations Engineering
University of Michigan

Pascal Van Hentenryck is the Seth Bonder Collegiate Professor at the University of Michigan. He is professor of Industrial and Operations Engineering, Professor of Computer Science and Engineering, and Core Faculty in the Michigan Institute for Data Science. Prior to this appointment, he led the optimization research group (about 70 people) at National ICT Australia (NICTA) (until its merger with CSIRO) and was a professor of Computer Science at Brown University for about 20 years, which he joined after his PhD in Belgium. Van Hentenryck is also an Honorary Professor at the Australian National University.

Van Hentenryck is a Fellow of AAAI (the Association for the Advancement of Artificial Intelligence) and INFORMS (the Institute for Operations Research and Management Science). He has been awarded two honorary doctoral degrees from the University of Louvain and the university of Nantes, the IFORS Distinguished Lecturer Award, the Philip J. Bray Award for teaching excellence in the physical sciences at Brown University, the ACP Award for Research Excellence in Constraint Programming, the ICS INFORMS Prize for Research Excellence at the Intersection of Computer Science and Operations Research, and an NSF National Young Investigator Award. He received a Test of Time Award (20 years) from the Association of Logic Programming and numerous best paper awards, including at IJCAI and AAAI. Van Hentenryck has given plenary/semi-plenary talks at the International Joint Conference on Artificial Intelligence (twice), the International Symposium on Mathematical Programming, the SIAM Optimization Conference, the Annual INFORMS Conference, NIPS, and many other conferences. Van Hentenryck is program co-chair of the AAAI'19 conference.

CONFIDENTIAL

UT Austin_0016425

COLUMBIA UNIVERSITY                    BC
IN THE CITY OF NEW YORK

COMPUTER SCIENCE

Mihalis Yannakakis
(212) 939-7145
mihalis@cs.columbia.edu
http://www.cs.columbia.edu/~mihalis

August 10, 2018

Dr. Ahmed Tewfik
Chair, Department of Electrical and Computer Engineering
University of Texas
Austin, Texas

Dear Prof. Tewfik:

This is a letter concerning Dr. Evdokia Nikolova who is being considered for promotion to the rank of Associate Professor with tenure. I know Dr. Nikolova since she was in graduate school and I am familiar with several of her papers.

Dr. Nikolova works in the general area of algorithms and their applications, especially in networks and transportation. Her research focuses especially on issues arising from uncertainty in available information, and from interaction between different agents. It involves rigorous mathematical modeling of the context (e.g. the transportation network) and the agents and their objectives including in particular modeling the risk tolerance and its effect in decision making. The works uses tools from game theory, probability, optimization, and design and analysis of efficient algorithms. She has compiled a strong research record of solid papers addressing rigorously these issues and providing basic models, concepts and results in this area.

In her early work, Dr. Nikolova studied routing and shortest path problems under uncertainty, and published a series of very nice papers presenting algorithms for finding shortest paths in networks where the edge lengths have given probability distributions and/or the lengths are discovered dynamically online during the route (the so-called "Canadian traveler problem", a problem that I had studied earlier myself). Subsequently, and especially in the recent years, she has expanded substantially the scope of her investigations in various directions, concentrating on modeling and analyzing risk and its effects.

In the paper "A mean-risk model for the traffic assignment problem with stochastic travel times" (with Stier-Moses, published in Operations Research 2014) she introduced a model that combines risk considerations for the users and stochastic information on the

Computer Science Building    Mail Code 0401    1214 Amsterdam Avenue    New York, NY 10027    212-939-7000    Fax 212-666-0140

CONFIDENTIAL                                                    UT Austin_0016426

network, in which the agents want to minimize a linear combination of the mean time and standard deviation, where the relative weights in the linear combination reflect the risk tolerance of the agents. The paper analyzes the equilibria in this model, both for atomic and nonatomic agents, their existence, computation, and succinctness.

In her paper "Risk sensitivity of price of anarchy under uncertainty" (with Piliouras and Shamma in ACM TEAC 2016), she studied how the price of anarchy is affected by the risk model. The price of anarchy measures the loss in efficiency due to the uncoordinated behavior of different agents, each optimizing independently their own objectives, as compared to a centrally optimized system. Although the price of anarchy of routing problems has been studied extensively in the past, this is the first paper that addresses the effects of risk. The paper shows that the risk model can make a big difference in the price of anarchy, ranging from a small constant to infinity. In a subsequent paper, "Risk-averse selfish routing" (with her student Lianeas and Stier Moses, to appear in Mathematics of Operations Research), she studies more closely the quantitative effects of risk aversion; she defines a parameter for this purpose, the 'price of risk aversion' measuring how much the performance deteriorates due to risk aversion, and studies this parameter in the mean-risk model, where the risk aversion is measured by the weight given to the variance in the delay of a path. The paper derives bounds on the price of risk aversion in terms of the size and the structure of the network.

Dr. Nikolova has done a number of other interesting works in various other aspects of networks and optimization. For example, a very nice paper in this year's EC conference shows how to set caps on tolls charged by toll operators to induce an equilibrium that achieves optimal total delay. In a paper in this year's IJCAI, she examines for which kinds of networks diversity in users' preferences in the relative importance of time versus cost, helps in reducing congestion.

Dr. Nikolova is productive and publishes regularly in prime conferences in algorithmic game theory like EC (ACM Conf. on Economics and Computation) and in AI like AAAI. She is also very active and involved in the community, serving often on the program committees of these and other conferences.

In summary, Dr. Nikolova has built a very strong record of solid research results. She investigates well-motivated, important problems, and applies a rigorous approach to model the problems and address them mathematically and algorithmically. I recommend her promotion to Associate Professor with tenure.


Sincerely,


Mihalis Yannakakis
Percy K. and Vida L. W. Hudson Professor
of Computer Science

**Appx.0366**

CONFIDENTIAL                                                                                    UT Austin_0016427

**From:** Mihailis Yannakakis <mihalis@cs.columbia.edu>
**Date:** Friday, August 10, 2018 at 3:17 PM
**To:** "Erengil, Jac" <jac.erengil@utexas.edu>
**Cc:** Ahmed Tewfik <tewfik@austin.utexas.edu>, Mihailis Yannakakis
<mihalis@cs.columbia.edu>
**Subject:** Re: Promotion Consideration, Dr. Nikolova

Attached please find my letter for Dr. Nikolova.

Best,
Mihailis

Appx.0367

## Mihalis Yannakakis

Mihalis Yannakakis is the Percy K. and Vida L. W. Hudson Professor of Computer Science at Columbia University. Prior to joining Columbia, he was Director of the Computing Principles Research Department at Bell Labs and at Avaya Labs, and Professor of Computer Science at Stanford University.

Dr. Yannakakis received his PhD from Princeton University. His research interests include algorithms, complexity, optimization, game theory, databases, testing and verification. He has served on the editorial boards of several journals, including as the past editor-in-chief of the SIAM Journal on Computing, and has chaired various conferences, including the IEEE Symposium on Foundations of Computer Science, the ACM Symposium on Theory of Computing and the ACM Symposium on Principles of Database Systems. Dr. Yannakakis is a member of the National Academy of Engineering, a recipient of the Knuth Prize, a Fellow of the ACM, and a Bell Labs Fellow.

Mihalis Yannakakis works on the theoretical foundations of computing, seeking to understand the inherent computational complexity of problems and to design efficient algorithms for their solution. He has applied this principled algorithmic approach to problems from different areas.

CONFIDENTIAL

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

EVDOKIA NIKOLOVA              *
    Plaintiff,              *
                      *
V.                           *   CASE NO. 1:19-cv-00877-RP
                      *
UNIVERSITY OF TEXAS AT       *
AUSTIN,                      *
    Defendant.              *


ORAL VIDEOTAPED AND VIDEOCONFERENCED DEPOSITION

OF

GREGORY L. FENVES,

AS BOTH ORGANIZATION REPRESENTATIVE

AND AS FACT WITNESS

Thursday, May 27, 2021


ORAL VIDEOTAPED AND VIDEOCONFERENCED

DEPOSITION OF GREGORY L. FENVES, produced as a witness

at the instance of the Plaintiff, and duly sworn, was

taken in the above-styled and numbered cause on

Thursday, May 27, 2021, from 9:05 a.m. to 5:11 p.m.,

before Debbie D. Cunningham, CSR, in and for the State

of Texas, reported remotely via Machine Shorthand,

pursuant to the Federal Rules of Civil Procedure.

--ooOoo--

**2**

```
1              APPEARANCES
2
3  FOR PLAINTIFF:
4    THE LAW OFFICE OF ROBERT NOTZON
       1502 West Avenue
5      Austin, Texas  78701
       (T) 512.474.7563
6
     By:  Robert Notzon, Esq.
7      Robert@NotzonLaw.com
8          AND
9      CREWS LAW FIRM, P.C.
       701 Brazos, Suite 900
10     Austin, Texas 78701
       (T) 512.484.2276
11
     By:  Robert W. Schmidt, Esq.   (Videographer)
12     schmidt@crewsfirm.com
13
   FOR DEFENDANT:
14
     OFFICE OF THE ATTORNEY GENERAL OF TEXAS
15     General Litigation Division
       P.O. Box 12548, Capitol Station
16     Austin, Texas  78711-2548
       (T) 512.463.2120
17
     By:  Benjamin Dower, Esq.
18     benjamin.dower@oag.texas.gov
            AND
19     Amy Hilton, Esq.
       amy.hilton@oag.texas.gov
20
21
   ALSO PRESENT:
22
     Evdokia Nikolova
23   Laura Barbour
     Jody Hughes
24
            --ooOoo--
25
```

**4**

```
1              EXHIBIT INDEX
2  Exhibit Number   Description            Page
3  Exhibit 33   Deposition Notice         12
4  Exhibit 34   2017-2018 Faculty Annual Report  75
5  Exhibit 35   Spreadsheet               78
6  Exhibit 2    Dean Wood's Assessment of  102
                Evdokia Nikolova
7
   Exhibit 36   2018-2019 Evaluation Template,  105
8               Cockrell School of Engineering,
                Promotion and Tenure Committee
9               for Evdokia Nikolova
10 Exhibit 37   11/13 & 14/2018 e-mail exchange  106
                between Sharon Wood and Sonya
11              Shaffer, RE: Nikolova
12 Exhibit 38   2018-19 Academic Year General  114
                Guidelines For Promotion and
13              Tenure
14 Exhibit 39   Evdokia Nikolova dossier  129
15 Exhibit 40   Recommendation For Change in  182
                Academic Rank/Status and
16              Statistical Summary for
                Brady R. Cox
17
   Exhibit 41   Recommendation For Change in  189
18              Academic Rank/Status and
                Statistical Summary for
19              John T. Foster
20 Exhibit 42   Recommendation For Change in  199
                Academic Rank/Status and
21              Statistical Summary for
                Zoya Heidari
22
   Exhibit 43   Recommendation For Change in  206
23              Academic Rank/Status and
                Statistical Summary for
24              Stephen Boyles
25              --ooOoo--
```

**3**

```
1              INDEX
2  APPEARANCES                      2
3
4  EXAMINATION OF GREGORY L. FENVES:
5  BY MR. NOTZON              8
6  BY MR. DOWER               207
7  BY MR. NOTZON              208
8
9
10 CHANGES AND SIGNATURE       210
11 REPORTER'S CERTIFICATION    212
12
13         --ooOoo--
14
15
16
17
18
19
20
21
22
23
24
25
```

**5**

```
1  (Thursday, May 27, 2021, from 9:05 a.m.)
2       P R O C E E D I N G S
3       THE REPORTER:  Today is Thursday, May 27,
4  2021.  This is the videoconferenced deposition of
5  Gregory L. Fenves in the matter of Nikolova versus UT.
6       Due to the COVID-19 Pandemic we are
7  remotely situated, and we are on the record at 9:05 a.m.
8  Central Standard Time.
9       My name is Debbie Cunningham, and my
10 business address is P.O. Box 245, Manchaca, Texas 78652.
11      Would all Counsel present please
12 introduce themselves for the record, starting with
13 Plaintiff's Counsel?
14      MR. NOTZON:  Robert Notzon and Bob
15 Schmidt for the Plaintiff, Evdokia Nikolova.
16      MR. DOWER:  Benjamin Dower and Amy Hilton
17 for The University of Texas at Austin, the Defendant.
18      And I believe that's all the counsel who
19 will be speaking today, and it may be fewer, even, than
20 that.
21      (Witness sworn by the reporter.)
22      MR. NOTZON:  Good morning.  Doctor, I
23 guess let's -- let's get clear first, Dr. Fenves, that
24 Ben has some stipulations that he'd like to read.
25      MR. DOWER:  Thank you, Robert.  I won't
```

Gregory Fenves - 5/27/2021

6

1  take up too much time with this.
2          First, the parties stipulate that this
3  deposition may be taken remotely via Zoom.
4          The parties stipulate that "objection,
5  form" is sufficient to preserve objections to the form
6  of the questions and will be used in lieu of the more
7  specific form-based objections.
8          The parties stipulate that all objections
9  except to form of the question or answer are reserved
10 until trial.
11         And then, finally -- and this is really
12 more to Ms. Cunningham and not so much a stipulation --
13 that the Deponent would like an opportunity to review
14 the transcript and recording, pursuant to the Federal
15 Rule of Civil Procedure 30(e).
16         MR. NOTZON:  Okay.  And, Bob, you're
17 recording.  Can you pin Dr. Fenves?
18         MR. SCHMIDT:  I have pinned him.
19         And, also, while we're talking about
20 stipulations, I think we've also stipulated that it's
21 not -- that I can record, and it's not necessary to
22 announce the start and stop time when we record.
23         MR. DOWER:  That is correct.  Thanks,
24 Bob.
25         MR. SCHMIDT:  Excellent.  No, thank you.

7

1  Yeah.
2          MR. NOTZON:  Okay.  I only say that, Bob,
3  because the green highlight keeps moving around; and I
4  didn't know if that was normal for the recording if you
5  pinned Dr. Fenves.
6          MR. SCHMIDT:  I don't know -- sorry.  I
7  don't know about the highlight.  I'm not seeing that on
8  my screen, but I do have him pinned on my screen.
9          MR. NOTZON:  Okay.  Good.
10         MR. SCHMIDT:  We can -- when we go on a
11 break, I'll double-check and make sure everything looks
12 okay.
13         MR. NOTZON:  And one more housekeeping
14 matter.  Ben, so in deposing Dr. Fenves, I can call him
15 Dr. Fenves or I can call him President Fenves, you know,
16 because we're talking to him in his role as the Former
17 President of UT; but I also don't want to say "Former
18 President."
19         MR. DOWER:  Well, he's also President of
20 Emory.  So, technically, "President" works for both past
21 and present roles.  Although, I don't have a preference
22 if that's what you're asking.
23         THE WITNESS:  I don't have a preference.
24         MR. NOTZON:  Okay.  So "Dr. Fenves" is
25 fine?

8

1          THE WITNESS:  It's fine.
2          MR. NOTZON:  Good.  Okay.
3          GREGORY L. FENVES,
4      having been duly sworn, testified as follows:
5              EXAMINATION
6  BY MR. NOTZON:
7      Q.  Good morning, Dr. Fenves.
8      A.  Good morning.
9      Q.  Thank you for being here.  I appreciate it,
10 especially with the schedule jockeying that we've been
11 doing for a long time now.  We're finally here to get
12 this done.
13         So if you could, tell us where you are
14 presently employed.
15     A.  I am presently employed by Emory University in
16 Atlanta, Georgia.
17     Q.  Okay.  And you're the president there, and you
18 started at what date?
19     A.  I'm the President of Emory University; and
20 that was beginning August 1st, 2020.
21     Q.  Okay.  And you were -- prior to that, you were
22 the President of the University of Texas at Austin for
23 how long?
24     A.  I was president of UT Austin from June of 2015
25 until May 31st, 2020.

9

1      Q.  And the role you held prior to being president
2  at UT, could you tell us what that was and the dates?
3      A.  So immediately prior to the -- as president of
4  UT, I was the Executive Vice President, Provost.  That
5  started October 2013 until I became president in June of
6  2015.  Prior to that, I was Dean of the Cockrell School
7  of Engineering.  The start date was September of 2008,
8  and it ended when I became provost in October of 2013.
9      Q.  Okay.  And was that your first job at UT?
10     A.  That was my first job in my return to UT.  My
11 first job at UT was an assistant professor from 1984 to
12 the end of 1987.
13     Q.  And then where did you go?
14     A.  So from January 1988 until I left for UT in
15 August of 2008 I was a professor and then later
16 Department Chair at the University of California-
17 Berkeley.
18     Q.  Okay.  So you got your tenure at Berkeley?
19     A.  My tenure was at Berkeley, that's correct.
20     Q.  Okay.  And did -- and how many years were you
21 an assistant professor at Berkeley before you got
22 tenure?
23     A.  I forget.  That's so long ago, I'd have to go
24 back and check my CV; but I believe I was awarded tenure
25 in 1989.

10

1    Q.   Okay.
2    A.   I'd have to actually confirm that on my own
3  CV.
4    Q.   So you do recall that you didn't go through a
5  complete six years at Berkeley before getting tenure?
6    A.   That is correct.
7    Q.   Okay.  So were you allowed to count your years
8  at UT assistant professor to assist you in getting to
9  the standard six before going up for tenure?
10   A.   Well, the -- this is my recollection of the UC
11  Berkeley policies from nearly 30 years ago --  more than
12  30 years ago, that the University looked at the
13  accomplishments over the time as a rank of assistant
14  professor; and that was considered the -- what was
15  reviewed at the time of promotion.
16   Q.   Okay.  Which would have included your work at
17  UT?
18   A.   Right.
19   Q.   All right.  And -- all right.  What motivated
20  you to come back to UT?
21   A.   I was offered the position to be a Dean of
22  Engineering at the Cockrell School of Engineering,
23  which was a very -- at a good point in my career to
24  think about that -- that role; and I was familiar with
25  the university and with the city of Austin from 20 years

11

1  earlier when I had been there.
2    Q.   Were you recruited?  You didn't apply; they
3  came and found you?
4    A.   It was a typical recruitment.  I was not
5  looking for a job and I received a call, that would I be
6  interested in being considered for the position; and I
7  decided to answer affirmatively to that.
8    Q.   Who recruited you?
9    A.   Well, the recruitment -- again, I'm trying to
10  remember.  Well, there was a search committee, a search
11  consultant, so I can't remember -- this was back in
12  2008.  So I can't remember who first contacted me.  It
13  was either a member of the search committee or a
14  consultant.  By that time you start talking to a number
15  of people.
16   Q.   Okay.  And you understand you are here as a
17  fact witness, basically what you personally remember
18  about what you saw or heard and experienced, as well as
19  being designated to speak as UT on three specific
20  topics.  Do you -- are you aware of that?
21   A.   I'm aware of that, just recognizing I'm no
22  longer employed by UT; but I do recognize that.
23   Q.   Okay.  Let me go ahead and put -- we're going
24  to go through exhibits during your deposition and what I
25  will do is I will try to place them in the chat for you

12

1  to download and so it's a process.
2    A.   Hopefully this doesn't exceed my technical
3  capabilities.
4    Q.   Me too.
5         Okay.  I believe it should be there, and
6  this is going to be Exhibit 33.
7    A.   Okay.  I have it.
8         (Exhibit 33 marked.)
9    Q.   (BY MR. NOTZON)  Okay.  And this is the
10  Deposition Notice that sets out the three corporate rep
11  topics.
12   A.   Okay.
13   Q.   And are you prepared to speak on those topics
14  as UT?
15   A.   Yes, I am, recognizing I'm no longer employed
16  by UT.
17   Q.   Right.  That's the second time you've said
18  that, but UT has designated you to speak as UT on those
19  three topics?
20   A.   That's correct.
21   Q.   Okay.  What did you do to prepare for those
22  three topics -- well, actually I won't ask you that
23  question just right now.  I'm going to try to ask you
24  the questions for you as the individual, Dr. Fenves, and
25  then go into talking to you as UT on those three topics

13

1  sometime later in the day.  Okay?
2    A.   Okay.
3    Q.   So when you became -- when you went from dean
4  to provost to dean [sic], those are essentially
5  chain-of-command promotions, would you agree?
6    A.   I went from dean to provost to president;
7  but -- just to correct your statement -- but that is
8  correct, that was progressing up the leadership roles in
9  the university.
10   Q.   I meant to say that, but I don't know what I
11  said.
12        Okay.  And during that time, did you make
13  any changes as the provost or as the president to the
14  promotional processes for tenure?
15   A.   Yes.
16   Q.   Okay.  Did you make any changes to the
17  requirement that six years in place at UT would be the
18  norm -- as tenure track?
19   A.   I made no changes to the policy on
20  probationary period.
21   Q.   Okay.  Did you make any changes to any one --
22  any of the rules or policies related to going up prior
23  to meeting the six-year probationary period at UT?
24   A.   I don't believe I made any changes to the way
25  it had been handled at the time I joined UT in 2008.

14

1    Q.   Okay.  And that would include the entire time
2    from 2008 until the time you left, you believe that
3    those policies and procedures remained constant?
4    A.   Regarding -- so there -- I do not recall any
5    changes in policies.  We did have some changes in
6    procedures to try to improve the process, timing and
7    clarification of information to faculty, department
8    chairs, and deans.  So there were some changes that
9    were, you know, rather continual.  Every year we looked
10   at what we could improve.
11   Q.   Okay.  Let me -- let me go ahead and specify
12   those specific area of whether or not there were any
13   changes; and that would be:  Were there any changes that
14   you implemented or observed between 2008 and when you
15   left UT in the -- let's say the bar that you have to
16   cross to get tenure if you -- if an assistant professor
17   was put up for tenure prior to six years' probationary
18   time at UT?
19   A.   I don't believe there were any changes.
20   Q.   Okay.  Were there any changes to counting of
21   time in probationary status made during that period of
22   time?
23   A.   No.
24   Q.   So, for instance, if someone started as an
25   assistant professor midyear, that midyear time would not

15

1    count for the probationary status?
2    A.   That is correct.
3    Q.   And if someone took a leave for a semester
4    during a year, that whole year would not count toward
5    the probationary leave -- I mean, probationary time?
6    A.   Well, it depends -- there were different kinds
7    of -- well, I don't have the policies in front of me.  I
8    don't think there were any changes, but there were
9    different kinds of leaves.  And I don't remember,
10   sitting here, exactly how those counted in regards to
11   the probationary period.
12   Q.   Okay.  Fair enough.  Let me ask specifically
13   related to probationary extension, which is different
14   from leave, right?
15   A.   That is -- it is different.  That's a very
16   important difference.
17   Q.   Okay.  And was probationary extension a policy
18   that was in place prior to you coming to UT in 2008?
19   A.   Okay.  So I'm trying to recollect.  I believe
20   there was a one-year -- we typically called it "stop-
21   the-clock policy," which had the effect of extending the
22   probationary period.  I don't like the term "extending
23   the probationary period," because there is a
24   probationary period; and it was very clear how we
25   counted it.  So I prefer "stop the clock."  I there was

16

1    one year -- and at some point the university did extend
2    that to allow to up to two years of stop the clock.  I
3    don't remember when that occurred.
4    Q.   Okay.  You weren't the decision-maker in
5    making that change to two years?
6    A.   I was not -- certainly by the time I became
7    president, that change had been incorporated.  I don't
8    remember if I was provost or if it occurred while I was
9    dean.
10   Q.   Were you a moving factor in getting the policy
11   change to add the potential for up to two years of stop
12   the clock?
13        MR. DOWER:  Objection, form.
14        Go ahead.
15   A.   Yes.  I strongly believe in the stop-the-clock
16   policies and the purpose of them.
17   Q   (BY MR. NOTZON)  Okay.  And what do you
18   understand the purpose of the policy is?
19   A.   It's -- the primary purpose is to recognize
20   that faculty have family responsibilities, generally
21   related to a child, either birth or adoption of a child,
22   whether they're male or female, and that it was in the
23   long-term benefit of the faculty member and of the
24   University to recognize that in assessing their
25   performance in the probationary period by extending --

17

1    extending the period.
2    Q.   Okay.  And -- and that's because six years is
3    a long period of time; and if you're in the mood to make
4    babies, you might want to have more than one in that
5    six-year period of time.  Is that right?
6    A.   Well, I can't -- so I can't speak for
7    anybody's family, you know, goals; but it was a
8    recognition that the one-year stop the clock was not
9    meeting all the needs of the faculty.  And as we looked
10   at other universities -- comparable, top-ranked research
11   universities -- many of them had two-year stop-the-clock
12   policies.  And we also operated in competing to recruit
13   the best faculty, and that was a factor in our decision.
14   Q.   And did -- are you aware that at UT at any time
15   looked into the possibility that the stop-the-clock
16   policy may have had differing impacts on faculty,
17   depending upon their circumstance?
18   A.   So I don't understand the question.  It was
19   generally viewed as a benefit to the faculty, highly
20   supported by the faculty.  It was not a requirement.  It
21   was an option by a faculty member to elect to stop the
22   clock.
23   Q.   Right.  And -- and you said it could be used
24   by male or female -- female or male faculty members
25   as -- from its inception, through the time that you were

18

1  president, correct?
2     A.  So that was the intent, certainly, in the
3  later years.  I think there probably was some
4  uncertainty about the applicability of the policy to
5  male faculty; but as -- as we clarified it, we made it
6  very clear that there was no gender basis for the stop-
7  the-clock policy.  I can't recall that the -- when --
8  and it probably happened before I got there in 2008,
9  what the original application of the policy was; but
10  certainly while the time I was there, we made sure that
11  it was equitably available to faculty members -- all
12  faculty members.
13     Q.  Equally available?
14     A.  Well, okay.  I'll use the word "equitably."
15  As we make decisions on personnel, I think about equity.
16     Q.  Okay.  So you would look at more than just the
17  gender of the recipient; you would look at the impacts
18  that it would have on the various genders?
19        MR. DOWER:  Objection, form.
20     A.  Is that question in regards to the stop-the-
21  clock policy or just in general?
22     Q.  (BY MR. NOTZON)  Stop-the-clock policy.
23     A.  We felt the equity consideration was that it
24  was available to faculty, whatever their gender is, and
25  was available to faculty whether they were giving birth

19

1  or adopting.  That was the equity consideration.
2     Q.  All right.  Did you look at whether or not the
3  policy was equitably enjoyed by both male and female
4  faculty members?
5        MR. DOWER:  Objection to form.
6     A.  I can't recall we ever did a study of it.
7     Q.  (BY MR. NOTZON)  Did you ever hear concerns
8  that the equities of the stop-the-clock policy, when
9  applied both to male and female faculty, benefitted the
10  male faculty more than the female faculty?
11     A.  I never -- I never heard anything -- I can't
12  recall that.
13     Q.  Okay.  Do you understand when considering
14  equity, you look at not just whether the gender is
15  transferable between the situations; but you also look
16  at the actual impacts on the different protected
17  classes?
18     A.  I think this -- this was viewed as a benefit
19  to faculty, to make an accommodation for childbearing;
20  and we wanted to make sure that it was available to all
21  faculty who had childbearing responsibilities.
22        MR. NOTZON:  Object as nonresponsive.
23     Q.  (BY MR. NOTZON)  What I'm trying to ask,
24  Dr. Fenves, is:  I understand that answer goes to
25  applying the policy equally between men and women; but

20

1  in looking at equities, did you look beyond just the
2  equal application between men and women and look at the
3  impacts on men and women and whether or not they were
4  different in terms of equities?
5     A.  I don't recall we ever conducted that type of
6  study.
7     Q.  Okay.  Do you understand that women, when
8  pregnant, have physiological concerns and requirements
9  that men do not have?
10     A.  Yes.
11     Q.  Do you understand that when caring for
12  children, like breast feeding and other concerns, that
13  women have different requirements than men have?
14     A.  Yes.
15     Q.  Do you understand that after giving birth,
16  there's psychological concerns, most commonly, as an
17  example, referred to as postpartum depression, that
18  women have that men don't have?
19     A.  Yes.
20     Q.  Do you understand that there are socially-
21  engrained differences in the roles and duties of men and
22  women in childrearing that continue to persist in
23  society compared between men and women?
24     A.  I'm generally aware of that.
25     Q.  Okay.  Given all those factors, do you

21

1  understand that the equities of applying the stop-the-
2  clock policy would be more beneficial to men who don't
3  have all those extra requirements than they are for
4  women?
5     A.  Well, for women there is maternity leave.  So
6  that's a benefit only accessible to women, and so I'm --
7  could you repeat the question?
8     Q.  Sure.  We're really talking about the stop-
9  the-clock policy --
10     A.  Right.
11     Q.  -- how that helps or relatively helps, in
12  equitable terms, men and women faculty members during
13  the six-year probation.  And so the question is:  Do you
14  understand that women might not have the same level --
15  well, might have less equitable enjoyment or benefits
16  from the stop-the-clock policy than men because women
17  are actually experiencing all of the possible negatives
18  that we already went through of actually going through
19  the birthing and giving birth and rearing children, that
20  men don't, while they're having their probationary
21  extension?
22     A.  I -- I can't speak to the specific impacts
23  on -- on faculty.
24     Q.  And that's because you're not aware -- you
25  didn't do any studies; and you're not aware of UT doing

22

```
 1   any studies on that issue, correct?
 2      A.  Correct.
 3      Q.  Despite the fact that all of the things we
 4   went through about women having those issues with
 5   pregnancy, birth, and childrearing were all known to you
 6   and to UT during the time that you were the president
 7   and prior to that?
 8      A.  Well, we did not -- I can't recall it being --
 9   I can't recall it being studied nor do I recall it ever
10   being raised as an issue in faculty promotion cases.
11         MR. NOTZON:  Object as nonresponsive.
12      Q.  (BY MR. NOTZON)  My question is:  You
13   understand it wasn't studied; but you also understand
14   that all of those issues we went through, listing what
15   women go through that men don't in terms of childcare,
16   were known, notorious as it were, to you and to UT
17   during that period of time?
18         MR. DOWER:  Objection, form.
19      A.  We did not -- it was never raised as an issue,
20   and we did not conduct a study on it.
21         MR. NOTZON:  I didn't -- object as
22   nonresponsive.
23      Q.  (BY MR. NOTZON)  I didn't ask if it was raised
24   as an issue in this question.  I'm asking that a study
25   wasn't done even though those were known issues?
```

23

```
 1         MR. DOWER:  Objection, form.
 2      A.  A study was not done.  It was not raised as an
 3   issue for either among the faculty or among the
 4   administration.
 5      Q.  (BY MR. NOTZON)  Well, let me ask it a
 6   different way then.  I still don't think you're
 7   answering my question.
 8         Would it be accurate that -- well, are
 9   you denying knowing all the things we went through that
10   women go through in birth and childcare during the time
11   that you were president and before that?
12      A.  I -- so I'm not denying I knew it as -- as
13   dean, provost, and president.  It was never raised as an
14   issue, that it got to me, that it needed to be
15   addressed.
16      Q.  Okay.  As you sit here and think about it now,
17   do you think that would be a good idea, to look at the
18   equities of that policy as it applies to males and
19   females and whether or not it's an actual equitable
20   policy so that both women and men enjoy the benefit
21   equitably?
22      A.  I can't say that now because, again, it had
23   never been raised as an issue; and so I can't say that.
24      Q.  Is part of your role as president and an
25   administrator to be aware of best practices in the field
```

24

```
 1   of academia?
 2      A.  We -- yes, we regularly look at what peer-
 3   comparable universities are doing.
 4      Q.  And that's how UT came to have the stop-the-
 5   clock policy, correct?
 6      A.  In part, yes.
 7      Q.  And that's how UT went to an additional second
 8   year?
 9      A.  In part, yes.
10      Q.  Okay.  And the way that you and other
11   universities go about doing that is keeping your finger
12   on the pulse of studies that are happening and being
13   conducted around the country and around the world?
14         MR. DOWER:  Objection, form.
15      A.  I can't speak to what other universities are
16   doing.
17      Q   (BY MR. NOTZON)  Speak to what you do then.
18      A.  We are -- we keep aware of what our peer
19   universities are doing, and my recollection is that
20   other universities with stop-the-clock policies were
21   applied to males and females.
22      Q.  And is it your testimony that there were no
23   studies that were conducted at any time prior to you
24   leaving UT that looked into the lack of equity or the
25   disparity of equity between men and women in the stop-
```

25

```
 1   the-clock policy?
 2         MR. DOWER:  Objection, form.
 3      A.  Sitting here today, I cannot recall any -- any
 4   studies.
 5      Q.  (BY MR. NOTZON)  Okay.  Because, just because
 6   or just -- if no particular faculty member complained or
 7   raised the issue of a lack of equity or a potential
 8   negative impact on women that men don't have in the
 9   stop-the-clock policy, that wouldn't be the end of the
10   inquiry for UT; they would also want to keep in mind
11   what is going on in studies that are being done across
12   the world, correct?
13      A.  That's a very general question.  We would
14   generally want to be aware of what's happening.  There
15   have been a lot of studies on gender equity at UT
16   related to many factors -- a number of factors.  This
17   factor was never raised through faculty committees
18   through the Gender Equity Council as an issue.
19      Q.  Okay.
20      A.  That I'm aware of.
21         (Faint background speaking.)
22         MR. NOTZON:  And I apologize that there
23   was -- my phone's answering machine, was that audible to
24   you guys?
25         MR. DOWER:  Yeah.
```

26

1          MR. NOTZON:  Sorry.  Let me try to change
2    that.
3          (Momentary pause.)
4    Q.  (BY MR. NOTZON)  On the gender equity studies
5    that you did or that you're aware of, Dr. Fenves, were
6    those conducted while you were the dean, the provost,
7    the president or all of the above?
8    A.  All of the above.
9    Q.  Okay.  Were you responsible for the -- those
10   gender equity studies being done?
11   A.  So once I became provost, most of that work
12   was done in the Office of the Provost.
13   Q.  Okay.  And those would have been university
14   wide?
15   A.  Correct.
16   Q.  Okay.  Were they -- so they weren't done prior
17   to you being provost?
18   A.  No, they were done.  In fact, soon after I got
19   there as dean -- I can't remember if it was 2008; it was
20   probably 2009 -- there was a major report on gender
21   equity at UT.  And I remember I spoke with a panel that
22   we had for faculty about it.
23   Q.  Okay.  So prior to that time, there hadn't
24   been any gender studies that you're aware of?
25   A.  I can't speak to what happened prior to 2008.

27

1    Q.  Okay.  So part of the study that was done that
2    you first were aware of at UT didn't reference the
3    successes or the trends from prior studies?
4    A.  This was in 2008 or 2009.  I don't recall.
5    Q.  Okay.  And did you -- from the time that you
6    got there in 2008 until the time that you left in 2020,
7    did you see any progress in the gender equity issues?
8    A.  Yes.
9    Q.  And let's -- let's focus on engineering and
10   not the university as a whole.  Do you have any -- did
11   you witness any benefits to gender equity issues in
12   engineering?
13   A.  Yes.
14   Q.  And what benefits did you see?
15   A.  Reducing inequities in salary, appointing
16   women faculty to endowed chair positions, and appointing
17   women to leadership roles within the College of
18   Engineering.
19   Q.  And were there any persistent disparities that
20   had not been successfully altered?
21   A.  Well, the long-term trend was to -- I'm sorry?
22   Q.  Still focusing just on engineering.
23   A.  Engineering, yes, on engineering.  So the
24   other -- well, I did leave one out, an important thing.
25   We significantly increased, while I was dean, the

28

1    recruitment of engineering facul- -- women faculty in
2    engineering.  They had been severely underrepresented;
3    and I think we made good progress, which continued after
4    I was dean.  And that is still work to be done.
5    Q.  Okay.  And then back to my question:  Were
6    there any areas that persisted to be disparate that
7    weren't improving during that period of time?
8    A.  I don't recall any.
9    Q.  What about retention and promotion?
10   A.  So we paid a lot of attention to retention,
11   especially for faculty that were underrepresented,
12   including women.  Rates of promotion, I don't recall if
13   there was any -- again, this is going back a number of
14   years.  I don't recall that there was any concern about
15   rates of promotion.
16   Q.  Okay.  If -- did -- do you recall that the
17   studies were showing that the rates of promotion for men
18   and women were about the same?
19   A.  I -- I can't recall.
20   Q.  Okay.  And when I say "promotion," I'm
21   specifically talking about from tenure track to tenure.
22   A.  Yeah, I can't -- I don't recall.
23   Q.  Okay.  And the -- the historic existence of
24   gender inequity in engineering was known to you and
25   experienced by you; is that correct?

29

1    A.  That is correct.
2    Q.  Did you do any studies or focus on any studies
3    related to gender inequities in engineering when you
4    were the dean?
5    A.  So as part of the gender equity report that
6    came out in 2009, we -- this is my recollection sitting
7    here now, nearly 12 years later -- part of that action
8    was to conduct studies on salary equity, which I recall
9    we did, and addressed where there were inequities in
10   salary; and that was the primary study that I'm certain
11   we undertook at that time.
12   Q.  Okay.  Would you agree that at the time you
13   left UT, that there was still disparities, even though
14   you recall that there were decreased disparities over
15   the period of time from 2008 to 2020?
16          MR. DOWER:  Objection, form.
17   A.  No, I don't agree with that.
18   Q   (BY MR. NOTZON)  So there's no more disparity
19   between men and women in engineering salaries?
20   A.  So -- so I can't speak to what the exact state
21   is; but as president and the provost under -- that
22   worked for me, we formed -- I can't remember the exact
23   name.  Gender Equity Council was the term I generally
24   used.  They did a very thorough statistic salary [sic.]
25   The University broke it down by schools, and my general

30

```
 1   recollection of that conclusion is that -- that
 2   assistant professor and associate professor ranks,
 3   that -- statistically, that we had substantially
 4   eliminated salary inequities; and that is my
 5   recollection at this time.
 6       Q.   Okay.  What about in the numbers of faculty
 7   being hired, was that inequity or disparity eliminated
 8   in engineering?
 9       A.   Well, engineering -- well, it depends on how
10   you define "equity in hiring."  The percentage of women
11   faculty that were hired, like I said, while I was dean,
12   increased substantially compared to the previous
13   five-year period before I was dean.  And I believe the
14   current dean and the department leaders have continued
15   to make progress; but across the school, it's not 50/50.
16       Q.   Okay.  So that has not been eliminated?
17       A.   There are still -- the distribution is still
18   not 50/50.
19       Q.   Okay.  And that would -- that would carry on
20   through the promotion to tenure because if you're not in
21   the door, you can't get to tenure until you get in the
22   door, correct?
23       A.   I'd like to clarify your question.  What would
24   carry on?
25       Q.   The lack of 50/50, the disparity that, still,
```

31

```
 1   there's more men than women that are present being
 2   hired; and, therefore, there's got to be more men than
 3   women making it to tenure?
 4       A.   That's correct.
 5       Q.   And even if the promotion rate of going from
 6   assistant to associate, from tenure track to tenure, for
 7   men and the same percentage for women, because the
 8   number of men is higher, the number of promoted men will
 9   be higher than the number of promoted women, correct?
10       A.   Correct.
11       Q.   Would you agree that UT, while you were the
12   dean and the provost and the president, that you, as an
13   administrator, had a duty to try to work on and
14   eliminate the gender disparities in the engineering
15   faculty?
16       A.   I believe we had a duty, and we made progress
17   in the gender equity issues that were identified through
18   the processes that we had.
19       Q.   Okay.  And what efforts did you make to reduce
20   the disparities besides conducting these studies to see
21   how you were doing?
22       A.   Well, it depends on which disparity that
23   you're asking about.
24       Q.   Let's talk about recruitment, salary, and
25   promotion.
```

32

```
 1       A.   So recruitment, we had substantial changes in
 2   the faculty search process while I was dean.
 3       Q.   How did that work?
 4       A.   Well, it was -- it was several points.  First
 5   of all, the position -- when there was an authorization
 6   to a department to recruit, it had to be based on a
 7   position description that was broad enough that it would
 8   be attractive to a wider range of candidates so that we
 9   would be looking at a larger pool.
10           The second is that we had requirements on
11   diverse representation within the search committee.  We
12   had required training search committee chairs on
13   unconscious bias in the search process.  We had some
14   expectations of proactive recruitment for faculty who
15   were traditionally underrepresented in engineering,
16   including women.
17           Then we had a requirement that the --
18   typically the Departments would propose three finalists,
19   faculty candidates, for a position.  Those had to be
20   approved by the Dean's Office; and there was a
21   requirement that one -- at least one of the three be an
22   underrepresented -- a qualified, competitive candidate
23   who has been traditionally underrepresented in
24   engineering, including women, unless there was a well-
25   justified extenuating circumstance.
```

33

```
 1           And so the result of that, while I was
 2   dean -- I don't have the exact statistics in front of
 3   me -- the percentage of women who were hired as
 4   assistant professors was significantly greater than --
 5   over a five-year period than the previous five years
 6   before I became dean.
 7       Q.   And I think I understand you actually were the
 8   dean when Dr. Nikolova was hired?
 9       A.   That's my understanding.  I don't recall her
10   hiring, but we hired a lot of faculty.  I don't recall
11   her specifically being hired.
12       Q.   Okay.  Do you recall that she came from A&M?
13       A.   Well, I know that now.
14       Q.   Okay.
15       A.   I don't recall if I knew it at the time.
16   Certainly, if I -- so, typically, I didn't always; but I
17   did interview all faculty candidates if the schedule
18   permitted.  I can't recall if I interviewed her; but I
19   certainly -- if I had, I certainly would have seen her
20   CV at the time I interviewed her and seen her record.
21       Q.   Okay.  And so, sitting here today, you don't
22   recall if you interviewed her or you don't recall the --
23   and salary negotiations, anything like that, any of
24   those details?
25       A.   Those are two different things.  So I don't
```

34

1  recall interviewing her.  I would not have been involved
2  in the salary negotiations.
3      Q.  Oh, okay.  Who would be doing that?
4      A.  That's primarily the department chair who
5  negotiates the salary and gets approval by the associate
6  dean.
7      Q.  And who was the associate dean in 2013?
8      A.  That would be Dr. Jerry Speitel.
9      Q.  Okay.  So he's been the associate dean for a
10  while?
11      A.  I appointed him as associate dean when I came
12  in as dean in 2008.
13      Q.  Okay.  What was he doing before that?
14      A.  He was the Chair of the Department of Civil,
15  Architectural and Environmental Engineering.
16      Q.  Okay.  Did you know him from your time back in
17  the Eighties?
18      A.  Well, it was 20 years earlier.  We were all
19  younger then, so I knew who he was; but I didn't know
20  him.
21      Q.  Okay.  Did -- did he apply for a job; or did
22  you go out and select him?
23      A.  I -- well, that's an interesting question.
24  The short answer is I selected him.
25      Q.  Okay.  And why'd you choose him over anyone

35

1  else?
2      A.  I was actually -- before coming to UT as dean,
3  I was in Japan -- Kyoto, Japan and the associate dean
4  who had held the position had -- was leaving to take on
5  a dean position at another university and so I needed to
6  quickly find an associate dean.  And so I talked to a
7  lot of people, got their recommendations; and there was
8  very strong consensus that Dr. Speitel, as a department
9  chair, was very highly regarded.  And so I asked him to
10  be associate dean.
11      Q.  Okay.  And he carried on being an associate
12  dean after you became the provost and the president,
13  correct?
14      A.  Yes.  As far as I know, he's still the
15  associate dean.
16      Q.  Okay.  What about the decision of when the
17  faculty, specifically Dr. Nikolova, when she would
18  start, either for the Fall Semester or the next January?
19      A.  I would not have been involved in that
20  decision.  That would be a negotiation with the
21  department chair.
22      Q.  Okay.  And you're aware of the requirement
23  between state universities that if the hiring decision's
24  made after, I think, May 1st, that there needs to be a
25  request made to A&M to approve starting in the fall

36

1  versus just going ahead and not having to ask A&M for
2  permission for a spring start?
3      A.  So I'm not aware there is a specific agreement
4  between public universities in Texas.  There has been a
5  general understanding among AAU universities, American
6  Association of Universities, of that type of
7  notification.
8      Q.  Because you don't want to leave somebody in
9  the lurch?
10      A.  It's just generally a courtesy because you
11  plan -- by late spring you've already staffed courses
12  and planned curriculum; and, yes, so to try to have a
13  smooth transition between two -- two AAU universities.
14      Q.  And from your memory, the decision of whether
15  to ask for clearance for a fall start would be on the
16  department chair?  So for instance --
17      A.  So that -- so I do not know the answer to
18  that.  I don't remember ever requesting it myself as
19  dean, provost, or president.  So it may -- I do not know
20  if that was -- notification was done by the department
21  chair or the associate dean.
22      Q.  Okay.
23      A.  Now, it's possible the associate dean would
24  write a letter and I would just sign off on it; but I
25  have no recollection of that.

37

1      Q.  Okay.  And the practical effect -- to revisit
2  what we had talked about earlier -- if the faculty
3  member comes in in January, instead of the fall, they
4  will lose that year in their probationary clock at UT?
5      A.  So I -- I'll answer the question as follows:
6  That year will not be included in the probationary
7  clock.  And that is generally viewed as a benefit
8  because they're able to start their career at UT without
9  it counting towards the probationary clock.
10      Q.  It could go both ways, depending on several
11  factors, correct?
12      A.  Again, it's generally viewed by faculty that
13  if a time at UT doesn't count towards the clock, that's
14  beneficial.
15      Q.  So is it your testimony that most assistant
16  professors prefer to go up for tenure at the latest
17  possible time instead of the earliest possible time?
18      A.  My testimony is that when a faculty member is
19  coming new to the University, if they don't have to
20  count that first year as the -- on the probationary --
21  the first half year on the probationary clock, that is
22  generally viewed as a benefit, to give them options
23  later in the future.
24      Q.  Okay.  You understand that not everybody has
25  that opinion?

38

1    A.  I can't -- as I said, that's my general
2  understanding of how it is viewed.
3    Q.  Okay.  Are you aware of anyone that has a
4  different opinion, that that would actually be a
5  detriment and not a benefit?
6    A.  I'm not aware of anybody other -- I'm not
7  aware of anybody who had asked to count time towards the
8  probationary clock.
9    Q.  Are you aware of any circumstances where
10  someone might view that as a detriment instead of a
11  benefit?
12    A.  I -- I haven't thought about it.  I can't
13  answer the question.
14    Q.  You do know that many assistant professors
15  choose to go up before their six years at UT have been
16  met?
17    A.  So the decision about submitting a case for a
18  promotion is not a faculty member's decision.  It is the
19  Department Chair's decision about whether to prepare a
20  case, with advice of their Budget Council or Executive
21  Committee.
22    Q.  Wouldn't it be true that no faculty member's
23  case would be presented for promotion without the
24  faculty member being behind that decision?
25        MR. DOWER:  I don't know whether the

39

1  audio caught that.  Could you repeat that answer?
2    A.  That is correct.
3        MR. DOWER:  Thank you.
4        Sorry, Robert.
5        MR. NOTZON:  No.  Thank you for
6  protecting the record.
7    Q.  (BY MR. NOTZON)  So back to the question,
8  you're aware that there are multiple assistant
9  professors that prefer to go up sooner than later?
10    A.  Yes.
11    Q.  And, therefore, losing a year would be a
12  detriment to those individuals and not a benefit,
13  correct?
14    A.  I don't see it that way; but if the Department
15  Chair and the Budget Council or Executive Committee
16  feels it is ready for promotion and meets the standards,
17  that -- I'm not -- I don't view it as a detriment.
18    Q.  I understand, but I'm not asking what you view
19  it as.  I'm asking if you understand that there are
20  people and circumstances that would cause them to view
21  losing the year as a detriment to their career?
22        MR. DOWER:  Objection, form.
23    A.  I can't -- I can't speculate on how faculty
24  view it.
25        MR. NOTZON:  It's been about an hour.

40

1  Let's go ahead and take a short break and -- yeah, so if
2  that's okay with y'all.
3        MR. DOWER:  It's fine with me.
4        THE REPORTER:  We're going off the record
5  at 10:04 a.m.
6        (Off the record from 10:04 to 10:13 a.m.)
7        THE REPORTER:  We're going back on the
8  record at 10:13 a.m.
9    Q  (BY MR. NOTZON)  Okay.  Dr. Fenves, just a
10  quick followup from a prior question.  One of the things
11  you mentioned was the benefits of starting in the spring
12  semester and having that first year -- that first
13  semester not count towards the probationary time would
14  provide the faculty member with options.  What kind of
15  options do you see that providing a faculty member?
16    A.  Well, to the most -- what I think it's
17  important to understand is that the six-year
18  probationary period, if that's fully used and a
19  promotion case is submitted, it's what we call
20  informally -- I don't recall; I don't think it's in
21  policy -- but it's called informally the "up-or-out
22  year."
23        So there's only two decisions that are
24  possible:  Promote to associate professor with tenure or
25  terminal appointment, which means that they will not be

41

1  promoted and they have a one-year terminal appointment
2  before they have to leave the university.  So that --
3  you know, most faculty that have -- would rather not
4  have that terminal -- that up-and-out-year consideration
5  -- or make a decision about whether they want to acquire
6  the record sufficient for promotion and go all the way
7  to the end of the probationary period or they have made
8  the case that meets the standards and answers the
9  question "why now" if it's an early promotion and have
10  that ability to do it, thus, sooner.
11        The advantage, the benefit -- the reason
12  I call it "benefit" is that if it's an early promotion
13  under the UT Austin rules, there are three decisions
14  that are possible:  Promote to associate professor with
15  tenure, terminal appointment -- and I can't recall ever
16  an early promotion having a terminal appointment -- and
17  the third is do not promote, which is not make a
18  decision now, without prejudice, and review the case
19  later in the probationary period.
20    Q.  And is there a different standard if you go up
21  early versus going up at the sixth year?
22    A.  So the question about early promotion is we
23  ask the department chairs and the deans to explain "why
24  now," why is the case ripe for making this decision
25  before the end of the probationary period.

42

1    Q.  And so the standard you're talking about there
2  is the standard to explain "why now"?
3    A.  Right.
4    Q.  Not the standard for qualifying for tenure?
5    A.  The question is:  Why now?  Why should we
6  consider the case now?  Explain it, and justify it.
7    Q.  Yeah.  I'm just trying to get the answer,
8  though.  When you say "the standard," it's not relating
9  to the qualifications of the professor's teaching,
10  research, service, et cetera?
11    A.  And so we're asking, you know:  Given the
12  record in teaching, research, service, awards -- all the
13  categories that we look at in a promotion case -- why is
14  this case ripe for making an affirmative decision to
15  promote at this time?  Whereas, on an up-and-out year,
16  we don't ask, "Why should we be considering it now?"  We
17  have to consider it now.
18    Q.  So in explaining why early, some of the
19  factors could be their qualifications as a faculty
20  member?
21    A.  Let me rephrase.  The only factors we look at
22  are their qualifications of the faculty member in any
23  promotion case.
24    Q.  I think we may be talking across purposes.  So
25  there's the question of to tenure or not tenure; and

43

1  that would be where the faculty member's qualifications
2  in all the categories, teaching, research, service,
3  et cetera, are reviewed, correct?
4    A.  That's correct.
5    Q.  I'm asking about the "do we review the person
6  early, the explain-why-now review."  Is it -- is that a
7  separate request from whether to tenure, or is why
8  tenure -- why consider for tenure now, also -- well,
9  it's the same question?
10    A.  Okay.  So the question we ask, why now, is
11  given the record of the faculty member in teaching,
12  research, service categories that we look at, why should
13  we consider the question of tenure at this point, as
14  opposed to considering the case when the full
15  probationary period has been used.
16    Q.  So you -- it's all part of the same question
17  about tenure, whether or not to tenure the person?
18    A.  Yes.
19    Q.  So the explanation for "why early review" is
20  not a separate question from the tenure-or-not-tenure
21  decision?
22    A.  I'm trying to understand the question.  The
23  review is:  Do we -- if it's early -- we're talking
24  about early cases; is that correct?
25    Q.  Yes, sir.

44

1    A.  So we have three choices:  Promote, terminal
2  appointment -- which means, you know, that's the end of
3  their assistant professor appointment at UT -- or do not
4  promote at this time, without prejudice; and so this is
5  all related to how we answer that question for if it's
6  an early promotion, if it's going up before the full
7  probationary period.  Our practice -- and it was that
8  way when I came as a dean in 2008 -- is to answer and
9  justify the question why we should consider it now; what
10  is it about the teaching, research, the service, and the
11  awards that we should consider the promotion decision
12  before the end of the probationary period.
13    Q.  So does that mean that there is a different
14  standard for an early promotion versus one that occurs
15  at the up-or-out year?
16    A.  So I disagree there's a different standard.
17  We have an expectation of what faculty should
18  accomplish.  It depends on the field, the discipline,
19  and the department.  Faculty have a progression as they
20  are proceeding in their career; and if it is just -- if
21  it is normal progress in their career, that's, alone,
22  not justification for an early promotion.  There has to
23  be something that is beyond what we would expect the
24  normal process -- the normal progress in their career
25  prior to the full probationary period.

45

1    Q.  I guess let me ask it a different way.  If,
2  in year five, they are at the level of promotable
3  standards -- if it had been their sixth year, but they
4  have reached that standard at year five, then that's
5  sufficient for promotion?
6    A.  Not necessarily.  In fact, if the -- if a dean
7  recommends a candidate for promotion in five years and
8  says -- and they get promoted next year, we don't find
9  that a compelling case for why now.
10    Q.  I didn't understand that answer.  I didn't say
11  that they'd be on track to meet promotion standards next
12  year, that they are -- they meet the standards now.
13    A.  So that...
14    Q.  Would that be sufficient?
15    A.  If they felt that they met the standards --
16  let me rephrase that, that answer.
17       They have to answer the question:  Why
18  are we considering promotion in the fifth year.  If the
19  answer is that they have fulfilled what we expect a
20  professor in a normal probationary period over a six-
21  year period to have fulfilled, exceeded, then, yes, we
22  will consider an early promotion.
23    Q.  So if they go up at year four, instead of year
24  five or six, does that mean that the level that they
25  must meet should explain that they are -- they have met

46

the six-year requirements in four years?
A. That's correct. We have an expectation, depending on the department and the field, in teaching and research -- those are the two most important categories -- but also service and significant awards; and if they have acquired -- made those accomplishments, I should say, in a shorter period, including four years, yes, we would -- that would make -- the dean would have to explain that in a compelling way --
Q. Okay.
A. -- for it to be considered a case for early promotion.
Q. Are there any other factors other than the standard teaching, research, and service that are considered for answering the question "why early"?
A. The only other factor that I can recall ever being considered is whether there's a retention issue, that they're -- if they have an offer from another university and if a dean is -- the department chair decision are -- the department chair and the dean are making a recommendation that we are at risk of losing the faculty member and that their desire is to keep the faculty member.
Q. Okay. What if it's a fear of an offer and not an actual offer?

47

A. We like to see more than just a fear. I can't -- these discussions have -- do come up in early promotion cases, and just a concern generally is not -- is not compelling.
Q. Also, wouldn't the person's performance in the standard categories of teaching, research, service, et cetera, wouldn't they actually have to also have met the standard on -- on its own?
A. Yes, they would, correct.
Q. So the -- the -- you know, the standing offer they might take wouldn't -- would have to be in addition to meeting the tenure standards?
A. Well, it would be a factor to consider; and again, I can't recall specific cases; but, generally, other universities that are trying to recruit UT faculty are seeing the same things we're seeing, a stellar record, and are trying to recruit them. So they generally -- someone that has an offer from a competing, top-ranked engineering -- engineering department -- let's call it "engineering" -- they're seeing the same thing we're seeing; and it's their compelling record that's making them attractive to be recruited by another university.
Q. Could that factor, having an offer from another university, replace, say, a weak service

48

performance?
A. Weak service. You know, we don't have high service expectations for assistant professors. Our goal is to have them focus on their research, building up their research portfolio and funding, getting the papers published in top journals, and do quality teaching. So we generally have relatively mod- -- low -- I shouldn't say "low" -- modest expectations for degree of service.
So a competing offer is -- if there's a hypothetical case with a judgment that there's modest service, but outstanding records in the other categories and a competing offer from a peer university, yes, would outweigh a service record.
Q. The same question, but let's move it to teaching scores.
A. That's a harder question to answer in general because it would depend on the specific facts of what the teaching record was.
Q. Is there some fungibility there?
A. Could you explain what you mean by fungibility?
Q. Yeah. Can you kind of like give a little here, give a little, like, their teaching scores are -- you know, they're kind of average; they're not great, but they're not bad. But, you know, we really want to

49

keep this person because they got an offer.
A. Again, these are holistic evaluations, we're looking at all the factors. There's no formula that we run the factors through to come up with an answer. So it would depend on the specific facts.
Q. Right. So I take that as a "yes," that the holistic idea is there's no bright-line rule?
A. I will answer that: We do a holistic evaluation of the entire record, and there are no -- there are no hard rules on any one factor.
Q. Okay. Any other criteria to consider other than what you've already testified to in the consideration of someone for early tenure?
A. So I can't recall any other significant factors to consider in answering the question why should we consider the case now for early promotion.
Q. Okay. Let me then ask an -- this question: What about prior years of assistant professor time at another university?
A. Okay. This is a very common situation. We like to recruit the top assistant professors from other universities. There are many advantages in doing that. And so when we have a early promotion, according to the clock, the UT Austin probationary time clock and it's a faculty member that has had prior service at a peer

50

1  department, a peer university, we certainly look at the
2  whole record in rank as an assistant professor.
3      Q.   What if it's not a peer institution?
4      A.   If it's not a peer institution, it depends on
5  what the institution is, what the department is, what
6  the area is.  So there are some institutions that are
7  not AAU members, which is a significant factor.  We're
8  looking at universities that are major research
9  universities; but they may be very fine departments,
10  top-ranked departments.  And so we'll look at that as
11  a -- as a factor.
12          But, on the other hand, we'll have some
13  faculty that begin their career in primarily -- at
14  universities that are primarily focused on teaching,
15  have not been able to assemble a research record because
16  that wasn't the focus of their previous position; and so
17  we will generally not give much weight in a situation
18  like that.
19      Q.   And, I guess, what's your definition of a peer
20  institution?  And you kind of were saying things that
21  indicate what that is.
22      A.   Yeah, it's -- again, we have no definition;
23  but indications of a peer institution:  The university's
24  a member of the Association of American Universities,
25  AAU.  If it's in the field of engineering, it's a top 10

51

1  or top 15 department because that's -- our UT Austin
2  school is in that category.  And so those are general
3  indications of what we would consider a peer institution
4  for the purpose of considering the assistant professor
5  record in teaching and primarily research and service in
6  a promotion case at UT Austin.
7      Q.   So an institution could be a research
8  institution but not in the top 10 or 15, it would not be
9  considered a peer institution or a peer department?
10      A.   It would not be weighted as highly.  I mean,
11  this is not a yes/no answer.  It depends on the
12  department, it depends on the university, and it also
13  depends on the record.
14      Q.   The individual's record?
15      A.   The individual's record.
16      Q.   Okay.  Now, moving on, you gave us the list of
17  things that you recall doing to increase recruitment of
18  underrepresented persons, which would include women, in
19  engineering.
20          Can you tell me what -- in the other
21  category of promotion, what you have done to try to
22  increase the female, specifically, promotion to tenure
23  and to eliminate that disparity that has been
24  experienced in engineering historically?
25      A.   Oh, but -- so I'd like to clarify the

52

1  question.  So the disparity that we had previously
2  talked about was in the percentage of women faculty, as
3  you -- as you pointed out correctly.  The promotion and
4  tenure process doesn't -- doesn't change that.  The
5  question is disparity in rates of promotion and success
6  to promotion.  Can I ask you if that's your question?
7      Q.   Yes, sir.
8      A.   Okay.  So in -- if are there -- so, first of
9  all, I don't recall we had significant disparities in
10  rates of promotion.  Again, this is a number of years
11  ago; but I don't recall it as a significant factor.
12          In terms of promotion for women faculty,
13  we did ask department chairs to make sure that there
14  was -- there was mentoring for underrepresented faculty,
15  particularly women -- including women, I should say --
16  to help them -- you know, help them understand how to be
17  successful as an assistant professor.
18      Q.   Okay.  Anything else that you did to try to
19  increase the number of women with tenure at UT in
20  engineering?
21      A.   So --
22          MR. DOWER:  Objection, form.
23      A.   -- the first step was to recruit more women
24  into engineering.  That was the first thing we did.
25      Q.   (BY MR. NOTZON)  Right.  Anything else?  So

53

1  recruitment, mentoring?
2      A.   Well, my -- my recollection is that it was
3  generally viewed as the stop-the-clock policies,
4  including adding a second year to the stop-the-clock
5  policy.  The -- making sure that the stop-the-clock
6  policies were really used and considered in the
7  promotion and tenure process.  I think that was
8  generally viewed as positive factors to support the
9  promotion in women faculty.
10      Q.   Anything else?
11      A.   That's all I can recall at this time.
12      Q.   Was there any effort to try to ensure the
13  absence of bias in the promotion process against women?
14      A.   I can't recall anything specifically; but we
15  did do unconscious bias training for Search Committee
16  chairs and some departments, I believe, did it for all
17  Search Committee members.  We did have an expectation
18  that that was a responsibility of department chairs in
19  their work in promotion-and-tenure decisions to be
20  sensitive to bias in decision-making.
21      Q.   I understood from your prior answer about
22  recruitment that the bias -- unconscious bias training
23  of the Search Committee chairs was done; but I'm
24  specifically asking about the promotion part, the
25  promotion review and consideration and decision.  So are

54

1 there any bias trainings that were implemented for those
2 people?
3     A.   I don't -- I don't recall.  I don't believe
4 so, but I don't recall.
5     Q.   And that would -- so in engineering, the
6 people that sit on the Budget Council in the department
7 that are reviewing faculty members', assistant
8 professors' dossiers for promotion are going to be
9 greatly majority men, correct?
10     A.   The Budget Council is composed of all full
11 professors in the department, so that is correct.
12     Q.   Right.  Because the history would still be
13 present that there's a small number of women compared to
14 men because that's the way the history went?
15     A.   Correct.
16     Q.   And would that carry on to the College
17 Promotion and Tenure Committee?  Would that also be male
18 dominant?
19     A.   Well, so that I can't answer.  As -- when I
20 was dean, while we appointed -- and now I can't recall
21 the process that the P&T members, committee members were
22 appointed -- I did try to have diversity on the P&T
23 Committee as dean.
24     Q.   Okay.  So you could add that to your list of
25 things you did to try to eliminate or decrease the

55

1 potential for bias in the promotion process?
2     A.   Yes.
3     Q.   "Yes" or "no"?
4     A.   Yes.
5     Q.   And so that would be you deciding who's going
6 to be on your committee and trying to increase the
7 number of women on the committee, remnant, I guess, in
8 other underrepresented categories?
9     A.   I do not recall the process for appointment
10 to the school P&T Committee.  I believe they were
11 nominate-- each department had one representative and
12 I believe they were nominated or selected by department
13 chairs, but I did work with department chairs to make
14 sure that we had some representation of underrepresented
15 faculty in the P&T Committee.
16     Q.   So that was a request you made.  You couldn't
17 require them to determine who the chair is going to
18 pick?
19     A.   It was a request from the dean to the chair,
20 that's correct.
21     Q.   Okay.  And did that -- did those requests
22 work?  Do you recall what your -- the makeup of your P&T
23 Committees were?
24     A.   So, again, this is going back to 2013 and
25 earlier.  I -- I do recall having -- having women on the

56

1 P&T Committee.  I can't remember if that was every year.
2     Q.   At least one?
3     A.   My recollection is at least one.
4     Q.   And would your recollection also be it was
5 never half or more?
6     A.   That is correct.
7     Q.   Okay.  Let's go ahead and talk about in your
8 role as president and the President's Committee in the
9 promotion review process.  What about that?  Did you do
10 anything to try to eliminate bias against women in that
11 committee?
12     A.   So the membership of the President's Committee
13 is determined by the handbook of operating procedures,
14 so it's by position, administrative position.  So as
15 president, I appointed the first woman provost in the
16 history of the university.  So aside from her
17 outstanding accomplishments as a scholar and academic
18 leader, the provost brought -- brought that diversity.
19 And we -- as the President's Committee, we did not do
20 any formal training; but as university leaders, we were
21 all very cognizant of the concerns about unconscious
22 bias.  And so we did not do formal training, but we
23 certainly -- each individual was very aware of being --
24 being concerned and watchful for unconscious bias in the
25 decision-making process leading up to the presentation

57

1 to the University and to the President's Committee in
2 our deliberations.
3     Q.   So let me follow up a little bit.  How many
4 people are on that committee, the President's Committee?
5     A.   So the President's Committee is the President,
6 the Executive Vice President and Provost -- so I guess
7 somebody will have to do the counting -- Executive Vice
8 President and Provost, the Dean of the Graduate School,
9 the Dean of Undergraduate Studies, and the Vice
10 President for Research.
11     Q.   Okay.  That's five.
12     A.   I think I got everybody, five.
13     Q.   Okay.  And while you were the president, how
14 many of those were women?
15     A.   So while I was President, the provost was
16 there -- well, the first year, I had an Interim Provost
17 who was a woman; and then I appointed the permanent
18 Provost.  So all five years the Provost was a woman.
19 The Vice President for Research -- so I think that was
20 the only woman on the committee.
21     Q.   Okay.  And would you agree that simply being
22 a woman does not mandate that there would be no
23 decision -- there would -- just because a person is a
24 woman doesn't mean that they can't or won't discriminate
25 against women?

**58**

1    A.   I think as a general proposition that's true.
2    Q.   Okay.  And just to clarify, no one -- as far
3  as you're aware, no one on the P&T Committee, the Dean,
4  the President, or the members of the President's
5  Committee were required to take unconscious bias
6  training?
7    A.   That is my recollection, did not have it as a
8  requirement.
9    Q.   During the time that you were the dean, the
10  provost, and the president, do you recall any complaints
11  of gender discrimination in your -- in the engineering
12  department or the engineering college, besides --
13  besides Dr. Nikolova?
14    A.   Dr. Nikolova.  I don't recall anything
15  specific, but it's -- there were tenure denials and
16  those were often -- those would -- well, I shouldn't say
17  often.  There would be in some cases a CCAFR report, and
18  I can't remember any specifics of those cases.  So I
19  can't say it didn't happen.
20    Q.   Okay.
21    A.   I just can't remember it.
22    Q.   Do you remember if there were any lawsuits
23  regarding gender discrimination or retaliation when --
24  stemming from a gender discrimination complaint when you
25  were the dean, the provost, or the president?

**59**

1    A.   There were quite a few lawsuits against the
2  university.  I can't remember -- I don't recall any
3  having to do with the promotion process itself.
4    Q.   Okay.  And gender based?
5    A.   I don't recall any.
6    Q.   Do you recall a faculty member named Pigony
7  (PHONETICALLY SPELLED)?
8    A.   The name sounds familiar.
9    Q.   Do you remember that she had a lawsuit?
10    A.   I don't remember the -- now that you mention
11  it, as I said, I don't -- now, I do remember, yes.
12    Q.   Okay.
13    A.   I don't remember the specifics of it.
14    Q.   Okay.  Do you remember that she had a trial?
15    A.   I don't recall that.
16    Q.   Do you remember that she -- the jury found
17  that UT had retaliated against her?
18       MR. DOWER:  Objection, form.
19    A.   I don't recall that.
20    Q.   (BY MR. NOTZON)  Okay.  Do you recall what
21  college she was in?
22    A.   No.
23    Q.   Did you have any role to play in that -- in
24  the allegations that she was making against UT?
25    A.   Sitting here today, I don't recall having any

**60**

1  involvement in that case.
2    Q.   Okay.  Any involvement or alleged involvement,
3  let's say?
4    A.   I don't recall any.
5    Q.   So the -- the promotion process that you're
6  aware of involves the preparation of a dossier, voting
7  by the Budget Council at the department level, a
8  write-up, an assessment from the Chair, a consideration
9  by the P&T Committee for the college, and the Dean
10  participating in that -- or being present for that
11  discussion, correct?
12    A.   Correct.
13       MR. DOWER:  Objection, form.
14    Q    (BY MR. NOTZON)  And then the Dean writing up
15  the Dean's assessment, which includes the Dean's
16  personal assessment -- or professional assessment and a
17  conveyance of what the P&T Committee -- the basis of
18  their vote, without calling out names, but providing the
19  President and the President's Committee an understanding
20  of what the basis of the vote was; is that correct?
21       MR. DOWER:  Objection, form.
22    A.   The -- the Dean is expected to convey their
23  professional evaluation and recommendation on the case
24  and -- informed by the P&T discussion and the P&T vote
25  and significant factors that were raised during the P&T

**61**

1  deliberation.
2    Q.   (BY MR. NOTZON)  Okay.  And is the Dean
3  expected to write those up in the Dean's assessment?
4    A.   Yes.
5    Q.   And is the Dean also a participant in the
6  discussions of the President's Committee?
7    A.   So the Dean presents to the President's
8  Committee, and there may be questions and discussion.
9  So that's -- that's the best way to characterize it.
10    Q.   Okay.  So it could be just the written
11  assessment from the Dean or it could be the written
12  assessment and a verbal presentation and answering of
13  questions?
14    A.   The answer is yes, and the process that we
15  followed did change while I was President.
16    Q.   And what -- what did it used to be; and what
17  did you change it to?
18    A.   So at the time I was Dean, Provost and the
19  time I became President, the Dean was -- would schedule
20  a hearing -- I don't know if that's the official word we
21  used -- but we scheduled a meeting with the Dean and the
22  full President's Committee.  And the Dean would then
23  present each case one at a time; and then after case,
24  we'd have a presentation, discussion, and then generally
25  a deliberation among the President's Committee with the

62

1  Dean present.
2          We changed it to a two-step procedure
3  that the -- since we had the Dean's recommendations, the
4  President's Committee would meet without the Dean to
5  determine which cases we could make a decision to
6  promote without the presence of the Dean.
7      Q.  Okay.  An efficiency move?
8      A.  It was an efficiency move, a time so we could
9  focus a discussion on the cases where we needed
10 discussion, as opposed to spending times on the cases
11 where the written record, the dossier, was so clear that
12 promotion was warranted.  And so then we would notify
13 the Dean about which cases they should be prepared to
14 discuss.  And then we would schedule that second meeting
15 for that school with the Dean and go through the same
16 procedure, have them present the case; and then there
17 would be questions and discussion.
18         The second change we made is that we did
19 do the deliberations of our discussion at the university
20 as the President's Committee without the Dean being
21 present.
22     Q.  Okay.  And why did you do it that way?  Why
23 did you eliminate the Dean's participation from the
24 discussion?
25     A.  We felt we could have more open discussions

63

1  among the President's Committee without the Dean being
2  present after we had heard from the Dean.
3      Q.  And after the decision is made, isn't the Dean
4  responsible for conveying that decision to the
5  candidate?
6      A.  That's correct in all cases.
7      Q.  And doesn't the Dean not being present reduce
8  the effectiveness of the Dean's ability to convey the
9  reasons why the candidate -- if promotion to tenure was
10 denied, doesn't that inhibit their ability or decrease
11 their ability to convey the reasons to the candidate?
12     A.  No, because what we did is in cases -- there
13 are two types of cases in that situation, the first is
14 the Dean recommending do not promote or terminal
15 appointment; and so in that case, the Committee is
16 either -- if we accept that recommendation by the Dean,
17 generally the Dean's reasoning -- they're supporting the
18 Dean's reasoning for it.  If there's any additional
19 information beyond that, that was conveyed directly to
20 the Dean generally by the Provost but in some cases by
21 the Vice Provost for Faculty affairs.
22         If the Committee -- the President's
23 Committee is overruling the Dean's decision, where the
24 Dean is recommending to promote and the University
25 Committee, the President's Committee decision is to do

64

1  not promote, then we had a -- there was a thorough
2  debrief with the Dean the reasons for that between the
3  Provost and -- generally the Provost.
4      Q.  Did that ever happen while you were president?
5      A.  Did what ever happen?
6      Q.  Where the Dean said promote and you said no?
7      A.  The Dean said promote and I said no.  I can --
8  I think in my last year as president -- the Dean said
9  promote and we said no.  So I can't remember a specific
10 one, but I -- it happened.  I can't remember a specific
11 case, but I believe it has happened.
12     Q.  Do you remember what school that was in?
13     A.  I don't.
14     Q.  What college?
15     A.  I don't.  I'd have to -- I'd have to go back
16 through the records.
17         So I'd like to put a little context.  At
18 the time I served on the University Committee as Provost
19 to President, I reviewed over 800 cases.  By the time I
20 was President I made decisions on 600 or so, more than
21 600 cases; so I'm just not recalling the specifics of
22 many -- of cases.
23     Q.  Okay.  And, yeah, just to clarify, as the
24 Provost and the President, you would have been on the
25 President's Committee in both roles?

65

1      A.  Correct.
2      Q.  Okay.  And do you recall at any time while you
3  were the Provost or the President that the President
4  made a decision that was contrary to the remainder of
5  the Committee, the President's Committee?
6      A.  In the policy of the University HOP, the
7  President makes the decision.  The President's Committee
8  is advisory -- the members of the President's Committee
9  are advisory to the President.  So the Committee, it
10 doesn't make a decision; it's the President who makes
11 the decision.
12     Q.  Okay.  So altering my question slightly, did
13 the President ever make a decision that appeared to run
14 counter to the advice of the remainder of the
15 President's Committee?
16     A.  The remainder.  Can you clarify what you mean
17 by "remainder"?
18     Q.  The non-presidents.
19     A.  So the -- my predecessor's practice and my
20 practice was to poll each member of the President's
21 Committee.  These are not votes.  I'm polling them on
22 their recommendation.  They were being polled on their
23 recommendation to the President.  And they weren't
24 always unanimous.  Sometimes there was some disagreement
25 on whether the case should be promoted or not.

66

1    Q.   Okay.  Then one more time:  Did you recall
2  that the President ever decided contrary to the majority
3  of the poll that was taken?
4    A.   Yes.
5    Q.   Okay.  And did you do that as President?
6    A.   Yes.
7    Q.   And did you do that with the result of tenure
8  being granted and denied or -- or just one or the other?
9    A.   So that's a different question.  So the --
10  what I recall in the decision was a decision from
11  promotion to associate professor to professor, where my
12  decision --
13    Q.   That's okay.  I don't need to hear about that.
14  Let's just focus on --
15    A.   A tenure decision.
16    Q.   Assistant to associate.
17    A.   Assistant to associate.  I can't recall.
18    Q.   Okay.  Now, the only -- the President's
19  Committee consideration and decision is the only part of
20  the process that's not written; is that correct?  The
21  only part of the promotion to tenure decision that's not
22  written; is that correct?
23    A.   Well, there's a written decision; but there is
24  no written minute or record of the basis for that
25  decision.

67

1    Q.   Okay.  And there's also no -- well, strike
2  that.
3         And it's -- you understand that not
4  having a written decision allows for -- well, it does
5  not allow for people outside of the process to know what
6  happened historically, correct?
7    A.   It does not allow.
8    Q.   Does not allow.  So because the discussion and
9  the reasoning for the decision is not put in writing, no
10  one can look back on that decision to know the reasoning
11  for that decision with certainty?
12    A.   There's no written decision.  The reasons for
13  a decision that would be contrary to the Dean's
14  recommendation are conveyed orally to the Dean.
15    Q.   And the only way to know what was conveyed to
16  the Dean would be the Dean and the person that told the
17  Dean; but that would not necessarily be the same thing
18  that was discussed in the President's Committee,
19  correct?
20    A.   The Provost -- and I think the general
21  practice was the Provost conveyed it to the Dean and
22  relied on the Provost to accurately convey the reasoning
23  of the final decision.
24    Q.   Okay.  Why not just put that in writing?
25    A.   The -- this was the process when I got to UT

68

1  in 2008, and I never felt that there was a reason to
2  modify the process or the policies.
3    Q.   Why not?
4    A.   Because my feeling was that it was working --
5  working well.
6    Q.   And what was the benefit of not putting it in
7  writing?
8    A.   I don't know if there was a particular
9  benefit.  It was working well, and I didn't feel a need
10  to change.
11    Q.   Slavery used to work; but it changed, didn't
12  it?
13         MR. DOWER:  Objection, form.
14    A.   We're talking about personnel decisions of
15  faculty members, and the process seemed to be working
16  well.
17    Q.   (BY MR. NOTZON)  There used to not be a stop-
18  the-clock policy; but that changed, correct?
19    A.   It did, yeah.  Yeah.
20    Q.   There used to be -- there used to not be a
21  anti-discrimination law; but then there was one,
22  correct?
23    A.   Correct, and we made sure we followed the law.
24    Q.   So just because that's the way it was done in
25  the past and not putting it in writing doesn't mean

69

1  that's a reason to keep doing it, correct?
2    A.   There was no -- there was no -- there was no
3  reason to consider a change.
4    Q.   Is one of the benefits of not putting it in
5  writing that there is some ability to avoid a historical
6  pinning down of the reason?
7    A.   I didn't view it that way.  I viewed it as a
8  process that was working well, and there wasn't a need
9  for a change.
10    Q.   Does it allow for -- not putting it in
11  writing, does it allow for some -- the ability to have a
12  more gray understanding of what the reasonings were?
13    A.   I think we -- we had clear understandings
14  among the President's Committee, and the Provost's
15  responsibility was to convey that to the Dean.
16    Q.   When you say it was working not to put it in
17  writing, what was the reason for doing it verbally
18  instead of in writing?
19    A.   The reasons for -- so this was the process.  I
20  don't know when it began, but it certainly was the
21  existing process when I became Dean in 2008.
22    Q.   So the --
23    A.   I don't know the original reasons, but that's
24  the procedure that was established.
25    Q.   So the only reason that you can provide us

Gregory Fenves - 5/27/2021

70

1 today is that's the way it was done?
2     A.   That's the way it was done, and I didn't see a
3 need for a change while I was president.
4     Q.   Do you see any benefits to not putting it in
5 writing?
6     A.   I -- I don't -- any benefits?  I don't --
7 it's -- I don't see -- I don't see benefits or
8 necessarily a down side.  It was a procedure that had
9 existed at UT prior to 2008, and I didn't see a need for
10 a change while I was president.
11     Q.   Well, weren't there requests to put it in
12 writing that were made repeatedly?
13     A.   There were requests.  I remember it was either
14 my last -- either my last year or my second-to-last year
15 as president.  This was a discussion that came up in one
16 of the panels that we would have regularly with the
17 University Committee panels with faculty department
18 chairs and deans, and it's possible it came up at one of
19 the monthly Faculty Council meetings; but I don't
20 remember, again, in that timeframe.  That was a long
21 time, that I recall.
22     Q.   And was your response the same to them as it
23 is to me, that if it ain't broke, don't fix it?
24     A.   I don't recall the specifics of what I said in
25 one or two of those forums, but it probably would have

71

1 been essentially that.  I do remember that one of the --
2 this was probably in the panel session -- somebody
3 making -- a faculty member making a statement,
4 "Everything is written up to the University Committee
5 why isn't the University Committee documenting it?"
6         And I said, "Everything up to the
7 University Committee is advisory to the President, and
8 the President needs that written advice and analysis."
9 It's not a reciprocal requirement that the President
10 explain in writing because we explain orally to the Dean
11 if there's a -- if there's a negative decision.
12     Q.   It's good to be the king?
13         MR. DOWER:  Objection, form.
14     A.   The President is not the king.
15     Q.   (BY MR. NOTZON)  In a sense -- you're saying
16 it's not reciprocal, you know, that the President gets
17 to not have to put anything in writing?
18     A.   There are decisions the President makes that
19 are put in writing.  I convey them.  I convey them
20 orally, without a written -- written reason.
21     Q.   And that's because the President -- from your
22 experience, the President views everything in a holistic
23 way and -- taking all things into consideration and
24 decides what's the best result for the university?
25     A.   Well, that -- so to answer your question,

72

1 that's a -- that should be the process for any decision
2 by a president of a university, what is the best
3 interest of the university, to support the roles and
4 missions of the university.  That's separate whether
5 those decisions are in writing or not.
6     Q.   I agree.  So why not put it in writing?
7         MR. DOWER:  Objection, form.
8     A.   This is a process that existed prior to 2008,
9 and I did not see a need to change the process.
10     Q.   (BY MR. NOTZON)  Does the process of not
11 putting the basis for the President's decision in
12 writing protect the University from potential liability
13 in litigation such as this?
14     A.   I never consulted with General Counsel on that
15 question.
16         MR. DOWER:  I'm going to instruct the
17 witness not to discuss what he did or did not discuss
18 with General Counsel, please.
19         MR. NOTZON:  Well, he can say he didn't,
20 so that's not a problem.
21     Q.   (BY MR. NOTZON)  But -- but your attorney is
22 accurate.  I'm not asking you if you did have a conversation
23 with an attorney, getting legal advice.  I'm not asking
24 what that was, and you shouldn't be talking about that.
25         Okay.  So moving on, whether you talked

73

1 to the attorney or not, I'm asking you whether you see
2 that as protection of the University from liability.
3     A.   I don't have the professional ability to
4 assess legal liability.  So this was a process that
5 existed prior to 2008, and I did not see a need to
6 change it.
7     Q.   Well, I don't know that it's rocket science to
8 understand that if something's in writing, it's harder
9 to avoid than if it's not in writing.  Would you agree?
10         MR. DOWER:  Objection, form.
11     A.   I'm not -- I was not trying to avoid anything.
12 I was looking at a process that I did not see needed to
13 be changed.
14     Q.   (BY MR. NOTZON)  Even though there's people
15 calling for it to change so that there is a written
16 record and some ability to rely on and review the
17 decision?
18     A.   It came up at one or possibly two occasions
19 that I recall.  To me, that's not sufficient reason to
20 justify a change.
21     Q.   And you believe that at no time in history did
22 anybody ever ask for the president's decision to be put
23 in writing?
24         MR. DOWER:  Objection, form.
25     A.   I can't say what happened in history.

74

1    Q   (BY MR. NOTZON)  Okay.  When was the first
2  time that you recall that Dr. Nikolova had an issue with
3  potential gender discrimination or pregnancy
4  discrimination?
5          MR. DOWER:  Objection, form.
6    A.  My recollection is when I was informed that
7  she had -- after the decision, I was informed that she
8  had submitted a grievance to the CCAFR Committee.
9    Q.  (BY MR. NOTZON)  Okay.  So prior to that,
10 there was never any discussion about her being
11 concerned -- her or others on her behalf being concerned
12 about the presence of gender bias or pregnancy bias in
13 her promotion process?
14   A.  Sitting here today, I can't recall anything
15 prior to being informed that she was submitting a
16 grievance to CCAFR.
17   Q.  Okay.  And who told you that?
18   A.  I can't say who specifically.  It would have
19 likely been Carmen Shockley, the Director of the
20 Academic Personnel Office.  It possibly could have been
21 Janet Dukerich the Vice President -- excuse me -- the
22 Vice Provost for Faculty Affairs.  It would have been
23 one of those two.
24   Q.  Okay.  And was that an official communication,
25 or was that a unofficial communication?

75

1          MR. DOWER:  Objection, form.
2    A.  Again, I don't remember the exact timing.
3  Typically, either Carmen or Janet would inform me
4  which -- if there were cases of grievances being
5  submitted to CCAFR and then, generally, they would have
6  a copy of it and their general practice was to send me
7  copies of the -- of the grievance.
8    Q.  (BY MR. NOTZON)  So that would have been an
9  official policy-based procedure of communication that
10 you learned of her -- of the presence of a potential of
11 a gender discrimination complaint?
12   A.  That's correct.
13   Q.  Let me -- let me see if I can put up another
14 exhibit.
15         MR. NOTZON:  Okay.  This will be
16 Exhibit 34.
17         (Exhibit 34 marked.)
18   A.  Okay.
19   Q.  (BY MR. NOTZON)  Let me know when you're
20 ready.
21   A.  I can see it.
22   Q.  Okay.  So this is the Faculty Annual Report
23 from 2017/2018, correct?
24   A.  Yes.
25   Q.  All right.  And if you look at the top of the

76

1  second page --
2    A.  Uh-huh.
3    Q.  -- that first paragraph --
4    A.  Right.
5    Q.  -- do you remember who that -- the last
6  sentence says that the final argument resulted in a
7  positive decision.  Does that mean that the termination
8  appointment would have been reversed, and they would
9  have been tenured?
10   A.  Correct.
11   Q.  And do you remember who that was?
12   A.  No.
13   Q.  I'm sorry?
14   A.  No, I do not.
15   Q.  Okay.  Because in the documents that I've
16 seen, it doesn't look like that -- at least that's not
17 recorded, that part.
18   A.  I -- I don't know --
19   Q.  Okay.
20   A.  -- what documents you're referring to.
21   Q.  Yeah, it's a spreadsheet provided by UT with a
22 list of the individuals that have been considered for
23 tenure and the votes and the decisions.
24   A.  I don't have that document.
25   Q.  All right.  I guess I -- maybe I can -- let me

77

1  just go ahead and put that up, too.  That will be 35 --
2  so just to be clear, in Exhibit 34, that person that's
3  being referred to, that would have been someone -- that
4  decision would have been made in the 2017-2018 -- so the
5  spring of 2018; or would it have been the year before?
6    A.  Well, at some point we changed the schedule
7  around that time.  So it was either the President's
8  Committee meeting in December of 2017; and final
9  arguments would typically take place, if submitted, in
10 January 2018.  Again, we changed the timing.  So it's
11 possible the President's Committee made the decision in
12 February or March of 2018, and then final arguments
13 would have occurred a month or so later.
14   Q.  Okay.  And this -- this document would have
15 been at the end of the academic year?
16   A.  I assume so.  I -- it's not dated, but it's a
17 summary of the academic year.  So it would be sometime
18 near the end or past the end of the academic year.
19   Q.  So it should be talking about a decision that
20 was made in the -- in that academic year?
21   A.  Correct.
22   Q.  That would have -- so that person who then got
23 tenure, the tenure would start in the fall of '18?
24   A.  September 1st, 2018.
25   Q.  Okay.  Let me put up 35.

78

1              (Exhibit 35 marked.)
2     Q    (BY MR. NOTZON)  Okay.
3     A.   So this is a spreadsheet?
4     Q.   Yes.
5     A.   Pull up Excel.  Okay.  All right.  I'm seeing
6  a spreadsheet.
7     Q.   Okay.  And if you look at the bottom of the
8  spreadsheet, there are two tabs.
9     A.   Uh-huh.
10    Q.   And the second tab is the tenure decisions.
11    A.   This is -- the tab is titled Engineering
12 Tenure Decisions.
13    Q.   Yes, sir.  And if you look at the Column A,
14 that's the column where the tenure would start.  So the
15 person should be -- from Line 82 down to Line 89 would
16 be one of the persons you're referring to, I'm assuming.
17    A.   Can I ask you what your question is?
18    Q.   Yes.  I'm trying to find out who that person
19 is -- I'm trying to refresh your recollection as to who
20 that person is that was initially denied tenure; then,
21 after final arguments, got tenure.
22    A.   So as referenced in the Faculty Council
23 minutes --
24    Q.   Yeah, that first paragraph.
25    A.   So that first paragraph, I understand, is a

79

1  statement about university-wide cases.  The spreadsheet
2  you just submitted to me is engineering.  So I don't
3  know that the person that's being referenced in the
4  Faculty Council minutes was in engineering or not.
5     Q.   That might explain it.
6          So, if you could, look at those people
7  and confirm that, from what you see, they wouldn't have
8  been one -- they wouldn't have been that person.
9     A.   There's a lot of data here.  You're asking me
10 to confirm --
11    Q.   I'll direct you to the Line 89.
12    A.   I'd have to -- well, I can take the time to
13 look at the spreadsheet.  It's the first time I've seen
14 it.  I -- I'm not sure how -- I need to understand what
15 information is here, first.
16    Q.   Sure.  I understand.  That makes sense.
17    A.   College up and out...
18          MR. DOWER:  Robert, we've been going for
19 about an hour.  Maybe we could take a break here.  I
20 don't want to interrupt your flow or -- if you're mid-
21 question.
22          MR. NOTZON:  Let's go ahead and go off
23 the record.
24          THE REPORTER:  We're going off the record
25 at 11:25 a.m.

80

1          (Off the record from 11:25 to 11:39 a.m.)
2          THE REPORTER:  We're going back on the
3  record at 11:39 a.m.
4     Q    (BY MR. NOTZON)  Okay.  Back from the break.
5  Dr. Fenves, we were talking about this spreadsheet and
6  you had -- I was trying to point you to Lines 82 to 89,
7  which, from Column A, appear to be the persons in the
8  engineering department that went up for tenure in the
9  2017-2018 academic year.  And I'm asking if any of
10 those people might have been the person mentioned in
11 Exhibit 34 on page 2 as the person that got their tenure
12 after final arguments.
13         Do you understand that those, I guess,
14 eight people would be in the group of people that might
15 have been one of those persons?
16    A.   No, several of them would not have been
17 because they went up early; and so final arguments is
18 only available for faculty who have completed the full
19 six-year probationary period.
20    Q.   Okay.  But in terms of the time period, we got
21 the time period right?
22    A.   If I understand -- you're asking me to look at
23 Lines 82 to 89.  If I understand the ques-- -- I'm
24 looking at those names.  I -- it's based on the
25 assumption that that Faculty Council document was

81

1  referring to faculty that were promoted in that year.
2  If that's the correct assumption, those are the right
3  lines.
4     Q.   Okay.  And it -- there's no -- there doesn't
5  seem to be any information on this spreadsheet related
6  to that -- or related to a reversal of a initial
7  decision to not grant tenure?
8     A.   I don't see any information for the cases in
9  which that would be a possibility.
10    Q.   And reading those names of those professors
11 doesn't refresh your recollection?
12    A.   No.  Some of them I don't even recognize, a
13 few -- actually, most of them I don't even recognize.
14    Q.   Right.  How many times did you reverse a
15 decision not to grant tenure after a final argument
16 while you were the president?
17    A.   I -- I can't remember.  Clearly there was one,
18 as documented here; but I can't remember beyond that.
19    Q.   I -- I would imagine that's not -- there would
20 be more not reversals than reversals.  Do you have an
21 understanding about that?
22    A.   So, first of all, that depends on final
23 arguments being submitted.  Those were not submitted in
24 all cases of terminal appointments; but, just generally,
25 it would be a rare circumstance to reverse a terminal

82

1  appointment.  But that process is offered and is done,
2  as you can see from those minutes.
3      Q.   Okay.  And you just don't have a memory of how
4  often or common it was?
5      A.   I don't.  I've reviewed over 800 cases in my
6  time on the President's Committee and made decisions on
7  600, so I don't remember the specifics.
8      Q.   Okay.  Do you remember how many times you
9  reversed a recommendation from Dean Wood?
10     A.   Sitting here today, I do not recall having
11 reversed a recommendation from Dean Wood.
12     Q.   Okay.  And looking at the spreadsheet,
13 Exhibit 35, and sticking with that tab, Engineering
14 Tenure Decisions --
15     A.   Uh-huh.
16     Q.   -- it appears that there's two times that you
17 reversed Dean Wood's recommendation and both were
18 Dean Wood's recommendation to not grant tenure and you
19 decided to grant tenure.  And I'll point them out to you
20 that I can --
21     A.   Please do, yeah.  I don't recall.
22     Q.   Yeah.  I'm just trying to introduce you to the
23 information.
24     A.   Okay.
25     Q.   So one is Line 45, and that's Professor Jayant

83

1  Sirohi.
2      A.   Sirohi.  Okay.  Yes, I see that.
3      Q.   Okay.  So the -- if you see where you --
4  Dean Wood recommended terminal appointment, and you
5  promoted to Associate Professor?
6      A.   That's what the spreadsheet shows, correct.
7      Q.   Okay.  And this was created by UT, so it's not
8  something I created.  Okay?
9      A.   The spreadsheet shows that, yes.
10     Q.   Okay.  And -- and it looks like the P&T
11 Committee voted to deny tenure as well?
12     A.   Which column is that?
13     Q.   That's T and U.
14     A.   Well, the P&T vote was three for tenure, four
15 against.
16     Q.   Yeah, so that would be a --
17     A.   That's advisory to the dean, but that's
18 correct.  That is the vote.
19     Q.   Yeah.  It's close, but it's still on the -- on
20 the terminal appointment side?
21     A.   Correct.
22     Q.   And then this would have been -- this was an
23 up-or-out-year decision, correct?
24     A.   That's what this spreadsheet shows, correct.
25     Q.   And I -- I have to ask:  Do you recall this

84

1  situation?
2      A.   I do not.  I don't -- I mean, I recall Sirohi;
3  but I don't recall the specifics of the case and the
4  reason we -- we -- I made the decision opposite of the
5  Dean's recommendation.
6      Q.   Okay.  You don't recall any -- and this is a
7  man, correct?
8      A.   Sirohi is a male, correct.
9      Q.   And you don't remember any -- anything about
10 why he was someone that you viewed should be tenured at
11 UT when the P&T and the Dean thought not?
12     A.   Sitting here today, I do not recall.  I would
13 need to review the case.
14     Q.   Okay.  And in all fairness, it was from the
15 tenure promotion decision year of 13-14.  So it would
16 have been one of your first times out -- actually, no.
17 You were --
18     A.   Oh, let me -- oh, I didn't see the date on
19 this.  That's my error.  So this was -- I would have
20 been Dean.  So my decision was -- let's see.  This was
21 2014-2015.  So I would have been Provost at the time.
22 So the decision would have been President Powers'.
23     Q.   Okay.  So President Powers reversed your
24 decision?
25     A.   I was Provost at the time, so --

85

1      Q.   Oh, okay.
2      A.   -- this would have been a recommendation from
3  Dean Wood to the President's Committee.  I was on the
4  committee as Provost.  President Powers would have made
5  that decision.
6      Q.   Okay.  All right.
7      A.   I should have checked that date.
8      Q.   Yeah, so never mind.  There's only one time
9  that you reversed Dean Wood on this -- on this data
10 from the engineering school -- well, it is engineering
11 since it's Dean Wood.  If you look at Line 99, Janeta
12 Zoldan -- and that would have been from the '19-'20
13 decision year -- so it applied -- she received tenure in
14 the 2021 year, this year.  Let me -- give you a chance
15 to read that Line 99, and let me know when --
16     A.   Okay.  I see that line.  I -- this was
17 relatively recent, but I still -- the name's familiar.
18 I remember she was a faculty member in the, I believe,
19 Department of Biomedical Engineering; but I'm not sure.
20     Q.   Yeah.
21     A.   I think that's what I recall.  I don't know if
22 that's on the spreadsheet.
23     Q.   It is.  It's G.
24     A.   Oh, it is Biomedical.  Okay.  So I do recall
25 her.  So, again, I don't remember that case in a number

86

1  of cases; and this would have been -- this would have
2  been a year ago.  So what I don't know is if that was
3  against the Dean's recommendation in the original
4  decision or there was -- this was a case where final
5  arguments were presented and it was based on a
6  reconsideration.
7      Q.  Right.  Either way, you decided to -- the
8  only -- the only person that recommended against
9  promotion was Dean Wood?
10     A.  I'd have to review the rest of the
11  spreadsheet.
12     Q.  Well, yeah -- it's there.  So the vote of the
13  P&T was 6 to 1.
14     A.  Uh-huh.
15     Q.  And the vote of the Budget Council was 11, 0,
16  0, 1, 1?
17     A.  Yes, that's correct.
18     Q.  So those are pretty strong recommendations
19  from those groups, right?
20     A.  Right.  And there's -- but there's --
21     Q.  And this was in the seventh year; and if you
22  look at --
23     A.  Oh, this was -- I'm sorry.
24     Q.  -- you can look or you can take my
25  representation that the other tab Engineering Assistant

87

1  Professors, that tab lists everybody that was an
2  assistant professor in engineering, whether they went up
3  for tenure or not and whether they took a probationary
4  extension or stop the clock, which Professor Zoldan did.
5  That's why it's occurring in the seventh year, and the
6  seventh year was her up-and-out year.  Would you like to
7  confirm that or --
8      A.  So looking at this spreadsheet, she was six
9  years in the probationary period.  So that was her
10  up-or-out year.
11     Q.  Right.  But she was seven years at UT?
12     A.  Yes, that's what the data shows.  So the
13  assumption is she had used the stop-the-clock policy for
14  one year, but we would have considered it as a six-year
15  probationary period.
16     Q.  Right.  I'm saying you don't have to assume if
17  you want to confirm, but I'm telling you the other tab
18  shows it.  But you're welcome to look if you want to.
19          I'm sorry?
20     A.  I don't need to.
21     Q.  Okay.  And you -- is it your testimony that
22  you don't recall the circumstances of this decision?
23     A.  Sitting here today, I don't recall the
24  specifics of the case or circumstances for the decision.
25     Q.  Okay.  And it would be accurate, though, that

88

1  at the time you made the decision to promote, you would
2  have known that Professor Nikolova, or Dr. Nikolova, had
3  already made a complaint against UT for not having
4  received tenure based upon gender discrimination and
5  pregnancy discrimination?
6          MR. DOWER:  Objection, form.
7      A.  By the timing, the way I understand the timing
8  of this decision for Zoldan, it took place in 2021 -- it
9  took place in -- I don't know what the years mean.  This
10  would look like it -- I don't know if this took place --
11  this couldn't have taken place in 2021 because I wasn't
12  on the President's Committee in 2021.
13     Q.  Well, let me -- let me tell you.  The first
14  column, which says 2020 to 2021 --
15     A.  Right.
16     Q.  -- that's the year that the promotion would
17  take effect.
18     A.  Okay.  So she became -- okay.  Now, I
19  understand.  That means --
20     Q.  The decision would have been made in the
21  spring of --
22     A.  2020.
23     Q.  -- 2020?
24     A.  Right.  Okay.  And so I understand
25  Professor Nikolova's grievance against CCAFR and the

89

1  litigation were underway with the year before.  So, yes,
2  I recognize that timing.
3      Q.  Okay.  And Professor Zoldan is a woman?
4      A.  Correct.
5      Q.  And had taken a pregnancy leave or -- I mean
6  a -- she had taken -- well, let's go ahead and look at
7  it.  If you look at the first tab --
8      A.  Yes.
9      Q.  -- now, this isn't organized in the same
10  fashion, so if you look at Line 86, you'll find her.
11     A.  Okay.
12     Q.  Let me know when you've got it.
13     A.  I have it.  I'm on Line 86.
14     Q.  Okay.  And if you look at -- down to
15  Column M --
16     A.  Uh-huh.
17     Q.  -- it shows that she was expecting a child in
18  Column K, that she took the probationary extension?
19     A.  I see that, yes.
20     Q.  So she would be in the similar position to
21  Dr. Nikolova of taking the probationary extension
22  because she was expecting a child and, therefore, was --
23  if she had been denied tenure, she might have been in a
24  similar situation to Dr. Nikolova of considering that
25  maybe she was denied for reasons other than not having

90

1  met the qualifications for tenure?
2          MR. DOWER:  Objection, form.
3      A.  I can't speculate on that.
4      Q   (BY MR. NOTZON)  Right.  But that -- those
5  facts would put her similar to Dr. Nikolova, correct?
6          MR. DOWER:  Objection, form.
7      A.  Again, I don't have -- I can't -- I can't
8  speak to that because I don't know what fact sets you're
9  talking about.
10     Q.  (BY MR. NOTZON)  Okay.  Well, Dr. Nikolova has
11  complained that UT did not give her tenure, either
12  because she's a woman or because she was pregnant.  Do
13  you understand that?
14     A.  I understand that.
15     Q.  Okay.  And you understand that Dr. Zoldan was
16  a woman who went up for tenure and was denied by
17  Dean Wood, like Dr. Nikolova was denied by Dean Wood;
18  and she had taken the probationary extension for
19  pregnancy?
20         MR. DOWER:  Objection, form.
21     A.  That's what the spreadsheet is showing.
22     Q.  (BY MR. NOTZON)  Okay.  And she also had a
23  positive vote from the P&T Committee and a positive vote
24  from her Budget Council, right?
25     A.  That's what the spreadsheet shows.

91

1      Q.  As did Dr. Nikolova, correct?
2      A.  Right.
3      Q.  And the only person that voted against -- from
4  the Dean on down, that voted against either Zoldan or
5  Nikolova was Dean Wood?
6          MR. DOWER:  Objection, form.
7      A.  The Dean made recommendations in those two
8  cases.  Without looking at the Zoldan case, I can't
9  speak to what the reasons were.
10     Q.  (BY MR. NOTZON)  Right.  No, I'm just talking
11  about the recommendation to the President's Committee
12  was the same?
13     A.  Could you repeat the question?
14     Q.  The only person that recommended against
15  tenure below the President's Committee was Dean Wood in
16  both the Zoldan and Nikolova case?
17         MR. DOWER:  Objection, form.
18     A.  I view them as two different cases.
19     Q   (BY MR. NOTZON)  Right.  They are two
20  different cases.
21     A.  So in each -- in one case the Dean's
22  recommendation was that Professor Nikolova was do not
23  promote at this time, without prejudice.  In this case
24  this was a terminal appointment in an up-or-out year.
25     Q.  Yeah.  Which was -- yeah, which is ultimately

92

1  denial of promotion?
2      A.  A terminal appointment, if approved by the
3  President's Committee, would be denial of a promotion,
4  correct.
5      Q.  So this is the only time that you reversed a
6  decision for recommendation from Dean Wood, from the
7  information provided by UT in this spreadsheet, correct?
8      A.  So Dean Wood became Dean in 2013 -- I should
9  say I became president in 2015, so that would be 2016
10  and beyond.  So Line 66 and beyond, so that is correct.
11     Q.  Once you found out that -- well, are you
12  aware of any investigation by any group at UT into
13  Dr. Nikolova's complaint of pregnancy or gender
14  discrimination?
15     A.  Dr. Nikolova did submit a grievance alleging
16  that to the CCAFR Committee.  The CCAFR Committee issued
17  a report.  I am not aware of any other administrative or
18  other proceedings investigating that claim.
19     Q.  Okay.  And just to be clear, is CCAFR a
20  university organization?
21     A.  So CCAFR is a part of a -- the policy, the
22  Handbook of Operating Procedures, I believe it's in.  It
23  is a committee of the Faculty Council.  So, yes, it is a
24  committee of the university.
25     Q.  Okay.  But it's not supervised by anybody at

93

1  the university?
2          MR. DOWER:  Objection, form.
3      A.  The --
4      Q   (BY MR. NOTZON)  Let me -- let me re-ask the
5  question.  That was a bad question.
6          It's not supervised by the Administration
7  of the University, correct?
8      A.  The Faculty Council is an independent body
9  within the overall shared governance responsibilities,
10  the faculty and the administration.  And so the Faculty
11  Council elects its own members, appoints its own
12  officers, and appoints its own committees, including
13  CCAFR.
14     Q.  So the answer is, yes, that's correct?
15     A.  The University Administration has no role
16  in -- in the Faculty Council proceedings, including
17  CCAFR.
18     Q.  Okay.  So back to my question, was there -- I
19  guess the answer would be -- I think you answered; but
20  just to be clear, no University of Texas Administration
21  organization, like OIE, Office of Institutional Equity,
22  or any of the EEO groups or Human Resources groups did
23  an investigation into Dr. Nikolova's complaint of gender
24  or pregnancy discrimination, correct?
25     A.  So I'm not aware of any university office

94

1  outside of the Faculty Council Committee conducting an
2  investigation.
3      Q.  Okay.  And why is that that a University did
4  not conduct an investigation of Dr. Nikolova's
5  complaint?
6          MR. DOWER:  Objection, form.
7      A.  So under the policy of the University of
8  Texas, as I remember it, the first step in a faculty
9  grievance process is through the Faculty Council, where
10 the faculty are reviewing the grievance and developing a
11 finding.
12     Q   (BY MR. NOTZON)  Isn't a faculty grievance
13 separate and apart from a complaint of discrimination?
14     A.  I -- I don't think I can answer that.  There
15 is an Equal Employment Opportunity office that
16 investigates complaints of -- a grievance of
17 discrimination.  I do not remember how that relates to
18 faculty.  They're clearly employees; but as faculty, my
19 understanding and my recollection about reviewing the
20 policies, is that primarily goes through the Faculty
21 Council Committee of CCAFR.
22     Q.  Would you agree with looking at the CCAFR report
23 that they -- well, let me back up.
24          Isn't it true that you have no reason to
25 believe that CCAFR has any expertise or training in the

95

1  investigation of complaints of discrimination?
2      A.  I -- so I can't say what training CCAFR has.
3  It's a Faculty Council Committee.  They're often members
4  of the law school faculty who are on CCAFR, but I don't
5  know the specifics.
6      Q.  You have no reason to believe that anybody on
7  CCAFR has been trained to conduct investigations of
8  complaints of discrimination or retaliation, correct?
9      A.  I have no knowledge of that.
10     Q.  What was the answer?
11     A.  I have no knowledge of that.
12     Q.  Whereas, you are aware that the organizations
13 at UT that conduct investigations of discrimination and
14 retaliation are trained professionals, correct?
15     A.  That's correct.
16     Q.  So I'll ask again:  Why is it that UT did not,
17 on its own, investigate a complaint of discrimination
18 made by one of its employees at any time?
19     A.  My general understanding -- and I would need
20 to go back and review and study the policy regarding
21 faculty -- is twofold:  One those complaints go through
22 the Faculty Council; and, Number 2, the University, to
23 my knowledge, doesn't investigate a complaint unless a
24 complaint has been filed with that office.  And I have
25 no knowledge of a complaint being filed with the Office

96

1  of Institutional Equity.
2      Q.  So you're not saying that there's a policy
3  that says that UT will take a hands-off approach to
4  complaints of discrimination and let CCAFR do an
5  investigation first?  That's not your testimony?
6      A.  My testimony, without referencing the relevant
7  policy documents, is faculty complaints and grievances
8  go through, primarily, CCAFR.  There may be a mechanism
9  for submitting complaints to the Office of Institutional
10 Equity, and that office will thoroughly investigate each
11 complaint that's filed with them.
12     Q.  Is it your testimony that the Office of
13 Institutional Equity will not investigate allegations
14 of discrimination unless a formal complaint is filed by
15 the -- by someone?
16     A.  I can't testify to what their procedures are.
17 I just can't.
18     Q.  As a member of administration, do you
19 understand that you -- if you receive a complaint of
20 discrimination, that you are required to report that to
21 the Office of Institutional Equity?
22     A.  Yes -- well, I'm sorry.  I'm sorry let me back
23 up -- rephrase -- could you say the question again?
24          MR. NOTZON:  Debbie, can you read it?
25          (The requested material was read as

97

1  follows:  "QUESTION:  As a member of administration, do
2  you understand that you -- if you receive a complaint of
3  discrimination, that you are required to report that to
4  the Office of Institutional Equity?")
5      A.  In terms of legal requirements, if I receive a
6  complaint of a Title IX discrimination, as a mandatory
7  reporter, I'm required to report that under Title IX to
8  the relevant Title IX -- to the Title IX official at the
9  University.  I'm not aware of any other legal -- legal
10 requirements.  And in the case of faculty, the procedure
11 is well established that complaints that violate due
12 process, including discrimination, go through CCAFR.
13     Q.  (BY MR. NOTZON)  Are there any policy
14 requirements that a member of UT Administration that is
15 aware of complaints of discrimination, that they are
16 required to report that to OIE or some other
17 organization within UT?
18     A.  I -- I can't recall any -- any formal policy,
19 required policy.
20     Q.  And that Title IX requirement, what do you
21 recall the -- you said you were a designated reporting
22 official?
23     A.  So under UT Austin policies at the time I was
24 President, all employees of the university were
25 classified as mandatory reporters under Title IX, with a

98

1  few exceptions.
2      Q.  Okay.  All employees, whether they supervised
3  anyone or not?
4      A.  Correct.
5      Q.  And you're not aware of any policy with UT
6  that required that anyone that is in a supervisory role
7  is required to report complaints of discrimination or
8  harassment, regardless of whether or not the victim is
9  complaining officially or not?
10     A.  I am not aware of any policy such as that.
11         MR. NOTZON:  Let's go ahead and take a
12  break for just a couple of minutes.  I'm getting close
13  to the end of, I think, the personal testimony and
14  looking to go towards the corporate rep; but let me
15  double-check that.  Okay?
16         MR. DOWER:  Fair enough.
17         THE REPORTER:  Going off the record at
18  12:14 p.m.
19         (Off the record from 12:14 to 1:07 p.m.)
20         THE REPORTER:  We're going back on the
21  record at 1:07 p.m.
22     Q   (BY MR. NOTZON)  Okay.  So, Dr. Fenves, back
23  from lunch.  So looking at Exhibit 32, which was the
24  depo notice, the three corporate rep topics are now what
25  I'm going to focus on.

99

1      A.  Okay.
2      Q.  The first one is the decision to deny tenure
3  to Dr. Nikolova, including facts and circumstances and
4  reasons for the decision.  So, if you could, tell us the
5  reason why you did not -- you decided to deny tenure to
6  Dr. Nikolova.
7      A.  Based on the dossier and the recommendation of
8  the Dean to "do to not promote," we agreed with Dean.
9  My recollection of the -- this deliberation of the
10  President's Committee is that it was primarily based on
11  concerns about the -- primarily the research funding,
12  the sustainability of maintaining a research program,
13  and the future trajectory of her research.
14         The second consideration was the
15  publications record, both journal publications and
16  conference publications, were not at the level that we
17  would really like to see for a tenured faculty member.
18         So those were the primary reasons for
19  agreeing with the Dean's recommendation.
20     Q.  Okay.  Funding -- funding sustainability and
21  trajectory for the future and the publication record?
22     A.  Publication record.
23     Q.  Okay.  And how do you recall that?
24     A.  I recall it by reviewing the dossier for
25  Dr. Nikolova's case and, you know, just based on my

100

1  recollection of the discussion at the time being
2  refreshed by the facts within the case.
3      Q.  Okay.  So earlier you testified to
4  approving -- or deciding on 800 and 600 cases in your
5  various roles, 600 as President, as a means of
6  testifying that you didn't recall details, to include
7  ones from just last year.
8         So what you're saying is -- well, I
9  guess:  Why is it that you are able to remember these
10  two reasons?
11     A.  Because I had the opportunity to review the
12  dossier in some depth.
13     Q.  Okay.  So if you had the opportunity to review
14  the other dossiers, you might have a recollection as
15  well?
16     A.  I might, yeah.
17     Q.  What did you do to prepare for your deposition
18  on this topic?
19     A.  I met with the Counsel for the University,
20  reviewed documents.
21     Q.  Did you have any discussions with anyone else?
22     A.  No.
23     Q.  And other than the dossier, what did you
24  review?
25     A.  I reviewed the dossier for Professor Nikolova

101

1  and then, to a lesser extent, because of the number -- I
2  think there were a total of 13 dossiers --
3      Q.  Oh, no.  This question is just for Topic
4  Number 1.
5      A.  Topic Number 1.  So I reviewed the dossier for
6  Dr. Nikolova, and then most recently the CCAFR report on
7  the grievance that Dr. Nikolova submitted, and my
8  response as President to the CCAFR report.
9      Q.  Okay.  And as part of the dossier for
10  Dr. Nikolova, you would have reviewed Dean Wood's
11  assessment?
12     A.  Correct.
13     Q.  Okay.  And did your review of that information
14  refresh your recollection at all of any communications
15  from Dean Wood to the -- to you and the committee when
16  she appeared to discuss Dr. Nikolova's case?
17     A.  The only communication that I recall would
18  have taken place during the meeting, the President's
19  Committee meeting, with Dean Wood to discuss the case.
20  And, yes, I had a general -- I can't recall any
21  specifics of that discussion; but reviewing the case, I
22  have a general -- a general memory of it taking place.
23     Q.  Okay.  And do you recall questioning Dean Wood
24  about why she's contradicting the Budget Council and the
25  P&T Committee?

102

```
1      A.  We would have certainly asked her to justify
2  that, yes.
3      Q.  Do you recall doing that?
4      A.  I -- so this was 2019.  I -- I don't
5  specifically recall it, but it would almost certainly
6  have happened because that's what we would do when a
7  Dean is making a do-not-promote recommendation,
8  especially if it is different from what the P&T
9  Committee vote was.
10      Q.  I'm putting an exhibit in the chat.  It was
11  previously marked as Exhibit 2.
12          (Exhibit 2 discussed.)
13      A.  For some reason it's not coming up -- I see it
14  in the chat; but for some reason -- oh, here we go.
15  Yes, I have it.
16      Q.  (BY MR. NOTZON)  Okay.  And this is
17  Dean Wood's assessment of Dr. Nikolova that you would
18  have reviewed as part of the President's Committee
19  process; is that correct?
20      A.  That is correct.
21      Q.  And that you recently reviewed in preparation
22  for today?
23      A.  Correct.
24      Q.  Do you see in here any communication from
25  Dean Wood that -- that expresses the P&T Committee's
```

103

```
1  positive review of Dr. Nikolova, which was, you know, a
2  100 percent vote that she had?
3      A.  Let me go through it again on that specific
4  question.
5          Under Overall Assessment she says, "As
6  noted previously, the Promotion & Tenure Committee
7  strongly supported Dr. Nikolova's case.  Then noted --
8  they noted the uniform support of her innovative
9  research and felt that her teaching was a minor
10  concern."
11      Q.  So that's the full extent of her commenting on
12  the P&T Committee's unanimous vote?
13      A.  I believe so.
14      Q.  Isn't she required under the policies and
15  procedures to provide a full assessment of the P&T
16  Committee basis for its vote and not just a summary
17  sentence like that?
18      A.  I don't know if that is a requirement.
19      Q.  Do you know that it's a requirement that she's
20  actually supposed to attend the P&T Committee's
21  discussion of Dr. Nikolova?
22      A.  I believe that is a -- that's part of our
23  policy or procedure.
24      Q.  And the reason -- one of the reasons for that
25  is because she is supposed to then, therefore, provide
```

104

```
1  that assessment for you and the Committee?
2      A.  Well, her whole document is a factual summary
3  that is included in the previous documents; and that
4  paragraph is typically what we would see in a Dean's --
5  a Dean's conveying of a Promotion and Tenure Committee.
6  That's a typical type of summary that we would see.
7      Q.  Along with other details that the P&T
8  Committee would have discussed and relied upon for a
9  unanimous vote, correct?
10      A.  I don't know if that is correct.  Again, the
11  summary is typically what we will see in a Dean's
12  report or a Dean's assessment to the University -- to
13  the President's Committee -- excuse me -- assessing --
14  conveying what the -- the nature of the P&T decision --
15  P&T recommendation was.
16      Q.  Isn't it accurate that the other part of the
17  process that is not in writing is the P&T Committee's
18  discussion?
19          MR. DOWER:  Objection, form.
20      A.  The P&T Committee meets -- it takes a vote on
21  record, is supposed to meet with the Dean and have a
22  discussion with the Dean about -- about the case.  So
23  that's -- that is the way it -- the policy -- the
24  procedure in which it has been done.  That's a
25  requirement.  Excuse me.
```

105

```
1          In engineering, when I was Dean, the P&T
2  Committee would draft the assessment.  So it would be --
3  they would take the first draft of what the Dean's
4  letter is and then I would take that as their report to
5  me and then it would become my -- my -- the basis for my
6  report and my decision.  I don't know if Dean Wood had
7  followed that same procedure.
8      Q.  Or if she changed it?
9      A.  Or if she changed it.
10      Q.  Okay.
11          MR. NOTZON:  Let's put up Exhibit 36.
12          (Exhibit 36 marked.)
13      A.  Okay.  2018/2019 Evaluation Template?
14      Q.  (BY MR. NOTZON)  Yes.
15      A.  Yes, I have it.
16      Q.  And it's a four-page document?
17      A.  Yes, correct.
18      Q.  Okay.  And these -- if you look down below, do
19  you understand that these are the notes from the P&T
20  Committee?
21      A.  I've never seen this document before.  This is
22  a different procedure than I had when I was Dean; but I
23  understand that these -- yeah, I've never seen this
24  before.  So I don't know who wrote it.
25      Q.  Okay.  Let me go ahead and put up the document
```

106

1  just before that as Exhibit 37; and when I say "just
2  before that," I'm talking about if you look in the
3  bottom right-hand corner of the first page, there's a
4  number, 7551.
5      A.   Yes.
6      Q.   That's UT's Bates number for that document,
7  and I'm going to put up Number 7550.
8      A.   Okay.
9           (Exhibit 37 marked.)
10     A.   Uh-huh, I see it.
11     Q.   (BY MR. NOTZON)  Okay.
12     A.   So I looked at it, "I managed to...the
13 committee notes of Nikolova."  Okay.
14     Q.   Right.
15     A.   So that's the P&T Committee notes.
16     Q.   Correct.
17     A.   Uh-huh.
18     Q.   In looking back at Exhibit 36, 7551 and the
19 subsequent pages, you see that this is the notes of the
20 P&T Committee's discussions and the basis supporting
21 their unanimous vote for Dr. Nikolova's promotion?
22     A.   I see a series of notes, yes, correct.
23     Q.   Do you see that there's several items in here
24 that are not part of and not summarized by Dean Wood in
25 her Exhibit 2?

107

1      A.   Well, I've got to go through it more -- more
2  carefully.  I mean, this -- Section B quotes external
3  letters.  Generally Dean's assessments don't quote
4  external letters.  You can -- our -- our regular advice
5  to deans is we can read the letters ourselves.  We don't
6  need them to use their space to quote letters, so that
7  one --
8      Q.   But they will -- they will do that when
9  they're wanting to say something positive?
10          MR. DOWER:  Objection, form.
11     A.   In general our advice to deans is, "Don't
12 quote from letters; we can read the letters."  Does
13 everybody follow our advice?  I can't say a hundred
14 percent.
15     Q.   (BY MR. NOTZON)  Do you see the explanation
16 provided for research?
17     A.   You're talking about Section 2.2C -- or
18 Section C?
19     Q.   Yeah -- well, Section 2, 2A as well.
20     A.   Yes, I see it.
21     Q.   Do you see some positive information here
22 that's not contained in Dean Wood's assessment?
23     A.   I see some factual information.  She has a
24 paragraph -- Dean Wood, I should say, has a paragraph on
25 the first page summarizing her research.  That looks

108

1  like -- again, for the purposes of the Dean's letter, it
2  looks like a very typical summary of research.
3      Q.   The statement that Dr. Nikolova is considered
4  a leader in this emerging area, do you see that that's
5  notably absent from Dean Wood's assessment?
6      A.   I see that --
7           MR. DOWER:  Objection, form.
8      A.   -- it's not included in her assessment,
9  that's correct.
10     Q.   (BY MR. NOTZON)  And you're talking about
11 one of the reasons you were denying tenure was her
12 publication record and that it was weaker than you
13 thought it ought to be.  Wouldn't that depend upon the
14 nature of the field?
15     A.   Yes, the publication record depends upon the
16 nature of the field and what the expectations are for
17 that field or for that subfield.
18     Q.   And was that taken into consideration by
19 Dean Wood or you?
20     A.   I believe so, yes.
21     Q.   And in what way?
22     A.   Through experience in seeing lots of cases and
23 through some of the comments in the external letters.
24     Q.   Which were positive, not negative?
25     A.   There were some positive -- quite a few

109

1  positive ones, but there were some letters that did
2  raise concerns and statements in some of the letters
3  that did raise concerns.
4      Q.   Could you point out the concerns that you
5  focused on in your denial of tenure to Dr. Nikolova or
6  that Dean Wood focused on?
7      A.   Well, I -- so, again, this was two years ago.
8  I can't remember the specifics of the discussion; but
9  as I've gone back and reviewed the dossier, seeing the
10 same -- same letters I would have seen in 2019, I see --
11 I see areas of concern.
12          I can't recall if those were specifically
13 addressed in our meeting with Dean Wood; but we would
14 have certainly seen them in our review, the members of
15 the Committee's review of the case.
16     Q.   Well, let's look at Exhibit 2.
17     A.   Which is Exhibit 2?
18     Q.   It's -- I had put it up there before.  So it
19 should be either on your computer or --
20     A.   Faculty Report -- so I have one, two, three --
21 it looks like I have six documents from you.  Which one
22 are you --
23     Q.   The one that starts EX2.
24     A.   EX2.  Oh, I see it.  I'm sorry.  Okay.
25          Sorry.  For some reason I'm not finding

110

1  it. Let me try to click on it again.
2    Q.  You had mentioned that it was hard -- it
3  wasn't opening, and then it opened, the first time you
4  approached it.
5    A.  So this is the -- it starts with the cover
6  page on Recommendation for Change in Academic Rank?
7    Q.  Yes, uh-huh.
8    A.  Okay.  Yes, I have the document.
9    Q.  Okay.  Look at page 3 of 5 there.
10    A.  Yes.
11    Q.  I see the factual recitation there.
12    A.  Yes.
13    Q.  But no comments, no explanations, no context
14  within the field?
15    A.  That is correct.
16    Q.  Okay.  So -- and going back to Exhibit 36,
17  there is some discussion in there about context.  So I'm
18  just trying to understand where your negative assessment
19  of her publication fits within the context of her
20  performance and the P&T Committee's positive unanimous
21  vote in support of her promotion based upon -- in part,
22  on her publications?
23    A.  Well, there's no context in the -- in that
24  summary from the P&T Committee about how the number of
25  journal articles, and the number of peer-reviewed

111

1  conference proceedings compare.  And so that -- and
2  there's nothing about context of research funding, which
3  are the two areas that -- as I've looked at the record
4  again, and -- and recognizing that we would have seen
5  that same record two years ago, were the main concerns.
6    Q.  You don't see context where it talks about the
7  conference papers and the accepted rate and the H score,
8  the H index?
9    A.  No, I don't see context.  It's a factual
10  statement about the number of publications, factual
11  statement about being published.  The majority of her
12  work, not all of her work, being published in
13  competitive peer-reviewed conference proceedings.
14  There's no context there of how -- what the expectations
15  are and the citation is given without context, but a
16  later statement that H index and citations are slightly
17  lower than total citations and likely different due to
18  time and effect since Professor Nikolova received her
19  Ph.D.  But then that raises the question of who they're
20  comparing to because I believe she would have been ten
21  years past her Ph.D.
22    Q.  Questions that could be asked but weren't?
23    A.  Well, as I said, this is the first time I've
24  seen this document; but my answer is:  I don't see a lot
25  of context in this summary.

112

1    Q.  And that information is not in Dean Wood's
2  assessment that you would have had to then be able to
3  ask questions about?
4    A.  The information was not in Dean Wood's
5  summary, but we had the entire dossier in front of us to
6  see the information.
7    Q.  Yeah, you have the entire dossier for
8  everybody; but the policy still requires the Dean to
9  provide the information supporting the P&T Committee's
10  vote as a -- an assistant to the President and the
11  President's Committee so that they don't have to go line
12  by line through the dossier, correct?
13    A.  That is not correct.
14    Q.  Okay.  So correct me.
15    A.  Two points:  We expect members of the
16  President's Committee to review the entire dossier.
17  That may not be every single line in a several-hundred-
18  page document; but there is thorough review among the
19  five members, especially on key issues that get
20  identified at various levels.
21       We do not expect the Dean to summarize
22  everything that's in the dossier because we have the
23  dossier available to us.  We ask for a concise statement
24  to support their recommendation.
25       My understanding and my recollection of

113

1  the policy is the Dean needs to be present to hear the
2  reasons for the P&T Committee's vote and any -- and
3  any -- and their view of the case.  I don't recall any
4  specifics about the requirement to summarize the P&T
5  discussion in detail.
6    Q.  Would you agree that it would be inappropriate
7  or in violation of the policy and procedures of UT for
8  the Dean to simply receive notes from the P&T Committee
9  and not be present for the discussion?
10    A.  I would have to review the documents whether
11  this is a policy requirement, or a recommendation, or an
12  expectation.
13    Q.  But didn't you just testify that the
14  expectation is that the deans are expected to be in the
15  P&T --
16    A.  I think it's the expectation.  Now, whether
17  it's a violation if they aren't -- I can't answer
18  without looking at the policy.
19    Q.  Okay.
20       MR. NOTZON:  Let's go ahead and take a
21  quick break.  I need a restroom break, and I need to
22  find a document.
23       THE REPORTER:  We're going off the record
24  at 1:40 p.m.
25       (Off the record from 1:40 to 1:46 p.m.)

114

1          THE REPORTER:  We're going back on the
2  record at 1:46 p.m.
3      Q    (BY MR. NOTZON)  Okay.  I'm putting Exhibit 38
4  up.
5          (Exhibit 38 marked.)
6      A    Yes, I see the General Guidelines For
7  Promotion and Tenure.
8      Q    (BY MR. NOTZON)  For the year that would apply
9  for Dr. Nikolova's consideration for tenure?
10     A    Correct.
11     Q    Okay.  So this would be the right document to
12  be looking at to determine what the policies and
13  procedures are related to the Dean's participation in
14  the P&T Committee procedures, correct?
15     A    Correct.  Correct.
16     Q    Okay.  And that would be found on page 8; is
17  that right?
18     A    Yeah.  Are you talking about Section 4 on that
19  page?
20     Q    Yes, at the top of the page.
21     A    Correct.
22     Q    Okay.  So it would be a violation for the Dean
23  not to be present, correct?
24     A    These are -- these are guidelines.  It would
25  a -- it would be contrary to the guidelines.

115

1      Q    Okay.  And it also talks about the nature of
2  the Dean's communication of what occurred in the P&T
3  discussions; although, not a summary, it is a fair
4  rationale?
5      A    That's what the guidelines say.
6      Q    Okay.  So merely providing a summary wouldn't
7  be a fair rationale, would it?
8      A    I think that was a fair statement of the -- of
9  the summary of the P&T doc -- Committee document that I
10  saw, and it's typical of what we see in Dean's letters.
11     Q    So it's -- there's never an occasion where you
12  ask for more information?
13     A    There -- there, again, with the 800 cases I've
14  reviewed on the President's Committee, there were cases
15  that we asked for, in the meeting with the Dean, some
16  more specifics if there were questions about the P&T
17  Committee's assessment.
18     Q    I mean, especially in light of the unanimous
19  support that Dr. Nikolova got from the P&T Committee,
20  you would want to have some understanding from Dean Wood
21  why they were so positive and she so negative, correct?
22          MR. DOWER:  Objection, form.
23     A    We would -- we certainly would have had a
24  discussion.  I don't recall the specifics, but we
25  certainly would have a discussion of why her

116

1  recommendation was different than the P&T Committee's.
2      Q    (BY MR. NOTZON)  But you don't remember what
3  that was?
4      A    I don't remember the specifics of a discussion
5  two years ago.
6      Q    And do you recall in your conversation with
7  the President's Committee whether Dean Wood was present?
8      A    Whether Dean Wood was present where?
9      Q    Remember, earlier you said that when the
10  President's Committee is discussing the candidates --
11     A    Oh, I see what you're saying.  So the dean,
12  Dean Wood, was certainly present when we discussed the
13  case with her.  We would always have a discussion if
14  there was a case for do not promote.
15     Q    Let me -- let me complete my question.
16  Obviously, she was there when she was talking to you
17  about the case.  I'm asking if she was there for the
18  conversation and discussion that occurred after she made
19  her presentation.
20     A    So this is -- when we changed -- so I do not
21  remember the date when we changed the procedure.  So I
22  can't -- I can't answer the question without some
23  information on did we change it that year, or was it
24  afterwards.
25     Q    Do you recall if Dean Wood was present when

117

1  you took a poll of the President's Committee?
2      A    Well, that would be the -- that's the same
3  thing.  The poll and the discussion of the committee, up
4  to a certain point, was done in the presence of the
5  Dean.  At some point we changed the procedure -- and it
6  may be for this case and this year -- she was present
7  for our meeting with her but was not present for the
8  poll and my decision.
9      Q    Do you recall the poll for Dr. Nikolova's
10  case?
11     A    I do not.
12     Q    Do you recall any comments from any of the
13  other four members of the committee?
14     A    I do not.
15     Q    Do you remember if there was a split in the
16  committee?
17     A    I don't remember.
18     Q    Do you recall if there was a concern about the
19  case being accelerated or early?
20     A    I do not recall that being part of the
21  discussion.  The discussion was primarily on
22  Dr. Nikolova's research funding record, trajectory --
23  and I'm almost certain that was the major part of the
24  discussion -- and then, also, the publication record.
25     Q    So the fact that Dr. Nikolova was early or

118

1 accelerated was not one of the reasons why you decided
2 to deny tenure?
3     A.  That is correct.
4     Q.  So if she was to go up for tenure -- if that
5 happened to have been her up-or-out year, you would have
6 issued a termination -- a terminal appointment?
7     A.  I can't speculate on what the decision would
8 have been with a different fact set and different
9 timing.
10     Q.  Well, I thought you said earlier that there is
11 no different standard; and, therefore, the timing is --
12 of her going up wouldn't necessarily have a role to play
13 in your decision?
14     A.  The -- the way I'm going to answer that
15 question is:  We did not have to make a terminal -- a
16 decision on a terminal appointment because under UT
17 Austin's rules, this was -- there was still time in the
18 probationary period.  So the best way to describe it is,
19 the case was not ripe for a review to make a decision to
20 promote or terminal appointment.
21     Q.  I'm having trouble understanding, Dr. Fenves,
22 when you say it's not ripe for review because you are
23 reviewing her case at that time and making a decision
24 whether to grant tenure or not based upon her
25 performance.

119

1     A.  And we did not feel the performance,
2 particularly in research, funding, and trajectory and
3 publications was ready to make that affirmative decision
4 to promote to tenure.
5     Q.  How would it have -- how would it have changed
6 if she was in her up-or-out year?
7     A.  We would have had to make a decision to
8 promote or a terminal appointment.
9     Q.  So the added factor of her being kicked out of
10 the department or not would be in play?  Sympathy would
11 have been a --
12     A.  I don't -- so when a -- under the UT Austin
13 rules, when a case is presented to the President's
14 Committee early, before the end of probationary period,
15 there is an option if the Committee and the President
16 does not feel the case warrants promotion, to come back
17 without prejudice for consideration.  When that happens,
18 then there's another year or two years or however many
19 years left on the probationary period to give more
20 confidence that the standards have been met; and
21 particularly in this case, research funding will be
22 sustainable and have a positive trajectory.
23     Q.  In this case, in Dr. Nikolova's case, the
24 question of why now, was that answered?
25     A.  So this was -- the question of why now, since

120

1 it was early, falls into this category that Dr. Nikolova
2 had been a professor, assistant professor for six years
3 by the tenure clock; and so that was sufficient why now
4 to consider this in a normative time of six years for an
5 assistant professor.
6     Q.  So the question was answered affirmatively?
7     A.  The question was answered -- the best way to
8 describe it -- implicitly because we could see that she
9 had six years as assistant professor.  The data that is
10 presented is publication records and research funding as
11 an assistant professor for six years in rank.
12     Q.  So that would have been sufficient for her to
13 get tenure if, in your opinion, she had better funding
14 sustainability and trajectory and publication records?
15     A.  That was sufficient for her to be considered
16 at this time as early promotion under UT Austin rules.
17 I can't speculate if she had additional funding, if she
18 had additional papers, what the decision would have been
19 because it would depend on the facts presented at the
20 time.
21     Q.  When you say she wasn't ripe for
22 consideration, that, to me, indicates that she is not --
23 that she's too -- too early; she didn't answer the early
24 question.  How do you view the term "ripe" in any other
25 way?

121

1     A.  We can -- so the typical approach was for
2 assistant professors -- an assistant professor who had
3 service at other universities, which we like to see --
4 we like to recruit talented faculty that already have
5 demonstrated a record as an assistant professor, bring
6 them to UT -- in this case, we've looked at the record
7 over six years as an assistant professor that were
8 counted four in rank at UT Austin and two at Texas A&M.
9     We did not feel -- I should say, I did
10 not feel, as President, based on the information that
11 was presented in the dossier, the discussion with the
12 Dean, until whatever deliberations -- I don't recall the
13 specifics -- that took place with the University
14 Committee, that there were -- that there was sufficient
15 confidence in research funding, trajectory, and
16 publications.
17     So as a committee we have a choice.  We
18 could say do not promote, which was the decision in this
19 case, without prejudice, to have more time to build
20 that -- build that case; or we could have made the
21 decision that six years as an assistant professor, we're
22 going to consider that an up-and-out year and issue a
23 terminal appointment.  That was not the recommendation
24 of the Dean.  That was not my decision as President.
25 And I can't recall, ever, a situation where we would

122

1  have done that, that we would give the faculty member
2  the benefit of the doubt, additional time to make a
3  case.
4        So, in summary, that's what I mean.  With
5  the facts presented, the timing of this particular case,
6  it wasn't ready for a promotion decision or a terminal-
7  appointment decision.
8     Q.  Well, not ready for promotion is different
9  than not ripe for consideration, correct?
10    A.  It's not ripe -- well, I use the term "not
11 ripe" to make a decision to promote with tenure.  That's
12 how I use the decision -- that's how I use the
13 terminology.
14    Q.  So Dr. Nikolova had a -- at that time, she had
15 a probationary extension, stop-the-clock, on her record,
16 correct?
17    A.  Correct.
18    Q.  And -- but even with that, she still met the
19 six years when you combined the A&M time, correct?
20    A.  Six years in rank by the way we counted four
21 years at UT Austin -- she had four years in rank at UT
22 Austin -- and we considered the time at Texas A&M.  I
23 can't remember if it was two and a half or two, but we
24 would have considered that two years in rank as an
25 assistant professor at Texas A&M, for a total of six

123

1  years as an assistant professor.
2     Q.  So the answer's "yes"?
3     A.  Yes.
4     Q.  So whether she decided to rescind the
5  probationary extension or not, the decision would have
6  been the same, to not promote?
7     A.  So that's a hypothetical, which if she had
8  rescinded the probation for one year, she would have
9  been five years on the -- on the -- five years at UT
10 Austin and two years at Texas A&M, for a total of seven
11 years as an assistant professor.  I -- you know, can't
12 say -- the facts that would have been the same, the same
13 concerns about trajectory -- research funding and
14 trajectory and publications would have still been there.
15 I can't say what the decision would have been in that
16 circumstance, but the facts would have been the same and
17 the concerns would have been the same.
18    Q.  So she still would have been early?
19    A.  Correct.
20    Q.  She would have met that answer based upon her
21 years of service, as you just recounted?
22    A.  Correct.
23    Q.  Is she -- would she have been at a different
24 standard for promotion than if she was -- than she was
25 at four years instead of at five years?

124

1     A.  I don't believe so.  She would have been an
2  assistant professor in that hypothetical case of as
3  seven years.  We would have looked at the same research
4  record, and we'd have the same concerns about the
5  current funding and the future funding.
6     Q.  And the policies and procedures also don't say
7  anything about a heightened standard for an early
8  promotion consideration, correct?
9     A.  From the time I was -- began as Dean in 2008,
10 to the entire time I was at UT, the understanding and
11 the guidelines for a promotion case that was submitted
12 before the end of the probationary period had to answer
13 the question of why consider the case now.
14    Q.  Right.  And provide an explanation, but not a
15 justification?
16    A.  Provide a reason why the case should be
17 considered and a decision -- and supporting the
18 recommendation and answer the question -- the -- my
19 predecessor, I remember as Dean, when I presented an
20 early promotion case, the question was, "Why now?"  And
21 whenever the President's Committee met with -- had
22 panels, the road shows, the briefings, this was a common
23 question; and there was often, you know, a lot
24 of discussion of examples of how to answer the
25 question "why now" when considering putting a case up

125

1  early or to -- to justify the reason for cases submitted
2  early.
3              MR. NOTZON:  All right.  I need to take a
4  quick break again.
5              THE REPORTER:  Going off the record at
6  2:07 p.m.
7              (Off the record from 2:07 to 2:17 p.m.)
8              THE REPORTER:  We're going back on the
9  record at 2:17 p.m.
10    Q   (BY MR. NOTZON)  Okay.  Dr. Fenves, the --
11 when Dean Wood was presenting Dr. Nikolova's case, did
12 she state that she was present for the P&T Committee
13 discussion; or did you just assume that?
14    A.  I don't recall if she stated it.  Usually, the
15 deans don't.
16    Q.  Don't state it?
17    A.  State it.
18    Q.  Because it's a requirement?
19    A.  Because it's an expectation of the guidelines.
20    Q.  And just to close out that one issue,
21 Exhibit 38, the last document, if you could, look at
22 that.
23    A.  Yes, I have it.
24    Q.  Go to page 3.
25    A.  Page 3.  Okay.

126

1    Q.   And look at the top there, the last sentence
2  of B, the first paragraph of B.
3    A.   Yes, I see it.
4    Q.   Okay.   And that's just -- that's the guideline
5  that explains -- that says the accelerated consideration
6  should be explained; and it doesn't use the word
7  justified or any other word, correct?
8    A.   That's correct, yeah.   And, if I may, I also
9  want to say sometimes there's terminology that's a
10 little interchangable by years in rank and years in the
11 probationary period.   So you can see that then says,
12 "Cases considered before the sixth year in rank are
13 accelerated," but the next one is "no later than a six-
14 year probationary period."   And we use -- we typically
15 use those terms interchangeably.   So when I say "in
16 rank," I'm meaning counted according to the policy as
17 the probationary period.
18   Q.   Yeah, in rank at UT?
19   A.   At UT, correct.
20   Q.   It's ambiguous because there are assistant
21 professors that are ranked at the other institutions as
22 well, but I understand when you're saying.   But thanks
23 for the clarification because it can get confusing.
24        So going back to the reasons for denying
25 Dr. Nikolova tenure, the funding sustainability and

127

1  trajectory and publication record, I'd like to get a
2  little more detail from you since you've had an
3  opportunity to go through dossier and the documents.
4  Could you explain what about her funding sustainability,
5  and trajectory into the future was an issue that was too
6  much for you to bear?
7        MR. DOWER:   Objection, form.
8    A.   I can explain the basis for my statement that
9  we were concerned and I was concerned, as President,
10 about her research funding, current funding and
11 trajectory.
12        Can you pull up the dossier that has the
13 information?
14   Q   (BY MR. NOTZON)  I have -- I don't have the
15 entire dossier; but focusing on Dean Wood's statement,
16 Exhibit 2, that is in front of you.
17   A.   Oh, well, that's -- so if I understand your
18 question, you were asking me what was the basis for my
19 assessment on funding and trajectory.   So I would like
20 to go to the dossier since that was reviewed at the time
21 in the case.   I have it in front of me, so I can
22 reference it by page number.
23   Q.   Sure.  Go ahead.  What is that?
24   A.   So I'm currently looking at the document
25 that was provided to me, UT Austin-0016339, and the

128

1  subsequent page, the following page.
2    Q.   Okay.  16339 and 40?
3    A.   Correct.
4    Q.   Okay.
5        MR. NOTZON:   We'll make that Exhibit 39.
6        MR. SCHMIDT:   Robert, do you want me to
7  hunt that down and pull out those two pages?
8        MR. NOTZON:   That would be great.
9        MR. DOWER:   Robert, I may be able to send
10 the full dossier in case, as we go through this, we're
11 jumping around in the dossier; But I don't want to
12 interrupt --
13       MR. SCHMIDT:   I have the full dossier.   I
14 could -- I haven't actually uploaded things myself yet
15 on this, but I can probably upload the full dossier if
16 that helps.   But it -- there are different numbers.   I
17 think I have it at Bates number, like, 1 through
18 something or other.
19       Ben, is your dossier that you have at the
20 same numbers that Dr. Fenves is looking at?
21       MR. DOWER:   I believe so.   And what that
22 tells me is that we produced to you -- produced the
23 dossier more than once.
24       MR. SCHMIDT:   Probably, yeah.
25       MR. DOWER:   Yeah.

129

1        President Fenves, does your dossier for
2  her have a change in rank form at the top that starts
3  16304?
4        THE WITNESS:   Right.
5        MR. DOWER:   Okay.  So --
6        MR. SCHMIDT:   And it goes through what
7  page?
8        MR. DOWER:   Oh, sorry.
9        MR. NOTZON:   Let's go off the record for
10 this discussion.
11       THE REPORTER:   We're going off the record
12 at 2:23 p.m.
13       (Off the record from 2:23 to 2:27 p.m.)
14       THE REPORTER:   We're going back on the
15 record at 2:27 p.m.
16       (Exhibit 39 marked.)
17   Q   (BY MR. NOTZON)  Okay.  I'm looking at -- oh,
18 the summary sheet.  Okay?  Research Summary 339 and 40.
19 Okay?
20   A.   Correct.
21   Q.   Go ahead.
22   A.   Could I ask the question be repeated?
23   Q.   Sure.  I think the question was:  Why did you
24 deny tenure on the -- on the basis for funding
25 sustainability and trajectory?  And I wanted some

130

1  details about that; and you said, "Let me go to the
2  dossier."
3      A.  So in engineering, research funding from
4  external sponsors with a high preference, especially in
5  electrical and computer engineering for federal agencies
6  that sponsor research, is a very important criterion for
7  advancement of faculty, including promotion and tenure
8  in faculty advancement.  The funding is needed to
9  sustain a faculty member's research program, especially
10 to be able to recruit and support graduate students,
11 which are absolutely essential for recruiting -- the
12 funding is essential for recruiting the best graduate
13 students and supporting them while they are doing their
14 research under the supervision of a faculty member, with
15 the sponsorship of the granting agency.
16      So there's a very high consideration for
17 research funding; and at the time of consideration for
18 promotion to tenure, we like to see a positive
19 trajectory, meaning that over the time of the
20 probationary period, the research portfolio has
21 demonstrated ability to be successful in competitive
22 peer-review grants from federal funding agencies; and
23 is -- Number 2, is sufficient to be able to support a
24 strong research program of a faculty member and we have
25 confidence that after approval of promotion and tenure

131

1  that that will continue through evidence of submitting
2  proposals and successful grants for a number of years
3  past the promotion case.  So that's the reason that this
4  is important.
5      Now, looking at page 166 -- excuse me --
6  16339 in Table 2, Table 2 is a listing of Dr. Nikolova's
7  current external grants -- so sometimes we refer to
8  those as extramural grants -- from funding agents and
9  contracts awarded.  There are three that are listed in
10 that table.
11     The first one, the grant period was
12 essentially over at the time.  It ended in 9/30/2018, so
13 essentially over at the time of the review.
14     The second grant, the CAREER award that
15 Dr. Nikolova had received, a very prestigious award from
16 the National Science Foundation, received while she was
17 at Texas A&M, was going to expire in April 30th, 2019.
18 So, again, I'd have to look at the timing; but that
19 would -- that would be about the -- about the time this
20 case was being considered and before September 1st,
21 2019.  So if she were to be promoted, that grant would
22 have expired.
23     The only active grant that Dr. Nikolova
24 would have -- would have had in the next year was an
25 NSF-funded grant that would have -- it went from

132

1  October 1st, 2017 to September 30th, 2021.  This is the
2  only active grant that she had in the next academic
3  year.  The funding level, I would call very modest.  Her
4  portion was $479,000 for a four-year period, so roughly
5  $120,000 of grant funding a year, which is -- especially
6  in ECE, it's a very modest level of funding.
7      If we go to Table 3, those are grants
8  that she had received that had already been completed
9  and no longer active and so couldn't support research.
10     Table 4 is Pending External Grants and
11 Contracts.  Typically, at the time of promotion, we
12 would like to see the faculty member have a good
13 pipeline of pending grants that's showing active
14 research; it's showing turning research ideas into
15 proposals for funding agencies and -- and gives us
16 confidence that there's not only sustainability at the
17 current level, which, based on these funding numbers, is
18 modest; a trajectory that's improving, which is what we
19 would like to see for faculty at the associate professor
20 rank.
21     Table 4, which is the information we had
22 at the time the case was considered, has one pending
23 grant.  This is from the Department of Energy.  I don't
24 know the specifics of this program, but this looks like
25 a total funding level of $10 million and a large number

133

1  of coinvestigators.  This would be what would be called
2  a center-type grant, that was not based at UT Austin.
3      So the PI appears to be at the University
4  of Minnesota and had agreed, if funded, to have a
5  subcontract to Dr. Nikolova UT Austin.  The funding
6  level over a four-year period, if it had been granted --
7  and we would know by now; I don't know what the status
8  of that grant application was -- would have been
9  $400,000, or about a hundred thousand dollars a year.
10     So as the Committee would have reviewed
11 this same document at that time, we would have seen a
12 modest level of current funding at about 120,000 a year.
13 We would have seen only one grant pending at even a
14 slightly lower funding level.  So these were the
15 concerns about the level of funding and the trajectory.
16     Q.  And were any considerations made as between
17 the applied and theoretical distinction of her research?
18     A.  So, yes, there are.  So we use a different set
19 of terms.  We think of experimental or laboratory-based
20 research compared with theoretical or computational-
21 based research; and, certainly, for experimental and
22 lab-based research, there's much higher funding levels
23 needed to operate a lab.
24     She does theoretical and
25 computational-based research, which is a much lower

134

1  level; but there is still the expectation that they are
2  supporting graduate students. Depending on the
3  particulars, an annual support for a graduate student
4  can be 60- to $80,000 a year. So the rule of thumb is
5  about $100,000 a year can support one graduate student
6  because there are other cost associated beyond the
7  graduate student.
8      Q.  And how many graduate students was she
9  supporting in her time at UT prior to being considered
10 for tenure?
11     A.  So at the time I'd have to go back and refer
12 to -- and I -- if it's in here. So I have to find out.
13 She had a number of graduate students. Some of them
14 were supported by the Department, which is often done
15 for assistant professors to help them get started on a
16 research program; but as a faculty member develops their
17 research program and becomes tenured, the Department
18 can't support all the graduate students for the faculty
19 member. So I don't know how many were specifically
20 funded off of her current grant at the time the case was
21 considered.
22     Q.  Do you know if there was any consideration
23 made regarding any changes to the field during this
24 period of time that reduced funding from federal
25 agencies in the 2016 to 2020 time period?

135

1      A.  I don't recall any discussion. Her work on
2  network analysis is a very hot topic. So I don't think
3  there was any discussion that this was a subject that --
4  topic in an area of research that was going to decline
5  soon in interest and importance and attention from
6  federal funding agencies.
7      Q.  And do you know if Dr. Nikolova was told at
8  her initial review whether or not her funding was
9  insufficient at that time and needed to be augmented?
10     A.  Could I ask you to clarify what you mean by
11 initial review?
12     Q.  The mid --
13     A.  Third-year review? I don't know. I'd have to
14 go -- it's in the dossier. I'd have to go back and
15 refer to the third-year -- the third-year report.
16     Q.  Okay. So closing out the detail that you're
17 providing on the basis for denying tenure on the funding
18 sustainability and trajectory issue that you had, is
19 there anything else that you want to add to that
20 testimony?
21     A.  Not related to funding.
22     Q.  Okay. Let's go ahead and move to the
23 publication record detail supporting your -- that you
24 based your decision to deny tenure on.
25     A.  Uh-huh, okay.

136

1      Q.  Well, wait. Before we go there, the statement
2  that you said about funding sustainability and
3  trajectory, that's also included in Dean Wood's
4  assessment; is that correct, Exhibit 2?
5      A.  Exhibit 2. Let me come back to that.
6      Q.  If you look on page 4, the top of page 4.
7      A.  She does say, "I have concerns about the
8  sustainability of her research program. These concerns
9  are compounded by the fact that both her teaching and
10 her external funding have dropped since she spent the
11 sabbatical semester at Berkeley in 2015."
12     Q.  Okay. And so that is in line with what you're
13 saying?
14     A.  That's consistent with -- with my testimony.
15     Q.  Okay. And you had said that part of your
16 decision-making was in compliance with what Dean Wood's
17 recommendation was?
18     A.  We were in agreement on this point.
19     Q.  Okay. All right. Go ahead and move to the
20 publications.
21     A.  Uh-huh. So if I reference the same page in
22 the research summary, the first table, Table 1, on
23 research summary --
24     Q.  Okay.
25     A.  -- at the time the case was considered --

137

1      Q.  Just to be clear -- just to be clear,
2  Dr. Fenves -- sorry -- it's Exhibit 39; and we're on
3  page -- we're still on page 16339?
4      A.  Correct.
5      Q.  Okay.
6      A.  So the top two lines in Table 1 showed that
7  Professor Nikolova has published -- had published three
8  papers in time and rank; and in this context, time and
9  rank means time as an assistant professor at UT and
10 Texas A&M. And we can go back to her CV and count the
11 three papers. She has papers before she joined A&M
12 during her time as a post-doctoral researcher at MIT.
13 Peer-reviewed conference proceedings as an assistant
14 professor, A&M and UT, a total of 18.
15         Now this -- in her field, in
16 optimization, computer science weight finding, there is
17 a strong outlet, important outlet in referee conference
18 proceedings; but journal publications are also
19 important. Those are journals of record and that --
20 much more so than conference proceedings, which tend to
21 be a more fast-moving, fast-changing field, like she was
22 working in; they're also highly-funded fields, in
23 reference to an earlier question.
24         Three journal papers is a low number; and
25 in combination with 18 referee conference papers is a

138

1   generally -- is a modest -- is a modest number is the
2   way I'll say it.  So there's nothing -- there was
3   nothing obvious that this is a strong publication record
4   that was getting the results of research out into the
5   field and the profession.
6       Q.  Okay.  Anything else --
7           (Simultaneous speakers.)
8       A.  I'm sorry.
9       Q.  Go ahead.
10      A.  The total citations -- and this is a
11  somewhat -- there are different ways of measuring
12  citations.  What are citations?  That means other papers
13  are referencing specifically the work of the author, in
14  this case, Professor Nikolova.  They're a measure of
15  impact.  Web of Science is one measure.  Google Scholar
16  is much more encompassing; although, we tend to use that
17  more now because it's more easily accessible.
18          Under a thousand citations is an -- is an
19  okay record.  It's not spectacular, and I think there
20  were some comments about that we showed -- that we
21  looked at in the review of the P&T Committee.  But those
22  are total citations including work done prior to
23  becoming an assistant professor, and I think Dean Wood
24  had a footnote that 130 or so of the citations were from
25  some highly-cited work that she had done at MIT, with

140

1   context that Dr. Nikolova's productivity and publication
2   is substandard or mediocre in the field?
3       A.  I didn't say substandard or mediocre.  I said
4   it is -- it is --
5       Q.  Not acceptable for tenure?
6       A.  It's not acceptable for tenure is the best way
7   to do it.
8           (Simultaneous speakers.)
9       A.  Okay.  So the practice in electrical computer
10  engineering is the chair of the department, Dr. Tewfik,
11  would do an analysis; and that is in the dossier.  And
12  so, you know, we would look at that.  So that's -- that
13  is in the dossier.
14      Q.  Okay.  And -- and can you pull that up and
15  show where he criticizes her productivity in
16  publications in context --
17      A.  He does not criticize it.  He has a favorable
18  comparison.
19      Q.  Okay.  So where is -- where is the evidence
20  that, in her field, in her specific genre, that her
21  productivity in publications is lacking, compared to
22  others?
23      A.  It's based on multiple levels of review,
24  having reviewed lots of cases over the years, our
25  understanding of what the expectations are.

139

1   her post-doctoral sponsor, I assume, prior to becoming
2   an assistant professor.
3           So this was, overall, a modest measure of
4   impact through -- through citations.
5       Q.  Okay.  Anything else?
6       A.  On publications, no.
7       Q.  Okay.  So to follow up on these issues, I
8   don't see any context here where you say that's not good
9   for someone in her field.
10      A.  Uh-huh.
11      Q.  I don't see any context where someone who has
12  gotten tenure at -- in the same exact field as her at
13  some other peer institution had substantially more --
14  double, triple, whatever, anything like that -- as a
15  basis to criticize her productivity.
16      A.  So this is based on many years of promotion
17  and tenure.  The Dean -- I don't know how many cases
18  they were doing in engineering; somewhere between 20 and
19  30.  So there's a -- there's a -- we have a good
20  understanding, reading -- a good understanding of what
21  the expectations are; and the external letters are also
22  factors that we look at in providing that context.
23      Q.  Would it be accurate what I said?  Is that
24  true that there are no statements putting these numbers,
25  this publication productivity that you criticized, into

141

1       Q.  That includes the review of the Budget
2   Council, the Chair, the P&T Committee, all of whom have
3   this wealth of experience in reviewing tenure cases,
4   too, correct?
5       A.  They had a lot of experience; and in this
6   case, I disagreed with them.
7       Q.  And I'm trying to find the data that goes
8   beyond you saying, "Trust me.  I know that this
9   productivity for this area is not enough," whereas, all
10  these other people -- and I would argue that the Budget
11  Council is a lot closer to her area of expertise than
12  you are about their acceptance of that productivity.
13          So that's what I'm trying to ask you.
14  Where is the objective evidence that your assessment
15  that it's not good enough is based on?
16          MR. DOWER:  Objection, form.
17      A.  This is a -- this is a qualitative assessment
18  that takes place at the University President's -- at the
19  President's Committee -- I use those terms
20  interchangeably -- subjective assessment based on our
21  years of experience of looking at cases.
22      Q.  (BY MR. NOTZON)  Okay.  So we have to take
23  your word for it?
24          MR. DOWER:  Objection, form.
25      A.  My decision is based on the years of

142

1  experience in looking at cases and what the expectations
2  are for promotion and tenure at UT Austin.
3  Q. (BY MR. NOTZON) So that would be a "yes" to
4  my question?
5  MR. DOWER: Objection, form.
6  A. Could you repeat the question?
7  Q. (BY MR. NOTZON) Sure -- or let me ask it a
8  different way. My prior question was that we have to
9  take your word for it. Asking it in a different way,
10 you don't have any evidence, data, to compare
11 Dr. Nikolova's productivity in publication that you say
12 is insufficient for tenure that we can look at to
13 compare her to someone else or some other people that
14 received tenure that had substantially more productivity
15 than her?
16 A. That's correct. I don't have specific data
17 that I based my professional judgment on over years of
18 experience.
19 Q. And we don't have any evidence that you have a
20 basis for understanding what her productivity -- why her
21 productivity that's on the page here in Exhibit 39 is
22 somehow less than somebody else that would be in her
23 field?
24 A. I don't have the specific data for that.
25 Q. And you didn't have it back in 2019, either,

143

1  did you?
2  A. Yeah. In 2019 I did not have that data, nor
3  do I have it now.
4  Q. All right. Is there anything else that you
5  would point to -- to that you relied on to decide not to
6  provide Dr. Nikolova tenure --
7  A. Well, the external letter -- I'm sorry.
8  Q. -- in agreement with Dean Wood?
9  A. So the external letters are very important at
10 each step of the evaluation, but it's something that the
11 President's Committee pays a lot of attention to; and
12 there were some concerning statements in some, not all,
13 but some of the external letters.
14 Q. All right. Do you want to point those out to
15 me?
16 A. I have the dossier in front of me if you want
17 to pull up the documents.
18 Q. Well, I don't know which ones you're talking
19 about. So --
20 A. So it's --
21 Q. -- if relying on some external reviewers, then
22 please point them out to us.
23 A. So let me start with the letter from MIT.
24 Q. And just give us the Bates number at the
25 bottom. This is all in Exhibit 39.

144

1  A. So this would be 16405 and 16406.
2  Q. Go ahead.
3  A. So this is from Patrick Jaillet, who I don't
4  know; but I do know he's a senior faculty member at
5  Massachusetts Institute of Technology. So, first of
6  all, in his overall comments -- he has a number of
7  comments -- and let me preface this by saying, having
8  read thousands of letters and -- not as active as I
9  used to be -- but writing letters of evaluation for
10 decades, there's a typical terminology that many letter
11 writers -- not all -- but many letter writers use that
12 has a progression to evaluate some aspect of a case.
13 And so that typical language is weak, modest, solid,
14 strong, outstanding, exceptional, typically is what
15 you'll see as the language. So, again, weak, modest,
16 solid, strong, outstanding, exceptional; and so that's
17 typically the kind of gradation of evaluation that they
18 would use.
19 And so Jaillet sees her overall record to
20 be a strong one. So, you know, it's -- that's sort of
21 in the upper range there; but it's not outstanding.
22 "Her publication record is very good." My
23 interpretation is that that's a fairly weak statement
24 about her publication record, very good, because, again,
25 if you go through that -- that progression. "Contains

145

1  solid papers," now, solid papers are, to me, are average
2  or a little bit above average. They're meaningful, but
3  just at about average or a little above average. Then
4  getting to research funding, "She has a good track
5  record." You know, again, that's a fairly -- that is
6  not a strong recommendation, a good track record. And,
7  "Seems to be a talented mentor," but that has to do with
8  graduate instruction.
9  Then he begins his conclusion at the
10 bottom of 6 -- 16405, "I'd say that her record is on par
11 with recently tenured cases." So "on par," again, I do
12 not interpret that as a -- as a terribly strong
13 recommendation.
14 And then he goes on to say he would put
15 her in the top 20 percent of those who have been
16 evaluated and subsequently received tenure. So that's
17 good, but it's -- we often see recommendations that put
18 a percentage in the top 2 percent, 5 percent, 10
19 percent. So 20 percent is not a terribly strong case;
20 and, of course, he doesn't provide any specifics.
21 So that's the MIT letter.
22 Q. Hold on --
23 A. Okay.
24 Q. -- before we go to the next one. He's saying
25 on par with people that received tenure --

146

1    A.   Yeah.
2    Q.   -- at peer institutions?
3    A.   Uh-huh.
4    Q.   Correct?
5    A.   That he's had to review.  He gives some
6  examples that are peer institutions, that's correct.
7    Q.   Georgia Tech, USC, MIT, and Northwestern are
8  all peer institutions, correct?
9    A.   Correct.
10   Q.   They're in the top 10 or 15 percent nationwide
11  programs, correct?
12   A.   Northwestern, I'm not sure about; but the
13  other three, yes.
14   Q.   Okay.  And when he says he's on -- she's on
15  par with those tenure cases, where does it say that she
16  needs to be better than people that receive tenure at
17  peer institutions?
18   A.   He's not saying that.  It's just -- he's --
19  on -- "on par" means -- to me, is about average; and --
20  you know, and coupled with the comments on the
21  publications and the research funding and then the
22  trajectory question -- I left that off, the next
23  paragraph -- "Trajectory is very good."  That, again, is
24  not a strong recommendation.
25        MR. NOTZON:  Object as nonresponsive.

147

1    Q.   (BY MR. NOTZON)  My question is that it's on
2  par with people that received tenure.  Where -- my
3  question is:  Where does it say at UT that to get tenure
4  at UT, you've got to be above the people that get tenure
5  at peer institutions?
6    A.   It doesn't say that.
7    Q.   Okay.  So -- so when you say "average," she's
8  not an average performer in the field.  She is on par
9  and average with other people that receive tenure at
10  peer institutions, correct?
11   A.   That's what the statement says, correct.
12   Q.   Okay.  And then he says, "I offer my full
13  support."  Is that also a negative comment?
14   A.   So we often see recommendations like that.  We
15  aren't asking for them -- we're asking for their
16  assessment; we're not asking for their recommendation.
17   Q.   So you don't see those as the same thing?
18   A.   No.
19   Q.   All right.
20        MR. NOTZON:  Let me take a quick break
21  again.
22        THE REPORTER:  We're going off the record
23  at 2:58 p.m.
24        (Off the record from 2:58 to 3:00 p.m.)
25        THE REPORTER:  We're going back on the

148

1  record at 3:00 p.m.
2    Q   (BY MR. NOTZON)  Okay.  Dr. Fenves, just to
3  complete this --
4        MR. DOWER:  Oh, are we good, Bob?
5        Sorry.  I think Bob --
6        MR. SCHMIDT:  I just -- I just now got
7  on, so thank you.  Yeah.
8        MR. NOTZON:  Okay.
9    Q   (BY MR. NOTZON)  All right.  Professor -- I
10  mean, Dr. Fenves, completing the Professor Jaillet's
11  letter, you said you don't know this guy.  Have you ever
12  reviewed his letters for other candidates?
13   A.   I can't recall that, but it's highly likely
14  that his letters have been -- he had letters for other
15  candidates, but I don't recall them.
16   Q.   And you didn't compare his letters for other
17  candidates with this letter, correct?
18   A.   I did not.
19   Q.   And so this -- this thousands of letters that
20  you've reviewed, there's no handbook of terminology that
21  exists out there, right?  This is -- this is your
22  seat-of-the-pants assessment of this letter, correct?
23        MR. DOWER:  Objection, form.
24   A.   There is no handbook, that is correct.  I've
25  been involved with promotion and tenure cases for over

149

1  30 years, most of that with engineering faculty and in
2  my role on the President's Committee have seen at least
3  4,000 letters.
4    Q.   (BY MR. NOTZON)  So you're -- you should be
5  really good at math because you're an engineer, right?
6        MR. DOWER:  Objection, form.
7        You can answer.
8    A.   I am an engineer.  My math skills have
9  degraded with time.
10        (Laughter.)
11   Q.   (BY MR. NOTZON)  But concepts -- mathematical
12  concepts are right up your alley?
13   A.   I'm -- I'm proficient in math.
14   Q.   Yes.  And -- and you're proficient at reading
15  promotional review letters from references?
16   A.   I believe I am.
17   Q.   Okay.  Would it be accurate that different
18  people use different terminology in different ways?
19   A.   That is correct.
20   Q.   How do you get -- when he says she's on
21  par with recently-tenured cases, as average, when he
22  also says in that same paragraph that she's in the top
23  20 percent of the people that have received tenure of the
24  people that he's reviewed?
25   A.   As I said, in comparison, we've often -- we

150

1   often seen cases where the letter writer says the
2   candidate's in the top 1 percent, 2 percent, 5 percent,
3   10 percent. We don't have a percentage cutoff in these
4   types of assessments.
5       Q.   And it's 1 percent, 2 percent, of what?
6   That's what's important, correct?
7       A.   Typically the percentage is of faculty that
8   are -- that have been considered and have been promoted
9   at peer -- peer schools or departments.
10      Q.   Again, there's no rule that that's the
11  percentage that they're talking about that you're
12  referencing in the abstract, right?
13      A.   There is no rule, correct.
14      Q.   Okay. So -- and in this letter, he says top
15  20 percent of all those that have received tenure. So
16  he's still referencing the tenured position, and he's
17  not saying the average. He's saying the top fifth?
18      A.   Yes, he is, correct --
19      Q.   Okay. And top --
20      A.   -- the ones he's reviewed.
21      Q.   Top fifth is nowhere near average, correct?
22      A.   "On par," to me, is not a strong endorsement.
23  Top 20 percent is stronger; but we have seen, after
24  reviewing many cases, cases that are characterized by
25  external reviewers as much higher percentages.

151

1       Q.   And nobody's taking anything away from those
2   people.
3       A.   Uh-huh.
4       Q.   I'm just saying there is no requirement
5   that to get tenure at UT, you have to be in the top
6   10 percent or 1 percent of people in the country that
7   receive tenure, correct?
8       A.   That is correct, there is no -- there is no
9   cutoff.
10      Q.   So I -- okay. We'll move on. What's your
11  next criticism of Dr. Nikolova's file?
12      A.   Well, the question is: What was it in the
13  external letters that raised concerns in the promotion
14  and tenure case?
15      Q.   For you.
16      A.   For me, yes.
17          So there's a letter from a
18  Professor Schulz at Technical University of Munich.
19      Q.   Bates number?
20      A.   It is 16413 to 16415.
21      Q.   Go ahead.
22      A.   Now, just as background, we do have a general
23  expectation that a candidate's promotion to assistant --
24  excuse me -- associate professor with tenure has at
25  least one reference outside the United States because we

152

1   want to see -- determine the level of international
2   impact that a candidate is having and attention they're
3   getting. So this was a letter that was submitted from
4   Professor Schulz.
5          So on the second page, 16415, at the top
6   of the page, discussing the publication, he makes a
7   statement that, "She may not have had what one may
8   typically consider a home-run paper, but with meticulous
9   work she has certainly helped to bring this research
10  direction forward." My interpretation is that's a
11  fairly weak -- weak recommendation. Detailed --
12  "meticulous work," helped move something forward is not
13  a strong -- strong endorsement of the impact of the
14  paper.
15         The second paragraph begins,
16  "Dr. Nikolova has only four journal publications..." We
17  would count three as an assistant professor at UT Austin
18  and Texas A&M. And he goes on to say, "...which would
19  be very few in any environment in which this would be
20  the main measure of success." So he's making a
21  statement that this is a few number, and he's qualifying
22  it because he doesn't know how important that is as a
23  measure. And journal publications are an important
24  measure, but then he does say that, "Three of the four
25  papers" -- and I don't know if it's three of the three

153

1   in -- as an assistant professor or two of the three --
2   "are in top journals." And that's a positive factor
3   that the papers are being put in -- in top journals.
4          Then he goes on to something that's
5   important in this field, referee journals -- excuse
6   me -- refereed conference proceedings, "...of which she
7   has many more." That was the 18 number that we talked
8   about.
9          But then there are some concerns that --
10  that are discussed in the remainder of the paragraph,
11  that they are going into top specialty conferences, such
12  as algorithmic theory, which is good; but the
13  implication is those are good if one chooses not to be
14  in the general theory conferences, which gets much wider
15  attention and impact because of the scope of those
16  conferences. So those are -- those are concerns about
17  the number and the impact of her journal publications
18  from the perspective of this international reviewer.
19         Then the final sentence in his letter is,
20  "All in all, I would encourage you to seriously consider
21  promoting Dr. Nikolova to Associate Professor with
22  Tenure." And we see these phrases many times, and
23  that's -- that's a polite way of saying they're
24  recommending you considerate; but it's not a -- it's not
25  an overall positive assessment.

154

1    Q.   So, before, you said, "We're not looking for a
2    recommendation; we're looking for an assessment"?
3    A.   Right.   And that's not a recommendation.   I
4    put that in the category of an assessment to seriously
5    consider.
6    Q.   Right.   So if he was saying something strong,
7    in your opinion, he would have said...?
8    A.   So we've seen -- we see statements like this.
9    Again, I've reviewed thousands of reference letters; and
10   this is a polite way in a reference letter that they're
11   recommending we look at it but don't say anything more
12   than that.
13   Q.   Don't say anything what?
14   A.   They don't say anything more than:   I
15   recommend you looking at the case.
16   Q.   And this is a German individual?
17   A.   I don't know his nationality, but he's at the
18   University of Munich in Germany.
19   Q.   With a name like von Humboldt?
20   A.   Well, that's his title of his --
21   Q.   Oh.
22   A.   -- professorship.   His name is Andrea Schulz.
23   Q.   Which is -- sounds German.
24   A.   And the University of Munich is a very good
25   university.

155

1    Q.   And have you ever compared letters from him
2    before?
3    A.   No.
4    Q.   Okay.   And where is the criticism of her
5    presenting at game theory -- algorithmic game theory
6    conferences?
7    A.   So it's -- it's -- again, these letters are
8    often worded very carefully; and, again, I have lots of
9    experience having read these letters.   So the sentence
10   at the bottom of that first full -- last sentence of
11   that first full paragraph on page 16415, I'll quote.
12   "As mentioned before, ACM EC is the top conference in
13   algorithmic game theory" -- so it's a specialty
14   conference sponsored by ACM -- "if one does not choose
15   to submit or get into" -- meaning have an accepted paper
16   into -- "general theory conference such as STOC, FOCS or
17   SODA," which is a very widely-known conference in that
18   field, in theory.   What the point is -- he's making is
19   she's publishing in top specialty conference.   She is
20   not publishing in the conferences that get a lot more
21   attention -- the general conferences that get a lot more
22   attention in theory, computational theory.
23   Q.   So she could have done better; but there's
24   nothing wrong with the fact that she was in a top
25   conference in that specialty, which is the specialty she

156

1    works in and teaches in?
2    A.   There's nothing wrong with publishing in a
3    top conference in a specialty.   The point is, it doesn't
4    get -- those papers don't get as much attention and
5    don't have as much impact as publishing a theory paper
6    in one of the large general conferences that have
7    higher -- excuse me -- lower acceptance rates.
8    Q.   So there's really nothing negative about that;
9    it's just not "blow your mind"?
10   A.   That's correct.   It's -- that's a fair
11   characterization.   It's -- it's what we would expect an
12   assistant professor to do.   In the categories I used, I
13   call this solid.   This would be a solid performance
14   in publications in conferences, which is an important
15   dissemination out- -- dissemination outlet, a form of
16   dissemination for this field.
17   Q.   So you would agree she -- this professor is
18   not trying to excuse her mediocre performance.   He's
19   saying she -- in your opinion, this sentence says she's
20   not in the top tier in the world; she's in the top
21   conference for that specialization?
22   A.   He's saying that she is not published in the
23   important general conferences in theory.
24   Q.   But she is in the top conference for that
25   specialization?

157

1    A.   For that special field, correct.
2    Q.   So there's nothing wrong with that?
3    A.   There's nothing wrong with it.   The question
4    is, as we're looking at the overall publication record,
5    the impact that it's having -- that it's having and the
6    attention that it's getting.   This is a statement that
7    at this point, it is limited to -- to the specialty
8    conference topic in algorithmic game theory.
9    Q.   And that's what she's -- that's what she's
10   working in, correct?
11   A.   That is correct.
12   Q.   That's her specialization?
13   A.   That her specialization.
14   Q.   Okay.   Next.
15   A.   Let me thumb through my notes here.   I think
16   the third one is from Cornell, page 16418 and 16419.
17   Q.   Okay.   And just to insert a question here,
18   we're going through these letters.   And is it your
19   testimony that the decision to not grant her tenure, you
20   remember it being based on these points; or are these
21   points that you have read through the dossier, with the
22   help of others, in the interim months and years since
23   the decision to deny her tenure?
24   A.   So I had no help in reviewing this document.
25   I do not remember the specifics of the discussion on

158

1  this case when it occurred in 2019. I'm identifying
2  these from my recent review of the case, but I would
3  have read these letters at the time the case was
4  presented to the President's Committee.
5      Q.  Okay.  And you've reviewed this dossier with
6  the understanding that Dr. Nikolova had filed a suit
7  against UT, complaining of gender discrimination,
8  pregnancy discrimination, retaliation, which also,
9  essentially, accuses you of the same discrimination
10  as -- and that's in your mind as you're reviewing this
11  document?
12     A.  I'm reviewing the doc- -- document because of
13  the allegation in the lawsuit.
14     Q.  And you know that you're, in part, being
15  accused of, if not discriminating against her, letting
16  the discrimination occur and continue?
17     A.  I'm -- the University of Texas, and I'm being
18  accused in my institutional capacity.  Yes, I
19  understand.
20     Q.  Of either discriminating or allowing the
21  discrimination and retaliation to occur, without fixing
22  it?
23     A.  In general, I understand that.  I have not
24  read the claims in -- the specific claims.
25     Q.  Okay.  Go ahead to the next letter.

159

1      A.  So this is David Shmoys at Cornell University.
2  There's a -- some narrative there about how he knows
3  Professor Nikolova, some -- a gen- -- general discussion
4  of her research area.  We see these often in reviews.
5      Q.  Is that a negative?
6      A.  No, that's not a negative, just there's a lot
7  of text in there; but it's -- my point is it's often
8  very general, via few comments.  So the -- the -- so I
9  don't recall what I -- what I did in 2019; but there is
10  a statement in the middle of that paragraph that, based
11  on my many years of doing this, would have caught my
12  attention.  And the sentence -- the full sentence is, "I
13  believe that the body of work is comparable in breadth
14  and depth to her peers approaching tenure decisions at
15  their respective research" orientation -- "research-
16  oriented universities..."  So comparable, the term
17  "comparable" --
18     Q.  You lost me.  Where are you reading from so I
19  make sure I'm following along?
20     A.  Sorry.  I'm sorry.  This is page 16419.
21     Q.  Okay.
22     A.  The first full paragraph that begins, "The
23  impact of..."
24     Q.  Okay.
25     A.  So about halfway down into that paragraph is a

160

1  sentence that, "I believe that the body of work..."
2      Q.  Okay.  I'm there.
3      A.  So, "I believe that the body of work is
4  comparable in breath and depth to her peers approaching
5  tenure decisions at their respective research-oriented
6  universities."  So comparable is not a strong -- strong
7  word.  The comparison group is approaching tenure
8  decisions, not --
9      Q.  Right.
10     A.  -- not has been granted tenure.
11         And then, the end of that sentence is a
12  sentence -- a type of sentence in an external letter
13  that -- that I and others -- and I don't recall
14  specifically -- but, typically, the President's
15  Committee will notice, "...that a tenure case of these
16  merits would have strong proponents at most top-10
17  departments."  So this is a very weak statement that
18  there will be some proponents for this case at most top
19  departments.  So that -- that, to me, is a -- is a
20  serious red flag.
21     Q.  Okay.  So maybe not at the top two schools,
22  but the rest?
23     A.  I don't understand the question.
24     Q.  Well, "at most top-10 departments" -- there's
25  ten departments in the top ten, right?

161

1      A.  "...at most top-10 departments," yeah.  So it
2  would have strong proponents at most, but not all
3  departments.
4      Q.  So that could be seven, eight?
5      A.  I -- I can't say what he had in his mind.
6      Q.  Well, it's not one or two?
7      A.  It's somewhere between six and nine, I
8  suppose.
9      Q.  Okay.  And where is UT?
10     A.  The ECE Department at this time, again, it's
11  somewhere in the top twelve.  It may be top ten.  It did
12  go up in rank, but I don't remember where it was at that
13  time.
14     Q.  So the majority of the schools that are even
15  above UT?
16     A.  In terms of the comparison set of departments,
17  that's correct.
18     Q.  Yeah.  Okay.  So somehow you view that as not
19  deserving tenure?
20     A.  It is a red flag that it's not just comparison
21  of who has received tenure at, let's call it, half the
22  top twelve departments; but the case would have strong
23  proponents.  That's a very weak statement.  That means
24  that there would be some who aren't strong or some who
25  are against.

162

1      Q.  And he -- and he provides further explanation
2   for his opinion to support UT being in one of those
3   departments that would support her tenure?
4      A.  Well, I don't -- I'm not reading that into the
5   letter.
6      Q.  Well, why not?  It's the last -- the rest of
7   that paragraph goes into detail about his perspective
8   and why he thinks she's a good bet.
9      A.  Well, she -- he's talking in the next sentence
10  about her as a mentor.  That wasn't a question in her
11  promotion case.  "...along with obtaining the research
12  support to maintain it," we question that premise, so
13  based on the data that was presented in the campaign.
14  "Her research agenda is a good one."  A good research
15  agenda is not a particularly strong endorsement.
16          "I think that she is moving towards not
17  just attacking stylized models, but...trying to
18  capture...real-world impact."  That's good.  And he
19  supports that process that she's doing.
20          She's articulate.  There was never any
21  question about her ability to articulate.  There was not
22  an issue in -- as I've stated in my decision to do not
23  promote -- on her classroom teaching.  And he has a
24  general statement about her potential for -- for
25  leadership and her research in general.

163

1          And, then, finally, his concluding
2   paragraph is not particularly strong.  "...roughly
3   consistent with the expected achievements required for
4   tenure."  "Roughly consistent" is not a term I hear -- I
5   can recall hearing; but that qualification "roughly,"
6   you know, doesn't sound to me as a particularly strong
7   endorsement that she's reached the expectations for
8   tenure.
9      Q.  Let me ask you another side question to this
10  exercise.  Isn't it true that one of the things that is
11  a mark of whether or not someone is endorsed by the
12  community is when letters are sent asking for references
13  that some percentage of the people don't respond, and
14  that's viewed negatively?
15     A.  So if I understand your question, it's:  How
16  do we view the number of declines or declinations for
17  requests for letters?  Is that what your question is?
18     Q.  Is a declination viewed as an indication of a
19  negative view of the person?
20     A.  So, the general answer is:  No, we don't pay
21  attention to declinations.  There's one exception to
22  that -- a possible exception I will mention -- and the
23  reason we don't is that when I was an active researcher,
24  before I got into administration, I would get a lot of
25  requests; and my personal policy was never to do more

164

1   than four reviews a year because of the time it takes.
2   And so we recognize we're often going to the best people
3   in the field who are often getting lots of requests, and
4   so there's no negative attribution for a particular
5   decline or even a few declines.  The exception -- and
6   this occurs rarely -- is when we see a very large number
7   of declinations, 10, 15 declinations.  There, we do have
8   some -- some concerns and do expect the Department Chair
9   and the Dean to explain a large number of declinations.
10     Q.  Wouldn't there also be -- like you say, you
11  would only do four -- other people out there in the
12  field that are only doing four; and they decide which
13  four they're going to do?
14     A.  Yes.  I would decide which four I was going to
15  do.  Sometimes it's first come first serve because they
16  don't all come in at once and then you pick and choose.
17  So sometimes there's a timing aspect.
18     Q.  Right.  But -- but that's you.
19     A.  I can only speak for how I did it.
20     Q.  Others might -- because these timelines are
21  fairly similar and the requests go out at about the same
22  time, too, and so they can pick and choose and decide
23  which ones they're going to write the letters for?
24          MR. DOWER:  Objection, form.
25     A.  The time -- every university is on a somewhat

165

1   different timeline.  The letters can be requested early
2   fall, all the way to -- you know, all the way to the
3   summer.  I mean, it really depends.  They don't all
4   necessarily happen at the same time.
5      Q.  (BY MR. NOTZON)  Okay.  Moving on.
6      A.  So those are the three letters that, as I
7   reviewed the dossier in preparation for this testimony,
8   that had -- had items that I called to your attention.
9   I don't recall the specifics; but I do know I looked
10  through the letters thoroughly for -- for cases,
11  especially for cases where there's a recommendation to
12  do not promote.  So I would have seen those at the time
13  of the review by the President's Committee.
14     Q.  And none of the letters assessed Dr. Nikolova
15  as being unworthy of tenure, correct?
16     A.  That is correct.
17     Q.  And neither Professor Tewfik or Dean Wood made
18  negative -- made comments about the letters of reference
19  being anything other than positive for Dr. Nikolova?
20     A.  Well, Dr. Tewfik, I'd have to go back and
21  review his letter.  I don't recall if he did.  Dean Wood
22  typically does not quote letters or make substantial
23  comments of letters in her Dean's assessment.  I do not
24  recall -- I should say I do not recall a discussion with
25  Dean Wood; but the general practice would have been,

166

1 given statements like I've discussed, to bring them up
2 for discussion with the Dean for the Dean's assessment
3 of those comments.
4    Q.  When you read Dean Wood's assessment of
5 Dr. Nikolova, Exhibit 2, did you see her referencing the
6 point that Dr. Nikolova somehow changed in her
7 trajectory after the 2015-2016 school year?
8       MR. DOWER:  Objection, form.
9    A.  I'd have to go back to that.  I think she --
10 the statement is the concerns that she discussed in the
11 last page of her assessment.  These concerns are
12 compounded by the fact that her teaching and external
13 funding -- and we were primarily focusing on funding --
14 have dropped since she spent the 2015 fall sabbatical
15 semester at UT.  So that's -- that was her -- her
16 statement about the change.
17    Q.  (BY MR. NOTZON)  Okay.  And you see up in the
18 first page, that's the time where she had the -- she was
19 at Simons Institute; and then the next semester it says,
20 "Modified Instructional Duties"?
21    A.  Correct.
22    Q.  And you understand that that's the year that
23 she had received the stop -- stop clock?
24    A.  I -- I assume that's the case, but I'd have to
25 go back and check what year that was.

167

1    Q.  That she was pregnant and delivered in that --
2 in that period?
3    A.  Right, I assume that's the case.
4    Q.  Okay.  And the Modified Instructional Duty, do
5 you know where she was at that time?
6    A.  I do not.
7    Q.  Could she be at UT and with modified
8 instructional duties due to her -- the birth of her
9 child?
10    A.  Could she be at UT?  Could you clarify in that
11 question what you mean by that?
12    Q.  Well, so, so you see the -- the -- I guess the --
13 where it says UT Austin, UT Austin, UT Austin -- have
14 you ever seen her use this kind of chart?
15    A.  "Her," being Dean Wood?
16    Q.  Yes.
17    A.  I don't recall, but it -- it's very possible.
18 She uses this as a graphic way to explain the status
19 each year.
20    Q.  Showing that she's only been working at UT --
21 you can only count three years on the UT probationary
22 period?
23    A.  Well, it would have been four years, as -- as
24 in the cover sheet, because this doesn't include the
25 year in which it's being evaluated, 2018-2019.

168

1    Q.  Right.
2    A.  So she would have had four years towards her
3 probationary status at UT Austin.
4    Q.  Right.  But she would still be work- -- she
5 could still be working.  On Modified Instructional
6 Duties, you're still expected to work, correct?
7       MR. DOWER:  Objection, form.
8    A.  Yeah.  So I'd have to go back and review
9 the policies on Modified Instructional Duties.  It's
10 still -- the expectation is that faculty are still
11 working on their research.  They're just not in a
12 classroom, teaching with a schedule that requires a
13 fixed schedule of a class; but they're -- they're still
14 employed by UT and still expected to be working on their
15 other non-teaching aspects.
16    Q.  (BY MR. NOTZON)  Which includes service?
17    A.  Correct.
18    Q.  And includes publication?
19    A.  Now, let me back up.  So service, let me
20 correct that.  I think Modified Instructional Duties
21 also includes a reduction in service expectations at the
22 department and university level, but I'd -- I'd have to
23 go back and review those policies.
24    Q.  But not elimination?
25    A.  Again, I would have to go back and review

169

1 those policies.  I think the general practice was when a
2 faculty member was on Modified Instructional Duties, we
3 were trying to eliminate, as much as possible,
4 requirements that they be on a fixed schedule.
5    Q.  Right.  Service isn't a fixed schedule, right?
6    A.  Well, service is typically committee service,
7 which has meetings that takes place on campus, sometimes
8 with specified frequency, or an expectation that they
9 would be in attendance at a committee meeting.
10    Q.  And mentoring students would still be there?
11    A.  Graduate students, generally, yes.
12    Q.  And let's go ahead and look at
13 Professor Tewfik's assessment.
14       MR. NOTZON:  I'm going to put it up on
15 the chat.
16       Oh, my chat's disabled now.  That's
17 strange.
18       MR. SCHMIDT:  Give me a second.  I am
19 looking at it.  Let's see.
20       MR. DOWER:  Robert, I think it's in the
21 dossier.  I think it's on 16309 --
22       MR. NOTZON:  Okay.
23       MR. DOWER:  -- if you just want to use
24 the same -- I think that's right.  Yes, I think that's
25 right.

170

1       MR. NOTZON:  That'll work.
2       THE WITNESS:  16 -- oh -- 309.  I see.
3  Okay.  Correct.
4    Q.  (BY MR. NOTZON)  Okay.  So does
5  Professor Tewfik say anything critical of Dr. Nikolova
6  in terms of her funding sustainability and trajectory or
7  publication record or the external reviews?
8    A.  Okay.  Let me go through this again.
9    Q.  That's -- that's the question for you to
10  answer as you look through his letter.
11    A.  So I'm looking at the middle of page 16312.
12    Q.  I'm there.
13    A.  And there's a one-sentence paragraph in the
14  middle of the page.  It says, "Professor Nikolova well
15  funded by highly competitive peer-reviewed grants and
16  industry."  I believe this is an incorrect -- this is
17  not a valid statement, based on the review of her
18  funding record, that in terms of current grants, with
19  only one would -- one have extended past the promotion
20  at a rate of about $120,000 per year with one pending
21  proposal -- I don't know if that was granted or not --
22  that would have only funded another hundred thousand per
23  year.  So I think this is a -- this statement is not
24  accurate.  And this is concerning when we see department
25  chairs not address shortcomings in the case, and it

171

1  reduces the credibility of the overall letter from the
2  Department Chair.
3       There's an issue that we talk about
4  regularly with the deans in meeting with the department
5  chairs that if there is a problem in the case, explain
6  it so that we understand it.  This is a statement that
7  does not do that.
8    Q.  In your opinion?
9    A.  In my opinion.
10    Q.  Okay.  Keep going.
11    A.  Then he goes through a comparison.  This is
12  typical for Dr. Tewfik in his promotion cases.  He
13  selects, generally, three or four other cases.  I don't
14  know the methodology by which he picks them to compare a
15  candidate.  And, generally, Dr. Nikolova, in a -- sort
16  of in the middle of a small number of cases that he has
17  selected, I don't find this particularly convincing
18  because of the small number -- you know, just look at
19  citations.  Again, it's a very limited sample of only
20  four cases.  It's right in the middle, with the
21  candidate the person from the University of Michigan,
22  who was promoted in 2012 with 2259 citations.  I assume
23  that is at the time of promotion, but hard to tell from
24  the methodology that he uses.
25       There's no other analysis of

172

1  publications, and there's also -- he is only quoting the
2  positive comments from the letter without addressing
3  some of the comments that raised concerns -- that I
4  would expect would have raised concerns when we looked
5  at the entire dossier.
6    Q.  All right.  Anything else?
7    A.  No, I don't see anything else.
8    Q.  Let's go ahead and go on to Topic 2, "The
9  tenure review decision process relating to the decision
10  to deny tenure to Dr. Nikolova as it relates to the
11  actions of the president and the president's committee."
12  I think we've already covered that.  Do you agree?  What
13  did you do, and who was there?  And you didn't really
14  remember.  And any comments that were made, and you
15  didn't really remember any details about that?
16    A.  I don't have anything further to add.
17    Q.  Okay.  To the process that you utilized to
18  deny Dr. Nikolova's tenure?
19    A.  I don't have anything further to add.
20    Q.  Okay.  All right.  So the third topic,
21  "The tenure applications and decisions for other
22  tenure track faculty in the school of engineering made
23  by...President Fenves since Dr. Nikolova began at UT; to
24  further clarify, we seek a Corporate Representative to
25  provide testimony regarding the following comparators'

173

1  tenure applications and UT's decisions as to them," with
2  a list of names.  And did you look at those dossiers?
3    A.  I did.
4    Q.  Is it accurate that you don't recall these
5  particular decisions that you made independent from your
6  review of those documents?
7    A.  I don't recall the --
8       MR. DOWER:  Objection, form.
9    A.  I don't recall the specifics of any decision.
10  I recognize many of the faculty -- I should say a number
11  of the faculty members.  Some of them I hired or had
12  promoted -- actually, I wouldn't have promoted any of
13  them, but had hired.  There was one that stood out
14  because it's such an incredible record and I worked with
15  him on a major center proposal, but he was -- he was the
16  one that I knew the best.
17    Q.  Who's that?
18    A.  This would have been in ECE, Deji Akinwande.
19    Q.  Okay.  So of this group, he would be the
20  stand-out superstar?
21    A.  Yes, but he's a superstar.  I'd have to go
22  through the specifics of each case.  He's the one I know
23  the best.  Let me put it that way.
24    Q.  Okay.  Both in terms of him as an individual
25  colleague and him as an applicant on paper?

174

1    A.   As an individual who has had a tremendous
2  publication record, funding record, and I'd put in the
3  category extraordinary leadership in a successful, major
4  center proposal at UT Austin.
5    Q.   Most top ten schools would give him tenure?
6    A.   Yes, I would say all top ten schools would
7  give him tenure.
8    Q.   As far as you know?
9    A.   As my -- my professional assessment is that if
10  his case were presented to a top ten department in
11  electrical and computer engineering, it would -- they
12  would award tenure.
13    Q.   Okay.  And you're currently at Emory?
14    A.   Emory University, yes, correct.
15    Q.   And is Emory a top ten school?
16    A.   Emory does not have a school of engineering.
17    Q.   Is Emory top ten in anything?
18    A.   It's got some outstanding programs, yes.
19        MR. NOTZON:  Object as nonresponsive.
20    A.   Yes, they are top ten in individual programs.
21    Q.   (BY MR. NOTZON)  Please name them.
22    A.   Biomedical engineering, nursing, the School of
23  Public Health, creative writing.  I think our chemistry
24  department is either a top ten or very close to a top
25  ten.

175

1    Q.   And UT -- okay.  And is that top ten in the
2  country or top ten for private schools?
3    A.   Top ten in the country.
4    Q.   And is UT -- when you were the president, were
5  they the top ten in anything?
6    A.   Yes.  Again, I'm doing this off the top of my
7  head -- well, let me ask a clarifying question:  Within
8  engineering?
9    Q.   We can start there.
10    A.   Petroleum & Geosystems Engineering was either
11  Number 1 or 2.  Civil and Environmental Engineering was
12  typically Number 3 or 4.  Let's see.  Chemical
13  Engineering was typically 5 to 7; it depended on which
14  ranking and which year.
15    Q.   Okay.  And that's those four?
16    A.   Those are what I can remember in the School of
17  Engineering.
18    Q.   Okay.  Would you say UT, overall, is a higher-
19  ranked university than Emory?
20    A.   Well, that's a -- that's a complicated
21  question to answer.  U.S. News & World Report ranking,
22  Emory is ranked 21st in the country.  UT Austin, I don't
23  know where it is now.  We did increase the ranking while
24  I was a president, but I think it's in the 40s under
25  U.S. News & World Report.

176

1    Q.   So Emory's higher?
2    A.   In U.S. News & World Report rankings.
3    Q.   Okay.  And have you ever participated in
4  promotional -- tenure promotional considerations at any
5  top five schools in the country?
6    A.   Well, at Berkeley, which is generally
7  considered, especially the College of Engineering, a top
8  two or three College of Engineering.  I was involved as
9  a faculty member and then a department chair for five
10  years.  And then, in addition, with the process at
11  Berkeley, I did serve on several, what they call, ad hoc
12  review committees for promotion cases.
13    Q.   Let's look at the -- of the 14, which would be
14  these 13 and Dr. Nikolova, are -- do you understand that
15  each one of these was -- went up for tenure early except
16  for Dr. -- Professor Tiwari?
17    A.   I'd have to go back and check, but I'll --
18  I'll agree that's correct.
19    Q.   Okay.  And is it accurate that none of these
20  individuals took a probationary extension year except
21  for Dr. Nikolova?
22    A.   I would have to go back and look at each case.
23    Q.   Okay.  Would it be accurate that none of these
24  individuals gave birth or was pregnant during their
25  probationary period?

177

1    A.   Well, I think all of them are male.  There
2  is -- so they would not have given birth.  I believe
3  there was one that's female.  Is Zoya a female?
4    Q.   I believe so.
5    A.   Yeah, so I don't know if she gave birth or
6  not.
7    Q.   In reviewing these individuals, do you recall
8  that the explanation for early review was either no
9  comment by Dean Wood or was only related to their prior
10  service at another institution?
11    A.   Again, I'd have to go back to the individual
12  cases.  Again, with the Deji Akinwande case, which I --
13  he -- I think it was -- there -- I'd have to go back.  I
14  believe there were statements just about the
15  extraordinary nature of his case.
16        For those cases where there was prior
17  years as an assistant professor at a peer university,
18  there probably was not a statement of why now because it
19  was quite clear from the record that a number of years
20  they'd been an assistant professor, including those
21  before UT Austin.
22        And, typically, as we saw in the Nikolova
23  case, Dean Wood does a nice job of summarizing the time
24  line and the total years as an assistant professor.  So
25  no additional explanation is needed.

178

1    Q.  Well, let me see if I can understand what you
2  just said.  It's true, is it not, that there is a
3  requirement that an explanation be given for an early
4  consideration?
5    A.  Yes.
6    Q.  So if no comment is made about it, that would
7  not be in compliance with the guidelines?
8    A.  Well, it could be if it's not provided in a
9  written form and the Dean's assessment to the
10  satisfaction of the President's Committee, somebody on
11  the President's Committee will ask the question "why
12  now" and expect an explanation.
13    Q.  And we'd have to take your word for it on that
14  because there's no writing.
15    A.  This is my testimony based on my experience on
16  the committee and as president for five years.
17    Q.  So the answer's "yes"?
18    A.  Correct.  My testimony is that, yes, that's
19  correct.
20    Q.  And even though you don't really recall what
21  happened in each of these incidents related to the
22  decision that you made or the discussions that you had
23  related to each case?
24    A.  So I have been -- in my years on the
25  committee, I have reviewed over 800 cases and made

179

1  decisions on 600 of those.  So I don't recall the
2  discussion on any specific one.
3    Q.  If someone was to say that a candidate that
4  goes up early for tenure two years, like in the fourth
5  year at UT, that they would have to be two standard of
6  deviations better than someone going up in their up or
7  out, what would you say to that?
8    A.  Well, I think Janet Dukerich has used that
9  language.  I think it was in the document that you
10  showed earlier in the minutes of the Faculty Council.
11  She was -- this was a report of the CCAFR report
12  summarizing statements that took place either in the
13  brown bag lunches or the road show -- I think that's
14  what it was called -- or the panels.
15        And I think Janet is -- is giving a -- is
16  giving a qualitative -- she's a business professor --
17  some quantification to give an idea that somebody that's
18  two years early, there has to be a significant reason to
19  consider the case at that time because it is so early to
20  evaluate what their performance would be during the
21  probationary -- during the full probationary period.
22    Q.  So you wouldn't disagree with that statement?
23    A.  I wouldn't characterize it that way myself,
24  but I wouldn't -- I wouldn't disagree with it.
25    Q.  But if the candidate, in fact, is in their

180

1  sixth, seventh, or eighth year of being an assistant
2  professor, would that characterization be accurate?
3    A.  So that would be in the context -- that
4  statement by Janet Dukerich would be in the context of
5  four years as -- in rank as an assistant professor.
6  That's -- that's the context of her --
7    Q.  Define "in rank."
8    A.  Yeah, so, again, I'm using the loose doc
9  terminology.  So that would count as four years as an
10  assistant professor -- her con -- her statement is to
11  give an idea that for a candidate who is four years as
12  an assistant professor is what we -- we have to answer
13  the question -- the Dean -- the Department Chair and the
14  Dean have to answer the question:  Why now, four years
15  as an assistant professor?
16    Q.  Anywhere?
17    A.  That we would count at UT Austin as part of a
18  probationary period or anywhere else.
19    Q.  I didn't understand what you just said.
20    A.  So the statement that Janet Dukerich made,
21  Vice Provost for Faculty Affairs, is, "We have a case
22  where a faculty member has been four years as an
23  assistant professor."  That could be either all at UT
24  Austin or a combination of UT Austin --
25    Q.  Okay.

181

1    A.  -- and another university prior to that.
2    Q.  All right.  I just wanted to make sure that
3  when you said "in rank" this time, you were talking
4  about as an assistant anywhere?
5    A.  That is correct.
6    Q.  And -- well, not to split hairs, but anywhere
7  but only at a peer institution?
8    A.  I appreciate that clarification.  At a peer
9  institution that has -- at a peer institution --
10    Q.  Okay.
11    A.  -- and a peer program for that particular
12  department.
13    Q.  Right, peer department?
14    A.  Right.
15    Q.  Okay.  So that if it's -- if it's like I said,
16  sixth, seventh, or eighth year of UT, plus a prior
17  institution, peer institution, that two standard
18  deviations would not be something you'd agree with?
19    A.  Not only would I not agree with it; we would
20  not use that standard in that situation.
21    Q.  All right.
22        MR. NOTZON:  Let's go ahead and take
23  another short break.  Okay.  Let's go ahead and go off
24  the record.
25        THE REPORTER:  We're going off the record

182

1  at 3:59 p.m.
2          (Off the record from 3:59 to 4:21 p.m.)
3          THE REPORTER:  We're going back on the
4  record at 4:21 p.m.
5      Q.  (BY MR. NOTZON)  Okay.  So let's -- in no
6  particular order, let's start with -- let's do Mr. Cox.
7  We have -- let's start with --
8          MR. NOTZON:  And this will be Exhibit 40,
9  and it will be two documents.  It will be the Dean's
10  Assessment and the Summary Sheet as Exhibit 40.
11          (Exhibit 40 marked.)
12      A.  And what page is that Summary Sheet on?
13      Q.  (BY MR. NOTZON)  The Summary -- the Dean's
14  Assessment is 11042.
15      A.  I have that.
16      Q.  And the -- the Summary is 11080.  Okay?
17      A.  Yes.
18      Q.  Okay.  So starting with the Dean's Summary,
19  this is an accelerated case, correct?
20      A.  This is an early case because he had been
21  three years on probationary status at UT.
22      Q.  Okay.  But it says a total of nine years in
23  rank there on the second page?
24      A.  He had previously been an assistant professor
25  at the University of Arkansas.

183

1      Q.  Is Arkansas a peer program in Civil,
2  Architectural and Environmental Engineering?
3      A.  No, it is not.
4      Q.  Okay.  So this wouldn't be just early; it
5  would be accelerated?
6      A.  No.  This is a -- this was a unique case
7  because Dr. Cox had worked with a very prominent
8  professor at UT, Ken Stokoe, on very specialized field
9  testing equipment, had been his post-doc -- had been his
10  Ph.D. student; and so this was a very special case with
11  Stokoe planning on retiring.  This was a very large,
12  high-profile program at UT and Brady Cox was judged by
13  the Department and then the Dean as the best person to
14  hire to continue that major field laboratory program
15  and -- and the use of the equipment.
16      Q.  Okay.  I don't see anything in here about
17  that.
18      A.  Well, this is my recollection of it because
19  it's an area that I do know something about; and I think
20  it's -- I have to go through the documents more
21  thoroughly.  I think it's discussed in the Budget
22  Council's review and the Chair's letter, but I don't
23  have to go through it.  I don't see it in the Dean's
24  assessment, but he clearly is talking about -- the Dean
25  is clearly talking about his research area in

184

1  geotechnical engineering and his role in this program
2  that was called the NEES program.  So there's some
3  narrative about that.
4      Q.  And --
5      A.  I am highly confident that this would have
6  been discussed at the time the case was considered.
7      Q.  Okay.  It does show that his funding at UT is
8  only 410,000, correct?
9      A.  Which page are you referring to?
10      Q.  Let's see here.  I'm referring to my notes.
11      A.  So if I look at the summary page, 11088,
12  his share of funding as an assistant professor is
13  1.9 million.
14      Q.  Right.  But it doesn't break out the prior
15  institution and UT, like a lot of these do, correct?
16      A.  I'd have to go back and more thoroughly look
17  at it.
18      Q.  So looking at the summary sheet, it doesn't
19  break out the UT work versus the prior work, like a lot
20  of these summary sheets do, correct?
21      A.  It does not break it out, that's correct.  I
22  don't remember what the other summary sheets do.
23      Q.  You're not familiar with other summary sheets
24  that break out --
25      A.  I'd have to go back and look at them, how they

185

1  did.  It is correct it does not break it out here.
2      Q.  I'm asking another question.  You don't
3  recognize, when I say that a lot of these summary sheets
4  will break out what's done at UT and what's done at the
5  prior institution, as a point of concern for the
6  reviewer?
7      A.  I don't -- it was not -- I don't recall it
8  being a point of concern.
9      Q.  Do you recall that Dr. Nikolova was criticized
10  for what she did at UT versus what she did at A&M as
11  being an indication that she wasn't good enough?
12      A.  I don't recall a criticism of what she did at
13  Texas A&M.
14      Q.  That's not my question.  My question is that
15  she was criticized for what she did at UT as compared
16  with what she did at A&M as somehow indicating that her
17  funding was substandard, that her sustainability was not
18  there, that her trajectory wasn't there; do you recall
19  that?
20      A.  I recall that her current level of funding was
21  a concern, and the pending proposals were a concern.
22      Q.  And it was discussing the fact that she had
23  not done as much at UT as she had done at A&M?
24      A.  The comment by the Dean was that there had
25  been a drop-off in the trajectory since 2015.

186

1    Q.   And, also, how much money she had gotten since
2  she'd been at UT and that her -- the majority of her
3  funding had occurred while she was at A&M; do you recall
4  that?
5    A.   I don't -- no, I do not recall that.  The
6  focus was primarily on what her current funding was and
7  what the pending -- the projections were based on
8  pending proposals.
9    Q.   Right.  And you don't see that focus in
10  Mr. Cox -- in Dr. Cox's assessment, do you?
11    A.   So I do not.  There's quite a -- quite a --
12  for Dean Wood, quite a lengthy discussion about his
13  research, the impact it has using these geotechnical
14  shakers.  This is a -- her assessment of this is it's a
15  significant development and holds a great potential for
16  the future.  So I don't see any concerns about his
17  trajectory.
18    Q.   And you see that Dean Wood doesn't say
19  anything about an early promotion?
20    A.   So -- I'm sorry?
21    Q.   At the end she makes no --
22    A.   Let me -- can I go back to the beginning?  So
23  the first paragraph --
24    Q.   You can do that after you answer my question.
25    A.   So can you repeat the question?

187

1    Q.   Yes.  Dean Wood doesn't say anything about
2  Dr. Cox being up -- answering the question for early
3  promotion in her recommendation?
4    A.   In the section called Overall Assessment, she
5  does not say it in there.
6    Q.   Okay.  Now, look at page 3 of 5 on the Dean's
7  assessment.
8    A.   Okay.
9    Q.   The paragraph starting, "While in rank" --
10    A.   Page 3 of --
11    Q.   Well, it's page 2 on the bottom of the -- of
12  the printed page?
13    A.   Yes, I see, "While in rank..."  Correct.
14    Q.   Okay.  Do you see where it says -- that
15  sentence says, "While in rank as an assistant professor
16  at the University of Texas at Austin, Dr. Cox has
17  received $0.62 million" --
18    A.   Uh-huh.
19    Q.   -- parentheses -- and then "...in research
20  funding with $0.41 million," which would be 410,000
21  being his share.  So he's only gotten .41 million since
22  he's been at UT out of 1.9 million.  Do you see that?
23    A.   Yes, I see it.
24    Q.   That's a significant drop-off from his share
25  prior to UT, right?

188

1    A.   Well, he's -- he's been at -- at the time this
2  was written, he had been at UT for a little over two
3  years because he was three years in rank; and he was at
4  the University of Arkansas for six years.  So yeah --
5    Q.   Do you see criticism of his drop-off in
6  funding, like Dr. Nikolova experienced in her criticism?
7  Do you see any questions being raised about --
8    A.   I don't see any questions.
9    Q.   -- 410,000 of funding at UT when he had a
10  hundred -- 1.9 million, which is still less than
11  Dr. Nikolova, right?
12    A.   In terms of what we're talking about, it's
13  different fields.  So the expectation of funding is not
14  the same across the School of Engineering.  It's a
15  different department.
16        But my reading of this is Dean Wood is
17  showing what his -- his portion is at UT Austin, his
18  share, 0.41 million, that took place over roughly a
19  little more than two years at the time this was written,
20  maybe two and a half years, compared with the remainder
21  of 1.9 million that he -- would have been his share over
22  six years at University of Arkansas.
23    Q.   There's no discussion or comment or question
24  about the decrease, correct?
25    A.   There is no discussion about the -- there's no

189

1  analysis of this, that's correct; but there are the
2  statements that he's had 16 funded research projects, 3
3  since he arrived at the University of Texas.  So he'd
4  been successful in a little over two and a half years,
5  and he was PI of 50 percent of his projects listed --
6  the number of agencies that he had been receiving
7  funding from.
8        MR. NOTZON:  Object as nonresponsive
9  after the affirmation of the fact that there's no
10  criticism about him in the drop-off of funding.
11    A.   There's no comment about the funding rates.
12    Q   (BY MR. NOTZON)  Okay.  Let's go ahead and
13  move on to -- let's see here.  Who's next?  So with
14  Dr. Foster, and the Dean's assessment starts at
15  page 13843.
16        MR. NOTZON:  And this is Exhibit 41.
17        (Exhibit 41 marked.)
18    Q   (BY MR. NOTZON)  Now, in this instance,
19  there's a very strong vote from the P&T Committee
20  against promotion, correct?
21    A.   Correct.
22    Q.   Is there any explanation from Dean Wood for
23  her going against that strong vote or -- or the basis
24  for the strong vote against him?
25    A.   Well, let me review this again.  She has a

190

1  very -- for Dean Wood, she has a very long letter.
2  Typically, her letters are two or two and a half pages.
3  This one is a little over six pages.
4        So in the middle of page 6, under the
5  section Overall Assessment, she's saying, "The members
6  of the Promotion and Tenure Committee do not believe
7  that Dr. Foster meets expectations for promotion to
8  associate professor with tenure.  They have three
9  primary concerns."  Do you want me to read them or --
10     Q.  No, they're there.  I see them.
11     A.  They're there.  She has three concerns.
12     Q.  Yep.
13     A.  And then she discusses each issue below with
14  her justification to explain her view of the concerns
15  raised by the P&T Committee.
16     Q.  And we have to take her word that those were
17  the only three concerns, correct?
18     A.  That is the information -- correct.
19     Q.  Because the P&T doesn't put that in writing;
20  and nobody reviews her assessment before it goes to the
21  President's Committee, correct?
22     A.  Correct.
23        MR. SCHMIDT:  Robert, while you're
24  looking at this, I just wanted to note we haven't
25  admitted these as an exhibit.  Do you want to do these

191

1  as 41?
2        MR. NOTZON:  I -- I actually said that.
3        MR. SCHMIDT:  Thank you.  Okay.  My
4  apologies that I missed it.
5        MR. NOTZON:  No problem.  40 is Cox; 41
6  is Foster.
7     Q.  (BY MR. NOTZON)  Also, Foster, he comes from
8  UTSA, correct?
9     A.  Correct.
10     Q.  That's not a peer institution, correct?
11     A.  It is not.
12     Q.  So he's not early.  He's accelerated?
13     A.  This is an accelerated case.  The question is:
14  How in the tenure evaluation was his service at UT
15  San Antonio reviewed?  And as I'm -- as I have reviewed
16  this, that his record, overall record, was considered a
17  promotion case for the following reason:  Petroleum --
18  very few universities have Petroleum Engineering
19  departments.  I think in the whole country there are
20  maybe four or five.  So for somebody in Petroleum
21  Engineering -- I think his Ph.D. was from Texas --
22  actually, it was from Purdue University -- wanted to get
23  into the oil and gas business, they were prob- -- this
24  is speculation.  They're looking for a position in Texas
25  where they would have access because it's a very

192

1  specialized -- very specialized field.
2     Q.  How does that alter the requirement of a peer
3  institution?
4     A.  It's based -- it's based on the situation, the
5  program and the -- and the case; and this was a case
6  that somebody moving in from the aerospace field,
7  applying new technologies and new ideas to the petroleum
8  engineer- -- petroleum industry, with a record of
9  research at a university where they would have access to
10  that type of research funding.  So that was viewed not
11  as a peer institution but as a record that was worth
12  considering and evaluating.
13     Q.  Is -- Dr. Foster also had 8 of his 15
14  reviewers didn't respond.  Isn't that an issue?
15     A.  So, in general, declinations are not a -- not
16  a serious consideration unless they're a large number.
17  If it gets above 10 or 15 declinations, we do have
18  concerns.  Petroleum -- I'm sorry?
19     Q.  How about more than half?
20     A.  They generally -- so this is also a very
21  specialized field.  Because there are few departments --
22  four or five Petroleum Engineering Departments --
23  declinations in Petroleum Engineering is a general
24  problem --
25     Q.  Wouldn't it be less declinations because

193

1  there's less individuals trying to get a promotion to
2  tenure in a Petroleum Engineering Department?
3     A.  There are -- so we just find in Petroleum
4  Engineering it is -- it's -- there tend to be more
5  declinations because the field is so small.
6     Q.  Nothing in the report said that, correct?
7     A.  I don't believe so.
8     Q.  And his teaching score was 3.4.  That's really
9  low, isn't it?  I don't see any mention of that.
10  Dr. Nikolova's getting trashed for a 3.9.
11        MR. DOWER:  Objection, form.
12     A.  So in Dr. Nikolova's case, at the University
13  Committee -- the President's Committee, teaching was not
14  an issue.
15     Q.  (BY MR. NOTZON)  Teaching is something that
16  she was criticized for by Dean Wood, correct?
17     A.  Dean Wood did make criticisms.  My
18  recollection is it was not a factor in the decision by
19  the President's Committee.
20     Q.  Okay.
21     A.  But let me go back to Foster.  So I'm at the
22  top of 13845.  Excluding the first time PGE 334 was
23  taught, Dr. Foster's instructor ratings in undergraduate
24  courses are near the department average; and his scores
25  for the graduate course are considerably above the

194

1   department average.  So it looks like he had one -- one
2   course one semester with low teaching evaluations, but
3   the rest were on -- were at or near or above the
4   departmental averages.
5       Q.   The same thing could be said for Dr. Nikolova.
6   She had one low score of 3.7, and rest higher than the
7   average in the top one or two of the people that have
8   taught that particular course?
9       A.   That's correct, and that's why it was not a
10  factor in the President's Committee deliberations.
11      Q.   Aren't his publications lower at UT than they
12  were at UTSA?
13      A.   So in terms of numbers, 7 archival journal --
14  sorry -- 7 in rank at UT and 12 at UTSA, for a total of
15  22.  He was at UT Austin for three years and he'd
16  previously been at Sandia Labs, so post-Ph.D. -- 2009.
17  He had a post-doc -- I'm just trying to figure out what
18  the timing is for his total at UTSA, how many years he
19  was at UTSA.  So he's there three years.
20          So it looks like he had 7 at UT over
21  three years and 12 at UTSA.  So they were lower at UT
22  over a -- for a three-year period, that's correct.
23      Q.   But no mention of that as a negative, no
24  mention of that as a trajectory?
25      A.   There's no mention of it, and it doesn't -- in

195

1   the Dean's report.  It was not an issue in the P&T
2   Committee.
3       Q.   And he had a very low H index of nine, even on
4   the Google approach, which is a higher -- usually yields
5   a higher number; and only 275 citations there on page
6   13845?
7       A.   That is correct.  In this field, there -- the
8   journals and the conferences that petroleum engineers
9   publish in tend to be very industry specific and don't
10  show up on Web of Science or Google Scholar.  And that's
11  very typical in the field of Petroleum Engineering.
12      Q.   And there's no mention of how much money he's
13  gotten since he's been at UT, is there?
14      A.   In the Dean's -- is your question in the
15  Dean's assessment?
16      Q.   Yes.
17      A.   Well, I'm looking at the bottom of 13845,
18  total research funding in rank.  So it says his
19  total research funding as an assistant professor is
20  10 million, 10.3 million, and his share being
21  2.4 million.  It's important to note he's a co-PI in a
22  seven-and-a-half-million-dollar MURI award from the --
23  from the Air Force, which is a very competitive award.
24  So there is mention of research funding.
25      Q.   Yeah, but no indication of what was received

196

1   compared from UTSA to UT, like Dr. Nikolova was faulted
2   for?
3           MR. DOWER:  Objection, form.
4       A.   The -- I don't believe Dr. Nikolova was
5   faulted for that or was it a factor.  The factor in the
6   decision was her current level of funding and the
7   projection, the trajectory of her future funding.
8       Q   (BY MR. NOTZON)  And isn't petroleum --
9   doesn't that have access to greater cash than
10  Dr. Nikolova's field?
11      A.   It depends on the time.  I think we'll see
12  another -- there's another case from Petroleum
13  Engineering where the candidate had the unfortunate
14  time -- unfortunate timing of a bust in the oil and gas
15  business, and the funding dried up.  So in Petroleum
16  Engineering it is highly cyclical, often correlated with
17  the price of -- price of oil per barrel.
18      Q.   Yeah, but the price of oil per barrel doesn't
19  usually stay down for a six-year period of time?
20      A.   Well, there have been periods where it has.
21  The department was almost closed in the Eighties because
22  of a long-term decline in the oil and gas industry.
23      Q.   But not in the teens?
24      A.   No, in early 2000s it was quite low and then
25  the so-called shale --

197

1       Q.   During this period time, Dr. Fenves.  Please,
2   stay with us at the end of the teens.
3       A.   End of teens?
4       Q.   Yeah, that's where we are, right?
5       A.   Yeah.  Well, let's see.  This case was 2014.
6   So it was the middle of teens.
7       Q.   Okay.
8       A.   And so there were quite a few cycles through
9   2010 to, you know, late teens, 2019.
10      Q.   Yes, but an six-year period where there's no
11  funding, where the petroleum engineers can't get funding
12  for an extended period of time where their probationary
13  period is dried up and you give them a pass at low to no
14  funding?
15      A.   My -- my testimony is that it's a cyclical
16  business, and the funding levels for research are
17  cyclical.
18      Q.   Okay.  You can say that for anything; but
19  there's no six-year period of dry funding in petroleum
20  at -- between 2014 and 2020, correct?
21      A.   Between 2014 and 2020?  Well, 2019, it
22  started -- I believe it started slowing down.  I was no
23  longer tracking it as much, but oil prices were quite
24  depressed in the late teens.
25      Q.   Okay.

198

1    A.  And if you're following the business news now,
2  the majors are having some significant issues in the
3  markets.
4    Q.  And, regardless, there's no breakout of his
5  funding that he's achieved since being at UT as a means
6  of assessing his funding?
7    A.  There's no breakout in the Dean's summary,
8  that's correct.
9    Q.  There's no discussion about whether or not he
10  has a trajectory or sustainability?
11    A.  Well, the trajectory, my reading of this is
12  good with the -- especially with the MURI grant; and it
13  says in the next paragraph, before -- just before moving
14  to UT -- I don't know how soon before -- Dr. Foster
15  received a 1.6 million-dollar award with Mukul Sharma,
16  active member in the department, from NETL, National
17  Energy Technology Laboratory, and has received
18  additional -- and received funding from Sandia, the Army
19  Research Lab, the Army Research Office, and GE Global
20  Research.  So that, to me, reads that there's a strong
21  record of funding and trajectory.
22    Q.  With no indication of what's his share and no
23  indication of what the funding is from the Sandia?
24    A.  That's correct in the summary.  I'd have to go
25  to look at the record to see the specific data.

199

1    Q.  Why wouldn't the data be there from Dean Wood?
2    A.  The Dean makes a summary.  She -- the record
3  is available for the President's Committee to review at
4  the time the whole case is prepared.  So she's -- she's
5  making her decision about what are the factors to bring
6  forth in her summary and overall assessment and
7  recommendation.
8    Q.  And she's talking all positives and no
9  negatives, despite the presence of a 3.4 teaching score,
10  an 8 -- of more than half the reviewers not responding,
11  and a very strong vote against?
12       MR. DOWER:  Objection, form.
13    A.  I -- I believe that Dean Wood addresses each
14  of those in her letter.
15    Q.  (BY MR. NOTZON)  Excuses them?
16       MR. DOWER:  Objection, form.
17    A.  I'm sorry.  I didn't understand the question.
18    Q.  (BY MR. NOTZON)  Excuses them, not addresses
19  them.  She excuses them.
20    A.  Oh, I believe she addresses them.
21    Q.  Okay.  All right.  Let's move on to Heidari.
22    A.  Heidari.
23       (Exhibit 42 marked.)
24    Q.  (BY MR. NOTZON)  That's on page 16914.  This
25  is, I think, the person you were talking about who had

200

1  very little funding since becoming -- since getting to
2  UT?
3    A.  Yes.
4    Q.  In Petroleum?
5    A.  Petroleum Engineering, yes.
6    Q.  Only $200,000, despite being at UT for three
7  years?
8    A.  That's correct.  That's on page 16917.
9    Q.  And three of the letter writers declined to
10  review her?
11    A.  I -- I'll accept that as correct without
12  looking at the case.
13    Q.  And, you know, Dr. Nikolova, everybody
14  responded; no -- no declinations at all, correct?
15    A.  Gen- -- that is correct.  Generally,
16  declinations are not a factor in the -- in the review.
17    Q.  They certainly can't be a factor if everybody
18  responded?
19       MR. DOWER:  Objection, form.
20    A.  The response rates and the declinations --
21  including declinations or lack of declinations are not a
22  factor with the exception of if there's a very large
23  number, like, generally exceeding ten declinations.
24    Q.  (BY MR. NOTZON)  And Dr. Heidari also has a
25  modest-to-low index of 11, even on Google, and only 372

201

1  citations?
2    A.  So in the field of Petroleum Engineering,
3  where most of the -- the important journals are in
4  industry conferences and specialized journals, Google --
5  the Web of Science and Google Scholar are generally not
6  capturing them.  So we -- this is very typical in the
7  field of Petroleum Engineering.
8    Q.  And she's given a pass on the funding at UT
9  that says -- they're saying that funding has been low in
10  Petroleum Engineering?
11    A.  That is correct.  And her record at A&M was --
12  the Dean says was impressive and lists several --
13  several awards at the top of page 16917.
14    Q.  The only problem is her period of time at A&M
15  and UT is consistent with Foster, who's getting millions
16  of dollars.  Why is -- why is the petroleum field a
17  problem for Heidari but not for Foster?  Is that
18  discussed or --
19    A.  Yeah, these were two different cases.  That's
20  not discussed.  I'd have to look at the specifics of
21  what his funding source was.
22    Q.  Well, I mean, you said it was from 2014.  And
23  here, we're looking at 2015 when she got here, so -- and
24  she was at A&M before.  So she would have been in
25  Petroleum Engineering at the same time as Dr. Foster,

202

1  and we're talking about the same period of funding.
2  And, yet, she's given a pass of only have having
3  $200,000 since she's gotten to UT in 2015?
4      A.  So she had a significant amount of funding at
5  Texas A&M.  Even though they are in the same department,
6  they are very different fields.  So Foster has a Ph.D.
7  in Aerospace and Aeronautics -- or Aeronautics and
8  Astronautics from Purdue; and he's applying very high
9  technology, physics-based technology and has access to
10  funding sources that are supporting that kind of work.
11         Heidari appears to be primarily in a
12  traditional area of Petroleum Engineering, important;
13  but traditional in the sense that petrophysics is almost
14  exclusively relying on industry for -- for their
15  research funding.  And most of her funding -- I'm sorry.
16     Q.  She can't support graduate students,
17  regardless of if there's any funding or not.  I mean,
18  she can't support graduate students, correct?
19     A.  That is correct.  Without the funding, you
20  can't support graduate students.
21     Q.  And she is going up early?
22     A.  Well, she's going up early under UT's policy
23  of three years on the probationary period; but she's
24  been a total of seven years in the rank of assistant
25  professor.

203

1      Q.  She could wait to see how -- if she's going to
2  get some funding, to see how her funding and trajectory
3  is going to look in the future?
4      A.  She could.
5      Q.  But -- but UT didn't do that with her --
6      A.  Uh-huh.
7      Q.  -- the year before Dr. Nikolova?
8      A.  She could.
9      Q.  She's a woman but didn't have a child during
10  her probationary period, didn't ask for a probationary
11  extension during her probationary period, correct?
12         MR. DOWER:  Objection, form.
13     A.  I do not see -- on the cover sheet, I do not
14  see that she had requested a stop-the-clock.
15     Q   (BY MR. NOTZON)  Okay.  And you can look at --
16  if you need to, you can look at Exhibit 35 and see that
17  she also didn't request any probationary extensions; or
18  you can take my word for it.
19     A.  I -- it would -- she did not have a
20  probationary extension because it would have shown on
21  the cover sheet.
22     Q.  Okay.  And if you look at the end of
23  Dean Wood's assessment, the last page, it talks about a
24  commitment that had been made to Dr. Heidari to go up on
25  her clock.  That -- there's -- you never saw anything in

204

1  writing about that, did you?
2      A.  No, I did not.
3      Q.  And any -- do you understand that the same
4  "commitment," quote, unquote, that was made to
5  Dr. Heidari had also been made to Dr. Nikolova?
6         MR. DOWER:  Objection, form.
7      A.  I -- I don't know what commitments were made
8  to Dr. Nikolova.
9      Q   (BY MR. NOTZON)  Okay.  And whether or not
10  somebody told her that she could go up at six years of
11  assistant of professorship between A&M and UT, that
12  wouldn't require UT to honor that, right?
13     A.  Could -- could you repeat the question?  I
14  want to make sure I understand it.
15     Q.  Sure.  If somebody told her as part of her
16  recruitment that she could go up at six years with
17  combined time between A&M and UT, UT would not have to
18  honor that?
19     A.  Would not have to honor the commitment?
20     Q.  The verbal statement.
21     A.  A verbal statement.  We don't have an
22  obligation to -- to put a faculty member up for
23  promotion unless the Department Chair makes that
24  decision.
25     Q.  And you don't have to grant tenure because

205

1  that Department Chair made that decision?
2      A.  We have no obligation to grant tenure because
3  the Department Chair submitted a case.
4      Q.  Was she up or out?
5      A.  No.
6      Q.  Okay.  So she could have waited.  She could
7  have -- UT could have waited; she wasn't up or out.  UT
8  could have said, "Hey, she's not gotten any money.  And,
9  oh, yeah, petroleum's tough right now; but let's see if
10  it's her or the field"?
11     A.  Yeah, anything's -- yes, anything could --
12  could be possible.
13     Q.  Okay.  And go ahead and look at the summary
14  sheet, which is 1690 [sic.]  That will be the
15  Exhibit 41 -- 42 is Heidari.
16     A.  I'm sorry.  Heidari 1690?
17     Q.  16960.
18     A.  16960.
19     Q.  That will be the last page of Exhibit 42.
20     A.  Yes, I have it.
21     Q.  Do you see how this summary doesn't break out
22  the UT funding?
23     A.  That is correct.
24     Q.  So just like with Foster, it's made to look --
25  I mean, just like with -- just like with Cox, it's made

Gregory Fenves - 5/27/2021

206

1  to look like she's got more money than she actually has?
2        MR. DOWER:  Objection, form.
3     A.  I don't -- I can't speak to the intent.  It
4  does not break out the funding from the two
5  institutions.
6     Q   (BY MR. NOTZON)  Let's go ahead and move on to
7  Boyles for Exhibit 43.
8        (Exhibit 43 marked.)
9     Q   (BY MR. NOTZON)  Okay.  And that starts at
10 page 12127?
11    A.  Correct.
12    Q.  He also had a negative vote from the -- wait.
13 I think I'm reading the wrong one, Boyles.
14       Boyles has on -- I guess in this -- in
15 this instance Boyles is -- mentioned how much money he's
16 gotten since he's been at UT, which is 2.3 million?
17    A.  What page are you referring?
18    Q.  Page 2, 12129.
19    A.  12129.
20    Q.  In the middle of the page.
21    A.  Oh, I see, yes.  Let me find that.  Yes.
22    Q.  And -- and then down just below that there's
23 quoted review letters --
24    A.  Yes.
25    Q.  -- saying positive things about him?

207

1     A.  Yes.
2     Q.  And then addressing potential critical
3  comments on the next page?
4     A.  Two -- two comments, yes.
5     Q.  And explaining them away?
6     A.  She explains why she did not feel those were
7  heavy weight in the overall deliberation.
8     Q.  Okay.
9        MR. NOTZON:  I just looked at the clock
10 and I was expecting a reminder and I'm sorry.  I went
11 over, 5:00 -- 6:00 o'clock.  And I apologize for that.
12       I will pass the witness.
13       MR. DOWER:  President Fenves, I just have
14 a few questions because I know that you're -- you have
15 an appointment to make.
16              EXAMINATION
17 BY MR. DOWER:
18    Q.  You testified today regarding weaknesses in
19 Dr. Nikolova's application for tenure as you perceived
20 them, yes?  Do you remember that?
21    A.  Yes.
22    Q.  Okay.  And are you confident that the
23 weaknesses you identified here today are the same
24 weaknesses upon which you based your decision at the
25 time?

208

1     A.  I'm highly confident those -- those things
2  that I reviewed recently in preparation would have been
3  the same things I would have noticed two years ago at
4  the time of the review.
5     Q.  And was your decision not to grant tenure to
6  Dr. Nikolova motivated by her sex or gender?
7     A.  No.
8     Q.  And was your decision not to grant tenure
9  motivated by her pregnancy status?
10    A.  No.
11       MR. DOWER:  Pass the witness.
12       MR. NOTZON:  Just a followup on that.
13          FURTHER EXAMINATION
14 BY MR. NOTZON:
15    Q.  Isn't it true that just because Dean Wood is a
16 female and recommended against tenure for Dr. Nikolova
17 does not mean that Dean Wood was motivated improperly by
18 discriminatory intent based upon gender or pregnancy?
19       MR. DOWER:  Objection, form.
20    A.  If I understand the question, my answer is:  I
21 do not believe Dean Wood was motivated by any
22 discriminatory intent.
23    Q.  (BY MR. NOTZON)  Not the question.  My
24 question is:  Isn't it accurate that you can't say that
25 just because Dean Wood is a woman that she had no -- she

209

1  would be eliminated from having any discriminatory
2  intent?
3     A.  I would -- that is correct.
4        MR. NOTZON:  Pass the witness.
5        MR. DOWER:  Reserve.
6        (Deposition concluded at 5:09 p.m.)
7              --ooOoo--
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

210

1          CHANGES AND SIGNATURE
2   WITNESS NAME:          DATE OF DEPOSITION:
3   GREGORY L. FENVES      May 27, 2021
4   PAGE/LINE   CHANGE          REASON
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____

212

1   STATE OF TEXAS   )
2            REPORTER'S CERTIFICATION
3        I, DEBBIE D. CUNNINGHAM, CSR, hereby
4   certify that the witness was duly sworn and that this
5   transcript is a true record of the testimony given by
6   the witness.
7        I further certify that I am neither
8   counsel for, related to, nor employed by any of the
9   parties or attorneys in the action in which this
10  proceeding was taken.  Further, I am not a relative or
11  employee of any attorney of record in this cause, nor am
12  I financially or otherwise interested in the outcome of
13  the action.
14       Subscribed and sworn to by me this day,
15  June 16, 2021.
16
17
18
19       _____
         Debbie D. Cunningham, CSR
20       Texas CSR 2065
         Expiration:  6/30/2021
21       INTEGRITY LEGAL SUPPORT SOLUTIONS
         P.O. Box 245
22       Manchaca, Texas 78652
         www.integrity-texas.com
23       512-320-8690; FIRM # 528
24
25

211

1        I, GREGORY L. FENVES, have read the
2   foregoing deposition and hereby affix my signature that
3   same is true and correct, except as noted herein.
4
5        _____
6        GREGORY L. FENVES
7
8   THE STATE OF _____  )
9        Before me, _____, on
10  this day personally appeared GREGORY L. FENVES, known to
11  me (or proved to me under oath or through
12  _____) (description of identity card or other
13  document) to be the person whose name is subscribed to
14  the foregoing instrument and acknowledged to me that
15  they executed same for the purposes and consideration
16  therein expressed.
17       Given under my hand and seal of office on
18  this _____ day of _____, _____.
19
20
21  _____
22  NOTARY PUBLIC IN AND FOR
23  THE STATE OF _____
24  My Commission Expires:_____
25

212

1  STATE OF TEXAS     )

2              REPORTER'S CERTIFICATION

3              I, DEBBIE D. CUNNINGHAM, CSR, hereby

4  certify that the witness was duly sworn and that this

5  transcript is a true record of the testimony given by

6  the witness.

7              I further certify that I am neither

8  counsel for, related to, nor employed by any of the

9  parties or attorneys in the action in which this

10  proceeding was taken.  Further, I am not a relative or

11  employee of any attorney of record in this cause, nor am

12  I financially or otherwise interested in the outcome of

13  the action.

14              Subscribed and sworn to by me this day,

15  June 16, 2021.

16

17

18

19  _____

20  Debbie D. Cunningham, CSR
    Texas CSR 2065
    Expiration:  6/30/2021

21  INTEGRITY LEGAL SUPPORT SOLUTIONS
    P.O. Box 245

22  Manchaca, Texas 78652
    www.integrity-texas.com

23  512-320-8690; FIRM # 528

24

25

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

EVDOKIA NIKOLOVA            *
    Plaintiff,            *
                          *
V.                         *   CASE NO. 1:19-cv-00877-RP
                          *
UNIVERSITY OF TEXAS AT     *
AUSTIN,                    *
    Defendant.            *

ORAL VIDEOCONFERENCED DEPOSITION

OF

CHRISTINE JULIEN,

AS BOTH ORGANIZATION REPRESENTATIVE

AND AS FACT WITNESS

Friday, March 19, 2021


ORAL VIDEOCONFERENCED DEPOSITION OF CHRISTINE

JULIEN, produced as a witness at the instance of the

Plaintiff, and duly sworn, was taken in the above-styled

and numbered cause on Friday, March 19, 2021, from

10:00 a.m. to 4:03 p.m., before Debbie D. Cunningham,

CSR, in and for the State of Texas, reported remotely

via Machine Shorthand, pursuant to the Federal Rules of

Civil Procedure.

--ooOoo--

**2**

```
 1              APPEARANCES
 2
 3  FOR PLAINTIFF:
 4      THE LAW OFFICE OF ROBERT NOTZON
        1502 West Avenue
 5      Austin, Texas  78701
        (T) 512.474.7563
 6
        By:  Robert Notzon, Esq.
 7      Robert@NotzonLaw.com
 8          AND
 9      CREWS LAW FIRM, P.C.
        701 Brazos, Suite 900
10      Austin, Texas 78701
        (T) 512.484.2276
11
        By:  Robert W. Schmidt, Esq.
12      schmidt@crewsfirm.com
13
    FOR DEFENDANT:
14
    OFFICE OF THE ATTORNEY GENERAL OF TEXAS
15  General Litigation Division
    P.O. Box 12548, Capitol Station
16  Austin, Texas  78711-2548
    (T) 512.463.2120
17
    By:  Amy Hilton, Esq.
18  amy.hilton@oag.texas.gov
        AND
19  Benjamin Dower, Esq.
    benjamin.dower.oag.texas.gov
20
21
    ALSO PRESENT:
22
    Laura Barbour
23  Jody Hughes
24          --ooOoo--
25
```

**4**

```
 1              EXHIBIT INDEX
 2  Exhibit Number   Description         Page
 3  Exhibit 12  Budget Council Assessment on    83
        Teaching Performance for
 4      Faculty Promotion Candidate
        Evdokia Nikolova
 5
    Exhibit 13  Evdokia Nikolova's Teaching     89
 6      Statement
 7  Exhibit 14    -- WITHDRAWN --         XX
 8  Exhibit 15  A spreadsheet identified as    146
        All ECE 18-19 final
 9
    Exhibit 16  5/17/20 e-mail exchange between  148
10      Christine Julien and Constantine
        Caramanis, RE: Additional Review
11      Material
12  Exhibit 17  5/17/20 e-mail exchange between  153
        Christine Julien and Michael
13      Orshansky, RE: Additional Review
        Material
14
    Exhibit 18  June 2020 e-mail communications  155
15      between Evdokia Nikolova and
        Chair Marculoscu's office,
16      Subject: Annual Review, assessed
        by Faculty Evaluation Committee
17      and Department Chair
18  Exhibit 19  Annual Review Comparators     155
19  Exhibit 20  Plaintiff's Notice of Oral and   157
        Video Deposition of Christine
20      Julien as Both Organization
        Representative and as
21      Fact Witness
22  Exhibit 21  February 2019 e-mail exchange   158
        between Christine Julien and
23      Andrea Thomaz, Subject: Re:
        [cse-ece-faculty] P&T decision
24
    Exhibit 22  '14-'15,'15-'16,'16-'17,'17-'18,  170
25      '18-'19 Annual Review Summaries
```

**3**

```
 1              INDEX
 2  APPEARANCES                    2
 3
 4  EXAMINATION OF CHRISTINE JULIEN:
 5  BY MR. NOTZON                  6
 6
 7
 8  CHANGES AND SIGNATURE        177
 9  REPORTER'S CERTIFICATION     179
10
11          --ooOoo--
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**5**

```
 1      (Friday, March 19, 2021, 10:00 a.m.)
 2      P R O C E E D I N G S
 3          THE REPORTER:  Today is Friday, March 19,
 4  2021.  This is the videoconferenced deposition of
 5  Christine Julien in the matter of Nikolova versus UT.
 6          Due to the COVID-19 Pandemic we are
 7  remotely situated, and we are on the record at
 8  10:00 a.m. Central Standard Time.
 9          My name is Debbie Cunningham, and my
10  business address is P.O. Box 245, Manchaca, Texas 78652.
11          Would all persons present please
12  introduce themselves for the record?
13          MR. NOTZON:  Robert Notzon and Bob
14  Schmidt for Evdokia Nikolova.
15          MS. HILTON:  Amy Hilton for the
16  University of Texas at Austin.
17          MR. DOWER:  Benjamin Dower, also for the
18  University of Texas at Austin.
19          MS. HILTON:  And we have some
20  stipulations we'd like to read into the record that we
21  discussed beforehand.  The parties stipulate that
22  objection to form is sufficient to preserve objections
23  to the form of the question and will be used in lieu of
24  the more specific form-based objections.  The parties
25  stipulate that all objections except as to the form of
```

6

```
 1   the question or answer are reserved until trial.  And
 2   the deponent would like an opportunity to review the
 3   transcript and recording.
 4           MR. NOTZON:  Agreed.  Okay.
 5           CHRISTINE JULIEN,
 6   having been duly sworn, testified as follows:
 7           EXAMINATION
 8   BY MR. NOTZON:
 9   Q   Good morning.
10   A   Good morning.
11   Q   Could you please state your name for the
12   record?
13   A   Christine Julien.
14   Q   And I understand you're Professor Julien?
15   A   That's right.
16   Q   Okay.  And you have the rank of full
17   professor?
18   A   Yes.
19   Q   Okay.  I'd like to go over kind of a little
20   short history to get some background.  How old are you?
21   A   42 -- 43.  Oh, my goodness.  I'm 43.
22   Q   Yeah, I know.  That happens to me, too.
23   A   Okay.
24   Q   And just when you get used to saying the
25   number, it changes.  It gets worse and faster.
```

7

```
 1           So are you married?
 2   A   I am.
 3   Q   And do you have children?
 4   A   I do.
 5   Q   And how many children?
 6   A   I have two children.
 7   Q   And how old are they -- or what were their
 8   birthdays?
 9   A   My oldest child was born on May 10th, 2007 and
10   my youngest on October 12th, 2012.
11   Q   Nice.
12           And did you have your children during
13   your probationary period?
14   A   My oldest child was born during my
15   probationary period.
16   Q   Okay.  And that was at UT?
17   A   Yes.
18   Q   Okay.  And when you went up for tenure, what
19   year did you go up on?
20   A   I was promoted in 2010.  So I went up the year
21   before that.  I started -- started in the rank of
22   Associate Professor in August of 2010.
23   Q   What -- my question was not specific enough.
24   A   Sorry.
25   Q   What year of your probationary clock did you
```

8

```
 1   go up on?
 2   A   Oh, on time.  So the sixth year.  Yeah, so on
 3   time.
 4   Q   And you've spent your entire career teaching
 5   at UT?
 6   A   I teach and do research at UT, yes.
 7   Q   Were you proposed or considered for
 8   accelerated promotion?
 9   A   I was not.
10   Q   Were you considering it?
11   A   I had some conversations with the Department
12   Chair at the time the year before.
13   Q   Who was that?
14   A   Tony Ambler was his name.
15   Q   Okay.  And what was the substance of that
16   conversation?
17   A   We discussed whether it made sense to apply
18   for early promotion and determined that since the
19   University has a higher kind of bar expectation for
20   early promotion, that it made sense to wait a year --
21   not to wait a year, but to do it on time, instead.
22   Q   Okay.  So that conversation happened what
23   year?
24   A   I don't -- I don't -- the best of my
25   recollection, I mean, just based on the timing, it's
```

9

```
 1   going to have happened in 2007, 2008, somewhere around
 2   then.
 3   Q   Okay.  Would it have been in your fourth year
 4   of your probationary clock?
 5   A   Yes, because I would have needed to have time
 6   to prepare the materials for early promotion.
 7   Q   And you would have been one year early if you
 8   would have gone up early?
 9   A   Yes.
10   Q   Okay.  And so it's your understanding that a
11   heightened standard for accelerated promotion has
12   existed since at least that time, through today?
13   A   Yes, that's how it was communicated to me at
14   that time.
15   Q   Okay.  And other than the Chair telling you
16   that, have you any other outside experience or knowledge
17   that there's a heightened standard for accelerated
18   promotion compared to on time?
19   A   Yes, this is a conversation we have on a
20   regular basis.
21   Q   Who's "we"?
22   A   The Department and the Department Chair in the
23   department meetings, faculty meetings.
24   Q   Okay.  So faculty and administration?
25   A   Yes.
```

10

1    Q.   Okay.  And so would it be your testimony that
2  it's common knowledge among the faculty that there's a
3  heightened standard for accelerated promotion versus
4  on-time promotion?
5    A.   It's my testimony that I've understood that
6  since I was an Assistant Professor and that that
7  conversation has happened with others present as well,
8  other people in the faculty present as well.
9    Q.   And would you -- but you would agree that it's
10 not in writing?
11   A.   I don't know if it's in writing or not.  It
12 could very well be in the HOP, the Handbook of Operating
13 Procedures, or in UT System Regent's Rules.  I haven't
14 checked for that.
15   Q.   You just know it from conversation?
16   A.   I have been told that by members of the
17 administration.
18   Q.   Right.  Verbally?
19   A.   I have not been shown a piece of paper where
20 it is the case.
21   Q.   Or told a cite?
22   A.   I don't recall having been pointed to one; but
23 it's possible that when I was preparing my tenure and
24 promotion materials, I would have been pointed to
25 something that would have indicated that.  I don't

11

1  remember.  I don't know.
2    Q.   Okay.  When you were pregnant and had a child
3  during your probationary period, did you take advantage
4  of the Modified Instructional Duty?
5    A.   I did.
6    Q.   And just the one semester?
7    A.   I did, yes.
8    Q.   And did you take advantage of the tenure
9  promotion extension?
10   A.   I did not.
11   Q.   Okay.  Were you offered it?
12   A.   I believe I was.  I don't know if I was
13 explicitly offered it.  I knew that it was available to
14 me and that I could opt to take it, and I opted not to
15 take it.  I don't remember how it became -- I became
16 aware that it was available to me.
17   Q.   And what was your decision-making process on
18 that, to take it or not to take it?
19   A.   Yeah.  I felt like I was on track for an
20 on-time promotion.  I felt like, with the support I had,
21 that I wasn't going to need extra time.  So I didn't
22 apply for extra time.
23   Q.   Did it help that your baby was born in May
24 instead of in the middle of the semester?
25   A.   It did not.  My daughter was born the day of

12

1  my final exam.  So there's no convenient time, it turns
2  out, in an academic schedule for a child to be born; but
3  there are less convenient times.
4    Q.   Right.  I was thinking more of you have the
5  first three months of life with less responsibility than
6  during the semester.
7    A.   I don't think that's the case in an academic
8  position.  Summers are equally as important as the
9  academic year for our jobs.
10   Q.   Okay.  But you were able the maintain your
11 productivity, regardless?
12   A.   Productivity is not constant, even in normal
13 times.  There was certainly a dip in my productivity;
14 but I did not feel as though it impacted my, kind of,
15 trajectory towards promotion.
16   Q.   In the overall six-year picture?
17   A.   That's right.
18   Q.   Okay.  Would you agree that Modified
19 Instructional Duty is not leave?
20   A.   When I took Modified Instructional Duty, I did
21 not believe I was on leave from the university.
22   Q.   And could you explain why you believed that?
23   A.   I was asked at that time, in 2007, to write a
24 form that explained what I would actually be doing
25 during the semester that was to follow the 2007

13

1  semester.  And so there was an agreement between me and
2  the Department about what my modified duties would be,
3  explicitly.
4    Q.   Okay.  And who were you negotiating that with?
5    A.   It wasn't a negotiation; but that conversation
6  happened with the Department Chair, Tony Ambler.
7    Q.   Okay.  And I take it from your answer you
8  don't know if that's standard for other people on
9  Modified Instructional Duty?
10   A.   I don't know if it's standard.  There was a
11 form, and I filled it out.  I assume others also fill
12 out a similar form, but I don't see them.
13   Q.   I just was asking because you didn't answer
14 the question when I asked you if Modified Instructional
15 Duty was not leave.  You weren't willing to answer that
16 in the general, just from your own experience.
17   A.   Yeah, the question was difficult for me
18 because it had somehow almost a one-and-a-half negative
19 in it.  So it was a little...
20       So I don't think of Modified
21 Instructional Duty as leave; and I don't think the
22 University does, either.
23   Q.   All right.  Thanks.  I just didn't understand
24 what the issue with my question was, and I have no
25 problem with you having issues with my questions.

14

1   Frequently people do, so no problem.
2           And did you get your Ph.D. at UT as well?
3       A.  I did not.  In fact, I don't have a Ph.D.; and
4   I like to be careful about the distinction because I
5   don't ever want to be accused of claiming I have an
6   actual Ph.D.  I have a DSC, which is an equivalent
7   degree.  It's from Washington University in St. Louis.
8   That's the institution I attended.
9       Q.  Okay.  And what do those letters stand for?
10      A.  Sorry.  It's a Doctor of Science.
11      Q.  Okay.  Does Wash U just not provide a Ph.D.?
12      A.  It's a long, long, you know, academic
13  political story.  It actually is a Ph.D. now; but at the
14  time I graduated, it was a DSC.
15      Q.  Thanks a lot, right?  Okay.
16          And you're now -- what is your Associate
17  Dean title?
18      A.  I am currently the Associate Dean for
19  Diversity, Equity, and Inclusion.
20      Q.  Do you have a fancy acronym for it?
21      A.  I call it the Associate Dean for DEI, because
22  it gets a little bit cumbersome on the tongue there.
23      Q.  Okay.  "ADDEI" would even be worse, I think.
24      A.  Yes.
25      Q.  Okay.  And when did you start that position?

15

1       A.  I started in the role in August of 2019.  At
2   that time the title was Assistant Dean for Diversity,
3   Equity, and Inclusion; and it changed in August to
4   Associate Dean.
5       Q.  That's a promotion?
6       A.  It was neither a change in duty nor a change
7   in salary.  It was just a change in title, I think, to
8   reflect the importance of the role.
9       Q.  Organizational height?
10      A.  More, I -- more organizational equity, I
11  think, in the sense that in the Cockrell School and
12  largely, I think, across campus, Associate Dean roles
13  are held by tenured faculty; and Assistant Dean roles
14  are not held by tenured faculty.  And so when the
15  position was created, this was something of on
16  oversight, I think, until it was corrected.  That was
17  how it was put to me, anyway.
18      Q.  Okay.  And who identified the inequity?
19      A.  Internally, I think the dean, Dean Wood,
20  identified it, from her conversations with me, based on
21  conversations with deans at other institutions, asking:
22  Why is this an Assistant Dean when you have other
23  Associate Deans -- and then, also, conversations
24  internally about other people in similar roles across
25  campus.

16

1       Q.  Okay.  And what was the process of you coming
2   to that position, starting that position in August?
3   When were you first either approached, or did you
4   approach with interest for the job?
5       A.  The Dean approached me about the job sometime
6   in relative early summer -- it could have been late
7   June, early July of 2019 -- to ask whether I would
8   consider taking on the role.  At that time we had
9   several exchanges back and forth throughout the summer
10  about what exactly were the expectations of the role
11  since it was new, and I had some concerns.
12          I know that at other institutions the
13  role is more of a:  We feel good because we have
14  somebody in this role, but this person doesn't really do
15  anything or have any power and I didn't --
16      Q.  Window dressing?
17      A.  I'm sorry?
18      Q.  Window dressing?
19      A.  Window dressing, yes.  And I didn't want to
20  take the position if that was the case.  And so the dean
21  and I had some significant conversations about how it
22  would be structured and what her commitment to DEI was
23  before I agreed to take the position.
24          I also spoke with people across campus.
25  There were two other people in similar roles who I spoke

17

1   to, to get their insights on just kind of the nature of
2   that role at UT.
3       Q.  And what were those two departments?
4       A.  I spoke to --
5       Q.  Just the department names.
6       A.  Oh, I'm sorry.  The equivalent person in
7   McCombs, the School of Business, and in the College of
8   Natural Sciences.
9       Q.  And how long had they been in existence in
10  their positions?
11      A.  The person at McCombs had been in her role for
12  about a year at the time, I think, maybe a year and a
13  half.  And the College of Natural Sciences is structured
14  differently.  The role doesn't have anywhere near the
15  same title; but the person doing it has been doing that
16  work in the College of Natural Sciences for, like, five
17  years, for quite some time.
18      Q.  Okay.  And the one for McCombs, was that
19  person the first person in the position?
20      A.  Yes.
21      Q.  So the start of the position and her role were
22  coexistent?
23      A.  Correct.
24      Q.  Okay.  And that conversation you had with
25  Dean Wood about what you wanted the position to be and

18

1  what she was willing for it to be, could you give us
2  kind of a little outline of what you were after so that
3  you could check that box that it's not window dressing?
4      A.  Yeah.  So it was not a single conversation.
5  It was a series of conversations.
6      Q.  I'm asking just for that list of things that
7  you were looking for, in total, not in just one
8  conversation, and the back and forth and what it ended
9  up being that you were satisfied that that box was
10  checked.
11      A.  Yeah.  So several of the things were:  What
12  are the roles?  What are the things that we're serious
13  about doing?  Where do we see the challenges?
14          So a lot of these were in faculty
15  recruiting and retention and then also in graduate
16  student post doc recruiting and retention.  The
17  commitment to provide resources to that; specifically,
18  you know, that's money, right, that we're going to
19  actually spend money on these initiatives.
20          And then another thing that was really
21  important to me was a commitment that she would show her
22  support when faculty were asked to participate because
23  faculty participation in these initiatives kind of
24  determines whether they're successful or not.
25          So those were the major things.  I think

19

1  one other piece that was pivotal for me to accept the
2  role was that we would do an explicit reevaluation of
3  where we were after a year.  I was only agreeing to do
4  it for a year.  So it was kind of a two-way trial.  And
5  so we did that this past summer.
6      Q.  And that reevaluation ended up with that
7  report?
8      A.  I'm sorry.  What report?
9      Q.  Oh, I took it from Dean Wood's testimony
10  yesterday -- and I may be mistaken -- that after your
11  first year, that a report was written?
12      A.  That's correct.  We did generate a DEI annual
13  report.  That was one of the things that I started when
14  I began.  I decided that we would start writing an
15  annual report, reporting on our DEI, kind of,
16  activities, initiatives, progress, and remaining
17  challenges.  That's not related to this conversation I'm
18  talking about with the Dean.  That's completely
19  independent.
20      Q.  Okay.  So your reevaluation was conducted
21  outside of that report.  That report was just part of
22  your job that you've been doing?
23      A.  That's right.
24      Q.  Okay.  And the resources, so do you have an
25  annual budget?

20

1      A.  I do not have an annual budget.  Right now I
2  make -- when I require resources, I make requests to the
3  Dean for support for those resources; and she allocates
4  funding for them, yeah.
5      Q.  Okay.  So when you asked for resources, she
6  told you:  Ask and you shall receive or...
7      A.  I asked if she was going to commit funding to
8  this.  She told me that she was, and she has since
9  demonstrated that she intends to -- or she has
10  demonstrated that by doing it, I guess is what I'm
11  saying.
12      Q.  So every time you've asked for money, you have
13  received it?
14      A.  As far as I can remember, that's the case.
15  The Dean has been very forthcoming with funding over the
16  past year and a half for DEI-related initiatives.
17      Q.  And have you been -- what kind of activities
18  have you engaged in, in terms of the -- well, let me
19  back up.
20          Why were you interested in this job?
21      A.  So I had been exploring leadership
22  opportunities for the past several years.  Just, you
23  know, I've reached full professor status.  I have a
24  solid research program.  And it's that time where I ask
25  myself:  Is this what I want to do, or do I want to do

21

1  something more?  So I'd been exploring what are the
2  options available to me from a leadership perspective.
3  I had communicated that to the Dean some years ago that,
4  you know, I was interested in trying on some leadership
5  roles.  So that's the one side.
6          This particular position is a passion of
7  mine.  I have spent a lot of time and effort over my
8  academic career promoting specifically women in
9  computing and trying to start new initiatives to broaden
10  participation in computing.  I'm kind of known for this
11  within our department.
12          I run some programs for middle and high
13  school students to try to encourage them to apply for
14  engineering.  Within my professional community, I have
15  promoted women and underrepresented minorities, to a
16  lesser degree, at our major conferences.  So this is
17  something where I have expertise and I see that there is
18  a lot of potential.
19          And then, just as a woman who's under-
20  represented in engineering, I think it's important work
21  to do.  So it was an opportunity to kind of, you know,
22  take on a larger leadership role, something I think I
23  could enjoy and could be good at and, also, at the same
24  time, impact an area where I think it's really important
25  to do so.  So that's why, I guess.

Christine Julien - 3/19/2021

---

22

1    Q.   Being a woman in engineering -- other than
2    being underrepresented, have you had any other
3    challenges being a woman in engineering?
4    A.   I'm not sure what your question is.  I'm
5    sorry.
6    Q.   You mentioned being a woman in engineering and
7    being underrepresented had caused you to have this
8    passion toward all the things you said you've been
9    doing.  I was wondering if there was anything other than
10   just being underrepresented as a female in engineering
11   that have caused you to make diversity and inclusion a
12   passion of yours.
13   A.   I don't -- I don't think so.  I mean, I think
14   the biggest -- I mean, most of the challenges that I
15   face as a woman or that women in engineering face happen
16   because of the underrepresentation.  So I'm not sure
17   what you're getting at.
18   Q.   So you're saying that the underrepresentation
19   is the source of all the issues that a woman might have
20   in the field of engineering?
21        MS. HILTON:  Objection, form.
22   A.   I'm not sure that's a characterization -- a
23   correct characterization, either.
24   Q.   (BY MR. NOTZON)  Okay.  What would be other
25   issues that a woman might have in engineering --

---

23

1    particularly you, that you have had in engineering,
2    other than that just being underrepresented?
3    A.   Well, again, I am underrepresented, so that
4    causes other things to happen.
5    Q.   Like?
6    A.   Which may include things like, you know,
7    comments because, you know, colleagues aren't used to
8    seeing a women in various different spaces that, you
9    know, may be insensitive or mal- -- not mal-intended --
10   mal-informed.  To be honest, those sorts of things do
11   happen.
12   Q.   Okay.  What about disregard?
13   A.   I have experienced something in professional
14   settings that I would categorize as disregard before.
15   Q.   Difference in treatment?
16   A.   In the sense that not everyone maybe is
17   regarded in the same way, I suppose there's a difference
18   in treatment.
19   Q.   Would that be the only difference in treatment
20   you've experienced is disregard?
21   A.   I can't recall anything that would kind of not
22   fall -- not, from my perception, fall in that case.
23   Q.   Okay.  So would it be accurate to summarize
24   that you have not experienced any gender-based
25   discrimination in your education or work career?

---

24

1    A.   So "discrimination" is a pretty vague and
2    broad term.  Can you define what you mean by
3    "discrimination"?
4    Q.   Difference in treatment --
5    A.   Difference in --
6    Q.   -- because of your gender.
7    A.   I'm -- again, I think this is a pretty broad,
8    blanket term.  I've had students call me "Mrs." instead
9    "Dr."  I assume they don't call their male faculty
10   "Mrs."
11   Q.   Or "Mr."?
12   A.   They do, in fact, sometimes call them "Mr."  I
13   don't know if the rate is the same.  So, I mean, that's
14   a difference in treatment; but I don't know if it's -- I
15   wouldn't necessarily call that "discrimination."  You'd
16   have to dig into the reasons underlying it in order to
17   label it "discrimination" or not.
18   Q.   Have you experienced any differential
19   treatment from management?
20   A.   By "management," I assume you mean department
21   chairs, deans?
22   Q.   Supervisors.
23   A.   I have not -- hold on.  I'm sorry.  Let me
24   back up.  I would say that, you know, allowing and
25   encouraging me to take Modified Instructional Duty when

---

25

1    I was pregnant, especially for my first child, I don't
2    know that at that time that happened for men.  So that
3    would have been a difference that came from my
4    Department Chair.
5    Q.   Okay.  Was that a health difference, a gender
6    difference?
7    A.   I don't know.  Since that time -- at that time
8    it wasn't as common for men to take Modified
9    Instructional Duty when they were having children.
10   That's more common now.  And I think that would play
11   into whether it was a health difference or gender
12   difference; and I will admit to not having picked that
13   apart at the time or since, so I don't know.
14   Q.   What about your -- well, let me back off from
15   your personal experience because it sounds like you have
16   not had very many experiences where your gender has been
17   used in such a way that it was a negative experience for
18   you.  Would that be fair to say?
19   A.   I'm sorry.  You're asking whether it's fair to
20   say...
21   Q.   That you have not actually had much, if any,
22   negative experiences being a woman in engineering?
23   A.   I don't -- I don't think I said that.
24   Q.   Okay.
25   A.   So I've definitely had negative experiences

---

26

1  being a woman in engineering.
2      Q.  Okay.  What are those negative experiences
3  that you've had?
4      A.  I've received comments from students.  I've
5  received comments from colleagues, both in UT and out of
6  UT.  I was going to say "United States and out of
7  United States" because sometimes that happens at
8  international conferences.  I mean, I've had comments, I
9  would say, is the most significant negative experience
10 that I have had.
11     Q.  Undervaluing you, or how would you describe
12 the comments?
13     A.  I mean, they're comments that -- you know, I
14 wouldn't have said "undervalued."  I would have said
15 disparaged; or maybe that's too strong of a word, also.
16 I would say -- I don't know.  I'm sorry.  My vocabulary
17 is a little dry today.  Negative comments.  Negative
18 comments because of my gender or things that would make
19 me feel uncomfortable because of my gender, I guess,
20 would be another way to suggest.  And everyone likes to
21 feel comfortable in their professional spaces, so that's
22 what makes them negative.
23     Q.  Making you think about the fact that you're a
24 woman in the space, instead of just being an engineer in
25 the space?

27

1      A.  That's right.
2      Q.  As if being a woman was relevant to that
3  experience, instead of just being an engineer?
4      A.  I don't -- actually, I don't know necessarily
5  that the comments were at all related to whether or not
6  being a woman was relevant in that space, even in the
7  minds of the givers of the comments.  That puts too much
8  credit in the minds of people.
9      Q.  You mean you're not attributing intent; it
10 could have been subconscious?
11     A.  Yes.  I mean, and the fact is I am a woman in
12 that space.  So in that sense, that is true.
13     Q.  Fair.  Prior to taking this job, and as part
14 of the passion that you have for the issue of the under-
15 representation of women in engineering, had you educated
16 yourself on the studies related to disparities of women
17 in engineering and the effects of those on women
18 engineers?
19     A.  Which job are you speaking of, the Associate
20 Dean position?
21     Q.  Yes.
22     A.  Okay.  Yeah.  I mean, I specifically had done
23 most of my work up to that point on women in computing.
24 I was fairly plugged into women in computing, women in
25 pervasive computing.  That's my particular research

28

1  area.  I'd done a little bit of work on -- or a little
2  bit of research, not work, but a little bit of reading
3  on inequities in smart cities because, again, that's one
4  of my research areas.  And I'd done some reading in the
5  literature on biases in especially, like, faculty
6  recruiting processes because I was chairing the Faculty
7  Recruiting Committee; and I wanted to make sure that,
8  you know, we were doing a good job there.
9          So I wouldn't have said that I was
10 anywhere -- and I wouldn't say now that I'm anywhere
11 near an expert in the literature, but I had read some
12 prior to taking the job and I have read more since.
13     Q.  And would your reading and research also
14 include issues related to retention and not just
15 recruiting?
16     A.  Yes.  Are you talking about readings in
17 research prior to taking the job or after taking the
18 job.
19     Q.  Both.
20     A.  So prior, I think I'd read less on retention;
21 and since, I've read more, much more on retention.
22     Q.  And what kind of focus have you had on the
23 retention issue related to the studies on gender
24 inequities in computing or engineering?
25     A.  So by "focus," do you mean what activities or

29

1  what research?  What do you mean by "focus"?
2      Q.  What issues, maybe, that you and the college
3  should be addressing to reduce the negative impact that
4  might affect negatively the retention of females in the
5  college.
6      A.  Yeah.  Okay.  So I think one of the things
7  we're working on a lot right now is just even
8  understanding what those barriers are, collecting that
9  information from people.  We have a climate survey open
10 right now that's going to help us do some of that.
11 Before my taking on this role, they'd, as far as I know,
12 never done a climate survey of faculty in the Cockrell
13 School.  So that's one thing that we've done.
14         We've also kind of just looked into best
15 practices from other institutions.  The University of
16 Michigan is one we lean on a lot.  You know, what kinds
17 of just, you know, actions, activities, policies,
18 processes are in place and learning about how we could
19 add some of those.
20         And then, we have a couple of ideas of
21 our own, as well, to kind of look into implementing.  I
22 don't know if that's answering your question.  It was
23 kind of a general question.
24     Q.  Would it be accurate to say that the climate
25 study that you say is currently occurring, that would be

30

1 an anecdotal gathering?
2     A.  What do you mean by "anecdotal gathering"?
3     Q.  You're getting anecdotal information from the
4 faculty?
5     A.  In the sense that anecdotes are, you know,
6 bits of stories that people will tell, there is an
7 opportunity in the climate survey for people to provide
8 those; but there's also a set of, you know, questions
9 that we should be able to get some quantitative measures
10 from, as well.  So we'll be able to look at kind of how
11 faculty versus staff versus students answer different
12 questions about whether they feel included, whether they
13 have the resources that they need to succeed.
14         I can't reiterate -- I can't just
15 regurgitation all of the questions that are on the
16 climate survey right now, but that's the sort of thing.
17 We have some numerical questions or some microscale
18 questions that we'll be able to run numerics on, as
19 well.
20     Q.  Okay.  So is it kind of a combination of
21 measurable and anecdotal information?
22     A.  Uh-huh.
23     Q.  Okay.  And the issues that you're putting in
24 the survey, I understand you reached out to Michigan for
25 assistance there.  Have you looked at the -- any studies

31

1 of the disparity of the female experience in engineering
2 faculty that have been published over the last decade or
3 so?
4     A.  I have read many of those studies, yes.
5     Q.  So things like that women in STEM -- women
6 faculty in STEM are rated by students lower than men in
7 studies that keep the gender as the only issue change?
8     A.  Yes.  So I'm fully aware of these studies.
9 These studies are kind of well-known throughout the
10 university, I think.
11     Q.  Okay.  So part of your climate study is
12 looking into students' teaching scores of the faculty?
13     A.  No, unfortunately -- well, not unfortunately.
14 No, we decided to keep the climate survey, for now, very
15 short.  We wanted to maximize response rates.  So we
16 don't dig in, and it's one climate survey that's gone to
17 everyone.  So we ask kind of the same questions
18 regardless of whether you're faculty, staff, or student;
19 and then, we'll partition the responses we get based on
20 whether it's from faculty, from staff, or student.
21         The idea behind that -- and we had, you
22 know, a set of people who were tasked with designing
23 that who are more expert in surveys and how to
24 administer them; but the rationale behind that was, you
25 know, we've not done this before.  We'll a get a first

32

1 view of the responses from the different groups, and
2 then we can start to make decisions about whether or not
3 we need to ask tailored questions of different groups
4 based on the responses we get.
5     Q.  You have to have a baseline for your study?
6     A.  That's right.
7     Q.  So what activities have you engaged in on the
8 retention side for female faculty in the college that
9 address some of these known negative impacts that women
10 have experienced based upon these studies?
11     A.  Again, as the Associate Dean for Diversity,
12 Equity, and Inclusion, is that what you're asking?
13     Q.  Yes.
14     A.  Okay.  So in my role as Associate Dean, what
15 have I done to address retention of underrepresented
16 groups?  And, in general, it's generically
17 underrepresented groups, although women are definitely
18 one of the underrepresented groups.  And I think the
19 biggest thing we've been trying to do is tackle bias in,
20 I'm going to say, personnel processes.  The things we've
21 done so far have been focused on faculty recruiting.
22         I spent the lion's share of my work last
23 year focused on faculty recruiting and mitigating bias
24 in that faculty recruiting process.  I recently started
25 pushing for there to be more of that same kind of effort

33

1 in the faculty annual review process, so the same kind
2 of training to recognize biases and to mitigate those
3 biases in those processes.  I think that, on the
4 retention side, would be the -- I'm trying to think if
5 there's any other; but I think on the retention side,
6 that would be the largest thing that we've done.
7         One other thing that we're trying to
8 design to do is what we call -- what we're referring to
9 as "stay interviews," the idea being, rather than
10 waiting for faculty to leave and fail to retain them and
11 then ask why are they leaving, find faculty who may have
12 had ample opportunity to leave but chose not to and find
13 out why they didn't and so try to couple those two
14 together so that we can learn more about the situation.
15 We haven't designed that yet, but that's one of the best
16 practices that we're looking at from other places.
17     Q.  So a targeted climate study?
18     A.  Yeah, it would be more like a focus group, an
19 interview, right?
20     Q.  When did you first let Dean Wood know that you
21 were interested in leadership roles?
22     A.  So I participated in a leadership training --
23 I hate the word "training" -- but a training program for
24 women academics in STEM, in the national program.  It
25 was a year long, called ELATE -- or it was called

34

1  "ELATE" at the time; it's been renamed ELATES.
2      Q.  How do you spell that?
3      A.  It's E-L-A-T-E.  It's run by Drexel
4  University.  I spent a year.  And it's, you know, you
5  read a bunch of, you know, articles about academic
6  leadership.  We had, I think, three or four onsite
7  meetings in Philadelphia with this group of cohort of
8  about 20, 22 people, 22 women faculty in STEM, on things
9  ranging from, you know, academic budgets to leadership
10  styles to -- you know, just what's involved in academic
11  leadership.
12          And as part of that program, I was asked
13  to -- I was asked to interview leaders at all levels of
14  the university, right?  So I sat with the Dean and my
15  Department Chair and the Dean, the Provost, and the
16  President for half an hour each, just to kind of have
17  these conversations.
18          But, on top of that, Dean Wood was
19  actually funding my participation in the program; so I
20  had several conversations with her.  And so it was
21  through that program, kind of my exit interview with her
22  from the program, like, "Would you recommend it; should
23  we do it for other faculty in the college," that I
24  expressed to her that I was, in fact, interested in
25  positions and, you know, with her being the Dean, if

35

1  there were opportunities, I was interested in them.
2      Q.  What year was that you did this program?
3      A.  I knew you were going to ask that.  I don't
4  remember.  It was a few years ago, maybe three years
5  ago.
6      Q.  I understand that there was a leadership
7  workshop that was conducted in the summer of 2018.
8  Would that have been part of this program?
9      A.  Summer of 2018, a leadership workshop.  I
10  don't know.  I'm sorry.  I don't know what that's a
11  reference to --
12          (Simultaneous speakers.)
13      Q.  -- a workshop with Dean Wood and others?
14      A.  Would I have been in a workshop with
15  Dean Wood?
16      Q.  And other female university people.
17      A.  Just in UT?  I'm sorry.
18      Q.  I think there could be other people involved
19  besides just UT faculty.
20      A.  I'm sorry.  I...
21      Q.  Nothing comes to mind?
22      A.  It doesn't ring a bell for me.  That doesn't
23  mean anything, right?  I participate in a lot of these
24  sorts of workshops.
25      Q.  Okay.  But you said three years ago, so it

36

1  sounds like 2018 would be, maybe --
2      A.  Yeah, it was a workshop; but, I mean, though
3  summer sounds wrong.  That's what sounds wrong to me
4  about that.
5      Q.  Okay.
6      A.  The workshop started in the summer and we met
7  for the first time, probably, in August and then maybe
8  met, again, in, like, November and then maybe again --
9  I'm guessing, but this is kind of what I remember.  I do
10  remember that the very last meeting was in March in
11  Philly, and there was a massive snowstorm.  And the
12  deans were all supposed to come for our final project
13  presentations and none of them could make it in because
14  we had all been in for the week and the snowstorm closed
15  the airport.  And she was unable to do that, but that
16  would have been March.  I'm sorry.  I would have to look
17  back and find the records of what year it was.  I don't
18  remember when it was, three or four years ago.
19      Q.  All right.  Do you remember -- and I
20  understand you say you don't remember, and sometimes
21  asking you questions might jog your memory.
22      A.  That's fine.
23      Q.  I'm not trying to badger you or anything, just
24  offering you opportunities to remember.  Do you recall
25  if it was before or after Dr. Nikolova went up for

37

1  tenure?
2      A.  I'm sorry.  That doesn't help me jog my
3  memory.  I do not recall.
4      Q.  All right.
5      A.  It was shortly after the new Biomedical
6  Engineering Department Chair joined because she also
7  attended this program.
8      Q.  Okay.
9      A.  So I spoke with her -- well, the first time I
10  met her was speaking with her about whether or not this
11  was a good idea to do, so.
12      Q.  And who was that person?
13      A.  Shelly Sakiyama-Elbert is her name.  She's the
14  Chair of Biomed.
15      Q.  Okay.
16      A.  To be clear, she had done the program at her
17  previous academic institution before she joined UT.
18      Q.  And so it was people from across the country.
19  Was it also international?
20      A.  No -- well, a couple of people from Canada, so
21  the same way Major League Baseball is international,
22  right?
23      Q.  Hockey, et cetera.  Okay.
24          And this leadership group that you were
25  working with, it was -- was it focused on looking at

38

1 moving into administration and it really didn't have a
2 diversity equity component; or how would you describe
3 it?
4 A. Yeah. So I wouldn't -- I wouldn't actually
5 take your statement as truth because I think that the
6 program, its purpose was to prepare women for academic
7 leadership positions, whether classical administration,
8 in the sense of department chairs, deans, associate
9 deans, presidents, whatever or less classical ones,
10 director of the research center. So it was kind of all
11 leadership positions across the board.
12      But on top of that, I will say that in
13 this particular leadership program, there was a
14 definite -- it wasn't solely focused on DEI; but there
15 was a definite philosophy that a good leader is one who
16 masters diversity, equity, and inclusion. And so I
17 would say that it's not possible to divorce that
18 leadership training -- or I would say any leadership
19 training -- from the issues of diversity, equity, and
20 inclusion.
21 Q. And it was targeted at women?
22 A. It was only for women. Everyone who
23 participated was a woman.
24 Q. So that it would presuppose diversity, equity,
25 and inclusion, I would assume?

39

1 A. I don't know. I wouldn't -- I don't
2 necessarily agree with what you're saying. I don't
3 necessarily think that it's true to assume that every
4 woman has a bend towards diversity, equity, and
5 inclusion work.
6 Q. No, but that would be a part of the leadership
7 discussion if you focus your communication and program
8 at one particular aspect of --
9 A. Again, I can't agree with that statement just
10 because I can't agree that just because you put a bunch
11 of women in a room and talk about leadership, it's a
12 foregone conclusion that DEI is going to be a part of
13 that, just because women are underrepresented.
14 Q. I thought that's exactly what you said in your
15 answer, that if you're talking about leadership,
16 diversity and inclusion have to be a part of it?
17 A. That is what I said. I said if anyone is
18 talking about leadership, the philosophy of this
19 program -- and I agree with that philosophy personally
20 as a leader -- that if anyone is talking about
21 leadership, that DEI should be a part of it. I don't
22 think that has anything to do with the fact that it was
23 just women in that room.
24 Q. Okay. When did you first meet Dr. Nikolova?
25 A. I'm not sure. I think we first met after she

40

1 came to campus, but I can't be absolutely certain I
2 didn't meet her as part of her on-campus interview. I
3 don't recall.
4 Q. How many women were in your department when
5 you started?
6 A. When I started, I believe there were three, I
7 think. They were all -- I do know they were all full
8 professors when I started.
9 Q. And since you've gotten there, between when
10 you got there and Dr. Nikolova got there, how many women
11 came?
12 A. Off the top of my head, I can think of one;
13 but I don't know. That's not a definitive answer. I'd
14 have to go back and look at how the faculty changed over
15 that time.
16 Q. Would it be accurate to say that the
17 department has -- or the department has not done a good
18 job of recruiting and retaining women, from your
19 experience?
20 A. I've been in the department for 16 years. I
21 think our efforts at recruiting and retaining women
22 have changed dramatically over that period of time, and
23 so I can't use one blanket statement to characterize all
24 16 years. I think we've done an excellent job recently.
25 I think that in my first several years we did struggle,

41

1 so.
2 Q. And where did you see that change happen?
3 A. What do you mean, where?
4 Q. Where in time did you see that happening?
5 A. Oh, okay. Oh, I would say probably in the
6 last five or six years is when. Probably about the time
7 that Eddie first joined the department was when we kind
8 of really started to see a shift.
9 Q. Okay. And what would you attribute that shift
10 to?
11 A. I don't know. I don't know. I think more
12 conversations and more people of all stripes joining
13 that conversation about how important it was to have a
14 diverse faculty. And so I think, you know, it's one of
15 those: You build critical mass and you build momentum
16 from that critical mass and, you know, snowballs roll
17 down mountains. So I think that's the change we've
18 seen.
19 Q. Prior to Dean Wood coming to you to recruit
20 you for the Assistant Dean position, had you done any
21 work on diversity and inclusion in your department?
22 A. Yes.
23 Q. And what did you do?
24 A. A lot of what I had done was support of our
25 women students, and I am still the advisor for the women

42

1  in the ECE group.  And I give the students a lot of
2  credit for the creation of that group; but the truth is
3  I don't think the group would have started if I hadn't
4  pushed it, you know, as the faculty mentor.  And so they
5  just celebrated -- I guess, it was two years ago.  I was
6  going to say they just celebrated their ten-year
7  anniversary; but it's twelve now, I think.  So I think
8  that was a big step.  I think giving our female students
9  that community was really important, and I worked hard
10 to do that.
11        I've also worked really hard at trying to
12 broaden participation generally in computing,
13 specifically for -- I think I mentioned this before --
14 underrepresented middle and high school students.
15    Q.  I asked another bad question.
16    A.  I'm sorry.
17    Q.  No, no, it's not you.  It was me.  I wanted to
18 focus your answer on faculty, not students.
19    A.  Oh, okay.  So your question rephrased would be
20 what have I done within the department to -- I'm sorry.
21 Can you just ask it again?  I think that would be better
22 for all of us.
23    Q.  I don't know if I even remember it.
24        MR. NOTZON:  Debbie, do you know?
25        THE REPORTER:  I can read it.

43

1        (The requested material was read as
2  follows:
3        "QUESTION:  Prior to Dean Wood coming to
4  you to recruit you for the Assistant Dean position, had
5  you done any work on diversity and inclusion in your
6  department?")
7    A.  Okay.  So now, I'm going to add "for faculty,"
8  right, to the question?
9    Q.  (BY MR. NOTZON)  Right.
10   A.  I would say not a lot.  I think that I had
11 done some work when I chaired the Faculty Recruiting
12 Committee to talk -- have conversations within the
13 committee about biases and how biases can creep into
14 that process and why it's important for us to mitigate
15 them.  I think that everything else I had done would be
16 characterized as more informal, speaking out in faculty
17 meetings, yeah.
18   Q.  Being a female presence?
19   A.  Yeah.
20   Q.  Okay.  Did Dr. Nikolova join you in that
21 faculty recruiting effort?  Was she on that committee?
22   A.  I don't remember.  I'm sorry.
23   Q.  How many times have you been on the Faculty
24 Recruiting Committee?  Is it an annual thing that you
25 re-up for?

44

1    A.  Well, it's -- it is an annual committee.  As
2  long as we have openings to hire, we have the committee;
3  and as far as I can remember back, we've had openings to
4  hire.  So we've had the committee every year.  I chaired
5  it two years.  I'd have to go back and look at my notes
6  to be able to tell you even which two years that was.
7  And then, in addition, I've served on it another couple
8  years as a member of it; but, again, I'd have to go back
9  and look at my notes.
10   Q.  Would you agree that that was one of the more
11 time-intensive committees?
12   A.  I would.
13   Q.  And do you recall Dr. Nikolova being on that
14 committee with you at any time?
15   A.  I don't recall the membership of the
16 committee, even when I chaired it or didn't chair it.  I
17 know that she has served on the committee, and I know
18 that I have served on the committee.  So I'm sure it's
19 very likely that we overlapped, but I don't recall.
20   Q.  How do you recall that she has served on the
21 committee?
22   A.  Just -- I don't know.  I guess maybe I could
23 be wrong about that, also.  I don't -- I don't know.
24   Q.  Okay.  I was just wondering, you know, did you
25 know from a list.  That's why I was thinking you were on

45

1  the committee together; if you don't know, you don't
2  know.  That's fine.
3    A.  I don't know.
4    Q.  How about, do you recall having conversations
5  with Dr. Nikolova about being on the Faculty Recruiting
6  Committee during her probationary period and the time
7  factor involved and how it might impact her?
8    A.  Yeah, I don't recall having that conversation
9  with Dr. Nikolova.
10   Q.  Okay.
11       MS. HILTON:  Robert, whenever it's
12 convenient, maybe in the next few questions, can we take
13 a break?  We've been going for about an hour.
14       MR. NOTZON:  We have to break for an
15 hour?
16       MS. HILTON:  Oh, no.  We've been going
17 for about an hour.
18       MR. NOTZON:  Oh, okay.  I'm sorry.  I
19 didn't hear you.  I'm like, what?  No, we can take a
20 break.
21       MS. HILTON:  Perfect.  Thanks.
22       MR. NOTZON:  I'm sorry.  I just didn't
23 hear you.
24       MS. HILTON:  No, that's fine.
25       MR. NOTZON:  All right.

Christine Julien - 3/19/2021

46

1    THE REPORTER:  We're going off the record
2    at 10:56 a.m.
3        (Off the record from 10:56 to 11:10 a.m.)
4    THE REPORTER:  We're back on the record
5    at 11:10 a.m.
6    Q   (BY MR. NOTZON)  Okay.  We're back from the
7    break; and just to clarify, Professor, the start of your
8    position as an Associate Dean, when you started as an
9    Assistant Dean, that was the first time that the School
10   of Engineering had ever done that, correct?
11   A.  Yes, I was the first person in that role.  Can
12   you hear me?
13   Q.  Yes, I can.
14   A.  Okay.  Just making sure.
15   Q.  And do you recall -- or do you understand that
16   the start of that position is, in part, related to
17   Dr. Nikolova's complaint stemming from her denial of
18   promotion in the spring of 2019?
19       MS. HILTON:  Objection, form.
20   A.  I was not told that was a reason for the
21   position.  I didn't know that.  I don't know that to be
22   true.
23   Q   (BY MR. NOTZON)  Okay.  Temporally, it lines
24   up though, correct?
25   A.  In the sense that the position was created

47

1    after the lawsuit, yes.
2    Q.  After she complained, not after the lawsuit.
3    A.  I'm sorry.  You're right.  After she
4    complained.  Yes, you have the dates correct for those
5    things.
6    Q.  It was only a few months from her denial of
7    promotion and her raising the issues of gender and
8    pregnancy discrimination to CCAFR and CCAFR's request
9    that efforts be made to address, study, and look at
10   those issues that your position was created, correct?
11   A.  I don't know the specific dates of those; but
12   if those are the dates, that's the order it happened in.
13   Q.  Okay.  Would it be accurate that you had not
14   heard of any efforts -- given your passion for the topic
15   over the years, that you had not heard any efforts from
16   the College of Engineering to create this position prior
17   to the Spring of 2019?
18   A.  I had not heard of any efforts of the college
19   to create this position, that's correct.
20   Q.  Prior to the Spring of 2019?
21   A.  I'm sorry, yes.  Prior to the Spring of 2019,
22   yeah.
23   Q.  Earlier when you talked about that you had had
24   some negative -- negative comments, I think, was the
25   only experience you had at UT related to being a woman

48

1    in engineering, I didn't go further and ask you what
2    were those negative experiences that you specifically
3    had at UT from faculty, not from students.
4    A.  So you're asking me now to relay the
5    experiences that I had at UT?
6    Q.  Yes, please.
7    A.  Okay.  Yeah, so I've had a case where a
8    faculty member -- a female faculty member was with me;
9    and another male faculty member commented on how nice
10   she looked in bike shorts.  I thought that was a
11   negative experience.
12   Q.  I'd like names, please.
13   A.  Oh, okay.  Well, this was during my
14   interview as an Assistant Professor.  The woman that was
15   with me -- she was dropping me off -- was Rebecca
16   Richards-Kortum.  She's no longer at UT.  And Yale Patt
17   was the person who made the comment to her.  So that was
18   one.
19       In the very first faculty meeting I
20   attended in my department, an older faculty member,
21   who -- I don't remember who it was.  I remember that it
22   was an older male -- white male faculty member said to
23   me, earnestly and genuinely, "If you're here and your
24   husband is also at work, who's at home taking care of
25   cooking and cleaning?"  And so that's...

49

1        And then others are I've had negative
2    comments or at least comments that made me uncomfortable
3    on my course instructor evaluations from students.
4    Q.  From faculty.
5    A.  Okay.  I'm sorry.
6    Q.  Faculty or administration.
7    A.  I've never experienced any from the
8    administration I can say for certain.
9        And those are the ones that stick in my
10   head that I would construe as negative experiences,
11   negative comments; and I just thought of another one.  A
12   comment was made in my presence about another female
13   faculty member who was single, and it was just another
14   male faculty member who I don't remember.  I'm sorry.
15   You wanted names.  The female faculty member in question
16   was Margarida Jacome -- she's passed away since -- and I
17   don't remember the male faculty member who made the
18   comment.  But basically it was something to the effect
19   of:  She's single.  She's always been single.  I wonder
20   why she's not married.  She seems like quite a catch.
21   So I think that -- the fact that the comments stick with
22   me is what kind of labels them, in my mind, as negative,
23   so.
24   Q.  I was steeling myself for the comment --
25   A.  I know.  I'm sorry.  I didn't deliver.

50

1    Q.  -- that you didn't deliver.  I mean, a guy's a
2  catch, too.  So, anyway.  All right.
3    A.  Well, yeah.  Sorry.
4    Q.  So that would be the sum total of negative
5  experiences that you've had from faculty members that
6  you can recall, sitting here today, at UT?
7    A.  That's what I can recall from at UT, faculty
8  members, negative experiences, yes.
9    Q.  Okay.  Let me broaden the question to what
10  you've observed.  Negative experiences from other
11  women -- that you've observed other women to have
12  experienced.  And I understand the shorts comment would
13  fall in there.
14    A.  Okay.  So some of these were other women
15  experiencing them.
16    Q.  But, yeah, that other women experienced or
17  directed at other women that you're aware of.
18    A.  That I'm aware of, I guess, is different than
19  observing, right?
20    Q.  Sure.  Let's start with observed.
21    A.  I think I covered the ones that I observed
22  just because, as an observer, I find them to be negative
23  experiences myself, so.
24    Q.  Yeah.
25    A.  I can't think of others that I've observed.

51

1    Q.  Okay.  And I want to make sure that we're not
2  just talking about comments.  We're talking about any
3  negative experience that you, from your experience, may
4  attribute to gender.
5    A.  Yeah.  So some things I would attribute to
6  gender have come up over time in faculty recruiting; and
7  one way this comes up that I see as a negative that I
8  think is gender based is when we're discussing hiring a
9  female faculty member, the conversation will turn to
10  what her husband does and whether he also needs a
11  position.  And, again, it's my perception that that
12  tends to happen much more frequently for women than it
13  does for men.
14    Q.  Yeah, but it's both ways, right, because you
15  could ask that question both ways?
16    A.  Either way, yeah.
17    Q.  But it doesn't happen --
18    A.  Yeah.
19    Q.  -- from your experience?
20    A.  It has happened the other way, also.  It just
21  seems to happen, in my perception, more frequently when
22  the person we're considering is a woman.
23    Q.  A non-scientific study?
24    A.  Completely non-scientific.  I'm almost
25  embarrassed by it.

52

1    Q.  Given your field.  Okay.  Understood.
2        Any others that you've observed, and then
3  we'll move to the broader category of -- well --
4    A.  Again, we're still talking about faculty,
5  right?  Faculty on faculty, if you will?
6    Q.  Yes.
7    A.  Yeah, I think that's pretty much what I can
8  recall.
9    Q.  All right.  So the next broadening would be
10  not that you're aware of -- I think that would be the
11  last broadening category.  The next would be that you
12  have heard about from the woman.
13    A.  So cases where a woman has said something to
14  me about...
15    Q.  Their negative experience.
16    A.  Negative experience.  I mean, there's
17  obviously --
18    Q.  Sticking with the faculty, still.
19    A.  Faculty or faculty or administration?
20    Q.  Yes, faculty and above.
21    A.  So there's, obviously, the cases that Eddie
22  brought up, so Eddie expressing a concern that the
23  tenure decision was related to her gender or an
24  implication that that might happen.
25    Q.  Let's leave Dr. Nikolova off to the side.

53

1    A.  Okay.
2    Q.  And we'll talk about those separate --
3    A.  Okay.
4    Q.  -- if that's okay with you.
5    A.  Sure.
6    Q.  Okay.
7    A.  So there was another female faculty member,
8  who she left; she went to UCLA.  Her name is Miryung
9  Kim.  We were close friends -- or we are close friends.
10  And I'm trying to recall if we've had conversations
11  about concerns about faculty, and I don't recall any.
12        If we broaden it to students, I can
13  discuss that.  I'm sorry.  I don't have any others.
14    Q.  So would it be Dr. Kim?
15    A.  Dr. Kim, yes.
16    Q.  Okay.  Was Dr. Kim -- and that's her last
17  name?
18    A.  Her last name.  Miryung is her first name.
19    Q.  Okay.  You know, it could be confused --
20    A.  Yeah.
21    Q.  -- in the English-speaking world, most likely
22  the United States.
23        Dr. Kim, so she left.  She had a negative
24  gender experience, but it wasn't with a colleague or
25  administration?

54

1     A.  I think her struggles were with students --
2  she had some concerns about students that she related to
3  me.
4     Q.  Students were mistreating her as a woman?
5     A.  I think that she -- the way that I had
6  interpreted the conversations that she and I had was
7  that the students were responding to her differently
8  than they would a male instructor.
9     Q.  Okay.  And just to -- I don't want to get into
10  any details, necessarily.  This would be a non-sexual
11  difference in treatment?
12     A.  Yes.  Although, I just now, through this
13  conversation, remembered another female colleague
14  mentioning a sexual difference in treatment from
15  students, as well, so.
16     Q.  But finishing with Dr. Kim, it was more her
17  interactions with the students and feeling not
18  respected, like she felt like a male professor would?
19     A.  She felt the students treated her differently,
20  expected different things from her, because she was a
21  woman, than they would a male instructor.
22     Q.  All right.  And what is the other individual
23  that you just remembered?
24     A.  I'm sorry, yeah.  The other person is Mary
25  Eberlein.

55

1     Q.  Okay.
2     A.  She was a non-tenure track, so a teaching-
3  track faculty, which means her role is solely teaching;
4  there's no research portion of it.  And, yeah, she was
5  treated differently in the classroom, effectively asked
6  out on a date by a student.
7     Q.  Okay.  All right.  And so that's the sum total
8  of your experiences where a female has complained to you
9  about being mistreated as a female in the department by
10  faculty -- well, that was a student one; but, yeah.
11        So if we broaden it to "aware of," are
12  there any others out there that are women faculty that
13  had issues with being treated differently because
14  they're women, from faculty or above?
15     A.  Yeah.  I don't -- I can't recall any
16  additional ones.
17     Q.  Okay.  With Dr. Nikolova, going back to
18  her, what was the first time that you recall her
19  mentioning -- well, the first time you observed or the
20  first time you mentioned -- she mentioned to you that
21  she felt like her gender may have been a factor when it
22  shouldn't have been?
23     A.  I think the first time I recall it being
24  explicitly mentioned was near when she was, like, just
25  finishing her third-year review and preparing her tenure

56

1  package, kind of in that timeframe; but I think it was
2  more implied than explicit.
3     Q.  Do you remember the context?
4     A.  Yeah.  The context was -- so one of the
5  contexts was around course instructor evaluation; and
6  she asked me the question had I ever -- did I feel like
7  my course instructor evaluation scores, like, the
8  numeric scores were different because I was pregnant.
9  And so I kind of took from that -- she didn't explicitly
10  say so, but I took from that an implication that she
11  wondered if maybe hers were.
12     Q.  And that's the student scores?
13     A.  That's the student scores, yeah.  I'm sorry.
14  I keep mixing this up.  You're asking specifically about
15  faculty?
16     Q.  No, no, no, I want anything gender related
17  between -- that Dr. Nikolova and you discussed.
18     A.  Okay.  So there was that.
19     Q.  And what was your response?
20     A.  No, I did not feel that that was the case.
21     Q.  Okay.  Had you been aware of any studies where
22  that was identified as a factor, gender?
23     A.  Gender for sure.  Actually, that was the first
24  time I had considered pregnancy, when she asked; and I
25  am not aware of any studies that looked at pregnancy

57

1  specifically.  That doesn't mean they don't exist.  But,
2  yeah, I was aware at the time when she asked and
3  probably included this in my response to her that there
4  were studies that showed that women do tend to receive
5  statistically lower course instructor evaluations when
6  you've controlled for everything else; but, again, that
7  hasn't been my experience.  But, I mean, I'm comparing
8  myself to myself, right?  So I don't know.
9     Q.  How do you know, right?
10     A.  Yes, there's no way to know for one
11  individual.  So you can only look at that, really, for
12  that.  That's why the studies include scores from a
13  broad range of institutions.
14     Q.  So, from your own experience, either you're
15  not being under scored because you're a female or
16  because you were pregnant at the time; or you actually
17  should be getting higher scores than you're getting.
18  And you're doing really well?
19     A.  Right -- well, I guess.  I mean, my scores are
20  high, to begin with.
21     Q.  That's what I'm saying.
22     A.  Yeah, so.
23     Q.  You're doing very well, but maybe you should
24  be doing even better?
25     A.  Yes, there is no way to know.

58

1    Q.  Right.  Other than -- I mean, let's talk about
2    the studies, right?  Do you -- the studies you've read
3    and that you've looked at, are they peer reviewed?  Are
4    they credible, reliable sources of information that you
5    use in your job as Associate Dean?
6    A.  Yes.
7    Q.  So, you know, there's no way to know; but
8    there is a way to know that, when you read these studies
9    and they exist and they're replicated and they're peer
10   reviewed, doesn't that, in fact, tell you that you know
11   that you've been under scored?
12   A.  No.  So the studies specifically don't say
13   anything for any particular individual.  The studies say
14   something for an average and they are peer reviewed and
15   they are robust studies, which means they have
16   statistical significance, which means they're covering a
17   very, very large sample and controlling for all kinds of
18   things.  Again, not my area; but I understand and trust
19   the venues that they've been published into and that of
20   this research.  And I think that the understanding and
21   the application is in the aggregate.  The application is
22   not to the individual.
23   Q.  Okay.  So despite the fact that you're a woman
24   in STEM and you're teaching and you get scores, just
25   because that study is robust and says, you know, on the

59

1    average, women are under scored compared to men just
2    because of their gender, your experience could -- is not
3    mandated to have that average result?  You could be not
4    under scored at all, from your personal experience.
5    That's what you're saying, right?
6    A.  Yes.  What I'm saying is that the aggregate
7    study says that, on average, women are under scored,
8    which basically means quite likely that some women are
9    not under scored at all -- and, perhaps, might be over
10   scored -- and some other women are under scored
11   dramatically, right?  And it all averages out to, on
12   average, under scoring.
13   Q.  Okay.  And so if you were to -- so what you
14   can say is, conclusively, you don't know what's going on
15   with you; but there's a chance that you're being under
16   scored, based upon the study?
17          MS. HILTON:  Objection, form.
18   A.  I would say that, based on the study, what the
19   study says, is that there is a higher likelihood that I
20   am being under scored than my white, male colleague,
21   teaching the same class.
22   Q.  (BY MR. NOTZON)  And if you wanted to look at
23   your personal experience and whether or not you're being
24   under scored, you'd have to look at other data.  You
25   can't just look at your scores, and you can't just look

60

1    at the study?
2    A.  I think that, in my opinion, and I think the
3    way we're trying to push policy at the university is
4    that the scores are not the be-all, end-all evaluation
5    of teaching.  So, yes, you have to look at a wide
6    variety of things.
7    Q.  Put the scores in context?
8    A.  Correct.
9    Q.  Okay.  Recognizing that the scores are not
10   necessarily gender-free measures of performance?
11          MS. HILTON:  Objection, form.
12   A.  The scores should be placed in context because
13   there's a lot of different reasons why they are not
14   perfect measures of teaching performance and outcomes,
15   learning outcomes, and all kinds of different things,
16   not just gender.  Gender is one piece.  Race is a piece.
17   Difficulty of course is a piece.  Whether or not the
18   course is required is a piece.  These all play into
19   under scoring or over scoring an instructor for a
20   particular course.
21   Q.  (BY MR. NOTZON)  And since Dr. Nikolova's
22   issue about pregnancy, have you determined that
23   pregnancy is also an issue that's been studied?
24   A.  I haven't.  I believe that when she asked me
25   this question, I did try to find some studies on this;

61

1    and I don't recall finding any.  But I maybe missed
2    them, or I don't know.  But I haven't seen any, you
3    know, peer-reviewed studies on the same -- on that topic
4    in the same way that they do gender.  It's possible it's
5    because, specifically, there's not enough data.  I don't
6    know.
7    Q.  Or you haven't seen it because you haven't
8    looked for it since, and they've now come up with it?
9    A.  Yeah.
10   Q.  Would that be accurate that since Dr. Nikolova
11   raised it, you haven't looked up that issue?
12   A.  I don't know.  I do a lot of looking for bias
13   in course instructor ratings, bias in faculty
14   evaluations, bias in all kinds of things.  It's part of
15   my job to do that.  I don't believe I've done a specific
16   Google search for, you know, impact of pregnancy on
17   course instructor evaluations; but it's possible that
18   I've come across some literature and forgotten it since
19   then.
20   Q.  And based on pregnancy, do you believe that
21   that could be a factor?
22          MS. HILTON:  Objection, form.
23   A.  You're asking whether I believe pregnancy
24   could be a factor in students' course instructor
25   evaluations?

Christine Julien - 3/19/2021

62

1    Q.  (BY MR. NOTZON)  Yes.
2    A.  I believe that anything a student can perceive
3  in the classroom could impact how they rate the
4  instructor, so.  I mean, I've gotten lower or higher --
5  I'm not sure -- ratings based on a pair of boots that I
6  wear to class on a regular basis.  So it's unclear how
7  it would impact the course instructor evaluations, to
8  me.
9    Q.  Is this another one of your non-scientific --
10    A.  Yes.  I mean, yes.  Yeah.
11    Q.  Okay.  Is part of your role as Associate
12  Dean identifying sources of bias in recruitment and
13  retention --
14    A.  Yes.
15    Q.  -- and trying to deal with it?
16    A.  Yes.
17    Q.  And what would you -- what could you say are
18  some of the sources of bias in retention issues?
19    A.  So the way that bias can impact retention, I
20  think --
21    Q.  I'm sorry.  I used the word "source."  I
22  really meant "signs," like, the existence of bias, not
23  where it comes from.
24    A.  Okay.  So I think bias -- bias can impact
25  retention specifically in how it's used to rate faculty,

63

1  I think.  I think other issues related to DEI might also
2  impact retention, but I'll answer specifically for bias.
3    Q.  Let me stop you.
4    A.  Okay.
5    Q.  Let me re-ask the question because that was
6  really disjointed.  I apologize.
7       So when you're looking at a situation
8  within faculty-to-faculty or faculty-to-administration
9  interaction and you're trying to eliminate the
10  possibility or existence of bias, what are you looking
11  for in terms of the signs that might indicate that bias
12  is present?
13       MS. HILTON:  Objection, form.
14    A.  I think I'm still confused about your
15  question.  So I'm looking at -- observing or listening
16  to a report of an interaction between two faculty
17  members and asking whether or not bias impacted that
18  interaction?
19    Q.  (BY MR. NOTZON)  That could be one or, like I
20  think you said, an example would be that -- you know,
21  for example, one faculty member in a particular
22  situation -- let's say, for example, one faculty member
23  is given an assignment and another faculty is not given
24  an assignment and the only difference between the two
25  are their gender or their race or, you know, that kind

64

1  of a difference in treatment or this person's allowed
2  to, you know, do something, turn it late -- turn in
3  their information late and this person isn't and the
4  difference -- you know, so a difference in treatment
5  might be a sign of bias.
6    A.  I'm still confused if you're asking about
7  whether the difference in treatment is a sign of bias or
8  if bias is causing the difference in treatment.
9    Q.  The first.
10    A.  So if I notice a difference in treatment -- I
11  can say these two people were clearly treated
12  differently -- and then I ask whether or not that was
13  caused by bias, this is your question, what are we doing
14  on that?
15    Q.  No, that just identifying a difference in
16  treatment is a sign that bias might be in play; and are
17  there other things that you're looking for besides
18  differences in treatment?
19    A.  I'm not trying to be dense.  I really just
20  don't understand what you're asking.  I'm sorry.
21    Q.  Well, let me ask if you agree that a
22  difference in treatment between two faculty members of
23  different genders could be a sign that bias is in play.
24  Is that accurate?
25    A.  If two faculty members are treated

65

1  differently, there could be bias behind the different
2  treatment, yes.
3    Q.  Okay.  And so the question will be if a male
4  and a female are treated differently, there could be
5  bias.
6       The next question:  If every time -- like
7  the timing of events, every time something happens for a
8  woman, this is the result; and so it's also a difference
9  in treatment.  But every time it happens to a man,
10  nothing happens.  So I guess that's also a difference in
11  treatment, but there's a timing issue involved in
12  identifying the bias.  Would you agree that that could
13  also form a sign of bias?
14       MS. HILTON:  Objection, form.
15    A.  Anytime two people are treated differently,
16  bias could be one explanation for the difference in
17  treatment if there's something else that's different
18  about them, race or gender or disability.  It's not
19  necessarily the case that bias is the reason for the
20  different treatment, but it's possible that bias is the
21  difference.
22    Q.  (BY MR. NOTZON)  If there's a false
23  explanation that's provided to justify the difference in
24  treatment, would that also lend credence to the
25  possibility that bias was at play?

66

1         MS. HILTON:  Objection, form.
2     A.  I don't believe that if there's a false
3 explanation, that there's any more justification --
4 like, any more strength in the belief that it was bias
5 versus not.  I don't think that would change the
6 potential for bias impacting the decision.
7     Q.  (BY MR. NOTZON)  Why is that?  Why does that
8 not increase the chance of bias?
9     A.  Because the explanation happens after; the
10 bias comes before.
11     Q.  Right, but the explanation could be trying to
12 hide the bias.
13     A.  It could be trying to hide the bias.  It could
14 be trying to hide something else.  It could be a
15 mistake.  I think reading into that would be beyond -- I
16 don't think it changes the likelihood that bias
17 influenced the decision in the first place.  That's my
18 opinion.
19     Q.  The likelihood of finding or the likelihood
20 that the bias was there or identifying -- it doesn't
21 help you identify that somebody could be trying to hide
22 something that they know to be improper or illegal
23 behavior?
24         MS. HILTON:  Objection, form.
25     A.  Can you -- so can you -- help me with the

67

1 pronouns in your question so I can make sure I'm
2 answering the right thing?
3     Q.  (BY MR. NOTZON)  Sure.  So you would agree
4 that when somebody engages in gender-based bias, that
5 they would know that that is not appropriate?
6         MS. HILTON:  Objection, form.
7     A.  Most of the time -- I don't even know if it's
8 most of the time.  It is possible that when someone
9 engages in gender bias, they know it's inappropriate.
10     Q.  (BY MR. NOTZON)  If not before they do it,
11 after they do it?
12         MS. HILTON:  Objection, form.
13     A.  In my experience, personal experiences, people
14 will engage in bias and not realize that it's wrong,
15 even when confronted with an accusation of -- even when
16 confronted with an accusation of participating in bias
17 and acknowledging that they did it, they don't
18 acknowledge that it's wrong.
19     Q.  (BY MR. NOTZON)  Okay.  And that's some
20 percentage of the time, but you --
21     A.  It has happened.  It's a non-zero percentage.
22     Q.  Yeah, but you wouldn't say it's the majority
23 of the time.
24     A.  It's not the majority of the time.  Most
25 people realize that treating people different because of

68

1 gender is wrong.
2     Q.  Right.  And when called out on it, might want
3 to deny that their actions were gender-based bias?
4         MS. HILTON:  Objection, form.
5     A.  Many people believe -- and the research backs
6 this up -- that those engaging -- so people who engage
7 in bias, making bias-influenced decisions do not realize
8 that they are doing it.  And that's the nature of bias.
9 And when confronted with it, they still don't believe
10 that they engaged in biased behavior, genuinely don't
11 believe that they engaged in biased behavior.  There's
12 plenty of research that shows that this is the case.
13     Q.  (BY MR. NOTZON)  So they will deny it.
14 Whether they believe it or not, they would deny it?
15         MS. HILTON:  Objection, form.
16     A.  A person who -- I'm sorry.  I'm not exactly
17 sure what you're asking; but a person who engages -- has
18 bias, which is -- you know, all of us have bias and if
19 that bias influences a decision in an unmitigated way,
20 in some cases people will not recognize that they did
21 it, even when confronted with it.
22     Q.  (BY MR. NOTZON)  Right.  So they'll either
23 deny it because they don't recognize it as being bias or
24 they'll deny it because they don't want to be held
25 accountable for it or they'll deny it because they don't

69

1 want to admit it?
2         MS. HILTON:  Objection, form.
3     Q.  (BY MR. NOTZON)  Those are possibilities,
4 right?
5         MS. HILTON:  Same objection.
6     A.  If a person is confronted and accused of being
7 biased, they can say lots of things; and all of -- they
8 could say:  Yes, I was.  Thank you.  They could say:
9 No, I wasn't.  They could say:  No, I wasn't but know
10 that they were.  So, yes, these are possibilities.
11     Q.  (BY MR. NOTZON)  And in that denial, they
12 could provide a false explanation to justify their
13 denial?
14         MS. HILTON:  Objection, form.
15     A.  Yes, they could.
16     Q.  (BY MR. NOTZON)  And if you could prove that
17 they knew that the justification they gave was false,
18 because they also have the true answer, would that be
19 some indication that bias was at play?
20     A.  No, you'd have to prove that they were biased
21 in the first place, I think, in order to make an
22 accusation that they were covering.
23     Q.  They know the true answer when they gave the
24 false answer.  That would not be --
25     A.  Sorry.

70

1        MS. HILTON:  Objection, form.
2    A.  Ask it, again, please.  I'm sorry.
3    Q    (BY MR. NOTZON)  I was trying to provide you
4  with that evidence that you said that you have to prove
5  that they knew that they were engaged in bias before
6  they did it.  And I said the evidence is in the
7  knowledge of the truthful reason why they took the
8  action and the knowledge that the false answer they gave
9  was false at the time they gave it.
10    A.  They would need to --
11        MS. HILTON:  Objection, form.
12        THE WITNESS:  Sorry.
13        MS. HILTON:  Go ahead, Dr. Julien.
14    A.  They would need to know that the explanation
15  they were giving is false.  They might not know that the
16  explanation that they're giving is false.
17    Q    (BY MR. NOTZON)  Right.  I said -- I mandated
18  in the hypothetical that they know it's false because
19  they know the true answer.
20        MS. HILTON:  Objection, form.
21    A.  I mean, we've wandered into a very special
22  case that's different from bias influencing decisions.
23  So I think we may have wandered away.  I'm not exactly
24  sure what track we're on, like, what the whole setup for
25  this is.  So I can't answer this hypothetical --

71

1    Q.  Okay.
2    A.  -- without a clear background.
3    Q.  Or a clearer example.
4        Would statics help you understand that
5  bias is at play?
6    A.  Statics about what?
7    Q.  So if there are, you know, fifty men hired for
8  a position and only one woman, might bias be something
9  that you might want to look into?
10    A.  So you're asking specifically about bias in
11  the faculty recruiting process?
12    Q.  No, this is just in general.  If a hundred men
13  are hired for a position or fifty men are hired for a
14  position and one woman is hired for that position, would
15  you want -- or would that indicate to you that bias
16  might be at play?
17    A.  There's not enough information in that
18  statistic.  You don't know what the applicant pool
19  looked like.  I mean, statistics can help to answer that
20  kind of abstract question.  Statistics can be useful in
21  teasing out whether bias is at play, but you have to
22  make sure you have the right statistics and that they're
23  capturing what you need to capture in order to evaluate
24  the bias.
25    Q.  My question is:  Would that cause you to want

72

1  to look into it because bias might be at play, not was
2  at play, not to conclude, but to look into it?
3    A.  So we use statistics all the time to ask these
4  questions of our various processes, and those statistics
5  can give us an indication as to whether or not bias is
6  at play.
7    Q.  Okay.  And you use that in your role as
8  Associate Dean?
9    A.  Yes.
10    Q.  And what statistics have you looked at to
11  determine -- specifically related to gender bias since
12  you've had the role?
13    A.  Yes.  So top of mind is faculty recruiting.
14  So we'll look at -- for faculty recruiting, we will look
15  at the statistics related to the applicant pool; and we
16  will -- we try not to ever look at a single year,
17  because, just like the examples with Course Instructor
18  Surveys, looking at a single person can be misleading.
19  So we look over multiple years.  We try to look across
20  departments so that we get kind of as broad a view as we
21  can.  We look at applicant pools.
22        We look at what we call "short lists" in
23  our Faculty Recruiting Committee.  So we take the broad
24  applicant pool, and we try to carve out kind of a set of
25  candidates that we're particularly interested in.  So

73

1  we'll look at the statics.  And when I say "statistics,"
2  I'm talking about demographics.
3        And so specific to your question, we
4  might be looking at men and women or people who identify
5  as women and people who identify as men, to be specific
6  and completely clear, in the applicant pool in that
7  short list of candidates.
8        Then, we'll look at the candidates that
9  we decide to bring on campus.  We will look at
10  specifically the candidates we decide to make offers
11  to -- that's what I said -- which is slightly
12  different than the candidates we make offers to for a
13  variety of reasons.  So the candidates we decide to make
14  offers to.  And then candidates who decide to accept our
15  offers.
16        So we'll look at all of those because all
17  of those are dates that have different implications for
18  how bias can play in, right?  And we'll kind of look at
19  how are we doing at each level and how do the
20  demographics of each group compare to the group before.
21  And that's one way we can look at, not does bias play
22  in, because, again, I can go back to we are all biased,
23  so we all bring biases to our jobs; but are we
24  successfully mitigating those biases throughout that
25  process.

74

1    Q.   And just to be clear, going back to the
2   student evaluation scores, the course evaluation scores,
3   CIS, you weren't trying to equate wearing boots or an
4   article of clothing with pregnancy as being a potential
5   impact on scores, were you?
6    A.   I was not trying to equate those, although the
7   comment about my boots was decidedly sexual in nature.
8   So it was a gender-based comment, but it was not a
9   pregnancy-based comment.
10   Q.   Okay.  So an article of clothing, you broaden
11   to sex being a factor?
12   A.   I didn't broaden it; the student did, who made
13   the comment, but yes.
14   Q.   So that was just a one-time event?
15   A.   It's the one that sticks in my mind.  I
16   believe I've had other comments on my Course Instructor
17   Surveys, although, it would have been -- none of them
18   are super clear in my mind.  So I think they have
19   tapered out, perhaps since I've gotten older.  I've
20   received similar comments from students who I --
21   comments on Course Instructor Surveys that I would have
22   deemed inappropriate, but I don't remember concretely
23   any other examples.
24   Q.   Okay.  Let's go back to Dr. Nikolova.  You
25   said the first time that you recalled her raising an

75

1   issue with you was this pregnancy on the CIS numbers for
2   you.  What was the next time you recall Dr. Nikolova
3   raising gender with you?
4    A.   I don't recall any concrete instances.  I
5   know -- like I said, the next one that I definitely can
6   put a time on was the e-mail she sent to the entire
7   faculty after her tenure decision, where it was
8   explicitly mentioned or at least explicitly suggested, I
9   guess, is the way to put that.  Those are the times I
10   recall.
11   Q.   Is that the e-mail where she, in short, said
12   that:  This is my experience, and I'm putting it out
13   there publicly to try to help?
14   A.   Yes, that's that e-mail.
15   Q.   All right.  I think it starts off "elephant in
16   the room"?
17   A.   That's right.
18   Q.   Did Dr. Nikolova know that you were pregnant
19   during your probationary period?
20      MS. HILTON:  Objection, form.
21   A.   I don't know.
22   Q.   (BY MR. NOTZON)  You didn't have discussions
23   about that with her?
24   A.   I don't think we ever discussed it explicitly,
25   but we were friend and she had met my daughter.  And

76

1   math is math, so I think it's probably a thing that she
2   knew.
3    Q.   Okay.  Did she consult with you as at least an
4   informal mentor?
5    A.   I think that, yes, it would be likely that we
6   would have discussed kind of how to navigate being
7   pregnant in the department.
8    Q.   Okay.  You just don't recall?
9    A.   I don't recall specific discussions about it;
10   but this is something I've done, you know, for junior
11   female faculty that have joined.
12   Q.   So other junior female faculty have been
13   pregnant during their probationary periods as well?
14   A.   Yes.
15   Q.   Okay.  And I think some of those are reflected
16   in the Modified Instructional Duty data.  Do you know
17   any that didn't take Modified Instructional Duty?
18   A.   I don't have any idea.  I would be surprised
19   to find out that any didn't avail themselves of it; but
20   that's everybody's choice, so.
21   Q.   Do you recall Dr. Nikolova ever complaining
22   about how she was being treated because of her pregnancy
23   or having given birth, you know, having a newborn or
24   breast feeding or pumping or anything like that?
25   A.   I don't recall any of those specifically with

77

1   Eddie.  I don't remember having those discussions with
2   Eddie.  I've had those discussions with colleagues
3   before.  I don't remember details about who I was having
4   those conversations with.
5    Q.   If you did, you're just not recalling them
6   now?
7    A.   That's right.  Discussing pregnancy, standing
8   an hour and a half while grossly pregnant, pumping in
9   your office are conversations that, you know, female
10   faculty will have.
11   Q.   Okay.  And you don't remember Dr. Nikolova
12   specifically making any comment about Chair Tewfik
13   treating her differently or mistreating her or not
14   recognizing her condition of being pregnant or caring
15   for a newborn or anything like that?  That doesn't ring
16   a bell for you?
17   A.   I don't remember any of those conversations
18   about disparate treatment relating to pregnancy or
19   gender.
20   Q.   Did you ever have conversations with
21   Chair Tewfik about Dr. Nikolova's issues related to her
22   complaints of gender or pregnancy?
23   A.   I don't believe I have -- oh, sorry.
24      MS. HILTON:  Objection, form.
25   A.   I don't believe that I have.

78

1    Q.   (BY MR. NOTZON)  Okay.  Have you had any
2  conversations with Dean Wood about Dr. Nikolova's
3  complaints of gender bias or pregnancy bias?
4    A.   I don't believe that I have.
5    Q.   And that would be before or after your
6  position as the Assistant Associate Dean?
7    A.   Yes, I don't recall having had any
8  conversation with Dr. Wood about Dr. -- or
9  Dr. Nikolova's pregnancy or potential gender bias.
10    Q.   After Dr. Nikolova sent that elephant-in-the-
11  room e-mail, did you take any action to respond to that
12  e-mail, to her?
13    A.   I don't think that I did.
14    Q.   Did you have any conversations with any other
15  faculty members in ECE about that e-mail?
16    A.   Yes.
17    Q.   Were these e-mail or verbal conversations?
18    A.   Both.
19    Q.   Okay.  And were you -- what was your -- I
20  guess, if you could, just describe those conversations
21  with us.
22    A.   So with the verbal conversations with other
23  colleagues in the department, or what are you asking me
24  to describe?
25    Q.   Sure.  We'll start with verbal or start with

79

1  e-mail, whichever you choose.
2    A.   Okay.  Yeah.  So I reached out to some of the
3  junior faculty, specifically some of the female junior
4  faculty, we had, you know, copied just to kind of catch
5  up.  I wanted to -- I was very concerned about them,
6  very concerned about how they would react to that
7  e-mail.  They're in an extremely vulnerable place, and
8  so we had coffee and kind of chatted about what they
9  felt like.
10        So those specific faculty that I talked
11  to, the one conversation that sticks in my mind was with
12  Hao Zhu and Jean Anne Incorvia.  So we just discussed
13  kind of how they felt about it, what their concerns
14  were, and I just tried to provide mentoring for them,
15  so.
16    Q.   Yeah.  I mean, that's the whole point of that
17  e-mail, right, is that assistant professors were in a
18  very vulnerable position, Exhibit A, Dr. Nikolova?
19    A.   Yeah.
20        MS. HILTON:  Objection, form.
21    Q.   (BY MR. NOTZON)  And so you were just making
22  yourself available to them, saying, you know, "I'm here
23  to answer any questions; and if you have any, need any
24  support, let me know," kind of thing?
25    A.   That's what it was.  I mean, we had a -- so,

80

1  you know, I reached out to them.  I don't remember if I
2  reached out to them by e-mail or in person; but we
3  didn't have a substantive conversation over e-mail, I
4  don't think.  I think the substantive conversation was
5  in person.
6        We had a morning meeting in the cafe, in
7  a public space, if that matters.  We broached the topic
8  of the e-mail that we had all received.  I asked how
9  they were feeling.  I asked how they were doing.
10        One of these colleagues is in a very
11  similar position to Eddie, having come to UT from
12  another serving -- I was going to say "serving some
13  time" -- spending some years at another institution.
14  And so just kind of making sure she felt comfortable and
15  kind of understood what the processes were and what the
16  implications were for her, I think that was the
17  conversation.
18    Q.   Okay.  And what was -- can you summarize your
19  advice to her?
20    A.   I mean, every tenure case is an individual
21  case.  I suggested that she should -- she's not in my
22  area.  None of these three faculty are in my area,
23  Eddie, Hao, or Jean Anne.  So it's hard for me to
24  provide kind of concrete:  Is your research good?  Is
25  your research -- I don't know.  But, you know, kind of

81

1  making sure you're getting good mentoring from within
2  your area, doing the right level of service, you're
3  teaching the right classes and showing a trajectory in
4  those classes that's important.
5        And then, the most important thing, to
6  me, is getting advice from your mentor, from the
7  Department Chair, from the Dean and understanding and
8  heeding the advice.  So making sure, you know, you
9  understand what the expectations are for promotion at
10  whatever timeline you intend to pursue it.
11    Q.   And that's really hard advice to give, right,
12  because there is no known goalpost that you can point
13  to?
14        MS. HILTON:  Objection, form.
15    A.   What goalpost are you speaking of?  I'm sorry.
16    Q.   (BY MR. NOTZON)  You know, if you're going to
17  prepare your promotional package to get tenure, to put
18  the package through the goalpost, as it were, to score;
19  but you don't know where that goalpost is.  You don't
20  know where the bar is.  You don't know what's high
21  enough to clear.  You don't know these things, right?
22        MS. HILTON:  Objection, form.
23    A.   So you know what's expected for tenure.  It's
24  not like it's a quantitative set of metrics and you can
25  achieve them and then wash your hands and be done.  I

82

1  don't think that's true at any institution.
2        I think that we have a good understanding
3  of what the bar is for tenure; and we try to assign
4  mentors for faculty members, I think, that have a good
5  understanding of what that bar is and can help, in a
6  very individual case, get somebody to understand what it
7  means to meet that bar.
8        I think that, you know, there's also the
9  height of the goalpost, if you will, so how high the bar
10 is, which is also different depending on the timeline.
11 And so I think that, you know, we communicate to people
12 that we hire when we hire them that, you know, we have
13 one tenure clock for everybody and anything else is
14 considered an early promotion and the bars are
15 different, so.
16     Q.  Right.  But if you go up early, like somebody
17 else went up early, then, you should be able to rely on
18 that bar?
19         MS. HILTON:  Objection, form.
20     A.  I'm sorry.  What are you asking?
21     Q.  (BY MR. NOTZON)  So if there are other
22 examples of accelerated promotion and they cleared the
23 bar that they cleared, is that an indication of where
24 the bar is at the higher level?
25     A.  Yeah, I mean, that's exactly how we provide

83

1  the advice that we provide is based on kind of what our
2  expectations are for that early promotion.  Of course,
3  every case is different because everybody's research
4  area is slightly different.  Everybody's teaching
5  slightly different classes -- dramatically different
6  classes, in some cases.
7        So you can't -- again, you can't just use
8  numbers from a previous case.  If we could, we would
9  just provide those numbers to everybody, right?  We
10 don't have them.  So each case has to be individual.
11     Q.  And you played a role with Dr. Nikolova's
12 assessment from the Budget Committee; is that right?
13 You wrote the teaching assessment?
14     A.  I co-wrote the teaching assessment that was
15 written by two of us.
16     Q.  Okay.  Let me -- we're going to make an
17 exhibit of that document, and it's going to be in your
18 chat.
19     A.  Oh, okay.
20     Q.  So you're going to have to download it to get
21 it as soon as I put it up.
22         MR. NOTZON:  Okay.  And this will be
23 Exhibit 12.
24         (Exhibit 12 marked.)
25         MR. SCHMIDT:  Robert, I think you just

84

1  sent that to me, only.
2         MR. NOTZON:  Oh.  I've got to pay
3  attention.
4         Okay.  I think it's there now.
5         THE WITNESS:  It is.  It's downloading.
6         MS. HILTON:  Robert, just while we're at
7  a pause, what time are you thinking we would be breaking
8  for lunch so people can start their orders?
9         MR. NOTZON:  So let's see.
10 Professor Julien, are you okay right now?  Can you go
11 for another 30 minutes or so?
12         THE WITNESS:  Maybe more like 15, 20.
13         MR. NOTZON:  Okay.  Yeah.  Then if that's
14 okay with you, then we can break at that time?
15         THE WITNESS:  It's okay with me.
16         MR. NOTZON:  Okay.
17         MS. HILTON:  Okay.  Thanks.
18     Q   (BY MR. NOTZON)  Let me know when you're ready
19 to take questions on it.
20     A.  I was just skimming it to refresh my memory,
21 so.
22     Q.  Sure.
23     A.  Okay.
24     Q.  All right.  And you say you co-wrote it.
25 Could you explain to us what portion -- or what your

85

1  contribution was to the project and the document
2  production?
3     A.  I don't remember.
4     Q.  Okay.  Do you remember if you wrote the first
5  draft or not?
6     A.  I think I probably wrote the first draft.  I
7  can't be absolutely certain, but it's likely that I
8  wrote the first draft.
9     Q.  Okay.  And why do you think it's likely you
10 did it instead of -- who was the other person?
11     A.  John Valvano.
12     Q.  Uh-huh.
13     A.  To be honest, I recognize myself in the
14 language.  So it looks like something I would have
15 written the first draft of, the organization of, and
16 whatnot.
17     Q.  Okay.  And at the time, were you in support of
18 Dr. Nikolova's promotion to tenure?
19     A.  I was on the fence when I wrote this.
20     Q.  Why is that?
21     A.  I knew that it was an early promotion.  I knew
22 that we had a higher bar for early promotion; and it
23 wasn't clear to me from what we had reviewed so far in
24 the Budget Council whether the portfolio met that bar,
25 especially -- I mean, yeah.

86

1    Q.  Okay.  And what about specifically related to
2    her teaching?
3    A.  I thought her teaching -- and I think that's
4    what this review says -- was good.  Her teaching is
5    good.  It's definitely not an off-the-charts, early-
6    promotion teaching portfolio.
7    Q.  Would you say she's at or above expectations?
8    A.  Yeah.  One clue, to me, in that from what we
9    wrote is at the end we say, "Her teaching record clearly
10   exceeds the expectation for an Assistant Professor in
11   the Department of Electrical and Computer Engineering."
12   We often will write something very specific there about
13   "exceeds expectations for promotion," which we didn't,
14   we chose not to write here, as an example.
15   Q.  Okay.  And in the summary, you say that,
16   "Dr. Nikolova takes her teaching obligations very
17   seriously and has strived to improve her teaching
18   effectiveness while still addressing the needs of the
19   ECE department and its students," correct?
20   A.  That's what it says, yes.
21   Q.  And I think you also comment you have personal
22   experience with Dr. Nikolova's teaching from the fact
23   that you guys taught the same course and she, I think,
24   used some of your curriculum and made changes and you've
25   used some of her ideas, as well, in your teaching.

87

1    Would that be accurate?
2    A.  Yes.
3    Q.  And I think you're actually an award-winning
4    teacher; is that right?
5    A.  Yes, I've won awards for my teaching.
6    Q.  And Dr. Nikolova has consulted with you about
7    your take on teaching.  That would be a reasonable thing
8    to do, to go to an award-winning faculty associate,
9    correct?
10          MS. HILTON:  Objection, form.
11   A.  I wouldn't say that she's consulted with me on
12   teaching.  I would say that we teach a class and there's
13   a team of us that teaches this class and we teach this
14   class collaboratively.  I don't recall having
15   consultative sessions about how I approach it or how she
16   approaches it.
17   Q   (BY MR. NOTZON)  Did you see anything in her
18   teaching -- well, in this report, do you see anything in
19   here that calls into question her performance as a
20   teacher as being a violation of policy?
21   A.  Are you asking if I see anything in this
22   report that indicates she has violated policy with
23   respect to her teaching?
24   Q.  Yes.
25   A.  I don't see anything that says that she has

88

1    violated any teaching policies.
2    Q.  If you were to have seen something in the
3    report that she prepared, her assessment, her teaching
4    report, would you have called it out in this report?
5    A.  If I had seen something in her -- I'm just
6    trying to understand your question.  If I had seen -- so
7    the input to this teaching statement was her -- well,
8    yeah, was her own teaching statement; and if I had seen
9    something that violated policy in her teaching
10   statement, would I have called it out?  I can't
11   conjecture about what I was doing when I wrote this, so
12   I don't -- I don't know the answer to your question.
13   Q.  So just in general, you don't see it as your
14   duty to the department and the college and the
15   university to identify some faculty members not
16   performing like they should, according to the rules and
17   regulations of the university?
18          MS. HILTON:  Objection, form.
19   A.  If I read a teaching statement by a faculty
20   member and I see that they are saying something that I
21   think is against rules at the university, I would --
22   yes, I think I would bring it up with the Department
23   Chair or the person, to address.
24   Q.  (BY MR. NOTZON)  So when you say "the person,"
25   that would be Dr. Nikolova in this instance, correct?

89

1    A.  Yes.
2    Q.  And would you bring it up to her like, "Hey,
3    what did you mean here or are you actually doing this or
4    what's going on," that kind of thing?
5    A.  If I saw a violation of university policy in
6    her teaching statement?  Yes, I would bring it up with
7    her and probably the Department Chair if I saw something
8    that I interpreted as a violation of the policy.
9    Q.  Right.  What if you just saw something that
10   doesn't look right, that it would be a negative mark on
11   her teaching if she was actually doing this, in your
12   opinion?
13   A.  Then I would not feel the same obligation to
14   bring it up.  This is a summary.  It doesn't capture all
15   of the positives or all of the negatives.
16   Q.  Okay.  But it does cover both?
17   A.  The goal here is to cover both, you know,
18   positive aspects of teaching and negative aspects of
19   teaching for the purpose of determining whether to
20   promote somebody or not.
21   Q.  Okay.
22          MR. NOTZON:  Let me go ahead and put up
23   another exhibit, Exhibit 13.
24          (Exhibit 13 marked.)
25   Q   (BY MR. NOTZON)  That's Dr. Nikolova's

90

1  teaching statement.
2     A.  Okay.  It's downloading.
3        All right.  Do you want me to read this
4  again?
5     Q.  That's the statement you were saying that you
6  relied on?
7     A.  If this is the statement that was included in
8  her promotion dossier, then that's the statement we
9  relied on.  Obviously, I didn't commit it to memory at
10 the time.
11    Q.  Okay.  I'm going to put up Exhibit 2 from
12 yesterday's deposition, as well, which is Dean Wood's
13 evaluation of Dr. Nikolova.
14    A.  Okay.
15    Q.  And I'm putting up Dr. Nikolova's assessment
16 because that's what yours was based on, but I'm really
17 going to question you about Exhibit 2.
18    A.  Okay.
19    Q.  But it's there for you in case you need it.
20       I guess, Professor Julien, since you've
21 looked at Dr. Nikolova's assessment -- teaching
22 statement --
23    A.  Uh-huh.
24    Q.  -- is there anything in her teaching statement
25 that you would see as improper conduct or some violation

91

1  of university teaching protocol?
2     A.  I mean, I haven't read it in detail a second
3  time.  It's long.
4        MS. HILTON:  May I suggest we maybe take
5  a break and Dr. Julien can read these documents and we
6  can also break for lunch at the same time?
7        MR. NOTZON:  We can do that.
8        THE WITNESS:  Okay.  That would be
9  helpful for me.
10       MR. NOTZON:  Okay.
11       THE REPORTER:  We're going off the record
12 at 12:20 p.m.
13       (Off the record from 12:20 to 1:20 p.m.)
14       THE REPORTER:  We're back on the record
15 at 1:20 p.m.
16    Q   (BY MR. NOTZON)  All right.  We're back from
17 lunch.  Professor Julien, did you get a chance to look
18 at those documents, Dr. Nikolova's teaching statement
19 and the Dean's evaluation?
20    A.  Yes.
21    Q.  Okay.  So starting with Dr. Nikolova's
22 teaching statement, did you find anything in there that
23 would be improper behavior of a faculty member at ECE?
24    A.  Well, having read both of them, I mean...
25    Q.  Don't cheat.

92

1        (Laughter.)
2     A.  Well, I mean, comments from the Student
3  Evaluations Section does talk about -- there's no way to
4  sugarcoat it -- it's blaming the TAs for lowering my
5  evaluations of the course.  I don't think it's improper.
6  I think that it's misplacing the responsibility for the
7  course, which I would say is a little bit different than
8  blame, so.
9     Q.  Okay.  That part of it, where you think she's
10 not taking responsibility, would you say that she places
11 the entire blame on the TAs for any of her --
12    A.  So the sentence I'm reading from the document
13 is, "I believe that was the key factor for lowering my
14 instructor and course evaluations."  And what she's
15 referring to there is the fact that the appointed TAs
16 had even worse performance than expected, as couched by
17 the -- or as implicated by the limited candidate pool.
18 So I think that, in her own words, she's placing at
19 least the most important factor on the TAs, the key
20 factor.
21    Q.  And what about the assignment -- creation and
22 grading of the assignments, is that a violation of your
23 duty as a faculty member?
24    A.  I'm sorry.  What do you mean, the creation?
25    Q.  That parenthetical in that sentence -- or in

93

1  that paragraph.
2     A.  Oh, the TAs' responsibilities are "creating
3  and grading homework and programming assignments"?
4     Q.  Yes.
5     A.  That, to me, is a statement of an expectation
6  of the TAs.
7     Q.  Okay.  And there's nothing wrong with doing
8  that?
9     A.  There's nothing wrong with asking the TAs to
10 help create and grade homework and programming
11 assignments.
12    Q.  Okay.  And, in fact, wouldn't it be true that
13 you do that in your own courses?
14    A.  I do, yes.
15    Q.  And I don't know if you recall or not, but you
16 had told Dr. Nikolova that that's the way you do it
17 before she taught the class?
18    A.  I don't recall if I told her that; but this is
19 the way I have done it, is that I ask the TAs to suggest
20 first drafts for the assignments and then finalize them
21 before they're distributed.
22    Q.  Okay.  And you do that for that particular
23 course?
24    A.  Yes.
25    Q.  Okay.  And so if Dr. Nikolova testified that

Appx.0447

94

1  you told her that, and that's why she does it, you
2  wouldn't be surprised if that had happened?
3        MS. HILTON:  Objection, form.
4     A.  We talked about the class before and my
5  mechanisms for teaching it.  We even, you know, have TAs
6  that would be TAs for my class one semester and then her
7  class the next semester and vice versa.  So it would be
8  easy to see how that knowledge would be shared across as
9  instructors.
10     Q.  (BY MR. NOTZON)  And now, moving on to
11  Exhibit 2, Dean Wood's evaluation of Dr. Nikolova,
12  viewing Dr. Nikolova's statement, your participation in
13  the BC Teaching Assessment, would you say that
14  Dean Wood's evaluation on teaching, which occurs on the
15  second and third page of Exhibit 2 --
16     A.  Uh-huh.
17     Q.  -- that that is a fair summary of that
18  information?
19     A.  Yes.
20     Q.  Even though it mentions nothing about any of
21  the positive comments?
22     A.  Okay.  I'm sorry.  So you're asking:  Is it a
23  fair summary of what information, of the information in
24  the teaching statement?
25     Q.  The question I asked was based upon your

95

1  document and Dr. Nikolova's document.
2     A.  Is the teaching a fair summary?
3     Q.  Yes, in Dr. Wood's document.
4     A.  I mean, it's three paragraphs from a seven-
5  page document, which was summarized into a three-page --
6  I think it was a three-page document into three
7  paragraphs -- four-page document into three paragraphs.
8  So there's definitely information lost, right?  This is
9  not a -- so, I mean, I believe she has summarized; and I
10  think she has focused on both positives and negatives in
11  her review.
12     Q.  What positives?
13     A.  In the first paragraph Dean Wood talks about
14  the positive -- especially the first several semesters,
15  the positive course instructor ratings and her ability
16  to engage students in the classroom.  Those are, to me,
17  positives.
18     Q.  You don't see that as a setup for a downward-
19  trend comment?
20     A.  I see it as a statement of the facts of what
21  her instructor ratings were for the first three
22  semesters -- three -- yeah, first three semesters.
23     Q.  Do you agree that there was a downward trend
24  based upon the teaching scores for those four classes in
25  three semesters?

96

1     A.  Looking at the numeric values of the course
2  instructor ratings, there is a downward trend over the
3  time that she taught this course.  You're talking about
4  the undergraduate course?
5     Q.  Right.
6     A.  Yes.
7     Q.  So you think ending at 3.9 is a downward
8  trend, that showed a downward trend?
9     A.  So the 3.9 is really a semester -- two
10  sections of the same class taught in the same semester.
11  So you kind of have to look at that as -- I would look
12  at it as an average, kind of 3.8, right?  In any case, I
13  think that overall, it's a somewhat downward trend.  Is
14  it a significant downward trend?  I mean, I don't know.
15  The numbers are lower.
16     Q.  Okay.  And you don't see any indication of a
17  justification or explanation for the context of those,
18  do you?
19     A.  I don't see an explanation or justification
20  for the context of that where?
21     Q.  In Dean Wood's statement.
22     A.  I see that Dean Wood is quoting and then
23  extrapolating from Eddie's statement that she is laying
24  the "key factor," so laying the blame on the TAs.  I
25  don't know if that's what you're asking or not.

97

1     Q.  No.  And you see how she said that, "Of
2  particular note, Dr. Nikolova indicated that the
3  teaching assistants are responsible for creating and
4  grading" and that she says that that is a contradiction
5  of the Cockrell School's philosophy of teaching?
6     A.  Yeah.  I think that what's at play here is a
7  little bit of the use of the word "responsible."  So I
8  would say that in my class, I am responsible for all
9  creation and grading of assignments.  So the TAs help do
10  that by making usually the first draft of them and we
11  get feedback and we edit over that, but I'm responsible
12  for them.  I mean, when assignments go out, I take
13  responsibility for them.
14        And I think that at play there is the use
15  of -- in Eddie's statement, she mentions that it's the
16  TAs' responsibilities, which just really goes to job
17  duties.  And so I think there may be a different use of
18  the word "responsible" and "responsibility" here, but
19  I think that's what's at issue.
20     Q.  Is it a fair reading of Dr. Nikolova's
21  statement that she is not taking responsibility for the
22  course as a whole, based upon the language she uses and
23  what you understand how Dr. Nikolova modeled her
24  teaching on the course after your specific reference to
25  having the TAs' duties include creating the assignments

98

1  and grading them?
2      MS. HILTON:  Objection, form.
3      A.  So, yeah, I don't know what you mean by "a
4  fair statement."  What I will say is that I believe that
5  in Dr. Nikolova's teaching statement, she is not taking
6  responsibility for the negative comments from the
7  students and is placing, the responsibility for
8  those negative comments on her TAs.
9      Q.  (BY MR. NOTZON)  And you didn't include that
10 in your assessment, correct?
11     A.  I didn't -- we didn't.
12     Q.  And why not?
13     A.  I don't know.  I don't.  I don't recall
14 intentionally omitting it.
15     Q.  I mean, you take your responsibility for
16 providing those assessments seriously, don't you?
17     A.  Yes.
18     Q.  And you -- as you've already testified, your
19 duty that you complied with was to look at the positives
20 and negatives that Dr. Nikolova presents in her teaching
21 and present them in your assessment, correct?
22     A.  That's correct.  Her teaching statement was an
23 input into our evaluative process.  My experience in the
24 class was another input, naturally.
25     Q.  And did you also look at the CIS scores and

99

1  the comments?
2      A.  Yes, of course.
3      Q.  And you saw that the great majority were
4  positive comments?
5      A.  Yes, they are.
6      Q.  You comment how she was innovative and how she
7  stepped up to redesign curriculum and, actually, teach
8  these courses; and she had large attendance in these
9  courses, which is also a factor in her performance as
10 well, correct?
11     MS. HILTON:  Objection to form.
12     A.  I don't think those are things that I said.  I
13 don't think that I mentioned that she had large
14 attendance in the class.  In fact, I don't know what the
15 attendance was in the class.  That's different from
16 registration in the class, which these are large
17 classes.
18     Q.  (BY MR. NOTZON)  I apologize for using
19 "attendance" instead of "registration."  The number of
20 students registered in the class is a factor, correct?
21     A.  A factor in what?
22     Q.  In the score.
23     A.  There are statistics that show that larger
24 classes tend to have lower course instructor ratings.
25 Applying that to a specific instance, again, are all of

100

1  the same pitfalls that we discussed earlier.
2      Q.  But it's a contextual factor that should be
3  accounted for because it's a known factor, correct?
4      MS. HILTON:  Objection, form.
5      A.  I'm not sure what you're asking.  Sorry.
6      Q.  (BY MR. NOTZON)  It's not -- I mean, it is
7  typical for teaching scores to be compared to other
8  teaching scores, correct?
9      A.  That's correct.  We especially compare within
10 the same class.  We compare longitudinally across the
11 same instructor.  We compare across the same category of
12 staff, so assistant professors, associate professors,
13 full professors, teaching faculty.  We also compare
14 along levels of class, whether it's required,
15 undergraduate, mezzanine, or elective; and we'll compare
16 size as an additional factor.
17     Q.  And over the years?
18     A.  And across years, yes.
19     Q.  And, in fact, Dr. Nikolova, if you compared
20 her scores on this class over a period of years for
21 everyone that has taught it, that she's in the top two
22 or three that have ever taught it of the over ten
23 that have taught?
24     MS. HILTON:  Objection, form.
25     A.  I don't know.  I'd have to review the course

101

1  instructor scores for all of the instructors.
2      Q.  (BY MR. NOTZON)  Do you recall Dr. Nikolova
3  approaching you in 2018 to help her prepare her teaching
4  assessment -- I mean, her teaching statement?
5      A.  I don't.  I don't recall one way or the other.
6      Q.  Okay.  If Dr. Nikolov testified that she did
7  ask you to help her with her teaching statement and you
8  didn't, did you make a conscious decision not to help
9  her?
10     A.  Are you asking about her teaching statement
11 for her promotion dossier?
12     Q.  Yes.
13     A.  Okay.  I don't remember making a conscious
14 decision not to help.  If one of my colleagues asks me
15 for help, I try to help whenever I can.  If I don't
16 help, it's usually an indication that I was too busy to
17 do that.
18     Q.  You would let her know, though?
19     A.  I don't know.
20         (Simultaneous speakers.)
21     I'm sorry?
22     Q.  You were friends?
23     A.  We were friends, yes.
24     Q.  And as a friend, you would let your friend
25 know if they ask you for something if you can or can't

102

1  do it, wouldn't you?
2      A.  I can't say what circumstances would have been
3  around some hypothetical situation.
4      Q.  Could you think of a reason why, if she asked
5  you for help with her promotion, that if you were too
6  busy, you wouldn't have told her so?
7      A.  If I was too busy to follow up and tell her
8  so, that would have been a reason why.  It would not
9  have been out of malice or mal-intent.  It would have
10  been forgetfulness or an e-mail getting buried in an
11  inbox.
12     Q.  Yet, you used the word "friend"?
13     A.  Yes.
14     Q.  Do you take your friendships seriously?
15     A.  I do.
16     Q.  Other than the birth of her child, would this
17  be one of the larger experiences of her life, going up
18  for tenure?
19         MS. HILTON:  Objection, form.
20     A.  I can't say what are large experiences in her
21  life.
22     Q.  (BY MR. NOTZON)  What about for you?  Was it a
23  very important part of your life?
24     A.  I'm sorry.  What's a very important part of my
25  life?

103

1      Q.  Obtaining tenure.
2      A.  It's been impactful in my life.  I honestly
3  don't recall putting together my tenure and promotion
4  package and the process of getting tenure as one of the
5  pivotal moments of my life.  It was not as important to
6  me, for instance, as graduating with my doctoral degree
7  or even my undergraduate degree.
8      Q.  Remember you said you talked to those two
9  junior female faculty after the elephant-in-the-room
10  e-mail came out because they were vulnerable?
11     A.  Yeah.
12     Q.  Wasn't Dr. Nikolova vulnerable, as well?
13         MS. HILTON:  Objection, form.
14     A.  I think the assistant professors are in a
15  position of uncertainty.  Having been there, I've felt
16  that, which is why I serve as a mentor to my colleagues,
17  Eddie, Hao, Jean Anne, included.
18     Q.  (BY MR. NOTZON)  So that would be a "yes"?
19         MS. HILTON:  Objection, form.
20     A.  Yes.
21     Q.  (BY MR. NOTZON)  And did you reach out to
22  Dr. Nikolova after that e-mail?
23     A.  I did not reach out to her after the e-mail
24  that she sent to the entire faculty that referenced the
25  elephant in the room.

104

1      Q.  Why not if you also viewed her as a vulnerable
2  member of the faculty and a friend?
3      A.  Yes, I viewed her as a friend.  I was super
4  sad, and I didn't know how to respond to her.  I didn't
5  know what to say, and so I didn't say anything.
6      Q.  You didn't say anything verbally.  You didn't
7  say anything in an e-mail, and you didn't even
8  personally approach her?
9      A.  I don't recall doing any of those.
10     Q.  As a friend, is not knowing what to say a good
11  enough excuse not to approach the person at all?
12         MS. HILTON:  Objection, form.
13     A.  In this case I believe that I didn't approach
14  her.
15     Q.  (BY MR. NOTZON)  Right.  That's a good enough
16  excuse, just because you didn't know what to say?
17         MS. HILTON:  Objection, form.
18     A.  I don't have an answer to that.  I don't.
19     Q.  (BY MR. NOTZON)  Other than, "I didn't know
20  what to say," do you have any other reason why you
21  didn't approach Dr. Nikolova at all?
22     A.  Not that I recall.
23     Q.  When was the last time you talked to her about
24  her not getting tenure?
25     A.  She reached out to me, I believe, after the

105

1  Dean's decision but before the President's Committee had
2  met, to ask for help on the rebuttal, I believe.  This
3  is what I recall.  I think that's the last time we
4  exchanged e-mails.  I think she -- I kind of think she
5  let me know when she had submitted it.  I think I heard
6  about it first from her before I heard about it from
7  Ochman, when he told us the file was dated; but the
8  timing could be mixed on that.
9      Q.  So just to clarify, the Dean recommended
10  against tenure.  She approached you about helping her
11  with her rebuttal; is that right?  Is that the next
12  thing that happened?
13     A.  I think so.  That's what I recall.
14     Q.  And she sent in her rebuttal.  Does that mean
15  you didn't help her with her rebuttal?
16         MS. HILTON:  Objection, form.
17     A.  I think that what happened -- and I'm -- so I
18  believe -- what I recall is that she asked for my help
19  on the rebuttal.  I responded affirmatively and said,
20  "Yes, I'll help you."
21         And then I don't remember if it was the
22  same e-mail or another e-mail I realized I didn't have
23  access anymore to the documents I needed to help,
24  including her teaching statement; and I asked for those.
25  And that's when it stopped.

106

1     So I don't remember if she sent them to
2  me. I think she sent them to me, and then I ran out of
3  time. I didn't have time to help.
4     And then I think she followed up after
5  the fact, to share her rebuttal with me or to share that
6  she sent the rebuttal, perhaps. I'm not sure.
7     Q. (BY MR. NOTZON)  So the ball was in your court
8  on the rebuttal, and you dropped it?
9     A. I don't recall specifically.
10    Q. Okay. One way --
11    A. I know we had a little bit of back and forth.
12  I recall that I responded to her original e-mail. I
13  didn't just ignore the original e-mail.
14    Q. Okay. On the rebuttal?
15    A. Yes.
16    Q. Okay. You responded in the affirmative and
17  then something happened -- there was a back and forth
18  and then something happened where it fell through and
19  you don't remember if it was you that dropped the ball
20  or her?
21    A. That's right.
22    Q. But you do believe that that interchange
23  occurred via e-mail?
24    A. Yes.
25    Q. Okay. And then the next thing is she sent you

107

1  a copy of her rebuttal, and did you have any interchange
2  about that?
3     A. I don't recall.
4     Q. Okay.
5     A. I don't recall if we talked about it in
6  person, perhaps, or on the phone or via e-mail. I don't
7  recall.
8     Q. But you're clear that you did not assist on
9  the rebuttal?
10    A. I don't think that I did.
11    Q. Did you read the rebuttal?
12    A. Yes.
13    Q. Did you provide her any comments about the
14  rebuttal?
15    A. Are you asking whether I provided comments
16  before she sent it to the whole faculty or before she
17  shared it to her file?
18    Q. I'll restrict my question to:  After you
19  received a copy of the rebuttal, did you provide her any
20  feedback on the rebuttal?
21    A. I don't think that I did. If I did, it was
22  almost certainly over the phone or something. I don't
23  know.
24    Q. Okay. And what was your reaction to the
25  rebuttal, or how would you describe the rebuttal? Was

108

1  it a good rebuttal? Did it address the points that it
2  needed to address? And all of these are, of course, in
3  your perception and opinion.
4     A. Yeah, do we have a copy? I mean, I need to
5  review the rebuttal again before I can give you my
6  perception on it. I don't have it in front of me.
7     Q. Okay. I'm asking for your memory of your
8  reaction to the rebuttal then right now -- well, right
9  now, I'm asking if you recall what your reaction to the
10  rebuttal was after you read it for the first time.
11    A. It's going to be -- I mean, I don't know what
12  it was. It was tied up with that elephant-in-the-room
13  e-mail, so there was a lot of information and a lot of
14  feelings that came with that e-mail. So I can't recall
15  specifically what my reactions were to the rebuttal, to
16  the Dean's statement, to her e-mail to the entire
17  faculty. I can't tease those apart one from the other.
18    Q. Okay. But just to be clear, the rebuttal was
19  separate from the elephant in the room, right?
20    A. Oh, maybe my recollection is wrong. I thought
21  it was attached to the elephant-in-the-room e-mail.
22    Q. Okay. So your memory is you received the
23  rebuttal at the same time as the elephant-in-the-room
24  e-mail?
25    A. That's what I recall. It's -- I don't know.

109

1     Q. I'm not saying that didn't happen. I just
2  want to ask you what you remember because I don't know.
3     Okay. And so that's the last time you
4  guys have had -- well, the e-mail asking for your help
5  on the rebuttal and her sending you the elephant-in-the-
6  room e-mail is the last time that you guys have
7  interacted about her denial of promotion?
8     A. I think so.
9     Q. Okay. Have you had any other communications?
10    A. Yes.
11    Q. Okay. About work-related issues or personal
12  issues?
13    A. I think exclusively what you would categorize
14  as work-related issues. Some of them are slightly more
15  social, but they're still kind of professional.
16    Q. Okay. Do you still consider yourself a friend
17  to Dr. Nikolova?
18    A. That's a tough question to answer. I don't
19  know. We haven't interacted outside of a very formal
20  academic setting for quite some time.
21    Q. Do you feel that that's something that
22  Dr. Nikolova has done or that you have made a decision
23  on?
24    A. I have not made a decision to exclude her as a
25  friend, so.

Christine Julien - 3/19/2021

110

1    Q.  Okay.  Have you taken any steps to interact
2  with her on a personal friend level?
3    A.  Sure.  We have an annual -- my family has an
4  annual Halloween party, and Eddie used to attend with
5  her family some number of times.  I think I always
6  invited her, even -- obviously, we didn't have it this
7  past year because of, you know, COVID; but I think other
8  than that, she's always been invited.  I think she
9  stopped coming.  That's my recollection.
10   Q.  Is it one of those open invitations, or do you
11  actually send out invitations?
12   A.  Oh, I send out invitations.  I don't invite
13  all my colleagues.  I invite choice colleagues.
14   Q.  So you are sure that you had sent an
15  invitation to her in 2019, because there's only been one
16  Halloween since she was denied?
17   A.  I'm not certain.  I'd have to go back and
18  look.  I'm not certain if I invited her, and I'm not
19  certain if she attended if I did invite her.
20   Q.  And other than that, any other attempts to
21  personally interact?
22   A.  Yeah.  We have a relatively -- I won't say
23  regular -- irregular meeting of women in the department,
24  and a lot of kind of other social interactions come out
25  of that.  We might catch up over coffee and then decide

111

1  to have lunch or dinner or something else, in addition.
2  Eddie's routinely been invited to those,
3  although, I think she's decided not to attend them
4  recently.  I don't know why.
5    I am -- I have been the person initiating
6  them.  It switches off between me and most of the time
7  the Department Chair.  So those are attempts.
8    I think there was one response from Eddie
9  to one of the recent ones, one of the virtual COVID
10  ones, initially saying she would attend, but then
11  withdrawing.  I don't know why.
12   Q.  Okay.  So I'm going to ask a slightly
13  different question, which is:  Have you made any
14  attempts on a one-to-one basis to reconnect or to
15  connect with Dr. Nikolova?
16   A.  I don't recall any.
17   Q.  Okay.
18   A.  There's a few times where we've had coffee,
19  but they may have all been before the elephant-in-the-
20  room e-mail, which is our point of reference.
21   Q.  Okay.  Are you saying that that is -- was a
22  watershed event in your relationship with her?
23   A.  I didn't say that.
24   Q.  I'm asking.
25   A.  Yeah.

112

1    Q.  So to what do you attribute the lack of
2  communication between you to?
3    A.  So I think that I stopped running into her on
4  campus.  So before these things happened, she was a more
5  regular presence on campus, and there are accidental
6  bumping into people or stopping by somebody's office
7  that happens when people are on campus.  And I think
8  that since the time of that e-mail, she's been -- we've
9  all been less present for the last year; but even before
10  that, I think she was less present on campus.
11    And then since March 2020, I mean, I feel
12  disconnected from all of my colleagues, who I also count
13  as friends, so.
14   Q.  Yeah.  We have a good, what, 13, 14 months, at
15  least, between the elephant and the room and March of
16  2020?
17   A.  Yeah.
18   Q.  I guess let me ask it this way:  Is it your
19  understanding that the lack of personal interaction
20  between you and Dr. Nikolova is based on Dr. Nikolova's
21  choice alone or both yours and her choice?
22   A.  I would say it's shared.
23   Q.  And for your share, what is the basis of your
24  reduction in personal interaction with Dr. Nikolova?
25   A.  What do you mean by "basis"?

113

1    Q.  Why.
2    A.  What's causing it?  I'm busy.  It's the old
3  adage out of sight, out of mind.  Like I said, I tend to
4  interact with people I bump into; and not bumping into
5  somebody means I have to take another extra effort to
6  reach out to them.  And I didn't, so.
7    Q.  And is there a reason you didn't make extra
8  effort, or was that just the way it happened?
9    A.  That's the way it happens.  I've got two
10  little kids and other stuff going on, so.
11   Q.  So you don't attribute the falloff in your
12  personal relationship to her denial of tenure or her
13  reaction to that denial of tenure, which includes the
14  complaints of gender and pregnancy discrimination?
15   A.  I do not attribute it to that.
16   Q.  Do you recall when you read her rebuttal
17  having any feeling of:  This is untrue.  This is
18  factually inaccurate.  This is not good?
19   A.  Without looking at her rebuttal again, I can't
20  answer that question.
21   Q.  Okay.  Let me find it for you.
22    MR. NOTZON:  Dang it.  I'm blaming Bob
23  for this.
24    Okay.  Now it should be up.
25    THE WITNESS:  Okay.  There it is.

114

1      MR. NOTZON:  Exhibit 7.
2      (Witness silently reading document.)
3      MR. NOTZON:  And I'm okay if you want to
4  go off the record and have a review of this just so
5  people can take a break, as well.
6      MS. HILTON:  That sounds good.
7      THE WITNESS:  Sorry.  I'm a slow reader,
8  so.
9      MR. NOTZON:  I am, too.  I like to read
10  the words.
11      All right.  So just come back when you're
12  ready.
13      THE WITNESS:  Okay.
14      THE REPORTER:  We're going off the record
15  at 1:56 p.m.
16      (Off the record from 1:56 to 2:11 p.m.)
17      THE REPORTER:  We're back on the record
18  at 2:11 p.m.
19      Q   (BY MR. NOTZON)  Okay.  You were able the look
20  at the rebuttal?
21      A.  I was.
22      Q.  Okay.
23      MR. NOTZON:  And what was the question I
24  had asked, Debbie?
25      (The requested material was read as

115

1  follows:
2      "QUESTION:  Do you recall when you read
3  her rebuttal having any feeling of:  This is untrue.
4  This is factually inaccurate.  This is not good?")
5      A.  All right.  So focusing on things that are,
6  you know, factually questionable in the statement, I
7  think that -- I kind of took some notes as I read
8  through.
9      Q.  (BY MR. NOTZON)  And let me clarify:  Are you
10  answering today, or are you answering from what you
11  recall back in 2019?
12      A.  I guess I'm answering for today because I've
13  read it just now, right?  And I can tell you what I know
14  to be factually inaccurate now.  I don't know what I was
15  thinking back then.
16      Q.  Let me ask you, first:  Do you recall at all
17  what your reaction was in first reading it back when you
18  first got it?
19      A.  I think that -- and I don't know a clear way
20  to explain this; but, in my head, my memory, I received
21  three things all at once, right?  So I received the
22  e-mail -- at least, this is how I recall it -- the
23  e-mail, this rebuttal, and the Dean's statement all at
24  the same time.  And I can relate my feeling in response
25  to that, but I can't say necessarily that those feelings

116

1  were attributed to one in particular.  Whether it was
2  the e-mail or the rebuttal itself, I can't say.
3      Q.  Okay.  And not to quibble with you too much,
4  but you said that she had asked you for help in writing
5  the rebuttal.  So the Dean's statement would have been
6  required for writing that rebuttal.  So she probably
7  would have sent you that with the request to write the
8  rebuttal separate?
9      A.  Yeah.
10      Q.  So I hear you saying that it's all jumbled up,
11  but you consciously know that they probably weren't all
12  together?
13      A.  Yeah, I mean, that's probably a fair
14  characterization.  In my head, like trying to tease out
15  a specific memory of, "I read this document, and I
16  responded in this way," you know, years ago is hard for
17  me to do in that kind of memory, right?  So I don't -- I
18  can't answer the question because I can't give you a
19  clear picture of what my feelings were at that time.
20      Q.  Well, can you give me your memory of what your
21  feelings were, whether it's to the whole jumbled group
22  instead of one particular document?
23      A.  Yeah, I can give you a sense that -- one of my
24  recollections is that it came across to me as defensive,
25  which, I mean, it was a defense, so in the sense that

117

1  defenses are defensive.  But I feel like it read, to me,
2  as overly-defensive; and that's style, perhaps.
3      Q.  And you would have recommended her not do that
4  had you participated, to alter that?
5      A.  I can't say what I would have done in that
6  moment.  I mean, everybody's personality is different.
7  The situation calls for different recommendations for
8  different people; and I would never try to make clones
9  of myself.  So I can't say what I would have recommended
10  in that space.
11      Q.  Okay.  Would you have made a recommendation at
12  all?
13      A.  Like I said previously, if a colleague asks me
14  for help, I would try to help that colleague as best I
15  could.  Not doing so in this case was surely a lack of
16  time, just being too busy with other things.
17      Q.  Do you recall that -- so there's the elephant-
18  in-the-room e-mail; but wasn't there also another e-mail
19  asking about potentially creating a petition or some
20  sort of affirmative action from the Department to the
21  President's office, essentially defending Dr. Nikolova's
22  candidacy for tenure and the Budget Council's vote in
23  support of that?
24      MS. HILTON:  Objection, form.
25      A.  I don't recall specifics related to that, but

118

1  I do recall mention of a petition.  I don't remember if
2  it came from Eddie herself or from other people in the
3  department, and I don't know if it was in the form of
4  e-mail or if this was in-person conversations.  I do
5  have a recollection that such a conversation was
6  broached in some context, but I can't recall what
7  context.
8      Q.  Do you think of it independently from the
9  elephant-in-the-room e-mail, as a separate action?
10     A.  I would associate it with following the
11 elephant-in-the-room e-mail.
12     Q.  Okay.  And do you recall meeting or advising
13 Eddie not to participate in that action?
14     A.  I don't recall.
15     Q.  Okay.  Was it your opinion at the time that
16 you would not participate in that action?
17     A.  I can't recall.
18     Q.  Do you recall taking any -- having any
19 conversations with anybody about the petition?
20     A.  I don't remember.  I do recall the petition.
21 I don't remember the details of who I talked to, whether
22 it was Eddie herself or whether it was another colleague
23 who had also talked to Eddie.  I don't recall.
24     Q.  Okay.  And you don't recall whether you had a
25 position of support for that or opposition or neutral?

119

1      A.  I don't recall.
2      Q.  You would recall if that petition -- well, you
3  already said that the petition was a follow-on from the
4  elephant-in-the-room e-mail?
5      A.  That's the way I remember it, yeah.
6      Q.  All right.  So back to the rebuttal.  You were
7  about to tell me your current understanding of what's
8  factually inaccurate.
9      A.  Yeah.  So there's a statement in here that
10 says that this class, the EE 360C, is one of the, quote,
11 "hardest classes to get high teaching evaluations for."
12 I don't think that statement is backed up by fact.  I
13 think that statement might be opinion, but it's
14 presented as fact.
15     Q.  Okay.
16     A.  So that's one place I would call into question
17 the fact.
18         There's another place in this rebuttal
19 where she mentions that high demand for classes
20 indicates quality of teaching; and, in my own
21 experience, that is not the case, not necessarily a
22 causal relationship.  So I don't think you can draw a
23 connection between the fact that the enrollment numbers
24 in her graduate class increased as an indication that
25 her teaching quality is high.  It's not an indication

120

1  that it's not; it's just not related.
2          There's an implication that we hadn't
3  been providing practice exams in Algorithms until Eddie
4  decided to do that, but we've been doing that since the
5  beginning of the course.
6          And then the last thing that I thought
7  was kind of factually questionable were some of the
8  comments about her start date in relationship to
9  Dr. Tiwari's -- Mohit's start date.  She said that Mohit
10 started in the Fall of 2013, and it was -- I'm trying to
11 find that again -- and she didn't start until January of
12 2014.  And so the goal there is to equate their time as
13 equivalent, but that's not correct because she started a
14 semester later.  So I think that's just a little
15 misleading.
16     Q.  Page 10, the third paragraph.
17     A.  Yeah, sorry.  Page 10.
18     Q.  I didn't know if you needed to see it.
19     A.  Yeah.  Thank you.
20     Q.  Okay.  She's not saying -- I mean, she's
21 acknowledging they started at different times, right?
22     A.  Yeah, perhaps.  Maybe I misread that.
23     Q.  And, you know, she's relying on the two and a
24 half years she taught at A&M, correct --
25     A.  Yes, that's correct.

121

1      Q.  -- as part of her justification for being
2  ready, as it were?
3      A.  Time and rank, yeah.
4      Q.  I think it's been referred to -- I've seen it
5  frequently as "technically early"?
6      A.  I don't know if that's a policy term at the
7  university.
8      Q.  No.
9      A.  I think early is early, from the University's
10 perspective.
11     Q.  Well, would you agree that -- so if you're --
12 if you've got six years of teaching experience from two
13 different universities, that's early as to UT's
14 probationary clock, based upon UT's policy, correct?
15     A.  If you don't have six years of experience at
16 the time of promotion at UT, UT's policy considers that
17 to be an early promotion.
18     Q.  Right.  I think I just said that.
19     A.  Okay.  Well, there was something about A&M in
20 there.
21     Q.  Well, my statement was if you have six years
22 of time in a combination of universities, that would
23 be considered early at UT because you wouldn't have six
24 years at UT?
25     A.  That's correct.

122

1    Q.   And that would be early for UT.
2         Now, if you had less than six years at UT
3    and less than six years at UT and somewhere else, that
4    would be early, early?
5         MS. HILTON:  Objection to form.
6    A.   The UT policy sees those as the same.  Early
7    is early.  There's no difference between what you did
8    before you joined UT.  Your probationary period starts
9    at the beginning of the academic year following when you
10   joined UT.
11   Q.   (BY MR. NOTZON)  Yeah, that's looking at the
12   policy; but I'm talking about in practical terms,
13   because you know, since you've been there so many years,
14   that people have gone up for tenure based upon their
15   prior service, teaching at other universities, some of
16   which have gone up with a total of six or more years of
17   combined service.  And that was fine, and they went up
18   and they got tenure, however they did.  Would you agree
19   with that?
20        MS. HILTON:  Objection, form.
21   A.   I agree that people have been tenured at UT
22   and that some people have been tenured early.
23   Q.   (BY MR. NOTZON)  Where they met the six years
24   of time, but they had to rely on prior service somewhere
25   else?

123

1    A.   My understanding is those cases were still
2    considered early promotion.  When you go up --
3    Q.   I'm really -- we're not arguing about what the
4    policy says.  I'm just asking you a simple question; and
5    I just want to know if you're aware of it or not, not an
6    explanation of how the policy views it.  Okay?
7    A.   Okay.
8    Q.   Are you aware that someone has gone up for
9    tenure at UT and received tenure when they had six years
10   of probationary experience at a combination of UT and
11   somewhere else?
12        MS. HILTON:  Objection, form.
13   A.   I don't agree with that statement exactly as
14   it's presented.  The probationary --
15   Q.   (BY MR. NOTZON)  The question is whether
16   you're aware or not of a faculty member that went up for
17   and received tenure when their teaching record was six
18   years as an Assistant Professor with a combination of
19   years between UT and another institution, yes or no?
20   A.   I'm aware of a person who has gone up for
21   promotion -- early promotion at UT in our department
22   after having spent some time at another institution.
23   Q.   With a combined --
24   A.   And succeeded in achieving early promotion
25   when they had been --

124

1    Q.   With combined years of teaching of six or more
2    years?
3    A.   Yes.
4    Q.   Okay.  Next question:  Are you aware of any
5    professor -- any faculty member having gone up for -- if
6    you want to say "early tenure," I don't care -- early
7    tenure with less than six years of time at UT and/or
8    another university that didn't even have six years of
9    combined teaching?
10        MS. HILTON:  Objection, form.
11   A.   I am aware of faculty that we have early
12   promoted who did not have six years in the probationary
13   period at UT or anywhere.
14   Q.   (BY MR. NOTZON)  Okay.  And are those persons,
15   that second category, are they considered to be more
16   early or held to a higher bar than just the people that
17   have achieved the six years or more combined between the
18   two universities?
19        MS. HILTON:  Objection, form.
20   A.   I do not believe so.
21   Q.   (BY MR. NOTZON)  Okay.  So they would have the
22   same high bar to meet, regardless of where they are in
23   the total years of teaching.  It all only has to do with
24   the UT years of teaching as to how high the bar is?
25        MS. HILTON:  Objection, form.

125

1    A.   So I'm not sure what you're asking.  The early
2    promotion bar is higher than the regular promotion bar.
3    Everybody's probationary period is measured from the
4    beginning of the academic year following when they
5    started at UT.  It's measured from there.  If they go up
6    for tenure before that, then, it's considered early
7    promotion; and the bar is considered to be higher.
8    Q.   (BY MR. NOTZON)  Okay.  What I'm trying to get
9    at is:  Is there a higher bar and then a higher, higher
10   bar and then a higher, higher, higher bar?
11   A.   Not that I know of.
12   Q.   Okay.  There's just the on-time bar and the
13   early, higher bar?
14   A.   As far as I know, yeah.
15   Q.   Okay.
16   A.   I mean, I guess if we're talking about a
17   single year of early.  If we're talking about multiple
18   years early, fewer than five years in a probationary
19   status at UT, there might be a different consideration.
20   Q.   Yeah, that's what I was -- that was the second
21   category of people that went up early that didn't even
22   meet the six.  So they would be more than just early at
23   UT; they'd be early at UT and without six years?
24   A.   Yeah, I'm trying not to muddle with is there
25   time at another institution.  What I'm saying is:  If

126

1  your probationary period at UT is at UT, six years,
2  you're on time.  If your probationary period at UT is
3  less than six years, you're early.  If it's less than
4  five years, you might considered early, early; but I'm
5  only talking about the probationary period at UT.  I'm
6  not talking about time at another institution, which the
7  questions have been kind of mixing time at another
8  institution and time at UT.
9      Q.  You're not aware that time at other
10  institutions has been used as a basis for going up
11  early?
12      A.  When a faculty member goes up for promotion or
13  tenure, their probationary period.  So if
14  someone spent time at another institution, the
15  publications, the service activities, everything that
16  they did at that other institution is used as part of
17  the evaluation.  The same is true for someone who's done
18  a post doc.  The same is true for someone who spent time
19  in industry.  It doesn't contribute to their
20  probationary period, but it is part of their corpus of
21  work.
22      Q.  I understand that.  But I'm trying to get at
23  the part of the policy that says that if it's an early
24  or accelerated promotion, that the reason for an early
25  or accelerated nature must be explained.  Do you

127

1  understand that as part of the policy?
2      A.  I don't -- I don't know.
3      Q.  Okay.
4      A.  I don't know the ins and outs of the policy.
5      Q.  Okay.  That's where my question was going, and
6  it was going towards there on the explanation that's
7  been provided for several files that I've read -- and I
8  don't know if you're aware of this or not; that's why
9  I'm asking -- is whether or not just having met the
10  total six years by a combining of the prior service and
11  UT was a basis that was given to explain the early
12  promotion.  If you're not aware of that, then --
13      A.  I can't -- I can't comment on that.  I don't
14  know.
15      Q.  Okay.  All right.  So the follow-up, now that
16  you've said the early, early part -- or understood what
17  I was talking about, maybe -- so what if you're at three
18  years?  So that's three years early at UT.  Do you know
19  of anybody that's gone up at three years?
20      A.  I -- I don't know.  I'd have to go back and
21  look at my colleagues and see when they went up.  I just
22  don't know.
23      Q.  Okay.  As you're sitting here today, you don't
24  know?
25      A.  Not off the top of my head.

128

1      Q.  Okay.  What about two or one?
2      A.  I have no idea.  I don't -- I don't recall any
3  of those, but I'd have to go back and look to give you a
4  definitive answer.
5      Q.  I would assume that those would be remarkable?
6      A.  Yeah, I would assume so, too.
7      Q.  And as they're remarkable, that's why I'm
8  asking if you would know that because if it would
9  happen, I would think that the scuttlebutt around the
10  university would have been a lot.
11      A.  Yes, but I -- it's a big university.  So if it
12  didn't happen in my department, the chances I'd know
13  about it are really slim because I haven't served on the
14  College of Promotion and Tenure; and I don't see
15  anything at the university level.
16      Q.  Okay.  How about any four years?
17      A.  There may be colleagues in our department that
18  have been done in four years.  Again, I'd have to look
19  back at all the different cases and refresh my memory on
20  them.
21      Q.  Okay.  And so, by the same token, you're not
22  really sure if four years is considered a higher bar
23  than the five year?
24          MS. HILTON:  Objection, form.
25      A.  I don't know what the University policy says

129

1  about it.  I don't know.
2      Q   (BY MR. NOTZON)  All right.  Let me -- oh, you
3  were providing me factually inaccurate observations
4  about the rebuttal, right?
5      A.  Yeah, I was done.
6      Q.  Okay.  Was there any other reaction you had to
7  the rebuttal other than you did say it was defensive?
8      A.  Yeah.
9      Q.  Is there anything else that you would
10  criticize or comment on?
11      A.  Yeah.  I mean, I would say one other feeling
12  that I get from it is a pretty personal feeling and that
13  related to the Algorithms class.
14      Q.  Personal to you?
15      A.  Personal to me in the sense that there's kind
16  of -- well, I don't know if it's personal to me -- but
17  in the sense that, "Dr. Julien has done a good job
18  teaching this class.  I do exactly the same things she
19  does in the class.  So it doesn't make any sense that
20  I'm not considered as doing a good job."
21          And I know from my own experience, having
22  taken on a course from another professor and using her
23  materials directly, that that is not surprising at all;
24  and you have to adapt a class.  And so I took a little
25  bit of an affront to that.  I mean, I guess that's just

130

1  a response I had to the read today; but...
2      Q.  Although, you were given a chance to help?
3      A.  Given a chance to help with what?
4      Q.  The rebuttal.
5      A.  Yes, she asked for my assistance; but, I mean,
6  I wasn't an author of this rebuttal.
7      Q.  Right.  But what I'm saying is:  You're taken
8  aback by it, but she also wasn't trying to hide it or
9  sneak it by you or, obviously, wasn't trying to offend
10 you because she invited you to help?
11     A.  That's correct.
12     Q.  Okay.  I just wanted to make sure --
13     A.  I mean, I wasn't -- yeah.  And, again, this is
14 my response to it -- just to be clear, this is my
15 response to it today.  I don't know what my response to
16 it was -- would have been previously and what I might
17 have said.  I don't know.
18     Q.  So did you ever meet with any other faculty or
19 discuss the petition with any members of administration?
20         MS. HILTON:  Objection, form.
21     A.  No.
22     Q.  (BY MR. NOTZON)  Did you ever try to talk
23 anybody out of the petition or express that that was not
24 the way to go?
25     A.  I don't recall that I did.  I don't recall

131

1  conversations about -- whether I had them with other
2  faculty or with Eddie, I don't recall the specifics
3  behind the conversations.
4      Q.  Do you recall how you felt about the petition
5  or the idea of a petition because I don't know if I ever
6  saw a petition?
7          MS. HILTON:  Objection, form.
8      A.  I just don't know how I can respond about how
9  I felt about something that I don't know if it ever
10 existed, either, so.
11     Q.  (BY MR. NOTZON)  So you don't remember having
12 a feeling about the idea of a petition?
13         MS. HILTON:  Objection, form.
14     A.  I don't remember that.
15     Q.  (BY MR. NOTZON)  Let me follow up on a couple
16 of the questions I had asked earlier.  On Dr. Kim, I
17 wanted to ask:  Do you recall that she actually did go
18 up for tenure and received a vote from the Budget
19 Council?
20     A.  I do.
21     Q.  Okay.  And do you recall that the initial
22 reaction to her going up for tenure was positive from
23 the Budget Council before the vote?
24     A.  What are you referring to as "the initial
25 response"?

132

1      Q.  I guess the move to approve her going up for
2  tenure.
3      A.  Yeah, we have a two-step process.  We vote,
4  usually, at the end of, like, a spring semester to put
5  people up for -- to encourage people or to approve
6  putting together a package; and we voted affirmatively
7  for that for Miryung.  And then we vote -- after the
8  package has been put together and we have received
9  letters, then we actually vote on the case.
10     Q.  And that was an early promotion, correct?
11     A.  That's correct, she was one year early.
12     Q.  And the vote to -- the first step of the two-
13 step, was a good majority vote?
14         MS. HILTON:  Objection, form.
15     A.  It passed.  I don't remember the score, if you
16 will, the actual vote count.
17     Q.  (BY MR. NOTZON)  You don't remember if it was
18 tight or extreme?
19     A.  I don't remember it, huh-uh.
20     Q.  Okay.  And then do you remember what the vote
21 was on the second step?
22     A.  I do not remember the details of the vote on
23 the second step.  I know that her case didn't move out
24 of the department, but I don't remember what the numeric
25 values of the votes were.

133

1      Q.  Okay.  And when you say, "It didn't move out
2  of the department," when it gets a negative vote from
3  the Budget Council, it doesn't go to the College?
4      A.  I'm hazing on the specifics behind Miryung's
5  case.  Because it was an early promotion, it wasn't an
6  up-or-out year, so she had an opportunity at that point
7  to curtail the process.  So it's possible that's what
8  happened.
9      Q.  Okay.  So you don't remember if she withdrew
10 it voluntarily or not?
11     A.  I don't remember.
12     Q.  Okay.  So you wouldn't have been the one
13 advising her one way or the other?
14     A.  Oh, I very well might have been.  We were
15 close friends.
16     Q.  But you don't remember doing that?
17     A.  I don't remember one way or the other, no.
18     Q.  Do you remember her complaining that a male
19 member of the faculty had been sabotaging her efforts,
20 either her promotion package or her research?
21     A.  I don't remember.
22     Q.  Did you have any official role to play in her
23 dossier?
24     A.  I don't remember that, either.  She was in my
25 research area, but I'd have to look back at the timing.

134

1 I might not have been on the Budget Council at that
2 point. I don't remember for sure. I'd have to look
3 back. I definitely assisted her and provided her
4 feedback on things at different times.
5    Q.  Do you remember if she went to the office of
6 the OIE, the Office of Equity and Inclusion, to complain
7 about the male faculty member?
8    A.  I don't clearly remember one way or the other.
9    Q.  Okay.  But after that withdrawing of her
10 promotion dossier, she left UT?
11    A.  She did.
12    Q.  She had the opportunity to go up a second
13 time, but she decided not to stay at UT; is that right?
14    A.  That's correct.
15    Q.  And for you, personally, I asked you about the
16 early promotion possibility.  Was that -- did you
17 actually consider it?
18    A.  Yes, I considered it in consultation with a
19 Department Chair and my mentors at the time.
20    Q.  Okay.  And it didn't go any further than those
21 discussions?
22    A.  No, I didn't -- my case didn't even go up to
23 preliminary vote to the faculty.  Who they also talked
24 to, to get input, I don't know; but as far as I'm
25 concerned, I didn't put anything together packet-wise.

135

1    Q.  And from your understanding of those
2 discussions, was that their advice to you?
3    A.  Yes, their advice to me was very clear; and
4 it's memorable.
5    Q.  Okay.  "Wait," was that the advice?
6    A.  "Wait.  There is a strong -- there is a higher
7 bar for an early promotion, and you have a very strong
8 regular term promotion case.  Wait."
9    Q.  Okay.  And you didn't have prior service at
10 another university that you could try to argue that met
11 your six years, correct?
12    A.  I came straight to UT from my graduate degree.
13    Q.  Okay.  Related to you being on the fence about
14 Dr. Nikolova's promotion -- that was your comment when I
15 was asking you about the teaching document that you
16 created with your colleague -- was there anything else
17 in the document other than that last sentence, that
18 summary sentence at the end, where you said it wasn't as
19 strong as some of the other sentences you'd written?
20    A.  I can't point to anything specifically; but
21 especially in the time period where this was written,
22 this is not an effusively strong statement.  This is a
23 good statement.  This is a statement of good teaching.
24    Q.  When it's great, there's a lot of adjectives
25 that are included; is that right?

136

1    MS. HILTON:  Objection, form.
2    A.  That's correct.
3    Q.  (BY MR. NOTZON)  I mean, from your experience,
4 faculty, when they want to signal their support, they
5 pull out the adjectives?
6    A.  We do.  You know, here, we're saying things
7 like, "She has contributed.  She stepped in."  We're not
8 saying, "She excelled at," as an example.
9    Q.  Yeah.  Okay.  You state the positive facts,
10 but you characterize them further with adjectives and
11 other facts that put it in context that this is above
12 and beyond good?
13    A.  In fact, we would use words like, "This is
14 above and beyond good," is what we would say.
15    Q.  Some comparison, comparative description, yes.
16 Okay.
17    Was there anything else about
18 Dr. Nikolova's dossier besides what you've commented on,
19 the teaching, that put you on the fence for
20 Dr. Nikolova?
21    A.  Yeah.  So we've talked mostly about the
22 undergraduate teaching.  I think the graduate teaching
23 was particularly concerning because usually the course
24 instructor ratings for graduate courses are quite high,
25 and hers are low and on average.  And, again, averages

137

1 are averages.  I think that was concerning for me.
2    And I think that a lack of teaching
3 record, so even with the time and service, the number of
4 classes she'd had the opportunity to teach was low.  So
5 it was hard to see what was going on.
6    And then I recall that I had concerns
7 personally about kind of student advising and mentoring
8 and whether or not students felt supported in her
9 research group.
10    Q.  Where did that concern come from?
11    A.  Just from conversations with students.  I
12 don't recall if it was in the advising statement that
13 was submitted with her dossier, but these were kind of
14 inputs that came up in the conversation in the faculty
15 meeting.  I mean, these were things that impacted my
16 decision, my thinking on that case.
17    Q.  Back to the teaching scores, we had talked
18 about how you compare courses and scores and how -- what
19 a good comparison is and what isn't.  You saw from her
20 rebuttal where she says on the undergraduate teaching
21 scores, that those were in the -- she was, like, the top
22 two or -- Number 2 or 3 out of the 14 professors that
23 have ever taught the course?
24    A.  She said three, what I read when I read this;
25 and that may be true.  I didn't do any data processing

138

1  on this table, yeah.
2      Q.  So that's -- I mean, that would put her in,
3  what, the top 15 percent?
4      A.  This isn't a comparison.  I don't know where
5  it would put her for this class.  I also don't know
6  where it would put her relative to the department.  I
7  did notice in the Dean's letter she pointed out
8  that fewer than 16 -- or 16 or 17 percent of the faculty
9  in the Cockrell School have 3.7 or lower, I think is
10  what she said.  So that puts the 3.7 at, you know, the
11  bottom of the course instructor ratings.
12      So, I mean, again, you can compare within
13  class; but you also need to think about the class in a
14  broader context of all the courses that are, say,
15  required for undergraduate students and how this
16  compares.  And I haven't run those numbers.  I don't
17  know.
18      Q.  Well, wouldn't you agree that it's unfair to
19  comment on the outlier low score and use that as a basis
20  to say -- and anchoring her to the bottom 16 percent
21  when that's the one outlier score?
22      MS. HILTON:  Objection, form.
23      Q.  (BY MR. NOTZON)  And all the others are within
24  .2?
25      A.  Yeah.  The statistic from the Dean's letter

139

1  causes me to wonder what is the rest of the distribution
2  of the scores; and so without the rest of that
3  information, I can't comment on what 3.9 indicates.
4  You're right, it'll be a number that's bigger than
5  16.6 percent; but I don't know what the number would be.
6      Q.  Well, she went through it in her rebuttal; and
7  she talks about how she is higher than -- well, let me
8  ask another is-it-fair question.  It's also not fair to
9  compare the scores in that class across -- which is what
10  the Dean did -- across engineering classes generally?
11      MS. HILTON:  Objection, form.
12      A.  As I said before, we do a lot of different
13  cross-sections on these course instructor evaluations.
14  We do averages for all courses.  We'll do averages for
15  just graduate versus undergraduate because, like I just
16  said, graduate courses tend to be higher.  We'll also do
17  comparisons across required courses or, like we
18  discussed earlier, courses based on size.  I think all
19  of those provide useful information of teaching
20  performance.
21      Q.  (BY MR. NOTZON)  Useful to what end is the
22  issue, though, because if you're comparing a required
23  high-registration class that has documented history on
24  the low end, you know, the sub-four numbers; and you're
25  then going to compare that to the median scores for

140

1  engineering classes generally, the usefulness of that is
2  to tank the professor, no?
3      MS. HILTON:  Objection, form.
4      A.  I guess it depends on what the relativeness of
5  the scores are.  I think that we want all of our -- I
6  mean, Course Instructor Surveys' quantitative value are
7  just one dramatically imperfect measure of a course; but
8  they are one measure we have.  They're a measure of the
9  students' satisfaction with the course.
10      Q.  (BY MR. NOTZON)  We're not arguing about that.
11  We're talking about why you were on the fence.  And
12  we're talking about undergraduate scores and comparing a
13  class where she's the top, Number 3, teacher score-wise
14  of all the teachers that have taught the course over the
15  past ten -- "X" years, and then trying to compare that
16  as below the median of all engineering classes, which
17  doesn't it take into account the contextual harm of all
18  the factors that I said; and that's not fair, is it?
19      MS. HILTON:  Objection, form.
20      A.  There are two -- we have on the table two
21  possible comparisons.  Compare this class to all
22  engineering classes.  Compare Eddie's performance in
23  this class just to this class.  I think the right
24  comparisons are to do -- we've got to go outside of the
25  class because several of these instructors that are

141

1  listed are not teaching this class anymore for a reason.
2  We're looking for new instructors who can do a better
3  job of teaching this class, right?
4      Q.  (BY MR. NOTZON)  That's your answer.  Okay.
5      Any other reasons you're on the fence
6  with Dr. Nikolova's promotion other than what you've
7  testified about so far?
8      A.  I don't recall any others.
9      Q.  Did you vote for Dr. Nikolova in the
10  promotion?
11      A.  I did vote.  Is that what you're asking?
12      Q.  For the promotion.
13      A.  I don't recall how I voted.
14      Q.  There was -- I think it was 32 to 1 and --
15      A.  And two abstentions, yeah.  And I don't know
16  how I voted.
17      Q.  Okay.  You don't know, or you don't want to
18  answer?
19      A.  I honestly don't know.
20      Q.  You don't know how you voted for the first
21  female that had gone up in a while?
22      A.  The fact that she was female didn't impact my
23  vote at all.
24      Q.  Okay.  And why is that?
25      A.  Because it had nothing to do with her

142

1   credentials for promotion or tenure.
2       Q.   I'm not saying that you voted because she was
3   female as a criteria -- qualifying criteria.  I'm saying
4   you voted for a woman to get tenure or not, which would
5   have been a meaningful event in your career, as an
6   underrepresented female, that is a passion for you.
7   That's not an event that would cause you to remember
8   what your vote was?
9       A.   I'm saying that Eddie's tenure case is no more
10  meaningful or less meaningful than any other tenure case
11  we do.  Whether or not it was a male or a female does
12  not impact my decision nor does it impact my memory of
13  that event.
14      Q.   So if you're voting for a female President,
15  that wouldn't be a memorable vote?
16      MS. HILTON:  Objection, form.
17      A.   Well, I can tell you who I voted for in every
18  single Presidential Election.  They've all been quite
19  memorable.
20      Q   (BY MR. NOTZON)  Okay.  That's not an answer
21  to my question, though.
22           There's never been a female President.
23  Would you not remember who you voted for if it was a
24  female, because it would have been the first female
25  President, not because she's a female, but because you

143

1   thought she was the best candidate?
2       MS. HILTON:  Objection, form.
3       A.   I mean, I believe that I will remember who I
4   voted for for President because it is a memorable event,
5   not because -- and I will remember who I voted for
6   because of who they were, not necessarily because they
7   were female.
8       Q   (BY MR. NOTZON)  Okay.  So this was not a
9   memorable event for you, voting for Dr. Nikolova or not?
10      A.   It was no more memorable than voting for any
11  other promotion case, for me.
12      Q.   Do you remember how you voted for Kim,
13  Dr. Kim, Step 2?
14      A.   I can't be absolutely sure how I voted for her
15  case.
16      Q.   Did you ever tell Dr. Nikolova not to go up
17  for early promotion?
18      A.   We had several conversations.  I kind of
19  served as something of an informal mentor, where she
20  relayed she had been given this information; and I and
21  others were trying to make it clear that this was going
22  to be considered an early promotion and that the early
23  promotion had a higher bar and that she should
24  definitely consider the advice that she was being given
25  about waiting.

144

1       Q.   So you gave her advice to wait?
2       A.   Yes.
3       Q.   Okay.  And did anyone else give her advice to
4   wait that you're aware of?
5       A.   I was told secondhand, perhaps by Eddie,
6   perhaps by the other people, that they had given her
7   that advice.
8       Q.   Did you tell her why you wanted her to wait
9   other than it's a higher bar?
10      A.   That would have been the reason I would give.
11      Q.   Okay.  Did you not give her context that,
12  "It's a higher bar, and I'm not sure that you meet that
13  higher bar" or "I don't think you meet that higher bar"?
14      A.   I don't know how explicit I might have been in
15  those conversations.
16      Q.   When you were pregnant during your
17  probationary period, did you teach that course, that
18  undergraduate course?
19      A.   I don't think so.
20      Q.   Okay.  Did you ever get teaching scores below
21  4.0?
22      A.   I don't remember.  I'd have to go back and
23  look at all my teaching scores.  It's possible that I
24  did early on.
25      Q.   Do you recall that your lowest score on record

145

1   is the semester you were pregnant?
2       A.   I do not recall that.
3       Q.   That's something that you could look up, isn't it?
4       A.   I could look it up.
5       Q.   Do you know if you were breastfeeding during a
6   semester when you were teaching?
7       A.   Oh, certainly, twice probably -- or maybe more
8   than that, actually.  I breastfed my children for a year
9   each.
10      Q.   And do you recall whether or not your teaching
11  scores were lower at those semesters?
12      A.   I do not recall.
13      Q.   Are you aware -- well, let's go ahead and look
14  at a couple of documents.  You were the Chair of the
15  Faculty -- I know I'm going to get this wrong --
16  Evaluation Committee?
17      A.   The Faculty Annual Review Committee?
18      Q.   Yeah.
19      A.   Yeah.
20      Q.   And there's a faculty annual review, and then
21  there's a peer evaluation?
22      A.   A peer teaching observation.  So the faculty
23  annual review is also technically a peer review because
24  you're being reviewed by your peers, right, but it's
25  called the faculty annual review; and then there are

146

1  peer teaching observations that are done of classroom
2  instruction.
3      Q.  Okay.  And those are two different things.  So
4  I want to talk about the one where you were the chair,
5  and so let me go ahead and put up a document that I
6  think was created for -- by your department on the whole
7  faculty.  So this would be...
8          MR. NOTZON:  Debbie, is this Exhibit 14?
9          THE REPORTER:  Yes.
10         THE WITNESS:  A spreadsheet, is that what
11  I'm opening here?
12         MR. NOTZON:  Yes, uh-huh.
13         THE WITNESS:  Okay.
14         (Exhibit 14 marked, but withdrawn.)
15     Q   (BY MR. NOTZON)  Oh, that's not the one I was
16  looking for, I don't think.
17         Okay.  But there it is.  All right.  I'll
18  put up the other one, Exhibit 15.
19         (Exhibit 15 marked.)
20     A.  Okay.  I'm familiar with this one.
21     Q   (BY MR. NOTZON)  Okay.  And if you look down
22  to where Dr. Nikolova is --
23     A.  Sorry.  Scrolling.
24         I'm there.
25     Q.  Okay.  Which line is it?

147

1      A.  47.
2      Q.  Thank you.
3      A.  Sure.
4      Q.  Okay.  And whose language is that in 47 D?
5      A.  That would have been the two reviewers of
6  her -- yeah, so the two independent reviewers of her
7  files from that committee, which in this particular case
8  was Constantine Caramanis and Michael Orshansky.  They
9  will have submitted language, and then I will have
10  merged them and then given it back to the entire
11  committee for their approval.  So it kind of has mostly
12  Michael and Constantine, but a little bit of me.
13     Q.  Okay.  And it says, "Meets Expectations."
14  And would it be accurate that this is for the year '18-
15  '19, right?
16     A.  Right.
17     Q.  Which is the year that she went up and was
18  denied tenure, but this was conducted the year after; is
19  that right?
20     A.  That's right because the review was for the
21  period from September 2019 through -- I'm sorry --
22  September 2018 through August 2019, but the review was
23  done in the Spring of 2020.  That's the cadence for this
24  review.
25     Q.  Okay.  And sitting here today, you don't know

148

1  if you added anything or not to the language -- or took
2  anything away from the language in 47 D?
3      A.  I don't believe that I did.  I may have added
4  connector words, semicolons, that sort of thing; but I
5  didn't add words.
6      Q.  All right.  Then let me pull up another one.
7          MR. NOTZON:  So this will be Exhibit 16.
8          (Exhibit 16 marked.)
9          THE WITNESS:  Okay.
10     Q   (BY MR. NOTZON)  Okay.  And this confirms what
11  you testified about, right, that Constantine was one of
12  the people rating; and he gave Dr. Nikolova a "Meets
13  Expectations," correct?
14     A.  Uh-huh, that's right.
15     Q.  So you see the explanation there, "Reasonable
16  publication record.  Teaching record also okay.  Service
17  to the department is low, but perhaps this is on account
18  of having been on leave."  Do you see that?
19     A.  Yes.
20     Q.  Was she on leave?
21     A.  She was on Modified Instructional Duty.
22     Q.  So she wasn't on leave?
23     A.  She was not on leave.
24     Q.  Okay.  And she was on Modified Instructional
25  Duty because of her -- because of a new baby or because

149

1  she was pregnant?
2      A.  I don't know that we were told.
3      Q.  Okay.  All right.  But you were clear that it
4  was because of child issues?
5      A.  I don't know that we were told.
6      Q.  Okay.  And at this point you're not
7  communicating with Dr. Nikolova to know that personally;
8  is that right?
9      A.  Modified Instructional Duty requires a
10  conversation with the Department Chair for the
11  justification of Modified Instructional Duty.  I'm not
12  the Department Chair, so she didn't have that
13  conversation with me.
14     Q.  I didn't ask about your official capacity.  I
15  asked about your personal capacity.
16     A.  But what I'm trying to say is that even if I'd
17  known in a personal capacity that she was pregnant, that
18  doesn't necessarily say why she was on Modified
19  Instructional Duty.  It could have been for a different
20  reason.
21     Q.  It wouldn't be hard to draw that conclusion
22  from your own experience?
23     A.  But it might be incorrect.
24     Q.  Were you able to know if she was on leave or
25  not?

150

1    A.  The input to the Faculty Review Committee
2    would have told us if she was on leave.  So the
3    statement that she was on Modified Instructional Duty
4    for Fall of 2018 and that we should review only Spring
5    activities came to us as a directive when we were given
6    the instructions, like that kind of template spreadsheet
7    from which we drew that.
8         I'm sorry.  I didn't quite answer your
9    question.  In that same spreadsheet we would have been
10   told if she was on leave, instead.
11   Q.  Okay.  So why didn't you fix that in
12   Exhibit 15, 47 D?
13   A.  What do you mean why didn't I fix it, fix
14   what?
15   Q.  Because she wasn't on leave.
16   A.  It doesn't say that she was on leave.  It says
17   that she was -- oh, I see what you're saying.  It says,
18   "...given the semester of leave."  This is a -- yeah,
19   it's a mistake.  Sorry.  That's the first time I've
20   noticed it.  To use the word "leave" in exchange for
21   Modified Instructional Duty, the intent there, I
22   interpreted that as a placeholder for Modified
23   Instructional Duty.
24   Q.  So you admit that you should have fixed that?
25   A.  I admit that there's a mistake and we used the

151

1    word "leave" when we should have repeated "Modified
2    Instructional Duty."
3    Q.  Okay.  Does Modified Instructional Duty give
4    you a pass on your performance?
5    A.  It does not.  Everything that you do on that
6    semester still counts, but this note was put in the
7    spreadsheet that we should consider only spring activity
8    or we should kind of change the denominator at some
9    level of the activity.
10   Q.  Why?
11   A.  That's the instructions we were given.
12   Q.  From whom?
13   A.  The template spreadsheet comes to us from Jac
14   Erengil, who is the Executive Admin Associate from -- in
15   the department.  I assume it's coming to her from the
16   Department Chair.
17   Q.  So you're saying the instruction, you assume,
18   is from Chair Tewfik?
19   A.  At this time this would have been
20   Chair Marculescu.  We had a new Department Chair at this
21   point in time.
22        THE REPORTER:  I'm sorry.  Can you repeat
23   that name?
24        THE WITNESS:  I'm sorry.  Marculescu.
25   Q.  (BY MR. NOTZON)  And would you have -- do you

152

1    view this as being accurate, that she, in fact, had less
2    production or, you know, less performance, justifying a
3    Meets Expectations in that year of '18-'19 than she had
4    had before?
5         MS. HILTON:  Objection, form.
6    A.  I agreed with this rating at the time.  To
7    actually answer your question, I would have to go back
8    and review all of the input that went into this process.
9    I wasn't one of the two reviewers of this, the two
10   independent reviewers of this particular case.
11   Q.  (BY MR. NOTZON)  So how did you -- when you
12   say that you agreed with it, how did you agree with it
13   if you didn't have the information to assess whether or
14   not it was accurate?
15   A.  Oh, I had the information.  I just didn't
16   study it in detail.
17   Q.  Okay.
18   A.  So when we generated the ratings, then we all
19   looked over and kind of checked what the two deep divers
20   did.  And in this particular case that was Constantine
21   and Michael.
22   Q.  Okay.
23        MR. NOTZON:  So this is Exhibit 17,
24   Debbie?
25        THE REPORTER:  Yes.

153

1         (Exhibit 17 marked.)
2         THE WITNESS:  Okay.
3    Q   (BY MR. NOTZON)  Okay.  So on this one, this
4    is the other person assigned to review Dr. Nikolova; and
5    it says, "I submitted my rating and comments for Eddie."
6    But I don't see that.  Do you know what they were?
7    A.  They were placed directly in the box folder in
8    a shared -- I'm sorry -- a shared box folder in a
9    spreadsheet.  I don't have those comments verbatim
10   handy.
11   Q.  Okay.  And so the process is that these
12   people, like, Constantine, had provided you the comments
13   in the e-mail.  Did you then take them and put them in
14   the spreadsheet yourself or was that outside -- you
15   know, he did it in the e-mail instead of in the
16   spreadsheet or did he do it in both locations?
17   A.  In this particular case, I don't recall,
18   especially since this was a late one; but we kept a
19   generic spreadsheet.  And I would have used
20   Constantine's comments and Michael's comments to merge
21   and -- or we would have collaborated on that to generate
22   the overall comment that you see in the other
23   spreadsheet.  Whether I also copied over Constantine's
24   into that other spreadsheet, I don't recall.  The
25   process for this was that everyone was supposed to put

154

1  their stuff in the shared spreadsheet; but because this
2  was kind of a lot of pressure because of the lateness of
3  it, the process shifted a little.
4      Q.  And I noticed from some of the communications
5  that several people are late; is that right?
6      A.  A very small number of people were late.  I
7  think we received three late that time.
8      Q.  And was Dr. Nikolova at fault for that
9  lateness?
10     A.  As far as I can tell, yes.
11     Q.  Okay.  Do you know any reason why she was
12  late?
13     A.  No idea.  We all received the same e-mails
14  from the Executive Admin Assistant.  If we were late, we
15  received reminders a couple of times.  I think that's in
16  one of these e-mails.  I don't know why.  When Diana
17  asked for it, we got it pretty quick after Diana finally
18  asked for it, the Department Chair.
19     Q.  Okay.  And did that affect her rating at all?
20     A.  No.
21     Q.  Did you understand that Dr. Nikolova had some
22  issues with the language that's in Exhibit 15, Box 47 D?
23     A.  I did not know that until this morning.
24     Q.  Oh, okay.  You never received any
25  communications about her complaining about that?

155

1      A.  As far as I know, no.
2      Q.  Okay.  I'm going to put up another exhibit.
3          MR. NOTZON:  So Exhibit 18.
4          (Exhibit 18 marked.)
5      A.  Okay.
6      Q.  (BY MR. NOTZON)  So Dr. Nikolova writes to the
7  Chair what she would propose the comments be because
8  she's stating how strong her year had been, compared to
9  the language that was in 47 D, that didn't comment at
10  all about the strength of her year.  She was saying it
11  was one of her stronger years, no?
12     A.  That's what she says, yeah.
13     Q.  Do you not agree that that looks to be like a
14  pretty strong year?
15     A.  It looks to me like it meets expectations for
16  an ECE faculty member at the University of Texas at
17  Austin.
18     Q.  So even reading that language from
19  Dr. Nikolova, that doesn't change your opinion that she
20  should be a Meets Expectations?
21     A.  It does not.
22         MR. NOTZON:  Exhibit 19.
23         (Exhibit 19 marked.)
24     A.  Okay.
25     Q.  (BY MR. NOTZON)  So this is kind of a

156

1  compilation of the data and there's three times that
2  Dr. Nikolova got Meets Expectations.  Are you familiar
3  with whether or not those are the same years that she
4  was on Modified Instructional Duty for her three kids?
5      A.  I don't know.
6      Q.  Okay.  Were you on the committee on each of
7  those three years?
8      A.  The years at the top here are the years of
9  activity or the years of the committee?
10     Q.  The years that the evaluation applied.
11     A.  Okay.  Yeah, I was the Chair of the committee
12  for the last two columns here and on the committee the
13  column before that.
14     Q.  Okay.
15     A.  And that was the first time I'd been on the
16  committee, I think.
17     Q.  And so from your perspective, those are the
18  accurate ratings that Dr. Nikolova received, without
19  regard to her being on Modified Instructional Duty?
20     A.  I don't have any evidence right now to second
21  guess them.
22     Q.  And the spreadsheet you were talking about
23  that the reviewers would input the information into,
24  that would turn into Exhibit 15; is that correct?
25     A.  I think we used a separate spreadsheet, and we

157

1  moved things from one spreadsheet to another.
2      Q.  Okay.  And do you know if you produced that
3  other spreadsheet, that working spreadsheet?
4      A.  I don't know.
5      Q.  Okay.
6          MR. NOTZON:  Let's take a short break.
7          THE REPORTER:  We're going off the record
8  at 3:19 p.m.
9          (Off the record from 3:19 to 3:29 p.m.)
10         THE REPORTER:  We're back on the record
11  at 3:29 p.m.
12     Q  (BY MR. NOTZON)  Okay.  I'm going to put up
13  another exhibit.  So this will be --
14         MR. NOTZON:  What number are we on?
15         THE REPORTER:  20.
16         MR. NOTZON:  20.  Okay.  This will be
17  Exhibit 20.
18         (Exhibit 20 marked.)
19     Q  (BY MR. NOTZON)  Ready?
20     A.  Sure.
21     Q.  Okay.  I'm not going to go over that right
22  now.  I'm going to save that until the end.
23     A.  Okay.
24     Q.  We have this silly little thing we've got to
25  do.

158

1    So let me go on and ask you -- I'm going
2 to put up another exhibit that we are going to talk
3 about, and this is Exhibit 21.
4    (Exhibit 21 marked.)
5    A.  Okay.
6    Q.  (BY MR. NOTZON)  Okay.  So this is an
7 interchange between you and Andrea Thomaz?
8    A.  Andrea Thomaz.
9    Q.  Andrea Thomaz, is that a male or female?
10    A.  Female.
11    Q.  I didn't hear you.
12    A.  Female.
13    Q.  Okay.  And you see this is discussion about
14 Dr. Nikolova; is that right?
15    A.  Yeah, these are responses to the elephant-in-
16 the-room e-mail.
17    Q.  Okay.  And we had mentioned -- I had asked you
18 questions about who you interacted with, and you didn't
19 mention this particular person.  And I'm just wanting to
20 know if this refreshes your recollection.
21    A.  Yeah, I don't think we exhausted the list.  I
22 started listing them, and we kind of got distracted by
23 some other line of questioning.  I didn't think that I
24 was done at the time.
25    Q.  Okay.  Are there others?

159

1    A.  I definitely had Andrea on my mind at the time
2 when we were talking before.
3    Q.  Let's finish the list out, then.
4    A.  Sure, sure, sure.  So I said.  Hao and Jean
5 Anne before.  I talked to Suzanne Barber, who was my own
6 mentor.  She is still working as a faculty member in the
7 department.  I talked to Andrea.  I talked to Andrea's
8 husband, Edison.  I talked to Mohit Tiwari.  And I'm
9 trying remember what I was listing before because I
10 think I had said I was reaching out to assistant
11 professors.  Andrea's not an assistant professor and
12 neither is Suzanne; but I think that's the people that I
13 probably -- I also talked to Sanjay Shakkottai about the
14 issue.  Sanjay was, I believe, one of Eddie's former
15 mentors, so.
16    Q.  Okay.  And this is Andrea reaching out to you,
17 not vice versa, right?
18    A.  Yes.  In fact, this is Andrea reaching out to
19 me and then we had a back and forth and then we got
20 together.
21    Q.  Okay.  And let's go ahead and talk about this
22 conversation that you had with her.  Could you explain
23 what you mean by it was handled badly on so many levels?
24    A.  Yeah.  I think that the biggest one that
25 sticks in my mind here is what we had already talked

160

1 about.  I was really concerned about the impact on the
2 other assistant professors, in particular the female
3 assistant professors.  And so I thought that this
4 e-mail, having been sent to the department the way it
5 was, from Eddie to everyone, was going to have a
6 significant negative impact.  So that was one level.
7    I think another level was the one that
8 Andrea mentioned.  Andrea and I had kind of started
9 serving as somewhat informal mentors for Eddie shortly
10 before her promotion case went forward.  Andrea
11 expresses regret, that I think we share, that we hadn't
12 kind of done that sooner and more deeply.
13    And then I think the other big takeaway
14 is one that Eddie actually gets at in her e-mail is that
15 the Department itself wasn't having a conversation about
16 the outcome of her promotion and tenure.  We weren't
17 having -- that wasn't shared with us.  We weren't having
18 a conversation.  We weren't discussing kind of what it
19 meant for us as a department, what it meant for our
20 junior faculty.
21    I think those are the big key things that
22 I recollect here.
23    Q.  So when you say "has been handled badly on so
24 many levels," it sounded like from your answer -- and
25 correct me if I'm wrong -- that you were criticizing

161

1 Dr. Nikolova's response to being denied tenure, instead
2 of the tenure promotion process?
3    A.  Yeah, not just her response, but kind of
4 everybody's response to it.  So kind of how the
5 Department handled it, how I hadn't dealt with it,
6 having known about it, and how Eddie dealt with it, as
7 well.  That's the levels, right?
8    Q.  Okay.  But I want to make sure we know what
9 the "it" is, which is the response to the denial from
10 the Dean or the whole -- or the denial from the Dean
11 itself?
12    A.  It was the response.  The way that we -- what
13 I was referring to was the way we, as a department; I,
14 as an individual; Eddie, as an individual, had responded
15 to that decision by the Dean.
16    Q.  And what are the "long, long stories"?
17    A.  I don't know.  It could have been
18 conversations, but I think that -- I don't remember --
19 that Hao had stopped by my office, so stories related to
20 that.  I don't know what the "long, long stories" refers
21 to.  I mean, like, I -- because Eddie had reached out to
22 me to help with her rebuttal, I had known about this
23 already.  So it could be a reference to that, but I
24 don't know what it was.
25    Q.  And what about -- did you have conversations

162

1  with Andrea about the petition?
2          MS. HILTON:  Objection, form.
3      A.  I don't recall.  I recall very little about
4  the petition.
5      Q      (BY MR. NOTZON)  What about conversations with
6  the other people that you've now named?
7      A.  So the other people I named, Andrea, Edison,
8  Mohit and Mohit's wife came over to my house for dinner
9  shortly after this e-mail; and we talked a little bit
10  about this.  But that conversation was including Edison
11  and Mohit, who were both assistant professors at that
12  time, so it would have been a careful conversation
13  because -- to, you know, control for the impact of this
14  on them; and a lot of that was with our kids playing and
15  screaming in the background, probably.  That's one
16  conversation.
17          I think that the conversation with
18  Suzanne -- her office is right next to mine -- and we
19  just kind of had a conversation about what happened,
20  what could we, as a department, have done different;
21  what could we, as a department, you know, do to support
22  Eddie -- and by "different," I mean to support Eddie
23  through this.  I don't recall discussing the petition
24  with anybody.
25      Q.  At this point was there any discussion about

163

1  her complaints of gender or pregnancy discrimination?
2      A.  Well, it's in this e-mail that she sent to us.
3  So it's possible that that came up.  I do not explicitly
4  recall speaking about that, even with the female
5  assistant professors.
6      Q.  Ever?
7      A.  I do not recall speaking about that with
8  anyone other than this information from Eddie.  I don't
9  recall that at all.
10      Q.  You didn't talk about it as being one way or
11  the other?  You didn't, say, believe it, not believe it?
12  "It's improper allegations.  You shouldn't have made the
13  allegations.  I'm worried about the allegations," none
14  of that?
15      A.  I don't recall any conversations about the
16  allegation of sexual discrimination or gender
17  discrimination or pregnancy discrimination.
18      Q.  We went over earlier the reasons why you
19  thought you were on the fence for Dr. Nikolova's tenure;
20  and when we went over those things, we talked about the
21  reason why you were on the fence from the negative side.
22  What were the positive side of what you saw from
23  Dr. Nikolova that you thought would have merited
24  promotion?
25      A.  Sure.  Her research is really strong; and her

164

1  letters from senior colleagues in her field were
2  extremely strong, as well.  And, you know, research is a
3  big portion of tenure and promotion at Tier 1 research
4  institutions.  So that was very strong.
5      Q.  What about her exposure nationally and
6  internationally?
7      A.  Yeah.  I mean, to me, that's part and parcel;
8  but I should be explicit.  Yeah, so her work with the
9  Simon's Workshops, which is all spoken to in the
10  letters; her publications in internationally-recognized
11  venues, these were all part of her kind of research and
12  the strength of her research.
13      Q.  Let's look back at Exhibit 19.
14      A.  Which one is that?  Sorry.
15      Q.  Oh, it's the little chart of Es and MEs.
16      A.  Okay.  Annual Review Comparators, that one?
17      Q.  Yeah, technically, to describe it by its name.
18          Okay.  So for 2016, do you know if --
19  Dr. Tiwari, when he got Exceeds Expectations, if he was
20  praised for his highly competitive conferences; but
21  there's no mention of Dr. Nikolova's in hers, and she
22  had three such papers at competitive conferences.
23      A.  I don't have the descriptions right in front
24  of me.  So I don't know what they say, so.
25      Q.  Do you have that available to you as the

165

1  corporate rep?  Should we move to that?
2      A.  I do have that, yes.
3      Q.  Okay.  Let's go ahead and look at that
4  Exhibit 20, the one with the Deposition Notice and the
5  corporate rep topics.
6      A.  Okay.
7      Q.  That last page of the exhibit, are those what
8  you understand to be the three topics that you're here
9  to testify about as Texas?
10      A.  Yes, yes.
11      Q.  And, to the extent that we've asked any
12  questions about Dr. Nikolova's annual evaluation and any
13  of the other evaluation questions, would you adopt those
14  as being the same thing you would have said as UT?
15      A.  Yes.
16      Q.  Okay.
17          MS. HILTON:  Robert, real quick, are you
18  finished with the individual deposition; and you're
19  moving to 30(b)(6) now?
20          MR. NOTZON:  Yes.
21          MS. HILTON:  I just wanted to make sure
22  we're not jumping back and forth.
23          MR. NOTZON:  Yeah, I hope not to.  Okay?
24          MS. HILTON:  Okay.  Yeah.
25          MR. NOTZON:  And I understand,

166

1  Ms. Hilton, that you're retaining objections to any
2  future concerns regarding this temporary fix, let's call
3  it?
4         MS. HILTON:  Right.  Yes, I think that's
5  accurate.
6      Q   (BY MR. NOTZON)  All right.  So,
7  Professor Julien, when I'm asking you about -- you said
8  you had documentation available to you about the other
9  ratings for the other individuals?
10     A   Yes.
11     Q   And what is that?
12     A   So, I mean, I've collected the spreadsheets
13  with the ratings in them.  I don't know what the process
14  here is.  Am I supposed to open them up and share them
15  similarly?
16     Q   If you're going to review it to answer a
17  question, yeah, I'd like you to put it in the chat.
18     A   Okay.  So you're asking the question
19  specifically about the comparison between Mohit and
20  Eddie for the 2016-2017 review; is that right?
21     Q   Let's see here.  Let's do the '15-'16.  That's
22  the one, I think, where he had a -- he was credited for
23  his highly competitive conference papers; but
24  Dr. Nikolova had three such papers and had not received
25  any credit for those or comments.

167

1      A   Okay.  So I have the spreadsheet where those
2  ratings exist.  Do you want me to share it with you
3  since I'm looking at it now?
4      Q   Sure.
5      A   Okay.
6         THE WITNESS:  So this file sharing is new
7  to me.  So let me see if I can not embarrass myself.
8         MR. NOTZON:  If you have a PC, you can
9  drag and drop it into the chat; but for Macs you have to
10  go through the clicking and browsing kind of thing.
11        THE WITNESS:  Well, I'm obviously an
12  academic Mac user.
13        MR. NOTZON:  Then you have the delays
14  like I have.
15        THE WITNESS:  Did that work for you?
16        MR. NOTZON:  I see it.
17        THE WITNESS:  Okay.  Excellent.
18     A   So this is what I collected as the results
19  from the '15-'16 annual review process, so that I can
20  see Mohit's review on Line 54.  It does say, "Papers at
21  highly competitive conferences including MICRO and
22  Usenix Security.  Strong funding including NSF CAREER."
23        And then for Nikolova, I see, "Good
24  publication, teaching and student supervision, funding
25  record, and service."

168

1      Q   (BY MR. NOTZON)  And so she's wondering what's
2  going on; she had three highly competitive conference
3  papers that year.
4      A   Okay.  Yeah, I mean, I guess the way I would
5  look at these reviews is that some of them mention
6  venues.  In fact, I think the mention of venues on Mohit
7  seems to be the anomaly, not the other way around, so.
8      Q   And Dr. Nikolova had an NSF CAREER funding, as
9  well.
10     A   In that same period of review?
11     Q   Yeah.
12     A   It was received during 2015-'16?
13     Q   Oh, no.  But she --
14     A   Yeah.  So it's important to note that faculty
15  annual reviews review exactly one year.  It doesn't look
16  at what happened before or after.  It's looking only at
17  things that happened between September of the academic
18  year and August of the summer following the academic
19  year.
20     Q   But the NSF CAREER funding, she's getting it
21  every year.  So she would be continuing to get that
22  money, including this year, if she had had it from the
23  year before, right?
24     A   Yes, but the mention of it in Mohit's, I would
25  take to mean here that he was awarded it that year.  I

169

1  would expect that a similar note would appear in Eddie's
2  review from whatever year she received the CAREER award.
3  So we note the award of the new funding in the year that
4  it's awarded.  The fact that she has the money and the
5  money is supporting her research program is part of the
6  good, you know, student support or whatever.  "Funding
7  record" is what it says there.
8      Q   Right.  It's just not -- this is the extent of
9  the information you have?
10     A   This is what I have.  Yeah, this is what I
11  have.  And then I have her CV that I could go back and
12  kind of try to recreate what this committee was, you
13  know, doing at the time.  I know the process this
14  committee went through, but I didn't talk to the
15  individual members who reviewed each one of these people
16  and ask:  What were you thinking?  What went into this
17  line of the review?
18     Q   And you have this chart for each year?
19     A   Yes, I do.
20     Q   Okay.  Could you go ahead and put up the
21  charts for the other years, as well, from the '16-'17,
22  '17-'18, '18-'19?  Is that what you have?
23     A   Yes.  So the '19-'20 reviews we're in the
24  process of doing right now.  So we haven't completed
25  them yet.

170

1  Q. So just the ones you have completed.
2  A. Do you want '14-'15, also?
3  Q. Sure.
4  A. Like, how far back do you want me to go?
5  Q. That's the extent.
6  A. Okay.
7  Q. And then what we'll do is we'll put all of
8  them together as one exhibit.
9  A. Okay.
10        MR. NOTZON: Is that okay with you,
11  Ms. Hilton?
12        MS. HILTON: Yes.
13        MR. NOTZON: Have you got that,
14  Ms. Cunningham?
15        THE REPORTER: Yes.
16        THE WITNESS: Sorry. I could have
17  thought about making it one single, but I did not.
18        MR. NOTZON: Don't worry about it.
19        THE WITNESS: This is a lot of clicks,
20  too.
21        MR. NOTZON: Yeah.
22        THE WITNESS: All right. One more.
23        (Exhibit 22 marked.)
24        MR. NOTZON: All right. Let's take a
25  short break, like, just a couple of minutes, if you

171

1  don't mind watching your screen.
2        MS. HILTON: Okay.
3        THE REPORTER: We're going off the record
4  at 3:51 p.m.
5        (Off the record from 3:51 to 3:56 p.m.)
6        THE REPORTER: We are back on the record
7  at 3:56 p.m.
8  Q. (BY MR. NOTZON) Okay. I have just a few
9  follow-up questions that are not corporate rep
10  questions.
11        MS. HILTON: Well, Robert, I think we had
12  discussed before we had agreed that we wouldn't be doing
13  a bunch of hat switching.
14        MR. NOTZON: Right. This is a follow-up,
15  just a few follow-up questions; and then we're done.
16        MS. HILTON: Okay.
17        MR. NOTZON: We're not going to go back
18  and forth.
19        MS. HILTON: Okay.
20        MR. NOTZON: We're just going to go back.
21        MS. HILTON: Okay.
22  Q. (BY MR. NOTZON) So, Professor Julien, you had
23  said recently, today, that research is a -- did you use
24  the word critical factor or important factor at a Tier 1
25  institute?

172

1  A. Yeah, substantial, or whatever.
2  Q. Whatever you said before?
3  A. Yeah.
4  Q. Does that mean -- is it your testimony that
5  research is the prime consideration in the research,
6  teaching, and service?
7  A. I don't think the University -- I'm sorry.
8  This hat switching is -- so the University might not
9  characterize it that way.
10     I think, as faculty, we emphasize
11  research as the most important thing in a tenure and
12  promotion package, with teaching being a pretty close
13  second, so.
14  Q. Okay. And service is a requirement --
15  A. Yeah.
16  Q. -- to get all that done?
17  A. Yes, but that's Christine. I'm sorry.
18  Q. Right. You are Professor Julien right now.
19  A. Yeah.
20  Q. Thank you for taking off the other hat.
21     All right. And then you had mentioned
22  how you were talking with other individuals after the
23  elephant-in-the-room e-mail and how you were discussing
24  with people different ways to support Dr. Nikolova, and
25  what did you do to support Dr. Nikolova as a result of

173

1  those conversations?
2  A. Those conversations were more reflections on
3  how could we adjust our mentoring precesses, what could
4  we do. I didn't do anything actively to reach out to
5  Eddie after the fact.
6     I think that the meetings with the ECE
7  women faculty may have started after that elephant-in-
8  the-room e-mail. I may be a little off on the timing
9  there. I know that just providing more community and
10  support for women in the department is something we
11  wanted to emphasize.
12  Q. Okay. And do you remember hearing from anyone
13  else what they were doing to support Dr. Nikolova,
14  different than what you've just said you were doing?
15  A. Yeah. I mean, there were some e-mails that
16  colleagues sent to -- they just "replied all," right?
17  So I would see some comments that people made to
18  everyone. I don't remember the specifics. I'd have to
19  go back and look at the specific e-mails, who they were
20  from and what she said; but I know there were some
21  colleagues who did express support in that way.
22  Q. That was going to be my question. Was what
23  they expressed supportive of Dr. Nikolova?
24  A. I think that everything that I read -- and
25  these were "reply alls" that included Eddie -- so I

174

1 think they were all supportive, as I recall.

2    Q.   You don't recall anybody coming out and

3 saying, "Ah," something not supportive?

4    A.   I don't recall anybody saying that on that

5 reply-all thread, no, or in any other context, so.

6    Q.   And your own personal reaction, personal,

7 professional, you, reaction to the elephant-in-the-room

8 e-mail from Dr. Nikolova?

9    A.   I was sad.

10    Q.   Could you expound?

11    A.   That she found herself in the situation, that

12 we as a department found ourselves in the situation.  I

13 mean, anybody can read from the e-mail that she was

14 hurting; and it made me sad.  It made me frustrated that

15 she felt that way, yeah.

16    Q.   Did you feel that she was justified in her

17 complaints of gender discrimination and/or pregnancy

18 discrimination based upon the information she was

19 conveying?

20    A.   I never once doubted that she was sincere in

21 expressing how she felt and how she perceived the

22 situation.  I perceived it differently, but I never

23 doubted her sincerity in that.

24    Q.   And what was the difference in how you

25 perceived it?

175

1    A.   I did not believe that her case was handled

2 differently because she was a woman or because she had

3 children.

4    Q.   Did you attempt to gather the information that

5 she had available to her?

6         MS. HILTON:  Objection, form.

7    A.   I don't know what information you're alluding

8 to.  I mean, I had her entire promotion dossier.  I had

9 her teaching statement.  I had her teaching reviews.  I

10 had the Dean's statement.  I'm not sure what additional

11 information she had available to her that I didn't have

12 available.  I didn't go looking for anything.

13    Q.   (BY MR. NOTZON) I guess you had her rebuttal,

14 then, too, right?

15    A.   I had her rebuttal then, uh-huh.

16    Q.   Okay.  And all of that combined did not lead

17 you to the conclusion that her gender or her pregnancies

18 had anything to do with the her being denied tenure or

19 any other treatment that she received at UT?

20    A.   I did not take away that perception as my own

21 perception, no.

22    Q.   All right.

23         MR. NOTZON:  I will pass the witness.

24         MS. HILTON:  No further questions.

25         MR. NOTZON:  All right.  Thank you,

176

1 Professor Julien.

2         THE WITNESS:  Sure.

3         THE REPORTER:  Ms. Hilton, do you need a

4 copy of the transcript?

5         MS. HILTON:  Yes, please.

6         THE REPORTER:  Thank you.  This concludes

7 the deposition at 4:03 p.m.

8         (Deposition concluded at 4:03 p.m.)

9              --ooOoo--

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

177

1         CHANGES AND SIGNATURE

2 WITNESS NAME:          DATE OF DEPOSITION:

3 CHRISTINE JULIEN        March 19, 2021

4 PAGE/LINE  CHANGE          REASON

5 _____

6 _____

7 _____

8 _____

9 _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

22 _____

23 _____

24 _____

25 _____

1                     CHANGES AND SIGNATURE

2  WITNESS NAME:                DATE OF DEPOSITION:

3  CHRISTINE JULIEN             March 19, 2021

4  PAGE/LINE     CHANGE                   REASON

5   Page 71 Line 4 - static to "statistics" - correcting typo

6   Page 71 Line 6 - static to "statistics" - correcting typo

7   Page 73 Line 1 - static to "statistics" - correcting typo

8   Page 73 Line 17 - dates to "data" - replacing incorrect word

9   Page 105 Line 7 - Ochman to "Ahmed" - misspelled name

10  Page 128 Line 14 - "College Committee" - missing word

11  Page 133 Line 4 - hazing to "hazy" - correcting typo

12  Page 173 Line 3 - precesses to "processes" - misspelling

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24  _____

25  _____

1        I, CHRISTINE JULIEN, have read the

2   foregoing deposition and hereby affix my signature that

3   same is true and correct, except as noted herein.

4        DocuSigned by:

5        *Christine Julien*
         1B92663C1100427...

6   CHRISTINE JULIEN

7

8   THE STATE OF __TEXAS__    )

9        Before me, __Laura Redd_____, on

10  this day personally appeared CHRISTINE JULIEN, known to

11  me (or proved to me under oath or through

12  _____TDL_____) (description of identity card or other

13  document) to be the person whose name is subscribed to

14  the foregoing instrument and acknowledged to me that

15  they executed same for the purposes and consideration

16  therein expressed.

17        Given under my hand and seal of office on

18  this __4th__ day of __May_____, __2021_____.

19        **Digital Certificate**

20        DocuSigned by:

21        *Laura Redd*
         FA7F8DB364F841A...

22  NOTARY PUBLIC IN AND FOR                    **Notary Seal**

23  THE STATE OF __TEXAS__            **LAURA REDD**
                                      Notary ID
24  My Commission Expires:__09/01/23__  288273-1
                                      My Commission Expires
                                      9/1/2023

25                                    **Notary w/o bond**

1 STATE OF TEXAS     )

2                    REPORTER'S CERTIFICATION

3          I, DEBBIE D. CUNNINGHAM, CSR, hereby

4 certify that the witness was duly sworn and that this

5 transcript is a true record of the testimony given by

6 the witness.

7          I further certify that I am neither

8 counsel for, related to, nor employed by any of the

9 parties or attorneys in the action in which this

10 proceeding was taken.  Further, I am not a relative or

11 employee of any attorney of record in this cause, nor am

12 I financially or otherwise interested in the outcome of

13 the action.

14          Subscribed and sworn to by me this day,

15 April 5, 2021.

16

17

18

19 _____

20 Debbie D. Cunningham, CSR
   Certified Shorthand Reporter
21 CSR No. 2065 - Expires 6/30/21
   INTEGRITY LEGAL SUPPORT SOLUTIONS
   P.O. Box 245
22 Manchaca, Texas 78652
   www.integrity-texas.com
23 512-320-8690; FIRM # 528

24

25

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

EVDOKIA NIKOLOVA          *
    Plaintiff,         *
                    *
V.                        *   CASE NO. 1:19-cv-00877-RP
                    *
UNIVERSITY OF TEXAS AT    *
AUSTIN,                   *
    Defendant.         *


ORAL VIDEOTAPED AND VIDEOCONFERENCED DEPOSITION

OF

EVDOKIA NIKOLOVA,

Tuesday, June 29, 2021


ORAL VIDEOTAPED AND VIDEOCONFERENCED

DEPOSITION OF EVDOKIA NIKOLOVA, produced as a witness at

the instance of the Defendant, and duly sworn, was taken

in the above-styled and numbered cause on Tuesday,

June 29, 2021, from 9:02 a.m. to 5:59 p.m., before

Debbie D. Cunningham, CSR, in and for the State of

Texas, reported remotely via Machine Shorthand, pursuant

to the Federal Rules of Civil Procedure.

--ooOoo--

2

1        APPEARANCES
2
3   FOR PLAINTIFF:
4      THE LAW OFFICE OF ROBERT NOTZON
        1502 West Avenue
5       Austin, Texas  78701
        (T) 512.474.7563
6
        By:  Robert Notzon, Esq.
7         Robert@NotzonLaw.com
8            AND
9         CREWS LAW FIRM, P.C.
          701 Brazos, Suite 900
10        Austin, Texas 78701
          (T) 512.484.2276
11
        By:  Robert W. Schmidt, Esq.
12        schmidt@crewsfirm.com
13
     FOR DEFENDANT:
14
        OFFICE OF THE ATTORNEY GENERAL OF TEXAS
15      General Litigation Division
        P.O. Box 12548, Capitol Station
16      Austin, Texas  78711-2548
        (T) 512.463.2120
17
        By:  Benjamin Dower, Esq.
18        benjamin.dower@oag.texas.gov
             AND
19        Amy Hilton, Esq.
          amy.hilton@oag.texas.gov
20
21   VIDEOGRAPHER:
        Brian Christopher
22
23   ALSO PRESENT:
        Laura Barbour
24      Jody Hughes
25          --ooOoo--

---

3

1              INDEX
2    APPEARANCES                        2
3
4    EXAMINATION OF EVDOKIA NIKOLOVA:
5    BY MR. DOWER                       7
6
7
8    CHANGES AND SIGNATURE            220
9    REPORTER'S CERTIFICATION         222
10
11          --ooOoo--
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

4

1           EXHIBIT INDEX
2   Exhibit Number    Description         Page
3   Exhibit 70   8/2 & 3/18 e-mail exchange    15
             between Dr. Nikolova and
4            Dr. Tewfik
5   Exhibit 71   4/27/18 e-mail exchange between   21
             Evdokia Nikolova and Jimmy Horn
6
     Exhibit 13   Teaching Statement         36
7
     Exhibit 72   Family Medical Leave policy    43
8
     Exhibit 73   Parental Leave policy        44
9
     Exhibit 74   Modified Instructional Duties    45
10           policy
11   Exhibit 75   10/8/15 MID request and       48
             subsequent approval documents
12
     Exhibit 76   4/13/18 MID request and       53
13           subsequent approval documents
14   Exhibit 77   9/16/19 MID request docs and    57
             subsequent approval
15
     Exhibit 52   Extension of the Tenure Track    60
16           Probationary Period
17   Exhibit 78   11/20/15 Approval of         62
             Probationary Period Extension
18
     Exhibit 79   9/20/19 Carmen Shockley letter   69
19           to Dean Sharon Wood, re:
             one-year probationary period
20           extension
21   Exhibit 80   4/9/18 Evdokia Nikolova e-mail   71
             to Karen Little, re: Hiring
22           Fiance and subsequent e-mail
             exchanges between Dr. Tewfik and
23           Dr. Nikolova regarding same
24   Exhibit 81   5/31/18 Ananth Dodabalapur     80
             e-mail to Ahmed Tewfik, re:
25           Evdokia 3rd year review

---

5

1   Exhibit 39   Evdokia Nikolova Dossier      98
2   Exhibit 7   Evdokia Nikolova's Rebuttal to   120
             Dean Wood's Assessment
3
     Exhibit 82   11/27/18 e-mail exchange between   124
4            Evdokia Nikolova and Fernanda
             Leite, Re: Quick Question from
5            electrical engineering colleague
6   Exhibit 83   3/25/19 Dr. Nikolova letter to    140
             CCAFR
7
     Exhibit 84   3/25/19 Dr. Nikolova Request for   143
8            Reconsideration to Dr. Fenves
9   Exhibit 60   HOP Procedures 3-3020        172
             Nondiscrimination Policy,
10           Effective 10/12/18
11   Exhibit 85   EEOC Charge of Discrimination,   176
             with cover letter
12
     Exhibit 86   Plaintiff's First Supplemental    177
13           Objections and Answers to
             Defendant's First Set of
14           Interrogatories
15   Exhibit 87   Plaintiff's First Amended      196
             Complaint
16
     Exhibit 88   September 5 & 6, 2019 e-mail    203
17           exchange between Dr. Nikolova
             and Dr. Tewfik
18
19          --ooOoo--
20
21
22
23
24
25

6

```
1        (Tuesday, June 29, 2021, 9:06 a.m.)
2            P R O C E E D I N G S
3        Today is Tuesday, June 29, 2021.  This is the
4  videoconferenced deposition of Evdokia Nikolova in the
5  matter of Nikolova versus UT.
6        Due to the COVID-19 Pandemic we are remotely
7  situated, and we are on the record at 9:06 a.m. Central
8  Standard Time.
9        My name is Debbie Cunningham, and my business
10 address is P.O. Box 245, Manchaca, Texas 78652.
11       Would all counsel present please introduce
12 themselves for the record, starting with Plaintiff's
13 counsel?
14       MR. SCHMIDT:  Yes, I'm Robert or Bob
15 Schmidt; and I'm also here with Robert Notzon, for the
16 Plaintiff, Dr. Nikolova.
17       MR. DOWER:  And Benjamin Dower, here with
18 my colleague, Amy Hilton, for the Defendant, the
19 University of Texas at Austin.
20       (Witness sworn by the reporter.)
21       MR. DOWER:  All right.  Before we get
22 started, the parties have a few stipulations that I will
23 just briefly read into the record.  First, the parties
24 stipulate that this deposition may be taken remotely via
25 Zoom.  The parties stipulate that "objection, form" is
```

7

```
1  sufficient to preserve objections to the form of the
2  questions and will be used in lieu of the more specific
3  form-based objections.  And, third, the parties
4  stipulate that all objections except as to the form of
5  question or answer are reserved until trial.
6        And, Bob, anything you'd like to add or
7  disagree with?
8        MR. SCHMIDT:  No.  You said it perfectly,
9  Mr. Dower.  Thank you --
10       MR. DOWER:  All right.
11       MR. SCHMIDT:  -- Ben.
12            EVDOKIA NIKOLOVA,
13 having been duly sworn, testified as follows:
14            EXAMINATION
15 BY MR. DOWER:
16   Q   All right.  So Dr. Nikolova, before we get
17 started, have you ever been deposed before?
18   A.  No.
19   Q.  Okay.  Well, you can relax.  I promise that
20 it's not going to be as bad as whatever you're
21 imagining.
22       So a deposition is basically just a very
23 one-sided conversation where I'm going to be asking you
24 questions.  It's sort of like an interview, with the
25 main difference being that you're under oath and that
```

8

```
1  we, obviously, have a court reporter here who's creating
2  a transcript.
3        So first, just a very few sort of tips
4  and a few introductory remarks to make sure that we're
5  on the same page.  First, you understand that you're
6  under oath here today?
7    A.  Yes.
8    Q.  And so that's the same oath as if we were in
9  court.  Do you understand that?
10   A.  Yes.
11   Q.  Okay.  And as part of the fact that we have a
12 stenographer who's writing down whatever anyone is
13 saying, which, for me will involve a lot of "okays"
14 because I tend to use that as a verbal tick after I get
15 an answer to every question; but what I'm trying to get
16 to is that because there's a court reporter creating a
17 transcript, it will be very important that we try not to
18 talk over each other.  When -- when people are talking
19 simultaneously, it makes the court reporter's job really
20 difficult; and so we want to make sure that
21 Ms. Cunningham's job is as easy as possible.  So I would
22 just ask that if I'm asking you a question, will you
23 please let me go ahead and finish the question, even if
24 you think you know what I'm about to say, just to avoid
25 muddying the record?
```

9

```
1    A.  Yes.
2    Q.  Okay.  And, similarly, I will do my very best
3  never to cut you off or start speaking until you're
4  finished speaking.
5        Another part of this is that because
6  there's a transcript being created, answers need to be
7  verbal.  So a head nod or a head shake won't show up in
8  a transcript.  So if you're indicating, you know, an
9  affirmative response to something or a negative response
10 to something, go ahead and please use the word "yes" or
11 "no" to go ahead and give that response so it will show
12 up in the transcript.  Can we have an agreement on that?
13   A.  Yes.
14   Q.  Perfect.  And if you ever don't understand a
15 question I'm asking, I promise I'm not trying to trick
16 you.  It's probably because I asked a confusing
17 question; and so if I ever ask a question that you don't
18 understand, can we agree that you will, please, ask me
19 to clarify it?  I promise I won't take offense to it.  I
20 just want to make sure that you understand all my
21 questions before you answer any of them.
22   A.  Yes.
23   Q.  Okay.
24   A.  And I just wanted to add that you broke up a
25 few times there and my computer says to me that my
```

10

1  internet connection is unstable; but let's -- let's
2  proceed, maybe.
3      Q.  Well, I don't -- I mean, I'm concerned that I
4  don't want to get into substantive things.
5          MR. DOWER:  Yeah, go ahead, Bob.
6          MR. SCHMIDT:  I'm sorry to interrupt you,
7  but why don't we take a five-minute break?  And I'll see
8  if there's another way to help make sure that her
9  internet is better.
10         MR. DOWER:  Sure.
11         THE REPORTER:  We're going off the record
12  at 9:12 a.m.
13         (Off the record from 9:12 to 9:20 a.m.)
14         THE REPORTER:  We're going back on the
15  record at 9:20 a.m.
16      Q   (BY MR. DOWER)  Okay.  So before we had the
17  technical issue, ironically, I think I was -- I was
18  getting your agreement that if you didn't understand a
19  question I was asking, that you would agree to tell me
20  so that I could try asking it a different way; and so do
21  we have that agreement?
22      A.  Yes.
23      Q.  Okay.  And so if you -- if you do answer the
24  question, can I then assume that you understood it?
25      A.  Yes.

11

1      Q.  Okay.  And I don't -- I'm not trying to get
2  invasive with this question, but are you on any
3  medication that would affect your ability to -- to speak
4  truthfully here today?
5      A.  No.
6      Q.  Okay.  I think the last sort of introductory
7  point is just that, you know, I think this is going to
8  be a fairly long conversation because there's a lot to
9  talk about.  Breaks are not only expected but mandatory
10  because no one's going to be able to make it
11  uninterrupted through this whole thing.
12         So if you want to take a break at any
13  time, just let me know.  The only thing I'll ask is if
14  there is a question pending, that you go ahead and
15  answer the question before we take the break; but
16  subject to that, you know, please just let me know and
17  we can take a bio break or whatever we need.  Do you
18  understand that?
19      A.  Yes.
20      Q.  Okay.  I want to start out just by asking a
21  few questions about what you did to prepare for today,
22  and I'll preface it with:  I am not going to ask you
23  what you talked about with your attorneys.  So please
24  don't disclose any of that.  I'm not asking that.  But
25  did you do anything to prepare for today's deposition?

12

1      A.  Yes.
2      Q.  Okay.  And so without revealing the contents
3  of conversations with your attorneys, what did you do to
4  prepare today -- or for today?
5      A.  I met with my attorneys.  I reviewed my
6  e-mails, text messages, and documents related to my
7  tenure case.
8      Q.  Okay.  Can you tell me what -- what documents
9  you reviewed?
10      A.  Let me try to remember the list.  I reviewed
11  my two statements; the Dean's letter for my tenure case;
12  the Chair's letter for my tenure case; the Dean's letter
13  for one of the comparators, Dr. Mohit Tiwari; the
14  Chair's letter for one of the comparators, Dr. Mohit
15  Tiwari; the Complaint that I filed, the Complaint; the
16  Interrogatories; the -- some of the other -- some other
17  documents that I had prepared, Modified Instructional
18  Duties, letters that I had submitted.
19         I'm blanking out on more.
20      Q.  That's -- that's fine.
21      A.  That's most of them, yeah.
22      Q.  All right.  You mentioned text messages.  Do
23  you remember which text messages those were?
24      A.  I reviewed text messages that I had between
25  myself and my former Department Chair, Dr. Ahmed Tewfik,

13

1  and also between myself and my former mentor,
2  Professor Sanjay Shakkottai.
3      Q.  And do you know whether all of those text
4  messages have been provided -- whether those text
5  messages have been provided to -- to us, I guess, UT's
6  attorneys, without disclosing any conversations with
7  your counsel?
8      A.  So I provided them to my attorneys, and I
9  believe that the ones between myself and my Chair have
10  been provided by my attorneys to you.  I'm not sure
11  about the ones between Professor Sanjay Shakkottai and
12  myself.
13      Q.  Okay.  And what were the -- the text messages
14  with Sanjay about?
15      A.  They were -- it was the entire history that
16  I -- the entire text message history that I had with
17  him, from beginning to end.  So anything, setting up
18  meetings; then, later, discussing -- mainly setting up
19  meetings.  Yeah, I haven't really discussed major
20  content over text messages with -- with him.
21      Q.  Did you ever discuss anything about your
22  tenure application?
23      A.  Yes.  So I believe one of the text messages
24  from Sanjay to me was right after the informal
25  department meeting when the Department voted on my case

14

1  before I started the official tenure process, when they
2  voted whether to give me the green light to go up or
3  not.  And Sanjay Shakkottai had presented my case to the
4  Department; and after the meeting, he texted me that
5  there were no issues and that it went fine.
6      Q.  Okay.  Did you have any text messages with him
7  about your concerns about either sex discrimination or
8  pregnancy discrimination?
9      A.  I don't believe that I have any on texts.  I
10  recall that I had one phone conversation that may have
11  sort of hinted at it, but I don't think we ever used the
12  word "discrimination" or anything like that.
13     Q.  Okay.  Do you remember when that --
14         (Simultaneous speakers.)
15     Q.  Sorry.
16     A.  I'm sorry.
17     Q.  And that will happen, and don't worry about
18  it.  We'll both just stumble over each other
19  apologizing.  Not a big deal.
20         Do you remember when that conversation
21  occurred?
22     A.  Yeah, it was about one month after I'd given
23  birth to my second child, to my daughter, ███.  And
24  Sanjay called me on the phone; and he said, "Oh, I'm
25  just calling to alert you that Ahmed has sent you an

15

1  e-mail which is a little harsh."
2      Q.  Okay.  And you said that was about a month
3  after you gave birth to your second child.  So would
4  that have been around either late July or early August
5  of 2018?
6      A.  That sounds right.
7      Q.  Okay.  And so in the conversation with him,
8  you mentioned -- or you mentioned -- I guess, what can
9  you tell me about that conversation?  What do you
10  recall?
11     A.  I think it was a very brief conversation,
12  mainly, with him because I didn't know the contents of
13  the e-mail; and Sanjay was mainly just kind of giving me
14  a warning sign because he knew my situation.  And I
15  think he mainly was trying to be helpful, and so he just
16  was alerting to me that there is an e-mail that I -- he
17  felt was harsh.
18     Q.  Okay.
19     A.  -- so I'd sort of psychologically prepare for
20  that.
21     Q.  And let me -- okay.  This is getting a little
22  bit ahead of myself; but since we're talking about it --
23  this will also be our first dry run at uploading a
24  document as an exhibit.
25         (Exhibit 70 marked.)

16

1      Q.  (BY MR. DOWER)  So the way it will work is I
2  will drag -- drop and drag the file into the chat; and
3  so in your Zoom chat you should see a PDF that has just
4  been sent to everyone.  And then, if you click twice on
5  it -- or maybe you have to hit those little ellipses in
6  the top right corner -- it should prompt you to download
7  it.
8          And what I would suggest -- and I don't
9  want to micromanage your process -- but I would suggest
10  creating some sort of folder, a temporary folder or
11  something, to save all these PDFs that we may be
12  referring to throughout today.  That way, if we refer
13  back to one that we looked at earlier, it will be easier
14  for you to find.  Obviously, you don't have to do that.
15  I just -- it'll probably make it easier.
16     A.  Thank you.  I've just hit download.  Let me --
17  let me look into organizing and creating a folder.
18     Q.  Take your time.
19         MR. SCHMIDT:  Can we take a short break?
20  I'm having some technical difficulties on my end.
21         MR. DOWER:  Sure.
22         THE REPORTER:  We're going off the record
23  at 9:30 a.m.
24         (Off the record from 9:30 to 9:35 a.m.)
25         THE REPORTER:  We're going back on the

17

1  record at 9:35 a.m.
2      Q.  (BY MR. DOWER)  All right, Dr. Nikolova.  So I
3  just uploaded what's been marked as Exhibit 70, and
4  would you agree with me that this is a few e-mails back
5  and forth between you and Dr. Tewfik?
6      A.  Yes.
7      Q.  Okay.  Do you recall, is this the e-mail
8  exchange that you were referring to a minute ago where
9  Sanjay called you to warn you there was an e-mail coming
10  with a harsh tone?
11     A.  Yes.
12     Q.  Okay.  Cool.  And so in -- so first of all,
13  the -- the first e-mail in the thread, which is the
14  bottom one when you're looking at the document, is an
15  e-mail on August -- or dated August 2nd, 2018; is that
16  correct?
17     A.  Yes.
18     Q.  Okay.  And so this is from Dr. Tewfik; and he
19  says that, "It has come to my attention that you are
20  having your fiance and perhaps one of your students work
21  on your promotion dossier.  This will have to stop
22  immediately."  Did I read that correctly?
23     A.  Yes.
24     Q.  Okay.  And so -- so at this time were you in
25  the process of assembling your dossier for the tenure --

18

1  for the tenure decision for the 2018-'19 academic year?
2      A.  I had already submitted all the documents that
3  I was told would be needed for my tenure dossier before
4  my daughter was born, so around early June of that year;
5  and I think this was regarding some clarifications that
6  were requested on the documents I had already submitted.
7      Q.  Okay.  And so in the second sentence, when
8  there's a request for a response to -- is it "Jilda"?
9  Is that how you pronounce it?
10     A.  I believe so.
11     Q.  Okay.  Do you recall what her request was?
12     A.  I don't recall her request.  I only recall
13 that it was a request on maybe modifying documents
14 somehow.
15     Q.  Okay.  And so what had happened was that your
16 fiance had written an e-mail on your behalf the day
17 before, and that's what triggered this e-mail?
18     A.  Yes.
19         MR. SCHMIDT:  Objection, form.
20         Occasionally, Dr. Nikolova, I'll object
21 and say, "Objection, form."  But disregard it and
22 continue on with your answer.
23     Q   (BY MR. DOWER)  So, first of all, is your
24 then-fiance, is that Jimmy Horn?
25     A.  Yes.

19

1      Q.  Okay.  Is it -- I want to make sure I refer to
2  him appropriately.  Is it Mr. Horn?  Is that how I
3  should refer to him?
4      A.  Yes.
5      Q.  Okay.  I don't want to be overly familiar by
6  using a first name.  So, okay.  So, Mr. Horn, was he
7  helping you prepare your dossier?
8      A.  No.  I'm trying to remember.  So he did help
9  minorly at some point, and I believe it was after that
10 e-mail.  He had not provided help before that e-mail,
11 and he provided minor help.  I think it was there was a
12 document where my publications were chronologically
13 ordered, and then they had to be provided in reverse
14 chronological order or something like that.  And I think
15 he helped me with that one formatting change.
16     Q.  Okay.
17     A.  But I believe that was after that e-mail.  So
18 up until that time, he had not provided any help.
19     Q.  So this -- the main complaint here was that he
20 was -- he was interfacing with UT regarding -- you know,
21 regarding follow-ups about the dossier; is that -- is
22 that correct?
23     A.  Yes --
24     Q.  Okay.
25     A.  -- so.

20

1          THE REPORTER:  I'm sorry.  I missed after
2  "yes."
3          THE WITNESS:  I'm sorry?
4          THE REPORTER:  I missed what you said
5  after "yes."
6          THE WITNESS:  Yes, I believe so.
7          THE REPORTER:  Thank you.
8      Q   (BY MR. DOWER)  Is there -- there's also a
9  reference in here to perhaps one of your students
10 working on your promotion dossier.  Did any of your
11 students ever work on your promotion dossier?
12     A.  Yes.
13     Q.  Okay.  And who was that?
14     A.  ████████ was one -- I had two students.
15 So ████████ was one of them, and ████ was the
16 other one.
17     Q.  And I anticipate Debbie may need some help
18 with the spellings.  Could you go ahead and spell those
19 names real quick?
20         MR. SCHMIDT:  If you know them.
21     Q.  (BY MR. DOWER)  Yeah, if you know.
22     A.  Yeah.  ██ will be a hard one.  So the first
23 name is ████  The last name, I'll do my best.
24 ██████████.  I may be slightly off on the
25 last name.

21

1      Q.  And then the second student?
2      A.  The second student is ████████; and the last
3  name is ████████.
4      Q.  Thank you.
5          So what did ██ and ██ do to help with
6  the dossier?
7      A.  I asked them for minor editing help where it
8  wasn't the actual substance of the document but
9  formatting, like tasks that basically were very time
10 consuming; but they didn't require, really, any input
11 from me.  And so it was like:  Okay.  Make the margins,
12 instead of one point whatever make them one-something or
13 make the font whatever, make sure that the document
14 fits -- with those tweaks, make sure the document fits
15 in four pages, instead of five pages, things like that.
16     Q.  Okay.  I'm going to show you another document.
17 Give me one second to find it and upload it.
18         MR. DOWER:  I believe this will be marked
19 as 71.
20         (Exhibit 71 marked.)
21     Q   (BY MR. DOWER)  And just let me know when
22 you've got that downloaded and open.
23     A.  I have it downloaded and open.
24     Q.  Okay.  And so this is an e-mail between you
25 and Mr. Horn talking about some of the teaching

22

1  statistics?
2      A.  Yes.
3      Q.  Okay.  And this is dated April 27th, 2018?
4      A.  Yes.
5      Q.  Okay.  And so -- there I go; I'm saying "okay"
6  as my filler word.
7          So is this an example of some of the ways
8  in which he was contributing to your -- to the creation
9  of the dossier, running averages and things like that?
10     A.  So this was before -- let me try to remember.
11  I believe it was before the department meeting that took
12  the vote on whether I should go up or not.  So it was
13  before the formal preparation of the tenure document,
14  and I think this was Jimmy helped me with running
15  statistics for the presentation that Sanjay was supposed
16  to do for, I think, in front of the department.
17     Q.  Okay.  So he wasn't helping with -- with the
18  creation of the dossier, but he was helping with the
19  presentation to the -- to the Budget Council that
20  pre-dates the dossier assembly process?
21         MR. SCHMIDT:  Objection, form.
22     A.  No.
23     Q.  (BY MR. DOWER)  No?  Am I -- okay.
24     A.  I wouldn't -- I wouldn't say he was helping
25  with the presentation.  He was helping with collecting

23

1  and analyzing information that I was to give Sanjay.  I
2  had discussions with Sanjay multiple times before the
3  slides were prepared, which I helped prepare for
4  Sanjay's presentation to the department.
5      Q.  Okay.  So he was helping prepare information
6  to equip Sanjay for Sanjay's presentation to the
7  department?
8          MR. SCHMIDT:  Objection, form.
9      A.  I wouldn't say that.  He was -- he was helping
10  me with information that I felt I needed to relay to
11  Sanjay, whether -- Sanjay ended up not using any of that
12  information for the presentation and we had a little
13  back and forth about what teaching average would be
14  useful for that presentation and he ended up not using
15  any of that information.
16     Q.  (BY MR. DOWER)  All right.  I think we can
17  close this one for now.
18         Let's go ahead and take a step back and
19  just start with some really basic stuff, just sort of
20  about your background.  Where were you born?
21     A.  I was born in Sofia, Bulgaria.
22     Q.  And when did you come to the United States?
23     A.  I came to the United States in 1998.
24     Q.  So I guess you graduated from Harvard
25  University in 2002; is that correct?

24

1      A.  Yes.
2      Q.  Okay.  And that was for your undergraduate
3  degrees, correct?
4      A.  Yes.  I also got a Master's Degree in the same
5  year.
6      Q.  Okay.  So that's the master's in computer
7  science and a BA in applied mathematics?
8      A.  Yes.
9      Q.  So if you came to the States in '98, so then,
10  I guess, did you do high school in the United States?
11     A.  No.
12     Q.  No.  Okay.  Where did you, I guess, attend the
13  primary education that precedes undergrad?
14     A.  I did most of it in Bulgaria, except for the
15  last two years, which I did in Canada.
16     Q.  Okay.  So when you -- when you went to
17  undergrad at Harvard University, was that the first time
18  that you lived in the United States?
19     A.  No.
20     Q.  Oh, no.  Okay.  When did you live in the
21  United States?
22     A.  Oh, I'm sorry.  Was your question about living
23  or entering the United States?
24     Q.  I meant living -- living in the United States.
25     A.  Then, yes, 1998 is when I first came to live

25

1  in the United States; but prior to that, I had come to
2  visit one time.
3      Q.  All right.  So then after you got your
4  undergraduate degrees from -- oh, well, I shouldn't say
5  undergraduate.  After you got those two degrees from
6  Harvard, then you went to Cambridge University; is that
7  correct?
8      A.  Yes.
9      Q.  And that's where you got the Master's in
10  mathematics, from Cambridge?
11     A.  Yes.
12     Q.  And then you went to MIT for your Ph.D.,
13  correct?
14     A.  Yes.
15     Q.  And did you get your Ph.D. in 2009?
16     A.  Yes.
17     Q.  And then you did -- you also did your
18  postdoctoral associate at MIT; is that -- or you were a
19  postdoctoral associate at MIT, correct?
20     A.  Yes.
21     Q.  And can you tell me, what is -- what exactly
22  is a postdoctoral associate?
23     A.  It's an intermediate position between Ph.D.
24  and the faculty position, which is now becoming more and
25  more standard; but it is more prevalent in some fields

26

1  than others.  Some fields have -- like, physics or
2  biology have a very long time period where it's normal
3  to go one full doc, a second full doc, a third full doc,
4  and so on.  Other fields, you can jump from Ph.D.
5  straight into a faculty position.  Computer Science was
6  getting into more -- it was becoming more standard to do
7  post-docs.  So it's basically an intermediary position
8  where you are -- depending on the full doc, where you
9  are either only research or a combination of research
10  and teaching as you prepare for a faculty position.
11      Q.  And were you doing pure research, or were you
12  doing the teaching and research when you were a
13  postdoctoral associate?
14      A.  I was doing pure research.
15      Q.  And so then you became an assistant professor
16  at A&M in 2011?
17      A.  Yes.
18      Q.  So how did you end up from the postdoctoral
19  associate at MIT to A&M?
20      A.  I submitted an application to the academic job
21  market, which have a standard deadline around December
22  of the prior academic year.  I looked up ads for open
23  positions.  I applied broadly in the U.S. and Europe.  I
24  was invited to interview.  I interviewed at several
25  universities.  I received an offer from Texas A&M, and I

27

1  accepted the offer.
2      Q.  And why did you choose A&M?  Were they the
3  first one to give you an offer; or was there something
4  particularly special about them that attracted you, just
5  like why A&M?
6      A.  So at the time I had one -- I had also applied
7  for a second post doc because one never knows with the
8  academic job market, many people end up not having any
9  interviews or not any offers.  I had -- this was my
10  only offer for a faculty position.  I also had an offer
11  for a post doc and I was weighing the two and I
12  decided -- many people sometimes will -- well, not many.
13  Some people sometimes will choose to take a post doc if
14  they believe that they can, you know, then get an offer
15  for a place they like better.
16          I was weighing the two, and I ultimately
17  decided that there were things that I liked about Texas
18  A&M.  There was a sense of community that I had felt
19  there; and even though it was quite far from what I knew
20  and from home and from all my friends, but I decided
21  that the sense of community and support I had felt was
22  strong enough for me to accept the offer.
23      Q.  So then you were at A&M from 2011 to 20- --
24  well, I guess -- was it the end of 2013?
25      A.  Correct.

28

1      Q.  Okay.  And then you joined UT Austin in
2  January 2014, also as an assistant professor?
3      A.  Yes.
4      Q.  Okay.  And you're still at UT Austin as an
5  assistant professor as of the date that we're taking
6  this deposition?
7      A.  Yes.
8      Q.  Okay.  I'm going to switch gears here a little
9  bit and I want to talk briefly about your family and I
10  realize that is somewhat of a personal topic.  And I'm
11  not trying to be overly invasive; but, of course, since
12  this is a pregnancy discrimination case, the nature of
13  some of these allegations sort of require me to ask some
14  questions about your family situation.  And so I just
15  want to put that up front that I'm asking about family
16  stuff.
17          So, first of all, we already covered --
18  so you're married to Mr. Jimmy Horn.  When -- when did
19  you meet Mr. Horn?
20      A.  I met him in September 2014 -- well, I met him
21  in person then.  I met him through online dating.  So
22  online we met.  I think we first exchanged messages in
23  the late spring of 2014; and then we ended up meeting
24  for the first time, I think, around September.
25      Q.  I will just share that I, too, have shared the

29

1  joys and not-so-much joys of online dating.  Which app
2  are you using if you don't mind me asking?
3      A.  At that time I believe we met on Ok-Cupid.  I
4  had tried several different platforms.
5      Q.  Yeah.  Okay.  I have too used Ok-Cupid, but I
6  should probably stop on sharing things like that.
7          Okay.  Well, actually, this could turn
8  into a great ad since it obviously worked?
9          So you met through Ok-Cupid and there
10  was -- you got -- you started the dialogue in September
11  2014, and you said you actually met in person in
12  December of 2014?
13          MR. SCHMIDT:  Objection, form.
14      A.  We met in person -- no.  We started a dialogue
15  in late spring of 2014 --
16      Q.  (BY MR. DOWER)  Oh.
17      A.  -- and we met in person around September --
18      Q.  Oh, okay.  I apologize.
19      A.  -- 2014.
20      Q.  I apologize.  I got that wrong.
21          And then you got married in January 2019;
22  is that correct?
23      A.  Yes.
24      Q.  Belated congratulations.  And you have --
25      A.  Thank you.

30

1    Q. -- three children together?
2    A. Yes.
3    Q. And so what is -- well, can you just name your
4 kids for me?
5    A. Our first one is a boy. His name is ███.
6 Our second one is a girl. Her name is ███. And our
7 third one is a boy. His name is ███, and we call
8 him ███.
9    Q. Here's the real test: What is ███
10 birthday -- or birth date, you know, with the year?
11    A. March 10 of 2016.
12    Q. And ███?
13    A. ███?
14    Q. ███ yes. I apologize.
15    A. June 13 of 2018.
16    Q. June 13, one three?
17    A. Yes.
18    Q. Okay. Just making sure I heard you correctly.
19 And then ███?
20    A. September 17 of 2019.
21    Q. And I have to apologize in advance for this
22 next question. I'm not trying to be invasive, but have
23 you had any other pregnancies since you've applied to
24 the job at UT other than those three?
25    A. No.

31

1    Q. Okay. I'm going to switch again a little bit
2 and kind of go back to your career trajectory. Why did
3 you decide to leave Texas A&M and come to UT Austin?
4    A. It was really the personal aspect. I was
5 single when I was at Texas A&M; and it is a relatively
6 small town where the social life is essentially much
7 more, you know, in the form of getting together with
8 colleagues at the university that's mostly your friends.
9 And it was a tight-knit community that I enjoyed, but I
10 wasn't lucky finding a husband in that community. And I
11 also really enjoyed -- outside of work, I enjoyed
12 various hobbies, like dancing; and there wasn't much of
13 dancing in College Station. There was very nice dancing
14 in Austin I discovered.
15    Q. What kind of dancing?
16    A. I do -- enjoy the most Argentine Tango and
17 Salsa.
18    Q. I imagine -- and I don't want to stereotype
19 A&M -- but I imagine they've got a pretty good, like,
20 country dancing scene at A&M; so maybe -- so maybe --
21 or am I wrong? Or is that just not your interest?
22    A. I am very broadly interested in dance and I
23 have gone country dancing, but I don't recall
24 discovering any country dance venues at A&M.
25    Q. Okay.

32

1    A. And maybe I just didn't look for them at the
2 time because I was specifically looking for tango and
3 salsa. I have gone country dancing in Austin a few
4 times.
5    Q. Where do you go if you don't mind me asking?
6    A. For which of the dancing?
7    Q. Oh, that's fair. Let's stick with country
8 real quick.
9    A. For country, I went a couple of times to The
10 Broken Spoke.
11    MR. SCHMIDT: Time to --
12    MR. DOWER: I knew --
13    (Simultaneous speakers.)
14    Q. (BY MR. DOWER) I knew you were going to say
15 that. Okay. While we're on the record, I won't ask --
16 or tell you why; but we -- anyway, okay. So the Broken
17 Spoke. Okay.
18    So, I mean, you ended up marrying
19 Mr. Horn. How did you -- or did you keep up the
20 dialogue with him after -- I guess while you were at
21 A&M?
22    A. Yes, let me -- no, wait. I met him online
23 when I was already at UT Austin.
24    Q. Oh, you met him after you came to UT Austin.
25 Okay. Sorry. I got my chronology wrong. Okay.

33

1    Okay. Any other reasons why you decided
2 to leave A&M?
3    A. So I had -- also, UT is, you know, higher end
4 in the department that I am. And I was able to attract
5 better students, and Ph.D. students are critical to my
6 career. At A&M I was having a hard time finding
7 students that had enough theoretical background for my
8 research. So they were really outstanding students, but
9 they tended to be more in the applied areas. And I
10 tried there. It just didn't work out with students
11 there.
12    Q. So how did --
13    A. Let me say there was a bonus. I'm sorry.
14    Q. Oh, no. Don't apologize. It's fine.
15    How did you end up getting recruited, or
16 how did you end up at UT Austin specifically?
17    A. I was invited to apply to the ECE Department
18 at UT Austin by Professor Constantine Caramanis.
19    Q. And did Dr. Caramanis -- excuse me -- contact
20 you out of the blue, or how did he reach out to you?
21    A. He must have -- I believe he wrote me an
22 e-mail. We had known each other, not -- not closely;
23 but we had known each other while we were Ph.D. students
24 at MIT. And when I went to Texas A&M, I guess I
25 remembered that he was somebody at UT Austin nearby. I

34

1  invited him to give a talk at Texas A&M, just out of
2  collegiality and sort of trying to build a local
3  community, a local research community.  And that was
4  sometime after I joined Texas A&M; I don't remember the year.
5          And then at some point he wrote me an
6  e-mail and he said -- we had conversations about how,
7  you know, he found Austin very fun; and he enjoyed it.
8  And he probably saw in me that I had a desire to move to
9  Austin since I was visiting it quite often for dancing.
10  And at some point he e-mailed me sort of out of the blue
11  saying, "Oh, we have a position which I think you would
12  be a great candidate.  Would you like to apply?"
13      Q.   And so then you submitted your application
14  materials through -- how did you submit the application?
15      A.   He -- I don't recall if I e-mailed him
16  documents or if I submitted them online somewhere at the
17  UT website.  I don't recall.  So basically I submitted
18  whatever the standard documents were.
19      Q.   And did you go through interviews as part of
20  that process?
21      A.   Yes.  I went through the full standard
22  process, which was, first, they contacted -- after
23  submitting my documents, somebody from the UT hiring
24  committee e-mailed me to invite me for a Skype call,
25  which was, I guess, about a half-hour call for people on

35

1  their short list.  And after -- sometime after those
2  Skype calls, somebody contacted me to invite me for a
3  full-length interview, which was in person at UT for, I
4  think, two days in a row.
5      Q.   And is that when you -- or I guess I should
6  ask it this way:  When did you first meet Ahmed Tewfik?
7      A.   I believe we met him first during my full
8  interview, in-person interview at UT Austin, which would
9  have been, I believe, around April of 2013.
10      Q.   And I appreciate that one of the issues in
11  this case is about -- about how your time at A&M would
12  be considered or not considered at -- at UT; and then as
13  part of that, that -- that Dr. Tewfik made some comments
14  to you about how your time at A&M would be considered.
15  Do you remember having a conversation with him about how
16  your time at A&M would be considered?
17      A.   Yes.  I don't recall the exact words of the
18  conversation.  The gist of it was that my -- that I
19  would be able to go up at UT Austin on my normal tenure
20  time clock that began at Texas A&M.  And he specifically
21  told me -- in fact, I don't think I even asked then; but
22  he specifically told me that the standard offer,
23  five-year offer, meaning that one would be evaluated
24  after five years at UT.  And he said, "We do that for
25  everyone whether or not you have prior experience, but

36

1  this is a plus for you since you can still go up at your
2  normal time that began -- started at Texas A&M; but if
3  you need more time for whatever reason, it gives you
4  more flexibility."
5      Q.   Okay.  So was that -- was that indicated -- so
6  he's the Chair of the ECE Department at the time?
7      A.   Yes.
8      Q.   And so was -- was he indicating that the ECE
9  Department would be supportive of putting you up for
10  tenure at the five-year mark?
11      A.   Yes.
12          (Exhibit 13 discussed.)
13      Q.   (BY MR. DOWER)  Okay.  Let me show you a
14  document that I believe has been previously marked as
15  Exhibit 13.  So you can -- there's an exhibit stamp on
16  this already.  You can basically ignore that.  We're
17  trying to avoid duplicate numbering.
18          Were you able to open Exhibit 13?
19      A.   I just opened it.  Let me just make sure to
20  save it in the right place.
21          Okay.  I have it saved, and I have it
22  open.
23      Q.   Is this the teaching statement you submitted
24  with the tenure dossier?
25      A.   I believe it is.  The reason I say I believe

37

1  it is, because I had many versions with one-word changes
2  here and there.  Without reading and comparing word for
3  word, I cannot be one hundred percent sure; but, yes, I
4  have no reservations that it is.
5      Q.   That is completely fair.  Really, what I want
6  to do is just direct you to page 5 and Table 2 because
7  I want to go through your -- your time at UT and, you
8  know, when you were teaching, when you weren't teaching;
9  and this seemed like a really nice visual to just sort
10  of help speed up that conversation.  So are you -- can
11  you see on page 5 of the PDF the Table 2, Course
12  Schedule by Semester?
13      A.   Yes.
14      Q.   Okay.  And so I just kind of want to run
15  through briefly your time at UT and when you were
16  teaching.  So this shows the Spring of 2014.  That was
17  the first semester you were at UT Austin, correct?
18      A.   Correct.
19          And may I just -- I apologize.  May I
20  just request a break, maybe in the next ten minutes or
21  so?  I feel I'm getting a little tired and losing focus.
22  So whenever you find it appropriate in the next ten
23  minutes or so.
24      Q.   Perfect.  We can definitely do that.
25          Okay.  So Spring 2014 you were teaching a

38

1   Game Theory course?
2      A.   Yes.
3      Q.   Is that a graduate course or an undergraduate
4   course?
5      A.   It's a graduate course.
6      Q.   Is there -- is there any way to tell which is
7   just by looking at it?  Like, what -- does the "V"
8   versus "C" signal something or --
9      A.   At some point I had asked that from UT because
10  every university had its own numbering and I believe
11  there is a way to tell from the numbers; but I forget
12  the exact, you know, answer now.  It has to do, I
13  believe, with -- you know, it's 381 versus 360.  So I
14  believe the second digit is the higher -- when it's
15  higher, it indicates a graduate course; and when it's a
16  6, it indicates an upper level -- undergraduate.
17  Basically the lower the number, the lower for the course
18  in the -- yeah, in the year that it is.
19     Q.   I appreciate that.
20     A.   Yeah.
21     Q.   Perfect.  Okay.  So then in Fall 2014, you
22  were teaching Algorithms?
23     A.   Yes.
24     Q.   And I take it from your testimony a second ago
25  that that's an undergraduate class?

39

1      A.   Yes.
2      Q.   Okay.  And so then in Spring 2015 you were
3   teaching Advanced Algorithms?
4      A.   Yes.
5      Q.   And that would have been a graduate-level
6   class, I take it?
7      A.   Yes.
8      Q.   And so Fall 2015 it says, "On teaching
9   relief."  So I take it -- am I correct in saying, then,
10  that you were not teaching students at that time?
11     A.   Yes.
12     Q.   Okay.  And that would have been when you were
13  at the Simons Institute; is that correct?
14     A.   Yes.
15     Q.   Okay.  And so then Spring 2016 you weren't
16  teaching that semester; is that correct?
17     A.   Yes.
18     Q.   And that was when you were on Modified
19  Instructional Duty?
20     A.   Yes.
21     Q.   I'm sorry.  Was that a "yes"?  I just couldn't
22  hear.
23     A.   Yes.
24     Q.   Okay.  Sorry.
25          Okay.  And so then Fall 2016 you're

40

1   teaching undergraduate Algorithms?
2      A.   Yes.
3      Q.   And then Spring 2017 you're teaching a
4   graduate-level Advanced Algorithms?
5      A.   Yes.
6      Q.   And then Fall of 2017 you were teaching two
7   classes of undergraduate Algorithms, correct?
8      A.   Yes.
9      Q.   And then Spring of 2017 [sic] you were not
10  teaching that semester, correct?
11     A.   Yes.
12     Q.   That was when you were at the Simons Institute
13  again; is that correct?
14     A.   Yes.
15     Q.   And then Fall of 2018, which goes outside this
16  chart, but it's my understanding that you were on
17  Modified Instructional Duty in Fall 2018, correct?
18     A.   Let me remember because there was a -- yes,
19  Fall of 2018 I was -- let me -- excuse me.  Excuse me
20  for moment.  I want to get the timing right in my head.
21  Fall of 2018 was after my daughter ███, was born.
22  So, yes, that's when I was on Modified Instructional
23  Duty for her birth.  Yes.
24     Q.   And then it's my understanding that in Spring
25  2019, you were teaching again?

41

1      A.   Yeah.
2      Q.   And then in Fall 2019 you were on sick
3   leave/leave without pay; is that accurate?
4      A.   Yes.
5      Q.   Okay.  And so you were not teaching in the
6   Fall of 2019, correct?
7      A.   Yes.
8      Q.   And then Spring 2020 you were on modified
9   instructional duty that -- in the spring?
10     A.   Yes.
11     Q.   Okay.  So you weren't teaching in Spring of
12  2020, correct?
13     A.   Correct.
14     Q.   And then in Fall of 2020 this, I guess, the
15  most -- well, actually, I guess it's not most recent
16  because it's June now.  So strike that.
17          So Fall of 2020 you were teaching the
18  undergraduate Algorithms class?
19     A.   Yes.
20     Q.   And then this semester that just ended, you
21  were on sick leave/leave without pay; is that correct?
22     A.   Yes.
23     Q.   And so no teaching this semester?
24     A.   Yes.
25          MR. DOWER:  Okay.  We can take that break

42

1  now.
2         THE REPORTER:  We're going off the record
3  at 10:16 a.m.
4         (Off the record from 10:16 to 10:31 a.m.)
5         THE REPORTER:  We're going back on the
6  record at 10:31 a.m.
7     Q    (BY MR. DOWER)  Okay.  Dr. Nikolova, this
8  next sort of part of our conversation is -- is about
9  sort of the various options that an assistant professor
10  has if -- if they become pregnant and they're sort of
11  weighing their options; and so that's sort of the lead-
12  in to what we're going to be talking about next.
13         So -- so the three policies I just
14  uploaded are the Modified Instructional Duties policy,
15  the Family Medical Leave policy, and the Parental Leave
16  policy.  Were you able to -- to download those three
17  policies?
18     A    Yes.
19     Q    So let's start with the Family and Medical
20  Leave policy, 5-4310.
21         MR. NOTZON:  Mr. Dower, could you
22  identify if you've marked these as Exhibits?
23         MR. DOWER:  I mean, I intend them to be
24  exhibits; but I don't know what order -- so when you
25  upload three things at once, I don't know which order

43

1  they're numbered.
2         MR. NOTZON:  Okay.
3         MR. DOWER:  So I guess if we took it in
4  order of -- the order of uploading, we would be looking
5  at -- I think Modified Instructional Duty would be -- I
6  think that would be 72.
7         THE REPORTER:  Mr. Dower, if I may, it
8  would make more sense if you mark them in the order that
9  you're going to talk about them.
10         MR. DOWER:  Oh, okay.  Well, I aim to
11  make things easier.  So if we're going to do it that
12  way, then since I'm starting with the Family Medical
13  Leave policy, we'll make that Exhibit 72.
14         Thank you, Debbie.
15         THE REPORTER:  Thank you.
16         (Exhibit 72 marked.)
17     Q    (BY MR. DOWER)  So the -- so do you
18  have that policy open, Dr. Nikolova?
19     A    Yes.
20     Q    Okay.  So one of the things that could qualify
21  someone to take Family and Medical Leave would be birth
22  or care of an employee's child; is that correct?
23     A    Yes.
24     Q    And I'm looking here, you know, under
25  Qualified Purposes.  It lists birth and care of the

44

1  employee's child as one of the things that might make
2  FML available.  Do you see that?
3     A    Yes.
4     Q    And under Scope there's a requirement about
5  how long you're -- you have to be employed by the State
6  of Texas before you're eligible for the Family and
7  Medical Leave Act.  Do you see that?
8     A    Yes.
9     Q    Okay.  And so with that, I just very briefly
10  want to reference the Parental Leave policy, which I
11  believe will be marked as Exhibit 73.
12         (Exhibit 73 marked.)
13     Q    (BY MR. DOWER)  Do you have that one open in
14  front of you?
15     A    Yes.
16     Q    And so do you see under Applicability that for
17  the Parental Leave policy, it's eligible employees with
18  less than 12 months of state service or less than 1,250
19  hours of work; and it keeps going from there.  Do you
20  see that?
21     A    Yes.
22     Q    And so if you look at the FML policy, the
23  Family Medical Leave policy we were just looking at, and
24  you look at the scope of that one and you compare it to
25  the scope of the Parental Leave, it looks like these are

45

1  sort of mutually exclusive, that the Parental Leave is
2  for people with less than the time; and the Family
3  Medical Leave is for people that have more than a
4  certain amount of time of state service.  Do you agree
5  with that?
6     A    It looks that way.  I need to carefully read
7  every word, but it looks that way from superficial
8  glancing at it.
9     Q    And so do you understand that these policies,
10  though, are to take off -- to take leave?  In other
11  words, if you're taking one of these two leaves for
12  birth and care of a child, you're not working.  Is that
13  your understanding?
14     A    Yes.
15         (Exhibit 74 marked.)
16     Q    (BY MR. DOWER)  And so then switching to
17  Exhibit 60-- or, excuse me -- 74, which is the
18  Modified Instructional Leave policy -- Modified --
19  excuse me; I just butchered that -- the Modified
20  Instructional Duties policy, do you have that in front
21  of you?
22     A    Yes.
23     Q    Okay.  So when you're doing Modified
24  Instructional Duties, you're -- well, let me just direct
25  you to the policy statement, actually.  So it says, "It

46

1  is the policy of The University of Texas at Austin to
2  modify the classroom instructional responsibilities of
3  faculty members and allow for equivalent academic
4  service when certain personal circumstances prevent them
5  from being able to perform their classroom teaching
6  duties, and when such modifications are found to be in
7  the best interest of the University's instructional
8  programs." Did I read that correctly?
9      A.  Yes.
10     Q.  Okay.  So -- so is it your understanding
11 then that when you're on Modified Instructional Duties,
12 it's -- you're not on leave; you're still, you know, an
13 active employee.  It's just that the classroom
14 instructional responsibilities have been modified to
15 allow for some equivalent, but instead of the classroom
16 instructional responsibilities.  Is that your
17 understanding as well?
18     A.  Yes.
19     Q.  Okay.  And so when we scroll down to
20 Eligibility Requirements, which is Subsection D, it says
21 that, "Faculty members who may apply for modified
22 instructional responsibilities are those who are a
23 principal caregiver of a healthy preschool child (or
24 children), or who are required to care for or assist a
25 member or members of their immediately family, who

47

1  although not ill or disabled, needs the help and
2  attention of the faculty member."  Did I read that
3  correctly?
4      A.  Yes.
5      Q.  Okay.  So -- so effectively then, this policy
6  allows an employee to reduce their teaching
7  responsibilities and replace it with some equivalent so
8  that they can -- they're able to care for a preschool-
9  aged child or maybe someone who needs the help who's a
10 family member.  Is that a fair summary?
11         MR. SCHMIDT:  Objection, form.
12     A.  Yes.
13     Q.  (BY MR. DOWER)  And so the process is that the
14 faculty member submits a written request.  That sort of
15 initializes the process, correct?
16     A.  Yes.
17     Q.  And then the request should include a
18 statement explaining the need and also a proposal
19 describing the work to be done in place of their normal
20 classroom responsibilities, correct?
21     A.  Yes.
22     Q.  And then that goes to the Chair or the Dean
23 who then reviews it; is that correct?
24     A.  Yes.
25     Q.  And then it goes from the Chair or the Dean to

48

1  the Office of the Executive Vice President and Provost
2  for final review?
3      A.  Yes, I believe so.
4      Q.  And so let me go ahead and upload another
5  exhibit.
6         MR. DOWER:  I believe this is Exhibit 75.
7         (Exhibit 75 marked.)
8      A.  I have it open.  Let me save it.
9      Q.  (BY MR. DOWER)  Yeah, go ahead.  It's four
10 pages, so go ahead and take a moment to look through it.
11     A.  (Witness silently reading document.)
12     Q.  And let me know when you're -- you're ready.
13     A.  Okay.  I looked through it.
14     Q.  Okay.  So the first page is -- or the first
15 two pages are dated October 8th of 2015; is that
16 correct?
17     A.  Yes.
18     Q.  And this is your memorandum for modified duty
19 during Spring of 2016, correct?
20     A.  Yes.
21     Q.  Okay.  And so this says that you're expecting
22 a baby on March 17th, 2016 and that you'd like to have
23 Modified Instructional Duty in the Spring 2016 semester,
24 correct?
25     A.  Yes.

49

1      Q.  And so then you proposed, instead of teaching
2  a class that semester, you would be focusing on
3  enhancing course materials for your Game Theory class
4  and that would be the substitution, so to speak?
5      A.  Yes.
6      Q.  Okay.  So when you were -- well, I guess just
7  to start with, what made you decide to submit this
8  application for Modified Instructional Duty?
9      A.  I understood that this was for -- the standard
10 process for when one is expecting a child.  I asked my
11 colleagues around; and they said, yeah, that's what I
12 should do.
13     Q.  And so were you anticipating that, with a new
14 baby in March, that it would be good to have the
15 flexibility not to teach that semester; or was it -- did
16 you just do it because of --
17     A.  Yes.
18     Q.  Okay.  And then, from what you said, your
19 colleagues indicated that this was pretty normal -- a
20 pretty normal request?
21     A.  Yes.
22     Q.  Okay.  Do you remember who you talked to
23 specifically who mentioned that?
24     A.  I don't remember.  I believe at the start of
25 the process Carol Bearden, who was the Executive

50

1  Assistant to Professor Tewfik, sent me a sample of a
2  memo of modified duty written by another faculty member;
3  and she said, "Here is what we expect, and write
4  something like that." So that's what I remember.
5      Q.   And so then -- so do you remember to whom you
6  submitted this?
7      A.   I believe I submitted the form to Carol
8  Bearden, and I probably CC'd Professor Tewfik.
9      Q.   And so then the next thing in exhibit -- or
10 the next exhibit, 75, is the -- Dr. Tewfik's memorandum
11 to Jerry Speitel; is that correct?
12     A.   Yes.
13     Q.   And so the first paragraph of this is sort of
14 a summary of your request. Is that a fair statement?
15     A.   Yes.
16     Q.   And then he goes on to say, "Evdokia normally
17 teaches two courses per academic year plus senior
18 design." Did I read that accurately?
19     A.   Yes.
20     Q.   And was that -- was that an accurate
21 statement?
22     A.   Yes.
23     Q.   And then he goes on to say that he had
24 "approved an unbalanced teaching load this academic year
25 for Evdokia to allow her to participate in most of the

51

1  activities of the UC Berkeley Mathematic Sciences
2  Research Institute during the Fall of 2015. As a
3  result, she will not be teaching at all this academic
4  year." Did I read that correctly?
5      A.   Yes.
6      Q.   And is that -- is that -- is what he said
7  accurate?
8      A.   Yes.
9      Q.   So the reference to UC Berkeley, was that -- I
10 guess this was when you were in the Simons Institute
11 that we were mentioning earlier?
12     A.   Yes.
13     Q.   Okay. So that's what this is referencing, the
14 stuff you were doing at the Simons Institute?
15     A.   Yes. And I apologize. I'm now seeing that
16 it's not completely accurate because it says UC Berkeley
17 Mathematical Sciences Research Institute; but it's --
18 the name -- the name of the institute is a little
19 different. But other than that, yeah.
20     Q.   Okay. Why don't -- really quick, why don't
21 you tell me -- so what is the Simons Institute?
22     A.   It's -- so I believe the name is the Simons
23 Institute for the Theory of Computation. It's an
24 institute that was formed to promote research in
25 theoretical computer science and related fields,

52

1  specifically, to promote collaboration of researchers in
2  this field and to promote visibility of such research to
3  the public.
4      Q.   And so what were you doing in the Simons
5  Institute while you were there in the Fall of 2015?
6      A.   I was a visiting researcher, along with maybe
7  about -- I would say about 40 or so professors from
8  universities across the United States and across the
9  world.
10     Q.   So then just returning to Exhibit 75,
11 Dr. Tewfik says that he supports your request and asks
12 "that you approve it." And it's addressed to Jerry
13 Speitel. Is that accurate?
14     A.   Yes.
15     Q.   And then -- and then the next document is a
16 memorandum from Janet -- no, from Jerry Speitel to Janet
17 Dukerich, indicating that the Cockrell School supports
18 the request?
19     A.   Yes.
20     Q.   Okay. And sorry, Dr. Nikolova. Some of this
21 is just for the record, and we can just keep it moving.
22 Do you remember whether this was approved?
23     A.   Yes, my MID was approved.
24     Q.   In -- in Spring 2016, were you supervising
25 senior design, or no?

53

1      A.   I don't recall.
2      Q.   Let me -- let me ask another question before
3  we move on. Is there a reason that you decided to go on
4  Modified Instructional Duty instead of taking leave?
5      A.   Well, for one, it was the standard process, as
6  my colleagues had told me. My understanding was that
7  under MID, I would continue receiving salary. I would
8  be paid, whereas, the other forms of leave would be
9  unpaid; and the other forms were limited to 12 weeks,
10 which it doesn't -- I just feel like it doesn't work
11 well with an academic schedule and the responsibilities
12 of a professor teaching a course. I just didn't imagine
13 how it would fit because if I'd taken the other form of
14 leave, I would have started teaching a course, let's
15 say, in Spring; and then someone else would have to take
16 over in the middle of the semester. So I don't know if
17 I had requested one how it would have worked. My
18 understanding was that the MID was for professors
19 specifically to accommodate for the academic semester-
20 by-semester schedule.
21          MR. DOWER: I just uploaded an
22 Exhibit 76.
23          (Exhibit 76 marked.)
24     Q    (BY MR. DOWER) Let me know when you've had a
25 chance to download that and take a look at that.

54

1    A.  I just opened it.  Let me save it.
2        Okay.  I'm ready.
3    Q.  Okay.  Well, you've probably figured out where
4  I'm going with this.  This is the Modified Instructional
5  Duty -- well, the first two pages is the Modified
6  Instructional Duty request for Fall 2018, correct?
7    A.  Correct.
8    Q.  Okay.  So in this one -- in this request,
9  first of all, this is dated April 13th, 2018, correct?
10   A.  Correct.
11   Q.  And so in this request you say that you're
12  anticipating -- or expecting a baby on June 30th, 2018;
13  and so you want Modified Instructional Duty for the Fall
14  2018 semester.  Is that accurate?
15   A.  Yes.
16   Q.  And so, instead of teaching, you would be
17  focusing on enhancing your -- I think it's -- this would
18  be the graduate-level Game Theory class?
19   A.  Yes.
20   Q.  And then if we go down to page 3 of
21  Exhibit 76, we have another memorandum from Dr. Tewfik
22  to Jerry Speitel.  Is that a -- is that what you see?
23   A.  Yeah.
24   Q.  And so it's kind of similar to before.  We
25  have a paragraph that summarizes your -- your request;

55

1  and then the second paragraph says, "The normal teaching
2  load for well-funded research-active faculty members in
3  the department is two courses per academic year, in
4  addition to supervision of a senior design team."  First
5  of all, did I read that correctly?
6    A.  Yes.
7    Q.  And is that -- is it your understanding that
8  that's accurate, that statement?
9    A.  Yes.
10   Q.  Okay.  And then he goes on to say, "One of the
11  courses must be an undergraduate course," and is that
12  your understanding as well?
13   A.  Yes.
14   Q.  Okay.  And then he goes on; and he says, "I
15  support Evdokia's request and recommend that you approve
16  it," correct?
17   A.  Yes.
18   Q.  And so the next page is the next step in the
19  process, where it's Jerry Speitel to Janet Dukerich; and
20  he indicates that the Cockrell School supports this
21  request, correct?
22   A.  Yes.
23   Q.  And then at the bottom of that page, page 4 of
24  the PDF, it says that it's approved by Carmen Shockley,
25  Assistant Vice Provost for Faculty Affairs.  Do you see

56

1  that?
2    A.  Yes.
3    Q.  And it's signed and dated, correct?
4    A.  Yes.
5    Q.  Okay.  And then, when we keep going, there's
6  an e-mail exchange between Dorothy Harris and Sonya
7  Shaffer in which Dorothy Harris asks for additional
8  information.  Do you see that e-mail?
9    A.  Yes.
10   Q.  And so it looks like Ms. -- or maybe doctor; I
11  don't actually know her title -- Dorothy Harris just
12  wanted clarifying information about how many -- like,
13  how many you'll teach for the academic year in which
14  you're assigned Modified Instructional Duty; is that
15  correct?
16   A.  Yes.
17   Q.  And then it clarifies -- or I guess Sonya
18  Shaffer clarifies that you'll be teaching one course in
19  addition to supervising a senior design course; is that
20  correct?
21   A.  Yes.
22   Q.  And so -- but this is for the cumulative
23  academic year, right?  Is that your understanding?
24   A.  Yes.
25   Q.  Is supervising a senior design course, is that

57

1  a semester-by-semester commitment; or is that a
2  commitment that goes for the whole year, typically?
3    A.  It's typically one of the senior design team
4  in two consecutive semesters, which may be both in the
5  same academic year; or they may be across two academic
6  years, depending on when they start.
7    Q.  And then on the last page of this document,
8  76, this is the -- this is the -- this is a memorandum
9  addressed to you from Jerry Speitel, letting you know
10  that the request for Modified Instructional Duties for
11  Fall 2018 had been approved?
12   A.  Yes.
13   Q.  And then there's a little bit of a discussion
14  here about the use of available sick leave.  Do you
15  recall having any discussions with -- with, I guess,
16  Jerry Speitel about whether you would be doing sick
17  leave in conjunction with -- with your modified
18  instructional leave?
19   A.  Not at that time.
20   Q.  So you had discussions, but they probably
21  occurred later -- or they would have occurred later?
22   A.  Yes.
23   Q.  Okay.  I've just uploaded Exhibit 77.
24       (Exhibit 77 marked.)
25   A.  I have it open.  I'm going to save it.

58

1    Q   (BY MR. DOWER)  Yeah, take your time.
2    A.  Okay.  I'm done.
3    Q.   So these are documents related to your request
4  for Modified Instructional Duty in the Spring 2020
5  semester, correct?
6    A.  Yes.
7    Q.   And so in -- in your memorandum, you indicate
8  you're expecting a baby on September 17th, 2019; and
9  you're requesting to have Modified Instructional Duty in
10  the Spring 2020 semester, the following semester,
11  correct?
12    A.  Yes.
13    Q.   And so instead of teaching classes in Spring
14  2020, you were proposing that you focus on developing
15  course material for a new graduate course; is that
16  correct?
17    A.  Yes.
18    Q.   This was -- went through the same process that
19  we've been describing, where Dr. Tewfik is supportive;
20  the Cockrell School supports the request; and then it's
21  approved?
22    A.  Yes.
23    Q.   And for -- for Spring 2020, did you end up
24  developing the course material for a new graduate
25  course?

59

1    A.  Yes -- I mean, not full -- not fully for the
2  entire course; but I worked on developing materials, as
3  stated.
4    Q.   And so at the end of that semester, was
5  that -- what happened with the work that you generated?
6    A.  It's revising various files in my computer.
7    Q.   I guess what I'm trying to ask is, you know,
8  is -- have there been any steps since Spring 2020 to
9  actually unveil a new graduate course?
10    A.  This is ongoing work, and it has been ongoing.
11  Part of it was done then, and it has remained.  In the
12  graduate course, we want to always incorporate some of
13  our research; and the research has been ongoing.  And so
14  whenever I teach a next such graduate course, I would be
15  incorporating everything from that semester and also
16  subsequent semesters.
17    Q.   Okay.  So you're incorporating it into some of
18  your instruction in some existing classes?
19    A.  Yes.  For this particular memo, yeah.
20    Q.   I'm not -- I'm just trying to make sure I
21  understand your testimony.  And so at this point
22  there's -- a new graduate course has not been unveiled,
23  but you incorporated some of the work you did into
24  existing courses.  Is that a fair statement?  Is that
25  accurate?

60

1    A.  No.  The memo speaks of a new graduate class,
2  and I have not -- I have not taught such graduate class
3  since the memo was written; and so in such sense, it has
4  not yet been unveiled.
5    Q.   I'm going to upload another document.  This
6  one is an exhibit that's previously been used.  So it's
7  already been marked as Exhibit 52.
8      (Exhibit 52 discussed.)
9    A.  Okay.  I have it open.
10      Okay.  I have it saved.
11    Q.   (BY MR. DOWER)  So this is the University's
12  Extension of the Tenure Track Probationary Period
13  policy; is that correct?
14    A.  Yes.
15    Q.   And so this is to extend the time in which a
16  faculty member -- I guess an assistant professor has
17  before they hit their up-or-out year.  Is that your
18  understanding?
19    A.  Can you please repeat the question?
20    Q.   Sure.  So this policy that -- you're extending
21  your probationary period when you invoke this policy,
22  correct?
23    A.  Yes.
24    Q.   And so the probationary period is the time
25  that an assistant professor has before they hit their

61

1  up-or-out year.  Is that your understanding?
2    A.  I'm sorry.  Say it one more time.
3    Q.   Sure.  So this policy extends the deadline by
4  which an assistant professor has before they hit the
5  year in which they will either receive tenure or be
6  given a terminal appointment?
7    A.  Yes.
8    Q.   Okay.  And so this is a different policy than
9  the Modified Instructional Duty policy, correct?
10    A.  Yes.
11    Q.   And so, theoretically, someone could be on
12  Modified Instructional Duty but choose not to extend the
13  probationary period, true?
14    A.  Yeah.
15    Q.   But, you know, you could -- by the same note,
16  you could, if you're on Modified Instructional Duty,
17  also seek to extend your probationary period?
18    A.  Yeah.
19    Q.   Do you have an understanding of what the
20  purpose of this policy is?
21    A.  Yes.
22    Q.   Okay.  And what is that understanding?
23    A.  My understanding is that when a faculty
24  member, male or female, has a new child or an adopted
25  child, that takes a significant amount of time and

62

1  effort; and to accommodate for having a family, for
2  having a child, the faculty member can be given an
3  additional year to complete a requirement -- the
4  expectation for -- to make tenure.
5      Q.  And so the year in which they may not be as
6  productive because they're focused on the new child
7  won't count towards that finite period of time in which
8  they have to get either tenure or dismissed?
9      A.  Yes.
10     Q.  I'm now uploading what, if I'm keeping track
11  correctly, should be Exhibit 78.
12         (Exhibit 78 marked.)
13     Q   (BY MR. DOWER)  Let me know when you've got
14  that saved and have had a chance to go through it.
15     A.  It's downloading.
16     Q.  I'm not trying to rush you.
17     A.  Actually, if I may also request another break
18  in the next ten minutes or so, whenever -- whenever it's
19  a good time for you.
20     Q.  Perfect.  And I appreciate these, like --
21  these, like, "in the next ten minutes," because that
22  gives me a little bit of flexibility.  So I appreciate
23  that very much.
24     A.  Okay.  I have it open.  Let me save it.
25         Okay.  I have it saved.

63

1          (Reporter coughed.)
2      MR. DOWER:  Bless you, Debbie.
3      THE REPORTER:  Thank you.
4      Q   (BY MR. DOWER)  Sorry.  Are you ready for me
5  or --
6      A.  I'm ready, yeah.
7      Q.  Oh, I'm sorry.  I think we were both waiting
8  for the other person.  I apologize.
9          Okay.  Well, so this -- the first page of
10  this document is -- is to let -- well, first of all,
11  it's addressed to you, correct?
12     A.  Yes.
13     Q.  And this is -- this is dated November 20th,
14  2015; and it's -- it's the Approval of Probationary
15  Period Extension, correct?
16     A.  Yes.
17     Q.  So -- so it starts out in the first paragraph
18  and it says that it was to let you know that your
19  request for Modified Instructional Duties for Spring
20  2016 has been approved by Senior Vice Provost Janet
21  Dukerich, correct?
22     A.  Yes.
23     Q.  And, as we just discussed, Modified
24  Instructional Duty is a separate thing from the
25  probationary period extension, right?

64

1      A.  Yes.
2      Q.  But then in the third paragraph it says, "In
3  addition, attached is the approval from the Provost's
4  Office for your request for a one-year extension to your
5  probationary period."  Do you see that?
6      A.  Yes.
7      Q.  Okay.  And so this is one of those examples of
8  where Modified Instructional Duty doesn't necessarily
9  have to be linked to a probationary period extension,
10  but it can be and in this case is.  Is that a fair
11  statement?
12     A.  Yeah -- yes.
13     Q.  And so then the next page is a letter
14  addressed to Jerry Speitel from Janet Dukerich.  Do you
15  see that?
16     A.  Yes.
17     Q.  And this goes through, you know, when you
18  joined the faculty and has a little chart of the
19  probationary years to basically show what would happen
20  if you took the -- you know, the extension year, the
21  probationary year in '15-'16.  Do you see that?
22     A.  Yes.
23     Q.  And it also says that the approved extension
24  to the probation period, that it may be rescinded at
25  Professor Nikolova's discretion.  Do you see that?

65

1      A.  Yes.
2      Q.  And that a request to rescind an approved
3  probationary period extension should be submitted in
4  writing to the department chair no later than February 1
5  prior to the fall promotion review, correct?
6      A.  Yes.
7      Q.  So, basically, the faculty member can get the
8  extension; but then they can rescind it.  They can take
9  it back later, up until some cutoff point, which is
10  February 1st, prior to the Fall promotion review,
11  correct?
12     A.  Yes.
13     Q.  Okay.  Do you -- so the version of this full
14  disclosure that we're looking at right here doesn't have
15  your signature.  Do you remember whether you got this
16  letter?
17     A.  I don't remember.  I believe that in my e-mail
18  recently I saw it, but I'm not completely sure.
19     Q.  And I'm not trying to trick you or anything.
20  There may be a version with your signature.  I'm just
21  trying to be transparent, and I suspect there's probably
22  a version with your signature somewhere out there in the
23  ether.  I just didn't find it last night when I was
24  preparing, but -- so right now you think that you
25  probably got this?

66

1      A.  I may have gotten it.  I don't remember.
2      Q.  Fair enough.  But suffice it to say that
3   it's -- the letter from -- or the memorandum that's
4   addressed to you from Jerry Speitel indicates that the
5   approval is attached; and then it has this thing that
6   says, "As noted in the memo, please read and then sign
7   to indicate your understanding of the extension."  And
8   just to be clear, I'm looking on the first page of this
9   exhibit in the third paragraph.
10     A.  The first page, third paragraph.
11     Q.  Second sentence.
12     A.  Oh, yeah.  "...please read and then sign
13  to..."  Yeah, I see where it says that.
14     Q.  Can you tell me what -- you know, going back
15  in time mentally to what you were thinking in, I guess,
16  around November 2015, why did you decide to request the
17  probationary period extension?
18     A.  I remember it very well.  I had a conversation
19  with my Chair, Professor Tewfik, in Fall of 2015.  It
20  was a phone conversation or a Skype conversation, and I
21  told him that I'm pregnant.
22         And he said, "Congratulations, and this
23  is what, you know, you need to do as a process.  It's
24  the Modified Instructional Duty.  You can get the form
25  from Carol, a sample form.  And then there is a one-year

67

1   extension, and I strongly -- I strongly advise you to
2   accept the extension."
3          And, actually, I thought all this time
4   that it was a voice conversation; but I just, upon
5   reviewing my e-mail last week, I saw an e-mail from him,
6   which said, "Oh, I went back and checked and, you know,
7   here is how the extension works; and I strongly advise
8   you to accept the extension."
9          And I said, "Okay."  I remember in the
10  phone conversation it wasn't clear to me why he was
11  urging me to accept it because I said, "Well, why should
12  I accept an extra year when I don't expect to wait until
13  my up-or-out year at UT, anyway?"  I was expecting to go
14  to be considered for tenure on my normal -- around my
15  normal time clock that began at A&M.
16         And he sort of gave me a counterargument
17  of, "No, no, no.  You should accept it."
18         And I said, "Okay."  He knows better, so
19  I will just accept it.
20     Q.  Do you remember what the substance of his
21  counterargument was?
22     A.  It was something along the line that there is
23  a limited time period by which I can accept it.  He said
24  something like, "Oh, well, you can only accept it now;
25  but if you decide later" -- "if you don't accept it now,

68

1   you won't be able to accept it later," something like
2   that, whereas, "If you accept it now, you can rescind it
3   later," or something like that.
4      Q.  So effectively:  If you don't take the
5   opportunity to take the extension now, the window of
6   opportunity will close; but if you do request the
7   extension now, you can always rescind it later.  No
8   harm, no foul."  Is that fair?
9      A.  Something like -- something like that.
10     Q.  He probably didn't say, "No harm, no foul."
11  That's probably me, but something to that effect?
12     A.  That's right, yeah.  There was something to
13  the effect that it will not hurt me, but it can only
14  help me if I accept it.
15     Q.  And so -- and, also, you wouldn't be teaching
16  in the March -- in Spring 2016, right, as a result of
17  the Modified Instructional Duties?
18     A.  Correct.
19     Q.  So if one of the things that -- you know, that
20  UT is looking at for tenure is teaching, that removes
21  some information that they might want to have and that
22  you might want to have as part of your portfolio?
23     A.  You could say that, yes.
24     Q.  Okay.
25         MR. DOWER:  Well, you requested a break;

69

1   and I want to oblige you.  So let's take a break now.
2          THE REPORTER:  We're going off the record
3   at 11:22 a.m.
4          (Off the record from 11:22 to 11:32 a.m.)
5          THE REPORTER:  We're going back on the
6   record at 11:32 a.m.
7          (Exhibit 79 marked.)
8      Q   (BY MR. DOWER)  Dr. Nikolova, I'm going to
9   direct your attention to what I believe has been marked
10  as Exhibit 79; and this is a letter from Carmen Shockley
11  about a request for a one-year probationary period
12  extension, dated September 20th, 2019, correct?
13     A.  Yes.
14     Q.  And I must confess that I don't have all of
15  the various documents that go with this ready to go, but
16  let me ask you this:  Did you apply for a probationary
17  extension around September of 2019?
18     A.  Yes.
19     Q.  And if we refer back -- or I'm going to refer
20  back in my notes.  This would have been when you were on
21  sick leave/leave without pay in the Fall of 2019?
22     A.  Yes.
23     Q.  And so you requested that the 2019 to '20
24  academic year be a -- not count towards the probationary
25  period; is that correct?

70

1    A.  Yes.
2    Q.  Okay.  And was this -- was this probationary
3  extension granted?
4    A.  Yes.
5    Q.  And why did you decide to seek a probationary
6  extension in the Fall of 2019?
7    A.  Well, this was after I received my tenure
8  decision of do not promote in February of 2019 in which
9  I also -- in which, or shortly after, I was informed
10  that I'm -- the reason for not getting promoted and the
11  fact that they were urging me to wait for two more years
12  in order to fulfill additional requirements that the
13  Dean outlined in her assessment letter for my tenure
14  review, such as, extra funding and improving my teaching
15  scores.
16            And around that time -- I don't remember
17  if it was after I was not notified of the tenure
18  decision -- I learned that I'm pregnant with my third
19  child; and I felt that with now three very small babies,
20  a brand-new newborn and two other small babies -- small
21  kids, it would be really hard to satisfy these extra
22  requirements in that upcoming year, which is why I
23  applied for an extra year.
24    Q.  So let me -- let me just make sure I
25  understand.  So you felt like with the third child, you

71

1  know, and with everything going on in your family
2  situation that it would be difficult to make that a
3  highly productive year; and you wanted to make sure that
4  you improved the metrics that the Dean's letter, after
5  the tenure decision, had flagged?
6            MR. SCHMIDT:  Objection, form.
7    A.  Yes.
8    Q.  (BY MR. DOWER)  Okay.  And, I mean, if there's
9  anything that you disagree with about what I said,
10  please let me know.  I'm not -- I'm not trying to put
11  words in your mouth.  I'm just making sure that I
12  understand your testimony.  So, I mean, is that --
13    A.  Yes.
14    Q.  Okay.  I'm going to change subjects a little
15  bit.  I'm going to bring up another exhibit.
16            Here we go.  Okay.  Sorry.  That took a
17  second.  I had to cross-reference something.  So, I just
18  uploaded Exhibit 80.
19            (Exhibit 80 marked.)
20    A.  I'm downloading.
21    Q    (BY MR. DOWER)  Take your time.
22    A.  Okay.  I have it open.  Let me save.
23            Okay.  I have it open.
24    Q.  Okay.  So I'll represent to you that I -- I
25  put these in chronological order so we -- for once, we

72

1  don't have to start at the bottom and work our way up.
2  It's actually in chronological order for once.
3            So the first -- the first page is an
4  e-mail from your gmail account to Karen Little; is that
5  correct?
6    A.  Yes.
7    Q.  And this was in April of 2018, correct?
8    A.  Yes.
9    Q.  Who is Karen Little?
10    A.  She is an administrative assistant in the
11  department for one part of the department -- actually,
12  it's not a part of the department.  It's a center called
13  the WNCG, Wireless Networking and Communications Group.
14  It's a center of about 15, 20 faculty, most from the ECE
15  Department, but a couple from other departments and --
16    Q.  I anticipate --
17    A.  -- they have their own setup.
18    Q.  I'm sorry.  I was just going to say, for
19  Debbie's sake, could you repeat the letters again?
20  Like, N-C-E, is that what you said?
21    A.  The abbreviation is WNCG, which stands for
22  Wireless Networking and Communications Group.
23    Q.  Thank you.  Sorry.  I just didn't want Debbie
24  to have to listen to that clip over and over again to
25  make sure she got it.

73

1            Okay.  And so in this e-mail you
2  indicated that you wanted to hire your fiance as a
3  part-time research scientist in your group, correct?
4    A.  Yes.
5    Q.  And he'd been assisting you for over a year
6  now with various research projects; and you were even
7  going to submit some joint publications, correct?
8    A.  Yes.
9    Q.  And so since he was -- so this -- you know,
10  this says that since he'd been committing close to 20
11  hours a week of unpaid research work for you, you were
12  wanting to actually hire him as a part-time research
13  scientist, correct?
14    A.  Yes.
15    Q.  And so you flagged this in the second
16  paragraph.  You're saying, "I'm assuming that" there's
17  some -- you'd have to declare some sort of conflict of
18  interest; and so you were -- you were asking for advice
19  on whether it's feasible and what are the conditions and
20  a proposal of a salary of something like a thousand
21  dollars a month.  Is that -- is that a fair synopsis?
22    A.  Yes.
23    Q.  And so when you sent this e-mail, you didn't
24  have an understanding one way or the other about
25  whether, you know, there would be an issue with you

74

1  making this proposal, right?
2     A.  Yeah.
3     Q.  And so, just to skip ahead then, so three days
4  later you get an e-mail from Dr. Tewfik; and he
5  indicates that he's -- you know, "We became aware this
6  morning that you would like to hire your fiance as a
7  part-time researcher in your group."  And the department
8  would not approve such an appointment.  Is that
9  accurate?
10    A.  Yeah.
11    Q.  And then he quotes a section from the Handbook
12 of Operating Procedures about -- about University
13 employees -- well, I guess I should probably read it
14 directly.  So it says -- his e-mail says, "No University
15 employee may approve, recommend, or otherwise take
16 action with regard to the appointment, reappointment,
17 promotion, salary, or supervision of a close relative as
18 defined by this policy."  Did I read that correctly?
19    A.  Yes.
20    Q.  Okay.  But, I mean, in fairness to you, when
21 you sent the e-mail to Karen Little, you had no idea
22 that that was at all problematic, right?
23    A.  Correct.
24    Q.  Okay.  And in -- and scrolling down to the
25 next e-mail, you respond and you say that you were not

75

1  aware of the policy and that you wouldn't have asked
2  otherwise?
3     A.  Correct.
4     Q.  And so is it accurate to say that your fiance
5  was -- had been spending close to 20 hours a week
6  assisting you in your research work?
7     A.  Yes.
8     Q.  Okay.  How -- how long -- I guess for what
9  period of time was he working with you on your research?
10    A.  We started conversations almost as far back as
11 we met.
12    Q.  Uh-huh.
13    A.  He -- when I met him, he -- he's a wind farm
14 developer.  He works in the industry.  He's not an
15 academic.  He does not have a Ph.D.  And just over
16 the -- you know, naturally, people ask each other,
17 "What do you do?  What do you do for work" and so on;
18 and so as he got to know more about my work and I got to
19 know more about his work, we felt it would be an
20 opportunity -- a rare opportunity for an academic to
21 interface with an industry person and sort of bridge
22 that gap between academia and industry to bring forward
23 some, you know, unique and interesting projects.  So we
24 had conversations on and off, sometimes more in-depth
25 for years; but then he -- and he introduced me to one of

76

1  his business partners with whom I also had
2  conversations.
3        And then he began spending a significant
4  chunk of time in the spring semester when we were at
5  Simons.  So that would have been Spring of 2018 when I
6  went to Simons and I took my whole family with me.  For
7  that time it was my son -- I guess at that time I only
8  had one child, and I was pregnant with my second.  And
9  Jimmy basically came to the Simons Institute, listened,
10 sat in on many discussions between me and other
11 researchers, me and my students; and over time, you
12 know, started contributing.  Kind of he got the gist of
13 what we are looking for, and started contributing; and
14 it was a very fruitful time.  Basically, that's where
15 the collaboration with him took off; and it has led to
16 several -- I think we have a couple of publications now
17 and several in progress.
18    Q.  I should probably take this opportunity to
19 ask a little more about his educational background.
20 What is -- I know you mentioned wind farm development.
21 What is -- tell me more about what your husband does,
22 please.
23    A.  Yeah.  So he's an entrepreneur, and he -- so
24 he has a bachelor's degree in mechanical engineering;
25 and he also is ex-Navy.  So he did a nuclear engineering

77

1  program at the Navy that he is very proud of.  And he
2  was operating a nuclear power plant on an aircraft
3  carrier for a while before he went -- he decided to go
4  to school.  So then he got a bachelor's degree in
5  mechanical engineering from the University of North
6  Texas; and how, by fluke, I understand, he got into wind
7  farm development.  And that's what he's been doing ever
8  since.
9     Q.  So I guess at this time in 2018 what was --
10 was he -- did he have a specific job?  I get that he has
11 this very impressive background.  I'm just trying to
12 figure out, what was he doing from an occupation
13 standpoint at this time?
14    A.  Correct.  So he had completed several projects
15 for wind farm development successfully, and he had
16 decided to take a break and retire from wind farm
17 development.  It had to do with business incentives and
18 so on in that area.
19        And he was basically looking for
20 something new, and he always wanted -- he felt that his
21 mom and dad had a good relationship.  Part of what made
22 the relationship successful between his mom and dad is
23 that they worked together, and so he was very keen on us
24 finding a way to work together.  And so he basically
25 kind of, you know, tried to learn about research and see

78

1  if he could work together with me.  So that's how this
2  came about.  So he wasn't actively doing anything else
3  at that time.  I guess, you could say he's a
4  househusband.  He hates -- he hates that.
5      Q.  I won't use -- I won't use the phrase in case
6  he ever sees the transcript; but so he was helping you
7  with your research and helping, you know, with the
8  family unit.  How long was that true?
9      A.  Let me see.  So he -- I don't remember the --
10  the timeline of when exactly his project closed.  I
11  remember there was a time when our first child, our son,
12  ███ was born it was quite tense at home with a new
13  baby; and he -- it was a very intensive work period for
14  him with the wind farm development.  He was in a phase
15  that required a lot of work hours and some travel.
16          And at some point that kind of went away;
17  and so whenever his part was completed, gradually, his
18  time commitment reduced.  And he started looking out for
19  something new.  And, again, you know, it's a gradual
20  thing where we had sporadic conversations on my work;
21  and, for sure, I remember that that spring semester he
22  wasn't actively working on any wind farm development.
23          But he always does -- he does a million
24  things.  So he -- when his wind farms closed, he got
25  some investments.  So he was managing his invest- -- I

79

1  mean, house -- like property.  He bought some houses
2  that he rents out, and so he was -- he's always doing
3  something.  So he's not one, you know, without doing
4  anything.
5      Q.  Gotcha.
6      A.  Basically, he made the time to -- he makes
7  time to, you know, work with me --
8      Q.  Uh-huh.
9      A.  -- as a collaborator.
10      Q.  Right.  So he'd been -- he'd been
11  collaborating with you, obviously, in your personal
12  lives; but I mean professionally, he'd been
13  collaborating with you for, I guess, over a year at the
14  time you sent this e-mail in April of 2018?
15      A.  Yeah, I think that's fair to say.
16      Q.  Okay.  And I'm, like, quoting the e-mail
17  because it, "He's been assisting me for over a year
18  now."  So that's where I'm getting that.  Okay.
19          Okay.  And then is he still -- well, I
20  guess -- I'm going to use the phrase; but I know that
21  you say he wouldn't like it; but the household, is he
22  still sort of playing the household husband role while
23  all these various side projects are going on?
24      A.  He complains about it every so often, yeah.
25      Q.  Okay.  So the answer to my question is:  Yes,

80

1  he's still doing that?
2      A.  Well, he -- he -- that's another -- whole
3  other sentence.  We've gone to couple's counseling for
4  that.  But, basically, he resents the role of being a
5  household husband; and he feels that now, because of not
6  having, like, an active full-time job, like, regular
7  employees do, that he ends up bearing more of the house-
8  hold responsibilities.
9      Q.  Gotcha.
10      A.  -- at the moment.  Also, myself, I'm going
11  through a difficult period.  So it's an ongoing
12  conversation between, you know, household chores and
13  baby duties.
14      Q.  Right.  Okay.  I think we are done with that
15  document, so.
16          All right.  Let's see.  I think we're on
17  Exhibit 81; although, hopefully, Bob will be kind enough
18  to correct me if I'm wrong.  I think I'm on 81.
19          MR. SCHMIDT:  You're correct.
20          MR. DOWER:  All right.  Thank you, Bob.
21          (Exhibit 81 marked.)
22      A.  Okay.  I have it open.  Let me save it.
23      Q  (BY MR. DOWER)  Let me know when you've had a
24  chance to peruse it.  I don't want to ask you questions
25  until you're ready.

81

1      A.  Okay.  So I have saved this.  Okay.  I have
2  saved this, and I have it open in front of me.  Would
3  you like me to read it?
4      Q.  I think, in fairness to you, you should
5  definitely look at it before I start asking questions,
6  so yeah.  I don't know whether you need to look at the
7  whole thing because the other -- the follow-up pages are
8  your third-year review.  I'm mostly going to ask you
9  about the e-mail on the first page.
10      A.  Okay.  So let me read the e-mail on the first
11  page.
12          (Witness silently reading document.)
13          I've read the e-mail.
14      Q.  Okay.  So before we get into the nitty-gritty
15  of this, of the e-mail, so can you just tell us what the
16  third-year review is, just generally?
17      A.  My understanding of it is that it's a review
18  which is typically performed in the middle of one's
19  tenure -- probationary -- in the middle of one's
20  probationary period in order to inform a candidate how
21  they're doing and help them make suggestions, if they
22  need to, to make sure they're successful during the
23  tenure review.
24      Q.  Well said.  Okay.  So, in your situation --
25  well, first of all, this e-mail is dated May 31st, 2018,

82

1  correct?
2      A.  Correct.
3      Q.  And so this is -- this is when you're in the
4  midst of your -- I guess preparing your tenure case,
5  correct?
6      A.  Correct.
7      Q.  Yeah.  So you had -- you know, you decided --
8  or you were going up for tenure early; and so instead of
9  this being at the sort of the halfway point or midway
10  through your tenure period, you're going up, like, while
11  this is going on, correct?
12      A.  Correct.
13      Q.  Okay.  And so, basically, what they decided to
14  do was to remove some of the constructive feedback
15  because they didn't want to put anything that indicated
16  any, like, sort of room-for-improvement areas, given
17  that you were going up for tenure that year.  Is that
18  fair?
19      A.  You could say that, yes.
20      Q.  Okay.  Would you agree with that?  I know I
21  said it; but, I just -- I mean, is that a fair
22  statement?
23      A.  Yeah.  The reason I'm a little bit -- you
24  know, I say, "You could say that," right, instead of
25  just saying "Yes, you're correct" --

83

1      Q.  Yeah.
2      A.  -- I would not quite word it the way that you
3  did; and part of it is that both the tenure bar and the
4  third-year review are highly subjective.  That's one
5  thing that I have a huge issue with and that I think's
6  at the core of this discrimination complaint.
7      Q.  Uh-huh.
8      A.  And so I feel that in this third-year review,
9  you know, a lot of random things may get said, like
10  arbitrary suggestions that aren't necessarily -- you
11  know, this is -- it's not like -- it's not a clearcut:
12  Okay.  We need five papers to get tenure; and we see
13  that you have, you know, published three.  So you need
14  to publish two more, right?  So this is something very
15  clear.
16          This -- there's no clear numbers for any
17  category.  There are no clear, you know, expectations.
18  Everything is very subjective, and it's subject to being
19  distorted.  A lot of it is perception.  And so that's
20  why I wouldn't word it the way you did.
21          Yes, people in the third-year review, I
22  think, do their best to give constructive feedback so
23  the candidate is successful.  At the same time, there is
24  this thing about the third-year review, you know, middle
25  of the runway, to where, you know, they expect that you

84

1  have two more years to tenure; and so they essentially
2  are telling you how you should spend those next two
3  years.  So this is very different from actually, you
4  know, advising you on a clearcut goal, like:  Oh, you
5  have to do ABC.  You have only done A and B; therefore,
6  you need to do C.  Does that make sense?
7      Q.  Yeah.  So there are some suggestions that
8  would normally be included which are the subjective
9  suggestions by the people -- the faculty who prepared
10  the third-year review; and you don't -- because the
11  process itself is somewhat subjective, you know, you're
12  not -- you're not necessarily -- you don't necessarily
13  agree with the suggestions that they would normally
14  include?  Is that a -- is that a fair statement?
15      A.  Again, it's not that I do not agree with them.
16  I take them as they are, and I work on them.  And so
17  this is what I did.  I took the review as it was and I
18  kind of addressed what I felt, you know, the suggestions
19  were and so I worked on it.  Whether I agree with it is
20  a different question.  I help --
21      Q.  Okay.  Well, let me -- let me just ask you
22  this:  The suggestions that were originally in the draft
23  of your third-year review were removed from the final
24  version, correct?
25      A.  This is what the e-mail states, correct.

85

1      Q.  Okay.  Do you know whether that's accurate,
2  whether this e-mail is accurate?
3      A.  I don't -- I know there were two versions of
4  the third-year review, and I'd have to go back word for
5  word to see what exactly was removed.  So I don't
6  remember what the suggestions were and what suggestions
7  were removed.
8      Q.  Okay.  So you don't know whether -- well, you
9  can't really, sitting here right now, say whether or not
10  it's accurate; but this e-mail indicates that -- that
11  they had agreed to the corrections you had suggested
12  based on the fact that you were going up for promotion?
13      A.  Correct.  That's what the e-mail states.
14      Q.  And you don't, sitting here right now, have
15  any basis to either agree or disagree with it because
16  you just don't remember?
17      A.  Correct.  I remember one thing, which
18  states -- which states after the edits, which was the
19  suggestion to have a couple extra publications.  I
20  remember that.  And since I didn't remember any other
21  suggestion, that's why I couldn't answer your question
22  affirmatively, because I know that this was the major
23  suggestion that essentially stayed in that corrected
24  draft.  So I don't recall other, you know, serious
25  suggestions, like, were there before and were removed.

86

1   Q.  Could you point out which part you're
2   referring to, since we have the -- the version right
3   here?
4   A.  Yeah, let me look through it.
5   Q.  Yeah, yeah.  Take your time.  I'm not trying
6   to rush you.
7   A.  Oh, okay.  So maybe this is what was removed
8   because I don't see it now in the summary paragraph.
9   I'm just looking in the summary paragraph.  So the
10  summary paragraph reads, "Dr. Nikolova has established a
11  solid research program in game theory, network
12  optimization, and algorithms.  She has achieved notable
13  success at funding and has the expected productivity in
14  terms of papers and students.  Her teaching is valuable
15  to the department and well-rated at both the
16  undergraduate and graduate levels.  Her service record
17  is appropriate for an Assistant Professor.  Post-tenure,
18  it would be good for her to become more actively
19  involved in leadership activities internally and
20  externally."  So maybe this is what I'm remembering, and
21  it may be somewhere further up.  But maybe this was the
22  suggestion I'm remembering that was removed, which was
23  to have a couple extra publications.
24  Q.  Okay.  So your memory is that there was
25  originally a suggestion that you might need some more

87

1   publications, and it looks like it was removed from the
2   final version?
3   A.  That's what it looks to me at the moment,
4   yeah.
5   Q.  Okay.  And if you want to review the whole
6   thing -- I mean, it's three pages; but, at the same
7   time, it's only three pages.  So if you want to review
8   the whole thing to see if it's anywhere else in here,
9   you know, please, be my guest.
10  A.  Okay.  Sure.  Yeah, I can -- I can read that
11  now.
12  MR. SCHMIDT:  I don't want to interject
13  in your deposition; but I do think for her to be able to
14  state whether or not something was removed, she'd have
15  to see, probably, both documents to make that -- at
16  least, that would be the way to conclusively make that
17  statement.
18  MR. DOWER:  I appreciate that.  I don't
19  have the other one on hand, but she did testify that she
20  remembers this one comment.  So we can at least
21  determine for that one whether it's in this version.
22  MR. SCHMIDT:  I understand.
23  MR. DOWER:  Okay.
24  A.  (Witness silently reading document.)
25  Yeah.  I read it, and I didn't see that

88

1   comment.  So it's possible that it was in the earlier
2   version and it was removed.
3   MR. DOWER:  Okay.  That's all I have for
4   this document, and this is kind of a good transition
5   point.  So maybe we could take the lunch break now since
6   it's noon.  Is that okay with everyone?
7   MR. SCHMIDT:  That's fine with us.
8   THE WITNESS:  Yes.
9   MR. DOWER:  Okay.  Should we just say
10  come back at 1:00 or...
11  MR. SCHMIDT:  That works with us as well.
12  THE REPORTER:  We're going off the record
13  at 12:06 p.m.
14  (Off the record from 12:06 to 1:00 p.m.)
15  THE REPORTER:  We're going back on the
16  record at 1:00 p.m.
17  Q  (BY MR. DOWER)  All right.  So I kind of want
18  to shift the discussion, now that we're back from the
19  lunch break, to the actual tenure process and the
20  decision to go up for tenure early.
21  So I guess the first question would
22  probably be:  When did you first decide to go ahead and,
23  you know, pull the trigger on going up for tenure in the
24  '18-'19 cycle?
25  A.  That was not my decision.

89

1   Q.  Okay.
2   A.  I was advised to go up by Professor Sanjay
3   Shakkottai.
4   Q.  Okay.  And so what did Sanjay Shakkottai tell
5   you?
6   A.  He -- we had -- I believe we had a lunch
7   meeting around September 2017, so the preceding year, in
8   which he said, "Hey, I think you're ready now; And
9   things are changing at the college where if you go up
10  now, you will not be considered early.  You will be
11  technically early, but you will not be" --
12  THE WITNESS:  Hello?
13  MR. DOWER:  I'm still here.
14  THE WITNESS:  Oh, everything crashed
15  here; but you still hear me, I guess?
16  MR. SCHMIDT:  We still hear you, yes.
17  MR. DOWER:  Oh.  Oh, shoot.
18  THE WITNESS:  Oh, the video crashed.
19  MR. DOWER:  Yeah, it really did.
20  MR. SCHMIDT:  Yeah, the video is gone.
21  THE WITNESS:  Okay.  Just a second.  I
22  just want to adjust my computer screen.
23  MR. NOTZON:  Want to go off the record
24  while we figure this out?
25  MR. DOWER:  Sure.

1      THE REPORTER: Off the record at
2  1:02 p.m.
3      (Off the record from 1:02 to 1:02 p.m.)
4      THE REPORTER: We'll go back on the
5  record at 1:02 p.m.
6   Q. (BY MR. DOWER) So I don't know whether to let
7  you finish or pick up with a new question. What would
8  you prefer, Dr. Nikolova?
9   A. Let me try to remember what I said. I think
10  we were discussing -- yeah, Sanjay Shakkottai, we
11  had a conversation around September the preceding year,
12  2017, in which he said, "Hey, I think you're ready now;
13  and things are changing at the college." I remember him
14  saying that things are changing at the college because
15  we had had that conversation in preceding years where he
16  said, "Oh, well, there is this thing that if you go up,
17  you will be -- you may be held to a higher bar."
18      And he specifically came to me that
19  September saying, "Hey, things are changing at the
20  college now. You will not -- you can go up now because
21  you will -- because you will not be held to a higher
22  bar. You are technically early, but you are not truly
23  early. So I think it's a good time for you to go up
24  now. Also, given that it's Ahmed's eighth year, final
25  year as Chair, and, you know, next year we'll have a new

1  Chair; we don't know what will happen. And Ahmed has
2  all the experience, so now is a good time."
3   Q. So -- so just to be clear, so you had a choice
4  about whether to initiate the process; and you exercised
5  that choice based on the advice of Sanjay Shakkottai.
6  Is that fair?
7   A. No, it was never my understanding that it was
8  up to me to initiate the process.
9   Q. So even though --
10   A. I thought that would come --
11   Q. Go ahead. Sorry. I apologize.
12   A. Sorry. I thought that would come from the
13  Chair or somebody at the department telling me, you
14  know, "It's time for us to consider you." And that's
15  what happened. Sanjay came to me and said, "It's time."
16   Q. And what was his position at that time?
17   A. He was serving as a mentor to me.
18   Q. Okay.
19   A. He was not an official mentor, but he had been
20  serving as the de facto mentor. He was my unofficial
21  mentor.
22   Q. Oh, okay. So your unofficial mentor advised
23  you to go -- to go up at that time?
24   A. Correct.
25   Q. Okay. And it's your understanding that you

1  didn't -- you couldn't say -- you couldn't say, "I'd
2  rather -- I'd rather wait another year," that you --
3      MR. SCHMIDT: Objection, form. I'm
4  sorry.
5   Q. (BY MR. DOWER) That you had no choice in the
6  matter?
7      MR. SCHMIDT: Objection, form.
8   A. This was not the discussion we had. It was
9  not about me saying, "Oh, I'm" -- about me having a
10  choice. It's -- I think it was -- I had had this
11  conversation with both Sanjay and Ahmed about the timing
12  of when to go up for tenure. I was expecting to go up
13  for tenure around my normal time clock, which would have
14  been two years earlier.
15      And so when that time came, I sort of
16  asked, you know, "What's going on? Should I be
17  considered now; or if not, you know, what do I need to
18  do to prepare?" And so I had had this conversation with
19  both Ahmed and Sanjay. It was not about that, oh, I had
20  a choice. I was -- I was waiting for the Department to
21  give me the green light to go up.
22   Q. (BY MR. DOWER) Okay. So because of the time
23  you'd spent at A&M, you wanted to go up as early as you
24  could -- or at least as early as was advisable; and
25  once they said the green light, go ahead, you wanted to

1  take -- you know, go ahead and start the process at that
2  point?
3      MR. SCHMIDT: Objection, form.
4   A. I wanted to go up -- I wanted to go up as
5  early as was fair.
6   Q. (BY MR. DOWER) And when Sanjay was referring
7  to a change at the college, did he mean a change in the
8  college of -- at the Cockrell School of Engineering?
9   A. I don't know what he meant.
10   Q. Okay. Did you talk to anyone else other than
11  Sanjay at that time about whether or not your -- it was
12  advisable to go up for tenure at that time?
13   A. I sought out advice from a couple other
14  faculty. I remember seeking out advice from Gustavo de
15  Valenciano.
16      THE WITNESS: Do you need the spelling of
17  that?
18      MR. DOWER: Probably.
19      THE WITNESS: I'm sorry. I didn't hear.
20      THE REPORTER: Yes, please.
21      THE WITNESS: Gustavo is spelled
22  G-U-S-T-A-V-O and then a separate word, small letters
23  D-E; and then the last name is Valenciano. I may
24  butcher that, but it's something like that
25  V-E-C-I-A-N-A [sic.] I may have missed a syllable

94

1 there.
2         MR. DOWER:  That's all right.  Close
3 enough.  We can always go back and cross-reference with
4 an e-mail or something and correct the spelling in an
5 errata sheet if we need to, all of which is to say:
6 Don't worry about it.
7     Q.  (BY MR. DOWER)  Who -- can you remember anyone
8 else that you sought advice from at that time period?
9     A.  Yeah.  I had a conversation with Christine
10 Julien; but the conversation was not, "Hey, do you think
11 I'm ready," because that's -- she was not close to my
12 area; and I had already had that conversation with
13 Sanjay, who had told me that I'm ready.  So in my
14 conversation with her, it was more asking her about what
15 the process is; and she told me what the process is.
16 And she -- after that conversation, which happened
17 around November of 2017, she advised me on the process;
18 and she sent me by e-mail a form, which was the Dean
19 Summary Sheet.  She told me all -- "This is what you
20 need to do.  You need to fill out this Dean Summary
21 Sheet, talk to Ahmed, discuss it with Ahmed; and then
22 Ahmed goes to the Dean and discusses your case with the
23 Dean to see whether the Dean would give the green light
24 and so on."
25     Q.  And so did you then talk to Ahmed?

95

1     A.  Yes.  After my conversation with Christine, I
2 received that form from her.  I filled it out.  I
3 scheduled a conversation with Ahmed.  And, again, it
4 was, I told him, "You know, Sanjay thinks I'm ready to
5 go up this year.  What is the process?"
6         And Ahmed said, "Well, this is what
7 happens.  That's what the process is like, A, B, C.  You
8 have to do these documents, A, B, C.  I'll take your
9 documents.  I'll discuss your case with the Dean.  And
10 then the Department is going to vote on your case; and
11 then, you know, if everything goes well, then you can
12 officially start the process in the summer."
13     Q.  And so -- so did -- and it's my understanding
14 that someone presented your case to the -- is it the
15 Budget Council or the Budget Committee?  I'm blanking
16 out.  What's the name of the department-level body?  Do
17 you remember?
18     A.  I believe it's Budget Council.
19     Q.  Okay.  That sounds right.  So it's my
20 understanding that there's an initial vote by the Budget
21 Council on whether to approve the tenure case, sort of
22 starting the process.  Is that your understanding as
23 well?
24     A.  That's my understanding as well.
25     Q.  Right.  And so -- and someone presented your

96

1 case to the Budget Council at the beginning of that
2 process?
3     A.  Correct.
4     Q.  Was that -- was that Sanjay Shakkottai who
5 made the presentation?
6     A.  Yes.
7     Q.  Okay.  Are you present at the meeting of the
8 Budget Council when they're talking about your -- your
9 tenure case?
10     A.  No.  I'm forbidden from being present, and I
11 believe the meeting is closed to assistant professors.
12 And it may also be closed to associates.  I'm not sure.
13     Q.  And so, actually, earlier when you alluding to
14 a text from Sanjay that said -- that he sent you after
15 he made the presentation -- do you remember testifying
16 about that earlier this morning?
17     A.  Yes.
18     Q.  Okay.  So just to tie this together, so he
19 would have sent you that text after his presentation to
20 the Budget Council; is that correct?
21     A.  Yes.
22     Q.  And do you remember when your tenure case was
23 initially presented to the Budget Council, just to
24 approve whether or not to continue with the process?
25     A.  Do you refer to the presentation to the Budget

97

1 Council before I submitted my tenure documents or after
2 I submitted my tenure documents?
3     Q.  Great question.  I'm referring to the before,
4 at the very beginning of the process.
5     A.  Yeah.  Can you repeat your question now?  I'm
6 sorry.
7     Q.  Yeah.  I'm trying to figure out whether --
8 when -- when did that happen?
9     A.  This happened in late Spring of 2018.  I want
10 to say early May, to the best of my recollection.
11     Q.  Okay.  And so once the Budget Council gave its
12 initial approval to you going forward with the tenure
13 case, is that when you started preparing the dossier?
14     A.  Correct.
15     Q.  And can you tell me -- can you tell me about
16 the process of assembling your dossier?  And if it would
17 be easier, I can probably make an exhibit; and then we
18 can just sort of talk through it if that would be easier
19 to organize the conversation.
20     A.  Yes, please.
21     Q.  Yeah, let's do that.  I agree.  It's easier to
22 talk when you've got a document in front of you.  So
23 give me one second.
24         Okay.  This is going to take a second to
25 upload because it's a little bit bigger file than some

98

1  of the other PDFs.
2        Okay.  It should be uploaded.  So you
3  should be able to download it now.
4     A.  I'm downloading.
5     Q.  It may take a second, and this has been
6  previously marked as Exhibit 39.
7        (Exhibit 39 discussed.)
8     A.  It looks like it may take several minutes on
9  my end.
10    Q   (BY MR. DOWER)  Well, while we're waiting, did
11 you talk to anyone else about whether it was advisable
12 to initiate the tenure process when you did it -- or, I
13 guess, when it was initiated?
14    A.  I don't recall at the moment talking to
15 anybody else, specifically asking whether it's a good
16 idea to go up at that time.
17    Q.  Is it still downloading?
18    A.  Yeah, it's about 40 percent downloaded.
19       MR. SCHMIDT:  I'm reaching out to our IT
20 guy right now, as we speak, to see if they can figure
21 out what's the deal, so.
22       THE WITNESS:  I think it's a very large
23 file.  It's my whole dossier.
24       MR. DOWER:  Yeah, it's 24 megabytes, so.
25       MR. NOTZON:  For the record, that's not

99

1  me, the IT guy.
2        (Laughter.)
3        MR. SCHMIDT:  I don't think anybody would
4  have thought that, but I'm glad you clarified that.
5        Any luck on that, Dr. Nikolova?
6        THE WITNESS:  It's about 80 percent on my
7  end.
8        MR. SCHMIDT:  Okay.  If you want to go
9  off the record, Ben.
10       MR. DOWER:  Yeah, I just -- I hate to
11 burn time just sitting here.
12       THE REPORTER:  We're going off the record
13 at 1:21 p.m.
14       (Off the record from 1:21 to 1:26 p.m.)
15       THE REPORTER:  We're going back on the
16 record at 1:26 p.m.
17    Q   (BY MR. DOWER)  Okay.  So, Dr. Nikolova, the
18 document that's Exhibit 39, the first page of that
19 document is the Recommendation For Change in Academic
20 Rank/Status form, correct?
21    A.  Correct.
22    Q.  Okay.  And that shows at the top of it your --
23 your years of academic service.  Do you see that?
24    A.  Yes.
25    Q.  Okay.  And so it lists that your years in

100

1  present rank are -- there's 5.5 total years in present
2  rank.  Do you see that?
3     A.  Yes.
4     Q.  Okay.  So at the time -- at the time this is
5  calculated, it had you at 5.5 years as an assistant
6  present -- as an assistant professor at UT Austin.  Is
7  that what you understand that to mean?
8     A.  Yes.
9     Q.  And then it has four years in probationary
10 status, correct?
11    A.  Yes.
12    Q.  And so the years in probationary status are
13 1.5 fewer than your years in present rank, you know, 5.5
14 minus 4?
15    A.  Correct.
16    Q.  And so one of those years that's the gap is
17 from your probationary extension in 2015 to '16,
18 correct?
19    A.  Yes.
20    Q.  And then the other .5 comes from the fact that
21 you started at UT in January of 2014, correct?
22    A.  Yes.
23    Q.  And so your probationary years, they don't do
24 it by semester.  It's basically whole numbers only,
25 correct?

101

1     A.  Yes.
2     Q.  Okay.  And, obviously, these numbers do not
3  count the two and a half years you spent at Texas A&M,
4  correct?
5     A.  Yes.
6     Q.  And do you have an understanding of the number
7  of years that would make this an up-or-out case?
8     A.  Yes.
9     Q.  Okay.  And so what do you believe that number
10 to be for this form?
11    A.  The number of years in probationary status
12 should be six.
13    Q.  Six.  Okay.  And so even if you had rescinded
14 your probationary extension, you would not have been in
15 your up-or-out year, correct?
16    A.  Yes.
17    Q.  I want to jump down a little bit.  We started
18 with this because I wanted to explore with you which
19 parts of your dossier you prepared and some things of
20 that nature.  So let me jump down to page 14 of the PDF,
21 which is the number in the bottom right that ends 317.
22 It's got a big seven-digit number, but it's probably
23 easier to refer to it by PDF page.
24    A.  Page -- I'm on page 14 of the PDF.  Can you
25 please confirm again what's --

102

1    Q.  Yeah.  You should be looking at your standard
2  resume.
3    A.  Yes.
4    Q.  Okay.  And so -- so this -- your resume is
5  something that you submitted as part of your dossier,
6  correct?
7    A.  Yes.
8    Q.  Okay.  And so when you were preparing to
9  submit your dossier, one of the things that you had to
10  do was to go through and generate a -- a fairly --
11  fairly lengthy resume that lists things like
12  publications, et cetera, correct?
13    A.  Yes.
14    Q.  Yeah.  And it's got oral presentations.  I
15  mean, this is a fairly detailed document.  Would you --
16  would you agree?
17    A.  Yes.
18    Q.  Okay.  And it also lists on page 22 of the
19  PDF your grants and contracts -- or I guess starting on
20  page 22 of the PDF?
21    A.  I'm on page 22 of the PDF now.
22    Q.  Do you see at the bottom Grants and Contracts?
23    A.  Yes.
24    Q.  Okay.  And so is this a document that you --
25  that you've prepared as part of your dossier?

103

1    A.  Yes.
2    Q.  Okay.  Is this -- is this something that you
3  had some students help with the formatting, like you
4  were referring to earlier?
5    A.  Yes, I believe so.
6    Q.  And so then we get to -- on page 26 of the
7  PDF, which is the -- this is more for the record; but
8  the one that says 329 in the bottom right.  It's the
9  Candidate's Summary of Activities.  Do you see that?
10    A.  Yes.
11    Q.  And so is this -- is this another -- this is a
12  chart.  Did you generate this chart?
13    A.  Yes, I believe so.  So I think I was given a
14  template and probably the chart was in the template and
15  I just had to fill in the values in the second column.
16    Q.  Perfect.  Thank you for clarifying that.
17        And then you've got on the next page a
18  Complete reverse chronicle -- chronological list of
19  publications and scholarly/creative works?
20    A.  Yes.
21    Q.  Do you see that on page 27 of the PDF?
22    A.  Yes.
23    Q.  And is this another one of the documents that
24  you helped -- or that you prepared as part of your
25  dossier?

104

1    A.  Yes.
2    Q.  And is this one of the documents that you had
3  some students help with the formatting on?
4    A.  Yes, I believe so.
5    Q.  Going down, there's -- on page 35 of the
6  dossier, there's what looks like an e-mail from the
7  Mathematics of Operations Research, dated
8  September 29th, 2017.  Do you know why this was included
9  in the dossier?
10    A.  Yes.
11        Did you want me to elaborate?
12    Q.  Oh, yes.  Sorry.  Yes.  Can you elaborate on
13  what this is?
14    A.  Yes.  So I think there was a question about
15  this journal publication which was accepted for
16  publication but was not yet officially hit the print.  I
17  was asked to provide an e-mail just, you know, as
18  evidence that it was a bona fide paper that was accepted
19  for publication.
20    Q.  Understood.
21        Okay.  And then on the next page, on
22  page 36 of the PDF, we get into a series of tables with
23  things like research summaries and grants and contracts
24  awarded.  Do you see that?
25    A.  Yes.

105

1    Q.  And so is this all -- is this part of the
2  stuff that you prepared for your -- for your
3  contribution to your dossier?
4    A.  Yes.
5    Q.  Okay.  And then the next part of the document
6  is the Budget Council Assessment on Teaching
7  Performance, which it starts on page 38.  Do you see
8  that?
9    A.  Yes.
10    Q.  Can you tell me, how does this part of the
11  process work in terms of having people on the Budget
12  Council perform an assessment of your teaching
13  performance?
14    A.  So I was not aware at all about this part of
15  the dossier.  In fact, I didn't -- I hadn't heard the
16  phrase Budget Council until after the fact.  I didn't
17  know what it meant.  I had never heard it, and I didn't
18  know that it was part of the tenure and promotion
19  process.
20        After I submit my documents, research
21  statements, teaching statements, service statements, and
22  so on, the Budget Council then prepares mirror versions
23  of these documents in the sense that they write their
24  own assessment of my teaching, research, service,
25  et cetera.  So I learned that later.

106

1    Q.  So at the time you were preparing your
2  dossier, you weren't aware that there were other people
3  that would be doing an assessment of your dossier as
4  part -- or, I guess, of your credentials as part of the
5  dossier?
6         MR. SCHMIDT:  Objection, form.
7    A.  I was not aware that there would be written
8  assessments of this form.  I remember Sanjay mentioning
9  something about it; but, again, it wasn't totally clear
10  to me that this was what was happening.  But he said
11  something like, "Oh, somebody who is preparing something
12  about your research is asking for some detail; and can
13  you tell me -- can you elaborate on that part of your
14  research?"  And so I elaborated that to him.  And he
15  said, "Okay.  Great.  Thanks."  So that is kind of the
16  extent of my awareness.
17    Q.  And on page 42 of the PDF, you include your
18  Teaching Statement, correct?
19    A.  Yes.
20    Q.  Do you -- when you were preparing your
21  Teaching Statement, did you consult with anyone about
22  what type of information you ought to include in there?
23    A.  Yes.  I sought help from as many colleagues as
24  I could.  I wanted to be well informed and well prepared
25  for it.  I sought out sample Teaching Statements from my

107

1  colleagues, Alex Dimakis, Constantine Caramanis, so that
2  I can see example statements of successful tenure cases.
3         I don't remember if I had a conversation
4  that -- where someone specifically told me:  This and
5  this and this is what needs to be included.  So I
6  basically took those example statements, and I extracted
7  what I expected the structure of the statement to be and
8  the contents.
9         I remember Sanjay telling me it's
10  important to include a paragraph on student comments, on
11  student evaluations; and that's where I included that
12  paragraph on student evaluations right before Section 3
13  on the Teaching Statement.  But, basically, I took my
14  colleagues' statements as an example.  I wrote mine and
15  then I e-mailed it to a couple of colleagues and I
16  solicited feedback to see if it can be improved.
17    Q.  Well, let me draw your attention to the
18  comments from student evaluations, just since you
19  brought it up; and that's on page 44 of the PDF.  Let me
20  know when you're there.
21    A.  I'm there.
22    Q.  Okay.  And so in this section you say, "In two
23  of the semesters I taught the course (Fall 2016 and Fall
24  2017) the available TA candidate pool was especially
25  limited.  That issue was coupled with even worse

108

1  performance than we expected from the appointed TAs,
2  which we diligently tried to improve through increased
3  communication in the weekly staff meetings.  I believe
4  that was the key factor for lowering my instructor and
5  course evaluations."
6         First of all, did I read those sentences
7  correctly?
8    A.  Yes.
9    Q.  So what happened with the TAs in those
10  courses?  Can you elaborate on this a little bit and
11  explain to me what happened?
12    A.  Yes.  Yeah, relative to many of the courses in
13  the ECE curriculum, EE 360C, which is undergraduate
14  Algorithms mathematical course; and it includes as part
15  of the course instruction and part of the student
16  evaluation through homework and exams.  And the problems
17  with the assignments is the students have to write
18  mathematical proofs, and this is something that they're
19  expected to know.  They're required.  There is a course
20  requirement of them having taken a prior course on
21  mathematical proofs, but many students are not
22  comfortable with this.  They are not familiar; and that
23  includes TAs, the TAs that we had, which are
24  undergraduate and graduate students.  Many just don't
25  have sufficient familiarity and background with writing

109

1  mathematical proof and just general, you know, knowledge
2  of algorithms, the course content.  So that's what I was
3  referring to here.
4    Q.  Yeah.  What's the division of labor between
5  the professor teaching the class and the TAs?
6    A.  So I --
7         (Simultaneous speakers.)
8    Q.  No.  Sorry.  Go ahead.  Sorry.
9    A.  Yeah.  When I came into UT and I was about to
10  teach the course for the first time, I had presented a
11  question because I didn't know what was appropriate to
12  delegate to TA of what the course instructor does.  And
13  so I had that discussion with Professor Christine
14  Julien, who had been teaching that course before I
15  taught it for the first time.  In fact, I was supposed
16  to co-teach it with her; and I was really excited I
17  would able to kind of learn from her on those aspects;
18  but she ended up not being able to teach it that first
19  semester with me.
20         In any case, she sort of told me what she
21  does; and I tried to follow what she does, which was to
22  delegate the -- I believe you're going to refer later on
23  to some of the homework and programming assignment
24  preparation to the TAs, as well as grading; and they
25  were also grading weekly, homework weekly, short

110

1  quizzes.  They assisted with grading exams.  Yeah.  So,
2  I mean, basically they were there to ensure the smooth
3  running of the course and to assist the instructors with
4  the smooth running of the course.
5      Q.  So when -- I guess going back then to just
6  sort of the general timeline, so did -- to whom did you
7  submit your dossier materials when you felt that they
8  were done?
9      A.  I solicited feedback from different faculty on
10 the different documents.  So I submitted my Research
11 Statement to some, my Teaching Statement to others, just
12 not to overwhelm any one faculty with too many
13 documents.  And the Teaching Statement I solicited
14 feedback from Christine Julien, as I mentioned.  That
15 was the closest person I felt could advise me well on it
16 as well as Gustavo de Valeciano.
17     Q.  And so after you got their feedback, did they
18 send you proposed edits; or was it more like, "Here's
19 some pointers" and they didn't try to make actual
20 changes to drafts?
21     A.  No, I never heard back from them.
22     Q.  Oh, okay.
23     A.  And I was somewhat disheartened about it, and
24 I just figured they were busy and didn't really push it.
25     Q.  What about the -- what about the sending in of

111

1  external review letters?  Can you tell me about how that
2  process worked?
3      A.  Sure.  I was asked by the Chair,
4  Professor Tewfik, to prepare a document that listed all
5  the letter writers that should be asked for letters or
6  would be good candidates to ask for letters; and they
7  were the result of discussions between my mentor, Sanjay
8  Shakkottai, and me.  So it was:  Some names would come
9  from me, and they were labeled as candidate names.  And
10 some names would come from Sanjay, and they were labeled
11 as department names.
12     Q.  Actually -- okay.  Well, go to page 85 of the
13 PDF; and this may help demonstrate what you just said.
14         Are you there?
15     A.  Yes.
16     Q.  Okay.  So like the letter at the top, the
17 first one says, "Nominated by Department."  Do you see
18 that?
19     A.  Yes.
20     Q.  So that would be an example of when the
21 Department reached out to that particular professor; is
22 that correct?
23     A.  They -- the Department did not necessarily
24 reach out, but the Department suggested the name.
25     Q.  I see.  So who actually contacts the professor

112

1  or the would-be reviewer?
2      A.  Once the statement is prepared, my
3  understanding there is that the Chair submits it to the
4  Dean's Office; and the Dean needs to approve it before
5  the Chair then solicits the letters.
6      Q.  I see.  Okay.  So it's your understanding that
7  the Chair is the one who actually reaches out to the
8  various persons that have been identified?
9      A.  Yes.
10     Q.  Okay.  But in any event, the professors who
11 are sending these letters, they don't just send them in
12 on their own volition.  They're all letters that were
13 solicited by the Chair of the Department?
14     A.  Yes.  On this list, yes.
15     Q.  Okay.  So once the dossier materials have been
16 finalized, do you send, like, a PDF to someone and say,
17 "Here's my contribution to the dossier?"  How does the
18 actual submission process work?
19     A.  So we had a promotion meeting for all
20 promotion candidates and their mentors and the
21 Department Chair before the official start of the
22 process.  The Department Chair introduced us to a lady
23 called Jilda, and he said that she would be assisting
24 all the promotion candidates with their dossiers.  She
25 was sort of the guard of procedures and rules and

113

1  regulations, and so they were advising us on all the
2  documents that need to be submitted.
3         So we were interacting with her.  Each
4  candidate was interacting with her.  So we would send
5  her things; and then she would send things back saying,
6  "Oh, you have missed a comma here and a period there;
7  and you need to change the format of this or that."  So
8  she was -- it was her responsibility as the keeper, I
9  guess, or the guardian that the rules are met for the
10 formal formatting and so on of the document.
11        So, basically, I was interacting with
12 Jilda on all of the documents; and I would send her
13 copies of everything.  And then she would -- she would
14 also offer edits.  So she actually had read my Teaching
15 Statement; and she offered some minor wording edits, I
16 think, on grammar and to just improve the flow of the
17 language.  And I -- so we had multiple back and forth;
18 and then I would keep asking, "Okay.  Is there anything
19 else that needs correction?"
20        And so whenever she said, "Okay.  It
21 looks good now," that was the final.  And so I have --
22 you know, I have a big DropBox folder with many, many
23 versions of documents; and then I made up a folder with
24 the final that I had sent to her, to be able to keep
25 track.  So she was the interface, basically, with me in

114

1  the -- this whole tenure process.
2     Q.  And do you remember -- do you remember
3  approximately when it was like, "It's done," like, where
4  the dossier is final; all the edits are finished?
5     A.  So there -- we had initial deadlines; and I
6  was very keen on getting everything done early before my
7  daughter was born because I was expecting my
8  my second child, on June 30 of that summer of 2019.  And
9  she actually was born on June 13, two and a half weeks
10  early.  And so I had given myself a deadline to be done
11  with all the documents by late May.
12        And I asked Jilda -- I said, "You know, I
13  understand these deadlines and I -- would you
14  please work with me to ensure that my documents are in
15  order by the end of May?"  And I believe it stretched
16  out into the beginning of June.  And so we worked with
17  me to get that finalized by the end of June [sic.]  And
18  at some point I said, "Okay.  Is that all?  Is that all?
19  Is that all?"
20        And then she said, "Okay.  You are all
21  set and done.  We have everything you need."  But I
22  guess that was not the final, final.  I think that's
23  kind of what you're asking, because there were inquiries
24  later in the summer that we discussed earlier today.
25     Q.  Okay.  And do you remember when the Budget

115

1  Council assembled to vote on the actual merits of the
2  promotion case?
3        MR. SCHMIDT:  Objection, form.
4     A.  I believe it was September of 2018.  I don't
5  recall the exact date.
6     Q   (BY MR. DOWER)  And do you recall how much
7  time went by between the Budget Council vote and then
8  the College/School Advisory Committee?
9     A.  I believe -- and I don't think I was informed
10  of that during the process.  To me, at the time it was
11  like a black box, where I just -- I was told about the
12  department vote because the Chair wrote me about it.  He
13  said, "It's a strong vote.  And, you know, I'll need
14  your assistance with my promotion letter for you."  But
15  from then on it became a black box, and I was expecting
16  to only learn the outcome in February when the
17  President's Committee's done; but I, sadly, learned, you
18  know, the negative outcome earlier than February.
19     Q.  Well, let's -- let's talk about that.  I'm
20  assuming from the context, by "negative outcome," you
21  mean Dean Wood's assessment of your tenure case?  Is
22  that what you're referring to?
23     A.  Yes.
24     Q.  So before we talk about her assessment letter,
25  did you ever speak to her at any point during the

116

1  process before her assessment letter came out?
2     A.  I never spoke directly to her, but
3  Professor Tewfik spoke to her about my case in the
4  spring prior to my officially starting the tenure
5  process.
6     Q.  And what did Professor Tewfik relay to you
7  about his conversation with her, if you can remember?
8     A.  Yeah.  To the best of my recollection, he said
9  that she had asked about certain publications on my CV
10  and she asked him whether they're highly competitive or
11  prestigious or something to that effect.  And then she
12  asked for an additional document to these summary sheets
13  that I mentioned, which was a document dedicated to
14  funding.  So I had to then go and write a detailed
15  document on funding.  And he said to me that basically
16  she kind of questioned the publications and she -- and
17  he told me that she was neutral.
18     Q.  Neutral --
19     A.  And I was -- he said, "The Dean is neutral on
20  your case."  And I didn't know what to make of it.  I
21  mean, it was the first -- it was the first such
22  discussion and occurrence in my life, in my career.  So
23  I didn't even know what to make of it.  And my
24  understanding was that she wasn't familiar with my
25  publication venue and that once she understands the

117

1  nature, that, you know, they're high-quality
2  publications, then, that would -- she would become
3  positive.
4     Q.  And where did you form that opinion, right --
5  I guess, how did you inform that opinion?
6     A.  It was just my understanding from my
7  conversation with the Chair regarding what concerns she
8  had brought up in that conversation.
9     Q.  Did you -- prior to Dean Wood's assessment
10  letter coming out, did you get any sort of advanced
11  notice that it might not be favorable?
12     A.  No, I never did.  It came as a huge shock.
13     Q.  How did you -- how did you learn that she had
14  written a letter that was -- that said that she didn't
15  believe your performance met expectations for early
16  promotion?
17     A.  I'm sorry.  I'm starting to tear up.
18     Q.  No, that's fine; and if you need to take a
19  moment, please feel free.
20     A.  I had a voice conversation with
21  Professor Tewfik over the phone.  He e-mailed me right
22  after Thanksgiving; and I actually remember that because
23  we had just had a really, really nice family
24  Thanksgiving with my in-laws, with Jimmy's parents.  And
25  his mom had -- his mom, who does energy healing and card

118

1  reading -- card reading and things like that, just for
2  fun, like, I had asked her to do a card reading for me;
3  and she said, "Oh, your daughter ███, is here to
4  help you heal from a loss."  And I was very puzzled
5  because I was really, like, content with my life until
6  that moment.  And I -- and I thought that it meant the
7  loss of my mom, who had passed away many years prior, in
8  2008, and I kind of took it like that; and I didn't
9  think much of it.
10        And shortly after -- right after
11  Thanksgiving, I received an e-mail from Chair Tewfik
12  saying, "I need to speak with you urgently.  What's a
13  good time?"  And I said -- I think he said Tuesday or
14  Wednesday of that week following Thanksgiving.
15        And I said, "Well, I'm available both
16  days.  Wednesday would be preferable, but I'm available
17  both those days."
18        And he said, "Okay.  I'll call you on
19  Tuesday at 9:00 a.m.," or something like that.  I'm not
20  sure if it was 9:00 a.m. or what time.
21        And so we had a phone conversation.  And
22  in that conversation he said, "I'm sorry.  You know, I
23  have bad news for you.  The Dean has written a negative
24  letter for you.  We have to -- we have to find out what
25  it is.  I haven't seen the letter.  You'll need to speak

119

1  to Carmen Shockley to see if you can get hold of the
2  letter so we can see how to address it."
3        Q.  And so what did you do next?
4        A.  I reached out to Carmen Shockley.  I had a
5  phone conversation with her; and I asked her, "What is
6  the process for obtaining the Dean's letter?"
7        And she said, "Just e-mail me and I'll --
8  just e-mail me; and I'll e-mail it back to you as an
9  attachment," which she did.
10        So I immediately forwarded the letter to
11  Ahmed and to my official mentor, Constantine Caramanis.
12  I don't recall if I forwarded it to anyone else.  I may
13  have forwarded it to Brian Evans.  Ahmed at that time
14  had mentioned that Brian Evans was working the CCAFR
15  Committee.  So I thought he may be able to advise me on
16  next steps, I guess.
17        I also reached out to Sanjay Shakkottai;
18  but he said to me, "I'm sorry.  Since I served on the
19  P&T Committee, I cannot further -- I cannot legally --
20  I'm legally bound; and I cannot discuss anything with
21  you.  So please reach out to Constantine."  So that's
22  what I did.
23        Q.  Is that because he presented your case, or
24  do you know?
25        A.  No.  It was specifically because of his

120

1  role -- you mean Sanjay?
2        Q.  Yeah.
3        A.  It was specifically because of his being a
4  member of the P&T Committee.  From what I understand,
5  the P&T Committee had to swear or legally take an oath
6  or something that they would not disclose P&T
7  discussions, something like that.  It was my
8  understanding, at least.
9        Q.  Have you -- or did you speak to Dean Wood
10  about the substance of her letter after it came out?
11        A.  No, I didn't.
12        Q.  Have you ever spoken to Dean Wood about her
13  recommendation?
14        A.  No, I haven't.
15        Q.  I'm going to upload another document, one,
16  thankfully, considerably smaller than the last one.
17  This has already been marked as Exhibit 7.
18        (Exhibit 7 discussed.)
19        A.  I have it open.
20        Q.  (BY MR. DOWER)  Okay.  So it's my
21  understanding that this is a document that you drafted
22  as a rebuttal to Dean Wood's assessment; is that
23  correct?
24        A.  Yes, yes.
25        Q.  Do you remember what -- what led you to draft

121

1  this document?  I mean, obviously, her assessment; but
2  did you -- were you advised that this was a good idea
3  or -- so what's the origin of this?
4        A.  Chair Tewfik had told me that I can do a
5  rebuttal.  I believe Carmen Shockley also told me that,
6  and she told me that I had a deadline of December 15 to
7  submit a rebuttal that would correct any actual,
8  mistakes and so on, and that it would become a part of
9  my promotion file; and it would be considered by the
10  President for the final decision.
11        Q.  And so did you -- and I guess you drafted
12  this between when the Dean's letter came out and
13  December 15th, then?
14        A.  Yes.
15        MR. SCHMIDT:  Ben, I'll mention that if
16  in the next ten minutes or so we could take a break, I'd
17  appreciate that.
18        MR. DOWER:  Yeah.
19        MR. SCHMIDT:  Whatever's a good time for
20  you.
21        MR. DOWER:  No, I appreciate that.  Why
22  don't we just take the break now?  That's fine with me.
23  Let's just break now.
24        MR. SCHMIDT:  All right.  Thank you so
25  much.

122

1    THE REPORTER: We're going off the record
2  at 2:06 p.m.
3    (Off the record from 2:06 to 2:15 p.m.)
4    THE REPORTER: We're going back on the
5  record at 2:15 p.m.
6    Q   (BY MR. DOWER) So after you submitted the
7  rebuttal to Dean Wood's assessment, what was the next
8  thing you heard as far as the tenure process was
9  concerned?
10   A   The next official thing was the president's
11 decision, which I heard around mid-February 2019.
12   Q   And you said the next official thing. So I'd
13 better ask: Was there anything unofficial that happened
14 between those things as far as the tenure process was
15 concerned?
16   A   Sure. I had a conversation with Sanjay
17 Shakkottai where I guess he sort of gave me the
18 opportunity to vent. He knew it was really hard on me.
19 He didn't really say much because he had already told me
20 that he cannot, I guess, say stuff, being legally bound
21 from his role on the P&T Committee. So it was more him
22 letting me vent.
23   And then I reached out to him around
24 January. I believe he told me, also, that there would
25 be time before the President's decision where the

123

1  Department can intervene or somehow kind of submit more
2  support in my behalf. And at some point I e-mailed him
3  and I asked, "Do you think the Department can prepare a
4  petition on my behalf, just to show there's strong
5  support for my case?"
6    And I -- at that point he said, well --
7  I don't remember exactly what he said -- but it was
8  something to the effect that he didn't think a
9  petition -- not he, but he had reached out to a couple
10 other colleagues and they didn't think that a petition
11 would be appropriate, but not to worry because there
12 should be time where, before the President makes the
13 official decision, there would be room for the
14 Department somehow to further advocate on -- on my
15 behalf.
16   Q   And I'm sorry. I lost track of the speaker.
17 Was that Sanjay Shakkottai who said that?
18   A   Yes.
19   Q   Okay. And did you e-mail anyone in the
20 department to see whether they'd be willing to put
21 together sort of a petition or a statement on your
22 behalf?
23   A   I believe I only e-mailed Sanjay and he had --
24 he reached out to, I think, a couple other people, not
25 many. So I didn't -- I don't think I reached out to

124

1  anybody else myself.
2    Q   Did you reach out to anyone else outside the
3  university?
4    A   Yes, I did.
5    Q   Who did you reach out to outside of UT?
6    A   I reached out to two female professors to ask
7  them about gender bias in teaching evaluations and
8  pregnancy bias in teaching evaluations; and those were
9  Professor Amy Grave, I believe, and Professor Andrea
10 Liu. I also reached out to a personal friend of mine
11 who was a professor of economics at Texas A&M, also, to
12 ask her what her experience had been with teaching
13 evaluations while she was pregnant; and she got back to
14 me and told me that she had noticed a dip in her
15 teaching evaluations both times she had been pregnant.
16   Q   Let me go ahead and upload another exhibit. I
17 think we're on 82 now.
18   (Exhibit 82 marked.)
19   THE REPORTER: And may I ask for a
20 spelling while you're doing that?
21   MR. DOWER: It's fine with me, Debbie, If
22 you're asking me; maybe you're not, but...
23   THE REPORTER: Yes.
24   MR. DOWER: Okay. Yes, please.
25   THE REPORTER: I think you said one of

125

1  the professors you reached out to, her first name was
2  Andrea. What was the last name?
3    THE WITNESS: Liu, L-I-U.
4    THE REPORTER: Thank you.
5    THE WITNESS: And I may be off on some of
6  these names.
7    MR. DOWER: Well, the document that I'm
8  uploading may be one of the people you were just
9  mentioning, in which case the document will have the
10 name spelling; but maybe not. Oh, wait. No, this is a
11 UT Austin person. So, no, this would not be one of the
12 outside-of-UT people.
13   A   Okay. I have the -- one -- the -- yeah.
14   Q   (BY MR. DOWER) Okay. So if we start at the
15 bottom, this was an e-mail you sent on November 27th,
16 2018. I'm referring here to the first line
17 chronologically, which is, you know, the bottom one in
18 the thread. Do you see that?
19   A   Yes.
20   Q   And so this is -- this is an e-mail you
21 sent to a faculty member, it looks like, in the -- at UT
22 Austin in the Civil, Architectural and Environmental
23 Engineering Department?
24   A   Yes.
25   Q   And you introduce yourself and explain that

126

1  you've not met; and you say, "I'm trying to gather some
2  data on female faculty at UT who have had -- who have
3  had children during their faculty careers and see if it
4  had an effect on their teaching evaluations.  Would you
5  mind sharing with me if you had children and if you
6  experienced any dip in your teaching evaluations during
7  or after your pregnancy/pregnancies?"  Other than a few
8  stutters, did I read that correctly?
9       A.  Yes.
10      Q.  I'm curious.  If you hadn't met her, how did
11  you identify -- I'm going to butcher the name --
12  Dr. Leite as someone that you might ask this question?
13      A.  I got her name from my Chair, from
14  Professor Tewfik.
15      Q.  Oh, okay.  What did -- what did he --
16      A.  I had --
17      Q.  -- say about her?
18      A.  Yeah, I'm sorry to interrupt you.
19          In one of the conversations we had after
20  we read the Dean's assessment and see that teaching
21  scores were a prominent reason for her decision not to
22  promote me, I remembered a conversation I had with
23  one of the UT faculty members that pregnancy may have an
24  effect on teaching scores, where women who are pregnant
25  may get lower teaching scores themselves, their own

127

1  trends, than if they were not pregnant.
2          And so I shared that with Ahmed.  And
3  because the Dean, you know, made the fairly key point of
4  my lowest teaching score of 3.7; and that occurred while
5  I was pregnant.  And so I just shared that with Ahmed;
6  and Ahmed said, "Well, why don't you reach out to some
7  women and ask them if they experienced it?  Two women
8  that I can think of are Christine Julien from our
9  department and this lady from the Civil Engineering
10  Department, Fernanda Leite."  So he gave me the name and
11  I looked her up and I e-mailed -- I sent her an e-mail.
12      Q.  Did you also reach out to Dr. Julien?
13      A.  Yes, I did.  I sent an e-mail to her.
14      Q.  Do you remember what she said in response; or
15  did she respond --
16      A.  I believe --
17      Q.  -- for that matter?
18          Go ahead.
19      A.  I believe Christine told me she had never
20  heard of this before and that she didn't think she had
21  experienced that herself.
22      Q.  Okay.  And so Dr. Leite responds and says that
23  she was on Modified Instructional Duty -- well, you know
24  what?  I shouldn't paraphrase this.  I should just -- so
25  it says that, "My daughter was born shortly after I

128

1  received news of tenure.  She was born April 2016.  I
2  was on Modified Instructional Duty (MID) in Fall 2016
3  and so went back to teaching when she was nine months
4  old.  Honestly, I did not see any difference in my
5  teaching evals.  The only rough part was restarting with
6  a two-course semester.  It would have been a smoother
7  transition if I'd gone from zero (MID semester) to one
8  course/semester, then back to two."  Did I read those
9  sentences correctly?
10      A.  Yes.
11      Q.  And so then you respond and you say, I --
12  again, I shouldn't paraphrase.  "Many thanks for sharing
13  your experience and thoughts on the issue.  I am not yet
14  doing a full-fledged study, though it may be worth
15  pursuing in the future.  I do for sure agree that the
16  equal modified instructional duty for female and male
17  faculty that is meant to not introduce gender
18  discrimination, actually introduces one.  And great to
19  know that other schools have actually taken this into
20  account and have tried to balance things better."  First
21  of all, just for the record, did I read that part
22  correctly?
23      A.  Yes.
24      Q.  So let me ask you:  When you say that the
25  Modified Instructional Duty for female and male faculty

129

1  that is meant to not introduce gender discrimination
2  actually introduces one, what are you referring to
3  there?
4       A.  I'm referring to the fact that it makes
5  the -- it's -- rather than levelling the playing field,
6  it makes -- it does the opposite.
7       Q.  And how so?
8       A.  By the fact that women who give birth go
9  through a lot of physical, mental, hormonal, emotional,
10  et cetera, changes that men do not go through simply
11  because they do not give the physical birth of a child.
12  Women who give birth, for one, you know, need to be in
13  the hospital giving the birth; but then for a period
14  leading up to and then after, have -- very essentially,
15  you know, similarly to -- you know, they're partially
16  disabled.  They have to be -- let me speak for myself
17  because every woman is different; and we can, of course,
18  talk about the average case.
19          But, you know, I had to be on bedrest.  I
20  was bleeding for a long period of time.  It was an
21  actual physical wound that had to be healed.  I was not
22  sleeping.  I was nursing my child, my baby.  I remember
23  the first two weeks after the pregnancy were incredibly
24  physically strenuous because for the first two weeks I
25  was told that I have to force the baby to nurse.  The

130

1  baby wouldn't naturally nurse, and they basically may
2  not wake up if they are not given proper nutrition.
3        So I had to make the baby eat.  I had to
4  kind of force feed the baby.  I had to force -- wake
5  them up from sleep, and I had to do that every three
6  hours.  And what I learned was that the actual feeding
7  from kind of waking up the baby and preparing to breast
8  feed and so on, until the time they are done taking
9  those few drops of breast milk, takes an hour.
10       And so we were on a -- you know, on a
11 two/one schedule where it's an hour of nursing, two
12 hours off; one hour of nursing, two hours off.  And
13 this goes on 24/7 without any break.  I need to sleep.
14 I need to get that sleep in the -- you know, in the two
15 hours between every...  And that was incredibly,
16 incredibly physically strenuous.
17       It got a little bit easier over time;
18 but, you know, in the process you get -- I got sore
19 nipples where it was terribly painful from the nursing.
20 So I had to kind of balance recovering my nipples with
21 breastfeeding the baby.  It was just so many things.
22 The sleep deprivation was incredible, just exhaustion
23 from the whole process was incredible.
24       My husband always wanted to be very
25 helpful and he would help with whatever he could, with

131

1  diaper changes and so on; but that was not enough.  Even
2  if I didn't do anything else but just nurse, that was
3  incredibly, incredibly physically tolling and not just
4  physically, but mentally and emotionally.  Your whole
5  being is sort of engaged, and my brain -- I don't even
6  know.  I don't know that I really had time to think
7  about what my brain -- what the state of my brain was.
8  You know, maybe one could say it was like mashed
9  potatoes.
10       But I know for sure that my husband
11 didn't have that.  He was able to focus on things.  He
12 was able to read e-mails, and he was able to work during
13 the time.  Whereas, for me, it was really like survive.
14 I was on survival mode without anything else, just
15 taking care of the baby and myself.
16   Q.  Well, first of all, thank you for sharing
17 that; and I know that was a little bit personal and
18 probably not comfortable sharing with a complete
19 stranger.  So I appreciate that, and I just want to
20 acknowledge that.
21       Let me follow up on one piece of this,
22 which is that the Modified Instructional Duty policy
23 discriminates; and I understand what -- you know, I
24 understand your testimony.  I guess my question is:  How
25 does the policy of allowing people not to teach for a

132

1  semester discriminate against women?
2    A.  So it's a basically neutral policy which, on
3  the surface, seems to be -- to seek out equality for men
4  and women; but it does the opposite.  And that may be
5  better understood by an analogy.  So let's take the
6  analogy of handicapped people for whom now, you know, by
7  law, there have to be ramps everywhere.  And let's just
8  take a handicapped person and a healthy, non-handicapped
9  person.  You know, by "handicapped," I mean, like,
10 somebody who has no legs and cannot walk upstairs.
11       So let's imagine that they are both told,
12 you know, "Here is equality for you.  You have to both
13 go up this flight of stairs.  The rules are equal for
14 both of you."  So this is equality.  "Is it fair" is
15 another question, right?  So the question of equity is
16 quite different.
17       So it's quite similar with the same idea,
18 providing essentially equal time off of teaching for
19 female and male faculty.  The female faculty has to
20 actually -- they need the time to physically heal from
21 the process of birth and recover as best they can to be
22 able to, you know, come to a point where they are
23 actually able to work.  Whereas, for the male faculty,
24 it is a much less strenuous.  I mean, they don't need to
25 go through physical recovery except for some sleep

133

1  deprivation and some time with the baby and time
2  changing diapers to whatever extent they do it; but
3  they're able -- my husband was able to work the entire
4  time I was taking to just recover from the pregnancy and
5  caring for the baby.
6        And I know for male faculty -- in fact,
7  one friend of mine told me, a professor at Columbia
8  university, he said for -- "Everyone knows -- everyone
9  knows that the" -- how did he call it -- Parental Leave,
10 because at Columbia it's a leave, not MID.  "Everyone
11 knows the Parental Leave semester is for research only,"
12 as in, they should not be touched for teaching or
13 service or anything else.  And so he just said it as:
14 Of course, duh, it's for research only.
15       And my -- at UT my experience has been
16 different.  I don't know.  I haven't really had the
17 conversation with other male colleagues; but I assume
18 that all male colleagues who had a baby researched,
19 never stopped doing research in the semester their baby
20 was born or the semester they took an MID.  And I would
21 guess that with other -- without other distractions of
22 teaching, they actually were able to focus and do more
23 research, while the female faculty were just trying to
24 survive and get back to a point where they're able to
25 regain the research momentum and carry on.

134

1    Q.  And just to be clear, you don't have any
2  personal knowledge about what male faculty do on, you
3  know, paternity leave at UT, correct?
4    A.  I have not discussed that very question with
5  any of my male faculty, but I could see just from
6  department e-mail exchange that they are active in the
7  semester they have babies.
8    Q.  So you're responding to department e-mails; is
9  that what you're meaning?
10   A.  Yes, yeah; but that's something that I would
11 love to know.  I mean, that's one thing I would love to
12 know is how much male faculty traveled for professional
13 work meetings right after having a baby.
14   Q.  So I guess one question I might ask is:
15 What's the solution?  Should UT abolish paternity leave?
16         MR. SCHMIDT:  Objection, form.
17   A.  Definitely not.
18   Q.  (BY MR. DOWER)  Okay.
19   A.  Definitely not.  So I think it's really
20 important and incredibly positive for men to get MID and
21 for men in general -- there is a trend, I think, in the
22 whole of U.S. which is really for men to receive
23 Parental Leave.  That's incredibly positive, but how
24 much a man gets versus a woman is a different story.
25 For example, if you allow me to read the second half of

135

1  the e-mail from Fernanda, I think there's a really good
2  suggestion there; and this is what I was responding
3  from.
4    Q.  Okay.  So she says, "I know of peer schools
5  that women get two semesters of Modified Instructional
6  Duty and men get one."  Is that what you're referring
7  to?
8    A.  Yeah, may I -- may I read the last couple from
9  where you left off?
10   Q.  Sure, sure.  Go ahead.
11   A.  Yeah.  So she says, "The only rough part was
12 restarting with a two-course semester.  It would have
13 been a smoother transition if I had gone from zero to
14 one, then back up to two.  I feel like women tend to
15 have a rougher transition back than male colleagues who
16 have kids and also take MID.  I know of peer schools
17 that women get two semesters of MID and men get one,
18 which sounds much more reasonable if you actually have
19 to give birth and breast feed/pump."
20         And I wrote back to her in response to
21 that, "I do for sure agree that the equal Modified
22 Instructional Duty for female and male faculty that is
23 meant to not introduce gender discrimination, actually
24 introduces one.  And great to know that other schools
25 have actually taken this into account and have tried to

136

1  balance things better."
2    Q.  Okay.  So it sounds like you're suggesting
3  that one way that universities could avoid the -- the
4  impact that you're hypothesizing where women, mostly
5  because of physiological reasons, are not able to work
6  while they're out on leave and men are, would be to
7  adopt different standards for men and women in terms of,
8  like, leave and things like that.  Is that fair?
9    A.  Correct, yeah.  I feel that -- I strongly feel
10 that men should get MID.  I think that's been really
11 positive in the overall culture in the U.S. for men to
12 start balancing the baby care and household, you know,
13 responsibilities with women.  I think men have
14 overall increased spans of responsibility and duty and
15 desire.  I think many men have the desire to be more
16 closely involved with bringing up their babies.  So I
17 think MID is very critical to be given to men as well;
18 but women having two MIDs versus men having one, I think
19 would be an excellent modification to make the playing
20 field more level, like it's intended to.
21   Q.  All right.  I think we're done with this
22 document, so you can close out of that.
23         Okay.  So then shifting gears back to
24 our -- you know, sort of the timeline, let's go ahead
25 and talk about how -- how did you first learn that

137

1  President Fenvis had decided not to grant you tenure in
2  February 2019?  And I recognize that this may be an
3  emotional topic -- and I apologize -- but, you know,
4  it's central to the case, so we've got to talk about it.
5    A.  I learned -- yeah, no problem.  I thank you.
6         I learned in a phone conversation with
7  Chair Tewfik.
8    Q.  Can you relay that, what that conversation
9  was, just what you can recall of it?  I know it's been a
10 couple of years.
11   A.  I recall that I was at the airport, flying
12 back from a conference.  I had been to a conference in
13 San Diego, giving a presentation; and I was flying back
14 that Saturday morning, whatever the date happened to be,
15 I think around February 16 or 17.  And that Saturday
16 morning the Chair had alerted me.  Had he known the
17 President's decision either the night before or that
18 same morning.  I don't remember.  And we spoke basically
19 Saturday morning, and it was a very short conversation.
20 And he just said, "The President has decided not to
21 promote you.  The President's decision is not to promote
22 you.  I'm very sorry about that."
23         And I said, "Oh, I'm disheartened to hear
24 that."
25   Q.  At that point had you already -- were you

138

1  already aware about the CCAFR process -- I should
2  probably define that acronym.  I know you know what I'm
3  talking about, but let's see.  It's the Committee of
4  Council on Academic Freedom and Responsibility, so
5  CCAFR.  I guess did you already know that there was a
6  possibility to -- to submit a letter to CCAFR, claiming
7  procedural violations?
8      A.  No.
9      Q.  Okay.  When did you learn that that was, you
10  know, something that was a potential option after
11  President Fenvis had communicated his decision?
12     A.  After I had learned of the decision.  I kept
13  hoping the decision would be positive.  I thought -- and
14  multiple people had told me that my rebuttal had been
15  very strong; and I thought that with the facts and the
16  logic presented in my rebuttal and all the detail, that
17  the President's Committee would take it into account and
18  would overturn -- well, I had hoped that the Dean
19  herself would change the recommendation to the
20  President; and I had hoped that the President's decision
21  would be positive.  And I had not taken any steps to --
22  further to prepare in case the decision had been
23  negative.  So it's only after I learned that it was
24  negative that I took steps to inform myself of what I
25  could do.

139

1      Q.  What steps did you take to inform yourself?
2      A.  So I don't remember if people -- if other
3  people reached out to me or if Chair Tewfik told me or
4  if I reached out.  I don't remember who initiated; but,
5  basically, I was -- I started a dialogue with professor
6  Brent Evans, who was the Chair of CCAFR; and he was very
7  knowledgeable.  And he informed me there were four -- I
8  believe he said four different processes, two of which
9  were submitting a request to the CCAFR committee; and
10  another was submitting a final argument document to the
11  President.  The other two, I think, one was submitting a
12  grievance and maybe a grievance with -- I don't remember
13  the other two.  I just felt that out of the four, the
14  two that I opted for were the more likely to help.
15     Q.  And so -- well, I guess, since we're talking
16  about it, let me just go ahead and upload both your
17  letter to CCAFR and the Request for Reconsideration.  If
18  you haven't noticed, I'm a big fan of showing documents
19  if we're going to talk about them.  I just think that
20  that's fair, so.
21         All right.  Let me see here.
22     A.  I'm downloading.
23     Q.  Yeah, yeah, take your time.  I wanted to make
24  sure neither of these had exhibit stamps already, and I
25  don't believe they do.

140

1         (Exhibit 83 marked.)
2      Q.  (BY MR. DOWER)  Okay.  Were you able to
3  download these?
4      A.  Yes, I'm saving the second one.
5      Q.  Yeah, take your time.
6      A.  I have both now.
7      Q.  Okay.  Let's -- I guess let's start with the
8  CCAFR letter, which means that that one will be
9  Exhibit 83; and the Request for Reconsideration will be
10  Exhibit 84.
11         So -- oh, shoot I uploaded the wrong --
12  wait.  Did I upload the wrong one?  Hang on.  Sorry.
13  Let me see.  Did I upload the -- no, I -- no, I didn't.
14  Okay.
15         Okay.  So the Nikolova letter to CCAFR is
16  dated March 15th, 2019 [sic], correct?
17     A.  Yes.
18     Q.  Okay.  And so this is the letter you put
19  together to submit to CCAFR in an attempt to -- to
20  appeal the denial of your tenure and promotion; is that
21  right?
22         MR. NOTZON:  I think you said March 15th;
23  but it's the March 25th, right?
24         MR. DOWER:  Oh, if I misspoke, I
25  apologize.  Yeah.  Sorry.  March 25th.  Thanks -- thank

141

1  you, Robert.
2      Q.  (BY MR. DOWER)  Yeah.  March 25th, correct?
3      A.  Yes.
4      Q.  Okay.  Can you tell me, when you were
5  preparing this document, who did you work with in
6  drafting this?
7      A.  I --
8         MR. SCHMIDT:  I'm going to jump in
9  real quickly.  She can answer this question, but should
10  not --
11         MR. DOWER:  Oh, not attorneys.  I'm not
12  asking about attorneys.
13         MR. SCHMIDT:  Yeah, it's going to come
14  out that I think she worked with an attorney on this.
15         MR. DOWER:  Oh, I didn't know that.
16  Sorry.
17         MR. SCHMIDT:  That's all right.  And I'm
18  just going to ask her not to reveal attorney-client
19  privilege.
20         MR. DOWER:  Okay.
21     Q.  (BY MR. DOWER)  So without disclosing any
22  communications you may have had with any attorneys, who
23  did you work with in preparing this?
24     A.  I -- I don't think that anyone helped me --
25  anyone from my colleagues at UT helped me with this

Evdokia Nikolova - 6/29/2021

142

1  draft.  I had hoped that Brian Evans would help me
2  because he had been very helpful during the rebuttal,
3  during -- preparing my rebuttal, I had sent multiple
4  versions and he had commented on them and helped with
5  language and so on.  And so I had kind of hoped for a
6  similar exchange with him here, but I think he had
7  become really busy.
8        And I, myself, had become very busy
9  because I was on a very short deadline.  There was a
10  huge amount of material to sort of assemble and so on.
11  And so I don't -- I don't recall anyone helping me on
12  the draft, per se.  I did, however, have some discussion
13  with Ahmed Tewfik, with Professor Tewfik, and possibly
14  with -- and with Brian Evans, outside of these
15  documents, as I was preparing it.
16        I think Professor Tewfik had advised me
17  that in order to appeal this, in order to have a strong
18  appeal, I needed to find a comparator in the School of
19  Engineering that has a worse record than mine that had
20  attained tenure recently.  And I had managed to find
21  such a comparator.  That was Dr. Zoya Heidari.  And I
22  shared that both with Brian and with Ahmed, and they
23  both thought it was a perfect case to compare.
24    Q.   And Zoya Heidari is in the -- is it the
25  Geosciences Department?

143

1    A.   She's in Petroleum Engineering.
2    Q.   Thank you.  Petroleum Engineering.
3        Okay.  And this -- this is going to sound
4  obvious; but Zoya Heidari is a woman, correct?
5    A.   Correct.
6        (Exhibit 84 marked.)
7    Q.   (BY MR. DOWER)  And then referring now to
8  Exhibit 84, the Request for Reconsideration, did -- so
9  this was addressed to President Fenvis directly,
10  correct?
11    A.   Correct.
12    Q.   And did you have any understanding at the
13  time that only a terminal appointment could -- could --
14  would -- let me start over.
15        Did you have an understanding at the time
16  that a Request for Reconsideration of a tenure decision
17  was only available if it was a terminal appointment?
18        MR. SCHMIDT:  Objection, form.
19    A.   No.
20    Q.   (BY MR. DOWER)  Okay.
21    A.   Brian Evans had advised me on the contrary.
22    Q.   Okay.  So Brian Evans had advised you that you
23  could submit a Request for Reconsideration in your
24  situation?
25    A.   Yes.

144

1    Q.   I want to sort of take a step back and talk
2  big picture.  In -- in this lawsuit you are suing UT for
3  discriminating against you with regards to the tenure
4  decision that we've been just talking about, correct?
5    A.   Correct.
6    Q.   And, specifically, you're suing UT for both
7  sex and pregnancy discrimination, correct?
8    A.   Correct.
9    Q.   And so part of my job is making sure that I
10  understand, you know, what -- what -- where you're
11  coming from, for lack of a better word, with regards to
12  these accusations.  And so for the tenure decision
13  specifically, which -- which UT employees are you -- do
14  you believe acted with intent to discriminate against
15  you based on your sex?
16        MR. SCHMIDT:  Objection, form.
17    A.   I do not understand the phrasing of "intent to
18  discriminate."  I feel that I cannot comment on the
19  intent.  Does that make sense?
20    Q   (BY MR. DOWER)  Okay.  Well, let me -- yeah,
21  let me try to explain myself a little bit better or
22  break this down.  In -- one of the allegations in this
23  case is that there are facially neutral policies that
24  have the effect of discriminating, such as what we were
25  just talking about a little while ago, Modified

145

1  Instructional Duty; it's facially neutral, but the
2  burden falls more heavily on women.  Do you remember we
3  were just talking about that about 30 minutes ago?
4    A.   Yes.
5    Q.   Right.  And so what I'm trying to do when I
6  say "intent to discriminate," I'm trying to distinguish
7  from that part of the case, to hone in on the -- the
8  allegation that UT Austin acted with intent to
9  discriminate against you based on sex with regards to
10  the tenure decision; but maybe I should take a step
11  back.  I mean, do you believe that the decision not to
12  give you tenure in 2019 was motivated in whole or in
13  part by you being a woman?
14    A.   Yes.
15    Q.   Okay.  And so what I'm trying to ask is:  With
16  regards to that, do you have specific people at UT
17  Austin at the time that you believe acted with that
18  intent?
19        MR. SCHMIDT:  Objection, form.
20    A.   If I may rephrase, what I feel happened is
21  that there are people who discriminated against me on
22  the basis of my gender and pregnancy, yes.
23    Q   (BY MR. DOWER)  Okay.  And so with regards to
24  the tenure decision, who do you believe -- who are those
25  people is what I'm trying to ask.

146

1  A.  So some of the people, I believe, are
2  Professor Ahmed Tewfik, Dean Sharon Wood, and
3  President Fenvis, possibly the president's committee.
4  Q.  And are those -- is that the same people if we
5  said pregnancy instead of sex?
6       MR. SCHMIDT:  Objection, form.
7  Q.  (BY MR. DOWER)  I'm just trying to figure out
8  is the list --
9  A.  The same people -- same people would come to
10  mind, yes.
11  Q.  And so for Professor Tewfik, why do you
12  believe that your -- that his behavior with regards to
13  your tenure decision was motivated by sex?
14  A.  So I -- I can list, I guess, several examples
15  that come to mind at the moment; and I may make a chunk.
16  But one is I feel that he kept changing metrics for
17  evaluating me.  Another is that -- if I may ask for
18  clarification, are we speaking about my knowledge as of
19  right now or my knowledge back then, when I first
20  submitted the complaint?
21  Q.  Let's say now.  Let's just say now.
22  A.  So in his deposition from March of this year,
23  he stated that I had initially been excellent when I was
24  hired -- and I'm paraphrasing -- and that afterwards, I
25  had essentially stopped being excellent, something to

147

1  that effect.  And he was asked what happened, and he
2  said that I formed a family.
3       He also said that if I had -- if I had
4  been a man, my vote from the Department for my tenure
5  case would not have been as strong.  He said either that
6  or that it was only strong because I was a woman.  He
7  said something to that effect.
8  Q.  Anything else for Dr. Tewfik?
9  A.  Yes.  Going back and reviewing -- going back
10  and reviewing the letter he wrote for my tenure case and
11  the letter that he wrote for Professor Mohit Tiwari, who
12  was considered for tenure in the same cycle as me and
13  who was given tenure, he gave Mohit the lowest teaching
14  scores, had been lower than mine.  He had a teaching
15  score of 3.5 and a teaching score of 3.8 versus my
16  lowest being 3.7 and 3.9.
17       So Mohit's lowest teaching scores were
18  strictly lower than mine; and Professor Tewfik, in the
19  teaching part of the letter, was largely -- easily
20  dismissed the negative and was largely positive.  And
21  when he mentioned the teaching score of 3.5, he
22  immediately offered -- sort of explained it away,
23  offering -- what's the word now -- an extenuating --
24  extenuating circumstances that one score was low because
25  the survey scores were submitted electronically instead

148

1  of on paper.  And another low teaching score was because
2  he had been having visa issues and missed a few
3  lectures; he had not been able to come back to the U.S.
4       For me, the teaching section, which had
5  higher worth teaching scores, alternated -- and this is
6  something that only -- I saw only now; I hadn't actually
7  noticed it earlier.  It kind of alternated positive,
8  negative.  For the positive, he always gave a negative.
9  So it was sort of -- kind of -- it was very meek.
10       And, for example, he gave -- he wrote
11  about one line of positive student comments; and it was
12  followed by two lines of negative student comments as
13  examples.  And this is to contrast with what I know from
14  my rebuttal in reviewing the student comments that the
15  majority of the student comments I had received were
16  positive; but he did not reflect that in his statement.
17  Rather than writing maybe two lines of positive and one
18  line of negative, he swapped that around.  So he chose
19  to emphasize the negative more, much more strongly.
20       In his -- and he never, for the score of
21  3.7 that I received, he did not offer the very major
22  extenuating circumstance that I had been pregnant and
23  teaching two courses at the same time, where he
24  specifically -- not he -- the Dean specifically said
25  that Mohit received his lowest score while teaching the

149

1  highest number of students.  Such an explanation was not
2  offered at all for, you know, the discussion of my
3  teaching score.
4       Afterwards, in interviewing the research
5  section of Ahmed's letter for me and Ahmed's letter for
6  Mohit, first of all, it seems to be common knowledge
7  that the longer a letter is, the better it is for the
8  candidate, just purely lengthwise.  So --
9  Q.  What makes you say that?
10  A.  It's from firsthand knowledge when I have
11  reviewed other candidates and hearing discussions of
12  others, if a letter is short, even if the letter states,
13  "I strongly support," it is not viewed as strong as a
14  letter which has a lot of detail.  So a four-page letter
15  is better than a two-page letter and so on.  So this is
16  just general knowledge.  And so reviewing that --
17  Q.  Hang on.  When you say "general knowledge,"
18  I'm a little -- I guess I'm surprised to hear that.  For
19  Dean letters, specifically, or for any sort of external
20  review?
21  A.  No, no, external review.
22  Q.  Okay.
23  A.  External review.  And in that case, I saw it
24  for Ahmed's letter.  So if you like somebody, you just
25  tend to go on and on and on and on about what you like

150

1  about them.  And maybe if you don't like them as much,
2  the letter is shorter.  You don't really -- that's what
3  I've heard and it's consistent with what I have read and
4  sat in committees evaluating other candidates for
5  faculty and so on.  And so --
6      Q.  Wait.  Have you ever sat in on a -- go ahead.
7      A.  -- it just struck me --
8      Q.  Go ahead.  I didn't mean to interrupt.  That
9  was rude.  Sorry, go ahead.
10     A.  It just struck me that the research section
11 that Ahmed wrote for me, in his letter for me, was about
12 one page and three quarters; whereas, for Mohit, it was
13 over two pages.  And I specifically remember one of the
14 words he used in his assessment of Mohit's research is
15 the word "brilliant."  He had this brilliant insight
16 about this or that; and in my letter, the words used
17 were much more toned.  It was like "interesting" or
18 something like that.  I don't really remember the
19 language; but, for sure, it was nothing like at the
20 level of brilliant.
21          And then for service, similarly, there
22 was a much longer section for Mohit than for me.  So for
23 me it was maybe three lines, and for Mohit, maybe six
24 lines, just giving an approximate count.  And for Mohit,
25 the service was "excellent" or "outstanding" or whatever

151

1  the word was.  He just went on and on raving about
2  Mohit's service.  And for mine, it was -- I think he
3  assessed Mohit's service as excellent and mine as, I
4  believe, "reasonable" was the word he used and below the
5  average for assistant professors.  And that struck me as
6  unfair.  It was not based on explicit metrics.
7      Q.  Is it --
8      A.  I don't know -- yeah.
9      Q.  Is it possible that Mohit Tiwari just had
10 better service to the department based on metrics that
11 are not easily measured?
12     A.  I would have to -- you're asking a loaded
13 question.  It's a question that's really at the heart of
14 discrimination, metrics that are not easily measured.
15     Q.  So is it your testimony that there are only
16 two types of metrics, the ones that are easily measured
17 and the ones that discriminate?
18     A.  No.
19     Q.  Okay.  So it is possible for something to be
20 difficult to measure but not discriminatory?
21     A.  Okay.  That's a complex question.  I would
22 need to hear it one more time.
23     Q.  Sure.  So I'm trying to understand the
24 dichotomy that you're presenting, and I just want to
25 clarify that it is possible for something to be

152

1  difficult to quantify but, nevertheless, non-
2  discriminatory?
3      A.  I am -- I feel that I'm not an expert to
4  answer this question.
5      Q.  Okay.
6      A.  I feel it's a complex question.
7      Q.  Okay.  Anything else for Professor Tewfik that
8  comes to mind for a reason that you believe that he
9  discriminated on the basis of sex?
10     A.  Yes.  He -- I know that the year before me,
11 there had been a tenure case for a male professor who
12 ultimately had not received tenure, but he had been
13 granted conditional tenure; and initially the Dean had
14 written a negative assessment and the President
15 initially had written -- had given a negative decision.
16 And I know from hearsay that Ahmed had gone out of his
17 way to fight for that case.
18          He -- he -- from what I know, he
19 didn't -- he was immensely crushed, immensely sad.  He
20 really liked that male colleague and he really wanted
21 him to succeed and he did everything he could to help
22 him succeed.  And he succeeded in reversing the negative
23 President's decision to a conditional.
24          Whereas, in my case, I feel that not only
25 he didn't go out of his way to fight it; but I feel that

153

1  he actually took actions to sabotage the ultimate
2  possible change of the tenure decision.
3      Q.  What actions do you feel he took to sabotage
4  you?
5      A.  He was prompted -- he was requested by at
6  least two colleagues, maybe even three, that I'm aware
7  of, to hold a department-wide meeting to discuss my
8  case.  A lot of people had after the decision had
9  voiced to me that they were very unhappy with the
10 decision.  Many were very puzzled and confused.  And at
11 least two or three people had asked for a
12 department-wide meeting to discuss my case to better
13 understand the details on what happened and on what they
14 could to reverse the President's decision.
15          And I became aware of an e-mail exchange
16 between Ahmed and Associate Dean Speitel, where he was
17 urged not to hold a large unified meeting and to sort of
18 divide and conquer.  And so he never held such a
19 meeting, despite multiple requests; and, instead, my
20 case was -- for the discussion -- the discussion was
21 suppressed.  He kept them in separate factions and in
22 separate groups from the department.  So no one really
23 ultimately could understand yet, to learn all the
24 details.
25     Q.  And so you believe by meeting with people in

154

1 small groups, that that was sabotaging your tenure case
2 with the President?
3    A.  Yes.
4    Q.  With regards to pregnancy discrimination, is
5 there anything that you would add to the list for Tewfik
6 that we haven't already talked about?
7    A.  Yes.
8    Q.  Okay.  What was that?
9    A.  I just remembered -- yeah.  Sorry.
10    Q.  No.  Go ahead.
11    A.  Yeah, I just remembered that reviewing my
12 faculty annual review from all the past years, I
13 realized that there was a pattern.  It has -- it seemed
14 to be the norm for the majority of the faculty to
15 receive an annual review of exceeds expectations.  There
16 are three possible ratings:  Exceeds expectations, meets
17 expectations, or do not meet expectations.  And in
18 multiple years, every single assistant professor
19 received the rating of exceeds expectations except for
20 me during -- precisely during the years when I had a
21 baby.
22    Q.  I'm sorry.  During the years when you
23 precisely -- I just didn't hear you.  I apologize.
24    A.  During the years when I had a baby.
25    Q.  Which year was that?

155

1    A.  I may give the years wrong, but I believe it
2 was in the year 2015-'16 and then again in the year
3 2018-'19 and then again in the year 2019-2020.
4    Q.  So you gave birth to your second child in June
5 of 2018, correct?
6    A.  Correct.
7    Q.  And it's your understanding that you didn't
8 get an "exceeds expectations" for that year?
9    A.  Yes, we just need to be careful.  June of 2018
10 falls outside of the nine-month academic year.  And I
11 believe that I received a "meets expectations" for the
12 year in which -- for the academic year in which I took
13 the MID for the birth of my child, and that was the
14 academic year of 2018-2019.
15       And then, related to that -- I'm sorry
16 for speaking without being asked -- but related to that,
17 another discriminating action was that I received lower
18 salary raises; and I ended up being among the lowest-
19 paid assistant professors in the department.
20    Q.  Okay.  Well, let's just focus in on the tenure
21 for now.  Anything you would add for Dr. Tewfik for
22 reasons that you think that he discriminated against you
23 with regards to the tenure process that we haven't
24 already discussed?  I'm just making sure that we've
25 covered everything.

156

1    A.  I cannot think of anything else right now.
2    Q.  Okay.  If something occurs to you, just let me
3 know.
4       Okay.  Well, let's move on then to
5 Dean Wood.  Why do you believe that Dean Wood was
6 motivated by sex or pregnancy with regards to the tenure
7 decision?
8    A.  So there are -- there is sex in her assessment
9 that led me to the conclusion, to this belief --
10    Q.  Okay.  Let's -- let's pull it up real --
11 sorry.  Go ahead.
12    A.  And there were --
13    Q.  I was going -- go ahead.
14    A.  And there were events outside of the letter
15 that also may have contributed.
16    Q.  Okay.  Let's do the letter first, and then
17 I'll follow up and ask you about those events.  Now, I
18 believe her letter is included in the big dossier, which
19 is Exhibit 39.  So if you go to that document that we
20 already looked at and go to the second page, it has her
21 assessment on there.
22    A.  I have it, yeah.  I have it in front of me.
23    Q.  Oh, that was -- that was quick.
24       Can you point me to the part of this
25 document that you believe -- to you is evidence of

157

1 pregnancy discrimination or sex discrimination?
2    A.  Yes.  The first -- the first occurrence is the
3 table that you see in the first page of her letter.
4    Q.  Okay.  I'm looking at it.
5    A.  The table -- to me, the mere existence of such
6 table speaks to a potential pregnancy discrimination or
7 intent.
8    Q.  How so?
9    A.  The table, first of all, looking through other
10 tenure candidates, I did not see such a table for
11 anybody, the others being male or women who have not
12 become pregnant.
13    Q.  You don't believe that the table is there to
14 show that you'd been in rank for a long period of time,
15 like, if you include Texas A&M?
16    A.  No, definitely not.
17    Q.  Okay.  Why not?
18    A.  Because there are other candidates who had
19 gone up for promotion with prior experience and there
20 was no such table for them and it was simply a
21 sentence --
22    Q.  Okay.
23    A.  -- of how they had been at a prior institution
24 and what their total time in rank is.  For example, Alex
25 Dimakis; for example, Zoya Heidari, and others.

158

1   Q.  Okay.  So the table --
2   A.  The table --
3   Q.  Go ahead.
4   A.  -- in 2015-2016 Modified Instructional Duties,
5   so it brings that center -- front and center:  She had
6   been pregnant.  Let's see what happens.
7   Q.  It doesn't say anything about --
8   A.  That is how -- that is my interpretation.
9   Q.  Okay.  So when you see Modified Instructional
10  Duties, to you, that signifies a pregnancy
11  discrimination?
12  A.  It calls attention to pregnancy; and if we go
13  further -- well, I think we can agree on the fact that
14  it lists -- it lists Modified Instructional Duties front
15  and center, right?  And so afterwards, when she goes
16  into her teaching assessment for me at the bottom of the
17  first page and beginning of the second page of her
18  assessment, she says, "Dr. Nikolova did not teach during
19  the 2015-'16 academic year, and since then her
20  instructor ratings have fallen."
21          There is a footnote, Footnote 1, in the
22  middle of the sentence.  And the footnote says:  She
23  participated in the Economics and Computational workshop
24  at the Simons Institute of Computing at UC Berkeley
25  during the 2015 Fall Semester and was scheduled to teach

159

1   two classes in the 2016 Spring Semester.  However, she
2   became pregnant during the 2015 Fall Semester and was
3   assigned Modified Instructional Duties during 2016
4   Spring Semester."
5          So, to me, that footnote, together with
6   the sentence, is making a case that my performance has
7   dropped specifically here, referring to my instructor
8   ratings, the student/teaching course.  They have dropped
9   since the time I have a baby.
10  Q.  Anything else in this letter that you believe
11  is evidence of pregnancy discrimination or sex
12  discrimination?
13  A.  Yes.
14  Q.  Okay.  What else?
15  A.  She -- well, two more things that are obvious.
16  One is on the grant, which is one of her two chief
17  complaints and one of her two theories for denying
18  promotion.  She says, "Only one" -- "While Nikolova" --
19  okay.  So this is the beginning of page 3 of her letter.
20  It says, "While Dr. Nikolova's external funding has come
21  from highly competitive sources, approximately 70
22  percent of her funding was awarded during her first
23  three years in rank.  Only one grant has been awarded in
24  the past four academic years."
25          So the mention of the past four academic

160

1   years includes the 2015-2016 probationary year, which
2   would not have been counted.  So she went -- when she
3   says, "Only one grant has been awarded in the past four
4   academic years," it sounds for sure worse than if she
5   had said, "Only one grant has been awarded in the past
6   three academic years."
7   Q.  Okay.  So it's not that you just --
8   A.  So it's magnified --
9   Q.  Okay.  Sorry.  Go ahead.
10  A.  Yeah.  It sort of magnifies the way -- the
11  negative impact of that sentence.
12  Q.  Do you -- yeah.  No, I follow.
13          Do you disagree with the accuracy of the
14  statement that only one grant had been awarded in the
15  past four academic years?
16  A.  I spoke to the -- yes, in part.  I spoke to
17  the -- in my final argument and in my CCAFR appeal, I
18  felt that a correction is needed and an explanation is
19  needed to that.  One of my earlier grants that was part
20  of the 70 percent funding was the NSF Career Award,
21  which was a grant that was -- so the notification came
22  in those first three years, came in 2014; but the actual
23  money arrived in five annual installments over five
24  years.  So even if I had wanted to use up all of that
25  money early on, it was not available.  So I received

161

1   that money -- it was about half a million -- so I
2   received about 100K each of five consecutive years.
3   Q.  Okay.  So it was --
4   A.  For the purpose of accounting, I felt this was
5   incorrect.
6   Q.  Okay.  So you -- it was -- the decision was
7   made to appropriate that funding earlier than four
8   academic years ago; but the funding itself was paid out
9   in annual installments.
10  A.  Correct.
11  Q.  Okay.
12  A.  And another really important point if I may --
13  Q.  Go ahead.
14  A.  -- was introducing a metric that I had never
15  been told of by my Chair or anybody else, a new metric
16  on my tenure evaluation, which is some sort of pace of
17  obtaining grants or a rate of obtaining grants.  So no
18  one had ever told me of this metric before.  No one
19  said, "Oh, you need to be sort of careful that your
20  funding comes in at equally-spaced out time, you know."
21  So no one had ever mentioned that to me before.
22          What I had heard was from my colleague,
23  Professor Alex Dimakis, who was given tenure after just
24  one and a half years at UT, being four years early.  He
25  was aiming to get over one and a half million dollars in

162

1  grants total.  So I felt I had that as well, and so I
2  felt I had matched it.
3          Also, Tewfik had never spoken about sort
4  of a pace of grants, obtaining grants, like the way it's
5  mentioned here.  And Chair Tewfik, when he first saw her
6  assessment, his reaction was, "Oh, she's playing the
7  same game here as she did last year for Professor Jang,"
8  who had ultimately been denied tenure.  He said, "She's
9  playing the same game as last year."  I didn't know
10 enough details about Professor Jang's case; but my
11 understanding was that she had made the case that Jang
12 had not obtained enough grants later on in his career,
13 as opposed to earlier on.
14     Q.  Anything else in this letter that, to you, is
15 evidence of sex discrimination or pregnancy
16 discrimination?
17     A.  Yes.
18     Q.  Okay.  What else?
19     A.  The fact -- the fact that she called my case
20 early and she specifically called it two years early.
21 So this is the last page of her assessment.  She
22 says, "If this were an up-or-out case, I would
23 likely agree with the recommendation of the Promotion
24 and Tenure committee," namely, to promote me.  "However,
25 Dr. Nikolova is being considered for promotion at UT

163

1  Austin two years early."  And she clarified later in her
2  CCAFR responses, as well as, I believe, she stated
3  something to that effect in her deposition in March of
4  this year, that she was following some rule of thumb
5  that the earlier the candidate is, the higher the bar
6  for promotion and tenure.  And she had specifically
7  stated, I believe to CCAFR, that two years -- the bar
8  was higher for two years early than for one year early.
9          And in my case, the second year early was
10 specifically for taking that pregnancy extension, very
11 specifically a higher bar because of me having taken a
12 pregnancy extension.
13     Q.  And when you say "pregnancy extension," you're
14 referring to the probationary year?
15     A.  Yeah.
16     Q.  Okay.  Anything else while we're looking at
17 this document right now that, to you, signifies
18 evidence of sex discrimination or pregnancy
19 discrimination?
20     A.  So I -- I'm thinking of one episode which may
21 or may not be evidence, but it may provide context --
22     Q.  Okay.  Go ahead.
23     A.  -- or show intent.
24     Q.  Go ahead.
25     A.  The ECE Department moved to a new building;

164

1  and it was, I believe, around summer, late summer or
2  fall of 2017.  A new building was built, and we moved
3  from our temporary building to that new building.  She
4  issued a memo that no furniture is to be changed in the
5  faculty offices; and, specifically, faculty were
6  prohibited from bringing in their personal furniture,
7  such as, sofas or personal fridges.
8          And that struck me as imposing a
9  difficulty on women faculty who may have a baby and are
10 breastfeeding who need to store breast milk in a
11 personal fridge.  And I raised it with Chair Tewfik in a
12 meeting with other faculty.
13         He said, "Oh, good point, Evdokia.  Thank
14 you.  I'll relay that to the dean."  And the next thing
15 we heard was that personal fridges were now allowed for
16 use in everybody's offices.  And so I don't know what
17 interactions or conversations he had with Dean Wood; but
18 being the only women assistant professor at the time and
19 the only woman having recently had a baby at that time,
20 she must have known where that came from.  And it may
21 have angered her.  I don't know.  It may have been seen
22 as challenging her authority.
23         So this is one of the first things that
24 came to my mind when I first learned of her negative
25 decision because I just couldn't understand why she had

165

1  been so negative against me.
2     Q.  So just to be clear, though, she did change
3  the policy to allow people to keep their refrigerators,
4  right, which was what your suggest was, wasn't it?
5     A.  Correct.  That doesn't exclude the possibility
6  she may have felt unhappy about having to go back on her
7  own words.
8     Q.  Do you -- did anyone ever tell you that she
9  was unhappy about it?
10     A.  No.
11     Q.  And you've never spoken to her about it,
12 correct?
13     A.  Correct.
14     Q.  Any other events -- well, first of all, is
15 there anything else in this document that we haven't
16 talked about that, to you, speaks to sex or pregnancy
17 discrimination?
18     A.  Yes.  You would like me to list?
19     Q.  Oh, yeah.  I'm sorry.  I'm asking what it is.
20 Yeah.
21     A.  So I felt I -- I wrote very long documents in
22 the rebuttal and subsequent appeals to CCAFR and final
23 arguments explaining, but I'll try to recap again here.
24 I felt that the assessment basically minimized my
25 positive accomplishments, which I thought were the

166

1  majority of my tenure case, and tried to pick out or
2  even create negative things that could be construed
3  negatively.  So in that sentence it was the opposite of
4  a holistic assessment.
5          Specifically, when speaking about my
6  teaching, it was overwhelmingly negative.  It did not
7  mention any positive student comments.  It did not
8  mention the positive peer teaching reviews that I had
9  received; and, instead, it just tried to really focus on
10  the few negative things that she could find.
11          And, to me, I felt that it had been
12  written that she -- she reached her -- she made her
13  decision first -- I don't know how -- and then just
14  tried to go back and pick evidence, use as evidence to
15  support her negative recommendations.
16          Similarly, for service, I feel that my --
17  she, herself, admitted in her deposition that she had
18  overstated the negative statement that she made for my
19  service records when she said at the bottom of page 3 of
20  her assessment that, "However, her teaching record is
21  modest and the Budget Council expressed concerns about
22  her relatively weak engagement in the department."
23          So she, herself, agreed that she
24  overstated this -- the Budget Council expressing
25  concerns with -- essentially, seeking out a comment that

167

1  Ahmed had put in his letter for me, which I also felt
2  was unfounded; namely, that a couple of faculty members
3  had expressed concerns about my service and my
4  participation.  And nobody was in the teaching group
5  that I am aware of.
6          So she decided to just pick that negative
7  thing and include it in her overall assessment as
8  opposed to offering an objective and balanced
9  representation of my service and in direct contrast with
10  the Budget Council's statement on my service, which was
11  written in objective records, stating all my different
12  service engagements and stating that my service exceeds
13  the expectation for an assistant professor.
14      Q.  What about events outside this letter?  Are
15  there any other events outside this letter that, to you,
16  evidence intent to discriminate on either sex or
17  pregnancy for Dean Wood specifically?
18      A.  Yes.  I -- I feel that if she had truly wanted
19  me to succeed and to help, she would not have gone about
20  it this way by writing completely out of the blue,
21  unexpected, to my colleagues in my department and, I
22  gather, the Promotion and Tenure Committee that had
23  voted unanimously for my case.  She just went against
24  all the levels under her, promoting against my
25  recommendation.

168

1          If she had truly wanted me to succeed,
2  she would have given me a warning somewhere along the
3  way before reaching that final, formal, and very
4  damaging stage.  She easily could have reached out.
5          I mean, back in the Spring she could have
6  told Ahmed, "No, she should not go up early because our
7  bar will be higher risks."  If she had given a negative
8  recommendation at that time, I would have listened; and
9  I would have waited for another year so that I'm not
10  considered early.  She never in the process reached out
11  to me; and as I understand, she did not reach out to
12  Ahmed to just say, "Stop," before it got to be too late
13  in the late stage in the formal tenure review.
14      Q.  Okay.  Let's talk about Greg Fenves.  Why do
15  you believe that Greg Fenves, in making the tenure
16  decision, was motivated by sex or pregnancy?
17          MR. SCHMIDT:  Objection, form.
18          MR. DOWER:  What's the basis, Bob?  Do
19  you want me to split it up?
20          MR. SCHMIDT:  No.  I think it just calls
21  for speculation and perhaps calls for a legal
22  conclusion.  It may not be the greatest objection, but
23  that's my objection.
24          MR. DOWER:  Okay.
25      Q   (BY MR. DOWER)  All right.  Dr. Nikolova,

169

1  sorry.  Go ahead -- or, in your opinion, from your
2  perspective, you know, why do you believe that Greg
3  Fenves discriminated against you with regard to the
4  tenure decision on the basis of either sex or pregnancy?
5      A.  And if I may -- before I get to answering the
6  question, if I may request for a break sometime in the
7  next ten minutes.  We've been going --
8      Q.  Okay.
9      A.  -- for a while.
10          So why -- why I believe Greg Fenves
11  discriminated on the basis of gender and pregnancy.
12  There is, unfortunately, no written record regarding the
13  President's Committee deliberations during the tenure
14  decision that was reached in mid-February on my case.
15  The only thing I can go by from that is the notification
16  I received from the Dean, which stated that the
17  President's decision was reached based on concerns with
18  teaching and funding, mainly because of the concerns she
19  had expressed in her letter.  In other words, the
20  President sided with her decision and just upheld her,
21  took the recommendation to base his final decision on.
22          At that time he may have been aware that
23  I had raised concerns of gender bias or pregnancy bias.
24  I do not have evidence regarding that.  So he may -- he
25  may have known that already; and so the decision, that

170

1  decision from February, may have come in part due to
2  discrimination and retaliation.
3        Later, from the written evidence that we
4  have, we know that he received an e-mail around the time
5  of final arguments when he could have reversed his
6  decision based on the details, objective evidence that I
7  had presented in final arguments.  He had received an
8  e-mail from one of my senior colleagues, Mattan Erez,
9  telling him that a similar situation had arisen.  One
10 previous time a woman had gone up in the ECE department
11 in the five or so years -- I think it was about five
12 years prior to my case -- and that there had been
13 suspicion about gender and pregnancy discrimination
14 about her case; and that if the same was found for mine,
15 the consequences for the department would be chilling.
16   Q.  Who sent --
17        (Simultaneous speakers.)
18   Q.  -- sent that e-mail?
19   A.  It came from Professor Mattan Erez.  The first
20 name is spelled M, like Mary, A, T, like Tom, T, like
21 Tom, A, N, like Nancy; and the last name is spelled
22 E-R-E-Z, zebra.
23   Q.  Do you remember --
24        (Simultaneous speakers.)
25   Q.  Go ahead.

171

1   A.  I'm sorry.  I'm sorry.  You go ahead, please.
2   Q.  I haven't seen this e-mail.  So do you
3  remember when it was sent?
4   A.  This was sent around April of 2019, around the
5  time that the President was scheduled to consider final
6  arguments for various candidates that had submitted
7  them.
8   Q.  Okay.  So you think it was sent somewhere
9  around April of 2019?
10  A.  I believe so.
11  Q.  Okay.
12        MR. DOWER:  All right.  Well, you had
13 requested a break; you're right, we've been going long.
14 So let's take a break.
15        THE REPORTER:  We're going off the record
16 at 3:47 p.m.
17        (Off the record from 3:47 to 4:05 p.m.)
18        THE REPORTER:  We're going back on the
19 record at 4:05 p.m.
20   Q   (BY MR. DOWER)  Let me -- oh, I should have
21 done this before, while we were on break.  I'm going to
22 upload another document, not a big one, though.  It
23 shouldn't take a million years, like that one time.
24 Just as soon as I can find it.  Give me one second.
25 Sorry.  Okay.  I --

172

1        MR. DOWER:  Bob, this is Exhibit 60.  I
2  don't have the one that was stamped, but this is
3  Exhibit 60 from John Dalton's deposition.
4        MR. SCHMIDT:  That's fine.
5        MR. DOWER:  Okay.
6        (Exhibit 60 discussed.)
7   A.  I have it downloaded.  Let me save it.  Okay.
8  I have it saved and open in front of me.
9        Do you want me to read it?
10  Q.  (BY MR. DOWER)  Oh, yeah.  Sorry.  I was
11 waiting to make sure you had a chance to open it, and I
12 think we were both waiting on each other again.
13  A.  Yeah.
14  Q.  So let me just drop -- go down to the top of
15 page 4, which is the -- it's sort of split between
16 page 3 and page 4; and it discusses the formal complaint
17 resolution process.  Do you see that?
18  A.  Yeah.
19  Q.  And so it says that, "A complaint alleging
20 discrimination or harassment must be submitted to the
21 Office for Inclusion and Equity or the Dean of
22 Students."  Did I read that correctly?
23  A.  Yes.
24  Q.  And so my question is just:  Did you ever
25 submit a formal complaint of discrimination to either

173

1  the Office of Inclusion and Equity or the Office of the
2  Dean of Students?
3   A.  And these are -- I assume you mean these are
4  UT's Office for Inclusion and Equity and UT's Office for
5  the Dean of Students?
6   Q.  Yes.  And I know that you filed an EEOC
7  charge.  So what I mean here is the UT internal Office
8  of Inclusion and Equity.
9   A.  I believe I did not submit complaints there.
10  Q.  Okay.  And my question is just:  Why not?
11  A.  Sure.  I actually had a conversation with
12 Professor Miryung Kim right after I learned about the
13 Dean's negative recommendation for me, so around late
14 November, early December 2018.  At that time she was
15 already an associate professor with tenure at UCLA.  And
16 I -- she left UT Austin during the first year that I got
17 there and I never really had gotten -- I think we only
18 overlapped for one semester in the Spring of 2014.
19        And I knew she left and I had overheard
20 that -- I mean, I had sort of heard hearsay from
21 colleagues, from Sanjay Shakkottai, she left because she
22 went up for tenure the prior academic -- the prior
23 summer; and she had had to withdraw her case.  And so I
24 kind of connected the dots after the fact and I realized
25 that she -- something happened to her and she withdrew

174

1  her tenure case.  And subsequently she interviewed and
2  left UT Austin for UCLA.
3       So I reached out to her.  I didn't know
4  any details at that time; and she told me things under
5  confidentiality I would rather not repeat, I guess,
6  because of that confidentiality I promised to her.
7       We actually heard a bunch of details from
8  Professor Tewfik in his deposition surrounding her case,
9  but the one thing related to your question here is that
10  she went to UT's Office for Inclusion and Equity and
11  they had essentially given her the runaround and told
12  her that there is nothing she could do and she shouldn't
13  complain.  And so she had been very disappointed and
14  basically decided to end it with UT.
15      So I did not go to the office because I
16  felt it wouldn't get me tenure.  I felt that what I
17  wanted was to get tenure at UT in a fair -- in a fair
18  way.  I wanted, you know, a fair assessment; and I
19  felt -- at that time I wasn't in the mode of
20  complaining.  I simply wanted to be granted with a fair
21  decision, and I felt that the way to -- the most
22  effective way to get that would be through a CCAFR
23  appeal and through the final arguments that I sent to
24  the President.
25      Q.  So I'm trying to balance my desire to make

175

1  sure that I have the information I need to do my job
2  with the desire to respect your desire to keep this
3  conversation with Miryung Kim confidential.  Can you
4  tell me what the conversation was about on a high level,
5  like, sort of in a general level?
6      A.  Yeah.  I asked her what -- what -- basically,
7  why she had withdrawn her tenure case, what had happened
8  for her to withdraw and to subsequently leave UT.
9      Q.  So was the topic of that con- -- or was the
10  reason that she left related to either gender or
11  pregnancy?
12      A.  Yes, she believed so.  And I believed so after
13  talking to her and especially after hearing Ahmed's
14  deposition.  He gave much of the details that she
15  basically told me under confidentiality.  So I guess we
16  have part of the answer.
17      Q.  Do you know what stage of the process she
18  withdrew her application?
19      A.  Yes.  I believe it was after the department
20  vote on her tenure case.
21      Q.  After the department and before the Dean?
22      A.  Correct.
23      Q.  Okay.  Let me show another document.  This is,
24  I believe, Exhibit 85?
25          MR. DOWER:  Bob, correct me if I'm wrong.

176

1  I think it's 85.  In fact, I'm pretty sure it's 85.
2          THE REPORTER:  That's what I have.
3          (Exhibit 85 marked.)
4      A.  I have it open.  Let me save it.
5          Okay.  I have it saved, and it's open in
6  front of me.
7          I'm ready.
8      Q.  (BY MR. DOWER)  Okay.  Before we switch gears
9  to this, going back to Miryung Kim, were her concerns or
10  her opinion that she had been treated differently on the
11  basis of gender, were those concerns directed -- about
12  Dr. Tewfik specifically?
13      A.  I do not recall her stating concerns about
14  Dr. Tewfik in that conversation.
15      Q.  What about Dean Wood?  Was any of it directed
16  about Dean Wood?
17      A.  I do not recall her directing it to Dean Wood.
18      Q.  Okay.  So then switching back to the EEOC
19  Charge, so I'm very conscientious of the need not to
20  invade any sort of privilege because, of course, the
21  top-level document of this is a letter from our very own
22  Bob Schmidt; and so I recognize we need to be careful
23  about that.  Without disclosing any of the
24  communications you had with any attorneys, what led you
25  to decide to go from:  I didn't get tenure, and I'm not

177

1  going to -- and I'm not filing an internal Charge of
2  Discrimination to filing a Charge of Discrimination with
3  the EEOC?
4      A.  I felt very strongly that I had been treated
5  differently because -- in part or in whole, because of
6  my gender and pregnancy; and I was determined following
7  the final decision of President Fenves in response to
8  the CCAFR findings.  I felt strongly about raising a
9  complaint.
10      So I was informed of the process to file
11  a complaint, to file an EEOC Charge.  I wasn't aware of
12  those different institutions and processes.  And so this
13  charge was filed, basically, as a step towards that
14  process.
15      Q.  Okay.  I just uploaded Exhibit 86.
16          (Exhibit 86 marked.)
17      A.  I'm downloading.
18      Q.  (BY MR. DOWER)  Yeah, take your time.
19      A.  I have it open.  I'm saving.
20          Okay.  I'm ready.
21      Q.  All right.  I want to talk about the
22  retaliation claims in this lawsuit, and so I thought
23  this would be a helpful way to -- helpful way to sort of
24  speed that conversation along.  So let's go to page 10
25  of the Interrogatory -- the Interrogatory Responses,

178

1  which is Exhibit 86.
2      A.   Okay.
3      Q.   And so the Interrogatory Number 8 asks you
4  to -- excuse me -- to "...identify and describe any
5  activities you took or communications you made that you
6  contend motivated Defendant to retaliate against you."
7  And the -- so I just kind of want to briefly walk
8  through the responses that you give and then maybe ask a
9  little bit of elaborating or clarifying questions.
10      So the first -- the first actions and
11  communications that you identified here is that, "In or
12  about August 2018 Plaintiff confided in Dr. Christine
13  Julien that she felt discriminated against by the ECE
14  Department Chair, Dr. Ahmed Tewfik, because of comments
15  he had made relating to tenure case during the summer
16  within one month of have given birth."  First of all,
17  just for the record, did I read that correctly?
18      A.   Yes.
19      Q.   Okay.  Can you tell me:  What were the
20  comments that this refers to?
21      A.   This refers to the e-mail that Chair Tewfik
22  sent me, that harsh e-mail that I have we covered at
23  the -- towards the beginning of this morning.
24      Q.   Right.  Okay.  Let me just confirm.  Let's
25  see.  So -- okay.  So it's the e-mail dated August 2nd,

179

1  2018 that I believe we labeled Exhibit 70?
2      A.   Yes.
3      Q.   Okay.  I've got too many PDFs open now.
4      Okay.  All right.  And so what did -- or,
5  I guess, tell me about the conversation with Dr. Julien.
6      A.   I reached out to her after a few -- a few days
7  after that e-mail exchange.  I wrote her, "Could we
8  please have a phone conversation?"  I needed someone to
9  kind of let steam off and vent because I had felt quite
10  upset from that e-mail exchange.
11      And she said, "Sure.  Yes, I'm happy to
12  talk."  And we had that phone conversation.
13      Q.   And can you -- what did you tell her in that
14  phone conversation?
15      A.   I started sort of telling her that I was very
16  unhappy with -- with the tone in Ahmed's e-mail.  And I
17  felt it was inappropriate and unfair for my condition,
18  having just had a baby very recently, that he is
19  essentially depriving me of support, telling me, like, I
20  didn't have any support while having had a baby; and I
21  felt it was unfair treatment relating to pregnancy.
22      And I was expecting -- I was hoping for
23  an empathetic ear, mainly to let steam off, mainly to
24  vent, possibly even advice on how to handle the
25  situation, how to get a closure; but that was very -- I

180

1  was very shocked by Christine's reaction.  She had -- up
2  until that moment, I had regarded her as a friend and as
3  a mentor.  And I had approached her previously a few
4  times in difficult situations that I had for mainly,
5  again, for empathy and kind of venting and some advice
6  and support; and she always had been very empathetic.
7  And in this phone conversation, she had no empathy; and
8  she, instead, tried to neutralize me.  And I -- it took
9  me a while to figure it out.
10      And my husband was overhearing the
11  conversation.  He only was hearing me; he wasn't hearing
12  her.  I was on the phone and he kind of made -- he saw
13  me starting to get emotional, and I started crying.  And
14  he just did like that (indicating.)  He saw that the
15  conversation was not going anywhere, and he signalled me
16  to stop.  And it kind of took me a while to recover from
17  the shock that I had lost a friend and that Christine
18  was not really on my side.  It took a while to process.
19      Q.   When you say -- sorry.  Sorry.  Go ahead.  I
20  didn't mean to interrupt.
21      A.   And, eventually -- eventually, I said -- you
22  know, I said to Christine -- I tried to end the
23  conversation politely and I said that, "I guess I'm not
24  really articulating myself well.  And, yeah, thank you
25  for your time."  And I ended the conversation.

181

1      Q.   And this was -- this was the -- the e-mail
2  that started this from Ahmed, the one with the sharp
3  tone, was about having your fiance and students work on
4  the promotion dossier, that was the origin?
5      A.   Correct.
6      Q.   Okay.  What -- when you said that Dr. Julien
7  tried to neutralize you, I'm curious:  What does that
8  mean to you; or what does that mean, tried to neutralize
9  you?
10      A.   She did not validate my emotions, which were
11  emotions of anger, getting very upset; and she, instead,
12  tried to argue with me that I shouldn't be feeling those
13  emotions.
14      Q.   All right.  Going back, did -- well, did you
15  tell her in this conversation that you felt
16  discriminated against?
17      A.   I do not recall using the word
18  "discrimination."
19      Q.   Okay.  Do you recall -- do you recall what you
20  did say about the comments?
21      A.   I don't really recall details other than what
22  I told you already.
23      Q.   That's fine.  That's fine.
24      Okay.  Well, let's -- we already talked
25  about -- I'm sorry.  I'm referring back to Exhibit 86.

182

1   We already talked about the furniture policy change in
2   the summer of 2018.  So I'll skip that.  Excuse me.
3           The next thing on this list is the, "In
4   or about December 2018, Plaintiff submitted a rebuttal
5   to the Dean's assessment which stated concerns of
6   'inequity' with the Dean's assessment and discussed
7   Plaintiff's pregnancy and impact on her perceived
8   performance deficiencies used as a justification for the
9   denial of tenure."  First of all, just for the record,
10  did I read that correctly?
11  A.  Yes.
12  Q.  Okay.  And is the document that this is
13  referring to, the Deans' rebuttal -- or, excuse me --
14  the rebuttal to the Dean, is that the rebuttal letter
15  that we looked at this morning?  And I think -- let me
16  see -- I think it was Exhibit 71; but I could be
17  misremembering -- oh, wait.  No, no, no.  It's already
18  pre-marked.  It's Exhibit 7.  Sorry.  And this one,
19  actually the file name has the exhibit number in it, so
20  that should be easier.
21  A.  I believe it is the rebuttal that we looked at
22  earlier.  I -- would you like me to --
23  Q.  Yeah, if you --
24  A.  -- pull it up and open it?
25  Q.  Yeah, if you don't mind.

183

1   A.  If I can locate it among the...
2   Q.  Yeah, it's been a lot.  It's the one that
3   starts SW031821, and then there's an underscore, EX07 in
4   the PDF file name.
5           (Simultaneous speakers.)
6   Q.  I can also upload it again if that's easier.
7   A.  What -- yeah, that may be easier.
8   Q.  Did you want me to re-upload it?
9   A.  Please do.
10  Q.  Okay.  I will do that.  I want to do whatever
11  makes this easiest, so.
12  A.  It's downloading.  I have it open.  I'm ready.
13  Q.  Perfect.  Okay.  So is this document,
14  Exhibit 7, the document that your interrogatory response
15  refers to as the rebuttal to the Dean's assessment?
16  A.  Yes.
17  Q.  So the reference to inequity in this document,
18  I believe, is at the bottom of page 10.  Can you jump to
19  that page for me, please?
20  A.  Yes.  I'm there, yeah.
21  Q.  Okay.  And so when the Dean's assessment talks
22  about concerns of inequity, is this -- excuse me.  When
23  your rebuttal to the Dean's assessment raises concerns
24  of inequity, is this the section of this document that
25  talks about inequity, on page 10?

184

1   MR. SCHMIDT:  Objection, form.
2   A.  This is one reference to inequity.
3   Q.  (BY MR. DOWER)  Are there any references in
4   this document to pregnancy?
5   A.  Yes.
6   Q.  Okay.  Where -- where is that?
7   A.  Let me try to find it.  I believe it was in
8   the section where I discuss my teaching scores and say
9   that I received my lowest score in the semester I was
10  pregnant.  Let me try to find it.
11  Q.  I think it may be the bottom of page 3.
12  A.  Yeah, I see.  I see it on the bottom of
13  page 3.
14  Q.  Okay.  So it says, "In Fall 2017 I also
15  happened to be pregnant and suffering from daily morning
16  sickness and fatigue.  (My second child ████" -- is it
17  or "████"?  Sorry.
18  A.  ████
19  Q.  ████  Sorry.  I do try to get these
20  things right.
21  -- "was born in June 2018.)  Despite my
22  personal challenges, I maintained the highest level of
23  professionalism and care, teaching and increased
24  teaching load of two sections and introducing new
25  initiatives to EE 360C, such as 'lunch with the

185

1   professor' and new weekly problem-solving sections, to
2   improve the student experience."  Did I read that
3   correctly?
4   A.  Yeah.
5   Q.  Okay.  And so that's the reference to
6   pregnancy in this document?
7   A.  Yes.
8   Q.  Okay.  Going back then to Exhibit 86, now at
9   the top of page 11, this is the interrogatory responses.
10  So the next thing on this list is:  Dr. Nikolova sent an
11  e-mail to the ECE department faculty which was forwarded
12  to Dean Wood that specifically raised concerns of sex
13  discrimination.  And I probably should have just read
14  this verbatim; but it says that it was an e-mail sent
15  February 19th, 2019; is that correct?
16  A.  Yes.
17  Q.  And that was after you'd found out that
18  President Fenves was going to deny your application for
19  tenure?
20  A.  Yes.
21  Q.  Okay.  And then the next one on this is the
22  appeal of the denial of tenure to the Committee of the
23  Council on Academic Freedom and Responsibility; and we
24  looked at that document earlier today, as well, correct?
25  A.  Yes.

186

1    Q.   And then the next one on this list is the --
2  it says, "On or about March 29th, Plaintiff provided to
3  President Fenves a Request for Reconsideration/final
4  arguments and an appeal of denial, raising concerns of
5  sex and pregnancy discrimination."  And is that the --
6  one of the other documents that we looked at today, the
7  Request for Reconsideration?
8    A.   Yes.
9    Q.   Okay.  And then we've got, "Plaintiff filed an
10  EEOC Charge of Discrimination."  We just looked at that
11  just a few minutes ago, correct?
12    A.   Yes.
13    Q.   And then we've got, "Plaintiff files this
14  lawsuit objecting to discrimination."  Obviously, we're
15  here talking, so we know about the lawsuit.  Okay.
16       And, obviously, I'm just trying to make
17  sure that we've covered everything in here.
18       And then there's a supplemental response
19  that says, "Dr. Nikolova also raised concerns in a
20  proposed" -- "proposed of sex discrimination" -- excuse
21  me; I'm getting tired.
22       Let start that sentence over.
23  "Dr. Nikolova also raised concerns and opposed of
24  sex/pregnancy discrimination to ECE Department Chair,
25  Dr. Ahmed Tewfik, in or about November and December

187

1  2018, as well as subsequently."  What is this -- what is
2  that sentence a reference to?
3    A.   I believe it is in reference to a discussion I
4  had with him over the phone about women who are pregnant
5  that may have lower teaching scores because of their
6  pregnancy.  And also we had a separate, different
7  conversation regarding an earlier version of my rebuttal
8  to the Dean's letter that I sent to Ahmed for review
9  before I submitted it officially.  And in that letter,
10  in that version of the rebuttal, at the very end I had
11  about a paragraph discussing -- stating that I found the
12  Dean's mention of pregnancy and Modified Instructional
13  Duty when referring to me inappropriate.  I was told by
14  Brian Evans that it violated certain privacy laws, and
15  so I had a mention of that.
16       And I gave a little -- I felt that she
17  considered it a negative that I become pregnant that
18  first time when I had been given an unbalanced teaching
19  load and I ended up teaching two classes in the
20  2015-2016 year.  I felt that she had stated it and she
21  probably felt negatively about it, as if I had gotten
22  pregnant on purpose to avoid my work duties.
23       And so I felt to alleviate that, I needed
24  to offer some personal detail so she's aware that I had
25  not -- it had not been a planned pregnancy.  And, in

188

1  fact, shortly before, maybe about a year earlier, I had
2  been -- I had sought advice by a fertility specialist;
3  and I was told something to the effect that I wouldn't
4  be able to have any children or that I would have issues
5  with getting pregnant.
6       And so I had written this personal detail
7  to kind of show to her that my pregnancy was not
8  planned, even though I was very happy about it when it
9  happened in light of that earlier, you know, doctor
10  suggestion.  So my pregnancy was not planned, by any
11  means; and I felt somewhat embarrassed about the
12  consequence that I would not be teaching two courses,
13  instead of the usual one course of teaching relief.
14       And I offered also in that earlier
15  version of the rebuttal that I had -- when I first
16  informed my Chair about my pregnancy, I had been
17  apologetic about it.  I said, "You know, I'm aware that
18  this now lets -- you know, lets me not teach two
19  courses -- makes me unable to teach two courses, instead
20  of the usual one."  And so I offered to teach an
21  additional course the following semester when I'm
22  capable of teaching; but the Chair had kindly declined.
23  At that time I felt he had not made me make up that
24  extra course.
25       And so that was roughly what the

189

1  paragraph was; and so Chair Tewfik, when he read my
2  rebuttal, he said, "Oh, yeah, this is a very strong
3  rebuttal; but I feel that you should remove that last
4  paragraph in the rebuttal so as not to antagonize the
5  Dean."
6       And I just kind of listened to his advice
7  without questioning; and I said, "Okay."  And I removed
8  the rebuttal [sic] and I submitted the final version
9  of the rebuttal without that paragraph to the dean and
10  the -- I think Carmen Shockley.
11    Q.   Okay.  So just so I'm clear because that was a
12  lot of information, I just want to make sure I digested
13  it correctly.  There was an earlier draft of your
14  rebuttal to Dean Wood's assessment that contained a more
15  explicit reference to pregnancy and that draft was
16  shared with Dr. Tewfik during your editing process and
17  he suggested not including that paragraph because he
18  felt it might antagonize the Dean, but he saw the
19  version of it that had that paragraph.  Is that -- is
20  that accurate?
21    A.   Yes.
22    Q.   Okay.  Just making sure that I understood.
23       Okay.  And then there's the last --
24  sorry.  Going back to Exhibit 86, it -- the next
25  sentence of that paragraph says, "Chair Tewfik opposed

190

1  gender discrimination on behalf of Dr. Nikolova to
2  Dean Wood, including in UT Austin 0007476." So I just
3  want to -- I mean, that e-mail speaks for itself; but I
4  just want to understand. So you're saying that Tewfik
5  opposed gender discrimination on your behalf as it
6  relates to the tenure decision, and you are also
7  accusing him of discriminating against you on the basis
8  of gender with regards to that same decision?
9      A.  Correct.
10     Q.  Okay. I think that covers that section.
11         So then the next interrogatory, Number 9,
12 is about what -- you know, what actions do you contend
13 Defendant took to retaliate against you; and so the
14 first response -- or the first paragraph, I should
15 say -- and I'm now looking at the top of page 12 of the
16 interrogatory responses -- specifically talks about a
17 peer teaching evaluation conducted by Dr. Julien after
18 you raised the concerns about sex and pregnancy
19 discrimination. Is that accurate? That's what the
20 first paragraph alludes to?
21     A.  Correct.
22     Q.  Are there -- I'm trying to save time because
23 it's getting close, towards 5:00 o'clock; and I want to
24 respect everyone's time. Other than what's listed in
25 this paragraph, are there any other reasons that you

191

1  believe that Dr. Julien and the other ECE professors --
2  well, actually strike that -- that Dr. Julien's teaching
3  assessment conducted of you after you complained about
4  sex discrimination and pregnancy discrimination was
5  motivated by an intent to retaliate other than what's in
6  this paragraph?
7      A.  Let me read the paragraph more carefully.
8      Q.  Okay. Please. Please do.
9      A.  Do you mind if I read out loud?
10     Q.  Oh, no. That's fine.
11     A.  "Before Dr. Nikolova had raised concerns and
12 opposed sex and pregnancy discrimination at UT,
13 Dr. Christine Julien and other ECE professors gave
14 Dr. Nikolova extremely positive teaching evaluations.
15 After Dr. Nikolova opposed sex and pregnancy
16 discrimination internally at UT, the former ECE
17 Department Chair Tewfik assigned Professor Julien to do
18 a 'Peer Teaching Evaluation' of Dr. Nikolova. Unlike
19 the previous evaluations of Dr. Nikolova's teaching,
20 Professor Julien gave Dr. Nikolova a negative and
21 unflattering teaching evaluation. The negative
22 evaluation was not accurate, was performed at the 'last
23 minute' (very late in the semester) when students were
24 preparing for or taking finals and are often less
25 engaged in a course, did not take into account the

192

1  nature of the course, and had other irregularities."
2         And now, to remember your question, were
3  you asking about --
4      Q.  I was asking --
5         (Simultaneous speakers.)
6      A.  -- or intent?
7      Q.  Yeah, anything else that, to you, demonstrates
8  an intent to retaliate against you by Dr. Julien,
9  because there's a list of things here; and I just wanted
10 to see if there was anything else you wanted to add to
11 that list.
12     A.  I am not sure if that would speak exactly to
13 the intent part; but in terms of possible motive that
14 she may have had to retaliate against me is we learned
15 in that following September, only three months later,
16 that she was picked to become the Assistant Dean for
17 Inclusion and I imagine being in conversations with
18 Dean Wood about that promotion. So she -- from that
19 September on, she literally, you know, started working
20 for the Dean; and, already, from before that, she may
21 have been preparing. And she was speaking to me from
22 all of this. She was speaking in administrative role.
23        And so I'm guessing that she wanted to
24 strengthen Dean Wood's case against me by providing a
25 more negative -- you know, a negative and unflattering

193

1  teaching evaluation because what Dean Wood had stated
2  was an actual, a key reason for not promoting me; and I
3  felt that Dr. Julien wanted to give more ammunition to
4  Dean Wood to strengthen her case.
5      Q.  All right. I think -- I think that fairly
6  covers that one. So let me move on to the next
7  paragraph.
8         I'll go ahead and read it out loud for
9  the record since you wanted to do that for the previous
10 one. So, "Before Dr. Nikolova opposed sex and pregnancy
11 discrimination, filed her charge of discrimination and
12 this lawsuit, Dr. Nikolova received positive annual
13 reviews. Unlike the previous positive annual reviews of
14 Dr. Nikolova, Professor Julien and the ECE Faculty
15 Evaluation Committee gave Dr. Nikolova a modest and
16 unflattering annual evaluation in June 2020. The annual
17 evaluation was not accurate and diminished or
18 negatively, pretextually, and disparately
19 mischaracterized Dr. Nikolova's performance that had
20 previously been regarded in a highly positive manner,
21 especially since the 2018-'19 academic year was one of
22 Dr. Nikolova's most productive years." First of all,
23 did I read that correctly?
24     A.  Yes.
25     Q.  And when you say that they gave you a modest

194

1  and unflattering evaluation in June 2020, the evaluation
2  they gave you was "meets expectations"?
3     A.  Correct, so it was the rating accompanied by
4  the text; and the text is -- the text was very
5  unflattering.
6     Q.  And so why do you believe that Dr. Julien and
7  the other ECE Faculty Evaluation Committee members --
8  why do you believe this was in retaliation for filing
9  the discrimination charge and this lawsuit?
10    A.  So, actually, I believe it falls under both
11  categories, pregnancy discrimination and retaliation.
12    Q.  Okay.
13    A.  And pregnancy discrimination, the reason I
14  believe it falls under that is that it started out --
15  the text of annual review started out by stating that I
16  was on Modified Instructional Duty in the Fall of 2018.
17  And that was sort of the anchor to pull everything down
18  as if, you know, a pregnant woman cannot do her job
19  well.  That sort of anchored it.
20         And the following text was very
21  unflattering:  She has reasonable publication service
22  and modest funding and low service; but that's
23  understandable, given her pregnancy extension, given her
24  Modified Instructional Duty.  And so --
25    Q.  So does it actually refer to pregnancy, or

195

1  does it just say Modified Instructional Duty?
2     A.  I believe it says only Modified Instructional
3  Duty, but it was very clear.
4     Q.  Okay.  So when you see "Modified Instructional
5  Duty," you're reading pregnancy into that because it was
6  Modified Instructional Duty based on the pregnancy?
7     A.  Correct.  And --
8     Q.  Go ahead.  Go ahead.
9     A.  -- you asked regarding pregnancy
10  discrimination -- well, you asked regarding retaliation.
11    Q.  Yeah.  I was about to --
12    A.  The reason why I think it can be seen as
13  retaliation is that it occurred after I had been denied
14  tenure, after I had already filed the lawsuit for
15  pregnancy and sex discrimination.  And I feel that it
16  was perhaps Christine Julien, as Chair of the Committee,
17  and the committee members who participated in writing my
18  reviews, saw it as helping the UT narrative that had
19  become now to diminish me as much as possible to show
20  that I was not qualified enough to be granted tenure.
21    Q.  Okay.  I think -- I think at least for now I'm
22  done with that document.
23         Let me -- let me do this.  Let me show
24  you the Complaint in the lawsuit, the First Amended
25  Complaint.  So I'll upload that.  I don't know whether

196

1  the Complaint in a case is really an exhibit -- I guess
2  it's an exhibit.  So this is 87, I guess; but it's the
3  Pleading, so.
4     A.  Is this about the exhibit or --
5         (Simultaneous speakers.)
6     Q.  Yeah, sorry.  Go ahead.  That was more of a
7  side talk to Bob, I guess; but you can ignore it.
8         MR. SCHMIDT:  That's fine.
9         (Exhibit 87 marked.)
10    Q.  (BY MR. DOWER)  Yeah, it's an exhibit.  It's
11  an exhibit.
12    A.  Did we already see this earlier?
13    Q.  No.  Sorry.  This is a new one.  I just
14  uploaded it to the chat.
15    A.  Okay.  Okay.  I have it open, and I'm saving
16  it.
17         And if I may request, also, maybe a break
18  in the next ten minutes or so.
19    Q.  Oh, that's fine.  And I'm hoping that this
20  will be the last break because I think we're getting
21  close to done.
22    A.  Okay.  I'm ready.
23    Q.  Okay.  So let me jump down to page 15,
24  Paragraph 83.  And just tell me when you're there.
25    A.  I'm there.

197

1     Q.  Okay.  And so in Paragraph, I guess, 83 and 84
2  it discusses a situation involving a request that you
3  supervise a senior design team while you were on
4  Modified Instructional Duty.  Is that -- is that a fair
5  characterization of Paragraph 83 and 84?  I mean, we
6  could read the whole thing.  It just feels like -- a
7  little bit excessive.
8     A.  I'll trust you.
9     Q.  Okay.
10    A.  I'll take your word for it.
11    Q.  Well, I really just want to use this as a
12  launching point to show you some of the e-mail exchanges
13  that actually happened, so -- just to sort of inform the
14  discussion.  So --
15         MR. SCHMIDT:  Since it's just two
16  paragraphs --
17         MR. DOWER:  Do you want me to read it
18  into the record, Bob?  I don't mind.
19         MR. SCHMIDT:  You don't need to read it
20  into the record, but I just think Dr. Nikolova should
21  read it if it's going to be a launching point.
22         MR. DOWER:  Yeah, yeah.  Absolutely.  No
23  objections there.
24    Q.  (BY MR. DOWER)  Dr. Nikolova, why don't you
25  just go ahead and take -- you don't need to read it out

198

1 loud because it's an exhibit.  So take a second to go
2 ahead and read Paragraphs 83 and 84.
3     A.  Okay.
4         MR. DOWER:  Actually, you know what, why
5 don't we take the break here?  And then she can read it
6 on the break.
7         MR. SCHMIDT:  That's great.  That's fine.
8         MR. DOWER:  Let's do that.
9         THE WITNESS:  Okay.  Great.
10        MR. SCHMIDT:  It servers two purposes.
11 Great.  Thank you.
12        THE REPORTER:  We're going off the record
13 at 4:57 p.m.
14        (Off the record from 4:57 to 5:13 p.m.)
15        THE REPORTER:  We're going back on the
16 record at 5:13 p.m.
17    Q   (BY MR. DOWER)  All right.  Well, when we left
18 off, Dr. Nikolova, you were going to go ahead and read
19 through to yourself Paragraphs 83 and 84 from your
20 Amended Complaint.  Did you have an opportunity to do
21 that during the break?
22    A.  I'm sorry, but I forgot.
23    Q.  Oh, no worries.
24    A.  I can do it right now.
25        MR. DOWER:  So much for efficiency, Bob.

199

1         (Laughter.)
2         MR. SCHMIDT:  Yeah.
3         MR. DOWER:  Don't worry about it.
4         MR. SCHMIDT:  It's two paragraphs.
5         MR. NOTZON:  She can't be blamed for
6 that.
7         MR. DOWER:  And I'm not blaming her.
8         MR. SCHMIDT:  You can blame -- you can
9 blame Robert Notzon or somebody else.  I don't know.
10        MR. DOWER:  I'll blame a Robert.  I won't
11 specify which one.
12    A.  (Witness silently reading document.)
13        I'm ready.
14    Q   (BY MR. DOWER)  Okay.  So having just read
15 Paragraph 83 and 84 from the First Amended Complaint, if
16 you would, go ahead and open one of the documents that
17 was just uploaded, the one marked Exhibit 57.
18    A.  Oh, yeah.  Exhibit 57, yeah.
19    Q.  Yeah.
20    A.  I'm ready.
21    Q.  Okay.  And I'm not.  I accidentally closed it.
22 Give me one second.
23        All right.  Here we go.  So since this is
24 in reverse chronological order, meaning that the oldest
25 e-mail's at the bottom, I'll -- let's start on page 4 of

200

1 5, which is an e-mail from Dr. Tewfik dated
2 September 3rd, 2019.  Do you see that?
3    A.  Yes.
4    Q.  And so -- so he starts out and he says, "You
5 have MID this semester.  However, you'll need to
6 continue to supervise your senior design team this
7 semesters" -- excuse me -- "semester" -- singular;
8 sorry, I misspoke.  "Others on MID this semester are
9 also supervising senior design teams and the college is
10 insisting on that.  Thank you."  Other than my little
11 verbal slip-up there, did I read that correctly?
12    A.  Yes.
13    Q.  Okay.  And is this -- is this the starting
14 e-mail or the e-mail that starts the -- the
15 communication that's referenced in Paragraphs 83 and 84
16 of your First Amended Complaint?
17    A.  I believe so.
18    Q.  Okay.  And so then, if we scroll a little bit
19 farther up, September 4th, 2019, you respond; and you --
20 I'm trying to avoid reading the whole thing -- but you
21 express confusion and some, I guess, misgivings about,
22 you know, why you're being asked to supervise a senior
23 design team.  Is that a fair characterization?
24    A.  Yes.
25    Q.  And so then he responds September 4th, 2019,

201

1 later that day, and says that, "The college has gotten
2 stricter on MID.  Alex and you are on MID and you both
3 will need to supervise/continue supervising senior
4 design teams.  Unlike courses, you have flexibility in
5 setting time with your team."  Did I read that
6 correctly?
7    A.  Yes.
8    Q.  And then, going up again, so then, the next
9 day, September 5th, you respond; and you point out that
10 from -- from a health and medical standpoint, it's very
11 different for Alex to be required to supervise a senior
12 design team because you just -- you just will have given
13 birth sometime between now and September 18th, 2019.
14 And so you raised some of the -- some concerns about
15 this expectation.  Is that a fair characterization of
16 it?
17    A.  Yes.
18    Q.  Okay.  And so then if we go further up, he --
19 Dr. Tewfik forwards your e-mail to Sharon Wood and Jerry
20 Speitel; and that's on Friday, September 6th, at I guess
21 2:40 a.m.  Is that -- is that what you see?
22    A.  I'm sorry.  Can you repeat, please?
23    Q.  Yeah, of course.  And I know it's late in the
24 day, and we're all tired.
25        On September 6th, 2019, at 2:40 a.m. he

202

1 forwards your e-mail to Sharon Wood and Jerry Speitel.
2 Do you see that?
3     A.   Yes.
4     Q.   And I don't know -- do you know whether -- was
5 this one of the times when Dr. Tewfik was out of the
6 country, do you remember?
7     A.   He may have been.  I don't remember for sure.
8     Q.   Yeah, that's fine.  I'm looking at some of
9 these time stamps and wondering whether he's in a
10 different time zone; but if you don't remember, don't
11 worry about it because I know that he -- during some of
12 this time, he was -- he was in another time zone,
13 another country.  I think he was in Spain.  Do you
14 remember whether he was in Spain at some point during
15 this time period?  No?  It doesn't ring a bell?
16    A.   It sort of rings a bell; but amongst so many
17 things in my brain, I cannot be fully sure.
18    Q.   Okay.  I'm really not trying to nail you down
19 on it.  It's fine.
20         Okay.  But suffice it to say the next
21 e-mail in this thread is from Dean Wood to Jerry
22 Speitel; and she says, "He has to back down on this.
23 She should not be asked to mentor the student group."
24 Do you see that message?
25    A.   Yes.

203

1     Q.   And then Jerry Speitel responds and says,
2 "Agreed.  I sent him an e-mail to update the discussion
3 that he and I had."  And that looks like that was sent a
4 little bit after noon on September 6th, 2019, correct?
5     A.   Yes.
6         (Exhibit 88 marked.)
7     Q.   (BY MR. DOWER)  Okay.  And then that brings me
8 to the other exhibit, which is, I think -- 88 is what
9 it's been marked.  And can you -- do you have that one
10 open?
11    A.   Yes.
12    Q.   And do you see the second from the top, it's
13 an e-mail from Dr. Tewfik to you that says, "I e-mailed
14 the dean and associate dean and they agreed to my
15 request to relieve you from senior design supervision,"
16 correct?
17    A.   Yes.
18    Q.   And then you respond; and you said, "Thank
19 you, Ahmed."  And that was, I guess, at about 3:00 p.m.,
20 also on September 6th, 2019, correct?
21    A.   Yes.
22    Q.   Okay.  And so the time from when Dr. Tewfik
23 indicates you -- you'll need to continue your super- --
24 to supervise your senior design team, we're talking
25 about a time from Tuesday, September 3rd at around noon

204

1 to Friday, September 6th at around 7:15 a.m., where he
2 withdraws it -- or where, I guess, it's withdrawn; is
3 that accurate?
4     A.   Yes.
5     Q.   Okay.  And this is what Paragraphs 83 and 84
6 are referring to in -- in your First Amended Complaint?
7     A.   Yes.
8     Q.   Okay.  So let me -- let me just ask just a
9 couple more questions about this.  Do you believe that
10 this -- that the request that you supervise a senior
11 design team was an act of retaliation against you?
12    A.   Yes, I do.
13    Q.   Okay.  And by whom, if you have an opinion?
14    A.   By a combination of Ahmed and the Dean's
15 Office.
16    Q.   And why do you -- I guess retaliation against
17 you for what, like, for what activity that you took?
18    A.   For filing the EEOC Charge.  At that time I
19 had not yet filed a lawsuit, but I informed him of my
20 intention to file the lawsuit.  And I believe that the
21 college -- so he wrote me an e-mail that the college
22 must be aware of my intention to file the lawsuit.
23    Q.   Okay.  One of the last things I want to
24 discuss with you before I pass the witness, in case Bob
25 has his own sort of follow-up, is the damages in this

205

1 case.  And I want to preface this with:  Whenever we're
2 talking about things like, you know, how this has
3 impacted you emotionally, it's, by definition, an
4 emotional subject; and so I approach this sensitive to
5 that fact.  And I want to be as respectful as possible,
6 and so just -- just know that I appreciate that this is
7 a sensitive area that I am about to talk to you about.
8 But with that lead-in, how has you not getting tenure in
9 February of 2019 impacted you emotionally?
10    A.   It has -- it just turned my world upside down,
11 literally.  I feel frequently and currently -- a lot
12 these days, I just feel lost.  I feel I lost my purpose
13 in life.  I feel I've lost -- I'm terribly afraid that I
14 have lost my career.  I'm afraid that I'm past the point
15 of no return.  I -- I've lost -- I feel my reputation
16 has been damaged professionally.
17         I was not -- I was -- I was completely
18 shocked that this past year I tried really hard and very
19 extensively to search for a position at another -- a
20 faculty position at another university; and I searched
21 very broadly, including much lower-ranked schools, way
22 below UT's league.  And I did not get -- I never
23 expected that I would not get any offers.  I did not
24 even get any full interview invitation to any U.S.
25 universities.

206

1    And I know that when I was filing the
2  lawsuit, I was warned that this is a possible effect,
3  that other potential employers may retaliate against me
4  for filing a complaint, whether it's the complaint or
5  the actual knowledge that has just come out that I have
6  been denied tenure at UT.
7        In the words of one of my former mentors
8  from Texas A&M, once I'm considered for tenure by a
9  University, if I'm denied tenure, I'm considered damaged
10 goods because without knowing any details of the case,
11 people are ready to jump to conclusions just on -- very,
12 very, very quickly; and the first conclusion that people
13 typically jump to is, "Oh, there must be something wrong
14 with her."
15       So I feel that this hugely damaged my
16 opportunity to move to another university and to
17 continue my career.  And I feel at this point I have
18 come to realize, despite what I had really hoped very
19 strongly previously, up until maybe a few months back,
20 that it would be impossible for me to continue my career
21 at UT.  Just being surrounded by -- by people that
22 previously I considered friends, that I looked up to,
23 that I sought advice from, and now I feel betrayed by, I
24 just would not -- it's been tremendously psychologically
25 damaging to me; and just the thought of going back to

207

1  that environment, I'm afraid would drive me even deeper.
2  I've gone through depression, anxiety,
3  insomnia; and currently from -- from my recent
4  conversations with them, my current psychologist -- I've
5  changed three or four different therapists; it was, I
6  really felt, a battle, an uphill battle to find the
7  right therapist, which was difficult in itself.  My
8  current psychologist thinks that it's PTSD because it
9  seems to have deepened over time (witness crying.)
10       In the first semester, I was still sort
11 of in the mode to, you know, do everything I can to
12 prove -- to prove my worth, to prove my professional
13 worth, to prove that the fairer decision would have
14 been to receive tenure and to do everything I can to
15 provide evidence, logic, facts to the responsible
16 parties so that I'm granted tenure.  And after that -- I
17 just put so much effort into this, just hundreds of
18 hours week after week, month after month, that I felt
19 burnt out (witness crying.)
20       And then I kind of went into a mode of
21 depression where I just very frequently felt down, and
22 it took me a while to realize that I was depressed.
23 And, finally, I think in December, about a year after
24 the first Dean's decision, after I first learned of
25 the Dean's negative letter, about a year later, I

208

1  realized that -- that I'm feeling low and I'm getting
2  depressed way more frequently than seems to be normal
3  (witness crying.)
4        And I started -- I reached out to a
5  psychologist.  I started feeling -- I started making a
6  diary just to understand for myself the extent of it,
7  just recording how many days I feel down, really down;
8  and it was, like, pretty much half.  Half the days or
9  more every week I was getting really depressed and
10 hopeless (witness crying.)
11       I wanted to -- at that time I had just
12 had my third baby.  I still really hoped -- I just had
13 this feeling in me that I hoped that things at UT would
14 be resolved.  And so I really worked hard to do my best
15 to satisfy the additional requirements that were set
16 forth for me by the Dean in order to satisfy her in the
17 future tenure decision so that I get tenure in the
18 next tenure consideration that I would go through
19 (witness crying.)
20       And so I worked really hard right after I
21 had my third baby on submitting grants, way more than I
22 would have if I had received tenure because I didn't
23 need the money; but I knew from her letter -- I didn't
24 need the money to support my group at that time.  I
25 still had money from my prior grant; but I knew that

209

1  getting another grant was necessary for me to have, you
2  know, a chance of success -- so not even a guarantee,
3  but a chance of -- a necessary condition for a
4  successful future tenure case.  And so two weeks after
5  my third baby was born, I was -- after, I
6  was... (witness crying.)
7     Q.   Take your time.  Take your time.
8     A.   Two hours -- two hours, one hour on, two hours
9  off in the breastfeeding; and I was completely -- my
10 brain was just much by this whole sleep deprivation.  It
11 was incredible, just exhaustion.  And so I -- right
12 after the pregnancy, I was back at -- back at the
13 computer every free minute I could that I was awake to
14 kind of come up and work on grant applications.
15       So I submitted a grant application, I
16 believe, just maybe a month after my baby was born.  I
17 submitted a second one two months after my baby was
18 born -- less than two months after my baby was born and
19 continued working on it.  And then I -- and then I was
20 exhausted, and then I just fell into deeper depression
21 (witness crying.)
22       I wanted to apply to other universities
23 just in case.  I had really wanted to remain at UT
24 because I loved Austin.  I loved my home.  And my family
25 had roots in Texas, but -- so I wanted, just in case, to

210

1  apply other universities; but I felt too depressed.  And
2  I was just unable to complete just the basic
3  application.  I was -- I was -- I didn't have it in me
4  to approach people in my community to be letter writers
5  for those other faculty applications (witness crying.)
6          And so I thought, well, I guess I just
7  cannot do it this year; and I applied for, anyway, a
8  pregnancy extension.  I just have to wait until next
9  year.  And those job applications, they happen really
10 only once a year, so around December.  So if you miss
11 it, you have to wait a full other year.  And that's what
12 I did (witness crying.)
13         And so this past December I had started
14 preparing other applications already in September,
15 three months prior, and was reaching -- and some
16 schools have earlier deadlines.  Depending on the school
17 and departments, there were deadlines ranging from
18 October through February.  And I just -- I worked really
19 hard on getting additional letters of reference
20 (witness crying.)
21         And I was sort of really disillusioned
22 and dismayed for what must have been damage to my
23 reputation in my professional community that people
24 who had previously written strong letters for my tenure
25 case now did not respond or declined to write me

211

1  letters in support of applications to other universities
2  (witness crying.)
3          And I did tell them that I -- because I
4  knew they would ask and they would see on my CV that I
5  had not been promoted.  So I felt I had to explain in my
6  e-mail, asking them for a letter, what had happened.
7  And that was really embarrassing and I didn't know how
8  to do it without going into too much detail, but at the
9  same time making it to where I'm not blaming and I'm not
10 pointing fingers and I sort of do it with dignity.  So
11 that was heartbreaking.  And, finally, I was thrilled
12 that I was able to -- after asking way more people than
13 I initially anticipated, I was able assemble enough
14 letter writers for my applications; and then it just
15 didn't work out (witness crying.)
16         And I never expected -- I remember very
17 begrudgingly submitting applications to universities
18 which were located in places I didn't want to be
19 geographically or very, very much lower ranked.  And
20 that is not because I'm snobbish but because I've become
21 aware of the difference in the rank and size, that if
22 you're at a lower-ranked university, the college may be
23 wonderful; but you have a really hard time attracting
24 strong students.  And that had been the case at Texas
25 A&M.  You know, it was hard to attract students with a

212

1  strong theoretical background needed for research.  I
2  never expected even those places would just not invite
3  me for an interview, let alone an offer.  And that
4  really hit me, I guess, in the last few months
5  (witness crying.)
6          I still last month -- I still, this
7  month, in June, this month, I still have kept receiving
8  rejection notices from universities; and I thought it
9  couldn't get much worse.  And I thought that some
10 universities -- that some universities would be
11 different and truly believe in gender equity and take
12 those things seriously and help, rather than hurt,
13 diverse candidates; and I experienced -- I guess the
14 real world kind of hit me (witness crying.)
15         And I feel in the last few months I've
16 been mentally preparing that there may not be any future
17 for me in academia, despite all my wishes and hard work
18 to the contrary.  So I feel it has really shaken my
19 confidence professionally and affected me personally;
20 and at this point, any -- any triggers, any small
21 triggers can quickly escalate into very -- have
22 detrimental effects on me (witness crying.)
23         There are many times that -- I don't know
24 if I should share -- I feel like I lost everything, so
25 why not...  What's more to do?  I think maybe three or

213

1  four weeks ago I had an argument, a very minor argument
2  with my husband; and it was short and very minor about
3  something really stupid.  He made a remark, a snappy
4  remark, you know, who had not washed the cutting board
5  at home; and -- and I kind of took it and kind of was
6  sharp with him back.  And it sort of escalated.  And we
7  didn't really argue that much, and I just felt really
8  angry (witness crying.)
9          It's just all the anger surfaced in me
10 from everything, I mean, not just that conversation.  I
11 think just the whole tenure and career and my life and
12 my hopes and my dreams; and it just seemed like
13 everything was upside down, and now including the one
14 secure foundation, which I felt had been my family.  I
15 felt like that was the last thing I had, and now even
16 that was even going down.
17         And I kind of closed myself in my room,
18 and I started thinking about all the movies I had seen
19 where people commit suicide.  And I just was imagining
20 and kind of thinking about them and the circumstances
21 and I thought I can really relate to them and I can
22 completely understand how those characters felt
23 (witness crying.)
24         And I, thankfully, don't have any friends
25 or family or people I know personally that have been

214

1  affected by suicide; but I have a close friend,
2  actually, who had attempted suicide in the past.  And I
3  had long discussions with her before and after, to sort
4  of understand that mental state and see how I can
5  protect myself from it.  And we had had a conversation
6  about it before, and she had told me it's really
7  important to have a back-up plan from when you are
8  thinking suicide.  You need to have a person that you
9  need to reach out to, and you need to know who that is.
10  And I knew immediately in my head, yes, I know that's my
11  husband (witness crying.)
12          And so after I closed myself in the
13  bedroom and was crying, just crying, just really sad and
14  hopeless and thinking about this; and I was thinking
15  there's really nothing wrong with suicide.  I don't why
16  people, you know, think -- I don't know why people --
17  it's actually an excellent -- it's a really good
18  solution.  It's an easy way out.  It is an easy way out
19  when the pain becomes so big that you cannot bear to go
20  through it.  And when you cannot see any possible way
21  out, it's so difficult and so painful, suicide is really
22  a logical option (witness crying.)
23          And I was thinking all of that; and I
24  was just crying, thinking -- thinking, being so sad for
25  my kids and thinking why -- why are my kids, my three

215

1  adorable kids that I love, why are they not enough to
2  fill that void?  It was going more and more in my head
3  (witness crying.)
4          I must have realized that I'm in danger,
5  and I was just starting to hyperventilate, crying; and I
6  called my husband.  I realized it was time that I called
7  for help.  I called my husband and he came to me and he
8  held me in the bed.  And I didn't beat around the bush,
9  and I told him I thought of killing myself.  And he was
10  very good.  He kind of calmed me, talked me through it.
11  "What is it you feel?  Should I take you to a hospital?"
12  I said no.  "Should I take you to a doctor?"  I said no
13  (witness crying.)
14          And he just kind of got me through it, I
15  guess.  He was able to patch me up, to kind of give me
16  enough of a boost to get me out of that state.  And I
17  relayed it to my psychologist at my meeting with him
18  afterwards, and what really scared me about it is how
19  little it took to get me to that state (witness crying.)
20          I just -- I had been actually happy the
21  day before.  In my calendar, my diary, I had noted that
22  I had been happy.  We had had some rough patch with my
23  husband; but, actually, that particular week -- I don't
24  remember anymore -- I feel like I had been in a pretty
25  good state the day before; and it just shocked me how

216

1  quickly it took me to get there (witness crying.)
2          And so I've now reached out to a
3  psychiatrist.  I previously was resistant because I'm
4  really scared of pills, of antidepressant pills from all
5  the stories that people get a life addictions to them
6  and are unable to go back.  And I said, oh, my god.  I
7  just got really worried about myself, and so I reached
8  out to another psychiatrist; and it turned out it's
9  another battle, uphill battle.  It's really hard to find
10  a good psychiatrist (witness crying.)
11          So now I -- I wasn't accepted by any of
12  the doctors I reached out to; and I have, instead,
13  followed up on two of them who recommended a more
14  junior psychiatrist who has been in their practice and
15  who I'm waiting, still, now to continue with.  You know,
16  I have yet to have my first psychiatrist appointment
17  (witness crying.)
18          So it has been a tremendous loss of, I
19  guess, personal self-worth, value.  While I've been
20  working really hard on getting back on track, I've been
21  reading articles on depression, on PTSD, on things that
22  I can do to help.  I educate diligently.  I read, you
23  know; get physical exercise; get meditation; try to get
24  enough sleep, which is challenging when I'm anxious
25  (witness crying.)

217

1          I currently go to a chiropractor who has
2  a more holistic approach; and he's given me -- he's
3  given me whatever, liquid supplements, that he said help
4  with sadness and depression.  And I'm just doing
5  everything I can to get better for my own sake and for
6  the sake of my family (witness crying.)
7          And I don't know if -- I don't know if I
8  would continue with a career.  I don't know if I will be
9  able to, even if I want to, because I feel like I've
10  been so badly shaken; and part of it is exhaustion.
11  Exhaustion sort of easily couples with depression.
12  As soon as I feel exhausted, which is very easily,
13  exhausted and overwhelmed, it typically makes me slide
14  into a depressed mode, easily hopeless; and because of
15  that, I have felt as if I have fewer productive work
16  hours that I can work (witness crying.)
17          And at this point I basically feel
18  incapable to kind of satisfy those high requirements
19  that were set for me, and I don't know if or when I
20  would fulfill them.  I feel that to get better
21  mentally, I need probably a two- or three-year break;
22  but I think that's impossible in my line of work, in my
23  profession, because as soon as you take a break, you're
24  out (witness crying.)
25          If it's past tenure, it's very possible.

218

1  It's easy, and many people do it.  They take leave
2  without pay, usually to start companies; but I imagine
3  it would have been easy to justify with motherhood, or
4  whatever, duties.  They take a couple of years' leave
5  without pay and then come back.  So that's very easy.
6  But pre-tenure, and especially if I want to find another
7  job afterwards, because at the moment I think I'm too
8  depressed to make a good impression, I feel like it
9  would be impossible to come back.  It's like once you
10  leave, you close the door; and the door never opens
11  again (witness crying.)
12          I will become permanently sort of
13  blemished.  People will probably just take a one-second
14  look at the state of my CV and say, "What's wrong with
15  her?"  And then they would go to all the other excellent
16  candidates that have not had any breaks in their career.
17  And so why bother, you know?  When you have plenty of
18  supply that's not been damaged, why bother, you know,
19  trying to figure out someone that's damaged.  Whether
20  they're right or wrong, it doesn't matter at all.  So
21  that's -- that's where we are (witness crying.)
22          MR. DOWER:  Dr. Nikolova, I thank you for
23  your time; and I hope that you feel that I've treated
24  you with respect throughout our conversation.
25          And I will pass the witness.

220

1              CHANGES AND SIGNATURE
2  WITNESS NAME:         DATE OF DEPOSITION:
3  EVDOKIA NIKOLOVA        June 29, 2021
4  PAGE/LINE   CHANGE        REASON
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____

219

1          MR. SCHMIDT:  I'd like to take a three-
2  minute break, and we'll come back.
3          MR. DOWER:  Okay.  Sounds good.
4          THE REPORTER:  We're going off the record
5  at 5:52 p.m.
6          (Off the record from 5:52 to 5:58 p.m.)
7          THE REPORTER:  We're going back on the
8  record at 5:58 p.m.
9          MR. SCHMIDT:  And we will reserve our
10  questions until the time of trial, and we also request
11  that we be provided the deposition to read and sign.
12          THE REPORTER:  This concludes the
13  deposition at 5:59 p.m.
14          (Deposition concluded at 5:59 p.m.)
15              --ooOoo--
16
17
18
19
20
21
22
23
24
25

221

1          I, EVDOKIA NIKOLOVA, have read the
2  foregoing deposition and hereby affix my signature that
3  same is true and correct, except as noted herein.
4
5      _____
6          EVDOKIA NIKOLOVA
7
8  THE STATE OF _____ )
9          Before me, _____, on
10  this day personally appeared EVDOKIA NIKOLOVA, known to
11  me (or proved to me under oath or through
12  _____) (description of identity card or other
13  document) to be the person whose name is subscribed to
14  the foregoing instrument and acknowledged to me that
15  they executed same for the purposes and consideration
16  therein expressed.
17          Given under my hand and seal of office on
18  this _____ day of _____, _____.
19
20
21      _____
22  NOTARY PUBLIC IN AND FOR
23  THE STATE OF _____
24  My Commission Expires:_____
25

222

1  STATE OF TEXAS      )

2                  REPORTER'S CERTIFICATION

3            I, DEBBIE D. CUNNINGHAM, CSR, hereby

4  certify that the witness was duly sworn and that this

5  transcript is a true record of the testimony given by

6  the witness.

7            I further certify that I am neither

8  counsel for, related to, nor employed by any of the

9  parties or attorneys in the action in which this

10  proceeding was taken.  Further, I am not a relative or

11  employee of any attorney of record in this cause, nor am

12  I financially or otherwise interested in the outcome of

13  the action.

14            Subscribed and sworn to by me this day,

15  July 24, 2021.

16

17

18

19  _____
    Debbie D. Cunningham, CSR
20  CSR 2065
    Expiration:  6/30/23
21  INTEGRITY LEGAL SUPPORT SOLUTIONS
    P.O. Box 245
22  Manchaca, Texas 78652
    www.integrity-texas.com
23  512-320-8690; FIRM # 528

24

25

Appx.0528

| | PAGE | LINE | CHANGE | REASON |
|---|---|---|---|---|
| 1 | | | | |
| 2 | 26 | 8 | change "full doc" to "post doc" | correction/clarification |
| 3 | 26 | 9 | change "are either" to "are doing either" | correction/clarification |
| 4 | 30 | 7 | change "Anthony" to "Antony" | correction/clarification |
| 5 | 33 | 3 | change "higher end" to "higher ranked" | correction/clarification |
| 6 | 33 | 8 | change "So they were" to "So there were" | correction/clarification |
| 7 | 33 | 13 | change "there was a bonus" to "that was a bonus" | correction/clarification |
| 8 | 35 | 7 | delete "him" | correction/clarification |
| 9 | 38 | 10 | change "had its own" to "has its own" | correction/clarification |
| 10 | 59 | 6 | change "It's revising" to "It's residing" | correction/clarification |
| 11 | 93 | 15 | change "Valenciano" to "Veciana" | correction/clarification |
| 12 | 109 | 12 | change "to TA of what" to "to TA and what" | correction/clarification |
| 13 | 114 | 17 | change "end of June" to "early June" | correction/clarification |
| 14 | 119 | 14 | change "working the CCAFR" to "working on the CCAFR" | correction/clarification |
| 15 | 121 | 7 | change "actual" to "factual" | correction/clarification |
| 16 | 124 | 9 | change "Grave" to "Graves" | correction/clarification |
| 17 | 147 | 18 | change "strictly" to "actually" | correction/clarification |
| 18 | 148 | 4 | change "which had" to "which I had" | correction/clarification |
| 19 | 148 | 5 | delete "worth" | correction/clarification |
| 20 | 156 | 8 | change "sex" to "text" | correction/clarification |

|   | PAGE | LINE | CHANGE | REASON |
|---|------|------|--------|--------|
| 1 | 159 | 9 | change "have a baby" to "had a baby" | correction/clarification |
| 2 | 162 | 7 | change "Jang" to "Zheng" | correction/clarification |
| 3 | 162 | 10 | change "Jang" to "Zheng" | correction/clarification |
| 4 | 162 | 11 | change "Jang" to "Zheng" | correction/clarification |
| 5 | 166 | 3 | change "sentence" to "sense" | correction/clarification |
| 6 | 167 | 4 | unclear what was actually said but reference to "teaching group" appears incorrect | correction/clarification |
| 7 | 170 | 9 | change "had arisen. One" to "had arisen one" | correction/clarification |
| 8 | 184 | 23 | change "teaching and increased" to "teaching an increased" | correction/clarification |
| 9 | 187 | 19 | change "ended up teaching" to "ended up not teaching" | correction/clarification |
| 10 | 189 | 8 | change "rebuttal" to "paragraph" | correction/clarification |
| 11 | 194 | 21 | change "publication" to "publications," | correction/clarification |
| 12 | 207 | 13 | change "fairer" to "fair" | correction/clarification |
| 13 | 212 | 1 | change "for research" to "for my research" | correction/clarification |
| 14 | 215 | 2 | change "going" to "growing" | correction/clarification |
| 15 | | | | |
| 16 | | | | |
| 17 | | | | |
| 18 | | | | |
| 19 | | | | |
| 20 | | | | |

1    I, Evdokia Nikolova, have read the foregoing deposition and

2  hereby affix my signature that the same is true and correct,

3  except as noted herein.  My date of birth is 1/24/79, and my

4  address is 400 East Monroe St., Austin, TX 78704, United States

5  of America. I declare under penalty of perjury that the

6  foregoing is true and correct.

7

8  Executed in _____ County, Texas, on the 23rd day of

9  August, 2021.

10

11

12  _____

13       Evdokia Nikolova

14

15

16

17

18

19

20

21

22

23

24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

EVDOKIA NIKOLOVA,           )
                            )
    Plaintiff,              )
                            )
VS.                         )   CAUSE NO: 1:19-cv-00877-RP
                            )
UNIVERSITY OF TEXAS,        )
                            )
    Defendant.              )


---------------------------------------

REMOTE ORAL DEPOSITION

OF

CARMEN SHOCKLEY
AS CORPORATE REPRESENTATIVE

MAY 28, 2021

---------------------------------------

REMOTE ORAL DEPOSITION of CARMEN SHOCKLEY produced

as a witness at the instance of the PLAINTIFF, and duly sworn,

was taken in the above-styled and numbered cause on the 28th

day of May 2021, from 9:01 A.M. to 1:23 P.M. reported remotely

before Jacqueline Love-Worline, CSR, in and for the State of

Texas, reported by machine shorthand remotely from Dallas,

Texas, pursuant to the Texas Rules of Civil Procedure and the

provisions stated on the record or attached hereto, and also

pursuant to the First Emergency Order regarding the COVID-19

State of Disaster declared by Governor Abbott dated March 13,

2020, renewed thereafter.

2

```
1           A P P E A R A N C E S
2  FOR THE DEFENDANT: UNIVERSITY OF TEXAS AT AUSTIN
3  BENJAMIN DOWER
   AMY HILTON
4  Assistant Attorney General
   Office of the Attorney General
5  General Litigation Division, P.O. Box 12548, Capitol Station
   Austin, TX  78711-2548
6  Telephone: 512-463-2120
   Benjamin.dower@oag.texas.gov
7
8
   FOR THE PLAINTIFF: EVDOKIA NIKOLOVA
9
   ROBERT NOTZON
10 The Law Office of Robert Notzon
   1502 West Avenue
11 Austin, TX  78701
   Telephone: 512-474-7563
12 Robert@notzonlaw.com
13 ROBERT SCHMIDT
   Crews Law Firm, P.C.
14 701 Brazos, Suite 900
   Austin, TX  78701
15 Telephone: 512-346-7077
   Schmidt@crewsfirm.com
16
17 ALSO PRESENT:
18 Laura Barbour, In-House Assistant General Counsel, UT Austin
19 Jody Hughes, Associate Vice President of Legal Affairs, UT
   Austin
20
21
22
23
24
25
```

4

```
1              EXHIBIT INDEX
2  NO.  DESCRIPTION                    IDENTIFIED
3  38  General Guidelines for Promotion and Tenure
       of all FAculty Ranks Exclucing the Medical
4      School 2018-2019 Academic Year        34
5  44  Plaintiff's First Amended Notice of Oral and
       Video Deposition of Carmen Shockley as a Fact
6      Witness and Corporate Representative   9
7  45  E-mail                                53
8  46  E-mail                                58
9  47  E-mail                                61
10 48  E-mail                                66
11 50  *Witness Notes                       N/A
12 51  Letter date 5/13/19 from G. Fenves to Dr. Brian
       Evans                                85
13
14 52  Extension of the Tenure Track Probationary
       Period                               94
15
16 53  E-mail                               111
17 *Exhibit retained/to be submitted by counsel
18
19
20
21
22
23
24
25
```

3

```
1              INDEX
2                                   PAGE
3  WITNESS: CARMEN SHOCKLEY
4     Examination by Mr. Notzon.......................5
5     Examination by Ms. Hilton.....................N/A
6     Signature Page.............................117
7     Reporter's Certificate.....................119
8
9  REPORTER'S NOTE 1:  Quotation marks are used for clarity and do
10 not necessarily reflect a direct quote.
11
12      REQUESTED DOCUMENTS/INFORMATION
13              N/A
14      CERTIFIED QUESTIONS
15              N/A
16
17
18
19
20
21
22
23
24
25
```

5

```
1          THE REPORTER: Today is Friday, May 28, 2021.
2  This is the videoconferenced deposition of Carmen Shockley in
3  the matter of Nikolova versus UT Austin. Due to the Covid-19
4  pandemic, we are remotely situated, and we are on the record at
5  9:01 a.m. Central Standard Time. My name is Jacqueline
6  Love-Worline, TX CSR No. 8970, and my business address is
7  located at P.O. Box 245, Manchaca, Texas 78652. Would all
8  persons present please state their appearances beginning with
9  the questioning attorney first.
10         MR. NOTZON: Robert Notzon and Bob Schmidt for
11 the plaintiff Evdokia Nikolova.
12         MS. HILTON: Amy Hilton and Benjamin Dower for
13 University of Texas at Austin.
14         Oh, and we have have some stipulations that we'd
15 like to read into the record.
16         The parties stipulate that this deposition may
17 be taken remotely via Zoom.
18         The parties stipulate that Objection Form is
19 sufficient to preserve objections to the form of the questions
20 and will be used in lieu of the more specific form-based
21 objections.
22         The parties stipulate that all objections except
23 as to the form of the question or answer are reserved until
24 trial.
25         And this isn't really a stipulation but the
```

6

1  deponent would like an opportunity to read and review the
2  transcript and recording pursuant to Federal Rule of Civil
3  Procedure 30(e), and the parties stipulate that Mr. Schmidt can
4  record this proceeding without the need to announce the time.
5       MR. NOTZON: Agreed.
6       CARMEN SHOCKLEY,
7  Having been duly sworn, testified as follows:
8       EXAMINATION
9  BY MR. NOTZON:
10  Q.  Good morning, Ms. Shockley.
11  A.  Good morning.
12  Q.  So have you ever had your deposition taken before?
13  A.  No, sir.
14  Q.  Okay. So as -- this is your first time and it's
15  fairly new to a lot of us being on Zoom, I'm assuming you're
16  pretty well experienced with Zoom  meetings?
17  A.  Yes.
18  Q.  Okay. Sad to hear it but it's the way it is.  The
19  deposition that we're here to do is your testimony not a
20  conversation, not -- it's fairly formal.  You're under oath as
21  you've just sworn, so what you'd have to say today would have
22  the same force and effect as if we were in front of a judge or
23  a jury.  You understand that?
24  A.  I do.
25  Q.  Okay. And the court reporter is going to be taking

7

1  down every word that's said today so it helps if we speak one
2  at a time and sometimes you're going to absolutely know what my
3  question is going to be before I finish it but if you could
4  wait for me to get the words out because she's going to type it
5  up on the page and if you start in, then the messages start
6  getting jumbled on the printed page as well as being hard to
7  hear or transcribe for the court reporter.  So if you could
8  wait for me to finish my question before you answer and I'll do
9  the reverse for you it should be helpful.
10       Lastly, this shouldn't take too long but if you
11  ever need to take a break for any reason just let me know and
12  we'll try to accommodate you as soon as possible, okay?
13  A.  Okay.
14  Q.  All right.  What is your position at UT?
15  A.  I am the Assistant Vice President for Faculty
16  Affairs.
17  Q.  Okay. And who is your direct supervisor?
18  A.  My direct supervisor is Tasha Beretvas.
19  Q.  And what's her title?
20  A.  Senior Vice Provost for Faculty Affairs.
21  Q.  Okay. And then her supervisor would be the Provost?
22  A.  That's correct.  Right now it's Interim Provost
23  Daniel Jaffe.
24  Q.  And is this the same position you held back in 2018
25  and 2019?

8

1  A.  It is.
2  Q.  Okay. And how long have you been in that position?
3  A.  In this position about three years and nine or
4  10 months.
5  Q.  Okay. And what position did you have before that?
6  A.  Before that I was Director.
7  Q.  Director?
8  A.  Correct. Yes, I was trying to think if there was a
9  qualifier.  Director of Academic Personnel Services in the
10  Provost office.
11  Q.  Okay. And how long were you in that position?
12  A.  That position -- I'm counting backwards in my head --
13  three years, I believe.
14  Q.  And who was the Provost at that time?
15  A.  I had several Provosts.  Since I have been in the
16  Provost office, I'd have to look at at their employment dates
17  to tell you which Provost I worked under when.
18  Q.  No problem.  Who promoted you to your current
19  position?
20  A.  My previous supervisor Janet Dukerich. She was the
21  Senior Vice Provost for Faculty Affairs at the time.
22  Q.  And is she still there?
23  A.  Not in that position.
24  Q.  Okay. What's her position now?
25  A.  Vice Provost for Advocacy and Dispute Resolution.

9

1  Q.  Okay.  And when did you start that position?
2  A.  Approximately two years ago.
3  Q.  Would that have been before or after Dr. Nikolova was
4  denied tenure?
5  A.  That would have been after.
6  Q.  You understand that you're here today both in your
7  individual capacity of what does Carmen Shockley remember or
8  not remember about what happened and also to speak as UT on
9  three topics.  Do you understand that?
10  A.  Yes.
11  Q.  Okay.
12  A.  Yes.
13  Q.  Oh, and are you Dr. Shockley or Ms. Shockley?
14  A.  Ms.
15  Q.  Okay.
16  A.  Thank you.
17       (Exhibit 44 identified.)
18  Q.  Yep.  We're supposed to be formal.  Okay.
19       Let me go ahead and put up as an exhibit -- it
20  will be Exhibit 44 the deposition notice.  It will be in the
21  chat.  This will give us practice for the deposition exhibits
22  we'll use today.  Are you able to view it?
23  A.  Yes.
24  Q.  And you see the three topics listed there?
25  A.  Yes.

10

1    Q.   Let's go off the record real quick.
2         (Technical difficulties.  Brief pause in the
3    proceedings.)
4         MR. NOTZON: Back on the record.
5         MR. SCHMIDT: Sorry, give me one second.  I'm
6    sorry.
7    Q.   (BY MR. NOTZON) Okay, Ms. Shockley.  You're able to
8    view the document?
9    A.   Yes.
10   Q.   Okay.  And the three topics listed there you're
11   prepared to testify as UT on those three topics?
12   A.   Yes.
13   Q.   Okay.  And we'll get to those a little bit later.  I
14   wanted to kind of talk to you as the individual first, okay?
15   A.   Okay.
16   Q.   How long -- well, when did you first start working at
17   UT just to get an entry there --
18   A.   July 2001.
19   Q.   And What job was that?
20   A.   I was an Administrative Assistant in the Dean's
21   office in the College of Fine Arts.
22   Q.   Now are you a longhorn by education as well?
23   A.   No, just my occupation.
24   Q.   Okay.  When did you first learn that there was an
25   issue related to Dr. Nikolova regarding gender or pregnancy

11

1    bias or discrimination in this -- in your experience?
2         MS. HILTON: Objection. Form.
3    A.   When did I first learn of her concern or something
4    else?
5    Q.   That there was a concern whether it was from her or
6    anyone else that there was a concern that there was gender or
7    pregnancy bias or discrimination involved with her employment?
8    A.   The first time I recall being aware that she had a
9    concern about gender or pregnancy discrimination was regarding
10   her promotion and tenure case and that would have been in the
11   spring of 2019 when she submitted a complaint to -- or a
12   request for review to the university's committee for counsel on
13   academic freedom and responsibility, an acronym that we
14   pronounce CCAFR and that's the first I recall of hearing of
15   that concern and that did come up in my reviews for the topic
16   as a corporate witness.  I was -- that's when I realized that
17   was the first.
18   Q.   Okay. You might not have remembered that had you not
19   reviewed the documents?
20   A.   That's correct.
21   Q.   Okay. And you specified that that was the first time
22   you learned that she had a concern?
23   A.   Yes.
24   Q.   Correct?
25   A.   Yes.

12

1    Q.   Did you ever have -- did you ever have an awareness
2    or understand that other people had concerns that gender or
3    pregnancy bias or discrimination might be an issue related to
4    Dr. Nikolova?
5    A.   No, not that I recall.
6    Q.   Right. You can't testify about what you don't
7    remember.
8    A.   Okay.
9    Q.   Okay. And when you learned of that, was it through
10   her CCAFR appeal?
11   A.   Yes.  I refer to that as a request for review, yes.
12   Q.   Okay. Her writing?
13   A.   Yes.
14   Q.   And what did you do with that information?
15   A.   That information was part of the request for review
16   to CCAFR, so waited for CCAFR to respond.  There wasn't
17   anything in my position to do with that information I'll say-so
18   then it was a matter of waiting for CCAFR to look into the
19   concerns raised in her request for review to see what they
20   documented about that.  Yes.
21   Q.   What was your -- I guess, how did you come about to
22   get a copy or be aware of her request for review?
23   A.   The general guidelines for promotion and tenure
24   specify that the Provost office will receive a copy of the
25   request that's made to CCAFR I believe in her case -- which I

13

1    can't recall in her case whether it was forwarded -- forwarded
2    me or whether I was copied on it directly.
3    Q.   Okay.  And you would have been the contact person
4    involved in that request for review from the Provost office?
5    A.   Correct.
6    Q.   Okay.
7    A.   Yes.
8    Q.   All right.  Is that also specified in the guidelines
9    or does it just say the Provost office and people know to get
10   it to you?
11   A.   I believe it says the Provost office.  I'd have to
12   look at the guidelines from that year to see exactly what it
13   said but I am also generally known in the Provost office as the
14   contact for the promotion and tenure process.
15   Q.   Okay.  And Did you ever have any discussions with
16   anyone -- well, before I go there, any other complaints that
17   you became aware of that either Dr. Nikolova or someone else
18   communicated about gender or pregnancy bias involving Dr.
19   Nikolova other than the request for CCAFR review?
20   A.   Not that I recall.
21   Q.   Did you have any conversations with either the --
22   your supervisor, Ms. Dukerich or the Provost or Dean Wood or
23   anybody in administration really about Dr. Nikolova's complaint
24   of gender or pregnancy discrimination?
25   A.   Not that I recall.  May I clarify your question?

14

1    Q.   Sure.
2    A.   For thinking of that in the frame of reference of the
3  initial -- the initial reading of that in the report, but is
4  that what you meant with your question?
5    Q.   No.  It's any of her complaints at any time about
6  gender and pregnancy bias, or anybody else's concerns about
7  gender and pregnancy bias involving Dr. Nikolova?  Did you have
8  conversations with anyone in UT administration about those?
9    A.   I don't recall specific conversations about those,
10  that's true, because it was part of her claim to CCAFR and part
11  of what they wrote down -- what they went -- referenced in
12  their report.  It would be typical for conversations to take
13  place about the claims made by a candidate and the finding of
14  CCAFR but I don't recall specific conversations about that
15  aspect.
16    Q.   Okay.  Did you play any role in responding to CCAFR?
17    A.   When the president is preparing to respond to the
18  CCAFR report, he has a meeting with the Provost and me and my
19  supervisor who was Dr. Dukerich at the time and legal counsel
20  from UT.
21    Q.   Okay.
22    A.   To answer your question, I participated in that
23  conversation.
24    Q.   Right, and because the UT attorney was there, I'm not
25  asking you to tell us what was said because that would be

15

1  protected.  I'm asking about conversations that don't involve
2  the attorney.
3    A.   I don't recall conversations that did not involve our
4  attorney.
5    Q.   Okay.  And just to be clear, you also didn't have any
6  conversations with anybody from the Dean's office for the
7  School of Engineering or the ECE department related to concerns
8  of gender or pregnancy bias concerning Dr. Nikolova, is that
9  correct?
10    A.   That is correct in terms of my recollection, yes.
11    Q.   I'm trying to figure out which questions I'm going to
12  ask you and which questions I'm going to ask UT, so pardon me
13  while I delay a little bit.
14       I guess, let me hear from you about your job
15  duties as the person from the Provost office that's in charge
16  of promotion and tenure issues.  I'm sorry, I probably
17  misstated that a little bit, but if you could expound on that.
18    A.   In that specific aspect of my position?
19    Q.   Especially as it relates to 2018, 2019 when Dr.
20  Nikolova was going up for tenure?
21    A.   Certainly.  Okay.  Let's see.
22       As I mentioned, I was and am generally
23  considered the individual in the Provost office who can address
24  questions related to the promotion and tenure process.  Those
25  questions typically come from candidates, Dean's, department

16

1  chairs, and members of the President's Committee during the
2  period of the year where they are actively reviewing and
3  discussing files.  Throughout other parts of the year, I assist
4  Senior Vice Provost and the Provost with assembling the general
5  guidelines for promotion and tenure and other related documents
6  that are on the Provost office website.  Let's see.  I attend
7  meetings on my own or with Senior Vice Provost or Provost or
8  other members of the President's Committee with department
9  chairs, Dean's and faculty members across campus throughout the
10  year to discuss the process and answer questions that
11  individuals have.  During the period where the President's
12  Committee is actively reviewing the files, I'm in charge or
13  responsible for making sure they have the materials that they
14  need in an orderly fashion and in a timely manner.  I sit in
15  with the President's review committee when they are discussing
16  files amongst themselves and with Deans.  Once the President
17  has made a decision in a case, I record his decision, or her
18  decision -- that's his decision.
19    Q.   What do you mean, "record"?
20    A.   Oh, good.  I write it down so that it can be
21  transmitted into the letter that the President sends to each
22  Dean.
23    Q.   And when you record that decision, is it a thumbs up
24  or a thumbs down?
25    A.   With each promotion candidate, there are a number of

17

1  -- I don't know if a number -- there are specific outcomes that
2  the President may decide up on.  They vary and can be nuances of
3  thumbs up -- thumbs down.  And in the related documents on the
4  Provost office website, there is a chart of the various types
5  of promotion files and the various outcomes that can come about
6  in those.
7    Q.   Would you write, while you're in the President's
8  Committee deliberations, discussions, conversations with Deans,
9  etcetera, do you take notes?
10    A.   No.
11    Q.   Okay.  Your position is to facilitate access to
12  dossiers and answer any questions related to process?
13    A.   Correct.  Yes, and I -- I should specify, when you
14  asked about notes, I was thinking of notes about the merits of
15  specific candidates.  It's true that I do not take notes on
16  those but I do take notes for ideas that come about from the
17  President's Committee about improvements to the process or
18  things that need to be clarified in the general guidelines or
19  discussed when they host various panel presentations.  I do
20  take those notes.  They're transitory and lead to the -- lead
21  in preparation for those discussions or improvements to the
22  general guidelines.
23    Q.   Which are separate and apart from any particular
24  information or deliberation related to a particular candidate?
25    A.   That's true.

18

1    Q.   And then to clarify the decision that you record, it
2  is just the result and not the reasoning?
3    A.   Correct.
4    Q.   And just to be careful, would you define transitory
5  and your use of that word just a little bit ago?
6    A.   Oh, sure.  The way I use that word was to describe a
7  record that I make in my capacity as the Assisant Vice
8  President that then becomes memorialized in a -- for example,
9  final decision letter from the President or changes to the
10  general guidelines for promotion and tenure.
11    Q.   For use in a future document?
12    A.   Yes.
13    Q.   Okay.
14    A.   Yes.
15    Q.   Do you recall a conversation related to Dr. Nikolova?
16    A.   Which conversation?
17    Q.   The President's Committee.
18    A.   Oh, yes, I do.  I recall her case being discussed
19  between the members of the President's Committee and the Dean.
20    Q.   Okay.  And was the Dean present for the deliberation
21  and the decision?
22    A.   She was present for discussion of the file.  I don't
23  recall if she was present when the Dean -- excuse me, when the
24  President made a decision.  I don't recall.
25    Q.   Okay.  Do you recall if the President made a decision

19

1  with the other committee members present related to Dr.
2  Nikolova?
3    A.   I don't recall specifically.
4    Q.   Okay.
5    A.   That would have been the normal practice.  I think
6  that's fair to say but I don't recall specifically on this
7  case.
8    Q.   The normal practice is for the President to make the
9  decision with the committee present and he announces his
10  decision -- he or she, but it's he in this case -- announces
11  his decision with the committee present and you?
12    A.   Yes.
13    Q.   And do you recall President Fenves taking a poll on
14  Dr. Nikolova's case from the committee?
15    A.   I recall him soliciting feedback from the committee
16  members, yes.  I don't know if I would characterize it as a
17  poll.
18    Q.   Okay.  Do you recall if there was conflict?
19    A.   I don't recall.
20    Q.   Okay.
21    A.   I don't recall that.
22    Q.   Maybe that's a -- too general of a word.  Was there
23  people on either side of the promote/don't promote --
24    A.   That's what I don't recall.
25    Q.   Okay.  I just didn't want to -- you know, I didn't

20

1  want to assume that conflict meant contention.
2    A.   Thank you.
3    Q.   Okay.  I guess if you could, what do you recall about
4  the discussion related to Dr. Nikolova with Dean Wood present
5  or not, if you could tell us.
6    A.   Pardon -- I cut you off.  What did you say at the
7  end?
8    Q.   If you could just tell us.
9    A.   I recall that it was not a clear case for tenure nor
10  was it -- it was just not a clear case.  There was -- I recall
11  there being a fair amount of discussion relative to other
12  cases.  I recall concerns about her record being discussed.  I
13  don't remember what they specifically were.  I recall strengths
14  about her case being discussed but I don't remember
15  specifically what they were.
16    Q.   Okay.
17    A.   That's typical.  I think that's a fair recollection.
18    Q.   Okay.
19    A.   An accurate recollection.
20    Q.   And do you understand that there was a unanimous P&T
21  committee vote in favor of promotion to tenure from the
22  college?
23    A.   I actually did not recall what the vote was.
24    Q.   Okay.  So there would be strong support for her
25  promotion from the chair, the budget committee, the P T

21

1  committee, and it was only Dean Wood that actually gave the
2  first negative vote.  Did you understand that?
3    A.   Yes, I do recall that.
4    Q.   Okay.  And so that alone would indicate that it
5  wouldn't be a clear case one way or the other, I would think,
6  right?
7    A.   I'd agree with that.
8    Q.   Okay.  And do you recall if the discussion centered
9  around the fact that she was coming up early, i.e., not having
10  spent six years at UT?
11    A.   Yes, because -- the reason I'm certain I recall that
12  is because I recall that the options for the decision that the
13  President could make included promote, terminal appointment,
14  and do not promote and for a tenured tract faculty member to
15  have the option of do not promote it means that they have not
16  completed six years of probationary status.
17    Q.   At UT?
18    A.   Correct, at UT.
19    Q.   Okay.  Other than just remembering that those were the
20  options, do you recall the conversation about whether to
21  promote to tenure or not involving in the fact that she was
22  coming up early, i.e., the qualifications?
23    A.   Could you ask that again, please.
24    Q.   Sure.  I'm just trying to -- when I asked you if her
25  early status had been discussed -- had been part of the

22

1  discussion, you said you recall that it was because there were
2  options and I was wondering if there was anything else you
3  recall other than the fact that at the end of the day, he had
4  an additional option or if you recall that there was actual
5  discussion about the topic among the participants.
6      A.  Okay, thank you.  I do recall there being discussion
7  about her years in rank at UT Austin and about her years of --
8  which of those years of rank -- not specifically, but the
9  number of those years in rank, that equal her probationary
10  period.  I do not recall specific detailed conversation about
11  that.
12     Q.  Okay.  And that's because she had taken a probationary
13  extension year so the counting had to be understood?
14     A.  That's correct.  For all tenure track faculty
15  members, we calculate the number of years in rank at UT Austin
16  and the number of those years that are considered that
17  individual's probationary period at UT Austin, and they
18  sometimes differ.
19     Q.  Largely because of the probationary extension?
20     A.  There are several reasons that they could differ.
21  That certainly is one of them the probationary period
22  extension.  And then if a faculty member has a leave of absence
23  without salary, that year would not count as a year of
24  probationary service.
25     Q.  Okay.  So those -- is it just two?

23

1      A.  The third one is a little different but a partial --
2  it matters in her case, a partial year of employment.  That
3  half year counts as a year in rank at UT Austin but that whole
4  year does not count as a year of probationary service because
5  these are counted in years not in half years.  And I'm a little
6  in my corporate hat right now, aren't I?
7      Q.  Well, it's kind of both.
8      A.  Okay.
9      Q.  It's kind of both, and I guess, yeah, I guess we
10  could start.  That would be the second topic.  But we're going
11  beyond that because we're talking about stuff outside that, the
12  probation.  So the -- and just as a preview of things to come,
13  if you recall that you testified about something that's related
14  to one of the topics that I'm going to ask you later, you could
15  say, as I testified before.
16     A.  Okay.
17     Q.  Because you're kind of both in certain circumstances.
18  You have professional personal experience but then you're also
19  testifying as UT and I'm fine taking that testimony efficiently
20  by you saying what I said before, okay.
21     A.  Thank you.  Okay.
22     Q.  Yes.
23     Q.  What is the difference between or what's the
24  distinction between time and rank and how would that be used
25  versus year of probationary achievement or accounting?

24

1      A.  Service, yes.  The general guidelines for promotion
2  and tenure specify that an individual who has fewer than six
3  years in rank is considered accelerated, and so that is how
4  that determination is made.  And the second part of your
5  question was?
6      Q.  And let me -- let's get a clarification of the term
7  in rank.
8      A.  Certainly.
9      Q.  I understand there's some ambiguity from talking to
10  Dr. Fenvez yesterday.  There's in rank meaning as an assistant
11  professor at UT?
12     A.  Yes.
13     Q.  Then there's in rank as being an Assistant Professor
14  at UT and anywhere else?
15     A.  In one's career.  I would agree with that.
16     Q.  Okay.
17     A.  Our general guidelines are referencing years in rank
18  at UT Austin.
19     Q.  Okay.  So when you're talking about general guidelines
20  in term, in rank means at UT?
21     A.  It does and we have since clarified that in the
22  general guidelines.
23     Q.  Okay.  So the question I was trying to get at was
24  counting you said the half year that she worked in the spring
25  of '14 was time and rank but not probationary service.  In what

25

1  way would the time and rank be used in the promotional process
2  versus probationary service?
3      A.  Okay.
4      Q.  If at all -- if it all, if it's used at all?
5      A.  Yes.  So the time and rank is used to determine
6  whether the case is designated as accelerated or not.  You can
7  also call that early or not.  Accelerated is just the
8  terminology that we use.  The probationary period years from a
9  process perspective, they -- an individual who has -- who is in
10  their 6th year at the time of review, their 6th year of
11  probationary service at the time of review has a different set
12  of outcomes than an individual who is not in their up or out
13  year also known as the 6th year of probationary service.
14     Q.  I guess I'm still confused because wouldn't it be --
15  well, why is it that time and rank determines whether it's
16  accelerated or not instead of the years of probationary service
17  that determines whether it's accelerated or not?
18     A.  I don't know the answer to that question.  That
19  decision for it to be -- for that to be the procedure in the
20  general guidelines was a procedure that I inherited in my role
21  not one I was part of developing.
22     Q.  Let's do a for instance.  Somebody starts half year
23  so that doesn't count on probationary service.  They take a
24  leave without pay for another semester some other time.  That
25  means that they have another half year of in rank but that

26

1  whole year doesn't count for probationary service, right,
2  because it's a partial year?
3     A.  Yes.
4     Q.  Is that right?
5     A.  Correct.  A partial year of leave of absence would
6  mean that year does not count as a year of probationary
7  service.
8     Q.  Okay. So then that person could be at six years of in
9  rank but five years -- well, four years of probationary
10  service.  So if they went up for tenure it wouldn't be
11  accelerated because they were at six years in rank?
12    A.  That's correct.  It would not be designated as
13  accelerated nor would it be an up or out year.
14    Q.  Okay. So the term accelerated is distinct from the
15  term early, or early doesn't even come into play?
16    A.  In our general guidelines, we don't use the term
17  early. We use accelerated. I understand early and accelerated
18  to be used synonymously but as you mentioned, there can be a
19  lot of confusion and a lot of clarification of what one means
20  when one says accelerated or early.
21    Q.  So which still leaves me with some confusion.  So we
22  have the example I used which is six years in rank and four
23  years probationary service would not be accelerated, correct?
24    A.  Correct, would not be designated as accelerated.
25    Q.  So when -- if that person went up for tenure on that

27

1  6th year of rank, there would be no need to explain the -- that
2  that's the term that's used right in the guidelines, is to
3  explain why the person is going up accelerated?
4     A.  The general guidelines do not require an explanation
5  for an individual who is in their 6th year in rank though I
6  will say it's often provided.
7     Q.  Because people are confused about the policy?
8     A.  To make sure that every one is on the same page about
9  what the years in rank are and what the years of probationary
10  service are.
11    Q.  Okay. So you see that frequently where somebody is
12  acting like they're accelerated when they actually have the
13  years in rank?
14    A.  You mean by acting like they're accelerated?
15    Q.  They're behaving and communicating as if they
16  understand that being at the 4th year of their probationary
17  status is accelerated or early when, in fact, they are in their
18  6th year in rank.
19    A.  I'd say it's more of an acknowledgement that they are
20  not in their upper out year or mandatory review in the 6th year
21  of probationary period service.
22    Q.  From your experience and I guess you must have been
23  in at this point thousands of the President's Committee
24  deliberations.
25    A.  It would be interesting to count.  Certainly there

28

1  have been a lot.
2     Q.  President Fenves gave us the number 800 for his time
3  as Provost and President.  Would you be there longer than that
4  in the room or shorter than that?
5     A.  Oh, I see, I have been in the room since he left the
6  university.  I don't know if he was counting his cases when he
7  was Dean.  Okay, Provost.
8     Q.  Because he wasn't actual on the committee.
9     A.  I don't recall if I had one year before him or not in
10  the committee room.
11    Q.  So you could -- you could be exceeding 1,000 at this
12  point?
13    A.  I suppose I could be.
14    Q.  Okay. So that just gives us background to the wealth
15  of experience that you have in that observation position. Do
16  you have a general feel for the person's that come up for
17  tenure review that there are more like over 50 percent or less
18  than 50 percent people that are in their upper out year or are
19  in the other category?
20        MS. HILTON: Objection. Form.
21    A.  Pardon?
22        MR. NOTZON: She said objection.
23        MS. HILTON: Oh, Carmen, at times I'll object to
24  the form and you can go ahead and answer the question.  It just
25  for something later on with our report.  You can go ahead and

29

1  answer.
2     A.  Thank you, Amy.  I am uncomfortable giving an answer
3  about data for data that I haven't looked at closely.  So
4  speaking as Carmen Shockley, it is my sense that more often
5  than not candidates are in that 6th year of probationary
6  service when they're being reviewed for their upper out year
7  though I'm not comfortable getting close to the 50 percent mark
8  with that.
9     Q.  Okay, I'll take that.  Just getting your seat of the
10  pants feel for it.
11        MR. NOTZON: Let's go ahead and take a short
12  break okay.  How this works -- off the record.
13        (A recess was taken at 9:47Â a.m.)
14    Q.  (BY MR. NOTZON)  Thanks for the break and again, if
15  you ever need one, you just let me know.  Could you tell me the
16  names of the people that you recall being on the President's
17  Committee in that spring 2019 iteration?
18    A.  Yes.  I'm trying to recall if I recall correctly.
19        MR. SCHMIDT: Can we pause the deposition for a
20  moment?  I'm having some issues on the recording side here.
21        (Technical difficulties.  Brief pause in the
22  proceedings.)
23    Q.  (BY MR. NOTZON)  Waiting for you.
24    A.  Thank you.  The members of the President's Committee
25  that year were President Greg Fenves, Provost Maurie McInnis,

30

1  the vice President for Research Dan Jaffe, the Dean of the
2  graduate school and Senior vice Provost for academic affairs
3  Mark Smith and the Dean of the undergraduate -- or Dean of
4  undergraduate studies Brent Iverson.
5      Q.  Of those individuals, do you recall one or more of
6  them being a proponent or opponent of accelerated promotions
7  for tenure.
8      A.  Just generally?
9      Q.  Yes.
10      A.  I can speak it generally for the committee, I
11  believe, on this topic, not for each individual.
12      Q.  Right.
13      A.  Okay.  So generally, the committees -- I wouldn't
14  describe them as either proponents or opponents of accelerated
15  cases since every case is looked at on a -- for it's unique
16  merits and on a case-by-case basis.  I'd say in general, my
17  understanding of the committees view that we have a --
18  what's referred to as a sort of normative time between reviews
19  so being at 6th -- for tenured specifically, being not earlier
20  than the 6th year in rank at UT Austin, and generally the
21  committee agreed that that was was the appropriate normative
22  time for a review not specific to anyone case, though --
23      Q.  Right, okay.  And you're saying when I ask you to
24  identify if there was one or more of the members of the
25  committee that championed that issue more than others, you're

31

1  not comfortable saying that meaning that you don't know or
2  you'd rather not say?
3      A.  -- I don't recall there being a difference of opinion
4  between the committee members this matter.
5      Q.  Okay.  And let me go ahead and clarify the -- or maybe
6  ask it a slightly different way kind of the same question but
7  instead of saying accelerated, saying prior to the up or out
8  year because those are distinct categories, right?
9      A.  They are.  Yes, they are.  Could you ask the question,
10  please, using that category?
11      Q.  Sure.  From your experience being in the room and
12  particularly in the iteration from the committee from two years
13  ago that you experienced in the spring of 2019, do you recall
14  any of the members being particular proponents or opponents of
15  someone going up for tenure in not their up or out year prior
16  to their up or out year which would then allow them to go up
17  again sometime later presumably?  Yeah, that's the question.
18      A.  Okay. I testified earlier about the different reasons
19  a person might not be in their up or out year and that number
20  of years might not be the same as the number of years in rank.
21  So I think that's important to keep in mind here because an
22  individual who goes -- for instance, who goes on leave of
23  absence to -- for professional reasons to take another -- for
24  professional reasons, therefore, that time is really still
25  continuing their faculty job for UT Austin doesn't have an

32

1  option about whether that year counts or doesn't count, right.
2  So that's understood.  And then individuals may take extensions
3  to the probationary period which they may also rescind and that
4  is understood.  I think that's important context.  That being
5  said, I recall in those conversations the President's Committee
6  asking of various cases.  I don't remember the specific case.
7  Asking -- no, not asking -- acknowledging, right, those
8  variables.  All that being said, I can't recall and don't think
9  I can speak for the President's Committee view on individuals
10  in their up or out year or not in their up or out year while
11  they have six years of rank -- in rank at UT Austin.
12      Q.  Okay.  So having been in the room for all these
13  conversations, you couldn't say that when someone came up that
14  was either accelerated or prior to their up or out year that
15  you could always count on doctor-such-and-such to raise that
16  and focus their attention on resolving that issue in their
17  participation and discussion?
18      A.  I agree with what you just said.
19      Q.  Involving -- let me do another add on category so we
20  have the accelerated, we have the prior to the up or out year
21  but not accelerated and those are involving UT time and work.
22  Let's add on the prior institution that they came from, be it a
23  peer or non peer institution and you'll let me know if that's
24  an issue as well from your understanding.  Does that change
25  anything in the promotional tenure review process?

33

1      A.  I believe there is -- or I don't believe but I have
2  observed there being conversation about an individual's prior
3  years in a similar tenure status or tenure track status at
4  another institution being part of the conversations for various
5  candidates.
6      Q.  Okay.  And those are also referred to and that's where
7  the ambiguity comes in, I think, as time in rank, right?  It's
8  time in rank but not at UT, but as an assistant  professor
9  tenured track at another institution.  Are -- is it your
10  understanding that the President's Committee reviews those
11  people as having sufficient time in rank, they combine the time
12  for the two institutions?
13      A.  I believe they consider whether -- can you ask that
14  again, please.
15      Q.  I'll try to ask it a different way.  Is there any
16  distinction whether from the fact of the difference that you
17  know somebody spent two years at a prior institution tenure
18  track and four years at UT, is there a distinction in how that
19  time is handled in the promotional review process?
20      A.  Thank you.  I do believe there's a distinction in the
21  way those files are discussed, yes, acknowledging that an
22  individual within their whole career may not be accelerated in
23  terms of a career trajectory versus your second example where
24  it's an individual who has had fewer than six years in rank at
25  UT Austin without prior service.  I do believe that distinction

34

1  is made within the conversations that take place in the
2  President's Committee.
3      Q.   And just to clarify, so the person would be
4  accelerated if only found in UT in rank time but when you count
5  the other time, they would meet the six-year in rank time
6  period, are once they consider the prior time, are they no
7  longer considered accelerated?
8      A.   They are still considered accelerated on UT Austin's
9  -- by UT Austin's guidelines.
10     Q.   So the question needs to be answered why now?
11     A.   Yes.
12     Q.   Okay.
13     A.   That question does need to be answered.
14     Q.   And the why now is an explanation, correct? That's
15 what the guidelines say?
16     A.   Yes, to explain -- I don't know if it said justify at
17 that time.  To explain and/or justify the reason for the
18 accelerated review, yes.
19         (Exhibit 38 identified.)
20     Q.   Let me go ahead and put up Exhibit 38 which are the
21 guidelines for the relevant period I believe.  Let me know when
22 you have it.
23     A.   Thank you.  I have them open.
24     Q.   Okay.  I think when you look at Page 3 -- well, first
25 confirm these are the right guidelines?

35

1      A.   Yes, these are the right guidelines.
2      Q.   Page 3 of the document and A3-B?
3      A.   Yes, that's what I'm looking at.
4      Q.   Okay.  And it says explain?
5      A.   Explain.  Yes, thank you.
6      Q.   And you see that as a different standard than
7  justify?
8      A.   I'm not sure I know what you mean by that question.
9      Q.   Do you see those as two different ideas of what is
10 required to satisfy an accelerated tenure year?
11     A.   Okay. Certainly they're different words.  I have a
12 feeling when I use them as I did earlier in my testimony, I'm
13 not thinking of them as vastly different standards.
14     Q.   Okay. When they're applied, are they a separate
15 question that must be answered like a box must be ticked and if
16 that box isn't ticked we can't go onto the review of the
17 qualifications of the candidate or is it part of the
18 qualifications of the candidate?
19     A.   I'm sorry, I don't understand your question.
20     Q.   Is it possible that when someone is coming up for
21 tenure review in an accelerated status as not both before six
22 years at UT in rank, that if they don't have a sufficient
23 explanation, not justification but explanation, that they would
24 not -- their case would not be ready to be reviewed?
25     A.   I think I understand, thank you.  The guidelines

36

1  state it's expected that that will be explained in the
2  department chair and Dean statements.  Are you asking me if it
3  was failed -- if there was a failure to explain that in a
4  promotion case would that case still be reviewed?
5      Q.   Or not, yes?
6      A.   Or not.  The answer is the case would still be
7  reviewed.
8      Q.   Okay.
9      A.   Even if a chair or Dean failed to give an explanation
10 for a review in their statement.
11     Q.   Or a satisfactory explanation?
12     A.   The case is still reviewed and part of that review is
13 the discussion with the President's Committee and if the
14 explanation given I suppose was less than satisfactory, that
15 would come up in that discussion between the Dean and the
16 President's Committee.
17     Q.   From your experience and observation, did you see
18 that the people that came up accelerated -- and I want to stop
19 repeating this -- before six years in rank at UT, but just to
20 make sure that we're talking -- about the same thing that -- I
21 just forgot my question.
22         (Last question and answer read back.)
23     A.   I'm still blanking so let's move on.
24         So, Ms. Shockley, in the review of the tenure
25 file, did you see that -- or did you hear discussions that

37

1  there needed to be, if the case was accelerated, that the
2  person had to have higher qualifications? So if it's one year
3  accelerated higher qualifications than if it was an up or out
4  year, or if it was two years early they had to have even more
5  qualifications?
6      A.   This is where the distinction between early in one's
7  career -- accelerated in one's career versus accelerated on the
8  -- on UT Austin's clock.  This is one of the places where that
9  distinction would be part of the conversation because for a
10 person accelerated in their career where their years in rank at
11 UT Austin also matched their years as a tenured track faculty
12 member at any institution there would be an expectation that,
13 that individual would -- I don't know if I would use the words
14 higher standard but that, that individual would demonstrate
15 enormous strengths in their productivity, research and other
16 aspects that are reviewed in a promotion case.  When an
17 individual is -- does that answer your question?  Let me stop
18 there.
19     Q.   I think so and you're saying in the category of
20 before six years in rank at UT and before six years in rank
21 anywhere?
22     A.   As a tenured track faculty member at another
23 institution, yes.  As I mentioned earlier or testified earlier
24 that that distinction would be recognized and discussed for
25 those faculty members, for those candidates.

Carmen Shockley - 5/28/2021

38

1    Q.   And that's separate and apart -- that would not --
2  that discussion wouldn't apply if the person had the time and
3  rank of six years or more at UT and somewhere else?
4    A.   I think -- so I think it may help to explain this in
5  one other way.  As we saw in the guidelines, those cases
6  considered before the six year in rank at UT Austin must be
7  explained.  One of -- or a part of that explanation or that
8  whole explanation could be well, that person has prior years as
9  a tenured track faculty member at another institution so that's
10  where it comes into a discussion and into the -- well, into the
11  discussion is in considering the explanation.
12    Q.   Okay, so I think that helps and maybe it creates
13  categories of conversation, let me propose my understanding of
14  what you're saying is you have a candidate that goes up for
15  tenure six years in rank at UT, six years probationary status
16  at UT, up or out year, they're discussed, there's no need to
17  talk about why they're accelerated or anything like that,
18  that's not part of the discussion, it's just about do they meet
19  the standard for tenure, correct?
20    A.   Yes.
21    Q.   Okay. That would be one category of people.  The next
22  category of people would be somebody that has six years in rank
23  at UT, is not accelerated but still is not in their up or out
24  year.  That conversation is going to be pretty similar to the
25  first category?

39

1    A.   I'm making sure I understand that example.  In rank,
2  not up or out?
3    Q.   Not accelerated and not up or out?
4    A.   Yes, that is a category.  I would say that's a
5  category of conversations, yes.
6    Q.   And that conversation is going to be not unlike the
7  first category of up or out?
8    A.   I would agree with that.
9    Q.   Okay. There's no reason to talk about anything else,
10  right? The only difference, would you agree the only difference
11  of that second category is that when it comes time if there's a
12  denial from the President's Committee, the rules say no final
13  argument, no reconsideration by the President's Committee?
14    A.   So in that second category the President -- the
15  second category being the individual has six years in rank at
16  UT Austin the individual has four years that are designated as
17  probationary service.  The President may decide to promote.
18  The President may decide a terminal appointment in that case or
19  do not promote.  If the President's decision is terminal
20  appointment then the individual may submit final arguments.
21    Q.   Okay?
22    A.   Okay. So terminal -- final arguments are allowable
23  when a candidate has a terminal appointment.
24    Q.   Okay. So even then, they might even be exact, the
25  conversation would be exact with them but I guess they'd still

40

1  have to say I have to make that additional decision which --
2    A.   Yes.
3    Q.   -- would not happen.
4    A.   Yes.
5    Q.   Which wouldn't happen in the first category because
6  it's already assumed a no tenure is terminal appointment.
7    A.   In the first category where someone is in their
8  mandatory review year, yes.  Do not promote is not an option in
9  that case.
10    Q.   Have you ever seen the President issue a terminal
11  appointment for a non route year?
12    A.   Yes. I don't recall if we have one or two examples
13  of that in my time in the Provost office but yes.
14    Q.   But not with President Fenves?
15    A.   I don't recall in the second one I'm thinking of who
16  was the President.
17    Q.   Okay. Did those examples, did they result in a
18  separation or --
19    A.   Not really, no.
20    Q.   Okay. They did a final argument and it was over
21  turned?
22    A.   I'd have to look at those two records specifically
23  because I don't recall if -- well, it would have been terminal
24  appointment.  They would have had the option to have final
25  arguments.  I don't recall if they did or not or if they were

41

1  put forward for reconsideration in their terminal year which is
2  a separate process that could -- can result in promotion.
3    Q.   Okay.
4    A.   Okay.
5    Q.   All right.  So let's -- we're going down the
6  categories of discussions that would happen.  So the third
7  category would be that they have six -- they have four -- they
8  have less than six years at UT but they have sufficient years
9  at the prior institution to make six or more years in rank
10  total.  Of course, they wouldn't be in their up or out year at
11  that point?
12    A.   Uh-huh.
13    Q.   So would that be a third category?
14    A.   Certainly a third category of candidate.
15    Q.   Because there would have to be a discussion of their
16  prior service?
17    A.   There would be, yes, I agree with that.
18    Q.   And it would have to be viewed as acceptable? Right,
19  to the committee, that their prior service combined with UT
20  service is sufficient to warrant consideration that the
21  explanation of accelerated would be satisfied by it or have to
22  be satisfied by it.
23    A.   I would say it would be acknowledged that that is an
24  explanation for an accelerated review at UT Austin.
25    Q.   And from your experience, you've seen that that is

42

1  the reason why -- the reason given, explanation for the
2  accelerated review of --
3      A.  I have seen that reason.
4      Q.  Multiple times?
5      A.  I have seen that reason given by Chairs and Deans.
6  That explanation, rather, given in Chair and Dean statements
7  for candidates, yes.
8      Q.  And I understand from my review some of the documents
9  that one of the reasons that is a common explanation is
10  that there is a -- I think it's called Provost strategy to
11  recruit faculty that are at other institutions that are already
12  have years in rank at those other institutions, is that
13  correct?
14      A.  I'm not familiar with the document you're describing.
15      Q.  It's not a title.  It's in some documents I've read
16  in this case that the Provost has indicated a preference or
17  support for recruiting faculty that have time in rank already
18  when they come to UT.
19      A.  I have certainly observed the Provost supporting that
20  type of hire as well as other types of hires where that
21  wouldn't be the case.
22      Q.  Yeah, it's not an only thing but it's an additional
23  recruitment tool.
24      A.  Additional?  By additional recruitment tool, what do
25  you mean?

43

1      Q.  That someone who is recruited that's already teaching
2  and already on a tenure clock somewhere else that they're
3  recruited to come to UT and told that it is possible that their
4  time at the prior institution could be used to count for the
5  time in rank to go up for tenure at the candidate's discretion
6  along with the Chair?
7      A.  Certainly can be used as an explanation, yes.
8      Q.  But I'm talking about it's also used as a
9  communication to the candidate during the recruitment?
10          MS. HILTON: Objection. Form.
11      A.  Would you be willing to rephrase that question for
12  me, please?
13      Q.  No. No problem.  So when you answered the last
14  question, you said certainly it's an explanation.  I understood
15  that to be to satisfying the guidelines for tenure review which
16  requires an explanation for accelerated review and my question
17  wasn't about that it was about when in terms of Provost
18  supporting recruiting faculty that already had experience in
19  rank somewhere else, that the candidate, the recruiting
20  candidate is told that, we want you to come to UT and if you so
21  choose, it's possible to count your time at your prior
22  institution as time in rank so that you could go up at six
23  years combined time and not have the wait the entire six years
24  at UT as an option.  It's not a guarantee or anything like that
25  but they're told that.  Do you understand that?  It's a

44

1  recruitment tool have that's what I was talking about.
2      A.  I would agree that -- let me start a little
3  differently.  It's hard for me to speak to the various ways
4  department Chairs and Dean's negotiate with faculty recruits
5  just because that is not part -- I'm not part of those
6  conversations so that's hard for me to speak to?
7      Q.  Okay, no problem.  If you're not aware of that then
8  that's no problem.
9      A.  Thank you.
10      Q.  Okay. And then let's say this is the last category
11  there's probably many more categories but there's the person
12  who has the tenure candidate who has less than six years
13  probationary status, less than six years in rank at UT and does
14  not have either has zero other experience or insufficient time
15  in rank at a prior institution to get to six years.  So it's
16  accelerated to UT and it's accelerated so it's kind of like
17  accelerated squared or double early or whatever.  That's a
18  different category of conversation?
19      A.  I would agree with that.  What I would agree with is
20  that that would certainly be acknowledged and a category of
21  conversation.
22      Q.  Okay.  And from what you were saying earlier, it
23  sounded like that's the category of people that there would be
24  a discussion that, hey, this guy has got to be -- this guy or
25  gal has got to be exception?

45

1      A.  Yes, I would agree with that.
2      Q.  Okay.
3      A.  Yeah, I think I phrased it as I don't quite remember
4  what my testimony was on that but yes I refer to my earlier
5  testimony.
6      Q.  She has it.  It's in the can as it will.
7      A.  Thank you.
8      Q.  All right. So that is what I wanted to to is to try
9  to get what you said before in those -- in that way and talk
10  about it in terms of categories.  Would you say that, that
11  additional expectation of the qualifications of the candidate
12  is only relates to that fourth category or is it -- does it
13  apply to any of the other categories as well?
14      A.  I want to be clear on what we're saying or what
15  you're asking would apply to the fourth category.
16      Q.  What are you looking at on the side there?
17      A.  Oh, I wrote down the four categories.
18      Q.  Okay. Okay. All right.
19      A.  Sorry.
20      Q.  That's okay.
21      A.  Just so that I could keep up with the four examples.
22  So in all cases for tenure at UT Austin, there is an
23  expectation of demonstrated excellence, impact and a future
24  trajectory which is aligned with that of a tenured associate
25  professor at UT Austin.  So that is part of the conversation in

Carmen Shockley - 5/28/2021

46

1 all categories I think, and I want to say that -- I would say
2 certainly the vast majority of conversations I've observed with
3 the President's Committee all files have strengths and
4 weaknesses that are assessed. It's been my observation that
5 the category of faculty who are accelerated -- and I'm still
6 looking at my four things -- who are accelerated in terms of
7 their time and rank at UT Austin being fewer than six years and
8 they don't have time at other institutions as a tenured track
9 faculty member that in that case, there is -- they're
10 especially looking for those strengths to far outweigh any
11 weaknesses. I believe in the other three categories and I'm
12 looking at them carefully -- I'm not sure that I have observed
13 the other three categories having a great difference in the way
14 that they are discussed in attempts of strengths and weaknesses
15 and the resulting decision. It's a hard question to answer
16 because each case is so unique and so I am trying to provide
17 helpful generalizations based on my observations, but yes, but
18 it's so unique.
19    Q. Okay. I didn't want to interrupt.
20    A. I'm sorry.
21    Q. Oh, no. Okay so I'm going to throw you a little
22 curve ball. So would that -- would your answers still be the
23 same if I have the added component of the time, the third
24 category where they have time at the other location that
25 satisfies the six years when combined with UT time and rank

47

1 that UT wouldn't necessarily have as close an eye on their
2 performance in that period of time that would cause them to
3 want the demonstration of excellence be greater at UT, the UT
4 portion?
5    MS. HILTON: Objection. Form.
6    Q. When compared with the other first two categories.
7    A. I understand we're talking about the category where
8 there are less than six years in rank at UT Austin as a tenured
9 track Assistant Professor, that that individual has had time as
10 a tenured track Assistant Professor at another institution, and
11 they are not up or out. Okay. I understand we're talking about
12 that category. I'm sorry, I don't understand from your question
13 is what about that category.
14    Q. Is the fact that the UT people, the President's
15 Committee considering this case, don't or feel that they might
16 not have the level of comfort with the performance of the
17 candidate because they only have X years at UT and didn't
18 really -- weren't there for the prior years or there's
19 something about their prior experience that would cause group
20 three to inch up a little bit and have to show a little bit
21 more to get to tenure than the first two categories and a
22 little bit less than the fourth category.
23    A. So I believe there are some similarities or I've
24 observed some similarities between this category and the
25 category of candidates where there are six years in rank at UT

48

1 Austin but they are not up or out. I believe that was our
2 second category. In both of those categories because it is not
3 a mandatory review, the university has the option to, if there
4 are -- if there are weaknesses in the file that are weighing
5 heavily against the strengths and so on balance it's not a
6 clear decision what's in the best interest of the university
7 and both of those categories the university has the option to
8 wait and see if those concerns can be resolved. And if that's
9 the case and a do not promote decision comes from the
10 President, then it would -- this is really speaking as Carmen
11 Shockley, it would be my hope those candidates come up again
12 having addressed those concerns ultimately hope every candidate
13 is successful for tenure.
14    Q. So and just to clarify that answer and that was a
15 great answer. It clarifies that portion. It's not that they
16 have to show more qualifications like the fourth category.
17 It's just that there's a safety outlet for the President's
18 Committee to not have to make the -- jump off the cliff
19 decision of the up or out that if there's any question, they
20 can err on the side of caution and kick the can down the road
21 as it would?
22    A. Yes, yes, if they don't -- if they're not yet
23 convinced it's in the best interest of the university to tenure
24 that individual they have the option to wait.
25    Q. Okay.

49

1    MR. SCHMIDT: Robert if you're at a stopping
2 point can we take a quick break?
3    MR. NOTZON: Sure, sure.
4    (A recess was taken at 10:40 a.m.).
5    Q. (BY MR. NOTZON) Ms. Shockley, wanted to ask you about
6 the -- one more question about the President's Committee
7 consideration of Dr. Nikolova. Do you recall anything about
8 what Dean Wood's participation was in that discussion?
9    A. I can't recall any -- her participation. She was
10 present for the discussion and participated in the discussion
11 with the President's Committee, I recall that. Do you mean
12 anything beyond that?
13    Q. If you recall. You know, she's the sole dissenting
14 vote or recommendation that gets Dr. Nikolova from some very
15 strong votes below her, and I would think that you know there
16 would be some distinction of her presentation about Dr.
17 Nikolova that was kind of different than others because of the
18 unanimous vote of her committee at the college level.
19    A. I don't recall the specifics of the conversation with
20 Dean Wood.
21    Q. All right. And then, you had mentioned that you don't
22 take notes of the discussion or the reasoning behind the
23 decision and I was wondering if you know why that is?
24    A. I suppose I don't.
25    Q. Okay. In the promotional process which you're

50

1  familiar with, you've worked in it for many years, the dossier
2  is in writing, the chair, the budget counsel's vote is
3  recorded, documented, the chair is to write a statement about
4  the -- explaining the support for the Budget Council's vote,
5  the pros and cons, the positives and negatives of the file and
6  explaining any abstentions and absences.  And then the P&T
7  Committee's discussion, the vote is documented and the Dean is
8  supposed to write, in this case, her own assessment as well as
9  fairly documenting the P&T's position and explaining their
10  vote.
11         And so there's quite a bit of written record
12  that people can look at to rely on but when it comes to the
13  actual decision and discussion and the reasons for granting
14  tenure or not granting tenure or the whatever available options
15  there are to the President, that isn't written down so that
16  nobody really knows why that happened.  Would that be accurate?
17         MS. HILTON: Objection. Form.
18     A.  It is accurate that the individuals and the
19  committees that you noted provide -- or there is a recorded
20  vote or there are statements that are written at the
21  department, committee department chair and Dean level.  That is
22  accurate.
23     Q.  The last part, nobody who wasn't in the room would
24  know -- well, actually, even if you're in the room, you
25  wouldn't necessarily know why the President decided what the

51

1  President decided because it's not explained in writing.
2     A.  It is -- I agree that it is not explained in writing.
3     Q.  And just to complete that thought, historically, you
4  can't go back and say you said you denied tenure for these
5  reasons, A, B, C, D, E, or you didn't.  You can't do that
6  because there is no documented explanation for the decision?
7     A.  That is correct that there would not be a documented
8  explanation to refer to.  That would be -- that's correct.
9     Q.  And when you do hundreds of these at a time, you would
10  be difficult to testify that you remember what happened and the
11  reasoning if you don't write it down?
12     A.  I guess that would -- that would vary depending on
13  the individual's memory and what they typically can and can't
14  recall but it's truly based on an individual's memory.
15     Q.  Memory and honesty?
16         MS. HILTON: Objection. Form.
17     A.  Can you ask that a different way, please.
18     Q.  Sure.  So sitting here two years -- over two years
19  later and finding out why Dr. Nikolova was denied tenure by the
20  President and the President's Committee and whatever the
21  reasonings were discussed and whatever formed the basis
22  for the denial there has to be memory but there also has to be
23  honesty, that whatever anybody who was in that room testifies
24  to about what happened and why, they'd have to -- they'd
25  actually have to remember what happened and then tell the truth

52

1  about it because neither of those are guaranteed, correct?
2     A.  I suppose that is true.  Yes, it would -- yes.
3     Q.  Whereas, if it's written down, we don't have to rely
4  on anybody's memory and we don't have to rely on anybody's
5  honesty because historically we know what happened.
6     A.  I see.  It would be relying on something different,
7  yes.
8     Q.  And were you ever told why -- well I'm assuming you
9  were told you're not allowed to take notes or record any of the
10  discussions that go on in the presence of this committee, is
11  that correct?
12     A.  I don't recall being told I'm not allowed to.  When I
13  was learning that part of the position from the individual who
14  sat in that seat before me, it wasn't part of what I was
15  trained to do, so to speak, being told these are your
16  responsibilities in the meeting.  I was not asked or told one
17  of my responsibilities would be to take notes on the merits of
18  the file.
19     Q.  Okay. So when you were told what to do nobody said
20  record or write down everything or explain why but your
21  testimony is they also didn't tell you not to?
22     A.  I don't recall being told not to write notes.
23     Q.  Well, you write notes about the stuff that relates to
24  process --
25     A.  Yep.

53

1     Q.  Your process of writing notes but you don't write
2  notes about the decision making or the reasoning.  So it seems
3  like you are making a conscious decision not to write about
4  those other things that are going on around you and picking out
5  items that don't relate to the specific promotional decision.
6     A.  Because I understand my role and reason for being
7  there to -- because of the way in which I understand that role
8  to write down the decisions that are made so that those can
9  then be put into a letter and to write down -- make note of the
10  ideas that come up as I mentioned -- as I testified earlier for
11  process improvements, general guidelines improvements,
12  potential presentations to different groups on campus.  So it's
13  more of an understanding of what my role is which I think I
14  have a good understanding of rather than directives about what
15  I'm not supposed to do just as I know I'm not supposed take a
16  phone call during that meeting, or that that would be contrary
17  to the expectation of me being there.  No, I haven't been asked
18  to record notes on merits of the individual files.
19     Q.  Not my job.  That's not part of my job description?
20     A.  That's true.
21         (Exhibit 45 identified.)
22     Q.  Okay. Let me go ahead and put up another exhibit.  So
23  this will be Exhibit 45.
24     A.  I've opened it up and I was going to take a moment to
25  familiarize myself with it.

54

1   Q.  Yes.  Just let me know when you're ready.
2   A.  Thank you.
3       (Brief pause in the proceedings.)
4   A.  Okay, thank you.  I was able to read it.
5   Q.  Okay.  So this would have been another time -- and I'm
6   not trying to got you or anything -- this would have been
7   another time that you would have been notified of Dr. Nikolova
8   having a complaint of discrimination.  Would that be accurate?
9   A.  Sorry, I do not recall this e-mail before looking at
10  it just now but, yes, I received this e-mail.
11  Q.  Okay.  And do you recall if -- so you're copied on
12  your supervisor's e-mail to Dean Wood.  Was that the first time
13  you were brought into this or were you also copied, because you
14  can't tell from Dean Wood's e-mail who she wrote it to besides
15  it being to Ms. Dukerich.
16  A.  That's true.  I don't recall if I was copied on Dean
17  Wood's e-mail on September 6 at 3:49 in the morning.
18  Q.  And then -- yeah.  And then 12 hours later that
19  you're there.  Did you participate in that conversation?
20  A.  I don't recall.  I'd have look at my calendar.
21  Q.  Okay. And I guess what I'm asking is, do you recall
22  what happened in the conversation if you were there and you
23  don't even remember being there?
24  A.  That's correct.  I'm sorry.
25  Q.  No, no, that's an answer.  I just want to know what

55

1   you know and what you remember.
2   A.  Sure, okay.
3   Q.  So does this refresh your recollection that the
4   lawsuit was -- this is the first time you learned of the
5   lawsuit from Dr. Nikolova?
6   A.  I don't know.  I don't recall if I was notified in
7   some other way prior to this.  I don't know.
8   Q.  Okay. You ever been -- other than to give your
9   testimony today, related to preparing as a corporate rep, did
10  you have any other conversations regarding the lawsuit from Dr.
11  Nikolova with anyone that wasn't an attorney?
12  A.  I don't recall specific conversations or specific
13  dates where conversations took place.
14  Q.  So you think you were part of conversations but you
15  don't recall when and where?
16  A.  That is correct.  That's a fair thing to say I'd
17  agree.
18  Q.  What do you recall?
19  A.  Pardon me?
20  Q.  What do you recall about those conversations if
21  anything?
22  A.  When -- I don't recall specific conversations about
23  or when those conversations took place or who they took place
24  with about this.  I feel like conversations are likely to have
25  happened because in my role in the Provost office, when a

56

1   faculty member brings about a grievance against another faculty
2   member or administration, or the few lawsuits that have come
3   about, I have been aware of those and had conversations about
4   them that is typical for my job.  But I'm sorry, I don't recall
5   specific conversations that took place.
6   Q.  Okay. So you can't -- you can't name one person that
7   you had a conversation with? You can't name anything about
8   conversations about Dr. Nikolova's lawsuit at all?  No?
9   A.  Outside of -- I think your question was specific to
10  outside of conversations with UT legal.
11  Q.  Yes.
12  A.  That is correct what you just said.
13  Q.  Are you aware of any other lawsuits against UT that
14  relate to gender or pregnancy bias or discrimination besides
15  Dr. Nikolova?
16  A.  Specific to gender or pregnancy? I mean, I don't know
17  the specific basis for --
18  Q.  Or retaliation?
19  A.  Or retaliation. I believe that, if I recall, I don't
20  know if I'm recalling correctly that Karen Pagani, another
21  faculty member who is an Assistant Professor who was not
22  tenured brought a lawsuit that may have had gender
23  discrimination and retaliation but I'm not familiar enough with
24  those -- the claims in her lawsuit to speak to that.
25  Q.  Okay.  Did you testify in that lawsuit?

57

1   A.  I did not.
2   Q.  Okay. Do you know if it went to trial?
3   A.  I do know that it went to trial.
4   Q.  Do you know what the result? In other words, did she
5   win or did UT win?
6   A.  Okay, I know that.  I'm trying to think of very
7   specific things.  I believe UT Austin I guess won I'm not sure
8   if that's the proper terminology for me to use but the finding
9   was for UT Austin.
10  Q.  Okay.
11  A.  Yeah.
12  Q.  You're not aware that she won the retaliation claim?
13  A.  Well, that is what I was trying to think of that I
14  believe there were four -- I recall that there were four -- I
15  don't know, I'm sorry I'm not going to use the proper legal
16  terms here but that there were four maybe judgments that the
17  jury returned a decision on, three of which were found or UT
18  Austin, one of which was found for professor Pagani I and that
19  it had to do with retaliation but I don't know the specific
20  judgment.
21  Q.  Okay. Any other complaints or lawsuits related to
22  gender, pregnancy or retaliation that you can recall besides
23  Pagani?
24  A.  Besides that one? I cannot recall the specific I
25  guess terms of the lawsuits that have been brought in the --

58

1  any other ones that I might be aware of.
2      Q.  Okay.  Have you testified in any other lawsuits?
3      A.  No, I have not.
4          (Exhibit 46 identified.)
5      Q.  Let me pull up another exhibit.  This will be 46.
6      A.  All right.  I've opened it up I'm going to read
7  through it to familiarize myself.
8          (Brief pause in the proceedings.)
9      A.  Okay, thank you.  I've read through the document.
10     Q.  Okay.  You're not on this e-mail chain but you're
11  referenced by Dean Wood about next steps.  Do you recall being
12  consulted about this communication from Dr. Nikolova, the final
13  arguments letter?
14     A.  I recall, in terms of Dr. Nikolova and her promotion
15  file and the final arguments process, I do recall there being
16  question about whether she was based on the outcome of her case
17  if final arguments would be considered from her.  If I recall
18  conversations and e-mails about that with -- I don't recall the
19  specific days and times but I recall conversations with Janet
20  Dukerich, with Sharon Wood, and with Professor Nikolova.  There
21  may have been other conversations but those are the ones I
22  recall.  I don't recall if professor -- Dr. Dukerich and Dean
23  Wood and I had a conversation, the three of us or not.
24     Q.  Okay.  If you see the e-mail chain communications,
25  Professor Twefik forwards this to Dean Wood, and Dean Wood

59

1  comments on the extensive research that Dr. Nikolova did.  And
2  then Dr. -- Professor Twefik asks about whether she had access
3  to the promotion file.  And then Dean Wood asking about or
4  assuming that or positing that Dr. Nikolova must have done
5  Freedom of Information requests or somebody else did, and then
6  Professor Twefik saying that's problematic.
7          Were any of those issues what Dean Wood was
8  consulting with you about that Dr. Nikolova may have had
9  inappropriate access to promotional files of other professors?
10     A.  I don't recall discussing that at all.
11     Q.  Would you agree that it's problematic the information
12  that Dr. Nikolova had and used in her final arguments
13  discussion?
14         MS. HILTON:  Objection.  Form.
15     A.  I have -- if she filed Freedom of Information Acts or
16  Freedom of Information requests, or open records requests is
17  how I typically I refer to them, and received documentation as
18  a result of that and used that information in her final
19  arguments, I do not find that problematic.
20     Q.  Okay.  That's a public record and anyone in -- that's
21  a citizen could have access?
22     A.  Certainly.
23     Q.  Okay.  Next one.
24     A.  I have opened this one.  I'm going to scroll down and
25  familiarize myself.  Oh, it's short.  Just take me a moment.

60

1          (Brief pause in the proceedings.)
2      A.  Thank you for that time.  I've read it.
3      Q.  Okay.  And again you're not copied on this e-mail but
4  you're referenced as having conversations with Dr. Nikolova.
5  Do you remember the context of those conversations that she
6  references?
7      A.  I remember talking with her during this time period,
8  certainly.
9      Q.  Would it be your job to let her know of the deadline
10  to withdraw her consideration and also let her know of the
11  potential threat of a terminal appointment in her situation?
12     A.  Certainly it would be my job as I testified earlier
13  to answer questions from candidates and so being asked a
14  question about when a candidate could withdraw their promotion
15  dossier would be my job to answer.  In a non-reviewed --
16  non-reviewed -- in a non-mandatory review or up or out review,
17  a candidate has the option to withdraw their file any time
18  before it goes to the President's Committee.  And since I'm
19  aware of when they go to the President's Committee, I would be
20  able to give her that deadline or give a candidate that
21  deadline.  It would also be my job to answer any questions
22  about possible outcomes referencing the charter recommended
23  actions document on the Provost website that I mentioned or
24  testified about earlier.
25     Q.  Okay.  And just to clarify it's your job to answer

61

1  questions.  Is it also your job to affirmatively communicate to
2  the candidate without them approaching you to ask questions?
3      A.  Do you mean would it be my job to reach out to a
4  candidate with information without having been asked a
5  question?
6      Q.  Yes.
7      A.  Okay.  One point of the process comes to mind where
8  yes it is my job after the President's decisions have been
9  made known to the Deans and candidates have been informed of
10  the final outcome, I contact any candidate via e-mail who has
11  either a terminal appointment pending or a decision of do not
12  promote to outline procedural next steps and resources that
13  they are eligible to avail themselves of.  That's one example
14  that comes to mind.
15         (Exhibit 47 identified.)
16     Q.  Okay.  So only after the President's decision but I
17  guess at this point with where we are in the timeline for Dr.
18  Nikolova and exhibit -- 47 is this exhibit, 862, Exhibit 47 is
19  at the point after the Dean has informed Dr. Nikolova that
20  she's recommended against tenure, you don't have any role to
21  play other than just field questions that come to you?
22     A.  Nothing is coming to mind in terms of our process
23  steps at this point, though I can't say that I've never reached
24  out to a candidate.
25     Q.  If a candidate calls you and asks questions, do you

62

1  go beyond the answer to their question and provide them with
2  other information that you might have that you think they might
3  want to know?
4      A.  I think, yes, that is -- yes, that could happen in a
5  conversation with a candidate.
6      Q.  Okay. I'm sorry, I didn't want to interrupt.  Are you
7  finished?
8      A.  Yes.
9      Q.  If -- do you recall if in this instance all these
10  issues that Dr. Nikolova is outlining in her e-mail, No. 1,
11  that she called you to ask questions and, No. 2, you provided
12  her this information, whether she asked for it or not?
13      A.  It's my recollection that she asked to speak with me.
14  We had several e-mail exchanges over the course of the year in
15  which she went under review.  I don't recall on each of these
16  points, specific to each point whether it was a question that
17  prompted my answer or I provided her additional information
18  during that call.  The -- I'll also say that the paragraph
19  where it says Carmen confirmed a case that happened some years
20  prior, I don't recall that part of the conversation and I'm not
21  sure which case that is referring to.
22      Q.  Okay.
23      A.  What gives me pause is that the part where it says
24  the department successfully pushed back to change that to not
25  promote.  I'm not sure what case that is referring to.

63

1      Q.  Okay. And earlier you testified that there were I
2  think you said two terminal appointments when it was not the up
3  or out year?
4      A.  Yes.
5      Q.  And that did not result in terminal appointments so
6  clearly you remember that something happened of that nature but
7  this is not something you remember or --
8      A.  I think what would be happening here is the
9  terminology being used.
10      Q.  Okay.
11      A.  So because -- yes, my earlier testimony that I do --
12  about the two -- I believe I said I recall one and I think
13  there was a second one may be what's being referenced here and
14  it may be a problem with terminology.
15      Q.  Okay.
16      A.  Yeah.
17      Q.  So that description of the terminal appointment and
18  if it wasn't an up or out year, that part is consistent with
19  the memory, but the other part isn't?
20      A.  That it was a not promote, and that -- excuse me --
21  that what I don't remember is that there was a terminal
22  appointment that the department successfully pushed back to
23  change to not promote.
24      Q.  Okay.
25      A.  Yeah.

64

1      Q.  What do you recall about the terminal appointment
2  when it wasn't an up or out year?
3      A.  So I recall that fact that it was a terminal
4  appointment when it was not an up or out year.  I recall that
5  ultimately the candidate was reviewed again -- or candidates if
6  there were two -- reviewed again and were promoted with tenure.
7  I don't recall a terminal appointment being changed to a do not
8  promote.  I just don't recall it.  I'd have to look back at our
9  promotion records to verify that.
10      Q.  Do you recall if the terminal appointment was changed
11  to tenure?
12      A.  I recall that there was a decision of terminal
13  appointment, and then later following another review, a
14  decision to promote with tenure.
15      Q.  So of the two terminal appointments that weren't up
16  or out years, one ended up with a promotion on further review
17  and one didn't?
18      A.  I'm really -- I should only be speaking about the one
19  I'm recalling since the other one was a reference, right, to
20  something I'm not quite certain about.  So what you've just
21  described I recall about one of the cases and I cannot recall
22  the details of the other case.
23      Q.  Okay.
24      A.  Yeah.
25      Q.  And then does anything else in this e-mail strike you

65

1  as inconsistent with what you would have told Dr. Nikolova and
2  that she recounts that you told her?
3      A.  Sure.  I'm going to look through them again real
4  quick.  So No. 5 in her e-mail, I -- it would be consistent for
5  me to tell a candidate that at that time that the President's
6  Committee is receptive to total time spent in rank, not just
7  UT, the key being they're receptive to it so that she -- and
8  she quotes exceptional, end quotes, standard for for truly
9  early cases, i.e. total time in rank less than five years does
10  not apply to me.  That's consistent with what I would tell a
11  candidate.
12      I think the next sentence I would have probably
13  worded differently had I been writing this for myself.  It says
14  the statement letter in Ahmed's letter from me explaining this
15  should suffice -- excuse me.  A letter in Ahmed's -- the
16  statement in Ahmed's letter for me explaining this should
17  suffice, meaning I have been seven years in rank.  I think
18  there are a lot of interpretations for the word "suffice".  I
19  would agree that that is an explanation that can be offered and
20  would be considered in an accelerated case.
21      Q.  All right. And if that No. 5 is consistent with what
22  you just testified, is consistent with what we talked about
23  earlier, the exception being Category 4?
24      A.  I'm looking at my -- reminding myself of the
25  categories and, yes.  Yes, thank you.

66

1            (Exhibit 48 identified.)
2      Q.   Okay.  Next.  Exhibit 48 is coming.
3      A.   Okay.  I have opened it and I will scroll down and
4  take a look.
5      Q.   Every time I put one up you don't have to say that I
6  you can just read and then I will wait until you say I'm ready.
7            (Brief pause in the proceedings.)
8      A.   Okay, thank you.  Thank you, I'm ready.
9      Q.   Okay.  So the letter from Professor Bloom is dated
10  January 8, also sent via e-mail that same day, and you're
11  copied on that along with the chain of command.  Would you
12  agree>
13     A.   Yes, I am copied on this along with others.
14     Q.   The others are the chain of command for Dr. Nikolova
15  with Dr. Dukerich and yourself being kind of not really in the
16  chain of command but in the office?
17     A.   Yes, in terms of her supervisor and those supervisors
18  above her, yes.
19     Q.   And she's writing to you on March 1st that she just
20  learned that the letter had not been submitted.  Did you do
21  anything with the letter on January 8 it will I -- actually let
22  me back up a little bit.
23     A.   Okay.
24     Q.   As part of your job duties that we talked about one
25  of the things I didn't ask you is whether you were responsible

67

1  for making sure the dossier were ready for the President's
2  Committee.
3      A.   Yes, that is part of my responsibility.  There are a
4  number of us in the Provost office who contribute to that
5  including myself.
6      Q.   Okay.  And that would include putting additional
7  documents or supplemental material in the file or not in the
8  file?
9      A.   Certainly I have done that before when asked by a
10  candidate or department chair or Dean.  I have facilitated that
11  part of the process that's described in our general guidelines.
12     Q.   Okay.  And are you also the gate keeper to not put
13  documents in to the file?
14     A.   What do you mean?
15     Q.   I'm sorry?
16     A.   I interrupted you.  Could you explain what you mean
17  by gate keeper, please.
18     Q.   Are you the person to decide whether something goes
19  in the folder or not?
20     A.   If a candidate or chair or Dean requested a document
21  be placed in a promotion file, it's not within my scope of
22  authority to deny that request.
23     Q.   Okay.  But you look at the e-mail and the letter in
24  Exhibit 48 at the bottom there, preferred communication, but
25  Dr. Nikolova is not copied, correct?

68

1      A.   I agree, yes, not on a copy we have, certainly.
2      Q.   And this January 8 is after the Dean has made her
3  decision and before the President has -- and the President's
4  Committee has met to review the file, correct?
5            MS. HILTON:  Objection.  Form.
6      A.   Off the top of my head, I do not recall when Dean
7  Wood met with the President but I agree this is before the
8  President's decision was written in a letter to Dean Wood.
9      Q.   Okay.  A month, a month and a week or so?
10     A.   Before that decision was written in a letter, yes.
11     Q.   Okay.  Did you do anything with this letter?
12     A.   No.  Well, I don't recall doing anything with this
13  letter.
14     Q.   Okay.  Why not?
15     A.   Well, I'll note I was not asked to do anything with
16  this letter, with this e-mail.  That's what comes to mind
17  first.
18     Q.   You weren't asked by Dr. Nikolova?
19     A.   That's correct.  I don't recall being asked by Dr.
20  Nikolova, Dr. Sinbez, McInnis, Wood.  You know the individuals
21  we were establishing our first supervisor and supervisor's
22  supervisors.
23     Q.   Do you see this as being a positive letter?
24            MS. HILTON:  Objection.  Form.
25     A.   I read this e-mail as being from someone who supports

69

1  her promotion and tenure at UT Austin.  Because he said to deny
2  it would be a travesty really.
3      Q.   Right, so at this point you know that Dr. Nikolova
4  has been recommended against tenure by her Dean.  She has the
5  threat of possibly getting a terminal appointment decision made
6  on her and this well respected, and I don't know if you know
7  he's a Turing Award winner, meaning it's hard to get higher
8  accolades in his field globally, writes this letter to
9  President Fenves on Dr. Nikolova's behalf.  Do you see that,
10  right?
11            MS. HILTON:  Objection.  Form.
12     A.   Yes, I acknowledge that he's written to President
13  Fenves.
14     Q.   It would have been his intent to positively impact
15  her consideration for tenure?
16     A.   I certainly can't speak to his intent but this is a
17  letter where he recommends her promotion.
18     Q.   That doesn't indicate to you what his purpose of
19  writing this letter is?
20     A.   I'm just careful to assign intent and purpose to
21  other people.
22     Q.   Okay.  You wouldn't argue with that conclusion?
23     A.   No, I would not argue.
24     Q.   Did you think to contact Professor Nikolova -- Dr.
25  Nikolova and say, hey, we got this letter, did you know about

70

1 it and if so, if you want it added to your folder, you will
2 need to ask me to do so?
3     A.  I would not have thought to do that.  That would be
4 inconsistent.
5     Q.  Inconsistent with your job duties?
6     A.  Inconsistent with -- yes.  Inconsistent with my job
7 duties and inconsistent with how I have handled e-mails that I
8 am copied on about other candidates.  Inconsistent with my
9 general approach to that.
10    Q.  This isn't normal is it that you get letters from
11 renowned scholars prior to the President's vote?
12        MS. HILTON: Objection. Form.
13    A.  In my role, I have been copied on letters from
14 external individuals related to candidates.  I do not recall
15 ever forwarding one of those e-mails to the candidate.
16    Q.  Earlier you said that there have been occasions where
17 you reached out to a candidate without them calling you first.
18    A.  Sure.
19    Q.  You don't think this would be one of those situations
20 where you confirm that they're aware of this letter and the
21 somewhat specific rule, that if they don't ask for it to be
22 included, it will just sit gathering dust and not have any
23 impact on the decision?
24        MS. HILTON: Objection. Form.
25    A.  Forwarding to the candidate about whom it was written

71

1 wouldn't -- I don't remember the whole question but it would be
2 inconsistent with my -- the way I -- I'm not answering your
3 question.  Could you repeat your question for me, please?
4     Q.  How is you taking any action to communicate with Dr.
5 Nikolova about this very positive letter that's clearly meant
6 to impact the decision that you believe won't be included
7 unless she asked for it to be included, how is that
8 inconsistent with your job?
9         MS. HILTON: Objection. Form.
10    A.  It's my experience that it would -- it's my
11 experience that this is not something that I had done before to
12 take any communication about a candidate, positive or negative,
13 to forward it to that candidate.  My role in the process is to
14 follow the general guidelines and other related policies for
15 promotion and tenure.  Sending something that I received about
16 a candidate to that candidate, to advise them on next steps,
17 would simply be inconsistent with that practice.
18        MR. NOTZON: Objection.  Nonresponsive.
19    Q.  You're making a conclusory statement that's
20 inconsistent.  I'm asking you how is it inconsistent, and so
21 that's what I'm trying to gather from -- it's -- do you have a
22 duty not to help identify when a document goes in the folder or
23 doesn't go in the folder?  I thought that was part of your role
24 is understanding what goes in the folder and doesn't, and if
25 there's no indication that she's notified of the letter being

72

1 sent, how does she know when to make the request, if ever?
2         MS. HILTON: Objection. Form.
3     A.  So it certainly is my job to ensure that required
4 documents as stated in the general guidelines are placed in the
5 file in the appropriate place.  It is not -- it simply isn't my
6 job to flag documents that are not required to a candidate to
7 see if they would like that document included or not.
8     Q.  Is it against your job duties to contact Dr. Nikolova
9 and say, hey, we have this letter, would you like to include it
10 and if you would you need to make a request?
11        MS. HILTON: Objection. Form.
12    A.  No.  I'll say no.
13    Q.  Were you told -- actually, I'll pull that back.  The
14 question is was it your decision how to handle this e-mailed
15 letter from Professor Bloom or did someone else tell you what
16 to do or not do with this letter prior to the President's
17 decision, President's Committee consideration of Dr. Nikolova's
18 file?
19    A.  At the time we received this?  Certainly I had an
20 understanding of what was consistent with what we had done with
21 statements like this in the past.  This is the kind of thing I
22 would have consulted with Janet Dukerich on as my supervisor.
23 I don't recall if we consulted on this or not.
24    Q.  Do you recall having a conversation with Dr. Nikolova
25 other than the e-mail exchange about her realizing after the

73

1 President's decision that the Bloom letter did not make it to
2 the folder?
3     A.  I don't recall if she and I spoke about this or not
4 other than the e-mail communication that you pointed out.
5     Q.  Okay. Let's look at Exhibit 38 again.
6     A.  Okay.
7     Q.  It's up there, you looked at it before.  Do you
8 recall?
9     A.  Is that the general guidelines?
10    Q.  Yes.
11    A.  Okay, yes thank you.
12    Q.  Okay. And if you'd look at Page 16?
13    A.  Thank you.  I'm on Page 16.
14    Q.  Sure. Is this the C10-C that the applicable
15 provision?
16    A.  Yes.
17    A.  I think that would be another one but, yes, that's
18 applicable.
19    Q.  I'm happy to look at another one, too, but let's go
20 ahead and talk about this one first.
21    A.  Thank you.
22    Q.  It doesn't say that before material is included that
23 there must be a request made, does it?
24    A.  You're correct.  I agree with that.
25    Q.  So given that there's no requirement that the

74

1  candidate makes a request -- well, I'll leave it.  Okay.  You
2  said there was another applicable provision?
3      A.  I'd like to scroll up and see.
4      Q.  Well --
5      A.  Pardon me.
6      Q.  As you were.  Go ahead.
7      A.  Okay.  Since it did change, I don't know if I'm
8  recalling something from what version.
9      Q.  Look at C9.
10     A.  Okay I'm scrolling down.
11     Q.  It's on Page 16.
12     A.  Thank you.
13     Q.  At the top of the page.
14     A.  C9.
15     Q.  Yes.
16     A.  Oh, that we -- additional statements.
17     Q.  Yes.
18     A.  I think that's the one we just looked at or was I
19  looking at the wrong thing?
20     Q.  No, we looked at C10-C?
21     A.  C10-C.  Other supplemental related materials?
22     Q.  Yes.
23     A.  Oh, I'm sorry, we may need to go back and touch base
24  I was answering questions related to C9 additional statements.
25     Q.  Okay.

75

1      A.  I apologize.
2      Q.  And the question of C10-C is there's nothing there
3  that says that a candidate must make a request before the
4  materials would be included the file.
5      A.  So for C10-C, making sure I'm in the right place,
6  other supplemental materials, it states the candidates have the
7  discretion to include any materials that they believe are
8  relevant?
9      Q.  Yes.
10     A.  Yes.  I agree.  It does not specifically say that a
11  candidate must request that they be added.  Rather it says
12  candidates have the discretion to include it.
13     Q.  Right.
14     A.  Yes.
15     Q.  That's ambiguous, isn't it?
16     A.  That candidates have the discretion to include.
17     Q.  Yeah.  It doesn't say the candidate must make the
18  request before the item is included but it says the candidate
19  has the discretion right --
20     A.  You know, I would -- I want to look back at the other
21  -- I'm not sure that we say anywhere in these guidelines the
22  candidate must request in order to include but there are other
23  materials that the candidate contributes -- contributes to the
24  dossier such as their teaching statement.
25     Q.  Right, well that would be a different -- that would

76

1  not be a letter from a professor, a world renowned scholar,
2  right?
3      A.  No it would be a teaching statement.
4      Q.  So that's a distinct document so whatever procedure
5  that would relate to that are different than what we're talking
6  about right now?
7      A.  I see.
8      Q.  So I'd like to focus on just Professor Bloom.
9      A.  Okay.
10     Q.  And you would agree that Professor Bloom's letter
11  would be accurately fall within the other supplemental
12  material?
13     A.  That is one place it could be put.
14     Q.  Well, it couldn't be in B, right, because it wasn't
15  solicited?
16     A.  It was not -- to my knowledge it was not solicited by
17  anyone copied on the e-mail.  I don't know -- I don't know if
18  she asked him to write or not.
19     Q.  And he's not a collaborator?
20     A.  I don't know.
21     Q.  Well it says so in his letter right?
22     A.  Oh okay.
23     Q.  It doesn't talk about him being a collaborator of
24  her.
25     A.  Does it state that he's not?

77

1      Q.  Feel free to read it.
2      A.  Thank you.  Yes, as long as it would not be an
3  appropriately filed it is a letter from a collaborator.
4      Q.  Ok.
5      A.  Typically when a candidate, C9 is I think what you
6  were going to ask me about next.
7      Q.  Well, let's finish this C10-C.
8      A.  Okay.  Yes.
9      Q.  Okay.  Clearly, I was asking you about the ambiguity,
10  okay.  Candidates have a discretion to include materials and
11  they would want to include materials -- this provision provides
12  the candidate with the discretion to deny including materials
13  that they might find unhelpful or include those that they find
14  helpful and they get to make that decision, right?
15         MS. HILTON:  Objection. Form.
16     A.  Candidates do get to decide what is in other
17  supplemental materials, yes.
18     Q.  Okay.  And that's the purpose of that provision and
19  given that this is a letter from a world renowned scholar and
20  it's a positive letter, it's a no-brainer what her discretion
21  would be when she has a recommendation of no tenure from the
22  Dean but positive, unanimous support tenure from
23  committee^ can't understand the word before committee she would
24  want this letter in her file, right?
25         MS. HILTON:  Objection. Form.

78

1    Q.  You couldn't argue that she would not want that
2  letter in, could you?
3           MS. HILTON: Objection. Form.
4    Q.  Thousands of experiences, come on, now.
5           MS. HILTON: Objection. Form.
6    A.  I would not argue with that.
7    Q.  So after -- so you don't recall having any
8  conversations with anybody about this letter prior to the
9  President's Committee considering Dr. Nikolova's file, is that
10 accurate?
11   A.  It is accurate that I do not recall having a
12 conversation with anyone about this letter.
13   Q.  Not saying it didn't happen but you just don't
14 recall?
15   A.  That's correct.
16   Q.  Okay. Did you have any conversations with anybody
17 about this letter prior to you writing to Dr. Nikolova saying
18 what you said in Exhibit 48?
19   A.  I believe -- I'm having a recollection that Janet
20 Dukerich and I did talk about that, about that question.
21   Q.  Okay.
22   A.  I don't recall the substance of that conversation
23 although my response would have been consistent with it.
24   Q.  Did you draft this e-mail or did somebody else?
25   A.  I don't recall that happening.

79

1    Q.  What happening?
2    A.  I don't recall drafting this for review prior to
3  sending it.
4    Q.  Okay. So you think you wrote this?
5    A.  I think I did, yes. Yeah.
6    Q.  And you agree, don't you, that what you wrote in this
7  e-mail is actually not true?
8           MS. HILTON: Objection. Form.
9    A.  Well, I don't agree with that.
10   Q.  Well, let's look at it especially the part where it
11 says explicitly requested to be added to the dossier. There's
12 nothing in the guidelines that state that, correct?
13   A.  I'd like to look at one other section of the
14 guidelines if I may?
15   Q.  Yes, please.
16   A.  Thank you.
17   Q.  I don't want to fault your language in this e-mail
18 without you confirming it. Let me nowhere you're looking.
19   A.  Oh, sure. I'm looking at C9, additional statements,
20 which is the folder the university uses when something is
21 requested -- a non-required document is requested to be added
22 to the dossier. I still believe my e-mail is accurate.
23   Q.  Where does it say in C9 that there must be an
24 explicit request from the candidate?
25   A.  Well, I'd like to read the sentence in my e-mail.

80

1  The university only adds documentation to a promotion dossier
2  that is required as documented in the general guidelines which
3  is true. Or explicitly requested to be added to the dossier,
4  which is true. I would also agree with you that -- well, if
5  you'll ask your question again.
6    Q.  Isn't it true that there's nothing in the guidelines
7  that state that there must be an explicit request from the
8  candidate before the document will be put in the dossier?
9    A.  That is true.
10   Q.  So how is your e-mail not untrue?
11   A.  Because the sentence in the e-mail says that the
12 university only adds documentation for promotion dossiers that
13 is required -- oops, sorry, my mouse -- that is required as
14 documented in the general guidelines. So a required document
15 that's listed in the general guidelines or explicitly requested
16 to be added to the dossier which would be a document that's not
17 required that's been requested explicitly to be added.
18           In other words, we don't add documents that
19 haven't been -- we don't add non-required documents that
20 haven't been requested to be added.
21   Q.  So the distinction is when that request is made and
22 how that request is made would be the ambiguity in your
23 statement that you're saying doesn't render it false?
24           MS. HILTON: Objection. Form.
25   A.  I don't see my e-mail as ambiguous.

81

1    Q.  How about -- what about C8?
2    A.  In the general guidelines?
3    Q.  Yes, look at Section I.
4    A.  I see that.
5    Q.  That doesn't say that a request needs to be made?
6    A.  I agree.
7    Q.  Why isn't that at play in this e-mail that you sent?
8    A.  I have not had -- in the times that we have received
9  e-mails like this, they have not been placed among unsolicited
10 letters in the dossier. Unsolicited letters in a dossier have
11 historically been any letters received by the department or
12 college prior to -- or as the file is being assembled.
13   Q.  And as we already talked about, you would have been
14 within your job duties to have contacted her and let her know
15 that the letter was there and identify for her that she had the
16 discretion to include it if she wants?
17   A.  I believe my testimony was that it wouldn't be
18 contrary --
19   Q.  Right.
20   A.  -- to my job duties.
21   Q.  Right.
22   Q.  Okay, one more.
23   A.  Okay.
24           (Exhibit 49 identified.)
25   Q.  And this is Exhibit 49.

82

1    A.   Thank you, I've reviewed it.
2    Q.   Okay.  And this is the -- you consulting with your
3  supervisor about the language and her making suggestions.
4    A.   Yes, it is.
5    Q.   Did you have any other conversations with anyone
6  else besides your supervisor about how to respond to the
7  document below?
8    A.   Not that I recall.
9    Q.   Okay, let's go off the record real quick.
10         (A recess was taken at 12:00Â p.m.)
11   Q.   (BY MR. NOTZON)  Okay, Ms. Shockley, before we go into
12  the corporate  topics real quick, I wanted to ask a question.
13         You understand that Dr. Nikolova provided a
14  final arguments document in her case, correct?
15   A.   Yes.
16   Q.   And it was not considered, correct?
17   A.   Correct.
18   Q.   And where is the provision that was relied upon to
19  not review her final arguments document?
20   A.   It's within the general guidelines.  Shall we look at
21  that?
22   Q.   Sure.
23   A.   It is section D 2, Page 17.
24   Q.   Okay.
25   A.   It specifies that a candidate whose case is terminal

83

1  appointment pending may present final arguments.
2    Q.   Okay.  And I guess this is one of those ambiguous
3  provisions because it doesn't say that only a candidate whose
4  case is terminal appointment may present.
5    A.   I agree that the word "only" is not in here.
6    Q.   And it doesn't proscribe against others from being
7  able to present final argument?
8    A.   I agree that it does not list the individuals with
9  other outcomes who may not present final arguments.
10   Q.   Okay.  And were you part of the decision-making
11  process to not review her final argument?
12         MS. HILTON:  Objection.  Form.
13   A.   I would have been asked in any case like this if an
14  individual who has a do-not-promote decision is eligible for
15  submitting terminal -- excuse me, is submitting final
16  arguments, and I would have advised that no, those are reserved
17  for a candidate whose case is terminal-appointment pending.  I
18  don't recall specifically who I talked to about that, the
19  general rule in her case.  I believe I had an e-mail -- I
20  recall having e-mail correspondence with her about that.  It
21  would have been typical for me to talk with the Provost or
22  President about that but I don't recall those specific
23  conversations about the rules here.
24   Q.   Okay.  Do you recall if anyone else provided -- and
25  this final arguments, it also could be called a request for

84

1  reconsideration?
2    A.   Because we have a provision in the general guidelines
3  for reconsideration, which is D4, I'm careful to use those
4  phrases of terminology very distinctly though I accept the
5  premise that an individual submitting final arguments is asking
6  for a different decision to be made.
7    Q.   Did you review Dr. Nikolova's final argument
8  document?
9    A.   I don't recall that I did.
10   Q.   And would it be your testimony that you didn't
11  because you didn't really have to because it didn't comply with
12  your reading of the guidelines?
13   A.   Correct.
14   Q.   And the decision made by the university was in
15  accordance with your reading of the guidelines?
16   A.   Yes.  The decision not to consider her final
17  arguments.
18   Q.   Do you know if anybody reviewed the final arguments?
19   A.   I don't know.
20   Q.   And even to this day you haven't reviewed them?
21   A.   No.  No.
22   Q.   All right.  Let's go ahead and move to the corporate
23  topic, the tenure review decision process relating to the
24  decision to deny tenure to Dr. Nikolova as it relates to the
25  actions of CCAFR.

85

1         What did you do to prepare for your deposition
2  on this topic?
3    A.   To prepare for my testimony on this topic, I
4  re-familiarized myself with Dr. Nikolova's request for review
5  by the committee of counsel on academic freedom and
6  responsibility, given that acronym we pronounce CCAFR.  I
7  reviewed her request.  I reviewed the committees, the
8  subcommittees response to the President, reviewed the
9  President's response to the subcommittee, to CCAFR.  I spoke
10  with Professor Pauline Strong who served as a subcommittee
11  member in the review of the case.
12   Q.   Is she a CCAFR committee member?
13   A.   Yes, yes, she is a member of the CCAFR subcommittee.
14  Thank you that what's coming to my mind right now in terms of
15  preparation.
16   Q.   So she was involved in writing the CCAFR response to
17  Dr. Nikolova's request?
18   A.   Yes, thank you.  That's correct.
19         (Exhibit 50 identified.)
20   Q.   Okay.  And before we go further, could you -- your
21  notes that you were -- have been taking and referring to, could
22  you show those up to the camera for me real quick?
23   A.   Sure.  They're messy.
24   Q.   Okay.  And just the one page?
25   A.   That's correct.

Carmen Shockley - 5/28/2021

86

1    Q.   Okay. It's common, we're going to ask you to scan
2    that in and send it to us.
3    A.   Okay.
4    Q.   And we'll make that Exhibit 50.
5    A.   Okay.
6    Q.   And it will be -- you can continue to make notes on
7    it as you will and we'll just -- when the depositions over, if
8    you would just scan those and e-mail them to your counsel and
9    then they can forward it to us.
10   A.   Okay, will do.
11   Q.   All right. What experience do you have with CCAFR
12   review? I guess there's the process, right?
13   A.   Yes. So that's what you're hear to testify about as
14   UT. You understand that the request for CCAFR review is made by
15   the candidate and there is -- I think at that time there was a
16   four-week deadline for CCAFR to respond, is that right?
17   A.   That sounds right, yes.
18   Q.   Okay. And they -- I think in that year they
19   complained that four weeks just wasn't enough; they needed more
20   time.  Did that time get changed?
21   A.   That time has not changed since then.
22   Q.   Okay. Still four weeks?
23   A.   Yes.
24   Q.   All right. When a faculty member, candidate asks for
25   a CCAFR review are you involved in that process?  I mean not

87

1    the request process but the presidential response to the CCAFR
2    report?
3    A.   So, yes, the person in my role, me, once CCAFR has
4    submitted it's report in response to the request, I do review
5    that and I participate in meeting with the President and the
6    Provost, legal counsel and Senior Vice Provost for Faculty
7    Affairs.
8    Q.   And do you participate in drafting response to the
9    CCAFR report?
10   A.   I do participate in that at the President's
11   direction.
12   Q.   Either drafting, editing, contributing in whatever
13   way the President asks you to --
14   A.   Yes, yes.  Particularly drafting.  Yes, particularly
15   the -- yes.
16   Q.   And in this case, what do you recall doing?
17   A.   In this case, I recall beginning the draft letter.
18   There are pieces of it that are quite standard where the
19   complaint is -- where the request for review is stated and
20   CCAFR's finding is stated.  Those elements of the letter I
21   would have contributed to.
22   Q.   Okay. And is it your -- and you've been involved in
23   that CCAFR response process for how many CCAFR reviews occur
24   that you have been involved in besides Dr. Nikolova?
25   A.   I'm not sure what the number is.

88

1    Q.   Double digits?
2    A.   Pardon?
3    Q.   Double digits, triple digits?
4    A.   In the time that I've been in this position or been
5    serving this role in the President's Committee or in the
6    promotion and tenure process, yes, it would be more than ten
7    total.
8    Q.   Dozens?
9    A.   I don't think dozens.  I'd have to look to see
10   exactly how many there have been.  We've had years with one,
11   years with four or five.  And over the number of years I've
12   done it, I'm coming up with a rough estimate.
13   Q.   Is there a deadline for the President to respond?
14   A.   We have a milestone date that we try to hit every
15   year.  Don't recall what it was in that given year so as we
16   sketch out the whole 12 months of calendar for promotion and
17   tenure.  We do insert a date by which we'd like the President
18   to have responded.
19   Q.   Okay. And in this case, you understand that there
20   were complaints of gender or pregnancy discrimination?
21   A.   I did see that in her report and interview notes and
22   the mention of it in the CCAFR report, too.
23   Q.   And did you see in the CCAFR report that they didn't
24   feel like they had adequate time or information to really opine
25   on that?

89

1    A.   I did see that.
2    Q.   Have you ever experienced that CCAFR actually
3    conducts an investigation into complaints of discrimination
4    when they're raised and a request for a CCAFR review?
5    A.   Not to my memory.
6    Q.   You would agree that as -- from your understanding of
7    how UT works, that complaints of discrimination and retaliation
8    are handled by some other organization not CCAFR?
9    A.   Yes, they would be best investigated by the office
10   designated to investigate those claims.
11   Q.   Which would be the office of institutional equity?
12   A.   Yes, it has had several names over the year but the
13   OIE acronym has stayed the same so yes that would who be -- at
14   that time I suppose.
15   Q.   Even before that, though, was it was the EEO office
16   or -- because you've been here long enough to even pre-date
17   OIE?
18   A.   Yes, I believe so.
19   Q.   Not calling any names.  All right.
20         So the limitation on CCAFR is breaches of
21   academic freedom and violations of policy, is that right?
22   A.   And procedure, yes, that's correct.
23   Q.   And what they're not supposed do is talk about
24   professional judgment?
25   A.   That's correct.

90

1    Q.  So --
2    A.  I'm sorry, I would clarify that just to say that
3  that's outside the scope of what they're asked to consider.
4        (Exhibit 51 identified.)
5    Q.  Okay.  And I saw how the President's response -- in
6  fact, I don't think we have that as an exhibit yet.  Let's go
7  ahead and make that Exhibit 51.  Let me put it up.  Got it?
8    A.  Working on it.
9    Q.  Not rushing.
10    A.  Now I have it.  I'm just going to look through it
11  quickly.
12        (Brief pause in the proceedings.)
13    A.  Okay.  Yes, thank you.
14    Q.  And that is the document that you helped create?
15    A.  That's correct.
16    Q.  All right.  And I see there's some comments about --
17  from President Fenves saying that this is a matter of
18  professional judgment and we're not going to go into it.  And
19  where is the line where if -- so that -- one of the questions I
20  have is if data is disregarded or not looked at, is that a
21  professional judgment or is that a mistake or a intentional
22  violation of the duty to do their job to actually opine on the
23  data that's available instead of not?
24        MS. HILTON:  Objection.  Form.
25    A.  Are you asking me where the line between what is a

91

1  professional judgment and what is potentially a policy or
2  procedure violation lies?
3    Q.  Good answer.
4    A.  Pardon?
5    Q.  That's a better way to ask it.
6    A.  With my corporate rep hat on, because each case is
7  unique, that may end up coming down to the specific allegations
8  and findings and then opinion of the President in each case.
9  In other words, CCAFR, the subcommittee specifically but
10  perhaps in consultation with a larger committee has to make
11  that determination.  I'm sorry, the candidate first would make
12  that determination and then the committee and then ultimately
13  the President.  I don't believe there is a distinct line
14  articulated in the guidelines that CCAFR follows or in the
15  guidelines -- the general guidelines for promotion and tenure.
16    Q.  So if CCAFR agrees with the faculty member that
17  there's a violation and it's not just a professional judgment
18  issue, they would write it up in that way and try to explain
19  it, but the end result is that if the President calls it a
20  professional judgment, that's the last word and there's no more
21  review?
22        MS. HILTON:  Objection.  Form.
23    A.  That is accurate -- I'm sorry, Amy.
24        MS. HILTON:  That's okay.
25    A.  I would say that's an accurate description of the

92

1  process.
2    Q.  Okay.  There would be no argument?  There would be no,
3  wait, it's not professional judgment because you have X, Y and
4  Z>.  There's no back-and-forth?  Once the President says, no,
5  that's professional judgment, not a violation that's the end of
6  it - --
7    A.  That's accurate.
8    Q.  -- all right.
9        Let's go to the next topic -- and that's the end
10  of it, right?  That's the sum total of the process?
11    A.  Yes, it is.
12    Q.  And so if the President makes a decision or doesn't
13  make a decision and then consequences flow from there?
14    A.  Outcomes, yes, uh-huh.
15    Q.  Better.  And the recommendations that they make, I
16  saw that the President forwarded those recommendations onto the
17  Provost office, I believe, and do you remember if any of those
18  five items got implemented?
19    A.  I am going to look back at the exhibit that you
20  uploaded just to make sure I speak to each of the five.
21    Q.  Sure.  Take your time.
22    A.  The decision not to promote was not reversed.
23    Q.  Why?
24    A.  It was decided still to this day that final arguments
25  are not considered and do not promote decisions.  The

93

1  recommendation to develop and annually update a faculty
2  handbook for engineering, you know, we don't really have on
3  campus nor do we require kind of a packaged and bound faculty
4  handbook in each of our colleges though colleges like Cockrell
5  School of Engineering do provide a lot of resources online for
6  faculty with regard to policy and ways -- and processes for
7  requesting certain things through their college.  Documents the
8  university policies regarding prior service and rank with
9  another institution.  This is honestly an ongoing conversation
10  that I still observe questions about and discussion about so it
11  certainly wasn't -- it's not something that was set aside as
12  irrelevant to UT Austin.
13    Q.  But no changes?
14    A.  We do not have a written policy at the university
15  regarding prior service.
16    Q.  Okay.
17    A.  Clarify the rules around requesting and rescinding a
18  request for an extension to the probationary period.  We have
19  developed as a result of this recommendation and other
20  questions that have come up along the way, have put together
21  FAQs on the Provost Office website trying to provide concrete
22  answers to the questions that often come up about that in an
23  effort to be very transparent about that process.
24    Q.  And I'll talk to you more about that in the next
25  deposition.

94

1    A.  Okay.
2    Q.  Because that's one of the -- that would fall within
3  that, right?
4    A.  Okay, yes.
5    Q.  All righty.  So onto the second topic.
6          Policies for faculty members relating to the
7  birth of a child including probationary extension or extension
8  stopping or pushing the clock with a tenure track faculty
9  relating to a new child, modified instructional duties and
10  other policy related pregnancy related -- let me put up the
11  policy.
12    A.  Thank you.
13          (Exhibit 52 identified.)
14    Q.  This is 52.
15    A.  Okay. I am familiar with this policy and I'm just
16  scanning --
17    Q.  Are there any other policies?
18    A.  There is no other policy -- well, in our handbook of
19  operating procedures this is the policy related to the
20  extension of the tenure track probationary period.  There is a
21  Regent's rule that has information about extensions, of course
22  we're subject to be governed by the Regent's rule and other
23  policies may reference this but they would all point back to
24  this policy.
25    Q.  All right.  Is there any other policy relating to

95

1  birth and the other categories on the topic?
2    A.  Let me look at the topic again.  I'm sorry.  So
3  specific to pregnancy and birth, and parental leave, we --
4  there are often intersections with the universities sick leave
5  policy because anyone -- because of the eligible use of sick
6  leave.  That's not faculty specific, that's a policy for
7  employees.
8    Q.  Yeah.
9    A.  The faculty are related. I think it's fair to say
10  that our modified instructional duties policy is -- I don't
11  think it uses the words birth of a child but it does -- it does
12  talk about care of a preschool aged child which is, you know,
13  birth to school age.  Oh, sorry forgot that.  There's a
14  parental leave policy that all employees are subject to.  FMLA
15  is not -- I don't believe it's in our handbook of operating
16  procedures. It might be referenced but there is a resource page
17  on the HR website.
18    Q.  Okay. And do you -- did the extension of the tenured
19  track probationary period, was it in place when -- already in
20  place when you arrived or is it something that came to be after
21  you got here as an employee?
22    A.  Policy was in place prior to me joining -- I guess me
23  joining UT Austin but prior to me come together the Provost
24  office.
25    Q.  Okay, I see that it's 1997.

96

1    A.  Uh-huh.
2    Q.  Okay. And do you see there's nothing in here about
3  rescinding?
4    A.  That's true.  That's accurate.  I suppose I should
5  look but that is not in this policy.
6    Q.  And why is that?
7    A.  Good question.  So when this policy was put in place
8  and up until -- I don't know the exact year, if it was 20 -- it
9  was in the 2014 to 2016 range, there was a decision to allow
10  faculty members who had received an extension to be able to
11  rescind that extension, kind of just take it off of their
12  record.  And we at that time I believe that was communicated to
13  campus stakeholders and we began writing it into each letter
14  where an extension was noted as being approved.  There's kind
15  of a clause, right, that it could be extend.
16    Q.  It could be rescinded?
17    A.  Oh, yes, thank you, it could be rescinded.  I don't
18  recall participating in conversations about adding that to the
19  policy since -- and there are sometimes conversations about
20  what is policy and what is process-based, so what rises to the
21  level of needing to be in our handbook of operating procedures
22  versus available, communicated related to a policy.  So I can't
23  -- I don't think I can answer why it's not in here but
24  hopefully that background gives some context.
25    Q.  Okay. I'm -- there's potential consequences for

97

1  rescinding or not rescinding -- let me use the term outcomes.
2    A.  Thank you.
3    Q.  You used before.  There are different outcomes that
4  can take affect if one rescinds or doesn't rescind their
5  probationary period that would impact or potentially impact
6  their consideration for tenure, correct, or at least the
7  timing.
8    A.  At least the timing.  Yes, I agree with that.
9    Q.  Well, not just the timing but it's the issue of
10  accelerated or not would be a factor that would be -- well, no,
11  right, because the only faculty that's affected is whether it's
12  up or out?
13    A.  That's right.
14    Q.  Because in rank doesn't change, the count goes
15  forward.  So -- but if -- if there's -- would you agree that in
16  a situation where somebody has six years in rank between UT and
17  another institution but only four years of probationary time,
18  that going up on the fourth year of probationary time or the
19  fifth year of probationary time, wouldn't change because those
20  would both be non up or out years?
21    A.  Yes, I'd agree with that.
22    Q.  Okay. So that the decision to rescind the
23  probationary extension if you're sitting at four years and that
24  would make it five years if you rescinded wouldn't change the
25  fact that you're not in an up or out year?

98

1    A.   That's correct.
2    Q.   Okay. And the -- do you see any potential
3  consequences to a faculty member who is going up in the fourth
4  year of probationary time having met six years or more of in
5  rank time with UT and somewhere else not rescinding and then
6  being at the fifth year?
7    A.   Not rescinding and then being at the fifth year of
8  probationary or --
9    Q.   No, rescinding and then being at the fifth year or
10  not rescinding and staying at the fourth year.  Is there any
11  difference in how you understand their candidacy for tenure is
12  reviewed?
13    A.   Okay, I'm thinking through your question.  When a
14  candidate is not up or out, the college and department
15  essentially make a decision about whether to put them forward
16  or not. I'm not sure if tracks completely with the example you
17  just gave, so please let me know if it doesn't.
18         So if rescinding a one or two probationary
19  period extension, then makes it an up or out year, then they go
20  forward without a decision being made about that with their
21  college and department.  So that's one outcome of rescinding, a
22  faculty member can shift the needle on when the up or out year
23  is.
24    Q.   But my hypothetical is going from four-year not up or
25  out, or five-year by rescinding not up or out.

99

1    A.   It would still be not up or out either way.
2    Q.   Is there any other difference?  There would be no
3  difference there because non up or out, non up or out, that's
4  not an issue?
5    A.   From a policy perspective, there would not be a
6  difference.
7    Q.   What about from a perspective of the way in which
8  their candidacy is reviewed for tenure?  Do they have a
9  heightened or higher bar that they have to cross at four years
10  versus five?
11    A.   Because this isn't written in this policy or in our
12  policies -- what's written in our policies or in the general
13  guidelines, we can do that again, is that the work will be
14  considered as though it were performed in the normal period of
15  service.  We'd have to look to see if that's what it said in
16  those guideline as well.
17         I don't know if speaking for Carmen Shockley is
18  needed here.  I don't -- should I be keeping separate the fact
19  witness and the corporate witness? If I were speaking as Carmen
20  Shockley -- maybe I'll just do that -- I have not perceived a
21  difference in that example that you just gave.
22    Q.   Okay. And as UT?
23    A.   We don't have any policies that would create a
24  difference between those examples.
25    Q.   Okay.

100

1    A.   Pardon my stumbling.
2    Q.   No, no, it is difficult at best to keep it straight
3  and have the two hats and I appreciate you being cognizant of
4  that.
5    A.   Thank you.
6    Q.   Who is the person that exists at UT -- that advises
7  candidates of probationary extensions and whether and what the
8  outcomes of rescinding or not rescinding are?
9    A.   I don't know if there is one person.  We try to put
10  out -- the university tries to put out communication,
11  question-and-answer sessions, FAQs and the like to equip
12  department Chairs, Dean's, some of your questions just
13  candidates themselves and mentors to candidates.  The faculty
14  affairs office that I'm part of and the Provost offices always
15  available to help answer questions from any of those
16  individuals.  I think what it comes down to, if a candidate
17  came to me and said who should I ask for advice on this, I
18  would say have a conversation with your chair and department --
19  your department chair and your Dean.
20    Q.   Okay. And I think this segues us into what you were
21  thinking about in response to the CCAFR request for changes.
22  There's an effort to have FAQs now post spring 2019.  Can you
23  talk about those changes?
24    A.   So the -- I think it was two years ago when Tasha
25  Beretvaz came into the role and started looking at the things

101

1  she -- she's a full professor in the college of education and I
2  think that the things that she brought to the role in terms of
3  clarifications, better transparency, more communication, these
4  FAQs were Dr. Beretvaz led effort where she said that there's
5  not enough clarity around these questions and answers and so
6  that was the beginning of the FAQs that we do reference quite a
7  bit now. Items such as the CCAFR recommendation certainly gave
8  not -- but credibility to that -- the fact that that idea
9  needed some exploration and action.
10    Q.   Any other changes that have occurred since spring of
11  '19 on the probationary extension period?
12    A.   When we found ourselves so severely disrupted in
13  spring of 2020 because of the pandemic, it was decided at the
14  UT system level that the maximum number of two personal
15  circumstances, extensions would stand, but that another
16  probationary extension could be offered because of the
17  operational impact of the COVID pandemic so I'd say that was a
18  change meaning essentially that an assistant professor could
19  get up to three probationary period extensions, two for
20  personal circumstances and one for operational impact.
21    Q.   Okay.
22    A.   That's a big change that came to mind.  I'm not sure
23  that we -- I'm not recalling -- another change is not coming to
24  mind.
25    Q.   Okay. And did you participate in drafting responses

102

1  to FAQs?
2      A.  I did.
3      Q.  Do any of them relate to the affects of rescinding or
4  not rescinding on the standard that's applied at tenure
5  consideration?
6      A.  I don't believe we addressed that in the FAQ.  I'd
7  have to look to be certain.
8      Q.  For instance, does rescinding or not rescinding the
9  probationary extension period have any impact on the height of
10  the bar that you have to cross to get tenured, upon
11  verification of that?
12      A.  No, I don't believe we have that in our FAQs.
13      Q.  If that question was put in the FAQs, your answer
14  would be?
15      A.  Be -- as asked just then -- that would be a hard one
16  to answer in that way.  As we've kind of developed in this
17  testimony, we do have different kind of categories that people
18  end up falling into so I'd be hesitant to answer that as
19  generally as I can answer a question such as what's the
20  deadline to apply.  It's a straightforward question-and-answer
21  that applies to everyone. The question you posed I think would
22  be better handled in a conversation so that we can look at that
23  specific faculty member's time and rank and extensions.
24      Q.  So an answer would be it depends, contact X, Y or Z?
25      A.  That would be -- yes, that would be very similar to

103

1  the answer.
2      Q.  What if the FAQ was what does considered as having
3  occurred during the -- what was it, normal period or what did
4  you say?
5      A.  The normal period of service.
6      Q.  Yeah.  What does that apply to and how does that
7  work?
8      A.  Specific to a probationary period extension?
9      Q.  Yes.
10      A.  So since that is articulated in the general
11  guidelines, I would probably copy, paste what's in the general
12  guidelines we could look at that to see if it answers that
13  question you're asking me.
14      Q.  Feel free. I don't see that it does.  I just make
15  that statement but it doesn't explain what it means.
16      A.  Oh, I see.  I see.
17      Q.  How it's applied?
18      A.  How it's applied.
19      Q.  So if you have X number of publication, it wouldn't
20  be divided by seven years, it would be divided by six?
21      A.  I was trying to think if we had something referencing
22  a denominator in that -- in those FAQs I don't think we do.
23      Q.  Well, taking the FAQs off the table just --
24      A.  Right, right, that was a reference point.  So I would
25  say the work -- the normal period of service would be as

104

1  service as an Assistant Professor, the normative time for
2  review that sort of six years that it would not be -- somewhat
3  of what you said, it would not be counted as though it happened
4  over eight years in rank therefore we wouldn't expect a greater
5  productivity in eight years that the university would expect in
6  a normative period of time.
7      Q.  Okay. And that's one of the ways that UT attempts to
8  specify how the policy does not negatively impact a person that
9  accesses that policy?
10      A.  I agree with that.
11          MS. HILTON: Robert, real quick.  Sorry to
12  interrupt.  I'm having a really hard time hearing you.  Is
13  there any way you could be a little closer to the microphone?
14          MR. NOTZON: I'm moving around too much?
15          MS. HILTON: Yeah, you're moving around too much.
16          MS. SHOCKLEY: And I'm probably shouting.
17          MR. NOTZON: No problem.  Any time, just let me
18  know.  Is this better?
19          MS. HILTON: Yes, thank you.
20          (Last question read.)
21      Q.  (BY MR. NOTZON) Do you understand that just how the
22  policy is applied to males and females is not the end of the
23  inquiry when it comes to the effect of the policy on the
24  faculty member?
25      A.  Can you please ask me that a different way?

105

1      Q.  Sure.  I was trying to start general, but the idea is
2  that a probationary extension for the birth of a child is
3  offered to allow the parent, male or female, to have time with
4  their child without it negatively impacting or drawing their
5  attention away to the work and to the tenure process which is,
6  you know, admittedly can be stressful, because you need to --
7  you need to be wonderful for six years.
8          But when a man who doesn't birth a child has the
9  extension, they're not as medically, physiologically,
10  emotionally, psychologically taxed as a woman is so when they
11  have the probationary extension they get an extra years worth
12  of effort that can be crammed into the six years so they get
13  seven years of work that's put down into six years whereas a
14  woman might actually lose that entire year depending on the
15  medical issues that they engage in?
16          MS. HILTON: Objection. Form.
17      Q.  Do you see that as a factor that is in play with the
18  implementation of the probationary extension for the birth of a
19  child?
20          MS. HILTON: Objection. Form.
21      A.  I do not.
22          THE WITNESS: Sorry, Amy.  I keep interrupting
23  you.
24      Q.  You do not, you said?
25      A.  I do not see that as a factor at play when

106

1 implementing this policy for our employees.
2     Q.   And is that because you disagree with what I said
3 that women have greater medical, physical, emotional tolls when
4 birthing a child than a men does?
5     A.   I don't agree that that is the situation for every
6 woman or every family.
7     Q.   Okay. I don't know what I said if it was for every
8 woman but definitely as between men and women there is going to
9 be a difference there.
10    A.   I am -- I'm not comfortable saying that that is
11 true...
12    Q.   Okay. How about that there is a potential substantial
13 difference in the experience between the birthing mother and
14 the non-birthing father?
15    A.   Because the policy is broader than that and I was
16 thinking about implications for the policy. What I'm thinking
17 of is there are some situations where that could be the reverse
18 because it's not just from that children born in a certain way
19 but it's also for adoption and other family circumstances
20 where, if you were talking about two partners who shared
21 household responsibilities it could be -- I'm not comfortable
22 saying that there's -- that we can generalize one having more
23 impact than another, one employee having a greater impact than
24 another without looking kind of case-by-case and getting their
25 feedback.

107

1     Q.   So how would UT handle it if there was a difference
2 in the experience?
3          MS. HILTON: I'm going to object to outside the
4 scope but, Carmen, you can go ahead and answer.
5     A.   I am not aware of those -- of that set of facts
6 presenting itself in a family situation. In addition, when
7 individuals are reviewed for promotion, it isn't comparative to
8 their partner or spouse which I don't think that's what you
9 were asking.
10    Q.   Well, let me ask it this way. In relation to the
11 child. Has UT done anything to study, understand, or modify
12 the policy based upon the fact that women actually go through
13 the birth of the child and have a draft of potential
14 consequences on their physical self and emotional and
15 psychological self that men don't have?
16         MS. HILTON: I'm going to object to -- sorry.
17 Are you done with your question? I didn't mean to interrupt.
18 I apologize. I object to outside the scope. But, again,
19 Carmen, you can go ahead and answer.
20    A.   I don't know if the university has done any, I think
21 you said research.
22    Q.   Study.
23    A.   Study?
24    Q.   Yes.
25    A.   Related to our employees who have taken probationary

108

1 period extensions and then formed a policy as a result of that.
2     Q.   Okay. Or considered altering the policy?
3     A.   There has not been consideration of altering the
4 policy along those lines that I'm aware of.
5     Q.   All right. Let's go ahead and go the third topic.
6     A.   Okay.
7     Q.   Tenured faculty in the UT department who have taken a
8 leave of absence of a semester or more, (not including absences
9 covered under the FMLA). Since Dr. Nikolova began at UT the
10 reason for those absences and any policies and facts that
11 govern the ability of tenured faculty members to take a leave
12 of absence. So let's start with the list.
13    A.   Okay. So we have a database of leave requests that we
14 enter into and I pulled those -- pulled that data and then
15 started to refine it based on the parameters in the topic,
16 specifically tenured faculty, right, who have taken a leave of
17 absence of a semester or more and since Dr. Nikolova began at
18 UT and -- so I do have some notes just that I have written down
19 that I can also provide kind of at the bottom of my topics page
20 where I found 13 individuals have met those parameters.
21    Q.   Why don't you just go ahead and include those in your
22 scanned version. I'll put all those notes in number 50.
23    A.   Okay, be happy to.
24    Q.   All right. So those 13 individuals, do we -- I
25 guess, do we have -- they had different periods of time where

109

1 they were on leave?
2     A.   Yes.
3     Q.   Either a semester or more?
4     A.   Yes.
5     Q.   What's the longest leave.
6     A.   May I look at the reference document I have?
7     Q.   Sure.
8     A.   Okay. To see what the longest period -- well, so our
9 information captures this by request so I'm looking at years at
10 a time. It is possible that someone in here may have had two
11 years in a row. The data is just not organized that way.
12    Q.   Are these two separate requests?
13    A.   Yes, each year would have had it's own request.
14    Q.   And you're going to provide me with that list of
15 people?
16    A.   Yes, I can provide you with this Excel sheet that I'm
17 looking at.
18    Q.   Okay. And the list it of people and the leaves they
19 had?
20    A.   Yes.
21    Q.   Okay.
22    A.   Yes.
23    Q.   And it indicates time of the leave and length of the
24 leave?
25    A.   Yes, it does, it has the year, the semester, if it's

110

1  less than a year it has the semester, it has the reason, if it
2  is approved.  Looks like one from last year is pending.  I'm
3  not sure what that means, and that it shows that they were all
4  in ECE.
5      Q.  Okay. And what are the -- so that covers everything
6  up to the and any policies and practices that govern?
7      A.  Yes.  So there is a handbook of operating procedures,
8  2-2210 I can also pull up or look up and it simply -- it's
9  really more of a process sort of.  This is when a leave is in
10  the best interest of the university, a faculty member may
11  request it and that request has to be approved by the
12  department chair, the Dean and the Provost office in the case
13  of a leave of absence and the University of Texas can approve
14  up to two consecutive years, a third consecutive year has to
15  have UT system approval.  And I did also in preparing for this
16  topic checked with the Dean's office in engineering
17  specifically Jerry Speitel, Gerald Speitel to see if there was
18  some sort of program or policy specific to the department that
19  wasn't -- that I wasn't aware of or that wasn't part of the UT
20  policy and as far as leave of absences go, there are not.
21          MR. NOTZON: Amy, do we have that policy HOP
22  2-2210 has that been --
23          MS. HILTON: I believe so.  Let me check real
24  quick.
25          MR. NOTZON: Okay.

111

1      A.  It's called faculty leaves and special academic
2  assignments.
3          MR. NOTZON: If we have that then we don't have
4  to make it an exhibit.
5          MS. HILTON: Yeah, certainly if you don't have it
6  we'll produce it but let me see if I can find it quickly.
7          MR. NOTZON: Why don't we just make that
8  Exhibit 53, okay?
9          MS. HILTON: All right.
10          (Exhibit 53 identified.)
11      Q.  (BY MR. NOTZON) That policy, HOP 2-2210, Ms. Shockley
12  we'll just make that Exhibit 53, okay?
13      A.  Okay.
14      Q.  Just to ask you a question about it.  Is there any
15  limitation to when the tenured faculty has access to that
16  leave?  Do they have to -- can they have it in their first year
17  of tenure or do they have to wait some X number of years before
18  they have access to that?
19      A.  Let me clarify that.  That policy is not only
20  specific to tenured faculty.
21      Q.  Okay.
22      A.  Okay. So it is all faculty are governed by it and,
23  no, it does not give a specific period of service in which
24  someone would be eligible or which someone would be eligible
25  for that.

112

1      Q.  So the consideration by the Chair, Dean and Provost
2  would be to their discretion without policy guidelines to help
3  them decide "yes" or "no." It  would just be based upon the
4  circumstances provided by the faculty member making the request
5  and whether it's granted?
6      A.  And the approver's assessment of whether that leave
7  would be in the university's best interest or not.
8      Q.  Okay. But using that general guide of the
9  university's best interest would be the only limitation?
10      A.  And the constraint on the number of years,
11  consecutive years.
12      Q.  That you testified. Okay.
13      A.  Thank you.
14      Q.  Okay.  All right.  Let me have a couple of minutes.
15  Don't go too far I've just got to check with my co-counsel and
16  decide if I've got anymore questions.
17          (A recess was taken at 1:11 p.m.).
18      Q.  Okay. On the CCAFR member that you spoke to, what was
19  her name again?
20      A.  Pauline Strong.
21      Q.  Okay.
22      A.  Okay.
23      Q.  What do you recall her providing you in terms of
24  information to testify today?
25      A.  Certainly.  It was a brief conversation.  I asked her

113

1  if there were any -- if she had -- not she but the subcommittee
2  had any conversations or reviewed any materials that were not
3  part of the CCAFR report and she said they did not and there
4  were not so I confirmed then that the report was complete and
5  if I testified that that was their process of inquiry that I
6  would be testifying truthfully.  She said yes.  I did ask her
7  about the -- in CCFAR's report they attach interview notes from
8  their interviews with Dr. Nikolova, Dr. Tewfik and Dr. Wood and
9  I noted in reviewing that that Dr. Nikolova's interview ended
10  with a line about -- I don't remember if she used both gender
11  and pregnancy bias and discrimination I'd have to look I'm
12  happy to look at that just to tell you exactly what it said
13  that's the last line of the interview notes and so I also asked
14  Dr. Strong if there was anything else said about that because
15  it ended there and she said her recollection was that they did
16  not discuss that further with Dr. Nikolova.  They recalled that
17  she said she couldn't recall if she was crying at that point
18  but that she was emotional about the conversation.  The report
19  notes that it was a 90-minute long conversation.  She offered
20  to me that they did talk about that aspect as a subcommittee
21  and did not for themselves as a CCAFR subcommittee, one did not
22  feel like it was within the scope of  their review and possibly
23  better handled in a grievance or with another office or through
24  other avenues open to Dr. Nikolova.  They did not see the
25  evidence for that themselves is what they she me they recalled

114

1 but she qualified that with that's not what -- that was not
2 within the scope of what our subcommittee was there to talk
3 about.
4     Q.   They didn't explore it sufficiently or put the time
5 into it because that's not what we do kind of thing?
6     A.   Right.  I think that's an accurate assessment.
7     Q.   Okay. All right.  And then back -- so that's the end
8 of your corporate hat.
9     A.   Okay.
10     Q.   Just one more time with your Shockley hat.  Do you
11 recall speaking to anybody that communicated to you that they
12 felt like Dr. Nikolova should have received tenure in the
13 spring of 2019?
14     A.   I recall talking with professor Brian Evans who was a
15 chair of CCAFR -- this was at the time not preparing for today.
16 I recall talking to him about this case.  I don't recall that
17 he said what you just asked me.  She should have received
18 tenure.  But I do recall that he had concerns about the
19 decision.
20     Q.   Okay. And did you -- did he just make that comment or
21 was there a discussion about it?
22     A.   We were having a discussion.  Actually I believe we
23 may have been talking about the guidelines for coming year.  As
24 I mentioned, they are reviewed every year and put forward and
25 he was the chair of CCAFR at that time and we were talking

115

1 about that and it came up -- I believe it came up in the
2 context of discussing the general guidelines.  It was not -- I
3 don't recall -- what am I trying to say -- reacting in a way
4 that would encourage further discussion about her case because
5 that would not be appropriate in my role.
6     Q.   Okay. And then did you feel that Dr. Nikolova's
7 qualifications merited tenure from your hundreds maybe
8 thousands experiences as compared with other individuals that
9 have received tenure under similar circumstances?
10     A.   So, yes, speaking as Carmen Shockley who doesn't have
11 a voice in the decision and isn't one of the decision makers,
12 while I don't recall all of the specifics of her file, I do not
13 recall having concerns or a disagreement with -- just in my own
14 mind -- with the President's decision.
15     Q.   Okay. And slightly different question, did you see or
16 observe that the factors that were called out to criticize Dr.
17 Nikolova were not factors that were focused on or relied upon
18 in the tenure review of other candidates? In other words, Dr.
19 Nikolova was faulted or criticized for saying that other people
20 weren't faulted or criticized.
21         MS. HILTON: Objection. Form.
22     A.   I don't recall that.  I also don't recall the
23 specifics of the case.  That would have led to a concern on my
24 part as testified, I do not -- I did not leave that year with
25 any concerns about the outcomes -- outcomes of the decision

116

1 making.
2     Q.   Pass the witness.
3         MS. HILTON: We'll reserve for trial.
4         (The proceedings concluded at 1:23 P.M.)

117

1         SIGNATURE AND CHANGES
2     WITNESS NAME: CARMEN SHOCKLEY
3         DATE, MAY 28, 2021
4 PAGE  LINE  CHANGE        REASON
5 _____
6 _____
7 _____
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

117

# SIGNATURE AND CHANGES

## WITNESS NAME: CARMEN SHOCKLEY

## DATE, MAY 28, 2021

| PAGE | LINE | CHANGE | REASON |
|------|------|--------|--------|
| 4 | 3 | Replace "Exclusing" with "Excluding" | To correct the name of the document |
| 9 | 1 | Replace "you" with "she" | The question was about Janet Dukerich rather than about me |
| 21 | 14 | Replace "tract" with "track" | I said track rather than tract |
| 23 | 3 | Replace "year" with "time" | I said time in rank rather than year in rank |
| 23 | 24 | Replace "time and rank" with "time in rank" | The question was about time in rank. |
| 24 | 25 | Replace "time and rank" with "time in rank" | Same as above |
| 25 | 1 | Replace "time and rank" with "time in rank" | Same as above |
| 25 | 5 | Replace "time and rank" with "time in rank" | Same as above |
| 25 | 15 | Replace "time and rank" with "time in rank" | Same as above |
| 27 | 20 | Replace "upper out year" with "up or out year" | I said up or out year rather than upper year |
| 28 | 7 | "Replace "...Dean.  Okay,  Provost" with "...Dean or Provost." | I said dean or provost rather than ...dean.  Okay provost. |
| 29 | 6 | Replace "upper out year" with "up or out year" | I said up or out year rather than upper year |
| 30 | 10 | Remove the word "it" | I didn't say it |
| 38 | 10-11 | I feel that this wasn't recorded correctly but am not sure what the change should be. | |
| 46 | 7 | Replace "time and rank" with "time in rank" | The answer was about time in rank |
| 46 | 14 | Replace "attempts" with "terms" | I said terms rather than attempts |
| 47 | 8 | Replace "tenured" with "tenure" | I said tenure rather than tenured |
| 47 | 10 | Replace "tenured" with "tenure" | I said tenure rather than tenured |
| 60 | 22 | Replace "charter" with "chart of" | I said chart of rather than charter |
| 63 | 20 | Replace "a not promote" with "a do not promote" | I said do not promote |
| 68 | 20 | Replace "Sinbez" with "Fenves" | The president's last name was Fenves |

117

# SIGNATURE AND CHANGES

## WITNESS NAME: CARMEN SHOCKLEY

### DATE, MAY 28, 2021

| PAGE | LINE | CHANGE | REASON |
|------|------|--------|--------|
| 81 | 17 | I am fairly certain that I didn't say it "wouldn't" be contrary –. | It is more likely that I said it WOULD be contrary.  Is it possible to have this reviewed? |
| 86 | 13 | My answer was "Yes."  Everything after that and through line 16 should be changed to a new "Q" | |
| 89 | 12 | Replace "year" with "years" | To correct the record |
| 92 | 25 | Replace "and" with "in" | To correct the record |
| 100 | 14 | Replace "offices always" with "office is always" | To correct the record |
| 100 | 25 | Replace "Beretvaz" with "Beretvas" | To correct the spelling of her last name |
| 101 | 4 | Replace "Beretvaz" with "Beretvas" | To correct the spelling of her last name |
| 101 | 8 | Replace "not" with "note" | To correct the record |
| | | General note – Professor "Bloom" should be changed to "Blum" throughout the deposition transcript | |
| 102 | 23 | Replace "time and rank" with "time in rank" | To correct the record. |
| 111 | 24 | Replace the second "eligible" with "ineligible" | To correct the record. |
| 113 | 16 | Delete "They recalled that" | To correct the record |

Appx.0563

118

1                 **SIGNATURE PAGE**

2         I, CARMEN SHOCKLEY, have read the foregoing

3 deposition and hereby affix my signature that same is true and

4 correct, except as noted on the correction page.

5

6              *Carmen Shockley*
              CARMEN SHOCKLEY

7

8 THE STATE of _Texas_ )

9 COUNTY of _Travis_ ) *Paula Rivera*

10        Before me ~~Carmen Shockley~~ on this day

11 personally appeared _Carmen Shockley_ known to me [or

12 proved to me on the oath of _____ or through

13 _Texas drivers licence_ (description of identity card or other

14 document)] to be the person whose name is subscribed to the

15 foregoing instrument and acknowledged to me that he/she

16 executed the same for the purposes and consideration therein

17 expressed.

18        Given under my hand and seal of office this

19 _21st_ day of _July_ , 2021.

20         *Paula Rivera*

21        NOTARY PUBLIC in AND FOR

22        THE STATE of _Texas_

23

24 My Commission Expires: _04/22/25_

                    **PAULA RIVERA-RUIZ**
                    **MY COMMISSION EXPIRES**
                    **APRIL 22, 2025**
                    **NOTARY ID: 133055762**

25

1  COUNTY OF DALLAS     )

2  STATE OF TEXAS       )

3                    REPORTER'S CERTIFICATION

4            I, JACQUELINE LOVE-WORLINE, CSR, hereby

5  certify that the witness was duly sworn and that this

6  transcript is a true record of the testimony given by

7  the witness.

8            I further certify that I am neither

9  counsel for, related to, nor employed by any of the

10  parties or attorneys in the action in which this

11  proceeding was taken. Further, I am not a relative or

12  employee of any attorney of record in this cause, nor am

13  I financially or otherwise interested in the outcome of

14  the action.

15            Subscribed and sworn to on this, the 22nd day of

16  June, 2021.

17

18

19

20  JACQUELINE LOVE-WORLINE, CSR NO. 8970
    Expiration Date:  11/30/2022
21  Firm Registration No.: 528
    FOR: INTEGRITY LEGAL SUPPORT SOLUTIONS
22  PO Box 245
    Manchaca, TX  78652
23  Telephone: 512-320-8690

24

25

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

EVDOKIA NIKOLOVA,            )
                            )
    Plaintiff,              )
                            )
VS.                         )   CASE NO. 1-19-cv-00877-RP
                            )
UNIVERSITY OF TEXAS,        )
                            )
    Defendant.             )


---------------------------------------

REMOTE ORAL DEPOSITION

OF

JERRY SPEITEL
AS CORPORATE REPRESENTATIVE

MAY 28, 2021

---------------------------------------

REMOTE ORAL DEPOSITION of JERRY SPEITEL produced

as a witness at the instance of the PLAINTIFF, and duly sworn,

was taken in the above-styled and numbered cause on the 28th

day of May 2021, from 2:01 p.m. to 4:39 p.m. reported remotely

before Jacqueline Love-Worline, CSR, in and for the State of

Texas, reported by machine shorthand remotely from Dallas,

Texas, pursuant to the Texas Rules of Civil Procedure and the

provisions stated on the record or attached hereto, and also

pursuant to the First Emergency Order regarding the COVID-19

State of Disaster declared by Governor Abbott dated March 13,

2020, renewed thereafter.

2

```
1           A P P E A R A N C E S
2   FOR THE DEFENDANT: UNIVERSITY OF TEXAS AT AUSTIN
3   BENJAMIN DOWER
    AMY HILTON
4   Assistant Attorney General
    Office of the Attorney General
5   General Litigation Division, P.O. Box 12548, Capitol Station
    Austin, TX 78711-2548
6   Telephone: 512-463-2120
    Benjamin.dower@oag.texas.gov
7
8
    FOR THE PLAINTIFF: EVDOKIA NIKOLOVA
9
    ROBERT NOTZON
10  The Law Office of Robert Notzon
    1502 West Avenue
11  Austin, TX 78701
    Telephone: 512-474-7563
12  Robert@notzonlaw.com
13  ROBERT SCHMIDT
    Crews Law Firm, P.C.
14  701 Brazos, Suite 900
    Austin, TX 78701
15  Telephone: 512-346-7077
    Schmidt@crewsfirm.com
16
17  ALSO PRESENT:
18  Laura Barbour, In-House Assistant General Counsel, UT Austin
19  Jody Hughes, Associate Vice President of Legal Affairs, UT
    Austin
20
21
22
23
24
25
```

3

```
1               INDEX
2                                        PAGE
3   WITNESS: JERRY SPEITEL
4     Examination by Mr. Notzon........................5
5     Examination by Mr. Dower........................N/A
6   Signature Page...........................................73
7   Reporter's Certificate.................................75
8
9   REPORTER'S NOTE 1:  Quotation marks are used for clarity and do
10  not necessarily reflect a direct quote.
11
12        REQUESTED DOCUMENTS/INFORMATION
13                N/A
14        CERTIFIED QUESTIONS
15                N/A
16
17
18
19
20
21
22
23
24
25
```

4

```
1              EXHIBIT INDEX
2   NO.  DESCRIPTION                    IDENTIFIED
3   54  Plaintiff's First Amended Notice of Oral and
        Video Deposition of Jerry Speitel as a Fact
4       Witness and Corporate Representative         20
5   55  E-mail                          33
6   56  E-mail                          58
7   57  E-mail                          65
8   58  E-mail                          67
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

5

```
1            THE REPORTER: Today is Friday, May 28, 2021.
2   This is the remote videoconferenced deposition of Jerry Speitel
3   in the matter of Nikolova versus UT Austin. Due to the Covid-19
4   pandemic, we are remotely situated, and we are on the record at
5   2:01 p.m.  Central Standard Time. My name is Jacqueline
6   Love-Worline, TX CSR No. 8970, and my business address is
7   located at P.O. Box 245, Manchaca, Texas 78652. Would all
8   persons present please state their appearances beginning with
9   the questioning attorney first.
10            MR. NOTZON: Robert Notzon and Bob Schmidt for
11  Evdokia Nikolova.
12            MR. DOWER: Benjamin Dower for the defendant UT
13  Austin. So --
14            THE REPORTER: Thank you. I'm sorry, excuse me. I
15  thought I heard someone say something.
16            MR. DOWER:  I did but I interrupted you and I
17  apologize for that.
18            I was going to go ahead and do the same
19  stipulations we've been doing in all these depositions.
20            The parties stipulate that this deposition may
21  be taken remotely via Zoom. The parties stipulate that
22  objection form is sufficient to preserve objections to the form
23  of the questions and will be used in lieu of the more specific
24  form based objections.  The parties stipulate that all
25  objections except as to the form of the question or answer are
```

6

1   reserved until trial. The parties stipulate that plaintiff's
2   counsel Mr. Robert Schmidt, can record and also does not need
3   to do the sort of announcement of the timing of the stopping
4   and starting of the record. And then lastly, and this isn't
5   really a stipulation but before I forget the deponent would
6   like an opportunity to review the transcript and recording
7   pursuant to Federal Rule of Civil Procedure 30-E and with that
8   I will yield the floor to you, Robert.
9          MR. NOTZON: Agreed.
10              JERRY SPEITEL,
11      Having been duly sworn, testified as follows:
12              EXAMINATION
13  BY MR. NOTZON:
14      Q. Good afternoon.
15      A. Good afternoon.
16      Q. Would it be acceptable to you to refer you as Dr.
17  Speitel?
18      A. Oh, that's fine, sure.
19      Q. Okay. So, Dr. Speitel, have you ever had your
20  deposition taken before?
21      A. I have not.
22      Q. Okay. As you've just experienced, you've been sworn
23  in so what you have to say today isn't just a conversation but
24  your testimony and it would have the same force and effect as
25  if you were in front of a judge and a jury. Do you understand?

8

1      A. That is correct.
2      Q. What is your position?
3      A. I am a tenured professor and I hold the CW Cook Dow
4   professorship in environmental engineering. I'm also the
5   Associate Dean for Academic Affairs in the Cockrell School of
6   Engineering?
7      Q. How long have you been Associate Dean?
8      A. Since 2008 so this is my 13th year.
9      Q. Okay. Did you have any administrative roles prior to
10  that?
11     A. I was department chair of the Department of Civil
12  Architecture Environmental Engineering from 2001 to 2008.
13     Q. When did you start at UT?
14     A. In 1988.
15     Q. As an assistant?
16     A. Yes, I started as an assistant professor.
17     Q. Okay. And where did you get your Ph.D.?
18     A. University of North Carolina Chapel Hill.
19     Q. And your undergrad?
20     A. Union College in Schenectady, New York.
21     Q. I won't ask you to spell it.
22     A. No idea. If you live there long enough you can spell
23  Schenectady.
24     Q. No doubt. Okay.
25         What are your job duties as Associate Dean?

7

1      A. I do.
2      Q. Okay. One of the factors that's involved here is the
3   court reporter will be taking down every word that's said by
4   anyone in this proceeding and some poor souls of us have to
5   read it later and make sense of it so it's best if you wait for
6   me to finish my question even if you kind of know where I'm
7   going, which would normally happen in a conversation, before
8   you start your answer and I'll do the reverse and try to wait
9   for you to finish your answer before I start my next question.
10  That way, when the sounds are transcribed the question will be
11  complete and the answer will be complete and we'll know what
12  goes to what. If you could do that for me, I'd appreciate that.
13     A. I will do that. Thank you for reminding me.
14     Q. And Because of that, we want to use actual verbal
15  responses and not just audible or visual responses, okay?
16     A. Yes, sir.
17     Q. All right. Kind of lastly, this shouldn't take too
18  long. Hopefully it's shorter than it probably will be but we'll
19  give it an effort. If you ever need a break just let me know.
20  This isn't an endurance test so I want you to be comfortable,
21  okay?
22     A. Thank you. I appreciate that.
23     Q. Sure. I might avail myself of that myself.
24         Okay. You're employed by the University of
25  Texas, correct?

9

1      A. I oversee faculty hiring, promotion of tenure, pay
2   raises, endowments. I oversee all of the academic programs
3   especially related to changes in programs and accreditation. I
4   have substantial responsibilities for financial planning
5   related to department operating budgets, faculty salaries,
6   endowments. I oversee some aspects of the graduate program.
7   Have some responsibilities for staff in terms of approving
8   requests for employment and from time to time, I get involved
9   in student matters if they're serious enough.
10     Q. Are you the only Associate Dean?
11     A. No.
12     Q. Okay. That's a lot of job duties you just listed.
13     A. Yes, it's sort of like a Chief Operating Officer
14  position.
15     Q. Okay.
16     Q. Are you the longest-tenured Associate Dean?
17     A. No. Two of us came in at the same time in 2008.
18     Q. Okay. Hired by Dr. Fenves?
19     A. Correct.
20     Q. Who was the other person?
21     A. John Eckert. He's the Associate Dean for research.
22     Q. And what year did you get your bachelor's degree?
23     A. 1976.
24     Q. Okay. I got mine in '85 so I was just wondering how
25  -- where we were in the -- mine was chemical engineering, so --

10

1 okay, about I never used it. Okay. So you've been in
2 engineering for quite a long time?
3     A.  Yes.
4     Q.  And would you say that you are familiar with the
5 existence of the disparity of experience between male and
6 females in the engineering field?
7     A.  Yes.
8     Q.  And some form of fashion that exists undeniably in
9 engineering and other stem fields?
10    MR. DOWER: Objection. Form. Doctor, I should
11 say I may object to form now and again but unless I
12 specifically instruct you not to answer you can basically
13 ignore it and proceed with your answer as long as we don't talk
14 over each other.
15    A.  All right. Thank you, Ben. Excuse me.
16    Robert might I get you to repeat the question.
17    Q.  No problem. I'll ask the court reporter to read it
18 for you so that way we don't have to clutter up the page.
19    (Requested portion of the record read back by
20 The Reporter as follows: "Q. In some form or fashion that
21 exists undeniably in engineering and other stem fields?" "MR.
22 DOWER: Objection. Form.")
23    A.  Yes, there's a number of studies to that affect I'd
24 like to think that it's diminishing -- has diminished over
25 time.

11

1     Q.  Okay. And have you seen or observed any data which
2 identifies to you that the gender disparity in engineering has
3 diminished since you became Associate Dean in 2008?
4     A.  Well, I think the main difference is that we now have
5 more women on the faculty and that helps the cause.
6     Q.  Okay. Any other improvements?
7     A.  We have more senior women, more tenured women, so as
8 they move through the ranks they're move nothing to leadership
9 positions. As you know, we have -- among the Dean we have two
10 women department chairs so -- three, excuse me. Three women
11 department chairs so that -- I think that's important progress.
12    Q.  Okay. Anything else that you could comment upon in
13 terms of your observing the reduction of disparity in the
14 female experience in engineering at UT?
15    A.  I can't think of anything else offhand, no.
16    Q.  Have you been responsible for or participated in any
17 efforts to alleviate any gender issues between males and
18 females in engineering at UT?
19    A.  Yes.
20    Q.  And what have you participated in?
21    A.  Well, I've participated in constructing faculty
22 recruiting procedures that we have in the Cockrell School of
23 Engineering which talk about proactive recruiting in diverse
24 candidate pools. I think that's one of the things that has
25 helped us increase the numbers, and it's also very active with

12

1 department chair in increasing the number of women faculty in
2 the Department of Civil Architecture and Environmental
3 Engineering. We've also researched committees. I've been a
4 big supporter of the various training activities that the
5 Provost has put together so that we can construct search
6 committees and search committee chairs about implicit bias and
7 things of those sorts so that we have more robust and fair
8 searches and ultimately higher -- make better hiring decisions.
9     Q.  I'm waiting for you to finish your list.
10    A.  I think that's all I can think of right now.
11    Q.  Okay. On the recruiting side, could you describe how
12 you try to increase diversity in hiring?
13    A.  We've done a couple of things. The staff in my
14 office and myself have assembled resources for the search
15 committees to point them towards where -- towards places where
16 they might recruit. Women and underrepresented minority
17 faculty members. We've also set the expectation that they're
18 going to have a diverse pool of short list candidates. Now,
19 that's not always happens but it happens a lot more frequently
20 than it did and we've talked a little bit about appropriate
21 things that one can say and not say in faculty recruiting
22 interviews. I think the university's family, which you might
23 euphemistically call family-friendly policies have improved
24 dramatically over the 30 plus years I've been here. Those are
25 the things I would point to right now.

13

1     Q.  On the family-friendly side is that university wide
2 or just engineering?
3     A.  No, these are university wide policies, stop the
4 clock, modify instruction duties, that's the sort of thing I'm
5 speaking to.
6     Q.  Okay. Anything else besides what happens university
7 wise that engineering has attempted to implement?
8     A.  Not anything that comes to mind right now.
9     Q.  Okay. And setting the expectations of a diverse
10 recruiting panel or an applicant pool I guess is what you said,
11 how do you set that expectation?
12    A.  Well, the written documents call for it. We have a
13 meeting usually the Dean and I and maybe more recently
14 Associate Dean for Diversity Equity and Inclusion have a
15 meeting every year with the department -- excuse me with the
16 search committee chairs and talk through what our goals are and
17 at the end of the day I have to approve everybody that gets an
18 interview so if things are not going as expected that leads to
19 questions and possibly a conversation with the Dean.
20    Q.  Okay. Do you participate in interviewing of
21 candidates yourself?
22    A.  Yes. The goal is that the Dean and I meet each
23 candidate that doesn't always happen but one of us certainly
24 meets each candidate.
25    Q.  Okay. And do you have any role to play in negotiating

14

1  salary?
2     A.  Yes.
3     Q.  And who else participates in negotiating salary?
4     A.  The department chairs. So the way it works is we
5  would decide, they would -- the Department Chair would ask to
6  make an offer and if the Dean approves it the next question I
7  ask the Department Chair is what salary do you propose and then
8  we have a conversation about that and at the Assistant
9  Professor level salaries don't cover a very broad range so I
10  might be the final approver.  If there's something unusual a
11  more senior person the Dean, I would probably talk with the
12  Dean to get approval for a salary or a range of salary that the
13  Department Chair can negotiate over without coming back to me.
14     Q.  Okay. So you have a -- there's a ceiling by which you
15  can operate under? Is that what you said?
16     A.  Well, no.  What I would say, the Department Chair
17  might -- we might have a range of salary.  We might say, all
18  right, well start out at X and you can go up to as high as Y if
19  you need to without coming back to me for permission.  If you
20  want to go higher than Y, then you're going to have to come
21  talk to me and potentially the Dean again.
22     Q.  Okay. And that range is provided for each individual
23  hire or is that range available to you for all the hires in
24  that category?
25     A.  You know, it depends on the department.  Generally

15

1  it's an individual conversation about each faculty member but,
2  again, at the Assistant Professor level there's not a lot of
3  difference.  These days, the Department Of Electrical and
4  Computer Engineering has a standard starting salary which is
5  essentially automatically approved by me because we don't
6  wander around with different numbers generally speaking.  We
7  just have a single salary.
8     Q.  How long has there been a single salary in ECE, or is
9  this for an incoming Assistant Professor?
10     A.  You know, I'd have to look at the records but several
11  years would be my offhand recollection.
12     Q.  Do you recall if that -- and let me clarify.  You're
13  saying that for ECE, a starting salary incoming Assistant
14  Professor is X regardless of who it is and who is coming in?
15     A.  Yes, unless there's some extenuating circumstance,
16  but, yes, it's $115,000, nine-month salary.
17     Q.  Okay. And that is regardless of whether they're
18  coming in straight off their Ph.D. or whether they have three
19  or so years of teaching experience at another institution?
20     A.  That salary is the nominal starting salary.  A
21  Department Chair could say to me I'd rather not do -- I'd
22  rather not do the 115,000 because of some extenuating
23  circumstance.  Could we go to 118,000?  And then I might --
24  again, I might approve that on my own, or if I think it's
25  something that I want to get the Dean's input on or the Dean

16

1  would want to have input on, I would talk to her.
2     Q.  Okay. And that conversation happens before an offer
3  is ever made to the candidate?
4     A.  Correct.  So the conversation -- yeah, typically a
5  department chair would call a candidate up and say,
6  congratulations, we're going to make you an offer.  Here's the
7  salary and now we need to start talking about other elements of
8  the offer, start-up package, summer salary support and graduate
9  research assistance support.
10     Q.  So and just to clarify is it your testimony that for
11  incoming Assistant Professors in ECE there's no negotiating
12  with them?
13     A.  No.  There's always negotiating.  I mean anybody --
14  there can be negotiating.  Generally for Assistant Professors
15  across the school most of the negotiation is not around salary
16  because there's not a lot of room for us to maneuver on
17  salaries.  Most of the negotiation is over start-up packages
18  for -- especially for experimentalists.
19     Q.  Can you explain a little more detail about what that
20  means, what start-up package bells and whistles are there?
21     A.  So some peoples -- some faculty members research is
22  computational, so pretty much all they need is computers and UT
23  has a pretty robust central computational system that the Texas
24  advanced computing center so they don't need very many
25  resources to start their research program.  Other people are

17

1  laboratory experimentalists so they might need to buy
2  analytical instruments, they need some money to purchase
3  supplies, sometimes they need money to use central user
4  facilities which house our fancy equipment and you have to pay
5  by the hour to use them.  And basically this money is provided
6  to them so they can get their research started in advance of
7  their research grants coming in the door because it takes time
8  to get the research grants in the door.
9     Q.  Okay. And are there just two categories; the
10  laboratory experimental and the computational?  Or are there
11  more categories that you would say exists for Assistant
12  Professors and their funding needs?
13     A.  There are some nuances around it but those are the
14  two primary categories.
15     Q.  Okay. I was just thinking off the top of my head that
16  some people have to do their work in the field so that would be
17  another category of difference of needed funding?
18     A.  Yes.  That would be a potential third one.  Very few
19  people are doing field work but, yes, you might have some
20  different needs if you were predominantly field work versus
21  laboratory experimentalist versus computational.
22     Q.  Okay. I guess the field work people would be more
23  closely associated with the experimental lab people than the
24  computational people?
25     A.  That is generally the case, yes.

18

1    Q.   And the funding required for graduate students to
2  help work on the research, are those different depending on
3  those different buckets that we just talked about or are those
4  costs pretty much the same, it's only the equipment and the lab
5  time and the travel that might be of difference?
6    A.   Yeah, our standard offer package to an Assistant
7  Professor in terms of graduate research assistant years and
8  summer salary is pretty consistent within each department.
9  Some departments have put more of their money and offer more
10  graduate research in assistant years than others, but it tends
11  to be pretty consistent from Assistant Professor to Assistant
12  Professor.
13    Q.   Do you recall making an offer to Dr. Nikolova to come
14  and work at UT?
15    A.   Well, I know we made an offer.  I don't actually
16  recall the specifics of the offer or the negotiation because it
17  was so long ago.
18    Q.   Right.  It was the summer of '13?
19    A.   Right, and I've probably done 250 negotiations since
20  then.
21    Q.   Okay. But do you recall that you were part of that
22  process?
23    A.   For sure I was part -- I don't specifically recall
24  being part of it but the records definitely show that I was
25  part of it.

19

1    Q.   Okay. So in preparing for your deposition today you
2  reviewed documents which refresh your recollection that you
3  were involved in that interaction?
4    A.   Right, but as Associate Dean, I would be involved in
5  any hiring that was done.  That's what I was -- what I was
6  saying is I'm involved in absolutely every hire, I just don't
7  have any specific recollection of the conversations that went
8  on during that time.
9    Q.   Okay. And what I was trying to do was get beyond is
10  it, there's no way in hell that you weren't involved in a hire
11  because that's the process, or you confirm that you were a part
12  of the process beyond just processing memory by looking at
13  documents.
14    A.   There's no way I wasn't part of the process and, yes,
15  I looked at some documents that clearly indicate I was part of
16  the process.
17    Q.   Okay, thank you.  Would that include the negotiation
18  of her salary that you participated in? Did you look at those
19  documents?
20    A.   I didn't look at any documents related to the
21  negotiation of her salary but, yes, as I related to you,
22  there's no doubt that I was involved in negotiating her salary.
23    Q.   No, I'm just asking you did you look at those
24  documents in preparing for your deposition today?
25    A.   No, because I -- quite frankly I didn't find an

20

1  e-mail.  I looked but I didn't find any e-mails related to the
2  negotiations of her salary so it must have been oral because
3  it's not uncommon for me to do this over the phone with the
4  Department Chair.
5    Q.   And you understand, you're here as a individual with
6  this being deposed for his memory and experience as an
7  individual, but also you're designated to speak as UT on a
8  particular topic, is that correct?
9    A.   Yes, sir, I understand that.
10         (Exhibit 54 identified.)
11    Q.   Let me go ahead and put up the deposition notice.
12  It's going to be put in the chat.  It's going to be Exhibit 54.
13  It takes me a little while to do it.  I think it should be
14  there.
15    A.   Yeah, I see it.  I'm having a little trouble -- I
16  guess do I need to download it is that what's going to happen?
17    Q.   I think so.
18    A.   Okay.
19    Q.   You click on it and it should open.
20         MR. DOWER:  Mr. Speitel, you may want to create a
21  folder somewhere so that all of the exhibits that Robert shows
22  you, you can all save them from the same location for easy
23  referencing purposes.
24    A.   All right. Let me try this.  Well, it opened.  I got
25  it.

21

1    Q.   Ok great. So we have the topic listed on the first
2  page of your notice and are you prepared to testify as UT on
3  that topic?
4    A.   Yes, sir, I am.
5    Q.   We're going to -- I'm going to ask you questions as
6  the individual first for a while then we'll move the topic
7  later in the day.  I just wanted to make sure that you were on
8  board for that part, okay. Let me ask you, when did you first
9  learn that there was an issue of gender bias or pregnancy bias
10  or discrimination involved in the Nikolova case or basically
11  anything related to her employment where somebody raised an
12  issue of gender or pregnancy bias?
13    A.   Well, I don't exactly remember the time.  It would
14  certainly have been in the general vicinity of when the lawsuit
15  was filed.
16    Q.   What I'm asking for is your memory as best you can
17  recall when you first saw the -- saw -- and alerted to or
18  acknowledged that there was an issue being raised of a concern,
19  and so if you can't give me a date I understand but if you can
20  give me whatever details you remember about the occurrence that
21  caused you to first become aware that there was an issue
22  related to gender or pregnancy bias for or with Dr. Nikolova.
23  That would be helpful.
24         MR. DOWER: Objection. Form.
25    A.   Well, as I said, I don't know the time.  I probably

22

1  received an e-mail from either UT legal or the Dean alerting me
2  to this -- to the lawsuit.
3       Q.   Okay. And just I want to make sure I'm clear. I'm
4  not asking when was the first time that Dr. Nikolova made a
5  legal claim or filed a lawsuit. I'm talking about any time that
6  there was a communication of concern that her gender or her
7  pregnancy may have been a reason why she was being treated in a
8  way that she thought was disparate to other individuals or that
9  somebody else thought was disparate to other individuals?
10      A.   I have no recollection of --
11           MR. DOWER: Objection. Form.
12      A.   When I learned any or heard any -- I have no
13  recollection of hearing anything else other than before the
14  lawsuit.
15      Q.   Okay. Let me -- I guess let me explore what you did
16  to prepare for your deposition today. I think you said you
17  looked for e-mails and communications related to this case, is
18  that right?
19      A.   Well, what I primarily did was prepared for my
20  potential testimony as a corporate representative, because
21  until a week ago, that's all I was doing. So I looked at
22  various documents related to our hiring practices, promotion
23  guidelines, our promotion checklists, modifying instructional
24  duty rules, probationary time rules, things of -- along those
25  lines, some aspects of the handbook of operating procedures

23

1  related to faculty so that I was prepared to answer questions
2  that you might have along those lines.
3       Q.   Okay. In the central UT sense, not necessarily the
4  Nikolova issues?
5       A.   Correct. And then I've also looked at the timeline
6  spreadsheet I believe the Dean put together for you just
7  to kind of get recalibrated on when things happened. And then
8  I looked at -- more recently I've looked at a couple of e-mails
9  related to our promotion -- e-mails between the chair of the
10  promotion tenure committee meeting and Ahmed Tewfik.
11      Q.   Okay.
12      A.   And I also looked at our faculty -- history of
13  faculty salaries.
14      Q.   Okay. So just to kind of go a little bit further
15  on when you might first have been aware of gender bias or
16  pregnancy bias related to Dr. Nikolova's concerns, do you
17  recall Dr. Nikolova raising any concerns in her appeal or
18  request for review to CCAFR?
19      A.   I don't recall that. I most likely didn't read that
20  appeal because -- yeah, it didn't really affect me because I
21  ran the promotion process but that was after the promotion
22  process in the Cockrell School of Engineering.
23      Q.   So you don't remember getting a copy of it or reading
24  it or talking to anybody about it at the time?
25      A.   That's correct. I have no memory of that.

24

1       Q.   Okay. And you understand that Dr. Nikolova also
2  provided a final arguments to the President as well as a
3  separate document. Did you ever know of that?
4       A.   I can't recall knowing of it. It's not uncommon for
5  Assistant Professors to provide a final arguments document.
6       Q.   But again you didn't read it or talk to anybody about
7  its contents?
8       A.   I don't recall reading it or talking to anybody about
9  its contents.
10      Q.   Okay. And then any communication from Dr. Nikolova
11  where she may have raised any concerns? You don't recall
12  getting or reading those e-mails?
13      A.   No, I do not.
14      Q.   And that would have been pre-dating the lawsuit?
15      A.   No, I don't recall that.
16      Q.   Okay. And do you also not recall receiving any
17  communications from persons other than Dr. Nikolova raising
18  concerns that there may be gender bias or pregnancy bias going
19  on with Dr. Nikolova?
20      A.   No, I don't recall receiving e-mails.
21      Q.   Okay. As a member of administration for many years,
22  do you understand you have duties to report complaints of
23  discrimination and Equal Employment Opportunity violations to
24  OIE if you observe them?
25      A.   I know I have a duty to report Title IX violations.

25

1  I'm not sure -- I don't understand that I have a duty to report
2  other things. I mean, obviously faculty members can file
3  grievances and things along those lines.
4       Q.   Okay. So if you saw -- if somebody told you I think
5  I'm being discriminated against because of my gender, you do
6  not believe you have a duty to report that to your supervisor
7  or OIE or some other organization within UT?
8       A.   I'm not clear that university regulations require me
9  to report. However, if something like that were mentioned to
10  me, yes, I would talk to the Dean about it and potentially talk
11  to Department Chairs and potentially other people to try to
12  investigate what really was going on. And, yes, eventually it
13  might end up an OIE, but typically a faculty member has to file
14  a complaint to get to OIE.
15      Q.   So your understanding is before any investigation is
16  initiated, that the alleged victim would have to make a formal
17  complaint?
18      A.   I understand that they can make informal complaints
19  but OIE has difficulty investigating without formal complaints.
20      Q.   Okay. And is it also your understanding that they
21  could also start an investigation based upon a report from an
22  observer that wasn't either the alleged victim or the alleged
23  perpetrator?
24      A.   I must admit that I don't know what OIE's operating
25  procedures are and what they can and can't do.

26

1    Q.   Okay. Have you ever been trained on the anti-
2    discrimination, anti-harassment, anti-retaliation policies and
3    the reporting requirements for UT?
4    A.   Yes, UT has various training through UT learn that
5    faculty and staff have to periodically attend. I just attended
6    Title IX training this past Friday.
7    Q.   Therein your knowledge of you're a mandatory
8    reporter?
9    A.   I knew it before that.
10   Q.   Because you attended that training before?
11   A.   I've attended different trainings before and we are
12   regularly reminded annually that we are mandatory reporters and
13   that the new state law is pretty strict in that regard.
14   Q.   Okay. And when was the last time you received
15   training regarding anti-discrimination, harassment and
16   retaliation policy?
17   A.   I can't remember but that be would recorded in the
18   University's database and you could certainly find the answer
19   to that.
20   Q.   Okay. Would that be within the last two years,
21   three years or you're not sure?
22   A.   I'm not sure.
23   Q.   If it was required, you would have done it?
24   A.   Oh, definitely, yes. I do all the required training.
25   Q.   Have you ever -- I think you mentioned earlier when I

27

1    was asking you about programs about minimize, eliminate gender
2    disparity, you mentioned implicit bias training. Did you
3    attend that?
4    A.   Yes, I've been to a number of workshops on implicit
5    bias training. There is the one the University recently has
6    made maybe within the last few years has made mandatory for
7    search committee chairs. I attended that. I encouraged our
8    Department Chairs to attend it. In fact, encouraged just
9    search committee members to attend but they're not mandatory
10   attenders.
11   Q.   Okay. And you're not a Search Committee Chair, right,
12   you just attended because the Search Committee Chairs that
13   you're supervising and advising have to -- so you viewed it --
14   or you attended it to know what their experience is?
15   A.   Yes, I wanted to see what the training was because I
16   wanted to understand what was being done and it seemed unfair
17   for me to demand that people go to a training that I'm not
18   willing to go to myself. A lot of things involved in that.
19   Bottom line it was the right thing to do.
20   Q.   How many times have you attended that training?
21   A.   I've attended that training once.
22   Q.   Do you remember when?
23   A.   Several years ago. I don't remember the exact date.
24   Q.   All right. And do you recall if Dean Wood also
25   attended?

28

1    A.   I don't recall, no.
2    Q.   When you attended that training, was it with a group
3    or was it you on a computer screen?
4    A.   No, it was in-person with a group, maybe 20, 30
5    people with a couple of facilitators in the front of the room.
6    Q.   And were you with other engineers or were you just
7    with a smattering of people that just happened to be -- have
8    their schedules clear at that particular time they were
9    offering that course?
10   A.   So I had arranged in collaboration with the College
11   of Natural Sciences to do a training session that was focused
12   on faculty from engineering and natural sciences because we
13   have -- we're similar in the sorts of recruiting we do and the
14   sorts of issues that might be arise. So I would say it wasn't
15   exclusively for engineering and science faculty but that was
16   the primary focus of it. Other people could attend.
17   Q.   Okay. And would you say it was a majority of
18   engineers there at the time?
19   A.   I don't recall the split of people.
20   Q.   What was the similar experiences between engineering
21   and natural sciences that caused you to put those together?
22   A.   The nature of being an engineering faculty member and
23   the nature of being a faculty member in natural science are
24   similar in that there's expectation for raising substantial
25   amount of external research funding and things along those

29

1    lines. Frequently we -- there's an intermixing of courses that
2    both would take. So that was the primary motivation and
3    searches are conducted in a similar fashion. So that's why we
4    did that.
5    Q.   I'm a little confused because you're talking about
6    putting the two together for implicit bias training. What does
7    the funding differences have have to do with implicit bias. Or
8    let me ask it another way. I understood you to say that you
9    put engineering together with natural sciences because of the
10   potential issue related to implicit bias that both departments
11   might experience in the recruiting and hiring process.
12   A.   I think the motivation for doing it was because the
13   recruiting practices, expectations, etcetera, are similar
14   between engineering and science, and they might not be, so if
15   you're doing a recruitment in fine arts.
16        But it was really a way to get more people to
17   go. They had scheduled an extra session, so their primary
18   motivation was to make it possible for additional engineering
19   faculty members to conveniently get this training which I
20   thought was helpful for the goals that we had.
21   Q.   Are you just not wanting to answer my question or --
22   because I've asked it several times now and you haven't answer
23   it.
24        MR. DOWER: Objection. Form.
25   Q.   What are the similar recruiting issues between that

Jerry Speitel - 5/28/2021

30

1  you viewed between engineering and natural sciences that would
2  be -- that would be in place that an implicit bias training
3  might address similarly between the two?
4      A.  Well, I mean, the similar -- the similar issues are
5  if you we're looking for similar issues, the -- obviously
6  science faculty also have starkly had low participation of
7  women on their faculty so we both have shared goals of you know
8  increasing the number of women on the faculty.  I think we both
9  also have shared goals of increasing under-represented
10 minorities on the faculty.  Actually these days you could argue
11 that that's a more significant problem than the representation
12 of women on the faculties.
13     Q.  Okay. So presumably the trainers could focus on
14 gender and race kind of issues to tailor for those two
15 departments whereas they might tailor some other issue for
16 other departments?
17     A.  I suppose so.  I don't know if they did anything
18 different than they would have done for anybody else.  They
19 knew that the session was set up with predominantly engineering
20 and science faculty in the room but I don't know if that had
21 any impact on what they did or not.
22     Q.  Okay.  But at least the experience of the question and
23 answer might be shared similarly between the two departments?
24     A.  Correct.
25     Q.  Are you involved in -- well, are you part of the P&T

31

1  committee for the college?
2      A.  No, I am not.
3      Q.  Okay.  Do you participate in the P&T discussions of
4  tenure candidacy?
5      A.  No, I do not.
6      Q.  So when they have their discussions, you are not in
7  the room?
8      A.  That's correct.  The only time I am in the room is
9  when there's a kickoff meeting -- there's a kickoff meeting
10 between the Dean and the committee and I'm involved in that
11 because as I mentioned to you before I oversee a process but
12 there's no discussion of cases, the cases haven't even been
13 sent to the committee yet at that time.
14     Q.  Okay.  And would it be accurate that you don't
15 participate in the writing or creating the Dean's assessments
16 of the candidates?
17     A.  That's correct.
18     Q.  And have you -- so when the P&T committee meet, do
19 they meet with or without the Dean?
20     A.  Initially without the Dean, and then -- to do their
21 work, and then they meet with the Dean at the end of the
22 process to go over their findings and recommendations on each
23 candidate.
24     Q.  Okay.  So what you're saying is they have their
25 discussions amongst themselves first and come to a vote and

32

1  then --
2          (Technical difficulties. Brief pause in the
3  proceedings.)
4      Q.  So are you saying that they have their discussions,
5  take their vote, and then -- on all the candidates, and then
6  when they're finished, they call the Dean into tell her what
7  the vote was?
8      A.  You know, I don't recall when the voting happens.  I
9  don't know -- I can't recall if it happens before or after they
10 speak with her but certainly they get their collective sense of
11 each candidate before they -- and then they meet with her and
12 go over their -- their findings with respect to each case.
13     Q.  Have you had conversations about Dr. Nikolova's
14 concerns of gender bias or pregnancy bias with anyone who is
15 not an attorney at UT?
16     A.  Not that I can recall.
17     Q.  Okay.  So you haven't discussed Dr. Nikolova's
18 complaints or her lawsuit with Dean Wood?
19     A.  Well, certainly we've discussed that there is a
20 lawsuit, but I haven't discussed the details of the lawsuit in
21 any way with her.
22     Q.  Or anyone else?
23     A.  No, no one else.  I don't -- to my knowledge, no one
24 else at the Cockrell School -- well, obviously the Department
25 Chair and others involved, and maybe some others but I haven't

33

1  discussed them with anybody.
2      Q.  Have you ever been accused of gender bias or
3  pregnancy bias by anyone?
4      A.  No.
5      Q.  Has the Engineering School been the focus of a
6  complaint of gender discrimination or pregnancy discrimination
7  other than Dr. Nikolova in your time as Associate Dean?
8      A.  I recall no such complaint, no.
9      Q.  When I say complaint I'm not talking lawsuit, I'm
10 talking anything complaint up to and including it?
11     A.  I can't think of any I can think of.
12         (Exhibit 55 identified.)
13     Q.  All right.  Let me pull up a new document.  This will
14 be 55. Okay. Should be on it's way.
15     A.  All right.  That went a little more smoothly.  I have
16 it.
17     Q.  Okay.  I'm still getting my stuff taken care of.  So
18 when I pull up these documents I want you to look at them and
19 then let me know when you're ready to take questions on them.
20     A.  So you're wanting me to read this whole string of
21 e-mails that's three pages or just...
22     Q.  I want you to be comfortable to take questions.  You
23 can -- you can read the whole thing right now and then say
24 you're ready or I can ask you questions then if you feel the
25 need to read before you answer you can do it that way too it's

34

1  just up to you.
2      A.   All right.  Let me just take a quick look at this.
3          (Brief pause in the proceedings.)
4      A.   Okay.
5      Q.   All right.  So this is -- starts with an e-mail from
6  Dr. Nikolova on January 6, 2019, and then it goes up from there
7  with a final e-mail from you making a comment.  Do you see in
8  Dr. Nikolova's e-mail that she is raising a gender issue for
9  the department?
10     A.   I don't see anything in there specifically related to
11 gender, no.
12     Q.   Let's explore that.  When you say specifically
13 related to gender, do you mean she doesn't say discrimination,
14 she doesn't say gender discrimination, something like that?
15     A.   Correct, because I thought that's what you asked me
16 if that's what it said.
17     Q.   The question was did Dr. Nikolova raise any gender
18 issues for the department in this e-mail.  So it's broader than
19 did she complain or use the words gender discrimination.
20     A.   I don't see that she raised any gender issues.  I
21 think she was more generally talking about faculty members who
22 might come to the university with experience from else --
23 Assistant Professors who might come with experience from
24 elsewhere.
25     Q.   And those individuals, the recent losses of three

35

1  women, correct?
2      A.   No.  Andrea Loov and Shang Wong are male.
3      Q.   Those are males?
4      A.   Yeah.  Only Mirian Kang of those three is a woman.
5      Q.   Okay.  And then when you talk about a female Assistant
6  Professor, in your e-mail, is she the only professor that came
7  with experience from somewhere else?
8      A.   I'd have to check the records.  You're talking about
9  somewhere else in EC or somewhere else in the entire Cockrell
10 School of Engineering?
11     Q.   I think there's issues with ECE as she's talking
12 about it which I'm assuming you're responding to?
13     A.   I'm not entirely sure that she is the only one but
14 it's possible, the only one in addition to Dr. Nikolova, that
15 is.
16     Q.   Okay.  So at this time, you're not responding -- it's
17 your testimony you're not responding with a female Assistant
18 Professor because you thought she was bringing up a gender
19 issue in her e-mail?
20     A.   I was responding relative to an Assistant Professor
21 who had come from elsewhere and had that Assistant Professor
22 been male, I most likely would have written the same e-mail
23 because it's really about early promotion, it's not about
24 gender.
25     Q.   Okay.  Here's another one.  This is previously marked

36

1  as Exhibit 25.
2      A.   Okay.
3      Q.   Okay.  So this is an e-mail from Sanjay to you asking
4  for help, additional information, and you forward that to
5  Professor Tewfik to respond and he responds back that he
6  doesn't understand and he pushes back, I guess, to your
7  request?
8      A.   I agree that he pushed back on my request.
9      Q.   And you say that in your communication with Dean
10 Wood, you state that you put that off as his wanting to avoid
11 additional work for him?
12     A.   Well, he was resistant to revising his -- let me
13 provide some context here.  This would have been after Ahmed
14 had written his letter advocating for promotion of Dr.
15 Nikolova, and the materials are then sitting with the Promotion
16 and Tenure Committee of which Dr. Shakkottai is the chair.  So
17 from my perspective at this point we're trying -- Shakkottai is
18 saying that we have a potential problem, that this doesn't seem
19 like it's -- we could use some more justification.  So
20 basically what I'm trying to do in this is help this case be
21 stronger by asking Ahmed to provide some more justification,
22 reasoning for why this case should be early because the
23 University rules do say that early cases have to be explained.
24     Q.   Right, not justified?
25     A.   I use those two words synonymously.

37

1      Q.   Okay, but they're not the same word?
2      A.   They're not the same word but they have -- they can
3  be thought of as synonyms.
4      Q.   And they can always be thought of as distinct, right?
5      A.   I imagine so if you looked at the dictionary
6  definitions they probably have some distinctness amongst then,
7  yes.
8      Q.   Did you ever go to Dr. Tewfik, Professor Tewfik and
9  ask him what he meant by his e-mail instead of just assuming he
10 didn't want to further justify?
11     A.   I don't recall what conversations I may have had with
12 him.  They would have been by phone if they were.  My point was
13 that I wanted him to strengthen his letter so that the case
14 that he was advocating for would be stronger.
15     Q.   I understand that.  What I'm asking you is what do
16 you understand his point and if you don't understand what his
17 point is, or you're not sure what his point was, did you ever
18 ask him to clarify his point at that time?
19     A.   I don't recall if I did or didn't.
20     Q.   This is October 2018 so this would have been before
21 the P&T Committee would have decided it's vote, I mean, the V-C
22 Committee decided it's vote and before the Chair would have --
23 is that right or is it --
24     A.   No, that's not correct.  The Budget Counsel would
25 have voted in late August or early September.  Tewfik would

38

1 then write his letter immediately after that which is what
2 we're actually talking about is his letter.
3    Q.   Okay.
4    A.   The P&T Committee is deliberating so they have not
5 voted yet and they're just looking at the case trying to
6 understand both how they feel about it and how it's going to
7 play at the next level up.
8    Q.   So did he -- did Professor Tewfik actually provide a
9 different write-up or did he rest on his letter that he had
10 initially written?
11    A.   I don't recall this whole back and forth ended up
12 with me telling him to talk to the Dean and I can't remember
13 how that played out.
14    Q.   Okay. And looking at his e-mail do you understand his
15 e-mail to be saying that what he has in his e-mail is
16 sufficient based upon prior experience? And prior candidates?
17    A.   Yes, and that's what I disagree with because he --
18 the University rules are clear.  She was early.  So there has
19 to be rationale for putting a candidate up early which is
20 sensible give gravity of the decision that the University is
21 making that being tenure which --
22    Q.   I'm sorry, I didn't want to interrupt you.  Did you
23 finish?
24    A.   I'm done, yes.
25    Q.   I don't think you understand my question or something

39

1 is not clicking here.  He is saying that he has provided the
2 explanation required based upon the explanations that have been
3 sufficient in prior candidacy which obtain tenure for faculty
4 going up early.
5    A.   And that's where he and I disagreed that I -- and the
6 committee asked him to provide more justification.  My role as
7 the person who runs the process is to communicate with the
8 Department Chair and ask him or her to be responsive to the
9 Committee's request.  So I'm not making a judgment here other
10 than the Promotion and Tenure Committee is asking for more
11 information and when that happens, I go to Department Chairs
12 and ask them to provide that information.
13    Q.   Did you -- so you already testified that you don't
14 remember going back to Professor Tewfik and having a discussion
15 about what he thought was sufficient or not, correct? You just
16 told him to go talk to the Dean?
17    A.   Well, no, I think there's a few more e-mails involved
18 here back and forth this but, yes, at the end of the day, he and
19 I were not in agreement and I recommended that he talk to the
20 Dean to resolve the matter.
21    Q.   So could you explain in what way he is incorrect?
22 What evidence, what data do you have that him pointing to her
23 prior years experience which put her not being early when you
24 count the A&M years that put her at six or more years in rank,
25 that that wasn't sufficient?

40

1    A.   Well, first of all, the University doesn't count
2 priors years so him just simply pointing out that these prior
3 years added up to six or more is insufficient.  There has to be
4 a reason beyond the years adding up.  There has to be
5 accomplishments.  There has to be rationale for sustainability
6 moving of the research program moving forward into the future.
7 So that's why just counting the number of years is insufficient
8 because it's an early promotion.
9    Q.   And I want to be clear that we're talking about
10 explaining why early not providing the whole basis for tenure.
11 Are we talking about the same thing here?
12    A.   I'm not sure I understood your question, I'm sorry.
13    Q.   Oh, okay.  So when a candidate goes up for tenure,
14 the Chair is responsible for writing up the budget counsel
15 position on the matter and explaining why this candidate should
16 get tenure.  If the person is early, they need to also provide
17 an explanation for why now versus some time in the future,
18 right?
19    A.   That's mostly correct. The Department Chair is not
20 obligated to take the same position as the Budget Council. They
21 can take an opposite position so, but they do have to talk
22 about what went on in the budget counsel meeting and things of
23 that sort but, yes, I agree with you otherwise.  Yes, they have
24 to make a decision about whether they favor promotion and if
25 it's not -- if it's early then they have to answer that

41

1 question.  Why should the University make this decision now
2 instead of waiting longer to have more evidence.
3    Q.   Yeah, so those -- what I'm trying to understand from
4 you is those are two separate requirements that the Chair has
5 to meet if the person is early?
6    A.   Yes, I agree with that.  I mean because they could --
7 first, there's no point in trying to argue an early case if
8 you're going to say you don't think they should be promoted
9 that's the end of the story right there you just say I think
10 it's too early we shouldn't do this.
11    Q.   Okay. So what I'm trying to understand is when he
12 says that talking about her prior years of service is what has
13 been done in other cases and he appears to mention that other
14 cases being males, that that was sufficient for them to open
15 the early explanation.  And then when you were answering my
16 question about that as to why you thought that wasn't
17 sufficient, you started bringing up research and sustainability
18 and funding and all of the stuff that qualifies somebody for
19 tenure separate and apart from the early question.
20         MR. DOWER: Objection. Form.
21    Q.   I'm trying to understand you?
22         MR. DOWER: Objection. Form.
23    A.   Well, at the end of the day, the University is making
24 a decision about whether to grant tenure or not and the
25 accumulated accomplishments are the key ingredient that go into

42

1 that decision.  And the -- just counting years is insufficient
2 and claiming years from other institutions allowing you to not
3 be considered early here is not in agreement with the
4 University's promotion and tenure rules.
5      Q.   Let me see if I can understand what you're saying.
6 It's insufficient to just mention years to get tenure or it's
7 insufficient to mention years to answer the explanation for why
8 now or both?
9      A.   Years alone are not sufficient to justify either a
10 promotion or an early case.  Now, obviously, at some point
11 you're up or out.  Your years are gone and a decision has to be
12 made but -- so obviously there's some elements of time
13 especially when your probationary period runs out, then that's
14 the end of the story in terms of accumulating more evidence.
15      Q.   Well, the question from Dr. Shakkottai is about her
16 years of experience, right, the count of years and rank,
17 correct?
18      A.   Yes.  He points out that she's accumulated four years
19 of probationary service and therefore it's an early promotion
20 by UT's rules.
21      Q.   Okay. And he says that additional justification,
22 which of course we know that's not right, it's additional
23 explanation is what he's asking for that's required is --
24 clearly Professor Tewfik's letter has all the things and all
25 the reasons why he believes she should be promoted to tenure in

43

1 addition to saying, hey, she's not actually early.  She's not
2 actually accelerated.  She is -- she has met the years in rank
3 according to the guidelines because of her prior experience at
4 A&M.  That's counts for at least six years?
5           MR. DOWER: Objection. Form.
6      A.   And that prior experience doesn't count so she's
7 early.
8      Q.   It can be considered?
9      A.   Yes, it can be considered and I will grant you that
10 most Assistant Professors run their full term.  The situation
11 in which assistant -- most likely a situation for not running a
12 full term is having served as an Assistant Professor at another
13 university.
14      Q.   Well, Dr. Sangavi didn't go full. Russell, Baker,
15 Cox, Andiwonde, Demoki, Boils, Sally, Foster, Salamone,
16 Heidari, Okonu, none of those people did their full six years
17 at UT.  They had prior experience at other universities and
18 they mentioned that they had years in rank which met or
19 exceeded six and therefore that was the explanation provided
20 for them for tenure and that was sufficient for those
21 individuals, and Tewfik is saying, what's going on here. Why
22 are you questioning the years of her in rank being six or more
23 between A&M and here when I know that has worked with the
24 males.  Why is that not -- why is that a problem for you -- for
25 Nikolova when it wasn't a problem for these other individuals?

44

1           MR. DOWER: Objection. Form.
2      A.   You know, again, I come back to what I told you about
3 most -- I think all of the ones that you say although I'd have
4 to go back and look at the records for people that had
5 Assistant Professorships elsewhere they were all early
6 promotions and their record was what caused them to be promoted
7 early not the number of years that they happened to be
8 Assistant Professor at the two universities combined.
9      Q.   You're changing subjects. We're not talking about
10 the decision to grant tenure right now. We're talking about
11 answering the explanation for early meaning not the full six
12 years at UT and all of those individuals that I named did not
13 have full time at UT but they answered the early question in
14 the justification by the Dean no less that they had prior year
15 experience which met or exceeded six years combined in rank
16 between the two institutions?
17           MR. DOWER: Objection. Form.
18      Q.   Do you understand that?
19      A.   Well, I don't know what was in those documents
20 because I haven't read them if ever and certainly not in a long
21 time so I can't really speak to what arguments were put forward
22 for those people to be promoted.
23      Q.   And I think we have your testimony that you didn't
24 even explore that with Dr. Tewfik as to what he means by
25 gender bias?

45

1           MR. DOWER: Objection. Form.
2      A.   I did not because to me the claim was without merit.
3 The idea was that we needed more justification for her to be --
4 for her case to be stronger so that she would be successful.
5 It wasn't about gender it was about trying to build a stronger
6 case for counting those years at A&M which is what he wanted to
7 have happen in terms of convincing the President's Committee
8 that her over all record was worthy of promotion.
9      Q.   You make that assumption because you never talked to
10 him, right?
11      A.   I told you I can't remember if I talked to him.
12      Q.   Okay. We have no evidence that you talked to him and
13 you say it didn't have merit but you can't tell us today that
14 you have any data or any information to analyze Professor
15 Tewfik's concern for gender bias, correct?
16      A.   Let's see what he wrote. I don't have any evidence,
17 no.
18      Q.   Okay. So he may have had several people that he could
19 have mentioned and told you why he thought there was evidence
20 of gender bias and provided you that information so that you
21 couldn't just offhand say his concern for gender bias was
22 without merit without actually looking at the data?
23           MR. DOWER: Objection. Form.
24      A.   The issue here is about years in service whether it's
25 a male or a female and whether the statement that he provided

46

1 was -- could have been strengthened to help her case. That's
2 what we were trying -- that's what I was trying to get him to
3 do to strengthen -- to put some more analysis into the case so
4 that it would be stronger.
5        MR. NOTZON: Objection. Nonresponsive.
6    Q. The issue that I'm asking about which is the relevant
7 issue because this is a deposition and I'm asking the
8 questions is what you understood when Dr. Tewfik said gender
9 bias and you've told us that you don't know and you didn't --
10 and at least right now you can't testify that you had any
11 information about the details of his gender bias concern and
12 that's correct, right?
13   A. That is correct.
14   Q. Okay. And there's no evidence here and presumably
15 you're also not recalling that you in fact had a conversation
16 with him that went into details about why his gender bias
17 claims was not accurate or why he did not have a sufficient
18 communication. You just kicked him up to the Dean?
19        MR. DOWER: Objection. Form.
20   A. I believe there were several additional e-mail
21 exchanges with him before I put him forward to the Dean, but,
22 yes, at some point it was clear, he didn't want to change his
23 letter as requested by the Promotion and Tenure Committee so at
24 that point the Dean had to get involved and decide whether we
25 were going to go with a letter that he wrote or whether we --

47

1 whether she wanted to act on the Promotion and Tenure
2 Committees concern and ask him to make modifications to the
3 letter.
4    Q. And in line with my prior question to you, would you
5 say that Professor Tewfik raised a gender bias issue related to
6 Dr. Nikolova?
7    A. Well certainly his sentencing says I hope this
8 question isn't a reflection of gender biases but I don't -- and
9 there's raising issues and then deciding whether the issue has
10 merit or not.
11   Q. Right and there's also running away from the issues?
12        MR. DOWER: Objection. Form.
13   Q. Correct?
14   A. I don't see that I ran away from this issue.
15   Q. Well, you -- in your e-mail to Dean Wood, you don't
16 validate that he has a concern, you don't explore that he has a
17 concern in fact you just regard it as being some sort of desire
18 to avoid work in your communication with Dean Wood. Correct?
19   A. I agree that he seemed -- he did not want to change
20 his letter.
21   Q. What it certainly doesn't show is you trying to
22 determine or explore whether his concern was valid, fact-based,
23 evidence-based, anything, correct?
24   A. That is correct because I didn't think it had merit
25 and I was attempting to improve her case.

48

1    Q. You know when somebody makes a complaint and someone
2 said that it's without merit without actually looking into it
3 and investigating it, I don't think that could be considered
4 anything other than ignoring or running away from that
5 complaint.
6        MR. DOWER: Objection. Form.
7    Q. Can you characterize it differently?
8    A. I just don't agree with you in this case.
9    Q. Okay. Did you do anything at any time to explore
10 Professor Tewfik's gender bias concern or anybody's gender bias
11 concern about Dr. Nikolova?
12   A. I don't know of anybody else that had a gender bias
13 concern as I indicated before I was focused on improving her
14 case.
15   Q. Right. But before you didn't remember that there was
16 this e-mail from Professor Tewfik specifically calling out
17 gender bias that you didn't do anything about? So that's why
18 I'm asking the question again.
19        MR. DOWER: Objection. Form.
20   Q. Did you do anything?
21        MR. DOWER: Objection. Form.
22   A. The actions I took are documented in the e-mail
23 stream that is available in the case. I don't recall if I had
24 any conversations with him.
25        MR. NOTZON: Objection. Non-responsive.

49

1    Q. Did you do anything, Dr. Speitel, to explore,
2 investigator or report gender bias that was conveyed to you
3 regarding Dr. Nikolova and her employment?
4        MR. DOWER: Objection. Form.
5    A. I took no action on this and he didn't actually say
6 it was gender bias, he had just expressed a hope.
7    Q. Hope springs eternal, huh?
8        MR. DOWER: Objection. Form.
9    Q. Is hope going to eliminate gender disparity in
10 engineering?
11        MR. DOWER: Objection. Form.
12   Q. Dr. Speitel?
13   A. Actions and hope, yeah.
14        MR. DOWER: Robert if this is a transition point
15 we've been going for about an hour and a half. Can we take a
16 break?
17        MR. NOTZON: Let me do one more exhibit, then we
18 can.
19   Q. (BY MR. NOTZON) This was previously marked as
20 Exhibit 24.
21   A. Okay.
22   Q. So this is the other e-mail chain you were recalling?
23   A. Yes.
24   Q. And she goes into more detail of saying that prior
25 experience at other institutions for two male professors he

50

1  specifically calls them out were sufficient to answer the
2  quote/unquote early issue, so he did provide you with
3  additional information but I still don't see you exploring his
4  concerns?
5       MR. DOWER: Objection. Form.
6  Q.  Do you?
7  A.  Again, this discussion was about her case not
8  previous cases.  I was trying to convey to him what I expected
9  that the concerns were going to be from the President's
10  Committee based on our experience with the committee in the
11  recent past and I was trying to get him to recognize that these
12  things might be concerns so that he might address them better
13  in his letter.
14  Q.  Dr. Speitel, the way discrimination works is you have
15  to compare the way she's treated with others so you can't just
16  say this is only about her candidacy while at the same time you
17  talk about your reference to prior experiences, he's also
18  trying to reference prior experiences and you're not engaging
19  him in what he's talking about.  Do you see that?
20       MR. DOWER: Objection. Form.
21  A.  What I see is that I'm looking at the case at hand
22  trying to help him make it stronger. That is what I see. The
23  cases that happened in the past are irrelevant to this case
24  because we're trying to be successful with this case and trying
25  to make a strong a case as possible for the President's

51

1  Committee and for the Promotions and Tenure Committee.
2  Q.  Do you agree or disagree that you do not address his
3  concerns about Dr. Nikolova being treated differently than male
4  Assistant Professors that were also early that used their prior
5  years of experience to meet the years in rank question?
6  A.  What I did at that point further up in the e-mail is
7  to tell him that it was time for him to talk to do Dean to get
8  clarity on this matter so I turned it over to the Dean.
9  Q.  I'll take that as a yes?
10       MR. DOWER: Objection. Form.
11  Q.  That you didn't address those issues with him, you
12  kicked it upstairs.  Is that fair?
13  A.  It seemed like he and I had reached impasse so it was
14  no point in continuing.  It was time for him and Dean to come
15  to some resolution in the matter.
16  Q.  Before you got to an impasse, did you engage with
17  Professor Tewfik at all on the issue that he was raising with
18  you about the similarity of the treatment, the dissimilarity of
19  the treatment under similar circumstances between her and the
20  two males?
21       MR. DOWER: Objection. Form.
22  A.  I don't recall if I had a conversation with him or
23  not obviously there's no e-mail.
24  Q.  Okay. We can take a break now.
25       (A recess was taken at 3:35Â p.m.)

52

1  Q.  Dr. Speitel, am I pronouncing your name correctly?
2  A.  Speitel, yes.
3  Q.  Okay. The emphasis on the second syllable?
4  A.  Yes, sir.
5  Q.  People always screw up my name so I like to be
6  sensitive on other people just because, you know, why not?
7  A.  Yeah, well, thanks for asking.
8  Q.  Yeah.  Okay. So in this interchange that you're
9  having with Professor Tewfik in October about Dr. Nikolova's --
10  his write-up and her candidacy did you view him and understand
11  him to be a strong supporter of Dr. Nikolova?
12  A.  Yes, I mean, he came down on the side of her being
13  promoted so I assumed that he wouldn't do that if he were not
14  convinced that she should be promoted.
15  Q.  Right.  And his advocating for her and saying that
16  she should be treated similarly to these guys, did you see that
17  also as an indication that he was a supporter of hers?
18  A.  Yeah.  I mean, he -- yes, I would say that that's
19  just another indication of his support for her, but the person
20  he was comparing to was Alex Dimakis and his promotion was four
21  years prior.  There was an evolving reluctance at the
22  President's Committee level to make decisions on tenure before
23  they had to not that they wouldn't but -- you know, you can't
24  -- things have changed over time, we have changed since Dr.
25  Nikolova went up so it's not like everything is static in time.

53

1  And quite frankly he had a very strong promotion package and as
2  I noted to Ahmed there were some potential holes in her's so
3  we've got to be careful about comparing people and time, and
4  differences in timeframe.
5  Q.  Right, okay. You also mentioned that at the P&T
6  Committee that there are notes that are taken, is that right, I
7  think you mentioned that?
8  A.  No, I didn't mention that there were any notes taken.
9  There is no written record of their deliberations.
10  Q.  Okay. Is there anything provided to the P&T Committee
11  to instruct them or advise them or educate them on their
12  duties?
13  A.  Yeah, as I mentioned, we -- we being the Dean and I
14  have a meeting with the committee and they get all the
15  promotion guidelines the Dean may ask them for specific
16  materials from them to help them with her letter.  I think at
17  that time she may have been asking them to begin the bear bones
18  draft of the letters as their report. Let's see, what else did
19  we do.  It's just something slipped my mind.  Oh, I think we
20  had started it but I'm not absolutely sure.  The committee
21  before they actually do any cases, they go through a case from
22  the previous year to just kind of get everybody calibrated so
23  that we're trying to get consistency in evaluation things of
24  that sort.
25  Q.  A successful case?

54

1    A.  Yes, a successful case but maybe not a case that was
2  you know so over the top clear cut that there's nothing to talk
3  about.  Something that's kind of in the middle but successful,
4  yes.
5    Q.  Okay. Kind of setting the bar like here is -- if you
6  beat this, you've got a good chance whereas if you talk about
7  somebody who is outstanding, it's hard to have a conversation?
8    A.  Correct.
9    Q.  Okay. All right. Do you recall the issue of Professor
10  Bloom writing a letter of recommendation for Dr. Nikolova?
11    A.  I have -- I don't recall Professor Bloom.  I do have
12  a vague recollection that a letter went into the President or
13  Provost external to the process, yes.
14    Q.  Okay and --
15    A.  I don't -- I wouldn't have actually recalled if it
16  was for Dr. Nikolova but if you're saying that it was.  I knew
17  in one promotion case that this did happen and I wasn't
18  absolutely sure it was her's or not but it only happened once.
19    Q.  Do you know the name Professor Bloom?
20    A.  No, I don't recognize the name, no.
21    Q.  Do you know the award, the Turing Award?
22    A.  I've heard of it, yes.
23    Q.  Okay. And what do you understand about that award?
24    A.  That it's a very preeminent award in computer
25  science.

56

1  guidelines?
2    A.  I'm not certain to what extent the guidelines off the
3  top of my head to talk about this sort of document.  Letters
4  generally are solicited by the Department Chair and that is the
5  source of letters for all promotion documents.  We don't
6  include unsolicited letters and this was an unsolicited letter.
7    Q.  Is it your testimony that the guidelines do not allow
8  for the inclusion of unsolicited letters?
9    A.  I can't specifically say that they do or don't allow
10  for that --
11    Q.  Okay.
12    A.  We certainly -- my recollection is that letter was
13  not included.
14    Q.  Okay. And your testimony is it's not part of the
15  normal process of having the dossier in place before the Budget
16  Counsel votes?
17    A.  Correct.
18    Q.  And we'll explore that a little bit.  Do you
19  understand that the letter came in after the Dean had already
20  written her assessment and recommended against tenure and the
21  P&T Committee had already voted unanimously to grant tenure
22  when the letter had come in?
23    A.  I have no recollection of when the letter came in
24  during the process.  As I've said, I have a vague recollection
25  of it just coming but I have no idea when it came.

55

1    Q.  Like it's hard to get higher than that?
2    A.  Yeah, it's at that level it's my understanding but
3  I'm not a computer scientist so I don't want to wander too far
4  beyond you know a laymen's understanding of it, so to speak.
5    Q.  If somebody said that you couldn't argue against it?
6  If somebody said it was the preeminent award in the world?
7    A.  No, I have no basis to argue against it.
8    Q.  Okay. And do you recall getting involved in deciding
9  what to do with that letter whether or not it should be
10  included in the dossier or not or anything like that?
11    A.  I have vague recollections of being involved and I
12  believe the letter was not included in the dossier but I can't
13  speak to that with absolute certainty.
14    Q.  I guess my question, why would you be involved?
15    A.  Because I oversee the process, of the promotion
16  process and so materials that get included the dossier are
17  specified by the University of Texas promotion guidelines so
18  this paticular would have come in external to the guidelines.
19  So the question is what should -- what do the guidelines say we
20  should do with it?
21    Q.  Well, I guess I'll quibble with you.  It can't be
22  external to the guidelines if the guidelines talk about what to
23  do with documents that come into the process after the Dean
24  makes a decision, say, right? If the guidelines actually talk
25  about this kind of document, it can't be outside the

57

1    Q.  Well, if it came after the Dean had already made her
2  recommendation and submitted her assessment, why would you
3  still be involved?
4    A.  Presumably because the recipient somehow contacted
5  me.  Again, as I mentioned to you, I really don't have much
6  recollection of this other than it happened.
7    Q.  Well, let me ask it this way.  If the Dean had
8  already written her assessment and is already out of the
9  college and it's on it's way to the President's Committee for
10  consideration, whether you were aware of the letter or not,
11  wouldn't it be true that your responsibilities for the tenure
12  and promotion process have been completed by that time?
13    A.  Yes.  Once it's out of the college then it's the
14  Provost office.
15    Q.  So you didn't have any specific responsibility to
16  participate in deciding what to do or not do with the letter
17  once it came in after it left the college?
18    A.  I would say that it's not my responsibility.  You're
19  correct that was not my responsibility.  Perhaps I was --
20  again, perhaps I was looped into provide some context or for
21  the decider to figure out what they wanted to do with the
22  letter.
23    Q.  Or you just gratuitously opined?
24        MR. DOWER: Objection. Form.
25    Q.  That's possible?

58

1   A.  I doubt it.

2   Q.  You would only -- you would have only commented if
3   you were asked for your opinion?

4          MR. DOWER: Objection. Form.

5   A.  Most likely, yes.

6   Q.  Okay. And at that point it would be the Provost
7   Office's responsibility about what to do or not do, right,
8   because the Provost Office are part of the President's
9   Committee and Ms. Shockley would be in charge of the process
10  stuff for the President's Committee, is that right?

11  A.  That's my understanding, yes.

12         (Exhibit 56 identified.)

13  Q.  Okay. All right. Let's go ahead and look at a
14  document.  This will be Exhibit 56.

15  A.  Okay.

16  Q.  All right.  So if you look at the beginning of the
17  chain at the bottom on the third page, that's Professor Bloom's
18  letter from 8 of January, 2019, and you see that as a very
19  positive letter, correct?

20  A.  Yes.

21  Q.  And you were copied on that letter, that e-mail?

22  A.  I agree.

23  Q.  And Dr. Nikolova is not copied on that?

24  A.  I agree that seems to be the case.

25  Q.  And March 1st comes around and Dr. Nikolova sends an

59

1   e-mail to Ms. Shockley -- well, I guess, let's confirm.
2   January 8 would have been after the Dean wrote her assessment
3   but prior to the President making a decision?

4   A.  I think so.  Clearly there's written evidence to back
5   that up but I believe you're correct.

6   Q.  Okay. And so Dr. Nikolova writes to the group that
7   got the e-mail to include you saying that on March 1st, she
8   recently found out that the letter was submitted but she
9   doesn't know what happened to it, correct?

10  A.  That's correct.

11  Q.  And then you respond 15 minutes later, the first
12  response without being requested for a response, with your
13  opinion that you don't think that it was appropriate not to
14  have included it in the process because Dr. Nikolova didn't
15  specifically ask that it be included?

16         MR. DOWER: Objection. Form.

17  A.  Yes, that's what that e-mail says.

18  Q.  Okay. And the context is correct, you weren't asked
19  for your opinion there?

20  A.  That is correct.

21  Q.  And Dean Wood also remarks three minutes later also
22  after the fact since she's already completed her part of the
23  process.  I mean, clearly this is a positive letter, right?

24  A.  It is and clearly the Dean indicated that we have had
25  already strong external letters so I'm not sure that it really

60

1   adds much to the dossier.

2   Q.  It certainly doesn't detract?

3   A.  That is correct.

4   Q.  And whether or not Dean Wood or the P&T Committee
5   drew any negatives from the external letters, that doesn't
6   change whether or not the President's Committee might do so in
7   their report, correct?

8   A.  I can't speculate on what the President's Committee
9   is or isn't going to do, I'm not part of that committee.

10  Q.  They're free to do what they want to do?

11  A.  They are, yes.

12  Q.  In fact, have you looked at the guidelines since you
13  wrote that opinion that she would have had to have specifically
14  asked for it to be included, that there is no requirement that
15  she specifically asks for it to be included?

16  A.  Well, as I indicated to you earlier that I've
17  reviewed the guidelines in preparation for this deposition.

18  Q.  And did you see that, that there's no requirement of
19  a specific request?

20  A.  I did not read the part about external materials
21  because I figured our discussion was going to be around
22  promotion and the timing report.

23  Q.  Okay. And Dean Wood at the last e-mail communication
24  says it's important for Dr. Nikolova to understand that she
25  didn't make a decision to not include the letter in the file

61

1   with a smiley face, Is that -- do you understand what the
2   smiley face signifies?

3   A.  I don't.  You would have to ask her.

4   Q.  Okay. At this point she's the only one who has voted
5   against -- well, I guess not at this point but the President
6   would have decided not to grant tenure by March 1st but she was
7   the first to recommended against tenure against Dr. Nikolova,
8   right?

9   A.  That's my understanding, yes.

10  Q.  Did you feel in responding so quickly and unsolicited
11  to this e-mail from Dr. Nikolova asking about the letter that
12  you had an interest in helping or protecting Dean Wood and
13  justifying Dean Wood's recommendation against tenure from any
14  contradictory evidence in support of Dr. Nikolova?

15         MR. DOWER: Objection. Form.

16  A.  No, I was just trying to clarify for Carmen that it
17  wasn't one of the reference letters that we solicited.

18  Q.  It's not disallowed that that could have been
19  included, in your opinion if Dr. Nikolova would have made a
20  specific request, it would have been part of the file and it
21  would have been considered by the President's Committee,
22  correct?

23  A.  Certainly supplemental materials can be added.  There
24  are -- I'd have to look at the rules.  You see, at some point
25  the dossier is complete and nothing else can be added to it so

62

1  we'd have to look at the timing on that but, yes, I agree that
2  the candidate can have supplement materials -- can supply
3  supplemental materials and sometimes when we get additional
4  information the candidate or in process the candidate does
5  supplemental materials because they're invited to do so.
6      Q.  Or because one comes in late?
7      A.  We -- the letters -- no, there are specific rules
8  around when reference letters are included in the dossier not
9  including the dossier's specific timing about that.
10     Q.  Right, but if it didn't make it in time for that,
11  then it would be considered a supplemental, right?
12     A.  Correct, it would be a supplemental letter.  The
13  letters have to be in before the Budget Counsel votes.  If the
14  letter comes in late, it can be put in the supplemental
15  materials.
16     Q.  Right.
17     A.  Because we want to have a clear record of what the
18  Budget Counsel had available to it when it voted.
19     Q.  I'm just trying to clarify that that wouldn't be
20  restricted from inclusion.
21     A.  Correct.
22     Q.  Okay, let me look at -- oh, let me ask a question.
23  On the teacher evaluation, could you explain why teacher
24  evaluations are done so far past the period that they're being
25  evaluated on? Isn't it look a year-and-a-half after?

63

1      A.  You're talking about the faculty annual review
2  evaluations is that what you're asking about?
3      Q.  Yes, sir.
4      A.  Well, every faculty -- I mean, this is University
5  rules.  Every faculty member has to file an annual report by
6  the end of September for the previous fiscal year. And then
7  during the current fiscal year, whatever process the committee
8  -- whatever process the department uses, they go through an
9  evaluation of that faculty member's performance which usually
10  results in a -- in the assessment tools.  They're done sometime
11  in this spring semester, and that assessment then feeds into
12  whatever merit raise conversation or poll we have. And those
13  decisions, depending upon whether there is or there isn't a
14  legislative year. Maybe non-legislative years are usually
15  April. Legislative years are usually late June to July.
16     A.  Okay.
17     Q.  So I agree it trails behind and that's by University
18  policy.
19     Q.  Like a complete year?
20     A.  You are correct, yes.
21     Q.  Okay. And isn't it accurate that as part of the
22  process or the protocol is that once the report is written,
23  there is no appeal or changing of that assessment?
24         MR. DOWER: Objection. Form.
25     A.  I believe the rules state that the faculty member can

64

1  submit written documents to refute the assessment -- I mean, as
2  far as -- the only thing that comes out of the assessment are a
3  ranking in one of four categories, exceed expectations, meets
4  expectations, does not meet expectation or unsatisfactory.
5  Also the fact that there's the usual University grievance
6  procedures are available to faculty members if they have
7  concerns about the evaluations.
8      Q.  So evaluations can be grieved? I thought there was a
9  limitation on what could be grieved.
10     A.  You know, I'm not an expert on that so we would have
11  to refer to the guidelines.
12     Q.  Okay. But what you are aware of is that the faculty
13  member has the ability to submit documents contradicting the
14  finding?
15     A.  I think that's the case. I'd have to refresh my
16  memory in looking at the annual review guidelines produced by
17  the University.
18     Q.  But isn't it true that they can't change the
19  assessment?
20     A.  That's correct.
21     Q.  In the four categories?
22     A.  That's correct.
23     Q.  So if anybody wanted to look beyond, they'd have to
24  go get the additional materials and then compare them but it
25  won't result in a change of the rating?

65

1      A.  That is my understanding, yes.
2      Q.  Which is fine if you don't have any dispute with
3  administration but if you do, that's a way that can be used to
4  negatively impact the faculty member, correct?
5      A.  I suppose that's possible.
6      Q.  Could that directly leads to whether and how much of
7  a raise would be obtained?
8      A.  The -- yes, the faculty annual evaluation is a key
9  factor in determining pay raises, yes.
10     Q.  All right.  Let me put up another exhibit.  Let me
11  ask a question.  Do you recall that Dr. Nikolova asked for
12  Modified Instructional Duty for the fall '19 semester?
13     A.  You know, I'd have to look at the spreadsheet.  I
14  know she's had modified instructional duties but I don't recall
15  when they exactly happened but we can pull out the spreadsheet
16  and go through it if you like.
17     Q.  Okay. This is going to be Exhibit 57.
18     A.  Okay.
19         (Exhibit 57 identified.)
20     Q.  All right. So this is Dr. Nikolova responding to
21  Professor Tewfik's request that she engage in mentoring during
22  her MID semester in the fall of '19, correct?
23     A.  That's correct.
24     Q.  And it sounds like someone from the Dean's Office had
25  instructed Professor Tewfik to let her know that that is the

66

1   case and was that person you?
2          MR. DOWER: Objection. Form.
3   A.   I don't recollect who did what on this and I'm not so
4   sure that it wasn't his idea at the beginning anyhow. So
5   modified instructional duties is not maternity leave. It
6   merely helps you not have the structured schedule of a -- of
7   teaching a course. And so it is conceivable depending upon how
8   frequently those senior design teams meet, that it would be
9   possible for somebody on modified instructional duties to
10  continue to handle that duty.
11  Q.   Right. But apparently from her second e-mail where
12  she goes into details about what she's experiencing and the
13  differences between her and -- is this Dr. Dimakis?
14  A.   Let me see here.
15  Q.   The reference is in Hallux.
16  A.   Yeah, that would be Dimakis.
17  Q.   And in response to that, Dean Wood says he has to
18  back down, he being Professor Tewfik, and agreeing that she
19  should not be asked to mentor, and then you agree with Dean
20  Wood and then you say you sent Professor Tewfik an e-mail to
21  update the discussion. What was the discussion that you and
22  him had?
23  A.   I can't recall the specifics of the discussion but in
24  the context of this, it probably was whether or not the faculty
25  member and MID should be doing, should be handling senior

67

1   design advising. Obviously that was informed by the additional
2   information that she provided.
3   Q.   Okay.
4   A.   And to date she didn't do this. She did not have a
5   senior design --
6   Q.   Okay.
7   A.   -- Information.
8   Q.   I'm sorry. I keep thinking you're finished and I jump
9   in on you. I apologize. All right, so I'll start now.
10         So when you're updating -- you're updating the
11  discussion of and requiring her to do the mentoring by removing
12  that requirement?
13  A.   Yeah, I can't absolutely say that's what it is but I
14  assume based on just the e-mail string, yes, that that's where
15  this all went, yes.
16         (Exhibit 58 identified.)
17  Q.   Let me put up another exhibit. This will be 58.
18  A.   Okay.
19  Q.   Does this refresh your recollection that you were
20  involved in the decision to instruct her to mentor during the
21  mid-semester?
22  A.   Yes, I was involved with a conversation with him
23  about whether -- about her continuing to mentor senior design
24  group.
25  Q.   Okay.

68

1   A.   I can't specifically remember whether he was
2   proposing that she do it or that I was proposing, asking
3   whether it was possible for her to do it. I just don't
4   remember.
5   Q.   And this is the e-mail you referred to in Exhibit 57?
6   A.   Yeah, that's what -- yeah, that's what I was
7   expecting that I would and something along the lines that we --
8   based on the information, new information that we need to
9   assign somebody else so that she had other responsibilities
10  other than her MID.
11  Q.   And then you have a P.S., there of letting him know
12  that he shouldn't feel the need to answer the questions that
13  she asks in that long e-mail?
14  A.   That's correct.
15  Q.   And one of those questions would be who in the Dean's
16  Office was involved in this?
17  A.   She says who exactly at the college made a decision
18  and when and I don't know. Again, what the e-mail is telling
19  you is I'm not completely convinced it wasn't his decision that
20  reinforced, or whether it was my decision after a suggestion,
21  after a conversation with him, but it gets back again to what
22  an MID is. It's not a leave.
23  Q.   Just to clarify my question, one of the questions
24  that he would not need to answer by your suggestion to him not
25  to would be who at the college --

69

1   A.   Correct, absolutely, yep, that's true.
2          MR. NOTZON: Let me have a couple minutes and
3   we'll be right back.
4          (A recess was taken at 4:26Â p.m.)
5   Q.   (BY MR. NOTZON) All right, Dr. Speitel, just a few
6   more questions.
7          Did you ever discuss Dr. Nikolova's promotion
8   or potential promotion with Dean Wood?
9   A.   Gosh, I can't remember that. Probably -- I'm not
10  sure if she would have been -- every year we have a regular
11  meeting with the Department Chairs and usually in February to
12  go over who might the promotion candidates be from their
13  department, not that they're going to be the promotion
14  candidates but who is the suite of people who might go forward
15  and we just had a conversation about where we think they are.
16  She provided some informal -- she and I provide some informal
17  feedback to the Department Chair for them to think about as the
18  Budget Counsel makes it's decision, so I have no recollection
19  of it but it's most likely that we did have a conversation
20  about her in the year that she went up.
21  Q.   The year before and the year that she went up?
22  A.   No, the year -- well, February -- January or February
23  of the calendar year that she went up.
24  Q.   Okay. So that was in January, February, '18, and then
25  she gets voted on at the end of '18 and then the President

70

1  decides in '19?
2      A.  Correct.
3      Q.  And you don't recall any of those conversations?
4      A.  No, we have conversations with every Department Chair
5  and there's probably in some cases we're probably talking about
6  50, 60 people a year.
7      Q.  Do you recall Dean Wood being initially against Dr.
8  Nikolova's tenure or being put up for tenure or prospect for
9  tenure prior to her vote or her recommendation to not give
10 tenure?
11     A.  No, I have no recollection of any conversations.
12     Q.  Do you recall having -- did you review or participate
13 in all of the Dean's assessment of Dr. Nikolova?
14     A.  Not that I can recall.  Normally I wouldn't
15 participate in that for anyone.
16     Q.  Okay.  Because you're not involved in that process, I
17 think you testified to that?
18     A.  Correct.  I'm involved in orchestrating the process
19 but I'm not a decision maker in the process.
20     Q.  Or a participant?
21     A.  Yes, correct, yeah.
22     Q.  All right.  From your years of experience in the
23 tenure promotion process, have you ever witnessed a candidate
24 get a strong Budget Counsel vote for tenure, a strong support
25 letter for tenure, a unanimous vote at the P&T Committee for

71

1  tenure and then the Dean go against it?
2      A.  I can't -- obviously those data exist but I can't
3  recall them off the top of my head.  It's certainly the -- I
4  think there are cases where the Dean made the final decision to
5  be as -- well, the Dean doesn't make the final decision.  The
6  Dean's decision was negative where there was positivity along
7  the way.
8      Q.  And from your recollection, do you recall the
9  President ever deciding differently than the Dean?
10     A.  I don't recall, but obviously that's another thing
11 that's in the records.  We can see whether that happened or
12 not.  I don't know.
13     Q.  I just didn't know if you paid attention that, if
14 that rarely happens, usually happens, or it could go their way
15 and you just never know what's going to happen?
16     A.  Yeah, I don't know what the data shows.
17     Q.  Okay.
18     A.  To answer the question.
19     Q.  I'm just talking about engineering.
20     A.  Oh, okay.  Engineering, okay.  I thought you were
21 talking about the University at large.
22     Q.  I figured I should probably specify.  So just talking
23 about your Dean, you know, your boss, and your college
24 candidates for tenure?
25     A.  My -- just to clarify I've worked for multiple Deans.

72

1  Taking the three Deans as a whole who I've worked for, I would
2  say that my general expectation is that the promotions and
3  President's Committee mostly goes with what the Dean says but
4  not always.
5      Q.  Just to ask that -- a prior question just a little
6  bit differently, do you recall the Dean ever deciding contrary
7  to a unanimous vote of the P&T Committee?
8      A.  No, I don't keep track of things like that.  I mean,
9  lots of times I don't even know what the vote of the P&T
10 Committee is.
11     Q.  Okay.  All right.  Well, thank you very much.
12         MR. NOTZON: I'll pass the witness.
13         MR. DOWER: I know we just took -- let me confer
14 with my colleagues.  I suspect we will pass but let me confirm.
15         MR. NOTZON: I don't mind.
16         (A recess was taken at 4:39 p.m.)
17         MR. DOWER: And the defendant will reserve.
18         (The proceedings concluded at 4:42 P.M.)
19
20
21
22
23
24
25

73

1              SIGNATURE AND CHANGES
2         WITNESS NAME: JERRY SPEITEL
3            DATE, MAY 28, 2021
4  PAGE  LINE  CHANGE          REASON
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

```
1                    SIGNATURE AND CHANGES

2                WITNESS NAME: JERRY SPEITEL

3                   DATE, MAY 28, 2021
```

| PAGE | LINE | CHANGE | REASON |
|------|------|--------|--------|
| 6 | 10 | Gerald E. Speitel Jr. | Full legal name |
| 8 | 3 | C.W. Cook Professorship in Environmental Engineering | Correct endowment name |
| 9 | 21 | Ekerdt | Spelling correction |
| 12 | 4 | "we've also researched committees" | Check recording; can't be correct |
| 13 | 23 | ... candidate. That ... | Fix typo |
| 14 | 11 | Delete "the Deane" | Improve readability |
| 16 | 21 | ... peoples' | Fix typo |
| 29 | 14 | ... be so, ... | Fix typo |
| 30 | 5 | Replace "starkly" with "historically" | Fix transcription error |
| 35 | 2 | Andrea Alu and Zheng Wang | Spelling correction |
| 35 | 4 | Miryung Kimg | Spelling correction |
| 35 | 9 | Change "EC" to "ECE" | Fix transcription error |
| 35 | 13 | "she" refers to "Hao Zhu" | Replace for clarity? |
| 37 | 21 | Change "V-C" to "BC" | Fix transcription error |
| 40 | 6 | Change "moving of the" to "of the" | Improve readability |
| 41 | 9 | Start sentence at "that's" semicolon after "there" | Improve readability |
| 51 | 23 | Add semicolon after "not" | Improve readability |
| 63 | 10 | "result in a -- in the assessment tools" | Check recording; seems incorrect |
| 66 | 15 | "Hallux" should be "Alex" | Fix transcription error |
| 66 | 25 | "and" should be "on" | Improve readability |
| 67 | 7 | "--information" | Check recording; words missing here |
| 68 | 9 | "had other" should be "had no other" | Seems like transcription error |

74

SIGNATURE PAGE

1

2          I, JERRY SPEITEL, have read the foregoing deposition

3   and hereby affix my signature that same is true and correct,

4   except as noted on the correction page.

5

6   _____
    JERRY SPEITEL

7

8   THE STATE of ___Texas_____ )

9   COUNTY of ____Travis_____ )

10          Before me _____ on this day

11  personally appeared _____ known to me [or

12  proved to me on the oath of _____ or through

13  _____ (description of identity card or other

14  document)] to be the person whose name is subscribed to the

15  foregoing instrument and acknowledged to me that he/she

16  executed the same for the purposes and consideration therein

17  expressed.

18          Given under my hand and seal of office this

19  _____ day of _____, 2021.

20          _____

21          NOTARY PUBLIC in AND FOR
            THE STATE of _____
22          My Commission Expires: _____

23

24

25

1   COUNTY OF DALLAS     )

2   STATE OF TEXAS       )

3                    REPORTER'S CERTIFICATION

4           I, JACQUELINE LOVE-WORLINE, CSR, hereby

5   certify that the witness was duly sworn and that this

6   transcript is a true record of the testimony given by

7   the witness.

8           I further certify that I am neither

9   counsel for, related to, nor employed by any of the

10  parties or attorneys in the action in which this

11  employee of any attorney of record in this cause, nor am

12  I financially or otherwise interested in the outcome of

13  the action.

14          Subscribed and sworn to on this, the 22nd day of

15  June, 2021.

16

17

18          _____

19          JACQUELINE LOVE-WORLINE, CSR NO. 8970
            Expiration Date:  11/30/2022
20          Firm Registration No.: 528
            FOR: INTEGRITY LEGAL SUPPORT SOLUTIONS
21          PO Box 245
            Manchaca, TX  78652
22          Telephone: 512-320-8690

23

24

25

Appx.0587

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

EVDOKIA NIKOLOVA                *
        Plaintiff,              *
                               *
V.                             *  CASE NO. 1:19-cv-00877-RP
                               *
UNIVERSITY OF TEXAS AT         *
AUSTIN,                        *
        Defendant.             *


ORAL VIDEOTAPED AND VIDEOCONFERENCED DEPOSITION

OF

AHMED TEWFIK,

AS BOTH ORGANIZATION REPRESENTATIVE

AND AS FACT WITNESS

Saturday, March 20, 2021


ORAL VIDEOTAPED AND VIDEOCONFERENCED

DEPOSITION OF AHMED TEWFIK, produced as a witness at the

instance of the Plaintiff, and duly sworn, was taken in

the above-styled and numbered cause on Saturday,

March 20, 2021, from 10:02 a.m. to 7:10 p.m., before

Debbie D. Cunningham, CSR, in and for the State of

Texas, reported remotely via Machine Shorthand, pursuant

to the Federal Rules of Civil Procedure.

--ooOoo--

**2**

1  APPEARANCES
2
3  FOR PLAINTIFF:
4    THE LAW OFFICE OF ROBERT NOTZON
      1502 West Avenue
5    Austin, Texas  78701
      (T) 512.474.7563
6
      By:  Robert Notzon, Esq.
7        Robert@NotzonLaw.com
8          AND
9      CREWS LAW FIRM, P.C.
        701 Brazos, Suite 900
10      Austin, Texas 78701
        (T) 512.484.2276
11
      By:  Robert W. Schmidt, Esq.   (Videographer)
12        schmidt@crewsfirm.com
13
    FOR DEFENDANT:
14
      OFFICE OF THE ATTORNEY GENERAL OF TEXAS
15      General Litigation Division
        P.O. Box 12548, Capitol Station
16      Austin, Texas  78711-2548
        (T) 512.463.2120
17
      By:  Amy Hilton, Esq.
18        amy.hilton@oag.texas.gov
            AND
19        Benjamin Dower, Esq.
          benjamin.dower.oag.texas.gov
20
21
    ALSO PRESENT:
22
      Evdokia Nikolova
23      Laura Barbour
        Jody Hughes
24
            --ooOoo--
25

**4**

1          EXHIBIT INDEX
2  Exhibit Number   Description          Page
3  Exhibit 23  Sujay Sanghavi Recommendation   160
              For Change in Academic Rank/
4              Status
5  Exhibit 24  10/26&27/18 E-mail Chain,   195
              Re: Question for ECE Chair
6              (Justify Evdokia Nikolova early
              promotion)
7
8  Exhibit 25  10/25&26/18 E-mail Chain,   205
              Re:  Question for ECE Chair
8              (Gender Bias)
9
    Exhibit 26  CCAFR Report and Appendix   226
10
    Exhibit 27  2/19-22/19 E-mail Chain,   229
11              Subject: P&T Decision
12  Exhibit 28  Stats Male/Female Promotions   232
              Spreadsheet
13
    Exhibit 29  12/12&13/18 E-mail Exchange   233
14              between Evdokia Nikolova and
              Ahmed Tewfik, Subject: Rebuttal
15              Draft
16  Exhibit 30  Text messages between Evdokia   235
              Nikolova and Ahmed Tewfik
17
    Exhibit 31  3/22/19 Evdokia Nikolova e-mail   238
18              to Ahmed Tewfik, Subject:
              Comparison with Zoya Heidari
19              from Petroleum Engineering
20  Exhibit 32  Plaintiff's Notice of Oral and   261
              Video Deposition of Ahmed Tewfik
21              As Both Organizational
              Representative and As Fact
22              Witness
23
24          --ooOoo--
25

**3**

1                INDEX
2  APPEARANCES                    2
3
4  EXAMINATION OF AHMED TEWFIK:
5    BY MR. NOTZON              6
6    BY MS. HILTON            271
7
8
9  CHANGES AND SIGNATURE        274
10  REPORTER'S CERTIFICATION    276
11
12        --ooOoo--
13
14
15
16
17
18
19
20
21
22
23
24
25

**5**

1        (Saturday, March 20, 2021, 10:02 a.m.)
2        P R O C E E D I N G S
3            THE REPORTER:  Today is Saturday,
4  March 20, 2021.  This is the videoconferenced deposition
5  of Ahmed Tewfik in the matter of Nikolova versus UT.
6            Due to the COVID-19 Pandemic we are
7  remotely situated, and we are on the record at
8  10:02 a.m. Central Standard Time.
9            My name is Debbie Cunningham, and my
10  business address is P.O. Box 245, Manchaca, Texas 78652.
11            Would all persons present please
12  introduce themselves for the record?
13            MR. NOTZON:  Robert Notzon and Bob
14  Schmidt for the Plaintiff, Evdokia Nikolova.
15            MS. HILTON:  Amy Hilton for the
16  University of Texas at Austin and Benjamin Dower for the
17  University of Texas at Austin.
18            THE WITNESS:  I'm Ahmed Tewfik,
19  University of Texas at Austin.
20            MS. HILTON:  And before we begin the
21  deposition, the parties have stipulated that "objection,
22  form" is sufficient to preserve objections to the form
23  of the question and will be used in lieu of the more
24  specific form-based objections.  The parties stipulate
25  that all objections except as to the form of the

Ahmed Tewfik - 3/20/2021

6

1   question or answer are reserved until trial, and the
2   deponent would like the opportunity to review the
3   transcript and recording pursuant to Federal Rule of
4   Civil Procedure 30(e).
5            MR. NOTZON:  Agreed.
6            MR. SCHMIDT:  Also, just to clarify,
7   we've also stipulated that we will be recording the
8   video; and that we will not be making the announcements
9   of the recording stopped in between the sessions, as
10  required by 30(b)5, I believe; is --
11           MS. HILTON:  Agreed.
12           MR. SCHMIDT:  -- that correct?
13           MS. HILTON:  Agreed.
14                AHED TEWFIK,
15       having been duly sworn, testified as follows:
16                EXAMINATION
17  BY MR. NOTZON:
18      Q.  Good morning, Professor Tewfik.
19      A.  Good morning.
20      Q.  Could you state your position with the
21  University of Texas currently?
22      A.  I am a Senior Professor at the University of
23  Texas, and I hold an Endowed Chair.
24      Q.  And how long have you held that position?
25      A.  I have held that position since I joined in

7

1   October of 2010.
2       Q.  Where did you come from?
3       A.  I came from the University of Minnesota.
4       Q.  Okay.  So you came as a full professor?
5       A.  I came as a full professor with an Endowed
6   Chair, yes.
7       Q.  And how long have you been a faculty member at
8   a university?
9       A.  I joined the University of Minnesota in the
10  Fall of 1987, so you can do the math.
11      Q.  Okay.  And that was as an Assistant Professor?
12      A.  As an Assistant Professor, correct.
13      Q.  I get 34 years with my math.  Is that your
14  math?
15      A.  I didn't do the math, but I can pull out my
16  calculator if you want.  I'm happy to.
17      Q.  That's okay.  I didn't know if you were
18  testing my math.
19           Okay.  And during your time at UT since
20  2010, have you held any administrative positions other
21  than the Chair of ECE?
22      A.  No, the only administrative position I held
23  was Chair of ECE.
24      Q.  Okay.  And how many years, or when you started
25  and when you stopped, whichever is easier for you?

8

1       A.  So I started in October 2010.  My term was
2   supposed to finish eight years later.  So it's four
3   years, and then it was renewed four years.  Then I was
4   extended a year because of a number of things that were
5   happening, and then I was asked to serve a few more
6   months because my successor couldn't assume the position
7   on time.  So I ended up serving as Chair from October
8   2010 through November of 2019.
9       Q.  Okay.  And you were replaced by Diana
10  Marculescu?
11      A.  That's correct.
12      Q.  And was she already at UT, or did she come in
13  from outside?
14      A.  No, so she came from outside.  She came from
15  Carnegie Mellon University.
16      Q.  Okay.  And what were the things that were
17  going on that caused you to be extended for a year?
18      A.  The things that were going on, there was an
19  external review of the department; and the committee
20  lauded our accomplishments, pointed out that the
21  university didn't have a succession plan; and on top of
22  this, we were in the process of moving to a new
23  building.  And so the combination of needing to bring
24  the department together and the fact that we needed a
25  little longer runway to get a successor is what had the

9

1   Provost ask me whether I would agree to serve an
2   additional year.
3       Q.  Okay.  And this litigation was not one of the
4   factors involved in that?
5       A.  Well, this extension happened before
6   Professor Nikolova was going up for tenure and promotion
7   so.  Yes, it did not factor in because this was not
8   anything that anybody could have guessed.
9       Q.  Okay.  And when you got extended for another
10  four years as a Chair, is that a common practice?
11      A.  No.  There's a review process; and after the
12  review process, then the Dean can decide to extend the
13  person or not.  So in my case there was a review
14  process.  There was a committee formed that gathered
15  feedback from faculty, staff, and students.  They
16  submitted their recommendation to the Dean and Dean
17  decided to extend me and I agreed to serve four more
18  years.
19      Q.  Okay.  And the Dean at that time was
20  Dr. Fenves?
21      A.  No.  The Dean at that time was Dean Wood.  I
22  don't recall whether this was the year that she was an
23  interim Dean or whether she had already been appointed
24  as permanent Dean.
25      Q.  Right.  Okay.  Because it would have occurred

10

1  around the 2014 time period?
2     A.  Yeah.
3     Q.  Okay.  So during your eight years as the Chair
4  of the ECE, did you have a particular focus -- well,
5  let's start with:  Did you have an awareness that there
6  was a dirth of female faculty in your department?
7           MS. HILTON:  Objection, form.
8     A.  Yes, when I came into the department, I did
9  note that we had a very small number of female faculty
10  members; and I actively worked on reversing that and
11  also increasing the number of female students in the
12  department.
13     Q.  (BY MR. NOTZON)  Okay.  And while you were at
14  Minnesota, did you have more or less female faculty in
15  the department?
16     A.  I honestly don't remember, but we didn't have
17  that many faculty members.  We may have had maybe one or
18  two; but this was so long ago that I -- I mean, I don't
19  know how to even check it because if I went to the
20  website, the faculty in the department are different
21  from the composition we had back then.  But the numbers
22  were small -- were extremely small back then, and had
23  trouble recruiting female faculty members.
24     Q.  Would you say as was the case across the
25  country?

11

1           MS. HILTON:  Objection, form.
2     A.  As was the case across the country, yes.  The
3  number of -- the percentage of female Ph.Ds and
4  graduates was low.  So there is a lot of competition for
5  getting the top female faculty candidates across all
6  departments.
7     Q.  (BY MR. NOTZON)  And did any -- were you
8  tasked with increasing the female faculty as part of the
9  recruitment and hiring process, or is this something you
10  did on your own?
11     A.  I was tasked to take a high-rank department to
12  the next level; and so there were a number of things
13  that when I came in, I had to do.  This was one of them,
14  recognizing the composition of the faculty.  And this
15  was one of the tasks that I focused on, but there were a
16  number of things.  I mean, I wasn't given a
17  prescriptive, do A, B, C, D.  I was just given the task
18  of increasing the reputation and effectiveness of the
19  department.
20     Q.  Okay.  And one of the factors in the
21  reputation of the department would be the number of
22  female faculty on staff that were qualified and quality?
23     A.  It's not a factor that -- you know, people are
24  not going to look at how many female faculty members and
25  says:  Well, if you have a large number of faculty

12

1  members, therefore, you're a top ten department.  The
2  reason I focused on that is because I fundamentally
3  believe that having diversity in your staff, you know,
4  on your team, leads to innovation.  It leads to people
5  being able to see around the corners.  It leads to
6  people recognizing issues that, you know, perhaps some
7  fractions of the populations are experiencing.  So it's
8  a good thing to have.  It's not just the right thing to
9  do.  It is a good thing to have if you want to enhance
10  the reputation of the department.
11           But, from that perspective, increasing
12  the number of female faculty on staff meant that the
13  overall output of the department, the quality of the
14  innovation that was going to come from the department, I
15  expected it to be higher; and that's what has transpired
16  since then.
17     Q.  And is this a belief and attitude that you had
18  coming in, or was this something that UT imparted to
19  you?
20     A.  This was a belief that I had coming in.  It
21  may have factored in the selection process why they
22  selected me as opposed to someone else, but UT has also
23  been extremely supportive.  So, for example, when I
24  asked to have training for our faculty, UT obligated and
25  provided me with the right people to do the training.

13

1  When I asked for extra positions for -- to increase the
2  diversity on our faculty, I was given a position; and
3  that's actually the position that Dr. Nikolova
4  ultimately was recruited for.  So UT did whatever it
5  could.  Whenever I asked for something, I got it when it
6  had to do with increasing diversity.
7     Q.  What training did you ask for and get?
8     A.  The training that I asked for was to -- there
9  were several training sessions that we did over the
10  years.  So, you know, one of the first sessions we --
11  I -- there was a -- I think, a vice president -- you
12  know, some -- someone in administration that was in
13  charge of diversity and had the right training.  So I
14  worked with that person.  We brought in that person and
15  others on her staff and another person that she works
16  with who's an expert in this who wasn't necessarily on
17  our staff.
18           We provided the faculty with training
19  material that they had to do ahead of the training.  We
20  brought in the trainers in the -- in one of our faculty
21  meetings, one of our Monday faculty meetings.  There
22  were discussions that the faculty had to engage in.
23           We had observers that observed, you know,
24  how people were reacting, who was saying what; and then
25  there were subsequent interventions, such as taking

14

1 people to small lunches and, you know, address some of
2 these issues to move people along.  And that has
3 continued.
4        So I think the last training session we
5 had, you know, may have had been in the Fall of '19 or
6 the Spring of '19 -- I can't remember -- but, you know,
7 we continued to have training sessions along those
8 lines.  There were training sessions that were
9 specifically aimed at faculty who were on our faculty
10 recruiting committees.  So there are a number of
11 training sessions.
12   Q.  So it included hiring -- recruiting and hiring
13 and retention issues, as well as interpersonal
14 interactions among the faculty and interactions between
15 faculty and students, et cetera?
16   A.  Yes, it was all encompassing.
17   Q.  Okay.  And just to clarify, not in a single
18 training; but there were multiple trainings that covered
19 all the bases?
20   A.  Correct, there were multiple trainings over a
21 number of years.
22   Q.  And is there a documentation of those
23 trainings that were provided and when they were provided
24 during the time you were Chair?
25   A.  I presume that if we search my e-mails, we

15

1 will find the announcements, you know.  You might find
2 the links to the material that was provided, you know.
3 So the answer is, yes; but someone would have to go in
4 and look for this information in the e-mails that
5 announced what was happening in a particular faculty
6 meeting or that was addressed to a particular recruiting
7 committee and asking them to take training.
8        In addition, at some point in time, the
9 rest -- and I can't remember whether it was the college
10 first or the university first -- where the training that
11 we were giving to recruiting faculty -- sorry --
12 recruiting committees became mandatory across the whole
13 university.  So if you looked at, also, the university,
14 I'm sure that somewhere on the Clovis site, you know,
15 you'll find the requirement and when it became
16 effective.
17   Q.  Okay.  And so you're saying you started doing
18 training on diversity and these issues prior to the
19 university making it mandatory that the hiring committee
20 be trained in that way?
21   A.  That's correct.
22   Q.  Okay.  And all the training that you received,
23 would you -- and you may have said this, and I
24 apologize.  So it may be replowing ground, but were
25 they -- all the trainers and the training provided from

16

1 a particular part of UT; or did you obtain trainers from
2 disparate areas?
3   A.  I can't answer that question because I went to
4 a particular person, and that particular person then
5 drew the right experts from multiple parts of UT.  And
6 as I mentioned, there was, at least in the first
7 training, one person that didn't seem to be at UT
8 because I remember that we were contacting her.  I can't
9 remember.  She might have been in Dallas or somewhere
10 else.  So every training, I contacted a single person;
11 but I wasn't in charge of, you know, bringing the right
12 people to the table.  They were in charge of doing this.
13   Q.  Who was that single person?
14   A.  I mean, in the -- in the last few years that
15 single person might have been the head of our Title IX
16 program.  At the very beginning it was -- I don't
17 remember her exact title, but it might have been Vice
18 President for Diversity or Associate Vice President for
19 Diversity and Inclusion, you know, something along those
20 lines.  I don't -- you know, those titles have changed
21 over time.
22   Q.  Okay.  So when you say you went to a single
23 person, you always went to a single person; but that
24 single person changed over time?
25   A.  Yes, that single person changed over time

17

1 because the focus of the activity within the university
2 moved as -- you know, as upper administration reworked
3 certain functions.
4   Q.  Were that -- were those single people,
5 persons, always from OIE?
6   A.  So I'm sorry, but I don't know what the
7 acronym stands for.
8   Q.  Office --
9   A.  Even if I -- okay.  Go ahead.
10   Q.  Office of Inclusion and Equity.
11   A.  Well, so the first person I contacted the
12 first time we had the training, as I said, that person
13 had a title of something relative to diversity and
14 inclusion or maybe equity.  What the exact title was, I
15 don't remember; but, subsequently, in following years,
16 you know, I may have gone to the same office and would
17 have been told: Well, why don't you work with the
18 Title IX -- you know, I would have to go back and look
19 at my notes.
20   Q.  Okay.
21   A.  Not my notes, my e-mails or something.  I
22 didn't take notes on that.
23   Q.  Right.  Somewhere in your records?
24   A.  Somewhere in the records, yes.
25   Q.  Okay.  And do you have a -- well, let me just

18

1  ask:  How many women were hired during the time that you
2  were Chair, women faculty; and how many remained at the
3  time that you ended your Chairship?
4       A.  Okay.  So when I came in, let me try to think
5  who was there.
6       Q.  And if I didn't say it, I meant female
7  faculty.
8       A.  I understand.
9            I believe, but I'd have to go back and
10  look at the exact roster, that when I came in, we had
11  four faculty members.  And I would have to go through
12  the website to count them now; but my guess is that
13  today we have roughly double, if not more, that number
14  faculty members.  During that process, during my tenure
15  one of the original four left; and of the ones that I
16  recruited, at this point, all of them seem to be on our
17  faculty.
18       Q.  Okay.  All the female faculty that have been
19  hired since you've been the Chair are still faculty at
20  UT?
21       A.  I believe that that's correct.
22       Q.  Okay.  And I'm not trying to "gotcha" or
23  anything, but I think I know that some female faculty
24  members have left.  Is it just the one that left that
25  had been here before you got here?

19

1       A.  That's my recollection.  When I arrived --
2  when I arrived, there were four female faculty members.
3  The only one that left was Professor Miryung Kim.
4       Q.  Okay.
5       A.  I don't recall any other female faculty member
6  leaving; and, you know, if my memory's failing me,
7  please correct me.
8       Q.  No, I'm just asking.
9            Okay.  So -- and Professor Kim, she was
10  an Assistant Professor, not tenured?
11       A.  That's correct.
12       Q.  And she went up for tenure, but received a
13  negative vote; is that right?
14       A.  No, that's not correct.  She went up for
15  tenure.  The vote that she received was viewed as
16  potentially weak by the Dean, the then Dean, an
17  Associate Dean; and then they relayed the information to
18  us.  And then we huddled back and discussed it and she
19  decided to withdraw the case.
20       Q.  Okay.  And the weak vote was at the Budget
21  Council level?
22       A.  Yes, the weak vote was at the Budget Council
23  level.
24       Q.  Okay.  So Professor -- or Dr. Kim withdrew her
25  candidacy at that point, and it didn't go to the college

20

1  vote level?
2       A.  She withdrew it somewhere between the time
3  that the department was done with the case and before
4  the college got a chance to officially vote on the case.
5       Q.  Right.  And was she up early?
6       A.  I honestly don't recall.  I presume that she
7  may have been up early because if she wasn't up early,
8  we probably would not have been able to withdraw her
9  case.  We would have been forced to go with the whole
10  process.
11       Q.  Because it would be her one and only chance to
12  go up?
13       A.  That's correct.  So I'm making an assumption,
14  but it's probably correct.
15       Q.  Is your assumption also that -- well, no.
16  I'll leave it.
17            Okay.  Do you recall -- so I understand
18  there's a two-step process at the department level
19  where, in the academic year prior to submitting the
20  dossier for promotion, that there's a Budget Council
21  vote as to whether or not the faculty member should be
22  put up for promotion; is that correct?
23       A.  That's correct.  The Budget Council -- again,
24  that's sort of my understanding -- is the only body
25  within UT that can decide whether we can put someone

21

1  forward for promotion or not, the exception being that
2  if that person is in their up-or-out year, then even if
3  the Budget Council votes not to put that person for
4  promotion, we will still go ahead and put that person
5  for promotion.
6       Q.  Okay.  And so the first vote for Dr. Kim, I
7  understand from prior testimony, or -- well, I
8  understand that the Budget Council vote was strong --
9  strong in support of her candidacy for Step 1 before it
10  became a weak vote in support of her promotion at
11  Step 2.  Is that your memory?
12       A.  I have no recollection of the votes, what they
13  were.  I have a recollection of, you know, what happened
14  in the second vote and the result of what happened, I
15  mean, the result of the weak vote; but I have absolutely
16  no recollection of the first vote.  And I would have to
17  go back and try to find the exact vote and the record
18  that we have of that vote to be able to answer your
19  question.
20       Q.  Okay.  And did you ever advise her one way or
21  the other as to whether or not she should go forward
22  prior to the Step 1, I guess?
23       A.  I was a strong supporter of Dr. Kim and we
24  stayed in touch after she left and then she kept -- you
25  know, she kept me abreast of all her developments.  So I

22

1  was a great fan of her and of her work and I don't
2  recall exactly what I may or may not have said given;
3  but given that I was a great fan of her -- of hers, I
4  presume that I did encourage her to go forward when she
5  did.
6      Q.  Would it be accurate to say that no matter how
7  much of a fan you are of a faculty member, you would not
8  advise them to go up if you felt that their chances were
9  weak?
10     A.  When we're going up for true early cases --
11  true early cases are when you go up for tenure and you
12  count the number of years that you have served in rank
13  at any institution, it's lower than what the expectation
14  is.  Then, you know, if we're doing something like that,
15  then at that point, I am not a risk taker.  I mean, we
16  take educated risks.  So I would make sure that the case
17  that would go up would be an extremely strong case and
18  that no one would be able to poke a hole into this
19  particular case.
20     Q.  Because, as you understand it, if a case is
21  early, true early, like you said, that it is put to a
22  higher bar than someone who is not true early?
23     A.  Different people have different perspectives
24  on the bar issue.  I am one who, my perspective on this,
25  which may not be the perspective of the rest of my

23

1  colleagues, may not be the perspective of the Dean, you
2  know, or anyone above the department that is involved in
3  that decision, my own perspective is that the bar is the
4  bar, that the bar doesn't change.
5      However, I think there is near unanimous
6  consent or agreement -- not consent -- agreement that if
7  someone is put up for promotion early, true early, then,
8  this is like giving that person an award; and you don't
9  get an award for just meeting the bar.  So you get an
10  award for far exceeding the bar, the same way that you
11  get an award, you know, a professional award because you
12  far exceed expectations.  So that's the way we have
13  looked at it; and at least that part, no one disagrees
14  on that aspect of early promotion.
15     Q.  Okay.  And just to be clear, the expected time
16  period that you referenced before -- you didn't put a
17  number on it -- but I believe that's six years, correct?
18     A.  For UT it's six years.  At different
19  universities it's different numbers.
20     Q.  Okay.  And -- but when you were talking about
21  that and you were talking about the expected time period
22  at UT and the prior institutions, the number that you
23  know to exist is six years?
24     A.  Right, that's the number that we use within
25  UT; and that's the number I was referring to.

24

1      Q.  Okay.  Because we are talking about UT?
2      A.  Yeah.
3      Q.  Okay.  And you've actually seen that -- what
4  you just explained about true early and meeting the
5  six-year requirement, you've seen that put in play over
6  the years that you were the Chair since 2010, correct?
7      A.  Correct.
8      Q.  Have you -- have you seen anyone other than
9  Dr. Nikolova be placed at the higher bar, even though
10  she wasn't true early?
11         MS. HILTON:  Objection, form.
12     A.  I don't believe that Professor Nikolova was
13  put at a higher bar than others in this particular case.
14     Q.  (BY MR. NOTZON)  So you believe she was
15  assessed in her tenure process at the same tenure
16  promotion qualification bar as someone that had done all
17  six years at UT?
18     A.  That's my belief.  Others may disagree; but
19  that's my belief based on all the documents that I've
20  seen from her case and based on the discussions with
21  some people, you know, the people that I had a chance to
22  talk to.
23     Q.  Okay.  And who are those people?
24     A.  Those people would be my colleagues and would
25  be the Dean.

25

1      Q.  Okay.  And the Dean -- other people in the
2  Dean's Office?
3      A.  Other people in the Dean's Office aren't
4  involved in the decision, so I wouldn't -- I mean, they
5  wouldn't opine on this and I wouldn't seek their views
6  on what was and, you know, what their impressions were.
7      Q.  They wouldn't opine, or you wouldn't give it
8  much credence?
9      A.  No, they wouldn't opine because this is not
10  their job.  They're not involved in it.  So, no, the
11  promotion process is very well documented.  The case
12  after the department goes to the college.  In the
13  college there is a committee that looks at it.  It's
14  made up of professors drawn from all the departments in
15  the college.  They are the ones who make the initial
16  decision -- or recommendation, not decision.  That
17  committee is sworn to secrecy.  So I have no clue, no
18  inkling what went into their discussions.
19         And then the next step is the Dean, and
20  the Dean is someone I spoke with about this case.  And
21  my assessment from the discussions with her is that she
22  really used -- you know, regardless of what she wrote in
23  her letter, that, in fact, she was applying the same
24  standard that she would have applied otherwise.
25         The committee that goes after that, the

26

1  Presidential Committee, in this particular case I had no
2  particular interaction with that committee.  There are
3  cases where I may be called to speak with that committee
4  and then I have a sense of where they stand, but in this
5  case I didn't.  And so I have no clue what transpired in
6  their deliberations or what they were thinking.
7      Q.  Okay.  Whether you talked to the P&T Committee
8  at the college level or not, you know what their vote
9  was, correct?
10     A.  I know what their vote was, but I also know
11 that --
12     Q.  I'm just asking one question at a time.
13     A.  Okay.
14     Q.  Okay?  Because I'm going to follow up.  All
15 right?
16         So you know what their vote was you said?
17 Yes, right?
18     A.  Right.
19     Q.  Okay.  And you also know what the P&T
20 Committee's vote was on prior candidates that have gone
21 up from your department, correct?
22     A.  Correct, but that's meaningless because the
23 committee differs from year to year.
24     Q.  Okay.  You still have expectations, don't you?
25         MS. HILTON:  Objection, form.

27

1      A.  In what sense?  I mean, can you clarify what
2  you mean by this?
3      Q   (BY MR. NOTZON)  Sure.  I believe you said you
4  make educated guesses.  You don't take all-out risks.
5  You make educated guesses based upon the prior
6  performance of the candidates that you've sent through,
7  correct?
8      A.  I make these educated guesses.  I don't
9  optimize these guesses on what I expect that particular
10 committee to do, vote, or say, or what they actually may
11 put in the first draft of the Dean's letter.  I optimize
12 on my understanding of what the Presidential Committee
13 will or will not do.
14     Q.  Because that doesn't change?
15     A.  Because that committee is the committee that
16 ultimately makes the decision.  If we all said "no," the
17 Presidential Committee could say, "Yes, promote."  And
18 if we all say, "Yes," the Presidential Committee could
19 still say, "No."  They are the ultimate decision makers.
20     Q.  Could you answer my question, though?
21     A.  I thought that I answered your question.  So
22 if I didn't, then I misunderstood your question.  So if
23 you can clarify, that would be great.
24     Q.  Yes, sir.  The question is:  Does the
25 President's Committee change?

28

1      A.  The President's Committee stays with the same
2  composition, normally, for a number of years because
3  it's made of the President, the Provost, the Vice
4  President of Research, the Dean of undergraduate school,
5  and the Dean of the graduate school; and these positions
6  don't change from year to year.  They will change over
7  time, but they're not going to change from year to year.
8      Q.  Okay.  And the P&T Committee changes every
9  year?
10     A.  The P&T Committee changes.  I don't know
11 exactly how it changes.  I haven't kept track of that.
12 Normally, people from our department serving on it
13 would serve for two years, so I would presume that
14 maybe roughly half of it would change from year to year.
15     Q.  Okay.  And so there is at least some
16 portion -- you're estimating half -- that remain from
17 the prior committees, so that there's a running,
18 historical reference that would exist in the committee?
19     A.  Half of the committee will remain on the
20 committee; but as I'm sure you're aware of, once you
21 have a new committee, even if half of it remains from
22 the previous year, there's a new dynamic.  And depending
23 on who you're getting on the committee, how vocal they
24 are, et cetera, things change.
25     Q.  And, also, things -- institutional memory on

29

1  those people that stay would be there to assist the
2  committee in their deliberations?
3          MS. HILTON:  Objection, form.
4      A.  Committees are made of human beings.  Human
5  beings react differently to different human beings.  So
6  even if in principal what you're saying might be the
7  goal for keeping half of the committee unchanged,
8  there's no guarantee that this would happen.
9      Q.  (BY MR. NOTZON)  Right.  But it does exist in
10 the committee, correct?
11         MS. HILTON:  Objection, form.
12     A.  The only thing that exists in the committee
13 that I can, you know, take into account is the fact that
14 half of the committee hasn't changed.  Anything beyond
15 that would be speculation on my part and, you know, I'm
16 not in that business.
17     Q.  (BY MR. NOTZON)  I don't mean to quibble with
18 you about it too much; but if half remained -- if your
19 estimate's correct, some portion, half -- you don't have
20 to guess that they have an institutional memory that
21 they retained, do you?
22         MS. HILTON:  Objection.  Objection, form.
23     A.  What do you mean by "institutional memory"?
24     Q.  (BY MR. NOTZON)  Their own memory of what
25 happened in their prior existence.

30

1    A.  They have their own memory, but then there is
2  the other half of the committee.  The cases are not
3  identical.  Each case is different.  The dynamic within
4  the committee is going to be different.  This has
5  nothing to do with the Promotion and Tenure Committee.
6  Any committee that you may have served on behaves that
7  way.  I've seen it in all sorts of committees.  I've
8  seen it within the P&T.  We are human beings.  The fact
9  that you remember what you did last year doesn't mean
10  that -- you know, that the committee will necessarily
11  anchor on what you did last year.
12        MR. NOTZON:  Objection, nonresponsive.
13    Q.  (BY MR. NOTZON)  I'll leave it, but -- because
14  I didn't ask all that.  But that's all right.  If you
15  don't want to answer my question, then I'll move on.
16        Did Professor Kim, before she left -- I
17  mean, Dr. Kim, before she left, did she communicate to
18  you that she had any complaints in the way she was
19  treated by anyone on the faculty at UT?
20    A.  Yes, she did.
21    Q.  And which faculty member did she complain
22  about?
23    A.  Professor Yale Patt.
24    Q.  And did that complaint involve her gender at
25  all?

31

1    A.  Yes.  Professor Yale Patt had a long history
2  of what I would call gender-related complaints.
3    Q.  Gender/sexual?
4    A.  I am not aware of the sexual part, but I'm
5  aware of the gender ones.
6    Q.  Okay.  So treating women differently than men?
7    A.  Correct, treating women differently than men
8  and beyond that.
9    Q.  What's the "beyond that" part?
10    A.  The "beyond that" part is making comments that
11  are inappropriate, you know, things of that nature.
12    Q.  Okay.  Sexual comments?
13    A.  Again, I'm not aware -- and maybe at some
14  point something came to my attention that I don't
15  remember right now; but the ones that I remember were
16  demeaning comments that he made, not of a sexual nature.
17    Q.  Okay.  And Dr. Kim's complaint about
18  Professor Patt, were they just comment related; or was
19  it something more?
20    A.  They were related to the way he behaved with
21  her after the vote, and I presume that -- and this is
22  just an assumption -- that someone may have relayed to
23  her potential comments that he might have made during
24  the deliberations.
25    Q.  Can you be more specific other than that?

32

1    A.  I don't remember.  I'd have to go back to
2  the -- you know, the feedback that you collect with the
3  votes.
4    Q.  And did professor -- did Dr. Kim complain
5  directly to you, or did you just learn of her complaint?
6    A.  No, she complained directly to me; and I had
7  sort of the same view of the state of affairs as she
8  did.
9    Q.  That Professor Patt was engaging in some sort
10  of misconduct?
11    A.  That Professor Patt was, yeah, engaged in
12  inappropriate conduct; and I asked Professor Patt to
13  stop communicating with Professor Kim.
14    Q.  And that was the end of it?
15    A.  That was the end of it, yes.
16    Q.  So neither you nor Dr. Kim reported Dr. Kim's
17  complaint about Professor Patt to any --
18    A.  No, that was reported to the Dean.
19    Q.  Okay.
20    A.  So it went up the chain.  So everybody was
21  aware of this, and Professor Patt was disciplined
22  several times during that time period.
23    Q.  Okay.  Was there an investigation conducted?
24    A.  There were investigations that were conducted,
25  yes, at different times with Professor Patt during that

33

1  timeframe.
2    Q.  All right.  And Dr. Kim left after she
3  withdrew her candidacy; is that correct?
4    A.  That's correct.
5    Q.  How long after she withdrew the candidacy did
6  she leave?
7    A.  I'd have to go back and look at that exactly
8  what happened when.  My best recollection -- and my
9  recollection may be incorrect -- was that she would have
10  left the year after.  So instead of going up for
11  promotion the year after, she then went to UCLA.
12    Q.  Okay.  So she finished out that academic year?
13    A.  That's correct.
14    Q.  Okay.  Because she would have withdrawn her
15  candidacy in the fall semester, correct?
16    A.  That's correct.
17    Q.  And have you kept up with Dr. Kim?  I think --
18  I thought you said -- did she make tenure at UCLA?
19    A.  Yes, she made tenure at UCLA.  And for -- I
20  mean, in the last few years I haven't been in touch with
21  her; but for a number of years, she kept me abreast of
22  her accomplishments, et cetera, so we were in touch.
23    Q.  Okay.  Who was the first faculty -- female
24  faculty member that you hired as Chair?
25    A.  That I hired as Chair?  What do you mean by

34

1  that?
2      Q.  After you became Chair, who was the first
3  female faculty member that was hired by the University
4  of Texas in your department as a subordinate to you?
5      A.  As a subordinate, well, all the faculty
6  members that were hired were reporting to me.  So if
7  that's what you mean by "subordinate," then they were
8  subordinate to me.
9      Q.  You didn't hear my question.  Let me try it
10  again.  After you became Chair, who was the first female
11  faculty member that was hired by the University of Texas
12  to work in your department, ECE, as your subordinate?
13      A.  I'm not getting what you mean by
14  "subordinate."  Do you mean somebody on the management
15  side of the department, or do you mean a faculty member?
16      Q.  A faculty member, Assistant Professor or
17  higher.
18      A.  There are a number of female faculty members
19  that were hired.  I don't know -- I mean,
20  Professor Nikolova may have been the first one.  Again,
21  I'd have to go back and look.
22      Q.  Okay.  You don't know?
23      A.  I don't remember.  Not, I don't know; I don't
24  remember.
25      Q.  If that's your answer, that's fine.  Okay?  I

35

1  just want to make sure you understand.  I'm looking for
2  the first one, and you don't remember.  Okay.
3          Go ahead and name the female faculty
4  members that were hired to work in your department after
5  you became Chair, whether you remember the order.
6      A.  In order for me to do this, you'll have to
7  allow me to go on our website and look at the list; and
8  I'll tell you who they are.  I mean, I probably won't
9  have an exhaustive list.  I don't quite remember who
10  everybody, and I will miss a lot if you're asking me to
11  list them.  And I absolutely don't remember the order in
12  which they were hired.
13      Q.  I thought you said there was only about four
14  or five of them hired?
15      A.  Yes, there may be more.  I mean, I have to go
16  back and look at the website to ascertain just how many
17  were hired.
18      Q.  Just give me your memory right now.
19      A.  So Nikolova was one.  Hao Zhu was another.
20  Jean Anne Incorvia was a third.  Diana Marculescu was a
21  fourth.  And I'm probably missing one or two.  So I
22  really have to go back to the website to -- well, Kim
23  was Number 5.
24      Q.  I thought you said she was here before you got
25  here?

36

1      A.  There was another Kim.
2      Q.  Oh.
3      A.  You know, there are many Smiths and many --
4  you know, I don't know -- you know, many people that
5  have your last name.  There are many people who have the
6  last name Kim as well.
7      Q.  Right.  I understand.  So there's a new
8  Professor Kim, female Professor Kim?
9      A.  There is a new female faculty member, Kim; and
10  there may be others.  I mean, I -- you know, it's been a
11  while since -- I am not in department.  I'm on leave, so
12  it's not like I see them every day.  I mean, I've been
13  away for a while.  So I don't -- I really would have to
14  go back to the website to count.
15      Q.  Okay.  So I didn't realize you were on leave.
16  So when did you go on leave?
17      A.  Normally, when you finish an administrative
18  stent, you are allowed to take a sabbatical; and that is
19  what I am on.  I'm on leave at this point.
20      Q.  Okay.  And when did you start that leave?
21      A.  I started that leave on December 1st --
22  officially on December 1st, when my successor took over.
23      Q.  Okay.  And how long is your sabbatical going
24  to last?
25      A.  My sabbatical will last through the end of

37

1  this year.
2      Q.  Okay.  So a year and a half of academic years?
3      A.  It's -- it will be more like two years by the
4  time I'm done.
5      Q.  Okay.  Because we just passed one year, right,
6  in December?
7      A.  That's correct.
8      Q.  And then at the end of this year -- so you
9  will start teaching in the Fall of '21?
10      A.  No, I'll start teaching in the Spring of '22.
11      Q.  Okay.  And you went through the names that you
12  remembered very quickly.  I wasn't able to catch them --
13  I don't know if the court reporter was -- but could you
14  go through that list again for Hao Zhu, Marculescu...
15      A.  Hao Zhu, Diana Marculescu, Evdokia Nikolova,
16  Kim -- I don't remember her first name -- Jean Incorvia;
17  and I'm probably missing one --
18      Q.  Okay.
19      A.  -- maybe more.
20      Q.  Okay.
21      A.  Oh, Thomaz.
22      Q.  Andrea?
23      A.  Andrea Thomaz.  I mean, I'd have to -- I mean,
24  if you give me -- I mean, either you allow me to go to
25  the website and I'll give you the exact number or I'll

---

**38**

1  have to take ten minutes and try to run through each
2  area in the department because I basically -- oh, there
3  was another one more in electromagnetics. I'm sorry. I
4  mean, I have problems at this point with names. I can
5  see her face, but my -- my -- her name escapes me. So
6  there are at least seven that I hired.
7      Q. We can -- when we take the next break, or the
8  first break, you're free to do that; and that's fine.
9  And then we can get that list from you.
10     A. Okay.
11     Q. I'm not trying to deny you. I just, you know,
12 don't want to break unnecessarily. Okay?
13     A. Yeah, that's fine.
14     Q. Okay. And the court reporter would love it if
15 you wrote the names in the chat so that she'd have the
16 spellings?
17     A. Okay.
18     Q. And you can do that before we go back on.
19 It's up to you.
20     A. Okay.
21     Q. Now, were you involved in the hiring of all of
22 those people that you've listed so far?
23     A. Yes.
24     Q. Okay. So I'm going to shift slightly to,
25 instead of hiring of females, to the females that have

---

**39**

1  gone up for tenure since you've been Chair.
2      A. Okay.
3      Q. Can you give me the list of those that you
4  remember; and if you don't remember anymore, that's
5  fine. But it's up to you how you --
6      A. I actually would have to go back again and
7  look at the roster. So, obviously, I remember
8  Professor Nikolova; but a lot of people went up for
9  promotion during my time. And so I would have to look
10 at the specific list of faculty members that -- first of
11 all, are you asking from assistant to associate or
12 associate to full?
13     Q. Just assistant to associate, yeah, just
14 because I don't want to get into something that I don't
15 think is necessarily relevant to our case.
16     A. Then highly likely -- and, again, I'll have to
17 go back and look -- that the only case was
18 Professor Nikolova.
19     Q. What about -- oh, okay. The --
20 Professor Heidari, wasn't in your department?
21     A. Yes, Professor Heidari is not in my
22 department.
23     Q. Okay. So just Dr. Nikolova went up, while you
24 were the Chair, from assistant to associate?
25     A. Right, she's the only one who completed the

---

**40**

1  process.
2      Q. Okay.
3      A. Very likely. Okay? I mean, again, I'd have
4  to go back and at least look at, you know, who's on the
5  website to remember.
6      Q. Please do.
7      A. Yeah.
8      Q. Please do. And, of course, that's -- Kim did
9  go up, but not all the way through?
10     A. Technically, Kim did not go up because she
11 withdrew her case; and it didn't go through the college.
12     Q. Okay. Was there anybody else that, like Kim,
13 Miryung Kim, started the process but withdrew?
14     A. I'm sure there are others in other
15 departments, but I don't remember in our own department
16 whether -- I honestly don't remember. And, again,
17 that's not -- that's not something that I would remember
18 by looking at a website. I mean, I would have to look
19 back in more details in other things.
20     Q. And just to clarify, I was just asking about
21 your department while you were the Chair.
22     A. Yeah, as I just said, I mean, I don't
23 remember; and it would take me more than just looking at
24 a website to remember that.
25     Q. Okay. You don't think you would remember a

---

**41**

1  female faculty member, while you were Chair, that went
2  up for tenure but withdrew, like Kim?
3      A. That's not the question that I heard from you.
4  I mean, I heard the question: Did anybody go up for
5  promotion and withdraw their case? You didn't say
6  "female." If you specifically are asking about female,
7  then, yes, Professor Kim was the only female faculty
8  member that went from assistant to associate and
9  withdrew her case.
10     Q. Thank you for the clarification, and I
11 apologize if my question was not well tailored.
12     MR. NOTZON: Let's -- let's go ahead and
13 take a break. It's almost an hour that we've been going
14 and you're free to look at the website and, of course,
15 you know, make sure you're comfortable and just come
16 back when you're ready.
17     THE WITNESS: Okay.
18     THE REPORTER: We're going off the record
19 at 10:57 a.m.
20     (Off the record from 10:57 to 11:15 a.m.)
21     THE REPORTER: We're back on the record
22 at 11:15 a.m.
23     Q. (BY MR. NOTZON) Okay. Back from the break.
24 And, Professor Tewfik, I see that you put up seven names
25 in the chat. Is that the -- are those names accurate

42

1  for the female faculty that were hired by ECE while you
2  were the Chair?
3      A.   Yeah, that's the best that I could do during
4  the break.
5      Q.   Okay.  Thank you for doing that.
6          Could you just go ahead and read the
7  list -- or I'll read it; and then you can confirm that
8  I've read it correctly, although, the pronunciations
9  might not be accurate.  Jean Anne Incorvia, Hyeji Kim,
10 Diana Marculescu, Evdokia Nikolova, Emily Porter, Andrea
11 Thomaz, and Hao Zhu?
12     A.   That's correct.
13     Q.   Okay.  And it looks like those are in
14 alphabetical order; is that correct?
15     A.   Yes, it looks like they are in alphabetical
16 order.
17     Q.   Okay.  They're not meant to have been put in
18 temporal order, correct?
19     A.   That's correct.
20     Q.   Okay.  Did you determine when they were hired
21 when you looked, or did you not?
22     A.   No, I didn't and I don't recall that
23 information and I couldn't have done that by just
24 looking at the website.
25     Q.   No problem.  I believe I have a chart that

43

1  shows when they were hired.  Let me read the years that
2  they started.  I won't identify whether it was January
3  or, you know, the Spring Semester or the Fall Semester,
4  but just give the year and see if that rings a bell for
5  you.  Okay?
6      A.   Okay.
7      Q.   Nikolova and Kim in '14, and this is the right
8  Kim, the second Kim.
9      A.   The second Kim could not have been hired in
10 '14.
11     Q.   Oh, okay.  When do you think it was?
12     A.   Much later, because, as I was transitioning or
13 handing off the reins of the department to my successor,
14 we were having problems with her visa.  So she couldn't
15 have been hired in '14.
16     Q.   Okay.  So it was more -- more recently?
17     A.   Yeah, probably '18 or '19.  Probably '18 and
18 that she couldn't have -- I mean, she didn't join -- for
19 sure, in the Spring of '19, I was dealing with her visa
20 issues.  She was -- I think she -- my vague recollection
21 is that she was supposed to start in '19 due to visa,
22 and then it slipped.
23     Q.   Okay.  Let's see.  I see a Kim listed.  Maybe
24 it's a different spelling.  H-Y-U-N, next word, J-U-N-G.
25 Is that a third Kim?

44

1      A.   I don't know what you're talking about.  Who's
2  that Kim?  Where are you getting this name?  Where did
3  you get your information?
4      Q.   Oh, I see.  It's not an ECE Kim.  It's a
5  different department.  So never mind.
6          All right.  Moving on, Thomaz, 2016, does
7  that sound accurate?
8      A.   I mean, given that you got the first one so
9  wrong, I can't confirm any of your numbers, basically,
10 so.
11     Q.   I got Nikolova correct, so you should at least
12 give me credit for that.
13     A.   Actually, I -- you know, again, without me
14 looking back at her dossier, I wouldn't even give you
15 credit for that.  I would have to confirm.
16     Q.   Okay.  So if I said '17 for Hao Zhu, '18 for
17 Incorvia, and '19 for Porter, you'd have the same
18 answer?
19     A.   Yeah.  You know, I wouldn't be able to confirm
20 any of your numbers.
21     Q.   Okay.  Did any of those women that were hired
22 besides Dr. Nikolova, of course, have prior teaching
23 experience at other universities as assistant professors
24 before they started at UT?
25     A.   Sorry.  I mean, this is a Zoom thing.  I lost

45

1  you.
2      Q.   Oh.
3      A.   What I got is, "Did any."  And then I didn't
4  hear the rest of it.
5      Q.   Okay.  I'll restate it.
6      A.   Okay.  Thank you.
7      Q.   Yeah, yeah, anytime, please; and I will do the
8  same, of course.  We have to work with technology, not
9  in spite of it.
10         So the question is:  Did any of the six
11 women that were hired to the faculty while you were the
12 Chair in ECE, other than Dr. Nikolova, did they have
13 prior teaching experience as assistant professors at
14 other universities?
15     A.   So several of them came in with teaching
16 experience, and some may have.  I would have to confirm.
17 So Andrea Thomaz was an associate professor at Georgia
18 Tech.  Hao Zhu was an assistant professor at Illinois.
19 Yeah, Marculescu was a professor at TMU.  Emily Porter
20 may have had teaching experience.  I can't quite
21 remember because she had a special position where she
22 was.  To the best of my recollection, Jean Anne and
23 Hyeji Kim didn't have prior experience.  They may have
24 taught a course while post-doc'ing somewhere, but I
25 don't remember that.  You know, this was not a factor --

Ahmed Tewfik - 3/20/2021

46

1  or, you know, it didn't stick in my mind that they had
2  prior experience.
3      Q.  Okay.  And it could be my hearing.  Did you
4  say that Thomaz had associate professor?
5      A.  Yes, Thomaz was an associate professor.  She
6  may have been an assistant, promoted to associate, a
7  fresh associate.  Anyway, she came -- you know, the year
8  she was hired, she was hired the same year as Dan
9  Wasserman -- that's my recollection or about, you know,
10 maybe plus or minus one year -- and one of them or both
11 of them were going through promotion at their
12 institution; and then we matched that promotion.  So,
13 you know, she may have been an assistant and then an
14 associate at UT; or she may have been an associate and
15 an associate at UT.
16     Q.  Okay.  And so just to clarify, professor
17 Thomaz was hired as tenured; she didn't have to go
18 through the tenure process at UT?
19     A.  That's correct.
20     Q.  Okay.
21     A.  But that meant that -- sorry; maybe I -- the
22 process for hiring her was as rigorous as the process
23 that we normally do for promotion.
24     Q.  Okay.  So the Department, the Budget Council
25 had to vote on her.  The Tenure & Promotion Committee

47

1  had to hire; the Dean had to write a letter, et cetera?
2      A.  Yes, and we had to have more reference letters
3  and -- so yes.  Yes to your -- your question.
4      Q.  Okay.  All right.  I wanted to go back to
5  Dr. Miryung Kim for a short bit.  You had said that she
6  had complained about comments that had been made and
7  other things that Professor Patt had done, and I wanted
8  to go over:  Was there any other complaints she had
9  besides against Professor Patt?
10     A.  Okay.  The only thing that I said specifically
11 is that she complained about interactions after the
12 vote; and that's the only thing that, because I reacted
13 to it, that sticks in my mind.  She may have had
14 complaints before that.  A lot of faculty members have
15 had complaints about Professor Patt, as well as
16 students; but I don't -- you know, I don't remember when
17 and how.
18     Q.  Okay.  So sitting here today, your memory is
19 that Dr. Kim was only complaining about Professor Patt
20 after her vote?
21     A.  That's not what I said.
22     Q.  Oh.
23     A.  What I said is what stuck in my mind is the
24 complaint that happened after the vote --
25     Q.  Oh.

48

1      A.  -- because this was an unusual situation; but
2  she could have, and likely may have, like many other
3  faculty members -- or the four faculty members that we
4  had in the Department, like other students who
5  complained about him.  And this is what triggered, as I
6  mentioned earlier, investigations and disciplinary
7  action.
8      Q.  Okay.  And those investigations occurred after
9  the vote?
10     A.  Some investigations actually occurred before
11 the vote, and others occurred after the vote.
12     Q.  Okay.
13     A.  He had a long history of investigations and
14 disciplinary actions.
15     Q.  I'm trying to understand where the "after the
16 vote" comes in.  Does that "after the vote" come in as
17 the point at which she came to you and conveyed to you
18 what her complaint was?
19     A.  She -- again, as I said, she may have
20 complained in the past about other things that may have
21 happened.  I don't recall those because there are so
22 many complaints that we got about him.  The only thing
23 that I recall vividly is the complaint after the vote.
24     Q.  Okay.  Her complaint to you?
25     A.  Her complaint to me after the vote, because --

49

1      Q.  Okay.
2      A.  Okay?  Because that's what stuck in my mind.
3      Q.  Okay.  I'm sorry for being dense.  It's just
4  I'm trying to make sure I understand.
5          So you recall what her complaints were to
6  you -- what her complaints -- what the comments were
7  that she was complaining about?
8      A.  No, I don't recall what the comments were.  I
9  recall that she complained, and I recall that I asked
10 Yale Patt to stop communicating with her.
11     Q.  And other than the comments from Doctor --
12 Professor Patt that she had conveyed to you, did she
13 convey any other complaint about anything to you at that
14 time?
15     A.  Again, this is the complaint that I remember.
16 I don't remember her complaining about something else,
17 so.
18     Q.  Okay.  And are you aware of who Dr. Kim
19 complained to other than you?
20     A.  No, I'm not.
21     Q.  Are you aware if she made a complaint outside
22 of the department to the -- again, OIE or HR or some
23 other entity?
24     A.  I just answered that I'm not aware of any
25 interactions she's had outside of the department.

50

1      Q.   Okay.  Did you have any discussions with any
2  of the members of the faculty about Dr. Kim's complaints
3  of the ECE?
4      A.   The way I addressed this was through the
5  training that I asked all the faculty members to take.
6      Q.   You responded to her complaint by asking that
7  additional training be taken?
8      A.   That's correct.  I asked that everybody
9  partake in the training.
10     Q.   Male and female?
11     A.   Male and female.
12     Q.   Okay.  And who provided that training, if you
13 can recall?
14     A.   I think I answered this question before the
15 break.
16     Q.   I just didn't know if your memory was
17 refreshed by this discussion.
18     A.   My memory wasn't refreshed by this discussion.
19     Q.   Okay.  So, again, I just don't know if I got an
20 answer to this question.  Did you have any discussions
21 with any members of the faculty about Dr. Kim's
22 complaint?
23     A.   Again, I answered this question by telling you
24 that the way I addressed this was by bringing the
25 training in.

51

1      Q.   See, that doesn't answer the question for me.
2  My question is:  Did you discuss with specific members
3  of the faculty or groups of the faculty Dr. Kim's
4  complaint?  And that's --
5      A.   I don't -- I don't recall that I discussed
6  this.  I may or may not have.  You know, we don't engage
7  in idle chitchat about these topics.  If there's a
8  problem, you address the problem; and you address it the
9  most effective way.
10     Q.   So it would be accurate, I think, from your
11 testimony, that the entire faculty knew that Dr. Kim had
12 made a complaint, at least one?
13     A.   I did not say that.  The only person who knew
14 that there was a complaint was Professor Patt because
15 Professor Patt was told explicitly not to communicate
16 again with Professor Kim or actually any other female
17 member on our faculty.
18     Q.   Okay.  Well, let me ask it a different way.
19 Did any other faculty member come to you expressing
20 concerns about Dr. Kim's complaint?
21     A.   I don't recall any other faculty member coming
22 to me.  It may have happened.  I don't recall.
23     Q.   So before the break, I was asking you about
24 the -- whether or not Dr. Nikolova was put to a higher
25 bar, and you said you don't believe she was.  And I

52

1  wanted to ask you if you felt that she was qualified to
2  receive tenure based on the normal bar of the six-year
3  bar that she qualified for using both her A&M and UT
4  years of teaching?
5      A.   You're asking about my personal assessment?
6      Q.   Personal/professional, yes.
7      A.   My personal/professional assessment was that
8  she was somewhere close to the bar.  She might have been
9  slightly under the bar or slightly above the bar.  She
10 might have just passed the bar.
11          On the other hand, my own personal
12 assessment was that she had done excellent work when we
13 were recruiting her; that, you know, her first few
14 semesters that she teached [sic] that she was doing
15 fine; and that, if given more time, she was going to
16 shine again.  And, therefore, I was willing to take a
17 risk and support her case.
18     Q.   Okay.  And so you don't feel strongly that she
19 was qualified for tenure, but enough to push forward?
20          MS. HILTON:  Objection, form.
21     A.   My assessment was probably no different than
22 the assessment of my colleagues or many of my colleagues
23 and the Dean, which is that she's somewhere close to the
24 bar.  Okay.  So she may have been slightly under for
25 some people, slightly above the bar for others; but my

53

1  own assessment is -- was that she had done excellent
2  work before she came to UT and in the first few
3  semesters at UT and that she was going to shine again.
4  And I wanted to make sure that we retained her and give
5  her the opportunity to shine again.
6      Q.   What occurred in the period after the first
7  few semesters that you just referred to that she would
8  shine again?  What was the period of not shining?
9          MS. HILTON:  Objection, form.
10     A.   You know -- again, you know, I didn't review
11 the case here last night; and I've been out for a while.
12 But from her personal circumstances, you know, she
13 formed a family and there are other things that happened
14 that may have slowed her down and that's sort of
15 natural.  And because I knew what she was capable of, I
16 expected her to do it again; and so that's -- that's the
17 position I took.
18     Q    (BY MR. NOTZON)  Okay.  And when you say
19 personal circumstances and starting a family, that's the
20 having the children?
21     A.   You know, having the children, getting to know
22 someone, you know, getting married.  I mean, you know,
23 we go through life; and, you know, some people delay
24 certain decisions and others don't.  And we just have to
25 take that into account.  At least, I believe you have to

54

1  take it into account when passing judgment.
2     Q.  Okay.  Is there anything else other than
3  having the children and getting married that you include
4  in the personal circumstances?
5     A.  For Dr. Nikolova or for other people?
6     Q.  For -- well, for Dr. Nikolova, given that you
7  used that term related to her, yes.
8     A.  These are -- that's what I was aware of.  So
9  if there were other circumstances and she would have
10  shared those with me, I would have factored those in as
11  well.
12    Q.  Okay.  I'm just asking what you had in your
13  mind when you said the term "personal circumstances."
14    A.  That's what I had in mind, yeah, that she was
15  forming a family.
16    Q.  Okay.  So when you say you don't believe she
17  was held to a higher standard, when Dean Wood wrote her
18  evaluation, she went against you.  She went against the
19  Budget Council.  She went against the Promotion and
20  Tenure Committee; and those were very strong votes,
21  correct?
22         MS. HILTON:  Objection, form.
23    A.  So I'd have to give some explanation here.
24  When people go up for promotion, there are written
25  documents; and then there are discussions that --

55

1  verbal, oral discussions that happen.  Departments tend
2  to support their own members.
3         After the case with Dr. Kim, the
4  Department sort of -- you know, if we were going to
5  support someone, then we were going to vote strongly in
6  favor of that person.  We were not going to -- again,
7  there was no other weak vote that I recall since Kim.  I
8  mean, the Department sort of learned a lesson.
9         That doesn't mean that the faculty
10  members of the Department would not have voiced their
11  concerns about the case and that the case is, you know,
12  barely meets the bar in some people's opinion or doesn't
13  meet the bar.  And these verbal concerns would have
14  filtered all the way up.  So that's why I am saying that
15  she wasn't held to a higher bar.
16         The other thing that I know is that,
17  typically, the promotion -- the Promotion and Tenure
18  Committee will draft the first draft of the letter that
19  the Dean writes.  I don't know if that happened in this
20  case or not, but I presume that it may have happened in
21  this case.  And so by reading the letter that the Dean
22  wrote regarding Nikolova's case, I can get a sense of
23  what the Promotion and Tenure Committee really was
24  thinking, even though they voted for promotion.
25    Q.  Okay.  Let me follow up with some questions on

56

1  that answer.  Let's start at the end.  Why do you think
2  the Promotion and Tenure Committee writes the first
3  draft?
4         MS. HILTON:  Objection, form.
5     A.  I can't speculate on this, but that's what I
6  understood from -- you know, from discussions with
7  various people is that -- that's what has been happening
8  for a number of years and stopped at some point.
9  Whether it stopped in '19 or stopped in '18, I don't
10  know --
11    Q.  (BY MR. NOTZON)  Okay.  Well, my --
12    A.  -- but at a recent point.
13    Q.  Okay.  My question still remains:  So you
14  said -- I asked you how you understood that a first
15  draft is created by the Tenure and Promotion Committee,
16  and I understand you're saying you don't know if that
17  was the case or not.
18         I'm asking:  What made you think that was
19  the case; and if you could name names of people or how
20  you got that understanding, that's what I'm after.
21    A.  Because some of our faculty -- some of my
22  colleagues in the department who served on that
23  committee relayed that information to me and to others
24  in the department.
25    Q.  Okay.  And could you name those people?

57

1     A.  One person which you know that he relayed that
2  information to us because it's, I think, in the e-mails
3  that you got is Ananth Dodabalaur.
4         THE REPORTER:  I'm sorry.  Can you repeat
5  the name?
6         THE WITNESS:  So I probably will butcher
7  it, so you'll have -- you will have to go to the website
8  and get the name; but it's "Do," D-O-D-O-B-A- --
9         MR. NOTZON:  Professor, you don't have to
10  spell it now.  We'll get it later.
11         THE WITNESS:  Okay.
12    Q.  (BY MR. NOTZON)  But Ananth is the first name?
13    A.  Yes.
14    Q.  Okay.  And we'll fill in that gap, so.
15         Okay.  Other than Ananth -- and I
16  apologize for the familiarity, but just as a short
17  stop -- did anyone else tell you this?
18    A.  I don't -- and I can't pinpoint a particular
19  person.  I can't give you a particular name, but I know
20  that has come up a number of times.  You know, every few
21  years we have a faculty member serving on the committee;
22  and I probably heard it more than once.
23    Q.  Okay.
24    A.  The only reason I remember Ananth is just
25  because I saw that e-mail recently.

58

1    Q.  So if the P&T Committee did not write the
2  first draft and that was solely from Dean Wood, would
3  that change your answer at all as to their perspective?
4        MS. HILTON:  Objection, form.
5    A.  I -- you know, as I said, I am guessing.  I
6  don't know for sure what their perspective was; but
7  given that -- you know, if they did write the letter,
8  that would give me a sense of what they're thinking.
9  And even if they did not write the letter, I know that
10  they meet with the Dean; and they provide feedback to
11  the Dean, which the Dean then factors in the letter.
12  That feedback is verbal feedback and is not necessarily
13  written -- reflected in the report nor in the vote.
14    Q.  (BY MR. NOTZON)  Would you agree that they
15  would not have the same impetus as the ECE Department
16  Budget Council to make sure they don't have any weak
17  votes on colleagues going up for tenure?
18        MS. HILTON:  Objection, form.
19    A.  I disagree with that because if you look at
20  the statistics of promotion, at least what I recall
21  seeing in promotion both of the assistant and associate
22  professors, almost everybody -- I mean, the percentage
23  of people who are promoted is extremely high; and if I
24  were to compare this with other universities, I would
25  say that in our case, there tends to be rallying around

59

1  our own in supporting promotion cases.
2        MR. NOTZON:  Object as nonresponsive.
3    Q.  (BY MR. NOTZON)  I'm asking -- well, let me
4  ask it a different way.  You have no information that
5  would lead you to believe that the P&T Committee
6  gathered amongst themselves and decided that they
7  weren't going to have any weak votes on candidates
8  coming up for tenure, correct?
9        MS. HILTON:  Objection, form.
10    A.  That's correct.
11    Q.  (BY MR. NOTZON)  Okay.  But you're testifying
12  that the ECE Budget Council came together and decided
13  that they were not going to have any more weak votes on
14  their colleagues going up for tenure after Dr. Kim?
15        MS. HILTON:  Objection, form.
16    A.  Nobody -- that's not what I said.  Nobody gets
17  together.  There's no meeting and people say, "Okay.
18  We're all going to vote for this."  But there is sort of
19  peer pressure.  There is an understanding, and then
20  those are votes.  Okay?  So I can't guarantee that it's
21  going to be a hundred percent vote.  There is no formal
22  agreement between people that we are all going to vote
23  one way, and that would be true, also, of the Promotion
24  and Tenure Committee.
25    Q.  (BY MR. NOTZON)  And what you do know of the

60

1  Promotion and Tenure Committee is that they voted 7/0
2  for -- to promote Dr. Nikolova, correct?
3    A.  I remember there was a strong vote.  I don't
4  remember the number, and I didn't take the time to
5  review the dossier before today.
6    Q.  Okay.  So just to finish the loop, you don't
7  have any indication that the P&T Committee was lukewarm
8  on Dr. Nikolova other than the belief that's unverified
9  that they may have written the first draft, correct?
10        (Simultaneous speakers.)
11        MS. HILTON:  Objection, form.
12    Q.  (BY MR. NOTZON)  You may have walked over each
13  other.  Could you repeat your answer, Doctor?
14    A.  Yes, I did not talk to the committee.  And, I
15  mean -- and I don't know that they wrote the first draft
16  for sure.  So, yes, this is sort of an assumption on my
17  part.
18    Q.  And then going back -- when I said I was going
19  to follow up, I'm following up, again, on that prior
20  answer.  You stated that there were several people in
21  the Budget Council that did not feel strongly about
22  Dr. Nikolova's candidacy for tenure or qualifications
23  for tenure; but they voted for her, anyway, as part of
24  this unspoken feeling that there were going to be no
25  more weak votes after Dr. Kim.  Could you name who those

61

1  people were that were expressing being lukewarm on
2  Dr. Nikolova?
3    A.  No, I could not name names.  I don't remember
4  who said what during the meeting; but I am reasonably
5  confident that if Dr. Nikolova was a man, not a woman,
6  the vote would have been weak.
7    Q.  And why do you have that opinion?
8    A.  Because during the meeting, the issue did came
9  up, you know, we don't have enough female faculty
10  members on the faculty.  We really would like to keep
11  Dr. Nikolova; and in the anonymous comments that we
12  collected, that sentiment also came through.
13    Q.  Did it suggest that -- did those anonymous
14  comments and the comments you received during the
15  discussions of the Budget Council, did they say:
16  Although we know she's not strongly qualified, we still
17  want her because she's a woman?
18    A.  Yes.
19    Q.  And those anonymous comments, were they
20  written down?
21    A.  We collect these anonymous comments with the
22  vote.
23    Q.  Okay.  And did you turn those over to us?
24    A.  I -- I don't know.
25    Q.  Okay.  Are they -- are those anonymous

62

1  comments included in the dossier when it goes up to the
2  P&T Committee?
3      A.  They may or may not have been included.
4  There's no rule that says that they are to be included,
5  and I don't remember whether they were forwarded or not
6  forwarded.
7      Q.  Whose decision would that have been?
8      A.  I mean, the Dean would know -- would be aware
9  of these anonymous comments; and she could have asked
10  that they be included or not.  I mean, if she doesn't
11  ask for them to be included, which they're not supposed
12  to be included, then they would not have been included.
13  If she asked for them to be included, then they would
14  have been included.
15          And that decision is not a per- person
16  decision.  That would be a rule that she would apply to
17  an entire year.  So she might -- like, in 2018, she may
18  have asked that the anonymous comments for everybody be
19  included, or in 2019 she may have done that.
20      Q.  So let me clarify.  You would let her know
21  that there are these anonymous comments and what they
22  were, and then she would then decide to ask for them to
23  be included or not?
24      MS. HILTON:  Objection, form.
25      A.  She would ask -- no.  She would say:  I want

63

1  all of the anonymous comments that we receive for all of
2  the people going up for promotion in a particular year.
3      MR. NOTZON:  Object as nonresponsive.
4      Q.  (BY MR. NOTZON)  My question is:  You said in
5  your prior testimony that she would know of these
6  anonymous comments; and I'm asking the following
7  question, that --
8      A.  You are making an assumption here that she --
9  the way you're phrasing your question, you're making an
10  assumption that she becomes aware of the specific
11  comments and then decides to include them or not include
12  them.  And what I'm telling you is that these are rules
13  that have not been consistently applied in which in a
14  given year she might say, "Please forward all of the
15  anonymous comments that you got," before she would know
16  what these anonymous comments are; in other years, she
17  wouldn't.  And since this is not a UT rule, it really is
18  up to the Dean.
19      Q.  (BY MR. NOTZON)  And you're testifying that
20  you don't recall what you did in this instance?
21      A.  No, I don't recall what we were asked to do in
22  this instance; but you probably know what we did because
23  if you -- I presume that you have her dossier with you.
24  And if it's in the dossier, then it was included; if
25  it's not in the dossier, then it was not included.

64

1      Q.  Okay.  So back to my other question that you
2  didn't answer, which is:  Whose decision is it that the
3  anonymous comments get included in the dossier --
4      A.  I did answer the question because I told
5  you --
6      Q.  Let me finish.
7      A.  I did answer the question.
8      Q.  Let me finish.  Is it just the Dean, or do you
9  have the authority to include them or not?
10      A.  It is just the Dean.  The UT rules are not --
11  do not force us to include them, and we don't include
12  material that we are not asked to include.
13      Q.  Let's go back to when you first met or
14  communicated with Dr. Nikolova.  Did you make contact
15  with her first, or did she make contact with you first?
16      A.  What are you referring to specifically?
17      Q.  The beginning of whenever you first met
18  Dr. Nikolova.
19      A.  I first met Dr. Nikolova, to the best of my
20  recollection, when she came to interview.
21      Q.  Okay.  Do you recall if someone reached out to
22  her to recruit her to come to UT or if she applied to UT
23  for an open position?
24      A.  The way that this works is whenever we have an
25  open position, we ask all our colleagues to reach out

65

1  and ask people to apply or ask people whether they have
2  students that we should be recruiting.  So she may very
3  well may have been approached by one of my colleagues
4  who told her that we're looking for someone and, "Why
5  don't you apply?"
6      Q.  Okay.
7      A.  That does not mean that, you know, she was
8  automatically going to get the position because a lot of
9  people are asked to join the pool that way.
10      Q.  Okay.  So would it be accurate that you didn't
11  contact Dr. Nikolova yourself?
12      A.  To the best of my recollection, that's true.
13      Q.  Okay.  And you met her at an interview, you
14  said, when she came to the campus?
15      A.  Yes.  I would have met her.  I would have
16  attended her talk, and I would have also spent time with
17  her.
18      Q.  And how many other people applied for that
19  position?
20      A.  I have no recollection, and I don't keep track
21  of that.
22      Q.  You're clear it's more than just her?
23      A.  Yes, I'm clear that it's more than her.
24      Q.  Okay.  And when it was time to make the
25  decision on who to hire, you were a part of that

66

1   process; is that correct?
2       A.  That's correct.
3       Q.  Who else was a part of that process?
4       A.  I don't remember the names, but we have a
5   recruiting committee that we put in place every year.
6   So that committee would have been part of the process.
7   The committee makes a recommendation to the faculty.
8   The faculty then gets together and votes on making an
9   offer.  That then goes to the Dean and the Dean needs to
10  endorse that offer or -- and then that would go to the
11  Provost.  And then the Provost would, you know, agree or
12  not agree to make the offer.
13          At the assistant professor level, in most
14  cases, my recollection -- and, again, you need to
15  double-check -- the Dean is delegated to make the
16  decision on behalf of the Provost.  So that may not have
17  gone up to the Provost.
18          In this very specific case, we had made
19  offers to probably at least one other faculty member.  I
20  mean, so there was a search.  The search didn't yield
21  the results; and then we extended the search.  And it
22  was during that extended period that we interviewed
23  Dr. Nikolova.
24      Q.  So there was somebody on campus that was
25  offered the job that turned it down?

67

1       A.  No.  We were recruiting, so that means that
2   that somebody was not on campus.  That somebody was
3   somewhere else.  Whether -- I don't recall the details
4   of that, whether we ended up making an offer and that
5   person just didn't join; or that, you know, while we
6   were making an offer, the person told us that she wasn't
7   going to be able to join.  But the end result is at the
8   end of the recruiting season, we didn't -- we didn't
9   fill that position; and then we extended it.  We
10  extended the search.
11      Q.  Oh, okay.  So Dr. Nikolova wasn't part of that
12  first search process?
13      A.  That's my recollection.
14      Q.  Okay.  And --
15      A.  Okay.  I don't recall whether she applied or
16  was approached during that first stage; but she wasn't
17  selected as part of the first group that we interviewed,
18  so -- or she was approached afterwards.  I have no
19  recollection of that.
20      Q.  You just recall that you don't remember her
21  being a part of that first search?
22      A.  I remember that she wasn't one of the names
23  that surfaced during the first search.
24      Q.  Okay.  And there were multiple people involved
25  there and resulted, like you said, in a single selectee,

68

1   who then turned down that offer, which then put the ball
2   back in the Department's court?
3       A.  That's correct.
4       Q.  Okay.  All right.  And so at what point did
5   you talk to Dr. Nikolova to make her the offer?  Was it
6   after the Dean had approved that?
7       A.  So --
8           MS. HILTON:  Objection, form.
9       A.  -- again, I told you what the process is.  The
10  Recruiting Committee makes a recommendation.  The
11  faculty then votes on that recommendation.  If the
12  faculty approves that, then I go to the Dean; and if the
13  Dean says, "Yes, you can make an offer to Dr. Nikolova,"
14  there is some bureaucratic steps that have to be taken
15  at that point.
16          And then I would normally call the
17  candidate and tell them, "We're going to make you an
18  offer," and start negotiations.
19      Q.  Okay.  So you contacted Dr. Nikolova after all
20  the approvals had happened?
21      A.  At least verbal -- some, you know, votes and
22  written approvals and at least a verbal approval from
23  the Dean.
24      Q.  Okay.  And what do you recall about that
25  communication you had with Dr. Nikolova?  Was it verbal

69

1   or in writing?
2       A.  The first interaction would be verbal.  I
3   would -- typically, I would say, "Okay.  We're going to
4   make you an offer.  Here's the offer.  Here are the
5   broad terms of the offer.  It consists of these things.
6   That's what I need from you.  I'm going to draft an
7   offer letter.  I'll send it to you.  We can then discuss
8   it while it's also proceeding through the bureaucratic
9   channels."
10      Q.  Okay.  And when do you recall her -- or do you
11  recall her expressing an interest in having her time
12  teaching at A&M count toward her probationary clock?
13      A.  I don't recall whether she expressed an
14  interest or not; but whenever I meet with a candidate
15  that is an assistant professor somewhere else or an
16  associate professor somewhere else, I will tell them
17  about the process, what's the promotion and tenure
18  process at UT.  I will tell them that, you know, UT uses
19  a six-year rule.  So you have to stay as an assistant
20  professor for six years.  You have to serve as an
21  associate for six years before UT considers you.
22          I would tell them that we -- as a
23  Department, we would look at the -- you know, your
24  service at a prior institution.  And we would argue
25  that, although technically it's early because it's

Ahmed Tewfik - 3/20/2021

70

1 breaking the UT rules, that, you know, we would like to
2 factor this and push you forward.
3     I would also tell them that there is a
4 difference between the, quote, the technically early
5 cases and the real early cases and that, you know, the
6 real early cases are like an award; and for that to
7 happen, you really have to excel.
8     Q. And this is a communication you have -- you
9 would have with any and every faculty member that you
10 you'd make an offer to?
11     A. This is an communication that I would have
12 with any candidate that we're interviewing who happens
13 to be an assistant or an associate professor somewhere.
14 If that candidate was a post doc or came from industry
15 or, you know, whatever, wasn't a faculty member
16 somewhere else, then the discussion would focus only on
17 the regular promotion flow and also on the real early
18 promotion, that, "We have done this sometimes. We have
19 succeeded, and this is what it takes."
20     Q. Okay. I just was trying to clarify that this
21 just wasn't a Dr. Nikolova conversation. This was a
22 conversation that you would have with somebody in
23 Dr. Nikolova's situation?
24     A. Right. So that's a conversation I had with
25 Hao Zhu. That's a conversation I had with -- I'm

71

1 blanking on his name right now -- Alex Dimakis, with Dan
2 Wasserman. You know, anyone who was a faculty member
3 somewhere else, I would have had that conversation with
4 them.
5     Q. Okay. And that's because every faculty member
6 that's being hired from one university to another wants
7 to know that they didn't waste "X" number of years on a
8 tenure clock. They want to know, you know, "Can I get
9 some credit for this," right?
10     MS. HILTON: Objection, form.
11     A. Different people have different attitudes
12 towards that. Some say, "Okay. This extends our
13 runway, so this is better for us. You know, we would be
14 better prepared for promotion."
15     Others are -- you know, are stuck on
16 timelines; and they say, "Yeah, I'd like to be able to
17 go up for promotion at the time that I would have
18 normally went through in this other institution."
19     So it depends on the individual.
20     Q. Okay. And the "circumstances, yeah.
21     A. What do you mean "the circumstances"?
22     Q. The circumstances that the individual finds
23 themselves in, right?
24     A. Yeah. At the end of the day it's a decision
25 that the individual has to make and the Budget Council

72

1 has to agree to.
2     Q. Okay. All right. So Dr. Nikolova comes and
3 she starts up, and she's hired in -- she starts
4 working -- well, she's hired -- made the offer in the
5 Summer of '13 and then starts working in January of '14.
6 Is that your memory?
7     A. I don't remember the years, but I do remember
8 that she started in January of a year.
9     Q. Okay. And one of the reasons -- well, do you
10 recall that in the Summer of '13, when the offer was
11 made to Dr. Nikolova, that the UT rule, or UT System
12 rule, was that if the offer was made after, I think it's
13 May 1st, that the school from which the faculty member's
14 coming has to approve releasing that individual if
15 they're going to start in the Fall Semester; is that
16 correct?
17     A. I don't think that that's a UT rule. My
18 understanding is that that's an agreement between
19 different universities.
20     Q. Okay. So but that -- whose rule it is is up
21 for -- up for question, but the rule is accurately
22 stated?
23     A. That's my understanding. Okay? I mean, I'm
24 not the one who has to deal with these rules. These are
25 dealt with at the Provost level.

73

1     Q. Okay.
2     A. I mean, I know vaguely that there is a
3 deadline of May 1st; and any offer that we're making
4 after May 1st has implication for when the person can or
5 cannot start.
6     Q. Would it be accurate that if Dr. Nikolova
7 could have started in the Fall Semester of that year,
8 that ECE would have gladly accepted her starting then
9 and not waiting?
10     MS. HILTON: Objection, form.
11     A. ECE would have gladly accepted her. Whether
12 the delay was due to the May 1st rule or because
13 Dr. Nikolova wanted to start in January, I don't recall.
14 And we have a lot of these cases where sometimes the
15 person doesn't want to start until January because they
16 want to settle, find a place, you know, whatever, any of
17 a number of reasons.
18     Q. (BY MR. NOTZON) Right. I'm just asking for
19 your -- for what you know.
20     A. I don't recall what -- what I know is, yes, I
21 mean, when we make an offer, I tell people, "You can
22 start in the fall, or you can start in January if you
23 want." If it's going to be beyond January, then it
24 requires more approvals.
25     Q. So, based on your prior testimony -- tell me

Appx.0606

74

1   if that is correct -- that you don't make the decision
2   as to whether or not to call A&M and ask if it's okay if
3   they release her for the Fall Semester; is that right?
4       A.  No, it's not my decision.
5       Q.  Okay.  And you're saying you believe it's the
6   Provost's Office decision.
7       A.  That's my understanding.
8       Q.  Okay.  And did you ask that the Provost Office
9   make the call?
10      A.  I don't ask for anything.  I mean, the only
11  thing I ask for is, "Here is my offer letter."
12          If the candidate says, "I want to start
13  in the Fall."  And if the offer is being made after
14  May 1st, then, the Dean cannot authorize the offer, even
15  if it's assistant professor.  That would have to go
16  through the Provost, and then the Provost has to do what
17  the Provost is supposed to do.  So it's not -- I don't
18  ask for anything.  There is a process that everybody has
19  to follow.
20      Q.  All right.  And so you don't know what the
21  decision-making process was at the Provost's Office to
22  ask A&M, or not, if they'd release Dr. Nikolova?  That
23  would be accurate; you don't know?
24      A.  Well, I think there is a misrepresentation in
25  what you're saying.  First of all, yes, I don't know;

75

1   but, second, it's not -- the Provost would not make a
2   decision to call or not to call.  If this is, indeed, a
3   rule that all universities have to abide by, then any
4   offer that goes after May 1st, the Provost will do the
5   right thing and call the Provost in the other
6   institution.  Okay?
7          So it's not a choice for the Provost to
8   call or on not call.  If the offer is being made after
9   May 1st, it is my understanding that the Provost has to
10  approach the Provost in the other situation.
11      Q.  Oh, okay.  Perhaps we have a different
12  understanding or a miscommunication.  Let me clarify it.
13  I believe that the rule is:  If the offer is made after
14  May 1st to start in the Fall, you have to make the call;
15  but if you're not starting in the Fall, then no call
16  needs to be made?
17      A.  That's correct.
18      Q.  So the Provost's Office would have to make a
19  decision, then, to call if Dr. Nikolova's going to start
20  in the Fall; but if she's just going to start in the
21  Spring, there's no need for them to call.  So a decision
22  has to be made to call or not call, right?
23      A.  There is no decision because we tell them,
24  after speaking with the candidate, that the candidate
25  wants to start in the Fall, in which case -- and the

76

1   offer is being made after May 1st, in which case they're
2   forced to do something; or we tell them the candidate is
3   going to start in January.  There's no decision to be
4   made.  It's like here's a red light, you know.  There's
5   no decision there you make or not make.
6       Q.  So in Dr. Nikolova's case, did she decide she
7   wanted to start in January; or did UT decide to offer
8   her a job starting in January?
9       A.  I have no recollection of what she decided or
10  not.  The only thing I know, because that's the process
11  I use every time, is I ask the candidate, "When do you
12  want to start?"
13          And I don't remember whether she said, "I
14  want to start in the Fall."  And then, you know, we
15  tried to make her start in the Fall and we couldn't, for
16  some reason, or she said, "I want to start in January,"
17  in which case, there was no issue.
18      Q.  Okay.  So since you don't remember,
19  Dr. Nikolova was someone that I could ask about that?
20      A.  You can ask Dr. Nikolova; but if you were --
21  if I were sort of -- you know, have to use the
22  information that you're providing on whether this was
23  "X" or "Y," I would have to see what happened at the
24  Provost level.  I mean, I would have to see the original
25  offer letter, whether it had -- which date did it have

77

1   and see whether that went to the Provost and the Provost
2   came back saying, "No, you can't hire her because A&M
3   said you can't."
4       Q.  Okay.  Now, so based upon the conversation you
5   had with Dr. Nikolova, which is the conversation you'd
6   have with any assistant professor that you're recruiting
7   and hiring, when it came time to -- when you hired her,
8   you understood that you and the Budget Council was going
9   to put her on track to go up for tenure at the sixth
10  year, counting both programs; is that right?
11          MS. HILTON:  Objection, form.
12      A.  That's not right because what I told you is
13  that when she joined, assuming no extension of her
14  block, she should be forced to go up for tenure six years
15  after joining.  Anything that happens before that
16  deadline or if there's an extension to that deadline
17  would have to come from Dr. Nikolova.  So Dr. Nikolova
18  would have to say, "I would like to go up for
19  promotion."
20          When Dr. Nikolova would go up for
21  promotion, when she would express something like that,
22  we would have a discussion.  I would offer my opinion,
23  and go through Budget Council.  And then the Budget
24  Council either approves it or doesn't approve it, but it
25  has to start with Dr. Nikolova.

78

1    Q.  (BY MR. NOTZON)  Okay.  And when you say the
2  Budget Council approves it or disapproves -- or doesn't
3  approve, that's the Step 1 of the two-step Budget
4  Council vote?
5    A.  That's correct.
6    Q.  Okay.  And from your experience with other
7  assistant professors that UT hired for ECE, that if they
8  had a total of six years, accounting for extended --
9  probationary extensions and whatnot, whatever, you know,
10 the clock calculation is, that the justifi-- or the
11 explanation for going up before six years at UT, it was
12 sufficient to say that they had six total years at both
13 programs as the reason why they were going up before six
14 years at UT; is that right?
15     MS. HILTON:  Objection, form.
16    A.  If you look at my letter for Nikolova and
17 others, you'll see that the first paragraph will say,
18 you know, "We're going" -- I don't remember the exact
19 verbiage; but it mentioned that we're putting this
20 person up for promotion to this position and that
21 person, if promoted, would have served "X" number of
22 years in rank.  And if that rank is less than six, I
23 would have said, "This is, therefore, an early promotion
24 case" or "It is, therefore, a technically early
25 promotion case because if you count these other years,

79

1  that would not have been an early promotion case."
2    Q.  Okay.
3    A.  Having said that, if Dr. Nikolova had joined
4  UT, you know, immediately as her first position and
5  would have said, "I want to go up for promotion after
6  four years," we'd have said, "No, don't go up for
7  promotion.  We don't think it's something that you
8  should do."  And if the Budget Council would have
9  approved it, my letter would have said, "This is an
10 early promotion."  And that would be the end of it.
11    Q.  Right.  Okay.  And you've said similar things
12 in other faculty members' letters that you've written;
13 is that right, that were going up technically early but
14 not early, early, not truly early?
15     MS. HILTON:  Objection, form.
16    A.  Yes.  This is -- this is exactly the same
17 text, copy and paste from letter to letter.  When they
18 have the same case, the verbiage is exactly the same.
19    Q.  (BY MR. NOTZON)  Okay.  And one example would
20 be Professor Dimakis?
21    A.  One example would be Professor Dimakis.
22    Q.  Okay.  Is there another example that you
23 recall?
24    A.  Not at the moment.  Dimakis was the one that
25 was probably closest to her, and that's why I remember

80

1  him.
2    Q.  Okay.  Let me throw out a name and see if it
3  refreshes your recollection; and I'm going to -- I'm not
4  going to try the last name, maybe.  Is it Sujay?
5    A.  Yeah, Sujay Sanghavi.
6     Yeah.  Okay.  So the difference between
7  Sujay Sanghavi and Alex Dimakis is that Sujay was
8  recruited before I joined; and Alex was recruited after
9  I joined.  So I was part of the recruiting process; and
10 that's why, you know, I remember him more than Sujay.
11    Q.  Right, but did Sujay go up while you were
12 Chair?
13    A.  He went up while I was Chair, but I don't
14 remember whether there was a discussion of technically
15 early or not technically early.  You know, this was --
16 he probably went up early in my tenure; and I basically
17 have no recollection of --
18    Q.  Okay.
19    A.  -- what happened then.
20    Q.  Do you recall if he had time -- he was hired
21 with years of experience as an assistant professor at
22 some other institution?
23    A.  Yeah, I know that he came from Purdue; and I
24 presume that he was an assistant professor at Purdue.  I
25 mean, I just don't remember the details of his case.

81

1    Q.  Okay.  And you don't remember if he was
2  technically early or true early?
3    A.  Well, he was not -- he definitely was not put
4  up as an early case because, at least in my mind, he was
5  not one of those super superstars that would deserve an
6  early promotion.  So if he went early, it would have
7  been a technically early case.
8    Q.  Okay.  And I understand that's your best
9  memory looking back over a period of years; and I'm just
10 asking for your memory, so no problem.
11     MR. NOTZON:  Okay.  We are at -- let's go
12 ahead and go off the record.
13     THE REPORTER:  We're going off the record
14 at 12:14 p.m.
15     (Off the record from 12:14 to 1:20 p.m.)
16     THE REPORTER:  We're back on the record
17 at 1:20 p.m.
18    Q.  (BY MR. NOTZON)  Okay.  Back from lunch.
19     And I didn't say this earlier,
20 President Tewfik, but I appreciate you making yourself
21 available on the weekend.  I know it was at your
22 request; but, still, it's still a weekend.
23     I wanted to see if I could refresh your
24 recollection just a -- and get your responses.
25 Dr. Nikolova -- and this is in relation to the

82

1  conversation you had with her the summer that you were
2  offering her the position and whether or not she would
3  start in the fall or the spring.  And do you recall
4  telling her that she did not have an option to start in
5  the fall, that she would have to start in the spring
6  because -- and -- because there was an agreement that --
7  between universities if she wasn't offered before
8  May 1st, she couldn't start in the fall?
9      A.  I have no recollection of these details.
10     Q.  Okay.  And to follow that, that she doesn't
11 recall being given the option to say whether she wanted
12 to start in the fall; and if she did, the process that
13 would have to occur for her to do that?
14         MS. HILTON:  Objection, form.
15     A.  To answer your question -- I mean, you're
16 asking me if she didn't recall?
17     Q   (BY MR. NOTZON)  No.  I'm asking if -- if that
18 is consistent with your memory as to what did not occur
19 in your conversation with her.
20         MS. HILTON:  Objection, form.
21     A.  I have no recollection of what occurred or did
22 not occur.  I can tell you standard practice, but I have
23 no recollection of what occurred or did not occur.
24     Q   (BY MR. NOTZON)  Okay.  I guess the last
25 question on that line is:  You've testified about what

83

1  the process is, and we know that you knew that at the
2  time you talked to her; is that correct?
3      A.  That's correct.
4      Q.  Okay.  And the -- whether you told her that
5  entire process or not, which seems to conflict with her
6  memory, as I've represented it to you, you can't testify
7  one way or the other, sitting here today, what actually
8  occurred in that conversation?
9          MS. HILTON:  Objection, form.
10     A.  That's correct, I have no recollection of the
11 details.  Again, I can, if you want, tell you the
12 standard practice of what happens in both circumstances.
13     Q   (BY MR. NOTZON)  No, you already did.  So I
14 think we're good.  Thank you.
15         Did you do any review of her performance
16 as an assistant professor at A&M?
17     A.  Can you repeat that again?  Did I do -- did I
18 review any?
19     Q.  Yes, yes.
20     A.  I don't recall reviewing any of her
21 performance at A&M.
22     Q.  Okay.  So when she was -- when she applied and
23 she was selected as the top candidate in the second
24 search, that would not have been part of her application
25 process?

84

1      A.  I don't recall what was in her packet; but I
2  can tell you, again, standard practice, which there are
3  letters of recommendations.  During the interview, we
4  may have asked questions; and then we also reach out to
5  people we know to ask about the candidate we're
6  recruiting.
7      Q.  Okay.  Was Dr. Nikolova asked to present
8  similar information as would be required for the tenure
9  application, that is, her research, her funding, her
10 service, her teaching, those kinds of things?
11     A.  She would have been asked; and, again, that's
12 standard practice.  She would have had to submit her CV.
13 She would have had to submit a teaching statement and a
14 research statement and a list of potential reference
15 letter of recs.
16     Q.  And publications?
17     A.  Well, the CV has the publications.
18     Q.  Okay.  Are there teaching scores required or
19 not required in the application, the CIS scores?
20     A.  The application and the CV and a teaching
21 statement.  So if the candidate volunteers information
22 about their teaching scores, great; if they don't,
23 that's up to them.
24     Q.  Okay.  And did you find Dr. Nikolova's
25 performance at A&M to be -- well, do you remember any

85

1  quantitative, or qualitatively, how you viewed her
2  performance at A&M?
3          MS. HILTON:  Objection, form.
4      A.  I don't recall that I focused on her
5  performance at A&M.  What I focused on, personally, is
6  the talk that she gave and my impression of how novel
7  her research was and the feedback that my colleagues
8  gave on the interview process.
9      Q.  (BY MR. NOTZON)  Okay.  And earlier you
10 testified about how well she was doing in the first
11 couple of years of her employment at UT and that she
12 fell off.  What was she doing right during those first
13 couple of years?  Do you have specific things in mind
14 where she was shining?
15         MS. HILTON:  Objection, form.
16     A.  So she was on the same -- I mean, she was
17 working on the same topics, as far as I recall, that we
18 hired her for, which, to me, was -- I mean, this was a
19 really nice topic, an innovative topic.  Her teaching
20 scores were nice.  They were good.  There was no reason
21 for me to raise any issue with her.
22         I don't remember precisely what -- our
23 discussions.  You know, like, I did not look precisely
24 at how many papers she's publishing; but, overall, she
25 seemed to be fine.  And even if she had slowed down in

Ahmed Tewfik - 3/20/2021

86

1  her publications at the time, I would not have been
2  concerned.  So for that reason, my recollection is that
3  she was doing fine.
4      Q.  Okay.  So your testimony is based upon your
5  memory of that feeling of being okay with her
6  performance at that -- above the tenure level -- track,
7  that is?
8          MS. HILTON:  Objection, form.
9      A.  My -- my recollection is feeling good about
10  where she was, given where she was in her trajectory.
11  It wasn't about, you know, is she ready to be promoted
12  or not.
13      Q.  (BY MR. NOTZON)  Right, I misspoke.  That's
14  why right at the end I tried to add that in.
15          And "trajectory" is the word you used,
16  and I will use that word.  She seemed to be on the right
17  trajectory?
18      A.  That's right.
19      Q.  Okay.  And then, when she fell off that
20  trajectory, where -- did she fall off that trajectory on
21  all criteria or specific ones; and if you could,
22  identify the ones where you felt like she was falling
23  off?
24      A.  Well, what started to happen -- and I can't
25  give you exact, precise dates -- I do recall that we

87

1  were in our temporary location in that UTA building;
2  and, you know, that might help us find exactly when that
3  happened.  My colleagues in the area came to me and said
4  they were concerned that she wasn't publishing enough
5  and that if that continued, then we would have
6  difficulty with the promotion cases; and I wanted her to
7  succeed.
8          So we started to have conversations at
9  that point.  I think my colleagues were her mentors, as
10  far as my understanding.  That's what they told me.
11  They reached out and told her that they had these
12  concerns, and they asked me to also speak with her.
13      Q.  Who came to you with concerns?
14      A.  Constantine Caramanis did, and Sanjay
15  Shakkottai did.
16      Q.  And were they her mentors, as well; or are
17  those two separate people?
18      A.  They were her mentors, as far as I recall; and
19  they were the people who also prepared her case.  So
20  that, you know, most likely means that they were her
21  mentors as well.
22      Q.  Okay.  And I'm just trying to clarify that
23  there was no one else that was coming to you with
24  concerns about her at that time?
25      A.  These were the people who were closest to her;

88

1  and I remember vaguely at the time that I also asked her
2  to have a mentor out of the area, to assist with other
3  issues that she raised in some of our conversations.
4      Q.  And did she follow that instruction?
5      A.  I presume, yes; but I have no recollection of
6  asking or, you know, confirming it one way or the
7  another.
8      Q.  So, just to clarify, you advised her to get a
9  mentor outside of the two individuals you named?
10      A.  Outside of the area, not just those two
11  individuals.  You know, the department is broken into
12  different areas.  So I just said, "Okay.  Let's find
13  someone who is going to advise you."  The concerns that
14  she had were not about research, you know, how to, you
15  know, interact with other people in the department --
16  that's sort of what I remember -- and other issues along
17  those lines.  And so I said, "Let's have another mentor
18  outside of the area who will not pass judgment on your
19  work, but could help you with other issues that you may
20  be navigating."
21      Q.  Okay.  And I'm just trying to clarify:  That
22  other person would be other than the two people you'd
23  already named?
24      A.  Obviously, because those two people are in the
25  area.

89

1      Q.  Okay.  You know that.  I don't know that, and
2  maybe other people don't know that.
3          Okay.  Did Dr. Nikolova's -- so is it
4  your testimony that you don't remember anything specific
5  that she was doing that she was not shining in that
6  "middle period," let's call it?
7      A.  That's not --
8          MS. HILTON:  Objection, form.
9      A.  That's not what I said.  I said they
10  specifically came and told me that they were concerned
11  about her publication rate.
12      Q.  (BY MR. NOTZON)  Okay.  And that's it?
13      A.  That was their main concern at the time that I
14  recall.  I mean, there may be other things; but that's
15  the one that stuck in my mind.
16      Q.  Okay.  Did you have any observations that you
17  felt like she wasn't shining, as you testified earlier?
18          MS. HILTON:  Objection, form.
19      A.  The fact that her publication record wasn't as
20  strong, that she was no longer on the trajectory that we
21  expect for people at her stage of development was a
22  concern.
23      Q.  (BY MR. NOTZON)  Okay.  And I want to be clear
24  that the falling off on the publication rate, was that
25  in comparison to her prior rate or in comparison to

90

1 other faculty in the department?
2     A.   This is a comparison to what is expected from
3 someone in her area.
4     Q.   Okay.  So a different area might have an
5 expectation of more or less papers; but for her area,
6 she was falling below the expectation of per-year
7 publication?
8     A.   Again, I don't remember the exact numbers; but
9 my recollection today is that she was below the
10 expectation of any area.  Some areas are more
11 complicated because they have experiments; and, you
12 know, it takes longer to publish papers.  Some areas are
13 more theoretical, like, Evdokia's.  She was below
14 anything that we had.  That was my recollection.
15     Q.   On a per-year basis?
16     A.   On a per-year and cumulative basis as well.
17     Q.   Okay.  But when you answered the question
18 before, you were saying "below her area," because that
19 would be the relevant measure to be looking at, correct?
20         MS. HILTON:  Objection, form.
21     A.   That is correct.  For me, that's what I do.  I
22 look at your specific area.
23     Q    (BY MR. NOTZON)  Okay.  And is it your
24 testimony that if she wasn't meeting it for any area,
25 that's maybe a heightened concern?

91

1     A.   That would be a heightened concern to my
2 colleagues because if that was the situation, then, when
3 promotion time came or when people would review her,
4 they would raise this, which they did.
5     Q.   Okay.  And, sitting here right now, can you or
6 can you not give us that number that would be the bare
7 minimum for either measure, either across any area or
8 her area specifically?
9     A.   No, I can't give you a number because this is
10 a relative number, so I have to look at that.  You know,
11 I have to refresh memory.  I've been out of this for two
12 or more years.  The last promotion I did was probably
13 three years ago.  So, I mean, these numbers aren't fresh
14 in my mind.
15     Q.   Okay.  And do those numbers change from year
16 to year?
17     A.   They don't.  And the numbers are -- you know,
18 you could have a very good year and a somewhat less good
19 year or bad year; and, you know, we sort of average
20 this.  But if you're consistently not on the trajectory,
21 then that's a problem.
22     Q.   Right.  So you want your cumulative to be at a
23 number, and you want your per-year average to be at a
24 number --
25     A.   That's correct.

92

1     Q.   -- or above a number?
2     A.   Above a number and -- yes.
3     Q.   All right.  Is there any particular document
4 that we could look at to find out what that number is
5 related to Dr. Nikolova's case?
6     A.   I don't know that there is a particular
7 document, but she must have provided you with lots --
8 you know, we had these discussions a number of times.
9 And we asked her to provide peers over the years so that
10 we can compare the numbers and she did provide peers
11 and these peers weren't necessarily peers that we would
12 consider as peers, but it's highly unusual for this
13 exercise to happen.  I don't recall it happening with
14 any faculty member where, early on, we would have
15 several conversations asking you to show us others who
16 are in your area who seem to have similar publication
17 numbers.
18     Q.   Okay.  And was she able to show you that?
19     A.   She did show me and she did show my colleagues
20 who raised the issues on that and their concerns were
21 that these faculty members were in different disciplines
22 and that numbers -- you know, she was basically
23 cherry-picking who to compare to and that this was not
24 going to be representative or relevant for our
25 discussion.

93

1     Q.   Her cherries weren't cherries?
2     A.   They were not the right cherries.
3     Q.   Okay.  So part of the tenure process is a
4 third-year review, kind of the midway; is that correct?
5     A.   That is correct.
6     Q.   And for these faculty members that are hired
7 with teaching experience at a prior university, do you
8 try to set that third-year review at the third year from
9 the beginning of their teaching experience at the other
10 school so that it's in the third year of the total six
11 of the technically early period?
12     A.   No.  That third --
13         MS. HILTON:  Objection, form.
14     A.   No.  That third-year review happens at the
15 third year of you being at UT.
16     Q    (BY MR. NOTZON)  Okay.  So if somebody goes up
17 for promotion at the second year at UT, because they had
18 four years or more somewhere else, then, there would be
19 no third-year review?
20     A.   That's correct.
21     Q.   Okay.  And that line of thought would continue
22 for each subsequent year, third year, fourth year,
23 et cetera?
24     A.   Can you elaborate what you mean by this?
25     Q.   Oh, you know, I guess we can go through it.

94

1  So at the third year, if they had three years or more at
2  a prior university, there wouldn't be a third-year
3  review because that would be the year they're going up
4  for tenure; is that right?
5      A.  You lost me completely here.
6      Q.  Okay.
7      A.  What are you asking?
8      Q.  I'll start over.
9      A.  Okay.
10     Q.  I asked you before about if somebody had two
11  years and four or more somewhere else, and you answered
12  that question already.  So the next one is:  Third year,
13  third year at UT, with three or more years somewhere
14  else, is there going to be a third-year review?  And I'm
15  assuming not because that would be the year they go up
16  for tenure, technically?
17     A.  No, they're going to have a third-year review
18  because the third-year review is mandated by UT in your
19  third year at UT.
20     Q.  Okay.  So they'd go through the third-year
21  review and the tenure review at the same time?
22     A.  If that happens because they would be going
23  through the promotion technically early, but the
24  third-year review happens at the third-year review.  We
25  can't do it technically early, and we can't do it

95

1  technically late.  It has to happen at a particular
2  time.
3      Q.  Okay.  And I guess this is unique to this
4  particular situation.  When you go up for tenure in your
5  sixth year, you actually apply for -- you start applying
6  for it in the fifth year, right?
7      A.  So you -- okay.  I mean, that math, I'm always
8  confused on.  Okay?  But, basically, you need to look at
9  my letters; and they would -- and I apologize because, I
10  mean, it's been a while since I did this.  Okay?
11     Q.  Well, don't worry about it.
12     A.  Okay.
13     Q.  Don't worry about it.  Okay.  I think we'll
14  figure it out.
15         So let me ask it this way:  The
16  third-year review, does it occur during the third year
17  or after the third year?
18     A.  My recollection is that it occurs during the
19  third year.  I may be off, again.  Okay?  But that's my
20  recollection.
21     Q.  In the spring semester or --
22     A.  We normally start these.  So whenever there's
23  a review, there is a deadline; and I vaguely remember
24  that deadline to be October 1st -- and if I'm off, I'm
25  probably off by, you know, a few weeks, not months --

96

1  where the candidate has to submit all of their material.
2  Then a committee is formed.  That committee is formed
3  sometimes in November.  Sometimes in October.  Sometimes
4  in December.  And most years the committee will look at
5  all of the cases in December.  They will draft a first
6  report in either December or early January.
7         Our practice in the department -- and I
8  can't speak to the rest of the school or university --
9  is to share that document with the candidate and then
10  ask the candidate if she or he feels there are factual
11  errors or there are redactions or edits they would like
12  the committee to make.
13         And then I go back to the committee, and
14  I forward to them the feedback from the candidates.  The
15  committee can accept these changes and make the changes
16  or reject those changes.  And then they provide a final
17  copy.
18         And then I have to write a memo, and then
19  the Dean has to write a memo.  So in these memos, we
20  put, "Concur with the committee" or we put "Diverge with
21  the committee" and I can diverge from the Dean's opinion
22  as well.
23     Q.  Okay.  So when you're doing the third-year
24  review, you really only have two years of information to
25  work with?

97

1      A.  Yes.  If my recollection is correct that it
2  happens during the third year, then, yes, you have two
3  years of documentation to work with.
4      Q.  Okay.  And if the person was hired with
5  teaching experience of another institution, would they
6  include that information as well, as part of a third-
7  year review?
8      A.  The teaching evaluation at UT is pretty clear
9  that it is about UT, what you did at UT, not what you
10  did in other institutions.  So the candidate could
11  include information about how they did in -- at another
12  institution.  The Committee doesn't have -- is not
13  obligated to look at that at all.
14     Q.  Okay.  And for -- do you recall doing
15  Dr. Nikolova's third-year review?
16     A.  Yes, I do.
17     Q.  Well, I guess before I ask that
18  question:  What is -- you kind of went over a little bit
19  of the third-year review process.  Is there always a
20  committee involved in the third-year review?
21     A.  Yes, there's always a committee of peers
22  involved in the third-year review.
23     Q.  Okay.  Do the committee of peers interact with
24  the faculty member; or do they just take the information
25  from the dossier and speak with you about it, as the

98

1  Chair, that is?
2     A.  They take the information from the dossier;
3  and any question they have, they have to funnel it
4  through me.
5     Q.  Okay.  So you're the liaison between the
6  committee and the faculty member?
7     A.  That's correct.
8     Q.  Okay.  And were there any changes in that
9  third-year review between -- prior to Dr. Nikolova going
10  through the third-year review with you?
11     A.  Changes to the process, you mean?
12     Q.  Yes, sir.
13     A.  I don't recall that there were any changes to
14  the process.
15     Q.  Okay.  So there's a Professor Tiwari, and he
16  went through a third-year review.  Did he go through the
17  third-year review the year before Dr. Nikolova?
18     A.  I don't remember when he was promoted or when
19  he went through his third-year review.  If you look at
20  when he started, you can figure out what his third-year
21  review -- when his third-year review would have
22  occurred.
23     Q.  Okay.  And so is it your testimony that you
24  did the third-year review with Professor Tiwari the same
25  way, the same process that you used for Dr. Nikolova, or

99

1  a different process?
2     A.  It should be exactly the same process.
3     Q.  Okay.  And that answer would be the same if I
4  asked you about any other faculty member while you were
5  the Chair?
6     A.  That's correct.
7     Q.  Okay.  Do you recall Dr. Nikolova's service
8  for the department?
9     A.  I recall that I appointed her at least once to
10  our Faculty Recruiting Committee and I also recall that
11  my colleagues were complaining that she wasn't attending
12  at least some of the meetings and she was not
13  responsive.  And that complaint came up again during the
14  promotion process.
15     Q.  Okay.  Would you say that the faculty hiring
16  committee is one of the more time intensive committees
17  in the department?
18     A.  That's correct.
19     Q.  And so putting someone on the committee that
20  is in their tenure probation would be impactful of their
21  potential productivity compared to a lesser-demanding
22  committee; is that right?
23          MS. HILTON:  Objection, form.
24     A.  It is standard practice for us to put
25  assistant professors on the Faculty Recruiting

100

1  Commitment; and, in fact, it is standard practice for us
2  to put recently hired assistant professors on the
3  Faculty Recruiting Commitment because, A, it gets them
4  to know other faculty members; B, they're putting in a
5  fresh pair of eyes; and they help us recruit additional
6  people.
7          So that's something that we've done for
8  everyone; and I don't remember anybody coming back and
9  saying, "Oh, this has impacted me," or that that has
10  come up during promotion and tenure cases.  And they
11  serve one year; they may serve a couple of years.  They
12  don't serve six years on the Recruiting Committee.
13     Q.  (BY MR. NOTZON)  Okay.  And so you're saying
14  every new hire assistant professor spends at least one
15  year on the committee?
16     A.  I am not saying every.  I am saying that it's
17  standard practice to do this.  Some people might say, "I
18  don't want to serve."  And sometimes we recruit six
19  faculty members.  We are not going to put all six of
20  them on the Faculty Recruiting Committee.  There is a
21  very limited number of slots for assistant professors.
22  So some people may not have served at all.  If we hired
23  five and then the next year six, et cetera, you can
24  imagine that some would not serve at all.
25     Q.  Okay.  And I believe the records reflect that

101

1  Dr. Nikolova served two years in a row on the faculty
2  hiring committee for the ECE.  Does that sound familiar?
3     A.  Again, I don't recall; but that's sort of
4  within the standard practice.  If you serve one year, I
5  typically will ask you to serve another year.  So
6  similar to the Promotion and Tenure Committee, where,
7  you know, we would keep you for a couple of years on the
8  committee.
9     Q.  Okay.  And does an assistant professor have
10  the right to turn that down?
11     A.  Yes.  I won't force anybody to serve on
12  anything.  I mean, I'd come to you and I'd say, "Would
13  you like to serve on this committee?"  And people will
14  say "yes" or "no."  If it's no, it's no.
15     Q.  As an assistant professor, you understand the
16  concern about saying no to your Chair when you're going
17  to go up for tenure --
18     A.  Sorry for interrupting you.
19          The first thing I say to my assistant
20  professors is, "Be vocal.  Anything you say, it's -- you
21  know, I'll take it.  Nothing will be used against you."
22  And we haven't used that against anyone.  And if this
23  was a problem, then every single assistant professor,
24  you know, would have knocked on my door and said, "I
25  want to serve on this committee."  And I can guarantee

Ahmed Tewfik - 3/20/2021

102

1  you that I would have had an easier time filling many
2  committees if people really felt that if they said "no,"
3  that I would take it against them.
4      Q.  Okay.  Do you understand that Dr. Nikolova was
5  also asked to be on the ME, the mechanical engineering,
6  hiring committee?
7      A.  She -- so professors in our department and
8  other departments are asked to serve on committees in
9  other departments.  This is solely at her discretion.
10  Being asked doesn't mean forced.  So if she was asked
11  and she said "yes," she knew what she was doing.  She
12  knew how she was spending her time; and, therefore, it's
13  her decision and not anyone's decision.
14     Q.  Would you say that three years on a hiring
15  committee for an assistant professor during tenure track
16  is a laudable amount of service?
17     A.  I don't know what the workload is when you
18  serve on the committee of another department.  I know
19  the workload in our department, because we have one
20  committee for all areas in the department, not one per
21  area.  So I don't know what she served on.
22         But, normally, in my letters of
23  promotion, if you have example of these letters, you
24  will see that in the service section, I will say that
25  "X" served our Recruiting Committee; and this is a

103

1  committee that requires a lot of time and, you know,
2  therefore, I'm very grateful and, as you put it, it's a
3  laudable service to the department.
4      Q.  Okay.  Do you have any other recollection of
5  Dr. Nikolova's service during her tenure track period at
6  UT?
7      A.  I don't, which doesn't mean that she hasn't
8  served on other committees or wasn't asked to do
9  something for maybe the centers to which she belonged.
10     Q.  Okay.  Would you testify that, as far as
11  service goes, that Dr. Nikolova exceeded the
12  requirements for tenure at UT?
13     A.  You don't get tenure on service.
14     Q.  No, I'm saying that criteria.
15     A.  Well, that criteria, there's no real criteria
16  for that, meaning, that, you know, if you did light
17  service, that might be fine in a department.  So, I
18  mean, I really can't -- you know, I really can't -- I
19  can't pass a professional judgment on what you're asking
20  me to do.  I mean, she served on a committee; and I was
21  grateful that she served on that committee.  Some of my
22  colleagues weren't happy with her service.  That's the
23  only thing I can tell.
24     Q.  And they weren't happy with her service for
25  the entire time she was there; or just, they had one

104

1  complaint or two, that you recall?
2      A.  What I recall is during the promotion and
3  tenure discussion, that topic came up that people were
4  concerned about her lack of engagement with the
5  department; and that, also, I vaguely remember, came up
6  in the third-year review, which, normally, the
7  third-year review, again, in the same spirit of people
8  supporting their peers, is usually written in such a way
9  that it supports the candidate when she or he goes up
10  for promotion.  So the fact that it surfaced in that
11  document sort of sends a signal that, you know, maybe
12  she can do more, better -- be more engaged.
13     Q.  Do you know if she was told these things at
14  the time she was on the committee?
15     A.  I am pretty sure that -- well, not -- so I
16  don't know what my colleagues told her or did not tell
17  her.  I personally didn't go back to her and saying,
18  "Look" -- or I don't recall going back to her; maybe I
19  did it -- and telling her:  You need to do this or that.
20         But my recollection is that my colleagues
21  would have spoken with her and tried to engage with her;
22  and when forming other committees, my recollection is
23  some of my colleagues would come and say, "We wouldn't
24  want to have her because she would be counted as a
25  member of the committee, but she would not be doing the

105

1  work."
2      Q.  And do you recall who was complaining about
3  her work on the committee?
4      A.  I can't give you names, but my recollection is
5  it was more than one person.
6      Q.  You can't give me names because you would
7  prefer not to or --
8      A.  No.  If I remembered a particular name, I
9  would have given it to you, like, you know, earlier
10  about Ananth.  If I -- had I not seen that e-mail
11  recently, I probably wouldn't have remembered that.
12     Q.  Okay.  Do you remember what the vote was of
13  the Budget Council vote, Step 1 vote, of whether or not
14  Dr. Nikolova should go up for tenure?
15     A.  Obviously not.  This was a few years ago, and
16  then there's a lot of votes.  So, no, I don't remember.
17     Q.  Okay.  Do you remember -- well, I'll tell you
18  that the record shows that it was 32 to 1, with 2
19  abstentions and, I think, 2 unqualifieds.  Do you
20  remember who the one "no" vote was?
21     A.  You must be confusing votes because I don't
22  recall that in that first vote, we report- --
23     Q.  No, no, Number 2.  Two.
24     A.  Second vote?
25     Q.  Second vote.

106

1    A.  Oh, okay.  Okay.  So can you repeat?  Sorry.
2  I thought you were talking about the first vote.  Okay.
3  Sorry.
4    Q.  That's okay.  32, 1, 2, 2.
5    A.  Okay.
6    Q.  Do you know who the one "no" vote was?
7    A.  No, there's no way for me to know who the one
8  no vote is, as you also can't tell me who voted for
9  President X versus Candidate Y, right?  So it's a
10  anonymous vote is another way of saying -- a long way of
11  saying it's an anonymous vote.
12    Q.  Oh, you believe you're not allowed to tell me
13  who that is?
14    A.  No, I cannot find out who that is.
15    Q.  Oh, you wouldn't even know who it was when it
16  occurred because you weren't there for the vote?
17    A.  The vote is an electronic vote, the same way
18  you'd vote for a president.
19    Q.  Okay.
20    A.  I know that you voted; but I don't know what
21  you voted, right?  It's the same thing.  We go to a lot
22  of lengths to make sure that however you vote, no one is
23  going to be able to find out that vote.
24    Q.  Now I understand.  Thank you.
25    So nobody knows what anybody's vote is

107

1  except in your letter you wrote that you and other
2  professor were the disqualified people?
3    A.  Yes, because I vote through my letter.  So I
4  can't vote twice.  And the other person was Mark Smith,
5  who served on the Presidential Committee; and he cannot
6  vote twice.
7    Q.  Okay.  Wasn't there a professor that was also
8  on the P&T Committee?  He would be -- he would be
9  disqualified too, right?
10    A.  So up to some point -- and I don't remember
11  what that some point was -- '16, '17 -- sometime during
12  Dean Wood's tenure, our standard practice within the
13  department was that if you served on the P&T Committee,
14  we asked you not to vote on the case at the department
15  level so that you don't vote twice on the case.
16    One year -- and I can't remember what
17  year it was -- '16, '17 -- that was picked up by the
18  Dean; and she asked me, "Why in your letter are you
19  saying that" -- at the time Mark Smith wasn't there, or
20  maybe he was there.
21    And I said, "We aren't able to vote."
22    She said, "Who's the third person" or
23  "Who's the second person?"
24    And I said, "The second person is
25  actually serving on the P&T Committee.

108

1    And she said, "No, from now on, you have
2  to allow that person to vote."
3    So sometime, '17, '18, it was the first
4  time that the person on the P&T Committee was allowed to
5  vote in our regular Budget Council votes.
6    Q.  Okay.  So there -- so that means that that
7  person would vote twice?
8    A.  Yes.
9    Q.  Okay.  Gotcha.
10    Do you recall that Dr. Nikolova had told
11  you that she was being recruited by Duke University for
12  a chaired position in the Fall of 2015?
13    A.  I don't recall what happened in '15; or at any
14  point in time, I don't recall that precise conversation.
15  However, when I looked at the letter that I wrote for
16  her, in the last few days, I see that at the end of my
17  paragraph, there is some statement, if I recall
18  correctly, that alludes to that.
19    Q.  Okay.  So the answer to my question is you
20  don't recall that happening?
21    A.  I don't recall it happening in '15.
22    Q.  Okay.  Do you recall the conversation about a
23  chaired position at Duke?
24    A.  I don't -- no, I don't recall any of these
25  details.  So the only thing I recall is, when I read the

109

1  letter, yeah, that's the only thing I recall.
2    Q.  Okay.  I didn't ask about that.  I just asked
3  my question.  So those details you don't recall?
4    A.  I don't recall the details.
5    Q.  Okay.  So in reviewing the -- your letter
6  following the Budget Council vote, your letter to the
7  Dean, would you consider that -- well, let me back up.
8    Do you consider yourself to have been a
9  strong supporter of Dr. Nikolova's tenure application in
10  the '18-'19 year?
11    A.  I consider myself as someone who wanted to
12  make sure that Dr. Nikolova stays as a productive member
13  of the department; and so the way I wrote my letter, my
14  communication with various people, was to say I would
15  like to see her in the department, which essentially
16  means I would like to see her promoted.
17    Q.  So would that answer be "no" to my question or
18  "yes"?
19    A.  The answer to your question is yes, I was a
20  proponent of having her promoted.
21    Q.  My question was -- used the word "strong."
22  Were you a strong supporter?
23    A.  What -- you know, your "strong" may not be my
24  "strong," so I can't answer that question.
25    Q.  Okay.  Maybe let me put it in words that you

Ahmed Tewfik - 3/20/2021

110

1  use.  Were you a close-to-the-bar supporter of
2  Dr. Nikolova's, or were you a farther-above-the-bar
3  supporter of Dr. Nikolova's?
4      A.  I think I answered this question earlier in
5  the morning where I said:  My assessment was that she
6  was close to the bar.  Whether she was slightly below
7  the bar or slightly above the bar, you know, I didn't
8  spend too much time on exactly where she was.  I know
9  she was closest to the bar than any other candidate that
10 went up for promotion under my tenure.  However, because
11 I knew what she was capable of delivering, I wanted to
12 give her the chance to shine again; and I wanted her to
13 stay in the department.  And I was reasonably confident
14 that she was going to shine again.  It was a bet.  Some
15 people, you know, agreed with me; some didn't.
16     Q.  Let's go ahead and look at your letter, and
17 it -- I'm going to put it in the chat here.  And it was
18 previously marked as Exhibit 6.  Do you see it there?
19     A.  No, I don't see anything in the chat.
20         MR. NOTZON:  Oh, dang it.
21         MR. DOWER:  Robert, I think you may have
22 accidentally sent it to Bob again.
23         MR. NOTZON:  I did it again.  There we
24 go.
25     Q   (BY MR. NOTZON)  Do you see it now?

111

1      A.  Yeah.
2      Q.  Okay.  Let me know when you're ready.
3      A.  I opened it, so I am ready.
4      Q.  All right.  So this is your October 29th, 2018
5  letter.  Did you write this letter?
6      A.  Yes, I did.
7      Q.  Did anyone else contribute to the language in
8  this letter?
9      A.  No one else contributed to the language in the
10 letter.  I did show the letter to Dr. Nikolova before
11 sending it up; and I also showed it to the person that
12 helps us with promotions, Jilda, who would have
13 corrected typos and, you know, words here and there.
14     Q.  Okay.  And did Dr. Nikolova provide any
15 requested changes?
16     A.  I don't remember what she may have provided;
17 but, normally, candidates will correct some of my
18 statements.  They may pick up and correct numbers.  So,
19 normally, I do get feedback from them.  They don't just
20 read it, and that's it.
21     Q.  Okay.  But you just don't remember what
22 Dr. Nikolova's response or contribution might have been?
23     A.  No.  I would have to go back and -- you know,
24 go and get the document that she sent me back or her
25 e-mail or something.

112

1      Q.  Okay.  There would be an e-mail trail about
2  that?
3      A.  If she did provide feedback, yes, there would
4  be an e-mail chain.
5      Q.  Okay.  And no one else contributed to the
6  letter?
7      A.  I also said that Jilda, the person who helps
8  with our promotion cases, would have read the letter and
9  corrected typos, et cetera.
10     Q.  I should have said no one else other than
11 you've already testified to --
12     A.  Yeah.
13     Q.  -- assisted with the letter; that's right?
14     A.  That's correct.
15     Q.  Okay.  And in looking at this letter, if you
16 could, point out the items where -- and I'm going to ask
17 you two ways -- the items that let you -- that let us
18 know that you believe that she is close to or below the
19 bar; and then I'm going to ask you what you thought were
20 her above-the-bar items.
21     A.  You have to parse the letter.  And so the
22 second paragraph, it talks about an emerging pioneer; it
23 doesn't say she's a star.  You know, some of the
24 comments at the end about why professors were concerned
25 about her.  If you go and look at the section about

113

1  teaching, you will see me talk about some of the
2  comments of the students.  And something that would be
3  picked immediately by every one is the fact that I
4  mentioned that some of the same comments that undergrads
5  made about her teaching were also made about -- by
6  graduate students, which is highly, highly unusual.  So
7  these are some of the things --
8      Q.  Excuse me.  Could you identify specifically
9  where you're talking about?
10     A.  So if I -- if you look at the bottom of
11 page 2, you will see that, "It's also interesting to
12 note that student comments in the two courses are
13 somewhat similar to the comments that she received in
14 EE360C, with many students praising her energy level and
15 enthusiasm and others complaining about boring classes
16 and solutions to homework not being provided in a timely
17 manner."  So that would send a message.
18         And in the Presidential Committee, there
19 is one person that -- the Dean of Undergraduate Affairs,
20 whose job is to read every comment by every single
21 student who's taken a class of someone going up for
22 promotion; and he would have provided further
23 information about that to the Committee.
24         And I would also mention that even though
25 my letter, and maybe the Dean's letter, do mention

114

1 course instruction survey numbers, really, what matters
2 in the Presidential Committee, to my understanding,
3 because this person makes sure that happens, is the
4 comments of the students. So the fact -- it's not so
5 much what her numbers were, but the fact that there are
6 comments saying that she is boring or her whiteboard
7 work isn't acceptable or that she's late turning on
8 solutions, et cetera. There are many, many more
9 comments if you dig through them. Those are the ones
10 that will raise, also, some red flags in the
11 Presidential Committee but also to the Dean and
12 Promotion & Tenure Committee, et cetera.
13         And these are things that, because at a
14 departmental level we were supportive, I had to mention
15 them; but I did not highlight them the way that others
16 may have.
17         Also, if you look at my research
18 statement, you'll see that I spent a lot of time on her
19 earlier work and not as much time on the more recent
20 work; and if you look at -- that's my recollection
21 because I haven't looked at the letters recently -- is
22 that the letter writers for her also emphasize the work
23 that we hired her for much more than the work that she
24 did while at UT. And then --
25     Q.  You --

115

1     A.  And something that you don't know and nobody
2 knows is at the very end, you know, when I was writing
3 the last statement, I had to write, you know, my last
4 sentence, I spent hours and days deciding whether to
5 include the word, "I strongly endorse her promotion" or
6 not. And the reason I included the word "strongly" is
7 because I had heard from the then dean, Fenves, that
8 without that word, you're essentially dooming the case.
9         So had I not put the word "strongly,"
10 essentially I knew that we were going to lose Evdokia.
11 So even though it took me a lot of time to put that word
12 in the letter, in the end, I put it in there because I
13 knew that without that word, I would lose my case.
14     Q.  And that's -- you're saying that's advice that
15 the prior dean, Fenves, had told you some years back?
16     A.  That's correct.
17     Q.  Okay. Kind of a word-to-the-wise thing?
18     A.  Yes.
19     Q.  Okay. So you were on the fence about it, and
20 then you eventually decided to go with it?
21     A.  I wasn't on the fence. I mean, I wanted her.
22 I mean, you know, I've said repeatedly today that I
23 believed in her; and I wanted her in the department.
24 But I was on the fence on whether -- how to write this,
25 right? I mean, because part of it is there is also a

116

1 credibility issue. You know, if I write, "I strongly
2 endorse this case" and the case is viewed as a weak
3 case, then the next time I write, "I strongly, you know,
4 endorse this promotion," you know, people may question
5 the validity of my judgment. And so that's why I kept
6 thinking about it for a time; but in the end, I was
7 willing to take the risk.
8     Q.  Okay. And you skipped from teaching, down --
9 or you said -- I guess you said a few things about the
10 research -- down to the bottom. Is there anything else
11 in the letter that you haven't identified that --
12     A.  Yeah, I'd have to take and read the whole
13 letter to pick up on things; but those are the ones
14 that, you know, normally, if I were reading the letter,
15 I would read the second paragraph carefully.
16         Normally, I would read the third-year
17 review; but in this particular case, it was sort of
18 immaterial. And I basically copied text from the
19 third-year review.
20         The teaching load is standard boilerplate
21 language, so there's nothing that -- I mean, except when
22 it talks about Evdokia in particular, so it's not
23 something I would pay attention to.
24         Then in the teaching, I would be looking
25 for the student comments; and in particular how she's

117

1 doing in one versus the other, undergraduate versus
2 graduate.
3         And in the research, I would be looking
4 at evidence that --
5     Q.  Dr. Tewfik, let me interrupt you. Let's go
6 ahead and take a short break. It's been about an hour
7 that we've been going. Go ahead and read the letter.
8 And I'm going to ask you to finish your answer to my
9 question of, "What in the letter identifies her
10 below-the-bar issues?" And then I'm going to follow it
11 with, "What in the letter identifies the above-the-bar
12 issues?" So, that way, you'll have a chance to review
13 the letter in detail. Is that okay?
14     A.  Yeah, that's fine.
15         MR. NOTZON:  Okay. Let's take a break.
16         THE REPORTER:  We're going off the record
17 at 2:13 p.m.
18         (Off the record from 2:13 to 2:30 p.m.)
19         THE REPORTER:  We're going back on the
20 record at 2:30 p.m.
21     Q.  (BY MR. NOTZON)  Okay. Professor Tewfik,
22 could you -- are you ready to answer the -- finish
23 answering the question on:  What in your letter
24 identifies the below-the-bar issues for Dr. Nikolova?
25     A.  Okay. So, first off, because I don't know

Ahmed Tewfik - 3/20/2021

118

1  whether, I mean, everybody's on the same page here, my
2  letter is written to support a promotion case.  So I
3  didn't write the letter to repeal the promotion case.
4  At the same time, my obligation is to present the facts.
5       So what I'm going to tell you is if I
6  were reading this letter, what are red flags that would
7  pop up and I would want to know more and pay more
8  attention to.  And, you know, then we can go into what
9  would come across as strong points or strong
10 characteristics of the case.  Okay?
11 Q.  Okay.  So just to clarify, so your answer is
12 nothing in the letter, to the uneducated, would identify
13 as subpar performance?
14 A.  Yes.  If I wanted -- I am not trying -- I
15 mean, there is no -- you know, this is not a secret
16 message that I'm trying to pass through the letter.
17 Okay?  I am stating in the letter -- the letter is
18 written because I wanted to have Professor Nikolova
19 promoted.
20      At the same time it is my obligation --
21 and, in fact, this is the first thing that happened,
22 like, within months from joining UT and meeting with the
23 President, he told me, "Your letters cannot be rah, rah,
24 rah letters.  You have to present -- they have to be
25 factual.  They have to present the weaknesses and the

119

1  strengths, and then we can have a discussion."  Okay?
2  So that's what that letter is meant to do.  Right?
3       So if someone in -- you know, some
4  professional is reading the letter, then, as they go
5  through the letter, when they see it's an emerging
6  pioneer and if they've seen my letters for other
7  candidates, that would tell them that someone hasn't
8  reached where we want them to reach; but they're on
9  their way to getting there.  Okay?  So it is saying I
10 believe in the potential of that particular person.
11 Now, it's up to them to agree or disagree with that.
12      In the third-year review, and knowing the
13 type of third-year reviews that Committees write and
14 knowing that these third-year reviews tend to be
15 supportive of the people that we're putting up, that we
16 would be putting up later for promotion, that the
17 language is very carefully selected, they would not have
18 known that this particular third-year review actually
19 went through a revision to just make sure that, you
20 know, it's as nice as possible; but they would have
21 picked on a few things in the first paragraph of that
22 third review.
23      So for her promotion case to be as strong
24 as possible, they would have picked on the issue of
25 slight increase of publication output.  Okay?  And they

120

1  knew that that third-year review was done at the same
2  time as, essentially, the promotion case.
3       They would have picked also on that fact
4  that the last sentence says, "Post-tenure, it would be
5  good for her to become more active both in leadership
6  activities internally and externally."  That sends a
7  clear message that she's not there yet in terms of what
8  she should be doing there.
9       Okay.  Then, in the teaching section, my
10 first sentence says, "Evdokia's instructor course
11 evaluation scores don't paint a complete picture of her
12 passion for teaching."  Someone who is an expert would
13 read this and know that we have a problem here.  This is
14 not going to be a strong teaching case.  A strong
15 teaching case would say, "She's one of our best teachers
16 in the department," or something along those lines and
17 would have a lot of praise from the get-go.  Okay?
18      Here, I'm starting by saying, "Don't just
19 get stuck on these scores because they don't paint a
20 complete picture."  I go on to say that the course, the
21 undergraduate course, that she's teaching is a very
22 tough course, so, you know, to try to balance the
23 impression that you might get if you just looked at the
24 scores.
25      But then if you look at the last sentence

121

1  of that paragraph, then you see that she's getting some
2  praise, but that she's getting also sort of redirect
3  flags.  For someone on the Promotion Committee -- on the
4  Presidential Committee, the Dean of Undergraduate
5  Studies would pay a lot of attention to that; and he
6  probably would have gone and looked at other exemplars
7  of that, you know, "We wish she had more office hours,"
8  the lectures not being exciting, the ineffective
9  teaching of the teaching assistants, her whiteboard
10 writing, all these things would mean:  Okay.  Fine.
11 You're telling us not to look at her scores.  We're
12 willing to believe you, but there seems to be other
13 issues.  And you'll have to convince us that -- why are
14 you disregarding these other issues.  Okay?
15      So to convince them why disregard these,
16 I had a paragraph that talked about the changes to
17 EE360C, that they were picked up by other professors.
18      Then I go to graduate courses, which tend
19 to have higher scores than the undergraduate course; in
20 this case, not really.  They're about in the same range.
21      And then the end of that paragraph,
22 again, mentions the student comments; and you'll see the
23 praise about her energy level and enthusiasm.  But then
24 you'll see the comments about boring classes and
25 solutions to homework not being provided in a timely

122

1 manner, which, for someone who's looking at the case,
2 would mean: Okay. Well, we still have problems here
3 because it seems to be a professor that isn't paying
4 attention to the needs of the students; and your first
5 and foremost duty, you're hired to teach students. So,
6 you know, are you taking this seriously? Basically,
7 this is the question that would arise from that.
8         Now, of course, my letter isn't the only
9 evidence they have. Again, they have the firsthand
10 knowledge of the student comments. So I tried to
11 balance this again by saying: Okay. You know, give me
12 the benefit -- or give her the benefit of the doubt
13 because she's done other things. She worked on the
14 Edison Lecture, et cetera.
15        On the research side of things, the
16 second paragraph talks about her work; but for someone
17 who's paying attention to what she's published when,
18 they immediately pick up the fact that this paragraph
19 and the next paragraph are essentially talking about the
20 work that she was doing early in career, in particular,
21 coming to UT and her first, maybe, year or two at UT.
22 And they would have picked that up, also, in the
23 recommendation letters that we got because the same
24 thing was there. So both of those, for some, I mean, it
25 would be great. Some people would say, "Yeah, this is

123

1 great. You know, she's a great researcher. She's had
2 an impact. She started something new." And they would
3 agree with me that she has the potential.
4         Others might get stuck on the fact that
5 well, this was her early work and that her later work,
6 which is what's in the next two paragraphs or next three
7 paragraphs, the work on tolls and the work on electric
8 distribution, that -- that is happening but may not have
9 had as much of an impact.
10        Those who look carefully at the letters
11 would also realize that, for example, the toll work, the
12 letters of recommendation that we got, based on our
13 discussions with Evdokia were from people in her field,
14 not people in the field where the work would have an
15 impact. And, in fact, in my discussions with the dean
16 later on -- and she alludes to this -- I think she
17 alludes to this in her letter -- because this is closer
18 to the dean's work -- she's a civil engineer -- she
19 didn't feel that this work was particularly impactful.
20        And then the last paragraph is about the
21 work and efficiency in electric distribution; and you --
22 at the very end of my paragraph, quoting from one of the
23 reference letters, there is a sentence that says, "Her
24 skills may bring some fundamentally new insights." It
25 doesn't say, "It brought." It doesn't say, "It

124

1 changed." It doesn't say any of that.
2         Whereas, if you look at other letters,
3 you'll find them saying, "This is the first time that
4 this result was established." You know, "This was the
5 first time that this was done." You know, "This was
6 something that no one knew about before." "This has
7 changed the work that the other professors are doing."
8         So all of these things -- so on the
9 research side of things, there is positive information;
10 but, again, there are potential red flags. I mean, in
11 my mind, if I were reading the letter and I wasn't the
12 Department Chair, maybe less then on the teaching side;
13 but there are issues there.
14        Then if I go down to Service, you know, I
15 had to say that she's provided reasonable service to the
16 department; and I had to acknowledge the fact that my
17 colleagues did say that her involvement was lower than
18 average. And, again, to counterbalance that, I put a
19 sentence that said, "Well, it's not a concern of mine
20 because of her personal circumstances." Okay? So I'm
21 not -- yes, I realize that, you know, this is not the
22 strongest service; but I'm just not concerned about it.
23 Okay?
24         So that's essentially how that letter
25 would be viewed by someone in the know. They would read

125

1 the letter. They would pick up the strong points, and
2 they would pick up the weaknesses. And then they would
3 go into the dossier to further dig into the weaknesses
4 and the strengths.
5    Q. Okay. Do you believe you've just answered my
6 question for the strengths as well?
7    A. I do.
8    Q. Okay. On the third-year review portion, is
9 there a reason why you didn't raise the increased
10 publications that she had in '17 and '18 that were at a
11 greater rate than had occurred prior?
12        MS. HILTON: Objection, form.
13    A. I didn't -- I didn't write the third-year
14 review. The Committee wrote the third-year review. So
15 they looked at her publications. They looked at the
16 cumulative rate, and their assessment was that there's a
17 problem there. And, in fact, the first version --
18    Q. (BY MR. NOTZON) Maybe you're misunderstanding
19 my question. I'm talking about the third-year review
20 portion of your letter, not the third-year review.
21    A. The third-year review portion of my letter
22 reports on the -- that section, in the normal letters,
23 state what the third-year review conclusion was, not my
24 opinion of the third-year review, and that what we did
25 since then. If there was a concern, how we addressed

126

1  this concern.  In this particular case, there was no
2  opportunity for me to say how we addressed this concern
3  because we basically went up for promotion a few months
4  later.
5      Q.  Well, you do say, "However, I do note" -- so
6  you provide two sentences of rebuttal to the third-year
7  review?
8      A.  Because those two students -- this is not a
9  rebuttal.  The third-year review said it would be good
10 to graduate a Ph.D. student; that's an unspoken
11 requirement at UT, which Evdokia was aware of.  And to
12 make sure that that third-year review doesn't anchor in
13 people's minds that she doesn't have a Ph.D. student for
14 those who are old school and are tied to that, I had to
15 remind them that she did, in fact, graduate a student.
16     Q.  That is an explanation that she took the
17 criticism from third-year review and even though it --
18     A.  No, no, no.  No, I'm very sorry.  This is
19 not -- she did not take the criticism -- you don't
20 graduate a Ph.D. student by just, like this (witness
21 snapping fingers.)  Okay?  Like, you know, graduate a
22 student -- okay, three months later, we graduate a
23 student.  The student had been working towards that, and
24 so her student was on track to graduate.  And, in fact,
25 if the student wasn't on track to graduate, we probably

127

1  wouldn't have put her case forward because we knew that
2  we were going to run into this objection.  Okay.  So
3  this is not her responding to criticism from the
4  third-year review.  We were on track for that.
5      Q.  Okay.  We'll let other people read the
6  sentence, "However, I do note that..." however they're
7  going to take it.  Whether you agree that that's a
8  rebuttal or an answer to the advice or criticism in the
9  third-year review, we'll let -- we won't quibble about
10 that.  Okay?
11         But let me just ask another question, and
12 let me get the question out.  At the bottom of the first
13 paragraph of the Third Year Review section of this
14 letter, Exhibit 2 -- I mean, Exhibit 6 -- it says,
15 "Post-tenure, it would be good for her to become more
16 actively involved in leadership activities internally
17 and externally."  Do you see that?
18     A.  Yes.
19     Q.  Okay.  And then before that, it asks about the
20 graduating a Ph.D. student and increasing her
21 publications, right?  That's what that section was
22 recommending for her as the results of the third-year
23 review, correct?
24     A.  Correct.
25     Q.  Okay.  And in the next paragraph you identify

128

1  that she, in fact, did graduate a Ph.D. student between
2  the third-year review and the tenure application; that
3  she also increased her publications with three
4  conference papers in the interim, correct?
5      A.  Correct.
6      Q.  Okay.  And -- but you didn't put in that she
7  had increased her leadership activities externally, at
8  least, by being asked to return to the Simons Institute
9  as an organizer with tenured professors in a national --
10 internationally renowned conference, correct?
11     MS. HILTON:  Objection, form.
12     A.  Correct, I didn't write that and --
13     Q.  (BY MR. NOTZON)  Why not, since that occurred
14 in the Spring of 2018?
15     A.  Because you don't get promoted for service.
16 Okay?  So the fact that you provided service isn't going
17 to promote you.  The two points that I alluded to in
18 that last paragraph are two points that were essential
19 for us being able to push the case forward.  So without
20 her graduating a student, a Ph.D. student -- and I
21 wanted to make sure that somebody reading the letter and
22 then anchoring on the third-year review, wouldn't say,
23 "Why is -- why are we looking at this case if she had no
24 Ph.D. student," when, in fact, she had a Ph.D. student.
25         And the statement about the three

129

1  conference papers is because up to the very last minute
2  before that first vote, we weren't sure whether we would
3  be able to put her case forward to the Budget Council or
4  not.  Had these three papers not come through, had they
5  not been accepted during that time, she would have --
6  you know, she would have submitted those papers probably
7  sometime before the third-year review report because of
8  the review cycle.  But had these three papers not come
9  through, we mostly would not have gone forward; and, in
10 fact, you have the e-mails, I'm pretty sure.  You know
11 that she's reported to me, "Oh, here is a paper that was
12 submitted and accepted."
13         And I said, "Great timing, exception."  I
14 didn't put that detail also in the letter.
15     Q.  Did you -- is it your testimony that service
16 is not required for a tenure promotion?
17     MS. HILTON:  Objection, form.
18     A.  No, that's not -- that's not my testimony.
19     Q.  I didn't think so.  So let me ask a ques- --
20 let me ask:  If, in fact, you're responding in the last
21 paragraph -- the second paragraph of the Third Year
22 Review section to specific statements that were made in
23 the third-year review about how she could be better,
24 that you didn't put in how she could be better in
25 response to one of the topics that they have there,

130

1 which is a criteria for tenure, which is service?  Why
2 didn't you put that in there?
3          MS. HILTON:  Objection, form.
4     A.  Okay.  So I didn't put that in there because
5 not everything in her CV -- I mean, she talks about this
6 in other places; and I didn't feel that this is an
7 essential part of the case, so I didn't put it in there.
8          Also, that information about the Simons
9 Committee is likely something that she shared with -- I
10 mean, unless this came -- and I don't -- I don't -- I
11 have no recollection of that -- unless this is something
12 that came sometime in August or July or June of that
13 year, it's something that I saw or that she made aware
14 about or that she made the Committee aware of; and I'd
15 have to go back and look at the e-mails for that.
16    Q.  Whether she let the Committee know or not,
17 it's whether you know or not, right?
18    A.  No.
19         MS. HILTON:  Objection, form.
20    A.  No, that's not true.  The Committee has her
21 CV.  The Committee -- she has -- she submits her
22 teaching statement.  She submits her research statement.
23 She has -- the Committee has all of her reviews, and she
24 can submit any statement that she'd like; and when she
25 saw -- and when she saw the first version of the

131

1 Committee report and was able to provide feedback, she
2 would have provided all of the information to help the
3 Committee write something that's more favorable to her.
4    Q.  And you're talking about this Budget Council?
5    A.  I am talking about the Committee that wrote
6 that third-year review.
7    Q.  Okay.  I'm not talking about the third-year
8 review.  I'm talking about the things that have happened
9 since the third-year review that are relevant to her
10 promotion to tenure application, which you include in
11 the second paragraph of your letter in the Third Year
12 Review section.  That's what I'm referring to.
13    A.  You are --
14    Q.  You put in -- the points that you put in that
15 second paragraph are not in her third-year review.
16 That's information that was obtained since that
17 third-year review was completed, correct?
18    A.  That is correct.  So --
19    Q.  No, no, please answer one question at a time.
20         And so you know that she was a part of
21 the Simons Institute in the Spring of 2018 and that she
22 was an organizer.  She was invited to be an organizer
23 and not just a participant, and this is -- she was
24 called back.  It is a very prestigious and competitive
25 event, and it is a high-profile event.  And it's

132

1 commented in other areas of her assessment; but you
2 didn't put it in here in response to this call for
3 additional leadership activities, did you?
4         MS. HILTON:  Objection, form.
5    A.  You are making a number of statements and
6 assumptions.  You know, you're essentially telling me
7 that if she serves on this committee, then that means
8 that she is a superstar and needs to be promoted.  I
9 mean, you're making certain assumptions on the
10 importance of that particular piece of information.  I
11 am telling you that --
12         (Simultaneous speakers.)
13    Q.  (BY MR. NOTZON)  Just tell me why you didn't
14 put it in.
15    A.  You are making that assumption.  I mean,
16 you're telling me this is a prestigious -- I mean, all
17 that stuff that you wrote, right?
18    Q.  No, I'm asking you --
19         (Simultaneous speakers.)
20    Q.  I'm reading from -- I'm reading from your
21 Budget Council's assessment.
22    A.  My Budget Council assessment, this is other
23 people's assessment.  So my -- my professional judgment,
24 as I was writing this letter, is that what is important,
25 the information that, in my professional judgment, is

133

1 going to be important for her promotion and to make her
2 case the strongest was to say that:  In fact,
3 remember -- look at her dossier -- she has graduated a
4 Ph.D. student and that she has published a few more
5 papers.  Okay?  That's my professional judgment.  I
6 mean, if you want to question my professional judgment,
7 it's up to you.
8    Q.  Well, I guess that's your answer to my
9 question is:  The reason you didn't put it in there is
10 because, in your professional judgment, it was not
11 helpful?
12    A.  Not it was not helpful; it was not necessary.
13    Q.  Okay.  It wouldn't have helped her be
14 considered for tenure?
15    A.  It wouldn't have changed a decision, anyone's
16 decision on whether she should get tenure or not tenure.
17         The other two points would have changed.
18 If somebody was for -- if somebody was:  Okay.  Is she
19 above the bar or below the bar?  That would have pushed
20 her below the bar.
21    Q.  And that's because you have a feel for what
22 the P&T Committee's going to do, what Dean Wood's going
23 to do, what the President's Committee's going to do, and
24 what the President's going to do from your past
25 experience; is that right?

134

1              MS. HILTON:  Objection, form.
2        A.  It is because I have a feel for that and I
3   have a feel and I heard my colleagues in the discussions
4   with the Budget Council.
5        Q.  Wait.  Wait.  Hold on.  No.  The Budget
6   Council would have no role to play in the decision
7   making above because that's what this letter's for.
8   This letter's not going to influence the Budget Council,
9   correct?
10       A.  It doesn't influence the Budget Council; but
11  having heard --
12             (Simultaneous speakers.)
13       A.  -- but having heard what the Budget Council
14  people are saying, I know what's important for a
15  Promotion and Tenure case.  I know that the Budget
16  Council didn't spend a ton of time on whether she served
17  on the Simons Institute or not; but I know they spent
18  time on the publications and I know that in previous
19  cases if you didn't have a Ph.D. student, that
20  essentially torpedoed your case.  And --
21             (Simultaneous speakers.)
22       Q.  Let me clarify.  Are you saying that the
23  Budget Council's input into your decision of whether or
24  not to put the Simons Institute information in that
25  paragraph is that they were also operating with their

135

1   knowledge about what would happen above you?
2              MS. HILTON:  Objection, form.
3        A.  They're not -- it's not a question of
4   creating with their knowledge above me.  It is our
5   professional judgment of what pieces of information are
6   very relevant and what pieces of information are less
7   relevant and which are in the rest of the dossier.
8   People are supposed to read the whole dossier.  They
9   don't just read my letter, and that's it.
10       Q.  (BY MR. NOTZON)  Professor Tewfik, what --
11  you're saying that it wouldn't change anybody's
12  decision; and anybody's decision is anybody's decision
13  above you, correct?
14       A.  Correct.
15       Q.  Okay.  So -- all right.  So when you say you
16  relied on your experience about what would happen above
17  you and the other members of the Budget Council, I'm
18  just finishing the sentence for you that it's other
19  members of the Budget Council's understanding of what
20  would happen in the decision-making process above you,
21  correct?
22             MS. HILTON:  Objection, form.
23       A.  You -- I don't know where you want to go with
24  this.
25       Q.  (BY MR. NOTZON)  I'm just asking you to

136

1   clarify your statement.
2        A.  I am clarifying my statement.  Each of us has
3   the duty of issuing a professional judgment on whether a
4   person "X" is -- should be promoted or not.  When we
5   make that professional judgment, we emphasize certain
6   pieces of information and other pieces of information we
7   take into consideration and we don't emphasize them.
8              When I wrote that statement, I emphasized
9   the pieces of information that, in my professional
10  judgment, are relevant.  And, furthermore, these pieces
11  of information is what I think other people will also
12  look at carefully when making their judgment on whether
13  to promote or not.
14             These other people's duty is to read the
15  entire dossier.  No one has removed the Simons
16  Institute -- mention of the Simons Institute in the
17  dossier.  I didn't do it.  The Budget Council didn't do
18  it.  The P&T Committee didn't do it.  The dean didn't do
19  it.  It's there, and it's everybody's duty to read the
20  entire dossier before making a decision.
21       Q.  And it's your duty to make a strong
22  presentation of your faculty member, going forward with
23  accurate information, both positive and negative?
24             MS. HILTON:  Objection, form.
25       A.  I -- I think I answered this question.  I told

137

1   you that in my first few months at UT when I met the
2   president, he told me that my letter should not be a
3   rah, rah, rah for the person that we're putting up for
4   promotion.  I should discuss --
5              MR. NOTZON:  Object as nonresponsive.
6        Q.  (BY MR. NOTZON)  I didn't ask that.
7        A.  That's what you asked.
8        Q.  No.  It would make this process go a whole lot
9   faster if you'd just answer my question.
10             Do you agree or do you disagree that the
11  Simons Institute is a big deal?
12             MS. HILTON:  Objection, form.
13       A.  Define "a big deal."  It could be a big deal
14  to you.
15             (Simultaneous speakers.)
16       Q.  (BY MR. NOTZON)  In the field that
17  Dr. Nikolova operates.
18       A.  It's a nice recognition, but what's "a big
19  deal"?  I mean, a big deal means that you do this, you
20  get promoted; or it's a big deal, you get this; and we
21  give you an award?  What is "a big deal"?  We give you a
22  huge raise?  What is "a big deal" to you?
23       Q.  Is it competitive to participate in?
24       A.  I have no knowledge of that because I'm not in
25  her field.

138

1    Q.  Haven't you read the letters?
2    A.  I've read the letters, but that -- that
3  doesn't tell me whether -- you know, how important that
4  is.
5    Q.  It doesn't -- they don't actually specifically
6  state that to you?
7        MS. HILTON:  Objection, form.
8    A.  I read the letters, and that was my
9  assessment.  And, furthermore, at this moment in time, I
10  don't remember the letters.  So if you want to show me
11  the letters, we can look at the letters and read them
12  and then we can debate how important it is or it's not.
13    Q.  (BY MR. NOTZON)  The truth is you read the
14  letters back in; and you made your decision back then,
15  correct?
16    A.  I read the letters --
17        MS. HILTON:  Objection, form.
18    A.  -- back then; and I made a decision back then,
19  yes.
20    Q.  (BY MR. NOTZON)  Okay.  Did you ever tell
21  Dr. Nikolova that she had a not strong, or even a weak
22  case, prior to her going up?
23    A.  As I mentioned sometime ago, I mean -- I don't
24  know -- half an hour ago or in one of the questions, up
25  to very close before the Budget Council, we were unsure

140

1  recommend going up for promotion at this time?
2    A.  I told her that if we -- my recollection is I
3  told her that if these paper did not go through, that we
4  should not go up for promotion at this time.
5        MS. HILTON:  Robert, can we take a brief
6  break?
7        MR. NOTZON:  In a little bit.
8        MS. HILTON:  Okay.
9    Q  (BY MR. NOTZON)  So in your letter, you
10  mention -- in Exhibit 6, at the beginning, you mention a
11  couple of professors in that second-to-last sentence of
12  the second paragraph?
13    A.  Yes.
14    Q.  Who were those?
15    A.  I told you that we -- the votes are anonymous,
16  and the comments are anonymous.  So I don't know who
17  those are.
18    Q.  Okay.  It doesn't say that those were
19  anonymous.  That's why I'm asking.
20    A.  It does say, "My colleagues expressed support
21  for Evdokia during the promotion case and in the
22  anonymous comments submitted with the vote."
23    Q.  That's a separate sentence.
24    A.  Well, I didn't write that in the next
25  sentence; but that's -- the next sentence referred to

139

1  whether we would be able to put her up for promotion or
2  not because we were waiting for the results of the
3  papers that she had submitted to conferences.  That
4  sends the message that there is a problem, that this is
5  not a strong case.  If this were a strong case, we would
6  have known a year in advance or nine months in advance
7  that we're good to go; nothing to worry about.
8        MR. NOTZON:  Object as nonresponsive.
9    Q.  (BY MR. NOTZON)  Professor Tewfik, did you
10  tell Dr. Nikolova that you felt that she had a weak
11  case?
12    A.  I don't recall what I specifically told her or
13  not, but what I do recall is what I just mentioned a
14  minute ago.
15    Q.  What you mentioned is facts; but you didn't
16  mention a conversation between you and Dr. Nikolova,
17  which is what my question is.
18    A.  I'm -- well, those facts are because these
19  were conversations I had with Dr. Nikolova that, "We
20  need additional publications so that this can get
21  through."  And this is why she did let me know when her
22  papers were published.
23    Q.  Thank you.  That's what I'm trying to get
24  clarified, that you actually told her this.
25        Did you tell her that you didn't

141

1  those anonymous comments.
2    Q.  Okay.  Now, the "weak engagement in the
3  department and the wireless communications and
4  networking center, the WNCG," so was it a combination of
5  the department and the wireless communications; or was
6  there a focus on one or the other?
7    A.  Different people had different opinions.
8    Q.  Okay.
9    A.  And I have no way -- so, first of all, these
10  comments surfaced a number of times, including in the
11  Budget Council meeting and including in the anonymous
12  comments; but in the anonymous comments, I have no way
13  of knowing whether the person belongs to WNCG or not.
14    Q.  Okay.  And it does say "a couple," a couple
15  out of 35 people -- or 37 people, that's not very many?
16    A.  This is two in the anonymous comments.  And
17  you could take it that way, yeah, the only two submitted
18  of these types of anonymous comments.  And that may be
19  your view.  And -- but in the Budget Council, people did
20  voice that concern before and after the Budget Council.
21  So it's not the concern of two people.  It's the concern
22  of many people, some of whom -- or most of whom elected
23  not to provide any anonymous comments with their votes.
24    Q.  And when you say "after the Budget Council,"
25  you're talking about the Budget Council vote on

Ahmed Tewfik - 3/20/2021

142

1  Dr. Nikolova?
2      A.  Yes.
3      Q.  Okay.  And did you ever tell Dr. Nikolova that
4  you felt that, based upon your prior testimony, that if
5  she would have been a man, she would not have been voted
6  up?
7      A.  I don't remember sharing that information with
8  her.
9      Q.  Okay.  Did you share that information with
10  Dean Wood?
11      A.  No.  This is my own assessment; and there is
12  no reason for me to share this information with
13  Dean Wood, in particular, that I wanted Dr. Nikolova to
14  be promoted, not to not be promoted.
15      Q.  Okay.  Did you share it with any members of
16  the ECE faculty?
17      A.  No, I don't share these types of opinions with
18  anyone.
19      Q.  Did anyone in the ECE Budget Council make such
20  a statement?
21      A.  Yes, people made such a statement; and there
22  is -- my recollection is in the anonymous comments,
23  there was at least one statement along those lines.
24      Q.  Okay.  Is that the only place you saw that
25  reference to if Dr. Nikolova was a man, she would not

143

1  have been voted up, was just in the anonymous comments?
2      A.  You know, this may have come up in the verbal
3  discussions.  So in terms of something written and where
4  I can look at and recall, that's where I can point to.
5      Q.  So is your testimony that it may have occurred
6  verbally as well, or you don't remember; you're just
7  making the possibility there because you don't remember
8  one way or the other?
9      A.  I don't remember one way or the other; but the
10  issue that came up that as discussion is, "We want to
11  retain her because we don't have enough female faculty
12  members."  So you can extrapolate from that and make
13  your own, you know, decision or conclusion.
14      Q.  So when that comment was made, you did not
15  explore the basis of that comment?
16      A.  I don't intervene in the Budget Council
17  discussions because I have my own opinion, so I just
18  listen.  People discuss it, and they vote.
19      Q.  And nobody else intervened to ask what was
20  meant by that comment?
21      A.  I don't recall the -- you know, this has been,
22  like, three years ago, almost.  I don't -- I don't
23  remember exactly what -- precisely who said what and who
24  responded to whom.
25      Q.  Is it your understanding from that comment

144

1  that it was -- that because she was a woman, the vote
2  was going that way to support tenure; or was it that,
3  "Hey, we just want a woman" -- not -- scratch.
4          That, "It's good that she's a woman
5  because we need more women"?
6          MS. HILTON:  Objection, form.
7      A.  I don't understand what you're asking.
8      Q  (BY MR. NOTZON)  Okay.  Your take on the
9  comments -- comment or comments, plural, whichever they
10  were, is that, had she been a man, she probably would
11  not have been voted up?
12          (Simultaneous speakers.)
13          MS. HILTON:  Objection, form.
14      Q.  (BY MR. NOTZON)  I'm sorry?
15      A.  That's correct.
16      Q.  Okay.
17          MR. NOTZON:  We can take a break now.
18  Sorry, Ms. Hilton.
19          MS. HILTON:  Thank you.
20          THE REPORTER:  We're going off the record
21  at 3:07 p.m.
22          (Off the record from 3:07 to 3:19 p.m.)
23          THE REPORTER:  We're going back on the
24  record at 3:19 p.m.
25      Q  (BY MR. NOTZON)  Okay.  I just want to finish

145

1  up that kind of -- that area of questioning, Professor,
2  on the number of people in the department that kind of
3  held this belief that we were talking about that the --
4  the one about Dr. Nikolova having issues of engagement
5  with the department or the wireless part.
6          There was -- you said there was a couple
7  of anonymous complaints, and then there were people on
8  the Budget Council verbally conveying this.  Do you have
9  a sense of the number of people that were conveying
10  this?
11      A.  No, I don't.  You know, I didn't count people;
12  but if I were to make a general statement, I would say
13  that the vast majority of the professors in WNCG shared
14  that opinion.  And those who served with Evdokia on the
15  Recruiting Committee also shared that opinion.
16      Q.  And if you counted all of those numbers
17  together, total -- and I know you're not saying
18  everybody -- but what would the upper limit of that
19  number have been?
20      A.  I can't give you an answer because I'd have to
21  go back and I really would have to look at how many
22  professors are full professors, not associate
23  professors, assistant professors in WNCG and which --
24  something that would be more difficult is to go back and
25  look at who served with Evdokia on, you know, the

146

1  Recruiting Committee and who I may have staffed for
2  other committees and who may have served with her on
3  this Recruiting Committee and who spoke and -- you know,
4  I wouldn't be able to even remember who actually spoke
5  up during the Budget Council meeting, as opposed to
6  before or after.
7      Q.  Okay.  But just in terms of an upper-limit
8  number of those two committees, of how many people were
9  on those two committees, you don't have a ballpark
10 figure?
11     A.  No.  You know, I vaguely remember that WNCG
12 might be about a third of the department; but then, out
13 of that third, how many are professors and how many were
14 professors in 2018, I just don't remember.
15     Q.  Okay.  Because it would only be the full
16 professors that would be at issue on these comments?
17     A.  Right, correct.
18     Q.  So you can't say more than 10, less than 10;
19 more than 20, less than 20?
20     A.  No, I couldn't.
21     Q.  And there's no way to recreate that, correct?
22 All those verbal comments, there's no documentation of
23 that?
24     A.  No, there's no documentation of that, yeah.
25     Q.  Would it be fair to say -- and this is the

147

1  last time I'm going to -- I think I'm going to try to
2  test your memory on this issue.  Would it be fair to say
3  that it was less or more than half of the Budget
4  Council?
5      A.  I really wouldn't be able to answer that
6  question because some people are vocal and they'll say
7  it.  Others may have discussed it with those same
8  people, you know, outside of a meeting; and then, that's
9  reflected in their vote or in some other comment they
10 made.  I have no way of -- you know, short of having a
11 survey, I have no way of giving you an answer.
12     Q.  Okay.  Did you ever let Dr. Nikolova know that
13 there was this level of displeasure or concern with her
14 lack of engagement in the department and the wireless
15 part prior to going up?
16     A.  I vaguely remember having a conversation with
17 Dr. Nikolova, again, when we were in the UTA building
18 around that topic; and she, in turn, mentioned a concern
19 of not being involved enough in WNCG meetings and
20 discussions between different people.  And this is when
21 I suggested to her to pick up a mentor outside of her
22 area.
23     Q.  Did -- when you were having a meeting with --
24 well, I guess, let me -- let me ask it this way:  Do you
25 remember in the Spring of 2018 -- which would have been

148

1  the period of time that the Budget Council is going
2  through Step 1 of Dr. Nikolova's tenure consideration;
3  is that correct?
4      A.  That's correct.
5      Q.  And then -- and she was -- was she on campus
6  at that time, or was she away at Simons?
7      A.  I have no memory of that.  I know that I spoke
8  with her one -- I think -- I believe I spoke with her
9  once -- at least once, I believe -- and I may be
10 completely wrong -- in person.  I know that we had a
11 discussion of -- I vaguely remember having a discussion
12 of maybe meeting with her in California because I was
13 going to fly to California, and that didn't happen
14 because my mother passed away around that time.  So she
15 might have been in California for some reason, or she
16 might have been in California for the entire semester.
17 I don't know -- I mean, I don't remember.
18     Q.  That's a long way of asking:  Did you know
19 that she was pregnant during that semester, Spring of
20 2018?
21     A.  I mean, unless she told me.  I mean, it
22 doesn't -- I don't remember she telling me, but she may
23 have told me; and, you know, that wouldn't have changed
24 anything, so -- meaning, during that semester.
25     Q.  No, I'm not asking if it would change

149

1  anything.  I'm just asking if you knew.  And I'll
2  represent to you her second child was born in June of
3  2018.  So, you know, she would have been pregnant since
4  September, on, kind of thing; and so I just didn't know
5  if that was a known issue for you.  And then she ended
6  up taking her Modified Instructional Duty for that
7  second child in the Fall of 2018, which would have been
8  the beginning of the consideration period for the
9  tenure, correct?
10     A.  I don't remember the details of pregnancy and
11 when she went on Modified Instructional Duty or not;
12 but, you know, yes, she took -- she took Modified
13 Instructional Duty semesters off.  I don't remember how
14 many or when.
15     Q.  Okay.  Well, would it be accurate that you
16 would have known at the time in the summer that her
17 dossier's being prepared that she had just given birth?
18         MS. HILTON:  Objection, form.
19     A.  So we -- normally -- and I don't -- I don't
20 remember what happened during that period of time; but
21 normally what happens is the faculty member comes to me
22 and says, "I'm pregnant" or "My wife is having a baby"
23 or "My partner's having a baby"; and then we have a
24 discussion.  "Okay.  When do you want -- when would you
25 like to take your semester off?"  They don't do this at

Ahmed Tewfik - 3/20/2021

150

1 the last minute. They normally do this far in advance.
2 So I would have to assume that if she did deliver in the
3 Summer of 2018, that she would have let me know sometime
4 in advance of that that she was pregnant. We would have
5 had that conversation, and we would have filled the
6 required paperwork around that time.
7    Q. And so if she -- when she took the Modified
8 Instructional Duty in the Fall of '18, that that would
9 be known to you and the department. Would it -- would
10 it also be something that the college would know?
11    MS. HILTON: Objection, form.
12    A. Yes. In recent years, this would be something
13 that the college would be aware of because in my first
14 years as Department Chair -- and I don't remember
15 exactly when the transition happened. Maybe it happened
16 when Dean Wood became the Dean; maybe it happened
17 shortly thereafter. I don't recall.
18       In the first few years, the faculty
19 member would come to me. I would give them the Modified
20 Instructional Duty, and it stayed at the department
21 level. At some point during Dean Wood's tenure, I was
22 required to write the memo and that memo needed to go to
23 the Dean and, you know, there was some discussion and
24 then they would say, "Approved."
25    Q. Okay. And so that change in the process would

151

1 have occurred shortly after Dean Wood became the dean?
2    A. I honestly don't remember exactly when it
3 happened, but it happened. I mean, this was part of a
4 lot more -- you know, more memo-writing requirements
5 over a period of time.
6    Q. Okay. So you would have to approve the
7 Modified Instructional Duty first and then send it up.
8 If you approved it, then the Dean would then have to
9 approve it?
10    A. Yes.
11    Q. And if you denied it -- or I don't know if you
12 ever have denied it. Have you ever denied a request for
13 Modified Instructional Duty?
14    A. So before I came to the department, there was
15 no such thing that if you became pregnant, we would give
16 you a month off teaching; and, in fact, in other
17 departments, that does not exist. They may lighten your
18 teaching schedule, but they will not take you off
19 teaching.
20       When I arrived in the department, the
21 first thing I said is, "We need to be friendly to our
22 professors. We need to be friendly to families, and
23 this is what I'm going to do." And since this was on
24 the department's dime, nobody objected. And, initially,
25 because it was just the department, I could do it. So

152

1 you came to me; you said, "I'm pregnant" or "My wife is
2 pregnant," I gave you your Modified Instructional Duty.
3 And that was the end of the story.
4       And, as I mentioned, when Dean Wood
5 became dean, at some point she said, "No, you can't do
6 this on your own. You really have to refer this to me;
7 and then I will say 'yes' or 'no.'"
8    Q. Okay. And so there's -- the only way to know
9 when that change happened is when those memos started
10 getting written and approved?
11    A. That's correct, yes.
12    Q. There's no -- there's no writing from the
13 Dean's Office that says, "This is the new policy on
14 Modified Instructional Duty"?
15    A. I don't remember such an e-mail; and, again,
16 we were probably the only department that had it to that
17 level. I mean, others had it, you know, like, instead
18 of teaching two courses, you might teach one course. So
19 I suspect that there was no e-mail blast to all the
20 departments saying that this is happening because the
21 change, really, was targeted at ECE.
22       I may have received and e-mail from the
23 dean or associate dean saying, "From now, you do this"
24 or I may have gone into a meeting and said, you know,
25 "'X' is going on Modified Instructional Duty," and they

153

1 said, "Oh, from now on, you'll have to ask our
2 permission."
3    Q. Do you remember who the first person is that
4 you had to write that memo for?
5    A. No, I don't.
6    Q. Okay. And so that memo that you would write
7 requesting Modified Instructional Duty to the dean for
8 approval and the dean's approval would be kept in the
9 faculty member's file?
10    A. I don't think so. Maybe in the faculty
11 department's file at the college level, not at the
12 department level.
13    Q. Okay. So you'd get a copy of the approval or
14 notice of the approval, but you wouldn't get the actual
15 approved memo?
16    A. I would get an e-mail saying, "Approved." You
17 know, I wouldn't get -- I don't remember. Maybe at some
18 point they were sending memos saying, "Approved." But
19 it's more likely that it was just an e-mail saying,
20 "Approved."
21    Q. Okay. And then do you forward that e-mail to
22 the faculty member?
23    A. No. Normally, once we started having that
24 requirement, we would tell the faculty member that we're
25 good to go. The most important person to know that this

154

1  is -- that it's been approved is really the departmental
2  executive assistant, who then makes sure that, you know,
3  that's taken care of.
4      Q.  Oh, and just to close that -- that process
5  box, in your memo requesting approval from the dean for
6  Modified Instructional Duty, are you identifying what
7  the faculty member's going to do in lieu of instruction?
8      A.  Yes, because when I started this policy and I
9  had to fit it under the UT policy, which has no such
10 allowance, I had to -- because I could have -- even
11 before the requirement for the memos, the provost or the
12 dean could have said, "What is this faculty member
13 doing?  You have no right to do this."
14          I would -- I would make sure to talk with
15 the faculty member; and I would say, "The faculty member
16 will be working on developing a new course" or will be
17 doing something else that doesn't require, you know,
18 being somewhere at a given time, you know, twice a week
19 or three times a week, et cetera.  So there was always
20 an explanation of what the faculty member would be
21 doing, even before the memo requirement.
22     Q.  Okay.  Which makes sense, yeah.  So do you
23 remember -- you know, do you remember writing a memo for
24 approval from Dean Wood for Dr. Nikolova?
25     A.  Well, the fact that Dr. Nikolova had, I don't

155

1  know, two or three -- I don't know how many -- Modified
2  Instructionals -- three?  Okay.  So she had three, means
3  that I had to write a memo at least twice, most likely,
4  three times to get it approved.
5      Q.  Okay.  And it's two before she -- or two
6  before and during her tenure consideration, just to be
7  clear.  That third one was most recently, so.
8          Did you ever have conversations with
9  Dean Wood about Dr. Nikolova's pregnancies, one, two, or
10 three?
11     A.  No, that's not something that I engage in,
12 have conversations about pregnancies or any other family
13 issues.  For the pregnancies and family issues in which
14 I would have to give a Modified Instructional Duty,
15 meaning, it would span an entire semester, I had to
16 write an memo.  So that was the extent of the discussion
17 is, you know:  There are these circumstances.  I'm
18 providing Modified Instructional Duty, and that was it.
19 And there was no other discussion about that.
20     Q.  And so -- and just to follow on from that, you
21 had -- let me see if we can reconstruct the number of
22 conversations you had with Dean Wood about
23 Dr. Nikolova's candidacy for tenure.  Okay?  So you
24 would have had the first discussion with her after
25 Step 1 vote of the Budget Council in the Spring of '18,

156

1  correct?
2      A.  No, I would have had much earlier
3  conversations.  So every year I do meet with the dean
4  and associate dean, and we talk about potential
5  promotion cases.  And during these meetings, they
6  don't -- they don't -- they cannot veto any case.  They
7  have no authority to say:  Yes, you can or cannot put
8  somebody up for promotion.  But what I'm doing at these
9  meetings is I present the information and I hear what
10 they're saying.  I look at their body language, and I
11 come back with an assessment, if we went forward, are
12 they going to be supportive or not.  And if they're
13 not -- in my opinion, if they're not supportive, then I
14 would go back and huddle with the faculty member and the
15 mentor of that faculty member; and we would decide do we
16 go forward or not.
17     Q.  Okay.  So when is the first one of those
18 conversations you recall regarding Dr. Nikolova?
19     A.  I have no recollection of when that first one
20 was.  I remember that Dr. Nikolova was keen on getting
21 promoted.  So I know that we had a number of
22 conversations around promotions before 2018.  When was
23 the first one, I don't know.  You know, it could have
24 been '17; it could have been '16.  I don't remember.
25     Q.  Okay.  Oh, and just to make sure we identify

157

1  the person, the associate dean you were talking about,
2  is that Dr. Speitel?
3      A.  Yes, it's Dr. Speitel.
4      Q.  Okay.  And -- but you do remember having a
5  conversation with Dean Wood and Dean Speitel prior to
6  the Spring of 2018 about Dr. Nikolova, or you're just
7  presuming you did?
8      A.  I'm presuming I did because I remember that
9  Dr. Nikolova wanted to be promoted before 2018.  So as
10 part of the decision process, I almost surely would have
11 discussed this verbally with the dean and associate
12 dean.
13     Q.  Okay.  And -- but you don't remember the
14 substance of that conversation or what Dean Wood or
15 Dean Speitel's reactions were at that initial time you
16 met with them?
17     A.  No, I don't; but given that we didn't go
18 forward with promotion at the time, you know, if that
19 occurred in '16 or '17, let's say, that would tell me
20 that I probably didn't get a strong enough signal and
21 that when we huddled back, we decided not to go forward.
22     Q.  Okay.  So let's go ahead and move to Spring of
23 2018 for that meeting.  Do you recall what was conveyed
24 during that meeting about Dr. Nikolova?
25     A.  So, again, I don't remember the details; but I

158

1 can tell you sort of how it works. So going into the
2 meeting, I normally ask the candidate to prepare a few
3 documents; and the purpose of these documents are to put
4 the best case on why we should go forward with a
5 promotion.
6        Some of these documents are really from
7 the department. For example, I ask the candidates to
8 write a statement about leadership and research and
9 teaching, you know, so sort of what are the great things
10 that you're doing which are above expectations in
11 teaching and research. I do -- we do a preliminary peer
12 comparison, so who else is like you and has been
13 promoted to the rank that we want to promote you to that
14 comes from top universities.
15        The College requires the candidate to
16 provide a particular document. That's a purely
17 numerical document that would list how many papers they
18 published and how many papers are published in each year
19 and how many were conference papers, how many were
20 journal papers. And there is information about, you
21 know, probably course instructor scores. There's
22 information about funding, et cetera; and then there is
23 the CV.
24        So all of that information I collect and
25 I forward to both Speitel and Wood ahead of our meeting.

159

1 So going into the meeting, they would have looked at it;
2 and then we chat. They provide me with their impression
3 of whether this is a case they think is strong or not or
4 whether that they think that we may have problems at the
5 Presidential Committee level.
6     Q.  Okay. And so with Dr. Nikolova, would it be
7 accurate that you don't remember what was specifically
8 shared from Dean Wood and Dean Speitel; is that right?
9     A.  Yeah, I don't remember exactly what was
10 shared; but what I do remember is because there was some
11 uncertainty in our mind in terms of should we go forward
12 or not and that uncertainty hinged on whether certain
13 papers that were under review would be accepted or not
14 and that I did not come out of that meeting having a
15 sense of, yes, they're supportive or no, they're not
16 supportive. Had I had a sense in that meeting that this
17 is going to run into trouble, I would have gone back to
18 Dr. Nikolova and Sanjay Shakkottai and Constantine
19 Caramanis and have said, "Based on what I heard, based
20 on the body language I saw, I would recommend we don't
21 go forward."
22     Q.  Okay. I just put a document -- did I?  No, I
23 didn't. I'm going to put a document in the chat to see
24 if this is the document that you're talking about, the
25 purely numerical document. It may or may not be.

160

1        (Exhibit 23 marked.)
2     Q.  (BY MR. NOTZON)  And all I'm asking is:  Is
3 this the type of document you're referring to?
4     A.  No, that's not the document that I'm
5 referring to. There is another form that's called --
6 that we, at least internally, refer to as The Dean's
7 Form; and that form does not go into the dossier.
8 That's a form that's used only in the March/April
9 timeframe, which just lists -- you know, it asks you to
10 put your name, how many years have been in rank, and
11 that sort of stuff. So that's not it.
12     Q.  Could you -- do you recognize that form,
13 Exhibit 23, what that's used for?
14     A.  So, normally, I don't see -- normally, I don't
15 see that document. Normally, I don't see the dossier
16 after it leaves the department. The reason I got to see
17 Professor Nikolova's dossier is because we recommended
18 that she ask for a copy of her dossier, and she made it
19 available to me. Normally, I don't see this form or
20 anything in the dossier that gets added to it after it
21 leaves the department.
22     Q.  Okay. So you -- so would you -- would it be
23 accurate that you don't recognize this form?
24     A.  That I normally don't see.
25     Q.  You recognize the form, but did you know that

161

1 you don't have access to it?
2     A.  I don't recognize the form, you know. When
3 you sent it to me and I looked at it, I got what it
4 meant; but, no, it's not a form that I see. Okay?
5     Q.  Okay.
6     A.  I mean, it's not a form that, "Oh, yeah this
7 is a form that I'm used to and I know exists."
8     Q.  Okay. That's what I'm trying to find out.
9 Okay. You can't tell me anything about this form in
10 terms of how it's used or if it's used or why it's used
11 at UT?
12     A.  No.
13     Q.  Okay. Then I don't need to ask anything about
14 the contents of it at this point.
15        All right. Let me stop before moving on
16 with the tenure process past the conversation with
17 Dean Wood and Dean Speitel.
18        Would it be accurate that if you're going
19 to rescind a probationary extension, that -- as a
20 faculty member that you would have taken prior to going
21 up for tenure, that you would need to rescind it, I
22 think is the proper term, prior to Step 1 of the Budget
23 Council?
24        MS. HILTON:  Objection, form.
25     A.  So I really can't answer this question because

162

1  I've seen it done in a number of ways over the years;
2  and so -- so much so that every year, when we have a
3  situation in which we are putting somebody up for
4  promotion and that person has taken an extension of
5  their tenure time, I would tell them at the beginning of
6  the process, "They may ask us to submit a memo in
7  January.  Sometimes they ask us to send an e-mail" --
8  for the faculty member to send an e-mail.  That could be
9  in May or June.  Sometimes they don't seem to care.  So
10  there is a variation, and you're going to see all sorts
11  of possibilities if you were to look at all of the cases
12  in which that has happened.
13      Q.  Okay.  So would it be accurate to say that
14  there is no specified written deadline by which a
15  probationary extension must be rescinded prior -- during
16  the -- or -- in order to be considered rescinded for the
17  tenure promotion consideration process?
18          MS. HILTON:  Objection, form.
19      A.  I really can't answer this question because
20  there could -- there could be a UT policy that says,
21  you know, "You have to do this."  But it could be that
22  Provost A enforced it and Dean B enforced it or
23  Provost C, you know, did not enforce it and then the
24  dean didn't care or the staff on -- the dean's staff
25  didn't care.

163

1          Basically, usually, you know, what
2  happened is I would send an e-mail, you know, one -- I
3  started to get confused.  I would send an e-mail to
4  Dean Speitel's assistant and say, "Okay.  You know,
5  Professor X is going up for promotion.  Do we need to do
6  anything?"
7          And then she would check with the
8  Provost's Office and come back saying, "Yeah, do this,"
9  or "No, you're fine."  And that answer, to the best of
10  my recollection, changed from year to year.  So there
11  was no consistency.
12      Q.  Okay.  All right.  So you don't know if
13  there's -- one way or the other, if there's a written
14  rule.  You're saying there might be, but you don't know?
15      A.  Yeah, there might be; and I don't know.
16      Q.  Okay.  All right.  And then next is:  You have
17  experienced that the ability to rescind a probationary
18  extension has changed to -- from one date to another and
19  back again, back and forth?
20          MS. HILTON:  Objection, form.
21      A.  You know, from my perspective, it seemed to be
22  somewhat random, you know, what exactly we needed to do
23  by when.
24      Q.  (BY MR. NOTZON)  Okay.  And that was -- that
25  was a pretty unclear question.  Let me try to make it a

164

1  little bit more clear for what I'm trying to get it.
2  The changes you've experienced, you've witnessed, is it
3  that the, quote, unquote, "deadline to rescind" keeps
4  getting pushed further along in the timeline or does it
5  exist at this date and then it's -- it could be later
6  and then the next time it might be earlier?  It just
7  goes back and forth?
8          MS. HILTON:  Objection, form.
9      Q.  (BY MR. NOTZON)  Do you see the distinction
10  I'm asking?
11      A.  Yeah.  I don't think that any deadline
12  changed.  I think the way it was enforced changed,
13  meaning sometimes it was strict enforcement; sometimes
14  an e-mail was fine.  Also, there is -- and that there is
15  a distinction, meaning that there's a way for you to go
16  up for promotion without rescinding the extension; and
17  there's a way for you to go up for promotion while
18  rescinding the extension.  And because of that
19  confusion, I think that the staff at multiple levels
20  were confused; and that's why, likely, we were getting
21  different answers at different times, like, "Yeah, you
22  need to submit a form in January" or when we did not
23  submit a form in January, in May, say, "Okay.  It's
24  fine.  You can submit a form now" or "An e-mail is
25  enough" or "Don't do anything."

165

1      Q.  And what is your understanding of -- well,
2  actually, before I ask that question, let me ask one
3  more.  Are you aware of anybody being told that they
4  were not allowed to rescind their probationary extension
5  year?
6      A.  Not in our department.  I'm not aware of
7  anyone.  And -- and, frankly, you know, if you want to
8  get answers to these questions, I'm not the one that you
9  should be -- you know, you should be talking to someone
10  on the dean's staff or, better yet, the provost's staff.
11      Q.  And I appreciate that in terms of policy, but
12  I'm asking you from your experience.
13      A.  From my experience, I haven't seen a case in
14  which we asked to put somebody up for promotion and
15  where there was this issue of rescinding the extension
16  and we were told, "No, you can't."
17      Q.  Okay.  Specifically related to Dr. Nikolova, I
18  understand that -- that she was not asked to -- whether
19  or not she wanted to rescind her probationary extension
20  year.  Do you recall that to be the case?
21      A.  I don't recall that; but what would have
22  happened is that Jilda, who is in charge of, you know,
23  helping with the promotion dossiers, would have picked
24  up the fact that Dr. Nikolova had asked for more than
25  one extension and would have reached out to the staff

Ahmed Tewfik - 3/20/2021

166

1   member and Dr. Speitel's office or would have asked me
2   to reach out to that member. And I would have asked the
3   question; and that member would have said, "Yes, you
4   need to do this" or "An e-mail is enough" or "There's
5   nothing you need to do."
6       Q.  Okay.  And just to clarify, you don't remember
7   one way or the other whether Dr. Nikolova was offered or
8   informed of the pros and cons of rescinding the
9   probationary extension?
10          MS. HILTON:  Objection, form.
11      A.  No, I don't recall that discussion.
12      Q   (BY MR. NOTZON)  Okay.  Would it have been you
13  to have that conversation with her, or would somebody
14  else have had that conversation with her?
15          MS. HILTON:  Objection, form.
16      A.  Since I'm not on top of these rules and
17  regulations, if there was any danger to rescinding an
18  extension, you know, that -- the conversation -- the
19  information would have come from the provost through the
20  Dean's Office to me, to the faculty member or directly
21  from the provost to the faculty member or from the
22  Dean's Office to the faculty member.
23      Q.  Okay.  And you don't recall that going through
24  you with Dr. Nikolova?
25      A.  No, I don't recall that.  I vaguely recall

167

1   that -- not in this particular case; but at some point
2   in time, it might have been mentioned that if we rescind
3   the extension, then, we risk the case being turned down
4   and that year becoming the out year -- that if the case
5   is turned down, that that becomes the out year of the
6   faculty member, where the faculty member would not have
7   another shot at it.
8       Q.  Isn't it recall -- referred to as the up-or-
9   out consideration?
10      A.  Yes.  So that if you -- if you did rescind
11  your extension, then, you -- effectively, you were
12  putting yourself in the up-or-out year.
13      Q.  Okay.  Was there ever a time that you were
14  the person that was communicating with the tenure-and-
15  promotion candidate about rescinding or not rescinding
16  their probationary extension prior to going through
17  probation -- I mean, prior to going through
18  consideration?
19      A.  My recollection is whenever there was such a
20  case, either we e-mailed the -- the college and asked,
21  "What should we do?"  Or the college, because they knew
22  who we were putting up for promotion, would come to us
23  and say, "Did this candidate do 'X'?  Did they rescind
24  their extension?"  And we say "yes" or "no," and then,
25  they would give us some instruction.  So that's how that

168

1   happened.  And then, depending on what we were asked to
2   do, there was the appropriate communication with the
3   faculty member.
4       Q.  Okay.  So you do remember being a part of that
5   communication for other folks, but you don't remember
6   being a part of that communication about probationary
7   extension recisions or not with Dr. Nikolova?
8       A.  Right, but the other folks -- I mean, if you
9   tell me did I -- was I part of that conversation with
10  'X,' I would have the same answer.  I -- I don't
11  remember.
12      Q.  You don't remember who; but you remember being
13  there for --
14      A.  Yeah.
15      Q.  -- somebody, one or two or three people?
16      A.  Yes.  And I assume that this happened with
17  every single person, that every single person, because
18  the staff at college level, I don't think ever let a
19  case pass without checking with the Provost's Office,
20  "Do we need to do this" or "Do we need to do that" or,
21  you know, "What should we do?"
22      Q.  Okay.
23      A.  Therefore, for each case, we would have gotten
24  instructions what to do.
25      Q.  Is it your understanding that because

169

1   Dr. Nikolova had the 2.5 years at A&M, that there would
2   have been no need for her to have rescinded her one
3   probationary extension at that time to get the six years
4   total to be technically early?
5           MS. HILTON:  Objection, form.
6       A.  I honestly don't -- you know, technically,
7   without rescinding or no rescinding, we could have put
8   her up for promotion at any point in time, you know, and
9   take the risk.  So we could have entered by X, Y, or Z;
10  but we could have done it.
11      Q.  Okay.
12      A.  The discussion of rescinding or not
13  rescinding, it's when we put the case in that there is
14  this discussion with the Provost; and I'm not the person
15  who can answer your questions on do we have to do it or
16  not do it.  You really would have to talk with someone
17  that's knowledgeable of the rules and would have then
18  been able to answer your question.  Had you done in '17,
19  what would have happened; had you done it in '16, what
20  would have happened.
21      Q.  I'm just trying to get your take on it
22  because -- so, here.  Work with me here, that using the
23  term "truly early" or "technically early," okay, that we
24  used before, earlier in the day, is it your
25  understanding that with having not rescinded the

170

1 probationary extension, Dr. Nikolova would have had,
2 instead of five and a half and two and a half years,
3 which would be counted as five and two, you would -- you
4 would say it was four and two, because you -- she had
5 the probationary extension; so that gets you the six for
6 technically early without rescinding the probationary
7 extension?
8         MS. HILTON:  Objection, form.
9     Q.  (BY MR. NOTZON)  Are you with me?
10    A.  I'm not, unfortunately.
11        (Laughter.)
12    Q.  Sorry about that.
13        Okay.  So I will represent to you --
14    A.  Okay.
15    Q.  -- that she -- at the time that she went up,
16 she was considered to be at 5.5 years, which UT counts
17 as five, because they don't count the half, right?
18    A.  Okay.
19    Q.  That she took probationary extension, which
20 means that it shortens to 4, correct?
21        MS. HILTON:  Objection, form.
22    Q.  (BY MR. NOTZON)  The probationary clock is at
23 4, because she took a probationary extension, right?
24    A.  Okay.  So because she took a probationary
25 extension the year that we were preparing the dossier --

171

1 at the end of the year that we were preparing her
2 dossier, that's the same year that she had her
3 third-year review, so from the official UT perspective,
4 this was her third year.  Okay?  Because they added all
5 of the extensions; they did their math.
6        And you know, we were going to do her
7 third-year review the year before; and they said, "No,
8 you can't do it."  And so we didn't do it, right?
9    Q.  Right.
10    A.  So from their perspective, it was -- she was
11 in her third year.
12    Q.  When that's happening, but the -- well, here,
13 let me -- let me just show you.
14    A.  So, yes.  Okay.
15    Q.  Let's stop having theoreticals.  Let's go
16 ahead and look at a document.  Okay?
17        Okay.  This is Exhibit 2.
18    A.  Okay.
19    Q.  Okay.  So if you see the first page there --
20 got it?
21    A.  Yeah.
22    Q.  Okay.  So if you see there, it says she's been
23 at UT for 5.5 years; but you don't count the half year,
24 right?  So that's 5, but then you put on the
25 probationary extension.  There was one of those.  So

172

1 that drops her down to 4, correct?
2    A.  That's what this document says, yes.
3    Q.  Okay.  And then -- and that would have
4 been -- and from what I understand from prior testimony
5 of the dean is that it's counted as of the date of the
6 promotion.  So the next August, so August of '19, that's
7 when you count the total years, not the actual year that
8 it's going up?
9    A.  That's correct.
10    Q.  Okay.  So with the 4 that is countable at UT,
11 if you add on the 2.5 at A&M -- which I think they
12 probably only count the 2 -- that gets her to her 6, so
13 that when she's going up here in the 2018-2019, the one
14 time she went up for tenure, she's -- according to the
15 term you were using, she's technically early, not truly
16 early, correct?
17        MS. HILTON:  Objection, form.
18    Q.  (BY MR. NOTZON)  I'm sorry.  Your answer?
19    A.  That's correct.
20    Q.  Okay.  So -- so that's what -- that's what I
21 was trying to ask you about.  At the time that she is in
22 the Spring of '18 headed into the possibility of --
23        MR. NOTZON:  Oh, time out.  Some Laura
24 Barber wants to get in.
25        MS. HILTON:  She's with UT System, yeah.

173

1        MR. NOTZON:  Just admit her?
2        MS. HILTON:  Yeah.  She had to sign off
3 earlier.  If you could let her in, that would be great.
4        MR. NOTZON:  Yeah, yeah.  Okay.
5        MS. HILTON:  Thank you.
6    Q.  (BY MR. NOTZON)  So -- so if she's there in
7 the Spring of 2018, according to what you understand the
8 consideration is, that it's your understanding that she
9 doesn't need to rescind the probationary extension at
10 that point because getting her from 6 to 7 doesn't
11 change the bar; is that correct?
12        MS. HILTON:  Objection, form.
13    A.  I really can't comment on she needs or she
14 doesn't need to do the recision because, as I mentioned,
15 I never understood exactly how that was done and when.
16 And so the decision on whether she should or should not
17 would have come from the Provost's Office.
18        So, again, the College would have said,
19 "We're putting these folks up for promotion."  And, you
20 know, something would come from the Provost's Office;
21 and they would have told us, "Do this" or "Don't do
22 that."
23    Q.  I appreciate that, but what I'm asking you is
24 for your understanding based upon what we talked about
25 earlier today, that if you're at 6 with the UT years,

Ahmed Tewfik - 3/20/2021

174

1  combined with the prior years, that you're technically
2  early; and there's no different standard applied.  Do
3  you recall that testimony?
4      A.  Okay.  I think there are two aspects here, one
5  that I can speak to and one that I cannot speak to.
6  Okay?  So the aspect that I can speak to is:  Yes, she
7  served for "X" number of years at the university; and I
8  count the number of years that she served at this other
9  institution.  And I say this is technically early.  And
10  there is a sentence -- actually, in the exhibit that you
11  sent me earlier, there is a sentence in there where I
12  say her case would not be early if these 3 years of
13  service are considered.
14      Q.  Yes.
15      A.  The other part is rescinding or not
16  rescinding.
17      Q.  And we're not talking about that right now.
18      A.  Okay.
19      Q.  Okay?  I'm just talking about:  You testified
20  earlier your experience was, from prior candidates for
21  tenure and promotion that were technically early,
22  meaning they had -- and we already went through all this
23  before, remember -- they had some years at UT and some
24  years at a prior institution that amounted to six or
25  more, they would be -- if it was -- if they were at UT

175

1  less than six years, they would go up as technically
2  early; and then, if their combined years was five or
3  less, they would be truly early do you remember that
4  testimony?
5      A.  If the combination of their service at another
6  institution, plus their service at UT, actual service,
7  okay, without -- because --
8      Q.  Yes.
9      A.  -- you know, the administration would say,
10  "No, we have to remove the years that you got
11  extensions."
12      Q.  Yes.
13      A.  With this apart, if the number of years at UT,
14  plus the number of years at this other institution is
15  equal to six years, you would see the same statement
16  that you see in the exhibit that you sent me that says,
17  "This is technically early because if we count these
18  three years, you know, we'll be fine."  I mean, there would be
19  no question about that.
20      Q.  And that there's no difference in the way that
21  the case is treated from an on-time assessment.  There's
22  no higher bar; there's no award, as you put it?
23          MS. HILTON:  Objection, form.
24      Q.  (BY MR. NOTZON)  That was your prior
25  testimony, right?

176

1      A.  Yes, yes.
2      Q.  So then my question is:  For Dr. Nikolova in
3  the Spring of 2018, she's going to be going up, even
4  counting -- even not counting the probationary extension
5  year, she's got six years combined between the two
6  institutions.  Therefore, from your experience, the bar
7  should be the same; and changing the bar from -- or
8  changing the years from six to seven by rescinding the
9  probationary extension year would not have changed the
10  consideration bar from your experience; is that correct?
11          MS. HILTON:  Objection, form.
12      A.  The bar is a subjective bar, meaning --
13      Q.  (BY MR. NOTZON)  Yeah.
14      A.  -- meaning I -- my position because, as I said
15  earlier, to get promoted or not promoted should be the
16  same bar.  Whether you are early or late, it's the same
17  bar.  Okay?  So from that perspective, you know, all
18  of -- all of this stuff is immaterial because we're
19  going by the same bar.
20          That does not mean that everybody at UT
21  has that same perspective, not only -- I mean, in this
22  case, the dean used this in her letter; but even within
23  the Budget Council, whenever we have cases that are like
24  Nikolova, there would one or more person asking, "Why
25  are we putting this person up for tenure now?  This is

177

1  early."  We would get into this discussion of
2  technically early versus really early, and they would
3  either abstain or vote -- I mean, I'm guessing that they
4  would either abstain or vote no.  But that is a
5  recurring theme.
6          So there are people at UT for whom even
7  technically early means a higher bar, and that's not
8  something I control or anyone controls.  I mean, if you
9  believe in it, I'm not going to be able to change your
10  opinion on that, right?  So.
11          MR. NOTZON:  Object as nonresponsive.
12      Q.  (BY MR. NOTZON)  Let me try it one more time
13  and maybe a different -- I'm going to try it a different
14  way.  And using your words in your -- your testimony
15  that if Dr. Nikolova had rescinded the probationary
16  extension year before being considered for tenure, that
17  she would have been at the seventh year of combined
18  years between UT and A&M and that she would not be
19  considered to have been getting an award of a truly
20  early tenure consideration.  Would that be accurate in
21  your understanding?
22          MS. HILTON:  Objection, form.
23      A.  I don't think so because you just did the math
24  in front of me; and you said, "Okay.  Without this extra
25  year, would she rescind" -- I mean, even if you rescind

178

1  this extra year, then she would be at four.  Four plus
2  two is six.
3  Q.  (BY MR. NOTZON)  No, no.  If she rescinds,
4  she'd be at five.
5  A.  If she rescinds, she's at five.  So that
6  becomes seven.
7  Q.  Yeah.
8  A.  Seven is way above the threshold.  I mean, you
9  should not be at seven.  At seven, you're either
10 promoted; or you're out.  Okay?  So --
11 Q.  Well, let's not add -- you're adding a whole
12 other thing.
13 A.  I'm not.  I mean, this is the way it works.
14 Q.  The question is -- the question -- my question
15 is not --
16       MR. NOTZON:  Again, object as
17 nonresponsive.
18 Q.  (BY MR. NOTZON)  The question is not whether
19 or not what happens in the back end.  I'm saying that
20 would not be considered an award for her, correct?
21 A.  Even in her current situation, that would not
22 have been considered an award.
23 Q.  Okay.
24 A.  If it were considered an award, my letter
25 would have said, "This is an early case," with no

179

1  mention of technical -- technically early.
2  Q.  Okay.  And we're not talking about your letter
3  because we're talking about the hypothetical of why --
4  we're talking about the hypothetical of if she did or
5  did not rescind the probationary extension year, what
6  would be the practical effect on her years there and
7  lining that up with your prior testimony.  That's --
8  that's all I was doing, but it sounds like it's not that
9  straightforward to you.  So maybe I'll just move along.
10       Okay.  All right.  So let me ask -- let
11 me ask it -- I'll ask you one more question, and then
12 we'll move on to some totally different topic.  What do
13 you understand would be the re-- okay.  I think you've
14 probably answered this.  The reason that Dr. Nikolova
15 would not rescind the probationary extension year is
16 because if she did, it would cause her to be in an
17 up-or-out situation when she went up for tenure, instead
18 of possibly having another shot sometime in the future?
19       MS. HILTON:  Objection, form.
20 Q.  (BY MR. NOTZON)  Is that right?
21 A.  That's my recollection in general.  And for
22 this specific case, you know, we -- you know, I don't --
23 I don't remember having conversations on what happened.
24 Okay?
25 Q.  Okay.

180

1  A.  But, generally speaking, my -- you know, if
2  randomly you came to me, that sort of was my
3  understanding.
4  Q.  Okay.  And I believe Dr. Nikolova said that
5  never -- that conversation never occurred, and you
6  cannot contradict her on that from your testimony?
7  A.  No, I can't.  Yeah, I don't recall that.
8  Q.  All right.
9  A.  However, if you really want to know, you can
10 look at the e-mails; and if there was an e-mail from
11 Speitel's Office saying something or other -- I mean, if
12 there was an e-mail saying she should rescind, then we
13 would have had that conversation.
14 Q.  Right.  That would be helpful.  And you're
15 saying that if that happened, there should be an e-mail;
16 and we should be able to see it?
17 A.  Yes.
18 Q.  Okay.  And if it doesn't exist, then that's a
19 good indication it didn't happen?
20 A.  Yes.
21 Q.  Okay.  But you're also not saying and
22 testifying that if there is no e-mail, that it didn't
23 happen?
24 A.  No, because I don't remember having -- either
25 having or not having a conversation.

181

1  Q.  Okay.  Did Dr. Nikolova do anything or not do
2  anything to hurt her consideration for tenure after the
3  Step 1 vote was to proceed?
4       MS. HILTON:  Objection, form.
5  A.  Can you clarify or, you know, be more
6  explicit?
7  Q.  (BY MR. NOTZON)  I'm trying to be really,
8  really, really broad.  Can you think of anything that
9  Dr. Nikolova did, which I would think would be in your
10 letter, that she did after -- because you wrote that
11 letter in October of '18, right, the end of October?
12 A.  Yeah.
13 Q.  So between the first-step vote of the Budget
14 Council in the Spring of '18, all the way through to the
15 date that you wrote your letter, did Dr. Nikolova do
16 anything that hurt her chances for promotion to tenure,
17 in your knowledge?
18       MS. HILTON:  Objection, form.
19 A.  In my knowledge, no, I don't think that
20 there's anything that happened that -- that would have
21 hurt her case.
22 Q.  (BY MR. NOTZON)  Okay.  What is -- did
23 Dr. Nikolova ever communicate to you -- well, let me ask
24 it a different way because that's kind of silly.
25       Did Dr. Nikolova -- when was the first

182

1 time you recall Dr. Nikolova complaining about being
2 treated differently because of gender or pregnancy?
3        MS. HILTON: Objection, form.
4    A. I -- I actually don't recall having such a
5 discussion. She may have. I don't -- I don't recall
6 that. And if -- I don't recall. Okay? I was going to
7 make an assumption on what she may have mentioned to me
8 when -- as a way of overcoming the negative vote, but I
9 don't recall a conversation.
10   Q. Okay. Do you recall -- I'm sorry?
11   A. Which doesn't mean it didn't happen. It's
12 just I just don't recall any such conversation.
13   Q. Okay. And so if you don't recall having a
14 conversation with Dr. Nikolova about that, would it be
15 true that you never talked to anybody above you or
16 outside of your department about Dr. Nikolova's
17 complaint to you; that follows, doesn't it?
18       MS. HILTON: Objection, form.
19   A. That's correct.
20   Q. (BY MR. NOTZON) Okay. So the next question:
21 Did Dr. Nikolova ever communicate with you in writing,
22 e-mail, or whatever, a complaint of being treated
23 differently because of her gender or pregnancy?
24   A. I don't recall that. What I recall is that
25 when we were talking about overcoming the Dean's first

183

1 decision or, perhaps later, the presidential decision,
2 she did bring up the issue of getting lower course
3 instructor survey scores because she's pregnant; and she
4 alluded to some of these studies. That, I recall. I
5 mean, I can't tell you it happened on a particular day;
6 but I recall that -- you know, that that was brought up.
7    Q. Okay. And was that in conjunction with her
8 preparing this rebuttal to the dean's evaluation?
9    A. I imagine that it happened at that time. It
10 may have happened as we were preparing the next one, but
11 it very -- it could very well have been during the first
12 rebuttal.
13   Q. Okay. And any other time that you recall her
14 communicating to you that she had complaints of
15 disparate treatment as being a woman or being pregnant?
16       MS. HILTON: Objection, form.
17   Q. (BY MR. NOTZON) After that?
18   A. After -- after what?
19   Q. After the initial one that you're thinking you
20 remember.
21       MS. HILTON: Same objection.
22   A. After the initial -- so the only other time
23 that that came up is, my recollection would be, in the
24 Fall of 2019 after I had authorized her Modified
25 Instructional Duties and then being told by the College

184

1 that, "Well, you know, from now on the Modified
2 Instructional Duties are going to be somewhat different
3 than they've been in the past."
4    I had raised the issue of, "Why now?"
5 And she also raised that issue, but I had raised it
6 before her.
7    Q. (BY MR. NOTZON) And I apologize. Some hot
8 rod went by and blasted its engine where I couldn't hear
9 what you said right at the beginning there.
10       MR. NOTZON: And so, Debbie, could you
11 read it back to me?
12       (The material was read as requested.)
13   Q. (BY MR. NOTZON) And when you just said that,
14 you were concerned that there may be some connection
15 with her complaint?
16       MS. HILTON: Objection, form.
17   A. No. My concern is: Why are you changing the
18 rules on us now? It was very basic. I mean, we have
19 run the Modified Instructional Duties in a particular
20 way since I became Department Chair. What happened now?
21   Q. (BY MR. NOTZON) So you're not suggesting that
22 there was any violation of Dr. Nikolova's rights.
23 You're just asking the question in the broad, general
24 sense of: I don't understand why there's a change now?
25       MS. HILTON: Objection, form.

185

1    A. Yes. And at the end of the day, I think this
2 discussion lasted for about maybe 24, 48 hours -- I was
3 traveling at the time -- and the College then said,
4 "Fine. We'll go your way." And we were done.
5    Q. (BY MR. NOTZON) Okay. So the -- would it be
6 accurate that the College didn't answer your question;
7 they just stopped pushing back and went back to the way
8 that you understood it to have been before that?
9        MS. HILTON: Objection, form.
10   A. Yes, they essentially went back to the way we
11 had implemented it.
12   Q. (BY MR. NOTZON) Okay. But the first part of
13 my question: They didn't answer your question, "Why the
14 change now?" They never answered that?
15   A. Well, I got one answer, you know: We're
16 paying the professors; and so, therefore, they need to
17 do something. And, you know, if they work with the
18 senior design teams, they're not constrained to meet at
19 a particular time. They can move these meetings as they
20 see fit, depending on their condition. So they gave me
21 a number of reasons like that, which I, you know, didn't
22 necessarily buy; and the matter was resolved in 24 to 48
23 hours.
24   Q. And when you say you didn't buy that, it's
25 because those answers didn't offer anything new because

186

1 that was already part of the initial existing program?
2          MS. HILTON:  Objection, form.
3     A.  Well, it's because we ran the program in a
4 particular way from when I became Department Chair and
5 implemented the program.  Up to the Fall of 2019, no one
6 ever came to me and said, you know, the professors
7 should teach senior design, you know, and not just be
8 given no teaching at all, you know, zero teaching and
9 work on course development.
10    Q.  Okay.  But my question particularly is:  Their
11 explanation to you did not provide you an explanation
12 because it didn't provide any new situation or
13 information that did not already pre-exist and was
14 already dealt with in the prior existing Modified
15 Instructional Duty benefit?
16         MS. HILTON:  Objection, form.
17    Q.  (BY MR. NOTZON)  Right?
18    A.  Yeah.  I mean, if they had told me, "There is
19 some rule that changed at UT," or something like that,
20 then, fine.  And then I would, you know -- they
21 essentially told me it was a new college rule; and, you
22 know, in some sense you might think this is a new
23 college rule.  And maybe in 48 hours I convinced them
24 not a good college rule, and they went back.
25    Q.  Okay.

187

1     A.  Kudos to them on that.
2     Q.  Yes.  Although, like you said before, you
3 shouldn't get an award for doing something that you're
4 already doing, right?  You shouldn't get an award for
5 doing what you already ought to be doing?
6          MS. HILTON:  Objection, form.
7     A.  Well, in this case, I would say the kudos is,
8 you know, people come up with ideas and they make
9 mistakes; and so kudos to someone who recognizes his or
10 her mistake and say, "Yeah, yeah.  I made a mistake,"
11 and changed their mind, instead of sticking with the
12 position.
13         MS. HILTON:  Robert, can we take a break
14 in the next few minutes, please?
15         MR. NOTZON:  Yes, but let me -- let me
16 think here if it's going to be now or in a few minutes.
17         MS. HILTON:  Okay.
18    Q.  (BY MR. NOTZON)  Oh, and this is kind of along
19 the lines of complaints.  Did you ever raise -- well,
20 before we get there, did anybody besides Dr. Kim and
21 Dr. Nikolova ever raise issues of gender bias in the ECE
22 while you were the Chair?
23    A.  Define what gender bias is.
24    Q.  Being treated differently because you're a
25 woman for any -- any reason.

188

1     A.  Well, I told you that we implemented a number
2 of training sessions; and I told you that we had a
3 particular faculty member that made inappropriate
4 comments.  He's not the only one.  There have been other
5 ones that also made such comments, but --
6     Q.  Okay.  Other than you've already testified?
7     A.  No.  What we -- what I observed and what
8 people complained about was things along those lines,
9 where inappropriate comments were made either to a
10 person in a private setting so that there was no other
11 person to witness that; but we corroborated it by --
12 because, you know, we heard similar complaints from
13 multiple people or questions or comments that were made
14 in a public setting, like a faculty meeting, and which
15 we felt were inappropriate.
16    Q.  Okay.  Anything else?  Any other complaints of
17 gender disparate treatment?
18    A.  Give me an example of something that you're
19 looking for; and I can tell you "yes" or "no."  But
20 that's something that comes to my mind.
21    Q.  I'm asking for your memory.  I don't have a
22 specific thing to -- to jog your memory.  I'm asking you
23 if you know of anything else other than what you've
24 testified.
25    A.  No.  I mean, the only thing is exactly what I

189

1 testified.  It's inappropriate comments, inappropriate
2 statements made in class or in a public or in a private
3 setting.
4     Q.  Did you ever raise a concern of gender bias
5 yourself?
6     A.  In -- you know, you have that e-mail when I
7 was asked about providing further justification for
8 technically early or not technically early.  I did raise
9 that concern.
10    Q.  Okay.  And I have that e-mail.  I guess I
11 might as well put it up and confirm that that's the
12 e-mail you -- you have.
13         MR. NOTZON:  Ms. Hilton, is it okay to go
14 through those -- those e-mails real quick; or do you
15 need the break now?
16         MS. HILTON:  I mean, if we could take a
17 break now, I would prefer that if possible.
18         MR. NOTZON:  No problem.
19         MS. HILTON:  Thanks.
20         MR. NOTZON:  I'm going to put up two
21 e-mails in the chat that you're welcome to look at in
22 the interim; and then, we'll talk about them when we
23 come back.
24         MS. HILTON:  Sounds good.  Thank you.
25         THE REPORTER:  We're going off the record

190

1  at 4:27 p.m.
2       (Off the record from 4:27 to 4:44 p.m.)
3       THE REPORTER:  We're back on the record
4  at 4:44 p.m.
5       Q    (BY MR. NOTZON)  Okay.  Back from the break.
6  Professor, before we go on to Exhibits 25 and -- no, 24
7  and 25, I'd like to ask a little follow-up question.  On
8  Modified Instructional Duty, are one of the things that
9  you -- you change out for a course is service?
10       MS. HILTON:  Objection, form.
11       A.  I don't -- I don't understand what you are
12  asking about.  I mean, it says Modified Instructional
13  Duty, so it only applies to instruction.  It's just that
14  I give teaching time off.
15       Q.  (BY MR. NOTZON)  Okay.  Well, I was just
16  asking:  If, instead of instructional duty, that the
17  replacement activity, is it sometimes service?
18       A.  This is Modified Instructional Duty; so,
19  therefore, it has to be a different type of
20  instructional duty.  And I explained earlier that I
21  would say that the person -- in consultation with the
22  person -- is going to work on a new course or, you know,
23  revising material for a course.  It has to be
24  instructional.
25       Q.  Thank you.  I appreciate that clarification.

191

1  I didn't know that.  That's why I asked the question.
2       In the -- on Exhibit 6, your letter, on
3  the Teaching portion, it doesn't look like you spent any
4  effort to try to explain Dr. Nikolova's lowest score of
5  3.7.  Would you agree with that?
6       A.  I listed the scores.
7       Q.  Would you agree with my -- my question?
8       A.  I didn't -- yes, I agree.  I didn't try to
9  explain a high score or a low score.
10       Q.  Okay.  Do you recall with Professor Tiwari
11  that you, in fact, engaged in efforts to explain away
12  his low score of 3.5?
13       MS. HILTON:  Objection, form.
14       A.  I don't recall.  So if you have my letter for
15  him or something, then, if you put it up and I can read
16  the letter and try to remember what happened.
17       Q    (BY MR. NOTZON)  Okay.  Would there be a
18  reason why you would try to explain away one professor's
19  low score and not another's?
20       MS. HILTON:  Objection, form.
21       A.  Yes, there would be because in the case of
22  Nikolova, the explanation for her teaching standing,
23  whether she was fine or not, is accurately captured by
24  the students' comments.
25       If I did something for Professor Tiwari,

192

1  then, there must have been something unusual that is not
2  captured in the student comments.
3       Q    (BY MR. NOTZON)  Would you agree that
4  Dr. Nikolova being pregnant at the time of that low
5  score of 3.7 would be an extenuating circumstance?
6       MS. HILTON:  Objection, form.
7       A.  Dr. Nikolova raised the issue with me or made
8  me aware of the fact that there is -- that she thinks
9  there's evidence of that out there.  I haven't studied
10  any paper on the topic.  I don't know whether these
11  studies have appeared in peer-reviewed journals and
12  others have looked at it and she didn't provide me with
13  evidence that, you know, this is -- that's what's
14  happening in -- in this case.
15       I also -- I also would say that her
16  scores -- it's not like she was having a 4.5 score, and
17  suddenly she dropped to 3.7.  Her scores are about in
18  the same range for the courses that she taught.  A 3.9
19  from a 4 isn't that different and 3.7 was the last one
20  and the comments seem to be consistent from semester to
21  semester.
22       So there was no reason for me -- I mean,
23  she would have to establish or you would have to
24  establish that there is, indeed, a correlation between
25  pregnancy in her case and the comments that -- and

193

1  scores that she got and that you see similar evidence
2  with other professors in ECE or elsewhere.
3       Q.  Thank you for that answer.
4       My question was more targeted at the fact
5  that she was pregnant when teaching, not the fact that
6  there's the possibility that there's a discriminatory
7  downward trend on -- from students scoring her.  Just
8  the simple fact that she was pregnant while teaching,
9  that that might be an extenuating circumstance?
10       MS. HILTON:  Objection, form.
11       A.  I don't believe it was an extenuating -- I
12  didn't have information that said that this is an
13  extenuating circumstance.
14       Q.  (BY MR. NOTZON)  Okay.  What about the fact
15  that she was teaching the two required courses, high
16  registration numbers, which both are consistently known
17  to elicit or attract negative scoring?
18       MS. HILTON:  Objection, form.
19       A.  She was assigned to teach certain courses, and
20  I really can't comment on what you just said because I
21  would have to go and jog my memory by looking at the
22  scores of other professors and the kind of student
23  comments they're getting.  Then we can do an apples-to-
24  apples comparison.
25       Q.  (BY MR. NOTZON)  You saw her rebuttal, right,

194

1  where she talks about how she's the third-highest scorer
2  for that course out of over ten faculty members that
3  have taught that course over a period of ten or so
4  years?
5        MS. HILTON:  Objection, form.
6     Q.  (BY MR. NOTZON)  Do you remember that?
7     A.  I saw her rebuttal.  I saw her rebuttal more
8  than a year ago.  You know, when I saw it, I mean, it's
9  a long time ago.  I have not read her rebuttal again in
10  last few days or month.  So I don't recall what was in
11  her rebuttal.
12        Also, I don't remember what she -- what
13  her comparison pool was.  If she picked ten years, well,
14  the course has changed dramatically over ten years; and
15  so going back ten years may not be relevant.  I don't
16  know if she included lectures as well as professors
17  tenure track or tenured professors.  That -- that would
18  make it different.  So I can't comment on that.
19     Q.  Okay.  The fact remains you didn't attempt to
20  ameliorate the negative connotation attached to 3.7,
21  correct?
22        MS. HILTON:  Objection, form.
23     A.  I didn't anchor on the 3.7, that's correct.
24  And I explained, you know, in the next paragraph about
25  course materials and other things she's done.

195

1     Q.  (BY MR. NOTZON)  But you left the 3.7 without
2  any context to try to soften the negative impact of that
3  3.7, correct?
4     A.  It is not my --
5        MS. HILTON:  Objection, form.
6     A.  My duty is to report facts, and then people
7  would interpret them.  The fact that she's pregnant is
8  not something that we've ever reported.  You know, the
9  fact that, you know, something else happened is not
10  something that we factored in the past.  I mean, it has
11  to be something dramatic for us to know that.
12        (Exhibit 24 marked.)
13     Q.  (BY MR. NOTZON)  Okay.  Exhibit 24, which is
14  the document that starts with 25607.
15     A.  Okay.  There is no exhibit anything on that
16  document, so.
17     Q.  Not yet.
18     A.  Okay.
19     Q.  I'm telling you that's the document I want you
20  to look at.
21     A.  Okay.
22     Q.  Have you looked at it?
23     A.  Yes.  Is this the one that starts, "Yes, I am
24  in my office now.  You can call me on my direct line --
25  or you can call my direct line"?

196

1     Q.  Correct.
2     A.  Okay.
3     Q.  And it starts with your e-mail at the very
4  bottom of page 3.
5     A.  Okay.
6     Q.  I guess I would say temporally starts.
7     A.  Okay.
8     Q.  And this is October 2018.  So you're three
9  days away from publishing your letter, correct?
10     A.  That's correct.
11     Q.  Okay.  And you've received a question from the
12  Tenure and Promotion Committee; is that what you
13  understand?
14     A.  That's correct.  And you made an incorrect
15  statement.  I had published, you know, in your
16  terminology, my letter.  My letter had been sent
17  earlier.  And then as a result of that letter, I got the
18  questions from the Promotion and Tenure Committee; and
19  they were asking for additional information.
20     Q.  Well, so the letter that we looked at,
21  Exhibit 6, is dated October 29th.
22     A.  Yes, that letter is Version 2.  That was not
23  the letter that was submitted initially to the Promotion
24  and Tenure Committee.
25     Q.  Okay.  So there's a prior version that -- that

197

1  we have?
2     A.  I don't know if you have it or not, but there
3  is a prior version that led to this e-mail exchange.
4     Q.  Okay.  What do you mean by zero correlation?
5  What's the artificial metric?  Do you see what I'm
6  talking about, what I'm asking about?
7     A.  Yes, that's the second paragraph?
8     Q.  Yes, in your October 26th 8:55 e-mail.
9     A.  Yes.  That second paragraph was referring to
10  early, technically early, all of this discussion of
11  having to justify -- provide additional justifications
12  for early promotion.  And my -- the paragraph -- the
13  first paragraph is the first paragraph in my original
14  letter.  So the difference between the two letters is
15  that in the version that you showed me earlier, there
16  are a couple of sentences after "Her case would not be
17  early," blah, blah, blah.
18     Q.  Okay.  And so artificial metric, you -- that
19  is referring to requiring some explanation that the six
20  years she's put in is not sufficient or is sufficient
21  or -- I just don't understand.  When you say "artificial
22  metric," could you define that term?
23     A.  Artificial metric is the number of years in
24  service and, you know, all this discussion that we've
25  been having and, you know, that you've been asking about

198

1  for --
2      Q.  Okay.
3      A.  -- I don't know how many times.
4      Q.  I won't take that personally unless you meant
5  it personally.
6          "...zero correlation with the metrics
7  that the outside world, industry, and academia uses to
8  evaluate impact and excellence in teaching and
9  research." Could you explain what you mean to the
10  uninitiated there?
11      A.  It means that when I measure your
12  accomplishments, I'm going to measure them by the impact
13  that your research is having, by where your students are
14  going, by the funding that you've generated, by your
15  ability to deliver excellence in teaching.  I'm not
16  going to judge that by the fact that you are in rank six
17  years or seven years or five years or four years.  Yes,
18  there is an expectation that after a certain number of
19  years, it's up or out; but that's what I meant.
20      Q.  Okay.  So you're saying zero correlation that
21  fixing the number of years as a paradigm doesn't
22  correlate with good tenurable factors?
23      A.  What I'm saying is we put somebody up for
24  promotion.  We said that it's technically early.  That's
25  the end of story.

199

1      Q.  And Dean Speitel disagrees with you, saying
2  that service in and of itself is not enough; and you
3  disagree with that?
4          MS. HILTON:  Objection, form.
5      A.  Where does he say that service by itself is
6  not enough?
7      Q   (BY MR. NOTZON)  If you see in the e-mail that
8  he responds to you.
9      A.  Yeah.
10      Q.  Read that.  And I can point it out to you if
11  you want, but I'm happy to have you read his entire
12  response.
13      A.  Yeah.  "Essentially, you are saying in your
14  letter that it would not be early if we take her service
15  into" --
16      Q.  Don't read it out loud.  Just read it to
17  yourself.
18      A.  (Witness silently reading document.)
19          Fine.  He's saying it's not in itself
20  justification for promoting her now.
21      Q.  And you actually know that to be not the case
22  from your prior experience, that you have said exactly
23  that; and that was relevant to obtain tenure for other
24  faculty members, correct?
25          MS. HILTON:  Objection, form.

200

1      A.  But it is my understanding that we put -- we
2  ask permission from the Budget Council for putting her
3  up for promotion.  The Budget Council said yes; and,
4  therefore, UT needs to consider her case because it went
5  through the department and up to the college.
6          My understanding may be wrong.  He didn't
7  point out to any sort of incorrect -- you know,
8  something incorrect in my reasoning.  So -- so I didn't
9  buy his explanation.
10      Q.  So I'm accurate that you -- your personal
11  experience, personal professional experience is that
12  prior experience at another institution, combined with
13  UT service amounting to six or more, is sufficient to
14  warrant consideration -- technically early consideration
15  of a candidate, correct?
16          MS. HILTON:  Objection, form.
17      A.  I -- I never got into such an argument; and
18  I'm not going to get into such an argument with you
19  because, as I mentioned, at any point in time any
20  professor can ask to be, you know, considered for
21  promotion.  And as long as the Budget Council says,
22  "Yes, we agree," then that process will go on.
23          Now, that doesn't mean that the case will
24  go through.  So if UT doesn't think that the person
25  should be promoted at this time, then UT makes that

201

1  decision.
2      Q.  Let me ask it a different way.  When Dean
3  Speitel says it is not in itself a justification for
4  promoting her now, your personal experience finds that
5  to be not true, correct?
6          MS. HILTON:  Objection, form.
7      A.  Could you repeat that?  I'm not getting what
8  you're saying.
9      Q.  (BY MR. NOTZON)  In that sentence where he
10  says, "It is not in itself a justification for promoting
11  her now," you understand that to be not true because of
12  your experience with other faculty where the prior
13  service at another university was, of itself, the sole
14  mitigating factor?
15          MS. HILTON:  Same objection.
16      A.  No, that's not my understanding.  My
17  understanding is that because we asked the Budget
18  Council for permission to put the person up for
19  promotion and the Budget Council said, "Yes," then
20  that's what initiates the process.  It has nothing to do
21  with service in another institution or no service in
22  another institution.
23      Q.  So if the Budget Council relied on their
24  having achieved six years with the prior experience
25  achieved, would that change your answer?

202

1        MS. HILTON:  Objection, form.
2     A.   If the Budget Council did not agree to
3  counting the number of years or...
4     Q.   (BY MR. NOTZON)  No, if that's what they based
5  their agreement on.
6     A.   The Budget Council makes its assessment based
7  on the case.  Some people may look at service and
8  service at a prior institution, and they come up with a
9  particular decision.  Others will look at the case,
10 which is precisely the metrics that I was precisely
11 referring to in my e-mail.
12    Q.   Didn't you provide the exact same explanation
13 for Dr. Dimakis going up that you provided for
14 Dr. Nikolova for going up?
15    A.   Yes, I did.
16    Q.   And wasn't that explanation providing the
17 explanation going up technically early?
18        MS. HILTON:  Objection, form.
19    A.   That explanation was to -- I mean, basically,
20 this is not an explanation.  It just says:  This case is
21 technically early because of this particular fact.  It's
22 not a justification for going up for promotion.  I'm
23 just stating a fact, and I stated the same fact for
24 Nikolova and Dr. Dimakis.
25    Q.   (BY MR. NOTZON)  So in the next e-mail you

203

1  say, "My justification is no different than the
2  justification I gave for Alex" -- which is Dr. Dimakis,
3  correct?
4     A.   Yes.
5     Q.   -- "four years ago.  I don't want to compare
6  these two cases."  Why don't you want to compare these
7  two cases.
8     A.   I didn't want to compare these two cases
9  because Alex Dimakis was a superstar.  He had started an
10 entire new field.  He had letters that he brought a
11 fresh breath or he's only innovator in information
12 theory.  He was an excellent teacher.  If I made that
13 comparison, that essentially would have torpedoed
14 Dr. Nikolova's case.
15    Q.   So when you say, "But, of course, Bill and
16 Greg" -- this would be Powers and Fenves, correct?
17    A.   Yes.
18    Q.   -- "separately told me that year that Alex" --
19 Dimakis -- "and Deji" -- what's Deji's last name?
20    A.   Akinwande.
21    Q.   Okay.  Is he also within your department?
22    A.   Yes.
23    Q.   Okay.  -- "were the two strongest cases across
24 all of UT that year."  So what you're saying is you're
25 not trying to compare Dr. Nikolova to them.  You're just

204

1  saying that they -- they had the same justification --
2  or Alex Dr. Dimakis had the same justification for going
3  up?
4     A.   No.  I'm saying I don't want to compare to
5  these two people, to Alex Dimakis and Deji Akinwande,
6  because both of them were superstars and that if I did
7  compare her to them, I would anchor on superstars and
8  that even if she met the bar, because now the bar is
9  raised so high, she would not make it.
10    Q.   You wouldn't want to compare her to them if
11 she's to have a chance is what you're saying?
12    A.   Yes.
13    Q.   Okay.  And you sent -- you sent that e-mail on
14 October 26th, that one, at 6:31 p.m.; but the one on the
15 26th at 8:00 a.m. is the first one, 8:55 a.m., correct?
16    A.   This is what I see from the document that you
17 sent me.  I don't remember what e-mails I sent, you
18 know, on Friday.  So I, obviously, don't know what
19 happened on, you know, October 26th at 8:00 a.m.
20    Q.   I'm asking you to confirm that the e-mail has
21 a heading that says you sent your first e-mail at
22 8:55 a.m. on the 26th of October 2018.
23    A.   Yes, that's what it says.
24    Q.   Okay.  Let's go ahead and look at the next
25 document, which is 7476.  That's going to be Exhibit 25.

205

1        (Exhibit 25 marked.)
2     A.   Okay.  And that's the one that says, "I also
3  received this e-mail from Ahmed"?
4     Q.   (BY MR. NOTZON)  Yes.
5     A.   Okay.
6     Q.   And I think this is the one you were referring
7  to.  If you look at this one -- and this one, it's the
8  second e-mail on the first page from you, October 26th
9  at 9:00 a.m., so five minutes after the other one we
10 just saw in Exhibit 24?
11    A.   Yes.
12    Q.   And this is from you to Dean Speitel; and it
13 says, "Not to be forwarded."  Why did you not want this
14 e-mail to be forwarded?
15    A.   Because, essentially, this e-mail is telling
16 the dean and associate dean that, "You're having a
17 problem" -- I mean, I perceived a discrepancy between
18 what I think the implication of what you're asking me to
19 do by providing this extra justification and what the
20 Provost told us to be doing; or that, "What you're
21 forcing us to do, essentially, would mean that we won't
22 be able to implement what the Provost is asking us to
23 do."
24    Q.   And it raises implications of gender bias?
25        MS. HILTON:  Objection, form.

206

1    A.  I did also say hope that this question isn't a
2  reflection of gender bias.
3    Q.  Right.  Where would the gender bias be?
4    A.  The gender bias be -- would be because when
5  Alex went up, I didn't get such a request; and when
6  Nikolova went up, I got the request.
7    Q.  Okay.  And is it accurate that Dr. Dimakis was
8  at six years with the combined service, just like
9  Dr. Nikolova was?
10    A.  I don't recall.
11    Q.  Okay.  Do you recall if Dr. Dimakis was
12  technically early or truly early?
13        MS. HILTON:  Objection, form.
14    A.  I don't recall and cannot even guess because
15  he was a superstar, so.
16    Q.  (BY MR. NOTZON)  So it could be truly early?
17    A.  Yes.
18    Q.  So -- and you said that you were telling the
19  Associate Dean and the Dean; but you're not.  Your
20  actually just telling the Associate Dean, right?
21    A.  This e-mail is to the Associate Dean.
22    Q.  And it says not to be forwarded.  So if you
23  wanted to include the Dean, you could have; but you
24  didn't?
25    A.  Well, yes.

207

1    Q.  And in contravention of your "not to be
2  forwarded message," he immediately forwards it -- well,
3  actually, he waits until the afternoon, right?  He waits
4  until the afternoon to forward it to Dean Wood?
5    A.  Apparently.
6    Q.  And he says you seem put out by being asked to
7  further justify an early promotion; and that's not what
8  you're saying, is it?
9    A.  No.  He -- he -- you know, I -- I don't
10  recall; but, you know, I may have given him a call.
11  He's seeing these e-mails.  I'm pushing back strongly,
12  you know, saying, "Why are you asking me to do this
13  extra work?  I don't want to do this extra work.  I've
14  finished my letter; it's done."  So, yes, I am upset
15  that I'm being asked to provide further justification.
16    Q.  Oh, so your only concern is the extra work; it
17  has nothing to do with the countermanding the Provost's
18  strategy or the potential for gender bias?  That's not
19  what you're concerned about?
20    A.  The con- -- running against the Provost is a
21  concern, but the fact that I'm being asked to justify it
22  or not justify it is not the topic of this discussion.
23  I mean, they're forcing me to add something to my
24  letter.  That's what I'm objecting to.  The other
25  aspects are aspects that would be based separately.

208

1  This is not extra work.
2        MR. NOTZON:  Object as nonresponsive.
3    Q.  (BY MR. NOTZON)  My question is:  He's saying
4  you're just put out by the extra work.  And I'm asking
5  you if it's true.  Is it your testimony that, in fact,
6  all you're concerned about is doing extra work; and
7  you're not concerned with countermanding the Provost's
8  strategy and the possibility of a gender bias?
9        MS. HILTON:  Objection, form.
10    Q.  (BY MR. NOTZON)  That's what you're really
11  concerned about here?
12        MS. HILTON:  Same objection.
13    A.  I am concerned about the fact that I was asked
14  to provide justification that I -- extra justification
15  beyond what I have in the letter.  The other two topics
16  are topics that we dealt with separately.  So if he is
17  right in saying that the current topic of discussion is
18  whether I should write another letter or not.  The other
19  two topics he knew we were going to take in some other
20  forum.  This is not pressing.  I wasn't asked to deal
21  with the situation in, like, 24 hours or 48 hours or,
22  you know, whatever.
23    Q.  So when he says basically that's what the
24  issue is, do you not see that as a diminishment or
25  disparagement of your concern for the Provost's strategy

209

1  and the potential for gender bias being in existence
2  here?
3        MS. HILTON:  Objection, form.
4    A.  I'm not going to opine on what he had in his
5  mind when he wrote this.  He may have written it
6  quickly.  I don't know.  I don't know what was in his
7  mind.  I don't know what -- what he was up to.  I wasn't
8  aware of this e-mail until this case came about.  So I
9  really can't say anything about this.  I know that we
10  continued those discussions, and I just cannot speculate
11  on his state of mind.
12    Q.  Okay.
13    A.  You need to ask him.
14    Q.  So tell me what happened after this e-mail
15  that you sent at 9:00 a.m. on October 26th regarding the
16  Provost's strategy and the potential for gender bias.
17  Tell me all the conversations that you had with Dean
18  Speitel, Dean Wood, or anybody else above you in
19  administration.
20        MS. HILTON:  Objection, form.
21    A.  Three things happened.  I added a couple of
22  sentences to my letter.  And so this is why my letter --
23  and I can go back to it here -- was dated October 29.
24  This is October 26.  So three days later I added those
25  two sentences to my letter.

210

1    The discussion about what the Provost is
2  asking us to do is something that's lasted for a long
3  time.  We had a long discussion about that that lasted
4  several months and on whether these types of
5  justification and forcing them is good or bad; and that,
6  I don't know that that got resolved.
7    The discussion about the gender bias was
8  resolved because, first of all, it was an N of 2.  There
9  were only two people, one male, one female.
10    And in other discussions and other
11 actions of both Speitel and Wood, they have shown that
12 they were extremely supportive of women; and they were
13 extremely supportive of all of the measures and training
14 that we implemented.  So that resolved that particular
15 issue.
16    Q.  Who were you having the conversations with
17 about the Provost's strategy of hiring assistant
18 professors with experience and their interest in being
19 considered for tenure technically early?
20    MS. HILTON:  Objection, form.
21    A.  I had those discussions with the Dean.  It was
22 raised in a Department Chairs' meeting with other
23 Department Chairs in the presence of the Dean.  It
24 happened in multiple forums, both public and private;
25 and it continued into -- well into the recruiting season

211

1  the next year.
2    Q.  (BY MR. NOTZON)  To what end?
3    MS. HILTON:  Objection, form.
4    A.  As I said, it wasn't resolved.
5    Q.  And what does that mean to you?
6    A.  What it means to me is that the concerns we
7  had about the policy -- I mean, the policy wasn't
8  changed, I mean; and, you know, the Dean didn't say,
9  "Yeah, this was a mistake.  I should have used another
10 argument" or "Yes, you know, we'll change; we'll try to
11 address this."  There was no resolution.
12    Q.  So when you say there's no resolution; the
13 policy didn't change, what does that mean?  Does that
14 mean that faculty -- from your experience, faculty that
15 have achieved six years from prior service and current
16 service are still available to be considered for tenure
17 technically early?
18    MS. HILTON:  Objection, form.
19    A.  What that means is if there was another person
20 the following year going up for promotion, let's say in
21 2019, and I had to write a letter for that person and I
22 would used exactly the paragraph that you have in the
23 other exhibit about technic- -- well, you know,
24 "Counting the other years, this would not be an early
25 case."  If they would have come back and said, "That's

212

1  not enough justification," you know, the scenario that
2  played out with Dr. Nikolova would have played out
3  again.
4    Q.  Did that happen?
5    A.  We didn't have such a case.  So, you know,
6  you'd have to see other departments -- if it happened in
7  other departments; but in our case, there was no such
8  case.
9    Q.  Okay.  So do you see that as the policy
10 changing?
11    MS. HILTON:  Objection, form.
12    A.  Well, what do you mean by do I see this as the
13 policy changing?
14    Q.  (BY MR. NOTZON)  Good question.  Do you see
15 that as the policy changing from what happened before
16 Dr. Nikolova went up to what is happening now?
17    MS. HILTON:  Objection, form.
18    A.  I can't pass a judgment on that because it
19 could very well be that in the intermediate years
20 between Dimakis and Nikolova there were other faculty
21 members in a similar situation from other departments
22 who were going through that process and the department
23 chairs were asked to provide further justification
24 beyond just those two sentences.  I have no -- zero
25 information.

213

1    Q.  Let me ask it a better way because I'm not
2  asking if you know what happened elsewhere.
3    From your knowledge, do you have any
4  knowledge that the policy changed from what you knew to
5  exist with Dimakis to what you were then told after you
6  put your letter up for Dr. Nikolova?
7    MS. HILTON:  Objection, form.
8    A.  For me to ans- -- policies change.  Policies
9  are not aimed at a department or an individual.  So for
10 me to say that a policy has changed, I really need to
11 know what happened between -- in the intermediate years.
12    MR. NOTZON:  Objection, nonresponsive.
13    Q.  (BY MR. NOTZON)  My question isn't whether the
14 policy changed or not.  Okay?  Please listen to my
15 question.  My question is:  It's true, is it not, that
16 you don't have any information which would confirm for
17 you that there was any change in the policy between the
18 time that Dimakis went up and the time after you
19 submitted your first draft of the letter for Nikolova,
20 correct?
21    MS. HILTON:  Objection, form.
22    A.  I was not informed prior to submitting my
23 letter for Nikolova that there was a change of policy.
24    Q.  (BY MR. NOTZON)  Okay.  And, in fact, you
25 weren't told that there was a change of policy after you

214

1  submitted your letter to Nikolova; you were just told
2  that it was unacceptable?
3       MS. HILTON:  Objection, form.
4    A.  That is not correct because --
5    Q.  (BY MR. NOTZON)  Where does it say -- where
6  does it say in that e-mail that there's a policy change?
7    A.  Well, an e-mail -- that e-mail is not all the
8  discussions we had about the topic.  If that policy was
9  a Nikolova special, I would not have had this discussion
10 with the Dean.  We would not have had the discussion at
11 the Chairs' meeting.  We would not -- that would not
12 have impacted our ability to recruit faculty members.
13      MR. NOTZON:  Objection, nonresponsive.
14   Q.  (BY MR. NOTZON)  I didn't say it was a
15 Nikolova policy, did I?  I didn't.  I said that there's
16 nothing in the writing to you telling you that your
17 justification for Nikolova is insufficient, is there?
18      MS. HILTON:  Objection, form.
19   A.  Did you read the e-mails from the very
20 first -- I mean, in the first exhibit, the e-mail coming
21 from Sanjay Shakkottai?
22   Q.  (BY MR. NOTZON)  Answer my question.
23   A.  Well, to answer your question, I am asking
24 whether you read that e-mail.  That e-mail says, "Please
25 provide further justification."

215

1    Q.  Where are you talking about?
2    A.  Well, in 7476.  I don't know what exhibit that
3  is because I don't have exhibit numbers.
4    Q.  Exhibit 25.
5    A.  So at the very bottom, there is an e-mail from
6  Sanjay Shakkottai that says, "Dear Jerry, the CSE P&T
7  Committee has the following question" blah, blah, blah.
8  "The committee requests that the ECE Chair provide
9  additional justification for the timing of the promotion
10 application of Dr. Nikolova."
11   Q.  That's a request.  That's not a policy --
12 statement of a policy change.
13   A.  That's a request.
14      MS. HILTON:  Objection, form.
15      (Simultaneous speakers.)
16   Q.  (BY MR. NOTZON)  That doesn't say there's a
17 policy change.  They're just making a question to you.
18      MS. HILTON:  Objection, form.
19   Q.  (BY MR. NOTZON)  Correct?
20      MS. HILTON:  Same objection.
21   A.  They're asking me to do something.
22   Q.  Yes, without a statement that there's a policy
23 change, correct?
24      MS. HILTON:  Objection, form.
25   A.  Well, if you're asking me, this trail of

216

1  e-mails does not have the word "policy change," yes,
2  that trail of e-mails doesn't have the word "policy
3  change."
4    Q.  Okay.  And it comes after you submitted your
5  Nikolova letter?
6       MS. HILTON:  Objection, form.
7    A.  The question comes after I submitted my
8  Nikolova letter.
9    Q.  (BY MR. NOTZON)  And this is the first time
10 that you've received a request for additional
11 information related to justifying a technically early
12 applicant for tenure, correct?
13      MS. HILTON:  Objection, form.
14   A.  I can't say that for sure.  I mean, I know
15 that for Dimakis that wasn't the case.  That's sort of
16 what I remember.  I don't remember what happened in
17 other similar cases.  For example, you mentioned Sujay
18 Sanghavi.  I don't remember what happened then.  And the
19 fact that you get questions after submitting your letter
20 is not unusual.
21   Q.  (BY MR. NOTZON)  You know that Sujay Sanghavi
22 went up before Dimakis?
23   A.  Yes, I do.
24   Q.  So it couldn't have happened after
25 Dr. Dimakis?

217

1       MS. HILTON:  Objection, form.
2    A.  I don't recall who else it might have
3  affected.
4    Q.  (BY MR. NOTZON)  Okay.
5    A.  But I know I remember that it didn't happen
6  for Dimakis.  That's what I remember.
7    Q.  Okay.  And you can't name anybody that was
8  technically early between Dimakis and Nikolova that
9  you -- that came from your department, correct?
10      MS. HILTON:  Objection, form.
11   A.  I don't remember any.
12   Q  (BY MR. NOTZON)  Okay.  Besides this change of
13 justifying the technically early consideration of
14 Nikolova compared to what you experienced with Dimakis,
15 was there any other change that you observed in the
16 Nikolova tenure consideration process?
17      MS. HILTON:  Objection, form.
18   A.  Not that I recall -- well, actually, I take my
19 answer back.  So the other change, which was unusual,
20 was for the Dean to let me know in November that she was
21 going to recommend that Nikolova was not going to be
22 promoted and asking me to speak with Nikolova.
23   Q  (BY MR. NOTZON)  Okay.  That had never
24 happened before?
25   A.  That had never happened before.

218

1    Q.  Let me ask if the Dean had ever denied
2  tenure -- or had the Dean ever talked to you about her
3  proposed denial of tenure -- well, let me -- I'm sorry
4  about the confusing question.  Let's start over.
5         Did the Dean, while she was Dean and you
6  were Chair, ever deny tenure to a candidate from your
7  department other than Dr. Nikolova?
8    A.  Yes.
9         MS. HILTON:  Objection, form.
10   A.  Yes.  The year before she denied tenure to a
11  male faculty member.
12   Q.  (BY MR. NOTZON)  Okay.  So that's -- I guess
13  that was why I asked the question.  When she did that,
14  did she come to you to ask you to talk to that faculty
15  member to -- about that potential denial?
16        MS. HILTON:  Objection, form.
17   A.  No, she didn't.
18   Q.  (BY MR. NOTZON)  Okay.  So that's why you're
19  talking about it being unusual?
20   A.  That's correct.
21   Q.  Okay.  Anything else that you can recall?
22   A.  No, that's -- you know, those are the two
23  things that I remember that sort of stuck in my mind.
24   Q.  Okay.  And what did she ask you to talk to
25  Dr. Nikolova about?

219

1    A.  She explained to me that she doesn't want to
2  lose Dr. Nikolova and that given that she's recommending
3  that Dr. Nikolova not be promoted and given that the
4  Presidential Committee can make a recommendation to deny
5  tenure and make that her out year, that she would
6  recommend that Dr. Nikolova consider withdrawing her
7  case so that we don't run this risk.
8    Q.  Okay.  And did you talk to Dr. Nikolova about
9  that?
10   A.  I did.
11   Q.  And tell me about that conversation.
12   A.  I mean, I don't recall the precise
13  conversation; but I relayed to her what the Dean had
14  told me.  And I relayed to her the fact that if she's
15  denied promotion, that could be her terminal year.  I
16  remember that we had a question and we wanted to confirm
17  that that was the case.  So Dean Wood was going to talk
18  to an Associate Provost; and she did and came back
19  confirming that, yes, the Promotion and Tenure -- the
20  Presidential Committee could make that the out year for
21  Nikolova.
22   Q.  Okay.  And did you tell her any of the things
23  that you felt about her dossier being weak or not -- you
24  know, on the fence or any of those comments that you
25  made?

220

1         MS. HILTON:  Objection, form.
2    A.  I asked her to take a look at the dossier so
3  that she can see all what's in it and the letter of the
4  Dean in particular and then make up her mind or decide
5  to write a rebuttal.
6    Q.  (BY MR. NOTZON)  Did she -- you and her have
7  any conversations about your letter and some of that
8  glowing recommendation that would come with a stronger
9  tenure letter?
10   A.  As I stated earlier, she, Dr. Nikolova, saw my
11  letter before it was ever sent to the college.  So she
12  saw the first version of my letter.  She probably
13  provided some feedback.  So she knew what was in the
14  letter.
15   Q.  Do you think, as an Assistant Professor, that
16  she would know where -- in other words, wouldn't you
17  agree that she is an uninitiated person in the process
18  of writing tenure letters?
19        MS. HILTON:  Objection, form.
20   A.  There is an expectation -- and that, I
21  believe, was clearly stated in the Dean's letter -- that
22  Dr. Nikolova would also look at what was mentioned in
23  not my letter but, you know, some of the facts that I
24  allude to in my letter, like the student comments and
25  that in her teaching statement would have responded to

221

1  those comments.
2         So we expect an Assistant Professor who
3  is ready to be promoted to an Associate Professor to
4  understand what are the expectations when it comes to
5  teaching and research; and if there are gaps that others
6  are going to pick up, that that person, in their
7  statement, would address these gaps.
8         MR. NOTZON:  Objection, nonresponsive.
9    Q.  (BY MR. NOTZON)  My question is:  Don't you
10  understand that Dr. Nikolova would be a novice and not
11  understand the nuance of -- the nuances of your letter,
12  as you testified in introducing it, that it has these
13  less-than-obvious statements that only the initiated
14  would identify as being unflattering?
15        MS. HILTON:  Objection, form.
16   A.  As I just answered, when someone who is ready
17  to be promoted from Assistant to Associate Professor
18  would -- should know what the expectations are and
19  should be able to see the weaknesses.  My letter stated
20  simple facts.
21        We're probably the only department where
22  the Department Chair shares his or her letter with those
23  coming up for promotion.  Normally, those going up for
24  promotion don't see the Department Chair's letter.
25        And the year after you're promoted, you

Ahmed Tewfik - 3/20/2021

222

1    actually do attend promotion cases and you vote on these
2    cases.  So there's nothing magical on, you know,
3    September 1st of your promotion where suddenly you know
4    what it means -- what it takes to be promoted to an
5    Assistant Professor and you're able to understand gaps
6    in teaching or research or a strong case.  You know,
7    this is something that you're supposed to have
8    understood and grown over time.
9            You are an adult.  We're asking you to
10   teach students with certain expectations from you, and
11   that's exactly what we expect from Nikolova or someone
12   else.
13       Q.  So I take it from your testimony that you
14   would agree you did not walk her through your letter and
15   identify the weaknesses; you expected her to do that on
16   her own?
17           MS. HILTON:  Objection, form.
18       A.  It is not my obligation to show her my letter
19   and it's not my obligation to walk her through anything
20   and it's not my obligation to tell her how to respond to
21   specific statements.  It is her obligation to understand
22   and review the student comments, for example, to be able
23   to respond to them from year to year and to address them
24   in her teaching statement.
25           MR. NOTZON:  Object as nonresponsive.

223

1        Q.  (BY MR. NOTZON)  That's not my question.  I
2    didn't ask if you have an obligation.  I asked:  Is it
3    true that you did not walk her through your letter and
4    identify the issues that she needs to respond to,
5    correct?
6            MS. HILTON:  Objection, form.
7        A.  I will respond again:  It's not my obligation
8    to do so, and I've never done it.
9        Q.  (BY MR. NOTZON)  Thank you for at least
10   answering it in a shorter fashion and eventually,
11   instead of initially and then providing information.  I
12   would appreciate it if you do it that way next time.
13       A.  Let me add:  I've never done it with anyone,
14   not just with Dr. Nikolova.  Let me be clear on what I
15   mean by my answer.
16       Q.  Thank you.
17           But you happily took Dean Fenves'
18   tutelage on how to write a letter, didn't you?
19           MS. HILTON:  Objection, form.
20       A.  I -- that last sentence in the letter is
21   important.  It sends a clear message to the committee;
22   and, yes, I took that into account in writing the
23   letter.
24       Q.  (BY MR. NOTZON)  That's not the only thing
25   that Dean Fenves advised you on in the letter that

224

1    you've testified to today, correct?
2            MS. HILTON:  Objection, form.
3        A.  Well, I don't recall saying anything else
4    about Dean Fenves advising me to do.  So if you can jog
5    my memory and tell me what he had told me that I don't
6    know, I would be appreciative.
7        Q.  (BY MR. NOTZON)  If you don't remember your
8    testimony, that's -- that's fine.
9            There was a question -- oh, let me -- let
10   me -- there was a question about the obtaining the Texas
11   A&M University student scores and I believe you blamed
12   Dr. Nikolova for having access to her file and not
13   recognizing that she needed to fix the absence of that
14   information instead of the Department having the
15   responsibility to do that.  Do you remember that
16   question?
17           MS. HILTON:  Objection, form.
18       A.  I stated earlier that UT will look only at the
19   information coming from UT.  So the Department didn't
20   have an obligation to seek these letters or this
21   information and Dr. Nikolova had access to her dossier
22   as it was being formed and she could have said, "I
23   really want these to be in" and we would have sent an
24   official request to get them in.
25       Q.  (BY MR. NOTZON)  You do recall having a

225

1    conversation with Dr. Nikolova in the Spring of 2018
2    when there was discussion between you and her about
3    preparing her dossier that you had indicated that
4    getting those scores was on the task list and that you
5    and the Department would obtain them?
6            MS. HILTON:  Objection, form.
7        A.  I don't recall the content of our
8    conversation; but if that was on the task list,
9    Dr. Nikolova is supposed to make sure that her dossier
10   and everything on the task list was done.  We're the
11   only Department that offers assistance to Professors who
12   are going up for promotion, like, in assisting her; but
13   at the end of the day, it's her responsibility to make
14   sure that any information she wants to be in there is
15   included and all the official information is included.
16       Q.  So why do you -- do you have any
17   understanding as to why, then, CCAFR would say that it's
18   the Department's responsibility to make sure that the
19   dossier's complete?
20           MS. HILTON:  Objection, form.
21       A.  So CCAFR stated their opinion; and as I
22   recall -- and, again, this was, you know, two years ago
23   or three years ago, President Fenves responded to that
24   and explained how CCAFR got a higher collection of their
25   statement incorrect.

226

1          (Exhibit 26 marked.)
2     Q.   (BY MR. NOTZON)  Go ahead and look at
3   Exhibit 26 that I just put in the chat.  It's the CCAFR
4   report with the interview to you -- or of you and the
5   appendix.
6     A.   Do you want me to read the whole thing, or
7   what do you want me to do?
8     Q.   I don't, unless you want to.  Your interview
9   is, I believe, on page 12 and 13 of 18 pages.  And if
10  you look at the top, the first bullet on page 13, that's
11  where you say that Dr. Nikolova had access to her file
12  and she should -- it's her responsibility to make sure
13  it's complete.
14    A.   Where is that?
15    Q.   I said the first bullet on page 13.
16    A.   Yes.
17    Q.   And do you recall that -- I mean, I can point
18  you in the CCAFR report, but do you recall that they had
19  ruled that it was the Department's responsibility, not
20  hers?  Or do you want me to point that to you?
21    A.   They ruled -- I mean, they ruled that; but
22  then, the President responded to that and pointed out
23  that they incorrectly ruled that.
24    Q.   I heard you the first time.  I just was asking
25  about this particular document.

227

1     A.   That particular document is a group of
2   Professors opinions.
3     Q.   I'm not asking what the document is, sir.  I'm
4   just asking you if you agree that they found that, or do
5   you need me to point it out to you?
6     A.   Point it out to me; and then, yes, this is
7   what they -- you know, so point it out to me.
8     Q.   Okay.  Look at page 6 in Item Number 7.
9     A.   Okay.  They say "the subcommittee believes."
10    Q.   I don't need you to read it.  I just need you
11  to confirm if I did -- what I said was correct?
12    A.   Can you repeat what you said?
13    Q.   That CCAFR had found it was the Department's
14  responsibility, not Dr. Nikolova's, to make sure that
15  her dossier was complete?
16    A.   It said that it believed.  It didn't say:
17  This is the case, and it contravenes to rule X, Y, and Z
18  in the UT process.
19    Q.   Okay.  So that's a "yes"?
20    A.   It's not a "yes."  It says it believes that.
21    Q.   Right, it believes.  Okay.
22         Oh, going back to page 12 and 13, there's
23  an interview of you.  Do you agree that that's an
24  accurate representation of your answers to their
25  questions?

228

1     A.   I -- I would have to read the whole thing; and
2   this is, again, so long time ago that I don't remember
3   what we discussed or not discussed.
4     Q.   Go ahead.  It's two -- a page and a half.
5     A.   Even if I read the page and a half, I wouldn't
6   be able to confirm or not confirm because this is so a
7   long time ago that I -- I just don't remember what
8   happened in the meeting.
9     Q.   Go ahead and read the page and a half, and
10  then you can answer.
11    A.   (Witness silently reading document.)
12    Q.   So I'm going ask you -- sorry to interrupt
13  your reading -- but I'm going to ask you either to
14  confirm that that's an accurate transcription of your
15  answer; or if you don't recall what your answers were,
16  if, in reading these, they convey what you believe to be
17  true, sitting here today.  Thank you.
18    A.   (Witness silently reading document.)
19         So I don't recall whether that was
20  exactly what I said, but what's in there is what I've
21  been telling you and what I likely would have said.
22    Q.   Okay.  So if I asked you those questions,
23  those would be your answers today?
24    A.   Yes.
25    Q.   Okay.  Thank you.

229

1          (Exhibit 27 marked.)
2     Q.   (BY MR. NOTZON)  There's an Exhibit 27 now
3   that I put up there -- that's going to be Exhibit 27 --
4   in the chat, the next document.  And it starts with the
5   e-mail from Dr. Nikolova on February 19th, on page 4 of
6   7, about the -- her case and making her denial of tenure
7   issue public?
8     A.   Yes.
9     Q.   Okay.  And you recall receiving this e-mail?
10    A.   Yes, I received it, along with others.
11    Q.   Okay.  And did you know Dr. Nikolova was going
12  to send it before she sent it?
13    A.   I don't recall that I knew that ahead of time.
14    Q.   Okay.  Did you have any conversations with her
15  about this e-mail?
16    A.   I don't recall having conversations with her
17  about the e-mail.
18    Q.   Okay.  Dean Speitel and Dean Wood seem very
19  concerned that you quell the unrest in your department
20  as quickly as possible; is that correct?
21         MS. HILTON:  Objection, form.
22    A.   That I -- were concerned that I quell the
23  unrest?
24    Q.   (BY MR. NOTZON)  Yes.
25    A.   They were -- they wanted me to address

230

1  misinformation that might have been in the e-mail that
2  she sent.
3      Q.  Okay.  So, yeah, in your e-mail of
4  February 19th at 8:50, on the top of page 3 --
5      A.  Yes.
6      Q.  -- it says, "I will" -- "My original plan was
7  to talk about the points that Jerry," which is Dean
8  Speitel, "mentions below.  I will probably also need to
9  rebut incorrect statements that she made in her e-mail."
10  And what were those incorrect statements?
11     A.  It was so long ago that I'd have to read her
12  e-mail; and so if you want me to do this, I'm happy to
13  do it.
14     Q.  Okay.
15     A.  And I'll have to very carefully read her
16  e-mail.  So I might take a long time.  Do you want me to
17  do that?
18     Q.  Probably.  Let me look before you do that.
19         In the next e-mail -- so as you go up to
20  page 2 -- Dean Speitel says something about Kim, and
21  that would the Dr. Kim that left UT; is that correct?
22         MS. HILTON:  Objection, form.
23     A.  I am lost now.  Which page?
24     Q.  (BY MR. NOTZON)  The bottom of 2, the e-mail
25  following yours about incorrect statements.

231

1      A.  Yes, this would be about Dr. Miryung Kim.
2      Q.  Okay.  And do you recall if Dr. Nikolova was
3  referring to her or referring to someone else?
4      A.  Again, I -- I'd have to go back and read the
5  e-mail; and if you're going to ask me questions, then I
6  have to take my time to read the e-mail.
7      Q.  Okay.  Let's keep going up the chain towards
8  the top of the document, which means we're going down --
9  forward in time.  And you ask, "Is this ECE or CSE," and
10  that's the data that Dean Speitel had sent you?
11     A.  That's correct.
12     Q.  And he admitted that it was CSE, which is the
13  College of Engineering, right?
14     A.  That's correct.
15     Q.  Which you're saying, "I'd rather have the ECE
16  because it's our department that's at issue," correct?
17     A.  That's correct.
18     Q.  And then as you keep going up, he says the EC
19  is broken out.  "The numbers are small, so I would be
20  cautious..."  And then he says -- he sends it again and
21  says, "I made a mistake."  Do you remember what the
22  mistake was?
23     A.  No, I don't.
24     Q.  Okay.  And then the very top e-mail, the last
25  e-mail in chain from you to -- just to Dean Speitel, it

232

1  says, "It went fine.  I'm glad I had it because of the
2  misinformation her e-mail has generated across the
3  department."  So there's misinformation that you say is
4  in the e-mail, and now you're saying there's
5  misinformation generated across the department.  Are
6  those the same misinformation, or you don't know?
7         MS. HILTON:  Objection, form.
8      A.  I would have to go back and read the e-mail.
9  I have a vague memory of a couple of issues that came up
10  in my meetings with the assistant and associate
11  professors; but, again, if you want me to read the
12  e-mail, I'll gladly do it.
13     Q.  (BY MR. NOTZON)  Okay.  Let me -- before you
14  go there, let me put up another document and see if this
15  is the stats that Dean Speitel had sent you and whether
16  it's the corrected one or the uncorrected one.  So this
17  will be Exhibit 28.
18         (Exhibit 28 marked.)
19     A.  I wouldn't be able to tell you whether this is
20  the corrected or not corrected because I don't have
21  these numbers memorized.
22     Q.  (BY MR. NOTZON)  Okay.  But it's one or the
23  other?
24     A.  It is one or the other, yes.
25     Q.  Okay.  Before you go on to read the -- let me

233

1  put another e-mail up, Exhibit 29.
2         (Exhibit 29 marked.) -
3      A.  Okay.
4      Q.  (BY MR. NOTZON)  Let me know when you're
5  ready.
6      A.  Yeah, I opened the e-mail -- I opened the -- I
7  mean that's the one that starts, "Thank you, Evdokia"?
8      Q.  Yes, uh-huh.  It's a fairly short document.
9  Go ahead and read it, please.
10     A.  (Witness silently reading document.)
11         Okay.
12     Q.  So looking at her e-mail to you, the first in
13  the chain, December 12 at 4:35, do you understand that
14  this is the first time that you can recall that she is
15  raising concerns about pregnancy or childbirth?
16     A.  As I mentioned to you, I don't know exactly
17  when it was.  We had a discussion at some point in time
18  during that process about her concern that the CIS
19  scores would be -- you know, would go down or could go
20  down when -- when the teacher is pregnant.
21     Q.  Did you ever see her -- you understand that
22  since this is December 2018, this is in the period of
23  time in which she's preparing a rebuttal to Dean Wood's
24  evaluation -- I mean, yeah, decision -- no,
25  recommendation?

234

1    A.   Well, the e-mail, if you read it, says, "I'm
2 planning to submit a rebuttal in a couple of days this
3 Friday."
4    Q.   Right.  So that's a "yes"?
5    A.   Yes, she's submitting a rebuttal two days
6 later.  Okay.  And -- and she's asking you to -- for
7    Q.   Okay.  And -- and she's asking you to -- for
8 your advice?
9    A.   Yes, she's asking me for my advice.
10    Q.   And did you see -- before she sent in the
11 rebuttal, did you see the proposed pregnancy/gender
12 issues that she's talking about?
13         MS. HILTON:  Objection, form.
14    A.   I don't recall seeing them.
15    Q.   (BY MR. NOTZON)  Did you have a discussion
16 about them before she sent in her rebuttal?
17         MS. HILTON:  Objection, form.
18    A.   The only thing, as I mentioned before, that I
19 recall was a discussion around CIS scores.
20    Q.   (BY MR. NOTZON)  And was the discussion about
21 CIS scores related to the rebuttal?
22         MS. HILTON:  Objection, form.
23    A.   I don't remember whether it was related to the
24 rebuttal or as an explanation for her scores.  I -- I
25 honestly don't remember.

235

1    Q.   (BY MR. NOTZON)  Okay.  And would it also be
2 that you don't remember whether you advised her to say
3 something or not to say something about gender or
4 pregnancy or other kind of bias in her rebuttal?
5         MS. HILTON:  Objection, form.
6    A.   I have absolutely no recollection of what my
7 advice to her would have been or might have been.
8    Q.   (BY MR. NOTZON)  Did you provide any written
9 proposed changes to her rebuttal?
10    A.   I don't recall whether I did or did not.
11    Q.   Okay.  I'll put up another exhibit.
12         MR. NOTZON:  Exhibit 29; is that right?
13 No, 30.
14         THE REPORTER:  30.
15         (Exhibit 30 marked.)
16         (Brief discussion off the record
17 regarding exhibits.)
18    Q.   (BY MR. NOTZON)  Let me know when you're
19 ready.
20    A.   I am.
21    Q.   Okay.  Do you recall these texts?
22    A.   I don't recall them, but I know that I did
23 text Professor Nikolova at various times to provide
24 advice.
25    Q.   Do you see these texts as being accurate

236

1 representations of your communications with
2 Dr. Nikolova?
3    A.   Well, they encapture one particular set of
4 communications with Dr. Nikolova.
5    Q.   Right.  I'm just asking if you question the
6 authenticity or if these were created and manipulated to
7 reflect something that you believe to be untrue or if
8 you think that they appear to be accurate.
9    A.   For me to say, "Yes, these are absolutely
10 true; and there's absolutely no modifications," I would
11 have to go and look and see if I can even find these on
12 my phone since I've changed phones since then.  So I
13 presume they are, but that's a presumption.
14    Q.   Well, I'd like to read them and see if -- and
15 I appreciate you're not being able to one hundred
16 percent guarantee.  I'm not asking for that.  I'm asking
17 if you can look at them and see, like with your answer
18 to the CCAFR interview, if you understand these
19 statements to be in line with what you would have said
20 or if you believe they misrepresent what you would have
21 said at those times.
22    A.   (Witness silently reading document.)
23         Yeah, they seem like what I would have
24 said.
25    Q.   Okay.  If we look at the bottom there,

237

1 which are the latest in time, there's one from you on
2 March 22nd, 2019?
3    A.   Uh-huh.
4    Q.   Do you recall what is -- what you're referring
5 to here?
6    A.   The one at 10:51 p.m.?
7    Q.   Yes, sir.
8    A.   Yes, that would be referring to the letter
9 that she wrote to the President.
10    Q.   Okay.  I believe the deadline for that may
11 have been the next day; is that right?
12    A.   I don't recall when the deadline was, but the
13 deadline typically is in March.
14    Q.   Okay.  So you start with, "Your arguments and
15 case are perfect," and then you advise her on how she
16 should approach things, et cetera.  What do you recall
17 about her arguments and case?
18    A.   I don't recall much about her arguments and
19 case.  I recall that I advised her to find someone who
20 had a similar profile and use that to make her case
21 instead of arguing that, "No, my teaching is great,"
22 when others feel it's not great.  It's just to find a
23 comparable and say, "Okay.  Why did you make this
24 decision when you made a different decision?"
25    Q.   And do you recall that she found anyone?

238

1  A. Yes, she found Heidari or something,
2  "Heidari," you know, a professor in Petroleum.
3  Q. Anybody else?
4  A. Heidari is the one that I remember.
5  Q. Okay.
6  A. Maybe she did find other people. I don't
7  remember.
8  Q. Did -- did you review Dr. Heidari's data to
9  see if, in fact, Dr. Nikolova compared positively to
10 her?
11      MS. HILTON: Objection, form.
12 A. I did review what Dr. Nikolova sent me about
13 Heidari, and I -- I think it's also in one of my texts
14 here. I said that, you know, that her case appears
15 weaker. I cannot -- I couldn't say anything beyond
16 appear or appears because I am not in Petroleum
17 Engineering. I cannot assess someone in Petroleum
18 Engineering, and that goes for both teaching and
19 research.
20 Q. Okay. Let me put up another document.
21      (Exhibit 31 marked.)
22 Q (BY MR. NOTZON) This is 31.
23 A. For some reason, it doesn't...
24 Q. You were saying?
25 A. For some reason I'm unable to open this. So

239

1  maybe I need to close some of the other ones.
2  Q. Are you getting overloaded? Yeah, I'm not
3  surprised.
4  A. It starts, "I'm working on my letter"?
5  Q. Yes.
6  A. Okay.
7  Q. And you see this is sent on March 22nd at
8  4:29 p.m., so before your text at 10-something that day.
9  And this appears to be her draft comparison of her file
10 to Dr. Heidari's file; is that correct?
11      MS. HILTON: Objection, form.
12 A. Yeah, that appears to be what she's getting
13 at.
14 Q. (BY MR. NOTZON) Okay. And so would you --
15 does this look like what you had been -- would have been
16 responding to in your texts?
17 A. I don't recall. She may have sent me other
18 documents. Maybe she sent me the entire final rebuttal.
19 I have no recollection.
20 Q. Okay. Absent the existence of any other
21 documents or paper trail of her sending you anything
22 else, you would agree that this would be what she sent
23 you earlier that day?
24      MS. HILTON: Objection, form.
25 A. No, I don't recall; and I would have to do a

240

1  search to find these documents.
2  Q. (BY MR. NOTZON) Yeah. I'm saying: Absent
3  any other documents that would turn up, you would agree
4  that this would be, then, the document that was -- you
5  were responding to?
6      MS. HILTON: Objection, form.
7  A. You're speculating, and I can't answer a
8  hypothetical.
9  Q. (BY MR. NOTZON) Okay. Go ahead and read
10 the -- Exhibit 27, the 18961 e-mail from Dr. Nikolova;
11 and, if you could, identify the misinformation in that
12 e-mail for us.
13 A. So you will have to be patient.
14 Q. I have the capacity.
15 A. Okay.
16      (Witness silently reading document.)
17 Q. Oh, you know what? Let me -- I'll ask you
18 about one other document before you go on that
19 excursion.
20      This was marked as Exhibit 11 before.
21 Would you rather see it as a spreadsheet, as one? Maybe
22 that would be easier instead of having to scroll back
23 and forth. I think I can do that. There it is as a
24 spreadsheet so you don't have to go back and forth.
25 A. Okay.

241

1  Q. Okay. So did you play a role in deciding the
2  reasons for pay and pay raises from 2013 to 2020?
3  A. Yes, I did.
4  Q. Okay. Could you explain why Dr. Nikolova is
5  the second lowest paid person in the department, despite
6  the multiple individuals that have less experience than
7  her?
8      MS. HILTON: Objection, form.
9  A. The reason is precisely the reasons that we
10 discussed earlier. When we make the salary
11 recommendations, we take into account the performance of
12 the person, what his or her research or activity has
13 been, what his or her teaching has been; and if your
14 performance is poor, you're going to get poor raises.
15 Q. It's accurate that all assistant professors
16 have the same duties and responsibilities and
17 expectations, correct?
18      MS. HILTON: Objection, form.
19 A. That is correct.
20 Q. (BY MR. NOTZON) Okay. And so the only
21 difference is their performance. Is that what you're
22 saying?
23      MS. HILTON: Objection, form.
24 A. That's correct. The merit raises reward good
25 performance.

242

1    Q.  (BY MR. NOTZON)  Okay.  And those -- the
2  performance is based on all the criteria we've been
3  talking about, research, funding, service, teaching, all
4  that?
5        MS. HILTON:  Objection, form.
6    A.  That's correct.
7    Q.  (BY MR. NOTZON)  Is it also based on the
8  annual review of exceeds or meets expectations?
9    A.  It's very loosely correlated with that because
10  these annual reviews tend to be on the higher side.
11  There are years where everybody in the department got
12  "exceeds expectations," and then we had to go back to
13  the committee.  So that information is typically not
14  given a lot of weight in these evaluations.
15    Q.  Okay.  It's not the rating so much as the
16  detail supporting the rating?
17        MS. HILTON:  Objection, form.
18    A.  The rating is -- yes, the rating does not
19  enter into the equation.
20    Q  (BY MR. NOTZON)  Okay.  At all or you just use
21  it as a guidepost, but you look below it to see what the
22  details are?
23        MS. HILTON:  Objection, form.
24    A.  It depends on the committee and the year.  If
25  the committee one year has almost everybody at exceeds

243

1  expectations or has people who have published no paper
2  as exceeds expectations, then you can imagine that that
3  year the ratings will be not even used as a signpost.
4  They would be completely disregarded.
5    Q  (BY MR. NOTZON)  Okay.  What about a --
6  someone with a meets expectations, would they ever get a
7  higher raise than someone who had an exceeds
8  expectations for that year?
9        MS. HILTON:  Objection, form.
10    A.  It could possibly happen because, again, the
11  committee might think it's okay for you to be a good
12  teacher and do no research or be a good researcher and
13  very poor at teaching, but that's not the view that the
14  Dean or Associate Dean or Provost or I would take.  So
15  we look at the actual evidence.
16    Q  (BY MR. NOTZON)  I don't understand.
17        Oh, so you're saying somebody could get
18  an exceeds expectations and somebody else could get a
19  meets expectations; and, yet, you and the other people
20  deciding on the raises could say that the meets
21  expectations actually performed better than the exceeds
22  expectations?
23        MS. HILTON:  Objection, form.
24    A.  The committee is a committee.  The committee
25  is a group of professors who come up with their ratings.

244

1  That's their particular view.  There are several other
2  people in the chain that also will opine on whether a
3  particular person exceeds or meets expectations, no
4  different than promotion, where the Budget Council has a
5  vote; the Department Chair has a vote, et cetera.  The
6  same story here.
7    Q.  So was that a "yes" or a "no"?
8    A.  Can you repeat the question?
9    Q.  Can someone getting a meets expectations get a
10  raise, a bigger raise, than someone with an exceeds
11  expectations on the same year?
12        MS. HILTON:  Objection, form.
13    A.  Well, who is giving the meets expectations and
14  exceeds expectations?  Are you referring to the meets
15  expectations and exceeds expectations rating of the
16  committee; or are you referring to meets expectations
17  and exceeds expectations that the Department Chair,
18  Dean, Associate Dean, and Provost are providing?
19    Q  (BY MR. NOTZON)  I'm saying what the final
20  rating is for the year.  Whoever -- you know, whatever
21  results in that rating of a meets expectations and an
22  exceeds expectations for those two faculty members for
23  the year, can somebody get a better raise as a meets
24  expectations on their record than somebody who got an
25  exceeds expectations for that same year?

245

1    A.  There is no final rating.  There is the
2  Committee's rating.  And, then, the other ratings are
3  the Department Chair, Dean, Associate Dean, Provost; and
4  those are what factor in the promotion.
5        The UT rules say that the rating coming
6  from the Committee is what's provided to the faculty
7  member.  The faculty member sees the raises.  If they
8  have a complaint about the raises, they come to me; and
9  I explain to them why they got that particular raise.
10    Q.  Okay.  So if -- so if you're giving a meets
11  expectations and exceeds expectations, you're not going
12  to give a bigger raise to a meets expectations than an
13  exceeds expectations upon your rating.  Is that your
14  testimony?
15    A.  That's correct.  Yes, that is correct.  So if
16  I give a meets expecta- --
17    Q.  You might do that -- you might do that if it's
18  just from the committee?
19    A.  Well, the committee is -- recommendation is
20  one input that I look at; but I also form my own opinion
21  and I have my own rating.  The Dean also looks at the
22  information, has her own rating.  Presumably, the
23  Provost does the same thing.
24        I make my recommendation based on my
25  assessment.  The Dean then approves or does not approve

Ahmed Tewfik - 3/20/2021

246

1  my recommendation based on her assessment, and then the
2  Provost approves or does not approve the recommendation
3  coming from the College based on the Provost's
4  assessment.
5      Q.  Have you ever given a bigger raise to someone
6  who got a meets expectations from the committee than
7  somebody who got an exceeds expectations from the
8  committee?
9      A.  I don't recall whether I did or did not.
10     Q.  Do you recall the salary equity assessment
11  that was made recently, last year or so?
12         MS. HILTON:  Objection, form.
13     A.  So in the last year I wasn't at UT, so I don't
14  know what happened.  I did not follow that.  So if
15  something happened in 2020 or something happened after
16  December '19, then, you know, I haven't followed that.
17     Q.  (BY MR. NOTZON)  Okay.  So, then, my next
18  question is:  Prior to your leaving, were you aware of a
19  salary equity assessment having been done?
20     A.  I don't recall that.
21     Q.  Okay.  Just to further jog your memory, in
22  case, it would have been a process by which salaries
23  were, quote, unquote, "equalized" or assessed an equity
24  assessment to even people out for whatever reason.  Do
25  you recall that ever happening?

247

1         MS. HILTON:  Objection, form.
2      A.  No, I don't.  I may have been told about a
3  committee that's looking into this, but I don't -- I
4  don't recall anything specific.
5      Q.  (BY MR. NOTZON)  Okay.  All right.  Well, go
6  ahead and look at that e-mail.  Do you mind us going off
7  the record?
8         THE WITNESS:  Sure.  Go ahead.
9         MR. NOTZON:  Okay.  And just let me know
10  when you're ready.
11        THE WITNESS:  Okay.  Well, if you're
12  going to go off the record, then, I will also take a
13  restroom break.
14        MR. NOTZON:  Oh, please.
15        THE WITNESS:  I will turn the monitor on
16  so you'll know that I'm on the record again -- well,
17  what do you mean by "off the record"?
18        MR. NOTZON:  Yeah.  We're stopping.
19  We're going away.  We're going to take a break, you
20  know.
21        THE WITNESS:  I mean, if you want me to
22  read it, it should be on the record, because you're
23  asking --
24        MR. NOTZON:  We can do that.  We can do
25  that, too, yeah.

248

1         THE WITNESS:  So, you know, I will
2  appreciate getting a five-minute break but then coming
3  back and read it; and that should be on the record as
4  part of the time that you're asking me to spend on this
5  case.
6         MR. NOTZON:  If you want to.
7         THE WITNESS:  Okay.
8         MR. NOTZON:  All right.
9         THE WITNESS:  Thank you.
10        THE REPORTER:  We're going off the record
11  6:19 p.m.
12        (Off the record from 6:19 to 6:25 p.m.)
13        THE REPORTER:  We're back on the record
14  6:25 p.m.
15     Q.  (BY MR. NOTZON)  I'm going to mute myself,
16  Professor.  So let me know when you're ready.
17     A.  (Witness silently reading document.)
18        Okay.
19     Q.  I'm back.  Go ahead.
20     A.  So what do you want me to do?
21     Q.  So the question I had asked is:  What
22  misinformation were you referring to in your e-mail from
23  her e-mail?  And I'll probably ask you some other
24  questions since you've read the e-mail.
25     A.  So we can start with, "The Dean's

249

1  recommendation 'do not promote' came unexpected and in
2  sharp conflict with the prior recommendations,
3  particularly for its reasoning, contradicting what I was
4  told in annual reviews and in my third rear review in
5  terms of what I should work on to have a successful
6  tenure case."
7         Her third-year review, which happened in
8  the same year she was promoted, pointed out that she
9  needed to publish more; and it talked about a lack of
10  service, a lack of engagement with the Department.  That
11  letter, she knew, usually is written in the most
12  positive manner to assist candidates.  The fact that the
13  language was in the letter was a big sign for her and
14  for me that this was going to be an issue.
15        In her annual reviews, we talked about
16  going up for promotion earlier than that.  We did not go
17  up for promotion.  The year that we went up for
18  promotion, we could not tell the Budget Council ahead of
19  time whether she was going to be included in the batch
20  that was going to be voted on in early May or late April
21  because we did not know whether her papers were going to
22  be accepted or not.  So that is misinformation that's
23  totally incorrect.
24     Q.  Wait.  So you're -- are you pointing to
25  something in particular in the e-mail, or are you just

250

1 responding --
2    A.  You asked -- you asked me to say what is
3 misinformation or incorrect statements.
4    Q.  Yes.  If you could point --
5         (Simultaneous speakers.)
6    Q.  You said you were going to go through it.
7 Could you point to what you're talking about?
8    A.  It's just what I told you, the sentence that
9 says, "what I was" -- "...contradicting what I was told
10 in annual reviews and in my third-year review in terms
11 of what I should work on to have a successful tenure
12 case."
13   Q.  Okay.  Gotcha.  You're saying all of the
14 testimony is saying that what she said there is
15 incorrect?
16   A.  What she said there is incorrect.
17   Q.  Okay.  Thank you.
18   A.  And she knew it was incorrect.
19   Q.  Okay.  That's your testimony.  I understand.
20   A.  Okay.  Then, she talks about the President and
21 the Dean having a very different set of promotion
22 standards from the Department; and there is no evidence
23 of the Dean or President having different promotion
24 standards than the Department.  They look at the same
25 information.  They value the teaching.  They value the

251

1 research.  They value the funding.  And that's what they
2 base their decision on.
3    Q.  Do they set the bar the same as the
4 Department?
5    A.  Different people in the department may have
6 different bars, you know.  It is not one plus one equals
7 two.  I mean, it's not that kind of a statement.  Okay?
8 So -- but if -- if there was a discrepancy between what
9 the Dean and the President had in terms of bars and what
10 the Department had in terms of a bar, then, our failure
11 rate would have been nearly 100 percent because,
12 essentially, we would be, you know, promoting people at
13 random from the department, like flipping a coin.  Maybe
14 it lands this way; maybe it lands that way.  That wasn't
15 the case.  There's no evidence of that.
16   Q.  Unless the Dean and the President are treating
17 her differently than other faculty members.  That would
18 be the outlier that would render your hypothesis
19 incorrect?
20       MS. HILTON:  Objection, form.
21   A.  There is no evidence of that, and Nikolova did
22 not provide any evidence of being treated differently in
23 this e-mail or --
24       MR. NOTZON:  Objection, nonresponsive.
25   Q.  (BY MR. NOTZON)  Just, my question is:

252

1 Wouldn't it be true that if the Dean and the President
2 were improperly motivated and they weren't treating her
3 like everybody else, that could be a reason why they
4 raised the bar differently or had the bar differently
5 from the Department, correct?
6       MS. HILTON:  Objection, form.
7    A.  Your original question and what I've been
8 going through is where there is misinformation or
9 incorrect statements in her e-mail, right?
10        (Simultaneous speakers.)
11   Q.  (BY MR. NOTZON)  Professor, I'm asking a
12 question in following up with what you just said; and
13 it's not -- it's a new question.  So a new question
14 requires a new answer, not pointing to my original
15 question.  Do you not want to answer my question?
16       MS. HILTON:  Objection, form.
17   A.  If you make your question clear, I'm happy to
18 answer it.  If it's a hypothetical, then, I'm not going
19 to answer it.  So your choice.
20   Q   (BY MR. NOTZON)  My questions are my choice,
21 that's true; and your answers are your choice.
22       It was your hypothetical that I was
23 asking a question about.  You stated in answer to my
24 question that their bar could be higher -- the Dean and
25 the President's bar could be higher than the

253

1 Department's bar.  And you're saying -- you answer to
2 that was:  No, because then a hundred percent of our
3 cases would be wrong.
4        And I said:  Unless their bar in the
5 instance of Dr. Nikolova was changed for some other
6 reason.  And that could be -- that could render your
7 assumption that if they changed their bar or if their
8 bar was different, it would be tanking a hundred percent
9 of your cases.  And I said:  Isn't that correct?  And
10 you have not answered that question.
11   A.  My response to you was not a hypothetical.  If
12 the -- if the bar is different between the Department
13 and the Dean and the President, then, putting up a
14 promotion case would be random.
15       If you have an electric device that uses
16 120 or 110 volts and you plug it in 220, it's going to
17 burn.  Okay?  So I am not -- I'm not -- this is not a
18 hypothetical.  There are facts in front of me, and those
19 facts do not support your hypothetical.
20   Q.  You're assuming that they didn't have a
21 different bar when they denied -- when the Dean and the
22 President denied Dr. Nikolova, you're assuming they
23 didn't have a different bar, correct?
24       MS. HILTON:  Objection, form.
25   Q.  (BY MR. NOTZON)  Because you don't know?

254

1        MS. HILTON:  Objection, form.
2     A.  I am -- I am referring to the sentence in her
3  e-mail, Number 1, "The Dean and/or President seem to
4  have a very different set of promotion standards from
5  the department."
6        MR. NOTZON:  Objection, nonresponsive.
7     Q.  (BY MR. NOTZON)  I'm not asking you about that
8  sentence.  I'm not asking you about that e-mail.  I'm
9  asking you about your statement that they didn't have a
10  different bar because the evidence you provide for that
11  assumption, that conclusion, is that a hundred percent
12  of your cases would be denied.  Okay?  I'm asking you a
13  follow-up question to that.
14     A.  Okay.
15     Q.  All right.
16     A.  What's the follow-up question, that they
17  changed the bar for Nikolova?
18     Q.  You don't know what their bar is, correct?
19        MS. HILTON:  Objection, form.
20     A.  No, I know what their bar is because I got to
21  read the Dean's letter; and I saw the arguments that she
22  made and how she made these arguments.  She didn't say
23  that -- well, she didn't say that her argument was, oh,
24  we were fine with 3.7 for everyone; and, then, suddenly,
25  we're not fine with Dr. Nikolova.  She didn't say that,

255

1  you know, we're fine with -- with people not publishing
2  or slow in publications.  The arguments that she's
3  making in her letter are exactly the same arguments that
4  she has made in other cases and we've heard her say
5  publicly.  So there's no reason for me to speculate or
6  to engage in speculation like you are.
7     Q.  (BY MR. NOTZON)  Professor Tewfik --
8        (Simultaneous speakers.)
9     Q.  Professor Tewfik, you -- you recommended
10  tenure.  Your Budget Committee recommended tenure
11  32/1/2/2.  The Tenure and Promotion Committee
12  recommended tenure at 7/0.  They didn't write the first
13  draft of the letter, as testified to by the Dean; so you
14  have no evidence there.
15        You don't know what the President's
16  reasoning or the President's Committee's reasoning
17  because it's not in writing and you weren't part of any
18  conversations with them.  Okay?
19        And you don't know -- so the Dean -- the
20  only thing you have is the Dean's letter, which is
21  contradictory to everything that all those other
22  positive voters recommended.
23        MS. HILTON:  Objection, form.
24     Q.  (BY MR. NOTZON)  So that is the different bar
25  than you assessed by definition, isn't it?

256

1        MS. HILTON:  Objection, form.
2     A.  No, it's not because the points that the Dean
3  raised in her letter -- so the final conclusion is
4  different; but the points that the Dean raised in her
5  letter are points that are in my letter, are in the
6  dossier, and --
7     Q.  And are not treated the same and are not
8  explained away.  Actually, don't -- the part about the
9  teaching scores, it's not the same.  The part about the
10  TAs, it's not the same.  The part about anchoring the
11  3.7 as being something that you were going to focus on
12  and saying only 16.5 percent of the professors have that
13  score when she's actually got a higher -- in the higher
14  percentage of the professors, no, it's not the same,
15  correct?
16        MS. HILTON:  Objection, form.
17     A.  The information in the letter are the same.
18  They are looking at the same facts.  The fact that the
19  Dean reached a different decision, yes, the Dean reached
20  a different decision; and that decision, yes, was other
21  than the decision of the Budget Council and other than
22  my decision and other than the official decision of the
23  Promotion and Tenure Committee.
24     Q.  (BY MR. NOTZON)  And the facts are not the
25  same, are they?

257

1        (Simultaneous speakers.)
2        MS. HILTON:  Objection, form.
3     Q.  (BY MR. NOTZON)  The Dean does not put
4  anything in her letter about the positives that are in
5  your letter.  The positives that are in the Budget
6  Council's assessment, she doesn't put those in there.
7  She doesn't put the positives that are in the Tenure and
8  Promotion Committee's written assessment bullet points,
9  does she?
10        MS. HILTON:  Objection, form.
11     A.  I -- actually, my recollection does not align
12  with what you're stating here.  I do -- my recollection
13  is that she had some good things to say about the
14  research; and the letter wasn't just negative, negative,
15  negative.  And it could not have been negative,
16  negative, negative.
17     Q.  (BY MR. NOTZON)  Right.  I didn't say all
18  negative.  It doesn't include justifications.  It
19  doesn't include explanations.  It doesn't include --
20  like with other individuals that go up for tenure that
21  have negative spots in their dossier that are excused
22  away or explained away or allowed to exist, that -- none
23  of that allowing to exist occurred with Dr. Nikolova's
24  file, correct?
25        MS. HILTON:  Objection, form.

258

1    A.  You know, if you want to put the Dean's letter
2  in the chat and you want me to take a look at it, then,
3  I can answer your question.
4    Q.  (BY MR. NOTZON)  On the salaries -- so the
5  whole part about the performance on an annual basis,
6  that deals with the raises, the amount of the raise each
7  year, correct?
8    A.  That's correct.
9      MS. HILTON:  Objection, form.
10      MR. NOTZON:  What's the objection on
11  that?
12      MS. HILTON:  I thought it was ambiguous.
13  Maybe I'm just not following you, Robert.  It's been a
14  long day.
15      MR. NOTZON:  Yeah.  Well, please don't
16  say it because you feel that you have to say it every
17  time.
18    Q.  (BY MR. NOTZON)  So the -- so the salaries --
19  how do you account for the difference in the base
20  salaries of the people that have, you know, one, two,
21  three, four, five, six, seven, eight years less
22  experience than Dr. Nikolova and they're getting paid
23  more?
24    A.  What's -- what's the definition of "base
25  salary"?  In academia there's base salary and bonus.

259

1  There's only one salary, so I don't know what you're
2  talking about.
3    Q.  Well, there's -- I'm trying to get at the
4  differences in pay of Dr. Nikolova being the second
5  lowest paid person in the department and the others that
6  are higher paid than her that have less to much, much
7  less experience than her.  And you mentioned your
8  testimony about the difference in the annual raises; but
9  that doesn't account for the difference in the starting
10  amounts, correct?
11      MS. HILTON:  Objection, form.
12    A.  The starting amounts are determined by the
13  market.  And so if the market dictates that we start
14  professors at a higher rate, we start them at a higher
15  rate.
16      And if you look at Professor Nikolova's
17  salary, you'll see that there is one year where it
18  jumped.  The reason that it jumped that year, despite
19  her perhaps less-than-stellar performance, is that in
20  that particular year, we had to raise the salary of
21  incoming, fresh assistant professors.  And I wanted to
22  make sure that there would be no inversion in our
23  salaries, meaning that the newcomers would not be paid
24  higher than good-performing professors who were already
25  in the department.

260

1      There was a long discussion about that;
2  and, in the end, I said that if the College and UT
3  wouldn't provide me with the money to correct for that
4  inversion, that I would take it from the departmental
5  budget.  In the end, I was given the money to do this;
6  and she was a beneficiary of that.  So that's the reason
7  for the starting salary being different from year to
8  year.
9    Q.  Yet, she still is the second-lowest-paid
10  person?
11    A.  She's still the second-lowest-paid person
12  because there was no such big bump after that, and
13  people who come after her that performed better than she
14  did got higher raises and overtime and had salaries
15  higher than hers.
16    Q.  And that would be -- the data for that would
17  be in -- would it be in writing, the assessment of the
18  performance that you relied upon to make those
19  decisions?
20      MS. HILTON:  Objection, form.
21    A.  Yeah, there are Excel sheets that would have
22  my ratings next to each professor and the recommended
23  raised; and then there are inputs from the Dean and the
24  Associate Dean.
25    Q.  (BY MR. NOTZON)  A spreadsheet?

261

1    A.  Yeah.  They could be verbal or an e-mail
2  attached to spreadsheet or, you know, when we'd go into
3  these discussions, I might say, "Why did you give this
4  person 2 percent?  You should have given that person
5  only 1.5 percent," and, you know, that sort of stuff.
6    Q.  Okay.  One more -- I think one more exhibit.
7  I don't want to get you too excited about that.  Do you
8  see it?
9    A.  No, I don't.
10      MR. NOTZON:  Oh, man.  Somebody jacked me
11  when I had it changed.  You know who you are.  Stop it.
12      Okay.  There it is.  This will be
13  Exhibit 32?
14      (Exhibit 32 marked.)
15    Q  (BY MR. NOTZON)  And this is the Deposition
16  Notice for today.
17    A.  Okay.
18    Q.  And you were identified as the organizational
19  rep for -- it's the last page, page 3, of the exhibit.
20  If you could, read that for me.
21    A.  "Ahmed Tewfik as the" --
22    Q.  Oh, no, just to yourself.
23    A.  Okay. (Witness silently reading document.)
24      Okay.
25    Q.  And do you understand that you were designated

262

1   to speak as UT on that topic?
2     A.  Yes, I do.
3     Q.  And what did you do to prepare yourself to
4   speak on that topic today?
5     A.  I had conversations with the lawyers, and I
6   asked them to send me some --
7        MR. NOTZON:  No --
8        MS. HILTON:  Dr. Tewfik, don't -- I'm
9   going to instruct you not to give any answers that would
10  intrude on the attorney-client privilege.
11    Q.  (BY MR. NOTZON)  So, in other words, what you
12  said to them and what they said to you, I'm not asking
13  you about; but the fact that you had the conversation
14  is -- you can tell me about that and how long it took
15  and all that kind of stuff.  Just don't tell me what was
16  said.  Okay?
17    A.  The conversation was informing me what this
18  meant and they asked me what kind of information I
19  needed and they provided me information that I needed.
20    Q.  Okay.  All right.  And what documents did you
21  review?
22    A.  I asked to get e-mail --
23    Q.  Just talk about what documents you prepared --
24  I mean, you reviewed to prepare for your testimony.
25    A.  I looked at -- I had asked for --

263

1        MS. HILTON:  Dr. Tewfik, do not -- I'm
2   going --
3     Q.  (BY MR. NOTZON)  You're referencing your
4   communication.  So just -- you can tell me what
5   documents you looked at.
6        MS. HILTON:  Yeah, you can tell him what
7   documents you looked at.  Do not provide any information
8   about conversations between you and Counsel.
9        THE WITNESS:  Okay.
10    A.  The documents I looked at were e-mails that I
11  had asked for and --
12        (Laughter.)
13        THE WITNESS:  Oh, sorry.
14        MR. NOTZON:  I'm sorry.
15    Q.  (BY MR. NOTZON)  Just talk about what you
16  looked at and not how you got it, not where you got it
17  or when you got it or anything like that.  Okay?
18        And I'm sorry.  I mean no -- I mean no
19  disrespect to you.  I hope you don't take offense.  I
20  hope -- it's late in the day.  I hope you're not
21  offended by my laughing.  I don't mean any disrespect.
22  Okay?  Are you okay?
23    A.  Yes, I am.
24    Q.  Okay.  I'm sorry.
25        So just talk -- just mention -- list the

264

1   documents that you looked at.
2     A.  I looked at the -- I browsed through the file,
3   and I browsed through e-mails.
4     Q.  The file?
5     A.  The promotion file.
6     Q.  Okay.  All right.  And I asked you a bunch of
7   questions about what you and the Department and the
8   Budget Council did related to the promotion of
9   Dr. Nikolova.  Were your answers that you gave as
10  Professor Tewfik the same as you would have given as UT?
11        MS. HILTON:  Robert, do we have an
12  agreement that by allowing you to ask the question this
13  broadly that UT is not waiving any objections to whether
14  or not any individual questions and answers were within
15  the scope of the topic?
16        MR. NOTZON:  We had that agreement the
17  past two times; so, yeah.  But I'd like to get his
18  answer.
19        MS. HILTON:  Okay.  That's fine as long
20  as we still have that agreement.
21        MR. NOTZON:  Yes.
22        MS. HILTON:  Okay.
23    A.  We talked about a lot of things.  My
24  understanding is this set of questions is about the
25  process, and the answers I gave about the process as

265

1   Dr. Tewfik are the same that I would give about the
2   process as UT.
3     Q.  (BY MR. NOTZON)  Okay.
4        MR. NOTZON:  All right.  Let me --
5   let's -- let me just check with my cocounsel.  So we can
6   take a minute, or if you want to --
7        MS. HILTON:  That's fine.  Why don't we
8   just take a couple-minute break.
9        MR. NOTZON:  Okay.  Thanks.
10        MS. HILTON:  Okay.
11        THE REPORTER:  We're going off the record
12  at 6:54 p.m.
13        (Off the record from 6:54 to 6:58 p.m.)
14        THE REPORTER:  We are back on the record
15  at 6:58 p.m.
16    Q.  (BY MR. NOTZON)  Okay.  Just a couple of
17  follow-ups and for those in the cheap seats, this is
18  asking questions for you -- from you as an individual,
19  okay, not as UT.
20        On the exhibit 27, when you read through
21  Dr. Nik- --
22    A.  Sorry.  So are we flipping back to not UT; now
23  I'm Ahmed again?
24    Q.  I thought I just said that.
25    A.  I just wanted to clarify that.

266

1    Q.  Yes, sir.
2    A.  Okay.
3    Q.  That's it's.
4    A.  Okay.
5    Q.  Exhibit 27, Dr. Nikolova's e-mail that you
6  spent time reading, where she made public her review
7  case --
8    A.  Yes.
9    Q.  Okay.  -- did you see in that e-mail from her
10  that she was raising a gender and pregnancy disparity
11  issues?
12    A.  I would have to go back and read it.  You're
13  just flip flopping from different things, so.
14        (Witness silently reading document.)
15        Okay.  Can you restate the question,
16  please?
17    Q.  Yeah.  Do you see that she has raised
18  complaints, concerns of gender and/or pregnancy
19  discrimination in that e-mail?
20        MS. HILTON:  Objection, form.
21    A.  Yes.  Her last paragraph is -- mentions that
22  she was the only woman among the six promotion
23  candidates; and there is another sentence about
24  "anecdotally," blah, blah, blah.
25    Q    (BY MR. NOTZON)  Okay.  Did -- what is your

267

1  reaction to those -- to her accusations, her complaints?
2    A.  My reaction to the fact that she was the only
3  woman among the six promotion candidates, well, yes,
4  it's a fact she was the only woman among the six
5  candidates; but she did not provide any evidence and I
6  couldn't see any evidence that played a role anywhere in
7  the process at any level.
8        And the anecdotal, "It is my impression
9  that women in this department have a longer time to
10  advancement," that's not true as far as I know.  I don't
11  know that anyone spent more time because she was a woman
12  at any rank.
13    Q.  Did you -- did you do any studies of the
14  numbers to account for the amount of time that women
15  spend on average compared to the amount of time men
16  spend on average obtaining tenure?
17    A.  Yes -- well, I didn't do the math; but what I
18  know is that people go up for tenure at the time.  There
19  are very rare cases in which someone went up for tenure
20  early, real early -- I mean, the true early, not the
21  technical early.  And I can only remember maybe a couple
22  of people for whom that happened.
23    Q.  So just to clarify, you said you didn't
24  actually look at the numbers.  You're just reacting on
25  your seat-of-the-pants feeling that there is no

268

1  difference in the amount of time it takes for men or
2  women to get to tenure in your department?
3        MS. HILTON:  Objection, form.
4    A.  I am reacting based on the fact that it
5  normally takes six years for people to be promoted; and
6  as far as I can recall, the only person for whom that
7  has gone beyond the six years, because of the
8  extensions, was Nikolova.  Nikolova is one.  You know,
9  it's one candidate at the Assistant Professor level that
10  went up for promotion.  So you have an N of 1 on which
11  you're basing a conclusion.
12    Q.  Okay.  The answer to my question is:  You
13  didn't go and look at the numbers for your department to
14  ensure that what she said was true or not true; is that
15  correct?
16    A.  Do I really need to look at the numbers if
17  she's the only one who went from Assistant to Associate
18  Professor as a woman, as far as I can recall?
19        MR. NOTZON:  Object as nonresponsive.
20    Q.  (BY MR. NOTZON)  My question is:  Did you or
21  did you not go and look at the numbers of everyone in
22  the department who's gone up for tenure and how long
23  it's taken, male versus female?
24    A.  Well, you asked me the question a minute ago;
25  and in between when you asked the question and now, I

269

1  did not go and calculate these numbers.
2    Q.  Okay.  On the salaries -- well, let me ask one
3  more question on that e-mail.  If you would have been
4  asked for your advice on that, whether or not
5  Dr. Nikolova should have sent that e-mail or not, what
6  would you have advised her?
7        MS. HILTON:  Objection, form.
8    A.  That's hypothetical.  But my advice would have
9  been to send an e-mail that would be along the letter,
10  the rebuttal letter that she wrote.  Be factual.  Be
11  precise.  You know, provide a comparison point; and make
12  your case that way.  Don't make statements that -- or
13  accusations for which you cannot provide any evidence.
14    Q.  (BY MR. NOTZON)  Were -- given that you had
15  earlier raised concerns of potential gender bias, what
16  were your feelings about her raising gender
17  discrimination?  Do you think that she was unjustified?
18  Did you think it was improper?
19        MS. HILTON:  Objection, form.
20    Q.  (BY MR. NOTZON)  Do you fault --
21    A.  I think -- I think it was unjustified because
22  there's no evidence of that; and, then, making
23  allegations such -- very serious allegations in a public
24  forum without backing is very serious.
25    Q.  Did you talk to her about that?

Ahmed Tewfik - 3/20/2021

270

1    A.  I didn't talk to her after -- I don't recall,
2  you know, having a discussion about her e-mail with her
3  after she sent the e-mail.
4    Q.  Okay.  Do you know what she has or what she
5  does not have in her mind about the reason -- the bases
6  for her accusations?
7    A.  I don't know what she has in mind.  I know
8  what the facts are.  If there are facts that she knows
9  and no one else knows, then, that's fine.  I mean, then,
10 she should have presented those facts.
11   Q.  Okay.  And so do you know what is in the mind
12 of the Dean and the President and the President's
13 Committee that voted against her?
14   A.  I don't -- so this is pertaining to what, to
15 gender bias?
16   Q.  Yes.  What was motivating them?
17   A.  I don't know what's in their minds; but what I
18 do know is how they acted in various other situations
19 and is there a correlation between such an accusation
20 and their actions, or no?  And, to the best of my
21 knowledge, I have never seen of any of them any action
22 that would lead me to think that they are biased.
23   Q.  On the salary issue, you said that you review
24 data, and then you enter your rating into a spreadsheet.
25 What data are you reviewing?  Are you reviewing the

271

1  FARs?
2    A.  What I'm reviewing -- yes -- is I -- there is
3  a Faculty Annual Review and the CV that's submitted in
4  September, so by October 1st; and I ask all the faculty
5  members to send me an updated CV or FAR during the
6  Spring term so that entering into these salary
7  discussions, I have the most up-to-date picture of their
8  accomplishments.
9    Q.  Is there anything else you review besides
10 those items that you just testified about?
11   A.  No, these are the items that I look at.
12   Q.  Okay.
13       MR. NOTZON:  Pass the witness.  Thank you
14 very much.
15       MS. HILTON:  One quick point of
16 clarification.
17              EXAMINATION
18 BY MS. HILTON:
19   Q.  Dr. Tewfik, do you understand that the
20 testimony you gave on behalf of UT was limited to the
21 Tenure Review Decision Process relating to the decision
22 to deny tenure to Dr. Nikolova relating to the actions
23 of the Electrical and Computer Engineering Department
24 and Department Chair?
25   A.  Yes.  My understanding was that that part of

272

1  the testimony was going to be about process and that I
2  would be speaking about the process as UT.  The way the
3  question was phrased, you know, I was sort of concerned
4  that because we had such a long discussion about so many
5  items earlier, that this would give the opposing counsel
6  a license to just take anything and then say that's the
7  UT position.
8        MS. HILTON:  Ms. Cunningham, is the -- is
9  Exhibit 30 the Plaintiff's Notice of Oral and Video
10 Deposition?  I apologize.  I haven't numbered this.
11       MR. NOTZON:  No, it's 32.
12       MS. HILTON:  32.
13   Q.  (BY MS. HILTON)  Doctor --
14       MS. HILTON:  Thank you, Robert.
15   Q.  (BY MS. HILTON)  Dr. Tewfik, do you have the
16 Exhibit 32, which is the Notice of Oral and Video
17 Deposition in front of you?
18   A.  Yes.  It doesn't have an exhibit number, so.
19   Q.  Okay.  Yeah, I understand.
20       If you'll just go to page 3, do you see
21 where it says Exhibit A?
22   A.  Yes.
23   Q.  Okay.  And do you understand that that topic
24 listed on Exhibit A encompasses the scope of your
25 testimony on behalf of UT today?

273

1    A.  Yes, I do.
2        MS. HILTON:  No further questions.  Thank
3  you.
4        MR. NOTZON:  Nothing.  Thank you.
5        THE REPORTER:  Ms. Hilton, do you want a
6  copy of the transcript?
7        MS. HILTON:  Yes, please.
8        THE REPORTER:  All right.  This concludes
9  the deposition at 7:10 p.m.
10       (Deposition adjourned at 7:10 p.m.)
11              --ooOoo--
12
13
14
15
16
17
18
19
20
21
22
23
24
25

274

1       CHANGES AND SIGNATURE
2   WITNESS NAME:        DATE OF DEPOSITION:
3   AHMED TEWFIK        March 20, 2021
4   PAGE/LINE   CHANGE        REASON
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____

276

1   STATE OF TEXAS   )
2          REPORTER'S CERTIFICATION
3          I, DEBBIE D. CUNNINGHAM, CSR, hereby
4   certify that the witness was duly sworn and that this
5   transcript is a true record of the testimony given by
6   the witness.
7          I further certify that I am neither
8   counsel for, related to, nor employed by any of the
9   parties or attorneys in the action in which this
10  proceeding was taken.  Further, I am not a relative or
11  employee of any attorney of record in this cause, nor am
12  I financially or otherwise interested in the outcome of
13  the action.
14         Subscribed and sworn to by me this day,
15  April 20, 2021.
16
17
18
19     _____
       Debbie D. Cunningham, CSR
20     CSR 2065
       Expiration:  6/30/21
21     INTEGRITY LEGAL SUPPORT SOLUTIONS
       P.O. Box 245
22     Manchaca, Texas 78652
       www.integrity-texas.com
23     512-320-8690; FIRM # 528
24
25

275

1          I, AHMED TEWFIK, have read the foregoing
2   deposition and hereby affix my signature that same is
3   true and correct, except as noted herein.
4
5          _____
6          AHMED TEWFIK
7
8   THE STATE OF _____   )
9          Before me, _____, on
10  this day personally appeared AHMED TEWFIK, known to me
11  (or proved to me under oath or through _____)
12  (description of identity card or other document) to be
13  the person whose name is subscribed to the foregoing
14  instrument and acknowledged to me that they executed
15  same for the purposes and consideration therein
16  expressed.
17         Given under my hand and seal of office on
18  this _____ day of _____, _____.
19
20
21         _____
22  NOTARY PUBLIC IN AND FOR
23  THE STATE OF _____
24  My Commission Expires:_____
25

276

1   STATE OF TEXAS     )

2                    REPORTER'S CERTIFICATION

3                I, DEBBIE D. CUNNINGHAM, CSR, hereby

4   certify that the witness was duly sworn and that this

5   transcript is a true record of the testimony given by

6   the witness.

7                I further certify that I am neither

8   counsel for, related to, nor employed by any of the

9   parties or attorneys in the action in which this

10  proceeding was taken.  Further, I am not a relative or

11  employee of any attorney of record in this cause, nor am

12  I financially or otherwise interested in the outcome of

13  the action.

14                Subscribed and sworn to by me this day,

15  April 20, 2021.

16

17

18

19  _____
    Debbie D. Cunningham, CSR

20  CSR 2065
    Expiration:  6/30/21

21  INTEGRITY LEGAL SUPPORT SOLUTIONS
    P.O. Box 245

22  Manchaca, Texas 78652
    www.integrity-texas.com

23  512-320-8690; FIRM # 528

24

25

Appx.0658

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION


EVDOKIA NIKOLOVA,        *
    Plaintiff,         *
                      *    CIVIL ACTION NO.
    v.                  *    1:19-CV-00877
                      *
UNIVERSITY OF TEXAS AT AUSTIN *
    Defendant,         *



**************************************************************

ORAL AND VIDEOTAPED DEPOSITION OF
SHANE THOMPSON, Ph.D.
JUNE 22, 2021

**************************************************************

    THE ORAL AND VIDEOTAPED DEPOSITION OF SHANE

THOMPSON, Ph.D., produced as a witness at the instance

of the Defendant, and duly sworn, was taken in the

above-styled and numbered cause on June 22, 2021, from

9:05 A.M. to 10:15 A.M., before Brian Christopher,

Online Notary Public in and for the State of Texas,

reported remotely by electronic reporting and

transcription, pursuant to the Federal Rules of Civil

Procedure and the provisions stated in the Record or

attached hereto.

2

APPEARANCES

FOR THE PLAINTIFF:

THE LAW OFFICE OF ROBERT NOTZON
1502 West Avenue
Austin, Texas 78701
(T) 512.474.7563
By: Robert Notzon, Esq.
    Robert@NotzonLaw.com

    AND

CREWS LAW FIRM, P.C.
701 Brazos, Suite 900
Austin, Texas 78701
(T) 512.484.2276
By: Robert W. Schmidt, Esq.
    schmidt@crewsfirm.com

FOR THE DEFENDANT:

OFFICE OF THE ATTORNEY GENERAL OF TEXAS
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Phone: (512) 463-2120

By: Benjamin Dower, Esq.
    benjamin.dower.oag.texas.gov
    AND
    Amy Hilton, Esq.
    amy.hilton@oag.texas.gov

ALSO PRESENT:
Laura Barbour, In-House Assistant General
Counsel, UT Austin

Jody Hughes, Associate Vice President of Legal
Affairs, UT Austin

3

INDEX

                                        Page
Stipulations . . . . . . . . . . . . . . . . . . . . . 1
Appearances . . . . . . . . . . . . . . . . . . . . 2
Examination By Mr. Dower . . . . . . . . . . . . . 5
Signature and Changes . . . . . . . . . . . . . . 45
Reporter's Certification . . . . . . . . . . . . . . 47

EXHIBITS

No. Description                          Page
67  Expert Report of Shane Thompson, Ph.D. . . . . 10

4

THE REPORTER:  This is a videotape
deposition of Shane Thompson, in the matter of
Nikolova v UT Austin.   We are located at PO Box
245, Manchaca, Texas 78652.  We are on the Record,
the time is 9:05 am.  My name is Brian Christopher,
with Integrity Legal Support Solutions.

Would all persons present please
introduce themselves, for the record, starting with
the Plaintiff's counsel?

MR. NOTZON:  Robert Notzon and Bob
Schmidt for Dr. Nikolova.

MR. DOWER:  And Benjamin Dower and Amy
Hilton for University of Texas at Austin.

THE REPORTER:  Okay.

Dr. Thompson, would you raise right hand,
please?

SHANE THOMPSON, Ph.D.,
having been duly sworn, testified as follows:

THE REPORTER:  You may proceed.

MR. DOWER:  Okay, before we get going,
the parties have some stipulations that I will
briefly read into the record.

First, the parties stipulate that this
deposition may be taken remotely, via Zoom.

The parties stipulate that, "objection

5

form" is sufficient to preserve objections to the
form of the questions and will be used in lieu of
the more specific form based objections.

The parties stipulated that all
objections, except as to the form of the question
or answer, are reserved until trial.

And I think, in light of our -- the fact
that Brian is making the recording, I don't need
any more stipulations.

MR. NOTZON:  I agree.

MR. DOWER:  Okay.  In that case we'll get
started.

DIRECT EXAMINATION

BY MR. DOWER:

Q.  Dr. Thompson, thank you so much for being
here.  Could you start out just by saying your name
for the Record?

A.  Sure.  Shane Thompson.

Q.  And you understand Dr. Thompson that
you're under oath here today?

A.  Yes.

Q.  And then, notwithstanding the fact that
we're all here via Zoom, it's the same oath that
you would be, you know, if we were in a court with
a judge?

Shane Thompson - 6/22/2021

6

```
1    A.  Yes.
2    Q.  Okay.  Have you ever been deposed before?
3    A.  Yes.
4    Q.  How many times if you will recall?
5    A.  I believe it's twice.
6    Q.  Okay.  And are those the two depositions
7  that are mentioned in your, I think, the C.V.
8  attached to your report?
9    A.  Yes.
10   Q.  Okay.  So that would be Nessler v. City
11 of Grand Junction Colorado and Heredia v. Pueblo
12 School District 60?
13   A.  That's correct.
14   Q.  Okay.  Well then you probably know some
15 of the sort of the rules or tricks of the trade
16 that I'm going to lay out, but just in case.  So
17 just to ensure that we have a clean stenographic
18 record, I'm going to try to -- or I'll ask you to
19 let me finish the question before you start
20 answering so we don't talk over each other, and I
21 will in turn try very hard not to cut you off or
22 interject before you're finished speaking.  Do we
23 have an agreement that we'll each try not to talk
24 over each other?
25   A.  Yes.
```

7

```
1    Q.  And that was perfect right there.  I know
2  you were eager to jump in with the yes and you
3  waited beautifully.  And because we're creating a
4  transcript, you know, the form of answers need to
5  be verbal and in a way that's unambiguous.  So
6  things like uh-hu or uh-huh in which the verbal
7  intonation let's the person understand whether it's
8  affirmative or negative on a piece of paper those
9  look the same.  So for answer I would ask that you
10 try to keep them to things that are verbal and
11 unambiguous on a transcript, do we have an
12 agreement on that?
13   A.  Yes.
14   Q.  Perfect.  If you don't understand the
15 question that I'm asking, I promise I'm not trying
16 to trick you, it's probably because I just asked a
17 confusing question.  So if you ever don't
18 understand the question I'm asking, can we have an
19 agreement that you'll ask me to rephrase or to
20 clarify the question?  Do we have an agreement on
21 that?
22   A.  Yes.
23   Q.  Perfect.  And so then if you do answer
24 the question, may I assume that you understood the
25 question?
```

8

```
1    A.  Yes.
2    Q.  Okay.  And I'm not -- this is just for
3  the record, I'm not trying to get invasive -- but
4  are you on any medication that would affect your
5  ability to accurately or truthfully answer my
6  questions?
7    A.  No.
8    Q.  Okay.  I frankly don't think this is
9  going to go very long, but we may take breaks.  And
10 if there's any time you need a break, just let me
11 know.  The only thing I would ask is that, if
12 there's a question pending, that you go ahead and
13 answer the question before we take a break.  Do we
14 have an agreement on that?
15   A.  Yes.
16   Q.  Okay.  Perfect.  Okay.  Well then, I want
17 to start out just by briefly asking you a little
18 bit about what you did to prepare for this
19 deposition if anything.  Did you do anything to
20 prepare for this deposition today?
21   A.  Looked over my reports.  Had probably a
22 10-minute call with Robert.
23   Q.  Okay.
24   A.  But that's it.
25   Q.  Okay.  So you looked over your report,
```

9

```
1  did you look over any other documents?
2    A.  I skimmed through the expert report of I
3  believe Dr. Deere and then Dr. Glick.
4    Q.  Okay.  Any other documents you reviewed?
5    A.  Yes.  Let me see what that is.  That's a
6  -- I was sent over Exhibit 38, I don't know how to
7  refer to these, but it was kind of procedure in
8  general guidelines for assistant to associate
9  professor promotions.
10   Q.  Okay.  Any other documents you reviewed?
11   A.  That's it.
12   Q.  Okay.  So how long would you say that you
13 spent preparing in total?
14   A.  An hour.
15   Q.  Okay.  When you were generating your
16 report, other than Robert Notzon and Bob Schmidt,
17 did you talk with anyone else to prepare that
18 document?
19   A.  No.
20   Q.  Okay.  All right.  I'm going to test my
21 ability to upload a document.  Let's see.  So in
22 the chat now, I'm uploading the revised version of
23 your report, let me know if you see that?
24   A.  I do.
25   Q.  Okay.  And we'll mark that as Defendant's
```

1 Exhibit 1.
2       MR. DOWER:  And Robert were you able to
3 access that?
4       MR. NOTZON:  Yeah.
5       MR. DOWER:  Okay.
6       MR. NOTZON:  You didn't want to just keep
7 going in sequential order, so we don't have double
8 numbers?
9       MR. DOWER:  I'm fine with that if you
10 know what the next number is?
11       MR. NOTZON:  It is.  It's 67.
12       MR. DOWER:  Okay.  Well then strike the
13 Exhibit 1, we'll call this Exhibit 67.  Okay.
14 BY MR. DOWER:
15       A.  And do I click on this or do you --
16       Q.  Yes.
17       A.  Okay.
18       Q.  If you click on it -- I mean, it's
19 nothing you haven't seen before since you authored
20 it.  But yeah, if you want to confirm by
21 downloading it, if you click to open or you hit the
22 three ellipses, I believe you'll have the option to
23 open the file.
24       A.  Okay.  Let's see.  It saved it for me.
25 Click to open.  Okay.  All right.

1       Q.  Were you able to get that open?
2       A.  Yes.
3       Q.  Okay.  And will you just confirm for me
4 that Exhibit 67 is the revised version of the
5 report you provided in this case?
6       A.  It is.
7       Q.  Okay.  And I've been told, but I want to
8 clarify with you, that the only difference between
9 the revised version and the original version is
10 that the revised version contains your hourly rate,
11 is that correct?
12       A.  That's correct.
13       Q.  Okay.  And is this a true and accurate
14 copy of your report?
15       A.  It appears that it is, yes.
16       Q.  Okay.  That's not intended as a trick
17 question just nothing jumps out to you as amiss?
18       A.  No.
19       Q.  Okay.  All right.  Well most of our
20 conversation today is just going to be going
21 through your report and me asking some clarifying
22 questions about it and about some of your opinions.
23 So I will try to direct you through by reference to
24 paragraph numbers, just for ease of clarity when
25 we're speaking.  And I want to start with the

1 materials that your report and your opinions are
2 based on.  And in the very first paragraph of the
3 introduction, it says, "That the preliminary
4 calculations in this report are based on data and
5 information provided in Appendix B."  Is that an
6 accurate statement?
7       A.  Let me go see Appendix B real quick.
8       Q.  Yeah.  Go for it.  And it's -- oh it
9 doesn't look like the pages are numbered after
10 that.
11       A.  Right.  Unfortunately.  I should have
12 numbered the pages.
13       Q.  The second to last page of the PDF if
14 that helps.
15       A.  Yes.  Yes.
16       Q.  Okay.  And so Appendix B identifies two
17 documents.  One, is the Probationary, Tenure Data
18 excel spreadsheet and then the other is Dr. Glick's
19 report on stereotyping and bias, is that accurate?
20       A.  Yeah.  That's correct.
21       Q.  Okay.  And so are there any materials
22 that are not contained -- or that are not those two
23 items I should say, upon which you relied on in
24 generating your opinion in this case?
25       A.  No.

1       Q.  Okay.  So then skipping ahead to the
2 second page of your report, under the purpose of
3 the declaration you identify three things in
4 paragraph 7 that you've been asked to do, is that
5 accurate?
6       A.  Yes.
7       Q.  Okay.  So this says that you've, "Been
8 asked to perform statistical tests and/or provide
9 opinions," and then it lists, you know, sub a, sub
10 b, and sub c.  Are there any opinions that you've
11 been asked to provide that aren't encompassed in
12 those three items?
13       A.  No.
14       Q.  Okay.  And I understand that later -- you
15 know, your report elaborates on those three items,
16 so there's elaboration.  I'm just trying to make
17 sure that your opinions are basically on sub a, sub
18 b, and sub c.
19       A.  Yes.
20       Q.  Okay.
21       A.  That's correct.
22       Q.  And so there aren't any opinions that
23 you've been asked to provide that aren't contained
24 in your report Exhibit 67, is that a fair
25 statement?

14

1    A.  Sorry, can you ask that again?
2    Q.  Sure.  Absolutely.  Basically what I'm
3  asking is that your report contains the entirety of
4  the opinions that you're offering in this case?
5    A.  That's correct.
6    Q.  Okay.  And thank you for asking me to
7  clarify.  That's totally welcome.
8       Okay.  Well then let's sort of hone in.
9  I'm going to talk about or ask you about each of
10  these opinions sort of one at a time starting with
11  the first one.  So your first opinion as reflected
12  in paragraph 7(a) is regarding whether, "There is
13  evidence of different treatment towards female
14  assistant professors, specifically their
15  prevalence of early tenure reviews."  Is that
16  accurate?
17    A.  That's correct.
18    Q.  Okay.  And your opinion, as reflected in
19  paragraph 8 is that, "There is statistically
20  significant evidence of different treatment towards
21  females in their prevalence at UT of going up for
22  early tenure reviews."  Is that accurate?
23    A.  Yes.  That's accurate.
24    Q.  Okay.  And in that sentence, you use the
25  phrase different treatment.  What does different

15

1  treatment mean as you're using it in that sentence?
2    A.  So different treatment means that there
3  is a different ability in these assistant
4  professors to be able to go up for early tenure.
5  And then early tenure correlates -- or sorry --
6  early review correlates perfectly to promotions.
7  So the treatment from the department is based on
8  the decision from those early reviews.
9    Q.  Okay.  And who is making the decision for
10  those early reviews?
11    A.  To go up for the early review or to -- so
12  it's my understanding that the professors make the
13  decision to go up early, the decision to grant
14  tenure in that early review is obviously the
15  University's.
16    Q.  Okay.  So honing in then on the
17  professor's decision to go up early, who is the
18  person or persons that you're saying are engaged in
19  the different treatment?
20    A.  The professors themselves -- maybe I need
21  that question rephrased.
22    Q.  Sure.  Well so if it's the individuals --
23  individual professor's decision that they would
24  like to put their tenure case up early, then -- and
25  your opinion is that there's a different treatment,

16

1  I'm trying to identify the actor who is engaged in
2  the different treatment.  Is it the -- is it that
3  each individual professor when they decide whether
4  they want to go up early that they are engaged in
5  the different treatment?
6    A.  No.  So let me zoom out a little bit.
7    Q.  Yeah.
8    A.  So they have the decision themselves to
9  be considered for early tenure review.
10    Q.  Right.
11    A.  However, they go up based on their
12  ability to get tenure, which I believe that
13  decision isn't made in a vacuum.  In other words,
14  if someone has -- if an assistant professor had
15  shown up and they're in their first year at UT and
16  they may say, "Oh, wow everyone who goes up early
17  gets granted tenure," before 2019.  Then maybe in
18  their first year they would say, "I'm going to go
19  up early for tenure," it correlates perfectly to
20  getting promoted.  I don't believe that, that
21  decision rests solely on the assistant professors
22  to go up early.
23    Q.  And what is that conclusion based on?
24    A.  I would say that I don't know the nuances
25  of how this decision is made.  I don't believe that

17

1  professors make that decision on their own whether
2  to go up early or not.
3    Q.  And what I'm asking is, what is that
4  belief based on?
5    A.  I suppose that's my own belief that a
6  professor doesn't make that decision on their own
7  to go up early.
8    Q.  Okay.  And so then to return to my
9  question what is the treatment at issue here?
10    A.  So I suppose that it's in two parts.
11  Kind of like I explained before where they're going
12  up early, that decision rests on the professor and
13  I believe guidance that they're getting from their
14  advisory committee about kind of the
15  appropriateness of going up early.  And then
16  everybody who goes up early, receives tenure.  And
17  so going up early equals tenure, prior to the year
18  that Dr. Nikolova goes up.  And so the treatment
19  from the department is through that mechanism where
20  going up early equals tenure and very few female
21  assistant professors go up early.
22    Q.  Okay.  So is it possible -- well first of
23  all, all of this is based on -- let me rephrase.
24     You've never spoken to a faculty member at UT
25  about this process, correct?

18

1    A.  I have not.
2    Q.  And you haven't reviewed any deposition
3  transcripts in this case, correct?
4    A.  That's correct.
5    Q.  Okay.  So all of this, what you're
6  describing, is effectively your supposition from
7  talking with, I guess, Plaintiff's counsel?
8    A.  Yes.  I guess you could say talking with
9  Plaintiff's counsel.  I don't think it makes any
10  sense that an assistant professor would go up early
11  without some influence from the Department.
12    Q.  And in Dr. Nikolova's case the Department
13  was very supportive of her, is that your testimony,
14  or your understanding?
15    A.  I don't have access to what they
16  suggested.  My assumption is that she had contact
17  or advice from the Department.  But again, I
18  haven't reviewed any documents or advice they may
19  have given her.
20    Q.  And earlier you said that people who went
21  up for tenure early all of them got tenure?
22    A.  Yes.  Prior to Dr. Nikolova's tenure
23  review, I believe it was in 2019, I may not have
24  got that year correct.
25    Q.  And if someone went forward and I said I

19

1  would like to go up early, and they were advised we
2  don't think your case is strong enough to merit
3  going up early, then they may not have put their
4  proverbial hat in the ring in terms of going up, is
5  that -- is that a fair statement?
6    A.  I believe that could be correct.
7    Q.  Okay.
8    A.  I don't know.
9    Q.  Okay.  But there is a self-selection
10  process going on here in terms of who decides to go
11  up for tenure early?
12    A.  Absolutely.
13    MR. NOTZON:  Objection, form.
14  BY MR. DOWER:
15    A.  I would say my supposition is that if --
16  well I'll stop there actually.
17    Q.  All right.  Let me move on to table 1
18  which is directly below paragraph 8.  And I want to
19  make sure I understand what the data in this table.
20  I think I do, but I'll walk you through it to make
21  sure I understand.  So first of all, this
22  identifies that there are 65 male assistant
23  professors who went up for tenure from 2009 through
24  2018.  Is that correct?
25    A.  That's correct.

20

1    Q.  Okay.  And that's the number in the top
2  left, the first, I guess, data entry in the top
3  left?
4    A.  Yes.
5    Q.  Okay.  And this is -- or is this male
6  assistant professors in the Cockrell School of
7  Engineering?
8    A.  I believe that is the case.  I could --
9  yes.  Yes.  That is correct.
10    Q.  And of those 65 male assistant
11  professors, 24 went up early?
12    A.  That's correct.
13    Q.  Okay.  And so that's where you get the 37
14  percent statistic under percent early review?
15    A.  Yes.  Correct.
16    Q.  And then you've got your fraction there
17  in parenthesis, 24 over 65?
18    A.  Yes.
19    Q.  Okay.  And so then similarly we've got 21
20  female assistant professors who went up for tenure
21  from 2009 to 2018, correct?
22    A.  Yes.
23    Q.  Okay.  And of those 21 who went up for
24  tenure, two of them went up early?
25    A.  Correct.

21

1    Q.  Okay.  And that's where you get the 10
2  percent statistic, it's a little bit -- I think
3  it's a little bit less than that, but it's 2 out of
4  21?
5    A.  Yes.
6    Q.  Okay.  And one of those two was Dr.
7  Nikolova?
8    A.  No.
9    Q.  No.
10    A.  This is pre Doctor Nikolova.
11    Q.  Okay.  So if we added her, I guess it
12  would be 3 out of and the denominator would
13  presumably change for how ever female professors
14  went up for a year?
15    A.  Yeah.  And it would also add in the
16  assistant professors who went up in her year as
17  well, so those numbers could have changed.
18    Q.  Right.  So then going back to paragraph 8
19  in the report, it says this disparity in early
20  tenure reviews between male and female assistant
21  professors is statistically significant at the 5
22  percent level.  Is that correct?
23    A.  That's correct.
24    Q.  Okay.  And when an outcome is
25  statistically significant that means that it's

22

1  basically unlikely to occur by chance?
2     A.  Yeah.  That's correct.
3     Q.  It's sort of a lay person's sort of
4  definition?
5     A.  Yes.
6     Q.  And it's not necessarily impossible, it's
7  just unlikely?
8     A.  That's correct.
9     Q.  And so then you basically conclude from
10  that, that the disparity in early tenure reviews
11  between male and female assistant professors was
12  unlikely to happen by chance?
13     A.  That's right.
14     Q.  Okay.  And do you have an opinion about
15  what caused the disparity in early tenure reviews
16  between male and female assistant professors?
17     A.  I don't have an opinion.  I guess, the
18  cause of why so few females may have gone up and so
19  many males may have gone up, there's nuances there
20  that I don't fully understand.
21     Q.  And you would agree that causation and
22  correlation are not the same thing?
23     A.  That's right.
24     Q.  And so just to use, kind of a silly
25  example, roosters crow a little bit before dawn and

23

1  then the sun comes up but, you know, we know that
2  roosters don't cause the sun to go up?
3     A.  Right.
4     Q.  Right.  You know, people shop a lot when
5  it's cold because of the winter holidays, but cold
6  doesn't necessarily cause people to buy more stuff?
7     A.  Right.  Right.
8     Q.  So sometimes there can be other variables
9  that explain the correlation?
10     A.  Yes.
11     Q.  And so here the variables that you looked
12  at were gender, early tenure decisions, and total
13  tenure decisions, correct?
14     A.  Yes.
15     Q.  And so would you agree that a
16  statistically significant disparity just by itself
17  doesn't necessarily tell us what caused the
18  disparity?
19     A.  Yes.
20     Q.  All right.  I want to skip ahead to
21  paragraph 15 which is now out of the summary and
22  into the body of this section of your opinion.  And
23  I'll give you a second if you need it to get to
24  paragraph 15.  Are you there?
25     A.  Yeah.  I'm there.

24

1     Q.  Okay.  Perfect.  So in paragraph 15, the
2  sort of italicized section, you say that your
3  statistical test is predicated on the question, "If
4  female and male assistant professors were equally
5  capable to go up for early tenure reviews, what is
6  the probability that male assistant professors
7  would go up early four times more often than female
8  assistant professors?"  Did I -- did I recite that
9  correctly?
10     A.  Yes.
11     Q.  Okay.  And so in this sentence can you
12  tell us what you mean by "equally capable of going
13  up for early tenure reviews"?
14     A.  Sure.  So the assumption of this question
15  is that female and male assistant professors are
16  otherwise equal.  So there's a lot of unobservable
17  characteristics and qualifications of, you know.
18  Of the 86 professors, we're assuming that there's
19  no material difference between a male and a female
20  assistant professor in those things that we don't
21  observe.
22     Q.  And some of those -- some of those
23  metrics might be observable in terms of -- you
24  know, there should be -- there could be some
25  quantitative measures of things like publications

25

1  or funding, things like that, correct?
2     A.  Yes.
3     Q.  But it's also really hard to run a sort
4  of analysis that computes all that because
5  professors' statistics aren't -- or I shouldn't say
6  statistics -- but that quantitative data doesn't
7  necessarily lend itself to an apples to apples
8  comparison, fair?
9     A.  Yeah.  I think that's correct.
10     Q.  Right.  Like the number of publications,
11  what's considered good in one field might be kind
12  of weak in another, things like that?
13     A.  Yes.
14     Q.  And what is considered, you know, good
15  sufficient funding or robust funding for research,
16  you know, if you just look at the number, you know,
17  what's considered robust in one field could be
18  pretty weak in another depending on all the
19  particulars?
20     A.  Yes.
21     Q.  Okay.
22     A.  That's correct.
23     Q.  Would you agree that your analysis also
24  assumes that the assistant professors are equally
25  interested in going upward?

26

1    A.  Yes.
2    Q.  And so, if gender correlated with
3  something like risk aversion at least in a
4  professional context, that could be an explanation
5  for the statistical disparity?
6        MR. NOTZON:  Objection, form.
7  BY MR. DOWER:
8    A.  It could be an explanation, but there's
9  no way to prove that I suppose.
10   Q.  And similarly there's not really an easy
11  way to disprove that is there?
12   A.  No.  Without further data, no.
13   Q.  Okay.  Want to move on then to your
14  second opinion.  And so I'm going to take a quote
15  from paragraph 7(b) but it's -- I don't think it's
16  a particularly controversial representation.  But
17  your second opinion is regarding whether, quote
18  there is, "Evidence of different impact towards
19  female assistant professors who take probationary
20  extensions and go up early."  Is that correct that,
21  that's the subject of your second opinion?
22   A.  That's correct.
23   Q.  Okay.  And I'm looking at paragraph 9
24  back in the introduction or rather this summary of
25  opinions.  And so in paragraph 9 you say, "There

27

1  were only three assistant professors who went up
2  early after taking probationary extensions."  Not
3  including Dr. Nikolova, is that correct?
4    A.  That's correct.
5    Q.  Okay.  And so when you add Dr. Nikolova
6  there were only four assistant professors in the
7  data you reviewed who both took a probationary
8  extension, one or more, and went up early, correct?
9    A.  That's correct.
10   Q.  Okay.  And so you would agree then -- I'm
11  looking at paragraph 10 for this -- that it's
12  mathematically impossible to conduct a statistical
13  test on such a small sample?
14   A.  Yes.
15   Q.  And so, you know, because you're a
16  statistician who understands those things, you can
17  neither confirm nor disprove whether there was a
18  different impact on female assistant professors who
19  take probationary extensions at UT?
20   A.  That's correct.
21   Q.  Okay.  And so because of that, you were
22  not able to form an opinion on whether there was
23  evidence of different impacts towards female
24  assistant professors who take probationary
25  extensions and go up early?

28

1    A.  Yeah.  I couldn't form a statistically
2  significant opinion on that matter.
3    Q.  Okay.  And so going back to sort of our
4  lay person definition of statistical significance,
5  you weren't able to offer an opinion about whether
6  or not those numbers occurred as a result of
7  anything other than just sort of random chance?
8    A.  That's correct.  And I would say, too,
9  the issue here is sample size.  So the ability of a
10  statistician to prove or disprove is inhibited by
11  the sample size.  It doesn't, therefore, rule out
12  any possibility.  So you rely on the data you have,
13  but being true to your practice and conventions and
14  statistics, you can't pull out statistically
15  significant evidence.
16   Q.  Right.  And I'll give you a hypo that I
17  think will help demonstrate the point for both of
18  us.  If you had a coin and you flipped it once you
19  wouldn't be able to say well is this likely to be a
20  rigged coin or not, because whatever the outcome
21  is, it doesn't tell you anything.
22   A.  Right.
23   Q.  And even if you flipped it a couple of
24  times, if it landed heads two or even three times
25  in a row, you really wouldn't be able to say with

29

1  confidence, oh this coin must be rigged, because
2  it's just too small of a repetition to be, you
3  know, unlikely to have occurred through just
4  happenstance?
5    A.  That's correct.
6    Q.  Okay.  And that's kind of the -- I know
7  that's a silly example -- but that's kind of
8  demonstrating the idea that we're talking about?
9    A.  Yes.
10   Q.  Okay.  All right.  Then I want to just
11  move on to the next opinion, the third opinion.
12  And again, I'm sort of quoting paragraph 7(c) to
13  the extent you want to refer to it.  And so your
14  third opinion is regarding whether, and this is
15  where the quote starts, "There is evidence that Dr.
16  Nikolova's denied promotion is statistically
17  unexplainable given the in-favor votes she received
18  from the departmental budget council and college
19  advisory committee."  Is that accurate that, that's
20  what your third opinion is about?
21   A.  Yes.
22   Q.  Okay.  And so in that sentence you use
23  the phrase, "statistically unexplainable," can you
24  explain what you mean by what you mean by
25  unexplainable?

30

1    A. Sure. So when you're testing kind of two
2  populations, in a traditional sense you're saying
3  okay, you've got population A and population B and
4  what if there's a difference between those two, and
5  given that difference, is the disparity between the
6  two groups statistically significant? In this
7  case, we have an instance where Dr. Nikolova
8  received a 100 percent in favor votes from here
9  college advisory committee, and we don't have
10  anybody who has ever been in that population who
11  has been denied promotion.
12      So if I remove Dr. Nikolova from that, I
13  don't even have a second group against which I
14  could compare the disparity, because a second group
15  doesn't exist. So the traditional statistical
16  significance between two groups isn't available to
17  me. So I've said here statistically unexplainable
18  in the sense that, okay, I look at everybody else,
19  I run a statistical model that predicts how likely
20  they are to receive promotions, and then I apply
21  that model to Dr. Nikolova. And so it's not a
22  traditional statistically significant threshold,
23  because that's impossible given that there was no
24  variation in 100 percent vote getters and promotion
25  denials.

31

1    Q. Okay. So if someone got a robust support
2  from the college level committee but then didn't
3  get tenure, with regards to the statistically
4  unexplainable, you would say well that doesn't
5  matter because it's not 100 percent and there's no
6  other data entry in which someone had 100 percent
7  support and did not get tenure?
8      MR. NOTZON: Objection, form.
9  BY MR. DOWER:
10    A. I may need you to rephrase.
11    Q. Okay. Well like in your regression
12  analysis you concluded that there was about a 1 in
13  25 chance that she wouldn't get tenure, right?
14    A. Right.
15    Q. So then that would -- that is explainable
16  in the sense that this could be that 1 in 25
17  scenario, right?
18    A. I suppose it could be explainable in that
19  way. However if we look at traditional statistical
20  thresholds, anything below 1 in 20 is considered a
21  statistically significant result. And so could it
22  have occurred by chance? Nothing is impossible, I
23  suppose, but a statistician would reject the idea
24  that this occurred by chance, because it falls
25  below the traditional threshold.

32

1    Q. Sure. I guess what I'm quibbling with is
2  your use of the phrase unexplainable, because it
3  could be just an unlikely event, right?
4    A. Sure. I think you're saying, am I saying
5  it's statistically impossible and that is not the
6  case --
7    Q. Okay.
8    A. -- right. Yes.
9    Q. I appreciate the clarity. Okay. I think
10  we're on the same page now. So and when you were
11  conducting this analysis, you used voting outcomes
12  by department budget council and college advisory
13  committees as a proxy for the wholistic performance
14  records, is that accurate?
15    A. That's correct.
16    Q. Okay. And so this analysis necessarily
17  assumes that these voting records are a good proxy
18  for performance records?
19    A. Yes. Correct.
20    Q. You know, you didn't presume to actually
21  go into the merits of Dr. Nikolova's application
22  and try to perform, you know, your own separate
23  review on how strong the case was, it's based on
24  the assumption that voting records at the
25  department and college level function as a proxy

33

1  for that type of substantive analysis?
2    A. Yeah. The assumption would be that those
3  in the department know the professors and know the
4  holistic intangibles of the professors would know
5  better than me how qualified they are for
6  promotion. You know, the statistician in me would
7  have liked to include all the data, but for the
8  reasons you mentioned earlier, they're not apples
9  to apples across departments and everything else.
10  And so relying on voting committees was the best
11  proxy for a holistic view of the professors.
12    Q. Okay. Are you suggesting that the
13  department and college advisory committee votes
14  predict an outcome, or cause it, or are you not
15  making that distinction?
16    A. They certainly predict an outcome.
17  Causing an outcome, I wouldn't say that.
18    Q. Okay. And you didn't include whether the
19  dean supported or did not support the tenure case
20  in this statistical analysis, correct?
21    A. That's correct.
22    Q. And that would be, I guess, a binary or a
23  dummy variable that's either effectively like one
24  or a zero either yes or a no. Fair?
25    A. Yes.

34

1    Q.  Okay.  And you don't know, sitting here
2  today, what that would do to your analysis if you
3  added that data as another predictor of outcome?
4    A.  Yeah.  I don't know.
5    Q.  Okay.  And in your analysis of the data
6  you found that 13 assistant professors were denied
7  promotions?  And, yeah, if you need to reference
8  the report.  I'm sorry, I didn't have a paragraph
9  cite for that.  I believe it was paragraph 26(a).
10    A.  Okay.  Yes.
11    Q.  Okay.  And the average in-favor
12  department budget council vote of those denied
13  professors was 67 percent?
14    A.  Yes.  Correct.
15    Q.  Okay.  So I want to make sure I
16  understand what that number means.  Are you saying
17  that the average department vote of the budget
18  council was that two thirds of the votes on average
19  were in favor of promotion?
20    A.  Yes.
21    Q.  And that's specifically for the
22  population that did not get tenure?
23    A.  Yes.  That's correct.
24    Q.  Okay.  So even for the people who didn't
25  ultimately get tenure, on average you know, two

35

1  thirds of their budget council supported their
2  case?
3    A.  Yes.  I would want to kind of -- my model
4  assumes that it's important that support has
5  degrees.  And so support, you know, I suppose could
6  be said is 51 percent.  My model assumes that 97
7  percent is different from 51 percent.  It's not a
8  binary variable.
9    Q.  And did you review any information about
10  -- that would tell you how the president of the
11  university, you know, used these votes in terms of,
12  you know, whether he or she thinks that -- I guess
13  cares about whether a majority -- supported it or
14  not versus, you know, 100 percent?
15    A.  I did not review anything like that.
16    Q.  Okay.  So part of this sort of assumption
17  of your analysis is that what we really care about
18  here is the full gradient of votes, you know, 100
19  percent to 0, and not sort of a well does the
20  majority support them or not?
21    A.  Right.  It would be that the dean and the
22  president -- the decision makers view a difference
23  between 95 percent and 55 percent, for example.
24    Q.  I want to ask you a little bit about your
25  regression model.  So first of all, you ran a

36

1  regression model on the relationship between voting
2  outcomes and promotion outcomes, correct?
3    A.  That's correct.
4    Q.  What program did you use to run the
5  regression analysis?
6    A.  It's called Stata.
7    Q.  Okay.
8    A.  It's common for economists.
9    Q.  I used Stata for my undergraduate senior
10  thesis.
11    A.  All right.
12    Q.  So I have some old, old personal
13  experience, a little outdated now.  What type of
14  regression did you use?  Like linear or what?
15    A.  So it's called a logistic regression.  It
16  takes a dependent variable, in this case the yes-no
17  of promotion, and predicts that value based on kind
18  of some independent variables.  In this case,
19  voting percentage.
20    Q.  Now your report summarizes a few key
21  takeaways from the model, but you didn't actually
22  include the regression analysis results themselves.
23  Was there a reason for that?
24    A.  There wasn't a reason for that.  I -- I --
25  there wasn't a reason.  I probably could have put a

37

1  table of the regression output.
2    Q.  Do you have that table?
3    A.  I would have it in my kind of log files
4  from the analysis.
5    Q.  Okay.
6    A.  So yes.
7    Q.  Does it include some like fit statistics?
8    A.  Yes.
9    Q.  Okay.  And like analysis of variance?
10    A.  Yeah.
11    Q.  Okay.  And you would agree with me that
12  those are the types of tests that are typically
13  used by statisticians to determine the
14  trustworthiness of their regression models?
15    A.  Yes.  But with some qualification.  I
16  assume you're talking about like an r-square or --
17    Q.  Yeah.
18    A.  -- something where we're saying okay how
19  much of the variation are we explaining in our
20  dependent variable if by using our independent
21  variables.  And you know, ideally you can explain a
22  fair amount of the variation in your dependent
23  variable, but there's kind of wide ranging
24  disagreement on how important an r-squared is in a
25  model.

38

1    Q.  Sure.
2    A.  The assumption is that there are a lot of
3  unobservable things that occur in the world.  We
4  can't throw the kitchen sink into our models all of
5  the time or really any of the time.  And so, you
6  know, having a high goodness of fit measure, higher
7  is better than lower, but how important is high
8  versus low is a subject of debate.
9    Q.  Sure.  But you would agree that those are
10  the types of metrics that a statistician would want
11  to look at to determine, you know, how, you know,
12  how trustworthy this analysis is, is that a fair
13  statement?
14    A.  Yes.  It's one of a handful of metrics
15  they would look at for sure.
16    Q.  Right.  And your report doesn't include
17  any of those metrics?
18    A.  It does not.
19    Q.  Okay.  And so just looking at the report,
20  you know, we can't really judge how strong your
21  regression model was -- or maybe strong is the
22  wrong word -- how trustworthy your regression model
23  was.
24    MR. NOTZON:  Objection, form.
25  BY MR. DOWER:

39

1    A.  I think that's fair.  I think there's
2  some statistics that I could have put in here to
3  allow the reader to make a more informed judgement
4  on the model.  I think that's true.
5    Q.  Okay.  And so just knowing the predicted
6  probability of promotion for Dr. Nikolova standing
7  alone is not really sufficient to judge how
8  trustworthy the regression model is?
9    MR. NOTZON:  Objection, form.
10  BY MR. DOWER:
11    A.  Yes.  I would say that's true.  And I
12  would also say I can provide these at request.
13    Q.  So taking a step back and sort of big
14  picture for this section, so your opinion is
15  basically that it's unlikely that she wouldn't get
16  tenure based on the department level and college
17  level votes?
18    A.  Yes.
19    Q.  Okay.  And you're not offering an opinion
20  about it is that she didn't get tenure, correct?
21    A.  That's right.  That's right.  It's based
22  purely on the votes.  My opinion in that matter
23  rests in the predictive capacity of the voting
24  percentages.
25    Q.  Give me a five-minute break and we may be

40

1  done.
2    A.  Okay.
3    Q.  All right.
4    MR. NOTZON:  And professor Thompson, just
5  turn off your camera and your microphone, but don't
6  leave the meeting.
7    THE WITNESS:  Okay.
8    THE REPORTER:  We're going off the Record
9  at 9:56 a.m.
10    (Recess taken from 9:56 a.m. to 10:09 a.m.)
11    THE REPORTER:  We're back on the Record,
12  the time is 10:09 a.m.
13  BY MR. DOWER:
14    Q.  Dr. Thompson, I thank you for your time
15  and I have no further questions.
16    A.  Okay.  Thank you.
17    MR. NOTZON:  All right.  Let me just ask
18  a couple questions.
19    CROSS-EXAMINATION
20  BY MR. NOTZON:
21    Q.  Earlier you were asked if you had
22  considered or taken into account the president's
23  decision on tenure in your model.  Could you -- did
24  you in fact take consideration of the president's
25  perspective given that the president decides

41

1  whether or not the candidate gets tenure?
2    A.  Yeah.  So the president's decision is
3  explicitly in the model, because the tenure
4  decision is made ultimately by the president.  And
5  so that kind of one zero variable accounts for the
6  president's decision in the regression model.
7    Q.  And there was questions of you as to
8  whether or not you included the kind of underlying
9  stats on the stats, as it were, the r-squared
10  numbers and those other measures.  Did you do it to
11  try to hide that information from any readers of
12  your report?
13    A.  No.  Some of it's overkill for a non-
14  technical reader, but I can provide all of those
15  measures from the model.
16    Q.  Okay.  And it's your intent to provide
17  those?
18    A.  Yeah.
19    Q.  Okay.  And there's a question about
20  whether or not the model is sufficiently -- your
21  opinion is sufficiently supported by your
22  statistical analysis and the model you use.  Is
23  that -- what's your opinion on that?
24    A.  Yeah.  The model that I used is in line
25  with conventional regression modeling.  In other

42

1  words, you're trying to predict an outcome using
2  predictors of that outcome, and so I've got voting
3  records of the assistant professors from the budget
4  council, from the advisory council, the model rests
5  on those voting records. It's sufficient to
6  predict the probability of promotion and I need to
7  provide the kind of output from that model so a
8  reader can look at those kind of statistics
9  underlying the statistics like goodness of fit.
10 But yes, the model -- the model meets convention
11 for statisticians and econometricians.
12    Q.  Okay. And lastly, you were asked if your
13 model could -- I think you testified that you could
14 not confirm that gender or pregnancy was the cause
15 of her not getting -- Dr. Nikolova not getting
16 tenure. But it's also the case that you couldn't
17 rule it out, either, is that right?
18    A.  That's correct.
19    Q.  Okay.
20    A.  So the statistical task that I'm doing
21 identifies statistical anomalies, so kind of
22 unlikely events. The causation or how these things
23 came to be is more on a jury to decide than me.
24    MR. NOTZON:  All right. I'll pass the
25 witness.

43

1     MR. DOWER:  I think I still have no
2  further questions. So Mr. -- or doctor -- excuse
3  me Dr. Thompson, thank you again for your time.
4     THE WITNESS:  Great. Thank you.
5     THE REPORTER:  Before we go off the
6  record, can I have counsel please state their
7  orders for the record, if there are any orders?
8     MR. DOWER:  Yeah. I regret to say I have
9  to use some generic thing about like -- whatever we
10 usually do. Although I think we were going to do a
11 rush transcript on this. Although given that we
12 only went for an hour on the record, now I'm
13 wondering whether that's really needed because I
14 wouldn't think that this would be particular long
15 transcription to transcribe.
16    THE REPORTER:  The normal turnaround --
17 the normal turnaround --
18    MR. NOTZON:  We would like the ability to
19 read and sign as well.
20    THE REPORTER:  Okay. The normal
21 turnaround would be a two-week turnaround, so it
22 would July the 6th would be the normal turnaround
23 for this. Would you need it before July the 6th?
24    MR. DOWER:  Well Robert and Bob, did we
25 have an agreement about the dispositive motion

44

1  deadline being whatever my email said -- what did I
2  say?
3     MR. NOTZON:  Do we need to still be on
4  the record?
5     MR. DOWER:  Oh. We can go off the
6  record. Sorry.
7     THE REPORTER:  Mr. Notzon, did you need a
8  copy of the deposition beyond the read and sign?
9     MR. NOTZON:  Yes.
10    THE REPORTER:  Okay. Perfect. And then
11 we'll send the transcript directly to Dr. Thompson
12 for read and sign?
13    MR. NOTZON:  Sure.
14    THE REPORTER:  Okay. Understood.
15    MR. NOTZON:  And we don't need the video,
16 we don't need that added expense.
17    THE REPORTER:  Understood. Okay. We're
18 going to go ahead and go off the record. This is
19 the conclusion of the deposition, the time is 10:15
20 a.m.
21    (Whereupon the deposition was concluded.)
22
23
24
25

45

1                CHANGES AND SIGNATURE
2  PAGE/LINE CHANGE            REASON
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

```
 1                 UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF TEXAS
 2                       AUSTIN DIVISION

 3   EVDOKIA NIKOLOVA,              *
          Plaintiff,               *
 4                                 *     CIVIL ACTION NO.
          v.                       *     1:19-CV-00877
 5                                 *
     UNIVERSITY OF TEXAS AT AUSTIN *
 6        Defendant,               *

 7                    REPORTER'S CERTIFICATE
               DEPOSITION OF SHANE THOMPSON, Ph.D.
 8                   TAKEN ON JUNE 22, 2021

 9           I, Brian Christopher, Notary Public in and for
     the State of Texas, hereby certify to the following:
10
             That the witness, SHANE THOMPSON, Ph.D., was
11   duly sworn by the officer and that the transcript of the
     oral deposition is a true record of the testimony given
12   by the witness;

13           That the original deposition was delivered to
     Benjamin Dower.
14
             That a copy of this certificate was served on
15   all parties and/or the witness shown herein on
     ─July 6, 2021──────────.
16
             I further certify that pursuant to FRCP Rule
17   30(f)(I) that the signature of the deponent was
     requested by the deponent or a party before the
18   completion of the deposition and that the signature is
     to be before any notary public and returned within 30
19   days from date of receipt of the transcript.  If
     returned, the attached Changes and Signature Page
20   contains any changes and the reasons therefore:

21           (Continued on next page)

22

23

24

25
```

Shane Thompson - 6/22/2021

48

1       I further certify that I am neither counsel
for, related to, nor employed by any of the parties in
2  the action in which this proceeding was taken, and
further that I am not financially or otherwise
3  interested in the outcome of the action.
Sworn to by me this 6thday of July, 2021.

4

5

6                            _____
                             Brian Christopher
7                            Notary Public # 12206962
                             My Commission Expires 01/05/2025
8                            Integrity Legal Support Solutions
                             PO Box 245
9                            Manchaca, Texas 78652
                             (512) 320-8690

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

EVDOKIA NIKOLOVA,           §
                            §
        Plaintiff,          §
                            §   CIVIL ACTION NUMBER
v.                          §     1:19-cv-00877-RP
                            §
UNIVERSITY OF TEXAS         §
AT AUSTIN,                  §
                            §
        Defendant.          §


ORAL AND VIDEOTAPED DEPOSITION
(VIA ZOOM VIDEOCONFERENCING)
PURSUANT TO F.R.C.P. 30(B)(6)
OF
UNIVERSITY OF TEXAS AT AUSTIN
BY AND THROUGH ITS
DESIGNATED ORGANIZATIONAL REPRESENTATIVE
AND AS A FACT WITNESS
SHARON L. WOOD, Ph.D.

THURSDAY, MARCH 18, 2021


- - -


INTEGRITY LEGAL SUPPORT SOLUTIONS

(877) 720-8690

www.integrity-texas.com

## Page 2

1    ORAL AND VIDEOTAPED DEPOSITION (VIA ZOOM

2  VIDEOCONFERENCING) PURSUANT TO F.R.C.P. 30(B)(6)

3  OF UNIVERSITY OF TEXAS AT AUSTIN BY AND THROUGH

4  ITS DESIGNATED ORGANIZATIONAL REPRESENTATIVE AND

5  AS A FACT WITNESS OF SHARON L. WOOD, Ph.D.,

6  produced as a witness at the instance of the

7  Plaintiff, Evdokia Nikolova, and remotely duly

8  sworn, was taken in the above-styled and

9  -numbered cause on the 18th day of March, 2021,

10  from 9:03 a.m. to 6:48 p.m., before Tommi

11  Rutledge Gray, CSR, RPR, and CRR in and for the

12  State of Texas, reported remotely by machine

13  shorthand, all parties appearing remotely, the

14  witness appearing remotely from Austin, Texas,

15  pursuant to the 36th Emergency Order Regarding

16  the COVID-19 State of Disaster, Paragraphs 3.c

17  and 3.d. and Notice of Oral and Video Deposition,

18  and in accordance with the Federal Rules of Civil

19  Procedure.

20    Requirements pursuant to F.R.C.P. 30(B)(5)

21  waived by all parties present.

22

23

24

25

## Page 3

1              A P P E A R A N C E S

2

3  FOR THE PLAINTIFF, EVDOKIA NIKOLOVA:

   Robert Notzon, Esq. (Via Zoom

4    videoconferencing)

   THE LAW OFFICE OF ROBERT NOTZON

5    1502 West Avenue

   Austin, Texas  78701

6    512.474.7563

   512.852.4788 - Fax

7    email:   robert@notzonlaw.com

8       - A N D -

9    Robert W. Schmidt, Esq. (Videographer)

   (Via Zoom videoconferencing)

10   CREWS LAW FIRM, P.C.

   701 Brazos

11   Suite 900

   Austin, Texas  78701

12   512.346.7077

   512.342.0007 - Fax

13   email:   schmidt@crewsfirm.com

14

15

   FOR THE DEFENDANT, UNIVERSITY OF TEXAS AT AUSTIN:

16   Benjamin Lindberg Dower, Esq. (Via Zoom

   videoconferencing)

17   Amy Snow Hilton, Esq. (Via Zoom

   videoconferencing)

18   OFFICE OF THE ATTORNEY GENERAL OF TEXAS

   Assistant Attorney General

19   General Litigation Division

   300 West 15th Street

20   Austin, Texas  78701-1649

   P.O. Box 12548

21   Capitol Station

   Austin, Texas  78711-2548

22   512.463.2120

   512.320-0667 - Fax

23   email:   benjamin.dower@oag.texas.gov

          amy.hilton@oag.texas.gov

24

25

## Page 4

1              A P P E A R A N C E S (Continued)

2

   ALSO PRESENT:

3    Joseph D. (Jody) Hughes, Esq. (Via Zoom

   videoconferencing)

4    Laura Alicia Barbour, Esq. (Via Zoom

   videoconferencing)

5    Evdokia Nikolova, Ph.D. (Via Zoom

   videoconferencing)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## Page 5

1                I N D E X

2  WITNESS:  SHARON L. WOOD, Ph.D.          PAGE

3

   APPEARANCES                    3

4

5  EXHIBITS INDEX                   6

6

   INDIVIDUALLY AS A FACT WITNESS

7  EXAMINATION BY MR. NOTZON          11

8

   DESIGNATED ORGANIZATIONAL REPRESENTATIVE

9  EXAMINATION BY MR. NOTZON          335

   EXAMINATION BY MR. DOWER          344

10

11  CHANGES (IF ANY) BY WITNESS         345

12

   WITNESS SIGNATURE PAGE            346

13

14  COURT REPORTER'S CERTIFICATE PAGE      347

15

16

17

18    REPORTER'S NOTE 1:  Quotation marks are

19  used for clarity and do not necessarily reflect a

20  direct quote.

21    REPORTER'S NOTE 2:  Please note that due

22  to the quality of remote videoconferencing and

23  the transmission of data, audio distortion can

24  occur which disrupts the process of preparing a

25  transcript that has been remotely recorded.

Sharon Wood - 3/18/2021

---

**6**

1          E X H I B I T S
2 NUMBER     DESCRIPTION          PAGE
3 Exhibit 1                    14
     Plaintiff's Notice of Oral and Video
4    Deposition of Sharon Wood as Both
     Organizational Representative and as
5    Fact Witness (Three pages)
6 Exhibit 2                    180
     Recommendation for Change in Academic
7    Rank/Status; Dean's Assessment (Bates
     UT Austin_00021 through UT Austin_
8    00025)
9 Exhibit 3                    200
     2018-19 Evaluation Template, Cockrell
10   School of Engineering, Promotion and
     Tenure Committee (Two pages)
11
     Exhibit 4                  283
12   Email to Douglas J. Dempster from
     Sharon L. Wood dated 1/27/2019 (Bates
13   UT Austin_0007965)
14 Exhibit 5                   289
     https://www.hartenergy.com/exclusives/
15   2020-pinnacle-award-winner-dr-sharon-
     l-wood-university-texas-186588 (One
16   page)
17 Exhibit 6                   292
     October 29, 2018, Chair's letter in
18   support of the promotion of Prof.
     Evdokia Nikolova to the rank of
19   Associate Professor with tenure
     (Bates UT Austin_00026 through
20   UT Austin_00030)
21 Exhibit 7                   308
     Rebuttal to Dean Wood's Assessment
22   (Bates UT Austin_00006 through UT
     Austin_00020)
23
24
25

---

**7**

1       E X H I B I T S (Continued)
2 NUMBER     DESCRIPTION          PAGE
3 Exhibit 8                    321
     Recommendation for Change in Academic
4    Rank/Status 09/17/2014; Dean's
     Assessment (Bates UT Austin_0016761
5    through UT Austin_0016764)
6 Exhibit 9                    326
     Recommendation for Change in Academic
7    Rank/Status February 15, 2018; Dean's
     Assessment (Bates UT Austin_0016914
8    through UT Austin_0016918)
9 Exhibit 10                   315
     Excel Spreadsheet of salary
10   information (Five pages)
11 Exhibit 11                  339
     Excel Spreadsheet of salary
12   information (Two pages)
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**8**

1  AUSTIN, TEXAS (VIA ZOOM VIDEOCONFERENCING;
2      THURSDAY, MARCH 18, 2021; 9:03 A.M.
3          P R O C E E D I N G S
4          THE COURT REPORTER:  Good
5   morning.  My name is Tommi Rutledge
6   Gray, Certified Shorthand Reporter
7   in and for the State of Texas No.
8   1693.
9       Today's date is March 18th,
10  2021 and the time is -- what time is
11  it?  It is 9:03 a.m.  Pursuant to
12  the Current Emergency Order
13  Regarding the COVID-19 State of
14  Disaster, this Oral Deposition of
15  Sharon Wood is being conducted and
16  all parties are appearing remotely
17  via Zoom videoconferencing.
18      The witness is located in
19  Austin, Texas.  I am administering
20  the oath and reporting the
21  deposition remotely via Zoom
22  videoconferencing by stenographic
23  means from my residence located in
24  Mesquite, Texas.
25      Will all counsel please state

---

**9**

1   their appearances for the record,
2   after which, I will swear in the
3   witness.
4       MR. NOTZON:  Robert Notzon
5   and Bob Schmidt for the Plaintiff,
6   Dr. Nikolova.
7       MR. DOWER:  Benjamin Dower
8   for the Defendant, University of
9   Texas at Austin.
10      THE COURT REPORTER:
11  Anyone else?  Okay.  Ms. Wood, could
12  I get you to raise your right hand,
13  please.
14      SHARON L. WOOD, Ph.D.,
15  the witness hereinbefore named,
16  being remotely duly sworn to
17  testify the truth, the whole
18  truth, and nothing but the truth,
19  testified under oath as follows:
20      MR. NOTZON:  And Mr.
21  Schmidt, are you recording?
22      MR. SCHMIDT:  Yes, I
23  am.
24      MR. NOTZON:  Okay.
25  And Mr. Dower, did you say you

10

1 wanted to read some stipulations?
2      MR. DOWER: Yes, please.
3 So these are -- these are the
4 things to which the parties have
5 stipulated, and, Robert, of course
6 if for some reason I get it wrong,
7 please correct me.
8      But the parties stipulate
9 that this deposition may be taken
10 remotely via Zoom. That's fairly
11 self-evident.
12      The parties stipulate
13 "Objection; form" is sufficient
14 to preserve objections to the
15 form of the question and will
16 be used in lieu of the more
17 specific form-based objections.
18      The parties stipulate that
19 all objections except as to the
20 form of question or answer are
21 reserved until trial.
22      And then this is not a
23 stipulation, but the deponent
24 would like an opportunity to
25 review the transcript and

11

1      recording pursuant to Federal
2      Rule of Civil Procedure 30(e),
3      and, Robert, I believe you also
4      wanted that the parties stipulate
5      that -- that we can waive the --
6      the full read-in.
7           MR. NOTZON: Already
8      done. All right. Thank you.
9      Agreed.
10          EXAMINATION
11 BY MR. NOTZON:
12      Q. Dean Wood, I guess it's --
13          MR. NOTZON: Mr. Schmidt,
14      I don't think you've pinned Dean
15      Wood.
16          MR. SCHMIDT: I have
17      pinned Dean Wood.
18          MR. NOTZON: Okay.
19          MR. SCHMIDT: And also,
20      I just want to make one -- one
21      more comment or stipulation -- and
22      I don't have my Federal Rules
23      here -- but I think we have agreed
24      that as a part of this recording
25      that I -- that we won't, every

12

1      time we take a break or go off the
2      record, won't read the time and --
3      and the provisions of Rule 30(b), I
4      don't recall, what? 5.
5           But if we could we have an
6      agreement on that, as well, Mr.
7      Dower.
8               MR. DOWER: Yeah,
9      that's -- that's fine with me.
10      Now I'm looking up to see
11      whether you got the Rule right.
12      I'm just -- how good is Bob in
13      this? He nailed it. It is --
14      it is 30(b)(5), I believe.
15           One of the hazards of
16      working from home is I don't
17      have my Rule book handy, so I
18      have to look it up online,
19      but anyway.
20               MR. NOTZON: Okay.
21 BY MR. NOTZON:
22      Q. All right. Good morning, Dean Wood.
23      A. Good morning.
24      Q. Have you ever had your deposition
25 taken before?

13

1      A. Once, Sir.
2      Q. Sorry to hear it.
3      A. Yeah.
4      Q. So you understand that you're under
5 oath?
6      A. Yes.
7      Q. Okay. And what you have to say today
8 has the same force and effect as if you were in
9 front of a Judge or a jury?
10      A. Yes.
11      Q. Okay. If at any time you don't
12 understand my question, please ask me to clarify
13 it for you.
14      If you need a break, please let us
15 know. This is not supposed to be an endurance
16 contest, so I want you to be comfortable, and
17 we'll take care of those. I may need a break
18 myself as -- as we go along.
19      You're -- you're also -- you've been
20 designated as an individual fact witness based
21 upon your personal experiences and knowledge, but
22 you've also been designated to speak as the
23 University of Texas on two Topics.
24      Do you understand that to be the
25 case?

14

1    A.  Yes, I do.
2    Q.  Okay.  And I'm going to go ahead and
3  put into the Chat a -- an exhibit.  And that's
4  how we'll deal with exhibits throughout the day.
5       And it should be showing up.  This
6  will be Exhibit 1.
7       (Exhibit 1 marked for identification.)
8    A.  Oh, I have to save it before I can
9  open it; is that correct?
10   Q.  I don't know.
11   A.  That's what it looks like.
12      THE COURT REPORTER:  Yes,
13   you'll need to download it first,
14   yes.
15      THE WITNESS:  Okay.
16   MR. NOTZON:  Yeah,
17   the download part, that's
18   correct.
19      MR. DOWER:  I don't
20   want to micromanage your process,
21   but you may want to create a
22   folder like that's just for
23   these -- the things that -- that
24   Robert uploads.  That way, you've
25   all got it in one place.

15

1       THE WITNESS:  Thank you.
2   I will do that.
3    A.  Just give me a second, please.
4  BY MR. NOTZON:
5    Q.  Yes.
6    A.  Okay.  I apologize for the length of
7  time it took me.
8    Q.  No problem.  We'll all hopefully get
9  more efficient as we go along.
10   A.  That's right.
11   Q.  So have you been able to view the
12  document?
13   A.  Yes, I have.
14   Q.  Okay.  Exhibit 1.  And the last page
15  of that exhibit has the two Topics listed.
16      Are those the two Topics you're
17  prepared to testify to as UT today?
18   A.  Yes, I am.
19   Q.  Okay.  And what we're going to do is
20  we're going to try to reserve the questions of
21  you as UT on those topics for later in the day.
22      I want to focus the beginning of --
23  of our day with you as an individual, okay?
24   A.  Yes.
25   Q.  All right.  So Dean Wood, could you

16

1  tell us a little bit about yourself.
2       We do have this video recorded, but
3  there's going to be some people that will be
4  reading the transcript.
5       Are you a man or a woman?
6    A.  I'm a woman.
7    Q.  Okay.  And about how old are you?
8    A.  I am 60 years old.
9    Q.  Okay.  And where did you do your
10  undergraduate work?
11   A.  I attended the University of
12  Virginia.
13   Q.  Okay.  And when did you get your
14  degree?
15   A.  1982.
16   Q.  In what field?
17   A.  Civil Engineering.
18   Q.  Okay.  And did you go straight to
19  graduate school?
20   A.  Yes, I did.
21   Q.  Okay.  And well, starting at -- with
22  the Civil Engineering degree, do you recall the
23  percentage of women in your graduating class?
24   A.  About 30 percent.
25   Q.  Okay.  And when you went to graduate

17

1  school, where did you go?
2    A.  University of Illinois at Urbana-
3  Champaign.
4    Q.  And what degree did you get?
5    A.  I received two degrees, a Master's in
6  Civil Engineering and a Ph.D. in Civil
7  Engineering.
8    Q.  Did you go straight through?
9    A.  Yes.
10   Q.  And what percentage of women were in
11  that -- those programs?
12   A.  That was quite a bit less.
13   Q.  Okay.
14   A.  I think in my entire graduate program
15  I had one class where I wasn't the only woman.
16   Q.  When you graduated, were you the only
17  woman?
18   A.  I was the second woman at the
19  University of Illinois to receive a Ph.D. in
20  Structural Engineering, so there -- there were
21  others in Environmental and other disciplines,
22  but in structural Engineering, which is what I
23  studied, I was the second woman.
24   Q.  At all times?
25   A.  Yes.

18

1    Q.  Okay.  And when was the first one?
2    A.  She graduated I think in December of
3  1983, and I graduated in May of 1986.
4    Q.  Okay.  And how did you know that?
5  She wasn't there when you were there, right?
6    A.  No, we overlapped.
7    Q.  Okay.  So you knew her personally?
8    A.  I knew her -- I know her personally.
9  She still is a very good friend of mine.
10       We had the same Ph.D. advisor, and he
11  was very proud of the fact that -- that Kathy was
12  the first woman to get a Ph.D. in Structural
13  Engineering from Illinois.
14    Q.  So your -- your -- I'm sorry -- the
15  term you used for him was --
16    A.  My Ph.D. advisor?
17    Q.  -- "advisor."
18       He was a man?
19    A.  Yes.
20    Q.  Okay.  And after you getting -- you
21  got your Ph.D., did you work in the industry or
22  did you say in academia?
23    A.  I stayed in academia.
24    Q.  And where did you go from there?
25    A.  I started -- I stayed at the

19

1  University of Illinois.  My appointment as an
2  Assistant Professor started in January of 1986,
3  so it was actually before I officially received
4  my -- my Ph.D.
5       I defended and deposited before I
6  started my position, but my graduation date was
7  later.
8    Q.  Okay.  So kind of technically early?
9    A.  The -- the requirements required me
10  to deposit my Ph.D. before I could start my
11  appointment as an Assistant Professor.
12    Q.  Yeah.  So -- and how many years did
13  you teach as an Assistant Professor there?
14    A.  I was -- I don't know this off the
15  top of my head.  I was promoted after six and a
16  half years to Associate Professor.
17    Q.  There in Illinois?
18    A.  Yes.
19    Q.  Okay.  And was that the norm, six and
20  a half years?
21    A.  Because I began in January, my first
22  Spring semester did not count for my probationary
23  period as an Assistant Professor, so then I was
24  reviewed after my fifth year in -- as an
25  Assistant Professor my -- my fifth year in

20

1  probation rank and I was officially promoted at
2  the end of my sixth year because it takes one
3  year for the review to occur.
4    Q.  And that -- you were -- that was your
5  up-or-out year?
6    A.  That is correct, yes.
7    Q.  So that sounds like it was norm
8  except for that first semester starting in
9  January.
10    A.  That's correct, yes.
11    Q.  Which in and of itself becomes a
12  norm?
13    A.  That was the norm, correct.
14    Q.  But not counting that first semester
15  towards the -- the clock?
16    A.  Correct.
17    Q.  Okay.  And how long did you stay as
18  an Associate Professor there?
19    A.  I left in -- at the end of the Fall
20  1995 semester.
21    Q.  Where'd you go?
22    A.  I came here to the University of
23  Texas as an Associate Professor, and started in
24  January of 1996.
25    Q.  Okay.  And why did you move?

21

1    A.  There were wonderful professional
2  opportunities for me at Texas.
3    Q.  Before we go on to Texas, I forgot to
4  ask, how many other female Professors,
5  Assistants, Associates, full Professors in
6  Engineering were there?
7       Well, let's start with Civil
8  Engineering.  I'm assuming you were teaching in
9  Civil Engineering?
10    A.  I was teaching in Civil Engineering.
11  At the time I started, I was the fifth woman in
12  the entire College of engineering.
13       There were two in Computer Science,
14  there was one in Industrial Engineering, and I do
15  not remember where the other one was, and -- and
16  me.
17       By the time I finished, there were
18  other woman on the faculty in Civil Engineering,
19  and I was not the first woman on the faculty in
20  Civil Engineering, there had been others.
21       As a matter of fact, the woman who
22  was in Industrial Engineering had started in
23  Civil Engineering, but her husband became the
24  Department head in Civil Engineering, and because
25  of nepotism rules, she moved to another

22

1    department.
2        Q.   Okay.  And the other women, what
3    levels were they at?  Assistant?  Associate?
4    Full?
5        A.   As I remember, the other four women
6    when I started were all full Professors.
7        Q.   Okay.  So they had been there a
8    while?
9        A.   That's correct.
10       Q.   You were the first female Professor
11   that had been promo -- or hired as an Assistant
12   Professor in some years?
13       A.   No.  While I was a student there,
14   there was a female Assistant Professor in the
15   Civil Engineering Department.
16       Q.   But she didn't stay?
17       A.   She did not.  And I -- I do not
18   remember her name nor do I remember why she left.
19   I was a student, so I wasn't paying attention.
20       Q.   Right.  Okay.  And so then when you
21   came to UT, did you seek out -- were you looking
22   to -- to move?
23       A.   I -- I was.  I had spent a year of
24   sabbatical at the University of Washington during
25   the 1983/'84 academic year.

23

1            At that time, I was offered a job as
2    an Associate Professor at Washington, which I
3    declined, and then I did interview at several
4    places before I chose the University of Texas at
5    Austin.
6        Q.   Okay.  And that was Washington and
7    Seattle?
8        A.   That's correct, yes.
9        Q.   I always get confused because of the
10   St. Louis one.
11       A.   Exactly; right.
12       Q.   Okay.  And so you -- you looked
13   around and -- and applied?
14       A.   I -- I did apply.  I believe I was
15   encouraged to apply.  I interviewed at Michigan
16   and Texas, and then later in the process Cornell
17   contacted me to see if I was interested in
18   applying there.
19       Q.   Okay.  And did you get multiple
20   offers?
21       A.   I -- I didn't -- I don't remember if
22   I got a written offer from Michigan.  I know they
23   contacted me and extended an oral offer.  I
24   certainly got the offer from Texas.
25       Q.   Okay.  To arrive as an Associate?

24

1        A.   That is correct.
2        Q.   Okay.  And would it be accurate that
3    you didn't leave Illinois because of a problem?
4        A.   So I do experimental work, and the
5    number of faculty members who were doing
6    experimental work decreased.  My Ph.D. advisor
7    left.
8            A -- there were just some reasons
9    like fewer people were doing it, so the costs
10   were going up.  So one of the big advantages of
11   coming to the University of Texas was they had a
12   very large structural engineering laboratory, a
13   lot of faculty doing work, meaning that it's
14   easier to share the costs of the -- the
15   machinists and that sort of thing.
16           And at the time, the Texas Department
17   of Transportation was providing a lot of research
18   funding, so this was a very attractive place to
19   come to really expand my research opportunities.
20       Q.   And not work too hard to -- to try to
21   go find those dollars?
22       A.   I wouldn't say that, Sir, no.
23       Q.   You -- you wouldn't say it required
24   less work to get research money sufficient for
25   your research program in Texas than it was in

25

1    Illinois?
2        A.   So I was able to grow my research
3    program because I continued to have federal
4    funding, and at the same time I could have -- I
5    could have State funding.
6        Q.   Right.
7        A.   But still writing proposals for
8    federal funding.
9        Q.   But wasn't it easier in Texas because
10   you had the State funding access and you had less
11   money that you needed to fund your research
12   because you were sharing costs?
13           MR. DOWER:  Objection;
14       form.  Go ahead.
15           And Dean, there may be times
16       where I object.  Go ahead and answer
17       unless I instruct you otherwise.
18       A.   I -- I think the opportunities for
19   collaboration were the primary reasons that I
20   chose to come.  And, to be honest, it never
21   occurred to me that it was easier or harder to
22   find research funding.
23           It was -- I had opportunities to
24   collaborate with faculty members that I did not
25   have at the University of Illinois.

26

1  BY MR. NOTZON:
2      Q.   Okay.  Well, you referenced the costs
3  when I asked you earlier.  That's why -- I -- I
4  didn't bring it up, you did, so that's why I was
5  asking --
6      A.   You're right, I -- I did.  And so in
7  that respect, having a large group of faculty
8  members who were sharing the costs of machinists
9  did help reduce the costs on any given research
10  project, that's correct, yes.
11     Q.   Because looking for and obtaining
12  funding is a time savings for Professors?
13     A.   It is also an expectation for
14  Professors, yes.
15     Q.   When you're doing that, you're not
16  doing other things you could be doing as a
17  Professor?
18     A.   Yes.  As a Professor you are juggling
19  multiple balls and you're always trying to
20  determine what -- where you should spend your
21  time, correct.
22     Q.   Would that be your least favorite
23  activity as a Professor, looking for funding?
24     A.   No.
25     Q.   What's your least favorite?

27

1      A.   I think the administrative oversight,
2  document -- documenting how you spent the money.
3  I've had some projects where there were quarterly
4  reports required, and so I think that's my least
5  favorite part.
6      Q.   How old were you when you arrived at
7  the University of Texas?
8      A.   I was 35 when I started there.
9      Q.   Okay.  And when did you get into
10  administration?
11     A.   I --
12          MR. DOWER:  Objection;
13  form.
14     A.   I became a Department Chair in 2008.
15  BY MR. NOTZON:
16     Q.   Okay.  And which Department?
17     A.   Department of Civil, Architectural,
18  and Environmental Engineering.
19     Q.   Okay.  And how long were you a Chair
20  there?
21     A.   I served as Chair for five years.
22     Q.   Okay.  And then what did you do?
23     A.   I became the Interim Dean of the
24  Cockrell School of Engineering.
25     Q.   Okay.  And that was in 2013/2014?

28

1      A.   That's correct, yes.
2      Q.   Okay.  And you took over from Dr.
3  Fenves?
4      A.   Yes.  Dr. Fenves was -- he became our
5  Provost and Executive Vice President, and so I
6  took over -- I became the Interim Dean.
7      Q.   Were you recruited or did you apply
8  for that job?
9      A.   So the Interim Dean is really a
10  temp -- it's a temporary appointment.  I had had
11  a conversation with Greg Fenves in his office.  I
12  told him that if he -- he told me he would like
13  to have someone serve as Interim Dean who had
14  experience as Department Chair, and I told him
15  that if -- if asked, I would be willing to serve
16  as the Interim Dean.
17     Q.   Okay.  And is this just before he got
18  named as Provost or after?
19     A.   He would only have spoken to me about
20  it after he had been named Provost.
21     Q.   Okay.  So how much time passed where
22  there was no Dean of the school?
23     A.   No time passed because he -- he was
24  named Provost, but it became effective about --
25  about a month or two later.

29

1      Q.   So it was in that -- in that
2  effective/not effective period?
3      A.   Correct.  So he -- he wanted to be
4  Dean through a Board of Regents meeting in the
5  fall, so I don't remember the exact date when my
6  appointment as Interim Dean was -- was effective.
7  I think it was in October of 2013.
8          And so he had been named sometime in
9  the summer, and I remember having an initial
10  conversation with him in August, and then the
11  Provost at the time, Steve Leslie, interviewed
12  me, spoke with me before he appointed me as the
13  Interim Dean.
14     Q.   Oh, so actually the Provost before
15  Mendez appointed you as Interim Dean?
16     A.   Yes.  That is how I remember it
17  because it -- the -- there -- there was a time
18  where I was named as the Interim Dean but I was
19  not yet appointed as the Interim Dean.
20     Q.   The dominoes flow up, not down?
21     A.   Yes.
22     Q.   And he -- and Fenves had to be
23  replaced first before he gets -- is that -- is
24  that how that works?  Like he couldn't leave the
25  Interim Dean position empty for any period of

Sharon Wood - 3/18/2021

30

```
 1  time?
 2      A.  We do not have vacancies like that,
 3  correct.
 4      Q.  Okay.  Do you know if you were the
 5  first choice of Dr. Fenves?
 6      A.  You would have to ask Dr. Fenves
 7  that.
 8      Q.  You don't know?
 9      A.  He -- he called me and asked me to do
10  it.  That is all I know.
11      Q.  Okay.  And so that brings us to
12  today.  You're still -- well, actually you were
13  Interim Dean for what, one year and then
14  Permanent Dean?
15      A.  I was appointed the Permanent Dean on
16  September 1st of 20 -- 2014, and the University
17  had an open search for the position, so I did
18  apply for that.
19          There was a Consultative Committee
20  that did a -- hired a headhunter, had a complete
21  pool of candidates.  I believe -- I -- there were
22  at least three but perhaps five, I don't remember
23  the exact number of people who actually
24  interviewed for the position, and then I had --
25  the -- the Provost, Greg Fenves, and the
```

31

```
 1  President, Bill Powers, made the decision
 2  regarding who the Dean would be, and they asked
 3  me to serve.  They -- they offered the job to me.
 4      Q.  Do you know who your competitors
 5  were?
 6      A.  I do, yes.
 7      Q.  And were they all external to UT?
 8      A.  Yes.  I -- I'm remembering the names
 9  of three of them, and those three were external,
10  yes.
11      Q.  Okay.  And whether you remember the
12  names of the other two or not, do you remember --
13      A.  I -- I was one, so that would be
14  four, and I can't remember if there were four or
15  five.
16      Q.  Okay.  So you and three or you and
17  four?
18      A.  Correct.
19      Q.  Okay.  And you're remembering three
20  as you sit here today?
21      A.  Yes.
22      Q.  And were those three that you
23  remember male or female?
24      A.  There was one female and two men.
25      Q.  Okay.  And have you been married?
```

32

```
 1      A.  No.
 2      Q.  Have you had any children?
 3      A.  No.
 4      Q.  Have you had any non-married domestic
 5  partners?
 6      A.  No.
 7      Q.  Do you have anyone that lives with
 8  you?
 9      A.  A human, you mean?
10      Q.  Good point.
11          Yes, I am asking -- let's start with
12  humans, yes.
13      A.  I am the only human living in my
14  house.
15      Q.  Okay.  And that's been the case since
16  you've been a Professor?
17      A.  Yes.
18      Q.  Okay.  And just to go ahead and
19  finish that thought, you have pets?
20      A.  I do.  I have three cats who live
21  with me.
22      Q.  All right.  And just since you told
23  us your age, I'll -- I'll disclose, I'm 58.
24          Are you in charge of caring for any
25  parents?
```

33

```
 1      A.  No.
 2      Q.  Okay.  Do you still have your
 3  parents?
 4      A.  Yes.
 5      Q.  Okay.  Congratulations.
 6      A.  Thank you.
 7      Q.  Me, too.
 8          All right.  So in your experience
 9  being -- in Engineering as a student, as a
10  graduate student, as a faculty member, as an
11  administrator, do you understand that there is a
12  dearth of women/females in the Engineering field?
13          MR. DOWER:  Objection;
14  form.
15      A.  I believe I have firsthand knowledge
16  of that, yes.
17  BY MR. NOTZON:
18      Q.  Okay.  Do you also understand that
19  there is a field of research about that topic?
20      A.  Yes.
21      Q.  And are those research results and
22  the data that they discuss, are those presented
23  in -- in national and international papers on
24  engineering?
25      A.  They are not presented in the
```

34

1  conferences that I attend as a structural
2  engineering.
3      Q.  So none of the conferences you've
4  been to have had a diversity seminar or presenter
5  on anything related to gender issues?
6      A.  Well, let me limit myself to
7  structural engineering first.
8      Q.  Okay.
9      A.  The American Concrete Institute which
10  is, where I have spent a lot of my professional
11  time, does have a "Women in Engineering" event.
12      I mean, I've been going since 1985.
13  I do not remember when it started.  I have
14  attended maybe a handful of times.  It is just a
15  casual get-together.
16      Q.  Okay.
17      A.  There are no presentations
18  specifically about -- about the women's role in
19  the industry.
20      Q.  It's more of a networking event?
21      A.  That is correct, right.
22      Q.  Okay.  Do you understand that in
23  other Engineering conferences that there are
24  presentations on studies related to diversity
25  issues and the lack of, so to speak?

36

1      Q.  You don't know that from studies that
2  you've read or -- or understand exist?
3      A.  I do not recall reading that
4  directly.
5      Q.  Okay.  You would not be surprised to
6  know that there are studies out there that
7  discuss this?
8          MR. DOWER:  Objection;
9      form.
10      A.  I would not be surprised.
11  BY MR. NOTZON:
12      Q.  And going on with this line of
13  questioning, do you understand that there are
14  also studies and reports on the disparity of the
15  female experience when it comes -- in Engineering
16  when it comes to student teaching scores?
17          MR. DOWER:  Objection;
18      form.
19      A.  So I -- I'd actually like to amend my
20  answer.  You -- you asked a question about how
21  women are treated that could be related to
22  their -- their salaries.
23      There was a fundamental study that
24  came out of MIT where they looked -- they looked
25  at a wide variety of factors, including the size

35

1      A.  Yes.
2      Q.  And do you understand from your
3  firsthand experience, as well as your knowledge
4  of the data or the reports, that the issues
5  related to gender in Engineering are more than
6  just the numbers --
7      A.  Yes.
8      Q.  -- of people present?
9      A.  Yes.
10      Q.  And those issues would be differences
11  in the way that women are treated?
12      A.  Yes.
13      Q.  Differences in the way women are
14  hired?
15      A.  Yes.
16      Q.  Paid?
17      A.  Excuse me.  There are studies that
18  talk about women's pay, yes.
19      Q.  Promotions?
20      A.  I believe that to be true.  I have
21  not seen that myself.
22      Q.  Funding?
23      A.  Again, I haven't seen that myself.
24      Q.  But you know it exists?
25      A.  I would assume it exists, yes.

37

1  of offices assigned to women, laboratory spaces
2  assigned to women that included salaries.
3      I -- I know of that report.  And then
4  the recent movie "Picture a Scientist" went into
5  great detail about that situation.
6  BY MR. NOTZON:
7      Q.  And you're referring to a specific
8  report.
9      Do you have any cite to that or
10  information about it that would allow me to find
11  it?
12      A.  I would have to look it up.  It came
13  out of -- it was -- the women at MIT were
14  specifically engaged in it, --
15      Q.  Okay.
16      A.  -- and it came out, I would say, 15
17  to 20 years ago.
18      Q.  Okay.  So a while ago?
19      A.  Yes.
20      Q.  Okay.
21      A.  The National Academy of Sciences or
22  the National Academy has put out some reports,
23  also.
24      Q.  Okay.
25      A.  Most recently, there -- there was one

38

1 about women in STEM which I read. I'm trying to
2 remember when that came out. It's since I've
3 been Dean.
4 But that prompted a lot of discussion
5 within at the time the three Deans at UT who were
6 over STEM fields, so Linda Hickey would be the
7 College of Natural Science, Sharon Mosey would
8 be the Jackson School of Geosciences, and I was
9 Dean of Engineering.
10 There was a lot of discussion when
11 that report first came out, and so I don't
12 remember exactly when it was, but we had a lot
13 of -- we had conversations about it.
14 Q. And what were the nature of those
15 conversations?
16 A. I think one of the -- one of the
17 primary issues was about how graduate student
18 funding is so tied to an individual mentor, and
19 so if -- if someone is in a I'll call it a
20 hostile environment as a graduate student, they
21 don't really have a recourse because they're --
22 they're so tied to their Ph.D. advisor.
23 And they were advocating that the
24 National Science Association, for example,
25 instead of funding a faculty member to do

39

1 research, they should fund the grad student
2 separately, so that the graduate students would
3 have the ability to -- to shift if they -- to a
4 better environment if it was not conducive to --
5 for them.
6 That would be a huge change, and so
7 we had a lot of conversation about that. I think
8 in -- in what we have done in the Cockrell School, I
9 won't say in response to that but over the past
10 few years, is we have set up a committee for
11 graduate students and also post-Doctoral Fellows,
12 so they're in a situation where they don't --
13 they're -- it is -- they're not in a good
14 situation, but they don't feel that they can talk
15 directly to their supervisor.
16 We have set up a committee of faculty
17 members so they can pick someone outside of their
18 Department to go and discuss the situation and
19 also have -- have someone who can be an advocate
20 for them and try to address the situation
21 before -- while it can still be addressed and
22 while they are still on track to complete a
23 degree.
24 Q. That sounds pretty sticky.
25 A. I believe it is, yes.

40

1 Q. Because if any comment gets made that
2 there was a complaint, everybody knows where --
3 who's being complained about and if you're
4 relying on your advisor for your approvals, that
5 would be pretty damaging to come forward.
6 MR. DOWER: Objection;
7 form.
8 A. I believe that's -- that's why some
9 people will only report after they've graduated.
10 We wanted to try to address things as quickly as
11 possible and just find an alternative advisor, if
12 necessary.
13 What's -- what's very interesting is
14 that in a recent discussion of Deans, some of the
15 private universities are actually polling all of
16 the former students of a -- of a candidate for
17 promotion to get an indication of what the
18 climate is in their Research Group to address
19 these specific issues.
20 For the private universities, they
21 don't have the same -- they don't have the
22 obligation to make the information public, so
23 then it could be held confidentially and the
24 advisor would not know, so they are moving
25 forward with that sort of survey to address

41

1 climate issues.
2 With us, the situation you described
3 is exactly the case, where if a former -- even a
4 former student were to make a complaint, the
5 advisor would know immediately and there's a very
6 high risk of retaliation. So we have not
7 attempted to implement that.
8 BY MR. NOTZON:
9 Q. So what -- what you're saying is the
10 private school they've added an extra component
11 from teaching, research, and service to this
12 extra component that they have to pass?
13 A. Right. So mentoring -- the mentoring
14 right now is included in our teaching component
15 and they are treating it separately, and at a
16 meeting --
17 Q. But you could see it as a subset of
18 mentoring?
19 A. We get -- mentoring is considered in
20 our process. It's a subset, yes.
21 Q. Okay. We got off on this tangent and
22 I was asking the question about your
23 understanding of discrimination of the female
24 experience in Engineering, or STEM, as -- as you
25 stated, in student teaching scores depending on

42

1  the faculty member's gender.
2      A.  There have been some reports to
3  indicate that, yes.
4      Q.  Okay.  Have you also seen reports
5  that pregnancy also plays a role?
6      A.  I have not seen that directly,
7  however, I have also heard that time of day
8  influences the teaching evaluations, time of the
9  classes offered.
10     Q.  Early morning would be worse?
11     A.  That is correct.
12     Q.  Really?  Okay.
13         But you're not saying that the early
14  morning is on par with gender?
15     A.  I have not studied that directly, so
16  I cannot comment on the -- I'm only reporting.
17  I've heard of some studies.
18     Q.  There's also -- you could also add
19  the other factors are Math, specific courses are
20  more criticized than others; is that right?
21     A.  Not necessarily.
22     Q.  Required courses more than elective
23  courses?
24     A.  In most cases, required courses
25  are -- have -- will be lower, but that is not

43

1  necessarily the case.
2      Q.  Large-attendance classes versus
3  small?
4      A.  There has been that discussed, I
5  think.  That is not always the case.
6      Q.  Yeah, but you understand that -- in
7  fact, you don't actually have to rely on studies,
8  you know that from your own experience at UT,
9  that all of those factors play a role in
10  affecting student teaching scores of faculty?
11     A.  Yes, I understand there are many
12  factors.
13     Q.  Okay.  And all the ones I've listed
14  are factors that you personally know to exist in
15  affecting teaching stores at UT, correct?
16         MR. DOWER:  Objection;
17  form.
18     A.  Yes.  Well, I -- I do not know --
19  I -- I do not have direct knowledge of pregnancy
20  because I don't always know when a faculty member
21  is pregnant and when they're -- what -- what
22  semester they're teaching, so I cannot stipulate
23  to that.
24         I can tell you that the other factors
25  you've mentioned are -- are I would say generally

44

1  regarded as having an influence.  I have not done
2  a detailed study on my own to influence it, --
3  BY MR. NOTZON:
4      Q.  Thanks for that --
5      A.  -- to study those impacts.
6      Q.  Thank you for that clarification.
7         As an administrator -- as the
8  administrator over the School of Engineering at
9  UT, do you see it as a duty that you have to
10  understand the issues that might be affecting all
11  of your employees?
12         MR. DOWER:  Objection;
13  form.
14     A.  I do believe that I -- I need to
15  understand issues that are facing our junior
16  faculty.  I think that's especially true right
17  now with the -- the stress of COVID, the
18  isolation that we're all facing, so, to be
19  honest, I'm just completing a -- a series of
20  meetings with the junior faculty groups of four
21  or five to make sure that I can hear directly
22  from them.
23  BY MR. NOTZON:
24     Q.  And you focused on -- I -- I -- I
25  said "employees" generally and you focused on

45

1  "junior faculty."  And when I -- when I hear
2  "junior faculty" I hear you say Assistant
3  Professors in your draft; is that right?
4      A.  I meant Assistant and Associate
5  Professors.
6      Q.  Okay.
7      A.  I -- I was giving you a specific
8  example of what I -- I'm doing right now.  I --
9  when I hear about staff complaints, I -- I
10  obviously investigate those.
11         I -- I have tried to be more -- have
12  more meetings with staff than my predecessor, but
13  the -- the staff is so large that there's no way
14  I can get to know everyone on staff in school.
15     Q.  And when you say "staff in school,"
16  you're talking about in the Dean's Office as well
17  as in the Departments below?
18     A.  And in the organized research units,
19  yes.
20     Q.  Okay.  How many thousands is that?
21     A.  I'm sorry, I don't know the number.
22     Q.  Okay.  Is it in the thousands or just
23  the hundreds?
24     A.  I would estimate it's in the
25  hundreds.

46

1    Q.  So I understand from your series of
2  answers that the answer to my first question
3  would have been "yes," that you do see that you
4  have a duty to understand the issues that are
5  impacting your employees --
6         MR. DOWER:  Objection;
7  form.
8  BY MR. NOTZON:
9    Q.  -- as best as you can?
10    A.  I feel the role -- as role of the
11  Dean, I need to understand if there are -- there
12  are things that are impacting negatively on our
13  faculty and staff.
14    Q.  You have a duty of responsibility to
15  protect your employees to the extent that you
16  can?
17         MR. DOWER:  Objection;
18  form.
19    A.  I believe that I need to know if
20  there are things that need to be add -- where
21  changes need to be made, so I'll give you a
22  specific example.
23         We were hiring Assistant Professors
24  and the laboratory renovations for them were
25  taking way too long, so they did not have a

47

1  laboratory to work in, they had to use someone
2  else's, so we made a priority of making sure that
3  laboratory renovations for our newest hires are
4  given the highest priority within the school.
5         So that was a change that was
6  implemented after listening to faculty and
7  understanding complaints.
8  BY MR. NOTZON:
9    Q.  Okay.
10    A.  I -- that's just the one that comes
11  to the top of my mind.
12         I think the -- the issue is there are
13  some -- I also have to follow University rules
14  and regulations, and so just last week someone
15  wanted me to reduce the teaching loads for all
16  the faculty, and I do not have the ability to do
17  that, so I -- I cannot snap my fingers nor -- and
18  make things happen, nor do I have an infinite
19  source of funding.
20    Q.  Let me change my question a little
21  bit.  You answered it fairly broadly, and I
22  appreciate that example of their interests -- you
23  know, addressing interests of employees.
24         I'm talking more in lines of
25  protecting employees from illegal activities like

48

1  discrimination or retaliation or, you know, harm,
2  even, assaults, you know, any -- any -- any kind
3  of illegal conduct.
4         You -- you understand you as the
5  administrator -- the chief administrator over the
6  School of Engineering are responsible for your
7  employees to make sure that those kinds of things
8  aren't happening, if possible?
9         MR. DOWER:  Objection;
10  form.
11    A.  So the employees would need to report
12  these type of activities to the appropriate
13  offices in UT Austin, so if there is a complaint
14  of illegal behavior or discrimination, there
15  would be an investigation.
16         I am not a qualified investigator,
17  and so I -- I might participate, I might provide
18  some context to the investigation.  Usually it's
19  done without my knowledge.
20         So there is a complaint, there's an
21  investigation, and then I am usually engaged --
22  if -- if there is a finding, I'm engaged in -- in
23  kind of the corrective action portion of that.
24         But I am not familiar with all the --
25  every -- every law.  That is beyond my

49

1  capability.  That's why we have different groups
2  within the University who will investigate on
3  specific topics.
4  BY MR. NOTZON:
5    Q.  And I -- that -- that sounds like a
6  reactive/passive approach, that if reported you
7  take action.
8         MR. DOWER:  Objection;
9  form.
10  BY MR. NOTZON:
11    Q.  Would that be accurate?
12         MR. DOWER:  Same
13  objection.
14    A.  So we have conversations with
15  Department Chairs about normal activities where
16  illegal action could occur.
17         So I'll give you an example of a
18  faculty interview:  In the past, women would be
19  denied job opportunities because they were asked
20  about their mari -- marital status.
21         So we have a list of questions that
22  have been vetted by UT Legal, right, that say,
23  what -- "What can you ask during an interview
24  and what questions should you absolutely not ask
25  during an interview" so we do not violate federal

50

1  law.
2      So that's -- that's something
3  where -- this is information we are proactive in
4  distributing to make sure that we are protecting
5  our faculty and also the candidates being
6  interviewed.
7  BY MR. NOTZON:
8      Q.  Thank you.  That's what I was
9  asking -- I was looking for, things that you saw
10  as a duty, and you have taken that duty on and
11  you ensure that your Departments are --
12  understand that there are these list of questions
13  that need to be used, and that they are trained
14  in that so that they implement that positive,
15  protective approach?
16      A.  So that is correct.  The University
17  also has mandatory training for all faculty and
18  staff that they have to go through every year.
19      This is web-based training.  This is
20  not -- it's not mandated by me; it's mandated by
21  the University.  I do see lists of people when
22  they don't complete their training.
23      So there's basic training that
24  everyone has to do.
25      Q.  Okay.

51

1      A.  But that is not at -- at the Cockrell
2  School level.
3      Q.  All right.  But you said --
4      A.  Oh, absolutely, yes.
5      Q.  And earlier you talked about that
6  meeting you had with the two other Deans, the
7  female Deans in STEM discussing issues related to
8  gender issues.
9      Would you see that also as a -- more
10  of a proactive approach to addressing potential
11  gender problems in your school?
12      A.  I think it's important to know what
13  other schools -- what other schools and colleges
14  are doing and make sure we're -- we're being
15  consistent, right.
16      Q.  And you-guys are discussing the
17  information you know about from outside UT and
18  also from within UT --
19      A.  Correct.
20      Q.  -- on -- on gender?
21      A.  Yes.
22      Q.  And I imagine you talk about other
23  things besides gender, as well?  You talk about
24  race, you talk about disability, you talk about
25  age, all those things?

52

1      A.  That is correct.  All those are part
2  of the mandatory training --
3      Q.  Okay.
4      A.  -- each faculty member has to do.
5      Q.  Pregnancy would also be in there?
6      A.  Yes.
7      Q.  Okay.  Is -- is pregnancy also one of
8  the topics that is not allowed to be talked about
9  in an interview besides marital status?
10      A.  That is correct.
11      Q.  Is pregnancy -- marital status, you
12  don't necessarily -- I guess you could have --
13  have a wedding ring, I don't wear all my time and
14  I've gotten dispensation from my wife on that,
15  just for informational purposes, so -- but it's
16  not always immediately apparent whether
17  somebody's married, but if somebody walks in and
18  they're pregnant and they're showing, it might be
19  pretty obvious.
20      Is there a restriction on using
21  pregnancy as a factor in taking employment action
22  against an employee?
23      A.  I'm not sure I understand the
24  question.  You said "taking employment action."
25  Does that mean extending an -- an offer to a --

53

1  to a candidate?
2      Q.  Well, that would be -- that would be
3  "employment action," yeah.
4      A.  Okay.
5      Q.  And that's in the hiring process.
6  But in any -- any process, taking any employment
7  action on an employee because of their pregnancy
8  or pregnancy status would be improper?
9          MR. DOWER:  Objection;
10      form.
11      A.  The modified instructional duties is
12  a case where a faculty member may request -- may
13  request not to teach in a given semester due to
14  the birth of a child.
15  BY MR. NOTZON:
16      Q.  But that's a request, right?
17      A.  And they -- so that's -- they -- they
18  request and that -- that gives them an ability to
19  do that.
20      Let -- let me give you an example
21  where -- I know as Department Chair we
22  interviewed -- when I was Department Chair we
23  interviewed one candidate that was pregnant and
24  we interviewed a second candidate who had just
25  given birth and needed to spend -- have time to

Sharon Wood - 3/18/2021

54

1  pump, and it was very awkward because she had not
2  told us she needed some extra time in the
3  schedule.
4         So after that situation, I made sure
5  that all of our -- when we were reaching out to
6  the candidates to set up the schedules, we asked,
7  "Is there any reason -- do we need to -- would
8  you like breaks at periodic times" so that we
9  could more easily accommodate something without
10 having the identify why they needed to have a
11 break.
12        So these are kind of the policies
13 that have been implemented to -- to make sure
14 that we're treating everyone fairly.
15     Q.  Okay.  And that's, again, not taking
16 action on an employee because of their status,
17 but you're developing an accommodation which
18 would apply to everybody, which would benefit
19 a -- a pregnant woman or a recently pregnant
20 woman?
21     A.  Right.  Or it could -- it could
22 benefit someone who has a physical disability and
23 just the fact -- fact of walking from office to
24 office, they need to rest, right?
25        I think we need to be cognizant of

55

1  the fact that not -- there are reasons why
2  someone may not be able to have a complete two-
3  day interview without -- without some periodic
4  breaks.
5      Q.  And without the need for disclosure?
6      A.  That's correct.
7         MR. DOWER:  Robert,
8  speaking of periodic breaks,
9  whenever we're at a good breaking
10 time.  We've been going for about
11 an hour.
12        MR. NOTZON:  Let me
13 just ask one more line of questions
14 on the modified instructional duty
15 just to close that out.
16 BY MR. NOTZON:
17     Q.  Modified instructional duty, is that
18 only available for child issue, pregnancy,
19 childcare, or are there -- are there the panoply
20 of disability issues that could be employed
21 there?
22     A.  So it can be used for birth or
23 adoption of a child, illness within the immediate
24 family, or taking care of someone in their close
25 family, including their parents.

56

1      Q.  Okay.  So all health-related issues?
2      A.  Yes.
3      Q.  Okay.
4      A.  And I think the requirement is if --
5  if it was for birth or adoption of a child, the
6  individual needs to be the primary caregiver.
7      Q.  Okay.  On -- it sounds for all of
8  those things?
9      A.  I believe so.
10        MR. NOTZON:  All right.
11 Yeah, we can take a break now.
12        MR. DOWER:  Okay.
13        THE COURT REPORTER:  We're
14 going off the record at 10:01 a.m.
15 (Recess held from 10:01 a.m. to 10:10 a.m.)
16        THE COURT REPORTER:  Okay.
17 We're going back on the record at
18 10:10 a.m.
19        MR. NOTZON:  And Bob,
20 you're recording?
21        MR. SCHMIDT:  Yes.  Back
22 on the record and recording.
23        MR. NOTZON:  I don't
24 doubt you.
25        MR. SCHMIDT:  I appreciate

57

1  the reminder.  No, thank you very
2  much.
3  BY MR. NOTZON:
4      Q.  Okay.  All right.  Dean Wood, we got
5  off on the modified instructional duty.
6         Do you ever say MID?
7      A.  I don't know.
8      Q.  Okay.  You say it all out the whole
9  time?
10     A.  I do.
11     Q.  Okay.  I will follow.
12        We got off on talking about modified
13 instructional duty when I was asking the question
14 about the propriety or not of pregnancy being
15 used as a basis for taking employment action.
16        And you responded with that, and --
17 and I'd like to draw the distinction in the
18 modified instructional duty is requested by the
19 employee, correct?
20     A.  Yes.
21     Q.  And so that's a request for an
22 accommodation, not an employment action by the
23 administration on the employee.
24        Do you see the distinction there?
25     A.  Yeah, I still would like a

58

1 clarification about "action."
2     Q.   Yeah.
3     A.   You're using a term I don't quite
4 understand.
5     Q.   Sure.  Any -- anything related to the
6 employment relationship.  So hiring, firing,
7 discipline, pay, you know, those kinds of things.
8     A.   Modified instructional duties would
9 have no impact on that, correct.
10     Q.   So when I said would -- would you
11 be -- would it be accurate that -- when you said
12 that like as an example not to use marital status
13 in request of a -- of an applicant about their
14 status, that wouldn't be appropriate, that
15 pregnancy would also be one of the things not to
16 ask about, correct?
17     A.   Yes.  We do not ask.
18     Q.   And al -- and also, any employment
19 action on the employee because of their pregnancy
20 would also be inappropriate?
21     A.   It would be inappropriate, yes.
22     Q.   Okay.  Do you have any performance
23 metrics or expectations based upon diversity --
24         MR. DOWER:  Objection;
25     form.

59

1 BY MR. NOTZON:
2     Q.   -- for yourself as Dean?
3         MR. DOWER:  Objection;
4     form.  Go ahead.
5     A.   I'm not sure.  Are you asking me if I
6 have quotas?
7 BY MR. NOTZON:
8     Q.   A quota would qualify, but I'm not
9 asking about quotas.  I'm asking about any
10 metrics.
11         MR. DOWER:  Objection;
12     form.
13     A.   The Provost has asked us to be very
14 thoughtful in ensuring we have as diverse a
15 faculty as possible with respect that excellence
16 is expected amongst all our faculty.
17         The Provost last year -- actually
18 last year specifically asked us to look at some
19 issues related to disparities in pay, perhaps due
20 to gender, perhaps due to race or ethnicity, and
21 so we did a full evaluation of all the faculty in
22 response to that request.
23         And so it -- it was something that
24 the -- the Provost was concerned that there
25 may be some underlying issues, and so that was

60

1 part of a -- every -- every Dean had -- went
2 through a very elaborate process last year.
3 BY MR. NOTZON:
4     Q.   Okay.  And so you're -- you're asked
5 to be mindful -- you were asked to look -- do
6 this analysis.
7         Is there a -- a measurement -- a
8 metric that is applied to you on an annual basis
9 to see how you're doing in your mind for them
10 towards diversity?
11         MR. DOWER:  Objection;
12     form.
13     A.   There is no one specific metric.
14 There are some schools where the number of female
15 faculty is much higher than the number of males/
16 men, and there are other schools the number of
17 men is much higher than the number of women.
18         So there are -- at the university
19 level there are some analyses that looks at pay
20 equity between men and women.  There has also
21 been some analyses that look at pay equity
22 related to race or ethnicity.
23     Q.   Are those analyses commented on in
24 your employment evaluations?
25     A.   I have discussed those with the

61

1 Provost.  I do not remember if they were actually
2 during my annual review.
3         But I meet with the Provost monthly,
4 and so those would be -- when -- when the --
5 probably not my annual review, but the -- the
6 University would do an analysis and then
7 distribute it, and so it would -- when those data
8 came out, there would be time for us to look at
9 it, and then there would be a discussion with the
10 Provost to see whether there were -- there were
11 some issues with pay -- inequity in pay, for
12 example.
13     Q.   But that's more of a University-wide
14 event that occurs whenever it occurs, not on an
15 annual basis?
16     A.   They had been occurring annually.  We
17 had a change in -- we had so much change in
18 leadership this year and a real focus on -- on
19 COVID and getting through the pandemic that I
20 have not seen those data.  Those data have not
21 been shared with us this year yet, this academic
22 year.
23     Q.   But they are occurring on an annual
24 basis or it just happens that they've been every
25 year because of happenstance?

62

1    A.  I don't know the answer to that.
2  It's determined by the Provost's Office.
3    Q.  Okay.  And another follow-up is those
4  things are happening University-wide and they're
5  not necessarily -- and they -- they are not
6  documented on your performance evaluation -- your
7  annual performance evaluation, --
8         MR. DOWER:  Objection;
9  form.
10 BY MR. NOTZON:
11   Q.  -- correct?
12   A.  My annual performance evaluation is
13 oral, so there would be no written documentation
14 of that.
15   Q.  Okay.  Have you ever had a written
16 annual evaluation since you've been Dean?
17   A.  Not that I remember.
18   Q.  Okay.  Have you ever had an oral
19 evaluation while you've been Dean where you've
20 been asked to report on the diversity in your
21 School?
22   A.  Yes.
23   Q.  Okay.  Is that annually or is that
24 just every once in a while?
25   A.  Well, I'm on my fourth Provost, so I

63

1  know that when Dr. McInnis was our Provost that
2  was part of the information I would prepare for
3  her each year.
4         But I did not prepare that for the
5  previous two, nor have I -- and I have not had --
6  or I guess I did have a review with the prior
7  Provost.  I have -- that was not what was
8  requested last year.
9    Q.  Okay.  And who is the Provost now?
10   A.  We have an Interim Provost.  It's Dan
11 Jaffe.
12   Q.  And what have you done in terms of --
13 well, have you kept any metrics on yourself in
14 terms of gender diversity in the School of
15 Engineering?
16   A.  We do maintain those statistics.
17   Q.  At your direction?
18   A.  Yes.  There is a -- there's an
19 actual -- a report that's posted on the website
20 that provides metrics for faculty, students -- I
21 don't remember if it has staff.  I think it does.
22   Q.  Okay.  And what's it called?
23   A.  I don't remember the name.  We have a
24 Diversity, Equity and Inclusion section to our
25 website, and our annual report is posted there.

64

1    Q.  Okay.  And the annual report would
2  cover the diversity issues but also other issues,
3  as well?  Or is that just a diversity report?
4    A.  This addresses some climate issues.
5  It -- it -- we have --
6    Q.  By "climate" you mean interpersonal
7  climate or weather climate?
8    A.  Interpersonal climate.
9    Q.  Okay.  I'm sorry.  That may be
10 obvious to you, but just in case.
11   A.  Right.
12   Q.  Okay.
13   A.  So I mean, the University has
14 statistics on the diversity of all the faculty,
15 and then we have -- we have started implementing
16 our own report, which not only reports statistics
17 but reports on activities that are being
18 undertaken.
19   Q.  So you're now in your is it seventh
20 year?
21   A.  In my seventh year as a Permanent
22 Dean.  I had one year as Interim.
23   Q.  Okay.  And how has the diversity
24 changed under your Deanship of, I guess,
25 comparing the diversity reports over the

65

1  period -- that period of time?
2         MR. DOWER:  Objection;
3  form.
4         MR. NOTZON:  Well, that's
5  a good -- that's a good objection
6  because I don't know what I'm
7  talking about.
8  BY MR. NOTZON:
9    Q.  Did that diversity report, has that
10 been going the entire time that you've been the
11 Dean, or did you implement it?
12   A.  I implemented it.
13   Q.  When?
14   A.  Our first report was -- came out last
15 Fall.
16   Q.  Okay.  So there's been one report?
17   A.  There's one report right now.
18   Q.  Okay.  And is that under Professor
19 Julien?
20   A.  Professor -- yes.  She's now
21 Associate Dean for Diversity and Inclusion,
22 Christine Julien.
23   Q.  That's -- that's under her
24 responsibilities?
25   A.  That was under her responsibilities

66

1  to prepare the report.
2      Q.  Okay.
3      A.  And she also is changing the format,
4  so it will be a different report when it is
5  released next year, next Fall.
6      Q.  And how long has she been in that
7  position?
8      A.  She's in her second year.
9      Q.  Okay.  So did she culminate her first
10  year with that report?
11      A.  Yes.
12      Q.  Okay.  And that -- that was your idea
13  to have her do that report after she took over
14  that position?
15      A.  Yes.  We had a committee, and without
16  having, I guess, a -- a clear meter it was -- it
17  was languishing.  We weren't getting -- it -- it
18  took a lot of time, and so Christine needed to be
19  able to devote time to it, so she was very, very
20  successful in -- in getting that report done.
21      Q.  Was creating the position that she's
22  in and writing the report your idea, or is this
23  something that's going on in the Colleges across
24  UT that you have adopted to incorporate into the
25  School of Engineering?

67

1      A.  I think it's a combination of both,
2  but the -- some Schools have -- have individuals
3  in that position; some Schools don't.
4          But I did make the decision that I
5  thought it was best practices to have some -- to
6  have the position, and then I also thought it was
7  important to have -- to be able to report on our
8  progress and any issues that arise so that
9  it's -- it's transparent to the members of our
10  community.
11      Q.  I don't know that I got an answer to
12  the other part of the question, which is what's
13  going on outside of the School of Engineering
14  and -- and whether that activity in the other
15  Schools influenced you --
16      A.  So I mentioned that --
17      Q.  -- at the University.
18      A.  -- some Schools have someone in this
19  position and some Schools don't, so that the
20  combination of just having discussions amongst
21  all the Deans, it appeared that would be a best
22  practice.
23      Q.  Who was doing it before you?
24      A.  Before Christine was appointed?
25      Q.  Sure.

68

1      A.  Michele Meyer, our Assistant Dean for
2  Engineering Student Services was nominally
3  chairing a committee.  It focused mainly on
4  students.
5      Q.  I -- I think -- I think you're
6  misunderstanding my question because I didn't ask
7  a good question.
8          Outside of the School of Engineering
9  was --
10      A.  Oh.
11      Q.  -- the focus of my question.  Would
12  that -- did anybody have a role like Christine
13  Julien and a report outside of the School of
14  Engineering prior to --
15      A.  Yes.
16      Q.  -- her starting that job?
17      A.  Yes.
18      Q.  And -- and which School are you aware
19  of and did you use those examples to form the
20  Julien position and the report?
21      A.  I think the College of Fine Arts was
22  one of the first to have a -- a report.  I looked
23  at that, but that was not the basis for how we
24  did it.
25          I don't remember looking at reports

69

1  from other Schools or Colleges, although we had
2  conversations at Dean's Council about it.
3          So I honestly can't tell you which
4  ones do and don't have it.  There are 18 Schools
5  and Colleges, and I -- I don't know the
6  administrative structure for all of them.
7      Q.  Are any other STEM colleges doing it?
8      A.  I know that Natural Sciences has
9  someone in -- in this position.  I don't think
10  they have the same title.  And I do not know what
11  the Jackson School is doing.
12      Q.  Okay.  Would you say that of the STEM
13  Colleges that Engineering is the first to
14  formalize the diversity position and to have a
15  report?
16      A.  No.  I believe Natural Sciences --
17  well, I believe Natural Sciences had a position
18  before us, but I do not know if they had a
19  report.
20      Q.  Okay.  Or how long they've had a
21  report?
22      A.  Right.
23      Q.  Okay.  Do you -- does Julien have any
24  dotted-line communications or reporting to the
25  University Office of Inclusion and Equity?

70

1      A.   They have a committee, just as we
2   have a Dean's Council, so there is a group of
3   these diversity and inclusion officers, and she
4   participates in those.
5      Q.   That's a way to get best practices
6   spread out across the University?
7      A.   That's correct.
8      Q.   And do you see all of this happening
9   since when?  Since 2019?  2018?
10         MR. DOWER:  Objection;
11      form.
12      A.   So when -- when Dr. McInnis started
13   as our Provost we started having more
14   conversations about -- let me take a step back
15   here.
16         I mean, there wasn't -- when Dr.
17   McInnis started as our Provost, we had more
18   conversations in Dean's Council about these types
19   of topics.
20   BY MR. NOTZON:
21      Q.   Okay.  But your decision to make the
22   position for Professor Julien was in the academic
23   year '19/'20 or '20/'21?  No, '19/'20.
24      A.   I think we made the decision in
25   '18/'19 because her appointment was effective

71

1   September of 2019.
2      Q.   Okay.  And when you say "we," who's
3   "we" made the decision?
4      A.   Well, amongst -- I use the "we" to
5   refer to the Leadership Team within the -- the
6   School, but it -- it was my decision.
7      Q.   Who is on the Leadership Team that
8   made the decision in I guess the Spring of '19?
9      A.   Or Summer.  I -- I don't remember the
10   details.  So Jerry Speitel, who's the Associate
11   Dean for Academic Affairs, he and I have had many
12   conversations about the leadership structure of
13   the -- the Cockrell School, and so I -- I made
14   sure that I get the opinions from Jerry and then
15   there are other members of the Leadership Team.
16         I mentioned Michele Meyer.  She's the
17   Assistant Dean for Engineering Services.  I -- I
18   believe she had a role in this, too.
19         The other members, I'm not sure I
20   asked them directly.  That would be John Ekerdt,
21   Associate Dean for Research, Eric Meyer, who's an
22   Assistant Dean for Continuing Education, --
23      Q.   Are they related?
24      A.   No.  -- Chris Higgins, who's our
25   chief Development Officer, and Pat Wiseman, who's

72

1   was our Chief Communications Officer.
2      Q.   So when you were saying "we," you're
3   pretty much talking about you and -- is it Dr.
4   Speitel?
5      A.   Yes.
6      Q.   "Speitel" or "Speitel"?
7      A.   "Speitel."
8      Q.   All right.  You have the benefit of a
9   easily pronounceable name, so you've probably
10   never had a problem with it.
11         Okay.  Oh, while we're on Mr.
12   Speitel -- or Dr. -- it's Dr. Speitel, right?
13      A.   Yes.
14      Q.   All right.  Did you inherit him or
15   did you hire him into that group?
16      A.   He -- both Jerry Speitel and John
17   Ekerdt served in their roles as Associate Deans
18   with Greg Fenves, and then they -- they continued
19   as I've been -- when I took the position in the
20   Dean position.
21      Q.   Okay.  You had the chance to hire
22   your own, but you chose to keep them?
23      A.   Yes.
24      Q.   Okay.  Does Dr. Speitel also have a
25   faculty role?

73

1      A.   Yes.
2      Q.   Does he teach?
3      A.   I don't remember the last time he
4   taught.  I know he's taught occasionally since
5   I've been Dean, but he does not teach regularly.
6      Q.   Does he have a re -- research
7   program?
8      A.   He still maintains some -- he still
9   has research meetings, yes, so...
10      Q.   Do you know what kind of funding he
11   has?
12      A.   I do not know his funding, no.
13      Q.   Do you know what his funding source
14   is?
15      A.   I do not.
16      Q.   Do you know the last time he got
17   funding?
18      A.   I do not.
19      Q.   Would you consider Dr. Speitel an
20   advisor?
21      A.   I do.
22      Q.   Does he assist you in writing any
23   documents that you might need?
24         MR. DOWER:  Objection;
25      form.

74

1      A.  There are some cases of documents
2  that he writes and some where I have full
3  responsibility.
4  BY MR. NOTZON:
5      Q.  Does he provide you with drafts for
6  you to then edit and send out or -- or -- or is
7  it -- well, I'll leave that question there.
8      A.  Yes.  So any document where -- where
9  it's about the budget, about enrollment, anything
10 related to finances, he will always provide
11 information and -- and often write a draft, and
12 then we will work on it together to where we
13 believe we're ready to submit it to the Provost's
14 Office.
15     Q.  So you consider him a close advisor?
16         MR. DOWER:  Objection;
17 form.
18     A.  I do.  As I consider all members of
19 the Leadership Team to be close advisors.
20 BY MR. NOTZON:
21     Q.  Does anybody else write for you, as
22 well, besides Dr. Speitel?
23     A.  My Communications Officer -- or Chief
24 Communications Officer often will write drafts,
25 prepare presentations.  It's all drafts.

75

1          Occasionally the Chief Development
2  Officer will write draft emails.  They -- their
3  office develops all the letters that go to donors
4  that I sign.
5          John Ekerdt and I are frequently
6  communicating about information that's going
7  to -- specifically related to researchers and the
8  Directors of Research Centers.
9          Christine doesn't actually draft for
10 me, but certainly she has -- we -- we -- I
11 reviewed the report that we mentioned earlier
12 before it was published.
13     Q.  Does Dr. Speitel ever help you write
14 tenure and promotion evaluations?
15     A.  No.
16     Q.  From your personal experience, either
17 as a student, a faculty member, or an
18 administrator, have you ever felt like you've
19 been discriminated against because of your
20 gender?
21         MR. DOWER:  Objection;
22 form.
23     A.  I believe in certain cases being a
24 woman has been a disadvantage to me, but I
25 believe in other cases being a woman has been an

76

1  advantage.
2  BY MR. NOTZON:
3      Q.  Please give me an example of each.
4  And -- and I'd ask you to give me your worst
5  example and your best example respectively.
6      A.  All right.  The best example was
7  early in my career I was invited to participate
8  in a number of workshops -- international
9  workshops because there was an interest in having
10 diversity.
11         And I think this -- it was a great
12 preparation for me in my career and it gave me
13 opportunities that I would -- that male
14 colleagues who were at my same level did not
15 have.
16         Disadvantages probably --
17     Q.  Just to follow up on that -- that
18 advantage, what you're saying is had you not been
19 a -- one of very few women while they were trying
20 to increase the exposure and experience of women,
21 you may not have been selected for that role?
22     A.  That is correct.
23     Q.  Okay.  All right.  And I'm sorry, go
24 ahead with your worst case.
25     A.  I think the -- the negative is that

77

1  many times people dis -- people assume the only
2  reason you were there was because you were a
3  token woman and that you had to -- you had to
4  demonstrate that you were there because of your
5  technical knowledge.
6      Q.  Okay.  So would -- would it be
7  accurate to say that perhaps the worst experience
8  that you had being discriminated against is the
9  unknown factor of whether or not people are
10 looking at you as a token or whether you've
11 earned your right to be there in their minds?
12     A.  I'm not sure I ever thought of it
13 that way.
14     Q.  Okay.  So when -- you're saying the
15 worst one was that you were actually told that
16 you were thought of as a token?
17     A.  Yes.
18     Q.  Okay.  Did that introduce into your
19 mind that, "Oh, my God.  Who else is thinking
20 that I'm the token"?
21     A.  You know, you're asking me to
22 remember something that happened 35 years ago, so
23 I cannot remember my state of mind.  I'm really
24 sorry.
25     Q.  No, that's okay.

78

1       Did that cause you to try to be the
2   best so that there would be no question that
3   you're not just a token?
4       A.  Yes.
5       Q.  You felt like you had to -- to meet
6   some standard that would be undeniable to the
7   people observing that there would be no question
8   about your competency?
9       A.  I feel I always need to be my best.
10      Q.  Yeah, but not because you want to be
11  your best, but because other people might think
12  you're a token if you weren't?
13          MR. DOWER:  Objection;
14  form.
15      A.  I -- what I've realized in my life is
16  that I can't worry about what other people think
17  about me.
18          I need to be the best that I can be
19  and be pleased with myself, and that's how I
20  approach it.
21  BY MR. NOTZON:
22      Q.  I understand.
23      A.  And I -- I try not to internalize if
24  there are negative comments that appear to be
25  related only to my gender, and I -- I believe I

79

1   do my best.
2       Q.  Have you always done that, or is that
3   the benefit of reaching the -- the wonderful age
4   of 60 and looking back?
5           MR. DOWER:  Objection;
6   form.
7       A.  I believe I've approached that my
8   whole life.  I have not worried too much about
9   what other people think about me.
10  BY MR. NOTZON:
11      Q.  So when you say that worst experience
12  happened, that only happened one time?
13      A.  No.  There were multiple cases.
14      Q.  Okay.  And -- and when you say "worst
15  experience," that's the worst experience you know
16  of, correct?
17      A.  Yes.
18      Q.  Would you agree that you don't
19  necessarily know if you've been the victim of
20  gender discrimination in every potential case
21  that might have been part of your journey through
22  Engineering?
23      A.  I don't believe it's possible to know
24  that.
25      Q.  And it is possible that you have been

80

1   a victim of gender discrimination given what you
2   know about the data related to women and STEM?
3       A.  It is possible.
4       Q.  Have you ever accused anybody of
5   treating you differently because you're a woman?
6       A.  Not to my recollection.
7       Q.  Okay.  Has anybody ever accused you
8   of gender discrimination?
9       A.  No.
10          MR. DOWER:  Objection;
11  form.
12  BY MR. NOTZON:
13      Q.  Do you understand that you're being
14  accused of gender discrimination in this case?
15      A.  I'm sorry.  I was not -- right.  I
16  was -- yeah.  Yes, Dr. Nikolova is accusing me of
17  gender discrimination.
18      Q.  And pregnancy discrimination?
19      A.  And pregnancy discrimination, yes.
20      Q.  Which arguably would be a subset?
21      A.  Right.
22      Q.  Undeniably would be a subset?
23      A.  Right.
24          MR. DOWER:  Objection;
25  form.

81

1   BY MR. NOTZON:
2       Q.  Okay.  And given that you're a woman,
3   do you understand how Dr. Nikolova can accuse you
4   of gender discrimination?
5           MR. DOWER:  Objection;
6   form.
7       A.  I have read Dr. Nikolova's
8   statements, and I believe I can understand her
9   opinion.
10  BY MR. NOTZON:
11      Q.  Okay.  And my -- my question is more
12  on the, I don't know, I might say theoretical
13  side, but do you understand that a woman can
14  discriminate against a woman because of her
15  gender?
16          MR. DOWER:  Objection;
17  form.
18      A.  I believe that a woman can
19  discriminate against a woman or against a man for
20  gender discrimination.
21  BY MR. NOTZON:
22      Q.  Okay.  I just wanted to -- some
23  people might not think that that's possible, and
24  I just wanted to know if you felt that way.  But
25  you don't.  Okay.

82

1        From your understanding of -- of the
2   faculty at the School of Engineering, would you
3   say that there are more or less women present on
4   the faculty than when you started?
5        A.  When I started as a faculty member or
6   when I started as Dean?
7        Q.  Dean.
8        A.  There are more.
9        Q.  Okay.  And -- and could you tell us
10  how many more?
11       A.  I would have to check my notes.  I
12  don't have that on the top of my head.
13       Q.  Okay.  More in terms of tenure-track
14  and tenure, or just tenure, or do you know?
15       A.  I believe it's in both -- in -- in
16  all ranks, there are more women than there were
17  when I started as Dean.
18       Q.  Okay.  And when you say "all ranks,"
19  you're talking about the three, Assistant,
20  Associate, and full?
21       A.  Correct.  We also have more women as
22  Department Chairs than when I started.
23       Q.  Okay.  And did -- did you play any
24  role in that?
25       A.  Yes.  Well, I -- there are search

83

1   committees who would submit a list of unranked
2   candidates to me, and then I made the selection
3   who the Department Chair is based on what I
4   believe their qualifications are.
5        Q.  Okay.  It's your decision?
6        A.  It -- it is.
7        Q.  Are you ever --
8        A.  I have to get approval from the
9   Provost, but I -- it is -- my recommendation is
10  approved, yes.
11       Q.  Have any of your recommendations been
12  reversed by the Provost on selecting a Department
13  Chair at all?
14       A.  No, no.
15       Q.  Do you ever have a concern as a
16  female administrator that you may be perceived as
17  shading toward female?
18       A.  That is not -- I'm sorry, you said --
19  you said a word "something for female," and what
20  was that word?
21       Q.  "Shading," or, you know, benefitting,
22  put -- putting your finger on the scale.
23          Have you ever -- are you ever
24  concerned that outside observers, whoever they
25  may be, above you, below you, outside of the

84

1   University might consider you as -- given that
2   you're a woman, that you may be benefitting
3   women?
4            MR. DOWER:  I'm going to
5        object to form.  Go ahead.
6        A.  To my knowledge, no one has -- has --
7   or to my -- based on my memory, no one has
8   brought that up to me, and --
9   BY MR. NOTZON:
10       Q.  That's not my question, though.
11       A.  I know.  Am I concerned that people
12  might think that I'm favoring women?
13       Q.  Yeah.
14       A.  I would say no.
15       Q.  Okay.
16       A.  And I -- I mentioned before, that
17  people's views of me are not what guide my
18  decisions.
19       Q.  So back when you were telling the
20  story of being concerned that somebody might view
21  you as a token, that -- that was just something
22  that happened in the past, and that no longer
23  happens anymore?
24            MR. DOWER:  Objection;
25        form.

85

1        A.  Unfortunately, it still happens
2   occasionally.
3   BY MR. NOTZON:
4        Q.  That's why I asked the question.
5            If -- if somebody will view you as a
6   token, somebody might also view you as
7   benefitting women.
8            MR. DOWER:  Objection;
9        form.
10       A.  You asked -- you asked me if I cared.
11  BY MR. NOTZON:
12       Q.  I didn't say "cared"; I said "Do you
13  feel."
14       A.  "Do I feel."  I apologize.
15          Do I feel that someone from the
16  outside may think I'm pro women?
17       Q.  Benefitting women.
18       A.  Benefitting women.
19            MR. DOWER:  I'll go ahead
20        and object to form.
21       A.  I -- I do not feel that way.
22  BY MR. NOTZON:
23       Q.  Okay.  So when you feel that you
24  might still be perceived as a token, when has
25  that occurred recently?

86

1      A.  I was attending a football game as --
2   at a donor's suite, and I was introduced to
3   someone from outside -- another individual at the
4   suite who was not an engineer, who was surprised
5   that there was a female Dean -- or a woman who
6   was Dean of Engineering.
7      Q.  And that surprise could be genuine
8   given the -- the whole dearth issue, but it also
9   could be raising the question of tokenism, right?
10         MR. DOWER:  Objection;
11   form.
12  BY MR. NOTZON:
13     Q.  That's what you're thinking?
14         MR. DOWER:  Objection;
15   form.
16     A.  I don't know what motivated this
17   individual to ask the question.  I'm sorry.
18  BY MR. NOTZON:
19     Q.  No, I know you don't.  I'm just
20   saying that was in your mind, is it could --
21   could be one or the other, but they didn't
22   explain and you didn't explore?
23     A.  I did not explore and they did not
24   explain, you are correct.
25     Q.  And this was a man?

87

1      A.  Yes, it was.
2      Q.  Would you have felt the same if a
3   woman had expressed surprise?
4      A.  Most of the time -- or any instances
5   I'm remembering right now, a woman has been very
6   complimentary and saying, "It's great you're in
7   this position.  It's -- it's a long time coming
8   to have a woman in a leadership role like this."
9         So their intent was clear, and I
10   didn't have to wonder about their intent.
11     Q.  So let me ask it a little bit
12   differently, then, because I don't think that
13   answers the question I asked, but I appreciate
14   the clarification.
15         If a woman had said what the guy said
16   in that box at the football game without
17   elaboration, would you have felt the same
18   potential tokenism concern?
19         MR. DOWER:  Objection;
20   form.
21     A.  If a woman had said exactly what the
22   man -- man said to me, I would have felt the same
23   way.
24         MR. NOTZON:  Let's go
25   ahead and take a short break.  I'm

88

1   going to be shifting gears here,
2   all right?
3         MR. DOWER:  That sounds
4   great.
5         THE COURT REPORTER:  We're
6   going off the record at 10:51 a.m.
7   (Recess held from 10:51 a.m. to 11:04 a.m.)
8         THE COURT REPORTER:  And
9   we're going back on the record at
10   11:04 a.m.
11         MR. NOTZON:  And you're
12   on, Bob?
13         MR. SCHMIDT:  And we
14   are on recording.
15         MR. NOTZON:  Okay.
16  BY MR. NOTZON:
17     Q.  So Dean Wood, I just want to follow
18   up on a couple of questions.
19         Are you aware of any investigation
20   that was conducted as a result of Dr. Nikolova's
21   complaints?
22     A.  Dr. Nikolova submitted a CCAFR
23   complaint, or complained to CCAFR, and so there
24   was an investigation that they completed.  That
25   report went to President Fenves.

89

1      Q.  Any other investigation?
2      A.  That's the only investigation I know
3   of.
4      Q.  Okay.  Do you understand that the
5   CCAFR Committee did or did not look at
6   investigating gender or pregnancy discrimination
7   issues?
8      A.  I don't believe it's within their
9   purview.  I believe their purview is directly
10   related to the promotion and tenure process.
11         If Dr. Nikolova had made another
12   complaint to the University, then another group
13   would have done the investigation, such as Office
14   of Equity and Inclusion, and then they would have
15   asked me to -- they would have -- they would have
16   engaged me to -- as part of their investigation.
17     Q.  So you're not aware of that
18   occurring?
19     A.  To -- to my knowledge -- I have not
20   been contacted by them.
21     Q.  Okay.  Have there been any
22   investigations into discrimination by OIE or any
23   other organization at UT within the School of
24   Engineering since you've been the Dean?
25     A.  Yes.

90

1      Q.  Could you just generally describe
2   them without going into great detail, the basis
3   of the -- the complaint and the -- the year and
4   the College.
5      A.  So the one I'm remembering most
6   frequent -- most fairly comes to my head was
7   reported in the "Austin American Statesman" in I
8   believe the Fall.
9         We had a Research Professor and
10   Emeritus Professor who a staff member had a
11   complaint against, and there was a finding
12   against that individual, and he was -- he was
13   prohibited from ever being employed by the
14   University again; he was prohibited from having
15   an office on campus.
16      Q.  Was this gender or sexual harassment?
17      A.  It fell under the broad sexual
18   harassment policy.
19      Q.  Okay.
20      A.  The University changed its policy
21   very recently, but it fell under the older sexual
22   harassment policy.
23      Q.  Okay.  And any other complaints/
24   investigations that you're aware of since you've
25   been there?

91

1            MR. DOWER:  Objection;
2   form.
3      A.  I -- I wouldn't -- I would have to
4   hypothesize or guess that we might have one or
5   two cases a year.  That was the only case I can
6   recall -- I'm sorry.  Let me take a step back.
7         I can remember -- there have been
8   complaints -- some complaints come in through the
9   anonymous hotline, so the investigation system a
10   slightly different.
11         There was I believe one faculty
12   member, a -- a complaint by a graduate student
13   that did not rise to the level of harassment.  I
14   believe gender was a component of it.  I did have
15   to advise a faculty member that he needed to be
16   much more careful.
17         There was a complaint by a post-Doc
18   who left the position early.  That was
19   investigated.  I do not remember what the finding
20   was.  I think -- I don't remember if there was a
21   finding or not.  I remember the investigation.
22         I remember investigation about a -- a
23   TA that had -- against female student.
24         So those are the only ones that I
25   specifically remember in my eight years, and the

92

1   student ones were handled a different way than
2   the -- the faculty ones.
3         Oh, we had -- we had a staff member
4   who was -- his employment was terminated because
5   he did kiss another staff member in a breakroom.
6      Q.  Okay.
7      A.  So to -- to the best of my knowledge,
8   that is -- that's what I remember.
9      Q.  And that first one didn't have an
10   investigation because it didn't rise to that
11   level and you -- you just spoke to the faculty
12   member and it was taken care of?
13      A.  There was an investigation that went
14   through the University processes but there was
15   not a finding.
16      Q.  Oh.
17      A.  And so then the resolution was me
18   talking with the faculty member, correct.
19      Q.  All right.  And back to I'd asked a
20   question about whether or not you'd done
21   proactive things to prevent discrimination in the
22   workplace, and you had given a list of the
23   questions to provide on interviews and the annual
24   training.
25         Is there anything else that you do in

93

1   the School of Engineering to try to avoid
2   discrimination?
3            MR. DOWER:  Objection;
4   form.
5      A.  One of the things that has been
6   happening lately, and I'd say in the past two or
7   three years, is we've been having different types
8   of months to celebrate.
9         So February is Black History Month,
10   and then there's a month for Hispanics and Lat --
11   I don't remember the term.  I'm sorry.
12         So we've been having days to
13   celebrate that to try to build community.  We've
14   had another one devoted to Asian-Pacific Islander
15   heritage.  So those are things that we've been
16   trying to do to build community.
17         We have a very longstanding --
18            MR. DOWER:  Isn't it --
19            THE WITNESS:  I'm --
20   I'm sorry?
21            MR. DOWER:  Isn't it women
22   this month?
23            THE WITNESS:  I believe it
24   is.
25      A.  We have a -- I was going to say we

Appx.0696

94

1  have a very longstanding "Women in Engineering"
2  program, and so they have a number of different
3  programs that they run throughout the year, but I
4  think this is -- they have some special things
5  for this month.
6        But to be honest, those are -- those
7  are delegated to individual staff members, so
8  that does not rise to my level to do the planning
9  for those events.
10       (Zoom vidoconferencing distortion.)
11       MR. DOWER:  Robert,
12  you're freezing up at least on my
13  end.  We may need to, you know,
14  log out and log back in.
15       THE WITNESS:  I'm sorry.
16  I could not hear the question.
17       MR. DOWER:  Do we want
18  to go off the record for a second
19  and help Robert with his issue?
20       MR. SCHMIDT:  Yes,
21  let's go off the record.
22       THE COURT REPORTER:  We're
23  going off the record at 11:12 a.m.
24  (Recess held from 11:12 a.m. to 11:22 a.m.)
25       THE COURT REPORTER:  We

95

1      are back on the record at 11:22 a.m.
2  BY MR. NOTZON:
3      Q.  Okay.  Dean Wood, technical
4  difficulties, but we're -- we're persevering.
5        Is there anything else that you do to
6  avoid or prevent discrimination in the workplace?
7        MR. DOWER:  Objection;
8  form.
9      A.  So I -- I think we talk -- I'm sorry.
10  Any time something comes up at Dean's Council
11  that it is important to share with the Department
12  Chairs, I make sure that we discuss it with them,
13  and then we have other things that we talk about
14  every year related to, you know, discrimination
15  or policies that -- that we might -- that we talk
16  about, just to make sure that all the Department
17  Chairs are reminded of those facts.
18  BY MR. NOTZON:
19      Q.  Okay.
20      A.  I think our -- a lot of our concern
21  is on search committees, and so there are
22  specific training and antibias training for --
23  for faculty search committees.
24      Q.  Was there ever a complaint from a
25  person named Nuria Gonzalez -- and I don't know

96

1  if I can pronounce the last name.
2      A.  There were a number of complaints
3  from Nuria and -- and her husband, yes, and also
4  the students associated with it, yes.
5      Q.  And -- and what were the -- who was
6  the complaint against?
7      A.  There were multiple complaints.
8  There were complaints against her; she made
9  complaints.  I would have to check my notes to
10  really keep track of everything because it was so
11  complicated.
12      Q.  Okay.  Did anybody in the group of
13  people complaining complain about you?
14      A.  Not to my knowledge, because I was
15  never asked to -- I was -- my participation in
16  the investigation was -- I was not in -- I was
17  not asked to -- speak as part of the
18  investigation, does that make sense?
19        I only dealt with -- I did not deal
20  with the investigators directly, I only dealt
21  with the Provost's Office, so I do not believe
22  that there was a complaint against me.  At least
23  I -- I was never aware of one.
24      Q.  In other words, you weren't
25  interviewed as a person with knowledge of -- of

97

1  relevant facts?
2      A.  Correct.
3      Q.  And -- and her husband's name is
4  Robert Heath?
5      A.  Yes.
6      Q.  Okay.  And -- and how do you
7  pronounce her last name?
8      A.  I would have to look at it to -- I'm
9  not sure I actually know how to pronounce --
10  pronounce it or spell it off the top of my head.
11  I'd have to look it up.
12      Q.  Okay.  And did that end up with
13  the -- the two of them, Professor Heath and --
14  and his -- is Nuria also a Professor, as well?
15      A.  She was in a Research Professor role
16  at the time.
17      Q.  Okay.  Did they leave UT?
18      A.  They did leave UT.
19      Q.  Okay.
20      A.  And she was offered tenure or a
21  tenure-track position at NC State, which is
22  where -- so they both got tenure or tenure-track
23  positions at NC State.
24      Q.  Okay.  And Professor Heath was a full
25  Professor in PCQ here at UT?

98

1    A.  That is correct.

2    Q.  Okay.

3    A.  So I do know that police investigated

4  complaints she had against the graduates and the

5  police did investigate, so it wasn't just the --

6  the UTPD investigated in addition to the office

7  of Equity and Inclusion.

8    Q.  Okay.  So there was an alleged crime

9  in -- in -- in addition to an interpersonal

10  relationship?

11    A.  There were many different

12  allegations, yes, and she did engage UTPD, right.

13    Q.  Okay.  And -- and you're saying --

14  was that one of the four that you were talking

15  about from before?

16    A.  No, I'm sorry.  I'd forgotten that

17  one.

18    Q.  Okay.  And to follow up, did -- are

19  you aware if there were any findings either by

20  the UTPD or OIE related to those series of

21  complaints?

22    A.  There were concerns about violations

23  of FERPA where student information was shared

24  that should not have been shared.

25      I don't know if it got to the point

99

1  of a finding and I think the fact that they both

2  resigned may have stopped the investigations.  I

3  honestly don't know.

4    Q.  When you say "they both resigned,"

5  you're talking about Nuria and her husband?

6    A.  Right.

7    Q.  Okay.  Did the graduate student stay?

8    A.  So the graduate student -- there were

9  four graduate students.  What -- the graduate

10  student who probably was the -- I would call the

11  leader of the group did complete his Ph.D. with a

12  different supervisor.

13    Q.  Okay.  But you're not aware of the

14  other three?

15    A.  I -- I know of at least one other is

16  still here.  I -- there could be two still here.

17    Q.  And were -- were they in ECE, as

18  well?

19    A.  Everyone involved was in ECE, yes.

20    Q.  Earlier you mentioned the evaluation

21  of faculty salaries that was done.

22      Do you remember what year that was?

23    A.  I know we had a special review for

24  equity last academic year, so that would have

25  been in '19/'20.

100

1    Q.  Okay.  '19/'20?

2      Hello?

3    A.  Yes, '19/'20, yes.

4    Q.  I'm sorry.  I -- I didn't know if I

5  was going off again.  Okay.

6      MR. SCHMIDT:  Just to

7    correct you-all, it's 2020?

8      THE WITNESS:  Oh,

9    wait.  No, it was --

10      MR. SCHMIDT:  Not 1920.

11      THE WITNESS:  This is

12    '20/'21 we're in right now.

13      MR. SCHMIDT:  Yeah.

14      THE WITNESS:  And we

15    did it last year, so that would

16    have been '19/'20.

17      MR. SCHMIDT:  2020.

18      MR. NOTZON:  No,

19    '19/'20.

20      THE WITNESS:  So

21    2019 to 2020 --

22      MR. SCHMIDT:  There

23    we go.  I'm sorry.  Yeah, yeah,

24    yeah.

25      MR. DOWER:  For the

101

1    record, you're -- you're saying

2    there should be a dash there.

3    You're not giving the year -- in

4    the Year of our Lord 1920;

5    you're saying '19 dash or

6    hyphen '20?

7      THE WITNESS:  That's

8    right.  The year 2019 dash 2020.

9      MR. SCHMIDT:  Okay.

10    Thank you.  I was -- I was

11    just -- that's all I was doing.

12      And Robert, I apologize.  I

13    didn't mean to interject.

14      MR. NOTZON:  Okay.  The

15    Dean and I knew what we were

16    talking about.

17  BY MR. NOTZON:

18    Q.  So on the faculty eval -- salary

19  evaluation, were there any findings?

20    A.  This was not a formal investigation,

21  so there would not -- not have been a possibility

22  of findings.

23    Q.  Okay.

24    A.  The Provost asked us to look

25  specifically at -- at our entire faculty and

102

1 identify if there were equity issues.
2     Q.  Okay.
3     A.  We had some -- some that were -- some
4 were men, some were women, and we -- we had to
5 pull up funds that we could use to address them.
6     Q.  And who was in charge of that for the
7 School of Engineering, the -- the identifying
8 potential disparity issues?
9     A.  So we asked each Department Chair to
10 look specifically at their Departments.  I'm
11 using "we" as Jerry and I, right?  Because Jerry
12 handled -- Jerry did all the background
13 spreadsheets that were important to him.
14         We -- Jerry and I also looked at them
15 independently.  Then we met with the Department
16 Chairs, compared our lists, and eventually came
17 to an agreement.
18     Q.  Okay.  And did you identify any
19 disparity issues in the School of Engineering
20 salaries?
21     A.  We did find equity issues in the
22 Cockrell School, yes.
23     Q.  Did you find any that were gender
24 related?
25     A.  I mentioned we had some men and some

103

1 women who were on this list.
2     Q.  Right.  Did you find any issues where
3 the females were being paid less than they maybe
4 should have been based upon your analysis?
5     A.  Well, we would only give raises to
6 individuals if they were being paid less, and we
7 found some men and some women on the list --
8     Q.  So --
9     A.  -- that were included.
10     Q.  Okay.  So it was a little of both
11 that were on the underpaid side based upon your
12 analysis?
13     A.  Correct.
14     Q.  And do you remember who they are?
15     A.  I would have to check my files.  I
16 don't know off the top of my head.
17     Q.  And that would be -- those -- those
18 salaries would have been adjusted between last
19 academic year and this academic year?
20     A.  Right.  Those salary adjustments
21 would have been in effect on September of 2020 --
22 September 1st, 2020.
23     Q.  And you would have taken those
24 adjustments at the same time as everybody's
25 receiving whatever other raises were being doled

104

1 out at that time?
2     A.  We would have, but because of COVID
3 the merit goal was reduced to zero.  So we were
4 in a situation that there were only -- only some
5 very specific raise -- raise goals that were
6 available.  One of them was related to this
7 equity issue.
8     Q.  How much money was made available by
9 the University for the School of Engineering for
10 this diversity issue?
11     A.  I don't remember.  I'd have to check
12 my notes.  Nor do I remember the total salary --
13 the total of all the salaries in the Cockrell
14 School.
15     Q.  And do you remember if there were
16 more women than men that were adjusted based upon
17 this review?
18     A.  I do not remember.  I -- we -- we
19 provide document -- spreadsheet documentation to
20 the Provost's Office.
21     Q.  Okay.
22     A.  There were both men and women on the
23 list.
24     Q.  Okay.  But you -- you have no idea or
25 no concept of the -- the relative quantities?

105

1     A.  I do not remember.
2     Q.  And you couldn't even say just more
3 or less or equal?  You just have no idea?
4         MR. DOWER:  Objection;
5 form.
6     A.  I would not want to ha -- hazard a
7 guess because this is a very detailed question
8 and I'd rather be able to provide you with the
9 actual information than something that could be
10 proven to be incorrect.
11 BY MR. NOTZON:
12     Q.  Would it be accurate to say based
13 upon your answer that that was not discussed as
14 to whether or not there were more women or more
15 men that were needing adjustments because of the
16 diversity analysis?
17     A.  Right.  That was not -- that was
18 not -- well, we looked at every individual.
19 There are cases -- yeah, we looked at every
20 individual in the Cockrell School.
21         So the Provost did not give us a
22 criteria that so much had to be used for women
23 and so much had to be used for maybe
24 underrepresented minorities.  They wanted us to
25 evaluate everyone in the school.

106

1        And then they -- usually they give us
2   a pot of money and tell us how we want to spend
3   it. In this case, they actually didn't give us a
4   pot.
5        They said, "What would you need to
6   address equity issues?" So it was done
7   differently this year than any type of raise goal
8   in the past.
9        Q.  Given that the whole basis for the
10  analysis and the adjustments was diversity, why
11  wouldn't you have discussed the gender or the
12  diversity issue that was being adjusted?
13          MR. DOWER:  Objection;
14  form.
15      A.  No, I'm -- I'm sorry, the -- the
16  issue was equity, and so there are cases where
17  perhaps we have two men at the same rank and
18  they've been here the same amount time, or
19  perhaps one got an adjustment because that
20  individual went out and got a job offer at
21  another university.
22        And so one of the things we would do
23  is we would then make them equal or close to
24  equal to address a -- a systemic problem like
25  that.

107

1        So there were a whole variety of
2   things that we considered in this, and we were
3   asked to address the equity of our salaries
4   within the Cockrell School.
5   BY MR. NOTZON:
6        Q.  Okay.  And may -- maybe I got
7   confused there.
8        So when you're saying "equity,"
9   you're talking financial equity.  You're not
10  talking gender, race, age, you're not talking
11  about those issues?
12      A.  We were asked to look at the salaries
13  and see if there were any issues of equity.  And
14  equity could be broad, right?  It -- it could be
15  anything.  It's just as you're describing.
16        So we looked at every individual and
17  we looked at the peers who had -- most closely
18  tied to them to see if there were differences in
19  salaries, and if those differences were based on
20  performance or on perhaps some other issues, such
21  as, as I mentioned before, one person getting an
22  external offer and getting a raise and another
23  one not.  So that -- that was how we approached
24  it.
25      Q.  So would it be accurate that your

108

1   testimony is that you didn't see a gender equity
2   issue that needed to be adjusted?
3      A.  I did not say that.
4      Q.  Okay.  Then I'm asking you.
5        Did you see that a gender issue
6   needed to be adjusted in this salary review?
7      A.  I believe within the entire scope of
8   the Cockrell School, there were some women who
9   had had -- their salaries needed to be adjusted.
10       Whether they were -- the reason that
11  their salary was lower to begin with, I did not
12  investigate.  All I looked at was where were they
13  relative to their peers, and if it was not a very
14  clear-cut performance basis, then we would look
15  at raise -- providing a raise.
16        So I know there were women on the
17  list.
18      Q.  And were those women on the list
19  adjusted to an equity basis as to men
20  comparators?
21      A.  There may be women comparators, too.
22      Q.  I'm asking --
23      A.  We looked at -- we looked at the
24  peer -- so you're asking me an example.  Again,
25  there are roughly 300 faculty members.

109

1        I've already told you I don't
2   remember how many women and how many men got
3   these raises, so I certainly cannot tell you how
4   many of the women were raised up relative to men,
5   and there weren't women in the comparative pool
6   and how many had women in their comparative pool.
7   I'm sorry, I cannot answer that question.
8      Q.  I didn't ask how many, I just asked
9   if there were any that were females that were
10  adjusted up to a male competitor.
11      A.  Yes.
12      Q.  Com -- comparable, not competitive.
13      A.  Yes.
14      Q.  Okay.  Were any men adjusted up to a
15  female that was higher paid?
16      A.  I cannot remember a specific case,
17  but I cannot preclude that from being the case.
18  I just don't remember.
19      Q.  Right.  It doesn't come to mind from
20  your limited rec -- recall of the many actions
21  that were taken based upon your prior testimony?
22      A.  Correct.
23      Q.  Okay.  Was Dr. Nikolova's salary
24  increased as a result of this analysis?
25      A.  I do not believe it was.

110

```
 1    Q.  If she got a raise effective
 2  September 1st, it would have been because of this
 3  analysis?
 4    A.  Yes, because our normal merit goal
 5  was set to zero.
 6    Q.  Right.
 7    A.  So there were -- I think -- I believe
 8  there were three categories of people who got
 9  raises.  There were people who are in a -- a
10  program established by the Provost three years
11  ago that was called Faculty Investment
12  Initiative, and it was the second phase.
13        So they were guaranteed raises over a
14  three-year period.  The Provost made the decision
15  to go ahead with those raises.
16        There were faculty who were putting
17  new endowments, and so because there was a new
18  endowment they were able to get an -- an increase
19  due to that.
20        Dr. Nikolova did not get a new
21  endowment because tenured faculty are the ones
22  who were getting endowments, so I'm pretty sure
23  that didn't happen.
24        And then the last case was a result
25  of this equity adjustment.
```

111

```
 1    Q.  Okay.
 2    A.  So those were the only -- those are
 3  the only categories of people who are able to get
 4  raises.
 5        That does not mean -- so we had
 6  already gone through the process before the merit
 7  goal was set to zero, so we were assuming that
 8  there would also be merit increases in addition,
 9  but then because of COVID and because of the
10  financial difficulty of the University, that --
11  those merit increases were set to zero.
12    Q.  Okay.
13    A.  So as a result, I know -- I know one
14  person, for example, has -- has filed a complaint
15  because he did not get a raise last year because
16  he was not in one of those three categories, and
17  so he's now filing a complaint because his salary
18  did not increase, and that -- that investigation
19  is under -- under way right now.
20    Q.  Okay.  And that was -- that's an
21  Assistant Professor?
22    A.  No.  This is the endowed Chair, so
23  full Professor.
24    Q.  All right.  And last will be review
25  questions.
```

112

```
 1        Did -- earlier you were the
 2  testifying about Julien -- Professor Julien's
 3  Diversity Committee had been doing -- a lot of
 4  her work was focused on students.
 5        Has she done any work related to
 6  faculty?
 7    A.  So actually the Committee has -- has
 8  done a lot.  The Committee existed before Dr.
 9  Julien stepped in, and the Committee itself has a
10  lot of staff on it, and they have done work with
11  students.
12        Dr. Julien really has been focusing a
13  lot on faculty efforts, her -- particularly how
14  we advertise -- advertise for faculty positions
15  and how the interview process is going, how we
16  ensure everyone's using best practices.
17        That was -- that was her primary
18  focus during the first year.
19    Q.  Okay.  So any focus on existing
20  factors?  Anything done on existing factors?
21    A.  You know, she's held a number of I'll
22  call them "coffee hours" for existing faculty,
23  but I don't know of any new policies that were
24  implemented for existing faculty during her first
25  year.
```

113

```
 1    Q.  Okay.  Or since she's been in that
 2  role?
 3    A.  Right.
 4    Q.  Okay.
 5    A.  I think the fact that much of the
 6  time has been -- especially for the past -- the
 7  past calendar year we've been in COVID.  It's
 8  been really hard to -- to have a lot of in-
 9  person -- you know, so actually -- so one thing
10  that did happen that she did is I mentioned the
11  movie "Picture a Scientist," so this -- it talks
12  about gender inequities in -- in STEM fields.
13        So this was something that we did in
14  collaboration with -- Christine lead this.  We
15  had a showing that was available to faculty in
16  Engineering, Natural Sciences, Jackson School of
17  Geosciences, and Pharmacy, and I believe that she
18  also had some follow-up conversations or -- or
19  the equivalent of a book club to have
20  conversations about the movie afterwards, so that
21  was something in specific that was really
22  targeted at -- at current faculty.
23        This -- the -- the woman who led that
24  MIT study that I referenced earlier was featured
25  in the movie.  There was also a woman, I don't
```

114

1  remember where she was from, but she had done
2  field work, and she had been harassed by her
3  supervisor when she was a Ph.D. student, so there
4  was a long dis -- there was -- that was part of
5  it.
6        And there was a third person I'm just
7  not remembering right now.  So I think this
8  really was trying to focus on these inherent
9  biases that can exist, and then the fact that
10  there were discussions afterwards was -- was
11  something that was -- an attempt to -- to help
12  foster discussion within the Cockrell School
13  primarily at -- for faculty and -- and grad
14  students.
15       Q.  Okay.  Following all this, no
16  specific policy was proposed or implemented?
17       A.  No.
18       Q.  Okay.  That would be accurate?
19       A.  Yes, you're correct; right.
20       Q.  And in -- in selecting Professor
21  Julien for this role, that was your decision?
22       A.  It was.
23       Q.  And were there -- was it a posted
24  position?  Were there other applicants?
25       A.  So I -- I did not post it.  Professor

115

1  Julien had participated in an academic leadership
2  program called "ELATES"; it's run through Drexel
3  University.  And she had -- when she
4  participated, which was a couple of years ago,
5  she had specifically said that she was interested
6  in a leadership role within the Cockrell School;
7  she was interested in an academic leadership
8  role.
9        So the -- the two women that I --
10  that I had hired from outside to be Department
11  Chairs also participated in that program, so I
12  reached out specifically to Christine to see if
13  this would be something that was of interest to
14  her, because when she -- when I had talked to
15  her, which was part of the requirement of this
16  leadership program, you know, she asked to be --
17  for me to consider her.
18       Q.  Okay.  When did she first tell you
19  that she was interested in administration?
20       A.  That would have been when she applied
21  for the ELATES program, which I do not remember
22  when it was.  I'd have to look in my files.  It
23  was several years ago.
24       Q.  While you were the Dean?
25       A.  Yes.

116

1        Q.  Okay.  And does Professor Julien
2  still teach?
3        A.  Yes.  She has a halftime
4  appointment -- she has a halftime academic
5  appointment.  And this is part of my negotiation
6  with the Associate Deans, as to what they want
7  their responsibilities to be.
8        Dr. Julien told me how much she
9  enjoys teaching, and so it was very important for
10  her to be able to maintain her role in the
11  classroom.
12       Q.  Okay.  And so her time is divided?
13       A.  Yes, not --
14       Q.  She was not expected to do one or the
15  other?
16       A.  Not only -- she has a 50 appoint -- a
17  50 percent appointment as Associate Dean and a
18  50 -- and 50 percent as a faculty member,
19  correct.
20       Q.  Okay.  And what about her research?
21       A.  That actually was my concern, right,
22  was that I wanted to make sure that her research
23  maintains a high level, but she -- she's -- we
24  came to an agreement that this is something
25  she -- so we -- we -- we -- she negotiated on

117

1  what she wanted to do, and I feel it's important
2  for people to -- to do what they want to do.
3        So she is still doing research.  She
4  is -- we're paying -- we're paying her two months
5  of summer salary, and -- and then she has a half-
6  time appointment which has a different pay rate
7  for her administrative role.
8        Q.  Okay.  And what's the -- what's the
9  two months of summer salary for?
10       A.  For her administrative role.
11       Q.  Okay.  Because it continues all year
12  long?
13       A.  Right.
14       Q.  Okay.  And do you know what kind of
15  funding she has?
16       A.  Not off the top of my head, no.
17       Q.  Okay.
18       A.  Normally, though, a faculty member
19  pays their summer salary from their research
20  grants, so by covering two months of her summer
21  salary, this would give her more flexibility in
22  her research grants.
23       Q.  Okay.  It doesn't claw away the --
24  the funding pool?
25       A.  No.

118

1    Q.   Okay.  And she's an Associate?
2    A.   She's a full Professor and an
3  Associate Dean.
4    Q.   Okay.  And when did she get her full
5  Professorship?
6    A.   She was promoted since I have been
7  Dean, but I do not remember the year.
8    Q.   Okay.  It was before she got this
9  role as Associate Dean?
10    A.   Yes.
11    Q.   Okay.  Let's talk about early
12  promotion.
13       Tell me if you understand that early
14  promotion is -- requires a different standard
15  than the full probationary clock period
16  promotion.
17    A.   Early promotion requires
18  additional -- the -- for early promotion -- a
19  candidate must be above the bar in all areas to
20  be successfully promoted on an early basis, yes.
21    Q.   Okay.  And where is that requirement
22  found in UT policy?
23    A.   So every year the University issues
24  guidelines for promotion and tenure, and there is
25  a statement in there that says early -- or -- I

119

1  think they using the word "accelerated" now --
2  accelerated promotion must be justified.
3       So that's -- that is where it
4  officially occurs in the policies, however, after
5  every promotion cycle the President's Committee
6  meets with Dean -- has an open meeting with Deans
7  and Department Chairs to talk about the last
8  cycle and what their expectations are and to make
9  sure that everyone is on the same page, and this
10  is frequently a conversation during those --
11  those presentations.
12    Q.   Isn't the language not -- it doesn't
13  use the word "justified"; it -- it uses the word
14  "explained."
15    A.   I believe you are correct.
16    Q.   And isn't it true that there's
17  nothing that says that you have to achieve a high
18  bar in all areas differently from the full
19  probationary clock review?
20    A.   So the written guide -- the written
21  guidance certainly says that, however, the oral
22  guidance that is given to the Deans is -- as I
23  mentioned, is "above the bar in all areas."
24       As a matter of fact, there were
25  numerous discussions within Dean's Council where

120

1  the Provost had conversations about accelerated
2  promotion.  It made it clear that the
3  expectations were that the accelerated promotion
4  would be used very rarely, and be used for cases
5  that are above the bar in all areas.
6       Role --
7    Q.   And -- I'm sorry.  Go ahead.
8    A.   No, go ahead.
9    Q.   And so this is a verbal
10  communication?
11    A.   Yes, it is.  It's oral.
12    Q.   There's nothing in writing?
13    A.   Correct.
14    Q.   Or -- or another way to put it, is
15  there's -- there's no formal policy that says
16  "above the bar in all areas for accelerated
17  promotion"?
18    A.   This is -- this is guidance that
19  is -- was given to us multiple times through the
20  Provost's Office.
21    Q.   Okay.  And when did you first
22  understand that "above the bar in all areas" --
23  well, I don't want to get locked into that
24  language.  I don't know if you do, either.
25       But when were you first informed

121

1  either as a Dean or before you were the Dean that
2  accelerated -- and I'll use the term "accelerated"
3  because that's the one you're using --
4  accelerated promotion would require a different
5  standard than what -- what's the other one?  So
6  there's "accelerated" and then there's -- that's
7  the other promotion called?
8    A.   It would be just called "on time."
9    Q.   Okay.
10    A.   And so --
11    Q.   All right.  So when did you first
12  understand that "accelerated" tenure
13  consideration required a higher standard than an
14  "on-time" tenure consideration?
15    A.   So when I was a Department Chair I
16  started attending -- there was an academic
17  leadership event.
18       The Provost's Office offered --
19  organized an academic leadership meeting before
20  the beginning of the academic year.
21       I attended that where they talked --
22  had a session on promotion and tenure.  I
23  attended the President's meetings with the other
24  members of the President's Committee where
25  they've talked about it.

122

1    And so I think that is how I gained
2  my understanding of it.
3    Q.   And that understanding has remained
4  constant from that whole -- so over ten years
5  you've had that understanding?
6    A.   No.  The -- the University -- I
7  honestly believe that the expectations have
8  changed as the members of -- as the members of
9  the President's Committee have changed.
10    And so there are -- every year,
11  that's why it's -- that's why they brief us every
12  year on things that they've noticed, things they
13  want us to address specifically.  But it is done
14  orally.  That's one of the things that makes it
15  challenging.
16    But the -- the members of the
17  Committee have -- have changed significantly.  I
18  think there's only one member of the Committee
19  who has served the entire time that I've been
20  Dean.
21    So each President has a different --
22  has a different take on what is required for
23  early promotion, and so that -- or, I'm sorry,
24  accelerated promotion, and then the Provost had
25  very -- when Dr. McInnis came in as Provost, she

124

1  "on-time" promotion.
2  BY MR. NOTZON:
3    Q.   Okay.  At least since the time that
4  you heard increased standard?
5    A.   Right.
6    Q.   Okay.  So when I said "it remained
7  the same," I meant that -- the higher standard.
8  That's why I went away from that "above the bar
9  in all areas" just in general.
10    A.   Right.
11    Q.   Okay.  So what you were telling me is
12  what has changed is the intensity of how high
13  that bar needs to be cleared?
14    A.   Right.  And -- and another thing that
15  has changed is --
16    Q.   Wait, wait.  Would you answer that
17  question first?
18    A.   Yes.  I'm sorry.  The -- yes, how far
19  above the bar.
20    Q.   Okay.  So that -- that bar has moved,
21  and where the bar is had moved over the period of
22  years, what?  15, 20 years now?
23    A.   No, 12, 13.
24    Q.   Okay.  All right.  Now you were going
25  to say something?

123

1  had some very strong feelings, also.
2    So as I mentioned, this was discussed
3  within the Dean's Council several times.
4    Q.   What was Provost McInnis' strong
5  opinion on it?  Strong which way?
6    A.   She also believed that an
7  "accelerated" promotion needed to be "above the
8  bar in all areas."
9    Q.   Okay.  So you -- you answered my
10  question earlier about the first time you heard
11  about "above the bar in all areas," a higher
12  standard for "accelerated" versus "on time" was
13  when you were a Department Chair.
14    And could you identify where -- and I
15  asked you if that remained the same, where a -- a
16  higher standard for "accelerated" over "on time"
17  continued, and you demurred.
18    So I want to find out, is there a
19  time at which between the time you first heard a
20  higher standard for "accelerated" was changed to
21  the same standard as "on time."
22    MR. DOWER:  Objection;
23  form.  Go ahead.
24    A.   I've never heard that the same
25  standard would be used for "accelerated" and

125

1    A.   I was going to say one thing that has
2  changed significantly is we -- we talked about --
3  or we didn't talk about, but the University has a
4  policy that a faculty member can request an
5  extension to the probationary period because for
6  the birth or adoption of a child or to take care
7  of a sick family member.
8    In the past they did not ask the
9  candidate to rescind if they wanted to go up at
10  the normal time, and now they're asking
11  specifically that you rescind so that it -- the
12  amount of time that you're -- that you -- if
13  you're at the six years of in rank, which would
14  be the normal time, right, if you had been five
15  years of probationary service and one year of
16  extension, they ask you to rescind the extension
17  so that you are at -- you will now have six years
18  of both probationary and in rank.
19    So that's a technicality which I'll
20  be happy to discuss in more detail, but that is
21  something that was not of concern earlier in --
22  while I was Dean and now is a big factor as I'm
23  Dean.
24    Q.   Okay.  Let -- let's go ahead and talk
25  about that.  That -- that's fine.  The -- and

Sharon Wood - 3/18/2021

126

1  let's clarify, because it -- it can be quite
2  confusing, I think at least for me.
3         So when we're talking about going up
4  on time, are you going up during the sixth year
5  so that you would have completed five years
6  before?
7     A.  So we're -- we're talk -- are we
8  talking specifically about the promotion from
9  Assistant to Associate Professor?
10    Q.  Yes, yes, yes.
11    A.  Okay.  Great.  Then yes.  On-time
12 promotion from Assistant to Associate Professor
13 occurs during the sixth year, so you have
14 completed five years of probationary service, and
15 you will have completed six years at the time
16 that your promotion is effective on September
17 1st the following year.
18    Q.  All right.  So when the -- when the
19 Dean's evaluation comes out and has on the blanks
20 how many years the applicant or the candidate has
21 been there, does it count -- does it say "sixth"
22 there if it's on time?
23    A.  Yes.  Well, yes.
24    Q.  Even though the sixth year hasn't
25 officially been complete?

127

1     A.  All right.  So that -- that sixth
2  year -- what they're referring to is what would
3  be the years they rank at the time the promotion
4  becomes effective, which would be on September 1.
5     Q.  Okay.
6     A.  So at that time the -- the candidate
7  would have completed six years in rank.
8     Q.  Okay.  You understand how it can be
9  confusing, because it's a par -- it's a paradigm
10 that somebody has to set?
11    A.  I understand completely how confusing
12 it is, yes.
13    Q.  All right.  So now we get into the --
14 the modified instructional duties.  And there
15 was -- you said that there was a -- a -- a point
16 in which the candidate who had -- had availed
17 themselves of the modified instructional duty was
18 told or offered the option of rescinding that
19 benefit?
20    A.  So I need to clarify here.
21    Q.  Sure.
22    A.  There's a difference between
23 "modified instructional duties" and "extension of
24 the probationary status."
25    Q.  Ah.  Please explain.

128

1     A.  Okay.  So modified instructional
2  duties allow a faculty member to do something
3  other than teach in a classroom for a semester.
4  They -- this is really done at the Departmental
5  level, and they agree they will focus on
6  developing notes for a new class or something.
7         But it gives them one semester when
8  they're not teaching.  It does not impact their
9  probation -- their clock -- their tenure clock.
10        Requesting an extension to the
11 probationary period means that a specific year
12 does not count, so if -- if I -- if I had
13 requested an extension to the probationary
14 period, my years of probationary status would be
15 one year less than my total number of years in
16 rank.
17    Q.  Got it.  And so you would also
18 understand my confusion about the tenure clock
19 also being attached to this issue.
20        And tell me if this is correct:  That
21 a majority of the people that take -- or avail
22 themselves of the modified instructional duty
23 benefit also do a tenured clock extension
24 associated with that?
25    A.  The majority do, yes.

129

1     Q.  Okay.  And what are the other reasons
2  why somebody asked for and can qualify for an
3  extension of their tenure clock besides modified
4  instructional duty?
5     A.  So the -- no -- no, not -- it's --
6  remember, they're not the same.
7     Q.  No, I know.  But -- but if you took
8  modified instructional duty, would you qualify
9  for the tenure extension?
10    A.  Completely separate process.
11 "Modified instructional duties" are negotiation
12 with the Department Chair about what you're going
13 to do -- how you -- you will enhance the
14 educational mission of the University for a
15 semester when you're not teaching.
16        "Extension of the probationary
17 period" is a form you fill out that goes to the
18 Provost's Office, and it will automatically be
19 accepted up to two times that allows you to not
20 count an academic year as part of your
21 probationary period.
22    Q.  Without question as for the reason?
23    A.  Well, there -- there are reasons
24 stated, right, is that it's the birth or adoption
25 of a child, a sick family member, a close parent,

130

1 something like that.
2    Q.  Wait.
3    A.  But I think you have to specify the
4 reason.  To be honest, I don't look at the forms,
5 but those are -- I could -- I could find that for
6 you.  That form is readily available.
7    Q.  Let me -- let me clarify.
8        Were you just answering qualifying
9 for extension of the probationary clock?
10    A.  Yes.
11    Q.  Because you -- you listed the same
12 things that would qualify you for the modified
13 instructional duty.
14    A.  That's correct.
15    Q.  Okay.
16    A.  That's correct.  But they're two
17 separate -- two separate things.
18    Q.  If you qualified for the one,
19 modified instructional duty, you would be
20 qualified for the tenure clock extension, but
21 they're two separate processes and decision-
22 making?
23    A.  Right.
24    Q.  Okay.  Gotcha.  And on the -- on the
25 extension of the tenure clock, I just wanted to

131

1 clarify that different -- is it different from
2 the modified instructional duty that there -- you
3 don't actually have to qualify for the request
4 for the extension; you can get the extension for
5 any reason or no reason?
6    A.  To get the extension?
7    Q.  Yes.
8    A.  No.  It -- it is for the -- in most
9 cases that I've seen it's for the birth or
10 adoption of a child, although the policy is
11 general enough that you could also do it for it
12 to take care of a family -- close family member.
13    Q.  Okay.  So you do have to provide a
14 qualifying reason to get your tenure clock
15 extended?
16    A.  Right.
17    Q.  Which would also be the exact same
18 qualifications for the modified instructional
19 duty?
20    A.  Yes.
21    Q.  Okay.  Are there --
22    A.  But the -- the result is different,
23 right?
24    Q.  I gotcha.  I gotcha.
25    A.  Okay.

132

1    Q.  Are there any -- I mean, we're just
2 talking about qualifying criteria right now.
3    A.  Right.
4    Q.  Is there any other qualifying
5 criteria for extending the probationary clock?
6    A.  Yes.  If you are on a leave without
7 pay during an academic year, then that year does
8 not count towards your probationary period.
9    Q.  Okay.
10    A.  And then in addition -- this happened
11 just last year because of COVID and the
12 disruption associated with COVID -- UT's system
13 allows two-week extensions of the probationary
14 period for modi -- because of birth or adoption
15 of a child.
16        Like they will allow an additional
17 year due to COVID -- the impact of COVID because
18 our laboratories were shut down, a whole variety
19 of reasons, so now there is a COVID extension,
20 also.
21    Q.  And would it be accurate, I would
22 assume, that you don't actually have to prove
23 that COVID impacted you; you -- you can just say
24 it?
25    A.  I believe the -- the way the system

133

1 rules work, you have to apply for a -- you have
2 to fill out a form to apply.
3        I personally have never seen the
4 form, so I don't know what you have to say, but
5 you --
6    Q.  Right.  You're not a decision-maker
7 on that?
8    A.  I'm not the decision-maker.
9    Q.  You don't --
10    A.  Right.  So the person who -- who
11 wants an extension has to complete a form.
12    Q.  Right.
13    A.  That's all I know.
14    Q.  And the Provost's Office makes the
15 decision?
16    A.  Correct.
17    Q.  All right.  And the -- now back to
18 the issue of rescinding the probationary clock
19 extension, that's where the rescission comes in,
20 correct?
21    A.  That is correct; right.
22    Q.  Okay.  When did that -- you said that
23 changed.
24        When did that change?
25    A.  It definitely occurred since I've

134

1 been Dean. I was reviewing for this -- this
2 meeting, and I think it happened in the '18/'19
3 academic year because the notes I have for '17/
4 '18 indicate it's some -- a statement about,
5 well, if the person is not at the -- is not up-
6 or-out, so they will not have completed six years
7 of probationary status, but they've extended --
8 they've gotten an extension and it would
9 otherwise be the normal time, then it's not --
10 you don't have to justify why it's early or
11 explain why it's early.
12     Q.   Okay.
13     A.   And so this is where -- you know, how
14 do we make this clearer? How do -- and so one
15 way to make it clearer is to say, well, if -- if
16 you don't want -- if you don't want that
17 extension, you now rescind it to formally say
18 this year counts as part of my probationary
19 period, and so now the years are -- are
20 numbered -- you know, now the years are counted
21 as the candidate wants them to be counted, and
22 there's no additional justification or
23 explanation for being early or accelerated.
24     Q.   Okay. Now the -- what -- I guess I'm
25 trying to understand, what changed? Was it

135

1 before once you took a year extension, you got
2 that year extension, you're stuck with it? Or
3 was the change that there was an affirmative
4 communication to the faculty member at a certain
5 point that they are approached with the opp --
6 opportunity to rescind?
7        What -- what changed?
8     A.   What changed was an opinion on the
9 President's Committee that they did -- they
10 wanted to limit the ability of people to be
11 considered multiple times for promotion.
12        So if a person requested an extension
13 to the probationary period and was going up at
14 their normal times, they had not rescinded it,
15 then technically they could ask to be
16 reconsidered for promote -- if it was not
17 successful, they could ask to be considered the
18 next year.
19     Q.   Oh, so they're -- they're trying to
20 avoid gaming the system?
21     A.   That's right. So by rescinding it,
22 now you're up-or-out, and you get one shot to be
23 considered for promotion.
24     Q.   So they're putting a little pressure
25 on the candidate to, you know, "Hey, maybe --

136

1 maybe you're gaming the system or not, we're not
2 going to say, but if you don't rescind the --
3 the -- the probationary extension, there's going
4 to be this itching question about whether or not
5 you're gaming the system"?
6     A.   Or the -- right. So if you --
7 remember we talked about being above the bar,
8 right?
9     Q.   Yeah.
10     A.   So if the expectation is higher if
11 you're going up earlier, which you would be if
12 you had -- if you counted that extension as
13 probationary, now the bar is -- you're meeting
14 the bar, so I think it's more -- more -- it's --
15 it's easier for the candidate or -- or it's more
16 clear for the candidate to understand there's one
17 bar, right, you -- you meet the bar, and then
18 you're also up-or-out, so you get one shot at
19 going -- at being considered.
20     Q.   Yeah. You're offered a carrot and a
21 stick at the same time?
22     A.   That is absolutely correct; right.
23     Q.   You're given the carrot of the lower
24 bar but the stick of "This is your last shot"?
25     A.   Right.

137

1     Q.   I guess the added carrot is that you
2 are confirming that you're not gaming the system?
3     A.   That's right. So as you noticed,
4 this gets to be a very technical discussion,
5 right, and lots of implications, and so this is
6 why there were so many discussions with the
7 Dean's Council about it.
8     Q.   Well, and -- and there are so many
9 unknowns, right? There is no identification of
10 how high the bar is, there is no known, "Are you
11 going to meet the standard or not." It's totally
12 unwritten, totally unidentified?
13     A.   It is unwritten. It is discussed
14 publicly, as I mentioned, and then as part of
15 the -- the normal process, right, is that the
16 Dean would meet with the -- all the Assistant
17 Professors and have conversations of "These are
18 the trends I'm observing. This is a change in
19 pol -- this is a change. Be aware of this."
20        But it's not -- there's -- there's no
21 check sheet that someone has to check off, "Yes,
22 I understand these changes," you're correct.
23     Q.   When you said "trends we're
24 observing," trends we're observing in the -- what
25 is good enough to make tenure?

138

1    A.  Well, the fact that one year you
2   didn't have to rescind and the next year they --
3   you're being encouraged to rescind if you want to
4   be considered with the same number of years in
5   rank, that's a -- that's a change, and so that --
6    Q.  But I'm talking about the trend.  I'm
7   talk -- you mentioned "trends."
8    A.  Right.  So I -- I -- I use that as
9   one of the things that changed, so the -- the
10  President's Committee, as -- as I mentioned,
11  would have a debrief every year after the cycle
12  has completed, and they would express that --
13  they would identify things that they thought they
14  didn't like, they wanted to change.
15      The wording that may appear in the
16  guidelines might be, you know, a very simple
17  statement, but then they would elaborate on it
18  during their meetings with the Deans and
19  Department Chairs, they might have additional
20  elaboration with the Deans, and the Deans have to
21  make sure that this information is conveyed to
22  the -- to the Department Chairs, and then the
23  Department Chairs convey that to the faculty
24  members.
25      Q.  I appreciate that, but I'm -- I'm

139

1   still -- I'm trying to get specifically at the
2   point of the candidate when making the decision
3   about rescinding or not, they don't know how high
4   the bar is really in either situation.
5       They don't really know, because
6   there's no specific defined criteria, a
7   measurable criteria that needs to be met on each
8   of the areas to make tenure on time or to make
9   tenure at the higher bar accelerated
10  consideration, correct?
11      A.  So I -- I'm going to talk -- tell you
12  the advantages of not having specific metrics.
13      Q.  Well, wait, wait.  Please answer my
14  question and then you can explain the advantages.
15      A.  Okay.  The -- the --
16      Q.  Do you agree with what I said?
17      A.  The Cockrell School does not have a
18  written policy that says, "To be promoted in the
19  normal time you need to achieve "X" and lists a
20  whole series of things," that is correct.
21      Q.  Okay.  And also, there's no written
22  higher bar metric that needs to be met, correct?
23      A.  Correct.
24      Q.  Okay.  And is it also the case,
25  and -- and I -- I'll -- I'll make a reference to

140

1   law school, the -- the -- the -- the way that law
2   students understand that grades are given is that
3   there's only a certain number of A's, and so it's
4   the whole running away from the bear thing.
5       I don't -- I don't have to run faster
6   than the bear; I just have to run faster than you
7   to get the egg, right?
8       So is -- is that how tenure is
9   granted, that when you go up for tenure it's not
10  about how you measure up in general for all time
11  in your performance as a Professor, but it's in
12  relation to how many people are going up and what
13  they're like?
14      A.  No, that is not correct.
15      Q.  Okay.  So if ten people go up and
16  they all qualify, they all go in?  There's no pot
17  that -- that's limited?
18      A.  There is no pot.
19      Q.  Okay.  It's -- it's not a limited
20  piece of pie?
21      A.  Correct, it is not limited.
22      Q.  Okay.
23      A.  I think since I've been Dean on the
24  order of 90 percent of the people have been
25  promoted.

141

1       Q.  Okay.  And there have been times
2   where every applicant that went up was promoted?
3       A.  I would have to check my records.  I
4   honestly don't remember.  I mean, there -- there
5   have been eight years, and I -- I cannot remember
6   each year, but...
7       I -- I believe that's the case, but I
8   would have to check to confirm that.
9       Q.  Okay.  In either way -- in either
10  instance, what you're saying is it is possible.
11  Whether it happens or not is another question
12  entirely depending upon the candidates and their
13  records?
14      A.  That is correct.  It is possible that
15  every person would be promoted, correct.
16      Q.  Okay.  All right.  And I understand
17  that the questions I'm asking you about this
18  process may be the exact same testimony that you
19  would give me as UT from the Dean and the Tenure
20  and Promotion Committee perspective, but you also
21  have personal knowledge of the specific questions
22  I'm asking.
23      So I'm asking you these, and I -- I'm
24  not --
25          MR. NOTZON:  Well, let's

142

1  go off the record real quick.
2       THE COURT REPORTER:  Yes,
3  we're going off the record at 12:21
4  p.m.
5  (Lunch recess from 12:21 p.m. to 1:23 p.m.)
6       THE COURT REPORTER:  Okay.
7  We're going on the record at 1:23
8  p.m.
9  BY MR. NOTZON:
10      Q.  Okay.  Dean Wood, back from lunch.
11      We were talking about the changes
12 that had been occurring in rescinding the
13 probationary extension, and I believe you said
14 that that change had occurred, and you said
15 something like the -- the academic year '18/'19.
16      Is that -- what do you recall about
17 when the re -- the changes to the rescission of
18 probation were occurring and -- and how that
19 played out?
20      A.  So I remember having multiple
21 discussions while Provost Mc -- while Maurie
22 McInnis was our Provost.
23      I looked at the -- the summary sheet
24 that I prepared for the Promotion and Tenure
25 Committee in '17/'18 and then again in '18/'19,

143

1  and the wording was different, and so I believe
2  it must have occurred in between -- in -- in that
3  '17/'18 academic year, but I don't actually --
4  that -- I -- I that -- that is -- that is the basis
5  of my assumption there.
6       Q.  Do you know if Dr. Nikolova was
7  informed or told that she was given the option of
8  rescinding her probationary extension?
9       A.  I honestly do not know if she was
10 told, however, in one of the -- in one of the
11 rebuttals that she wrote, she had a comment in
12 there, and I'm paraphrasing here, about "I was
13 told that extending my probationary period would
14 not count against me because I could always
15 rescind it."
16      So that implied to me that she at;
17 least knew that she could have rescinded it.
18      Q.  Well, knowing you can rescind it and
19 being offered the opportunity to do it as part of
20 a process are two different things, correct?
21      A.  I -- I agree with you, and I do not
22 know.  I would like to hope that she was offered
23 it, but I do not know.
24      Q.  Okay.  Who would have offered it to
25 her?

144

1       A.  That should have been at the
2  Department level.
3       Q.  Okay.  And was there -- well, is
4  there currently a deadline within which you need
5  to rescind your probationary extension?
6       A.  I believe the standard deadline in
7  the Provost's Office is February, however, they
8  have been letting us do it any time before early
9  May.
10      So there -- the reason is, you want
11 to have it done before requests for letters are
12 sent out to external reviewers.
13      Q.  Okay.  So when you say "February,"
14 it's got -- it's February of the fifth year?
15      A.  Correct.
16      Q.  And if it's early, February of the
17 year before you're considered?
18      A.  That's correct.
19      Q.  Okay.  Is -- is that deadline still
20 in place?
21      A.  So I -- it's my understanding the
22 Provost's Office is flexible with the deadline,
23 and as long as we do it some -- in May, that that
24 is sufficient notification to them --
25      Q.  Okay.

145

1       A.  -- to rescind it.
2       Q.  And is that in writing?
3       A.  I don't know.  I've seen
4  correspondence from Jerry to candidates, but I
5  have not checked that myself.  I would have to
6  check that.
7       Carmen Shockley would be a very good
8  person to ask that question to in the Provost's
9  Office.
10      Q.  And what's her position?
11      A.  I'm sorry?
12      Q.  What's her position?
13      A.  She is in the Provost's Office, and
14 she's an Assistant Vice President.  So she's in
15 the -- she is a staff member who oversees the
16 faculty evaluation process.
17      Q.  Do you recall -- well, let me ask a
18 question on the -- specifically related to Dr.
19 Nikolova.
20      If she would have rescinded her
21 probationary extension, she would have still been
22 at 5.5, correct?
23      MR. DOWER:  Objection;
24 form.
25      A.  If she had rescinded, she would have

146

1  still had five and a half years in rank, however,
2  UT's system says that half years don't count
3  toward fulfilling the probationary period, so it
4  would have been five years of probationary
5  service.
6  BY MR. NOTZON:
7      Q.  So she still would have been, quote/
8  unquote, "early" based upon UT time?
9      A.  Yes.
10     Q.  And would that mean that she would
11  still be subject to the higher bar on all areas?
12     A.  Yes.  However, verbally the President
13  had told -- had informed us that the -- the
14  earlier the person is, the more difference they
15  expect between the normal and where the can --
16  each candidate is.
17     Q.  Okay.  And when you say "us," you're
18  talking about Deans?
19     A.  Deans.  And I -- I do not remember
20  exactly -- I don't remember explicitly if that
21  was discussed with the Department Chairs also,
22  however, this is something that I would have
23  discussed with the Department Chairs.
24     Q.  Okay.  And do you know if Dr.
25  Nikolova was told that it would be a doubly high

147

1  bar if she didn't rescind?
2          MR. DOWER:  Objection;
3      form.
4      A.  I do not know what Dr. Nikolova was
5  told because that would have been the Department
6  Chair talking with her.
7  BY MR. NOTZON:
8      Q.  Okay.  You have no information from
9  anyone that they had told her?
10     A.  I have no information.
11     Q.  When did you first learn that
12  Dr. Nikolova was wanting to go up in the 2018/
13  2019 year?
14     A.  So in Februrary of -- February/March
15  timeframe of 2018, each of the Department Chairs
16  was asked to provide summary information about
17  candidates who were being considered for
18  promotion in their Departments.
19         At this point in time Jerry and I
20  both did a very quick informal review of the
21  files, then met with the Department Chair and
22  shared any concerns, but the decision to move
23  forward with the case is based on a vote of the
24  Budget Council.
25     Q.  The -- in the Department?

148

1      A.  In the Department, correct.
2      Q.  Okay.  And did you -- other than
3  reviewing the files, one of which would have been
4  Dr. Nikolova's, did you have any conversations
5  with anybody from the Department?
6      A.  Well, we met with -- Jerry and I met
7  with the Department Chair to discuss the cases.
8      Q.  Okay.  And that would be Professor
9  Tewfik?
10     A.  That's correct.
11     Q.  And am I pronouncing his name
12  correctly?
13     A.  I don't believe that I pronounce his
14  name correctly.
15     Q.  Okay.
16     A.  I've never quite gotten the Egyptian
17  pronunciation down.
18     Q.  Okay.  I see it's spelled and I want
19  to say "Tewfik," but that would be doubly
20  incorrect?
21     A.  Well, that's how -- I call it -- I
22  called him Ahmed Tewfik, but I don't believe that
23  is actually -- I think that's the English version
24  of it, his last name.
25         I don't believe that's how it would

149

1  be pronounced in Egypt.
2      Q.  Okay.  And so when you met with
3  Professor Tewfik, it was just you or you and Dr.
4  Speitel -- Speitel?
5      A.  It would have been the three of us,
6  Ahmed, Jerry, and me.
7      Q.  And do you recall your communication
8  to Chair Tewfik about Dr. Nikolova's proposed
9  candidacy?
10     A.  I do not have -- I -- I have no
11  recollection of exactly what I said and I don't
12  have any notes based on that conversation,
13  however, I'm sure that we had a conversation
14  about the higher bar and higher expectations for
15  any early promotion case.
16     Q.  Did you discuss her total years
17  counting A&M?
18     A.  That's part of the -- the information
19  that is submitted for review includes that
20  information.  She would have submitted a CV at
21  the time, so it would have those years.
22     Q.  Okay.  Was there any discussion that
23  you recall about the ameliorating effect of
24  actually having enough time as an Assistant
25  Professor if she went up in the '18/'19 year?

150

1    A.  I -- I think those are all things
2  that were considered.  That's all part of the
3  process, right.
4    Q.  Do you recall if you provided any
5  constructive criticism about what she could do
6  based upon your initial review to make her
7  application more likely to succeed?
8    A.  So at that time there was very little
9  that a candidate can do because this is February
10  and they -- they start preparing documents in the
11  May or June timeframe.
12      I think the discussion would have
13  been with Ahmed that any -- if this case is to
14  move forward, we have to be able to -- to explain
15  why the early -- the case is moving forward now.
16    Q.  Okay.  So you -- you don't think you
17  would have said, "Publish another couple of
18  papers," "Get -- get better teaching scores this
19  semester," you know, anything like that?
20    A.  I don't know if she was teaching that
21  semester.  I don't remember the details.
22    Q.  No, I'm saying in general, just those
23  kinds of things.
24    A.  I mean, I think that would be part of
25  the review process.  I -- I just had a review

151

1  yesterday with the Department Chair.
2      I rarely comment on -- I don't think
3  I've ever commented on -- well, I'd say I rarely
4  comment on the actual number of papers.
5      We certainly have been looking at --
6  at teaching, looking at research funding, but at
7  that point there is very little a faculty member
8  can do.
9      What -- the discussion with the
10  Department is how high a risk is it to move
11  forward.
12    Q.  But you don't --
13    A.  But as I say, my comments are -- my
14  comments are advisory because it is the decision
15  of the Budget Council when they want to put a
16  candidate forward.
17    Q.  Right.  Do you frequently or not
18  provide constructive criticism about the
19  application packet and its contents?
20      MR. DOWER:  Objection;
21      form.
22    A.  As I mentioned, I -- what I try to do
23  is identify what I see as risks of the case so
24  that the Department can put together the best --
25  the strongest case possible for the candidate.

152

1  BY MR. NOTZON:
2    Q.  So if there are risks -- if -- so if
3  there are -- if there are risks that you
4  identify, they know that they might want to
5  strengthen those areas if they can?
6    A.  Yes, or -- so I'm going to quote --
7  I'm going to paraphrase what I infer from the
8  President's Committee, and that is every case has
9  some flat spots, but if you can identify the flat
10  spots and put them in context, that will help the
11  Committee make their final -- make their final
12  recommendations to the President, and if you
13  sweep something under the rug and don't address
14  it, that will be -- that will not be in the best
15  interests of the candidate.
16      So in some ways this is
17  counterintuitive because a lot of times people
18  only want to talk about the positives, so it's
19  important to address both the strengths and
20  weaknesses of the case.
21      And I think that's part of this
22  process is to identify, okay, these might be
23  potential weaknesses, now we don't have the full
24  dossier at this time, we have very slimline
25  information, these are potential weaknesses.

153

1  Make sure you address them in the case.
2      And it's more the Budget Council and
3  the Department Chair rather than the candidate
4  because the candidate has complied most -- you
5  know, there's -- there isn't a lot of time for
6  the candidate to make significant changes at this
7  point.
8    Q.  Do you -- in talking to the Chair, do
9  you indicate positive, negative, neutral chances
10  for the candidate that you're discussing?
11    A.  Well, I -- I would identify -- I
12  would say, "I think this is a high risk and I
13  would recommend it not moving forward," or I
14  would say, "I think this is a slam dunk."  Those
15  are the types of things that I would say.
16    Q.  Okay.  So you wouldn't -- you don't
17  have a policy of -- of uniformly providing a
18  neutral, flat, no response kind of thing for that
19  question?
20    A.  I usually will give, as I indicated,
21  a level of risk do I think this will raise any
22  flags at the President's Committee based on my
23  previous experience with the President's
24  Committee, just based on a -- on a review of a
25  portion of the dossier.

154

1    Q.   And your -- your experience with the
2  President's Committee is in large part based upon
3  the prior candidates that have gone up; is that
4  correct?
5    A.   That is correct; right.
6    Q.   Okay.  So at -- at that point in --
7  in the 2018/2019 -- going into the 2018/2019
8  year, you have been the Dean for three years?
9  Four years?  Yeah, four years at that point?
10   A.   So I -- I talked with the President's
11 Committee as Interim, so that'd be '13, '14, '15,
12 '16, '17.
13   Q.   So five?
14   A.   I would have had five interactions
15 with the Committee at that time.
16   Q.   Okay.  But you -- you've got a pretty
17 good feel at that point?
18   A.   Right.
19   Q.   And at -- at that point were your --
20 your experiences, the -- your observations of the
21 Presidents and the President's Committee's review
22 of candidates from the School of Engineering,
23 were you feeling com -- comfortable with your,
24 quote/unquote, predictions or reading the tea
25 leaves, as it were?

155

1    A.   Well, it's very difficult because I
2  don't have the entire case, so I'm --
3    Q.   I'm not -- let -- let me -- let me
4  clarify.  I'm not talk -- I'm -- I'm not talking
5  at this point by -- about what you said or didn't
6  say to the -- to Chair Tewfik in March or April
7  of -- of 2018 as -- as much as when you talk
8  about expectations and your viewing a file, do
9  you feel like at five years you've felt like you
10 have a -- a good and consistent expectation of
11 how the applications or the candidates are
12 considered above you?
13   A.   I can share with the -- the
14 Department Chairs my observations from the
15 Committee things that the Committee have been
16 asking me in oral conversation about some
17 candidates, but it -- it is still a very
18 preliminary feeling just because I haven't done a
19 thorough review of the case.
20        So it really is a highlighting to the
21 Department Chair what potential issues could be
22 so that they can think about them and then have
23 the Budget Council think about them before
24 making -- taking a vote.
25   Q.   Okay.  And -- and again, you don't

156

1  recall any particular statement you made about
2  Dr. Nikolova's proposed candidacy in the Spring
3  of 2018; is that correct?
4    A.   So I know that we have been having
5  problems with the teaching evaluation scores from
6  classes, undergraduate classes, especially, in
7  ECE, so I'm sure I said something about, "We're
8  going to have address the teaching evaluations,"
9  but that would probably be the extent of it.
10   Q.   And when you say "we were having
11 problems," you're talking about Dr. Nikolova's
12 scores particularly?
13   A.   No.  There had been several cases
14 in -- in the two years before Dr. Nikolova's case
15 was considered where the President's Committee
16 had had a lot of questions about the -- the
17 course evaluation scores themselves and were
18 concerned that -- about the -- the teaching
19 within the Department.
20        In -- in one case, Dr. Tewfik had to
21 accompany me to discuss the situation with the
22 President's Committee.
23   Q.   Did those concerns at the President's
24 Committee about ECE undergraduate teaching scores
25 result in any candidate being denied promotion

157

1  prior to the '18/'19 year --
2        MR. DOWER:  Objection;
3  form.
4  BY MR. NOTZON:
5    Q.   -- while you were the Dean?
6    A.   So I'm -- I am struggling because we
7  did have a denial of promotion in ECE the year
8  before Dr. Nikolova's case was considered.
9        I believe it was for a different
10 reason.  I don't remember that individual's
11 teaching scores.
12        I know that we had a facu -- a
13 Professor -- a candidate from Associate to full
14 who there were a lot of questions about that
15 individual's teaching scores when the promotion
16 case was considered, but it was approved.
17   Q.   Would it be accurate that you didn't
18 tell Chair Tewfik about Nikolova, that she
19 shouldn't go up in the Spring of 2018?
20        MR. DOWER:  Objection;
21 form.
22   A.   I have no recollection, however, I --
23 I have no recollection of exactly what I told
24 him.
25        I -- but I do -- at that time, as I

158

1  mentioned, I was only giving advice, so it is
2  not -- it was not my decision whether a candidate
3  should move forward, so I would not have said,
4  "Do not put this case up." I would have simply
5  talked about the risks of putting the case up.
6       Since then, the President's Committee
7  has given -- has told the Deans, "You do have the
8  authority to stop a case if it's not up-or-out."
9       But at that time, we -- I did not
10  have that authority or I didn't believe I had
11  that authority, so I only would have given
12  highlighted risks of the case moving before
13  because it was not my decision. I was only
14  serving in an advisory role at that point.
15     Q. So that's a new authority that you
16  didn't know you had? At least you didn't know
17  you had it before if you had it.
18       You -- you obtained this authority
19  from the President's Office since the 2018/2019
20  year?
21     A. Right. That would have been conveyed
22  to us during a Dean's Council meeting. I
23  mentioned we had numerous discussions and --
24     Q. Would that be documented?
25     A. No. There are no -- there are no

159

1  Minutes from those meetings.
2     Q. Okay. And that would have been after
3  Dr. Nikolova's candidacy was denied?
4     A. I'm not sure -- I'm not sure when
5  exactly it happened. I think it was after her
6  case was considered.
7       I don't -- you know, the final
8  decision -- it happened between when she
9  submitted it and when the final decision was
10  made. I don't know exactly where it was in that
11  timeframe.
12     Q. Okay. Was there ever a point where
13  you didn't believe she should go -- Dr. Nikolova
14  should go up for tenure prior to you considering
15  her candidate -- candidacy package?
16     A. No. I -- I made my decision when I
17  reviewed the complete -- during my review of the
18  complete package.
19     Q. Okay. Did you have any conversations
20  with anyone in ECE about Dr. Nikolova's
21  application after the package came to you for --
22  you and the Tenure and Promotion Committee for
23  consideration?
24       MR. DOWER: Objection;
25  form.

160

1     A. Well, there was a member of the --
2  from EC -- a faculty member from ECE on the
3  Promotion and tenure Committee, so if we can
4  exclude any conversation with the Promotion and
5  Tenure Committee...
6  BY MR. NOTZON:
7     Q. Yes.
8     A. I believe that I sent some questions
9  back just to clarify the case, which some would
10  have been addressed to the Department Chair and
11  some would have been addressed to Dr. Nikolova,
12  but I did not have any oral conversations once I
13  received the full package, no, and that is
14  because our policy is that this review is based
15  on the written documentation in the package.
16     Q. Okay. So there's a process that's --
17  that's provided that if there are questions, that
18  they can be resolved in writing?
19     A. That is correct.
20     Q. And that's because if it's in
21  writing, then everybody knows what happened and
22  nobody can be accused of putting -- again,
23  putting his finger on the scale one way or the
24  other?
25     A. Yes. So it -- it's transparent.

161

1  All -- all of that goes through Jerry's office,
2  so I'm not the person asking.
3       So when the candidate or the
4  Department Chair gets the questions, they don't
5  know if it's coming from the Promotion and Tenure
6  Committee or from me, and then they respond in
7  writing, and then the -- the case is updated --
8     Q. Okay.
9     A. -- with that information.
10     Q. So for Dr. Nikolova, you recall
11  providing questions to be -- follow-up questions
12  to her -- her application?
13     A. I recall at least one, yes.
14     Q. Okay. Do you recall if the Tenure
15  and Promotion Committee submitted any additional
16  questions to your questions?
17     A. I don't know because I would not be
18  informed of their questions.
19     Q. Okay. They can do it independent of
20  you?
21     A. That's correct.
22     Q. Is the Tenure and Promotion Committee
23  informed of your additional question?
24     A. So what would happen is the staff
25  member in Jerry's office, her name is Sonya

162

1  Shaffer, would alert them that we had gotten some
2  new information and a portion of the document had
3  been updated.
4      Q.  Okay.  So after the fact, after
5  getting that response back from --
6      A.  That's right.  After the response,
7  but in a very short timeframe because we don't
8  have a whole lot of time to review these
9  documents.
10     Q.  Right.  It's a long process, right.
11         Okay.  So by the same token, you're
12  not informed if there's anything new in the
13  package from the Tenure and Promotion Committee
14  asking questions?
15     A.  I don't necessarily see their
16  questions.  If something is updated, I'll be told
17  it's updated.
18     Q.  Right.  So if it's updated, you would
19  understand where it came from?
20     A.  Well, it would either come from me or
21  from them.  They're the only people -- that's the
22  only two groups that can ask questions at this
23  point, so if I didn't ask it, it comes from them.
24     Q.  Right.  Okay.  All right.  I -- I was
25  just trying to get there through your testimony,

163

1  but you didn't seem to want to --
2      A.  I'm sorry.
3      Q.  -- volunteer that you actually would
4  eventually learn of their questions, so...  All
5  right.  I could have probably done that a little
6  more artfully, so...
7          And -- and do you remember what your
8  question was?
9      A.  I remember asking a question about a
10  journal paper that -- I remember now two
11  questions.
12         One was about a journal paper, was it
13  actually in print, and another was, there was a
14  Ph.D. student listed with an expected graduation
15  date, and I asked did they actually graduate.
16     Q.  Oh, okay.  That was the one from the
17  Fall of 2018, the Ph.D.?
18     A.  Yes.  Or I -- I believe the person
19  graduated in the summer, so there was an August
20  2018 graduation date, and this -- on the CV it
21  was listed as anticipate -- "expected in," --
22     Q.  Right.
23     A.  -- and I wanted to see if that had
24  happened or not.
25     Q.  Okay.  And so you didn't ask anything

164

1  about her teaching?
2      A.  Well, the dossier includes data, it
3  includes a numerical summary, it includes all of
4  the peer eval -- written peer evaluations, it
5  includes a Budget Council statement, and it
6  includes the candidate's statement.
7          So after reading all those, I
8  honestly don't remember if I had additional
9  questions.  I -- I don't remember.
10         But there's a lot of information to
11  read about teaching.
12     Q.  Yes.  And is there any -- do you know
13  if there's any record of you meeting with Chair
14  Tewfik about any changes to the rescinding of the
15  probationary extension?
16     A.  I remember sending an email to Sonya
17  Shaffer, the admin in Jerry's office, to ask,
18  "Did Dr. Nikolova rescind," and I was told she
19  didn't.
20         That is all I ever -- I did not
21  have -- I -- that is -- that is the extent of my
22  memory.
23     Q.  Okay.  So would that be -- because
24  I'm -- I'm asking about not the results of the
25  communication.  I'm asking you about do you

165

1  recall if there's any communication between you
2  and Chair Tewfik about the change in the process
3  of --
4      A.  Oh, I'm sorry.
5      Q.  -- telling candidates that took a
6  probationary extension that they should consider
7  rescinding for the reasons we talked earlier?
8      A.  We would have discussed that at a
9  Department Chairs meeting.
10         We would have discussed that at a
11  Department Chairs meeting.  I don't know if that
12  was in -- I don't know if that's in our
13  guidelines or not.
14     Q.  And you would presume that Chair
15  Tewfik would have had that conversation with all
16  the candidates that had taken a probationary
17  extension, but you don't know whether or not that
18  occurred?
19     A.  Correct.
20     Q.  Okay.
21     A.  I do not know if it occurred.
22     Q.  Right.
23         Was Dr. Nikolova the only candidate
24  from ECE that had taken a probationary extension
25  that year, you know, that go -- that went up for

166

1 tenure consideration in '18/'19?
2     A.  So I know that Mohit Tiwari was also
3 up for -- he was in his up-or-out year.  He did
4 not have an extension.  I don't remember if there
5 were other Assistant Professors from ECE.  I'm
6 sorry, I don't remember.
7         And -- and on many of these
8 questions, I'd be happy to check my files and
9 answer, but I know that's not part of this
10 deposition, so...
11     Q.  Okay.  You're not restricted from
12 that.  If you want to, you're welcome to, but
13 that's up to you.
14         MR. DOWER:  Dean, we --
15 we've produced spreadsheets that
16 have this information on it.
17     It's up to you whether you
18 want to do that, but I believe
19 we've produced this information.
20         THE WITNESS:  I put
21 this in a box folder that I asked
22 our team to check with you.  I
23 just checked the file.
24     There were only two Assistant
25 Professors considered that year,

167

1     and, as I mentioned, Mohit Tiwari
2 did not have an extension.
3 BY MR. NOTZON:
4     Q.  Okay.  From ECE?
5     A.  From ECE, that's correct; right.
6     Q.  And Provost McInnis, do you remember
7 what her years of being the Provost were?
8     A.  Yes.  So I told you I started in 2013
9 and then Greg was -- was Provost until the Spring
10 of 2015, then Judy Langlois was the Provost for
11 an interim year, so that would have been the
12 '15 -- so that means Dr. McInnis started in '16.
13     Q.  Okay.  '16/'17?
14     A.  Yes.
15     Q.  Okay.  And when did she stop?
16     A.  She resigned last spring, so he would
17 have -- she would have still been here for the
18 Fall of 2020.
19         So I believe four years that she
20 served on the President's Committee.
21     Q.  So when you were saying that there
22 were changes to how high the bar would be in
23 tenure promotion cases considerations, given that
24 there is no specified height of the bar for any
25 of the areas, what does that mean that it would

168

1 change in practice?
2     A.  So remember I -- I talked about
3 flat -- cases having flat spots?
4     Q.  Yes.
5     A.  So if a person is being considered at
6 the normal time for promotion and there is a -- a
7 weakness, a flat spot, and there could be a wide
8 variety of them, then that's considered perfectly
9 normal and that -- that doesn't necessarily --
10 that -- that would not lead to a negative
11 decision.
12         But if the case is early, the
13 expectation is that we don't have the flat spots,
14 that we have -- that would be -- would be above
15 the "meeting expectations" in each area, and, to
16 be honest, the -- the well for "meeting
17 expectations" is -- is based on a holistic review
18 of the candidate.
19         And I believe that's very important
20 because there are many different domains within
21 Engineering, and it would be inappropriate to
22 judge someone outside their own domain.
23         So even within ECE, for example, we
24 have electrical engineers who have backgrounds in
25 physics.  They publish only in journals, whereas

169

1 the people who are in software engineering are
2 publishing only in conferences.
3         So where people choose to publish
4 depends on what they -- their expertise and what
5 the expectations in their domain are.
6         So Dr. Nik -- Nikolova's a little in
7 the middle.  She had some journal publications,
8 but primarily conference publications.
9     Q.  And that -- that factual distinction
10 and the uniqueness of the -- the area of the
11 Professor would -- could translate to all of the
12 criteria, correct?
13         Like for instance, funding, some
14 researchers require greater amounts of money
15 because of the nature of their research, lab work
16 or fieldwork or you name it, with things that
17 would cost more money than people that are doing
18 theoretical work, would you agree?
19     A.  That is -- experimental work is going
20 to cost much more than computational, theoretical
21 work because you -- you need supplies, you need
22 to -- maybe you're in -- you need mice, right, to
23 do biomedical research.
24         So absolutely there is a huge
25 variation in the level of funding needed to

1  sustain a research program.
2     Q.  And -- and the sources of that
3  funding and what may be impacting those sources
4  at any particular time.
5         Also, like we were talking about the
6  teaching evaluation scores, the -- whether or not
7  it's a required undergraduate course or an
8  elective graduate course, the median scores vary
9  greatly?
10    A.  They do.  For the specialty graduate
11 courses that tend to be small, that's where
12 faculty members tend to get -- in general, get
13 their highest teaching evaluations, and then in a
14 lower division, large undergraduate class, and
15 especially a required class, would tend to be the
16 lowest, that's correct.
17    Q.  And you want to take into account
18 things like that as well as something that might
19 be going on just contextually for each of the
20 individual candidates?
21    A.  That is correct.  So one of the
22 things in particular with teaching evaluations is
23 to look at the trend of the teaching evaluations
24 in individual classes.
25        So the first time that a faculty

1  member teaches a class, it might be -- the
2  students might say it's disorganized because
3  they're just developing their notes, but then by
4  the second or third time they're teaching a
5  class, you would expect you wouldn't see those
6  comments and you would see that the faculty
7  member is more comfortable presenting the
8  material, knows where the students are, and you'd
9  see an upward trend in the teaching evaluations.
10    Q.  And that's your -- that's considering
11 that nothing else is going on?
12    A.  That is correct; right.
13    Q.  But for the -- that's taking into
14 account the relevant issues that might be
15 happening, which is you don't see any difference
16 between the teacher teaching that semester versus
17 a passage of time and experience to get to the --
18 the next level?
19    A.  Right.  So that's why specifically in
20 the Cockrell School guidelines that are given to
21 the faculty member to write their teaching
22 statement, they're asked to identify any other
23 factors that could influence -- could have
24 influenced their teaching.
25        I'm reminded of a case in another

1  department where a faculty member commented that
2  she was teaching while -- and she had just had a
3  baby.  The baby wasn't sleeping well, it was an
4  8:00 o'clock class, and she just wasn't sleeping
5  enough, and therefore, that allowed to put that
6  semester in context that that -- it -- it made
7  sense why the teaching evaluations were lower.
8     Q.  And either -- either the candidate
9  will put that in their statement or the Budget
10 Committee or the peer reviewers will put that in
11 their statement, but if -- if the -- if the file
12 has that context for you, then -- and -- or -- or
13 you might already know those things as you're
14 reviewing, that there's a context here that
15 should be considered, like that it's an
16 undergraduate required class with, you know,
17 three times, four times more students than
18 another undergraduate class?
19        MR. DOWER:  Objection;
20    form.
21    A.  So the size of the class, where it is
22 in the curriculum is all part of the
23 documentation.
24        The -- the tabular forms include
25 the -- the course number and name and also the --

1  the number of students registered.
2         I believe the Budget Council and also
3  the candidate are asked to address directly if
4  these are required classes, to provide that
5  context.  So that information is readily known.
6         If the individual has another
7  situation -- as I mentioned the -- the individual
8  who had been -- the newborn child and the child
9  wasn't sleeping well, that is not generally known
10 by the Budget Council or it doesn't come out in
11 factual data, which is why it's part of the --
12 the candidate list it as one of the factors -- the
13 candidate should include in their statement if
14 there are other things they want us to consider.
15    Q.  And so back to the early high bar
16 issues, if someone is going up, quote/unquote,
17 "technically early," and you understand
18 "technically early" means that they have prior
19 time as a -- a faculty member in another
20 university, added onto the time at UT which meets
21 or exceeds the sixth year, that would be
22 "technically earned"?
23        MR. DOWER:  Objection;
24    form.
25    A.  The UT system rules state that prior

174

1  service at another university does not count
2  in -- as time in rank at UT -- at a UT system
3  institution.
4  BY MR. NOTZON:
5      Q.  Yeah, I'm not asking that.  I
6  understand that.  I'm just trying to get a -- a
7  definition of "technically early," meaning that
8  there have been multiple Professors or faculty
9  members that have gone up for tenure in the
10  School of Engineering since you've been Dean that
11  meet or exceed six years when you put the two
12  experiences together, correct?
13     A.  That is correct.
14     Q.  But they have not six years or
15  they -- they won't have had six years at the time
16  they would go up?
17     A.  That is correct.
18     Q.  Okay.  I've seen it referred to as
19  "technically early."  Is that not a term that
20  you're familiar with?
21     A.  I don't think it was a formal
22  definition, but we -- we probably did use it at
23  some point, yes.
24     Q.  Okay.  And when -- with Dr. Nikolova
25  in the '18/'19 year when she went up, if you

175

1  counted -- even with the probationary extension,
2  is -- is it your understanding that she still did
3  not have the time of the full -- she wouldn't
4  have had the full six years counting both the A&M
5  and the UT time?
6      A.  I believe she would have had six
7  years because she was considered two years early
8  at UT and she taught two and a half years at
9  Texas A&M.
10     Q.  Okay.  So she would have met the --
11  the "technically early" definition?  Or would she
12  really have only been at five -- I -- I think
13  we -- we covered this.  She would have been at
14  the 5.5, right?
15     A.  May I con -- if I could consult --
16     Q.  Yeah, please do.
17     A.  Okay.  (Witness reviews documents.)
18     Q.  No, I think you're right.  She would
19  have been at 6.5?
20     A.  I believe that's correct; right.
21  And -- and I said she "...will have served a
22  total of eight years in rank as Assistant
23  Professor (two and a half years at Texas A&M and
24  five and a half years at UT Austin)."
25     Q.  Minus the extension year gets you to

176

1  the six and a half?
2      A.  Well, no.  Remember I told you that
3  if you start in the middle of a year, it -- UT
4  system policy says it doesn't count?
5      Q.  Right.
6      A.  So that -- that year, the '13/'14
7  academic year, it didn't count toward her
8  probationary service at UT Austin because --
9  unlike the University of Illinois where I had the
10  choice of counting that year or not counting it,
11  UT Austin -- UT's system policy does not give the
12  candidate the ability to make that decision.
13     Q.  So UT system would say six?
14     A.  I'm sorry?
15     Q.  UT system would say six would be the
16  number, not 6.5?
17     A.  Correct.
18     Q.  Okay.  But isn't it true that some
19  candidates have gone up and instead of being on
20  time "technically early," if you count both
21  periods of time, even with the UT system rule of
22  not counting half years, six or more years as an
23  Assistant Professor at rank, as -- as it's
24  called?
25         There are several candidates that

177

1  have gone up with less than that, correct?  So
2  technically earlier, both prior to the six years
3  at UT, but also not having enough to make six
4  years when you combine them both?
5      A.  Yes, I -- I am thinking of at least
6  one case where that was true, yes.
7      Q.  So would that mean that the bar would
8  be triply high?
9              MR. DOWER:  Objection;
10  form.
11     A.  So no.  The -- the -- the height of
12  the bar is based on the years of UT service is my
13  understanding.
14  BY MR. NOTZON:
15     Q.  Okay.  So if somebody's three years
16  early, that's triply high?
17     A.  That would be a high bar, but I -- I
18  have -- have mentioned before that the
19  President's Committee was changing their mind
20  about some of these things during this period.
21     Q.  And if it's four years early, that's
22  quadruply high?
23             MR. DOWER:  Objection;
24  form.
25     A.  What I remember being told is that if

178

1 it's more than one year early using UT's
2 policies, the bar is higher. I do not -- there
3 was no discussion of how high.
4        As you have mentioned before, because
5 this is a -- this is domain specific, and I think
6 the -- what the President's Committee was telling
7 us was urging caution in moving cases forward too
8 early.
9        They had -- they had seen trends they
10 weren't happy with, and I would say those trends
11 were across the entire University, and they
12 wanted us to -- to make changes.
13 BY MR. NOTZON:
14    Q. You said the trends were across the
15 University?
16    A. Well, when they were -- I only know
17 the trends that are --
18    Q. But it's your -- I mean, that -- you
19 said that.
20    A. Yes, I did say that, yes.
21    Q. Okay. And how would you know that?
22    A. Because they discussed it with all
23 the Deans and not just with me.
24    Q. But you wouldn't have the details
25 associated with those situations?

179

1    A. I do not, no.
2    Q. So when I asked how would you know
3 that there's a trend, you wouldn't know what
4 the -- what the actual trend was because you
5 wouldn't have the details of those specific
6 candidacies, correct?
7    A. Correct. However, there's been a lot
8 of discussion recently about promotion from
9 Associate Professor to full, and many of the
10 people on the Committee has -- have addressed
11 this at Dean's Council, and they've all given
12 their opinions, they've talked about why it's
13 important for someone to remain in rank as an
14 Associate Professor for the full term -- for the
15 normal term.
16    Q. I go -- let's not go into that since
17 we're not --
18    A. Okay.
19    Q. -- we're not --
20    A. But I can tell you that it is
21 expressed in multiple ways during oral
22 conversations during Dean's Council, so it is not
23 just within the Cockrell School.
24    Q. Okay. So you considered Dr.
25 Nikolova's candidacy, and you wrote an

180

1 evaluation. So let's go ahead and pull that up.
2    (Exhibit 2 marked for identification.)
3 BY MR. NOTZON:
4    Q. I'm going to put it in the chat.
5        MR. DOWER: Robert, is
6    this -- we've been going for about
7    an hour. If we're transitioning to
8    a new topic, could we take our
9    customary like five-minute break?
10       MR. NOTZON: Sure. Let
11   me -- let me go ahead and put it
12   up there --
13       MR. DOWER: Sure. That
14   way we can download it.
15       MR. NOTZON: -- so you
16   have it. Okay. This will be
17   Exhibit 2.
18 BY MR. NOTZON:
19    Q. Okay. And then Dean Wood, let me
20 know that you've got it and then we'll take a
21 break.
22    A. I have it. You're right, it went
23 much faster the second time. Thank you.
24       MR. NOTZON: Okay. All
25   right. See you in a bit.

181

1        THE WITNESS: Okay.
2    Thanks.
3        THE COURT REPORTER: We're
4    going off -- we're going off the
5    record at 2:16 p.m.
6    (Recess held from 2:16 p.m. to 2:27 p.m.)
7        THE COURT REPORTER: We're
8    going back on the record at 2:27 p.m.
9        MR. NOTZON: Bob, you
10   need to say "Ready and recording";
11   otherwise, we're going to --
12       MR. SCHMIDT: Ready and
13   recording.
14       MR. NOTZON: Thank you.
15 BY MR. NOTZON:
16    Q. Okay. On Dr. Tiwari, I think you'd
17 mentioned that he had not taken a probationary
18 extension, but didn't he and then rescind it?
19    A. I don't know.
20    Q. Okay. You don't recall?
21    A. I'm not sure -- I don't recall.
22    Q. Okay.
23    A. I don't know. I'd have to check.
24    Q. Okay. I looked on the -- the
25 spreadsheet that was sent, and -- and there was

182

1  no indication that -- well, there was no
2  indication that -- that a modified instructional
3  duty was taken, but if -- if a -- if a
4  probationary extension was taken and then
5  rescinded, it wouldn't show on the tenure
6  decision sheet, correct?
7      A.  It would not show, that's correct.
8      Q.  Okay.
9      A.  If you would like -- if -- if you
10  would like me to check after the meeting, I can
11  look at the official files and see if he did.
12  I'd be happy to check on that if you'd like.
13  Just let -- let Ben know.
14      Q.  Would that be in your Dean's
15  evaluation of his tenure application?
16      A.  No.
17      Q.  Because he would have rescinded?
18      A.  That's correct.
19      Q.  And he would have rescinded the
20  February or May, whenever --
21      A.  In the Spring before the case was
22  considered, right.
23      Q.  Okay.
24      A.  If -- if that were the case.  I do
25  not know if he had a -- if he requested an

183

1  extension.
2      Q.  It wouldn't be in the packet?  That's
3  the whole --
4      A.  That's correct.
5      Q.  That's the whole point of making the
6  deadline.
7      A.  Right.
8      Q.  And -- and -- and the -- the real
9  purpose of the deadline is so that everybody else
10  doesn't go through -- well, if you rescind or
11  not, you're still going up for tenure?
12      A.  You are, that's correct.
13      Q.  So that won't -- that won't change
14  all of that.  It won't change -- it won't --
15  because I think you initially had said that you
16  want that to happen before the request for
17  letters go out, but the request for letters would
18  go out anyway, the letters would be written
19  regardless of whether there was a grace or an
20  extension or whether or not UT considers it early
21  or on time, correct?
22      A.  Well, I -- I think I -- I mentioned
23  this earlier, the President's Committee wanted
24  people to only get one chance to be considered
25  for promotion, so if they don't rescind, then

184

1  because their years of probationary service are
2  less than six, they could be considered again the
3  next year, and that's why they want people to
4  rescind so it's an official up-or-out case.
5      Q.  Okay.  And -- and so is it the case
6  that Dr. Nikolova was the only non-up-or-out case
7  that has gone up?
8      A.  In what period of time?
9      Q.  From 2018/2019 to the present.
10          MR. DOWER:  Objection;
11      form.
12      A.  I would have to check my records.
13  BY MR. NOTZON:
14      Q.  Okay.  The -- the change has happened
15  since then, correct?  This -- this desire to only
16  go up the one time has happened as a result of
17  Dr. Nikolova's case?
18      A.  No, it was discussed at least -- I
19  believe it was discussed before a decision was
20  made on her case.  I don't remember if it was --
21  when it was in that year, but I believe --
22  because it -- it would have happened before her
23  case was considered.
24      Q.  Well, then why does she get another
25  chance.  If the whole purpose of making the

185

1  change was to only have one time, then she would
2  have been informed of that decision had it been
3  made prior to her decision, so it must not have
4  been made prior to a decision or she got treated
5  different, correct?
6          MR. DOWER:  Objection;
7      form.
8      A.  She was not treated differently.  If
9  she had rescinded, she would have had five years
10  of probationary service, which would still not
11  have been up-or-out.
12  BY MR. NOTZON:
13      Q.  It would still have her going up
14  twice?
15      A.  Right.  But the -- they -- they
16  didn't want -- I'm actually -- Dr. Nikolova's
17  case doesn't -- is not necessarily what they were
18  trying to prevent.
19          The -- before, they said -- their
20  statement said that if the reason why the
21  candidate has accumulated less than six years of
22  probationary service, it's because they had an
23  extension to the probationary period, and they're
24  going up at the time they normally would have
25  been considered before -- if they had not

186

1  extended it, then you don't have to explain.
2          That's a very longwinded way of
3  saying -- an easier way of saying rescind and
4  then you're up-or-out and then we don't have to
5  explain it.
6          So if you don't want to use your --
7  if you don't want to use -- if you want to count
8  that year that was originally designated as
9  probationary -- non-probationary status, rescind
10  it, and then we just count years in rank, they're
11  the same as probationary years in rank, and
12  it's -- it would be -- it will be easier for the
13  recordkeeping.
14          So you'll -- you'll notice on this
15  cover sheet that you just sent me, it lists
16  "Total Times at UT Austin," "Total Years In
17  Rank," and then "Number of Years in Probationary
18  Status," so they're actually counting that
19  separately.
20      Q.  Got it.
21      A.  In some of the earlier --
22      Q.  But I don't understand the idea of
23  when the decision was made that we're going to
24  promote a one-time only going up for -- for
25  tenure promotion and the decision is to rescind

187

1  or not rescind and -- but that doesn't stop
2  someone from going up where even if they rescind,
3  they're [sic] still get a second bite at the
4  apple.
5      A.  So I -- I think we are -- we're
6  talking about slightly different things.  So I
7  agree with what you just said.
8          If someone has accumulated fewer than
9  six years of probationary status and they are
10  considered for promotion, UT policy would still
11  allow them to be considered multiple times,
12  however, the Commit -- the President's Committee
13  has the option of saying, "Do not promote," as
14  they did with Dr. Nikolova, or they could say
15  "Terminal appointment pending," which would not
16  give the candidate the chance to go up again.
17  And so they did not do that with Dr. Nikolova.
18      Q.  Have they done that --
19      A.  They said "Do not promote."
20      Q.  Have they done that with anybody?
21      A.  Not to -- I don't -- not within my
22  know -- my direct knowledge.
23      Q.  Is that just a threat that the
24  President's Office now uses to try to motivate
25  candidates to rescind?

188

1          MR. DOWER:  Objection;
2  form.
3      A.  I don't think "threat" would be an
4  appropriate word, and I think there is a -- a
5  spreadsheet --
6  BY MR. NOTZON:
7      Q.  Would it be accurate, though?
8      A.  I don't believe it's -- I think
9  there's a spreadsheet that was "Possible
10  Decisions," and it's amongst the possible
11  decisions.
12          I don't want to get into the -- I --
13  I don't write the policy, and so I really don't
14  want to have to defend the policy.
15      Q.  Okay.  Then it's a stick?
16          MR. DOWER:  Objection;
17  form.
18      A.  I would not -- I -- I'm sorry.  I
19  can't characterize the intent of the policy.  It
20  is one of the many options available to the
21  President's Committee.
22  BY MR. NOTZON:
23      Q.  Okay.  Earlier we talked about
24  carrots and sticks and you agreed with me.  Now
25  you won't.

189

1          MR. DOWER:  Objection;
2  form.
3  BY MR. NOTZON:
4      Q.  Is that accurate?
5          MR. DOWER:  Same
6  objection.
7      A.  I believe -- I believe it's accurate.
8  Maybe I'm getting tired, Sir.  I'm sorry.
9  BY MR. NOTZON:
10      Q.  Okay.  Do you know if Dr. Nikolova
11  was told that she was under the possibility of
12  having a negative result of being told that she
13  was up-or-out after going up in '18/'19 if she
14  didn't rescind?
15          MR. DOWER:  Objection;
16  form.
17      A.  I'm sorry.  I don't understand the
18  question.
19  BY MR. NOTZON:
20      Q.  You just said that one of the options
21  the President has in reviewing a tenure
22  application is to say -- regardless of whether or
23  not they've used up their full six years of
24  probationary time at UT, that the President
25  could, in response to the application for tenure,

190

1  say, "Ah, sorry.  No pro -- no tenure and you
2  don't get any more chances," correct?
3      A.  No, that is pub -- that's a published
4  policy on the Provost's website.  I do not know
5  if Dr. Nikolova read the policy.
6      Q.  When was that policy published?
7      A.  It's update -- the Pro -- the
8  Provost's Office maintains policies every year.
9  They update -- keep them updated.  I --
10     Q.  Was that policy published and
11  available to Dr. Nikolova in the Spring of 2018
12  when she had to have withdrawn or rescinded her
13  probationary extension to not be potentially
14  penalized with an up-or-out decision when she was
15  not in an up-or-out year?
16         MR. DOWER:  Objection;
17     form.
18     A.  I'm sorry.  I -- I don't agree with
19  how you're phrasing the question because Dr.
20  Nikolova was not in an up-or-out year as she was
21  when -- when her case was considered or if she
22  had rescinded she would not have been up-or-out.
23  BY MR. NOTZON:
24     Q.  Right.  But you said that the
25  possibility when she goes up for tenure, even

191

1  though she's not in her up-or-out year, was that
2  the President could say, "This was your last --
3  your one and only chance, and you're gone; you're
4  up-or-out"?
5      A.  That is a longstanding policy
6  that's -- that's posted on the President's -- on
7  the Provost's website.
8      Q.  So for Dr. Nikolova it's your
9  testimony that should have been aware because
10  that policy was published and pre-existed Dr.
11  Nikolova applying for tenure or -- or that policy
12  was published prior to the Spring of 2018?
13     A.  That policy has not changed since
14  I've been Dean, yes, sir.
15     Q.  Okay.  And -- but by the same token,
16  you're not aware of the President's Office ever
17  enforcing that policy and, in denying tenure,
18  taking the chance away from a second opportunity
19  if they weren't in their up-or-out year; is that
20  right?
21     A.  I am not aware of that option ever
22  being used, that's correct.
23     Q.  Okay, okay.  And before we move on,
24  were you able to recall what the question is that
25  you sent down to Dr. Nikolova when you had a

192

1  clarification?
2      A.  I thought I told you --
3         MR. DOWER:  Objection;
4      form.
5      A.  -- that I asked if the paper had been
6  published and if the Ph.D. student had graduated.
7  Those are the two I remember.  I don't remember
8  if there were others.
9  BY MR. NOTZON:
10     Q.  Oh, I'm -- I'm sorry.  I -- thank you
11  for reminding me.  I'm getting tired.
12     A.  Yes.
13     Q.  And -- and is it -- what if the
14  student had not graduated?  Would that have been
15  a deal-breaker?
16         MR. DOWER:  Objection;
17     form.
18     A.  It's -- the case is evaluated on a
19  holistic basis.  I told you there are strengths
20  and weaknesses that would have been -- that has
21  the potential to -- that is considered as a
22  weakness, but it is not -- it is not a deal-
23  breaker.
24         We have had a few cases go through
25  without that.

193

1  BY MR. NOTZON:
2      Q.  Okay.  One of the proverbial "flat
3  spots"?
4      A.  That's correct.
5      Q.  Okay.  And just like the bar being
6  high to clear or the bar being wherever the bar
7  is to clear, being unknown and a moving target, a
8  flat spot is also a moving target?
9         MR. DOWER:  Objection;
10     form.
11     A.  So I mentioned that each case is
12  evaluated on holistic review based on the
13  individual's dom -- area of expertise, and so
14  the -- the expectation is that all faculty will
15  supervise and graduate -- and mentor graduate
16  students.
17         So have -- having a graduate student
18  graduate is one of the common expectations for a
19  promotion case, however, there are certain
20  circumstances where there may be extenuating --
21  extenuating circumstances where it might not be
22  possible.
23         And so that falls into the category
24  of the candidate would have to describe it, the
25  Budget Council would need to evaluate it, and it

194

1  would need to be explained so that it could be
2  put in context with the President's Committee.
3  BY MR. NOTZON:
4      Q.  And that -- that answered those for
5  every flat spot?
6      A.  Yes, it does; right.
7      Q.  And so I -- I also take it your
8  answer of -- of not -- not graduate -- having a
9  student that you're mentoring not graduate is an
10  undeniable flat spot because it's a binary you
11  either graduated or you didn't graduate?
12      A.  Right.  That's right.
13      Q.  And graduating is what you're after,
14  getting them through.  Okay.
15          The flat spot gets more subjective
16  when you talk about, let's say, funding, how much
17  funding is enough funding, that kind of thing?
18      A.  Yes.
19      Q.  Okay.  All right.  Let's go ahead and
20  look at your assessment of Dr. Nikolova.
21          Did you write this assessment start
22  to finish?
23      A.  Start to finish, no.
24      Q.  Did you start it?
25      A.  I'm sorry.  I'm hes -- I'm hesitating

195

1  because --
2      Q.  Let me just ask you -- let me just
3  ask you:  How did this get written?
4      A.  Yeah, thank you.  That's a much
5  better way.
6          So actually I'm going to change my
7  answer.  When I first started as Dean the College
8  Promotion and Tenure Committee would write a
9  draft of the letter and then I would edit it, and
10  I found that that actually took more time than me
11  just writing the letter from the beginning.
12          So I was trying to remember the year
13  in which I asked the Committee to change from
14  drafting the letter to addressing specific
15  points.
16          And so the year that Dr. Nikolova's
17  case was considered was the first year that the
18  Committee did not draft the letter, but they -- I
19  had a series of bullet points on each item that
20  they addressed.
21          So in this case, I -- I was
22  incorrect, I did start -- I did write this from
23  start to finish myself.
24      Q.  Okay, okay.  So the list of bullet
25  points is what the Tenure and Promotion Committee

196

1  provided you?
2      A.  Right, so I developed a list and then
3  they responded to my list, that's correct.
4      Q.  Oh, your bullet points to them were
5  topics you wanted to hear from them on?
6      A.  That's correct.
7      Q.  And are those responses from that
8  committee, are they part of the packet?
9      A.  No, they are not.
10      Q.  Why not?
11      A.  All that's required to be in the --
12  in the doc -- in the University documentation,
13  all that is required is a vote of the Promotion
14  and Tenure Committee, and so that's what's
15  recorded on that cover sheet.
16          The -- the Dean's letter is also
17  required and the Dean's vote are required, so
18  this is the Dean's assessment and that's --
19  that's what it is.
20          However, if -- if the Committee and I
21  disagree, which in this case we did, I'm under
22  the obligation to document where the Committee
23  and I disagreed and why.
24      Q.  And we jut have to take your word for
25  it?

197

1          MR. DOWER:  Objection;
2  form.
3      A.  Those -- those are the guidelines --
4  those are the rules that's written in the UT
5  Promotion and Tenure Guidelines, yes.
6  BY MR. NOTZON:
7      Q.  Okay.  So that whatever written
8  record that justified the -- the Committee's
9  vote, there is no written record provided like
10  there is in the Budget Committee?
11      A.  That's correct.  That's -- that's in
12  accordance with UT guidelines, however, that
13  document was shared with your -- your team, so
14  you have those -- you have those bullet points.
15      Q.  Oh, we do have those bullet points?
16      A.  Yes, you do.
17      Q.  And your bullet points and their
18  responses or just your bullet points?
19      A.  Both.
20      Q.  Okay.
21      A.  So I think I posted on the box
22  folder.  Hold on just a second.  I posted on the
23  box folder the Promotion Checklist which is my
24  bullet point -- no, sorry.
25          The -- let me find it.  Evaluation

Sharon Wood - 3/18/2021

198

1 template.  So let me -- I think I can also upload
2 that file.  Okay.  Just a minute.  Let me do it a
3 different way.  It may be easier.
4          MR. NOTZON:  And Ben,
5 is this one of the documents we
6 recently received?
7          MR. DOWER:  Yes.
8          THE WITNESS:  The --
9          MR. DOWER:  This -- this
10 would have been one of the ones
11 that we provided recently.
12          THE WITNESS:  This week.
13          MR. DOWER:  Yeah.
14          MR. NOTZON:  Of -- of
15 the unnumbered ones?
16          THE WITNESS:  Right.
17          MR. DOWER:  Yes.
18          MR. NOTZON:  Okay.
19          MR. DOWER:  I believe
20 this one went all the way -- let
21 me just see.  What -- what did she
22 upload?  Her evaluation tem -- I
23 believe we provided these on --
24 what is today?  I'm losing track.
25          I believe we provided you

199

1          with these on Tuesday.
2          MR. NOTZON:  Oh, we --
3 I don't need to know the date.
4 I -- I know -- I remember --
5          THE WITNESS:  And then
6 the -- the legal team provided me
7 with some of the files they had
8 previously sent you.
9          I did review all those, and
10 I saw there was an email from me
11 to Sonya Shaffer that said, "I've
12 misplaced the Promotion
13 Committee's comments, and, Dr.
14 Nikolova, will you please send it
15 to me?"
16          She sent me the file, and the
17 file was attached to that email.
18 So that -- I've seen it in the
19 past week as I've been preparing
20 for the deposition.  I don't know
21 the number, however.
22 BY MR. NOTZON:
23     Q.   And you're saying Dr. Nikolova
24 provided that to you?
25     A.   No.  I wrote to Sonya Shaffer --

200

1     Q.   Uh-huh.
2     A.   -- who is the Administrative
3 Assistant in Jerry Speitel's office.
4     Q.   Yeah.
5     A.   She is the staff support for the
6 Cockrell School's Promotion and Tenure Committee.
7 And when -- when I met with the Promotion and
8 Tenure Committee, they gave me a hard copy.
9          I misplaced the hard copy and so I
10 asked Sonya to send me an electronic version so I
11 would have it.  And that correspondence is
12 amongst the number of pages that you have that
13 you got from the legal team.
14     Q.   Okay.  So -- so we -- the -- the
15 Tenure and Promotion Committee's responses to
16 your bullet points here on Exhibit 3 are a
17 separate document?
18     A.   Yes.  And they are already in your
19 possession.
20     Q.   Okay.  And I -- I -- you -- you don't
21 know the Bates number of that document?
22     A.   I could provide it at a later time if
23 you would like.
24          (Exhibit 3 marked for identification.)
25 BY MR. NOTZON:

201

1     Q.   Okay.  All right.  So the Committee
2 voted unanimously for her -- for Dr. Nikolova's
3 promotion to tenure, correct?
4     A.   That is correct.
5     Q.   Did their responses to your bullet
6 points correspond with that unanimous support?
7     A.   Yes.  I -- I believe they talked
8 about the teaching being a potential weakness as
9 they were asked to iden -- identify strengths and
10 weaknesses, --
11     Q.   Okay.
12     A.   -- but I would have to look at
13 that -- that directly, yes.
14     Q.   Do you know, when -- when you were --
15 when the Tenure and Promotion Committee was
16 meeting to discuss Dr. Nikolova's case, you were
17 present; is that correct?
18     A.   No.
19     Q.   Okay.
20     A.   Oh, oh, I'm sorry.  When they were
21 meeting to discuss her case?  No.
22     Q.   Okay.
23     A.   Once they had reached a conclusion,
24 then I did meet with them and they presented
25 their conclusion -- their recommendation to me.

202

1    Q.   Okay.
2    A.   But I was not there when they were --
3  when they were developing their own conclusions.
4    Q.   Okay.  And when you said when they
5  conveyed their recommendation to you, was that
6  recommendation just the result of the vote, or
7  was it responses to your bullet points here on
8  Exhibit 3?
9    A.   No, I -- mentioned that they gave
10 me a hard copy of their response to my bullet
11 points.
12   Q.   Yeah, but --
13   A.   They would do that for every faculty
14 member, and then they would also tell me they're
15 voting as -- as we continued the discussion.
16   Q.   Okay.  So -- but when you met with
17 them, they were conveying the result of the vote
18 as well as the written document responses to your
19 bullet points at the same time?
20   A.   So what happens is I could ask them
21 questions because I've done an independent
22 review, and I could ask, "Did you consider this?
23 How did this factor into your opinion?"
24       So normally they take a preliminary
25 vote before they meet with me, and then they do

203

1  their final vote afterwards to make sure that
2  everyone has heard all the discussion, yeah.
3    Q.   And you recall -- is -- is it your
4  testimony that you recall the Committee conveying
5  to you verbally that they had an issue with her
6  teaching?
7    A.   I believe it's amongst the -- I
8  believe it is --
9    Q.   Responses?
10   A.   -- amongst the -- in the summary
11 statement, right?  The summary is essentially,
12 "Make sure the Dean knows if there are any flat
13 spots so that when she has to go and talk to the
14 President's Committee she's prepared to address
15 them." I believe it is listed there.
16       That is my belief.  I don't have that
17 in front of me, but that is my -- my
18 recollection.
19   Q.   Okay.  And did you use their written
20 responses to your bullet points as the start of
21 your evaluation of Dr. Nikolova, Exhibit 2?
22   A.   Yes, it was -- it -- it was used
23 extensively because they're -- they're compiling
24 information from a hundred-page document into a
25 three-page summary, which makes it easy for me

204

1  then to identify key points that I want to
2  discuss.
3    Q.   Okay.  That said, their summary was
4  still in support of her promotion?
5    A.   That's correct.  And that's reported
6  on the cover sheet.  And it also is stated --
7  it's stated in -- my "Overall Assessment" is "As
8  noted previously, the Promotion and Tenure
9  Committee strongly supported Dr. Nikolova's case"
10 and it was reported --
11   Q.   When -- when you read from a
12 document, --
13   A.   I'm sorry.
14   Q.   -- the -- the court reporter has to
15 still take down every word, --
16   A.   I apologize.  So I'm on the last
17 paragraph of Page 3.
18       THE COURT REPORTER:  Thank
19 you.
20   A.   "As noted previously" --
21 BY MR. NOTZON:
22   Q.   You don't have to reread it, I'm sure
23 she got you, she's real good, --
24   A.   Okay.
25   Q.   -- but don't make it go for her too

205

1  long.
2    A.   Last paragraph of Page 3.
3    Q.   Okay.  All right.  Let's go ahead and
4  go to your assessment.
5        Do you think you're going to be able
6  to identify the pieces of your evaluation in
7  Exhibit 2 that you cribbed from the Committee and
8  that -- and the ones that came from you
9  specifically?
10   A.   No.
11   Q.   Okay.
12   A.   I mean, for example, I would have
13 asked them to -- the bullet points under
14 "Research."
15   Q.   You're talking about Exhibit 3?
16   A.   So Page 2, there are five bullet
17 points under the topic "Research," so these are
18 quantitative metrics.
19   Q.   You're talking about Exhibit 2, yes.
20 Okay.
21   A.   I would have relied on the Committee
22 to tell me if these were highly selective
23 conferences related to algorithmic game theory
24 and artificial intelligence.
25       I -- I rely on their domain expertise

206

1  and also what's in the Budget Council's
2  Statement.
3      Q.   Yes.
4      A.   They -- there's an impact after for
5  the journal she published in.  I would have
6  relied on their statements there.  I would not --
7  yeah.
8      Q.   You'd either rely on the -- well,
9  okay.  Let me -- let me phrase it this way:
10  Did -- other than what the Committee gave you,
11  the Tenure and Promotion Committee -- am I saying
12  it wrong?  It's "P&T," not "T&P"?
13      A.   It's P&T, right.
14      Q.   Okay.  Do you say "P&T"?
15      A.   I do say "P&T."
16      Q.   Okay.  At least you're abbreviating
17  something.  Okay.  I like shortening it.  So P&T.
18          If the P&T Committee gave you this
19  summary, did you look at anything else to write
20  your evaluation, or did you rely on what the P&T
21  Committee gave you?
22      A.   I read every part of the entire
23  dossier.
24      Q.   Okay.  So when they're summarizing
25  down to three pages, they're doing that for your

207

1  benefit, but you don't have to rely on it?
2      A.   Correct.
3      Q.   And you don't rely on that?
4      A.   I use it to make -- to see if there
5  are things -- make sure I haven't missed
6  something that they point out.
7      Q.   Was there anything -- well, do you
8  ever rely on the three-page summary only when you
9  write your evaluation?
10      A.   No, I do not.  I -- I am required by
11  the guidelines to do an independent
12  evaluation, --
13      Q.   Okay.
14      A.   -- and I read every document --
15  every -- all parts of every document.
16      Q.   Do you follow up with the P&T
17  Committee to ask them questions about why they
18  didn't say X, Y, or Z in their summary to you?
19      A.   Yeah, sometimes I question -- I
20  question why they've taken a -- why I had a
21  different opinion than they have, that's correct.
22      Q.   In Dr. Nikolova's case, do you
23  remember what questioning you did of the P&T
24  Committee?
25      A.   Yes.  I asked them -- because this is

208

1  an early promotion case, I had a long discussion
2  with them about what -- where the bar should be
3  for an early case, and I believe they felt, and I
4  think I stated this, that the Budget Coun -- I'm
5  sorry.
6          I'm on Page 1, second paragraph, "The
7  Budget Council in the Department of Electrical
8  and Computer Engineering felt that her total time
9  in rank was" submiss -- "sufficient to warrant
10  consideration for promotion this year.
11          "The" coll -- the Cockrell School's
12  Promotion and Tenure Committee agreed with this
13  assessment."
14          So that was our fundamental
15  disconnect is that I have -- had sat in on five
16  or six, however many, of the President Committee
17  meetings where they had talked about how years
18  should be counted, how probationary service
19  needed to be counted, and the Committee said,
20  "Well, then that was indeed why I included the
21  little chart in my statement."
22          They said, "Well, if you look, her
23  total time in rank is about -- is -- that's how
24  much time someone should spend in rank."
25          And they found that to be compelling,

209

1  but they were not present at all of the meetings
2  I've discussed with you, nor did they attend --
3  do they attend the briefings with the President's
4  Committee and the Department Chairs.
5          So I think that was the fundamental
6  disconnect with this case.
7      Q.   And this need to explain the early --
8  the accelerated consideration, that had been --
9  that had been the norm for the whole time you'd
10  been a Dean, correct?
11      A.   It had, but I -- I told you that the
12  President was -- the President's Committee was I
13  think clarifying their intent in more detail, and
14  in the past in the Cockrell School this case -- a
15  case with this number of years in rank, we would
16  have said, "Well, this is technically --
17  technically more than the total time -- normal
18  time in rank," and we would not have had as much
19  additional scrutiny.
20      Q.   Is it your testimony that this year,
21  the 2018/2019 year, was the year that things
22  changed to become more heightened in the scrutiny
23  of accelerated consideration?
24      A.   It is my testimony that -- well,
25  exactly what's occurring in this year, it could

210

1  have possibly occurred in the previous year, but
2  I -- I know that we were -- in the time -- it was
3  in the timeframe when Greg Fenves was President,
4  Maurie McInnis was Provost, and Dan Jaffe was --
5  was Vice President for Research that these -- the
6  policies began to gel, and they spent more time
7  talking with us about reclarifying what is an
8  early case versus what is not an early case -- or
9  accelerated cases versus a normal time, so...
10     Q.  What is or -- what is and is not
11 accelerated and what will the consequences of
12 that accelerated consideration be?
13     A.  Right.  So --
14     Q.  Can you tell us if those new policies
15 and procedures were implemented this particular
16 year, 2018/2019, for the first time?
17         MR. DOWER:  Objection;
18     form.
19     A.  So I -- I believe that to be the
20 case, because in my summary I said, "If this were
21 an up-or-out case, I would likely agree with the
22 recommendation of the Promotion and Tenure
23 Committee.
24     Q.  What does that have to do with the
25 timing of the new policy being implemented in

211

1  this year?  I don't -- I don't see the connection
2  there.
3      A.  Okay.  That's a very good question.
4  I had never used that -- that type of wording
5  before, and I -- this is -- in my mind, what this
6  statement is saying is that there is a clear
7  distinction between the -- the up-or-out case or
8  the higher bar required for early promotion.
9      So I -- I -- I write the letter
10 essentially to the President's Committee, and
11 that's what I'm trying to -- that's my intent
12 here.
13         And I -- I apologize, this is Page 4
14 [sic], the first paragraph, that if it were an
15 up-or-out case, right, we know there are some
16 flat spots.
17     I'm not saying I would agree, but I'm
18 saying the chance -- that there's a greater
19 likelihood I would agree with the Promotion and
20 Tenure Committee, but because I understand --
21 because the next sentence says, "However, Dr.
22 Nikolova is being considered for promotion at UT
23 Austin two years early."
24     So to me that's saying, "Wait.  It's
25 two years early, so we have a higher bar."  All

212

1  of that is consistent with what the President's
2  Committee had been telling us, both in -- in
3  meetings with the Deans and in public when they
4  had their Deans and Department Chairs briefings.
5      Q.  Despite the fact that you have no
6  knowledge that Dr. Nikolova understands that two
7  years early means an even higher bar?
8          MR. DOWER:  Objection;
9      form.
10     A.  I honestly could not -- I do -- I
11 have not spoken directly with Dr. Nikolova,
12 therefore, I have no direct knowledge of what she
13 knows or does not know.
14 BY MR. NOTZON:
15     Q.  You do know that there is nothing in
16 writing that says two years early is even a
17 higher bar than one year early?
18     A.  I do know that, yes.
19     Q.  And you do know that there's nothing
20 in writing that says three years early is even
21 higher than that, correct?
22     A.  I agree we have no written policy.
23     Q.  Do you also agree that there are
24 people that have gone up for tenure that are more
25 than two years early that have flatter spots than

213

1  Dr. Nikolova?
2          MR. DOWER:  Objection;
3      form.
4      A.  I agree that there are some people
5  who went up more early.  Using this current
6  definition, you have flat spots, yes.
7  BY MR. NOTZON:
8      Q.  Flatter than Dr. Nikolova?
9      A.  I would not be able to make that
10 assessment without doing a complete review of all
11 the cases, which I have not done.
12     Q.  Okay.  Did you review Dr. Nikolova's
13 rebuttals and appeals to your decision --
14     A.  I --
15     Q.  -- in your -- not your decision, but
16 your evaluation?
17     A.  Right; my recommendation.  I did,
18 yes.
19     Q.  And did you not see her arguments
20 that she had higher performance measures and
21 metrics in the several criteria areas than the
22 people that had been given tenure in the years
23 prior?
24     A.  So as -- as I told you, we don't do
25 that sort of comparison because the domains are

214

1  so different.
2      I believe that her comparison was
3  actually -- I had no impart, so she -- she wrote
4  a response to my letter, and then she also had
5  a -- wrote to the President and to CCAFR, the
6  Committee of Counsel on Academic Freedom and
7  Responsibility.
8      Although I read that information, I
9  have no input into those decisions, so I -- I
10 do -- I do not believe that one can compare
11 across different domains.
12     I can tell you, though, that some
13 cases that were promoted were early promotions --
14 accelerated promotions that happened before Dr.
15 Nikolova's case had flat spots.  I agree with
16 that assessment.
17     Q.  You're saying you can't compare
18 across domains, but that's, in fact, what you
19 did, didn't you, when you're evaluating her and
20 her teaching scores?
21     A.  So I'd like to call your attention to
22 Exhibit 3, which is what I've put up.
23     So you'll see there's Item No. 1
24 there.  And this is related to teaching, and
25 there are five bullet points.

215

1      The first bullet point is related to
2  CIS rankings, and you'll notice that there is
3  something there about what types of course, it's
4  "required, undergraduate, undergraduate
5  elective."
6      The second bullet point -- bullet
7  point addresses student comments.
8      The third bullet point, it says, "Did
9  the faculty member" actually -- "accurately
10 capture the primary concerns raised by the
11 students in their teaching statement?
12     "Did they implement changes to
13 address the concerns?  Was the faculty member
14 successful in improving their teaching in rank?"
15     "Did the Department" -- the fourth is
16 did the Department provide mentoring?  "Did the
17 peer reviewers address any of the same concerns
18 raised by the students?  Did the peer reviewers
19 provide substantive feedback to the faculty
20 member?"
21     And then "Is there anything notable
22 in the faculty member's development as a teacher
23 that should be highlighted," (as read).
24     So in the discussion of teaching,
25 there are five points that I had specifically

216

1  asked the Promotion and Tenure Committee to look
2  at, and only one is a numerical ranking.
3      Q.  Did your evaluation of Dr. Nikolova
4  cover all five of those bullet points?
5      A.  It did.
6      Q.  Did it accurately document Dr.
7  Nikolova's responses -- I mean, Dr. Nikolova's
8  responses on those five bullet points?
9      A.  I did not -- I did not include in my
10 statement comments about the peer reviewers, for
11 example, and I know this is something that Dr.
12 Nikolova commented on, because the peer reviewers
13 were quite -- quite complimentary of her
14 teaching.
15     Q.  Effusive, nonetheless?
16     A.  Yes.  Amongst the President's
17 Committee, it is actually almost -- it is a
18 comment they bring up often is that there is this
19 fundamental disconnect between the peer reviewers
20 and the students because it's very rare that a
21 peer reviewer has constructive feedback for the
22 faculty member.
23     As a matter of fact, the Electrical
24 and Computer Engineering Department changed their
25 policies to try to have more reflection in

217

1  both -- by both the candidate and the peer
2  reviewers to provide more assistance to a
3  candidate.
4      Q.  Doctor -- I mean, Dean Wood, let me
5  ask you some questions about your evaluation
6  under "Teaching" of Dr. Nikolova.
7      You referred to her having a
8  "downward trend" when she had one outlier score
9  of the four, and all the other three were within
10 one -- point one-tenth of a point of each other,
11 correct?
12     A.  I agree with your assessment, yes.
13     Q.  And she was teaching two large
14 classes in the same semester when she got that
15 outlier score, correct?
16     A.  Yes.
17     Q.  And she was pregnant during that
18 semester, correct?
19     A.  I did -- I did not know that at the
20 time that I wrote my statement.
21     Q.  Regardless if you knew that or not,
22 there was one outlier score in a semester where
23 she's teaching two large classes of a required
24 undergraduate class that is purported and known
25 to be one of the more difficult required courses

218

1   in the college that she -- that Dr. Nikolova was
2   complimented for stepping up to the plate and
3   taking on that responsibility for the Department,
4   correct?
5           MR. DOWER:  Objection;
6       form.
7       A.  So I -- I -- I disagree with several
8   of the comments you just made.
9   BY MR. NOTZON:
10      Q.  Tell me which ones, because I'm
11  quoting from those peer reviews.  But go ahead.
12      A.  Okay.  So the faculty will often
13  claim, and within any Department, that a given
14  class is the hardest one in the curriculum.
15          That is probably the most frequent
16  comment that I see when I read all these
17  promotion dossiers.
18      Q.  I didn't say "hardest."
19      A.  Greg Iverson --
20      Q.  I didn't say "hardest."
21          MR. DOWER:  I'm going
22      to -- I'm going to ask that you
23      let the witness finish the answer,
24      please.
25          MR. NOTZON:  Sure.

220

1   was one of the hardest," that I also made other
2   statements about that course being two large
3   required courses, which are also known to be
4   sources of downward scores, correct?
5           MR. DOWER:  Objection;
6       form.
7       A.  So if one -- if a faculty member was
8   teaching the same class, then -- and the trend
9   is -- is going up, that indicates that they're
10  getting better in the class, and that is an
11  indication that they're becoming more familiar
12  with -- with the class.
13          MR. NOTZON:  Object;
14      nonresponsive.
15      A.  They're also understanding student
16  expectations, so --
17  BY MR. NOTZON:
18      Q.  This is nonresponsive.
19      A.  -- by comparing her trends in the
20  class, I'm not comparing her with -- I -- I first
21  did a comparison with other people, and now I'm
22  looking at her alone.
23          She's teaching a large class but
24  she's taught it now three or four times and it
25  has remained flat or slightly downward.

219

1       A.  One of the members of the President's
2   Committee is Brent Iverson, who teaches Organic
3   Chemistry, and so he has specifically said that
4   he does not found the technical content of the
5   class to be a mitigating circumstance because
6   he's teaching Organic Chemistry to 500 people at
7   a time.
8           So what the President's Committee
9   likes to see is that there is -- regardless of
10  where the faculty member starts in the class, but
11  as they teach the class more frequently and they
12  become more familiar with the background of the
13  students and also with the expectations, that
14  there will be an increase in the course
15  evaluations.
16          So I agree with you, I was -- I
17  should have said a -- "has remained flat" rather
18  than, I'll -- I'll say, "have fallen," but there
19  certainly was not an upward trend in her
20  teaching, which is -- normally occurs when a
21  faculty member teaches a class in their third or
22  fourth time.
23  BY MR. NOTZON:
24      Q.  And you would agree with me that your
25  response was quibbling with -- when I said "It

221

1           MR. NOTZON:  Object as
2       nonresponsive.
3   BY MR. NOTZON:
4       Q.  My -- my -- my question is
5   specifically about all the components that
6   affected Dr. Nikolova in that one semester
7   teaching two of the four data points, where one
8   of them is exactly the same as the prior one, the
9   other one is point two-tenths -- point two points
10  away, so not a horribly low score comparatively,
11  and she's teaching both of them at the same time
12  with large student populations.
13          And you say she didn't know she
14  was -- you didn't know she was pregnant at the
15  time.  You know, be that as it may, those other
16  mitigating factors are still there and you know
17  that.
18          So -- but you don't mention any of
19  that.  You don't provide any explanation or
20  discussion that there's anything other than "She
21  should have gotten a higher score; she should
22  have an upward trend," period, without discussing
23  any of these factors, correct?
24          MR. DOWER:  Objection;
25      form.

Sharon Wood - 3/18/2021

222

1    A.  I did not discuss other factors,
2  however, the President's Committee does read the
3  case, the size of the class -- the class size is
4  documented in several tables, so that would have
5  been very obvious to them, too.
6  BY MR. NOTZON:
7    Q.  But you didn't attempt to explain
8  that flat spot, did you?
9    A.  I did not attempt to -- to describe
10  that, no -- explain that, no.
11    Q.  Is -- you -- you -- you criticize her
12  for the Teaching Assistant comment that she wrote
13  in her teaching assessment which she was quoting
14  the students complaining about the Teaching
15  Assistant's scoring and assignments.
16      Did -- did you also -- why didn't you
17  question her as part of your questioning as to
18  what she meant by what the Teaching Assistants
19  were being asked to do and not do?
20      MR. DOWER:  Objection;
21  form.
22    A.  So Dr. Nikolova wrote a statement
23  that specifically addressed her teaching.  She
24  was asked to reflect on the teaching, make
25  comments about how the -- the students' comments

223

1  had impacted her teaching, and she -- I'm
2  paraphrasing now.  I don't have her comments
3  directly in front of me.
4      But she indicated that she received
5  positive comments, but all the negative comments
6  were associated to the Teaching Assistants, and
7  then -- and that --
8  BY MR. NOTZON:
9    Q.  She didn't say "all of them," did
10  she?
11    A.  I said I was paraphrasing, I did not
12  have it in front of me, so I'm -- please give me
13  a little leeway here.
14    Q.  Well, "all" -- "all" is hard.  It's
15  hard to give you --
16    A.  Okay.  I'll say -- how 'bout we
17  change it to "most"?  "Most" of the negative
18  comments were related to the Teaching Assistants.
19  Are you okay with that?
20    Q.  No, but go ahead.
21    A.  Okay.  A -- a -- a fraction --
22  actually, --
23    Q.  "Some"?
24    A.  "Some."  Okay.  I'll use "some."  But
25  there was -- she said she had attributed them

224

1  directly to the Teaching Assistants, and in all
2  of my reading of teaching statements amongst
3  everyone who's been promoted in the Cockrell
4  School up to this time, this was -- this was, I
5  thought, the most direct deflection of taking
6  responsibility; that everything that happens in
7  the classroom is the faculty mem -- member's
8  responsibility.
9      And so to say -- to blame some of the
10  negative comments -- well, not -- I don't want to
11  use "some."  I -- I inter -- when I read it I
12  interpreted it to be a majority of the negative
13  comments directly to the Teaching Assistants I
14  believed was not taking responsibility for the
15  class.
16    Q.  So if you felt that strongly about
17  this issue, you didn't feel a need to ask Dr.
18  Nikolova to explain herself, --
19    A.  Well, actually, I gave --
20    Q.  -- the follow-up questions that you
21  sent her?
22    A.  Actually, I gave her the opportunity
23  to.  So I -- I called Ahmed after I had made my
24  ne -- after I made my negative recommendation,
25  and I wanted Dr. Nikolova -- Nikolova to know.

225

1  And I said, "She has two options.  She can
2  provide a written rebuttal to this that will be
3  included in this -- in the case when it goes to
4  the President's Committee so they will see her
5  response to this, so if I have misrepresented her
6  case, she will be able to provide that
7  information directly to the decision-makers.
8      Alternatively, she has the option of
9  withdrawing her case so that if the Committee
10  agrees with my decision, she would not have a
11  negative decision on her record.
12      And she, indeed, did decide to submit
13  supplemental document to rebut my statement.  So
14  I did give her the opportunity to respond.
15      MR. NOTZON:  Object as
16  nonresponsive.
17  BY MR. NOTZON:
18    Q.  That wasn't my question, Dean Wood.
19      My question is:  If you felt so
20  strongly about this issue with Teaching
21  Assistants, which, according to your testimony
22  and the way you presented, you do, why didn't you
23  ask her in your follow questions before making
24  your final decision to explain herself on this
25  issue?

226

1    A.  So my follow-up questions in most
2  cases are -- I can't remember any case that it
3  isn't -- are really in the quantitative nature
4  of, as I mentioned, the two cases to you, did
5  this student graduate, did -- was a proposal
6  funded, was -- was this paper published.
7        When a candidate has the ability to
8  write a statement, I don't then ask questions
9  about their statement.  I take their statement on
10 face value.
11   Q.  Another quantitative issue was did
12 you mean to contradict the philosophy within the
13 School of -- of Engineering when you wrote what
14 you wrote?
15       MR. DOWER:  Objection;
16   form.
17   A.  I'm sorry, I don't understand the
18 question.
19 BY MR. NOTZON:
20   Q.  You -- you know, if this is so
21 important and you're saying that she has -- her
22 statement contradicts the philosophy within the
23 Cockrell School of Engineering, if -- if that's
24 something that's so critical to you and you're
25 going to rely on this and her -- her funding as

227

1  the two main reasons why you're not going to
2  promote her -- support her promotion and tenure,
3  and opposition to both your P&T Committee and the
4  Budget Council and the Chair, you -- you're not
5  going to give her one opportunity to explain
6  herself?
7        MR. DOWER:  Objection;
8    form.
9    A.  Sir, she did have an opportunity to
10 address it.
11 BY MR. NOTZON:
12   Q.  And she did, didn't she?
13   A.  Excuse me?
14   Q.  She did, didn't she, but only after
15 you ruled against her?
16   A.  In some respect I think timing has to
17 do with this.  I often save my toughest case to
18 last, and so there -- there's not time to get the
19 case in.
20       So by providing her an opportunity
21 afterwards, she had -- she could see that -- my
22 entire statement and she could response to it.
23   Q.  You can't really rely on timing, Dean
24 Wood, can you, because you sent her follow-up
25 questions.

228

1        So having one extra question in there
2  would not have added more time, would it?
3        MR. DOWER:  Objection;
4    form.
5    A.  No, I -- I disagree.
6  BY MR. NOTZON:
7    Q.  How would it have added time?
8    A.  Excuse me, would you like me to
9  answer the question?
10   Q.  How would it add more time?
11   A.  Because I -- I reviewed the CV first,
12 and I tried to make sure there's clarification on
13 all of the -- the quantitative information the
14 CV.
15       Then I -- I read each case at least
16 once, possibly twice.  That takes a considerable
17 amount of time.
18       There are also more than ten cases
19 being considered each -- in each review cycle.
20 So there may be a significant gap between when I
21 send the initial -- that set of questions that I
22 mentioned requesting clarification and when I
23 finish this -- my -- my letter.
24       MR. DOWER:  Robert,
25   it's been about an hour.  Can we

229

1  take a break relatively soon?
2        MR. NOTZON:  Not just
3    yet.
4        MR. DOWER:  Okay.  Well,
5    then I would like the record to
6    reflect that you are banging the
7    table as you shout at my witness.
8        MR. NOTZON:  I don't
9    think that's accurate, and good
10   thing it's recorded.  Okay, so...
11   Especially when I'm way over here
12   and she's way over there, I
13   don't -- I -- I -- even if that was
14   happening.  That's silly.
15 BY MR. NOTZON:
16   Q.  Okay.  Dean Wood, you -- you next
17 fault Dr. Nikolova for her research, and you say
18 that you -- it raises questions about the
19 sustainability of her research funding.
20       And -- but you don't give any
21 explanation for what those questions are and how
22 they contradict the findings of the Budget
23 Committee -- the Budget Council and your P&T
24 Committee.
25       Can you explain that?

230

1     A.  Yes.  The Vice President of Research,
2  that's Dan Jaffe, would often ask questions about
3  how many grants continue beyond the end of the --
4  the year that's being under review.  Is there
5  sufficient funding to support all the members of
6  the research group?
7          So that's why I'm saying that because
8  so much of the funding occurred early, it -- it
9  raises some questions of whether there's
10  continuity of funding.
11     Q.  Are you finished?
12     A.  Yes.
13     Q.  Doesn't that depend on how much
14  funding she needs and over what period of time
15  and how much funding she has?
16     A.  Yes, it does.
17     Q.  And -- and did you go through that
18  analysis?  Because according to every other
19  person that's written on this, she had excess
20  funds based upon those criteria.
21          MR. DOWER:  Objection;
22  form.
23     A.  I don't believe -- I believe Dr.
24  Nikolova talks about excess funds.  I don't
25  believe others talked about excess funds.

231

1          And I disagree with her assessment.
2  BY MR. NOTZON:
3     Q.  They say -- they talk about
4  sufficient funds, don't they?
5     A.  "Sufficient" and "excess" are not the
6  same.
7     Q.  "In excess of her needs" would be
8  "sufficient," wouldn't it?
9     A.  Okay.  So --
10     Q.  "Yes" or "no"?
11     A.  Yes.
12     Q.  Okay.
13     A.  I -- I would like to provide
14  clarifying information, however.
15     Q.  No, thank you.
16          We talked earlier about what kind of
17  dollars are needed for what kind of research, and
18  do you recall Dr. Nikolova's response to your
19  criticism about her funding, the sustainability
20  of her funding?
21          Do you recall that --
22     A.  Yes, I -- I believe she said that she
23  had spent a million dollars and all of her time
24  and rank up to that time, and she had about two
25  and a half years of research funding moving

232

1  forward.
2     Q.  And -- and why was that not
3  sufficient amount of time given what she also
4  wrote about her ability to get funding from her
5  track record at that time?
6     A.  So I checked the University records.
7  In three years she actually spent a million
8  dollars of research expenditures from grants and
9  contracts, so that -- that was a bit of an
10  exaggeration to say over seven years she spent a
11  million dollars.
12          Secondly, she was given a startup
13  package that included her summer salary, graduate
14  student years, and also some discretionary money,
15  and so I believe that that -- those funds, which
16  are -- allowed her to main -- have a large
17  research group, but she was not paying those
18  people with a grant from grant funds.
19          So if one takes into account how much
20  a grant would have to pay for graduate students,
21  and I believe she referred to a group of four,
22  and her own summer salary, and them some money
23  for travel, tuition, all these other things that
24  were added on, computers, her -- her -- I -- a
25  projection of two and a half years is a -- I

233

1  believe is an over -- is an exaggeration, and
2  that -- and it does -- her funding did not last
3  that long.
4     Q.  And you're the only one that caught
5  that?
6          MR. DOWER:  Objection;
7  form.
8     A.  There are many cases where I -- I do
9  a more detailed evaluation than the Budget
10  Council or the -- or the Promotion and Tenure
11  Committee because I -- I see so many more cases
12  than they do, and I also know the questions that
13  the President's Committee asks me.
14          So it takes a lot of time and -- to
15  cull through all this information, and many times
16  the Committees don't put that time in.  So yes, I
17  was the only one that saw that.
18  BY MR. NOTZON:
19     Q.  Why did you refer to her funding in
20  terms of years instead of prior to UT and at UT
21  like you do in other evaluations?
22     A.  So she was able to transfer some of
23  her research funded that she was awarded grants
24  at Texas A&M and then was able to transfer them
25  to UT and spent them here, so I considered her

234

1  entire time in -- in rank as an Assistant
2  Professor.
3      Q.  But you also criticized her for not
4  having additional funding, even though she got
5  funding at UT?
6      A.  Right.  So one of the things that --
7  one of the trends that we like to see for someone
8  who's being considered for promotion is that the
9  funding starts -- starts low, as any Assistant
10  Professor would, and then it increases during
11  their time in rank.
12      And so I noted that her first -- I
13  would say in the '13/'14 and '14/'15 academic
14  year, things were on a great track, and then she
15  spent a year -- there was a year that was not --
16  her modified instruct -- she had her probationary
17  year, she spent time at UC Berkeley, she had --
18  did not teach, she had the birth of her first
19  child, and after that it didn't seem as if the --
20  the growth was being sustained at the same level.
21      And so very often in these
22  assessments the Department Chairs and the Budget
23  Council look at average funding, and I think that
24  trends are -- in terms of -- the -- the trends
25  are actually very important in these assessments.

235

1      And we -- we've seen this not only in
2  promotion cases but other evaluations of faculty.
3      Q.  Why is a trend important instead of
4  sufficient funding important based upon the needs
5  of the research program?
6      A.  Well, I told you, there's a
7  fundament -- I -- Dr. Nikolova and I disagree on
8  how much funding is required to support her
9  research group of four people, and because she
10  had so much startup funds that came in when she
11  started at UT, she was able to use those funds to
12  cover a -- a large portion of her research group.
13      Those funds expire after about two
14  years, so she would need more funding to pay --
15  from grants to pay for that same size research
16  group.
17      Q.  Why would she -- and my next question
18  is:  Why would she be penalized for getting a
19  high initial set of funding instead of the norm
20  that you're used to seeing, like you testified,
21  of a new Assistant Professor starting off small
22  and growing?
23      A.  She was not penalized for starting
24  strong.
25      Q.  You're -- you're saying she had a

236

1  downward trend because she ended up getting a
2  large infusion of money to start, which -- which
3  was -- in a total amount, but it was scheduled
4  over a period of years.
5      It was meant to go over a period of
6  years and was used over a period of years.
7      A.  You're right, it was.
8      Q.  So to call that a downward trend
9  is -- was that not really fair, was it?
10      A.  As I mentioned, very often in
11  promotion cases, the ones that are successful,
12  you'll see that more grants are coming in toward
13  the end of the probationary period so that the
14  faculty member is getting more funding.
15      And the size of the group, you know,
16  as -- as the startup funds diminish, they're able
17  to pick up the -- the -- difference with
18  their research funding.
19      Q.  Let's go back to the teaching.  I
20  want to look at Footnote 2 on Page 2 of Exhibit
21  2.
22      You refer to "16.5 percent of the
23  instructor ratings for tenure and tenured-track
24  faculty in the Cockrell School are 3.7 or below."
25      So you're comparing her across the

237

1  entire College of Engineering, regardless of the
2  type of course it is, regardless of the required
3  course, regardless of how many students are
4  there, and to make it worse, you're using her one
5  outlier score the one time where she's teaching a
6  double overloaded course as the number that
7  you're pegging her to, instead of at least using
8  her average.
9      Why did you --
10      MR. DOWER:  Objection;
11  form.
12  BY MR. NOTZON:
13      Q.  Why did you do that?
14      MR. DOWER:  Objection;
15  form.
16      A.  That's a very good question.  I --
17  BY MR. NOTZON:
18      Q.  Do you think that's fair to comment
19  on her outlier score?
20      A.  Well, it -- it's what I did at the
21  time, so I definitely felt it was fair at the
22  time.
23      Q.  Or you felt it would put her in the
24  least favorable light, correct?
25      MR. DOWER:  Objection;

238

1    form.
2        A.  Well, I'm -- I was trying -- I mean,
3    I also have to defend what I write, and so it's
4    very clear from this that I picked one number and
5    I'm providing the context for it.
6        So I -- I'm not -- so I'm -- I'm
7    defending my assessment, yes.
8        Q.  Nobody has to believe that your
9    intent in this document was to be fair, do they?
10       MR. DOWER:  Objection;
11   form.
12       A.  I need to do an independent
13   assessment, Sir, and I did an independent
14   assessment.
15   BY MR. NOTZON:
16       Q.  That's your testimony but that's for
17   a jury to decide, isn't it?
18       MR. DOWER:  Objection;
19   form.
20       A.  I did an independent assessment as
21   required of me as Dean of Cockrell School of
22   Engineering.
23   BY MR. NOTZON:
24       Q.  I'll take that as your answer.
25       What about Footnote No. 4 on that

239

1    same page?  What was your intent in citing to
2    work that she had completed during her graduate
3    studies at MIT?
4        Let me ask a -- a -- a preliminary
5    question first.  The paper that was cited, when
6    was the paper published?
7        MR. DOWER:  Objection;
8    form.
9        A.  That information is included in the
10   dossier because we asked the candidates to
11   include the -- the front page of their Google
12   Scholar profile on -- from the website.
13       So I don't know when it was -- when
14   it was published; it includes her entire history.
15   And so what happens is the h-index and the
16   citations are very dependent on one's research
17   domain, and also, if one does a post-Doc, really
18   the -- the prominence of who they worked with in
19   a grad school and post-Doc.
20       And so this is providing context
21   that, you know, she -- she has a very highly
22   cited paper, it's more than 10 percent of her
23   total citations, it's -- so it establishes that
24   she has a very good reputation about her graduate
25   students.

240

1        And then you also want to know are
2    some of her papers being recognized from UT
3    Austin, so 42 citations based on work at UT
4    Austin is also quite high.
5        So that's the context in which it's
6    presented is that you -- you expect citations to
7    grow as a faculty mem -- as a faculty member
8    spends more time in rank, and it's not
9    immediately apparent when looking at these
10   citations what -- which are based on work that
11   they've done at UT.
12       So I've been -- I've been adding
13   this, this is consistent, this is the things that
14   I do in -- in every evaluation, really since
15   the -- the President's Committee has started
16   looking at the trends and citations.
17       I find it's very helpful to talk out
18   how -- how well their work is represented --
19   their work at UT is represented within the
20   community.
21       MR. NOTZON:  Object as
22   nonresponsive.
23   BY MR. NOTZON:
24       Q.  That whole -- that whole answer
25   followed my question of do you know when that

241

1    paper was published.
2        A.  It's elsewhere in the do -- in the
3    dossier.
4        Q.  Okay.
5        A.  I don't know off the top of my head.
6        Q.  Thanks.  Just, you know, that was the
7    question.
8        So based upon what you just said, it
9    sounds like you were also trying to show a
10   downward trend in the citations of her papers.
11       MR. DOWER:  Objection;
12   form.
13       A.  Absolutely not.
14   BY MR. NOTZON:
15       Q.  Okay.
16       A.  Citations take time to develop.
17       Q.  Right.  So the longer a paper exists,
18   the more likely the citations will grow?
19       A.  That's correct.
20       Q.  Especially if the issue written about
21   has legs, as it were?
22       A.  That is correct.
23       Q.  Influence in the community?
24       A.  Correct.
25       Q.  What I see lacking in this letter is

242

1  any kind of -- or not "any," but very few
2  adjectives that put Dr. Nikolova's work in
3  context or a descriptive context that exists if
4  many of your -- of the Deans' evaluations of
5  other faculty members that you're supporting.
6        I don't see -- would you agree with
7  that, that you have fewer adjectives describing
8  Dr. Nikolova's work than you use in other papers?
9     A.  I have not done --
10          MR. DOWER:  Objection;
11    form.
12    A.  -- that assessment.  I can tell you
13 that the Provost encouraged me to write shorter
14 letters.
15 BY MR. NOTZON:
16    Q.  Would you agree that you also didn't
17 put in the positive comments which were -- the --
18 the great majority of the comments from the
19 students on Dr. Nikolova were positive comments
20 from the students?
21          MR. DOWER:  Objection;
22    form.
23    A.  I know that there were many positive
24 comments, and, you're right, I did not refer to
25 them.

243

1  BY MR. NOTZON:
2     Q.  Do you know that they were -- a good
3  two-thirds, at least, if not more, of the
4  comments were positive comments?
5          MR. DOWER:  Objection;
6    form.
7     A.  I do not know that.  I have read all
8  the comments, but I do -- have not -- I've not
9  tried to -- attempted to quantify them.
10 BY MR. NOTZON:
11    Q.  Well, you know Dr. Nikolova in her
12 rebuttal to your evaluation did quantify them?
13    A.  I believe she did, yes.
14    Q.  So you do -- you have read it at one
15 point?
16    A.  I have.
17    Q.  We already talked about how you
18 didn't cite any of the positive comments from the
19 peer reviewers and how they gushed about her
20 teaching, correct?
21          MR. DOWER:  Objection;
22    form.
23    A.  That is correct.
24 BY MR. NOTZON:
25    Q.  Did you include any of the quotes

244

1  from the external reviewers that were all from
2  institution -- peer institutions that are higher
3  ranked than UT?
4          MR. DOWER:  Objection;
5    form.
6     A.  The President's committee asked me
7  specifically not to include quotes in my letter.
8  This was a change that they asked all of us to
9  implement.
10        The only difference to that is if
11 there was a negative comment in the letter, they
12 want it to be addressed in the Dean's letter.
13        So that is a change that has
14 occurred -- that occurred in response to -- to
15 the President's Committee.  And I -- I do not
16 believe that all of the letter writers came from
17 higher-ranked institutions.
18 BY MR. NOTZON:
19    Q.  Most of them?
20    A.  I do not -- I -- I believe most did,
21 but I do not -- not all.
22    Q.  Okay.  And -- and you are
23 specifically tasked with approving the letter
24 writers for each candidate, correct?
25    A.  That is correct.

245

1     Q.  And so when you got Dr. Nikolova's
2  list of proposed letter writers, you approved
3  those?
4     A.  That is the policy.  I do not
5  remember exactly when I approved her's, but that
6  is the policy, and I believe that that was
7  followed.
8     Q.  And so that would have also been the
9  case of you approving the letter writers for
10 other candidates that had letter writers from
11 non-peered institutions, correct?
12    A.  So the policy changed since -- while
13 I was Dean and when it was required to -- for the
14 Dean to approve the letter writers.
15        I don't remember what year that
16 changed, but that has changed since I've been
17 Dean.  The other --
18    Q.  Has -- I'm sorry.  Go ahead.
19    A.  The other issue that I know Dr.
20 Niko -- Nikolova brought up was in reference to
21 another candidate in a -- in a Department that
22 had -- where --
23        There are very few Departments of
24 Petroleum Engineering across the U.S., and so in
25 that specific example there was one international

Sharon Wood - 3/18/2021

246

1  reviewer, there was one member from a non-top ten
2  ranked Department, and all the other reviewers
3  were from top ten ranked Departments of Petroleum
4  Engineering, even though they may not have been
5  from what are normally considered to be peer-
6  reviewed universities.
7        Q.  And why didn't you identify that in
8  your evaluation of that candidate?
9        A.  The -- if -- if -- if an individual
10  is -- or if a faculty member is from a top ten or
11  top twenty ranked Department, that's considered
12  to be appropriate for the review.  And so --
13        Q.  But --
14        A.  And if a -- if a faculty member is
15  not in a top ranked Department, then they ask for
16  some sort of reason, and being an actual Academy
17  member is sufficient reason to go out of a -- to
18  a lower-ranked university or lower-ranked
19  Department.
20        Q.  Can you tell me why you mention Dr.
21  Nikolova's getting pregnant --
22        A.  I'm sorry.  I --
23        Q.  -- in this letter.
24        A.  I'm sorry.  Where is that?
25        Q.  You -- you mentioned it at least a

247

1  couple of times, but the one I'm -- your first
2  mention of it is in Footnote No. 1 on Page 2.
3        MR. DOWER:  I'm going
4  to object to form.
5        A.  So the reason for that is Dr.
6  Nikolova did not teach during the '15/'16
7  academic year, and that -- that's actually my
8  first statement on the top of Page 2.
9        And so the President's Committee is
10  interested in knowing why -- or what the norms
11  are for teaching in each Department, and then if
12  there's a deviation from the norm.
13        So it was important to recognize that
14  she was allowed to spend the Fall semester at UC
15  Berkeley, so she was not in residence, this was
16  something that the Department Chair felt was
17  important for her professional development, and
18  then she had agreed to teach two classes in the
19  Spring, but she did not teach those two classes
20  because she was expecting -- I believe her first
21  child was born during that Spring semester, so
22  she was placed -- she requested modified
23  instructional duties.
24        So this was an explanation of why Dr.
25  Nikolova did not teach in the '15/'16 academic

248

1  year.
2        MR. NOTZON:  Object as
3  nonresponsive.
4  BY MR. NOTZON:
5        Q.  My question is not that she didn't
6  teach in that year or the reasons for why she
7  wasn't teaching in the Fall of 2015.
8        The question was why did you mention
9  the pregnancy or the getting pregnant part?
10        MR. DOWER:  Objection;
11  form.
12  BY MR. NOTZON:
13        Q.  You could have, could you not, said
14  that she was given modified instructional duty,
15  you could say what she did in the Fall of 2015,
16  you could -- and -- and -- and the -- the benefit
17  to Dr. Nikolova's exposure and -- and
18  professional reputation, but also the service to
19  the community and the reputation of UT was also
20  benefitted by that, and then you could say that
21  she was given modified instructional duty for the
22  Spring semester, but you didn't, did you?
23        MR. DOWER:  Objection;
24  form.
25        A.  You're correct.  I was, I believe,

249

1  paraphrasing what the Department Chair said in
2  his letter, and you're absolutely right, I could
3  have deleted the first phrase and just said, "She
4  was assigned modified instructional duties for
5  the spring semester," you're correct.
6  BY MR. NOTZON:
7        Q.  Were you also trying to penalize her
8  for having been irresponsible and getting
9  pregnant while she was away in the Fall semester
10  when she was expected to teach two classes in,
11  quote/unquote, payment for that time away?
12        MR. DOWER:  Objection;
13  form.
14        A.  That was never my intent.  That never
15  crossed my mind.
16  BY MR. NOTZON:
17        Q.  You don't see that in your Footnote
18  1?
19        A.  As you mention it, I see how it could
20  be interpreted that way, but that was not my
21  intent.
22        Q.  "However, she became pregnant," even
23  though she was scheduled for two classes in the
24  Spring semester.
25        How could you take it any other way

250

1  if you're in the business?
2          MR. DOWER:  Objection;
3      form.
4      A.  I've already -- I've already
5  addressed my intent, I believe.  That was not my
6  intent as you're explaining it.
7  BY MR. NOTZON:
8      Q.  You also state that since that
9  academics year, she's just fallen off.  She's jut
10  not the same person that she used to be before
11  she got pregnant.
12          MR. DOWER:  Objection;
13      form.
14  BY MR. NOTZON:
15      Q.  Isn't that correct?
16      A.  I said that her instructor ratings
17  fell.  I did not link it to children or
18  pregnancy.
19      Q.  Didn't you?  You say that right after
20  Footnote 1 is there on the top of Page 2.
21          In Footnote 1, it specifically talks
22  about her getting pregnant while she was away
23  from UT at another program, correct?
24      A.  You have correctly read the document,
25  but that was not my intent.  As I told you, I

251

1  look at trends, and I -- this was a trend, was
2  that the teaching ratings are -- were lower after
3  that semester.
4      Q.  Let's put the cherry on top by
5  looking at the top paragraph of Page 4 of Exhibit
6  2.  And you don't just talk about her following
7  the 2015/2016 school year having fallen off, you
8  talk specifically about, "These concerns are
9  compounded by the fact that both her teaching and
10  her external funding have dropped since she spent
11  the 2015 Fall semester at UC Berkeley,"
12  parentheses, "(getting pregnant)," closed
13  parentheses?
14          MR. DOWER:  Objection;
15      form.
16      A.  No, sir.  She spent a semester on --
17  to -- away from UT Austin to enhance her
18  professional -- her professional career.
19  BY MR. NOTZON:
20      Q.  And she did enhance her professional
21  career and UT's reputation for having her,
22  correct?
23      A.  She did enhance her professional
24  career and therefore it had an impact on UT
25  Austin, correct.

252

1      Q.  And in fact, her Department was
2  raving about her innovations in the classroom and
3  in the curriculum which were adopted by other
4  award-winning faculty members like your
5  associate, Dean Julien.
6          You talked about how wonderful she
7  wrote the assessment of her teaching and how
8  wonderful she was, correct?
9          MR. DOWER:  Objection;
10      form.
11      A.  I believe you're characterizing the
12  statements in the dossier correctly.
13  BY MR. NOTZON:
14      Q.  And she then went back to Simons in
15  the Spring of 2018 after, quote/unquote, "paying
16  for the per -- privilege to go by the double big
17  class in the Fall semester," despite being
18  pregnant, and she organized -- along with tenured
19  Professors, she was the only nontenured Professor
20  as an organizer, correct?
21          MR. DOWER:  Objection;
22      form.  Robert, when you say
23      "quote/unquote," are you quoting
24      yourself?  What are you quoting?
25          MR. NOTZON:  You can

253

1      object, Mr. Dower.
2          MR. DOWER:  Okay.
3      Objection; form.
4          MR. NOTZON:  Thank
5      you.
6      A.  She did go back to -- to this
7  institute at UC Berkeley, and she did organize a
8  semester-long workshop, and the other faculty
9  members were more senior than she, yes.
10  BY MR. NOTZON:
11      Q.  And that was an increase in -- in her
12  responsibilities and exposure, and increased
13  reputation, correct?
14      A.  I believe that to be true.
15      Q.  And you don't make any statement
16  about that upward trend, do you?
17      A.  I do mention that workshop during the
18  Spring 2018 as part of her professional service.
19      Q.  You mention the fact of it, but you
20  don't characterize it.  You don't put an
21  adjective on it.  You don't put it in context of
22  it being an upward trend, do you?
23      A.  I did provide the context of "The
24  Simons Institute is the world's leading venue for
25  collaborative research in theoretical computer

Sharon Wood - 3/18/2021

254

1 science," so that provides the context of the
2 importance of this. But you're right, I did not
3 describe an upward trend.
4     Q. You provide the importance of the
5 Institute. You don't provide the importance of
6 her participating and you don't talk about your
7 assessment of that participation being something
8 that you view as important to either her career
9 or UT's reputation, do you?
10     A. I --
11         MR. DOWER: Objection;
12 form.
13     A. I did state that the other four
14 organizers were tenured faculty members and --
15 and I gave the names to say they were very highly
16 ranked universities.
17         So I provided the context of that
18 related to her professional service so that it
19 could be -- that context could be -- that the
20 members of the Pres -- President's Committee
21 could put her work in context.
22 BY MR. NOTZON:
23     Q. While you don't provide any positive
24 assessment of it, you just provide the fact,
25 correct?

255

1         MR. DOWER: Objection;
2 form.
3     A. I provided the facts, yes.
4 BY MR. NOTZON:
5     Q. Did Dr. Nikolova -- has Dr. Nikolova
6 run out of funding for her research here two
7 years later?
8     A. I cannot answer that question with
9 authority.
10         MR. NOTZON: Let's take
11 a break.
12         MR. DOWER: Okay.
13         THE COURT REPORTER: We're
14 going off the record at 4:00 o'clock
15 p.m.
16 (Recess held from 4:00 p.m. to 4:14 p.m.)
17         THE COURT REPORTER: And
18 we are back on the record at 4:14
19 p.m.
20         MR. SCHMIDT: Okay. And
21 we are back recording, as well.
22 BY MR. NOTZON:
23     Q. Okay. Dean Wood, during the P&T
24 Committee consideration of Dr. Nikolova and your
25 interaction with them, were there any of the P&T

256

1 Committee members that were particularly vocal
2 about -- in their support of Dr. Nikolova?
3     A. The -- Chair of the Promotion and
4 Tenure Committee that year was Dr. Nikolova's
5 mentor, and I did not know that at the time, so
6 he -- he also is the ECE representative.
7         So I think he was very -- I -- I -- I
8 didn't know that at the time I wrote this letter,
9 either, just to put that in context.
10         I believe he was a very strong
11 supporter for Dr. Nikolova.
12     Q. "Was" meaning no longer, or "was"
13 meaning at the time?
14     A. No, you asked me at the time that I
15 met with him, and so that's why I used the past
16 tense.
17     Q. Okay. Just to clarify.
18         I have seen a bunch of emails from
19 ECE faculty members responding to Dr. Nikolova's
20 email kind of publicly airing her displeasure
21 with your evaluation and -- and -- and denial of
22 tenure.
23         Have you seen those emails, as well?
24     A. I did not deny tenure. The President
25 made the decision. I made a recommendation in my

257

1 independent assessment.
2     Q. A recommendation to deny?
3     A. To not promote at this time, that's
4 correct.
5     Q. Yep. All right. And thank you for
6 keeping me to that accuracy on what your
7 responsibility was.
8         So what was my question?
9     A. You asked me if I had seen the
10 responses from the faculty members.
11     Q. Yeah.
12     A. And the answer is no. Dr. Tewfik
13 forwarded to me the email that Dr. Nikolova sent
14 to Sanjay, and that's all that I've seen.
15     Q. Okay. You didn't -- nobody forwarded
16 you the other emails from faculty members or the
17 email from Dr. Nikolova where she compiled the --
18 the comments that were -- she was authorized to
19 publicly disclose and those that were not?
20     A. I do not remember seeing that.
21     Q. Okay. I -- I saw where there was a
22 number of emails that were forwarded to you by
23 ECE faculty that came from Dr. Nikolova or others
24 that you weren't copied on.
25     A. Okay.

258

1    Q.  Do you know what I'm talking about?
2    A.  I'm sorry.  I honestly don't
3  remember.
4    Q.  Were there any members of the P&T
5  Committee that were communicating to you their
6  displeasure with your recommendation?
7    A.  Not to my knowledge.
8    Q.  So other than -- and the person
9  you're referring to is Sanjay, is that right,
10  that was her mentor?
11    A.  Sanjay Shakkottai, yes.
12    Q.  Okay.  Thank you.  It's not in front
13  of me, so I didn't have it memorized.
14  "Shakkottai"?
15    A.  Yes.
16    Q.  So Professor Shakkottai.
17        Anyone else besides him that was
18  vocally in support of Dr. Nikolova either during
19  the process or since?
20        MR. DOWER:  Objection;
21    form.
22    A.  I -- I don't remember anything, but I
23  think -- I have also not reviewed my emails
24  specifically to answer that, and it was not
25  amongst the emails that I reviewed in preparation

259

1  for this deposition.
2  BY MR. NOTZON:
3    Q.  Has anybody reached out to you in
4  support of not giving Dr. Nikolova tenure?
5    A.  Not to my knowledge.
6    Q.  Other than, of course, President
7  Fenves.
8    A.  Well, --
9    Q.  We're not talking about --
10    A.  -- they made the decision.
11    Q.  Yeah, I'm talking about anybody at or
12  below your level of responsibility.
13    A.  I don't -- I don't remember any
14  case -- well, I don't remember any case where a
15  faculty member within the Cockrell School of
16  Engineering has contacted me after I've made a
17  recommendation on -- on a promotion of tenure
18  case.
19    Q.  Okay.  So my question would include,
20  is there anybody that has communicated with you a
21  reaction to your recommendation against tenure
22  for Dr. Nikolova, whether it be a comment in
23  passing, a written comment, or any communication
24  to you that they have an opinion on what you
25  wrote or recommended?

260

1    A.  So I mean, Ahmed Tewfik reached out
2  to me because he wanted me to be aware that Dr.
3  Nikolova had been -- had shared emails within the
4  Department and -- and distributed the
5  information.
6        I honestly do not remember if I
7  received any follow-up emails from that.
8    Q.  Okay.  So looking at Exhibit 2, your
9  evaluation dated 20th of November 2018, does this
10  include all the reasons for your recommendation
11  to deny tenure to Dr. Nikolova?
12    A.  To not promote her early, yes.
13    Q.  Okay.  And so I should expect to hear
14  nothing else as another reason that you would
15  have recommended not promoting her to tenure at
16  that time later in this case?
17    A.  I don't believe so.  I believe that
18  I've addressed my -- I addressed my concerns in
19  my written letter.
20    Q.  Okay.  And -- and -- and that's
21  because you're required to put your reasoning in
22  writing; is that right?
23    A.  That is correct; right.
24    Q.  Okay.  And you'd said that this was
25  the first time that -- or the first year where

261

1  you directed the P&T Committee not to give you a
2  draft of the recommendation letter.
3        And is -- would it be accurate
4  that -- well, let me ask it:  When in past years
5  the P&T Committee would write a -- a first draft
6  of the recommendation letter, would they know
7  what your position is when they wrote it?
8    A.  No.
9    Q.  Okay.  So their letter would be based
10  upon their position and their vote?
11    A.  Correct.  Their draft, yes.
12    Q.  Supporting their position and their
13  vote --
14    A.  Correct.
15    Q.  -- on what the recommendation ought
16  to be?
17    A.  (Nodding head affirmatively.)
18    Q.  "Yes"?  Okay.
19        So you said the reason that you told
20  them this particular year the first time to not
21  do that was to save time.
22        Would it also be accurate that it
23  would be easier for you to not have to have a
24  record of what their position was in support of
25  the tenure you're about to deny or recommend

262

1  not promoting?
2           MR. DOWER:  Objection;
3    form.
4       A.  No, I don't believe that was a factor
5  at all.  I made the decision to change the
6  process sometime during the summer.
7           I had not looked at any of the cases
8  other than a cursory review at that time, so it
9  really was an attempt to -- I find it --
10  especially since the Provost had asked me to
11  shorten my letters, I would -- I had I think
12  found it to be more efficient for me and in my
13  thought process to -- to take their input and
14  incorporate it into my letters.
15  BY MR. NOTZON:
16      Q.  And what was the Provost's
17  instruction on shortening your letter?
18      A.  Well, one -- one thing specifically
19  was "Don't include quotations from the external
20  letter writers."
21          That had been something we had done
22  specifically in the past, and it took quite a bit
23  of time to document and put all that in place.
24  And the feedback from the President's Committee
25  is, "We read those letters anyway.  We don't need

263

1  to read it in -- in your letter."
2       Q.  Uh-huh.
3           Was there a specific reduction in
4  page numbers?
5       A.  No.
6       Q.  What kind of lengths were you writing
7  beforehand?
8       A.  I think probably three to five pages
9  was normal.
10      Q.  And so Dr. Nikolova's is four pages,
11  right?
12      A.  That's right.
13      Q.  So is -- I don't see the shortening.
14  Do you?
15      A.  Yes.  Because if I disagree or if I
16  want to elaborate on a point I'll need to spend
17  more time addressing it in my letter.
18          Normally the -- the strongest cases
19  have the shortest letters.
20      Q.  They're all adjectives?
21          MR. DOWER:  Objection;
22    form.
23      A.  I'm sorry.  I -- I can't answer that
24  question.  I haven't done an analysis of my
25  letters.

264

1  BY MR. NOTZON:
2       Q.  So do you ever make an attempt to not
3  put something in writing?
4           MR. DOWER:  Objection;
5    form.
6       A.  I did that specifically in one case
7  this year.
8  BY MR. NOTZON:
9       Q.  And whose was that?
10      A.  This was an Assistant Professor in
11  Biomedical Engineering where the Department
12  recommended a terminal appointment, and I agreed
13  with the Department on a terminal appointment.
14          There were concerns about the
15  candidate's mentorship of graduate students, and
16  so I did not want -- because this is information
17  that's available for the public record, the
18  Department Chair didn't mention that and I -- I
19  addressed -- I did not put that in my specific
20  letter to protect the graduate student.
21      Q.  A FERPA thing, --
22      A.  Well, --
23      Q.  -- or just a -- a professional
24  courtesy?
25      A.  I think a professional courtesy.

265

1       Q.  Or was it a protection for UT's
2  exposure?
3       A.  That never occurred to me.
4       Q.  Okay.  Any other instances where you
5  attempted to keep things verbal instead of in
6  writing?
7       A.  I'm not recalling any -- any other.
8       Q.  Okay.  In the hypothetical having
9  been Dean for five years, six years -- let me --
10  did we say six?
11      A.  I'm in my seventh year right now.
12      Q.  Seventh year.
13          In the hypothetical, is there a
14  situation where you would recommend not putting
15  something in writing to yourself?
16          MR. DOWER:  Objection;
17    form.
18      A.  You mean putting in writing to
19  myself, so I'm writing a letter to myself?
20  BY MR. NOTZON:
21      Q.  No, you're making a -- you know,
22  you're kind of talking to yourself, "I'd better
23  not put that in writing"?
24      A.  So you're talking about if I have a
25  promotion review?

266

1    Q.   Sure.
2    A.   The only thing that has occurred to
3   me in my time was the case of the -- the graduate
4   students that felt that -- I -- I found out the
5   reasons or I spoke to the graduate advisor in
6   that Department to understand the reasons why the
7   graduate students left and what the concerns were
8   related to mentoring because there were a large
9   number of people who left this individual's lab,
10  and so I did not --
11   Q.   A person from this year?
12   A.   Yes.
13   Q.   Okay.
14   A.   So that's the only time when I
15  thought, "I don't want to put this in writing, I
16  can justify my decision based on other things,
17  but I will tell the President's Committee this."
18       But that's the only time that I can
19  remember having that thought.
20   Q.   So the -- your answer is the only
21  basis for not putting something in writing that
22  you've either used or can think of that would be
23  appropriate would be the protection of a
24  student's privacy?
25   A.   And protecting them from any type of

267

1   potential retaliation.
2    Q.   Okay.  As best you can?
3    A.   Right.  As best as I can remember.
4    Q.   Oh, no, I mean as best as you can
5   protect them.
6    A.   That's right, because actually --
7   that's it; right.
8    Q.   You only have so much ability.  All
9   right.
10       Okay.  On the President's Committee,
11  did you interact with the President's Committee
12  personally?
13   A.   Yes.  So the President's Committee
14  changed their policy this year, also.  No, I'm
15  sorry.  They didn't.  I'm sorry.  This was the
16  old policy.
17       So what would happen is I would go in
18  and I would discuss each case with the
19  President's Committee.  Then they would ask me
20  questions and I would try to -- you know, I try
21  to answer those questions to the best of my
22  ability, and then they would -- they would vote.
23       And that's an advisory vote to the
24  President that took place there.
25   Q.   Let me clarify.  So you -- you -- you

268

1   sounded like you were talking about in the
2   general, this is how the process would work and
3   not necessarily in Dr. Nikolova's case; is that
4   right?
5    A.   It's both.
6    Q.   Okay.  And is this -- that's the way
7   it has happened since you became Dean?
8    A.   So up until the year Dr. Nikolova was
9   considered, I would go in and I would discuss
10  with the President's Committee every person who
11  was being considered.
12       The following year they decided to
13  change the policy, so they would tell me which
14  one of the candidates they wanted me to discuss.
15   Q.   Okay.  And that was this year?
16   A.   That was this year and also last
17  year.  So -- so the -- the Fall -- the cycle that
18  started in 2019 and also the cycle that started
19  in 2020.
20   Q.   Gotcha.  So you've done that two
21  times now?
22   A.   That's correct.
23   Q.   The -- the -- the two times since Dr.
24  Nikolova's time?
25   A.   Yes.

269

1    Q.   Okay.  So in Dr. Nikolova's time
2   you -- you went to President's Committee when
3   they told you it was time to come, and you talked
4   with the Committee and the President and you
5   about every candidate from the Engineering
6   School?
7    A.   Yes.  And there was some other --
8   there were some staff members in the room, too.
9    Q.   Okay.  And did you make a
10  presentation, or was it a question-and-answer
11  form?
12   A.   No, it was more of a question-and-
13  answer.
14   Q.   Okay.  You're there to answer any and
15  all questions they might have as best you can?
16   A.   Correct.
17   Q.   Okay.  And -- but now they identify
18  cases that they want to talk about ahead of time?
19   A.   No.
20   Q.   So you have to prepare for everybody?
21   A.   Essentially I have to pre -- I find
22  out maybe three days in advance the people they
23  want to discuss, so, you know, I --
24   Q.   Okay.  And so their job is not to
25  make your job easier, that's right?

270

1    A.  That is correct.
2    Q.  All right.  No surprise.
3         So -- so you go and you would answer
4  the questions.
5         So presumably -- well, is it true
6  that the ones that they don't talk to you about
7  could be either they've already decided to --
8  what they're going to do positive or negative and
9  the ones they want to talk to you about are only
10 the ones that are close calls?
11   A.  No.  They only -- the ones they do
12 not discuss with me are the ones that are the
13 very strong positive cases.
14      They discuss all the cases that
15 are -- I'd say -- you used the term "close
16 calls," so all the cases that are -- where
17 they -- yeah, they discuss the ones that are
18 closer to the bar and also anyone where there's a
19 recommendation against promotion.
20   Q.  Okay.  Maybe this hasn't happened
21 since it's only been two times now, and I -- I
22 don't know if it has.  Yeah, maybe it has.
23      Do they talk to you even if they're
24 going to vote to promote if you -- if they're
25 disagreeing with you, you -- you were

271

1  recommending non-promotion?
2    A.  Are you referring to the case in
3  Biomedical Engineering from last year?
4    Q.  What was the name again?
5    A.  Janet Zoldan -- "Zoldan."
6    Q.  Yeah, uh-huh, that's right.
7    A.  So the Committee made an initial
8  recommendation to -- to the term they use is
9  "terminal appointment pending."
10   Q.  (Nodding head affirmatively.)
11   A.  And as Janet submitted final arguments, the
12 Committee reviewed the final arguments, they met
13 with me again, and they changed their mind based
14 on her final arguments.
15   Q.  Okay.  So there was an initial -- you
16 went in, talked to them about her case, and y'all
17 agreed to terminal, and then she wrote the final
18 arguments, you went back in to have a
19 conversation, and based upon that and whatever
20 her arguments were, they reversed?
21   A.  So I am not part of the decision-
22 making process.  I want to make sure that's
23 clear.
24   Q.  Thank you.
25   A.  I -- I do not vote; I only answer

272

1  questions and provide clarification.  And yes, I
2  met again after she submitted her final
3  arguments.
4         The primary concern in her case was
5  the sustainability of research funding, and in
6  the period between when my letter had been
7  submitted and the final arguments were submitted,
8  she had received another research grant.
9         So that was considered to be
10 sufficient evidence of sustainable research
11 program, and they decided to change their vote.
12   Q.  Because you had no other basis to
13 recommend denial?
14   A.  The -- the primary concern in her
15 case -- and I -- I did not review all the details
16 of the case -- was the sustainability of her
17 research funding.
18   Q.  Okay.  When the President's Committee
19 decides, you are not present; is that right?
20   A.  For the past two years that is the
21 case, right; that is correct.
22   Q.  But --
23   A.  Before that -- well, the -- the
24 Committee doesn't decide.  The Committee vote is
25 a recommendation to the President, so -- but in

273

1  the past, from 2018/'19 academic year and
2  earlier, the Committee would vote while the Dean
3  was in the room.
4    Q.  Okay.  So you were there for the vote
5  for Dr. Nikolova?
6    A.  I was, yes.
7    Q.  And what was their vote at that time?
8    A.  There were zero in favor of promotion
9  and five against promotion.
10   Q.  Okay.
11   A.  And as I mentioned, that vote is
12 advisory to the President, so that is not
13 reported anywhere.
14   Q.  Right.
15   A.  I was present so I can report to my
16 direct knowledge of that vote.
17   Q.  And the President's decision -- the
18 President's Committee consideration and decision
19 and the President's decision are all not
20 documented, correct?
21   A.  That is correct.
22   Q.  Okay.  When do you recall was the
23 first time that Dr. Nikolova, specifically her,
24 had raised issues of gender or pregnancy bias
25 associated with her application for tenure?

274

1    A.   So I -- I don't remember if it was in
2  her -- the supplemental information she submitted
3  to the President or a part of the -- the final
4  arguments for CCAFR review.
5        So I don't remember if it came before
6  or after the President's -- my first meeting with
7  the President's Committee, but I believe it
8  happened sometime in that period.
9    Q.   Sometime after your decision, but
10  before the CCAFR decision?
11    A.   Well, that would bracket -- that
12  would certainly bracket it, yes.
13    Q.   Can you bracket it short?  Thinner?
14    A.   No, I'm sorry, I -- I just don't --
15  you know, she wrote a number of different
16  documents, and I don't have it committed to
17  memory as to when that actually came up, but I
18  believe it came up -- and my document was dated
19  the 20th of November.
20        I believe the final decision by the
21  President was sometime I think in April.  So I
22  think it's in that timeframe, but I -- I don't
23  remember the details.  I'm sorry.
24    Q.   Okay.  Could it be between your
25  November 20th evaluation and the President's

275

1  initial agreement with you?
2    A.   Yes.  I believe that that
3  statement -- that question is consistent with
4  what I just said, that it was after --
5    Q.   Well, you -- but I think --
6    A.   April is when the CCAFR Committee --
7  when the President would have made the decision
8  on CCAFR, and so --
9    Q.   No, I'm talking about the President's
10  first decision to not promote that happened in
11  like February.
12    A.   Right.  And that's what I'm saying.
13  I don't remember when she brought the topic up,
14  whether it was in her response to my letter,
15  which was in a supplemental document in the
16  dossier, or in her final arguments, or in her
17  CCAFR.
18        So there are three documents, and I
19  don't know which one it -- it would have been in
20  the first time.
21    Q.   Okay.  And you think that she
22  definitely raised concerns of gender/pregnancy
23  bias in one or all of those documents?
24    A.   I believe that to be true.
25    Q.   Do you know if she raised gender or

276

1  pregnancy bias concerns elsewhere than those
2  three documents?
3            MR. DOWER:  Objection;
4  form.
5    A.   Well, she filed the lawsuit, so there
6  was certainly that.
7  BY MR. NOTZON:
8    Q.   During that period of time.  Sorry.
9    A.   Right; yeah.
10    Q.   Good -- good catch.
11    A.   You know, we talked about how she
12  engaged the faculty.
13    Q.   Yeah.
14    A.   So there was definitely an email that
15  came out -- a flurry of emails then.
16        Again, that's amongst the many
17  documents that were in that same general period,
18  and I just don't remember which one -- which one
19  was the first one it was raised in.
20    Q.   Okay.  And I'm just raising that
21  to -- just to jog your memory that there were
22  these emails that she may have raised that that
23  may have also been the source.
24        I just didn't know if you felt that
25  was the case or not.

277

1    A.   So I know there were a series of
2  corres -- or written correspondence during that
3  period, but I can't pinpoint the exact time --
4    Q.   And you're sure --
5    A.   -- or the exact point.
6    Q.   I'm sorry.  And you're sure you never
7  heard it from her directly verbally?
8    A.   Well, Dr. Nikolova -- I believe since
9  my letter of -- of November of 2018, I believe
10  I've only been in one meeting where Dr. Nikolova
11  was present.
12        That was a Zoom meeting with
13  Assistant Professors and Dr. Marculescu, so I was
14  meeting with the Assistant Professors and the
15  Department Chair in Electrical and Computer
16  Engineering, and that was in the Spring of 2020
17  after COVID hit.
18    Q.   Okay.  So that would be "yes"?
19    A.   That'd be "yes."
20    Q.   Okay.  Next question along the same
21  lines.
22        Did anyone else raise concerns with
23  you of gender or pregnancy bias about the way
24  Dr. Nikolova's tenure promotion case was handled,
25  verbally or in writing that you're aware of?

278

1    A.  So Ahmed Tewfik may have -- we may
2  have discussed that this was a concern that had
3  been raised.
4        He was -- if -- if it was -- to my
5  recollection, he was alerting me to the issue.  I
6  did not -- in my recollection, I don't believe
7  that he said "I agree with that assessment."
8        And I -- I think I've already said
9  that I -- I did not get any direct emails or have
10  correspondence with anyone after the decision.
11    Q.  Okay.  Was -- from your recollection
12  of Chair Tewfik's communication with you that
13  you've just described, was he conveying to you
14  that Dr. Nikolova had been complaining about
15  gender or pregnancy bias, or that he was
16  concerned about there being the presence of
17  gender or pregnancy bias in what had been
18  happening with Dr. Nikolova's case?
19    A.  He was conveying that she had
20  expressed concerns about gender and/or pregnancy
21  bias.
22    Q.  Okay.  Do you recall anyone
23  expressing agreement or concern -- agreement with
24  Dr. Nikolova or concern that on their own
25  perception that gender or pregnancy bias may be

279

1  afoot in the way Dr. Nikolova was treated?
2    A.  I do not remember that, no.
3    Q.  Okay.  I -- I want to show you --
4  well, let me -- let me ask you the question.
5        We had talked about your
6  experience -- your first-time experience with
7  being treated as less than being a woman in
8  Engineering, and -- from before, but -- but you
9  said you also felt like you had positive
10  experiences and benefits being a woman in
11  Engineering given the timing at which you have
12  come up through the ranks.
13        What would you say is kind of your
14  secret to -- not secret, but your strategy for
15  succeeding as you have in the field of
16  engineering being a woman?
17    A.  I think hard work is really
18  important.  I think I often -- I often advise
19  listening to other people and trying to
20  understand other per -- perspectives is
21  important.
22        And then for me I think what was
23  really important was my strong affiliation with a
24  technical society and having leadership
25  opportunities there, and then moving into

280

1  leadership opportunities here at UT Austin.
2        But I -- I had the opportunity to be
3  many some leadership roles early in my career.
4    Q.  And the leadership roles you were in
5  early in your career, they were general
6  population groups, in other words, male and
7  female?
8    A.  Yes.  In some cases I may have been
9  the only woman in the room, but there was no --
10  there was no limit on who was in the room.
11    Q.  Okay.  It wasn't a female-only kind
12  of association?
13    A.  Correct.
14    Q.  Okay.  And when you say "hard work,"
15  you're talking about not only what you do and how
16  you produce, but time in and -- and just being
17  present, would that be accurate?
18    A.  Yes, I believe that's accurate.
19    Q.  Would you -- would you say that
20  having a personal life would detract from your
21  ability to be successful?
22    A.  When I talk to junior faculty I made
23  a point of saying they need balance in their
24  lives, and that their personal lives are really
25  important.

281

1        I made a point of talking with them
2  about this new COVID extension, right?  Many of
3  our junior faculty members are trying to home
4  school their children.
5        And I said, "You may not be as
6  productive as you were before, so this is an
7  opportunity for you to designate this and extend
8  your probationary period if it's appropriate for
9  you."
10        So I made a point of saying that
11  family is extremely important and they needed
12  to -- they -- they need to bal -- they need to
13  decide the balance.
14    Q.  Okay.  And -- and so you recommend
15  that -- that it's okay to put emphasis on the
16  balancing of their professional life with their
17  personal life?
18    A.  I believe that to be true.
19    Q.  And -- and would it be true that you
20  honor that decision to have balance?
21    A.  Yes, yes, I believe that to be true.
22    Q.  Would it be the case that the other
23  administrators at the University of Texas honor
24  that decision, as well?
25        MR. DOWER:  Objection;

282

1    form.
2        A.  So I can't speak for every
3    administrator at UT Austin, however, I can say
4    that the Provost's Office has been very
5    aggressive, especially this year with all the
6    disruption due to COVID, to make sure that --
7    that nontenured -- or that tenured faculty and
8    also Assistant Professors have -- have the
9    opportunity to designate the -- their -- how
10   disruptive COVID was in their professional lives.
11       There are things now that called
12   COVID statements where you don't disclose why
13   there was disruption but you talk about how that
14   impacted your professional career.
15       And so I believe that this is
16   something that is -- is very important to the
17   Provost's Office, as evidenced by the policies
18   they've implemented.
19   BY MR. NOTZON:
20       Q.  Have you during your career always
21   been supportive of your colleagues spending
22   personal time on themselves?
23       A.  I -- I believe there's balance.  So
24   if someone is -- you know, if someone is not
25   fulfilling their job responsibilities, they're

283

1    not coming to class because they've taken a
2    vacation, that's a lot different than someone who
3    is -- you know, so I think -- I think I need more
4    context to be able to answer that completely.
5        Q.  Okay.  It's all in the details,
6    right, so...
7            When you say "balance," you're
8    talking about making sure your job gets done, but
9    also making sure that you have a functioning,
10   viable personal life?
11       A.  Right.  Well, I do not believe
12   someone needs to sacrifice their personal life
13   for their professional career.
14       Q.  Okay.  And -- and that's -- that's a
15   long-held belief you've had?
16       A.  Yes, it is.
17       (Exhibit 4 marked for identification.)
18   BY MR. NOTZON:
19       Q.  Okay.  Let me show you an -- an
20   email.
21           Do you recall who Doug Dempster is?
22       A.  Yes.  Doug is a -- the Dean in the
23   College of Fine Arts.
24       Q.  Okay.  And so he's been a Dean while
25   you've been a Dean?

284

1        A.  He's been a Dean longer than I have,
2    yes.
3        Q.  Okay.  And have you interacted with
4    him about doing things Dean-like and advising him
5    on how you do things?
6        A.  We've -- we have shared ideas.  I
7    mean, we are friends.  We -- we cycle together
8    once a week or so, and we also -- I'd say he's my
9    closest friend amongst the Deans.
10       Q.  Okay.
11       A.  And so I know that -- I think we -- I
12   was trying to understand more about Fine Arts, he
13   was trying to understand more about Engineering,
14   and so I know I did share Dr. Nikolova's case
15   with him, and he shared the -- a case that he
16   found particularly challenging with me.
17       Q.  Okay.  And -- and so the -- the
18   reason you were interacting with each other was
19   just sharing your -- your challenging issue and
20   how you dealt with it?
21       A.  I think -- I think that was the
22   understanding, yes.
23       Q.  Okay.  Let me go ahead and put --
24   this will be Exhibit No. 4, and it should be
25   arriving in your chat.

285

1        A.  You're right.  I said that.
2        Q.  Okay.  So when you -- when you sent
3    ECE_Nikolova vol -- V -- "V2," is that Volume 2
4    or Version 2?
5        A.  It would be Version 2.
6        Q.  And is that your Exhibit 2 that we've
7    been going over?
8        A.  I believe so.
9            What happens is I developed my final
10   draft, Sonya Shaffer -- Sonya Shaffer does an
11   editorial review of it, and then I modify it to
12   put "Version 2" or perhaps there's another
13   editorial made for Version 3.
14       Q.  Okay.  So I'm just clarifying that
15   it's your evaluation that you believe you
16   attached to this email --
17       A.  Yes.
18       Q.  -- for him to review?
19       A.  Right.
20       Q.  Okay.  And -- and this is from
21   January, so this is two months later, right, --
22       A.  Right.
23       Q.  -- from when you wrote it.
24           And then it says, "Intentionally, I
25   did not state all my reasons in the letter," and

286

1  "I felt that some things were best discussed with
2  the Committee."
3       When you say "the Committee," which
4  Committee are you talking about?
5       A.  That would be the President's
6  Committee.
7       Q.  Okay.  And which issues did you not
8  talk about in writing that you talked about
9  verbally?
10      A.  That's a very good question because I
11  don't remember.
12      Q.  Okay.  Did Dean Dempster ask you that
13  question?
14      A.  I don't believe so.  He sent me a
15  case about a saxophone player that he was -- he
16  was struggling with.
17      Q.  And did he agree that putting things
18  in writing would not be always advisable?
19      A.  I honestly don't remember a follow-up
20  of the case.
21      Q.  Okay.
22      A.  I remember talking with him about --
23  so I remember talking with him about his case.  I
24  don't remember if he had any comments about this
25  case at all.

287

1       So you're right, I did say that.  I
2  had forgotten completely.  I would have to check
3  my notes to see if there are things that I --
4  that I just don't remember right now.
5       Q.  Okay.
6       A.  But I -- I know that pregnancy would
7  not be one of the issues that would -- would have
8  been a concern for me.
9       Q.  Because that would be illegal?
10      A.  Well, that would be illegal, but it
11  also is not consistent with my core belief.
12      I believe faculty members need to --
13  should have families.
14      Q.  Okay.  Is it -- is it okay to have
15  two pregnancies during your tenured-track time,
16  or is that a -- a deal-breaker?  Is that
17  exceeding the -- the balance?
18      A.  The University allows a maximum of
19  two extensions for probationary period.
20      Q.  So you reckon if you can pop out
21  three kids and -- and still keep working, that's
22  fine?
23      A.  So my -- I told you very early on
24  that I was the second woman to get a Ph.D. in
25  Structural Engineering from the University of

288

1  Illinois.
2       The first woman was Kathy French
3  who's still a very close friend of mine, which I
4  also told you.  She had three children -- she has
5  three children.  I believe two were while she was
6  an Assistant Professor.  And I told many people
7  Kathy's story of how she was grading final exams
8  while she was still in the hospital, and I found
9  that to be atrocious.
10      Q.  Yeah.
11      A.  And so I have been a very strong
12  supporter of having a family.  I also remember
13  having conversations with her of "You can't do
14  everything.  You have -- you -- you know, you
15  have family responsibilities.  You cannot also be
16  doing everything on a professional side."
17      So I -- this is something that has
18  been important to me throughout my career, and
19  while I do not have children, my best friend
20  does, and I've seen what she's gone through.
21      Q.  Do you understand the commitment of
22  time, energy, emotion, health involved in having
23  and raising children?
24          MR. DOWER:  Objection;
25      form.

289

1       A.  Well, I can tell you I have many
2  friends who have children and so I've had
3  discussions with them.
4       I have no direct knowledge because,
5  as I told you, I've never been married and I do
6  not have any children.
7  BY MR. NOTZON:
8       Q.  So you don't purport to know but you
9  empathize?
10      A.  I definitely empathize.
11      (Exhibit 5 marked for identification.)
12  BY MR. NOTZON:
13      Q.  Okay.  Let me put something else in
14  the chat.  And so it's a link to an interview you
15  did for an award you got last year.
16      A.  Okay.
17          THE COURT REPORTER:
18      Exhibit 5; is that correct?
19          MR. NOTZON:  That's
20      Exhibit 5, yes.
21      A.  Okay.
22  BY MR. NOTZON:
23      Q.  So I'm not -- I've never played a
24  video as part of the deposition, so, you know,
25  you don't have to -- you're welcome -- I'm

290

1  assuming you -- you remember this interview?
2      A.  I remember the interview.  I don't
3  honestly remember any of the questions she asked.
4      Q.  Did you ever see the video?
5      A.  No, I didn't.
6      Q.  Okay.  Well, in -- in that cases
7  you're welcome to watch the entire thing.
8          MR. NOTZON:  Tommi,
9  you're -- you'll -- you'll have
10  it as Exhibit 5, so you can, you
11  know, type it out at -- at your
12  leisure.
13          THE COURT REPORTER:
14  Generally what we do is I just put a
15  parenthetical saying "Digital media
16  played," and I --
17          MR. NOTZON:  And I -- no
18  problem.
19          THE COURT REPORTER: --
20  don't necessarily transcribe it.
21          MR. NOTZON:  Okay.
22          MR. DOWER:  Robert,
23  could we -- we take a quick break
24  for Sharon to watch the video and
25  see if you have follow-up questions.

291

1          MR. NOTZON:  That's fine.
2  And everybody can watch it, yeah.
3          MR. SCHMIDT:  That's
4  perfect; yeah.
5          MR. DOWER:  Why -- why
6  don't we just take like whatever
7  it is, five minutes, ten minutes,
8  whatever.
9          MR. NOTZON:  Ms. Wood,
10  just come back when you're ready.
11          THE WITNESS:  Okay.
12  Thank you very much.
13          THE COURT REPORTER:  We're
14  going off the record at 5:01 p.m.
15  (Recess held from 5:01 p.m. to 5:09 p.m.)
16          THE COURT REPORTER:  We
17  are going back on the record at
18  5:09 p.m.
19  BY MR. NOTZON:
20      Q.  Dean, were you able to view that
21  video?
22      A.  I did, yes.
23      Q.  Okay.  And that is you?
24      A.  That is me, yes.
25      Q.  And the answers to those questions,

292

1  you would adopt in -- as part of your testimony
2  today?
3      A.  Yes, even though it seems to
4  contradict some of the things I said earlier,
5  yes.  And -- yeah.
6      Q.  Do you disagree that it contradicts
7  what you said today?
8      A.  Well, I -- I was thinking of the
9  small group in -- that small group in Europe when
10  I made the comment about "Sometimes people will
11  ask you why you're there."  I think --
12      Q.  I think that's consistent.
13      A.  Okay.  I think the work life balance,
14  I did say, "Yeah, sometimes it's a myth" because
15  I think the myth -- the myth that I often think
16  about is the supermom who can do everything, and
17  I believe that might have been the conversation
18  we had even before that I referenced.
19          I -- I also believe, as I just said,
20  one cannot do everything, and so you have to set
21  priorities, and I also said that family is
22  important, yeah.
23      (Exhibit 6 marked for identification.)
24  BY MR. NOTZON:
25      Q.  Oh, when -- let me -- let me go ahead

293

1  and put this document up in the -- chat for
2  Exhibit 6.
3      A.  Okay.  I have it.  I'm sorry.
4      Q.  Okay.  And this is Chair Tew --
5  Tewfik's letter in support of tenure for Dr.
6  Nikolova.
7          Do you recognize that?
8      A.  I do.
9      Q.  Is there -- did you see this letter
10  prior to Chair Tewfik sending it to you as part
11  of the official promotion packet?
12      A.  I believe I saw an earlier version of
13  this letter that did not include the last two
14  sentences of the first paragraph.
15          And I believe that through Jerry I --
16  I said that Ahmed had to do a better job of
17  justifying her -- I'm forgetting the right -- the
18  correct verb, maybe it's "explaining" -- why the
19  case was being considered now.  And so --
20      Q.  I think "justify" is the word that's
21  used in that email.
22      A.  Yeah.  So I believe that the
23  second -- the last two sentences of the first
24  paragraph on the first page were added to this
25  document in response to my letter --

Sharon Wood - 3/18/2021

294

1    Q.   Okay.
2    A.   -- in response to my email, because
3    that is part of the University guidelines that
4    the Dean and the Department Chair need to include
5    that sort of information.
6    Q.   Okay.  And this is -- this adds the
7    additional information that -- that Dr. Nikolova
8    had requested this -- this consideration that she
9    go up considering the time that she was a -- a
10   faculty member, correct?
11   A.   That is correct.
12   Q.   And -- and Chair Tewfik acknowledged
13   that -- he doesn't say whether or not he agreed
14   to that or not here, does he?
15   A.   He does not.  And actually the
16   decision to move the case forward depends on a
17   vote of the Budget Council.
18        So therefore it's -- so he is -- he
19   is correct that she could have asked for it, but
20   he -- it would have been -- he did not make a
21   commitment to her.
22   Q.   Right.  But he doesn't say he did or
23   not -- whether he did or not?
24   A.   That's -- that correct; right.
25   Q.   He doesn't say one way or the other?

295

1    A.   Correct.
2    Q.   And did you talk to him to see if he
3    made a commitment to her?
4    A.   So -- hold on a second.
5        As I remember, Dr. Nikolova was
6    recruited before I became Dean, so she was
7    recruited during the '12/'13 academic year, so I
8    was not part of any discussions at the time.
9        I -- I don't remember if I asked him
10   specifically if there was a commitment.
11   Q.   And when you -- when you say
12   "commitment," what are you understanding that
13   means?
14        Are you saying, you know, an
15   acknowledgment?  A handshake?  A written and
16   notarized document/contract?  What -- what are
17   you saying when you say "commitment"?
18   A.   It would have been a -- an oral
19   conversation.
20   Q.   Okay.
21   A.   As -- as I mentioned, the actual
22   decision to move a case forward depends on a vote
23   of the Budget Council, and so that -- it -- it
24   would not be a notarized document; it would not
25   be stated in the offer letter.

296

1        I -- I believe that there -- we have
2    been putting some information in the offer letter
3    lately, but at the time I do not believe it was
4    in her offer letter.
5    Q.   Okay.  But you -- if -- if there
6    was -- being the professional that you are and --
7    and the collegial person that you are -- purport
8    yourself to be, you would expect that if he had
9    told her that that would be possible, that there
10   would be an effort to honor that?
11        MR. DOWER:  Objection;
12   form.
13   A.   I think we have -- I think the -- the
14   issue is the President's Committee has had --
15   has -- the President at the time that she was
16   extended an offer would have been President
17   Powers, and, as I spoke earlier, the President's
18   Committee had discussed how they were looking at
19   early promotion, and it -- their perception or
20   their -- their view of early -- of accelerated
21   promotion had changed with time.  So I'm sorry,
22   would you repeat the question?  -
23        MR. NOTZON:  Can you
24   help me, Tommi?
25        (Previous record read.)

297

1    A.   I believe that the case -- that Ahmed
2    would have discussed the case with the Budget
3    Council for their consideration.
4    BY MR. NOTZON:
5    Q.   So that would be "yes"?
6    A.   Yes.
7    Q.   Okay.  And elsewhere in this pile of
8    paper there is a statement about a commitment to
9    Dr. Heidari, that a commitment was made to her to
10   have her go up considering the time spent at --
11   on faculty elsewhere.
12        Is that commitment also -- was that
13   also a verbal commitment?
14        MR. DOWER:  Objection;
15   form.
16   A.   To the best of my knowledge it was,
17   for the reasons that I stated earlier.
18   BY MR. NOTZON:
19   Q.   And who was that commitment with and
20   to, if you -- if you know?
21   A.   Well, the Department Chairs are the
22   people who are negotiating with the faculty
23   members -- with Assistant Professors, so it would
24   have been Jon Olson would have been negotiating
25   with her.

298

```
1      Q.   Okay.  It wasn't you?
2      A.   It was not me, no.  I -- I do not
3   negotiate with Assistant Professors.
4      Q.   Okay.  I just wanted -- I just didn't
5   know.  I -- I didn't know who it was, so...
6      A.   Right.
7      Q.   But you had made reference to the
8   commitment in your evaluation, I believe.
9           So you understood the commitment had
10  been made because Chair Olson would have told you
11  about it?
12     A.   That's correct.
13     Q.   Okay.  Do you -- in looking at Chair
14  Tewfik's letter and from your memory of it -- I'm
15  assuming you prepared for your deposition today
16  and reviewing this letter.
17          Would you agree that this is a letter
18  in support of Dr. Nikolova?
19     A.   I believe it -- it is that, yes, and
20  he states he strongly endorses her promotion.
21     Q.   Do you read the letter to be
22  consistent with a strong endorsement for
23  promotion?
24     A.   I -- I did interpret the letter that
25  way, yes.
```

299

```
1      Q.   Okay.  And in your evaluation,
2   Exhibit 2, you say that "The" Budget Committee --
3   the "Budget Council had expressed concerns about
4   her weak engagement."
5           Do you remember that?
6      A.   I do, yes.
7      Q.   And -- and would you agree that Chair
8   Tewfik's letter does not talk about the Budget
9   Council's concern about a weak engagement?  He
10  said "a couple of people" had made comment about
11  it.
12          Do you recall that?
13     A.   He said -- that is quoting him
14  correctly, yes.
15     Q.   And that he specifically attributes
16  the one negative and two abstentions to those
17  couple of Professors that raised concerns about
18  her relatively weak engagement?
19     A.   That is correct.
20     Q.   Why would you characterize that as
21  coming from the Budget Council in total in your
22  evaluation?
23     A.   Oh, I'm -- I'm sorry.  The -- the
24  Budget Council is the full Professors, so
25  their -- that vote -- okay, so if I go up one or
```

300

```
1   two sentences the Budget Council recognized her
2   strong accomplishments and potential, and it goes
3   on to say "32 Yes, 1 No, 2 Abstain, and 2
4   Ineligible."
5           And so that is the full Professors,
6   and so I -- I could -- I could have said
7   "Professors," but to be honest, "Professors" and
8   "Budget Council" are synonymous.
9      Q.   No, my -- my question is you credit
10  the concern from the Budget Council when the
11  concern clearly from Professor Tewfik is only a
12  couple of Professors.
13     A.   Yes, that is correct.
14     Q.   So you're -- you're equating "couple"
15  with "32" -- 30 -- actually, "35."  That's not
16  fair, is it?
17     A.   So I -- I had a conversation with
18  Ahmed before he wrote this letter, right after
19  the vote had come in, and he shared with me the
20  comments that were -- the written comments that
21  came in as part of that.  As I remember, there
22  were four.
23          And I know that you have these
24  because, again, in preparation I saw that --
25  those comments several times in the documents
```

301

```
1   that we sent you.
2           There was one comment there that
3   talked about the relatively weak engagement in
4   the Department, and Ahmed had conveyed to me
5   orally that he felt that was -- that more than --
6   that was a common concern amongst the Budget
7   Council, and so I -- I think that was the basis
8   of my statement, was an oral con -- discussion
9   with him.
10     Q.   So do I take it from your testimony
11  just now that you're accusing Professor Tewfik of
12  inaccurately documenting the communications he
13  received from members of the Budget Council?
14          MR. DOWER:  Objection;
15  form.
16     A.   So -- so Dr. Tewfik is accurately
17  rep -- representing the -- the vote that took
18  place at the meeting when Dr. Nikolova's case was
19  discussed, and there were four comments and there
20  was one -- there were -- and he -- so I believe
21  he is correct in saying "a couple of Professors."
22     Q.   He didn't say a couple of Professors
23  "wrote comments."  He said "raised concerns."  No
24  one else raised concerns, according to this
25  letter.
```

302

1        MR. DOWER:  Objection;
2    form.
3        A.  So the -- the requirements given by
4    the guidelines for the University are that the
5    Department Chair needs to document the
6    conversation that takes place in the Budget
7    Council when a vote is being considered.
8        And so he says, "a couple of
9    Professors raised concerns," and then he
10   attributed the negative vote and the abstentions,
11   which would be one "no" and two "abstentions" to
12   those concerns.
13       Q.  If he's supposed to communicate
14   accurately -- I would assume -- accurately assume
15   in that communication -- the communications from
16   the Budget Council, and you're saying that he
17   verbally told you that it was a general
18   concern -- a general consensus among the Budget
19   Council that they were worried or concerned about
20   her weak engagement, and he doesn't say that at
21   all, he only said, "A couple have raised
22   concerns" and he leaves it there and doesn't say
23   anything about a broader concern, but you're
24   saying he did, he told you?
25       MR. DOWER:  Objection;

303

1    form.
2        A.  So I said --
3    BY MR. NOTZON:
4        Q.  That goes -- that goes back to my
5    question.
6        Are you saying that Chair Tewfik is
7    misrepresenting what happened in that Budget
8    Council meeting in this letter in support of Dr.
9    Nikolova?
10       MR. DOWER:  Objection;
11   form.
12   BY MR. NOTZON:
13       Q.  Is that your testimony?
14       MR. DOWER:  Objection;
15   form.
16       A.  I am stating in any way that he
17   mis -- misrepresented the conversations during
18   that meeting.
19       What he -- he conveyed to me in --
20   orally was that in previous conversations, so it
21   occurred prior to this Budget Council meeting,
22   that had been some of the conver -- that had been
23   some of the concerns raised by full Professors in
24   the Department.
25   BY MR. NOTZON:

304

1        Q.  And did he also convey to you that
2    those conversations he had with other full
3    Professors was they were making or disregarding
4    the fact that Dr. Nikolova had been pregnant
5    twice?
6        MR. DOWER:  Objection;
7    form.
8        A.  I don't remember ever discussing a
9    link between Dr. Nikolova's performance in the
10   Department and her pregnancy.
11   BY MR. NOTZON:
12       Q.  Chair Tewfik specifically references
13   it in this letter, doesn't he?
14       A.  Well, he -- he noted that she was
15   on --
16       Q.  Do you want me to point out to you
17   where I'm talking about?
18       A.  If you don't mind, please.  I'd
19   appreciate that.
20       Q.  I'm talking about at the last
21   page, --
22       A.  Okay.
23       Q.  -- the long -- the two sentences --
24   three sentences under "Service."
25       A.  (Witness reviews documents.)  So I

305

1    interpreted that as -- maybe in two ways.  I
2    mean, one reason why the level of involvement was
3    lower was because she actually was a resident in
4    California for two semesters.
5        Q.  It doesn't say "professional
6    circumstances," does it?
7        A.  This says "personal," you're right.
8        Q.  And it says --
9        A.  However, there is a personal --
10       Q.  And it says "personal circumstances
11   at this stage of her life," which is the time at
12   which she is having babies.
13       MR. DOWER:  Objection;
14   form.
15   BY MR. NOTZON:
16       Q.  She could be at the Simons Institute
17   in her 50's or 60's or 70's as a professional.
18   Isn't it clear that he's referencing her having
19   two pregnancies during her tenure promotion
20   period?
21       A.  So as I told you, I only knew of one
22   pregnancy at the time that I wrote my letter.  I
23   did not realize that she was pregnant and when
24   her second child was born.
25       Because the modified instructional

306

1  duties are held at the Department level, and I
2  had told you I didn't know she was pregnant.  All
3  I knew is she had an uneven teaching load and
4  that she -- she spent two semesters at Berkeley.
5       Now that could happen without her
6  being pregnant, so the fact -- so in my mind, she
7  only had one pregnancy, and that -- I mean, so I
8  don't think there's -- I -- I did not know she
9  was pregnant a second time.  That did not factor
10 into my decision at all.
11     Q.  Even if it was one pregnancy, it's
12 still -- he references a personal circumstance
13 at -- at this stage of her life, and you had a
14 conversation -- you have direct conversations
15 with Dr. Tewfik about this letter.  You could ask
16 him what he means.
17          MR. DOWER:  Objection;
18      form.
19 BY MR. NOTZON:
20     Q.  You're saying you didn't?
21     A.  So I had a -- I did not ask
22 specifically.  I had a conversation with him
23 because he was not meeting the University
24 guidelines for what needed to be included in the
25 Department Chair's letter.

307

1       So that was why I had the
2  conversation with him, to add the explanation of
3  why the case was being considered now.
4      Q.  And this sentence has to be read in
5  context with the prior sentence we were reading,
6  right, where it says, "As noted by some of my
7  colleagues during the BC discussions, her level
8  of involvement in the Department has been lower
9  than average," okay?
10      That has to be read in context
11 with the "a couple of people raised concerns,"
12 right?
13     A.  Yes, I believe so.
14     Q.  Okay.  You can't take that sentence
15 and -- and read it on its own and say, "Oh, the
16 BC in Total had a concern," can you?  You can't
17 ignore that he wrote what he wrote at the
18 beginning of this letter is my question, can you?
19     A.  I -- I agree with that.
20     Q.  Okay.
21     A.  I'm trying to -- I'm sorry.  I'm
22 trying to remember what I wrote.
23     Q.  Do you want to see it?
24     A.  I can see it.  I'm sorry.  I see it.
25 You're right.  It says, "Budget Council expressed

308

1  concerns."  And so that could have been an
2  overstatement, I will agree with that.
3      (Exhibit 7 marked for identification.)
4  BY MR. NOTZON:
5      Q.  Okay.  Let me put up another exhibit.
6  This will be No. 7.  I haven't gotten any faster,
7  even though you've gotten faster.
8       Okay.  Exhibit 7 should be there.
9      A.  I have it.  I'm sorry.
10     Q.  Okay.  So earlier in your testimony
11 you took issue with Dr. Nikolova saying that she
12 had misrepresented her funding spending I -- I
13 think was the gist of your disagreement with her
14 rebuttal of your evaluation.
15      Is there anything else that you
16 reviewed in Dr. Nikolova's rebuttal that you
17 disagreed with factually?
18          MR. DOWER:  Robert,
19      I'm going to suggest that we take
20      a quick break so she can read it,
21      and that way the time won't be
22      held against you.
23          MR. NOTZON:  Sure.
24          MR. DOWER:  Okay.  Let's
25      go off -- off the record.

309

1          THE COURT REPORTER:  We're
2      going off the record at 5:34 p.m.
3      (Recess held from 5:34 p.m. to 5:57 p.m.)
4          THE COURT REPORTER:  We're
5      going back on the record at 5:57
6      p.m.
7          MR. SCHMIDT:  And we are
8      recording, as well.
9          MR. NOTZON:  Okay.
10          MR. DOWER:  Bob -- Bob,
11      your video's still on, so if you
12      want to go secretive...
13          MR. SCHMIDT:  I do.
14 BY MR. NOTZON:
15     Q.  All right.  Dean, so you were going
16 to let me know if there were any other issues in
17 Professor -- Dr. Nikolova's rebuttal that you had
18 factual disagreement with besides the spending of
19 her funding.
20     A.  That is correct.  So --
21     Q.  If you want to just list them... You
22 don't have to necessarily explain them.
23     A.  Sure.  So I -- I do not know that EE
24 360C is one of the hardest classes to get high
25 teaching evaluations for.  I -- I don't have

310

1  direct knowledge of that area.  I'd have to check
2  that.
3          I also, as I mentioned to you, I did
4  not know that she was pregnant and suffering from
5  morning sickness at the time I wrote my letter.
6          And then I do have concern -- I -- I
7  disagree, as you -- as we mentioned, about the
8  funding to sustain a research program.  Normally
9  we don't -- if there is a no-cost extension, the
10  faculty member would have listed that on their CV
11  so that it would indicated when the funding would
12  actually end.  That was not done.
13          And then she talked about the fact
14  that she started in January and that year did
15  not -- as a result, that year did not count -- I
16  agree that that is an issue.
17          One of the challenges is that the ECE
18  is often one of the latest Departments to extend
19  offers, and offers that are not extended by I
20  think it's May 1st, you need to request
21  permission from the Provost's Office.  And so it
22  could have been done.  I was not Dean at the
23  time, so --
24      Q.  Requested from the Provost's Office
25  at UT or the other institution?

311

1      A.  So the UT Provost's Office could have
2  sent a letter to the Provost at Texas A&M to
3  request an earlier start.
4      Q.  And did they?
5      A.  No, they didn't.  They -- there was a
6  delay, and that -- that -- technically, that had
7  an impact on her directly.  There's no --
8      Q.  Do you know why they didn't ask A&M?
9      A.  I don't know.  I was not Dean at the
10  time.
11      Q.  Okay.  So I -- I'm specifically
12  asking for issues that you had with the factual
13  accuracy.
14      A.  Right.
15      Q.  So --
16      A.  Yeah, I'm not -- I think my primary
17  concerns with the factual accuracy are related to
18  the sustainability of her research program.
19      Q.  Okay.  And other than what you
20  testified to already about how much she has spent
21  and when, is there any other issue that is
22  factually inaccurate in her rebuttal -- that you
23  think is factually inaccurate -- inaccurate in
24  her rebuttal?
25      A.  Right.  So she estimated her expenses

312

1  to be 250,000 a year; expected expenses.  I
2  disagree with that.
3          And then obviously that would impact
4  the length of time over which her funding
5  would -- would continue.
6      Q.  I -- I -- I assumed you'd already
7  testified about that, but if that's new
8  information, fine.  But I was trying to ask you
9  if there was anything that you hadn't already
10  talked about.
11      A.  That is -- those are the factual
12  issues that I've already -- that I haven't talked
13  about.
14      Q.  Okay.  All right.  Would you say --
15  and I -- I kind of asked this before, but I --
16  it's just a slightly different question.
17          I asked you if Chair Tewfik was a
18  strong supporter of Dr. Nikolova's promotion to
19  tenure, and you said based upon his letter, he
20  was.
21          I'm asking if in addition to that,
22  because I can read the letter, too, was he off
23  the record also a strong supporter of her
24  promotion to tenure, in conjunction with his
25  letter.

313

1      A.  His letter was stronger than personal
2  conversations we had had.
3      Q.  Okay.  And what conversations had you
4  had and when that led you to believe -- and what
5  -- what were they that led you to believe that he
6  didn't hold the same personal opinion as he did
7  in writing?
8      A.  So we would have had annual
9  conversations about salary increases as part of
10  the merit review process.  And I'm using "we"
11  here to refer to Jerry Speitel and myself meeting
12  with Ahmed.
13          And in those, he would -- he would
14  indicate that -- several times, and there were a
15  series of these, he mentioned that he did not
16  think her performance was -- he -- I'm -- I'm
17  sorry.  I'm trying to be precise and I apologize.
18          His discussion of her was not as
19  strong as indicated in his letter for promotion.
20      Q.  Okay.  And -- and what are the things
21  he said that led you to believe that he was not a
22  strong supporter of her?
23      A.  Well, one year the -- the Review
24  Committee within Electrical and Computer
25  Engineering ranked about 90 percent of the

314

1  faculty members as "exceeds expectations," and
2  the University definitions are that "meets
3  expectations" should be the norm for the
4  Department.
5       So Ahmed did a separate review that
6  he -- that he used for the merit allocations, and
7  he used a scale from 1 to 3, with "1" being
8  highest and "3" being lowest.  He assigned her a
9  value of 2.5.
10      Q.  And that was some year before she
11 went up?
12      A.  Yes, it was.
13      Q.  Okay.  Let me ask the same question
14 again for the year she went up.
15      A.  May I look at the data, so -- because
16 I'm not remembering -- may -- may I look at my
17 information?
18      Q.  What I'm asking is, is there
19 something that happened during the year that she
20 went up when he wrote this letter of strong
21 support for her?  Because if she did something
22 some years ago and she had a trend, as you like
23 to put it, up, I don't think we should be
24 saddling her with that comment that he made about
25 her back when because you like upward trends.

315

1       So the year that she went up, is
2  there something that you're recalling that you
3  felt like Chair Tewfik was not as strong a
4  supporter of Dr. Nikolova, if at all, than his
5  letter was?
6       A.  May I look at some data I prepared to
7  answer that question?
8       Q.  Sure.
9       A.  (Witness reviews documents.)  Okay.
10 So --
11      Q.  And what are you looking at?
12      A.  So I believe this was also shared
13 with you.  This is a spreadsheet.
14      Q.  Can you go ahead and put it up?
15      A.  Yes, I will try to do that.  Hold on
16 a second.  I will share with everyone, and I
17 apologize, let me -- sorry.  It's open, so I need
18 to close it.
19      Q.  I don't think you have to, but -- at
20 least the way I do it.  Are you on a -- are you
21 on a PC or a Mac?
22      A.  I'm on a PC.  Okay.  I have just --
23      (Exhibit 10 marked for identification.)
24 BY MR. NOTZON:
25      Q.  Okay.

316

1       A.  I've just shared that document as an
2  Excel spreadsheet.  I believe this was shared
3  with you earlier.
4       Q.  I see it.
5       A.  Okay.  So if I open -- if I look at
6  this document, Dr. Nikolova was considered for
7  promotion in the '18/'19 academic year.
8       Q.  Yeah.
9       A.  So the most recent review would have
10 been in the '17/'18 academic year.  Both the
11 Committee and the Department Chair gave her
12 "exceeds expectations," and her merit raise
13 exceeded the raise goal.
14      So you are correct, that there is an
15 upward trend there.
16      Q.  So you had no indication that Chair
17 Tewfik was not a strong supporter of her when she
18 went up for tenure?
19      A.  I had past information.  I did not
20 have current information.
21      Q.  Okay.
22      A.  The --
23      Q.  Were you influenced by that past
24 info -- information, that you didn't --
25      A.  I'm sorry.  May I complete -- may I

317

1  complete the previous question?
2       Q.  I'm sorry.  I didn't realize I was
3  interrupting you.  I'm sorry.
4       A.  The only indication I had was, as I
5  mentioned earlier, is that he indicated the
6  comments about engagement in the Department was
7  more prevalent than as discussed within the
8  Budget Council.
9       So I just want to make that clear.
10 And then, I'm sorry, your question is?
11      Q.  Following up on that question,
12 that -- did you understand that to be a personal
13 opinion he held, or he was conveying what others
14 in the Budget Council, from your understanding,
15 that he was conveying?
16      My -- my -- my whole questioning
17 right now is about whether or not him as an
18 individual was not as strong a supporter for Dr.
19 Nikolova as his letter states and as you've
20 testified his letter states.
21      A.  So I -- my memory of the conversation
22 is that he agreed with that sentiment that I just
23 mentioned.
24      Q.  Okay.  Even though in his letter he
25 said it's understandable because of current her

318

1  circumstances at this stage of her life?
2      A.  Yes.
3      Q.  So he wasn't making that allowance
4  for her in his oral communication with you?
5      A.  He did not state that in the
6  conversation --
7      Q.  Okay.
8      A.  -- to the best of my memory.
9      Q.  Thank you.  Yep, yep.
10          THE COURT REPORTER:  Do
11  we want to mark that as an exhibit,
12  or no?
13          MR. NOTZON:  Yes, please.
14  Yeah.
15          THE COURT REPORTER:  That
16  will be No. 10.  Thank you.
17  BY MR. NOTZON:
18      Q.  Before we get to 8 and 9, I wanted to
19  ask you a question on -- I'm not going to go --
20  I -- I don't think I have time to get into the
21  whole salary thing.
22      I just wanted to ask you one question
23  on salary, and that is, I understand that there
24  are four or five first-year Assistant Professors
25  with no teaching experience that are making more

319

1  money -- have a higher salary than Dr. Nikolova
2  is sitting there with, you know, eight, ten
3  years' experience.
4      Is -- is -- can you explain that?
5      A.  I believe that is the case.  It is my
6  understanding, and I'm -- I'm giving a
7  generalization here, is that in order to hire
8  individuals in some fields where some of the high
9  tech firms are giving starting bonuses and stock
10  options, this has had a big -- this has really
11  upset our salary scale, and so that may be a
12  contributing reason to it.
13      Q.  Would she be entitled to this equity
14  adjustment that we were talking about earlier?
15      A.  Well, the equity adjustment review
16  occurred during the '19/'20 academic year.
17      Q.  Last year.
18      A.  Last year.  And her salary, as I
19  remember, remained the same.  So in our
20  discussions with a -- with the new Department
21  Chair, that would be Diana Marculescu who started
22  in December of 2019, that equity adjustment was
23  not part of that -- did -- did not result from
24  that conversation.
25      Q.  Do you know why?

320

1      A.  I do not have a memory of that
2  conversation.
3      Q.  Okay.  Did those first-year
4  Professors, were they employed last year?
5      A.  So one -- I think one problem --
6  potential problem, I don't know -- I don't
7  remember the exact dates, is that they were
8  offered salaries before we knew the merit
9  increases were cancelled.
10      So we were anticipating that there
11  would be a merit increase that would allow us to
12  adjust some of the Assistant Professor salaries,
13  but then that was cancelled due to COVID, as I've
14  mentioned.
15      And when this happens, we -- we have
16  to make it a priority to look at it very
17  carefully the next time we have a merit raise
18  goal.
19      I -- we do not yet know if there will
20  be a merit raise goal for this -- during this
21  academic year.
22      Q.  It -- it could be that I'm just
23  getting tired, but I'm -- I'm not sure if you
24  answered my question.  If you did, I'll chalk it
25  up to being tired.

321

1      Were those first-year Professors with
2  no teaching experience that I've mentioned, the
3  three, four, five or however many of them there
4  are, were they employed for the first time this
5  year, or were they employed for the first time
6  last year, or a little of both?
7      A.  I would have to look at that.  I
8  honestly don't know when everyone actually
9  started.  We could enter that later if you would
10  like that specific information.
11      Q.  Well, I'm -- I'm sure we can look it
12  up.  I just was asking if you knew.
13      A.  We've had -- we've had -- had a
14  number of faculty hires in ECE over the past few
15  years, and so I would assume -- I know some
16  faculty members started in -- in the Spring of
17  '19, some started in the Spring of 2020.
18      I don't know what their salaries are
19  relative to Dr. Nikolova's.  I'd have to look
20  that up.
21      (Exhibit 8 marked for identification.)
22  BY MR. NOTZON:
23      Q.  Okay.  Let's go ahead and look at
24  Exhibit 8, which is the Dimakis evaluation by
25  you.

322

1      A.  Right.
2      Q.  And so this was a recommendation that
3   you wrote back -- is it your -- the second
4   year -- your -- your first full-time, Dean?
5      A.  That is correct.
6      Q.  Okay.  And he had only been at UT for
7   two years?
8      A.  I believe that is correct.  Actually,
9   yeah, he's -- it states in there he's been at his
10  current ranking for one and a half years.
11     Q.  Okay.  And so the justification
12  for -- and so how many years early is he?
13     A.  I -- I would have to calculate it,
14  Sir.  I don't remember.  Oh, the cover sheet -- I
15  don't believe it's on the cover sheet, so he
16  would be four years early using the current
17  accounting.
18     Q.  Okay.
19     A.  But you'll notice that the
20  documentation of our current sheet is not the
21  same as this, (indicating), so this is one that
22  reflected the changes that had been made in the
23  process.
24     Q.  But it was still six years back when
25  you became Dean?

323

1      A.  The -- the total time in probationary
2   status would have been -- that's why I looked at
3   the form.  Like he has two years of probationary
4   status here, so this would be four years early,
5   yes.
6      Q.  Okay.  And the justification for his
7   accelerated consideration was his prior service
8   at USC, correct?
9      A.  That is my understanding, yes.
10     Q.  Okay.  And is there any other
11  justification?
12     A.  Well, I spent quite a bit of time
13  telling you that after Provost -- after Provost
14  McInnis came in there had been a lot of
15  discussion about early promotions.
16        So this is before that time, so
17  President Powers was President, and so this was a
18  different -- I'll call it a different era, but
19  certainly a different President was leaving his
20  mark on the promotion and tenure process.
21     Q.  So at this time you didn't have to
22  explain more than the fact that he had at least
23  six years of a -- of a -- an Assistant Professor
24  faculty experience under his belt?
25     A.  I don't believe that I -- I have not

324

1   reviewed the -- the guidelines for that year in
2   particular, but I do --
3      Q.  Okay.
4      A.  I believe that the -- the explanation
5   or at least the President's interpretation of
6   what the explanation should be was after this
7   case was considered.
8      Q.  Okay.  Now if -- if you look at
9   his -- in that first -- in that first paragraph,
10  it seems confusing to me because it says he had
11  three and a half years at USC and one and a half
12  years at UT, and that adds up to five in my math,
13  but it says here it would be six.
14     A.  So this addresses the concern that
15  you raised earlier that the year in which the
16  review takes place is counted as a year of
17  probationary service.
18        What this also points to was my
19  conversation earlier that this -- this letter was
20  drafted by the Promotion and Tenure Committee,
21  and because they are not as familiar with the
22  rules, they would often use, just as this first
23  paragraph indicates, terminology that is not
24  quite consistent with what the University is
25  expected to see.

325

1         So that's one of the reasons that
2   I -- I shift away from editing -- this is
3   factually correct, but it's -- it's not very
4   clear.
5      Q.  It's using wrong -- it's using wrong
6   numbers?
7      A.  Well, the -- the numbers are correct,
8   his case -- if the -- if the case is successful
9   and if his time at USC is considered, he will
10  have served as an Assistant Professor for a total
11  of six years, so that is a correct statement.
12        It does not refer directly to
13  probationary status as we would now.
14     Q.  Okay.  Would you also agree that he
15  is not, according to the term, "meeting a high
16  bar on all areas," that he wouldn't meet that
17  standard?
18     A.  No.  I believe he would meet that
19  standard.
20     Q.  Is his funding less than Dr.
21  Nikolova?
22     A.  Well, he raised 3.4 million in
23  research funding over the course of his career,
24  with his Chair being 1.8.  It also -- and it
25  occurred earlier, so I --

326

1    Q.   But Dr. Nikolova's at 1.8.
2    A.   You asked me was it less.
3    Q.   Well, if she didn't make it, how can
4  he make it?  If she didn't make the high bar,
5  then how can he at the same funding level?
6    A.   So one thing that's not evident here
7  which I would have to look at is the -- okay.
8  Let me make one more -- let me make a statement.
9         I mentioned that one of the things
10 the President's Committee started looking at
11 during my time as Dean was whether grants
12 extended beyond the probationary period.
13        So that was not something that we
14 were explicitly looking at or that I was asked to
15 address at the time that this letter was written.
16        There was a different Vice President
17 for research, and so that was -- I -- I want to
18 emphasize, you know, a holistic review of every
19 case, and I do not go back and try to compare
20 year for year.  We try to review each case on its
21 value.
22        (Exhibit 9 marked for identification.)
23 BY MR. NOTZON:
24    Q.   Okay.  Let's go ahead and look at
25 Exhibit 9, Dr. Heidari.  Am I pronouncing that

327

1  right?
2    A.   Yes, I believe you are.
3    Q.   And this is a female, right?
4    A.   Yes.  Dr. Heidari is -- is a woman,
5  yes.
6    Q.   And she has three years at UT, so
7  she's early, --
8    A.   That is correct.
9    Q.   -- or accelerated.
10        And this is the year before Dr.
11 Nikolova went up, correct?
12    A.   That is correct.
13    Q.   And it -- it seems as though -- well,
14 one, the -- the evaluation's longer than Dr.
15 Nikolova's, has more adjectives, has more quotes.
16    A.   Okay.  I'm sorry.  I did address that
17 in my statement earlier.  I told you that the
18 Provost has specifically asked me to shorten the
19 comments.
20    Q.   And you're saying that that direction
21 was given in the 2018/2019 year?
22    A.   After the 2017/18 review cycle, that
23 was guidance was given to me.  I also believe
24 that this was not a straightforward case, and so
25 I took the time to really understand her research

328

1  funding.  It's on Page 3.  There are a number of
2  bullet points after that first sentence.
3         That was not clear from her -- from
4  her CV.  I also believe that I asked for
5  clarification about the relative competitiveness
6  of some of these brands because I could not find
7  information on the website about it.
8    Q.   She got consideration for things,
9  like not re-establishing her research program,
10 not getting funding because of the downturn in
11 the petroleum industry.  She got -- she got
12 excuses for her flat spots, would that be
13 accurate?
14    A.   She did get excuses for her flat
15 spots, that is correct.
16    Q.   And would you agree that her
17 publications are nowhere near Dr. Nikolova's?
18    A.   Dr. Nikolova made the point that
19 their h-indices were very different.  That is to
20 be expected given the nature of their research,
21 so...  The petroleum engineering field is much
22 smaller.
23    Q.   The citations are very different,
24 too.
25    A.   That is correct.  But I -- I told you

329

1  that we do a holistic review of every faculty
2  member, and so citations are -- citations,
3  h-index are some of the factors that have a --
4  have a big impact on -- that are very dependent
5  on the research domain.
6    Q.   And other than she had prior
7  experience, was there any other justification for
8  her accelerated review?
9    A.   I have to admit, I would -- I did not
10 remember this when I -- when I read this last
11 night.
12        There is a discussion of how she -- a
13 commitment -- I'm quoting now the last paragraph
14 on Page 4, "A commitment was made when she was
15 recruited from Texas A&M that her promotion case
16 would be considered in a timely manner."
17    Q.   And you said you had gotten that from
18 the Chair?
19    A.   Well, I don't negotiate with
20 Assistants and Professors, so I would not -- the
21 Department Chair would make -- would -- would
22 have any type of discussion with them.
23    Q.   So -- so the same justification for
24 her going up early.  And how early would she be
25 going up?

330

1    A.  She's going up early.  She's going
2  up -- I believe it -- if I look on the first
3  sheet, it says that she has three years of
4  probationary status; that she'd be going up three
5  years early.
6    Q.  Okay.  Is -- is -- does she have the
7  full six if you count A&M?
8    A.  I believe she had four years at A&M,
9  so she would have seven years total in rank.
10    Q.  Okay.  So her prior experience and a
11  commitment would be the reasons for her to be
12  able to go forward, justifying, using your word,
13  or explaining, using the actual policy word, for
14  the accelerated review; is that right?
15        MR. DOWER:  Form.
16  Objection; form.  Go ahead.
17    A.  In this case, yes.
18  BY MR. NOTZON:
19    Q.  Okay.  Is that -- from your
20  understanding, is that sufficient?
21    A.  Well, remember I did tell you that
22  the Committee gives feedback every year, and
23  amongst the feedback was that a discussion of how
24  we need to -- how service at another university
25  should be considered, so, I'll be honest, this

331

1  is -- they -- they felt we had too many cases
2  going up early, "early" in the sense of how much
3  time was spent at UT.
4    Q.  Is this another example of that rule
5  that changed between '17/'18 and '18/'19?
6    A.  That is my memory, yes.
7    Q.  So Dr. Nikolova just has really bad
8  luck in all these policy changes?
9    A.  She had very bad luck here.
10    Q.  Okay.  Had nothing to do with any
11  other basis?
12    A.  No.
13        MR. DOWER:  Objection;
14  form.
15  BY MR. NOTZON:
16    Q.  Professor -- I mean, Dr. Heidari, she
17  did not have any modified instructional duties,
18  correct?
19    A.  She did not.
20    Q.  And she didn't have any probationary
21  extensions, correct?
22    A.  She did not.
23    Q.  And she didn't get pregnant, correct?
24    A.  I don't know if she's -- if she's
25  pregnant.  I don't know if she's married.

332

1    Q.  Okay.
2        MR. DOWER:  Tommi,
3  how much time do we have left?
4        THE COURT REPORTER:  We're
5  actually over by about three
6  minutes.
7        MR. NOTZON:  Then we will
8  close it down.  Thank you very much,
9  Dean Wood, and --
10        MR. SCHMIDT:  Actually,
11  can we stop for one second before
12  you close it down?
13    Are you okay with like two
14  or three -- let me -- can we pause
15  it and let me talk to Robert
16  off -- off the record?
17        MR. DOWER:  Sure, yeah.
18        MR. SCHMIDT:  If we --
19  if we need to do like a five-minute
20  additional question period, are you
21  okay with that?
22        MR. DOWER:  As long as
23  it's not a lawyer's five minutes,
24  because a lawyer's five minutes --
25        MR. SCHMIDT:  Yeah, okay,

333

1  okay.
2        MR. DOWER:  -- means 15 to
3  20.  Let's -- let's try to keep it
4  to a normal person's five minutes.
5        MR. SCHMIDT:  Great.
6  Okay.  Thank you.  We'll -- we'll
7  be right back on the record.
8        THE COURT REPORTER:  We're
9  going off -- we're going off the
10  record at 6:29 p.m.
11  (Recess held from 6:29 p.m. to 6:34 p.m.)
12        THE COURT REPORTER:  We
13  are back on the record at 6:34 p.m.
14        MR. NOTZON:  Okay.  Thank
15  you for your agreement to go over
16  just a little bit, Mr. Dower.
17  BY MR. NOTZON:
18    Q.  Dean Wood, I asked you some questions
19  about the President's Committee where you were
20  talking about Dr. Nikolova, and I didn't ask you
21  what you recall discussing during that meeting.
22    Could you --
23    A.  I think the information that you
24  shared with me prompted me on that.
25    So I think the -- I think the

334

1  information that I would have sheared was that
2  in -- in personal con -- conversations with me,
3  Dr. Tewfik was not as positive as he was in his
4  letter.
5      Q.  Okay.  So you conveyed that to the --
6  the President's Committee?
7      A.  I believe that is the information
8  that I conveyed to the President's Committee.
9      Q.  Okay.  Do you recall any questions
10  from the President's Committee or concerns that
11  they had?
12     A.  There were -- there were a number of
13  questions about teaching, but that is always the
14  case.
15         I think the -- they had questions
16  about research funding also, so we talked about
17  that.  I'm not sure I remember -- I have some
18  follow-up notes that I made afterwards if -- will
19  you give me a minute to look for those notes and
20  then I can --
21     Q.  Sure.
22     A.  Okay.
23     Q.  As long as Ben doesn't count these as
24  lawyer minutes.
25         MR. DOWER:  I mean, I --

335

1  I will see.
2         MR. NOTZON:  Since --
3  since I'm not actually --
4         THE WITNESS:  You're
5  not asking, right.
6         MR. DOWER:  You know
7  what?  I -- I have a timer running,
8  but I'm willing to early stop the
9  timer for this.
10     A.  So I apologize.  The -- the document
11  I'm thinking of I do not have immediate access
12  to, so maybe send that to you at a later date
13  through -- through Ben.
14         MR. DOWER:  Yeah, and
15  if -- if we haven't already produced
16  it, we will produce it.
17         MR. NOTZON:  Thanks.
18  BY MR. NOTZON:
19     Q.  Okay.  And then just two follow-ups.
20  The -- on the Corporate Rep side for the
21  promotion candidacy of Dr. Nikolova, speaking as
22  UT, do you adopt Dean Wood's testimony about the
23  issues that you engaged in as the Dean and that
24  the P&T Committee that you testified about, are
25  those consistent with UT's position on what

336

1  happened at the Engineering College?
2      A.  I believe that's correct, yes.
3      Q.  Okay.
4         MR. NOTZON:  Are you
5  comfortable with that, Ben?
6         MR. DOWER:  Yeah, I
7  mean, as -- as long as it's
8  within scope of the topic, you
9  know, then I'm -- I'm comfortable
10  with it, and I suppose if we
11  later have a fight about whether
12  one in particular line is part
13  of the topic or not, as long as
14  you agree that I'm not waiving
15  the ability to have that fight
16  when the time comes, I'm
17  comfortable doing it this way,
18  and that way we won't --
19         MR. NOTZON:  That's
20  reasonable, yeah.
21         MR. DOWER:  Yeah, okay.
22         MR. NOTZON:  If I -- if
23  I -- if I misrepresent that it's a
24  college issue and you say, "Wait,
25  this is something else," yeah,

337

1  I'm okay with that.
2         MR. DOWER:  And --
3  and -- and it should be -- you
4  know, and I'm not saying
5  misrepresent.  There could be a
6  reasonable difference of opinion,
7  but either way, as long as you
8  agree that we're not waiving the
9  objections if we have that fight
10  later, it's fine with me.
11         MR. NOTZON:  Absolutely.
12  Okay.
13  BY MR. NOTZON:
14     Q.  And the follow-up with the -- the
15  testifying as UT on the salaries, I wanted to
16  ask -- so we've already -- I've already asked you
17  some questions about salaries with those first-
18  year Professors.
19         Do you adopt those as UT, as well?
20     A.  As UT, I -- you probably would like
21  a -- I believe you have a spreadsheet.
22         THE WITNESS:  Ben, do
23  they have the spreadsheet of
24  salaries?
25         MR. DOWER:  Yeah.

338

1  A.  So you have the spreadsheet of
2  salaries.  I -- I believe that combined with my
3  testimony is correct.
4     MR. NOTZON:  Okay.  Let
5  me -- let me -- let's go ahead and
6  make that an exhibit.  And that --
7  where is that?  I think -- well,
8  I --
9     MR. DOWER:  Well, you
10  know what, Robert?  You've got
11  the spreadsheet.  When the time
12  comes, the spreadsheet is what
13  it is, and we produced it to
14  you.
15     MR. NOTZON:  Okay.
16  All right.
17  BY MR. NOTZON:
18  Q.  So you adopt -- you'll -- and -- and
19  that --
20     MR. NOTZON:  That
21  spreadsheet is not identified here.
22  That's the problem I'm having.
23     MR. DOWER:  Okay.
24  A.  You know what?  I just found it.
25  BY MR. NOTZON:

339

1  Q.  Okay.
2  A.  So why don't I share it, if that's
3  okay.
4  Q.  That -- that would be perfect.
5  A.  Okay.
6  Q.  And then I just wanted to ask one
7  follow-up question with that.
8  A.  Okay.  Hold on a second.  Now I --
9  now I've lost the folder I was putting things in.
10  I apologize.
11  Q.  No problem.
12     MR. DOWER:  I heard a
13  Judge say once, "The lawyer
14  saying they've only got one
15  question left is like the one
16  potato chip.  It's never
17  literally one."
18     MR. NOTZON:  One
19  potato's worth of potato chips.
20     MR. DOWER:  Oh, yeah.
21  There you go.
22  (Exhibit 11 marked for identification.)
23     THE COURT REPORTER:  And
24  this is going to be Exhibit 11; is
25  that correct?

340

1     MR. NOTZON:  That's
2  correct.
3     THE COURT REPORTER:  Okay.
4  (Discussion held off the record.)
5     MR. NOTZON:  Can you --
6  all right.  Let's go off the
7  record real quick.
8     THE COURT REPORTER:  We're
9  going off the record at 6:40 p.m.
10  (Recess held from 6:40 p.m. to 6:42 p.m.)
11     THE COURT REPORTER:  Okay.
12  We're going back on the record at
13  6:42 p.m.
14  BY MR. NOTZON:
15  Q.  Okay.  So Dean Wood, as UT, do you
16  have a reason why Dr. Nikolova is paid less than
17  everybody except for one Assistant Professor?
18  A.  As UT, this is based on a
19  recommendation from the Department Chair, based
20  on evaluations of faculty members.
21  Q.  So --
22  A.  So -- I'm sorry.  Let me -- let me
23  provide a little more clarification for you.
24  Q.  I'm asking UT, and if UT is telling
25  my I've got to talk to somebody else, --

341

1  A.  No, no.  What I'm saying is within
2  the Cockrell School of Engineering we have a
3  process where the Department Chair makes a
4  recommendation, then it gets reviewed by the Dean
5  and the Associate Dean of Academic Affairs.
6     There's an iteration, and then that
7  sets the salary.  And so that is -- that was the
8  recommendation that came out of the -- that
9  process.
10  Q.  So would it be accurate that -- that
11  the -- the Dean or the Dean's Office didn't
12  modify what the Department sent up to them?
13  A.  I don't have the act -- the final
14  version, but they certainly did not -- they did
15  not make an additional adjustment.
16  Q.  So if I need to know the exact
17  reasons why the pay salary is what it is
18  currently compared to everybody else, I'd have to
19  talk to the Department?
20  A.  I'm sorry, I don't think -- I'm not
21  sure that we have an -- an actual documentation
22  for that.  Hold on.  I'm going to go back to the
23  other -- whoops, I have the wrong one.
24     The other spreadsheet that we were
25  talking about, which was Exhibit 10, so in -- in

342

1    this particular case --
2        Q.   Exhibit 10 now?
3        A.   Exhibit 10, I'm looking at the
4    academic year which would have 2018/'19 which
5    would impact the raises for 2019/'20.  Dr.
6    Nikolova received a review of "meets
7    expectations" from both the Department Chair and
8    the Committee.
9            The merit raise goal was 3 percent,
10   and she was given a merit raise of 3 percent, so
11   she was given the merit raise goal.  And that was
12   a typical raise in the Department for someone who
13   "meets expectations."
14       Q.   So -- but that doesn't answer the
15   question as to why she's lower than everybody
16   except one Assistant Professor.
17       A.   Right.  So in -- in some cases --
18       Q.   That's -- that's what I'm -- that's
19   my question.
20       A.   Right.  So the -- the -- the salaries
21   in the Department have been bumped up because
22   of -- because of the competition from the high
23   tech industry.  As I mentioned before, they give
24   signing bonuses and they give stock options.
25           And it appears that other people's

343

1    salaries were kept ahead of the incoming people,
2    and Dr. Nikolova's is slightly behind the
3    incoming people.
4        Q.   Okay.  So everybody that is higher
5    than her is a high tech beneficiary?
6        A.   They are benefitting from that,
7    correct.
8        Q.   Okay.  And -- and Dr. Nikolova and
9    the other person below her is not benefitting
10   from that?
11       A.   That is my understanding of the
12   salary structure.
13       Q.   And also would it -- would it --
14       A.   The -- the UT representation of the
15   salary structure, right.
16       Q.   Okay.  It would be accurate that any
17   pre-existing disparity between Dr. Nikolova and
18   the other people prior to the hiring of the high
19   tech beneficiaries, let's call them, would --
20   would remain in place?
21       A.   In -- in this case, it did.  I --
22   yeah, in this case, it did.
23           MR. NOTZON:  That's it.
24   Thank you.  Pass the witness.
25           EXAMINATION

344

1    BY MR. DOWER:
2        Q.   I wasn't going to ask anything, but
3    now -- now I do want to make sure that what Dean
4    Wood's said is also properly incorporated into
5    what UT says on the topic of salary, which is
6    just that when Dean Wood was testifying, she also
7    had an observation about an expected merit bump
8    that didn't come to pass because of COVID, and so
9    I guess I'm asking UT as the Corporate Rep to
10   clarify:  Did that affect the 2019 to 2020 year,
11   or was that after that?
12       A.   That would have been after that.
13   That would have been the 2020/2021 academic year.
14           MR. DOWER:  Okay, okay.
15   In that case, pass the witness.
16           MR. NOTZON:  I'll pass.
17           MR. SCHMIDT:  Okay.  We
18   are done.  Thank you.
19           THE COURT REPORTER:  We're
20   going off -- we're going off the
21   record at 6:48 p.m.
22           (Deposition concluded at 6:48 p.m.)
23
24
25

345

1            CHANGES AND SIGNATURE
2    SHARON L. WOOD, Ph.D.          MARCH 18, 2021
3    PAGE  LINE      CHANGE            REASON
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
25   _____

```
1              CHANGES AND SIGNATURE

2   SHARON L. WOOD, Ph.D.              MARCH 18, 2021

3   PAGE     LINE          CHANGE              REASON

4    18       11        "Kathy" should be "Cathy"      spelling

5    21       18       "woman" should be "women"      error

6    22       25      "1983/'84" should be "1983-84"   spelling

7    23       6        "and" should be "in"            spelling

8    29       15      "Mendez" should be "Fenves"      spelling

9    34       2      "engineering" should be "engineer"  spelling

10   38       7       "Mosey" should be "Mosher"       spelling

11   38       24    "Association" should be "Foundation"  error

12   66       16       "meter" should be "leader"      error

13   67       5       "some" should be "someone"       error

14   90       6       "fairly" should be "recently"    error

15   97       15      "Research Professor" should be

16                    "Research Associate Professor"    error

17   97       25         "PCQ" should be "ECE"         error

18   98       4    "graduates" should be "graduate students"  error

19   99       25      " '19/'20 should be "19-20"      spelling

20      (this same error occurs several times on p. 100)

21  100       12      " '20/'21" should be "20-21"     spelling

22  102       4    "we had to pull up funds" should be  error

23                    "they put up funds"

24  102       13    "important" should be "returned"   error

25  104       3        "goal" should be "pool"         error
```

Sharon Wood - 3/18/2021

345

```
 1              CHANGES AND SIGNATURE

 2   SHARON L. WOOD, Ph.D.              MARCH 18, 2021

 3   PAGE    LINE           CHANGE              REASON

 4   _104_     5_           "goals" should be "pools"          error_

 5   _106_     7_              "goal" should be "pool"          error_

 6   _110_     16_         "putting" should be "put in"       spelling

 7   _116_     4_          "academic" should be "administrative"  error_

 8   _132_     12_      "UT's system" should be "UT System"    error_

 9   _132_     16_           "Like" should be "Now"            error_

10   _134_     2_         " '18/'19" should be "18-19"        spelling

11   _134_     3_          " '17/'18" should be ""17-18"      spelling

12   _135_     16_         "promote" should be "promotion"    error_

13   _136_     11_          "earlier" should be "early"        error_

14   _142_     15_        " '18/'19" should be "18-19"        spelling

15   _142_     25_         " '17/'18" should be "17-18"       spelling

16   _142_     25_        " '18/'19" should be "18-19"        spelling

17   _143_     3_          " '17/'18" should be "17-18"       spelling

18   _146_     2_        "UT's system" should be "UT System"   spellling

19   _149_     25_        " '18/'19" should be "18-19"        spelling

20   _152_     24_       "very slimline" should be "incomplete"  error_

21   _166_     1_         " '18/'19" should be "18-19"        spelling

22   _167_     13_         " '16/'17" should be "16-17"       spelling

23   _168_     16_           "well" should be "bar"            error_

24   _173_     25_          "system" should be "System"       spelling

25   _174_     2_          "system" should be "System"        spelling
```

```
                     CHANGES AND SIGNATURE

 SHARON L. WOOD, Ph.D.                    MARCH 18, 2021

 PAGE    LINE           CHANGE                   REASON

 174     25        " '18/'19" should be "18-19"         spelling

 176      4        "system" should be "System"          spelling

 176      6        " '13/'14" should be "13-14"         spelling

 176     11        "UT's system" should be "UT System's"   spelling

 176     13        "system" should be "System"          spelling

 176     21        "system" should be "System"          spelling

 189     13        " '18/'19" should be "18-19"         spelling

 196     24        "jut" should be "just"               spelling

 197     10        "Committee" should be "Council"       error

 206      4        "after" should be "factor"            error

 218     19        "Greg" should be "Brent"              error

 219      4        "found" should be "find"              error

 223     16        " 'bout" should be "about"           spelling

 231     24        "and" should be "in"                  error

 234     13        " '13/'14" should be "13-14"         spelling

 234     13        " '13/'15" should be "14-15"         spelling

 247      1        Mr. Notzon stated that I included in my statement

                   "a couple of times" that Dr. Nikolova was pregnant.

                   This statement is incorrect.  I only noted her pregnancy

                   once in footnote 1 on p. 2.                  error

 247      6        " '15/'16" should be "15-16"         spelling

 247     25        " '15/'16" should be "15-16"         spelling
```

```
 1              CHANGES AND SIGNATURE

 2    SHARON L. WOOD, Ph.D.              MARCH 18, 2021

 3    PAGE     LINE          CHANGE              REASON
```

| PAGE | LINE | CHANGE | REASON |
|---|---|---|---|
| 252 | 5 | "associate, Dean Julien" should be | |
| | | "Associate Dean Julien" | spelling |
| 259 | 17 | "of" should be "or" | error |
| 272 | 1 | "2018/'19" should be "2018-19" | spelling |
| 288 | 2 | "Kathy" should be "Cathy" | spelling |
| 288 | 7 | "Kathy" should be "Cathy" | spelling |
| 295 | 7 | " '12/'13" should be "12-13" | spelling |
| 303 | 16 | "not" is missing from "I am <not>" | error |
| 316 | 7 | " '18/'19" should be "18-19" | spelling |
| 316 | 10 | " '17/'18" should be "17-18" | spelling |
| 319 | 16 | " '19/'20" should be "19-20" | spelling |
| 320 | 20 | "goal" should be "pool" | error |
| 321 | 17 | " '19" should be "2019" | spelling |
| 325 | 24 | "Chair" should be "share" | error |
| 327 | 22 | "2017-'18" should be "2017-18" | spelling |
| 329 | 20 | "Assistants and Professors" should be | |
| | | "Assistant Professors" | spelling |
| 331 | 5 | " '17/'18" should be "17-18" | spelling |
| 331 | 5 | " '18/'19" should be "18-19" | spelling |
| 331 | 24 | "she's" should be "she was" | error |
| 342 | 4 | "2018/'19" should be "2018-19" | spelling |
| 342 | 5 | "2019/'20" should be "2019-20" | spelling |

1                     CHANGES AND SIGNATURE

2     SHARON L. WOOD, Ph.D.              MARCH 18, 2021

3     PAGE     LINE        CHANGE                REASON

4      342      9        "goal" should be "pool"        error

5      342      11       "goal" should be "pool"        error

6      344      13       "/" should be "-"              spelling

7      135      14       "it" should be "the extension"    clarify pronoun

8      135      16       "it" should be "their promotion case"    clarify pronoun

9     _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18    _____

19    _____

20    _____

21    _____

22    _____

23    _____

24    _____

25    _____

Sharon Wood - 3/18/2021

346

1

2

3

*DocuSigned by:*

*Sharon L. Wood*

——BAA263A766FC47B...————————————

SHARON L. WOOD, Ph.D.

4

5

6   STATE OF   Texas              )

7   COUNTY OF  Travis             )

8

9        Subscribed and sworn to before me by the

10  said witness, SHARON L. WOOD, Ph.D., on this the

11  ___4th___ day of ___May_____, 2021,

12  subject to the aforementioned corrections/

13  changes, if any:

14  **Notary Seal**                    **Digital Certificate**

15  ┌─────────────────────────┐
    │  NOTARY PUBLIC          **LAURA REDD**
16  │   ★    STATE OF TEXAS    Notary ID
    │                          288273-1          *DocuSigned by:*
17  │                          My Commission Expires
    │                          9/1/2023          *Laura Redd*
    └─────────────────────────┘              ——FA7F8DB364F841A...

18  **Notary w/o Bond**

19                            _____
                              Notary Public in and for
20                            the State of ___**Texas**___

21  My Commission Expires: ___09/01/2023_____

22

23

24

25

1                REPORTER'S CERTIFICATE

2        I, TOMMI RUTLEDGE GRAY, TEXAS CSR NO.

3  1693, Certified Shorthand Reporter, Registered

4  Professional Reporter, and Certified Realtime

5  Reporter, certify:

6        That pursuant to the 36th Emergency Order

7  Regarding the COVID-19 State of Disaster,

8  Paragraphs 3.c. and 3.d, the foregoing

9  proceedings were taken remotely before me via

10  Zoom videoconferencing, at which time the witness

11  was remotely put under oath by me;

12        That the testimony of the witness, the

13  questions propounded, and all objections and

14  statements made at the time of the examination

15  were recorded remotely stenographically by me and

16  were thereafter transcribed;

17        That the foregoing 346 pages are a true

18  and correct transcript of my shorthand notes so

19  taken.

20        I further certify that I am not a relative

21  or employee of any attorney of the parties, nor

22  financially interested in the action.

23        I further certify that before the

24  completion of the deposition, the Deponent,

25  SHARON L. WOOD, Ph.D., and/or Counsel for the

348

1   Defendant, University of Texas At Austin,

2   ___XX___ did _____ did not request to review

3   the transcript.

4        I declare under penalty of perjury under

5   the laws of Texas that the foregoing is true and

6   correct.

7        Dated this 6th day of April, 2021.

8

9

10

11
                    _____
12                  TOMMI RUTLEDGE GRAY, Texas CSR 1693
                    Expiration Date:  10/31/21
13                  Firm Registration #528
                    INTEGRITY LEGAL SUPPORT SOLUTIONS
14                  P.O. Box 245
                    Manchaca, Texas  78652
15                  Telephone - 512.320.8690
                    Email - info@integrity-texas.com
16

17

18

19

20

21

22

23

24   ROBERT NOTZON, ESQ.:  07:12

25   BENJAMIN LINDBERG DOWER, ESQ.:  00:01

Appx.0767

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

EVDOKIA NIKOLOVA,　　　　　　§
　　Plaintiff,　　　　　　　　　　§
　　　　　　　　　　　　　　　　§
V.　　　　　　　　　　　　　　　§　　　　CASE NO. 1:19-CV-00877-RP
　　　　　　　　　　　　　　　　§
UNIVERSITY OF TEXAS AT AUSTIN,　§
　　Defendant.　　　　　　　　　　§


## PLAINTIFF'S FIRST SUPPLEMENTAL OBJECTIONS AND ANSWERS TO DEFENDANT'S FIRST SET OF INTERROGATORIES

TO:　Defendant, by and through its attorneys of record, Benjamin L. Dower, Assistant Attorney General, Office of the Attorney General, General Litigation Division, P.O. Box 12548, Capitol Station, Austin, Texas 78711-2548, Fax (512) 320-0667, benjamin.dower@oag.texas.gov.

　　　NOW COMES plaintiff Evdokia Nikolova ("Plaintiff" or "Dr. Nikolova") and submits Plaintiff's First Supplemental Objections and Answers to Defendant's First Set of Interrogatories.

　　　Plaintiff refers Defendant to all deposition testimony to be taken in this action.  Plaintiff also refers Defendant to all discovery responses and documents produced in discovery or exchanged between the parties, pleadings and documents filed with the Court, and all deposition exhibits in this case.  Plaintiff reserves the right to supplement and amend these interrogatory responses in accordance with the Federal Rules of Civil Procedure.

### OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

　　　Plaintiff objects to definition of "Plaintiff," "you" and "your" and it's inclusion of Plaintiff's attorneys, to the extent the definition or any interrogatory attempts to or is construed to seek information that is protected by the attorney-client or work product privileges.  Plaintiff hereby raises and asserts the attorney-client and work product privileges in response to any and all

1



*Title VII: Disparate Impact Claim(s)*

<u>**INTERROGATORY NO. 4:**</u>

 In paragraph 45 of Plaintiff's First Amended Complaint, you allege: "The probationary extension, the MID policy and other policies and practices applied by UT Austin have the effect

4

of discriminating against female assistant professors and/or those who become pregnant during their tenure review time period compared with other assistant professors. UT Austin's promotional processes that purport to be facially neutral have been applied in a manner that has resulted in a disparate impact against female faculty and/or pregnant faculty in favor of male or non-pregnant faculty."

Identify and describe the specific policies or practices you contend are responsible for the alleged disparate impact described in paragraph 45 of Plaintiff's First Amended Complaint and describe why you believe the policies or practices cause the disparate impact. In your description, please include the specific language of the policy you contend causes the disparate impact, the category of persons you contend are disparately impacted, and the basis for your contention that the neutral policy has that disparate impact, including by identifying any data or documents that support the contention, if any.

**ATTORNEY OBJECTIONS:**

Plaintiff objects to this interrogatory on the grounds that it seeks to have Plaintiff marshal all evidence. Discovery in this case is not completed, nor has evidence been presented at trial. Defendant is in possession or control of almost all documents and witnesses, and the information requested is equally or more available to and in the possession of Defendant. Plaintiff objects to this Interrogatory on the grounds that it is overly broad, vague and ambiguous, including the request to identify specific language of policies and any documents that support Plaintiff's contention. Subject to and without waiving these objections, see the following answer.

**RESPONSE:**

Defendant's facially gender-neutral policies and practices that have a disparate impact may include:

The probationary extension and tenure policies and practices, including: Handbook of Operating Procedures 2-2020, Extension of the Tenure Track Probationary Period; Handbook of Operating Procedures 2-2160, Recommendations Regarding Faculty Compensation, Faculty Promotion, Tenure, Renewal of Appointment, or Nonrenewal of Appointment; the Modified Instructional Duty policy in the School of Engineering/ECE Department; and other policies and practices applied by Defendant.

A facially "equal" extension relating to tenure and "equal" reductions in teaching duties for both male professors and for female professors who give birth to a child provides male professors with clear advantages. These advantages include the fact that male professors do not bear the burden of actually giving birth to a child, and consequently do not have to deal with the medical and physical issues surrounding childbirth and time after for physical recovery from childbirth, and other obligations and issues mothers frequently experience in the year following childbirth such as nursing, post-partum depression, etc. Providing male professors with the same extension for tenure and reduction in teaching as a female professors who actually gives birth and is the primary caregiver of the child, effectively allows male professor more time to perform research and all faculty other duties relative to female professors who have children. Additionally, the requirement for visual presence (such as being present at service meetings at the university) when female

5

faculty are in the last months of pregnancy; after giving birth; and/or while performing nursing duties, requires additional time and effort that burdens faculty who are mothers disproportionate to male faculty.

The Cockrell School of Engineering's facially gender-neutral practice and policy that student teaching evaluation scores should be above 4.0 to be considered acceptable and/or worthy of promotion, and using student evaluations of teaching as an important or determinative factor in tenure promotion decisions disparately impacts female professors due to well-documented, published, and persistent gender biases within students when completing teaching evaluations, because women and pregnant women have been shown to receive lower scores despite contradicting and more compelling evidence of teaching effectiveness.    Student teaching evaluations scores have also been shown to be affected by the gender of the students completing the evaluations and disciplines, in addition to the gender of the professor. Plaintiff is teaching in a predominantly male student field of math and science that results in female faculty receiving lower teaching scores than male faculty.

It has also been shown that women are given lower teaching scores when pregnant and while nursing for reasons including physical appearance changes, loss of energy (for example due to morning sickness, other pregnancy issues and pre-birth physical restrictions) and time requirements following birth for breast feeding/milk pumping.  This lower teaching score occurred in at least one semester (Fall 2015) when plaintiff was pregnant and teaching an atypical double load of two large classes.  Ratings while Plaintiff was pregnant and/or immediately after birth were specifically used by Dean Wood in her negative assessment of Plaintiff's teaching, suggesting that those scores indicated a trend of lower teaching scores, when viewed in conjunction with the policy and/or practice acceptable and/or worthy of promotion.

Plaintiff also refers Defendant to deposition testimony in this case, deposition exhibits, documents produced in discovery, expert witness reports, and pleadings filed.

**SUPPLEMENTAL RESPONSE:**

Defendant's tenure policies, practices and procedures for going up for tenure prior to the sixth year of their probationary period at UT have a disparate impact on female professors.  *See* Expert Report and Deposition of Shane Thompson and documents produced by UT.

Additionally, there is a typo regarding a date in the fifth paragraph of the RESPONSE above.  The reference to 2015 should be 2017 so that the correct sentence should read:

"This lower teaching score occurred in at least one semester (Fall 2017) when plaintiff was pregnant and teaching an atypical double load of two large classes."

<u>**INTERROGATORY NO. 5:**</u>

Identify all documents provided to, relied upon, or reviewed by any testifying or consulting expert in conducting any analysis of the effects of Defendant's policies or practices on members of a protected class.

6

Respectfully submitted,

CREWS LAW FIRM, P.C.
701 Brazos, Suite 900
Austin, Texas 78701
(512) 346-7077
(512) 342-0007 (Fax)

By:      /s/ Robert W. Schmidt
Robert W. Schmidt
State Bar No. 17775429
schmidt@crewsfirm.com
Joe K. Crews
State Bar No. 05072500
crews@crewsfirm.com

By:      /s/ Robert Notzon
Robert Notzon
Texas Bar No. 00797934
The Law Office of Robert Notzon
1502 West Avenue
Austin, TX 78701
512-474-7563
512-852-4788 fax
Robert@notzonlaw.com

ATTORNEYS FOR PLAINTIFF

18

## <u>CERTIFICATE OF SERVICE</u>

This will certify that a true and correct copy of the above and foregoing document was served in accordance with the Federal Rules of Civil Procedure on June 28, 2021, on the following counsel of record:

Benjamin L. Dower, Asst Atty Gen
Amy S. Hilton, Asst Atty Gen
General Litigation Division
PO Box 12548, Capitol Station (MC019)
Austin, TX 78711-2548
Fax (512) 320-0667
benjamin.dower@oag.texas.gov
amy.hilton@oag.texas.gov

/s/ Robert W. Schmidt
_____
Robert W. Schmidt

Appx.0773

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| EVDOKIA NIKOLOVA, | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Civil Action No.: 1:19-CV-00877 |
| | § | |
| UNIVERSITY OF TEXAS AT AUSTIN, | § | |
| *Defendant.* | § | |

Probationary, Tenure Data.xlsx

Microsoft Excel file submitted to the Court on a Flash Drive

2019-20 ECE FACULTY ANNUAL PERFORMANCE REVIEW RATINGS  BASED ON MOST RECENT COMPLETED ACADEMIC YEAR (2018-19)

ECE Committee Members: Christine Julien (Chair), Constantine Caramanis, Alex Huang, Lizy John, Michael Orshansky, Emanuel Tutuc

| Last Name, First Name | Title | Committee Rating | Committee Comments | Chair Rating |
|---|---|---|---|---|
| Abraham, Jacob | Professor | ME | Dr. Abraham has received competitive research awards and as good research output in terms of conference and journal publications. Most of the graduate students are part-time, and the funding level is modest. Teaching is excellent. | ME |
| Akinwande, Deji | Professor | EE | Prof. Akinwande has six current grants, a vibrant research group, has published 17 paper in the current year,  has excellent CIS scores, and is clearly a strong mentor of our students. He has served on the technical committees of flagship device conferences, such as the IEEE Device Research Conference (DRC) and International Electron Device Meeting (IEDM). | EE |
| Andrews, Jeffrey | Professor | EE | Dr. Andrews has a great research and publication record and has received several awards. He has had three PhD students complete during the review period. And he has excellent teaching reviews for EE313, a required undergraduate course. His service record in the review period is very strong, including co-chairing the faculty recruiting committee. | EE |
| Arapostathis, Aristotle | Professor | ME | *Prof. Arapostathis is an active researcher in a highly mathematically sophisticated field. His contributions are well appreciated in his community. Moreover, the period under review coincides with some of his most productive years, and also marks a period of continued and increased recognition from his community. He teaches core courses in the department. His service to the department, university and also his broader research community are all solid.* | ME |
| Baccelli, François | Professor | EE | Dr. Baccelli is half-time in ECE. He has solid teaching and an excellent publication and mentoring record. | EE |
| Banerjee, Sanjay | Professor | EE | *Prof. Banerjee's research productivity and impact are exemplary. He receives excellent reviews of his teaching from both students and peers, and his service to the research community and to the University are solid.* | EE |
| Bank, Seth | Professor | EE | Dr. Bank is a consistently strong researcher, considering all measures (inputs, outputs, students). His teaching quality is also extremely high, as is his service to the department (e.g., faculty recruiting) | EE |

| Barber, Suzanne | Professor | EE | Dr. Barber has high publication productivity, excellent funding, and a solid mentoring program. She has very high teaching scores that are way above average in the department, especially considering the size of the class and the quality of the student comments. It is obvious that Dr. Barber puts a lot of time into her teaching. | EE |
|---|---|---|---|---|
| Bovik, Alan | Professor | EE | Dr. Bovik has a superb record. His teaching is very strong, and his has very high research visibility. His group is large with a great track record, spannning funding and publications. | EE |
| Caramanis, Constantine | Professor | EE | Prof. Caramanis is leading a large research group, his publication productivity is high, the group is well-funded from a diverse set of funding sources. His teaching evaluations are excellent and he is notably active in creating and modifying his course offerings. His service, including as an WNCG director, is outstanding. Very active in outreach as well. | EE |
| Chen, Ray | Professor | EE | Dr. Chen has consistently attracted significant research funding, including a second MURI program. His publication and research record are excellent. His teaching and service are also very good. | EE |
| Cuevas, Al | Associate Professor of Instruction | ME | Dr. Cuevas has a good teaching record with a mix of student feedback on courses. He teaches undergraduate service courses and has nothing to indicate a concern with his instructional contributions. | ME |
| de Veciana, Gustavo | Professor | EE | Dr. de Veciana has had excellent teaching and service to the department in the period under review. He also has a very strong research record. | EE |
| Dimakis, Alex | Associate Professor | EE | Dr. Dimakis as a reasonable number of publications in top venues in his area, including the Annals of Statistics. His significant levels of fundraising (with good levels of continuity) support a good suzed group. He has also had excellent service to the department and externally. His teaching is excellent. | EE |
| Dodabalapur, Ananth | Professor | EE | Prof. Dodabalapur has a very solid research record over his career and within the period of review. His teaching is good, and he is a significant contributor to the first introductory EE course in the department. He is also a substantial contributor in service to his research community and to the university. | EE |

| Eberlein, Mary | Associate Professor of Instruction | ME | Dr. Eberlein is a professor of instruction whose primary responsibility is classroom teaching. While student feedback on the course surveys is somewhat negative, peer evaluation is more positive, and Dr. Eberlein's personal reflection indicates that the instructor is working to adjust the course and material. The department should provide Dr. Eberlein support in improving her teaching. | ME |
| Erez, Mattan | Professor | EE | Dr. Erez has high research and publication productivity and a good amount of research funding. He has also won industry faculty awards. His teaching record is also strong and he performs a significant amount of service to the department. | EE |
| Evans, Brian L | Professor | EE | Dr. Evans has excellent service to the department and to the university. His teaching is also excellent (off the charts). Research productivity and studetn supervision are high. | EE |
| Fagelson, William | Assistant Professor of Instruction | EE | Dr. Fagelson has made outstanding contributions to teaching, advising, and mentoring students in the department. In addition, he has engaged proactively in many activities beyond teaching, including developing the writing curriculum for our students. | EE |
| Garg, Vijay K | Professor | EE | *Prof. Garg's research productivity during the review period has been high. He is also an excellent instructor whose teaching has been recognized by a Lepley ECE Departmental Teaching Award. His service to the department, university and also his broader research community are all solid.* | EE |
| Gerstlauer, Andreas | Associate Professor | EE | Dr. Gerstlauer has shown a high research productivity, with a good amount of funding and several invited talks. He received a best paper runner up award. He has very strong teaching evaluations, and his level of service to the department is great. | EE |
| Gharpurey, Ranjit | Professor | ME | Dr. Gharpurey's recent activities have been related to expanding his resesarch into a new area. He has a modestly funded research program, good publication record, good mentoring and teaching. | ME |
| Ghosh, Joydeep | Professor | EE | *Prof. Ghosh leads a top-notch research program, producing impactful and high visibility results. Alumni from his group have been placed in top industry and academic positions. He teaches large required undergraduate courses, and very popular graduate courses. He provides significant service to the department, the university and his broader academic community.* | EE |

| Gligoric, Milos | Assistant Professor | EE | Dr. Gligoric has an excellent publication record and excellent funding for an assistant professor. He has one PhD student completed and three in the pipeline. On the teaching side, Dr. Gligoric has taken on the honor's version of 312 and is excelleing at it (while also excelling at graduate teaching). For the service side, there is perhaps too much service, but Dr. Gligoric is an excellent contributor both internally and externally. Within the department his contributions to faculty recruiting are particularly notable. | EE |
| Hall, Neal | Associate Professor | ME | Dr. Hall has a good publication record, solid funding to date. In the review period, funding and mentoring appear to flatten a little. He has modest sized group with a few PhD students in the pipeline. His teaching is excellent. | ME |
| Hallock, Gary | Professor | NR | Retiring 8/31/20, so PT review was not scheduled; does not need a review at all;  Include note here reflecting this. | NR |
| Hanson, Alex | Assistant Professor | NR | Hired 9/1/19; will not have 18-19 activity; no review needed. | NR |
| Heath, Robert | Professor | EE | Dr. Heath has high research productivity and solid service, including his leadership of the UT-SAVES center. He has received many awards an given many invited talks. He also has great teaching evaluations. | EE |
| Huang, Alex Q | Professor | EE | Prof. Huang leads a large 20+ group of students and 3 post-docs supported by a significant amount of research funding. 3 PhD students graduated during this period. He has a very strong publication record. Teaching record is solid, but the numbers indicate that it is an area that requires continued focus. He has served on the Faculty Council and his overall service record is strong | EE |
| Incorvia, Jean Anne | Assistant Professor | EE | Dr. Incorvia has established a vibrant research group and has recently received the NSF Career award. In the period under review, she has an impressive number and level of invited talks. Her publication record is good, with a notable commitment to undergraduate researchers. The size of her group is good, and her level of service is perfect for an assistant professor, with contributions to the department and in outreach. | EE |
| John, Lizy K | Professor | EE | *Prof. John's efforts in teaching, research, and service are all exemplary. She is an accomplished teacher in both undergraduate and courses; her research is prolific and highly visible, and she is a valued contributor to the department, university, and her technical research community* | EE |

| Julien, Christine | Professor | EE | Christine's record of teaching is superb. In addition to being outstanding in the classroom, she shows pioneering leadership in developing her classes, as well as in her service in revising the entire curriculum of ECE. Her research is very solid and her publication record is reasonable. She supports a good size group through competitive NSF and NIH grants with several large proposals pending. Her service to the department and university through a variety of committees and her leadership in organizing Edison Lectures is very strong. | EE |
| Khurshid, Sarfraz | Professor | EE | Great publication record and good funding. Solid pipeline of students, making good progress. External service is excellent, though internal service could be increased. Excellent teaching, and students report that Dr. Khurshid is engaged and attentive to their questions and concerns | EE |
| Kim, Hyeji | Assistant Professor | NR | Hired 1/16/20; will not have 18-19 activity; no review needed. | NR |
| Kulkarni, Jaydeep | Assistant Professor | EE | Dr. Kulkarni's research productivity and funding are good, especially for an  assistant professor. He has multiple students in the pipeline, several invited talks, lots of publications, and funding from a variety of sources (NSF and industry). His service (internal and external) is good. Student comments on his teaching indicate that he immediately and directlry incorporates student feedback, and Dr. Kukarni's own teaching reflection reinforces this. | EE |
| Lee, Jack | Professor | ME | Dr. Lee performs a good amount of service for the department as the head of the Graduate Studies Committee. His research productivity through publications is excellent, and he maintains a modestly sized research group with reasonable funding. | ME |
| Marculescu, Diana | Professor | NR | Hired 12/1/19; will not have 18-19 activity; no review needed. | |
| Marculescu, Radu | Professor | NR | Hired 1/16/20; will not have 18-19 activity; no review needed. | |
| McDermott, Mark | Professor of Practice | EE | Dr. McDermott has an excellent instructional record, notably teaching both undergrad and graduate courses. He has developed a new entrepreneurial course and routinely brings the state of the art with respect to tech to the classroom. | EE |
| Metcalfe, Robert | Professor | NR | ECE faculty cmtee has not historically reviewed Metcalfe. Note: PT review was due this Fall19, but has been deferred due to LoA 19-20 (for the eventual PT, Dean's Office will likely form a special committee). | NR |

| Millan, Jose | Professor | NR | Hired effective 9/1/19: no 18-19 activity; no review needed. | NR |
|---|---|---|---|---|
| Mokhtari, Aryan | Assistant Professor | NR | Hired effective 9/1/19: no 18-19 activity; no review needed. | NR |
| Nandakumar, Vallath | Lecturer (proposed title: Asst Prof of Instctn) | ME | Dr. Nandakumar has clearly reflected on recent student and peer feedback and adjusted his teaching in response. While there are some continuing concerns for the teaching record, the overall quality of student reviews is improved, and his personal reflection indicates the changes he has made. | ME |
| Neikirk, Dean | Professor | NR | (Should not need a review; verify with Dean's Office) | NR |
| Nikolova, Evdokia | Assistant Professor | ME | Dr. Nikolova was on Modified Instructional Duty in Fall 2018; this review is for Spring 2019 activity only. Dr. Nikolova has a reasonable publication and teaching record. She maintains a modestly funded research group. During this period, her service to the department was relatively low, but this is also reasonable, given the semester of leave. | ME |
| Orshansky, Michael | Professor | EE | Professor Orshansky had three PhD students graduating in the current review period, and had excellent levels of funding. The teaching is quite good as well. The research productivity (papers) is reasonable, including two best paper nominations | EE |
| Pan, David Z | Professor | EE | *Prof. Pan is a very active researcher in integrated circuits design and computer aided design for manufacturability, reliability, security, machine learning and hardware acceleration. His contributions are very well appreciated in his community. During the period under review, he was elevated to IEEE and SPIE fellow, and received the SRC Technical Excellence award, and many of his contributions co-authored with students have received best paper awards. His teaching record is very good. His service to the department, university and also his broader research community are all solid.* | EE |
| Patt, Yale | Professor | ME | Dr. Patt has published a single research paper in the period under review, but in the top venue in his research area. He has one PhD student completed, with several in the pipeline. All students are fully funded with gift funding. Dr. Patt's research is highly visible; he has received multiple awards and given multiple invited talks. Based on the student feedback on teaching and the peer teaching evaluation, teaching is good. Students in the graduate course comment on the need for a textbook; Dr. Patt's FAR includes the plans for such a book. | ME |

| Porter, Emily | Assistant Professor | NR | Hired 9/1/19; no 18-19 activity; no review needed. | NR |
| Priebe, Roger | Associate Professor of Instruction | EE | Dr. Priebe's teaching is excellent, well above average for the department, even though he teaches a large required undergraduate course. Beyond teaching, though, he also serves externally on the SIGCSE program committee and is active in the CS education community. His shoes are big ones for the department to fill. | EE |
| Register, Frank | Professor | EE | Dr. Register maintains a relatively small group size but continues to publish his work in very good venues, attesting to the high quality of his work. He was the general chair of a major conference in his area. As the graduate advisor for the department, he performs an extremely high level of service to the department. | EE |
| Sanghavi, Sujay | Associate Professor | EE | Dr. Sanghavi's teaching record is excellent, even given the large undergraduate course. His publication record is stront, and he gave two invited talks and completed a PhD student. He has a solid funding record and performs a reasonable amount of department service. | EE |
| Santacruz, Pedro | Assistant Professor of Instruction | EE | Dr. Santacruz joined in January 2019, and Spring 2019 was his first semester teaching in the program. There is therefore very little data here. The CIS forms are not available for Spring 2019, so we just have the numbers, which are good for a first semester. The peer evaluation, including the instructor's reflection are quite good. | EE |
| Santoso, Surya | Professor | EE | Dr. Santoso record shows very strong publications (in both number and quality), a good level of funding, and a strong number of students. He also makes solid contributions to the department by serving on many committees. His teaching is excellent. | EE |
| Shakkottai, Sanjay | Professor | EE | Dr. Shakkottai excels across the board at teaching, research, and service. He also served as the director of WNCG in this period. | EE |
| Shankar, Shyam | Assistant Professor | NR | Hired 9/1/19; no 18-19 activity; no review needed. | NR |
| Soloveichik, David | Assistant Professor | EE | Dr. Soloveichik is doing fundamental research work, and he has a solid publication record and great funding. His research group is on the small side, but Dr. Soloveichik describes efforts to grow the size of the group. Excellent teaching record, and his service (both internal and external) is great for an assistant professor. | EE |

| Sun, Nan | Associate Professor | EE | Dr. Sun has excellent research productivity, visibility, funding, and student advising. He gave a large number of invited talks and received several awards. He was on an FRA during the review preiod so has no teaching record. Service is reasonable both internally and externally. | EE |
| Swartzlander, Earl | Professor | ME | Dr. Swartzlander maintains a small research group and a modest level of funding. In the review period, the group had good output, including five patents. Dr. Swartzlander's teaching is excellent. | ME |
| Tamir, Jonathan | Assistant Professor | NR | Hired 1/16/20; no 18-19 activity; no review needed. | NR |
| Telang, Nina | Associate Professor of Instruction | EE | Dr. Telang is a model instructional faculty in the department. Not only is her teaching outstanding, she is also a significant contributor to the department in other ways, developing new courses and course materials, undertaking new initiatives for student wellness and mental health, etc. | EE |
| Tewfik, Ahmed | Professor | EE | In 2018-19, Dr. Tewfik served as chair of the department and taught no classes. He has provided excellent leadership and service to the department | EE |
| Thomaz, Andrea | Associate Professor | NR | Dr. Thomaz did not submit a FAR for 2018-19. The committee believes she was on leave the entire review period. No review was done. | NR |
| Thomaz, Edison | Assistant Professor | ME | Dr. Thomaz has a good publication record and excellent service, including service within the department, the university, and in the external research community. His funding is reasonable but could be improved; based on the information about submitted proposals, this will likely change. Teaching is also good, based on positive comments on the student feedback forms. | ME |
| Tiwari, Mohit | Associate Professor | EE | Dr. Tiwari has an excellent publication record and a well funded research group. He has received multiple best paper awards and nominations. His teaching record is good, and he excels at supervising undergraduate research. | EE |
| Touba, Nur | Professor | EE | *Prof. Touba's research has high impact; he is very discerning in his choice of venues for publication of his work. He maintains a reasonably sized but high impact research group. He clearly excels at teaching and has taken on a significant amount of service contributions in the department and his technical community.* | ME |

| Name | Title | Dept | Comments | |
|---|---|---|---|---|
| Tutuc, Emanuel | Professor | EE | Prof. Tutuc's teaching record is excellent. In the reporting period, three of his PhD students completed their degrees (one was co-advised), and he continues to support and advise a robust research group. He has a strong publication record with an excellent number and quality of journal and conference publications during the review period. He also has a solid funding level, including projects from NSF, SRC, and industry and has performed external service as an editor for APL. | EE |
| Valvano, Jonathan | Professor | ME | Dr. Valvano has a modest but increasing research program, with some funding, one publication, and a few students. Teaching is good. Service to the department (as undergraduate advisor) is excellent. | ME |
| Vikalo, Haris | Professor | EE | Dr. Vikalo has a solid publication record with good funding to support a solid research group. He has a great teaching record and good service to the department. | EE |
| Vishwanath, Sriram | Professor | EE | Dr. Vishwanath has a solid teaching record in EE351K. Lots of publications and invited talks, and a very large research group with adequate funding. | EE |
| Wasserman, Daniel M | Associate Professor | EE | Dr. Wasserman has a strong publication record, exceptional teaching record and has provided significant amounts of service to the department. | EE |
| Wuster, Tracy | Assistant Professor of Instruction | ME | Dr. Wuster has a very solid instructional record. Reviews from students and peers indicate that he is a good lecturer and attentive to student needs. | ME |
| Yerraballi, Ramesh | Professor of Instruction | EE | Dr. Yerraballi maintains a consistently excellent teaching record. Beyond this, though he has also contributed to the development of new course materials in the department and to a broad array of service within the department and across the university. | EE |
| Yilmaz, Ali | Professor | EE | Dr. Yilmaz's performance is high in all aspects. He has a great publication record, good sized group, healthy funding, including recent funding. He received a couple of research awards from the Oden Institute. Teaching is also good. | EE |
| Yu, Edward | Professor | EE | Dr. Yu is exceptional in all aspects: research, which includes directing the first MRSEC center at UT, teaching, with very substantive contributions to both undergraduate and graduate courses, and consistent and significant service to the department. | EE |

| Zhu, Hao | Assistant Professor | EE | *Dr. Zhu is a highly visible researcher, with a healthy, impactful, and sustainable research program. Her teaching is improving, and her reflection demonstrates her commitment to continuous improvement in teaching. Finally, her service to her research community and the department are well above the norm for assistant professors at similar stages of their careers.* | EE |

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| Evdokia Nikolova,<br>　　　*Plaintiff,* | § |
| | § |
| | § |
| v. | § |
| | § |
| University of Texas at Austin,<br>　　　*Defendant.* | § |
| | § |
| | § |

Civil Action No.: 1:19-CV-00877

The following is an excerpt of data derived from Probationary, Tenure Data.xlsx, which is included elsewhere in the Appendix (*see* Appx.0774):

| FirstName | LastName | Gender | First extension year (if applicable) | Reason for 1st extension | Date (or year) left UT Austin (if applicable) | Action President |
|---|---|---|---|---|---|---|
| Efstathios | Bakolas | Male | 2016 | Expecting child | | Promote to Assoc. Prof. |
| Marcelo | Behar | Male | 2015 | Expecting child | 8/31/2017 | N/A |
| Michael | Blackhurst | Male | 2013 | Expecting child | 8/31/2014 | N/A |
| Amy | Brock | Female | 2013 | Expecting child | | Promote to Assoc. Prof. |
| Michael | Cullinan | Male | 2015 | Health reasons | | Promote to Assoc. Prof. |
| Ashish | Deshpande | Male | 2014 | Expecting child | | Promote to Assoc. Prof. |
| Ned | Dimitrov | Male | 2016 | Expecting child | 8/31/2017 | N/A |
| Chadi | El Mohtar | Male | 2012 | Expecting child | | Promote to Assoc. Prof. |
| Raissa | Ferron | Female | 2010 | Expecting child | | Promote to Assoc. Prof. |
| Wassim | Ghannoum | Male | 2011 | Expecting child | | Terminal Appointment |
| Lea | Hildebrandt Ruiz | Female | 2013 | Expecting child | | Promote to Assoc. Prof. |
| Trevor | Hrynyk | Male | 2015 | Expecting child | Resigned tenure-track position 04/30/2019 | N/A |
| Vijay | Janapa Reddi | Male | 2015 | Expecting child | | Promote to Assoc. Prof. |
| Mary Jo | Kirisits | Female | 2009 | Principal caregiver of a pre-school child | | Promote to Assoc. Prof. |
| Evdokia | Nikolova | Female | 2015 | Expecting child | | Promotion Denied |
| Carolyn | Seepersad | Female | 2008 | Expecting child | | Promote to Assoc. Prof. |
| Nan | Sun | Male | 2015 | Expecting child | | Promote to Assoc. Prof. |
| Yaguo | Wang | Female | 2017 | Expecting child | | Promote to Assoc. Prof. |
| Ying | Xu | Female | 2011 | Expecting child | | Promote to Assoc. Prof. |
| Janeta | Zoldan | Female | 2013 | Expecting child | | Promote to Assoc. Prof. |