UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| EVDOKIA NIKOLOVA | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CASE NO. 1:19-cv-00877-RP |
| | § | |
| UNIVERSITY OF TEXAS AT AUSTIN, | § | |
| Defendant. | § | |

**PLAINTIFF'S RESPONSE TO MOTION FOR PARTIAL SUMMARY JUDGMENT**

Respectfully submitted,

CREWS LAW FIRM, P.C.
701 Brazos, Suite 900
Austin, Texas 78701
(512) 346-7077
(512) 342-0007 (Fax)
schmidt@crewsfirm.com


By: /s/ Robert W. Schmidt
Robert W. Schmidt
State Bar No. 17775429
Joe K. Crews
State Bar No. 05072500

/s/ Robert Notzon
Robert Notzon
The Law Office of Robert Notzon
Texas Bar No. 00797934
1502 West Avenue
Austin, Texas 78701
(512) 474-7563
(512) 852-4788 facsimile

**ATTORNEYS FOR PLAINTIFF**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 20, 2021, this document was served pursuant to Federal Rules of Civil Procedure on counsel for Defendant through the Court's electronic filing system at the following address:

Benjamin L. Dower
Assistant Attorney General
Amy S. Hilton
Assistant Attorney General
Office of the Attorney General of Texas
General Litigation Division
P.O. Box 12548
Capitol Station,
Austin, Texas 78711-2548
Fax (512) 320-0667
benjamin.dower@oag.texas.gov
amy.hilton@oag.texas.gov

By: /s/ Robert W. Schmidt

## I.  LEGAL STANDARD

"The Fifth Circuit has made it clear that summary judgment is strongly disfavored in Title VII actions."[1] The Supreme Court has "emphasized the paramount role that juries play in Title VII cases, stressing that in evaluating summary judgment evidence, courts must refrain from the making of 'credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts,' which 'are jury functions, not those of a judge.'"[2]

## II.  FACTS OF THE CASE

### 1.  UT Hires Nikolova as a Tenure Track Assistant Professor.

Nikolova is an exceptional computer scientist and professor. Given her strong credentials,[3] UT hired her as an assistant (tenure-track) professor in the Dept. of Electrical and Computer Engineering ("ECE Dept.") starting in Spring 2014. **Ex. 1**, EN CV.[4] Prior to hiring, UT committed to allow Nikolova to go up for tenure before the normal six years by counting her years of tenure-track experience at A&M. **Ex. 3,** Email Tewfik Commit; **Ex. 4,** Text Tewfik Confirm; **Ex. 5** Chair Rec at 1; **Ex. 6**, UT 2-2010; **Ex. 7**, UT 2-2160. UT made similar commitments to other faculty members which UT honored, unlike with Nikolova. **Ex. 8**, Heidari Tenure Docs at UT 16918.

The ECE Dept. is overwhelmingly male dominated. When Nikolova went up for tenure, there were 53 tenured faculty members within the ECE Dept., 49 men, 92.5% and 4 women, 7.5%. **Ex. 9**, CCAFR Appeal; **Ex. 10**, Gender XL UT 34032. During the five years between when Nikolova was hired and Spring 2019 when she was denied tenure, the ECE Dept. promoted 7 of 7 men and

---

[1] *Perales v. Am. Ret. Corp.*, No. SA-04-CA-0928 NN, 2005 U.S. Dist. LEXIS 22630, at *38 (W.D. Tex. 2005) (citing *Fierros v. Tex. Dep't of Health*, 274 F.3d 187, 190-91 (5th Cir. 2001).

[2] *Fierros,* 274 F.3d at 190-191, (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51, (2000)).

[3] Nikolova earned a BA and MS from Harvard, an MS from Cambridge, and a PhD from MIT. She held a postdoctoral appointment at MIT, and then worked as a tenure-track professor by Texas A&M, a top US engineering school, for 2.5 years. Ex. 1, EN CV at 34, **Ex. 2,** CCAFR Decision at UT 699.

[4] UT's MSJ refers to "concerns" when Nikolova was hired, however, UT did not and cannot link these alleged concerns to any claim or defense in this case (e.g., five years before any relevant decisions, not same decision makers, etc.).

zero of 2 women (one being Nikolova) who went up for tenure.[5] *Id.*; **Ex. 11**, Tenure Data XL; **Ex. 12**, Tewfik Dep 19:1-23.

## 2. <u>UT Recognized Nikolova's Outstanding Performance.</u>

At UT, Nikolova excelled. Research and publication are considered significant factors for tenure at tier one universities. **Ex. 13**, Julien Dep 163:18-164:4; **Ex. 14**, Fenves Dep 46:2-9. UT recognized Nikolova's "strong publication record," publishing in "high impact journals" and "highly selective conferences." **Ex. 15**, Dean's Assess at UT 23-24; **Ex. 16**, Budget Council Report on Research ("BC Research"). Nikolova was selected to be an organizer at the Simons Institute for the Theory of Computing at UC Berkeley.[6] UT also recognized Nikolova's strong record in teaching and service. **Ex. 18,** BC Teaching; Ex. 17, BC Service.

## 3. <u>UT Puts Nikolova Up for Tenure "Technically Early"</u>

Given her excellent record, the ECE Dept. Chair Tewfik and the ECE Budget Council, (all tenured full ECE professors) determined during the 2017-18 year that Nikolova was ready to go up for tenure in 2018-19; which she did. **Ex. 19,** Nikolova ("EN") Dep 90:9-93:5; **Ex. 20**, First Vote. UT policies require that a tenure-track assistant professor must be considered for tenure and promotion "*not later than an individual's sixth year"* at UT. Ex 6, Policy 2-2010, Ex. 7, Policy 2-2160 (emphasis added). However, UT's policies *do not* limit a professor from going up for tenure *before* having six years at UT.[7] *Id.* UT's "General Guidelines" for promotion and tenure in 2018-19 stated that "[c]ases considered before the sixth year in rank are accelerated and must be

---

[5] UT's College of Engineering, which includes the ECE Dept., was also heavily male-dominated with 174 male tenured professors (84%) and 33 females (16%). **Ex. 10**, Gender XL.

[6] Widely considered one of the most prestigious institutes for theoretical computer science attended by the most famous scientists and mathematicians in the world. Ex. 15, Dean's Assess, "It is quite remarkable that Prof. Nikolova was invited to organize a workshop there at her stage of career." *Id.* Ex 17, BC Service.

[7] An assistant professor cannot go up for tenure before their sixth year at UT without the support and approval of the Dept. chair and Budget Council, Ex. 14, Fenves Dep. 38:17-21, Ex. 12, Tewfik Depo. 20:17-21:5.

explained," but there is no requirement that a "higher bar" must be cleared for tenure before the sixth probationary year at UT. **Ex. 22**, Guidelines at UT 737; Ex. 2, CCFAR Dec. at 699-700, 702.

If an assistant professor like Nikolova has less than six years at UT, but six or more years' total service at UT and another peer institution, the application is considered "technically early" or "accelerated" and UT "look[s] at the whole record in rank as an assistant professor." Ex. 14, Fenves Dep 49:17-50:2; 121:1-8.[8] By 2018-19, Nikolova had worked as an assistant professor for eight years (5.5 years at UT and 2.5 at A&M). Thus, Nikolova went up for tenure "technically early," but also "late" as she had two more years' experience than the six-year norm. *Id.*, Ex. 1, EN CV.

### 4.  Nikolova Was "Technically Early" Due in Part to Pregnancy "Probationary Extension."

In addition to working first at A&M, UT considered Nikolova "technically early" because she took a "probationary extension" in 2015-16 due to pregnancy and birth of her first child that year.[9] **Ex. 24,** Pregnancy Extension. UT Policy allows male and female assistant professors to apply for a one-year extension (giving them an additional year before they are *required* to go up for tenure) if they are "the principal caregiver of a preschool child." **Ex. 25**, UT 2-2020. Nikolova took the extension following Chair Tewfik's strong advice to do so, telling her that it cannot hurt her if she did. Ex. 19, EN Dep 66:14-68:14.

### 5.  Everyone Before Dean Wood Strongly Supported Nikolova For Tenure.

The ECE Dept. and School of Engineering overwhelmingly supported Nikolova's tenure:

- Spring 2018, ECE Dept. Budget Council (all Full Professors) voted to put Nikolova up "early" for tenure 27 Yes, 2 No, and 1 Abstain, ECE Dept. Associate Professors voted 10 Yes, 0 No, and 1 Abstain. Ex. 20, First Strong Vote.[10]
- Fall 2018, ECE Dept. Budget Council voted to support tenure (32 Promote, 1 No, 2 Abstain). **Ex. 26**, Second Strong Vote.

---

[8] *See also* Ex. 12¸ Tewfik Dep 69:10-70 :7; Ex. 21, Wood Dep 174:18-23.
[9] **Ex. 25**, UT Rule 2-2020; Ex 19, EN Dep 63:13-16.
[10] Chair Tewfik told Nikolova at the time these were "strong votes" by the Budget Council in support of her. *Id.*

- Fall 2018, the School of Engineering's schoolwide P&T Committee unanimously supported tenure: 7 Promote, 0 No, and 0 Abstain.[11]

External reviewers – prominent professors in her field at peer universities – also all strongly supported her for tenure. Ex. 15 Dean's Assess at UT 24; Ex. 5, Chair's Rec at UT 29. For example, her reviewers wrote:

- "remarkable scientist with a strong case for tenure and promotion" and "[s]he would certainly have received tenure easily at all the institutions I have been affiliated with . . ." **Ex. 28**, External Letters at UT 249;
- "Restricting myself to the last few years I can say that her record is in par with the recently tenured cases that I have been asked to review (at Georgia Tech, USC, MIT, and Northwestern). Over a fifteen-year period, I would put her in the top 20% of all those I have evaluated and subsequently received tenure." *Id. at* UT 231-32;
- "Simply put Dr Nikolova is one of the world's leading junior researchers . . . Her work has already had significant impact but I think it will have much more impact yet in the future. . . I very strongly recommend Nikolova's promotion . . ." *Id. at* UT 224-25;
- "compares well to the cohort of tenured associate professors in major research Universities . . . This is a strong tenure case." *Id. at* UT 229[12]

Chair Tewfik "strongly endorse[d]" Nikolova's tenure, writing that Nikolova compares very favorably to her "most prominent peers at the first-tier Depts in Electrical and Computer Engineering, such as MIT, Stanford, UC Berkeley, UIUC, Georgia Tech, Caltech and Princeton."[13]

### 6.  **Denying Nikolova Tenure Was Statistically Impossible For Non-Discriminatory Reasons.**

With such strong support, one would certainly expect Nikolova to be awarded tenure,[14] and the historical data strongly supports that:

- Between 2009-18 (9 years preceding Nikolova's tenure review), UT considered 86 Engineering School tenure cases. Ex. 11, Tenure Data XL; **Ex. 30**, Thompson Report.

---

[11] **Ex. 27**, EN Recommendation Form.

[12] Quotes cited to, respectively, Professor Pascal Van Hentenryck, Georgia Tech; Professor Patrick Jaillet, MIT; Professor Ashish Goel, Stanford. Additionally, Manuel Blum, member of the National Academy of Science and Turing Award recipient, regarded as "the Nobel Prize for computing," (https://en.wikipedia.org/wiki/Turing_Award) also wrote a letter strongly supporting Nikolova. **Ex. 28**, Blum Letter. Although sent to Fenves and all UT official responsible for tenure files, Blum's letter was excluded from Nikolova's file. *Id.*

[13] **Ex. 5**, Chair's Rec. at 4-5. UT attempts to rely on Chair Tewfik's deposition testimony that Nikolova was "closer to the bar" than other candidates and other negative comments. However, Tewfik's recent testimony contradicts his statements to Nikolova and his Report, raising fact issues. *See* Ex. 12, Tewfik Dep 219:22-223:8, Ex. 5, Chair Rec.

[14] Only two decisions occur after the P&T Committee vote: Dean Wood's recommendation and President Fenves's decision. Ex. 27, EN Rec. Form.

Of those, 62 received unanimous votes from the P&T Committee like Nikolova and 61 received tenure. Nikolova was the first and only who received a unanimous vote from the P&T Committee who did not receive tenure. *Id.*

- The average Budget Council vote for persons denied tenure was 67% in-favor, while Nikolova received a 97% in-favor vote. *Id.*
- The voting data considered over the 9-year period prior to Nikolova going up predicts that Nikolova was 96.3% likely to have been tenured. *Id.*
- Of the 29 persons that went up early for tenure in the Engineering College between 2009 and 2020, only 3 of 29 were women; only 1 of 29 was pregnant-Nikolova; and only 1 of 29 was denied tenure-Nikolova.[15]
- UT's denial of tenure is statistically unexplainable for non-discriminatory reasons. *Id.*[16]

## 7.  **Dean Wood Votes to Deny Tenure For False, Pretextual Reasons.**

In spite of Nikolova's outstanding record and overwhelming support, Dean Wood voted to deny tenure. Ex. 15, Dean's Assess. Wood's Assessment and other related evidence contain numerous red flags of discriminatory gender and pregnancy animus.

### A.  **Dean Wood Links Nikolova's Pregnancy to Her Negative Assessment.**

In her Assessment, Dean Wood specifically raised and blamed Nikolova's pregnancy[17] for why Nikolova did not teach two courses in Spring, 2016. Ex. 15, Dean's Assess at UT 23. Given the fact that Nikolova was approved for Modified Instructional Duty ("MID")[18] due to her pregnancy and birth, Wood had no legitimate reason to raise that the courses were not taught, Nikolova's pregnancy, or being on MID. Pregnancy and MID are not relevant and should not be used against a candidate in promotion or employment actions. Ex. 21, Wood Dep 53:5-54:21, 57:21-58:21. Wood also referred to Nikolova's pregnancy by suggesting her teaching scores showed a downward trend (despite an absence of data showing such trend – see next section) and stating that trend began after the year Nikolova was pregnant. Ex. 15, Dean's Assess at UT 23.

---

[15] The two other women did not take any extensions and were not pregnant. There were only three men (of the 26 early men) who took extensions due to their partners "expecting child." Ex. 11, Tenure Data XL.

[16] UT's claim [#39, pg.1] that Nikolova was a "marginal candidate for early promotion" is unsupported and disputed.

[17] Nikolova gave birth to her first child on March 10, 2016. Ex. 19, EN Dep 30:3-20.

[18] MID allows a faculty member who is "a principal caregiver of a healthy pre-school child (or children)" to take a semester break from teaching by replacing teaching with other duties or projects. **Ex. 32,** UT 2-2240.

### B.  Dean Wood Misleadingly Claims Low Teaching Scores and Downward Trend.

Dean Wood knew that required, undergraduate courses that have larger numbers of students and difficult math content score lower in student evaluations. Ex. 21, Wood Dep 41:21-44:5. Dean Wood also knew that Nikolova's "low" teaching scores were from a large, required, undergrad course with a heavy math content (Algorithms 360). **Ex. 33**, Nikolova Rebuttal at UT 7-8, **Ex. 34**, EN Teaching Statement at UT 63; Ex. 18, BC Teaching at UT 58. Importantly, Wood also knew that Nikolova had the 3rd highest scores among *all 13 instructors who had taught that course* over the previous five years, including tenured professors. *Id.* **Ex. 35**, EE360 Scores.[19].

Additionally, while Nikolova received only *slightly* lower scores during her second and third semesters teaching Algorithms 360, two scores were only one tenth of a point lower (4.0 to 3.9) and the third was only three tenths lower (3.7), which occurred while Nikolova was teaching two sections of that same large course during the same semester[20] (69 and 65 students in each section) and while Nikolova was pregnant with her second child. *Id.* Wood made no mention of any context or ameliorating factors. Instead, she disingenuously compared Nikolova's teaching scores with the scores of *all* engineering faculty for *all* courses, Ex. 15, Dean's Assess at UT 23.

### C.  Dean Wood Treated Male Professors Teaching Scores More Favorably

Dean Wood's misleading, negative focus on Nikolova's scores for Algorithms 360 is significantly different than her treatment of male assistant professors she recommended for tenure after excusing their lower student evaluation scores, including:

---

[19] The two instructors with higher scores than Nikolova were tenured and also US-born native English speakers. Nikolova is from Sofia, Bulgaria. English is her second language and she speaks with an accent. Ex. 19, EN Dep 23:18-23. Native English speakers receive higher student evaluation scores. Chávez, K., & Mitchell, K. (2020). Exploring Bias in Student Evaluations: Gender, Race, and Ethnicity. *PS: Political Science & Politics, 53*(2), 270-274. https://www.cambridge.org/core/journals/ps-political-science-and-politics/article/exploring-bias-in-student-evaluations-gender-race-and-ethnicity/91670F6003965C5646680D314CF02FA4.

[20] In Engineering, assistant professors normally only teach one course per semester. Ex. 5, Chair Rec at UT 27.

- Mikhail Belkin: Dean Wood excused low scores for a course, stating it "appears to be difficult to teach" and compared scores to others who had taught the course. **Ex. 36**, Belkin Tenure Docs at UT 22433.
- Mohit Tiwari: Dean Wood excused his scores stating they have "oscillated between 3.5 and 4.6" and noted that Tiwari's "most challenging semester" was when he had "the largest number of students (78) in the class." **Ex. 37**, Tiwari Tenure Docs at UT 16432.[21]
- John Foster: Dean Wood excused a low 3.4 score by pointing out the class size. **Ex. 38**, Foster Tenure Docs at UT 13844-45.
- Brady Cox: Also "technically early" like Nikolova, Dean Wood excused Cox's lower scores as the result of primarily one class and other reasons, including that "multiple guest lecturers exacerbated organizational issues." **Ex. 39**, Cox Tenure Docs at UT 11043.
- Navid Saleh: Also "technically early," Wood noted "concerns were expressed" about a drop in ratings, but dismissed the concerns. **Ex. 40**, Saleh Tenure Docs 14144, 14146-47.

**D. <u>Dean Wood Knowingly Relied on Gender-Biased Student Teaching Scores</u>**

Dean Wood admitted to knowledge of scientific studies showing that gender impacts teaching scores against women. Ex. 21, Wood Dep, 33:8-20; 35:2-21; 41:21-42:3, 43:13-44:5.[22] Wood acknowledged, based on her own experience at UT, that gender is among the factors that play a role in student teaching scores and is generally regarded as having an influence on the scores. Ex. 21, Wood Dep, 33:8-20; 35:2-21; 41:21-42:3, 43:13-44:5. Thus, Dean Wood's reliance on Nikolova's teaching scores – particularly the minute differences in those scores and the fact that Nikolova's scores were at the top for faculty who had taught the course – when she is aware such scores are gender biased, raises questions of gender animus.

**E. <u>Dean Wood Falsely Criticized Nikolova's Commitment to "Teaching Philosophy."</u>**

In her Assessment, Dean Wood critically focused on one small portion of Nikolova's Teaching Statement, claiming it contradicted "the philosophy" of the engineering school regarding teaching assistants. Ex. 15 at UT 23. However, Wood disparately took the statements out of context and

---

[21] Importantly, Tiwari was in the bottom half, 5th of 8 instructors who taught the course, while Nikolova was in the top quarter, 3rd of 13, who had taught Algorithms 360. Ex. 9, CCAFR Appeal UT 628; **Ex 41**, EE 319 Scores.

[22] Associate Dean of Diversity, Christine Julien, also admitted that reliable studies show that women tend to receive statistically lower scores when other factors are equal.[22] Ex. 13, Julien Dep 56:21-57:8; 58:1-6.

ignored the fact Nikolova relied on TA's in the exact same manner as other faculty.[23] Based on

Nikolova's Statement, Wood speculated that, "I do not believe that she has taken responsibility for

improving her teaching . . ." despite the fact that Nikolova unequivocally showed in her statement

she takes teaching seriously and made efforts to continually improve, including:

- she looks "for cues and facial expressions, …, as a way of testing whether I am successful in connecting with my audience";
- "Grading assignments, exams, as well as soliciting direct feedback is also an invaluable way of being on top of the needs of individual students and my overall teaching effectiveness";
- she and another professor "held an event…, 'Lunch with the professors,' to show our personal sides through dialogue driven by student questions";
- "tried hard to learn from my experience and the advice of colleagues that I continuously solicit, and I will keep working on developing better techniques for recruiting and selecting highly qualified TAs, as well as becoming better at TA management;
- "developed and taught a new course on 'Algorithmic Game Theory' …, and will continue incorporating new state-of-the-art material into the course";

Dean Wood's negative inferences conflict with the ECE Dept.'s Budget Council, which reviewed

Nikolova's statement and wrote:

> "Nikolova takes her teaching obligations very seriously and has strived to improve her teaching effectiveness while still addressing the needs of the ECE Dept. and its students. . . . In closing, Nikolova is passionate about teaching, which comes across to her students and results in a highly effective style. Her teaching record clearly exceeds the expectation for an [Asst. Prof.] in the [ECE Dept.]." Ex. 18, BC Teaching at UT 60-61.[24]

## F.  Dean Wood Disparately Applied a "Higher Bar" to Nikolova Due to Pregnancy.

Dean Wood's recommendation to deny tenure to Nikolova is also *highly suspect* because Dean

Wood acknowledged in writing that she applied a higher standard to Nikolova. Ex. 21, Wood Dep

146:7-16, 174:5-178:3. Dean Wood wrote, "If this were an up-or-out case, I would likely agree

---

[23] As Nikolova explained, the TAs worked under the professors' instructions with extensive supervision from Nikolova and her fellow instructors, who are responsible for the final assignment. Ex. 33 EN Rebut at UT 6-7.

[24] Dean Wood's criticisms are also at odds with Chair Tewfik's Recommendation for promotion, which stated that Nikolova made "transformative changes . . . that have had a positive effect on the students she taught and . . . other instructors . . . who have adopted Evdokia's innovations." Ex. 5 Chair Rec at UT 27.

with the recommendation of the Promotion and Tenure committee. However, Nikolova is being considered for promotion at UT Austin two years early." Ex. 15 Dean's Assess at UT 25. Wood testified that because Nikolova was "technically early" or "accelerated" she had to meet a "higher bar [in] all areas." Ex. 21, Wood Dep 146:7-16, 174:5-178:3. According to Wood, the more years "early," the higher the bar. *Id.*

Dean Wood considered Nikolova "technically early" and held her to a "higher bar" in part because of her probationary extension due to pregnancy. Ex. 21, Wood Dep 125:1-18; 134:13-23; 136:10-19, 146:17-147:6. Quite simply, Wood's application of a higher bar because of the pregnancy probationary extension is discriminatory on its face. While UT held Nikolova to a higher bar because she did not rescind her probationary extension due to pregnancy, UT did not treat a male ECE faculty member, Mohit Tiwari, the same. Both were given a deadline of "no later than February 1" to rescind the extension, but Tiwari was advised and allowed to rescind his on June 1, 2018, after the deadline. Ex. 24, Pregnancy Extension at UT7054, **Ex. 42**, Tiwari Rescind at UT26886. Critically, Nikolova had been told by Chair Tewfik that the pregnancy extension could not hurt her and unlike Tiwari was never advised to rescind. Ex. 19 Nikolova Dep 66:14-68:14; Ex.9, CCAFR Appeal at UT 624.

Importantly, Dean Wood's application of a "higher bar" because Nikolova was "technically early" or "accelerated" *was not accepted or applied by anyone else at UT*, including President Fenves who testified that Nikolova's case was not discussed as being "accelerated" or "early" and that was not one of the reasons why UT denied tenure. Ex. 14, Fenves Dep 117:18-118:3.[25] Fenves testified that Nikolova had sufficiently answered the question "why now" by having at least six years experience at UT and A&M. *Id.* at 42:5-27, 119:25-120:8. Assistant Vice President Shockley

---

[25] **Ex. 43**, Email P&T Normal, **Ex. 44**, Email Tewfik Object Different; Ex. 2, CCAFR Dec at 4; *see also* Ex. 12, Tewfik Dep 175:13-176:1.

testified that when an assistant professor has six years at UT and a peer institution, department chairs and deans use that to explain why the professor is being considered "early," consistent with UT's guidelines. Ex. 23, Shockley Dep 41:5-42:7; Ex. 22, Guidelines at UT 737;.

Chair Tewfik strongly objected to the higher bar:

> "All promotion cases should be evaluated by the well established and accepted metrics for judging excellence in teaching and research Judging this promotion case by an artificial metric that has zero correlation with the metrics that the outside world industry and academia uses to evaluate impact and excellence in teaching and research will do irreparable harm to our ability to continue to recruit highly promising assistant or associate professors from other institutions."

Ex. 44, Email Tewfik Object. Tewfik further stated, "My justification is no different than the justification I gave for Alex [Dimakis] four years ago." *Id.* Importantly, *Tewfik called out what he recognized as gender discrimination when he wrote,* "I hope this isn't a reflection of gender bias." **Ex. 45**, Email Gender Bias. UT did not respond to his concern.

### G. UT's Oversight Committee Found Nikolova's Tenure Review Was Flawed by Errors, Applied a Higher Standard, and Expressed Concern About Discrimination.

After UT denied tenure, Nikolova appealed for a review of the decision to the Committee of Counsel on Academic Freedom and Responsibility ("CCAFR"), a faculty committee that investigates allegations of violations of policies concerning tenure and promotion.[26] Ex. 9, CCAFR Appeal. CCAFR conducted an investigation, including interviewing Nikolova, Wood, and Tewfik and discussing the case with the entire committee. Ex 2, CCAFR Decision at UT 696, 703.

CCAFR's investigation found that:

- "[T]he decision not to promote the Candidate to the rank of Associate Professor with tenure was flawed by procedural errors . . ." *Id.* at 702.
- Dean Wood's higher standard for Nikolova was improper, stating, "In our view, different standards are not justified in this case, if ever, since this is not an early case if all of Nikolova's 7 years in rank as Assistant Professor are taken into account." *Id.* at 699.

---

[26] https://facultycouncil.utexas.edu/a1-committee-counsel-academic-freedom-and-responsibility.

- "Cases considered before the sixth year in rank at UT must be explained, which Chair Tewfik did by citing to Nikolova's prior service at A&M, her probationary extension" and the commitment made when she was hired. *Id.* at 699-700.
- Nikolova's "**Denial of Tenure Raises Concerns Related to Gender and Pregnancy.**" CCAFR Decision at UT 701 (emphasis original).
- The ECE Dept. should "conduct a substantial review of gender equity, diversity, and inclusion" which "could include a review of the comparative materials compiled by the Candidate" relating to male assistant professors who were treated more favorably (discussed later in this response). *Id.*
- "We are also concerned over the general implications for diversity and inclusion…we recommend that serious consideration be given to the reversal of [Nikolova's denial of tenure] decision." *Id.* at UT 703.

In response to the CCAFR Decision, Dean Wood and Associate Dean Gerry Spietel mocked the decision, stating "Let's just say I have better things to do with my time than write a handbook," one of the CCAFR recommendations. **Ex. 46**, Email CCAFR Mocked. No action was taken by UT at any level to address CCAFR's findings, other than Fenves' rejection of them.[27]

## H. Dean Wood Deliberately Hid Her Reasons for Denying Tenure to Nikolova

Although the Dean's Assessment is required to include all of the reasons for the Dean's recommendation,[28] Dean Wood admitted in an email to another UT Dean that she intentionally left out some of her reasons for denying tenure to Nikolova, stating, "This is the most controversial case. Intentionally I did not state all my reasons in the letter as I felt that some things were best discussed with the committee."[29] **Ex. 48**, Email Reasons Left Out.

## I. Women Discriminate Against Other Women.

In 2020, Dean Wood was interviewed after receiving an award at a Women in Energy luncheon.[30] During the interview, Wood recounted a gender-based discriminatory comment she

---

[27] **Ex. 47**, CCAFR Pres Response. There was no investigation and no review of the department.

[28] Ex. 21, Wood Dep 260:8-23; Ex 14, Fenves Dep 60:22-61:4.

[29] Dean Wood denied any memory of her reasons "best discussed with the committee." Ex. 21, Wood Dep 286:7-11. Deliberate dissembling, such as concealing the reasons for an employment decision, raises a fact issue for the jury.

[30] *See* *https://www.hartenergy.com/exclusives/2020-pinnacle-award-winner-dr-sharon-l-wood-university-texas-186588* and transcript attached hereto.

encountered from a male colleague stating, "you *have* to be better than everyone." *Id.* Wood also stated that "*work-life balance is a bit of a myth* because you can't do everything and sometimes 'work-life balance' implies that you can." *Id.* (emphasis added) Wood testified that she has never been married, had a domestic partner, or children. Ex. 21, Wood Dep 31:25-32:17. While some may assume that women don't discriminate against women, scientific research disproves this assumption, showing that "women who attain powerful positions in male-dominated (including STEM) fields tend to discriminate as much as or even more severely than men when judging junior women's work commitment."[31] Reasons include that successful women in masculine fields often felt they had to work harder to overcome biases, and consequently hold junior women to a higher standards since that is what they had to do to succeed. *See* **Ex. 49**, Report on Bias at 58.[32]

## 8. **President Fenves Agrees With Dean Wood To Deny Nikolova Tenure**

After Dean Wood's recommendation to deny tenure, President Fenves and the President's Committee met with Wood and discussed the case, including why her recommendation differed from the P&T Committee. Ex. 14, Fenves Dep 101:23-102:9, 121:9-12. "Based on the dossier and the recommendation of Dean Wood to '…not promote,' we agreed with the Dean." *Id.* 99:7-8.

President Fenves testified he denied tenure to Nikolova for two reasons: (1) concerns about her research funding and its "trajectory;" and (2) that her publication record, "both journal publications and conference publications were not at the level that we would really like to see for

---

[31] *See e.g.* Rodrigues, M. A., & Clancy, K. B. H. (2019). A comparative examination of research on why women are more underrepresented in some STEM disciplines compared to others, with a particular focus on computer science, engineering; National Academy of Sciences. www.nap.edu/resource/25585/Commissioned_Paper_Rodrigues.pdf.

[32] Plaintiff designated Dr. Peter Glick, a highly-respected researcher and psychology professor, to provide testimony on scientific studies of sex and pregnancy discrimination generally and in STEM, including studies concerning women discriminating against other women and gender bias in student evaluations. We expect UT will challenge Dr. Glick as was done in a case currently pending before Judge Yeakel, Mullenix v. University of Texas at Austin, 1-19-CV-1203-LY-SH. Although Judge Yeakel granted UT's motion to strike in that case (Doc. #125), Yeakel's order is distinguishable from this case and Glick's testimony will provide valuable insight to assist the trier of fact.

a tenured faculty member." *Id.* at 99:7-19. Contrary to Dean Wood, Fenves testified clearly that "in Nikolova's case, teaching was not an issue." *Id.* at 193:12-14.

## A.   UT's Reasons for Denying Tenure to Nikolova Have Changed

President Fenves' testimony about the reasons that Nikolova was denied tenure are suspect because the reasons have changed. Fenves' claimed reasons are different from and conflict with the reasons that UT gave Nikolova at the time she was denied tenure. UT's letter denying tenure to Nikolova stated that the reasons for denial at the President's Committee were "the sustainability of your research funding and your commitment to the teaching mission of the Cockrell School." **Ex. 50**, Denial Reasons Letter. In contrast, Fenves testified that "*teaching was not an issue*" and that Nikolova's *publications were a reason*. Ex. 14, Fenves Dep at 99:11-17, 193:12-14.

## B.   UT's Claim It Denied Tenure Due to Funding Is Contradicted by the Evidence.

President Fenves testified that an important consideration is whether a candidate "has demonstrated ability to be successful in competitive peer-review grants from federal funding agencies," and that after promotion, the candidate has funds into the future. *Id.* 130:3-131:4. Nikolova clearly *had* demonstrated an ability to obtain federal funding, with very competitive NSF grants, including a "CAREER" award, which Fenves admitted is "very prestigious." *Id.* 131:5-22.

Fenves criticized Nikolova's future funding as "very modest." Ex. 14, Fenves Dep 132:1-6. However, in 2018-19 when Nikolova went upr for tenure, she had recently (2017) been awarded a four-year NSF grant of $479,985 that extended two academic years beyond 2018-19, and could also likely be extended for an additional year. Ex 1, EN CV at UT 43; Ex 33, Rebut. at UT 14; **Ex. 51**, Reconsider/Final Arg at UT 266. While the amount technically allotted after 2018-19 was

approximately $240,000 for two years,[33] because of the lower cost of her theoretical research,[34] she had the entire $479,985 available for future research, plus other unused funds. *Id.*

## C.  Nikolova's "Funding Trajectory" Was Better Than Male Professors Awarded Tenure.

Contrary to UT's claims, Nikolova's total funding and funding trajectory was better than or comparable to many tenure candidates who *Wood and Fenves* both supported in recent years:

| Name[35] | Year | Dept | Grants Total/at UT | Grant $ for future/# Yrs | Applied/ Theory | Gender | Tenure ? |
|---|---|---|---|---|---|---|---|
| Nikolova | 18-19 | ECE | $1.8M/ $928,108 | $479,985 or $240,000 conservatively/ 2 years | Theory | Female | Denied |
| Tiwari | 19-19 | ECE | $3.5M | $253,000/ 2 years | Applied | Male | Tenured |
| Heidari | 17-18 | PGE | $3.4[36]/ $200,000 | $0/0 years | Applied | Female[37] | Tenured |
| Okuno[38] | 17-18 | PGE | $1.05M/ $440,000 | $0/0 years | Theory & Applied | Male | Tenured |
| Salamone | 17-18 | CAAE | $1.3M/ $700,000 | $150,000/ 1.5 years | Applied | Male | Tenured |
| Yeh | 17-18 | BIOM | $980,000 | $162,500/ | Applied | Male | Tenured |

[33] Funding in the future is calculated by taking the total grant amount and dividing it by the years of the grant: $479,985 (total grant) ÷ 4 years = $119,996 per year. Nikolova's NSF grant extended two years past 2018-19: $119,996 per year x 2 years = $239,992.50. Projections into the future for other professors are calculated in the same manner.

[34] Fenves admitted funding expectations differ depending on whether research is theoretical (like Nikolova's) or applied/experimental, which requires lab work and "much higher funding levels." Ex. 14, Fenves Dep 133:16-23.

[35] The evidence for person named: Ex 1, EN CV at UT 43; Ex 33 Rebut. at UT 14 ; Ex. 51, Reconsider/Final Arg at UT 266; Ex. 37, Tiwari Tenure Docs at UT 16432, 16452-53; Ex. 8**,** Heidari Tenure Docs at UT 16917, 17025-28; **Ex. 52,** Okuno Tenure Docs at UT14656, 14696-97, **Ex. 53**, Salomone Tenure Docs at UT14861-62; **Ex. 54**, Yeh Tenure Docs at UT 15091; **Ex. 55,** Sun Tenure Docs at UT14367-68; **Ex. 56,** Reddi Tenure Docs at UT 17184-85; Ex. 40**,** Saleh Tenure Docs at UT 14215-16; **Ex. 57,** Dimikas Tenure Docs at UT 16848; **Ex. 58,** Humphreys Tenure Docs at UT 11870-71. **Ex. 59,** El Mohtar Tenure Docs at UT 11227, 11334-35; Ex. 39, Cox Tenure Docs at UT 11150-52, 11061-64; **Ex. 60,** Bickel Tenure Docs at UT 23007; and **Ex. 61,** Gerstlauer Tenure Docs at P566.

[36] Dean Wood noted, "the level of peer review for these grants is not clear" and "To date, Dr. Heidari has not received any federal research funding, but this is not a requirement for promotion." Ex. 8**,** Heidari Tenure Docs at UT 16917, 17025-28. One may ask why Dr Heidari is being considered for promotion at this time when she has not yet reestablished her research program at UT. A commitment was made when she was recruited from Texas A&M that her promotion case would be considered in a timely manner. The Department's budget council and I do not believe that the global downturn in oil and gas prices should be the deciding factor in the duration of her probationary period at UT." *Id.* at UT 16918. UT made a similar commitment to Nikolova which was not honored.

[37] Heidari is female but was not pregnant during her employment at UT and had no probationary extension or MID due to pregnancies. Ex. 8, Heidari Tenure Docs; Ex. 21, Wood Dep 331:16-25; Ex. 11, Tenure Data XL.

[38] Dean Wood noted in Okuno's assessment that "Two of the external reviewers gave lukewarm assessments of Dr. 0kuno's record of external funding," and that he had no federal funding. Ex 52, Okuno Tenure Docs at UT14630.

| | | | | 1.5 years | | | |
|---|---|---|---|---|---|---|---|
| Sun | 16-17 | ECE | $1.7M | $310,000/ 3 years | Applied | Male | Tenured |
| Reddi | 16-17 | ECE | $1.7M | $433,319/ 2 years | Applied | Male | Tenured |
| Saleh | 16-17 | CAAE | $1.47/ $800,000 | $0/0 years | Applied | Male | Tenured |
| Dimakis | 15-16 | ECE | $1.78M | $208,332/ 2 years | Theory | Male | Tenured |
| Humphrey [39] | 14-15 | AEE | $1.7 | $66,000/ 2 years | Applied | Male | Tenured |
| El Mohtar | 14-15 | CAAE | $1.1 | $300,000/ 2.5 years | Applied | Male | Tenured |
| Cox | 14-15 | CAAE | $1.9 | $84,000/ 1 year | Applied | Male | Tenured |
| Bickel | 13-14 | Mech | $1.345/ $1.224 | $75,000/ 2 years | Theory | Male | Tenured |
| Gerstlauer | 12-13 | ECE | 1.4 | $140,000/ 1 year | Applied | Male | Tenured |

### D.  **Nikolova Had A Better Publication Record Than Males Granted Tenure.**

President Fenves claimed that Nikolova's publications were insufficient, however, he admitted that he had no evidence or data to support his after-the-fact criticism other than essentially, "Trust me. I know that this productivity for this area is not enough." Ex. 14, Fenves Dep 140:19-142:18. Fenves' claim is contradicted by the following evidence:

- Dean Wood: "Nikolova has a strong publication record." Ex. 15, Dean's Assess at UT 24.
- Chair Tewfik, the Budget Council, and P&T Committee all wrote that Nikolova's publication record was strong and that her Google "h-index"[40] was on par or better than her peers at top institutions who received tenure. Ex. 5, Chair's Rec. at UT 29-30, **Ex. 62**, P&T Comm Notes at UT 7551-52; Ex 16, BC Research at UT 78-80.
- Assistant Dean Julien testified that Nikolova's research was "very strong." **Ex. 13**, Julien Dep 163:18-164:4.

---

[39] Dean Wood noted that Humphreys had not received any "competitive federal grants, which is the traditional means for assistant professors to demonstrate the sustainability of research funding," yet Woods "was not concerned by this aspect of his case." Ex. 58, Humphreys Tenure Docs at UT 11764.

[40] The Google Scholar "h-index" is a quantitative, objective metric used to estimate "the importance, significance, and broad impact of a scientist's cumulative research contributions." https://www.pnas.org/content/102/46/16569. The Google Scholar h-index is used by UT to evaluated a professor's publication success. Ex. Fenves Dep 138:10-17.

Nikolova's publication record was also strong compared to male ECE faculty when they were granted tenure. For example, in 2018-19, UT approved a male ECE colleague, Tiwari, who started at UT one semester before Nikolova but had no prior teaching experience. Both Nikolova and Tiwari had 12 peer-reviewed proceedings at conferences[41] in rank at UT, although Nikolova had 30 total and Tiwari's had significantly less at 22. Ex. 15, Dean's Assess at UT 23, Ex. 37, Tiwari Docs at UT16432. Nikolova published three archival journal publications in rank at UT, while Tiwari published only two at UT. *Id.* Nikolova's h-index and total citations are also better than or comparable to other male candidates in the ECE Dept. who Wood and Fenves approved for tenure:

| Name[42] | Yr Considered | h-index | # Citations | Gender | Tenure? |
|----------|---------------|---------|-------------|--------|---------|
| Nikolova | 2018-19 | 17 | 923 | Female | Denied |
| Tiwari | 2018-19 | 18 | 1150 | Male | Approved |
| Sun | 2016-17 | 12 | 489 | Male | Approved |
| Hall | 2014-15 | 13 | 648 | Male | Approved |
| Akinwande | 2014-15 | 19 | 893 | Male | Approved |
| Sanghavi | 2013-14 | 19 | 1122 | Male | Approved |

## 9.  <u>Professor Nikolova Opposed Discrimination.</u>

After Nikolova was denied tenure, she raised concerns that UT had discriminated against her due to her gender in an email on February 18, 2019 to the entire ECE Dept. discussing the "elephant in the room" – gender discrimination in her denial of tenure. **Ex. 63**, Email Elephant. The email cited the fact that five male candidates received promotion and she, the only female candidate was denied. *Id.* She also stated it was her impression "that women in this Dept. have a longer time to advancement if they pass through that hurdle at all." *Id.*[43] Nikolova also opposed gender and

---

[41] Fenves and Wood both acknowledged that in computer science, conference papers are the primary mechanism for disseminating research rather than journal articles. Ex. 15, Dean's Assess at 3, Ex.14, Fenves Dep 137:15-23.

[42] The evidence for each named faculty member: Ex. 1, EN CV at UT46; Ex. 37, Tiwari Tenure Docs at UT16456; Ex. 55 Sun Tenure Docs at UT14303; **Ex. 77**, Hall Tenure Docs at UT11635; **Ex. 78**, Akinwande Tenure Docs at UT10549; and **Ex. 79**, Sanghavi Tenure Docs at 5.

[43] She stated perhaps this may not be evidence of discrimination, but "it is food for thought." *Id.* In fact, her suspicion is strongly supported by the statistical data. Ex. 11, Tenure Data XL, Ex. 30, Thompson Report.

pregnancy discrimination in her CCAFR appeal, a separate letter to Fenves, and ultimately this lawsuit. Ex. 51, Reconsid/Final Arg, Ex. 9, CCAFR Appeal. In spite of UT policies requiring that complaints of discrimination be investigated, no investigation was ever done. **Ex. 64**, Policies Re Discrimination; **Ex. 65,** Email No Consider Discrim.

10. **Diversity Dean Criticizes Nikolova and Retaliates For Opposing Discrimination.**

Nikolova's informal mentor and one of the few female tenured professors in the ECE Dept., Christine Julien, was openly critical of Nikolova for sending the "elephant in the room" email opposing discrimination. Julien testified that "I thought that this e-mail, having been sent to the department the way it was, from [Nikolova] to everyone, was going to have a significant negative impact," in particular on the other remaining female assistant professors. Ex. 13, Julien Dep 159:21-160:6. Julien criticized Nikolova, not the disparate tenure decision or process, and was afraid Nikolova's email would essentially upset junior female faculty. *Id.* at 160:23-161:15.[44]

Approximately 2 months after the "elephant in the room" email, Julien did a teaching evaluation for Nikolova. **Ex. 66**, Peer Teaching Eval. Before Nikolova opposed sex and pregnancy discrimination, the ECE Dept., including Julien, gave Nikolova rave reviews regarding her teaching and extremely positive peer teaching evaluations. Ex. 18, BC Teaching, **Ex. 67**, Prior Teaching Evaluations. After Nikolova opposed discrimination, Julien gave her an unwarranted negative evaluation.[45] Ex. 66, Peer Teaching Eval at UT 6328-29.

Unflattering or negative peer teaching evaluations for a tenure-track faculty are essentially *never done* because it seriously damages the professor's chance to obtain tenure. **Ex. 69**, Email

---

[44]Julien testified she had been friends with Nikolova before the "elephant in the room" email, however, after Nikolova's email and denial of tenure, Julien did not reach out to Nikolova or recall making any attempts to connect with her since.[44] Ex. 13, Julien Dep 101:22-23, 103:21-104:9, 111:12-20. Notably, one week after Nikolova filed this suit on 9/9/19, Dean Wood promoted Julien to a newly created position as the Assistant Dean of Diversity and Inclusion and later promoted her again to Associate Dean. *Id.* at 14:18-15:8, **Ex. 68**, Diversity Dean.

[45] There was only one arguably minimally positive comment, that Nikolova's "questions were clear and audible and she used her voice and body language to include the entire classroom." *Id.* at UT 6328.

Patt. Thus, Julien's review not only differed significantly from the previous reviews of Nikolova, it broke the accepted norm of speaking positively about a junior tenure-track colleague.

Julien's review also violated the ECE Dept.'s own procedures designed to ensure the integrity and meaningfulness of the review. Another professor had been initially assigned to evaluate Nikolova's teaching but declined to do so because the review would have been performed after the deadline and too late in the semester to get an accurate teaching evaluation. **Ex. 70**, Email Sanghavi Declines.[46]

### 11. <u>UT Retaliated Against Nikolova In Her Performance Review</u>

Dean Julien also performed Nikolova's annual evaluation as Chair of the ECE Dept. Evaluation Committee for the 2018-19 academic year, the same year UT denied Nikolova tenure and she opposed discrimination. **Ex. 71**, Annual Evaluation 18-19; **Ex. 72**, Email Annual Eval Process.[47] Nikolova a "Meets Expectation" rating, and the review stated, "Nikolova has a reasonable publication and teaching record. She maintains a modestly funded research group. During this period, her service to the Dept. was relatively low, but this is also reasonable, given the semester of leave." Ex 71 *at* 35126.

The evaluation failed to accurately evaluate Nikolova one of Nikolova's most productive and successful years, in which she published top journal and conference publications. *Id.* at UT 35123; **Ex. 73**, Nikolova FAR 18-19. The review also unnecessarily raised that Nikolova was on MID for the birth of her second child. *Id.*

The committee gave two male assistant professors with less accomplished records higher

---

[46] At that point in the semester, *students* were giving final presentations, so Nikolova's teaching could not be evaluated. *Id.* The procedures called for pre and post-observation meetings, but Julien did neither. *Id.* at UT 6321-22, 6324.

[47] UT stated that two other professors (not Julien) performed the annual review of Nikolova, however, Julien was chair of the evaluation committee, reviewed and signed off on all reviews and "in a few cases," there were "longer conversations." Ex. 71, Email Annual Eval Process. Julien was clearly involved and had influence over Nikolova's 2018-19 review. Additionally, the other two professors who reviewed Nikolova also received the department wide "elephant in the room" email opposing discrimination. Ex 63 Email "Elephant".

reviews than Nikolova. Milos Gligoric received "Exceeds Expectations," and the committee wrote he had "an excellent publication record and excellent funding for an assistant professor." **Ex. 74**, Annual Reviews All Faculty 18-19. Gligoric's "excellent publication record" was *less* than Nikolova's and his "excellent funding" was significantly less than Nikolova's "modest funding".[48] David Soloveichik received "Exceeds Expectations" and was described as having "a solid publication record" despite having published significantly less in the period than Nikolova.[49] Ex. 74, Annual Reviews All Faculty 18-19.

Like the peer teaching evaluation,[50] a negative or neutral performance evaluation is hugely significant for a tenure track faculty member. First, the performance review is taken into account as part of the determination of merit raises.  Ex. 12, Tewfik Dep 242:7-246:4. Perhaps more importantly, both President Fenves and Chair Tewfik testified how even the slightest word choice that might not be obvious to a typical person can send "red flags" to the President's Committee. *Id.* 117:21-125:4; Ex. 14, Fenves Dep. 143:4-163:8.[51] A "Meets Expectations" review describing a "reasonable publication and teaching record" and a "modestly funded" research would be devastating to a professor going up for tenure.

## III.  LEGAL ARGUMENTS

### 1.  Nikolova Has Presented Direct Evidence of Pregnancy Discrimination

The Fifth Circuit has held that "remarks may serve as sufficient evidence of . . . discrimination

---

[48] Gligoric: no journal and 8 conference publications; one grant totaling $502,947 through 2022. **Ex. 75**, Gligoric FAR. Nikolova: 3 journal and 9 conference publication; two grants totaling $1,041,525 through 2021. Ex. 73, Nikolova FAR.

[49] Soloveichik: two journal articles and written conference paper. **Ex. 76**, Soloveichick FAR.

[50] As ECE Prof. Patt explained, the standard practice was to "put nothing in writing that could eventually hurt a colleague's promotion package." Ex. 69, Email Patt at P 3194.

[51] For example, Fenves claimed that a statement in an external review of Nikolova that her publication record "was very good" was actually a "weak" statement of support. Ex. 14, Fenves Dep 144:22-25. Fenves interpreted a statement that Nikolova was "in the top 20% of cases" who obtained tenure as "not a terribly strong case." *Id.* at 145:14-19.

if the offered comments are: 1) [pregnancy] related; 2) proximate in time to the terminations; 3) made by an individual with authority or influence over the employment decision at issue; and 4) related to the employment decision at issue."[52] Dean Wood's Assessment (Ex. 15) meets all these elements:

1. The Assessment raised (unnecessarily) that Nikolova did not teach two courses, was on MID, and attributed the failure to teach the courses to Nikolova's pregnancy.
2. The Assessment occurred as part of and was related to the denial of tenure.
3. Wood discussed the case with Fenves and influenced the decision to deny tenure. [53]

## 2. <u>Nikolova Has Established A Prima Facie Case Of Discrimination</u>

When circumstantial evidence is used to prove claims under Title VII, courts use the burden-shifting framework set out in *McDonnell Douglas*.[54] UT accurately sets out this framework in its MSJ at pgs. 20-21. Nikolova meets her burden by raising a genuine issue of material fact that either the employer's reason (1) is a pretext or (2) while true, "is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic."[55] Nikolova establishes a prima facie case[56] for gender discrimination by showing that she was:

"(1) a member of a protected group; (2) qualified for the position; (3) suffered an adverse employment action; and (4) was treated less favorably than a similarly situated employee outside the protected class or was otherwise [rejected for tenure] because of a protected characteristic."

*Gibson v. Verizon Servs. Org.*, 498 F. App'x 391, 395 (5th Cir. 2012). The Fifth Circuit has held that the fourth prong of the *prima facie* case, may be met with "evidence, circumstantial or direct,

---

[52] *Arismendez v. Nightingale Home Health Care, Inc.*, 493 F.3d 602, 607-08 (5th Cir. 2007) (TCHRA case).

[53] Even if not found to be direct evidence of pregnancy discrimination, Wood's unjustified **Error! Main Document Only.**statements must still be considered together with other evidence in the record, as a whole, as circumstantial evidence of discriminatory animus or pretext. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000) *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 388 (2008), and *Laxton v. Gap Inc.*, 333 F.3d 572, 583 n.4 (5th Cir. 2003).

[54] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973); *See Jiang v. Tex. Comm'n on Envtl. Quality*, No. 1:17-CV-739-RP, 2018 U.S. Dist. LEXIS 137284, at *9 (W.D. Tex. 2018) (Pitman, J.)

[55] *Jiang,* (citing *Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 411-12 (5th Cir. 2007)).

[56] UT admits Nikolova's "burden of establishing a prima facie case of disparate treatment is not onerous," [#39, pg.22] as the Supreme Court has held. *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

from which a factfinder might reasonably conclude that the employer intended to discriminate in reaching the decision at issue."[57] The evidence in this response clearly meets this standard.

Nikolova's evidence also specifically shows that UT treated similarly situated men and one non-pregnant woman (Heidari) better on critical factors used to deny tenure, including:

- Funding: 14 men and non-pregnant women were awarded tenure with far less or comparable funding both in total dollar amounts and trajectory.[58]
- Publication: five men were awarded tenure with less than or comparable publication records within the ECE.
- Teaching: five men received preferential treatment from Dean Wood by her excusing or justifying teaching scores while ignoring similar factors for Nikolova.

### 3. <u>Nikolova Presented Overwhelming Evidence Of Pretext and Discrimination.</u>

### A. <u>UT's Reasons For Denying Tenure Are Contradicted By Credible Evidence.</u>

Nikolova's evidence shows UT's reasons for denying tenure are "only a 'pretext'—that is, a false or weak reason advanced to hide the actual reason." *Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 237 (5th Cir. 2016). "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive.…[to infer] a party's dishonesty about a material fact as affirmative evidence of guilt" *Reeves,* 530 U.S. at 147.

Nikolova's evidence raises genuine questions regarding Fenves's two reasons for denying tenure: insufficient grant funding and publications.  The ECE Dept., Chair, the College P&T Committee, all external reviewers, and even Dean Wood found Nikolova's publications were strong and merited tenure. Similarly, all but Fenves and Wood found Nikolova's funding strong

---

[57] *Palasota v. Haggar Clothing Co.*, 342 F.3d 569, 576 (5th Cir. 2003), *cert. denied,* 540 U.S. 1184 (2004).

[58] Nikolova need not show comparators were identical to her situation. *Turner v. Kan. City S. Ry. Co.*, 675 F.3d 887, 893 (5th Cir. 2012). All comparators referred to had the same decisionmakers, Fenves and Wood, and like Nikolova were all assistant professors in the School of Engineering. Also, Chair Tewfik confirmed that all assistant professor "have the same duties, and responsibilities and expectations" and their performance is reviewed under the same criteria of research, funding, service, and teaching. Ex. 12, Tewfik Dep 241:15-242:6.

and Nikolova has presented other objective evidence that the funding justification is false.

Dean Wood's stated reason that Nikolova's teaching commitment was a reason for her tenure denial was not shared by anyone else, including Fenves, and was also contradicted by objective evidence: Nikolova's teaching record, student scores and Teaching Statement. All of these contradictions raise fact issues on the real reason for denying tenure that a jury should decide.

**B.  UTs Changing Reasons For Denying Nikolova Tenure Is Evidence of Pretext**

Shifting or inconsistent explanations for an employment action may be evidence the employer's reasons are false or pretextual.[59] The fact that UT's claimed reasons for the tenure denial have changed from allegedly being Nikolova's teaching to being publications is additional evidence a jury may use to find the dissembling was used to hide the real discriminatory reasons.

**C.  UT's Failure to Follow Its Own Policies Is Evidence of Pretext and Discrimination**

An employer's failure to follow its own policies raises fact issues of discrimination.[60] Nikolova's evidence shows that UT failed to follow its own policies when it denied her tenure. UT's CCAFR found Nikolova's tenure decision was "flawed by procedural errors." Ex. 2, CCAFR Decision at UT 702. In particular, Dean Wood's application of a "higher bar" to Nikolova violated UT's written policy, conflicted with all other UT representatives, including President Fenves, and with how other tenure cases were handled, and raises a strong inference of discrimination.

**D.  Unjustified Reference to Pregnancy and MID Provides Evidence Of Discrimination.**

Dean Wood unnecessarily and negatively injected Nikolova's pregnancy and MID into her tenure assessment without any legitimate reason for doing so. Dean Wood's references to Nikolova's pregnancy and MID in her Assessment raise an inference of discriminatory animus.

**E.  Dean Wood's Hidden Reasons For Denial Of Tenure Demands Jury Review**

---

[59] *Burton v. Freescale Semiconductor, Inc.,* 798 F.3d 222, 235-36 (5th Cir. 2015), *Burrell,* 482 F.3d at 412-16.
[60] *Burton.,* 798 F.3d at 236, 239; *Russell*, 235 F.3d at 225..

Admission of deliberate dissembling, such as concealing the true reasons for an employment decision, raise fact issues for a jury.[61] Wood wrote that she viewed Nikolova's candidacy as "the most controversial" and that "I did not state all my reasons in the letter as I felt that some things were best discussed with the committee." Ex. 48, Wood's Email. Incredibly she testified she had no memory of any issues she found "best discussed" rather than put in writing as required. Ex. 21, Wood Dep. 286:7-11 A jury should have the opportunity decide the significance of this evidence.

## F.   Compelling Statistical Evidence of Disparte Denial of Nikolova's Tenure

Statistical evidence may demonstrate potential discrimination. *McDonnell Douglas*, 411 U.S. at 805 (statistics may reveal "a general pattern of discrimination"). The stark statistics in this case demand a jury's review, including the fact that over 11 years, Nikolova was the:

- **only person not tenured** out of 62 that received 100% vote from the P&T Committee,
- **only person not tenured** out of 29 considered "early" for promotion,
- **only pregnant person not tenured** out of 29 considered "early" for promotion,
- **only woman not tenured** out of only three women considered "early" for promotion,
- **only person not tenured** out of four that took a probationary extension (other 3: men).

## G.   Knowing Reliance on Gender-Biased Scores Infers Gender Discrimination

The fact that Dean Wood denied tenure to Nikolova based upon a 0.2 difference in her student teaching score despite that these scores are known to be biased against women, is evidence a jury may consider to find gender animus. Additionally, the Dean's disingenuous, misleading comparison of Nikolova's scores for one class, Algorithms 360, to all scores for all courses in the School of Engineering, while making multiple excuses for the lower scores of men, is evidence a jury could consider shows a discriminatory animus.

## 4.   Nikolova Has Presented Clear Evidence Raising A Fact Issue on Retaliation.

---

[61] *See e.g. Reeves,* 530 U.S. at 147 (2000) (because the employer is in the best position to put forward the actual reason for employment decisions, "the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling cover up a discriminatory purpose.")

To established a prima facie case of retaliation under Title VII, a plaintiff must show that: (1) she participated in protected activity under Title VII, such as opposing discrimination, filing a charge of discrimination or a lawsuit; (2) the employer took a materially adverse employment action against her; and (3) a causal connection exists between the protected activity and the adverse employment action.[62]  UT does not challenge that Nikolova engaged in protected activity, but does claim that the actions taken were not serious enough to support a retaliation claim and that there is no "causal connection" between her protected activity and the adverse actions. [#39, 23-26]

## A.  <u>Negative Peer Teaching Evaluation and Performance Review Are Adverse Actions</u>

"An action qualifies as materially adverse if it might dissuade a reasonable worker from making or supporting a charge of discrimination."[63]  The Supreme Court specifically and clearly emphasized that what constitutes an adverse employment action *depends on the circumstances:*

> [T]he significance of any given act of retaliation will often depend upon the particular circumstances. Context matters. The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships . . . A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school age children. A supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight.  But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination…an act that would be immaterial in some situations is material in others.

*Burlington*, 548 U.S. at 67-68.

As shown by President Fenves' testimony, Ex. 14, Fenves Dep 144:22-25, 145:14-19, in the context of an assistant professor attempting to obtain tenure at a tier one university, poor

---

[62] *McCoy v. City of Shreveport,* 492 F.3d 551, 556-57 (5th Cir. 2007); *Teague v. Williamson Cty.*, No. 1:18-CV-1098-RP, 2020 U.S. Dist. LEXIS 87695, at *30-31 (W.D. Tex. 2020) (Pitman, J.).

[63] *Murillo v. Travis Cty.*, 2018 U.S. Dist. LEXIS 50273, at *14-15 (W.D. Tex. 2018) (Sparks, J.) (*citing Burlington Northern. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67-68, (2006)); *See Teague*  at *34-35.

evaluations as shown here against Nikolova would absolutely discourage other similar professors from speaking out against discrimination.[64]

## B.   Nikolova's Evidence Of Causation and Pretext For Retaliation

Evidence for a causal connection includes: "temporal proximity between a protected act and adverse employment action; an employment record that does not support the adverse action; and an employer's departure from typical policies and procedures."[65] "[P]laintiffs may rely solely on temporal proximity between protected activity and an adverse employment action only if the two are very close." *Id.* at *39-40. Prof. Julien gave Nikolova the negative teaching evaluation approximately two months after she received Nikolova's "elephant in the room" email opposing gender discrimination. Such close proximity is sufficient by itself to establish causation. *Id.* Additionally, UT's failure to follow its own policies to ensure the integrity of the review is additional evidence of both causation and pretext.[66]

Regarding the negative annual review conducted nine months after Nikolova filed this lawsuit, while the temporal proximity alone is arguably not close enough to support causation, it is some evidence of causation. Moreover, Nikolova does not rely on temporal proximity alone. The review inexplicably conflicts with previous positive observations. Nikolova has also provided evidence that her performance was better than at least two male assistant professors who were given better, "Exceeds Expectations," ratings.

Finally, oral statements exhibiting negative animus may be used to demonstrate pretext or may be used as additional evidence of retaliation. *Laxton v. Gap Inc.*, 333 F.3d 572, 583 (5ᵗʰ Cir. 2003),

---

[64] *See e.g. Fallon v. Potter*, 277 F. App'x 422, 429 (5th Cir. 2008) (evidence raised a fact issue whether adverse actions would discourage a reasonable employee from engaging in protected activity).

[65] *Teague* 2020 U.S. Dist. LEXIS 87695, at *36, (*citing Garvin v. Sw. Corr., L.L.C.,* 391 F. Supp. 3d 640, 653 (N.D. Tex. 2019))

[66] The review was conducted after the deadline, late in the semester when a grad student, not Nikolova, was actually giving the presentation. Julien also failed to conduct pre and post-observational meetings as required by the procedure.

*Russell v. McKinney Hospital Venture,* 235 F.3d 219, 222 (5th Cir. 2000). Diversity Dean Julien's testimony criticizing Nikolova for sending the "elephant in the room" and the "negative impact" it would have on the remaining female assistant professors is evidence to support both causation and pretext for both the performance review and teaching evaluation.

5. **Disparate Impact.**

In consultation with her attorneys and expert, Nikolova notifies the Court that she is no longer pursuing a disparate impact claim. Because disparate impact claims require detailed statistical data and analysis to be viable, plaintiffs are frequently required to plead the claim prior to having such statistical analysis. That was the case here. Nonetheless, it is worth noting that UT misstated Nikolova's actual disparate impact claims and arguments. Nikolova's expert Thompson made the statistically significant finding that men *were four times more likely to be considered early for tenure* than women. Ex. 30, Thompson Report. Although this practice is significant and UT's policies disparately and seriously hurt women faculty, because Nikolova herself *was* considered early (but rejected), it does not support a personal disparate impact claim for Nikolova.

H. **Conclusion**

Based on the foregoing, Plaintiff respectfully requests that Defendant's motion for partial summary judgment be denied and such other relief as justice and equity so require.