IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| EVDOKIA NIKOLOVA,<br>*Plaintiff,*<br><br>v.<br><br>UNIVERSITY OF TEXAS AT AUSTIN,<br>*Defendant.* | §<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No.: 1:19-CV-00877 |

## DEFENDANT'S REPLY IN SUPPORT OF MOTION
## FOR PARTIAL SUMMARY JUDGMENT

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**GRANT DORFMAN**
Deputy First Assistant Attorney General

**SHAWN COWLES**
Deputy Attorney General for Civil Litigation

**THOMAS A. ALBRIGHT**
Chief for General Litigation Division

**BENJAMIN L. DOWER**
Deputy Chief for General Litigation Division
Texas State Bar No. 24082931
benjamin.dower@oag.texas.gov

**AMY S. HILTON**
Assistant Attorney General
Texas State Bar No. 24097834
amy.hilton@oag.texas.gov

Office of the Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2120 / Fax (512) 320-0667

**COUNSEL FOR DEFENDANT
THE UNIVERSITY OF TEXAS AT
AUSTIN**

To the Honorable Judge Robert Pitman:

To meet her summary judgment burden, Nikolova must demonstrate a material fact dispute regarding whether President Fenves's detailed rationales for not granting tenure are mere pretext for pregnancy or sex discrimination. Nikolova focuses her response on attacking Dean Wood, *e.g.*, with seven section headers starting with "Dean Wood [verb]." Dkt. #44, 7–14. But Wood was not the decision-maker; Fenves was. And to transfer Wood's purported animus to Fenves, Nikolova needed to show that Fenves "did not conduct his own independent investigation, and instead merely 'rubber stamped' the recommendation of [Wood]." *See Long v. Eastfield Coll.*, 88 F.3d 300, 307 (5th Cir. 1996). The evidence does not support that conclusion. There is no evidence that the reasons explained by Fenves in his deposition are an inauthentic cover-up for pregnancy or gender discrimination. *See Nasti v. CIBA Specialty Chem. Corp.*, 492 F.3d 589, 594 (5th Cir. 2007). As for Nikolova's retaliation claim, she has neither identified evidence that the actions were materially adverse, nor has she met her burden to demonstrate a material fact dispute on but-for cause.

**Arguments & Authorities**

**A.     Discrimination Claims**

Nikolova has not met her burden to demonstrate a triable issue of fact on whether UT's reasons for denying her early tenure are pretextual. "[T]he presumption of discrimination drops out of the picture once the defendant meets its burden of production." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (cleaned up). To survive summary judgment, Nikolova needed to "put forward evidence rebutting each of the nondiscriminatory reasons [UT] articulate[d]." *See Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 220 (2001). She has not done so.

**1.    Nikolova lacks direct evidence of pregnancy discrimination.**

Nikolova argues that she has direct evidence of pregnancy discrimination. Dkt. #44, 21–22. She does not. Direct evidence must "prove, without inference or presumption, that [pregnancy] was

a basis in employment decisions in the plaintiff's workplace." *Etienne v. Spanish Lake Truck & Casino Plaza, L.L.C.*, 778 F.3d 473, 476 (5th Cir. 2015). Here, Wood's assessment stated "Dr. Nikolova did not teach during the 2015-16 academic year" with a footnote explaining that "[Nikolova] participated in the Economics and Computation workshop at the Simons Institute for the Theory of Computing at UC Berkeley during the 2015 fall semester, and was scheduled to teach two classes in the 2016 spring semester[;] [h]owever, she became pregnant during the 2015 fall semester and was assigned modified instructional duties during the 2016 spring semester." D's Appx.0109 (Dkt. #39-1, 109). To believe this is evidence of discriminatory intent requires an inference that (1) the footnote operated to Nikolova's detriment, rather than her benefit; (2) Fenves read and internalized the footnote's fleeting reference to pregnancy when reviewing Nikolova's 125-page dossier; and (3) he considered her pregnancy status when making his tenure decision. The necessity of inference renders the evidence circumstantial, not direct, and each inference is unwarranted.

**2. Wood was not the decision-maker, and Nikolova's focus on her only highlights the lack of evidence challenging Fenves's stated bases for his decision.**

Lacking evidence that Fenves's decision not to promote Nikolova before her up-or-out year was based on sex or pregnancy, Nikolova relies almost exclusively on allegations against Wood, even devoting an entire section in her Response to press the general observation that "Women Discriminate Against Other Women." Dkt. #44, 13–14. Nikolova's Response is replete with assertions that Wood "denied tenure" to Nikolova. *E.g.*, Dkt. #44 at 7–14, 25. But it is undisputed that Wood could only make recommendations, and that only the President decides whether to grant tenure. *E.g.* D's Appx.0384–86 (Dkt. #39-2, 143–45).

Nikolova's Response also makes much of two overlapping arguments. First, she argues that the differences in Fenves's reasons for deciding not to promote her early and Wood's reasons for declining to recommend early promotion are contradictory and demonstrate pretext. Dkt. #44, 24. Second, she argues that these differences illustrate UT's "[c]hanging [r]easons" for denying early

promotion—another purported indication of pretext. *Id.* at 25. It is true that Wood had concerns about "the sustainability of [Nikolova's] research funding" and her teaching record while Fenves had concerns about "the sustainability of maintaining [her] research program" and her publications record. D's Appx.0110, 394 (Dkt. #39-1, 110, 394). But the incomplete overlap between Fenves and Wood does not create a material fact dispute about whether Fenves's reasons are pretextual and the real reasons discriminatory. Instead, the variation simply demonstrates that different people reviewing the same dossier formed opinions that differed in some respects. If anything, the fact that Fenves did not share Wood's concerns about Nikolova's teaching undermines Nikolova's attempt to transfer Wood's purported anti-woman or anti-pregnancy prejudices to Fenves.

Nikolova argues that "UT's claimed reasons for the tenure denial have changed from allegedly being Nikolova's teaching" (Wood) "to being publications" (Fenves) "is additional evidence [of pretext]." Dkt. #44 at 24. But *UT's* reasons have not changed over time. Fenves and Wood each had two primary concerns about Nikolova's application, one of which they shared and one of which they did not. This does not indicate that UT has changed its explanations, creating an inference that the explanation is false. And interim decisions that arguably might have some effect on an ultimate decision are not actionable. *Banks v. East Baton Rouge Parish Sch. Bd.*, 320 F.3d 570, 575 (5th Cir. 2003); *Dollis v. Rubin*, 77 F.3d 777, 781–82 (5th Cir. 1995). Nikolova's arguments on this point fall short of demonstrating that Fenves's stated reasons for denying her early promotion and tenure are "unworthy of credence." *See Wallace*, 271 F.3d at 220.

### 3. Nikolova cannot establish pretext based on comparator evidence, and the persons she identifies are not similarly situated.

Nikolova also attempts to use comparator evidence but misses the mark for two reasons. First, identifying a proper comparator is part of the plaintiff's *prima facie* case, *Ernst v. Methodist Hosp. Sys.*, 1 F.4th 333, 339 (5th Cir. 2021), but it is insufficient to demonstrate pretext, *Mengitsu v. Miss. Valley State Univ.*, 716 F. App'x 331, 334 (5th Cir. 2018) ("Even assuming Lee is an appropriate comparator,

Mengistu has failed to rebut defendants' numerous nondiscriminatory explanations . . . ."); *Minnis v. Bd. of Sup'rs of La. State Univ.*, 620 F. App'x 215, 218–19 (5th Cir. 2015) (noting that the comparators did not matter "because even if [the plaintiff] was able to establish a prima facie case, his claim still fails at the pretext stage"). Second, Nikolova has not demonstrated that any person identified in her response is a similarly situated comparator. Even at the *prima facie* stage, "[t]he plaintiff must establish that the comparator was treated more favorably than the plaintiff *under nearly identical circumstances*." *Ernst*, 1 F.4th at 340 (emphasis added). "Employees with different supervisors, who work for different divisions of a company or who were the subject of [] employment actions too remote in time from that taken against the plaintiff generally will not be deemed similarly situated."[1] *Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009).

Focusing on funding in isolation, Nikolova identifies 14 would-be comparators who received tenure starting in 2013. Dkt. #44, 16–17. This shotgun approach—identifying many faculty members but offering only incomplete dossiers and information about each tenure case—is insufficient to create a triable issue of fact. Moreover, none of these tenure decisions were made under "nearly identical circumstances":

| NAME | DISTINCTION |
|---|---|
| Tiwari | • Obtained almost twice Nikolova's total grant funding while in rank at UT—and from 15 different sources—a superior funding record.[2] <br> • Was in his "up-or-out" year and not accelerated (6 years in present rank at UT).[3] <br> • Did applied research (developing secure computer systems), not theoretical.[4] |
| Heidari | • Female (not a proper comparator for gender discrimination).[5] |

---

[1] In *Alkhawaldeh v. Dow Chem. Co.*, for example, the Fifth Circuit held that, for the plaintiff "to satisfy the 'similarly situated' prong, he [needed to] identify at least one non-Muslim Jordanian Arab FS/FL in Dow's Epoxy Research and Development Group who received a 1 rating, as he did, and who completed a PIP, as he did, but who was not fired, as he was." 851 F.3d 422, 426–27 (5th Cir. 2017).
[2] Dkt. #44, 16 (Nikolova's response itself); P's Ex. 37 (Dkt. #44-2, 166).
[3] P's Ex. 37 (Dkt. #44-2, 164); D's Appx.0715 (Dkt. #39-2, 474).
[4] Dkt. #44, 16 (Nikolova's response itself); P's Ex. 37 (Dkt. #44-2, 164–65).
[5] Dkt. #44, 16.

| NAME | DISTINCTION |
|---|---|
| Heidari (continued) | • Obtained almost twice Nikolova's total grant funding while in rank at UT, a superior funding record, especially considering "[t]he global decrease in oil prices ha[d] reduced [her] ability to secure research funding from industry at UT."[6]<br>• Different department (Petroleum and Geosystems Engineering) and research area (applied Petroleum Engineering, in which funding is obtained almost exclusively from the industry and is highly cyclical).[7] |
| Okuno | • Different department (Petroleum and Geosystems Engineering) and research area (Petroleum Engineering, in which funding is obtained almost exclusively from the industry and is highly cyclical).[8] |
| Salamone | • Different department (Civil, Architectural, and Environmental Engineering) and research area (applied Civil Engineering).[9] |
| Yeh | • Was in his "up-or-out" year and not early (6 years in present rank at UT).[10]<br>• Different department (Biomedical Engineering) and research area (applied nanotechnology).[11] |
| Sun | • Was not accelerated tenure case (6.5 years in present rank at UT).[12]<br>• Did applied research (circuit design), not theoretical.[13] |
| Reddi | • Was not an accelerated tenure case (6 years in present rank at UT).[14]<br>• Did applied research (combined software/hardware engineering), not theoretical.[15] |
| Saleh | • Different department (Civil, Architectural, and Environmental Engineering) and research area (applied Environmental Engineering).[16] |
| Dimakis | • Different decision-maker (not Fenves).[17]<br>• A "superstar," who "had started an entire new field," one of "the two strongest cases across all of UT that year;" and had Nikolova been compared to him, it "essentially would have torpedoed [her] case."[18] |
| Humphrey | • Different decision-maker (not Fenves).[19]<br>• Was in his "up-or-out" year and not accelerated (6 years in present rank at UT).[20] |

---

[6] Dkt. #44, 16; P's Ex. 8 (Dkt. #44-1, 62).

[7] P's Ex. 8 (Dkt. #44-1, 59–62); D's Appx.0418–20 (Dkt. #38-2, 177–79).

[8] P's Ex. 52 (Dkt. #44-3, 255–58); D's Appx.0418–20 (Dkt. #38-2, 177–79).

[9] P's Ex. 53 (Dkt. #44-3, 263–65).

[10] *See* P's Ex. 54 (Dkt. #44-3, 271); *see also* D's Appx.0538 (Dkt. #39-2, 297).

[11] P's Ex. 54 (Dkt. #44-3, 271–73).

[12] P's Ex. 55 (Dkt. #44-4, 1); *see also* D's Appx.0538 (Dkt. #39-2, 297).

[13] Dkt. #44, 17; P's Ex. 55 (Dkt. #44-4, 2–3).

[14] P's Ex. 56 (Dkt. #44-4, 11); *see also* D's Appx.0538 (Dkt. #39-2, 297).

[15] P's Ex. 56 (Dkt. #44-4, 12).

[16] P's Ex. 40 (Dkt. #44-3, 12–14).

[17] P's Ex. 57 (Dkt. #44-4, 22) (signed "for the president" by then-Provost Fenves on December 17, 2014), *with* D's Appx.0371 (Dkt. #39-2, 130) (Fenves became UT President in June 2015).

[18] D's Appx.0639 (Dkt. #39-2, 398).

[19] *See* P's Ex. 58 (Dkt. #44-4, 29) (signed "for the president" on December 17, 2014).

[20] P's Ex. 58 (Dkt. #44-4, 29).

| NAME | DISTINCTION |
|---|---|
| Humphrey (continued) | • Different department (Aerospace Engineering and Engineering Mechanics) and research area (applied, satellite navigation, Aerospace Engineering).[21] |
| El Mohtar | • Different decision-maker (not Fenves).[22]<br>• Was in his "up-or-out" year and not accelerated (7 years in present rank at UT).[23]<br>• Different department (Civil, Architectural, and Environmental Engineering) and research area (applied, Geotechnical Engineering).[24] |
| Cox | • Different decision-maker (not Fenves).[25]<br>• Different department (Civil, Architectural, and Environmental Engineering) and research area (applied, Civil Engineering).[26] |
| Bickel | • Different decision-maker (not Fenves).[27]<br>• Was in his "up-or-out" year and not accelerated (6 years in present rank at UT).[28]<br>• Different department (Mechanical Engineering) and research area.[29] |
| Gerstlauer | • Different decision-maker (not Fenves).[30]<br>• Did applied research (system-level design of embedded computer systems, modeling systems-on-a-chip embedded in products), not theoretical.[31] |

Nikolova takes a similar approach in the context of publications, to no greater effect. Even if identifying a proper comparator were sufficient to demonstrate pretext—which it is not—she has not demonstrated that the proffered tenure cases are nearly identical.

| NAME | DISTINCTION |
|---|---|
| Tiwari | • Was in his "up-or-out" year and not accelerated (6 years in present rank at UT).[32]<br>• Superior publication credentials, even by the metrics selected by Nikolova (higher h-index and # citations).[33]<br>• Did applied research (developing secure computer systems), not theoretical.[34] |
| Sun | • Was not accelerated tenure case (6.5 years in present rank at UT).[35] |

---

[21] P's Ex. 48 (Dkt. #44-4, 30).
[22] *See* P's Ex. 59 (Dkt. #44-4, 39) (signed "for the president" on December 17, 2014).
[23] P's Ex. 59 (Dkt. #44-4, 39).
[24] P's Ex. 59 (Dkt. #44-4, 39–41).
[25] *See* P's Ex. 39 (Dkt. #44-3, 1) (signed "for the president" on December 17, 2014).
[26] P's Ex. 39 (Dkt. #44-3, 1–2).
[27] *See* P's Ex. 60 (Dkt. #44-4, 51) (signed "for the president" on December 16, 2013).
[28] P's Ex. 60 (Dkt. #44-4, 51).
[29] P's Ex. 60 (Dkt. #44-4, 51–53).
[30] *See* P's Ex. 61 (Dkt. #44-4, 60) (signed "for the president" on December 16, 2013).
[31] P's Ex. 61 (Dkt. #44-4, 60–61).
[32] P's Ex. 37 (Dkt. #44-2, 164); D's Appx.0715 (Dkt. #39-2, 474).
[33] *See* Dkt. #44, 18; P's Ex. 37 (Dkt. #44-2, 168).
[34] Dkt. #44, 16 (Nikolova's response itself); P's Ex. 37 (Dkt. #44-2, 164–65).
[35] P's Ex. 55 (Dkt. #44-4, 1); *see also* D's Appx.0538 (Dkt. #39-2, 297).

| NAME | DISTINCTION |
|---|---|
| Sun (continued) | - Did applied research (circuit design), not theoretical.[36]<br>- A publication record that "increased significantly during the second part of his probationary period."[37] |
| Hall | - Different decision-maker (not Fenves).[38]<br>- Was not accelerated tenure case (6.5 years in present rank at UT).[39]<br>- Different area of research (Electrical Engineering, specifically transduction; translating acoustic and mechanical vibrations to electronic signals).[40] |
| Akinwande | - Different decision-maker (not Fenves).[41]<br>- Different area of research (Electrical Engineering, specifically in the area of 2D electronic materials).[42] |
| Sanghavi | - Different decision-maker (not Fenves).[43]<br>- Superior publication credentials, even by the metrics selected by Nikolova (higher h-index and # citations).[44] |

**4. Nikolova's use of statistics does not raise a genuine issue of material fact.**

While Nikolova contends that denying her tenure was "[s]tatistically [i]mpossible [f]or [n]on-[d]iscriminatory [r]easons," that contention is misleading, based on the wrong data, and insufficient to demonstrate pretext. *See* Dkt. #44, 6.

First, Nikolova's statistician admitted that, by "statistically impossible," he simply meant it was "unlikely that she wouldn't get tenure based on the department level and college level votes." D's Appx.0667, 669 (Dkt. #39-2, 426, 428). Second, his analysis assumed that department- and college-level voting records are good variables for predicting likelihood of obtaining tenure. *Id.* They are not. As a general matter, "[d]epartments tend to support their own members." D's Appx.0602 (Dkt. #39-2, 361); *see also* D's Appx.0044 (Dkt. #39-1, 44). And this tendency was particular pronounced when

---

[36] Dkt. #44, 17; P's Ex. 55 (Dkt. #44-4, 2–3).
[37] P's Ex. 55 (Dkt. #44-4, 3).
[38] Dkt. #44-4, 162 (signed "for the president" on December 17, 2014).
[39] Dkt. #44-4, 162.
[40] Dkt. #44-4, 162–63.
[41] Dkt. #44-4, 173 (signed "for the president" on December 17, 2014).
[42] Dkt. #44-4, 175.
[43] Dkt. #44-4, 179 (signed "for the president" on December 16, 2013).
[44] Dkt. #44, 18; Dkt. #44-4, 183.

Nikolova went up for tenure, as the ECE Department had recently suffered a faculty member leaving UT as a result of lukewarm support, causing the Department to "learn[] a lesson" that "if [they] were going to support someone, then [they] were going to vote strongly in favor of that person." D's Appx.0602 (Dkt. #39-2). Third, statistical evidence "usually cannot rebut the employer's articulated nondiscriminatory reasons." *Scott v. Univ. of Miss.*, 148 F.3d 493, 510 (5th Cir. 1998), *abrogated on other grounds by Kimel v. Fl. Bd. of Regents*, 528 U.S. 62 (2000). Here, if anything, tenure decision data actually undermines Nikolova's accusation that UT engaged in discrimination, as the data shows no statistically significant relationship between (1) either gender or pregnancy and (2) the decision to award tenure. Dkt. #39, 17; D's Appx.0774, 785 (Dkt. #39-2, 533, 544).

> **5. Nikolova fails to rebut the nondiscriminatory reasons Fenves decided not to promote Nikolova early.**

At his deposition, Fenves testified about the reasons Nikolova's performance did not merit early promotion and testified that he had reversed Wood's recommendation for another candidate as well. D's Appx.0392, 394, 399–403 (Dkt. #39-2, 151, 153, 158–162). Any suggestion that Fenves simply agreed with Wood's assessment without undertaking his own analysis of the weaknesses of Nikolova's application is belied by the specificity he provided, as well as the other circumstantial evidence of independent analysis. *See id.* Indeed, Nikolova repeatedly acknowledges the differences between Fenves and Wood. *E.g.*, Dkt. #44, 15, 24. For example, while she devotes multiple pages decrying the purportedly "higher bar" to which Wood held her application, she says that Fenves—the sole decisionmaker—did not apply a higher bar. Dkt. #44, 10–12, 24. And Nikolova has simply not pointed to summary-judgment evidence that puts Fenves's detailed testimony into dispute or shown that he acted on gender or pregnancy.

**B.     Retaliation Claims**

Nikolova claims UT retaliated in three ways: in her teaching assessment, in her annual faculty evaluation, and by assigning her to supervise a senior design class (before promptly rescinding the

assignment). *See* Dkt. #21 at ¶¶ 74–84. UT moved for summary judgment on all three of these claims, and the third is apparently uncontested, as it went entirely unmentioned in Nikolova's response. *Compare*, Dkt. #39, *with* Dkt. #44. Nikolova's retaliation claim should be dismissed because Nikolova identifies no employment actions that would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). She has also not met her burden to demonstrate that, "but for" a protected activity, she would have received *only* positive comments on her peer teaching assessment or that the evaluation committee would have given her an "exceeds expectations" rating in her annual review. *See Feist v. La., Dep't of Justice*, 730 F.3d 450, 454 (5th Cir. 2013).

    **1. Peer Teaching Evaluation**

Nikolova has not met her burden to demonstrate that her peer teaching assessment would deter a reasonable person from engaging in a protected activity. After receiving the first draft of the assessment, Nikolova submitted multiple rounds of proposed changes, many of which were incorporated. *See* D's Appx.0189–90 (Dkt. #39-1, 189–90). And the constructive feedback that was retained in the final draft was described by CCAFR Chair Evans as "interesting and informative"—which is hardly how someone would describe a review that would dissuade someone from raising a complaint of discrimination. Appx.0201–02 (Dkt. #39-1, 201–02). Nikolova's response does nothing to refute the authorities identified in UT's motion holding that even a written reprimand is not materially adverse, much less a document whose explicit purpose is to "be part of an on-going constructive dialogue," making constructive comments expected and inherent. Appx.0192 (Dkt. #39-1, 192). Nikolova has not demonstrated that the inclusion of constructive comments would deter a reasonable person from engaging in a protected activity.

Nikolova has also not met the "high burden" of but-for causation. *See Alkhawaldeh*, 851 F.3d at 430. Contrary to Nikolova's contention that "close [temporal] proximity is sufficient by itself to

establish causation," Dkt. #44, 27, "temporal proximity alone is insufficient to prove but for causation," *Strong v. Univ. Healthcare Sys., L.L.C.*, 482 F.3d 802, 808 (5th Cir. 2007). No reasonable factfinder could conclude that, but for a protected activity, Julien would have written only positive comments in the peer teaching evaluation, such as her observation that "[Nikolova] used her voice and body language to include the entire classroom even though she was technically interacting with the single speaker," while omitting her constructive suggestions, such as her observation that "[m]any students were looking at their computers or doing other work" during the student's presentation on a paper that the other students had already read, and therefore time limits or alternative mechanisms for conveying the material might be beneficial. *See* D's Appx.0196–97 (Dkt. #39-1, 196–97).

**2. Annual Faculty Review**

Nikolova also has not demonstrated a material fact dispute regarding her "meets expectations" annual faculty review. First, receiving "meets expectations" instead of "exceeds expectations" is the type of "minor annoyance" that does not rise to the level of material adversity. *See Booker v. Holder*, No. H–07–2914, 2009 WL 4432689, at *17 (S.D. Tex. 2009) (holding that an annual performance review that initially contained a "does not meet expectations" rating that was subsequently amended to "meets expectations" was not materially adverse in the context of Title VII retaliation); *Turner v. U.S. Capitol Police Bd.*, 983 F. Supp.2d 98, 107 (D.C. Cir. 2013) (holding that "the 'meets expectations' close-out evaluation [did] not constitute the materially adverse action required to make out a retaliation claim"). Second, while Nikolova emphasizes that the faculty who conducted her performance review were aware of her protected activity, "mere knowledge" is not sufficient to establish even *prima facie* causation, much less at the pretext stage. *See Standley v. Rogers*, 202 F. Supp. 3d 655, 669–70 (W.D. Tex. 2016), *aff'd*, 680 F. App'x 326 (5th Cir. 2017). Nikolova has not met her burden.

## CONCLUSION

For all these reasons, UT respectfully asks the Court dismiss Dr. Nikolova's Title VII claims.

Respectfully submitted,

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**GRANT DORFMAN**
Deputy First Assistant Attorney General

**SHAWN COWLES**
Deputy Attorney General for Civil Litigation

**THOMAS A. ALBRIGHT**
Chief for General Litigation Division

*/s/ Benjamin L. Dower*
**BENJAMIN L. DOWER**
Deputy Chief for General Litigation Division
Texas State Bar No. 24082931
benjamin.dower@oag.texas.gov

**AMY S. HILTON**
Assistant Attorney General
Texas State Bar No. 24097834
amy.hilton@oag.texas.gov

Office of the Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2120 / Fax (512) 320-0667

**COUNSEL FOR UT AUSTIN**

## CERTIFICATE OF SERVICE

    I hereby certify that on November 12, 2021, a true and correct copy of the foregoing document was served via the Court's ECF system to all counsel of record.

                                                              */s/ Benjamin L. Dower*
                                                              **BENJAMIN L. DOWER**
                                                              Deputy Chief for General Litigation Division