**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| **EVDOKIA NIKOLOVA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **CIVIL ACTION NO.  1:19-CV-00877-RP** |
| | § | |
| **UNIVERSITY OF TEXAS AT AUSTIN** | § | |
| | § | |
| **Defendant.** | § | |
| | § | |

**DEFENDANT'S MOTION TO EXCLUDE OPINION AND TESTIMONY OF
PLAINTIFF'S EXPERT DR. PETER GLICK**

Defendant The University of Texas at Austin ("Defendant") submits this Motion to Exclude the Opinions and Testimony of Plaintiff Evdokia Nikolova's ("Plaintiff" or "Nikolova") Expert Dr. Peter Glick. In support of this request, Defendant respectfully shows the Court the following:

## I.      INTRODUCTION

Nikolova alleges that, by denying her tenure application, UT Austin subjected her to discrimination because of her sex and pregnancy and retaliated against her for filing a discrimination charge with the EEOC in violation of Title VII. Nikolova also alleges a pay discrimination claim under the Equal Pay Act. To support her claims, Plaintiff has designated Dr. Peter Glick, a social science researcher, as an expert to provide information on stereotyping, bias, and discrimination in the workplace.

Glick's opinions and testimony should be excluded because they fail to satisfy the standards for admissibility set forth in *Daubert v. Merrell Dow Pharms., Inc.*[1] and codified in

---

[1] 509 U.S. 579, 592-93 (1993) (requiring for admissibility that evidence be both reliable—meaning "the reasoning or methodology underlying the testimony is scientifically valid"—and relevant—

Federal Rule of Evidence 702. First, Glick's application of the "social framework" analysis to this case is not based on valid or reliable scientific principles or methods.[2] In particular, Glick admits that he did not apply a valid scientific method in reaching his opinions that the evidence in this case is consistent with discrimination. Second, Glick relies solely on selected documents and information provided by Plaintiff, rather than relying on representative data and information relevant to his opinions. Indeed, Glick admits that he did not review UT's policies or conduct any independent assessment of UT's promotion and tenure data in this case. Third, Glick's opinions regarding stereotyping and bias in society can only lead to prejudice and jury confusion, and they will not assist the trier of fact in determining whether Defendant intentionally discriminated against Nikolova because of her sex or pregnancy in violation of Title VII.

As set forth below, numerous courts have excluded this type of "social framework" testimony, and the Supreme Court recognized it could "safely disregard" such testimony as unhelpful in deciding discrimination cases.[3] Moreover, Glick's testimony in this case is remarkably similar to his testimony that was excluded in another pending case—*Mullenix v. The University of Texas at Austin*. As here, Glick's opinions and testimony in *Mullenix* relied solely on information provided by the plaintiff, were not based on a reliable scientific method, and failed to assist the trier of fact in determining whether Mullenix was subject to discrimination. For these

---

meaning "that reasoning or methodology can be properly applied to the facts in issue").

[2] Ex. A, Glick Rpt. at 6-7, 42 (noting scientifically valid methods and "standard social scientific techniques" were not utilized, alleging scientific integrity would be compromised), ("To establish gender bias with scientific certainty requires a controlled experiment that keeps everything but gender constant to create a perfect comparator."). *See also* Ex. B, Glick Dep. 47:22-48:7 ("I am very clear in my report that I am not conducting studies on . . . University of Texas or the specific individuals involved and, therefore, *cannot come to a scientific conclusion about whether or not discrimination occurred in this case*.") (emphasis added).

[3] *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 355 n.8 (2011) (citing John Monahan et al., *Contextual Evidence of Gender Discrimination: The Ascendance of "Social Frameworks,"* 94 Va. L. Rev. 1715 (2008)).

reasons, the court in *Mullenix* excluded Glick's opinions and testimony under Rule 702.[4] This

Court should likewise exclude Glick's opinions and testimony in this case.

## II.     GLICK'S REPORT AND TESTIMONY

Plaintiff produced Glick's expert report on April 19, 2021,[5] and Glick appeared for

deposition on November 5, 2021.[6] Glick describes his report as follows:

> I will provide "social framework" testimony to inform the decision
> makers in this case about empirically validated principles
> concerning the operation of stereotypes and bias that can, in turn,
> lead to workplace discrimination via double-standards toward
> women as compared to men. Additionally, I will explain the biases
> that occur when women become pregnant, have young children, and
> use workplace accommodation policies offered by their employer to
> accommodate pregnancy and caregiving. Social psychological and
> organizational research provides a scientific knowledge base
> illuminating the forms stereotyping and discrimination take, the
> circumstances that elicit stereotyping and bias, and their relation to
> discriminatory behavior. This information can substantially
> supplement decision-makers' knowledge, going beyond common
> assumptions about how stereotypes and biases operate.[7]

Glick's report describes his methodology of consisting of two components. First, he

"reviews research findings based on well accepted scientific methodologies" to "inform trial

decision makers about principles of stereotyping, bias, and discrimination that have been

established with scientific certainty based on well accepted empirical methodologies in

psychology."[8] This is the general "social framework."[9] Glick, however, goes beyond the

---

[4] *Mullenix v. The Univ. of Tex. at Austin*, No. 1-19-cv-1203-LY-SH, 2021 WL 4304815, at *4-*7 (W.D. Tex. Sept. 21, 2021).

[5] Ex. A, Glick Rpt.

[6] Ex. B, Glick Dep.

[7] Ex. A, Glick Rpt. at 6.

[8] *Id.* at 7-8 (emphasis omitted).

[9] *See e.g.*, Melissa Hart & Paul M. Secunda, *A Matter of Context: Social Framework Evidence in Employment Discrimination Class Actions*, 78 FORDHAM L. REV. 37, 52 (2009) (in litigation, the "social framework" methodology encompasses testimony not about a particular case, but "to offer a backdrop of information about how the phenomenon of stereotyping operates so that the fact finder can assess the specific case in light of that information").

traditional social framework analysis by "consider[ing] how research on stereotyping, bias, and discrimination relates to Dr. Nikolova's case based on case documents [he] reviewed" and attempting to "point out ways in which case facts are consistent with th[e] possibility . . . discrimination occurred."[10] Glick's report includes separate sections corresponding to (i) general causation entitled "Scientific Research on Stereotyping and Discrimination," which summarizes certain social science research regarding when bias and discrimination tend to occur, and (ii) specific causation entitled "Application to Current Case."[11] In his section applying the social science to this case, Glick first opines that Nikolova's student teaching evaluations may have been the result of sex and pregnancy bias.[12] Glick also states that Dean Wood's "perception that Dr. Nikolova showed decreased work commitment after pregnancy and childbirth is highly consistent with stereotypes" towards women and mothers, and that Dean Wood's "decision-making about Dr. Nikolova was consistent with bias toward pregnant women, mothers, and workplace accommodation policy use."[13] In addition, Glick offers his opinion that Dean Wood's gender and prior experiences could make her more likely to discriminate against Nikolova because Dean Wood purportedly has an "ethos" that prizes work devotion "that exacerbates bias against pregnant women, mothers, and women who use workplace accommodation policies for family purposes."[14]

In his deposition, Glick made clear that when he speaks of bias, he includes both explicit bias (i.e., bias the decision-maker is aware of) and implicit, or unconscious bias; and when referring to discrimination, he includes both intentional and unintentional acts (i.e., actions both

---

[10] Ex. A, Glick Rpt. at 40.
[11] *Id.* at 10, 40.
[12] *Id.* at 45.
[13] *Id.* at 57.
[14] *Id.* at 55, 59-60.

driven by and lacking a motivating animosity).[15] Glick further explained that a person does not have to be aware of their bias to engage in discriminatory behaviors,[16] and that he is not claiming a decision based on that bias is driven by any intent to discriminate against a particular group.[17] Indeed, Glick admitted that, under his definition of discrimination, a person may engage in unintentional discrimination even when they have no conscious awareness or intent to do so.[18]

Furthermore, Glick's report and deposition testimony recognize that research shows that stereotyping, bias, and discrimination (as he defines them) "represent complex processes that depend on situational context, organizational climate and practices, individual attitudes, and other factors."[19] Glick's report relies on meta-analyses of research studies regarding workplace gender bias, and these meta-analyses rely on unpublished studies, studies that are more than 60 years old, and studies conducted in other countries, such as China, Japan, Egypt, Turkey, and Saudi Arabia.[20] Despite the importance of situational context, Glick admits that he did not conduct any analysis to determine whether the cited studies forming the basis of his opinion were conducted in similar situational contexts as the current case.[21]

---

[15] Ex. B, Glick Dep. 23:6-33:20.

[16] *Id.* at 26:19-30:8.

[17] *Id.* at 30:9-31:13 ("I guess the way I would put it is in my report. I'm not making claims of people's degree of awareness of their biases.").

[18] *Id.* at 30:14-32:6, 33:5-20.

[19] Ex. A, Glick Rpt. at 7, 11; Ex. B, Glick Dep. 33:21-36:18, 171:11-172:11 (noting concerns with applying research on call-back rates to promotion and tenure decisions).

[20] Ex. B, Glick Dep. 77:15-78:18 & Ex. 2 (discussing use of studies from 1960's and unpublished studies in Roth et al. meta-analysis); 98:24-99:1 & Ex. 3 (discussing use of studies from China in Joshi et al. meta-analysis, Glick Dep. Ex. 3 at 1537, relying on studies by Chen, Z. et al. from China); 113:25-114:15 & Ex. 5 (discussing use of studies from China, Egypt, Saudi Arabia, and turkey in Koenig, et al. meta-analysis, *see also* Glick Dep. Ex. 5 at 622-624, chart summarizing studies in meta-analysis); 121:4-122:3 (discussing use of studies going back to 1953 in Clausen meta-analysis, cited in Glick report).

[21] *Id.* at 106:1-14 ("[I]f you're asking did I go and then read all the studies they cite [in a meta-analysis], no I did not."), 95:8- 101:2. *But see* Ex. A, Glick Rpt. at 44 (drawing conclusions about pregnancy bias in professor evaluations after noting there is no research on the topic).

In addition, Glick admits that he cannot determine with any scientific certainty whether discrimination occurred in this case or judge the credibility of evidence or witnesses.[22] In fact, Glick admits that his analysis of the social science research to this case has not been (and *cannot be*) tested in a scientific manner,[23] and that unlike the research studies in his field or in scientific journals, his report makes no attempt to rule out any alternative, non-discriminatory explanations for the employment decisions in this case.[24]

Despite these admissions, Glick makes sweeping generalizations about how the environment in the College of Engineering and Dean Wood's own purported biases and experiences were conducive to sex and pregnancy discrimination.[25] Glick offers these opinions based solely on a review of select documents provided to him by Dr. Nikolova's attorneys, without ever having conducted an analysis of the remaining discovery in this case (such as Dean Wood's deposition), much less any analysis of data and information relating to teaching evaluations, tenure, and promotion within the College of Engineering.[26] Nevertheless, he concludes, among

---

[22] Ex. A, Glick Rpt. at 40; Ex. B, Glick Dep. 50:16-51:16, 67:6-70:19.

[23] Ex. B, Glick Dep. 50:16-51:16 ("[W]ould I submit the last section of this report to a journal as though it's a journal article that would be peer reviewed and would be published. No."), 67:6-69:3, 70:15-19.

[24] *Id.* at 67:18-70:14, 165:2-167:5; *see also* Ex. A, Glick Rpt. at 57-58 (noting that research showing possibility of discrimination is not determinative even if a subject displays all factors shown to increase the probability of exhibiting bias in a specific context).

[25] *Compare* Ex. A, Glick Rpt. at 18-19 *with id.* at 43 (extrapolating that research implies Defendant's proffered reasons were pretextual; that Plaintiff's use of flexible workplace policies as a mother likely impacted her more negatively than a co-worker using the same flexibility without children without evaluating if that was the case for other employees); *id.* at 21-24 *with id.* at 45-46 (opining that even if decision-makers for Plaintiff were not biased, she suffered from bias because her pregnancy may have reduced her student's opinion of her competence *and id.* at 44 (noting there is "no direct research on pregnancy bias on teaching evaluations").

[26] *Id.* at 9; Ex. B, Glick Dep. 66:2-67:5.

other things, that Dean Wood's "decision-making about Dr. Nikolova is consistent with bias toward

pregnant women, mothers, and workplace accommodation policy use."[27]

In sum, Glick provides no scientific basis for opining that Dean Wood or anyone involved

in this case held a bias against women in general or pregnant women in particular. Likewise, Glick

provides no scientific basis to conclude that anyone in this case engaged in intentional

discrimination against Nikolova actionable under Title VII, or even that the evidence in this case

is consistent with discrimination (as he claims).

### III.    ARGUMENTS & AUTHORITIES

#### A.    Legal Framework for Admissibility of Expert Testimony

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Rule 702

provides that expert testimony is admissible only if:

> (a) [T]he expert's scientific, technical, or other specialized
> knowledge will help the trier of fact to understand the evidence or
> to determine a fact in issue; (b) the testimony is based on sufficient
> facts or data; (c) the testimony is the product of reliable principles
> and methods; and (d) the expert has reliably applied the principles
> and methods to the facts of the case.[28]

Accordingly, expert testimony must be both relevant and reliable.[29] The proponent of expert

testimony bears the burden of establishing that the testimony is reliable, relevant, and from a

qualified expert.[30]

---

[27] Ex. A, Glick Rpt. at 57.

[28] FED. R. EVID. 702.

[29] *Carlson v. Bioremedi Therapeutic Sys., Inc*, 822 F. 3d 194, 199 (5th Cir. 2016); *see also Mullenix*, 2021 WL 4304815, at *1 ("[J]udges must ensure that scientific testimony or evidence is not only relevant, but also reliable.") (citing *Daubert*, 509 U.S. at 589).

[30] *See Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc); *Sims v. Kia Motors of Am., Inc.*, 839 F.3d 393, 400 (5th Cir. 2016).

4860-5697-9202.7 / 092536-1004

In evaluating expert testimony, the Court "must make 'a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue.'"[31]

> The subject of an expert's testimony must be "scientific knowledge." The testimony must be grounded in the methods and procedures of science and more than subjective belief or unsupported speculation. This is not to say it must be "known" to a certainty; arguably, there are no certainties in science. In order to qualify as "scientific knowledge," an inference or assertion must be derived by the scientific method.[32]

In other words, expert testimony can be found reliable only if it is "supported by appropriate validation" and "establishes a standard of evidentiary reliability."[33] Among other factors, reliability of expert testimony is judged by "whether the expert's theory or technique: (1) can be or has been tested; (2) has been subjected to peer review and publication; (3) has a known or potential rate of error or standards controlling its operation; and (4) is generally accepted in the relevant scientific community."[34]

## B. Glick's Application of "Social Framework" Analysis to This Case Is Not Based on Reliable Scientific Methods.

Here, Glick acknowledges in his expert report and deposition testimony that his opinions about the existence of bias and discrimination in this case are not based on scientific principles and methodology.[35] Glick further confirmed in his deposition that his opinions regarding the application of social science to this case are not based any scientific methodology. In particular,

---

[31] *Burleson v. Tex. Dep't of Crim. Justice*, 393 F.3d 577, 583-84 (5th Cir. 2004) (quoting *Daubert*, 509 U.S. at 592-93).
[32] *DaPaz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 388 (5th Cir. 2009) (internal alterations and citations omitted) (quoting *Daubert*, 509 U.S. at 589-90).
[33] *Daubert*, 509 U.S. at 590.
[34] *Burleson*, 393 F.3d at 584 (citing *Daubert*, 509 U.S. at 593-94).
[35] Ex. A, Glick Rpt. at 6.

8

Glick affirmed that the following statements from his report in *Mullenix* equally apply to his opinions in this case:

> For specific causation, as explained below, social frameworks experts often do not apply a scientific certainty standard because it may not be possible or not feasible to conduct a rigorous study to determine whether discrimination occurred in a specific case to an individual plaintiff. In such cases, experts cannot testify with scientific certainty about whether discrimination occurred.
>
> * * *
>
> Although I point out ways in which general principles can be applied to the current case and opine about where case facts are consistent with the possibility of discrimination, I expressly note that because alternative explanations cannot be ruled out, my case opinions do not carry the weight of scientific certainty. In the end, the case decision-makers must decide whether discrimination occurred.
>
> ***
>
> Because alternative explanations offered by Defendant to explain their actions cannot be ruled out scientifically, case decision-makers must ultimately decide whether they believe discrimination likely did or did not occur.
>
> * * *
>
> When an organizational study is not feasible alternative explanations to discrimination cannot be scientifically ruled out. As a result, it's not possible to pin down with scientific certainty whether a specific person experienced discrimination.[36]

Moreover, Glick admitted in his deposition that his specific causation opinions have not been tested, are not subjected to peer review or publication, and are not accepted by the relevant scientific community:

> Q. … Is there a scientific technique that supports the rendering of your judgment in this case as to whether or not what occurred here would be consistent with potential bias and discrimination?
>
> A. So, again, I think you're asking me if the final section of my report involved doing a formal scientific study on the University

[36] Ex. B, Glick Dep. 69:4-70:19 (confirming that quoted portions of *Mullenix* report apply to his opinions in this case).

4860-5697-9202.7 / 092536-1004

of Texas and the people involved. And the answer is: No, I did not.

Q. Are you aware of any scientific technique that would allow – that would support statements, the statements that are found in the – your section regarding the application of this case as to whether Dean Wood's conduct was consistent with discrimination?

A. So, again, I'm applying my expertise in the scientific framework to offer avenues for the jury to consider and to make observations about the case; but that section of the report, as I made clear in the report, is not, itself, performing a scientific study. And I, therefore, resist making precise scientific conclusions as a result.

Q. And that methodology that you – or the opinions that you provide in Section V regarding application to this case are not based on methodologies that have been subject to peer review or publication; is that correct?

A. That – yes, that would be correct. I think that's basically what I was trying to say. And I think your other question was, you know, is there a method, you know, to determine, for instance, with a scientific certainty, whether discrimination occurred in a particular case. There isn't a method to do that, at least not for an individual case such as this.[37]

Glick further acknowledged in his deposition that he did not perform any studies of the Cockrell School of Engineering regarding bias or discrimination.[38] Accordingly, Glick acknowledges that his opinions as to specific causation in this case are not scientific conclusions. Courts have repeatedly excluded such social framework testimony under Rule 702, including Glick's testimony in the *Mullenix* case.[39]

---

[37] *Id.* at 199:23-201:4.

[38] *Id.* at 47:22-48:7, 73:9-18, 181:12-18.

[39] *See Mullenix*, 2021 WL 4304815, at *4-*7 (excluding similar testimony from Glick); *E.E.O.C. v. Bloomberg L.P.*, No. 07 CIV. 8383 LAP, 2010 WL 3466370, at *15 (S.D.N.Y. Aug. 31, 2010) (rejecting similar social framework testimony where expert "[b]y his own admission . . . did not conduct a scientific study that would meet peer review standards"); *Van v. Ford Motor Co.,* 332 F.R.D. 249, 267 (N.D. Ill. 2019) (excluding specific causation social framework testimony where plaintiff failed to identify any reliable methodology used by expert). Glick's report argues that his type of "social framework" testimony has been "widely accepted" by courts, including the U.S. Supreme Court, citing *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), and a lone federal district court in Massachusetts, *Tuli v. Brigham & Women's Hospital, Inc.*, 592 F.Supp.2d 208 (D.

Despite his failure to apply scientific methods, Section V of Glick's report, titled "Application to Current Case and Opinions," speculates that the environment in the College of Engineering and Dean Wood's own biases and experiences were conducive to sex and pregnancy discrimination. In particular, Glick opines that Nikolova's student teaching evaluations may have been the result of sex and pregnancy bias.[40] He states that Dean Wood's "perception that Dr. Nikolova showed decreased work commitment after pregnancy and childbirth is highly consistent with stereotypes" towards women and mothers, and that Dean Wood's "decision-making about Dr. Nikolova was consistent with bias toward pregnant women, mothers, and workplace accommodation policy use."[41] Glick also claims Dean Wood's gender and prior experiences made her more likely to discriminate against Nikolova because Dean Wood purportedly has an "ethos" that prizes work devotion "that exacerbates bias against pregnant women, mothers, and women who use workplace accommodation policies for family purposes."[42]

As recognized by the *Mullenix* court's decision to exclude Glick's testimony in that case, "[t]hese are the type of social framework opinions that 'have elicited criticism from the very scholars' Glick relies on for his social framework analysis."[43] As the founders of social framework state, "a social framework necessarily contains only general statements about reliable patterns of

---

Mass. 2009). Ex. A, Glick Rpt. at 7-8. As the court in *Mullenix* recognized, *Price Waterhouse* does not stand for the proposition that the type of testimony offered by Glick satisfies Rule 702, and the Massachusetts case is unpersuasive because did not address the arguments raised by UT Austin in challenging Glick. *Mullenix*, 2021 WL 4034815, at *6 n.7.

[40] Ex. A, Glick Rpt. at 45.

[41] *Id.* at 57.

[42] *Id.* at 55, 59-60.

[43] *Mullenix*, 2021 WL 4304815, at *5 (quoting *Dukes*, 564 U.S. at 355 n.8 (citing Monahan et al., *supra* note 3); *see also* Ex. A, Glick Rpt. at 6 n.8 (citing John Monahan & Laurens Walker, *Social science research in law: A new paradigm*, 6 AM. PSYCH. 835 (2004)).

11

relations among variables as discovered within social scientific research, whether communicated via jury instructions or testimony of a qualified expert, *and goes no further*."[44]

> There is little doubt that those experts who purport to link findings from academic studies to behaviors in particular cases do not apply the same level of intellectual rigor used to produce the empirical studies from which they extrapolate. Any attempt to link basic research findings to specific organizational settings and outcomes requires that many assessments be made about the presence and operation within the organization of variables that have been found to be important within the basic research settings. To make these assessments in a scientifically reliable way, the variables must be clearly defined, measured, and their relationships systematically tested, with the definitions, measurements, and tests reported in a transparent way so that another researcher could attempt to replicate the assessments. To qualify as scientific, a system of measurement or testing cannot be a private system that only one researcher (or expert) can apply. A scientific paper that contained only a series of descriptive conclusions and did not disclose the particular methods used and measurements taken to reach those conclusions would be promptly rejected by a scientific journal. Unfortunately, some courts have allowed experts to link social frameworks to the facts of particular cases despite the experts' failure to meet these scientific requirements.[45]

In *Wal-Mart v. Dukes*, the Supreme Court relied on this article and the authors' conclusions to find testimony presented by a social framework expert did not offer "significant proof" that Wal-Mart operated under a general policy of discrimination required for class certification under Rule 23. Specifically, the expert witness testified that Wal-Mart's corporate culture made it "vulnerable to gender bias," but admitted that he could not calculate to any statistical degree whether "employment decisions at Wal-Mart might be determined by stereotyped thinking."[46]

---

[44] Monahan et al., *supra* note 3, at 1745 (emphasis added).

[45] *Id.* at 1738-1739; *see also* Ex. C, John Monahan & Laurens Walker, *Twenty-five years of social science in Law*, 35(1) L. AND HUMAN BEHAVIOR 72, 79 (2011) ("Where this [social framework testimony] occurs, we believe it essential that courts limit expert testimony to a description of studies found to be scientifically valid under *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993), and preclude the witness from speculatively 'linking' the general research findings to a specific [organization].").

[46] 564 U.S. at 354 (internal quotations omitted).

12

Against this backdrop, the Supreme Court found that the expert's testimony "does nothing to advance respondents' case," and that the Court could "safely disregard what he has to say."[47]

The same conclusion applies to Glick's testimony in this case. Even if the underlying social science evidence summarized in Glick's report were reliable and accepted in the social science community, he "may not extrapolate unfounded conclusions from that evidence."[48] Yet, that is exactly what he did, despite the fact he admits that he cannot determine with any scientific certainty whether discrimination occurred in this case.[49] Such "'opinion evidence that is connected to existing data only by the *ipse dixit* of the expert' should not be admitted."[50]

### C.    Glick Relied Solely on Information Provided by Nikolova.

Rule 702 requires that expert opinion by "based on sufficient facts or data," and expert testimony based on unrepresentative data is not reliable.[51] Courts have excluded social framework testimony as unreliable where the expert has relied on select data and information chosen by the plaintiff, recognizing that "[r]elying on the information fed to [the expert by the plaintiff] without independently verifying whether the information is representative undermines the reliability of [the expert's] analysis."[52] Indeed, just a few weeks ago, the court in *Mullenix* found Glick's expert

---

[47] *Id*. at 354-355.

[48] *Van*, 332 F.R.D. at 267.

[49] Ex. B, Glick Dep. 70:15-19 ("Q. Okay. Just to confirm, accordingly, can you determine with a scientific certainty whether  discrimination occurred in this case? A. I think I already stated that; but no, I cannot.").

[50] *Bloomberg*, 2010 WL 3466370, at *15 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 157 (1999)).

[51] *DaPaz*, 555 F.3d at 389 ("[W]here an expert's opinion is based on insufficient information, the analysis is unreliable."); *see also Mullenix*, 2021 WL 4304815, at *6.

[52] *Bloomberg*, 2010 WL 3466370, at *14 (citing *Rowe Enter., Inc. v. William Morris Agency Inc.*, No. 98 Civ. 8272, 2003 WL 22124991, at *3 (S.D.N.Y. Sept. 15, 2003)); *see also Childers v. Trustees of the Univ. of Pa.*, No. CV 14-2439, 2016 WL 1086669, at *6 (E.D. Pa. Mar. 21, 2016) ("Much like the expert excluded in *Bloomberg*, 2010 WL 3466370, [the expert's] methodology of sifting through evidence to find passages that support the  Plaintiff's theory of the case does not meet Rule 702's requirement of reliability.").

13

report "not reliable because it was based on unrepresentative data" because Glick had relied solely on "selected documents provided to him by Plaintiff" and had failed to "review UT Law's policies or practices regarding sex discrimination, harassment, and grievances."[53]

The same holds true in this case. Glick admits that his report in this case is based solely on data and information given to him by Nikolova's counsel.[54] Glick failed to verify whether such information was representative of the data in this case and did not ask to review any additional information.[55] For instance, Glick did not bother to review the deposition of Dean Wood or any of the other depositions taken in this case, nor did he review any of UT's policies, procedures, or data regarding tenure and promotion (other than information alleged by Nikolova in her tenure appeals and pleadings).[56] While Glick was provided a copy of UT Austin's summary judgment briefing in this case (presumably to prepare for his deposition), he did not bother to review the actual evidentiary record attached to summary judgment briefing.[57]

By reviewing only information hand-selected by Nikolova's attorneys without any independent verification or further analysis, Glick has failed to employ "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field" that is required for admissible expert testimony.[58] As in *Mullenix*, Glick's opinions and testimony are therefore unreliable and subject to exclusion.

---

[53] *Mullenix*, 2021 WL 4304815, at *6-7.

[54] Ex. B, Glick Dep. 58:11-62:1; Ex. A, Glick Rpt. at 9 (section entitled "Documents Reviewed in Preparation of this Report").

[55] Ex. B, Glick Dep. 59:2-62:1; 170:22-171:10 (noting he did not request data showing the parental status of alleged comparators despite making assumptions based on Plaintiff's parental status).

[56] *Id.* at 59:2-62:1.

[57] *Id.* at 59:24-60:13.

[58] *Kumho Tire*, 526 U.S. at 152; *see also* Monahan et al., *supra* note 3, at 1719 (criticizing expert in *Wal-Mart v. Dukes*, who "simply reviewed the litigation record in light of his understanding of what social science research shows about stereotyping," without conducting any independent analysis, verification, or studies); *Karlo v. Pittsburgh Glass Works, LLC*, No. 2:10-CV-1283, 2015

**D.     Glick's opinions should be excluded based on his failure to rule out alternative explanations.**

Furthermore, Glick's opinion should be excluded as unreliable because he failed to consider and eliminate other possible reasons that Nikolova's bid for early promotion was denied. Courts regularly exclude expert testimony as unreliable for failure to consider and exclude other causes.[59] For example, in *Munoz v. Orr*,[60] the Fifth Circuit held that an expert's opinion on statistical disparities in a disparate impact case was unreliable because, *inter alia*, the expert admitted that he failed "to consider other variables such as education and experience as explanations for any observed discrepancy between promotion rates".

Here, Glick admits that there are myriad alternative explanations for the facts of this case, outside of discrimination.[61] Indeed, Glick admits that it is possible that the facts of this cases are inconsistent with discrimination, and that he cannot determine which is more likely.[62]

---

WL 4232600, at *7 (W.D. Pa. July 13, 2015) (excluding social framework expert where the expert failed to perform an independent, objective analysis to determine if implicit bias played a role when terminating the plaintiffs, and did not visit the defendant's workplace, speak with any employees, or interview the managers involved).

[59] *Black v. Food Lion, Inc.*, 171 F.3d 308, 313-14 (5th Cir. 1999) (reversing the trial court's admission of an expert, because he engaged in post-hoc reasoning when establishing a cause of injury without eliminating other possibilities); *Lee Green v. LA. Dept. of Pub. Safety & Corr.*, 2:06 CV 1018, 2010 WL 1628769, at *6 (W.D. La. Apr. 20, 2010) ("Corbett's expert report failed to consider alternate causes of Oliver Green's hoarseness and his death; thus, his methodology is flawed and his testimony is unreliable."); *see also* FED. R. EVID. 702 Advisory Committee's Note to 2000 Amendment ("Courts both before and after *Daubert* have found other factors relevant in determining whether expert testimony is sufficiently reliable to be considered by the trier of fact. These factors include: . . . (3) Whether the expert has adequately accounted for obvious alternative explanations.").

[60] 200 F.3d 291, 301-02 (5th Cir. 2000).

[61] Ex. B, Glick Dep. 69:19-70:14 (agreeing that "alternative explanations offered by defendant to explain their actions cannot be ruled out scientifically"); 165:2-23 ("I can't rule that out, you know, she would have acted the same way against a man.").

[62] *Id.* at 165:2-169:7 (Glick admitting "I can't rule out that – that those judgements [made by Dean Wood] are due to other reasons" and "I can't tell . . . with some scientific probability that that was what happened.").

Furthermore, Glick fails to offer any testimony or opinions regarding the motivations of the ultimate decision-makers in this case. Glick's report and testimony focuses almost exclusively on Dean Wood and her alleged bias against Nikolova. However, as set forth in more detail in Defendant's motion for summary judgment, former UT Austin President Dr. Gregory Fenves and the President's Committee had the final say, and the committee voted unanimously against Nikolova's early promotion.[63] As Dr. Fenves put it, "we did not feel the performance, particularly in research, funding, and trajectory and publications was ready to make that affirmative decision to promote to tenure."[64] Yet, Glick's report fails to even mention Dr. Fenves or the President's Committee, much less consider their stated explanation for their final decision as an alternative to Glick's narrative of alleged bias and discrimination.

Like the Fifth Circuit found in *Munoz*, Glick's failure to control for other explanatory alternatives makes his expert opinion "essentially worthless."[65]

### E.     Glick's Opinion Will Lead to Prejudice and Confuse the Jury.

Even if Glick's testimony were relevant, it should nevertheless be excluded under Federal Rule of Evidence 403, because any probative value is outweighed by the risk of unfair prejudice and confusion to the jury. In particular, expert testimony about implicit bias and unintentional discrimination is not helpful to a jury that has to decide whether a plaintiff was subject to intentional discrimination prohibited by Title VII.[66] Courts (including the court in *Mullenix*) have

---

[63] ECF 39-2 at App'x. 398, 740, 741.

[64] *Id.* at App'x. 399.

[65] 200 F.3d at 301 (quoting *Tagatz v. Marquette Univ.*, 861 F.2d 1040, 1045 (7th Cir. 1988).

[66] *White v. BNSF Ry. Co.*, 726 F. App'x 603 (9th Cir. 2018) (affirming district court's exclusion of expert witness regarding implicit bias, as there was no showing of how the testimony would be helpful to a jury in a disparate treatment case requiring evidence of intentional discrimination); *E.E.O.C. v. Wal-Mart Stores, Inc.*, No. 6:01-CV-339-KKC, 2010 WL 583681, at *4 (E.D. Ky. Feb. 16, 2010) (finding testimony more prejudicial than probative where expert opined that gender stereotyping may be subconscious but identified no intentional act by defendant based on gender

repeatedly cited the risk of prejudice and jury confusion as reasons for excluding social framework testimony like Glick's that offer opinions about the potential impact of implicit bias in cases requiring evidence of intentional discrimination.[67] As the court in *Mullenix* recognized, "[b]ecause the majority of Glick's expert report focuses on gender stereotyping and bias throughout society, the jury may assume that such stereotyping and bias existed at UT Law. The burden is on the Plaintiff to prove that she was discriminated against because of her sex, not just that gender stereotyping or bias exists throughout society."[68]

The same reasoning applies equally here. Glick admits that his testimony and opinions about bias and discrimination include unconscious or implicit bias, as well as unintentional discrimination.[69] Glick's opinions, therefore, have no relevance to the ultimate issue of whether Defendant intentionally discriminated against Nikolova because of her sex or pregnancy status. Such opinions will only lead to prejudice and jury confusion, and should therefore be excluded.

## IV.   CONCLUSION & PRAYER

The Court should exclude Glick's opinions and testimony because they do not satisfy the requirements for expert testimony set forth in the Federal Rules of Evidence.

---

stereotyping); *Jones v. Nat'l Council of Young Men's Christian Ass'ns of the U.S.A.,* 34 F. Supp. 3d 896, 901 (N.D. Ill. 2014) (excluding social framework expert testimony because plaintiffs presented intentional discrimination claims, but the expert's opinion spoke "to the question of implicit, or hidden, bias – not intentional acts," and the testimony was therefore not "of assistance to the factfinder.").
[67] *Mullenix*, 2021 WL 4304815, at *7; *White*, 726 F. App'x at 603; *E.E.O.C.*, 2010 WL 583681, at *4.
[68] *Mullenix*, 2021 WL 4304815, at *7.
[69] Ex. B, Glick Dep. 30:17-33:20.

4860-5697-9202.7 / 092536-1004

Dated: November 16, 2021                  Respectfully submitted,


                                              */s/ Darren Gibson*         
Darren Gibson
Texas State Bar No.  24068846

LITTLER MENDELSON, P.C.
A Professional Corporation
100 Congress Avenue, Suite 1400
Austin, Texas  78701
512.982.7250
512.982.7248 (Fax)
dgibson@littlercom

**ATTORNEYS FOR DEFENDANT**

18

## CERTIFICATE OF CONFERENCE

I certify that on November 12, 2021, I discussed the foregoing Motion with Robert Schmidt, Counsel for Plaintiff, and explained that Defendant would be moving to exclude Dr. Glick's testimony for the same reasons the court's relied upon in excluding Dr. Glick's testimony in *Mullenix*. Plaintiff's Counsel indicated he was OPPOSED to this Motion.

*/s/ Darren Gibson*
Darren Gibson

## CERTIFICATE OF SERVICE

I hereby certify that on November 16, 2021, a true and correct copy of the foregoing document was served via the Court's ECF system to all counsel of record.

*/s/ Darren Gibson*
Darren Gibson

19