**IN THE WESTERN DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **EVDOKIA NIKOLOVA,** | § | |
| **Plaintiff** | § | **CIVIL ACTION** |
| | § | |
| **VS.** | § | **NO. 1:19-CV-00877-RP** |
| | § | |
| **UNIVERSITY OF TEXAS AT AUSTIN,** | § | **JURY REQUESTED** |
| **Defendant** | § | |

**PLAINTIFF'S RESPONSE TO DEFENANT'S MOTION TO EXCLUDE**
**OPINION AND TESTIMONY OF PLAINTIFF'S EXPERT DR. PETER GLICK**

TO THE HONORABLE ROBERT PITMAN:

## I.     SUMMARY OF ARGUMENTS

Defendant's Motion To Exclude Opinion And Testimony Of Plaintiff's Expert Dr. Peter Glick (Dkt. #49) mischaracterizes the case law relating to the admissibility of expert testimony in the well-established scientific fields studying discrimination and bias.  Such testimony has widely been admitted and found useful in discrimination cases.

## II.     STANDARDS FOR ADMISSION OF EXPERT TESTIMONY

Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms.,* 509 U.S. 579 (1993) and its progeny provide the standards for the admission of expert witness testimony. *Daubert* factors for assessing admissibility of expert testimony, which are neither exhaustive nor definitive, include: (1) whether the theory or technique underlying the expert's testimony has been tested; (2) whether it has been subjected to the rigors of peer review and publication; (3) whether it has any known rate of error and standards for controlling such error; and (4) whether the theory or technique has attained 'general acceptance' within the relevant expert community. *Id.* at 593-94. However, as this Court has recognized, "Not every *Daubert* factor will be applicable in every situation and a court has discretion to consider other factors it deems relevant." *Wal-Mart Stores*

*v. Tex. Alcoholic Bev. Comm'n*, No. 1:15-cv-134-RP, 2017 U.S. Dist. LEXIS 230837, at *15-17 (W.D. Tex. 2017) (Pitman, J.) (citing *Kumho Tire*, 526 U.S. at 151-52.)

In the Fifth Circuit, generally, the "fact-finder is entitled to hear [an expert's] testimony and decide whether . . . the predicate facts on which [the expert] relied are accurate." *Pipitone v. Biomatrix, Inc.,* 288 F.3d 239, 250 (5th Cir. 2002). As the Fifth Circuit has emphasized, "It bears reminding that the trial court's role as gatekeeper [under *Daubert*] is not intended to serve as a replacement for the adversary system. Rather, as Daubert makes clear, vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* (citations and quotation marks omitted). Moreover, "as a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *Primrose Operating Co. v. Nat'l Am. Ins. Co*., 382 F.3d 546, 562 (5th Cir. 2004) (citations omitted). "'Experts should be excluded only if their testimony is so fundamentally unsupported that it cannot possibly help the factfinder. *Viterbo v. Dow Chemical Co.,* 826 F.2d 420, 422 (5th Cir. 1987)." *Browning v. Sw. Research Inst.*, No. SA-05-CA-0245-FB, 2006 U.S. Dist. LEXIS 98612, at *6-7 (W.D. Tex. 2006) (some citations omitted). Thus, where an expert provides evidentiary support and reasoning for his assumptions, even if the other party disagrees with those assumptions, "these challenges are best left to proper cross examination." *Id.*

Finally, as this Court recognized in *Wal-Mart Stores,* 2017 U.S. Dist. LEXIS 230837 at *23-24, "Notwithstanding the dictates of *Daubert*, the rejection of expert testimony is the exception rather than the rule. *Daubert* did not work a seachange over federal evidence law, and the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system.  A party opposing the admission of an expert witness will be able to employ the ordinary

tools of the adversary process, including cross-examination and the admission of rebuttal evidence, to expose any deficiencies" in the proffered testimony.  (Citations and quotations omitted.)

### III.   PROF. GLICK'S REPORT PROVIDES SCIENTIFIC RESEARCH AND OPINION TESTIMONY THAT WILL AID THE TRIERS OF FACT.

#### A.   The Field of Scientific Study on Stereotyping and Discrimination Is Well-Established.

Dr. Glick is a leading expert in the field of study relating to stereotypes, discrimination and bias, particularly sex discrimination.[1] As Dr. Glick's expert report explains, scientific research on stereotyping is well established, having been systematically investigated for many decades. *Id.* at 7-10. The study of stereotypes (beliefs about social groups), prejudice (biased feelings toward social groups), and discrimination (differential treatment of social groups) has become a major subfield of social psychology and research topic among applied and organizational psychologists using principles that have been established with scientific certainty based on well accepted empirical methodologies in psychology.[2] *Id.* His testimony provides a scientific knowledge base that helps explain how and when stereotyping and discrimination tend to occur and goes beyond common assumptions and may run contrary to conventional expectations.  *Id.*

#### B.   Prof Glick's Report Consists of Two Parts: (1) A Review of the Scientific Research Relating to Discrimination and Consideration and (2) Discussion and Opinions Applying The Research to the Facts of This Case.

Dr. Glick's report and proposed trial testimony includes two substantive sections. The first examines the abundant peer-reviewed scientific studies and research into stereotypes, bias, discrimination and retaliation. The second consists of his consideration and application of the

---

[1] Glick is a Professor in Social Sciences and Psychology at Lawrence University in Wisconsin and has widely published in peer-reviewed journal articles and books on prejudice, stereotypes, and discrimination, including comprehensive reviews of sex discrimination in the workplace. His work in these areas has been cited over 40,000 times. *Id.* The largest and most prestigious organizations in psychology have honored and elected him as a "fellow" (the *American Psychological Association* and the *Association for Psychological Science*) as well as more specialized societies. **Exhibit 1**, "Report on Stereotyping and Bias in the Matter of Evdokia Nikolova, Ph.D. v. University of Texas at Austin," Dr. Peter Glick, Ph.D., April 19, 2021.

[2] *See e.g. Bowers v. NCAA*, 564 F. Supp. 2d 322, 361-62 (D.N.J. 2008) ("This is not cutting-edge science, but is instead a conventional social science approach that courts have routinely admitted as methodologically reliable.")

scientific research to this case. Defendant's motion to exclude focuses almost entirely on the second section concerning Dr. Glick's application and opinions relating to this case. While both sections of the report and proposed testimony easily meet the standards forth in Daubert and Rule 702, in the event the Court were to rule that some of Dr. Glick's opinions applying the research to the facts of this case should be excluded, Plaintiff moves that this Court admit Glick's testimony relating generally to the sociological, psychological and scientific research into discrimination and retaliation.

1. **Glick's Report Concerning Scientific Studies Relating to Discrimination and Retaliation Will Be Incredibly Helpful To the Jury.**

   a. **Stereotypes Skew People's Perceptions Through "Confirmation Bias."**

Dr. Glick's report and proposed testimony begins with research regarding negative stereotypes associated with women in the workplace. These stereotypes include that women are viewed as less competent than men in male dominated fields and that women are less suited to leadership positions in the workplace. *Id.* at 13-14. As discussed more *infra*, numerous negative stereotypes also exist relating to pregnant women.

Importantly, Glick explains how stereotypes and biases then skew how people process information about a person through "confirmation bias." *Id.* at 15-18. People acting on the basis of stereotypes or bias tend to spot and place more importance on items that reinforce that stereotype, leading people to believe that their initial expectations are supported by evidence. *Id.* Stereotypes can predispose people to leap from observed behavior to confirm their beliefs and can distort inferences about further behavior, falsely increasing people's certainty about initial inferences. *Id.* Research shows that people are especially likely to: (a) remember information that "fits" their impressions (rather than information that contradicts) and (b) interpret ambiguous information about others in ways that support their stereotyped impression. *Id.*

4

**b.** **Discriminatory Gender Bias Is Prevalent In STEM and Impacts Student Teaching Evaluations.**

Dr. Glick discusses the extensive scientific research regarding bias, stereotypes and discrimination in masculine dominated fields, particularly the "STEM" (Science, Technology Engineering and Math) fields, including work commissioned by the *National Academy of Sciences*. *Id.* at 19-21. UT's Associate Dean of Diversity for the School of Engineering, Christine Julien, also was aware of and has read studies relating to discrimination against women in STEM and found them to be credible, reliable information that she uses as a part of her job. Dkt. 44-1, Ex. 13, Julien Dep 30:25-31:10; 56:21-57:8; 58:1-6. UT's Dean of the School of Engineering and a decision-maker in this case, Sharon Wood, was also aware of research relating to discrimination against women in STEM, was familiar with at least some of the studies and reports and had experienced the dearth of women in the field first hand. Dkt. 44-1, Ex. 21, Wood Dep, 33:18-38:13; 41:21-42:3, 43:13-44:5.[3]

As acknowledged by Dean Julien, credible, reliable research shows that female professors, particularly in STEM fields, tend to receive statistically lower student teaching evaluation scores when controlling for all other factors. Dkt. 44-1, Ex. 13, Julien Dep 30:25-31:10; 56:21-57:8; 58:1-6; Ex. 1 at 21-22. Both Dean Wood and Dean Julien were aware of these studies and Dean Wood acknowledged, based on her own experience at UT, that gender is among the factors that plays a role in student teaching scores and is generally regarded as having an influence on the scores. *Id.* Dkt. 44-1, Ex. 21**,** Wood Dep, 33:18-38:13; 41:21-42:3, 43:13-44:5. Bias disfavoring female professors tends to be stronger among male students (who tend to be the majority in many STEM fields), despite evidence that students learn equally well from female and male professors. Ex. 1

---

[3] This is illustrated by the glaring lack of tenured women faculty in UT's Electrical and Computer Engineering Department (49 men, 92.5% and 4 women, 7.5%) and the School of Engineering overall (174 male tenured professors (84%) and 33 females (16%)). *See* Plaintiff's Response To Defendant's Motion For Summary Judgment (Dkt. 44) at 3-4.

at 21-22.  Other factors, such as class size, math content, and whether the course is a required also can impact student evaluations.  *Id.* Dkt. 44-1, Ex. 13, Julien Dep 30:25-31:10; 56:21-57:8; 58:1-6; Dkt. 44-1, Ex. 21, Wood Dep, 41:21-42:3, 43:13-44:5.

**c.  Stereotypes Can Lead To Discrimination Against Pregnant Women, Particularly Those Who Accept or Use Workplace Accommodations.**

Dr. Glick also presents fascinating research relating to pregnancy discrimination, including that fathers typically experience no discrimination or in fact are viewed *more favorably* (a "fatherhood bonus") in employment, while the evidence shows women are more likely to face discrimination. Ex. 1 at 28-33. In general, stereotyped perceptions fall along the lines of "He'll be a great worker because he's motivated to feed his family" whereas "She's going to be less committed to work because she will be devoting herself to her kids." *Id.* at 31. Research shows that women using workplace accommodation programs for motherhood may become even more stigmatized as less competent and less committed to work.  *Id.* at 33-35. Dr. Glick's testimony and the research in this area is, of course, relevant to this case because Plaintiff Nikolova had been pregnant twice and had used UT's faculty policies intended to accommodate parents, such as Modified Instructional Duty ("MID") and a "Probationary Extension" to extend her tenure period. Both of these pregnancy accommodations were cited by Dean Wood in her recommendation to deny tenure to Dr. Nikolova.  Dkt. 44-1, Ex. 15, Dean's Assessment at UT 23.

**d.  Women Discriminate Against Women.**

Dr. Glick's report also provides illuminating and possibly counter-intuitive research relating to discrimination *by women against* women. While some may assume that women might be less likely to discriminate against other women, scientific research disproves this assumption, showing that women who achieve authority or powerful positions in male-dominated fields (including STEM) tend to discriminate as much as or even more severely than men when judging

junior women's work commitment. Ex. 1, at 24-28, 57-59. Reasons include that successful women in masculine fields often felt they had to work harder to overcome biases, and consequently hold junior women to a higher standards since that is what they had to do to succeed. *See* Ex. 1 at 58. This scientific evidence is particularly relevant in this case because the first person who recommended denying tenure to Dr. Nikolova (in spite of strong, overwhelming support for her tenure before) was a female, Dean Wood. Additionally, Dean Wood publicly recounted some of her experiences in STEM as a woman and stated, "you *have* to be better than everyone." *See* https://www.hartenergy.com/exclusives/2020-pinnacle-award-winner-dr-sharon-l-wood-university-texas-186588. Wood also stated that "work-life balance is a bit of a myth because you can't do everything and sometimes 'work-life balance' implies that you can." *Id.*

### e. **Discrimination Is More Likely In Subjective Evaluations Or Where Criteria Can Be Inconsistently Applied**

Dr. Glick puts forth research regarding how discrimination is most likely to arise in employment decisions and how organizations can take steps to limit discriminatory bias in such decisions. Ex. 1 at 35-38, 45-54. Research supports that discrimination is less likely when decisions are based on objective performance criteria rather than subjective opinions.   *Id.* Additionally, discrimination tends to arise more when there are not clear and consistent benchmarks and evaluators are able to "move the goalposts." *Id.* Thus, guidance is important on how to weigh different criteria to prevent evaluators from adjusting how that criteria is weighed to disguise or justify discrimination. *Id.*

### f. **Scientific Research Regarding Retaliation.**

Finally, Dr. Glick offers scientific research relating to retaliation, including research showing that even when evidence strongly supports that an individual has been discriminated against, observers tend to view someone claims discrimination as an overly sensitive "whiner." *Id.*

at 38-39.

**2. Prof. Glick Carefully Discusses And Opines How The Research Applies To This Case.**

In his report, Dr. Glick uses his extensive experience and expertise in the field to consider how the research may apply to some of the potential evidence in this case. *Id.* at 41-60. In each section, Prof. Glick thoroughly and carefully discusses the research and its possible application to the facts of this case. Prof. Glick posits questions raised by the research that a jury may wish to ask and consider. Importantly, Glick's clearly articulates that he *is not making any determination as to whether there was, in fact, discrimination (or retaliation)*. That is the providence of the jury and he is careful to not intrude or overstep in that regard. *Id.* at 40. Dr. Glick's opinions are nuanced and thoroughly supported, but the following are his ultimate conclusions:

1. Opinion: The research on gender bias in student evaluations of teaching in STEM fields and pregnancy biases suggest that Dr. Nikolova may have received lower teaching ratings than similar male or non-pregnant female colleagues and that decision makers considering tenure should at least take that possibility into account.
2. Opinion: In contrast to the more objective and benchmark-based approach taken by the Budget Council, Dean Wood used a subjective approach known to allow bias to affect decisions through subjective inferences and shifting standards.
3. Opinion: Dean Wood's perception that Dr. Nikolova showed decreased work commitment after pregnancy and childbirth is highly consistent with stereotypes toward pregnant women, mothers, and women who make used of workplace accommodations for family reasons. Both in terms of process (e.g., subjective interpretation) and content (inferred lack of commitment), the Dean's decision-making about Dr. Nikolova is consistent with bias toward pregnant women, mothers, and workplace accommodation policy use.
4. Opinion. Research suggests that Dean Wood's gender and prior experiences with discrimination would not serve to protect against bias against Dr. Nikolova, but rather could make discrimination more likely. Further, Dean Wood's attitude that "*work life balance is a bit of a myth*" is consistent with an ethos prizing work devotion that exacerbates bias against pregnant women, mothers, and women who use workplace accommodation policies for family purposes.

*Id.* at 41-60.

## IV.   ARGUMENTS AND AUTHORITIES

**A. Courts Regularly Admit and Rely On Sociological and Psychological Expert**

**Testimony.**

In the case at hand, Defendant's primary argument is that Glick's application of the academic research to the facts of this case is "not based on any scientific principles and methodology." However, social sciences and psychological expert testimony has been admitted and relied on by courts and juries for many years.[4] In employment discrimination cases, sociological testimony was admitted and relied upon by the Supreme Court in the landmark sex-stereotyping case, *Price Waterhouse v. Hopkins,* 490 U.S. 228, 235-36, (1989). In *Price Waterhouse*, a social psychologist Susan Fiske testified that "the partnership selection process at Price Waterhouse was likely influenced by sex stereotyping." 490 U.S. at 235. The expert offered her opinion on the likelihood that various partners' comments had been based on sex stereotypes, though she had not met or examined the partners. The Court recognized that, "Fiske based her opinion on a review of the submitted comments, explaining that it was commonly accepted practice for social psychologists to reach this kind of conclusion without having met any of the people involved in the decisionmaking process." *Id*. at 236.[5] While *Price Waterhouse* did not, of course, mandate the use of social science expert testimony, it certainly recognized that it can be important and useful in discrimination cases.

Additionally, the Supreme Court has recognized in other cases that expert witnesses may permissibly link general research data to the facts in a particular case, noting that "trained experts commonly extrapolate from existing data." *General Electric Co. v. Joiner*, 522 U.S. 136, 146-47 (1997). Moreover, in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 148-49 (1999), the court

---

[4] In *Brown v. Bd. of Educ.,* 347 U.S. 483, 494 n.11, 74 S. Ct. 686, 692 (1954) the Supreme Court relied on psychological and sociological studies relating to the impact of race discrimination on children in schools to overturn the "separate but equal" doctrine.

[5] While the defendant in *Price Waterhouse* did not challenge the expert at the trial court level, the Supreme Court nonetheless considered and rejected arguments relating to the validity of the field of study of stereotypes, and, similar to UT's argument's here, that the expert's testimony was based on "intuitive hunches" and the detection of sex stereotyping was "intuitively divined." *Id.* at 255.

recognized that "[e]xperts of all kinds tie observations to conclusions through the use of what Judge Learned Hand called 'general truths derived from … specialized experience.' And whether the specific expert testimony focuses upon specialized observations, the specialized translation of those observations into theory, a specialized theory itself, or the application of such a theory in a particular case, the expert's testimony often will rest 'upon an experience confessedly foreign in kind to [the jury's] own.'"

Moreover, the Fifth Circuit has specifically approved the admissibility of expert "social-science" testimony and its application to the facts of a specific case. In *United States v. Simmons*,[6] the trial court in a sexual assault case allowed prosecutors to introduce expert testimony by a university psychology professor regarding the behaviors of victims of sexual assault. The professor provided testimony regarding such behavior generally (*e.g.,* non-reporting to police and feelings of shame, humiliation, and self-blame) and testified that the victim's behavior was "*quite consistent with that … of rape victims.*" *Id.* at 1123 (emphasis added). The defendant objected to the admission of the expert testimony on grounds similar to that of UT in the present case – that the testimony was not reliable, was based on scientifically suspect methodology, and usurped the jury's role by providing testimony on the ultimate issue of whether the victim was sexually assaulted. The Fifth Circuit rejected all of these arguments and found no error by the trial court.

In *Simmons,* the defendant objected that there were "no empirically valid or reliable forensic diagnostic techniques" regarding the expert's testimony, similar to UT's objection that Glick's application of research to the present case, including that the Dean Wood's assessment and statements were "consistent with" stereotypes towards pregnant women, mothers, and the use of workplace accommodation policy use, 53-57, and attitudes that exacerbate bias. 57-60.  The Fifth

---

[6] 470 F.3d 1115, 1121-24 (5th Cir. 2006).

Circuit rejected that "reliability" argument and explained that:

> Obviously, these are inherent limitations for such research. Nevertheless, expert testimony drawing on it is *not* thereby proscribed by *Daubert. See Jenson v. Eveleth Taconite Co.,* 130 F.3d 1287, 1297 (8th Cir. 1997) (recognizing inherent methodological limitations in all social-science research, particularly sexual-harassment research; nevertheless, holding such expert testimony admissible), *cert. denied,* 524 U.S. 953, 118 S. Ct. 2370, 141 L. Ed. 2d 738 (1998). First, as a general matter, "[t]o show that expert testimony is reliable … the government need not satisfy each *Daubert* factor." Instead, as *Daubert* emphasized, the trial court's "gatekeeping" function is "a *flexible* one." (emphasis added). In fact, our court has held expert testimony admissible even though multiple *Daubert* factors were *not* satisfied. *See, e.g.,* **United States v. Norris,** 217 F.3d 262, 269-71 (5th Cir. 2000) (testimony admissible under *Daubert* even though "no error rate was known" and "no independent validation" of the expert's testing had occurred).

> Second, naturally occurring circumstances, such as the social stigma attached to rape, may preclude ideal experimental conditions and controls. *See, e.g.,* **Jenson,** 130 F.3d at 1297 (noting the necessarily diminished methodological precision of "soft" social sciences, particularly in areas involving sexual victimization). In such instances, other indicia of reliability are considered under *Daubert,* including professional experience, education, training, and observations. *See, e.g., Pipitone v. Biomatrix, Inc.,* 288 F.3d 239, 247 (5th Cir. 2002) (finding expert's testimony reliable under *Daubert* where "based mainly on his personal observations, professional experience, education and training"). Because there are areas of expertise, such as the "social sciences in which the research, theories and opinions cannot have the exactness of hard science methodologies,", *Jenson,* 130 F.3d at 1297, trial judges are given broad discretion to determine "whether *Daubert's* specific factors are, or are not, reasonable measures of reliability in a particular case."

*Id.* at 1122-23. While the standards for admission of expert testimony under Rule 702 and *Daubert* are the same in both civil and criminal matters, if social-science testimony similar to the case at hand meets the standards for admission against a defendant facing felony charges and years of incarceration, such testimony is clearly admissible in the case at hand. Similar to *Simmons*, Glick's testimony utilizes his "professional experience, education, training, and observations" to educate the jury about the science relating to discrimination as well as his professional observations that certain conduct is "consistent" with stereotyping and that decisions made based on subjective and moving criteria open the door to potential discrimination. Importantly, Glick's clearly articulates

11

that he *is not making any determination as to whether there was, in fact, discrimination (or retaliation)*. That is the providence of the jury and he is careful to not intrude or overstep in that regard.

Numerous other courts have specifically admitted expert testimony on stereotyping in discrimination cases, including as discussed *infra*, *specifically that of Dr. Glick*. "As observed over a decade ago, '[s]ocial framework' analysis . . . has become commonplace.'" *Chinn v. Whidbey Pub. Hosp. Dist.*, No. C20-995 TSZ, 2021 U.S. Dist. LEXIS 216975, at *7-8 (W.D. Wash. 2021) (*citing Apilado v. N. Am. Gay Amateur Ath. All.*, No. C10-0682, 2011 U.S. Dist. LEXIS 159575, at *3-6 (W.D. Wash. 2011). "Social science testimony is relevant and helpful to a jury in discrimination cases." *Maciel v. Thomas J. Hastings Props.*, Civil Action No. 10-12167-JCB, 2012 U.S. Dist. LEXIS 204761, at *9 (D. Mass. 2012).[7] "'Social framework' analysis … can assist the jury's understanding of 'the causes, manifestations, and consequences of . . . stereotyping as well as the organizational circumstances which allow such stereotypes to flourish.'" *Apilado*, 2011 U.S. Dist. LEXIS 159575, at *3-6, *citing Butler v. Home Depot, Inc.*, 984 F. Supp. 1257, 1264 (N.D. Cal. 1997) and Walker and Monahan, *Social Frameworks: A New Use of Social Science in Law*, 73 Va. L. Rev. 559 (1987).

In *Tyus v. Urban Search Mgmt.*,[8] the Seventh Circuit held it was error for the trial court in a housing discrimination case to exclude social science testimony relating to the effects of all-white advertising campaigns on African Americans. "Social scientists in particular may be able to show that commonly accepted explanations for behavior are, when studied more closely,

---

[7] Citing *Tyus v. Urban Search Management*, 102 F.3d 256, 263-4 (7th Cir. 1996) (professor of sociology in Fair Housing Act case); *MHANY Mgmt. Inc. v. County of Nassau*, 843 F. Supp. 2d 287, 318-319 (E.D.N.Y 2012) (urban planning expert regarding race euphemisms in Fair Housing Act case); *Tuli v. Brigham & Women's Hosp., Inc.*, 592 F. Supp. 2d 208, 214-216 (D. Mass. 2009) (social framework analysis by Dr. Glick in Title VII); *Chadwick v. WellPoint, Inc.*, 561 F.3d 38, 49 n. 14 (1st Cir. 2009) (sociological testimony in Title VII case).
[8] 102 F.3d 256, 263 (7th Cir. 1996).

inaccurate." *Tyus*, 102 F.3d at 263. "These results may sometime fly in the face of conventional wisdom." *Id.*

In *EEOC v. Morgan Stanley & Co.*, 324 F. Supp. 2d 451, 461-62 (S.D.N.Y. 2004), the court considered arguments to exclude a social science expert that are similar to those being made by UT in the case at hand.  The court held that the critiques of the expert's testimony, including that that his opinions were subjective, that a social framework methodology is not accepted, the expert did not rely on first-hand knowledge or studies, and that he omitted inconsistent literature, went to the weight of the expert's testimony, not its admissibility, and are factors that should be evaluated and weighed by the trier of fact.  *Id.*

Defendant's argument that Glick's opinions relating to this specific case "have not been subjected to peer review or publication" (Dkt. 49 at 9-10) is a "red herring." It is absolutely not required under *Daubert* or Rule 702 that every opinion of an expert be peer reviewed or subject to publication.  *E.g. Kumho Tire,* 526 U.S. at 148-49, *Simmons*, 470 F.3d at 1122. It is hard to fathom a legal case in which an expert's opinions on that case are peer-reviewed and published. If that were the standard, expert testimony would essentially never be allowed. That is simply not how litigation and expert witnesses work in the real world.

Additionally, as Glick explained and one would expect as a simple matter of common sense, it is not feasible and likely impossible to conduct an "after the fact" peer-review type study because of "social desirability biases" (among other reasons) to determine to a scientific certainty whether a defendant in a specific legal case discriminated against a particular plaintiff.  Glick Dep at 67:8-69:18. *See also Simmons*, 470 F.3d at 1122 (social stigma precludes ideal experimental conditions regarding sexual harassment).

**B.  *Dukes* and *Mullinex* Are Clearly Distinguishable From The Case At Hand**

Defendant misleadingly characterizes the Supreme Court's decision in *Wal-Mart Stores,*

*Inc. v. Dukes*, 564 U.S. 338, 131 S. Ct. 2541 (2011), as it relates to "social framework" testimony. That mischaracterization was reflected by the court in *Mullenix v. The Univ. of Tex. at Austin*, No. 1-19-cv-1203-LY-SH, 2021 WL 4304815, at *4-7, 2021 U.S. Dist. LEXIS 180630 at *12-17 (W.D. Tex. Sept. 21, 2021) (Yeakel, J.). Defendant's motion in the case at hand states, "the Supreme Court recognized it could "safely disregard" such testimony as unhelpful in deciding discrimination cases."  (Dkt. #49 at 2). This is an inaccurate representation of *Dukes*. Rather, in *Dukes,* the Court considered whether "social framework" testimony alone was sufficient to certify "one of the most expansive class actions ever" consisting of 1.5 million members. To certify a class, the Court explained that the plaintiff must meet the "commonality" requirement by providing "[s]ignificant proof that an employer operated under a general policy of discrimination." *Id.* at 353. However, the Court found that "[t]he only evidence of a 'general policy of discrimination' respondents produced was the testimony of Dr. William Bielby, their sociological expert. Relying on 'social framework' analysis, Bielby testified that Wal-Mart has a 'strong corporate culture,' that makes it 'vulnerable' to "gender bias." The Court then found:

> "[W]hether 0.5 percent or 95 percent of the employment decisions at Wal-Mart might be determined by stereotyped thinking" is the essential question on which respondents' theory of commonality depends. If Bielby admittedly has no answer to that question, we can safely disregard  what he has to say. It is worlds away from "[s]ignificant proof" that Wal-Mart "operated under a general policy of discrimination."

*Id.* at 354-55. *Dukes* simply does not hold or otherwise support the proposition that social framework testimony is inadmissible in employment discrimination suits, rather that it was insufficient by itself to support certification in a massive class action.

In *Dukes*, *id* at 354, n. 8 and *Mullenex,* 2021 U.S. Dist. LEXIS 180630 at *12-16, the courts relied upon an essay published in the Virginia Law Review, Monahan, Walker, & Mitchell, "Contextual Evidence of Gender Discrimination: The Ascendance of "Social Frameworks," 94

Va. L. Rev. 1715, 1747 (2008).[9]  The 2008 essay actually *endorsed* the admission and use of social framework testimony generally in legal cases. *Id.* at 1732.  However, the essay criticized expert testimony applying social science research to the facts of a particular case. The Monahan essay claimed that an application of the social science research should only be admissible if the expert conducted a specific audit or study of the relevant party while in litigation. *Id.* at 1748.

Numerous courts have rejected the approach recommended by Monahan and regularly admit social framework testimony in discrimination cases, including testimony that applies the research to the facts of the case.[10] In *Chinn,* 2021 U.S. Dist. LEXIS 216975, at *7-8, for example, the court found the essay unpersuasive and noted that other courts had continued to allow social framework testimony even after the essay's publication. In *Merrill v. M.I.T.C.H. Charter Sch. Tigard*, No. 10-219-HA, 2011 U.S. Dist. LEXIS 36497, at *11-12 (D. Or. 2011), the court discussed the Monahan essay and held, "Despite questions raised by the article, the existence of a disagreement among experts in the field does not render [the expert's] testimony unreliable. Disputed expert testimony remains reliable as long as 'it falls within 'the range where experts might reasonably differ, and where the jury must decide among the conflicting views.'" (citing *S.M. v. J.K.*, 262 F.3d 914, 921-22 (9th Cir. 2001)).  Additionally, as discussed *supra,* conducting a valid, peer-reviewed study applicable to a specific lawsuit it is not required under the law and also unfeasible and essentially, scientifically impossible.

---

[9] The essay's authors, Monahan and Walker, coined the term "social framework testimony" in a 1987 essay also published in the Virginia Law Review.. Laurens Walker & John Monahan, Social Frameworks: A New Use of Social Science in Law, 73 VA. L. REV. 559, 563–67 (1987).

[10] The Monahan essay's position has been described as a "radical" departure from the accepted application of Fed. R. Ev. 702, and that "[u]ltimately, the arguments for blanket exclusion of social framework testimony in these cases can best be understood as part of a political debate and a litigation strategy." Hart & Secunda, "A Matter Of Context: Social Framework Evidence In Employment Discrimination Class Actions," Melissa Hart & Paul M. Secunda, 78 Fordham L. Rev. 37, 53. 67 (2009). Additionally, the Monahan approach has rejected by numerous psychologists and sociologists. *Id.* at 39.

Finally, Nikolova's offer of Glick's expert testimony in this case has no similarity whatsoever to the situation in *Dukes*.  Nikolova is not relying on Glick's testimony as the "only evidence" to meet the high burden for a class certification, but rather to educate the jury relating to how stereotypes lead decisionmakers to selective and skewed consideration of evidence as part of confirmation bias, and how subjective conclusions and "moving the goalposts" with respect to the review of tenure criteria can be conditions in which discrimination can occur. In the case at hand, Glick's expert testimony will provide the jurors with scientifically validated research and information that helps explain how discrimination and stereotypes can impact employment decisions.

With respect to the *Mullenix* decision, which is not binding on this Court, the report offered in that case was far more fact dependent and considered and opined on the actions of multiple decisionmakers (as opposed to simply Dean Wood in the case at hand). Also in *Mullenix,* the court did not consider and apparently the plaintiff did not argue (as in the case at hand) that even if Glick's opinions on the application of research to facts was not admitted, the substantive portion discussing the research in this area should be allowed. As noted *supra*, UT Dean of Diversity and Inclusion Julien has read studies relating to discrimination against women in STEM and found them to be credible, reliable information that she uses as a part of her job.  Ex. 2, Julien Dep 30:25-31:10; 56:21-57:8; 58:1-6. In a recently decided opinion in a discrimination case, *Chinn*, the court admitted all of the social science expert's testimony relating to the research, but deferred ruling until trial on the extent to which the expert "will be permitted to opine on the ultimate issues of fact." 2021 U.S. Dist. LEXIS 216975, at *9. While all of Glick's testimony easily passes scrutiny under *Daubert* and Rule 702, Plaintiff respectfully requests the Court allow Glick to testify about the social science research, and defer any further rulings till the time of trial.

### C. **Neither _Daubert_ Nor Rule 702 Restricts This Practice, And Glick Relied On All Relevant Source Documents From UT.**

Defendant further argues that Glick's application of the research to the facts of the case should be excluded because Glick only reviewed documents provided by Plaintiff's counsel. The argument has absolutely no merit for multiple reasons. First, there is absolutely no requirement under _Daubert_ or Rule 202 that an expert seek and obtain documents from the opposing party or that the expert review all documents in a case.  The arguments that Glick "failed to consider certain data are not sufficient to exclude his opinions. Experts should be excluded only if their testimony is so fundamentally unsupported that it cannot possibly help the factfinder." _Browning,_ 2006 U.S. Dist. LEXIS 98612, at *6-7 (citing _Viterbo v. Dow Chemical Co.,_ 826 F.2d 420, 422 (5th Cir. 1987)). Generally, "[q]uestions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." _Viterbo,_ 826 F.2d at 422. Additionally, numerous "courts have found no basis for exclusion when experts were challenged for failing to take into account certain data." _Browning,_ 2006 U.S. Dist. LEXIS 98612, at *6-7.[11]

Moreover, Glick reviewed the substantive, underlying source documents produced by UT and at issue in this case.  These include Nikolova's complete tenure dossier – the exact same set of documents reviewed by the President and President's Committee to make its tenure determination. They include Dean Wood's written statement in which she offers the specific reasons that allegedly were the reasons she recommended against the denial of tenure for Nikolova, the Department Chair's Assessment, the multiple written assessments of the Budget Council, the votes of the College of Engineering's P&T committee as well as external reviewers.  The evidence

---

[11]  Citing _Moss v. Ole South Real Estate, Inc.,_ 933 F.2d 1300, 1307 (5th Cir. 1991); _Matador Drilling Co. v. Post,_ 662 F.2d 1190, 1199 (5th Cir. 1981); _Hartley v. Dillard's, Inc.,_ 310 F.3d 1054, 1061  (8th Cir. 2002); _Cummings v. Standard Register Co.,_ 265 F.3d 56, 65 (2nd Cir. 2001)).

reviewed also includes the complete notes reflecting the interviews and words offered by Dean Wood and Chair Tewfik explaining their decisions as part of the review of the tenure decision by UT's own "CCAFR committee," as well as all of the documents reviewed by the CCAFR committee, the CCAFR committee's report, and President Fenves' response to the Committee's decision. Glick did not review depositions as those had not been taken at the time his report was due. While UT makes a point that Glick did not review UT's policies and procedures, there is no indication how a review of policies or procedures would make his report or testimony more reliable.

D.  **Glick's Failure to Rule Out Alternate Explanations Is A Strength Of His Report.**

UT's argument that Glick's testimony should be excluded "because he failed to consider alternate explanations" (Dkt. 49 at 15-16) has no merit.  In support of the argument, UT cites *Munoz v. Orr*, 200 F.3d 291, 301 (5th Cir. 2000), which is easily distinguished from the present case. *Munoz* involved a disparate impact claim that an employer's promotion program had a disparate impact on Hispanics.  Disparate impact claims can generally *only* be proven by a statistical showing that a neutral policy was the actual cause of a discriminatory impact. The *Munoz* expert's statistical analysis was excluded because it began with the assumption that employees were not promoted because they were Hispanic, did not include a "regression analysis" that accounted for other reasons why employees were not promoted, contained numerous mathematical errors, and ultimately could not conclude that the policy was, in fact, the cause of the disparate impact.

UT also criticizes Glick's report because he "fails to offer any testimony or opinions

regarding the motivation of the ultimate decision makers in this case."[12] However, the court in *Tuli v. Brigham & Women's Hosp., Inc.*, 592 F. Supp. 2d 208, 211-12 (D. Mass. 2009) specifically ruled that expert testimony *from Glick* was admissible precisely *because* Glick did not offer testimony or opinion on the actual motivation of the decisionmaker.  As the court held:

> Professor Glick's testimony . . . provides the jury with a context for considering the evidence before it, as opposed to a roadmap to a particular outcome. He expressly refuses to come to a conclusion about whether there has been discrimination in this case because such an opinion is for the jury and because he concludes -- appropriately -- that it is not possible to make any decision to a reasonable degree of scientific certainty about a real world case. In this regard, Professor Glick's testimony is not unlike social psychological testimony about eyewitness identification. Such testimony does not tell the jury what to decide in any given case; it only tells them what to consider.

*Id.* As recognized by the court in *Tuli*¸ Glick's expert testimony is similar to expert testimony regularly admitted in criminal cases.

## E.   Research Relating To Bias and Stereotypes Is Helpful and Not Confusing To A Jury.

Defendant's final argument is that Glick's report should be excluded under Federal Rule of Evidence 403 because of the risk of unfair prejudice and confusion to the jury. Defendant argues (and the court in *Mullinex* agreed) that because social science research includes research relating to implicit bias, the research would confuse the jury. This argument is meritless. First, numerous courts have found that evidence relating to stereotypes is permissible and useful in discrimination cases. *E.g. Price Waterhouse,* 490 U.S. at 251 (evidence showing reliance on stereotypes can support claim of intentional discrimination); *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1748-49, 207 L. Ed. 2d 218 (2020) (plaintiff could sue under Title VII based on adverse action caused by failure to conform to stereotypes); *Samaha v. Wash. State Dep't of Transp.*, No. CV-10-175-RMP,

---

[12] UT claims that the ultimate decision makers in the case are the UT President and President's Committee. However, as thoroughly briefed in Plaintiff's Response to Defendant's Motion for Summary Judgment, Dean Wood participated in and influenced the President's Committee discussion and decision-making.

2012 U.S. Dist. LEXIS 190352, 2012 WL 11091843, at *4 (E.D. Wash. Jan. 3, 2012) (evidence of stereotypes and implicit bias relevant to intentional discrimination).

Moreover, regardless of whether a person has implicit bias, a person can still act intentionally and discriminatorily. The two are in no way mutually exclusive. Glick's research educates jurors on where discriminatory biases come from, how they are put into action, and what organizations can do to prevent discrimination in employment decisions. None of this evidence relies upon or is "tainted" by "implicit bias."  Moreover, UT is able to argue – non-scientifically – that School of Engineering Dean Wood is a woman and therefore she would not make any decisions that could have been based upon gender or pregnancy discrimination against another female colleague. Prof. Glick's expert testimony provides the scientifically validated data that such an assertion is questionable at best. Dean Wood used tiny differences in student teaching evaluation scores as justification for her recommended denial of tenure. Credible studies exist, as acknowledged by UT's Diversity and Inclusion Dean Jullian and generally known about by Dean Wood that student evaluations are biased against women, particularly in STEM. Dr. Nikolova should be allowed the ability to provide the jury with such scientifically validated information regarding those studies to evaluate their significance. UT is free and able to question Prof. Glick regarding this evidence and expert testimony.

Finally, because it is illegal and generally unacceptable to discriminate, employers and their decisionmakers involved in lawsuits almost unanimously deny being motivated by intentional discrimination.  This leaves open the real possibility that they may attempt to hide claiming any bias was unintentional or implicit.  Educating the jurors on bias generally helps the jurors to spot such bias and ultimately decide whether it was intentional.  This is particularly important because the evidence frequently used show intentional discrimination may look the same as implicit bias. The jury must view the evidence and decide whether the disparate adverse decisions were made

intentionally or otherwise.  The jury charge will set forth the specific standards. Numerous courts have held that testimony like that of Prof. Glick is actually helpful to the jury. To the extent there is any confusion, the Court can give the jury appropriate instructions.

Respectfully submitted,

CREWS LAW FIRM, P.C.
701 Brazos, Suite 900
Austin, Texas 78701
(512) 346-7077
(512) 342-0007 (Fax)
schmidt@crewsfirm.com

By: _/s/_ _Robert W. Schmidt_
Robert W. Schmidt
State Bar No. 17775429
Joe K. Crews
State Bar No. 05072500

Robert Notzon
The Law Office of Robert Notzon
Texas Bar No. 00797934
1502 West Avenue
Austin, Texas 78701
(512) 474-7563
(512) 852-4788 facsimile

**ATTORNEYS FOR PLAINTIFF**

**CERTIFICATE OF SERVICE**

I hereby certify that on December 14, 2021, this document was served pursuant to Federal Rules of Civil Procedure on counsel for Defendants at the following address:

Benjamin L. Dower
Assistant Attorney General
Office of the Attorney General of Texas
General Litigation Division
P.O. Box 12548
Capitol Station,
Austin, Texas 78711-2548
Fax (512) 320-0667
benjamin.dower@oag.texas.gov

_/s/_ _Robert W. Schmidt_

21