# EXHIBIT 2

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

```
EVDOKIA NIKOLOVA            *
      Plaintiff,            *
                           *
V.                          *   CASE NO. 1:19-cv-00877-RP
                           *
UNIVERSITY OF TEXAS AT      *
AUSTIN,                     *
      Defendant.            *
```

VIDEOTAPED ORAL DEPOSITION

OF

PETER GLICK, Ph.D.

Friday, November 5, 2021

(Reported Remotely)

VIDEOTAPED ORAL DEPOSITION OF PETER GLICK,

Ph.D., produced as a witness at the instance of the

Defendant, and duly sworn, was taken in the above-styled

and numbered cause on Friday, November 5, 2021, from

9:01 a.m. to 4:02 p.m., before Debbie D. Cunningham,

CSR, in and for the State of Texas, reported remotely

via Machine Shorthand, pursuant to the Federal Rules of

Civil Procedure.

--ooOoo--

2

```
 1              APPEARANCES
 2
 3  FOR PLAINTIFF:
 4      CREWS LAW FIRM, P.C.
        701 Brazos, Suite 900
 5      Austin, Texas 78701
        (T) 512.484.2276
 6      By:  Robert W. Schmidt, Esq.
             schmidt@crewsfirm.com
 7          AND
    THE LAW OFFICE OF ROBERT NOTZON
 8      1502 West Avenue
        Austin, Texas  78701
 9      (T) 512.474.7563
        By:  Robert Notzon, Esq.
10           Robert@NotzonLaw.com
11
    FOR DEFENDANT:
12
        LITTLER MENDELSON, P.C.
13      100 Congress Avenue, Suite 1400
        Austin, Texas 78701
14      (T) 512.982.7250
        By:  Darren Gibson, Esq.
15           dgibson@littler.com
            AND
16      Shana Kelly, Esq.
            AND
17  OFFICE OF THE ATTORNEY GENERAL OF TEXAS
        General Litigation Division
18      P.O. Box 12548, Capitol Station
        Austin, Texas  78711-2548
19      (T) 512.463.2120
        by:  Benjamin Dower, Esq.
20           benjamin.dower.oag.texas.gov
            AND
21      Amy Hilton, Esq.
             amy.hilton@oag.texas.gov
22
23  VIDEOGRAPHER:  Philip Cawston
24
    ALSO PRESENT:  Laura Barbour
25           Jody Hughes
```

3

```
 1              INDEX
 2  APPEARANCES                        2
 3
 4  EXAMINATION OF PETER GLICK, Ph.D.:
 5  BY MR. GIBSON                      6
 6
 7
 8  CHANGES AND SIGNATURE            210
 9  REPORTER'S CERTIFICATION         212
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

4

```
 1              EXHIBIT INDEX
 2  Exhibit Number    Description              Page
 3  Exhibit 1   Peter Glick, Ph.D. Expert Report  13
 4  Exhibit 2   Roth article              77
 5  Exhibit 3   Joshi article             89
 6  Exhibit 4   Koch article             102
 7  Exhibit 5   Keonig article           113
 8  Exhibit 6   Anne Boring article          124
 9  Exhibit 7   MacNell article          126
10  Exhibit 8   Correll article              140
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

5

```
 1        (Friday, November 5, 2021, 9:01 a.m.)
 2            P R O C E E D I N G S
 3            THE VIDEOGRAPHER:  The time is 9:01 a.m.
 4  we are on the record.
 5            THE REPORTER:  Today's date is Friday,
 6  November 5th, 2021.  This is the videotaped oral
 7  deposition of Peter Glick, Ph.D.; and it is being
 8  conducted remotely.  The witness is located in Omro,
 9  Wisconsin.
10            I am Debbie Cunningham, and our
11  videographer today is Philip Cawston.  My CSR Number is
12  2065.  We are both with the firm of Integrity Legal
13  Solutions in Austin, Texas.
14            I am administering the oath and reporting
15  the deposition remotely by stenographic means.
16            Would Counsel please state their
17  appearances and locations for the record, beginning with
18  Plaintiff's Counsel?
19            MR. SCHMIDT:  Yes.  It's Robert Schmidt,
20  here for the Plaintiff, Dr. Evdokia Nikolova.
21            MR. NOTZON:  And Robert Notzon, also here
22  for the Plaintiff; and Bob and I are both in Austin.
23            MR. SCHMIDT:  Yes.
24            MR. GIBSON:  Hi.  Darren Gibson, here for
25  the Defendant University of Texas at Austin.  I also
```

6

1  have an associate of mine who's observing the
2  deposition, Shana Kelly, on the line as well.
3          MR. NOTZON:  And where are you, Darren?
4          MR. GIBSON:  Oh, Austin, Texas.  Thank
5  you very much.  Yes.
6          THE REPORTER:  Doctor, will you --
7          MR. SCHMIDT:  You're in Austin, Darren,
8  I thought you were in Dallas.
9          I'm so sorry.
10         MR. GIBSON:  No.
11         MR. SCHMIDT:  All right.
12         THE REPORTER:  Doctor, will you raise
13 your right hand, please?
14         THE WITNESS:  Yes.
15         (Witness sworn by the reporter.)
16         MR. GIBSON:  Thank you, Ms. Cunningham.
17             PETER GLICK, Ph.D.,
18     having been duly sworn, testified as follows:
19             EXAMINATION
20 BY MR. GIBSON:
21    Q.  Dr. Glick, it's nice to see you.  Just for the
22 record, we've met before, correct?
23    A.  Yes, we have, in a deposition.
24    Q.  In another case involving the University of
25 Texas at Austin involving a law professor named Linda

7

1  Mullenix; is that correct?
2     A.  That is correct.
3     Q.  And you were retained by the plaintiff in that
4  case as well; is that correct?
5     A.  Yes.
6     Q.  How many times have you approximately served
7  as an expert in a lawsuit?
8     A.  I think about 2 dozen.  I don't know.  I
9  haven't counted recently, so I can't give you an exact
10 number; but over about 25 years, maybe 2 dozen.
11    Q.  Have those generally been in employment
12 lawsuits?
13    A.  Generally, yes.
14    Q.  And have you always represented -- or been
15 retained by the plaintiff?
16    A.  Not always, no.
17    Q.  When have you been retained by a defendant?
18    A.  Recently I was retained by a defendant.  I'm
19 blanking on the name of the case.  I can think of two
20 times I was retained by the defendant.
21    Q.  And which two cases were those?
22    A.  I don't have my vitae in front of me, so let
23 me think.
24    Q.  We'll pull up -- I can provide -- I mean, we
25 will make your ex- -- we can go ahead and make your

8

1  expert report an exhibit.
2     A.  I have my report, but I didn't print out the
3  part that has my vitae in it.
4          MR. GIBSON:  Ms. Cunningham, I just want
5  to make sure we're doing this correctly.  Are we to drop
6  exhibits into the chat?  That's the way I've done it in
7  previous depositions.  Is that the way everyone would
8  agree to do this?
9          THE REPORTER:  Yes, sir.
10         MR. SCHMIDT:  Actually -- yes, that's
11 fine.  I was also going to say, Darren, in the prior
12 depositions that we have done with UT in this case, on
13 objections we have just agreed to use the Texas Rules of
14 Civil Procedure and just say, "Objection, form."  Do you
15 agree to that, or do you want us to go ahead and state
16 the objection?
17         MR. GIBSON:  I can adhere to that.
18         MR. SCHMIDT:  Okay.  That's fine.  Yeah,
19 just follow the Texas Rules on that.
20         MR. GIBSON:  Great.
21    A.  So as I'm thinking about it, I think I
22 remember now Gould v. Interface would be the recent one.
23 I believe it's Jay, J-A-Y, Gould, G-O-U-L-D v.
24 Interface.  It's a corporation.  And then the other one,
25 I think -- I think was Kelly versus Drexel.  And that's

9

1  an older case.
2     Q.  (BY MR. GIBSON)  Got it.  And so -- and both
3  of those were employment cases?
4     A.  Yes, yes.
5     Q.  And in both of those cases, you were retained
6  by the defendant?
7     A.  That's correct.
8     Q.  Thank you.  And so just --
9          MR. GIBSON:  Let's pause for a second.
10 It looks like we have an additional attorney joining,
11 Counsel for UT Austin from the Attorney General's
12 Office.  It looks like Ben Dower's joining.  So I'm
13 going to pause.
14         And, Ms. Cunningham, would you address
15 Mr. Dower for the record?
16         THE REPORTER:  Mr. Dower, would you
17 please state your appearance?
18         MR. DOWER:  Sure.  I don't expend --
19 expect to have much of a role, and I apologize for being
20 late.  My fiancee has a Temporary Injunction Hearing
21 this morning.  So we were focused on getting her ready
22 to go.
23         Benjamin Dower for the Defendant UT
24 Austin.
25         MR. NOTZON:  I'd say TMI.

10

1          (Laughter.)
2          MR. DOWER:  Are we -- are we on the
3   record already?
4          MR. SCHMIDT:  Yeah, we are.  It's fine.
5          MR. DOWER:  All right.  Well...
6          MR. SCHMIDT:  It's not TMI.  Hello, Ben.
7   How are you?
8          MR. DOWER:  I'm doing well.  And, again,
9   I apologize for the interruption; and I will do less
10  "MI" or less "I" from here on out.
11         MR. SCHMIDT:  Robert is giving you a hard
12  time.
13         MR. NOTZON:  But isn't that from
14  Seinfeld, like, you have to say "fiancee" a lot?
15         (Laughter.)
16         MR. SCHMIDT:  That's right.
17         MR. GIBSON:  All right.  Well, now that
18  we have Ben, we will keep moving forward.
19     Q   (BY MR. GIBSON)  Dr. Glick, I think you
20  testified that you have represented -- or been retained
21  by -- I apologize; I keep saying that.  Bad habit.
22  You've been retained by the defendant in two employment
23  cases which you identified; but, otherwise, in the
24  remaining employment cases, you have been retained by
25  the plaintiff; is that correct?

11

1      A.  That's correct.
2      Q.  I just want to start with some ground rules
3   very quickly now that we've got that out of the way.  I
4   would just ask that you answer my questions verbally,
5   particularly since we are on Zoom.  Please avoid head
6   nods or "uh-huhs" or "huh-uhs" and -- to make sure we
7   get an accurate record for the court reporter.
8          If you could -- if I ask a yes-or-no
9   question -- well, you can answer however you would like;
10  but please just make sure to avoid head nods and things
11  like that because it is very important that the court
12  reporter get an accurate transcript today.
13         I will try to avoid interrupting you when
14  you are testifying unless I think we're going in a
15  completely -- if you're going on a tangent that we don't
16  need to go down, I might interrupt; but, otherwise, I'm
17  going to really try to avoid interrupting you.  I would
18  ask that you do that same so that the court reporter can
19  get down a transcript of the question and the answer as
20  well as any objections that your -- that Plaintiff's
21  Counsel may lodge as well.
22         If you need a break, just let me know; we
23  can take a break.  The only rule is if there's a
24  question pending, I would ask that you answer the
25  question that is pending before you take a break.

12

1   Mr. Schmidt may lodge objections.  He's
2   certainly free to do so.  I would ask that you -- after
3   he's objected, please go ahead and answer the question
4   unless he instructs you for some reason not to answer
5   the question.
6          MR. GIBSON:  Mr. Dower, Ben, I just
7   want to confirm that the parties have agreed, based on
8   Mr. Schmidt's representation, that in prior depositions
9   the parties have agreed to allow objections solely as to
10  form.  Do you agree that -- is that consistent with the
11  Defendant's prior practice in this case?  And for the
12  record, I have not participated in any of the prior
13  depositions in this case.
14         MR. DOWER:  That's correct, with the --
15  with the caveat that it doesn't -- you know, that it
16  doesn't waive -- you know, it doesn't waive any of the
17  non-form objections.  Of course, that's standard.  And,
18  also, that the "objection, form" is sufficient to
19  preserve the objection as long as it is, in fact, a form
20  objection.
21         MR. GIBSON:  Great.  I just wanted to
22  confirm that for the record.
23     Q   (BY MR. GIBSON)  Dr. Glick, do you have -- are
24  you taking any medications that would affect your
25  ability to answer questions today?

13

1      A.  No.
2      Q.  And any other medical condition that would
3   affect your ability to answer questions?
4      A.  No.
5      Q.  And I will say that you're very bright because
6   the sun is hitting your head.  Is there any way -- I
7   just -- because, recognizing that these depositions may
8   be used at trial, is there any way to adjust that?
9      A.  Let me -- I closed the blind, but let me
10  reorient myself and see if this works better for you.
11     Q.  That's great.
12         MR. SCHMIDT:  That is better.
13         THE WITNESS:  Yeah, a clearer picture.  I
14  appreciate that.  All right.  Let me just -- okay.
15  There.
16         MR. GIBSON:  Thank you.  Sorry.  Sorry
17  for that.  I just want to -- you know, if we ever use
18  this for trial, I would like for the jury to have a
19  clear picture of you without being blinded by the
20  sunshine.
21         THE WITNESS:  Without my halo.
22         MR. SCHMIDT:  To see your -- your lovely
23  image.
24         (Exhibit 1 marked.)
25     Q.  (BY MR. GIBSON)  Okay.  So I want to start off

14

1  by -- I put Exhibit Number 1 into the chat, which is
2  your expert report.  If you could, just pull that up and
3  confirm that that is, indeed, your expert report in this
4  case.
5      A.  Oh, in the chat.  I see.  Okay.  It's wanting
6  me to save it.
7          Okay.  There.  Yes, this looks like my
8  report.
9      Q.  Great.  In your list of cases that you have
10  listed there at the end, starting on page 75, it appears
11  that the most recent two cases you listed -- the most
12  recent case is Paulette Fauceglia versus University of
13  Southern California.  Do you see that on page 75?
14      A.  Yes, I do.
15      Q.  Do you have any more recent cases since that
16  time?
17      A.  Yes, I do.  This is a little bit out of date.
18      Q.  It was provided in April, to be fair.  So no
19  worries.  I just want to make sure that we provide any
20  additional information that's occurred since April.
21      A.  Right.  I would have to -- to pull up a list.
22  I could provide that later, if you want; or I can take
23  the time now to try to figure that out.
24      Q.  Why don't you tell us what you recall, as you
25  sit here today, any additional cases you've been

15

1  retained as an expert since that needs to be provided to
2  update this list?
3      A.  So I just have a question about that.  I think
4  I've been told in the past that if there was a
5  deposition, that that's the ones -- those are the ones
6  that I should be providing; or should I be providing
7  anything I was retained in, regardless of whether it was
8  federal court or something else or no deposition?
9      Q.  So this list states Expert Witness Litigation
10  List; and it appears to include cases where you have
11  both provided a report, as well as cases where you have
12  been deposed.  So it -- this list does not appear to
13  require you to have been deposed for you to have listed
14  it on the list.  It also appears to include both state
15  court and federal court cases.
16          So my understanding of your list is that
17  it includes all cases where you have been retained and
18  have at least provided a report.  So I would ask that
19  you -- unless you have a different understanding of what
20  cases are listed in your report -- that's my
21  understanding of your report -- I would ask that you
22  answer the question to the best of your recollection of
23  any additional cases that you've served as a witness
24  since those cases are listed in the report.
25      A.  Well, I mentioned that Gould v. Interface; and

16

1  I think that's not -- it doesn't seem to be in that
2  list.  So that's one that I definitely recall, and there
3  was a deposition for that case, right?
4          And I'm trying to get the rules here.
5  You know, I'm not a lawyer.  So I've sometimes been told
6  by a lawyer:  Oh, well, don't list, you know, ones where
7  you didn't have a deposition.  And, you know, I mean,
8  obviously, I have listed those in my vitae.  So I'm just
9  trying to be consistent with whatever, you know, the law
10  requires.  I'm not trying to be coy here.
11          I'm just trying to sign into my
12  university because my list will be accessible that way.
13          MR. SCHMIDT:  And, actually, Dr. Glick,
14  I'm going to interrupt you.  I would not refer to
15  outside documents right now during the deposition unless
16  you absolutely need to.  I think just go by your memory.
17          THE WITNESS:  Okay.
18          MR. SCHMIDT:  And if you need --
19          THE WITNESS:  Well --
20          (Simultaneous speakers.)
21          MR. SCHMIDT:  -- a document, that'd be
22  fine.
23      A.  There's another case I recall that was before
24  an arbitration panel; and that's Zagelbaum, I believe,
25  versus United Health.

17

1          Let's see.  What else can I recall?
2  Those are the ones that immediately come to mind.  I'm
3  sure that I will -- if there were -- there were others.
4  There's one involving Anna Maria College.  I'm trying to
5  remember the plaintiff's name.  I'm not sure if that was
6  in my list.
7      Q.  Okay.
8      A.  So these are recent cases.
9      Q.  Sure.
10      A.  Yeah, I don't see that in the list.  Those are
11  the ones that come to mind.
12      Q.  Okay.
13      A.  Mullenix, as you know, since you were involved
14  in that, Mullenix versus University of Texas, yeah.
15      Q.  Okay.  So let's start with Gould v. Interface.
16  Do you recall where that case is based out of?
17      A.  I'm thinking that was Atlanta; but I'm not
18  sure, also, what I can say about these cases.  So I
19  don't want to violate any confidentiality agreements.
20      Q.  I mean, I think that you would -- if
21  you were providing an updated report, you would list
22  these on your cases; and so --
23      A.  Oh, right.
24      Q.  -- far I haven't asked you any questions about
25  anything that would not be listed on your report, so.

18

1    A.  Correct.  I was -- I was just -- I was just
2  asking for advice on that.  I'm happy to provide the
3  kind of things that would be listed on my report.
4  Again, I'm not trying to be coy here.
5    Q.  And do you recall if that was state or federal
6  court, the Gould v. Interface case?
7    A.  I believe it was federal court, but I'd -- I'd
8  want to check.
9    Q.  You said that was Gould, G-O-U-L-D?
10    A.  Yes, I believe so.
11    Q.  And do you know if there's been any sort of
12  motion to exclude your testimony in the Gould case?
13    A.  I don't believe there was.
14    Q.  Okay.  You also mentioned a case called
15  Zagelbaum versus United Health, which you believe was an
16  arbitration?
17    A.  Yeah, it was an arbitration panel of some
18  sort, I think a state based one in New York -- in New
19  York City was -- was the case.  So I think it's a
20  New York state based arbitration panel.
21    Q.  Okay.  And then -- and do you know if there
22  was any motion or any ruling by the arbitration panel
23  regarding the admissibility of your testimony in that
24  matter?
25    A.  I know that they heard my testimony in a -- in

19

1  a hearing.
2    Q.  Did you testify in the hearing?
3    A.  Yes.  I testified in a hearing, yes.
4    Q.  And, finally, you mentioned a case involving
5  Anna Maria College?
6    A.  Correct.
7    Q.  And do you recall where that case was located?
8    A.  That's in Massachusetts, and I recall the
9  plaintiff is Pinckney.  I think it's -- I don't know if
10  there's a "C" in there or not -- but Pinckney versus
11  Anna Maria College; and that was in Massachusetts, I
12  believe, in federal court.
13    Q.  And do you know if there was any motion to
14  exclude your testimony in that case?
15    A.  I don't believe there's a motion to exclude my
16  testimony.  I can't recall one.
17    Q.  Okay.  And you also mentioned the Mullenix
18  case.  Obviously, I'm aware of that; but for the record
19  I would just like to ask you a few questions about that.
20  You provided a report and deposition in that case; is
21  that correct?
22    A.  Yes.
23    Q.  And there was a motion to exclude your
24  testimony in that case; is that correct?  Are you aware
25  of that?

20

1    A.  Yes.
2    Q.  Are you aware of the outcome of that motion?
3    A.  Yes, I'm well aware of the outcome.
4    Q.  And what was the outcome of that motion, to
5  your knowledge?
6    A.  To my knowledge, the outcome of that motion
7  was I was excluded from the case.
8    Q.  Okay.  So we're going to be focused quite a
9  lot on your report today.  So I just want to make sure
10  you've got that handy, whether it's printed in front of
11  you or the exhibit.  So you have an additional copy
12  printed in front of you; is that correct?
13    A.  Correct, I have a copy that includes up to
14  page 60, which is the -- you know, the report itself.  I
15  didn't bother to print out other appendage -- appendices
16  after that.
17    Q.  Before I go on, I want to make sure I
18  understand sort of the scope of your role as an expert
19  witness.  How much do you normally make as an expert
20  witness on an hourly basis for your work?
21    A.  I charge $400 an hour.  That's also listed in
22  my report.
23    Q.  And it sounds like you do quite a bit of
24  expert work.  I mean, I think you've listed
25  approximately six or seven cases just this year where

21

1  you were serving as an expert; is that correct?
2    A.  I'm not sure of the count this year; but this
3  year was a much increased workload compared to the past,
4  for sure.  So over 25 years, you know, I'm guesstimating
5  maybe 2 dozen cases.  It was an unusually -- unusually
6  large number of cases this year.
7    Q.  Do you know how much money you received in
8  expert witness fees in 2020?
9    A.  I don't have that figure in front of me.  I
10  could try to guesstimate.
11    Q.  What's your approximate estimate of the amount
12  of expert witness fees you received in 2020?
13    A.  I would guess that it's over $50,000.
14    Q.  Could it be over a hundred thousand dollars?
15    A.  I doubt it, but I haven't done my taxes yet,
16  so I haven't -- I haven't looked at it.
17    Q.  Okay.  And is this year busier than last year?
18    A.  Yes.  By far, this is the busiest year I ever
19  had.
20    Q.  And do you know how much you've charged in
21  expert witness fees in total this year, for 2021?
22    A.  Again, I could figure that out; but I don't
23  have that in front of me.  I haven't -- I wouldn't want
24  to hazard a guess.
25    Q.  Do you know how much you've charged in this

22

1 case, in particular, so far?
2      A.   Again, I'd have to go and look; but I think I
3 charged a 7500-dollar retainer.  I may have, you know,
4 expended extra hours and then I would have charged a bit
5 more; but I'm guessing.  And, again, I'd have to go back
6 and look.  I didn't prepare financial data here for this
7 deposition, but I would think it's under $10,000.
8      Q.   You charge $5,000 -- according to your report,
9 you charge $5,000 per day for deposition and trial
10 testimony?
11     A.   Correct.
12     Q.   Okay.  I'd like to start with Section II of
13 your report, called Type of Testimony.  In this you
14 talk -- in this section you refer to social framework
15 testimony; and you use quite a number of terms,
16 including stereotype, bias, and discrimination.  Can you
17 please define what you mean by stereotype?
18     A.   So by stereotypes -- and just to preface this,
19 I'm giving definitions that are kind of the common
20 understanding in my field.  So stereotypes would be
21 traits that people associate with a specific social
22 category.
23     Q.   And am I correct in understanding that those
24 traits may be accurate, or they may be inaccurate?
25     A.   Stereotypes can certainly have, you know,

23

1 differing degrees of accuracy.
2      Q.   What do you mean by bias?
3      A.   So bias would be leanings toward more or less
4 favorable kinds of impressions or actions toward
5 individuals based on their social category membership.
6      Q.   And when you use the word bias, does that
7 include unconscious bias?
8      A.   Well, there's certainly different kinds of
9 categories that we could talk about of bias.  In my
10 field we do talk about explicit versus implicit bias
11 would be more the terms that might correspond with what
12 you're talking about.
13     Q.   So when you -- so when you use the term bias
14 in your report, are you including both explicit and
15 implicit bias when you use that term?
16     A.   Bias would be an overall umbrella term.
17     Q.   So is the answer "yes"?
18     A.   That would be yes, it could be one or the
19 other.
20     Q.   Or it could be both?
21     A.   Yeah, sorry.  I was about to finish.  Or it
22 could be both.
23     Q.   Sorry.  I didn't mean to interrupt you.
24     A.   No, no, that's fine.
25     Q.   In your report do you distinguish -- I don't

24

1 recall you generally distinguishing between explicit and
2 implicit bias in your report.  Am I correct in
3 understanding that when you generally use the word bias
4 in your report, you are not distinguishing between
5 explicit and implicit bias?
6      A.   I cannot recall making those distinctions.
7 I'd have to go through my report with a fine-tooth comb,
8 but I believe that I did not introduce those
9 distinctions in the report.
10     Q.   You also introduce other types of biases or
11 other ways to categorize biases, and the explicit versus
12 implicit was one of those.  What are other types of ways
13 to categorize biases?
14     A.   Actually, I didn't really have anything in
15 mind when I said that.  Sorry.  You know, implicit
16 versus explicit is a -- you know, is a -- that's what's
17 generally talked about and researched in my field.  I
18 don't have anything off the top of my head that I can
19 think of of other kinds of categories of bias or some
20 other kind of distinction in mind.
21     Q.   What do you mean when you use the word
22 discrimination in your report?
23     A.   Discrimination refers to treating people
24 differently based on their social category memberships.
25     Q.   When you use that social category or

25

1 membership term, can you please explain what that means?
2      A.   So we categorize -- people categorize others
3 on a whole variety of dimensions.  Things like gender is
4 a category that people very frequently, commonly put
5 people in, put other people into.  You could talk
6 about things like ethnicity or race.  Social class could
7 be used as a category.  So, really, those -- anything
8 that -- that distinguish people and put them into groups
9 that are perceived to be somewhat discreet.  That is
10 different kinds of groups can be used as a basis of
11 categorization.
12     Q.   And I believe you, also, in your report use
13 the word prejudice.  What does prejudice mean to you?
14     A.   Well, more commonly in my field prejudice is
15 generally associated with the differential emotions
16 towards different groups.  That's how it would be
17 commonly used.  Again, it's kind of an umbrella term.
18     Q.   Okay.  So does prejudice incorporate a concept
19 of intentional or conscious feelings about a particular
20 group?
21     A.   So, you know, first off, that term
22 intentional that, I think, has a lot of legal meanings
23 and may have different interpretations.  I think intent
24 is a concept that's used very commonly in legal
25 language; although, again, I want to put the caveat out

26

1  there that I am not a lawyer.  So, normally, intent
2  isn't exactly the way that people in my field tend to
3  put this.  And when we talk about implicit bias, we're
4  talking more about whether people are aware of their
5  motivations and aware of the mental processes that
6  might, for example, lead them to treat people
7  differently based on their category memberships.
8      Q.  So how does that -- how does that implicit
9  bias or un- -- being unaware affect discrimination?
10         (Simultaneous speakers.)
11     A.  All right.  So I --
12     Q.  Go ahead.  I'm sorry.
13     A.  Oh, I'm sorry.  Sorry.  Go ahead.  No, finish,
14  please.
15     Q.  No, go ahead.
16     A.  All right.  So you're asking me sort of --
17  kind of an example of implicit bias?  Is that what
18  you're asking me?
19     Q.  No.  I'm trying -- my apologies.  I'm trying
20  to understand the link between implicit bias and
21  discrimination.  So let me ask you this question:  Can
22  implicit bias lead to discrimination as you define that
23  term?
24     A.  Yes.
25     Q.  And implicit bias, meaning a bias that someone

27

1  is not even aware they have, can lead to differential
2  treatment as, i.e., discrimination based on a membership
3  in a social category as you define it?
4      A.  So the way that we distinguish between
5  explicit and implicit bias concerns methodologies where
6  I don't think we can't pin down that the person is
7  completely unaware of their bias because, with explicit
8  bias, you're asking them the question outright; and
9  people have a lot of motives not necessarily to tell
10  you -- you know, to reveal that they -- that they have a
11  bias.  So there are social desirability concerns when
12  you ask somebody directly about biases toward different
13  groups.  The tendency is to deny that.
14         So implicit bias research kind of
15  developed as a way to bypass those social desirability
16  tendencies by creating measures where people -- people's
17  responses aren't as deliberately controlled, that is,
18  they can't as easily suppress biases that they may have.
19  So the question of whether they're aware of that
20  implicit bias is a very tricky question that I think we
21  can't completely pin down.
22     Q.  So when you use the word discrimination, you
23  are not using that word to mean discrimination based on
24  a bias of which someone is necessarily even aware of; is
25  that correct?

28

1      A.  Yeah, we should -- that was a convoluted
2  question to me.
3      Q.  I'll ask it a different way.
4      A.  Yeah, yeah, yeah.
5      Q.  Does a person have to be aware of their bias
6  to engage in discrimination on the basis of that
7  particular social category?
8      A.  Theoretically, there's the possibility that
9  they don't have to be.  Can we prove that they're
10  completely unaware?  That's -- that's not -- you know,
11  the research doesn't necessarily show that people are
12  completely unaware of their biases.
13     Q.  Can you -- do you prove that they're aware
14  when you use the word discrimination?  Do you -- is that
15  first -- is proving that they're aware of their bias a
16  condition upon using the word discrimination?
17     A.  Overall, I would say no.
18     Q.  Okay.  So -- and is it true that people have
19  biases that they are not aware of?
20     A.  Theoretically, that's possible.  What I'm
21  saying is proving that that's true is really quite
22  tricky or impossible because, when you're trying
23  to assess whether they're aware, that relies on them
24  reporting their awareness; and there are well-known
25  biases in reporting that awareness.

29

1      Q.  But you can -- so put in a different way, you
2  can -- social science has been able to identify biases
3  that affect behavior without being able to prove that
4  the individual is aware that they have the bias?
5      A.  Well, so there is research, for example, where
6  people use what is called a bogus pipeline, basically,
7  convince people that you have a lie detector sort of
8  arrangement, where if they don't tell the truth, they're
9  going to be exposed.  And what you typically find in
10  those circumstances is that people will admit to biases
11  more readily; but, you know, in research that doesn't do
12  that -- and that's not -- you know, that's a
13  labor-intensive method that not everybody employs.  In
14  that research that does not use that kind of
15  methodology, we can't tell for sure the degree of
16  awareness or lack of awareness that a person might have.
17         So, theoretically, yes.  Theoretically, a
18  person might not be aware of their tendency to treat
19  people differently or they may not acknowledge it to
20  themselves, which is maybe slightly different.  They may
21  be not acknowledging it deliberately to other people
22  because they don't want to be -- you know, they don't
23  want to see themselves as biased; and they don't want
24  other people to see themselves as biased.  So there can
25  be kind of a suppression of that when you ask people

Peter Glick - 11/5/2021

30

1  about it.
2          So, you know, what I'm saying is:  We
3  can't prove lack of awareness.  Okay?  We can show that
4  people who deny that they're being discriminatory and
5  who claim to have very strong motives to be non-
6  discriminatory, we can demonstrate that those people
7  may, nevertheless, discriminate; but we don't know their
8  degree of awareness.
9      Q.  And so in your report when you use the words
10  bias and discrimination, I presume that you are not
11  using those terms to presume that the person is
12  necessarily even aware that they have those biases or
13  are engaging in what you call discrimination?
14      A.  I guess the way I would put it is in my report
15  I'm not making claims of people's degree of awareness of
16  their biases.
17      Q.  And just to be clear, when you use the word
18  bias, you're not making any claim that that person is
19  aware of the bias?
20          MR. SCHMIDT:  Objection, form.
21      A.  I'm not making any claim about people's
22  awareness of their biases.
23      Q.  (BY MR. GIBSON)  And you are not necessarily
24  making a claim that the decision based on that bias is
25  driven by an intent or -- to discriminate against that

31

1  particular group?
2      A.  Well, again, I mean, people reporting on
3  intent is very tricky in research because people,
4  especially in the context of a legal case, are unlikely
5  to say:  Yes, I intentionally discriminated, so.  But
6  even in an -- you know, in an experiment or research
7  where you ask them, people are commonly suppressing
8  intent to discriminate.  So, you know, I'm not making
9  claims about people's awareness of their intent to
10  discriminate.
11      Q.  Are you making claims about their intent to
12  discriminate?
13      A.  I think I said no to that question.
14      Q.  I just want to make sure.
15      A.  Yeah.
16      Q.  So you're not -- you're not -- when you use
17  the word discrimination, you are not making -- you are
18  not including in that definition any -- you're not
19  presuming or requiring that there be an intent to
20  discriminate when you use the word discriminate?
21          MR. SCHMIDT:  Objection, form.
22      A.  Could you just repeat that?
23      Q.  (BY MR. GIBSON)  When you use the word
24  discriminate or discrimination in your report, you are
25  not including a requirement that the person you're

32

1  describing as discriminating has an intent to
2  discriminate?
3      A.  I'm not requiring that the person will report
4  that they have an intent to discriminate.  I'm not
5  requiring that they are necessarily thinking that they
6  are discriminating.
7      Q.  How would you describe animus?  Are you
8  familiar with the term animus?
9      A.  Animus.  Is that -- are you asking me from a
10  legal perspective, or are you asking me from a
11  psychological perspective?
12      Q.  I'm asking you from a -- your understanding as
13  an expert in this case.  I'm not asking you for a legal
14  opinion.  I'm asking you:  What do you -- what do you
15  understand that word to mean --
16      A.  Well, it's not --
17      Q.  -- in the context of bias and discrimination?
18      A.  Right.  Okay.  Well, that specific term is not
19  commonly used in my area; but my understanding of -- I
20  can give you my dictionary definition of the term animus
21  as far as I understand it, which would be hostility or
22  antipathy toward -- in the context of discrimination,
23  hostility or antipathy toward a group and members of
24  that group by virtue of their membership.
25      Q.  And, again, just to make sure I'm clear, your

33

1  use of the word discrimination in your report does not
2  require that the actions be motivated by hostility or
3  antipathy to that group; is that correct?
4          MR. SCHMIDT:  Objection, form.
5      A.  So, more broadly, discrimination can take
6  place in the absence of -- of, you know, overt animus or
7  antipathy.  So that is -- that is a kind of
8  discrimination that can occur.
9      Q.  (BY MR. GIBSON)  And am I correct that your
10  report does not distinguish -- when it uses the word
11  discrimination, it does not distinguish between
12  discrimination that is premised upon overt hostility or
13  antipathy versus discrimination that may be based on an
14  implicit bias?
15      A.  Yeah.  So I think the answer to that is "yes."
16  I'm not making my -- say, discrimination more generally.
17  It could include both of those things.  You know, so
18  there's a variety of things that could be included under
19  that umbrella term that lead to unfair discriminatory
20  treatment toward people because of a group membership.
21      Q.  Okay.  You, also, in your report at various
22  points describe how bias and discrimination are very
23  context specific.  What do you mean by that?
24      A.  So what I mean by that is that -- that,
25  really, there are circumstances that are more likely to

34

1 promote the possibility of bias that we know from the
2 research that under certain circumstances people will
3 engage in bias more readily. So imagine a person who
4 does have a bias, has a stereotype that leads to bias or
5 discrimination or can lead to bias or discrimination.
6 That person, under certain circumstances, may not, you
7 know, allow that bias to affect their, say, evaluation
8 of another person.
9         So some circumstances permit bias to
10 occur more readily. Some circumstances, you know,
11 actively kind of encourage the expression of bias.
12 Other circumstances inhibit or mitigate the likelihood
13 of bias, and we know this from the research.
14        So it's -- I mean, you can think of an
15 extreme case where somebody is so -- you know, so
16 enamored of a hateful ideology that they're always going
17 to express their bias no matter what cost, no matter
18 what situation. That's not the typical kind of ways in
19 which bias gets expressed. That's not a typical kind of
20 case.
21    Q.   Does cultural context matter with respect to
22 whether or not biases may lead to discriminatory
23 decisions?
24        MR. SCHMIDT: Objection, form.
25    A.   That's an extremely broad statement.

35

1    Q.   (BY MR. GIBSON) Question. Question, not a
2 statement.
3    A.   Oh, okay. An extremely broad, broad question.
4 You know, at a very broad level, cultural context
5 certainly can matter; but I'm not sure exactly what you
6 have in mind or exactly what you mean by cultural
7 context. So I'm a little wary of this question unless I
8 understand a little more in detail what you're -- what
9 you're getting at as an example.
10    Q.   Sure. Well, let's start by talking about
11 location. Does, for instance, cultural context in
12 Saudi Arabia matter relative to the cultural context in
13 the United States as to whether bias against, oh, let's
14 say on the basis of sex may be expressed by a particular
15 individual?
16    A.   Absolutely, perceived social norms will, you
17 know, affect the likelihood of expression of bias;
18 but what I want to add to this is that what happens when
19 people perceive the cultural norms to be prohibiting the
20 expression of prejudice is that people will seize on any
21 other reasons or excuses that seem non-prejudicial to
22 express their prejudices.
23        So with all of these things, when I say
24 some factor matters, it's not the only factor; and it
25 also can interact with other things going on in a

36

1 situation. So to say that, you know, I wouldn't make an
2 absolute statement, for instance, that, oh, in a culture
3 that suggests prejudice and bias is a bad thing, that
4 nobody is going to act on a bias and discriminate.
5 That's not true. All right? It means that
6 discrimination becomes more subtle. It becomes more
7 covert. It becomes more expressed in situations where
8 people have a sense that they can deny that they have
9 discriminatory motives. So that's really what I mean by
10 it's highly contextual. It's complicated.
11    Q.   It sounds like you were referring to a
12 particular individual, meaning it's an individual who
13 has a bias in one -- if they're placed in one
14 environment may express that bias more overtly versus if
15 they're placed in a different environment, they may
16 express that bias more covertly?
17    A.   That's a good example, yes. That's what I was
18 getting at as an example.
19    Q.   Is it also true the context itself can affect
20 the research such that whether or -- like, is it
21 important that the research to determine whether or not
22 a particular bias is affecting a particular situation,
23 such as a workplace, that the research is context
24 specific to the relevant context, meaning, does research
25 about workplaces in oil rigs in Saudi Arabia, about the

37

1 treatment of women on oil rigs in Saudi Arabia, does it
2 matter that that's on oil rigs in Saudi Arabia when
3 we're talking about whether that's relevant to white-
4 collar workers in New York City; or is it important that
5 the research be more closely aligned with white-collar
6 workers in New York City if you're going to make the
7 statement that the research applies to the specific
8 context in which you're seeking to apply it?
9    A.   Okay. I think I -- I get where you're going
10 with this and what you're trying to get at. And just --
11 so this, you know, requires that you really have a kind
12 of deeper level of understanding of how the field of
13 social psychology works. And so what we try to do
14 generally is to try to understand variables that -- that
15 influence these kinds of things. What are the kinds of
16 factors that influence people's tendency to discriminate
17 and understand that -- understand those as psychological
18 variables.
19        So I'll just -- I'm going to try to give
20 an example. So let's say that you're trying to
21 understand how forest fires work, right? You could
22 still study that process outside the context of a
23 forest. Let's say you're studying the role of oxygen in
24 fueling a fire, right? Oxygen is, you know, a factor
25 that plays into whether the fire is going to be

38

1  propagating itself or not, let's say.  All right?  I'm
2  not an expert in this area; but that's my understanding,
3  right?  So you could try to study that role in -- you
4  know, in a context that is outside of setting a forest
5  on fire, right?
6           And so those basic processes tend to
7  generalize two different situations.  So we understand
8  these contextual factors in terms of variables.
9           Let me give you another example that may
10  be -- might be more -- you know, more psychology-like.
11  For instance, research on obedience to authority
12  suggests that people are likely to go along with the
13  commands of an authority they see as legitimate
14  authority, right?  So we use variables like perceived
15  legitimacy.  In different cultures who's a perceived
16  legitimate authority may differ, right?
17           So, you know, a very famous study in
18  social psychology was the study by Milgram where he
19  looked at -- he created an authority.  A scientist was
20  the -- you know, the authority figure; and people
21  complied with the scientist's orders to seemingly
22  administer extremely painful shocks to another person in
23  a manner that people were quite surprised about how --
24  what percentage of people would actually obey this
25  authority figure.

39

1           If you try to replicate -- so the point
2  of that study is, right, as long as they perceive the
3  authority figure to be legitimate, people tended to
4  comply with the authority figure.  If you manipulated or
5  changed the perceived legitimacy of the authority, you
6  could reduce the degree of compliance with the
7  authority's commands.  This -- you know, you have to
8  study this in a specific, you know, way, right?
9           If you're going to make this an empirical
10  study, you've got to do something.  You've got to -- you
11  know, he could have used a different kind of authority,
12  like, it could have been police officers, right?  It
13  could have been different kinds of things, right?
14           But what we generally find is that when
15  we understand these kinds of basic variables and
16  processes, like perceived legitimacy, we can test
17  overarching principles about, for example, when bias is
18  likely to lead to discrimination; and these give us a
19  framework for understanding more broadly what -- you
20  know, what may be going on in the world.  So we
21  understand the things in terms of these processes and
22  variables that have a pretty good track record of
23  generalizing, that is, people are people, right; and
24  they're subject to certain kinds of psychological
25  principles.  Whether they're, you know, students in a

40

1  laboratory or whether they're people who are operating
2  in business, they still are exposed, for instance, to
3  similar gender stereotypes in the culture, right?
4           So when we understand this more kind of
5  basic principles kind of level, you can make some
6  generalizations about what happens in different
7  situations.  I could give you another example, but I
8  feel like I've been going on for a long time.
9      Q.  And I'm trying not to interrupt.
10           Let me ask a separate question.  Based on
11  reviewing some of the research that you cited in your
12  report, it appears that attitudes and behaviors towards
13  women in the workplace have changed over time.  Would
14  you agree with that statement?
15      A.  Again, that's a very broad, general statement,
16  so --
17      Q.  It is.  And I'm not -- I'm not asking you to
18  be specific.  I'm not asking you to agree to every
19  single thing has changed.  I'm asking:  Have there been
20  changes in the social science re- -- what the social
21  science research shows regarding the treatment of women
22  in the workplace over time?
23      A.  There have been changes; and there have been
24  things that have not changed, yes.
25      Q.  Okay.  Do you think it's important that if

41

1  we're trying to apply research to current fact
2  scenarios, that that research be -- it would be
3  preferable that that research be closer in time to the
4  current state of affairs, rather than a long time ago,
5  particularly with respect to the treatment of women in
6  the workplace?
7      A.  I'd say it's generally preferable that we have
8  up-to-date research and -- you know, but there are
9  things in social psychology that have certainly held up
10  over the long run.  So there's some since in which, you
11  know, some basic processes tend to remain similar over
12  time.
13      Q.  And, similarly, are there differences -- does
14  social science show differences in the way in which
15  women are treated in the workplace in different
16  geographies across the world?
17      A.  Well, again, yes, absolutely.  You know, there
18  are countries in the world where women are simply
19  directly forbidden, for instance, from participating in,
20  you know, certain aspects of work or -- or, you know,
21  strongly and overtly discouraged.  So -- and then there
22  are other places in the world where women are much more
23  likely to -- to be participating in the workforce.
24      Q.  And would you, again, agree that, in general,
25  if you're trying to apply social science, particularly

42

1 regarding the treatment of women in the workplace, to a
2 particular fact scenario, to understand what's going on
3 in a particular fact scenario, that it would be
4 preferable to have social science that is more closely
5 aligned with the specific fact scenario that is being
6 assessed, such as a workplace in the United States --
7 social science based on a workplace in the United States
8 versus social science based on a workplace in, let's
9 say, China?
10       A.   Well, again, broadly speaking, I'd say the
11 answer is yes.  But, again, I would add some caveats to
12 my answer that it really depends on what kind of
13 processes you're studying.  Well, yes, certainly how
14 applicable.  But, yes, certainly in those extremes that
15 you -- that you are citing, yeah, I'd say, broadly, yes.
16       Q.   And isn't it also true that social science
17 varies based on specific workplace environments,
18 particularly around the treatment of women in certain
19 workplace environments?  I think in particular you've
20 cited social science about -- in work environments where
21 women have traditionally not held a strong -- or been
22 well represented or have not held positions of
23 authority, that social science shows that they're
24 treated differently versus workplaces where they
25 traditionally have held -- been well represented and

43

1 held roles of leadership; is that correct?
2       A.   Yes, in certain ways, that's correct.
3       Q.   Okay.  And so would you agree that, in
4 general, if we're trying to look to social science to
5 provide relevant commentary on a particular -- what's
6 going on in a particular workplace, it would be better
7 to have social science research that's more closely
8 aligned with that type of workplace?
9       A.   Again, I would say, in general, that's
10 something that would be valuable; but depending on what
11 processes you're studying, that wouldn't necessarily
12 have to be the case.
13            THE WITNESS:  We've been going for about
14 an hour.  Can we just take a very quick break?
15            MR. GIBSON:  Yeah, we can.  We can take a
16 five-minute break.
17            THE WITNESS:  Sure.  Okay.  That would be
18 great.
19            THE VIDEOGRAPHER:  The time is 9:59 a.m.
20 We are off the record.
21            (Off the record from 9:59 to 10:08 a.m.)
22            THE VIDEOGRAPHER:  The time is 10:08 a.m.
23 We are back on the record.
24       Q    (BY MR. GIBSON)  Dr. Glick, I'd like to turn
25 to Section II of your report, called Type of Testimony.

44

1       A.   Where is my report?  Okay.  I'm sitting on it.
2 All right.  Yes.
3       Q.   So when you talk about social framework
4 testimony, what is social framework testimony?
5       A.   So my understanding -- and I'm, again, not a
6 lawyer, okay?  So I have some experience with providing
7 testimony and experience with, you know, dealing with
8 this in courts; but my understanding of social framework
9 testimony is that an expert can provide the scientific
10 framework, in my case, for findings in my field that
11 might be relevant and helpful to a jury to make their --
12 to inform their decisions in their decision-making
13 process.
14            My further understanding -- and this
15 varies from judge to judge, so I wish the rules were --
16 in the courts were completely clear and unambiguous and
17 consistent across all judges; but they're not.  But in
18 my experience, judges have generally allowed the expert
19 to talk about relevance to the case; and in my case,
20 I -- I stop short of providing any sort of a sense that
21 I can scientifically determine what happened in a
22 particular case for reasons that I could explain.
23       Q.   So let me make -- see if I understand.  So you
24 are -- your report provides, after -- well, starting
25 with Section IV, I believe it is, basically what I would

45

1 call a summary of various social science studies in
2 various groupings.  Would you agree with that?
3 Basically, you sort of do a summary of the studies?
4       A.   Well, right.  I -- what I do is I provide
5 information relevant to the case decision-makers based
6 upon the science that I am, you know, a contributor to,
7 but I'm also an expert in that I -- you know, so that
8 I'm providing that as a scientific background that, you
9 know, includes details, like we've been talking about,
10 about the kind of contexts in which discrimination is
11 more or less likely to occur, which may be relevant to,
12 you know, informing their decision-making process.
13       Q.   And then you provide testimony regarding the
14 application of that science to the specific facts of
15 this case that's described in the section titled
16 Application to the Case in your report; is that correct?
17       A.   Correct.  And that's where there's kind of
18 a -- you know, there's separate sections for a reason,
19 because the scientific section is, you know, really
20 talking about the research, which has a known error rate
21 and things like that.  The application to the case is
22 suggesting avenues for the case decision-makers to think
23 about.
24       Q.   And you say on page 6 of your report that,
25 "Social framework testimony aims to inform decision-

46

1  makers about relevant, scientifically validated
2  principles.  This is not the same as performing
3  diagnostic tests for individuals or organizations named
4  in a legal case."
5      A.  Correct.
6      Q.  To be clear, your report does not purport to
7  provide scientific analysis of the facts of this case;
8  is that correct?
9      A.  Well, I wouldn't put it that way, no.  I would
10  say that the Application to the Case section is informed
11  by expertise in the scientific framework.  So that
12  expertise in the scientific framework is informative in
13  identifying areas where behavior kind of meshes with or
14  potentially matches the kind of pattern you would expect
15  if certain kinds of bias were occurring.  It also
16  identifies contextual factors that, you know, might
17  mitigate or make bias more likely.
18      So it's based on the scientific
19  framework, but I want to make clear the distinction
20  that, in the application to the case, you're not
21  conducting a study specifically on the organization or
22  the people involved, which would, I think, be an undue
23  burden and also problematic from a scientific
24  perspective; but instead, you're using the scientific
25  framework and expertise to identify these kinds of

47

1  factors that are, you know, potentially involved in the
2  case.
3      Q.  You do not apply a scientifically valid
4  methodology to provide the opinions that you provide in
5  the section called Application to the Case; is that
6  correct?
7      A.  Well, again, my opinions are informed by --
8      Q.  That wasn't my question.  I'm not asking -- we
9  can all agree that your opinions -- my guess -- well,
10  let me ask you this question:  Do you have any opinions
11  about discrimination in the workplace that are not
12  informed by your background?  Can you -- can you cast
13  off your scientific background when you -- cast that off
14  when you provide opinions about discrimination in the
15  workplace?
16      A.  I don't think so, no.
17      Q.  Right.  So every opinion that you provide
18  about discrimination in the workplace is informed by the
19  fact that you're a scien- -- a social scientist?
20      A.  It's informed by my understanding of research
21  with a known error rate and all that, yes.
22      Q.  Right.  So we -- we all understand that.  My
23  question is:  Did you conduct any scientific study of
24  the facts of this case to come to the opinions that you
25  provide in the section called Application to this Case?

48

1      A.  I am very clear in my report that I am not
2  conducting studies on the organization, University of
3  Texas, or the specific individuals involved and,
4  therefore, cannot come to a scientific conclusion about
5  whether or not discrimination occurred in this case.
6  And I'm just very careful about that and very honest
7  about that.
8      Q.  You do provide opinions that the facts of this
9  case are consistent with discrimination, don't you?
10      A.  I point out where the -- there are, for
11  instance, contextual factors that will make
12  discrimination more or less likely; and I can talk
13  about specific examples in this case if you like.  And
14  I -- and I point out where, based on the research, we'd
15  expect a certain pattern of kinds of judgments and
16  some -- and that, you know, seem to match with -- match
17  with the -- some of the facts of the case or some of the
18  testimony in the case.
19      So it's really kind of a -- I'm pointing
20  out what patterns we would expect based on the research,
21  when would discrimination be more or less likely to
22  occur, which form would it be more or less likely to
23  take, and then point out areas for the jury to consider
24  without telling them -- I'm, again, very explicit that
25  I'm not ultimately making the conclusion.  They need to

49

1  make a legal judgment.  I can't make a scientific
2  judgment that says, you know, that, with a certain
3  degree of probability, that discrimination did or did
4  not occur.
5      Q.  For instance, you say, "The Dean's decision-
6  making about Dr. Nikolova is consistent with bias
7  towards pregnant women, mothers, and workplace
8  accommodation policy use."  That's on page 57 if you
9  would like to refer to it.
10      A.  Yeah, I recall that.  That's correct.
11      Q.  So you are making a statement that the Dean's
12  decision-making is consistent with bias towards pregnant
13  women?
14      A.  Yeah, I'm making a statement that if there
15  were bias towards --
16      Q.  I'm sorry.  That's not the words -- please
17  don't restate what you said.
18      A.  Okay.
19      Q.  You didn't --
20      (Simultaneous speakers.)
21      Q.  You said, "The Dean's decision-making about
22  Dr. Nikolova is consistent."
23      A.  Yeah.  Yes, yes.  I'm not denying anything.
24      Q.  Great.  Great.
25      A.  I stand by that statement.  I'm just

50

1  explaining to you, you know, how I conceive of that
2  statement; and it's in the context of saying that this
3  is not a scientifically -- this is not a conclusion that
4  has a specific probability value to it and that the
5  ultimate decision about whether it was, indeed,
6  discrimination is up to the case decision-makers.
7       Q.  Is there any scientific methodology that you
8  used that's supported by a peer-accepted and peer-
9  reviewed methodology that allows you to say that
10  Dr. Nikolova's de- -- I'm sorry -- the Dean's decision-
11  making about Dr. Nikolova is consistent with bias toward
12  pregnant women, mothers, and workplace accommodation
13  policy use?
14          MR. SCHMIDT:  Objection, form.
15       A.  Yeah, could you repeat or restate that?
16       Q.  (BY MR. GIBSON)  Sure.  Is there a scientific
17  theory or technique that is generally accepted in the
18  scientific community that supports the statement that
19  says, "The Dean's decision-making about Dr. Nikolova is
20  consistent with bias toward pregnant women, mothers, and
21  workplace accommodation policy use"?
22       A.  Again, if you're asking if I conducted a
23  scientific study on the organization that could draw
24  that conclusion to a scientific certainty, the answer is
25  "no."

51

1       Q.  Are there any peer-reviewed articles that --
2  where researchers engage in the type of statements about
3  an individual case based on a re- -- the limited review
4  of evidence that you conducted in this case to make
5  statements about whether or not conduct is consistent
6  with bias?
7       A.  Okay.  So, here, I feel like what you're doing
8  is you're saying, you know, I submit the last
9  section of this report to a journal as though it's a
10  journal article that would be peer reviewed and would be
11  published.  No, that's not the intent of that section.
12  That's not the context of that section.  My
13  understanding is that this is a legal case; and that is
14  the rendering of an expert opinion, again, rooted in the
15  science of discrimination from somebody who's an expert
16  in it.
17          I believe that other colleagues who were
18  similarly rooted and understand this research would come
19  to similar conclusions, right?  But is this the same as
20  doing a scientific study?  No.  I'm very clear about
21  that.  I'm not trying to deny anything here.  I feel
22  like you're trying to frame that question in a way that,
23  you know -- that makes it sound worse or something like
24  that.  But, again, I was very straightforward about my
25  framing of this section and the context of this section.

52

1       Q.  And you mentioned that you have served as an
2  expert in the Gould v. Interface case.
3       A.  Correct.  Yes, I did.
4       Q.  In that report did you include a section in
5  that report called Application to the Case or a similar
6  type of section where you sought to apply social science
7  to the facts of that case?
8       A.  Yes, I did.
9       Q.  In your report you also talk about acceptance
10  of social framework testimony by Courts, again, in
11  Section II.  Are you seeking to provide an opinion
12  about -- a professional opinion, an expert opinion, on
13  the acceptance of social science framework testimony in
14  legal cases?
15       A.  Again, I'll restate that I am not a lawyer.
16  Okay?  So --
17       Q.  That wasn't my question.
18       A.  All right.  That's my preface to my answer.
19  That wasn't my complete answer.  All right?  You said
20  you wouldn't interrupt me, so I wasn't done.
21          All right.  So -- oh, now, can you
22  restate the question because now I'm -- I'm losing the
23  question?
24       Q.  Are you providing -- your report makes
25  statements about the acceptance of social framework

53

1  testimony in legal cases by Courts.  Do you have -- are
2  you qualified to make that statement?
3       A.  The statement that I made about that is based
4  on my experience.  I've done, I don't know, maybe two
5  dozen cases.  My testimony, others have challenged --
6  you know, tried to get my testimony excluded.  The
7  opposing side has tried to get my testimony excluded;
8  and with the exception of the case that you're well
9  aware of that was a recent case, my testimony has not
10  been excluded.  And, in fact, in a federal court in
11  Boston the judge excluded other experts but denied the
12  motion to exclude me and specifically praised the way in
13  which I structured my report and drew my conclusions,
14  which is similar to the way I did it in this case.
15          And, you know, social framework testimony
16  has become a bone of contention, you know; and judges,
17  in my understanding -- I'm, again, not claiming to be an
18  expert in the legal treatment of this testimony.  My
19  understanding is that the rules have generally permitted
20  what I do, have even -- and in one case even praised
21  exactly how I do it; but the rules tend to shift from
22  judge to judge.  They seem to have a lot of discretion
23  to interpret those rules.
24          And so, yeah, I would love it if the
25  rules were so clear cut and the application of the rules

54

1   were so clear cut that, you know, I could -- I'd be
2   happy to -- to change the way I do these reports in
3   order to mesh with the rules that the Courts are playing
4   by; but that seems to shift from judge to judge. That's
5   my experience. That's my understanding. Do I -- I
6   don't claim to be, you know, a legal expert in social
7   framework testimony or how -- how much discretion judges
8   have to rule on that.
9       Q.   Then why did you include opinions to that
10  effect in your report if you don't claim to be an expert
11  on that topic?
12      A.   I'm providing context based on my experiences;
13  and based on my experiences, I've never been excluded.
14  And I wrote this report before this recent case in which
15  that finally happened, right?  So, you know, this is my
16  understanding.  I'm not claiming this to be some sort
17  of -- you know, this is my understanding of the
18  situation based on my experience.
19      Q.   Have you written a report since the decision
20  in Mullenix?
21      A.   No, I have not.
22      Q.   Will you need to -- when you do, will -- will
23  you include that in your report as a -- so that it
24  includes all relevant data regarding whether or not your
25  testimony is admissible?

55

1       A.   Oh, I'm definitely going to take that into
2   account.  I already -- there were two cases for which I
3   have not yet written a report and I contacted the
4   lawyers and I said, "You know, I want you to know about
5   this.  You know, here's my understanding of this ruling;
6   and this may change how -- how I structure reports based
7   on" -- you know; but, again, I'm not a lawyer.  So
8   relying on the -- the judgment of lawyers, one lawyer
9   told me:  Well, what a -- what a judge in Texas decides
10  isn't going to affect what a judge in their state
11  decides, even though they're both in federal court.
12          So, you know, I'm definitely being up
13  front about this; and I even e-mailed this decision to
14  cases that -- you know, that I'd already written a
15  report for but, you know, have not, to my knowledge, yet
16  been resolved because I want to be very up front and
17  open about this.  And I would prefer to play within
18  whatever the rules the Courts are playing by; and you
19  know, unfortunately, that seems to be a little bit of
20  shifting sand, as far as I can tell.  So, you know, it's
21  hard to know exactly what to do.
22      Q.   Why didn't you cite Wal-Mart v. Dukes in your
23  expert report?
24      A.   Wal-Mart v. Dukes was a class action suit, and
25  that's a substantially different kind of case.

56

1       Q.   You understand that the -- this Court, the
2   Western District of Texas, in the decision regarding
3   your report in this case did not find it sufficiently
4   different to find it unimportant?
5           MR. SCHMIDT:  Objection, form.
6       A.   Look, again, you know, these are legal
7   arguments, right?
8       Q   (BY MR. GIBSON)  The reason I'm asking about
9   them is because you make legal arguments in your report.
10  So I understand you keep saying they're legal arguments,
11  but your report that I'm looking at makes legal
12  arguments about admissibility of this testimony.  So you
13  can keep saying it's legal arguments; but if you don't
14  want me to ask you questions about legal arguments, I
15  would suggest you not put legal arguments in your
16  report.  Okay?
17          So I'm going to keep asking you these
18  questions.  You can keep qualifying it, but my question
19  is:  Why did you ignore Wal-Mart v. Dukes that
20  specifically talks about this kind of testimony; and why
21  did you also ignore the Monahan argument which
22  specifically criticizes the exact methodology that you
23  employ in this case?
24          MR. SCHMIDT:  Objection, form.
25      A.   Okay.  So, first off, I just want to say that

57

1   I don't feel like I'm making legal arguments.  I'm
2   rendering my understanding of how the Courts have
3   generally acted.  This is my understanding, my
4   experience.  This is not the -- you know, this is --
5   this is my understanding.  I'm explaining the rules I'm
6   trying to abide by as I understand them.
7           Again, my understanding is that judges
8   have a lot of discretion in what they decide is
9   admissible or not as far as expert testimony.  The case
10  that you bring up, Wal-Mart v. Dukes, was a class action
11  suit; and in that kind of case, if you're talking about
12  discrimination against, for instance, women as a class
13  in a giant corporation, there will be potentially data
14  available to do the kind of study that -- that might
15  render -- you know, give scientific -- you know, use a
16  scientific methodology.  All right?
17          So I'm just giving my understanding, my
18  experience.  I do understand that judges have a lot of
19  discretion, that some, you know, admit this kind of
20  testimony and some don't.  I, again, wish that that
21  wasn't the case, that there were really clear-cut kind
22  of application of the rules so that I would have more
23  certainty that I wouldn't be excluded.  I didn't like
24  the experience of being excluded, you know.  And in past
25  cases, in all of the past cases that I've done, I've

58

1 never been excluded. This sort of testimony has been
2 accepted. So in my experience, it's whatever, 1 out of
3 25; and it was a recent decision.
4       I am not claiming to have the expertise
5 to make this as a legal argument. As far as the
6 scholars, Monahan and Walker, they don't get to make the
7 rules. The Courts make the rules. The Courts, in my
8 experience, have generally accepted this kind of
9 testimony; and if a judge doesn't, there's not anything
10 I can really do about it.
11     Q. I would like to move to Section III of your
12 report.
13     A. Sure.
14     Q. Page 9.
15     A. Page -- okay. Yeah.
16     Q. I'll just -- is this a list -- this says this
17 is a list of the documents you reviewed in connection
18 with drafting this report; is that correct?
19     A. That is correct.
20     Q. How did -- how were these documents
21 identified, to your knowledge?
22     A. These documents were sent to me by
23 Mr. Schmidt.
24     Q. So these were documents provided to you by
25 Plaintiff's Counsel?

59

1     A. Yes, that's usually how it works.
2     Q. Did you ask him for any additional documents
3 after he provided you these documents?
4     A. I asked him to provide me with all of the
5 relevant documents; and usually -- I can't recall
6 specifically -- but, usually, I make it clear that I
7 don't want to be surprised in a deposition by the -- you
8 know, the existence of other documents I should have
9 been aware of.
10     Q. This list does not include any deposition
11 testimony; is that correct?
12     A. I believe the depositions or most of those
13 depositions were not taken at the time that my report
14 was due. So there was, I guess, an agreed-upon
15 deadline, as far as I understand it, as to when my
16 report was due; and depositions had not yet been taken.
17     Q. Have you asked for them since that time?
18     A. Well, I -- I didn't -- I did discuss with, you
19 know, Mr. Schmidt whether I should be reviewing
20 depositions. The report is based on documents that were
21 available at the time of my report, and I very
22 specifically say in the report that I reserve the right
23 to alter opinions based on further information.
24     Q. And my question is: Have you received any
25 additional information since writing your report

60

1 regarding the facts of the case?
2     A. The additional information that I have
3 received, I did receive your Motion for Summary
4 Judgment, I believe, and then the response to that
5 motion.
6     Q. Okay. Did you -- did you look at the exhibits
7 to that?
8     A. I did not look at the exhibits to that. I did
9 not receive those exhibits.
10     Q. Okay. So you saw the motion but not the
11 actual evidence cited that was cited as part of the
12 motion?
13     A. I did not see the exhibits for those motions.
14     Q. Okay. Just to confirm, you have not reviewed
15 the deposition of Dean Wood in this case; is that
16 correct?
17     A. That's correct, I haven't reviewed her
18 deposition; but I, you know, have reviewed her
19 explanation of her decision-making or the Committee's --
20 Committee on Academic Freedom's notes on that.
21     Q. Are those -- so you reviewed notes taken by
22 other people about what she purportedly said to them?
23     A. Yes, I reviewed notes of what a Committee
24 contemporaneously documented about what Dean Wood said
25 to them. I also -- the Dean's assessment letter for

61

1 Dr. Nikolova. So there were some direct -- you know,
2 direct primary documents, I would call them, that --
3 that represent Dean Wood's justifications and opinion.
4     Q. Did you review any -- and, again, you didn't
5 review any other deposition testimony in this case,
6 correct?
7     A. Looking at the list, I can't remember any --
8 any specific depositions in review; but the list -- the
9 list should be complete about what I reviewed at the
10 time that the report was due that was available. And so
11 the list on page 9 of my report should be complete; and
12 then, since then, as I said, I saw the summary motion --
13 the Motion for Dismissal and the response.
14     Q. Did you review any policies and procedures
15 from the University of Texas? I don't see any listed
16 here.
17     A. Other than what's listed on the list, no.
18     Q. Okay. Did you review any data regarding
19 teacher evaluations and tenure and promotion from the
20 University of Texas regarding the treatment of faculty
21 members, including male versus female faculty members,
22 in those areas?
23     A. Again, I reviewed what was on the list. I
24 think there were definitely some things on the list that
25 discussed teaching evaluations; but -- but other than

62

1  that, no.
2     Q.  And as I recall in your report, you presume
3  certain facts stated in the Plaintiff's complaint are
4  true; or you spec- -- you know, you say, "Assuming these
5  facts are true," and then you make statements about
6  those facts.  Did you --
7     A.  I -- in my report, I'm careful, trying -- I
8  believe I tried not to make credibility judgments; and
9  that's another understanding that I have of the rules
10 for social framework testimony based on what the Courts
11 allow.  And my understanding is that I'm not supposed to
12 make credibility judgments, that is, who's -- if there's
13 a he said/she said, I'm not judging who -- who was more
14 accurate, right?  So in those cases, as I very carefully
15 state in my report, I say if the jury -- something like,
16 along the lines of:  If the jury finds this credible,
17 then, you know, here's something to consider, right?  So
18 I make that contingency very clear.  I'm trying to be
19 careful and fair in that kind of statement.
20    Q.  Do you conduct any scientific research where
21 you rely solely on data provided by the subject to
22 make -- to provide scientific determinations regarding
23 the treatment of that subject, meaning, would you ever
24 rely on the person who's alleging to be discriminated
25 against in science to give you the evidence -- solely

63

1  that person to give you evidence of whether or not they
2  have been discriminated against?
3        MR. SCHMIDT:  Objection, form.
4     A.  Okay.  So I think you're kind of -- I'm
5  worried that this question is kind of blending science
6  and legal determinations, right?
7     Q.  (BY MR. GIBSON)  I don't want to blend the
8  two.
9     A.  All right.
10    Q.  I want to focus on science.  Let's focus on
11 science.
12    A.  Right.  So, you know, there certainly might be
13 studies where -- I'm sure there are studies where people
14 look at the perceptions of individuals on whether
15 they're discriminated against; and then in -- you know,
16 when you would -- in your discussion section you would
17 make clear what the potential drawbacks to relying on
18 that as, you know, whether or not discrimination
19 occurred.
20        So you might be studying people's
21 perceptions.  That's a legitimate area of psychological
22 study.  And you might try to correlate those perceptions
23 with other indicators of whether there was
24 discrimination or not.  But, sure, that might happen in
25 a scientific study; but you would be very careful in

64

1  your discussion section to note the potential weaknesses
2  of this and caveats about what you can conclude from it.
3     Q.  Have you ever personally conducted science
4  where you make a determination of whether or not someone
5  is more or less likely to be subject to bias or
6  discrimination based solely on evidence provided by that
7  person?
8     A.  Not that I can think --
9     Q.  Okay.
10    A.  -- of offhand, no.
11    Q.  Can relying on evidence solely by a person who
12 claims to have been discriminated against of the alleged
13 discrimination introduce bias into a scientific study?
14        MR. SCHMIDT:  Objection, form.
15    A.  Again, I'm -- I'm having a hard time decoding
16 your question.
17    Q.  (BY MR. GIBSON)  Do you think it's -- do you
18 think that it's reflective of bias that you only
19 reviewed evidence that was specifically identified and
20 told to you that you should review by Plaintiff's
21 Counsel, who is an advocate for Plaintiff in this case?
22        MR. SCHMIDT:  Objection, form.
23    A.  Again, I asked for whatever would be relevant
24 to -- to making this case; and that's a pretty common --
25 that's commonly how things proceed.  And the -- I will

65

1  just point out that this -- you know, this evidence, the
2  things that I reviewed, include the -- you know, the
3  Budget Council's procedures and findings; the UT
4  committee who reviewed the decision-making, their
5  findings; includes Dean Wood's assessment.  So it's not
6  like there's only, you know, Dr. Nikolova's voice here.
7  This is -- you know, there are primary documents that
8  document the ways in which decisions were made.
9        And, furthermore, I do not make the
10 ultimate conclusion about whether discrimination
11 occurred or not.  So I feel like your question is kind
12 of presuming some things that I didn't do.
13    Q.  Well, you make opinions about whether or not
14 the actions of a dean is consistent with discrimination,
15 correct?
16    A.  I make -- I render opinions about whether
17 deans -- you know, the kinds of judgments Dean Wood
18 make -- made are more or less likely to -- to have -- to
19 be -- you know, to -- that discrimination would be more
20 or less likely on those kinds of judgments and also
21 whether the pattern of judgments made are consistent
22 with the research on, for instance, bias against mothers
23 or people who use leave policies for caretaking.  So
24 those are the kind of judgments I make.  Again, I don't
25 ultimately render the conclusion about whether

66

1 discrimination occurred.
2    Q.  That wasn't my question.
3        So you -- are you comfortable making --
4 rendering opinions about whether or not someone's
5 conduct is consistent with discrimination based solely
6 on being -- looking at evidence provided to you by the
7 Plaintiff's attorney?
8    A.  Well, again, if the -- if the information
9 covers the relevant decision-making processes and is --
10 includes primary documents, I'm comfortable with those.
11 I also very clearly state in my report that if there's
12 additional information, that -- that -- you know, that I
13 reserve the right to alter my judgment after carefully
14 considering it.  So if there's some specific sorts of
15 information that you would like me to review, I'd be
16 happy to review that; but I'm not going to make an
17 off-the-cuff, you know, determination.  I'd have to
18 weigh it with the rest of the information that I have.
19    Q.  Did you speak with Dr. Nikolova about this
20 case directly?  Have you ever spoken to her directly?
21    A.  No, I believe I have not.
22    Q.  Okay.  What is -- in some of your other
23 reports you use the phrase specific causation.  What do
24 you understand the words specific causation to mean?
25        MR. SCHMIDT:  Objection, form.

67

1    A.  My understanding of that is that in this kind
2 of legal framework that we've talked about, about social
3 framework testimony, specific causation would refer to
4 what -- you know, what -- specific causal conclusions
5 about what happened in the case.
6    Q.  (BY MR. GIBSON)  And is it general-- is it
7 possible or feasible to conduct a study to determine
8 whether discrimination occurred in a specific case to an
9 individual?
10    A.  After the fact, I think it's really impossible
11 to completely scientifically nail that down in the
12 context of a legal case; and so I just don't think
13 someone who claims they can do that really can do that.
14    Q.  And is one of the reasons it's very difficult
15 to rule out alternative explanations for behavior other
16 than discrimination or bias?
17    A.  I'm sorry.  Can you repeat that?
18    Q.  Sure.  Is one of the reasons it's difficult or
19 near impossible to do that in a scientific manner is
20 because it's difficult to rule out alternative
21 explanations for behaviors other than discrimination or
22 bias?
23    A.  Okay.  So -- so when you say -- the fact that
24 you can't conduct a study is what you're saying, right?
25 Okay.  So, as I explained, I think, very clearly and

68

1 carefully in my report, you know, when you're doing
2 scientific studies, you can, for instance, create
3 identical materials and randomly assign people to
4 different conditions and -- and see whether, you know, a
5 candidate who's labeled as female versus a candidate
6 who's labeled as male who has otherwise absolutely
7 identical information about them is, on average, treated
8 differently.  That's how we typically really causally
9 scientifically nail down whether discrimination occurs
10 or not.
11        And even in those circumstances, we can't
12 for sure identify specific individuals as having
13 discriminated or not because they're randomly assigned
14 to different conditions; but we can say that overall
15 there's a tendency for discrimination to occur or not
16 occur in these circumstances.  So we can't really do
17 that in an individual case.
18        And, of course, we talked about social
19 desirability biases.  I don't think if I interviewed
20 Dean Wood and said, "Did you intentionally
21 discriminate," or "Did you discriminate," that, you
22 know -- or if I provided her with identical materials
23 from a man versus a woman that she would, you know --
24 she wouldn't be likely to discriminate because she
25 would -- it would be clear that they were identical.

69

1 So, you know, you really can't completely nail that
2 down; and so that's why -- that's why I don't come to a
3 scientific conclusion in that section on the case.
4    Q.  In the Mullenix report you state the
5 following -- I'm just going to quote this -- "For
6 specific causation is explained below.  Social framework
7 experts often do not apply a scientific certainty
8 standard because it may not be possible or not feasible
9 to conduct a rigorous study to determine whether
10 discrimination occurred in a specific case to an
11 individual plaintiff.  In such cases experts cannot
12 testify with scientific certainty about whether
13 discrimination occurred."
14    A.  Right.
15    Q.  You continue -- do you agree with that
16 statement with respect to this case as well?
17    A.  Yes, I agree with that statement with respect
18 to this case.
19    Q.  Similarly, in Mullenix, you -- in your
20 Mullenix report you state, "Although I point out ways in
21 which general principles can be applied to the current
22 case and opine about where case facts are consistent
23 with the possibility of discrimination, I expressly note
24 that because alternative explanations cannot be ruled
25 out, my case opinions do not carry the weight of

70

1 scientific certainty."
2    A.  Right, yes.  And I think I was consistent with
3 that in the Nikolova report.
4    Q.  And you -- just again, you would agree that
5 that statement also applies to the Nikolova report?
6    A.  Yes.
7    Q.  And, finally, Mullenix at 49 you state,
8 "Because alternative explanations offered by defendant
9 to explain their actions cannot be ruled out
10 scientifically, case decision-makers must ultimately
11 decide whether they believe discrimination likely did or
12 did not occur."  Would you agree with that statement as
13 applied to this case as well?
14    A.  Yes, I would.
15    Q.  Okay.  Just to confirm, accordingly, can you
16 determine with a scientific certainty whether
17 discrimination occurred in this case?
18    A.  I think I already stated that; but no, I
19 cannot.
20    Q.  I would like to start -- go to page 10 of your
21 report.  This is where you provide what I'll call a
22 summary of scientific research on stereotyping and
23 discrimination.  Most of these studies -- are most of
24 these studies done in an experimental environment or in
25 a real-world environment?

71

1    A.  There's a mix.
2    Q.  What are -- what would you say most of them
3 are conduct- -- how most of them are conducted?
4    A.  I would have to go through and count.
5    Q.  Okay.
6    A.  So I wasn't keeping count.  I -- you know, so
7 I couldn't tell you right now.
8    Q.  On page 6 of your report, if I recall
9 correctly, you say -- let's see.  Where did I see this?
10        The second paragraph, about two-thirds of
11 the way down, you say, "Social scientific research on
12 stereotyping and discrimination normally involves
13 voluntary participants who receive assurances (which
14 they can rely on) that their responses are anonymous and
15 confidential."
16    A.  Yes.  Certainly in the context of, say, a
17 laboratory experiment, yeah.
18    Q.  And are these often -- experiments often
19 conducted using undergraduate students at universities
20 and colleges?
21    A.  They're certainly often conducted that way,
22 but they're also often conducted in more real-world
23 settings or with people who have -- increasingly with
24 samples that are obtained on the internet for getting
25 more diverse samples, more people who are employed, and

72

1 so on.
2    Q.  And some of the studies that you cite include
3 two different kinds of experiments within the same
4 article or publication, one of which would be what I'll
5 call a Lab A study that's, you know, sort of in what
6 I'll call a scenario.  It's not the real world, but it's
7 sort of a hypothetical scenario where undergraduates are
8 asked to do -- respond in some way.  And then they also
9 include what are called audit studies.  What's an audit
10 study?
11        MR. SCHMIDT:  Objection, form.
12    A.  An audit study would be to send out, for
13 example, resumes to employers to a -- you know, it's
14 often a large number of employers; and then vary,
15 through random assignment, whether you, for instance,
16 send the identical resume with a male name versus a
17 female name to see on some measure, like, what
18 percentage of people get called back or, you know, those
19 kinds of measures.  It's a -- it's an attempt to test
20 those things out in more of a, you know, business
21 setting.
22    Q.  (BY MR. GIBSON)  In addition, some of the
23 studies that you cite also look at actual data from
24 real-world situations, including universities, such as
25 student teacher evaluation data?

73

1    A.  Sure.  Some of them look at real-world
2 situations and they're not -- you know, sometimes
3 they're not necessarily experimental studies, that is,
4 not necessarily randomly assigned and so on.  And then
5 there's also studies that are in organizations, for
6 instance, looking at rates at which men and women
7 receive organizational rewards as compared to how
8 they're evaluated in performance.
9    Q.  Did you do any of those kind of studies here
10 in this case with respect to data from the University of
11 Texas, for instance?
12    A.  Again, I think I've already answered that
13 question.  I did not do that kind of study at the
14 University of Texas.  I think that would be a
15 prohibitive burden on the Plaintiff to perform that kind
16 of study, and it wouldn't ultimately resolve that
17 question of saying to a scientific certainty that the
18 Plaintiff herself was discriminated against.
19        So I think you're -- you're setting -- if
20 you're suggesting that that would be something that a
21 plaintiff should do, I think for an individual
22 plaintiff, that's -- that's -- that's asking -- that's
23 really placing undue burden on them from my perspective;
24 and, also, it's --
25    Q.  Is that your personal --

74

1    A. -- not ultimately going to resolve the issue
2  from a scientific perspective.
3    Q. Is that your personal opinion, or are you
4  offering that as an expert that that would provide an
5  undue burden on a plaintiff?
6    A. Well, as you -- as you noted, everything's
7  informed by my experience as -- you know, as a social
8  scientist. So I'm -- I'm not giving you a legal
9  opinion. That's certainly is "undue burden," I know,
10 has legal resonance. That would be for a judge to
11 decide.
12      My argument would be that: Look, to
13 demand that an individual plaintiff fund such a large-
14 scale study that isn't ultimately -- I mean, that could
15 establish that there's a pattern at the university;
16 but it ultimately is not going to establish with a
17 scientific certainty that this individual plaintiff was
18 discriminated against.
19      So I think I'm just pointing out that
20 there's kind of a disconnect here between that and then
21 saying with a scientific certainty that this particular
22 plaintiff was discriminated against.
23    Q. So wouldn't that evidence be more relevant
24 than evidence, say, about student teacher evaluations
25 from universities in the Netherlands?

75

1    A. Well, the research that I cite isn't confined
2  to the Netherlands, for one thing.
3    Q. I didn't say it was. I didn't say it was.
4  That wasn't my question. So if you could answer the
5  question instead of taking every question in a
6  defensive tone, we could just get through this faster.
7  I wasn't -- I didn't say all of your studies were from
8  the Netherlands. I'm asking -- I asked you a question.
9    A. I'm not trying to be defensive. I'm just
10 trying to -- to make sure that I'm not --
11    Q. You made a statement about the studies that
12 are cited in your report that have -- that is not what I
13 said in my question.
14    A. If you're asking would it be useful to have
15 data on how male and female professors are evaluated
16 within the Cockrell School, for instance, that would be
17 useful data.
18    Q. Did you ever request that data?
19    A. I did not request that data.
20    Q. Did you ever request data about the history
21 of promotion and tenure decisions within the Cockrell
22 School of Engineering or UT Austin in general?
23    A. Well, there was, you know, information about
24 that in the materials I received; and I -- and I cited
25 those and said, "Well, if -- you know, if that's found

76

1  to be credible and true, that provides a background --
2  background information."
3    Q. Again, did you ask for that information?
4    A. I did not ask for that information.
5    Q. Okay. I'd like to ask you about some of the
6  studies that you cite in your report. First, if you
7  could turn to page 11 of your report, in the first
8  paragraph, third line, you say, "Specifically, in 6
9  studies involving over 4,000 individuals that included
10 both supervisors' performance evaluations and ratings of
11 subordinates 'promotion potential,' even though women
12 were generally rated as performing better than men,
13 supervisors were more likely to rate men as having
14 higher promotion potential than women." Do you see
15 that?
16    A. Yes, I see that.
17    Q. Okay. In Footnote 20 you cite the Roth
18 publication, "A meta-analysis of gender group
19 differences for measures of job performance"?
20    A. Correct, yes.
21    Q. Great. Let's talk about the Roth study. It's
22 going to take me just a second to get that to you. Hold
23 on just a second.
24      I have to relabel things to make sure I
25 give them the proper exhibit numbers. Just a second.

77

1      (Exhibit 2 marked.)
2    Q. (BY MR. GIBSON) Okay. It should be in the
3  chat function now.
4      THE WITNESS: Hey, am I still with you
5  guys --
6      MR. GIBSON: Yes.
7      THE WITNESS: -- because my Zoom is
8  saying it's not responding? All right. I think it's
9  just --
10      MR. GIBSON: Yes, we can still hear you.
11      THE WITNESS: Okay. All right. I think
12 it was just having trouble doing both, opening the
13 document and -- okay. Let's see if that will open.
14    A. Yeah, I see it.
15    Q. (BY MR. GIBSON) Great. Does this appear to
16 be the study that you're referring to in Footnote 20?
17    A. It does appear to be that study.
18    Q. Great. Do you know the timeframe of the
19 studies that were cited -- well, first, what's a
20 meta-analysis?
21    A. Okay. A meta-analysis is a statistical
22 conglomeration of a lot of previous data. So you try
23 to identify, you know, out there in the research
24 literature among published studies and even potentially
25 among what seem to be high-quality non-published

78

1  studies, like in a dissertation, the kind of universe of
2  studies that might be relevant to a specific question
3  and then try to aggregate them together statistically to
4  try to estimate -- you know, to try to test a question
5  or multiple questions.
6      Q.  Okay.  Do you know the timeframe of the study
7  used in this report?
8      A.  Let's see.  I can't offhand tell you the
9  timeframe.  I think it took -- when was the study
10  published?  The study -- the data are, I'm sure, older
11  than exactly when the study was published.  It was
12  published in 2016; but the data, I believe, were from
13  decades of research.  That's not uncommon with a
14  meta-analysis.
15      Q.  Okay.  So do you think you can make -- so
16  would it surprise you to find out that some of the
17  studies cited in here are from the 1960s?
18      A.  I wouldn't be shocked, no.
19      Q.  Do you think that that affects the application
20  of this meta-analysis to current, present-day work
21  environments?
22      A.  Well, I'm trying to remember if in this
23  meta-analysis they looked at time of publication as a
24  variable because that would be kind of a typical thing
25  to do to see if the tendency had diminished or not; but

79

1  I'd have to go back because I'm not an encyclopedia.  I
2  can't remember for sure if they used the time of
3  publication as a moderating factor.
4      Q.  Okay.  Do you know -- and do you think it's
5  appropriate to use unpublished research in a
6  meta-analysis?
7      A.  Well, usually, the people who are conducting
8  the meta-analysis, which goes through peer review, the
9  bulk of the studies are usually published; but they also
10  try to -- get unpublished studies because, you know,
11  of concern that they're getting a really good sample.
12  And they try to, you know, look at indicators of quality
13  of the study.  So -- so that's not unusual at all for --
14  for authors to try to do that, but they usually have
15  criteria that they will impose to try to weed out
16  studies that they see as low in quality.
17      Q.  Do you -- do you think it's appropriate to --
18  do you think it matters what the context of the study
19  was in terms of the specific work environment that was
20  being examined?
21      A.  Well, again, that could be a moderating
22  variable that people might look at.  It really depends.
23  It really depends, you know.  For instance, as you
24  mentioned, we -- the research -- research tends to find
25  that in male-dominated occupations, discrimination is

80

1  more likely.  So that would be something that would be a
2  potential moderating factor to look at in -- in a
3  meta-analysis and to see if that -- you know, that shows
4  up in the -- in the study results --
5      Q.  Did you --
6      A.  -- if they even categorize that.
7      Q.  Did you determine whether or not any of those
8  additional analyses had been done in this study before
9  you relied upon it and using it in this case?
10      A.  Okay.  It's one of many studies that I cited.
11  I, again, can't -- don't have encyclopedic recall for
12  details of everything that I cited.  You know, this is
13  a meta-analysis published in a peer-reviewed good
14  journal.  So I -- I -- you know, I can't -- I reviewed
15  it.  I thought it was worth including.  I can't tell
16  you everything about the study in a -- kind of like you
17  pick something out of a specific page, whatever, I'm
18  happy to look at it; but I can't recall all the details
19  at this -- offhand, at this moment.
20      Q.  You rely on this study in reaching the
21  conclusions in this -- your opinions in this case; is
22  that correct?
23      A.  I rely on this as part of the framework, the
24  scientific framework, and not just this study.  You'll
25  see that immediately following, there is a study that,

81

1  arguably, is much better, larger, looking at actual
2  allocation of rewards rather than ratings of
3  promotability, a much larger sample, you know, right?
4  And -- and so when you -- you also look for whether
5  there's -- you know, these are both meta-analyses.
6  Those -- those are useful studies to cite.
7      Q.  In your statement about the Roth article, you
8  say that there's -- "in 6 studies involving over 4,000
9  individuals."  Can -- I don't understand what studies
10  you're citing to because in this meta-analysis, they
11  look at much more than six studies.
12      A.  Right, right, they did.
13      Q.  Can you --
14      A.  But only in six studies did they have both
15  performance evaluations and ratings of promotability.
16  So the number of studies in which they had ratings of
17  promotability was much lower than their overall sample.
18  So I didn't want to claim that in their overall sample
19  that's what they found because they needed to have those
20  measures included in the study.  This is part of the --
21  you know, the -- when you're doing a meta-analysis,
22  different studies look at different measures.  And so,
23  you know, this is -- this is really very common that
24  there might be a subset of studies where you could test
25  a question that aren't true for the bulk of studies.

82

1    Q.  And so which studies were those?  Can you --
2  well, first, before I get to there, which -- where in
3  the Roth article does it state the statement for which
4  you cite the article?  Can you please identify in the
5  Roth article where it says that in 6 -- in 6 studies
6  involving 4,000 individuals that included both of these
7  things?
8    A.  I would --
9       MR. SCHMIDT:  I'm going -- sorry,
10  Dr. Glick -- I would -- if you're -- if you're getting
11  into specifics of the article, I think it makes sense
12  for Dr. Glick to have the time to read and look at it.
13  So I just want to encourage that happening.
14       MR. GIBSON:  Literally -- he's literally
15  said a study says a specific thing.
16       MR. SCHMIDT:  Right, and you're asking
17  where in the article -- sorry.
18       MR. GIBSON:  Robert-- or, Bob, I'd think
19  he would have reviewed this before he made that
20  statement, so -- and that statement is a specific quote
21  from his -- his article -- from his report; and I'm
22  simply asking where in the study it says that.
23       MR. SCHMIDT:  And I'm saying that he
24  needs the time to look at the document.
25       MR. GIBSON:  Great.  We can take -- he

83

1  can do that on a break.  We'll come back to this, and he
2  can do that on a break.  I'll keep asking him questions,
3  though.
4    Q.  (BY MR. GIBSON)  Actually, let me -- let me
5  confirm, Dr. Glick, are you unable to iden- --
6  currently, without reviewing the Roth study, are you
7  unable to identify where in the study it states the
8  statement that you cite it for?
9    A.  As I stated, I don't have an encyclopedic
10  photographic memory to recall that; and this was written
11  months ago or more than months ago.  So I would have to
12  have time to review the study.  And this is what I was
13  going to say even before Mr. Schmidt intervened,
14  helpfully, to make the same point.  So, no, I do not
15  have encyclopedic recall.
16       If you want to give me sufficient time to
17  look through this long paper and figure that out, then I
18  could spend some time doing that.  I don't know if that
19  time counts against your deposition time, but I feel
20  like it would be fair if it did.
21    Q.  Well, or you can say that you are unable to
22  ident-- if your answer wants to be you're unable to
23  identify where in the report it makes this claim, you
24  can make that statement; and we can move on.
25    A.  Okay.  I --

84

1    Q.  If you would like time to review that, then
2  you can do that on a break and come back to it.
3    A.  Okay.
4    Q.  That happens often.  But I'm not going to
5  spend my deposition time sitting here with you looking
6  over a document that is a source, reported source, for a
7  statement in your report that you can't identify how
8  that state- -- reported source supports your statement
9  in your report.
10       MR. SCHMIDT:  Objection, form.
11    A.  I can't spontaneously at this moment identify
12  the spot in which they state that.
13    Q.  (BY MR. GIBSON)  Okay.  Do you know what six
14  studies they were referring to?  Does -- so -- this is
15  important; and you're rolling your eyes at me,
16  Dr. Glick.  But there are studies in this meta-analysis
17  that involve 4-H agents in Wisconsin from the 1960s.
18  There are -- there are unpublished studies that don't
19  even say what in the world they're about.  And so I'm
20  trying to understand.  You're making a statement that 6
21  studies involving 4,000 individuals showed something,
22  and I'm trying to understand what -- what studies you're
23  even talking about.  So that's --
24       MR. SCHMIDT:  Objection, form.
25    Q.  -- what I'm trying to get at.

85

1       You can take a break if you want to
2  come -- as I understand it now, you're unable to
3  identify what those studies are or where that is in this
4  article.  Am I correct that you are unable to identify
5  which six studies you're talking about from the
6  meta-analysis or where the article discusses this point;
7  is that correct?
8       MR. SCHMIDT:  Object to form.  Let me --
9  let me just talk, Dr. Glick.
10       I'm going to object to form.
11       And -- and, Darren, I know this is
12  important to you and I know you're taking it seriously;
13  but the tone and the aggressiveness, I think, is -- is
14  uncalled for.  And I just ask that you be conscious of
15  that.
16       MR. GIBSON:  I would -- I would agree
17  except I got eye rolls when I was literally asking him
18  about statements in his -- in his article, so.
19       MR. SCHMIDT:  I'm not trying to be
20  argumentative with you.
21       MR. GIBSON:  I would suggest the witness
22  also take it as seriously as I take it and I'm sure
23  everyone is taking this.
24       MR. SCHMIDT:  And I agree with that; but
25  I also -- the facts that you're stating, you're talking

Peter Glick - 11/5/2021

86

1  about different 4-H studies.  You're making various
2  assumptions that are not in evidence that I don't think
3  we can attest to.  In other words, I don't know what --
4  what -- you're making a lot of statements that Dr. Glick
5  would need the time to review this article to be able to
6  respond to.  So I just -- that's my objection and my --
7  and my comment.
8      A.  And to answer the question, at this moment,
9  without reviewing the study, I could not identify the
10  six studies that are being -- that were included, you
11  know, that had both promotability ratings and evaluation
12  performance reports.
13          I do just want to respond to the eye-
14  rolling thing.  My -- my -- I feel that you are being
15  belligerent and that you're being unreasonable, and
16  that's -- that's the reason for it.  I a-- I a-- I a--
17  I -- I don't know if I should apologize for the eye
18  rolling.  I'm just -- I'm just reacting to what I see as
19  kind of hostile, belligerent, and unreasonable demands
20  to immediately identify something in a very long article
21  that I reviewed months and months ago.
22      Q.  (BY MR. GIBSON)  And just to be clear, I
23  didn't immediately -- I didn't demand that you
24  immediately identify it.  I said if you want to take
25  time, I'm happy to do so.  We can come back to it.  I

87

1  still don't -- do you want to do that?
2      A.  Well, I guess if Mr. Schmidt thinks it's
3  important that I do it, then I would.  I -- I -- you
4  know...
5      Q.  I will give you the opportunity.  We'll come
6  back to this later; and if you want to supplement your
7  answers, you may do so.  I'm happy to do that.
8          I'm not being unreasonable.  I'm simply
9  asking for you to identify in an article how it supports
10  a state-- literally a quote that you've made in your
11  report, and I don't think that's unreasonable.  I don't
12  think it's unreasonable to ask you to explain how a
13  citation supports the statement for which you cite the
14  citation.
15          MR. SCHMIDT:  And I'm just going to
16  respond real quickly that I don't -- I don't -- Darren,
17  it's not an unreasonable question; but for him to do
18  that, it will take him time to review the article and to
19  find that information.  And if you'd like to spend the
20  time doing that, we will do that.  If you don't want to
21  do that, then we'll move on.
22          MR. GIBSON:  Great.  Thanks.  We can move
23  on.
24          MR. SCHMIDT:  If you're asking him if he
25  can recall it photographically right now and point to

88

1  the page and footnote number or what have you, I think
2  the testimony is he cannot do that at this moment.  If
3  you want to go further in it, we'll do that.
4          MR. GIBSON:  Great.
5      Q.  (BY MR. GIBSON)  If you could, go to the next
6  article, Footnote 21.
7      A.  Yes.
8      Q.  You said that that was a better meta-analysis
9  that you cited that involved more data and more
10  subjects; is that correct?
11      A.  I said that what it involved -- yes, I think
12  it -- I believe, from what I recall, that it -- that it
13  was certainly larger with respect to having both
14  performance evaluations and measures of organizational
15  rewards.  And in addition to having -- and an addition
16  thing -- additional thing I said was better was that
17  they looked at actual organizational rewards rather than
18  ratings of promotability.  So it's actual, you know,
19  actions, which is a nice feature of that meta-analysis.
20      Q.  Do you know if there were any geographic
21  limitations to this meta-analysis?
22      A.  Not that I can think of at the moment.  Again,
23  I'm not going to have encyclopedic recall for a
24  meta-analysis that reviewed however many studies with
25  tens of thousands, or even more, participants now.

89

1      Q.  Do you know if there's any industry
2  limitations in the meta-analysis?
3      A.  Not that I'm aware of.
4      Q.  And what about time limitations, do you know
5  if there were any time limitations in the meta-analysis?
6      A.  There's always time limitations.  I'm not sure
7  what you mean by that.  I mean --
8      Q.  Meaning limitations --
9          (Simultaneous speakers.)
10          MR. GIBSON:  I'm sorry.  I didn't mean to
11  up interrupt.  I apologize.
12      A.  Yeah, I'm just saying, I mean, if you mean by
13  publication year, I mean, obviously, this was published
14  in 2015.  So there's not going to be -- studies
15  conducted or published after 2015 aren't going to be
16  included if that's what you mean by time limitations.
17          (Exhibit 3 marked.)
18      Q.  (BY MR. GIBSON)  So I've added in footnote --
19  I'm sorry -- in the chat Exhibit Number 3.  If you can,
20  please open Exhibit Number 3, please.
21          THE WITNESS:  It's been more than an hour
22  now.  I was wondering if we could have a short break
23  before we go into this one.
24          MR. SCHMIDT:  I -- I agree.  I was going
25  to say the same thing.  Whatever -- if -- yeah, whatever

90

1 is a good time for you, Darren --
2          MR. GIBSON:  Fine with me.
3          MR. SCHMIDT:  -- but if we could take a
4 break at some point.
5          THE WITNESS:  Yeah, yeah, I need a break.
6 All right.  Yeah, I mean, I --
7          MR. GIBSON:  Can I please speak?
8          THE WITNESS:  Yeah.
9          MR. GIBSON:  How long of a break would
10 you like, in minutes?
11          THE WITNESS:  A five-minute break would
12 be fine.
13          MR. SCHMIDT:  I'd -- I'd actually like a
14 ten-minute break.  I need to run to the restroom and
15 check out some stuff here.  So can we come back in ten
16 minutes?
17          MR. GIBSON:  Sure.
18          MR. SCHMIDT:  Great.  Thank you very
19 much.
20          MR. GIBSON:  We'll come back at 11:26.
21          MR. SCHMIDT:  That sounds great.
22          THE REPORTER:  We're going off the record
23 at 11:17 a.m.
24          (Off the record from 11:17 to 11:27 a.m.)
25          THE VIDEOGRAPHER:  The time is 11:27 a.m.

91

1 We're back on the record.
2          MR. GIBSON:  Great.
3      Q.  (BY MR. GIBSON)  The last section I think we
4 talked over a little bit of each other.  Probably -- my
5 guess -- my guess is Debbie probably wasn't very happy
6 with that.  So for her sake and for the record's sake,
7 let's try to make sure we're not interrupting each
8 other.
9          Let me finish my question, again; and I
10 think I've been pretty good about letting you provide a
11 full answer.  I apologize.  I may sometimes try and stop
12 you if I think we're going left -- in left field.  I'm
13 really not -- but I'm going to try not to interrupt.
14 And if you can, let me ask my question and then
15 objections be lodged and then answer the question.  And
16 try to keep the answer to the question -- again, I'm not
17 trying to say you shouldn't add context; but it really
18 helps us move forward if you answer the question I asked
19 and try to avoid lots of additional things that maybe
20 would be asked.  I'll probably ask, anyway; but just let
21 me ask it in the next question.
22          I'm also going to be asking you more
23 questions about citations.  If you don't know, that's
24 fine.  I'm not trying to put you on the spot.  I'm not
25 trying to trick you.  I am going to ask you questions

92

1 about the cite -- the research that you cite and
2 summarize.  That -- I mean, that is what -- the majority
3 of your report.  Okay?  So I am going to be asking you
4 about those -- those articles.  If you don't -- if you
5 need time, if you don't recall, that's totally fine.
6 Just say that, and we can come back to it.  I'm not
7 going to spend my deposition for you to spend time
8 reading the articles that you cite so you can answer the
9 questions; but if you want to spend time on a break, we
10 can go back.  That's fine, too.  Okay.  So just, you can
11 say that.  Again, I'm not trying to trick you; but I am
12 going to ask you about very specific things about the
13 specific articles that you rely on in your report.
14          Okay.  Going to the Joshi article, you
15 have that up, Exhibit Number 3?
16      A.  I have that downloaded, yes.
17      Q.  Great.  Are you aware -- so, first off, you
18 say that -- you quote -- and you're quoting, I think --
19 you're quoting the article to say, "Sex differences in
20 organizational rewards were almost 14 times larger than
21 sex differences in performance evaluations."
22      A.  Yes.
23      Q.  Okay.  Were the sex differences in performance
24 evaluations found to be -- were there sex differences,
25 statistically significant sex differences, in the

93

1 performance evaluations?
2      A.  I'm trying to remember.  There's -- I'd have
3 to look.  I mean, if it was significant -- statistically
4 significant, it might be because the -- there's so much
5 power when you have so many participants; but you can
6 see right in the abstract that the d score was .04,
7 which would be considered a very tiny kind of effect,
8 whereas, the sex differences in rewards were d of .56,
9 which is considered a moderate effect size.
10      Q.  Do you think it's approp- -- so if -- if the
11 differences in performance evaluations were not
12 statistically significant, do you think it's appropriate
13 to make a comparison that -- of something that is
14 essentially, from a static standpoint, zero that
15 something else is fourteen times larger?
16      A.  No, I think it's approp- -- I mean, yes, I do
17 think it's appropriate.  Sorry.  I phrased that wrong.
18 Yeah, I think it's appropriate.  They're comparing the
19 size of the difference in performance evaluations,
20 right, which are either relatively trivial, meaning that
21 women were rated about as highly as men on performance
22 evaluations; yet, men were rewarded at a much higher
23 rate, you know, relative to those -- that lack of
24 performance evaluation difference.  I think that's
25 entirely appropriate.

94

1          I will point out that that's quoting
2    directly from the article which was accepted in what's
3    considered a relatively prestigious journal and subject
4    to very significant peer review that is in the applied
5    area of really trying to study organizations.
6          Q.  Will you turn to page 1530 of the article,
7    please?
8          A.  Okay.  15...
9          Q.  And I'll pull this up just so we're all
10   looking at the same thing.
11         A.  Yeah.
12         Q.  If I can do this appropriately.
13             Let me do this.  Okay.  We are now
14   looking at the Joshi article.  Is that what you see on
15   your screen, Dr. Glick?
16         A.  Well, I'm looking at page 1530 and -- yeah.
17   So, yeah, that article -- but I'm -- I was looking --
18   oh, shoot.  Now, where...
19         Q.  That's okay.  I'll flip to it.  We can all
20   look at the same thing.  I apologize --
21             (Simultaneous speakers.)
22         A.  The -- the font is really small on your
23   screen, and now I sort of lost --
24         Q.  Let me restart --
25         A.  That's better.

95

1          Q.  Let me restart --
2          A.  That's better.
3          Q.  Dr. Glick, can I restart the questioning?
4          A.  Sure.
5          Q.  Does Exhibit 3 appear to be the Joshi article
6    that's cited in Footnote 21 of your report?
7          A.  Yes, it does.
8          Q.  Great.  I'm going to go to -- okay.  I am on
9    page 1530 of Exhibit 3, Figure 1.  Do you see that?
10         A.  Yes, I do.
11         Q.  Great.  And does this show the various
12   studies -- is it your understanding that each data point
13   is a study that was used in the meta-analysis?
14         A.  I would like to re-read this section just to
15   make sure; but that's what it appears to be, yes.
16         Q.  Okay.  And does that indicate in some studies
17   the effect was in favor of women, and in some studies
18   the effect -- let's talk about performance evaluations
19   first.
20         A.  Uh-huh.
21         Q.  In some studies the effect of the performance
22   evaluations favored women; in some studies, it favored
23   men?
24         A.  Correct.
25         Q.  Right.  And that in some studies it was within

96

1    the null effect, which would be the lightest, white-
2    colored triangle in the middle, which would mean there
3    were no statistic -- statistical significance between
4    the evaluations of men and women; but in other studies,
5    there was quite a bit of difference between the
6    evaluations of men and women, correct?
7          A.  Yes.
8          Q.  And do you know the specific context of those
9    data -- and it's okay if the answer's no.  I just want
10   to confirm:  Do you know the specific context of the
11   data points that are -- show a statistical difference
12   that favor women?
13         A.  From this chart, no.
14         Q.  Great.  Okay.  And if you go to the next
15   chart, that is the chart of organizational rewards where
16   most but not all of the data points of the studies show
17   a -- that men are receiving more organizational rewards
18   than women because that -- those are the data points
19   that are on the right side of the chart; is that
20   correct?
21         A.  That is correct.
22         Q.  However, there are also data points on the
23   left side of the chart; is that correct?
24         A.  Yes.
25         Q.  And those would be studies that show a

97

1    statistically significant benefit where women receive
2    more of the organizational rewards than men; is that
3    correct?
4          A.  Correct.
5          Q.  Do you know the context of the specific
6    studies that are on the left side of the -- this
7    particular chart?
8          A.  Not from this chart.
9          Q.  Okay.  Are you aware that this meta-analysis
10   looked at studies from all over the world?
11         A.  I, again, want to review the paper before
12   making absolute statements about that.
13         Q.  Okay.  Well, let's do that.  Let's go to page
14   1536, and I'm going to highlight a section.  Do you see
15   the -- do you understand that the asterisk -- well, I'm
16   on page 1536, which is a list of references; and at the
17   beginning of the list of references it says, "References
18   marked with an asterisk indicate studies included in the
19   meta-analysis."  Did I read that correctly?
20         A.  Yes.
21         Q.  So --
22             (Simultaneous speakers.)
23         Q.  -- that I'm highlighting that starts with
24   Bhatnagar, B-H-A-T-N-A-G-A-R --
25         A.  Yes.

98

1    Q.  -- does that appear to be a study that was
2   included in the meta-analysis?
3    A.  That appears to be a study included in the
4   meta-analysis.
5    Q.  Does that study appear to relate to Indian
6   knowledge workers?
7    A.  Correct.
8    Q.  That's -- it's your understanding that's in
9   India?
10   A.  Yes, that was -- that's the implication, yes.
11   Q.  Do you know if that study -- do you know where
12  that study fell on the charts re- -- that are really
13  the -- as I understand, those two charts summarize the
14  data that you really highlight from this study about the
15  differences between those two effects, correct?
16   A.  Right.
17   Q.  Do you know where that chart appears on that
18  study?
19   A.  You mean --
20   Q.  I mean, where this study appears on the chart.
21  My apologies.
22   A.  Right.  Okay.  I figured that's what you were
23  asking.  No, I do not.
24   Q.  And if I told you that there's numerous
25  studies in here from China, would that surprise you?

99

1    A.  It would not shock me, no.
2    Q.  Okay.  Do you think it's appropriate to make
3   conclusions about whether or not something is -- well,
4   do you think it's appropriate to rely on studies from
5   China in making conclusions about how social science
6   research may be applicable to the Nikolova case?
7    A.  It really depends on what that study is about.
8    Q.  Great.  I'm asking:  Do you have an answer
9   with respect to the specific studies used in this
10  meta-analysis from China?  Was it -- is it appropriate
11  to use those studies to make conclusions about the work
12  environment at the University of Texas at Austin in 2021
13  that Dr. Nikolova was subject to?
14   A.  Well, again, I think that -- that it would be
15  better to have studies that are closer to the context or
16  certainly that are, you know, closer to the setting; but
17  that doesn't mean that these studies are useless.  And I
18  think if you go back to the chart, you see that -- I
19  mean, it's a pretty striking chart -- that there are
20  relatively few studies that are showing an advantage to
21  women.  And if you look at that chart, I mean, there are
22  studies in here that are from -- from the U.S. or
23  northern Europe that might be culturally somewhat
24  similar in terms of overall gender equality.  So I think
25  that the meta-analysis is still highly relevant.

100

1    Q.  Okay.  So are you aware that there are studies
2   in here about Swiss bankers?
3    A.  I would trust you if you told me that there
4   were.
5    Q.  Great.  Going back to the chart, I think there
6   may be one or two studies in here about university
7   faculty members.
8    A.  There may be.
9    Q.  Do you know if the studies about university --
10  looking at the charts on page a 1530 of this study, do
11  you know if the studies about university faculty members
12  are actually the studies that show that there's a
13  preference in favor of women --
14   A.  I can't tell that from this chart.
15   Q.  -- in the university faculty context?
16       Sorry.  In the university faculty
17  context?
18   A.  Sorry.  I thought you were finished with your
19  question.  I'm looking at the paper and not your face,
20  so it's hard to tell when you're done.
21       You can't tell from this chart, no.
22   Q.  So it's possible --
23   A.  You can't tell either way.
24   Q.  So it's possible that those studies that are
25  about universities or faculty members actually show the

101

1   opposite of what the meta-analysis shows?
2    A.  That could be possible, yes.
3    Q.  And just to confirm, have you done any
4   separate analysis of studies involving faculty members
5   at univers- -- at American universities to determine
6   what those studies show in this type of context?
7    A.  Well, I believe in my report there are studies
8   that are about women in engineering that -- you know,
9   women in engineering in the U.S., organizational
10  climate, those sorts of things.  There are certainly
11  reports on that that I cite.
12   Q.  Okay.  But in terms of -- other than the
13  reports you cite from -- I think most of those are from
14  other social scientists.  Have you done any analysis of
15  the studies that specifically relate to faculty members
16  in the United States?
17       MR. SCHMIDT:  Objection, form.
18   A.  I'm not sure what you're asking me.  Have I
19  done analysis of them?  Are you asking if I've done
20  research on university faculty directly?
21   Q.  (BY MR. GIBSON)  Yes.
22   A.  Is that what you're asking?
23   Q.  Yes.
24   A.  So have I researched that, like, done a study
25  myself and researched --

102

1   Q.   Yeah.
2   A.   -- not like library research?
3        Not that I can think of offhand, no.
4   Q.   On Footnote 22, also -- Footnote 16 and
5   Footnote 22, you rely on a meta-analysis called Koch,
6   K-O-C-H?
7   A.   I'm not hearing you very well.  What --
8   Q.   I apologize.  I'm not facing my computer.  Let
9   me restate the question.
10       In Footnotes 16 and 22 you cite to a
11  meta-analysis to support the statements in your report;
12  and that meta-analysis is authored by someone named
13  Koch, K-O-C-H, et al., A Meta-Analysis of Gender
14  Stereotypes and Bias in Experimental Situations [sic] of
15  Employment Decision Making.  Do you see that?
16  A.   Yes.
17  Q.   Okay.  Let me pull that one up.
18       (Exhibit 4 marked.)
19  Q.   (BY MR. GIBSON)  That should be in the chat
20  now, although I didn't open it.
21  A.   I'm trying to download it.  All right.
22  Q.   I also have it on the screen, so we can talk
23  about it from there if you like.
24  A.   Oh, all right.  Well, that might be easier
25  since downloading it seems to be a little bit difficult

103

1   on my computer.
2   Q.   Does this appear to be the article that is
3   cited in Footnotes 16 and 22 in your report, the
4   meta-analysis by Koch, et al?
5   A.   Yes, it does appear to be so.
6   Q.   Great.  Are you aware that the studies in this
7   article go back to 1970?
8   A.   I trust that that could be the case.
9   Q.   Do you think that a meta-analysis of gender
10  stereotypes and bias in experimental situations [sic] of
11  employment decisionmaking that relies on studies that go
12  back 50 years is a basis upon which to determine whether
13  or not conduct occurring in 2021 is consistent with
14  discrimination?
15  A.   Well, again -- and I'd have to look through
16  the meta-analysis -- but it's quite common for them to
17  look at date of publication as a moderator variable to
18  see whether, you know, more recent studies are finding
19  something different than older studies, especially in a
20  topic like this.
21  Q.   Do you know if that was done here?
22  A.   Offhand, I can't tell you.
23  Q.   Okay.  Do you know if any of the studies were
24  in a university setting?
25  A.   Offhand, I couldn't tell you.

104

1   Q.   Do you know if any of the studies were from
2   countries other than the United States?
3   A.   Offhand, I can't tell you.
4   Q.   Would it surprise you that there are studies
5   in here from Israel and Malaysia?
6   A.   It would not shock me.  Again, in a meta -- in
7   a meta-analysis people are trying to be comprehensive in
8   what they include and diverse in what they include; and
9   then, from there, it is quite common to try to look at
10  various moderator variables that might give insight
11  into, for instance, when and where bias might be more
12  prevalent.
13  Q.   Do you know what portion of these studies
14  relied on undergraduates in an experimental context?
15  A.   Again, offhand, I could not tell you that.
16  Q.   Did you conduct any analysis of the studies
17  upon which this meta-analysis relied upon before using
18  this meta-analysis to -- as a basis for your opinions in
19  this case?
20  A.   Well, I think if you look at that page, all I
21  say about that meta-analysis is that it's a frequent --
22  increasingly frequent topic of research among applied
23  and organizational psychologists.  So for that citation,
24  it's -- I -- I think that's all I said right there.
25  Q.   You also cite it in Footnote 22 as well,

105

1   correct?
2   A.   Let's see.  Footnote 22.  Yes, I did.
3   Q.   And you cite that as, "For example,
4   organizations can take steps to limit bias in personnel
5   decisions by relying on objective information and
6   behavioral benchmarks rather than subjective opinions"?
7   A.   Uh-huh, yes.
8   Q.   This is the only case -- the only citation you
9   have to support that statement; is that correct?
10  A.   There are other citations I could provide you
11  to support that statement.
12  Q.   That wasn't my question.  That's the only
13  citation you provide in your report to support that
14  statement; is that correct?
15  A.   I'd have to review all of my report, but that
16  may be the case.
17  Q.   Okay.  Again, before -- you did not conduct a
18  an assessment of the studies in that meta-analysis to
19  determine whether or not they were appropriate for using
20  in applying the conclusions of that study to this case?
21       MR. SCHMIDT:  Objection, form.
22  Q.   (BY MR. GIBSON)  Am I understanding your
23  testimony correctly?
24       MR. SCHMIDT:  Objection, form.
25  A.   I am not understanding your question.

106

1    Q.   (BY MR. GIBSON) Again, did you conduct an
2  assessment of the studies used in this meta-analysis
3  before applying the conclusions of the meta-analysis to
4  this case?
5    A.   I'm having trouble understanding what you mean
6  by "conduct an assessment."
7    Q.   Did you look at the studies, whether as
8  they're summarized in meta-analysis or individually,
9  separately, to determine whether or not they were
10  applicable to this case, the Nikolova case?
11    A.   I looked at the meta-analysis as a whole and
12  the things discussed in the meta-analysis.  If you're
13  asking did I go and then read all of the individual
14  studies they cite, no, I did not.
15    Q.   Did you even look at the summary of the
16  meta-analysis that -- I'm sorry.  Did you even look at
17  the summary of the studies that's in the meta-analysis
18  to determine whether or not those studies were
19  appropriate bases to create conclusions about this case?
20    A.   Summary of the -- I don't know what you mean
21  by "summary of the studies."  The entire meta-analysis
22  is a summary of the studies.
23    Q.   So this -- this meta-analysis -- meta-analysis
24  includes detailed descriptions of all the studies.  And
25  my question is:  Did you go and review those before

107

1  determining that this was an appropriate meta-analysis
2  to use in this case?
3    A.   I do not recall.  I'd have to look at the
4  study again in detail to answer that question.
5    Q.   Let's look at it.  If you look at the end,
6  they first list all the studies.  That starts on
7  page 142, with a similar use of the asterisk to
8  determine which studies were used in the analysis.
9  There's then a summary of studies by job titles and
10  study year, going back to 1974.  There's then an
11  assessment of -- a table of the studies that includes
12  all sorts of information about the studies, where it
13  was -- what country it was from, the study design, the
14  type of participants, the various data, and sex
15  distribution of the studies.  Did you look at any of
16  this before determining whether or not this
17  meta-analysis was appropriate to use in the Nikolova
18  report?
19    A.   I believe I looked at it.  I can't recall how
20  much time I spent on these particular tables.
21    Q.   Okay.  So if you looked at it, you would
22  have been aware, for instance, that many of these
23  studies come from around the globe.  So just looking at
24  page 151, for instance, while most are from the
25  United States, we do see Canada, Austria, Germany, the

108

1  United Kingdom, the Netherlands, Sweden, Israel,
2  Malaysia, Israel again.  So you would have been aware
3  that those studies were done in those countries if -- if
4  you would have looked at it as you think you did?
5        MR. SCHMIDT:  Objection, form.
6    A.   Yes, I would have been aware that there were
7  studies from different parts of the globe and that
8  most of the studies, as you said, were -- were from
9  North America, Europe, where there's considerable
10  cultural similarities when it comes to, you know, bias
11  against women.
12    Q.   (BY MR. GIBSON)  Sure.  Your section on --
13  well, throughout your report you rely on a lot of
14  studies that are certainly more than a decade old and in
15  some cases over 20 years old.  Do you have any concerns
16  about relying on studies that are two decades old when
17  making statements about how stereotypes about women in
18  the workplace -- you know, whether such stereotypes
19  exist and how they impact evaluation of women in the
20  workplace?
21    A.   It depends.
22    Q.   Well, okay.  Let's go to Footnote 23.  You
23  cite an article by Cohen from 1998 to support the
24  statement, "Other factors exacerbate the likelihood that
25  stereotyping and discrimination will occur.  When women

109

1  or minority group members are underrepresented, they
2  tend to be viewed as a 'poorer fit' for a job than men
3  or majority group members," citing an article from 1998.
4    A.   Okay.
5    Q.   Do you have any concerns about making
6  statements about the state of the workplace for women in
7  2021 based on research that was published in 1998?
8    A.   Well, generally, I rely on my understanding of
9  the research area as a whole.  I'm not citing every
10  study that might demonstrate this point.  I recently
11  wrote a second edition of a book, co-wrote with my
12  colleague Lori Rudman, on the social psychology of
13  gender, where we reviewed studies in the workplace.
14  That's just recently been published.  And these
15  principles have shown generally to hold up pretty well.
16        So this is a case where maybe it would
17  have been smart of me to update the reference; but based
18  on the review that we've conducted, I'm pretty confident
19  in these statements.
20    Q.   So are you familiar with the federal rule
21  requiring you to cite the bases upon which your
22  opinions -- the sources upon which your opinions are
23  based?
24    A.   I am citing --
25        MR. SCHMIDT:  Objection, form.

110

1        Sorry go ahead.
2    A.  I'm not -- I couldn't cite you the particular
3  rule.
4    Q.  (BY MR. GIBSON)  And, similarly, in
5  Footnote 32, you cite stereotype -- you cite an article
6  from 2002 about gender stereotypes and how that affects
7  women and men in high-power, dominance-oriented traits.
8  This is on page 13.  And do you agree that it would be
9  better to have an article that was closer in time than
10  1992 -- I'm sorry -- than 2002 to --
11    A.  Yes, and I do.  If you look right below it, I
12  cite Rudman, Moss-Racusin, Glick, and Phelan -- the
13  Glick is me --
14    Q.  Uh-huh.
15    A.  -- in a 2012 review article that reports more
16  recent data.
17    Q.  Uh-huh.
18    A.  And the same results come out.  Gender
19  stereotypes show a great deal of stability on some
20  dimensions over time.
21    Q.  But not all dimensions; is that correct?
22    A.  Correct.
23    Q.  What dimensions do they not show stability in?
24    A.  Well, the one dimension where they have shown
25  a change -- well, first off, one dimension where they've

111

1  shown a change is over time to actually ascribe more
2  communality or warmth traits to women.  Another place
3  where they've shown a change is to -- to attribute more
4  overall competence to women than was previously the
5  case.
6    Q.  In addition, the -- the gender stereotypes
7  regarding leadership have been decreasing over time as
8  well; is that correct?
9    A.  I don't know what exactly you're asking.
10    Q.  So you cite to articles to support the
11  argument that leadership qualities are seen as gender
12  and the characteristics of good leaders are seen as
13  gender.
14        MR. SCHMIDT:  Objection, form.
15    A.  Yes, and on agentic characteristics the
16  gender -- the stereotypes still remain favoring men on
17  these characteristics such as decisive, aggressive --
18  aggressive, forceful, dominating, those sorts of things
19  which are associated with leadership.  So there's still
20  this association of stereotypically masculine
21  characteristics with leadership.
22    Q.  (BY MR. GIBSON)  But those are changing,
23  correct?  Those are becoming more androgynous, as the
24  research describes?
25    A.  To some extent, they -- I'd have to go back

112

1  and -- and look at that.  There's -- there's a, you
2  know, recent paper by Alice Eagly that looked at this
3  over decades; and I'm trying to recall offhand -- I
4  mean, the overall message was that men were still
5  favored on agency.  I can't remember whether that gap
6  was closed significantly or not.
7    Q.  Well, let's look at a study that you -- if you
8  go to Footnote 53 you say, "Stereotypes set up different
9  expect-" --
10        MR. SCHMIDT:  Can you show the document
11  that you're referring -- reading from?
12        MR. GIBSON:  Absolutely.  We're back to
13  Exhibit Number 1, his report; and I'll pull that up.
14  Just a second.
15    Q.  (BY MR. GIBSON)  Hopefully you should be able
16  to see that now.
17    A.  I'm not -- I'm still seeing the old one, I
18  think.
19    Q.  You should see your report starting, Gendered
20  Double Standards, at page 18.
21    A.  Oh, I have my report, so that's fine; but my
22  screen has not changed.
23        MR. GIBSON:  Bob, is that what you're
24  seeing?
25        MR. SCHMIDT:  Yeah, my screen has not

113

1  changed, either.  I'm pulling up the report on my -- on
2  my -- as an exhibit.
3        MR. GIBSON:  I'm not sure why that is.
4        MR. SCHMIDT:  What page are you referring
5  to, page 18?
6        MR. GIBSON:  Page 18.
7        MR. SCHMIDT:  Okay.  Just give us -- give
8  me a second.  Okay.
9    Q.  (BY MR. GIBSON)  There we go.  Okay.  So you
10  say that, "Stereotypes set up different expectations for
11  men and women, leading to double standards in how people
12  evaluate individual women and men.  High-status roles
13  are typically associated both with stereotypically
14  masculine traits (ambition, assertiveness, decisiveness)
15  and with men as 'role of [sic] incumbents.'"
16    A.  Role incumbents.
17    Q.  Yeah, role incumbents.
18        For the first statement you had cited a
19  report -- article from 2011, another meta-analysis,
20  cited by Koenig; is that correct?
21    A.  Correct.
22    Q.  Right.  Let's look at that.  Hang on just a
23  second.  I'm trying to make sure I'm not showing you
24  guys the wrong thing here.
25        (Exhibit 5 marked.)

114

1    Q.  (BY MR. GIBSON)  Okay.  Here's the Koenig
2  article.  I'm dropping it into the chat, also opening it
3  and showing it on the screen.  You should now see the
4  Koenig article.  Take a second to look at that.  Does
5  this appear to be the article cited in Footnote -- which
6  was is --
7    A.  Yes, it seems to be the article.
8    Q.  -- 53?
9        Great.  Okay.  Are you aware that this
10 article also uses international studies from China,
11 Japan, Egypt, Saudi Arabia, and Turkey?
12   A.  I trust that that could well be the case.
13 Again, I have to review the article; but the typical
14 procedure in meta-analysis is to try to be inclusive of
15 all published studies.
16   Q.  Do you think it's appropriate to use an
17 analysis that relies on, among other things, studies
18 from Saudi Arabia about leadership stereotypes being
19 masculine to make determinations about the way that
20 stereotypes and bias function at the University of Texas
21 at Austin in 2021?
22   A.  There are also studies conducted in the
23 United States.  That's where a lot of the research tends
24 to be done, so this is not -- this is not a phenomenon
25 that's only demonstrated in Saudi Arabia.

115

1    Q.  But you -- you haven't -- for this particular
2  point, you didn't cite studies that were done in the
3  United States; instead, you cited a meta-analysis that
4  relies on studies from the United States as well as
5  China, Turkey, Egypt, and Saudi Arabia?
6    A.  Yes --
7    Q.  My question is --
8    A.  -- right.
9    Q.  And you didn't answer the question.  The
10 question is:  Do you think it's appropriate to make
11 determinations about how -- what -- how stereotypes and
12 bias function at the University of Texas at Austin in
13 2021 based on studies from China, Saudi Arabia, Egypt,
14 and Turkey?
15        MR. SCHMIDT:  Objection, form.
16   A.  If that were based solely on studies from
17 those countries, the answer would be "no."  But my
18 opinion is not based solely on studies from those
19 countries.
20   Q.  (BY MR. GIBSON)  That statement is based
21 solely -- the only support you provide for that
22 particular statement in your report for Footnote 53 is
23 this study, correct?
24   A.  Which -- yes, this study which includes data
25 from the U.S. as well as from other countries.

116

1    Q.  Do you know how the results of that study
2  might be different if, let's say, Saudi Arabia wasn't
3  included?
4    A.  Well, again, it's pretty typical in
5  meta-analyses -- and I'd have to go back and look at
6  this particular one to see -- but it's pretty typical to
7  separate some of these issues out to test moderation,
8  that is, is it different, the effects stronger or weaker
9  depending on timing of the study, depending on where
10 it's conducted, those sorts of things.
11   Q.  Okay.  And this also includes studies from the
12 1970s, going back as far as 1973?
13   A.  Yes.  Meta-analyses typically include older,
14 as well as more recent, studies; and they also typically
15 look at timing of publication as a possible moderator.
16   Q.  Did you look to see if this study did that or
17 whether -- what the potential impact of that was on this
18 study?
19   A.  At this time I cannot recall specifically.
20   Q.  Turn to page 634 of this study, in particular
21 a section called A Priori Moderators.  Is this one of
22 the instances that you're discussing where they look at
23 the year of publication to determine whether or not the
24 results of the study change over time?
25   A.  That looks to be the case, yes.

117

1    Q.  Great.  Does it say that, "Evidence of
2  increasing" -- the first sentence -- "Evidence of
3  increasing androgyny of the leadership stereotype over
4  publication years emerged in all three paradigms,
5  including in the multiple regression equations that
6  controlled for moder- -- other moderator variables"?
7    A.  Where are you seeing that?
8    Q.  The first sentence of A Priori Moderators,
9  Year of publication.
10   A.  Right.  Okay.  I see.  It's really very small.
11 Can you make that a little larger?
12   Q.  I'm happy to.  You should also have it in
13 your -- to be able to --
14   A.  Yeah, it's easier if I look at it here because
15 it's --
16   Q.  I'm happy to do that.
17   A.  -- not slowing us down.
18   Q.  That's about as big as I can make it.
19   A.  No, that's good.  That's good.  Good, good,
20 good.
21        Okay.  So, "Evidence of increasing
22 androgyny of the leadership stereotype over publication
23 years emerged," right, "...including in the multiple
24 regression equations that controlled for all [sic] other
25 moderator variables (albeit as a mod- -- a marginal

118

1  effect in the agency-communion multiple meta-
2  regression.)"
3      Q.  So, in conclusion, that paragraph says,
4  "Thus, our conclusion is that leadership now, more than
5  in the past, appears to incorporate more feminine
6  rational [sic] qualities, such as sensitivity, warmth,
7  and understanding, thus adding them to the masculine
8  dominance and strength qualities traditionally
9  associated with leadership"?
10     A.  Sure.
11     Q.  So then this was in 2011, based on -- so this
12  was a decade ago they had already come to this
13  conclusion, correct?
14     A.  Yes, this conclusion but it doesn't mean that
15  there's the -- that discrimination has disappeared on
16  this dimension.
17     Q.  Do you --
18     A.  It means that there has been change over time,
19  yes.
20     Q.  Do you know whether or not more recent
21  studies -- what recent studies show, within the past
22  decade within the United States?
23     A.  I'd have to look specifically at this paradigm
24  in the last decade; and offhand, I can't tell you of --
25  right now I can't -- you know, I can't cite a study for

119

1  you.
2      Q.  Okay.
3          THE VIDEOGRAPHER:  My apologies for
4  interrupting.  Mr. Glick, we can hardly see you on
5  camera.
6          THE WITNESS:  Oh, I'm sorry.  I'm sorry.
7  Yeah, I'm looking at the other stuff on the screen.
8  Sorry about that.
9          MR. NOTZON:  While you're at a break in
10  your questioning right now, are --
11         MR. GIBSON:  Sure.
12         MR. NOTZON:  -- do we want to talk about
13  a lunch break; or are you going to try to push through
14  and finish?
15         MR. GIBSON:  I'm happy to talk about a
16  lunch break.  I don't think we'll be able to push
17  through and finish.  So I would suggest we take a lunch
18  break.  I think now is a good time.  I'm happy to take
19  it now.  If other people have preferences, I'm happy to
20  follow other people; but we -- we are going to need a
21  lunch break.
22         MR. SCHMIDT:  And do you have any
23  estimate of how much longer you're going to go this
24  afternoon?
25         MR. GIBSON:  I mean, the last time I

120

1  spoke with Dr. Glick, it took the whole day, I think,
2  so.
3          MR. SCHMIDT:  Okay.
4          MR. GIBSON:  I hope not to take the full
5  day again, but I don't -- I would -- if I had to make an
6  estimate, not holding me to it, I would say hopefully
7  we'll be done by 4:00 o'clock.
8          MR. SCHMIDT:  All right.  Sounds great.
9          MR. NOTZON:  So, Dr. Glick, you can make
10  the call on when you want to break for lunch.
11         THE WITNESS:  Now's fine.
12         MR. GIBSON:  Great.  We'll take a one-
13  hour lunch break.  Be back at 1:15.  It's now 12:13.  So
14  the time back is 1:15.  Thanks everybody.
15         MR. SCHMIDT:  Thank you.
16         THE VIDEOGRAPHER:  The time is 12:13 p.m.
17  We are off the record.
18         (Off the record from 12:13 to 1:27 p.m.)
19         THE VIDEOGRAPHER:  The time is 1:27 p.m.
20  We are back on the record.
21     Q   (BY MR. GIBSON)  Dr. Glick, I would like to
22  move forward.
23         Oh, first, before we proceed, we just
24  had about a little over an hour break for lunch.  Did
25  you want to go back and address, I think it was,

121

1  Footnote 20, the Roth article, regarding the questions I
2  had asked about that?
3      A.  No.
4      Q.  Okay.  We will proceed.
5          Okay.  So I'd like to move to the portion
6  of your report regarding the -- that's entitled -- it
7  starts on page 21, entitled Discrimination From Below:
8  Bias In Teaching Evaluations.
9          First off, let's talk about Footnote 70.
10  That's the Clayson article from 2009.  Do you see that?
11     A.  Yes.
12     Q.  Great.  Do you -- do you know if there's any
13  time limitation on that study?
14     A.  Again, I'm not sure if you're asking what the
15  timeline is of which -- which publication years they
16  included.
17     Q.  Do you know if there's any limit on the
18  publication years of that study?
19     A.  Not that I -- not that I can tell you right
20  now.
21     Q.  And do you -- are you aware that the study
22  includes -- the meta-analysis includes individual
23  studies that go back as far as 1953?
24     A.  Again, I'd have to review the study; but I
25  trust that there might be some older -- older studies in

122

1  there.  Again, meta-analyses try to be very inclusive;
2  and then they often look at things like publication
3  year, as we talked about with prior meta-analyses.
4      Q.  Do you know if publication year was looked at
5  in this analysis?
6      A.  Offhand, I can't tell you.  I'd have to go
7  back and review it.
8      Q.  Okay.  Do you know if the case -- any
9  difference between the types of classes that were being
10 evaluated, like, math versus physics, versus business
11 classes?
12     A.  Again, I'd have to go back and review the
13 details of the study of the meta-analysis.
14     Q.  Okay.  Do you know if the meta-analysis
15 included engin- -- any engineering classes?
16     A.  Again, I'd have to go back and look at the
17 details of the meta-analysis.
18     Q.  Okay.  Did you conduct any sort of analy- --
19 did you review the details of the meta-analysis before
20 including it as a basis upon which you -- one of the
21 bases of the conclusions in your report in this case?
22     A.  I read it if that's what you mean.
23     Q.  Did you read it as part of drafting this
24 report or have you just -- when you say you've read it,
25 does that just mean you've read it at some point in the

123

1  past or you've read it as part of drafting the report in
2  this case?
3      A.  I've read it as part of drafting the report.
4      Q.  And so that means you made a conclusion that
5  the -- it was an appropriate study upon which to base
6  your opinions in this case?
7      A.  Sure.
8      Q.  Okay.
9          MR. NOTZON:  Just to clarify, it was "an"
10 appropriate, instead of inappropriate, correct?
11         MR. GIBSON:  That's correct.
12         (Laughter.)
13     Q.  (BY MR. GIBSON)  An, A-N, appropriate study.
14 One of other appropriate studies.
15     Q.  Yes.  Obviously, it's one of many that you
16 cite in your report.
17         Let's in particular shift to the next
18 page where you start really going into the studies that
19 support the link between sex and student evaluations,
20 particularly on Bullet Point No. -- I'm sorry --
21 Footnote 75.  Are you -- Footnote 75 is an article by a
22 researcher named Boring.
23     A.  Uh-huh.
24     Q.  Do you know where the -- Gender Biases in
25 Student Evaluations, do you know where the evidence in

124

1  that study was from, meaning juris- -- what country it
2  was from?
3      A.  I couldn't tell you for sure, but -- I'm
4  thinking maybe Germany, but I can't remember for sure.
5      Q.  Let's pull that up.
6          MR. GIBSON:  Okay.  Sorry.  I had all
7  this ready to go, of course; and then my computer made
8  me reboot.  So I had to shut it all down.  So sorry it's
9  taking a little longer.
10         (Exhibit 6 marked.)
11     Q.  (BY MR. GIBSON)  You should have Exhibit 6 in
12 your -- in the chat.  I'll also pull it up on the share
13 screen so that you can confirm that Exhibit 6 is the
14 article you're referring to in Footnote 75.
15     A.  Yes, that looks like it.
16     Q.  Great.  Are you aware that this study uses a
17 database from a French university?  Do you see that in
18 the very first line?
19     A.  I see that.  So I got Europe right.
20     Q.  Great.  And are you aware that this study was
21 based on sort of introductory classes at this French
22 university?
23     A.  Again, I'd have to review all of it; but...
24     Q.  Sure.  Do you --
25     A.  I assume that you're being correct on that.

125

1      Q.  Okay.  And it does discuss that at some point,
2  the specific classes somewhere down here in the
3  analysis.  Let's see if we can get there.  22,000
4  observations involving 4,000 students and 372 teachers.
5  It says, "Almost all students are 18 years old, as the
6  first-year undergraduate studies at this university are
7  only open to students who just completed high school."
8  Do you see that?
9      A.  Yes.
10     Q.  All right.  Do you have any understanding that
11 the classes that were represented here were STEM classes?
12     A.  Again, I'd have to review it to see what
13 the -- no, I can't recall offhand --
14     Q.  Okay.
15     A.  -- what the classes were, what they included.
16     Q.  And do you have any concerns about relying
17 on studies from Europe and making conclusions
18 about gender bias and student evaluations in the
19 United States?
20     A.  To the extent that they tend to be consistent
21 with other studies, I don't have a particular concern
22 here.
23     Q.  Okay.  Let's look at one of those studies.
24 Let's look at Footnote 76.  That's the article by
25 MacNell.  I'll pull that one up.

126

1        It takes time to get these all in the
2   proper order.
3        A.  Well, I guess we have all day or seven hours
4   of the day.
5        Q.  We do have seven hours; and this is certainly
6   on my time, so.
7            (Exhibit 7 marked.)
8        Q.  (BY MR. GIBSON)  All right.  And here,
9   Exhibit 7 should now be in the chat.  I will open
10  Exhibit 7.  You should now be able to see Exhibit 7 now.
11  Does Exhibit 7 appear to be the article cited in
12  Footnote 76 of your report?
13       A.  Yes, it appears to be so.
14       Q.  Great.  Do you recall that this article was
15  based on looking at students, undergraduate students, at
16  a North Carolina public university?
17       A.  I don't remember North Carolina, but I trust
18  your word for it.
19       Q.  And when you say STEM in your report, what do
20  you mean by STEM?
21       A.  Science, technology, engineering, and math is
22  what the acronym stands for.  So that's a variety of
23  fields ranging from biology, chemistry, math,
24  engineering.  It can be applied fields as well as basic
25  science fields.

127

1        Q.  Do you consider social sciences to be part of
2   the "S" of STEM?
3        A.  I think they're not typically what people
4   necessarily include in STEM.  I'm not sure what the
5   National Science Foundation would say about that.  You
6   know, psychology is a scientific field and it does use a
7   lot of the methodologies that are similar to the natural
8   sciences; but I would say overall, I think people
9   typically are referring to natural sciences more.
10       Q.  And fields like anthropology are not
11  necessarily match-based fields, and would you agree that
12  sort of anthropology is moving even farther away from
13  what might be considered STEM than even psychology?
14       A.  It depends.  Yeah, I mean, overall; but it
15  depends on the type of anthropology that people are
16  doing.  There's some very intensive -- math-intensive
17  anthropology.  So it's -- there's a lot of subfields in
18  anthropology is my understanding.
19       Q.  Great.  I'm just going to page 296 just to
20  show you that in this study it says:  Data were
21  collected from online introductory-level anthropology/
22  sociology course offered during a summer session at a
23  large public university in North Carolina.
24       A.  Yes.
25       Q.  Does that, in your view, necessarily mean that

128

1   this was a STEM class?
2        A.  No, that would not be what I think I would
3   classify as a STEM class.
4        Q.  Okay.  In the -- Footnote 76, however, is
5   citing the following -- is cited to support the
6   following sentence, "Given that math content and female
7   professors are associated with lower ratings, it is not
8   surprising that female (compared to male) STEM
9   professors receive lower average teaching evaluations,"
10  Cite 76, MacNell.
11       A.  Let me just see here, 76.  Yeah, I mean, I --
12  that -- that -- I think what I'm citing there is the
13  sort of female-and-male gender difference, that part of
14  the sentence.  So I suppose I could move the footnote to
15  the earlier part of the sentence.
16       Q.  So just to be clear, there's not
17  necessarily -- this doesn't appear that this study
18  supports a particular application of the math content
19  STEM portion of the sentence?
20       A.  Right, right.
21       Q.  Okay.  And I think the previous study we
22  looked at, it did not -- or you did not recall whether
23  it specifically identified studies -- the classes that
24  were being taught to the new 18-year-old French college
25  students, correct?  That study did not necessarily -- it

129

1   wasn't clear that that study included any STEM classes?
2        A.  Not that I can recall.
3        Q.  Okay.  Similarly, in Footnote 79, are you
4   aware that that study that you cite -- and you spend a
5   paragraph discussing that study -- was a study based on
6   business school -- a business school in the Netherlands?
7        A.  That could be, yeah.  I mean, I trust your
8   word for it.
9        Q.  Okay.  So in that whole section there's a
10  study called Mitchell, K. M., Gender bias in student
11  evaluations.  I don't think I have that one up.  I
12  apologize.  But are you aware of whether or not that
13  study relates to students in the United States?
14       A.  I could not tell you offhand.
15       Q.  And do you know if that study related to STEM
16  fields?
17       A.  I couldn't tell you offhand.  I'd have to,
18  again, go back and look at it to be sure.
19       Q.  Okay.  Going back to this study that you rely
20  on, the MacNell study from North Carolina, do you know
21  how many students were involved in that study?
22       A.  Again, I'd have to review it.  I'm not going
23  to memorize the number of participants.
24       Q.  Sure.  I'm looking at page 293, Experimental
25  Design.  Does this appear to show that there were

130

1  approximately 43 students in this study?
2      A.  Yeah, that's what that table seems to
3  indicate.
4      Q.  Okay.
5      A.  But there will be a participants section,
6  probably, if you scroll back up; and that will tell you
7  for sure, typically.
8      Q.  That's going to be --
9          (Simultaneous speakers.)
10     A.  Yeah, they're not really using that format.
11  Okay.
12     Q.  Okay.  I just want to make sure that this --
13  the study that at least we're confident is from the
14  United States relied on 43 students in a class in
15  North Carolina, anthropology class in North Carolina,
16  correct?  Did I get that right?
17     A.  This particular study.  It appears so for this
18  particular study; but, again, I'd like to -- to have
19  time to really review it.
20     Q.  The next section you have discusses -- is
21  entitled Discrimination From Above:  Female Leaders in
22  STEM Also Discriminate Against Women.  Do you see that
23  section starting at page 24?
24     A.  Yes, I do.
25     Q.  Okay.  Let me make sure I'm looking at this

131

1  correctly here.  You have a statement starting in the
2  second sentence.  It says, "However, absent a critical
3  mass that approaches gender parity in representation,
4  women (as compared to men) who achieve authority in
5  masculine fields can be just as, and sometimes more
6  likely to discriminate against women.  For example, in
7  an 'audit' study..."  And then you go on to cite an
8  audit study cited in Footnote 81 regarding -- it's
9  entitled -- Ross -- Moss-Racusin is the author?
10     A.  Yes.  That was in the proceedings of National
11  Academy of Science, and that did look at actually STEM
12  faculty.
13     Q.  And it says -- is there -- are you citing that
14  study for the -- to support the statement that women are
15  more likely to discriminate against women?
16     A.  That one showed no difference in the tendency
17  to discriminate between male and female STEM faculty in
18  the U.S.
19     Q.  That's what I thought.  So why did you cite
20  that study to support the statement that women sometimes
21  are more likely to discriminate against women when the
22  study found that not to be the case?
23     A.  Because I go on to cite other studies that
24  involve STEM faculty that show circumstances under which
25  women are actually more likely, on average, to

132

1  discriminate.
2      Q.  Let's talk about some of that.  In the
3  Footnotes 83 through 86, those are some of the articles
4  you cite, correct?
5      A.  Correct.
6      Q.  Do you know what country those are based off,
7  the countries?
8      A.  Generally, the Netherlands.
9      Q.  Yeah.
10     A.  That's where those researchers are based.
11     Q.  Uh-huh.  So Derks, et al. -- there's multiple
12  articles from Derks, et al.
13     A.  Uh-huh.
14     Q.  Those are all articles based on research done
15  in the Netherlands; isn't that correct?
16     A.  I don't know if I want to commit to "all," but
17  generally I would say their research is typically done
18  in the Netherlands.  That's their base.
19     Q.  As well as the footnote in 85, Ellemers, is
20  that -- would you agree that's also conducted in the
21  Netherlands?
22     A.  Most likely.  She's also Dutch.
23     Q.  And then Faniko, that -- would it surprise you
24  to find out that article was conducted in Switzerland?
25     A.  That wouldn't shock me, no.

133

1      Q.  Okay.  And those articles focus on a
2  particular phenomenon called The Queen Bee phenomenon in
3  Academia.
4      A.  Correct.
5      Q.  What is The Queen Bee phenomenon in Academia?
6      A.  Well, as my report explains, when there's a
7  field in academia that's heavily male dominated, women
8  who advance in that field tend to kind of assimilate the
9  values that are -- tend to be more kind of -- we could
10  call them masculine values; and also they tend to --
11  research has shown, to question the commitment of women
12  who are junior in the field.  And they are also kind of
13  reluctant to -- to identify strongly with feminine
14  traits.  So they kind of -- there's also a tendency to
15  kind of -- to reject feminine traits.
16          So it's an effect of assimilating into
17  their field; and the results show that they can be even
18  more discriminatory toward women than men, which most
19  people, I think, find kind of surprising that women
20  would be as or more discriminatory.
21     Q.  How much more likely are they?  You say they
22  tend to discriminate against women more than men.  How
23  much more likely?
24     A.  Well, in the Faniko, et al., they look at this
25  over time.  So that's a 2020 study.  So it looks at some

134

1  of their older data and recent data.  So that's nice
2  from the perspective of does it still happen.  In fact,
3  that was kind of part of the major theme of the article;
4  and they found similar findings in recent data as they
5  found in older data.  And the effect sizes -- I actually
6  e-mailed them about effect sizes.  I haven't gotten --
7  they said they would get back to me, but they haven't
8  yet sent me the actual effect sizes.
9        But if you look at the mean differences
10 on the rating scales -- I can't -- one to five or one to
11 seven rating scale, for instance, on perceived career
12 commitment, the differences are -- are something on the
13 order of between .5 to 1 point on -- five- or
14 seven-point rating scale.  So that's -- that's generally
15 a pretty big difference.  We assume a standard deviation
16 was around 1 on those types of scales.  That's what I
17 usually find.  Then that's a difference of probably a
18 moderate to a large effect in having -- in that -- you
19 know, women questioning the career commitment of junior
20 female colleagues more so than men.
21     Q.  And certainly with -- as with, I think,
22 virtually all of these studies, that doesn't mean that
23 every female academic necessarily behaves in that
24 manner, correct?
25     A.  Absolutely.  Absolutely correct.  It's always,

135

1  as I've said, complicated, right?  And there's always a
2  lot of different what we call variance, V-A-R-I-A-N-C-E.
3  In the last deposition that was translated into variant;
4  it's variance.  There's always a lot of variance; that
5  is there's a lot of factors that go into, for instance,
6  how people rate each other.  And so there's a -- you
7  know, there's -- but there's an average difference;
8  that's -- that's what we're talking about.  It doesn't
9  mean there are no exceptions by any means.
10     Q.  And just to be clear, some women in leadership
11 in academia may treat other women better; some women may
12 treat other women worse, but these studies that you've
13 cited found that, on average, women in those leadership
14 positions treated other women less favorably?
15     A.  Yes, we're on the same page.
16     Q.  Great.  And so my question is:  How much more
17 likely was it that a woman in that position would treat
18 women -- men -- or -- I'm sorry -- women less favorably
19 than men?  Was it twice as likely, 10 percent more
20 likely, three times as likely?  Do we -- do you have any
21 sense of how strong this effect was in terms of how
22 likely is it that a woman in that position will treat
23 women less favorably based on --
24     A.  Well, you can't -- okay.  So first off,
25 they -- the way they reported the data, I can't give

136

1  you that kind of figure from the data.  I can tell you
2  that the difference, the average difference, was a
3  pretty palpable one and was statistically significant;
4  but they -- as I said, I asked them for effect size so
5  that I could sort of approach more the answer to the
6  question that you're asking.  But I think we -- last
7  time we had kind of a go-round on effect size and I
8  think we were somewhat talking past each other on some
9  of these points; but in this study, I don't have --
10 they didn't publish the information that would allow you
11 to -- to really test it.
12     Q.  Okay.  Let's go back to -- let's just go back
13 a little bit to the bias in teaching evaluations.  How
14 much more likely is it that an individual student will,
15 in fact, exhibit bias towards -- as you allege in your
16 report, that an individual student will exhibit bias
17 towards a female professor, relative to a male
18 professor, because, again, just to make sure we're all
19 on the same page, some students will not exhibit any
20 bias, correct?
21     A.  Sure.
22     Q.  And some of the students might exhibit bias
23 towards female professors relative to male professors,
24 correct?
25     A.  That would be possible.

137

1      Q.  But, on average, the studies that you cited
2  found that, on average, students tended to favor male
3  professors in evaluations relative to female professors?
4      A.  Right, correct.
5      Q.  And my question is:  How -- by how much?  Do
6  you have any way to quantify the effect of this
7  favoring?  Is it by 1 percent, 10 percent, a hundred
8  percent, any sort of way to quantify that?
9      A.  Okay.  Well, there's different ways you can
10 look at it.  One, you can look at the size of a mean
11 difference; and, you know, let's say teaching ratings
12 are made on a one-to-five scale.  Is that mean
13 difference a .1 difference, which might be, you know, a
14 sig- -- you could get that to be a -- possibly a
15 statistically reliable effect; but it's certainly much
16 less of a -- of an effect than if it was a 1.0
17 difference, right?
18        And there's other measures that we've
19 talked about in the past, you and I, of effect size
20 that can give you some sense of if you've randomly
21 selected -- and this is where I think we went wrong in
22 our conversation -- but if you framed it this way, if
23 you randomly selected an individual from the condition
24 in which they rated a woman and you randomly selected an
25 individual, you know, in the condition where they rated

138

1  a man, you could, from that information, get a sense of
2  the likelihood that the woman would be rated lower than
3  the man or -- you know, or higher than the man, those
4  sorts of probabilities.
5       Q.  Just to be clear, you don't have any of that
6  information, either with you today or as part of your
7  report, meaning -- meaning, you have not attempted to
8  quantify this effect to determine how much more likely
9  it is that a student, given student, or even a group of
10  students, may or may not favor a male faculty member
11  when engaging in student teacher evaluations?
12      A.  I haven't calculated that probability for
13  these studies.  Sometimes you can't do that, depending
14  on how they report the data; but I certainly have paid
15  attention to the strength of the effect, the relative
16  strength of the effect, that is, the relative strength
17  of average differences.
18      Q.  Going back to page 26 we were discussing
19  previously, you do cite to one study in Footnote 87
20  that's from the United States; but unlike the other
21  studies you cite, this one is not in academia but in
22  business; is that correct?
23      A.  Yes.
24      Q.  Okay.  And then on page 27 in Footnote 88,
25  you cite a study.  That study's from Hong Kong; is that

139

1  correct?
2       A.  That may be the case.  Yeah, I can't tell you
3  offhand.
4       Q.  Do you know if any of the other studies that
5  you cite are studies from the United States?
6       A.  Any of the other studies in this entire
7  section?
8       Q.  That you cite in section in Footnote 89, 90,
9  91.
10      A.  Well, certainly the authors in 89 and 90 are
11  American authors.  You know, 92 -- oh, 91.  I mean, I
12  can't -- again, I'd have to go back and look.
13      Q.  Okay.  Going to the next section called
14  Pregnancy and Motherhood, you cite to a Halpert study
15  in Footnote 95 and 97.  That study involved undergrad --
16  are you aware that that study involved the opinions of
17  undergraduates regarding working mothers?
18      A.  I'd have to look at that again because I think
19  that might have had more than one study contained in it,
20  but I'd -- I'd have to go back and review it.
21      Q.  I'd like to go to the study that's cited at
22  Tab -- I'm sorry -- Footnote 99 and 101 regarding the
23  Correll -- it's titled -- Correll is the name of the
24  first author.
25      A.  Yep, Shelley Correll.  Yeah.

140

1       Q.  In particular, I wanted to ask you -- hold on
2  just a second.
3          In that study, it studied -- used
4  undergraduate volun- -- or paid -- paid undergraduates
5  for this study; and it looked at both female applicants
6  who were mothers and nonmothers and male applicants who
7  were fathers and nonfathers.  Does that sound familiar?
8       A.  Yes, that was part of that article.
9          MR. GIBSON:  Let me just go ahead and
10  pull this up in case we need to refer to this.
11         (Exhibit 8 marked.)
12      Q.  (BY MR. GIBSON) Do you see that now?
13      A.  Yes, that looks like the article.
14      Q.  Chicago Journals --
15      A.  Journal of Sociology -- American Journal of
16  Sociology.
17      Q.  Got it.  Okay.  Let's jump down to some of the
18  results here.
19         MR. SCHMIDT:  Sorry to interrupt, Darren.
20  Did you put that in the chat section to download?
21         MR. GIBSON:  Sorry about that.  Let me do
22  that real quick.  Sorry.
23         It should be there now.  Thanks for that,
24  Bob.
25         MR. SCHMIDT:  Thank you.

141

1       Q.  (BY MR. GIBSON)  Okay.  Particularly, I want
2  to go to page 1316 of the article.  Let me go down here
3  a little bit, and I'll blow this up.  It appears to be
4  Table 1 from the article; is that correct, Dr. Glick?
5       A.  Yes, that's the further experimental study
6  that you mentioned.
7       Q.  Right.  And in particular, doesn't this
8  show that -- this is in the study using the paid
9  undergraduates; and you were correct that there were
10  two -- well, you might have mentioned there were two
11  studies in this article --
12      A.  Correct.
13      Q.  -- a paid undergraduate study and then an
14  audit study looking at some data from -- I don't -- I
15  forget exactly what the audit study was; but we can
16  look at that.
17         But in this study, this table, does
18  that actually -- that actually shows that the female
19  applicants who were mothers were -- had the lowest
20  proportion of recommended for hire, as shown on the
21  last line; is that correct?
22      A.  Yes.  Correct, that's a significant difference
23  from the rest.
24      Q.  And the next proportion is male applicants,
25  nonfathers?

142

```
1     A.  Right.  Male applicants, nonfathers, yes.
2     Q.  And then next is male applicants, fathers?
3     A.  Right.
4     Q.  And then next is actually female applicants,
5  nonmothers?
6     A.  Right.  Female applicants, nonmothers, yes.
7     Q.  So female applicants who were not identified
8  as mothers were the most likely be identified as a
9  recommended for hire; is that correct?
10    A.  Yeah, well, now, you've got to look at whether
11 there's statistically significant reliable differences,
12 right?  So it depends on which comparisons are being
13 made; and the comparison's between the parents and
14 nonparents of the same gender, I think.  So we can't
15 say that the -- for instance, that the nonmothers and
16 nonfathers are necessarily statistically significantly
17 different.
18    Q.  They didn't do that analysis?
19    A.  I think not.  I'd have to go back and really
20 read over it carefully to be sure, but they imply
21 differences between parents and nonparents.  So that
22 would be within gender, I believe.  And so that, yeah,
23 it depends on which comparisons they report.
24        So, you know, you're going to get
25 fluctuation in any mean, if you just -- like if you just
```

143

```
1  repeated the experiment or -- you know, right?  You
2  know, people's ratings vary, right, within the same
3  condition.  So you're going to get fluctuations between
4  conditions that are not necessarily statistically
5  significant.
6     Q.  Okay.
7     A.  And I think they were highlighting comparisons
8  between parents and nonparents.  That seems to be what
9  the footnotes are saying.  So that would mean that there
10 was a highly statistically significant difference with
11 that double dagger or an asterisk, or whatever they're
12 showing there, or a significant difference between the
13 female applicants for the mothers and nonmothers.  And
14 then for the fathers, the fathers were preferred over
15 the nonfathers.  But I don't think they're making the
16 comparisons the other direction, which is -- you know,
17 would be a good thing to compare as well; but I don't
18 think we can infer that those are -- those other means
19 are different.
20    Q.  Hold on just a second.
21        Let's go to page 1330 and see what they
22 have to say there.  I'm not sure whether they make any
23 conclusions with respect to the -- that study,
24 Number 1; but they do make conclusions with respect to
25 the audit study.  And I want to highlight for you this
```

144

```
1  statement -- this is on page 1330 -- "While we find no
2  evidence of a fatherhood bonus in the audit study, as
3  shown by the insignificant effect of parent status, the
4  significant and positive main effect for the female
5  applicant variable means that childless women are
6  significantly more likely to receive a callback from
7  employers compared with equally qualified childless
8  men."
9     A.  Yes, they found that in this study.
10    Q.  Does that support the idea that, in fact, if a
11 woman does not have children, that she is actually more
12 likely to receive a callback than --
13    A.  In that particular study, that's what they
14 found.
15    Q.  Okay.
16    A.  At the same time -- at the same time they
17 found discrimination against mothers.
18    Q.  So they found discrimination against mothers?
19    A.  Right.
20    Q.  So you're equating the fact that mothers were
21 less likely to be called back as discrimination?
22    A.  Yeah, that would be a discrimination paradigm;
23 and here there seems to be discrimination in favor of
24 the childless woman relative to the childless man.
25    Q.  Okay.  So some studies actually show
```

145

```
1  discrimination in the reverse?
2     A.  That can happen.
3     Q.  It's not called reverse discrimination,
4  meaning discrimination against men, in favor of women in
5  certain contexts?
6     A.  Yes.  It's highly contextual, yeah.
7     Q.  And do you know what the context of this study
8  was, of particularly the audit study that they're
9  looking at?
10    A.  What do you mean by the context?  I mean, they
11 sent out resumes to various kinds of possible employers,
12 similar resumes with male versus female names randomly
13 assigned.  They used this callback statistic, which is a
14 standard to use in -- in these audit studies because
15 it's a convenient kind of statistic; but, of course,
16 callback doesn't mean that you actually get the job.
17        And callbacks, you know, as you'll see,
18 it's a -- it's a smaller portion that gets called back.
19 So it's a -- you know, it's a little bit of a -- you're
20 sacrificing -- if you look in the first study, you had
21 all these variables that they were looking at, right?
22 You're sacrificing some element of precision to go for
23 this kind of more realistic group that you're polling
24 and also, you know, to do it in a kind of the real-world
25 context.
```

146

1    Q.  Sure.  So I want to ask you briefly about the
2  difference between correlation and causation.  Can you
3  explain that difference for -- in the way that you
4  understand it as an expert in this field?
5    A.  So a correlation is establishing that there's
6  a relationship between two variables.  So, for instance,
7  over time if we chart daily temperatures, there might be
8  a correlation between the average high of that day and
9  ice cream sales.  Does that mean that ice cream sales
10 cause the weather?  Does that mean that the weather
11 causes the ice cream sales?  Does that mean that they're
12 associated but for some other reason?  All of those
13 things can't be determined completely through just
14 evidence of correlation.
15       So, usually, to try to isolate causation,
16 we try to do an experimental study where it's the kind
17 of thing I talked about before where you randomly assign
18 people to different conditions.  For instance, in a
19 discrimination study, they get information that's
20 identical about someone who's a woman versus a man;
21 and then you see if there are significant differences
22 on various outcome variables.  Because you have, you
23 know -- because you have created that comparison, then
24 you can start to make causal conclusions more readily.
25 So that's kind of the basics of correlation causation

147

1  versus experiment and causation.
2       Now, there are statistical techniques you
3  can try to do in correlational studies to try to rule
4  out some of the alternative explanations; but you can't
5  isolate causation as well as you can in an experimental
6  study.
7    Q.  And virtually all the studies cited in your
8  report are -- are reporting correlations between two
9  variables?
10   A.  I wouldn't say that.  I think I cite
11 experiments more frequently, I would expect, than --
12 than correlational studies.  I mean, there's a mix.
13 There's room for both in scientific methodology.
14       Sometimes correlational studies, you can
15 study something that you really can't do -- effectively
16 do an experiment on because you can't create the
17 comparisons or control the conditions in a certain way.
18       So I think I cite a mix of studies; but I
19 would say as a social psychologist, I'm -- I'm more
20 prone typically, I would think -- I haven't counted them
21 up -- but I'm more prone to citing experimental studies.
22   Q.  And I may have misstated that.  But these
23 studies link -- they have variables, gender -- for
24 instance, gender of an applicant and an outcome and they
25 correlate those two and they make a link about causation

148

1  based on the correlation of those two variables --
2    A.  I --
3    Q.  -- of the gender of an applicant and whether
4  or not they get a callback?
5    A.  Right.  So there's different study designs.
6  In an experimental study you would have randomly
7  assigned people or employers to a condition to receive
8  either the -- you know, the male resume or the female
9  resume.  When you randomly assign them and you observe
10 then an average difference in how they're treated,
11 you've done an experimental design.  You've -- you've --
12 you know, by randomly assigning a group, you've kind
13 of -- the idea is you're washing out all those sort of
14 noisy variables that might affect how people rate other
15 people that are not, you know, part of what, really,
16 you're studying; and the statistics control for that
17 because they can -- you -- you assess how much of this
18 noise there is within conditions.  So you can then
19 assess whether the difference between conditions is
20 statistically reliable.
21       So by randomly assigning, by
22 manipulating -- we call it manipulating; it sounds bad
23 to me -- but by controlling the conditions, right, and
24 having these different conditions, creating these
25 comparisons, that's when you can make causal

149

1  conclusions.
2    Q.  So it's the ability -- my understanding is
3  it's the ability to remove and account for potential
4  other explanations that allow an experimental study to
5  move from correlation to causation?
6       MR. SCHMIDT:  Objection, form.
7    Q.  (BY MR. GIBSON)  Conclusion?
8    A.  Right.  So that's -- I mean, I guess I quibble
9  slightly with how you put it; but it's the being able to
10 control the conditions to create the comparison to
11 assess the amount of, you know, random noise, for our
12 purposes, that's going on within conditions and to make
13 that -- that comparison across an average difference.
14 That's where we can say causally there is -- you know,
15 we can conclude with a certain degree of scientific
16 certainty that -- that this variable has a causal
17 effect on the outcome.
18   Q.  But simply because there's a causal
19 connection -- or a correlation between two variables
20 and an outcome doesn't mean that there's necessarily a
21 causal relationship, correct?
22   A.  Correct.  If you only just measured, you know,
23 these two variables, like, you measured the ice cream
24 sales; you measured how they varied along with the high
25 temperature of the day, you can't infer, for instance,

150

1  that ice cream sales caused the temperature to be
2  higher, right?  You know, and you can't even infer the
3  reverse, though that's a more plausible conclusion,
4  right?  And there can always be other variables that are
5  related to these two variables that create that
6  correlation.
7      Q.  Correct.  And I think you've stated in your
8  report, or certainly in other reports that we've
9  discussed, that the inability to account for all of
10  those other variables in a real-world situation is one
11  of the reasons it's so difficult to do a scientific
12  study of an individual workplace to determine whether or
13  not individual decisions are the function of
14  discrimination or -- on a particular protected class or
15  the function of multiple other potential variables?
16      A.  Broadly, yes, you know, I think especially
17  when you're talking about:  Was a specific individual
18  discriminated against, yeah, that's really, to me, not
19  going to be feasible.
20      Q.  I'd like to go to the section on Evaluation
21  Procedures Can Minimize Or Permit Discrimination.
22      A.  Sure.
23      Q.  Let's go to the second page of that on
24  page 36.  You state in the beginning, "Therefore,
25  organizations that wish to avoid having bias contaminate

151

1  their personal" -- I'm sorry -- "their personnel
2  evaluations should rely on objective indicators and
3  compare an individual's scores to carefully determined
4  behavioral benchmarks."  You don't have any --
5      A.  Right.
6      Q.  You don't have any studies that support that
7  entire paragraph.  There's no citation that's -- that
8  you cite that show that use of objective criteria will
9  alleviate the correlation that is found when using
10  subjective criteria?
11      A.  I cited previously, building up to this
12  section, about how, you know, when you have subjective
13  criteria, when you allow -- when you don't have
14  benchmarks, how bias can creep in.  So partly this a
15  logical conclusion based on that other material.
16          But in addition to that, I can, you know,
17  happily provide you with some citations for that, for
18  instance, Madeline Heilman in a Research in
19  Organizational Behavior article.  There's a Harvard
20  Business Review article where Shelley Correll, the one
21  who did the motherhood bias study we were talking about,
22  is one of the coauthors.  So this -- this isn't
23  something that is novel or unexamined.
24      Q.  Would you agree that the SAT is an objective
25  evaluation standard?

152

1      A.  Okay.  So when you say objective, are you
2  saying completely free of bias?
3      Q.  No.  I'm using the word objective in the way
4  that you use it.
5      A.  Right.  Okay.  So, for instance, if you said
6  that we're going to base admissions on a standardized
7  test, like the SAT, and then we're going to have a
8  certain benchmark, then you have a process where, you
9  know, you're doing the sort of things that I'm talking
10  about.  This is a more objective measure.  And then you
11  have certain benchmarks.  So you're preventing bias at
12  that evaluation stage.  There can be a problem, however,
13  where bias -- if the measure itself is subject to
14  biases, right, it's not free of bias, then that bias
15  kind of carries forward to the evaluation stage, even
16  though you're introducing no bias at the evaluation
17  stage.
18      Q.  And you, in fact, discussed such a concept
19  with student evaluations.  You allege that student
20  evaluations themselves are biased; and, therefore, they
21  can't be accurately relied upon in this process and they
22  have problems -- well, I won't try to go beyond that of
23  what you say in this case.  But, anyway, you attack
24  student evaluations themselves as an objective measure;
25  is that correct?

153

1      A.  I think that student evaluations -- there's
2  research suggesting that they are subject to gender
3  biases, especially in math-intensive kinds of courses,
4  and also that student evaluations are not necessarily a
5  reliable measure of student outcomes.  So they are --
6  they are problematic; but if you base tenure decisions,
7  for instance, partly on student evaluations, you have a
8  certain standard that you're employing, you know,
9  consistently, you're -- you're insulating, again,
10  against introducing further bias at that stage.  But
11  you -- you know, if, indeed, the measure itself is
12  subject to bias, you have carried that forward.  So it
13  is -- it is problematic.
14      Q.  Is there evidence that suggests selection for
15  grants is biased?
16      A.  There is some evidence that there's some small
17  bias in -- against female principal investigators in
18  obtaining grants in scientific fields.
19      Q.  Is there evidence that selection for
20  publication in journals can be biased?
21      A.  I think there's also some evidence, again, for
22  first author, some -- some small bias against first
23  authors who are females and also in citation counts.
24      Q.  So those are -- those three things that you
25  just mentioned, grant funding, publication -- numbers of

154

1  publications and citation counts are all things, I
2  think, that you specifically suggest would be objective
3  measures; but you have also just said they also reflect
4  bias?
5      A.  I said that they can be subject to a small
6  amount of bias in -- in these earlier stages; but I'm
7  distinguishing -- you know, when I'm talking about this
8  in context, I'm talking about the Budget Council's
9  procedures, right?
10     Q.  I'm not talking about yet that section of the
11 report.
12     A.  All right.  Okay.  We're not there yet.
13     Q.  We're talking about summary --
14     A.  Yes, there is -- there is some evidence for
15 that.  I didn't think that was particularly at issue
16 in this case, so I didn't decide to invest in going
17 into the research on that; but that can, similarly, have
18 some -- some degree of bias against women in scientific
19 fields, yes.
20     Q.  Do you have any evidence that suggests or that
21 shows that using the objective indicators, as you've
22 described them, actually results in outcomes that are
23 less biased than using what you describe as subjective
24 evaluations in the scientific field?
25     A.  Well, that depends.  That means that you have

155

1  to have -- I have to think about this.  So are you going
2  to repeat that again?
3      Q.  Sure.  Do you have any studies, evidence,
4  citations that says using the objective criteria that
5  you propose for academics, would you have also said
6  include bias such as citation counts, grant money,
7  teaching evaluations, numbers of publications, any of
8  those things that using those indicators to assess merit
9  in an employment decision is a -- actually reduces bias
10 versus using subjective measures, as you described?
11     A.  Well, from the research that I cited, we know
12 that the more subjectivity involved, the more likelihood
13 that biases creep in.  I'm not sure I can cite you a
14 study that shows if you use these exact methods, that
15 you will then have, you know, more female professors
16 getting tenured.  I don't think I have a study that says
17 that.  I guess I would ask:  What's the alternative, you
18 know, to using these defensible kinds of measures?
19         Again, yes, there's some evidence that
20 these can also be biased; but then you go down the road
21 of are you going to have, you know, different standards
22 for women and for men.  And I think that's -- that's
23 also philosophically a problematic issue, right?
24         So I think the important thing is to be
25 aware of the biases and to as close -- as much as

156

1  possible, stick to these kinds of relatively more
2  defensible measures.
3      Q.  My -- so the -- the answer to my question is,
4  I think, a "no."  You do not have studies that you can
5  point to to show that using the objective criteria that
6  you've identified versus using subjective criteria
7  results in a reduction of bias against women in
8  evaluations?
9         MR. SCHMIDT:  Objection, form.
10     A.  Well, again, I think there are individual
11 studies that -- that show examples of -- of just exactly
12 that sort of thing that I've cited.
13     Q.  (BY MR. GIBSON)  Which ones?
14     A.  So, for instance, having a fixed benchmark;
15 for instance...
16     Q.  Which study is that?
17     A.  The Uhlmann and Cohen study cited in 114.
18 They found that people shifted the criteria they used to
19 judge women and men in a stereotypically masculine job;
20 but then when they, you know, sort of a condition where
21 they fixed the criteria how you're going to weight them
22 in advance, that avenue of bias disappeared.
23         So it's kind of there's a logic to --
24 let's put it this way:  As we established, there can be
25 bias at the earlier stage that's kind of baked into some

157

1  of the metrics.  There can be some degree of bias there.
2  And there can be bias at the decision-making stage that
3  we know has more free run when you rely on subjective
4  criteria rather than pre-determined benchmarks and
5  relatively more objective criteria.  Is that creating a
6  perfect world?  Not necessarily, but we know that that
7  cuts off some of these processes that can occur at this
8  later stage.
9      Q.  Okay.  But -- so the one you cited was about
10 police chiefs, correct?
11     A.  Yeah, a masculine field.
12     Q.  And that was allowed -- in that case the
13 evaluator shifted the criteria that they were relying
14 upon when there was a benchmark that was established?
15     A.  When there was no benchmark established and
16 they buried whether the male candidate versus the
17 female candidate was superior on -- and I think in this
18 study it was superior on either street experience or the
19 person was -- the other person -- the other person had a
20 higher education.  And then they flipped it, right?
21         So they flip-flopped that in an
22 experimental study.  It's a really nice example of an
23 experimental study.  You have a male candidate.  You
24 have a female candidate.  One's higher on one dimension
25 and lower on the other.  That dimension is

158

1  systematically varied in different conditions.
2         And what they found is that people
3  shifted to preferring the criterion that distinguished
4  the male candidate as superior.  When the male candidate
5  had more street smarts they said, "Oh, street smarts is
6  more important."  When the female candidate had, you
7  know, street smarts, they're -- they're underplaying the
8  importance of street smarts; and they're saying, "Oh,
9  education" -- which favors the male candidate -- "is
10  more important."
11        So people are flexibly shifting the
12  goalpost when you give them that opportunity; but when
13  they repeated the experiment and fixed what was deemed
14  to be most important, then you cut off that avenue of
15  bias.  So that's an example of showing how when you, you
16  know, do these kinds of procedures, you can reduce the
17  amount of bias.
18        Yes, that was with an example of the
19  masculine field, being police chief.
20     Q.  The next section you have is Retaliation
21  Against Women Who Complain About Discrimination.
22        MR. SCHMIDT:  Darren, I just wanted to
23  interject, we've been going a little bit over an hour;
24  and if we can take a break fairly soon, I'd appreciate
25  it.  I don't know when is a good time, but I wanted to

159

1  throw that out there.
2         MR. GIBSON:  Now is a fine time.  A
3  five-minute break?
4         MR. SCHMIDT:  Perfect.  Thanks.
5         THE VIDEOGRAPHER:  The time is 2:28 p.m.
6  We are off the record.
7         (Off the record from 2:28 to 2:34 p.m.)
8         THE VIDEOGRAPHER:  The time is 2:34 p.m.
9  We are back on the record.
10     Q.  (BY MR. GIBSON)  All right.  Let's go ahead
11  and -- one of the things, before we start discussing the
12  application of -- to the current case that you have in
13  what's called Section V of your report, I want to just
14  make sure I understand some of the statements you've
15  made and just confirm that you have not quantified these
16  statements.
17        For instance, in page 10 of your report,
18  starting at the bottom you say, "For example, laboratory
19  research showing that women, compared to men, tend to
20  receive equal praise for performance but are denied
21  tangible rewards corresponds to findings in field
22  studies that even though women receive similar or better
23  performance evaluations in actual jobs, managers rate
24  them as lower on 'promotability.'"  Do you have any
25  understanding of how often that's likely to occur when

160

1  you say women tend to receive equal pay but are denied
2  tangible results?
3     A.  Well, again, it goes back to, like, the Joshi
4  study, the Joshi, et al. meta-analysis that we talked
5  about; and we talked about the effect size in that.  So,
6  you know, in that study the effect size for the
7  difference in organizational rewards was .56, I think.
8  And so that could be translated into the kind of
9  quantitative figure I think you're asking for, which is
10  kind of the proportion of the time that -- that women
11  versus men would be given lower rewards.
12     Q.  And what is that?  What does that translate
13  to?
14     A.  I'm not -- I'd have to look.  I don't have
15  this whole conversion table in my head.  That's not
16  usually the way that it's reported in social scientific
17  research.  It's much more common to provide the
18  Cohen's d.  I think I could kind of quickly lay my hands
19  on a conversion table for that; but I think with a d of,
20  like, .56, it might be, like, two-thirds, 70 percent of
21  the time that women would be -- you know, overall, that
22  women receive lower rewards than men, something like
23  that.  So there's definitely going to be exceptions,
24  absolutely no doubt about it, a lot of variables to play
25  in; and this is one that -- you know, that -- one of

161

1  other variables.
2     Q.  And I'm really asking these questions for the
3  purposes of the jury because I will tell you, I'm pretty
4  sure the jury's not going to understand what Cohen's d
5  value means or how to translate that into --
6     A.  Right.
7     Q.  So I'm not trying to catch you.  I'm not
8  trying to be tricky.  I'm trying to understand your
9  testimony as it might relate to what a -- how a juror
10  would think, and so I'm trying --
11     A.  Yeah.
12     Q.  -- to understand that, so.
13        And, again, for that study there is a
14  Cohen's d that's reported.  I get that we can try to
15  communicate that in the form of a likelihood, and so
16  that's great.
17        Let's go to some of the other statements
18  that you make.  So, for instance, on page 12 you say,
19  "When women or minority group members are
20  underrepresented, they tend to be viewed as a poorer --
21  'poorer fit' for a job than men or majority group
22  members."  Again, do you have how often they tend --
23  women tend to be viewed as a poorer fit in that context?
24     A.  I don't, offhand, have that, you know.  Again,
25  if we have something like a Cohen's d, we might be able

162

1  to kind of give an estimate of that.
2      Q.  Okay.
3      A.  But, again, I will just say there's always
4  going to be exceptions, absolutely.
5      Q.  And, similarly, on, like, page 16 you have a
6  statement, "Research shows that people tend to excuse
7  men's emotional or situational" -- I'm sorry.  "Research
8  shows that people tend to excuse men's emotionality as
9  situational while attributing the same emotional display
10  by a woman to an underlying disposition," citing
11  Footnote 48, the Barrett case -- the Barrett study.  And
12  I just want to make sure I'm not missing anything.  Do
13  you have any understanding of a way to say how much --
14  how likely is it that people will tend to do that, based
15  on the study?
16      A.  Again, I could try to figure that out by going
17  back to the article, seeing if they report statistics in
18  a way that kind of is amenable to that, to giving some
19  sense of, you know, how overlapping these distributions
20  are between how men and women are rated, to give some
21  idea of -- you know, that -- that might be accessible
22  to a jury about -- about that effect.
23      Q.  Okay.  And is it generally going to be the
24  case that unless you reported a difference -- which, I
25  mean, to be fair, on the Joshi study you did report the

163

1  14 to -- you know, 14 times more likely.  Other than
2  that, I don't see a lot of information like that
3  included in your report.  Is it going to be -- is the
4  answer likely to be the same if I ask you about other
5  studies, that you would have to look at the study to see
6  whether they report effect size to determine whether or
7  not you can provide the type of information I'm asking?
8      A.  Probably.  Some of them I might remember,
9  like, you know, for instance, I, you know, remembered
10  the effect size of the Joshi, et al.; but, yeah, I mean,
11  for many of them, probably I would have to go back and
12  look.
13      Q.  Do you remember any of the effect sizes for
14  any of the other cases off the top of your head that you
15  cited?
16      A.  Other --
17          (Simultaneous speakers.)
18      Q.  I'm not expecting you to.
19      A.  Yeah, I don't know.
20      Q.  I'm just -- you did remember Joshi.
21      A.  I don't know.
22          (Simultaneous speakers.)
23          MR. SCHMIDT:  I'm going to throw in an
24  objection to form.  I'm throwing an objection to form
25  into that question.

164

1      Q.  (BY MR. GIBSON)  If there are others that are
2  like:  Oh, yeah, I know --
3      A.  Yeah.
4      Q.  -- this study or that study, I would be very
5  interested; but I'm not expecting you to.
6      A.  Right.  Yeah, I -- not -- as I just sort of
7  leaf through them -- oh, on Moss-Racusin, I remember
8  that they -- that the effect sizes, I think, on theirs
9  were various measures, they said, were moderate to
10  large, I -- I believe.
11      Q.  What --
12      A.  I believe I might have mentioned that.
13      Q.  And what footnote are you referring to?
14      A.  Well, it's 81; but I think that might not be
15  the slot.  Oh, yeah, yeah, yeah.  There it is.  "Effect
16  sizes for discrimination were moderate to large."
17  Moderate to large would mean they were probably around
18  a d of .5 to .8, or maybe bigger; and then that would
19  be -- I don't know -- you know, maybe from moderate,
20  be like maybe two-thirds, to -- to large, maybe like
21  80 percent, you know, something like that.
22      Q.  Okay.  All right.  I think now I'd like to
23  turn to page 40 of your report regarding application to
24  the current case and opinions.
25      A.  We're making progress, aren't we?

165

1      Q.  Yes, we are.
2          So one of the things that you -- the way
3  you describe some of your opinions about how you apply
4  the research to this case is that you testify that
5  certain behaviors, particularly by Dean Wood, are
6  consistent with bias.  Did you determine whether they
7  are also consistent with no bias?  Did you -- did you do
8  the analy-- any analysis to determine whether or not
9  her behaviors could be consistent with a lack of bias?
10      A.  Well, what I'm saying is if you look at some
11  of the -- the -- for instance, the content of the
12  judgments made of Dr. Nikolova, you know, those are --
13  saying that she's not as committed is the kind of thing
14  that would occur had motherhood and pregnancy bias
15  occurred.  So that's what I mean that -- you know,
16  consistent with bias.
17          What I'm saying is I cannot rule out
18  that other explanations, for instance, that, you know,
19  Dean Nikolova [sic] you know, simply judged -- she would
20  judge a male -- imagine there were a male Dr. Nikolova,
21  right?  We don't know how she would have judged him.  So
22  what I'm saying is I can't rule that out that, you know,
23  she would have acted the same way against a man.
24          But I can say, well, based on the
25  research, if she were to discriminate, this is the kind

166

1 of form it would take and then look at the case and say:
2 Okay. Well, she questioned Dr. Nikolova's commitment,
3 which is consistent with the form motherhood and
4 pregnancy and taking workplace, you know, accommodation
5 policies would -- would tend to take.
6         So, again, you know, I'm leaving this
7 open. The jury needs to -- to make that ultimate
8 decision because I can't say with a scientific
9 certainty. I can say: Look, if you look at it, this
10 resembles what we'd expect based on the research; but I
11 can't tell that, you know, with some sort of scientific
12 probability that that was what happened.
13     Q.  When you say that you expect it based on the
14 research, you mean that it -- that it occurs more often
15 than not?
16     A.  I'm not saying -- I'm not making it a more-
17 often-than-not judgment because I think that would
18 tread on the jury's purview; and I don't want to stick
19 a -- you know, a certain probability judgment, which I
20 think, you know, that's -- I can't put that kind of
21 probability -- I don't feel comfortable putting that
22 kind of probability judgment on it.
23         If I were a member of the jury, then
24 fine, yeah, I've got to make that judgment; and I would
25 feel fine making that judgment. You know, I think it's

167

1 a difficult job the jurors have; but I would -- you
2 know, I would be empowered to make that judgment. I
3 don't want -- I'm trying not to, yeah, to say something
4 that I -- I don't -- that I feel is in any way going to
5 mislead the jury.
6     Q.  Okay. Going to page 41, you state, quote --
7 at the bottom of the first full paragraph, "Research
8 into biases related to pregnancy, motherhood, and use of
9 workplace flexibility policies provide more specific
10 information about the pattern of discrimination, if it
11 occurred, would likely take." When you say "would
12 likely take," how likely is "likely"?
13     A.  Well, yeah, I guess I could get rid of
14 "likely" there. You know, this is a pattern that we
15 would expect.
16     Q.  When you say it's a pattern you would expect,
17 is that because there have been studies that confirm
18 that that conduct -- or that show that that conduct is
19 associated with a statistically significant bias against
20 working mothers?
21     A.  There's research -- if I understand your --
22 I'm just going to phrase it a little bit more the way I
23 want to phrase it as I'm trying to understand your
24 question. So what I would say is there's research that
25 shows that pregnancy, motherhood, taking flexible

168

1 workplace policies for the purpose of childrearing,
2 that those are -- that when you experimentally
3 manipulate those things, right -- so you're looking for
4 causality -- that what you see is that, on average,
5 people will view a woman as less committed to her job
6 and that that translates, also, into people viewing
7 women as less promotable.
8         So these are the biases that the
9 research shows occur. And so if you were asking ten of
10 my colleagues: Okay. If somebody was pregnant, took
11 the -- you know, the leave, all of those things, on
12 what dimensions of evaluation would this person
13 potentially suffer, suffer discrimination, they'd say,
14 "Oh, well, she'd be seen as less committed." Right?
15 That would be -- that's, like, a very clear finding from
16 the research.
17         You know, I can't -- I can't translate
18 that into saying that that is the reason why Dean Wood
19 made that judgment. What I'm saying is: The research
20 suggests that's the kind of judgment that would be made
21 if somebody was exhibiting a kind of pregnancy,
22 motherhood, workplace accommodation bias.
23     Q.  But, to be clear, you don't have any idea
24 whether or not Dean Wood is exhibiting a pregnancy/
25 motherhood bias?

169

1     A.  I can't say with any sort of scientific
2 certainty. I'm saying that what she said about
3 Dr. Nikolova, you know, it's consistent with what we'd
4 expect from somebody who is exhibiting this kind of
5 bias; but we can't -- I can't rule out that -- that
6 those judgments are due to other reasons.
7     Q.  So how often in the studies that link a
8 question -- questioning commitment and competence to --
9 or citing to, I guess -- how often in linking those two
10 things -- I'm not -- I apologize. I'm not phrasing this
11 question very correctly. Let me rethink about how I
12 want to phrase the question.
13         I'll move on. In the next paragraph
14 on page 41, you cite to the fact that Nikolova --
15 Dr. Nikolova claims that since she joined the faculty in
16 2014, all seven men who went up for tenure and promotion
17 received promotion; and three women, including
18 Dr. Nikolova, who were considered were denied. Do you
19 see that?
20     A.  Uh-huh. Yes, I see that.
21     Q.  Do you know if those other individuals were
22 mothers?
23     A.  I do not know if that was the case or not.
24     Q.  And, in fact, some of the data we've seen has
25 shown that if they were not mothers, they actually --

170

1 there's data supporting the fact that they may have
2 received a benefit, relative to men, for being nonmother
3 women in the workplace; and they may actually be -- be
4 preferred over men in the workplace. We've seen some
5 data to that effect, correct?
6         MR. SCHMIDT: Objection, form.
7     A. Oh, you mean the Correll study?
8     Q. (BY MR. GIBSON) Yes, that showed that in that
9 actual audit study, nonmother women were significantly
10 more likely to be selected than were the similarly
11 situated men?
12         MR. SCHMIDT: Objection, form.
13     A. That -- I don't think that -- I don't
14 remember. We'd have to go back whether that comparison
15 was made because I think comparisons were made within
16 gender; but, also, that was a study about callbacks, you
17 know. So it's a little bit different; but, yeah, I
18 mean, I think in this section I'm talking about the --
19 how mothers, people who take workplace accommodation
20 policies, and pregnant women are treated relative to
21 childless women and to men.
22     Q. (BY MR. GIBSON) So you made two points I want
23 to focus on. Number 1, you were, like, the point is
24 childless women compared to women who are mothers and
25 compared to men; but you don't know whether any of the

171

1 other three women that reportedly did not get tenure had
2 children or not?
3         MR. SCHMIDT: Objection, form.
4     A. I'm not aware of the parental status of the
5 other women.
6     Q. (BY MR. GIBSON) Did you ever ask for that
7 information?
8     A. I did not ask for that information, but I'd be
9 happy to review information that -- that could be
10 provided to me.
11     Q. And you also pointed out that that study, the
12 Correll study, that actually shows that women without
13 children were preferred over men in getting a callback,
14 was in the con- -- was in the limited context of a
15 callback situation, correct?
16     A. Right.
17     Q. So would you -- did you make that statement
18 because that means that you're concerned that it doesn't
19 necessarily apply to a tenure promotion decision?
20     A. Well, I'm saying that it's -- it's a
21 significant -- there are significant differences with a
22 callback that's not the ultimate hiring decision, right?
23 So, you know, that's -- that's a step along the way.
24     Q. Do you have any -- well, and you're right.
25 That's not a hiring decision nor is it a -- it's also --

172

1 a hiring decision is a step away from a promotion
2 decision, correct?
3     A. That's correct, too. Yes, that's correct,
4 too.
5     Q. So you had concerns about citing that study
6 because it was in the context of a callback. Do you
7 have any studies that are in the context of promotion of
8 tenured faculty?
9     A. I have studies that were about organizational
10 rewards, such as promotion, like the Joshi
11 meta-analysis. And I cited the Correll study.
12     Q. But, again, do you have any studies that are
13 about promotion, tenure and promotion at universities?
14     A. Offhand, I'd have to -- I'd have to think
15 about that. Offhand, I can't give you a study about --
16 that was directly about promotion at universities.
17 There is a -- there is a reference I cite, but I think
18 it's a book about promotion at universities. But, yeah,
19 offhand, I can't think of which ones might be about
20 promotion at a university.
21     Q. Kind of at the bottom of page 41 you say,
22 "Should case decision-makers find this information
23 credible, it suggests background conditions that make
24 discrimination more likely."
25     A. Sure.

173

1     Q. More likely than what?
2     A. More likely than if there had been a history
3 of, say, equal promotion of men and women.
4     Q. Do you know what the history is of promotion
5 of men and women?
6     A. Well, I think there's an allegation here. As
7 I say, Dr. Nikolova alleges that only 4 of 53 tenured
8 faculty within the engineering department are women. So
9 that's a very small proportion of women, and we also
10 know in the research that male-dominated fields tend to
11 be less hospitable, right, to women. And -- and she
12 makes a claim about people going up for promotion. If
13 that -- those claims are incorrect and you want to
14 present evidence that they're incorrect, I'd be happy to
15 review that and this would modify, essentially modify
16 what I say in this section.
17     Q. Would you want to look at data that -- well,
18 who's the primary decisionmaker that your report,
19 particularly this section of the report, refers to,
20 Dean Wood, correct?
21     A. Yeah, well, Dean Wood is the -- the level of
22 decisionmaking where earlier positive recommendations
23 were overturned, yes. So I think necessarily in this
24 case if there was discrimination, that's kind of the
25 starting point.

174

1    Q.   Would you -- if you were looking at data about
2  whether or not a particular person is discriminating in
3  a particular context, wouldn't you want to look at data
4  that's related to that person?
5    A.   Yeah, if there's data related to deans --
6  Dean Wood's decisionmaking, that would certainly be a
7  background kind of context, you know.  You know, if
8  she -- if there were a sufficient number of promotion
9  decisions of women and men -- you know, I think there
10  are -- you know, in the -- in the Response to Summary
11  Judgment some comparisons with male comparators.  All
12  those sorts of things would be relevant, and -- and I
13  would be happy to review more information.  Again, I
14  reserve the right for that to -- to possibly alter my
15  opinions.
16    Q.   Do you know if the data that is -- you say
17  it's, you know, cited by Dr. Nikolova in her appeal,
18  even relates to Dean Wood?
19    A.   I don't know how long Dean Wood was in that
20  position.  I don't know if there's a sufficient database
21  for Dean Wood or not.
22    Q.   So if that data did not relate to Dean Wood,
23  that would not be data that would make it more likely
24  that Dean Wood would engage in discrimination; is that
25  correct?

175

1    A.   Well, I wouldn't quite put it that way.
2    Q.   Okay.  So --
3    A.   Remember, we're talking about how senior
4  women within an institution who achieve higher
5  positions -- well, everybody, of course, tends to
6  adhere to the norms of the institution.  So the general
7  kind of climate is something that's relevant.  We
8  already talked about this, how the general norms in an
9  environment can make it more likely that somebody will
10  exhibit bias versus suppress that bias.  So I don't want
11  to make a blanket statement about that.
12    Q.   Right.  So meaning you don't want to make a
13  blanket statement that if the data about proposition of
14  women doesn't even relate to the dean, that doesn't
15  mean -- that doesn't affect your analysis?
16    A.   Well, there's a lot of other things that go
17  into my analysis.  I'm just saying that that's -- you
18  know, that's kind of a lack of information then.  If
19  it's not related to Dean Wood, then it's really not
20  kind of -- I don't want to say -- I use the word very
21  broadly -- diagnostic.  You know, it's not, like, sort
22  of information about Dean Wood.  So, you know, it's not
23  like a -- it's not going to be extremely helpful if you
24  are providing me with information -- that's like saying
25  if you provided me with information about some other

176

1  dean, is that going to affect my opinion of Dean Wood,
2  you know, that's -- that's not really going to probably
3  affect the overall weight of this information.
4    Q.   Because you presume Dean Wood, because she's a
5  woman of power in a male-dominated field, is more likely
6  than not to follow the -- the norms of that field, as
7  you just said, in fact, everybody does?
8    A.   Well, I'm saying people who obtain positions
9  of power and rank in an area, the research would suggest
10  that you demonstrate and adhere to the norms that are in
11  that organization.  That's who organizations tend to
12  promote.  That's the -- that's the root to obtaining
13  power and authority typically.  Are there exceptions to
14  the rule?  There's always exceptions to the rule.
15         So I'm saying that based on what we know
16  social psychologically that -- you know, I don't have a
17  particular beef with Dean Wood, you know, personally --
18  that this is -- this is the sort of thing that -- the
19  process that -- that social psychology would suggest
20  occurs.
21    Q.   The next page, on page 42, you end the first
22  paragraph, "If decision-makers find Dr. Nikolova equally
23  qualified on objective measures to such comparison
24  candidates, it would suggest a discriminatory double
25  standard towards her."

177

1    A.   Sure, yeah.  Based on my use of the term
2  discriminatory in the context of my field, yes.
3    Q.   If they -- if case decision-makers did not
4  find Dr. Nikolova equally qualified, would that mean
5  that it would suggest that there was not a double
6  standard towards her?
7    A.   Well, it would certainly undermine her case,
8  you know.  It doesn't mean there was, you know, no
9  discrimination necessarily; but if there is -- if
10  there was a process, like the Budget Council's process,
11  its benchmarks and all of that, then at that
12  decisionmaking level, you know, I would stick to my --
13  you know, my report of that -- you know, if they had
14  that kind of process, there might be some tainting of
15  some of the metrics; but at that level of
16  decisionmaking, it would -- it would mitigate the
17  likelihood that there was bias.  And if she, you know,
18  didn't stand up on these metrics, then I think that
19  would substantially weaken her case, yes.
20    Q.   I find it somewhat surprising that in this
21  case you rely heavily on the Budget Council's
22  determination and the fact that there was a group of
23  people who made a determination using a metric of, you
24  know, standards, that then the dean overrode that, and
25  you then critique the dean for doing so and find that

178

1  the dean's conduct was consistent with discrimination.
2           In the Mullenix case, the dean, in fact,
3  followed the recommendations of the Budget Committee and
4  you still criticized the dean for following the
5  recommendations of the Budget committee --
6           MR. SCHMIDT:  Objection, form.
7      Q.  -- and you did not point out that, in that
8  opinion, that the Budget Committee itself was a form of
9  mitigating bias by the fact that it was a committee of
10  multiple people, as you do in this case.  Is there a
11  reason why you didn't do that in the Mullenix case but,
12  yet, you do it here?
13          MR. SCHMIDT:  Objection, form.
14      A.  I think my -- my opinions in both cases are
15  entirely consistent if you carefully read my report.  In
16  my report in the current case for Dr. Nikolova, what I
17  talk about is just what we were talking about.  The
18  Budget Council in this case is in a different
19  department, a different school than the Budget Council
20  in the other case.
21          The Budget Council in this case had
22  carefully-constructed benchmarks.  For instance, they
23  had looked at recently-tenured individuals at peer
24  institutions and looked at things like the citation
25  counts for their research, their grant dollars that they

179

1  had obtained, the impact factor of the journals that
2  they published in.  All of these sorts of things were --
3  were very carefully laid out, very carefully assessed.
4           Now, again, some of those metrics --
5  there's some bias creeping into some of those metrics;
6  but once you look at the Budget Council level, the
7  Budget Council in the engineering school is completely
8  different in their procedures than the other Budget
9  Council you're talking about, who would, for instance,
10  assign one person to read the target individual's work
11  and render an opinion, right, which leaves open the door
12  to all sorts of subjectivity.
13          On this Budget Council -- let's put it
14  this way:  You could take the engineering -- the Budget
15  Council that evaluated Dr. Nikolova, if -- if you set
16  out -- set out all their criteria, right, all of the
17  things that they used, how they weighed them, the
18  benchmarks they compared them to, then you could just
19  bring in a whole new set of individuals, a whole new set
20  of faculty who adhere to the same standards, they're
21  going to find that Dr. Nikolova, when they research her
22  citation count, they're going to get the same number,
23  right?  That's not going be a subjective judgment on
24  their part.  They're going to compare that to the same
25  benchmark of recently-tenured individuals at other

180

1  institutions.  They should come up with the same
2  recommendation.
3           By contrast, the other Budget Council was
4  much more along the lines of very subjective potential
5  decisionmaking where it was kind of one person's opinion
6  one year, another person's opinion the next year, right,
7  those sorts of things that could be influenced by common
8  biases.
9           Let's say that I'm a Budget Council
10  member in the Nikolova case and let's say, you know, I
11  have some bias against her; but if I'm charged with I
12  have to look up her citation count and compare it to
13  these already-set benchmarks, well, then, you know, the
14  conclusion is pretty much going to be based on, you
15  know, what the -- what I'm instructed to do.  I don't
16  have the room to -- to allow -- you know, I don't have
17  the room to introduce my bias in that way.
18          MR. GIBSON:  I'd like to take just a
19  quick five-minute break.
20          THE WITNESS:  Okay.
21          THE VIDEOGRAPHER:  The time is 3:06 p.m.
22  We are off the record.
23          (Off the record from 3:06 to 3:17 p.m.)
24          THE VIDEOGRAPHER:  The time is 3:17 p.m.
25  We are back on the record.

181

1          MR. GIBSON:  I think Robert would like to
2  make a --
3          (Simultaneous speakers.)
4          MR. SCHMIDT:  I'm sorry.  Go ahead,
5  Darren.
6          MR. GIBSON:  No.
7          MR. SCHMIDT:  Since we're back on the
8  record, I would request that Dr. Glick be given a copy
9  of his deposition to read and sign and make corrections
10  if necessary.  That is what I have.
11          MR. GIBSON:  Okay.
12      Q   (BY MR. GIBSON)  Dr. Glick, on page 42 of your
13  report, you referred -- we were mentioning the fact that
14  there's a reference to comparator information regarding
15  other male faculty who were promoted.  Have you done any
16  separate analysis of the information regarding
17  comparators in this case?
18      A.  No, I did not.
19      Q.  Excuse me.  I'd like to go to your statements,
20  I think -- oh, let's first go to page 44, please.
21  First, you say -- you're talking about evaluations.  You
22  say, "Thus, being visibly pregnant may well have
23  unfairly affected Dr. Nikolova's teaching evaluations."
24  Do you know if Dr. Nikolova was visibly pregnant at the
25  time of the evaluations in question?

182

1    A.  I'd have to go back and look at the timeline,
2  but I'm not sure offhand.
3    Q.  And in order to do that scientifically, you
4  would actually have to ask the people who provided the
5  evaluations if they perceived her to be visibly
6  pregnant --
7        MR. SCHMIDT:  Objection, form.
8    Q.  -- correct?
9        MR. SCHMIDT:  Objection, form.
10   A.  Well, I mean, you know, to really
11 scientifically study this, you'd have to make a
12 comparison of a pregnant versus non-pregnant
13 Dr. Nikolova, randomly assigning people to conditions,
14 say, different classes that sort of thing, which you
15 could do with a pregnancy prosthesis.
16   Q.  (BY MR. GIBSON)  But, again, you don't know if
17 she was visibly pregnant or not at the time of the --
18   A.  Offhand, I cannot tell you.
19   Q.  You, also, in the next paragraph refer to
20 well-meaning evaluators.  When you say "well-meaning
21 evaluators," are you intending to refer to the fact that
22 evaluators may engage in implicit -- I'm trying to use
23 the word that you prefer to use -- maybe an unconscious
24 bias in evaluation of faculty members?  Is that what
25 you're saying?

183

1    A.  I'm trying to find it.
2        MR. SCHMIDT:  Objection -- I'm sorry.
3  Objection, form.  And I would ask that you point it out
4  where that section is.
5        MR. GIBSON:  Sure.  Page 44, the same
6  page we were talking about before --
7        MR. SCHMIDT:  Okay.
8        MR. GIBSON:  -- the first full paragraph,
9  third line.
10   A.  Right, right, right, right, right.  So there,
11 in that context, what I'm talking about is if the
12 metrics themselves are infested with bias, you could
13 have the most objective, well-meaning evaluators in the
14 world; and, you know, with a procedure of the kind that
15 I'm saying would, you know, mitigate further bias being
16 introduced by the evaluators, but there still could be
17 bias baked into things like the teaching ratings.
18        But I'm saying that, okay, aside from
19 that, just looking at the Budget Council kind of
20 procedures, you know, setting aside any possible
21 biases baked into the metrics, you know, when you look
22 at those -- those -- the Budget Council procured, you
23 wouldn't be introducing further bias; but you could be
24 carrying bias through by having the information itself
25 being tainted at an earlier stage.

184

1    Q.  (BY MR. GIBSON)  And you would consider that a
2  discriminatory outcome if a decisionmaker was using a
3  metric that itself was tainted with bias, even though
4  the decisionmaker did not have any; themselves were
5  unbiased, as you say?
6    A.  Right.  I mean --
7        MR. SCHMIDT:  Objection, form.
8        THE WITNESS:  Sorry.
9    A.  Yeah, from -- from my perspective, the fact,
10 though, there would be a discriminatory outcome without
11 bias being introduced at this later stage, there still
12 could be a discriminatory outcome.
13   Q.  (BY MR. GIBSON)  Based on the bias of the
14 metric itself?
15   A.  Right, based on the bias of the metric itself;
16 and then there's also the point that in these fields,
17 you know, people who are -- are making these decisions
18 would, you know -- they should be aware of the
19 possibility of these biases, right, because there is --
20 these biases are -- are known to exist.  How you handle
21 that, I think, is a very difficult question; but -- but
22 it is something that decision-makers should be aware of.
23   Q.  You also, in your opinion section, which is at
24 the top of page 45 you say, "Research on gender bias in
25 student evaluations of teaching in STEM fields and

185

1  pregnancy biases that reduce women's perceived
2  competence and commitment suggest that Nikolova may have
3  received lower teaching ratings than similar male or
4  non-pregnant female colleagues."  Did I read that
5  correctly?
6    A.  Yes.
7    Q.  Does it also suggest she may not have
8  received lower teaching ratings than similar male and
9  non-pregnant female colleagues?
10   A.  It doesn't rule out that possibility, but the
11 research suggests that the bias is likely to be in the
12 direction of a lower teaching evaluation.  But I can't
13 rule out the possibility that no bias occurred.
14   Q.  And that's presuming -- that requires that the
15 evaluators to have known she was, in fact, pregnant?
16   A.  For pregnancy bias to occur, they would have
17 to perceive her as being pregnant, right?  It would have
18 to be at some level they're perceiving her to be
19 pregnant.
20   Q.  Below you say -- you're talking about
21 evaluator bias.  You should -- and you talk about
22 objective metrics; and you say, "For example, commonly
23 used metrics to assess a professor's scholarship include
24 grant dollars received, number of publications,
25 frequency with which others cite publications, journal

186

1  impact factor." Those are the ones you cite.
2      A.  Yeah, and these are ones that the Budget
3  Council in the Engineering School uses.
4      Q.  Okay.  And, again, I would ask that you not
5  interrupt me and let me ask my question.  Okay?  The
6  question was:  You say, "Commonly used metrics include,"
7  and you list a bunch of metrics.  Do you have any
8  citations to support your statement that those metrics
9  are commonly used in higher education as a metrics to
10  assess professor scholarship?
11     A.  I don't have a citation to that.  That is more
12  on the order of kind of common knowledge among
13  academics.
14     Q.  Do you normally base your scientific
15  conclusions based on common knowledge?
16     A.  This was not a scientific conclusion.
17     Q.  You mean the entire section, everything that's
18  in this section entitled Application To Current Case And
19  Opinion?
20     A.  No, I mean --
21         MR. SCHMIDT:  Objection, form.
22         THE WITNESS:  Sorry.
23         MR. SCHMIDT:  Go ahead.
24     A.  No, I mean that statement, the statement you
25  asked about.

187

1      Q.  (BY MR. GIBSON)  Well, that statement is --
2  you rely on that statement to -- to say that that's --
3  those are objective metrics that could have been used in
4  this case, right?
5      A.  Those were, in fact, the metrics that the
6  Budget Council in this case used and uses for tenure
7  decisions; and I'm saying that the Budget Council at
8  that level of decisionmaking, you know, setting aside
9  the possibility of earlier biases baked into the
10  metrics, that they did a very careful job.
11     Q.  Again, that's not what you say.  You say,
12  "These are commonly used metrics to assess a professor's
13  scholarship."  Do you mean to assess a professor's
14  scholarship at the University of Texas School of
15  Engineering -- College of Engineering, I mean?  Is that
16  what you mean, or do you mean across higher education?
17     A.  I think if you look at across higher education
18  at research universities, that for these kinds of
19  decisions, they will look at things like journal impact
20  factors, citation index, and so on.  That is my belief.
21  I do not have a study to give you about that, but my
22  belief is that these are commonly used.  And in this
23  particular case they were used.
24     Q.  Okay.  Turning to page 53, you state in con --
25  in your opinion in bold, "In contrast to the more

188

1  objective and benchmark-based approach taken by the
2  Budget Committee, Dean Wood used a subjective approach
3  known to allow bias to affect decisions through
4  subjective inferences and shifting standards."  Do you
5  think that that statement reflects specific causation in
6  this case, an opinion about specific causation?
7         MR. SCHMIDT:  Objection, form.
8      A.  That that subject -- no, it's about general
9  causation, that a subjective approach is more likely to
10  yield or allow bias.  And, again, I don't conclude that
11  in this case Dean Wood's decision was -- I'm not making
12  a scientific conclusion about whether that was bias or
13  not.  So I don't ultimately make that conclusion.
14     Q.  (BY MR. GIBSON)  You make the conclusion that
15  Dean Wood used a subjective approach known to allow bias
16  to affect decisions through subjective inferences and
17  shifting standards.
18     A.  "Known to allow" doesn't mean that it -- you
19  know, that it was.  And by "subjective," I mean here
20  that -- that introducing subjectivity into the decision-
21  making process is known to allow biases to operate; and
22  I'm not concluding that they necessarily did in this
23  individual case.
24     Q.  But you don't put that in your report in terms
25  of the specific caveat that you just added to me about

189

1  this specific opinion?
2         MR. SCHMIDT:  Objection, form.
3      Q.  (BY MR. GIBSON)  You don't say:  But I am not
4  making conclusion of whether or not that occurred
5  specifically in this case when you drafted the paragraph
6  entitled Opinion on page 53?
7         MR. SCHMIDT:  Objection, form.
8      A.  I say right above this, "Ultimately case
9  decision-makers will need to decide which processes to
10  place more trust in" -- that is, the Budget Council or
11  Dean Wood -- "and to determine whether Dean Wood's
12  conclusions were biased and discriminatory."  I give
13  that caveat right before I issue that opinion, yeah.
14     Q.  (BY MR. GIBSON)  And then you say Dean Wood --
15  how do you know that the subjective approach that
16  Dean Wood purportedly used is known to affect bias or
17  known to allow bias to affect decisions when you have
18  never assessed the specific approach that Dean Wood used
19  in this case?
20         MR. SCHMIDT:  Objection, form.
21     A.  I make it clear in the context of this section
22  that if the case decision-makers find this to be a
23  subjective approach, that's known -- that generally
24  subjective approaches are known to open the door to
25  bias.  That doesn't mean that bias necessarily occurred,

190

1  but that's their decision.  I make that very clear in
2  the context leading up to the opinion.
3          You know, looking at the opinion now, I
4  think, you know, I could maybe tweak the wording a
5  little bit; but the context is very clear to me that, if
6  you read the rest of the section, that that's what I'm
7  saying.
8      Q.  Similarly, on page 57, on your opinion on
9  the last sentence you say, "Both in terms of process
10 (e.g., subjective interpretation) and content (inferred
11 lack of commitment), the Dean's decision-making about
12 Dr. Nikolova is consistent with bias towards pregnant
13 women, mothers, and workplace accommodation policy use."
14     A.  Correct, and at the same time I make the same
15 caveats in the section that precede that conclusion.
16     Q.  But you don't include those caveats in this
17 sentence.  You don't say that the Dean's decision-
18 making -- you don't say if you determine, that if the
19 jury determines that this -- the following facts, then
20 it would more likely than not that the Dean's decision-
21 making about Dr. Nikolova would be consistent with that.
22 You don't have any of those caveats.  You say it is.
23 "The Dean's decision-making about Dr. Nikolova is
24 consistent with bias towards pregnant women, mothers,
25 and workplace accommodation policies."

191

1      A.  And I'm clear --
2          MR. SCHMIDT:  Objection, form.
3      A.  I'm clear in -- the same answer as I gave in
4  the prior section.  I'm clear throughout the section
5  about the caveats before I render that conclusion.  So
6  you have to read that in context.  You know, if you want
7  to take it out of context -- and I don't -- I don't say
8  "more likely than not."  That was in your question.  I
9  don't -- you know, I don't use that kind of language.
10         We've already talked about "is consistent
11 with."  It follows the kind of pattern that you would
12 expect if there were discrimination, but I'm very clear
13 preceding this that, really, that's up for the -- the
14 jury to determine.  So I think in context my meaning is
15 clear.  I think you're taking it out of context and
16 trying to twist it in a way that makes it sound like I'm
17 making a -- some sort of conclusion that it was
18 discriminatory and I'm not doing that and I, again,
19 think it's clear in context that I'm not.
20     Q.  In the following page, 59, you said,
21 "Research suggests that Dean Wood's gender and prior
22 experiences with discrimination would not serve to
23 protect against bias against Dr. Nikolova, but rather
24 could make discrimination more likely."
25     A.  Correct.

192

1      Q.  So you make the conclusion that simply
2  because Dr. Wood is a woman, that she is more likely to
3  discriminate against Dr. Nikolova?
4          MR. SCHMIDT:  Objection, form.
5      A.  I think you just twisted what I said.
6      Q.  (BY MR. GIBSON)  You said, "Research suggests
7  that Dean Wood's gender and prior experiences" -- okay.
8  I'm sorry.  Because she's a successful woman in the STEM
9  field, would not -- that doesn't preclude her from
10 discriminating; but rather, it makes it more likely?
11         MR. SCHMIDT:  Objection, form.
12     A.  I'm saying that the research says that a
13 successful woman in the STEM field is equally or even
14 more likely, based on the research, to discriminate
15 against women; and that's what the research shows.
16 We've gone over that already.  Again, I have the same
17 caveats in this section that I have in the other
18 sections; and I'm leaving that decision up to the jury,
19 as is appropriate.
20     Q.  (BY MR. GIBSON)  And the research that I've
21 seen that you cited really does that on an average
22 basis.  It says, on average, women are more likely to --
23     A.  So this --
24     Q.  Am I correct that -- let me rephrase it
25 separately.  I didn't see any research that allowed

193

1  researchers to make a determination about whether an
2  individual decision by an individual person was more
3  likely to be motivated by discrimination relative to
4  someone else.
5          MR. SCHMIDT:  Objection, form.
6      A.  So, again, we go back to the way in which we
7  isolate causation and the really -- and as you and I
8  talked about, the only way to really isolate causation
9  is by doing these experiments where we -- you know,
10 because we can't give people:  Oh, here's an identical
11 resume under a woman's name and an identical resume
12 with a man's name.  They'll obviously know what the
13 study's about.  Okay?  And we know their social
14 desirability biases where there's -- that's perfect
15 circumstances to -- you know, for them to -- they're not
16 going to discriminate.
17         So we have to randomly assign people to
18 different conditions, and then we see when everything's
19 identical, right?  We're doing a very precise method so
20 that we can isolate causality and we can examine the
21 circumstances under which discrimination occurs, and we
22 see this across the average differences between the
23 groups because there are always other factors involved
24 that are going to push people's ratings around.
25 Somebody's more lenient.  Somebody's harsher.  Well, we

194

1 randomly assigned to big enough groups that those things
2 even out.
3       We use statistics to determine the amount
4 of those kinds of noisy factors that are going in there
5 because we can see that within -- the differences within
6 the same condition. Not everybody within the male
7 target condition is rating the guy the same way, right,
8 because there are individual differences and all these
9 things going on. So we can get -- we can find out if
10 there is a difference that is statistically reliable
11 between how people, on average, treat the male target
12 versus the female target. And this is really the best
13 way we have to disentangle this.
14       So we can't isolate one individual in
15 that circumstance and say, "That person discriminated,"
16 right? "Oh, they rated a woman low, so they
17 discriminated." We can't isolate that one person
18 because we don't know what they would have done to an
19 identical man. So it's the nature of the research that
20 you're talking about. We can't make that isolated, you
21 know, kind of judgment; and that's why I tried to be
22 clear in my report that we can't do that you know, like,
23 say, "Oh, Dean Wood discriminated." I'm not -- I'm not
24 able to make that judgment in a scientific way.
25       I can't -- even in these experiments, I

195

1 can't identify an individual and say, "That individual
2 discriminated." What I can say is, "Oh, when they --
3 when people, you know, a bunch of people evaluated an
4 identical male target to an identical female target, on
5 average, we got this size of difference," right? And,
6 you know, there's some variation in that, of course.
7 There's going to be some exceptions to that, but this
8 tells us the pattern of discrimination. We can vary
9 different contextual factors, see how that affects it.
10 We can isolate the causality so you're not sitting here
11 saying, "Oh, all you have is a correlation. You don't
12 have causation." Well, we can look at causation by
13 using these methods; and that's the knowledge base.
14       Q. Can I ask a question?
15       A. That's what I'm trying to communicate.
16       Q. So in all of these studies there is a
17 distribution on a curve. And some people in the studies
18 show the biased behavior, and some don't. But, on
19 average -- the research you cite to support your
20 position show that, on average, more people exhibit the
21 bias behavior than don't?
22       MR. SCHMIDT: Objection, form.
23       Q. (BY MR. GIBSON) Is that a generally correct
24 statement?
25       A. I quibble a little bit with the --

196

1       Q. Let's not quibble on little things. Is it
2 generally accurate?
3       A. Well, no, the little things matter here
4 because, again, we can't say whether a specific
5 individual discriminated or not. And I feel like you
6 framed it that way.
7       Q. No.
8       A. And I don't want to contradict --
9       Q. I am specifically not framing it that way.
10      A. Okay. These studies --
11           (Simultaneous speakers.)
12      MR. SCHMIDT: Can you repeat your
13 question?
14      MR. GIBSON: We can't talk over each
15 other.
16      MR. SCHMIDT: Can you -- can you repeat
17 your question?
18      Q. (BY MR. GIBSON) My question is: Can you
19 predict -- here's a question: Can you predict whether a
20 particular individual will or will not engage in
21 particular behavior in a study -- can you go the reverse
22 in a study? Can you say that because this person has
23 certain attributes, they would appear as in the portion
24 of the study that showed the effect, not in the portion
25 of the study that wouldn't show the effect? Can you do

197

1 that? Can you reverse predict how someone would perform
2 in a study?
3       MR. SCHMIDT: Objection, form.
4       A. You can do studies where you measure
5 individual characteristics, for instance, like, certain
6 kinds of ideologies or attitudes that they might have
7 and examine whether those characteristics predict that
8 they're more likely to discriminate because, for
9 instance, you can -- you can factor that in
10 statistically. So you can -- you can see if there's a
11 bigger difference between how people who score a certain
12 way on a measure evaluate women versus men. So you
13 could -- you know, that gives you information.
14       Can you say for certain whether if
15 somebody scores a certain way, that that person
16 necessarily will discriminate? No, we can't say that
17 for certain; but we can say that, based on the research,
18 there's a greater likelihood that that would be the
19 case, broadly speaking.
20       Q. Broadly speaking across the entire population?
21       A. Broadly speaking across people with similar
22 characteristics, like, say, adhering to a certain
23 ideology.
24       Q. But you can't make that determination and
25 apply it to a specific individual, correct?

198

1    A.  Yes, I cannot -- this is like saying can
2  you -- you know, you might be able as a meteorologist to
3  predict the pattern of weather with a certain degree of
4  accuracy; but are you going to be able to predict the
5  path of a blizzard in a snowflake?  No.  When you're
6  asking can I predict what an individual is going to do,
7  you know, in these kinds of circumstances, that's -- you
8  know, that's -- that would be very, very dicey.
9    Q.  It's not only you can't predict you it; you
10  can't, after the fact, determine whether or not specific
11  decisions were motivated -- motivated by specific
12  factors.  You can't make a scientific determination as
13  to whether or not Dr. Wood -- Dr. Wood's gender and
14  prior experience, in fact, made her more likely to
15  discriminate or, in fact, caused her to discriminate?
16    A.  As an individual, right.  I mean, we already
17  went over this, I think.  I think I already answered
18  that question.  And if I understand the question
19  correctly, the answer is:  No, I cannot.  And I've
20  already been very upfront about that and -- and, you
21  know, that my whole section about application to the
22  case is constantly framed with that kind of caveat.
23    Q.  Let's see.  It'll take me just a couple of
24  minutes here.  Hold on just a second.  I've got to
25  transition.

199

1          Okay.  I apologize.  Hold on just a
2  second while I pull something up.
3          MR. SCHMIDT:  While you're doing that,
4  Debbie, do you have a time in terms of how long we've
5  been going?
6          THE REPORTER:  Four hours, twenty-four
7  minutes.
8          MR. SCHMIDT:  Thanks.
9          I know Darren's going to be done by 4:00,
10  so.
11          MR. GIBSON:  I just -- I think I'm going
12  to wrap up.  I think these are pretty easy.
13          MR. SCHMIDT:  I'm joking.
14          MR. GIBSON:  Oh.
15          MR. SCHMIDT:  But go ahead.  I was giving
16  you a hard time.
17          MR. GIBSON:  I'm sorry.  I wasn't
18  listening.  I was focused on something else, but I think
19  I'm going to be pretty close.
20    Q.  (BY MR. GIBSON)  I'm going to ask you a few
21  questions.  I just want to make sure that -- I think
22  these are relatively easy questions.
23          Is there a scientific technique that
24  supports the rendering of your judgment in this case as
25  to whether or not what occurred here would be consistent

200

1  with potential bias and discrimination?
2    A.  So, again, I think you're asking me if the
3  final section of my report involved doing a formal
4  scientific study on the University of Texas and the
5  people involved.  And the answer is:  No, I did not.
6    Q.  Are you aware of any scientific technique that
7  would allow -- that would support statements, the
8  statements that are found in the -- your section
9  regarding the application of this case as to whether
10  Dean Wood's conduct was consistent with discrimination?
11    A.  So, again, I'm applying my expertise in the
12  scientific framework to offer avenues for the jury to
13  consider and to make observations about the case; but
14  that section of the report, as I made clear in the
15  report, is not, itself, performing a scientific study.
16  And I, therefore, resist making precise scientific
17  conclusions as a result.
18    Q.  And that methodology that you -- or the
19  opinions that you provide in Section V regarding
20  application to this case are not based on methodologies
21  that have been subject to peer review or publication; is
22  that correct?
23    A.  That -- yes, that would be correct.  I think
24  that's basically what I was trying to say.  And I think
25  your other question was, you know, is there a method,

201

1  you know, to determine, for instance, with a scientific
2  certainty, whether discrimination occurred in a
3  particular case.  There isn't a method to do that, at
4  least not for an individual case such as this.
5    Q.  Okay.  Do you have a personal opinion as to
6  whether or not Dr. Nikolova was subject to
7  discrimination in the tenure decision that's at issue in
8  this case?
9    A.  I don't want to render any personal opinion on
10  this because I think that's going outside my role.
11    Q.  That's fine, but do you have a personal
12  opinion?
13    A.  Having reviewed all of the materials in the
14  case, if I were a juror, sure, I have an opinion on it.
15    Q.  Based on looking at the evidence that you've
16  reviewed, what's your personal opinion?
17          MR. SCHMIDT:  Objection, form.
18    A.  I'm not going to state my personal opinion
19  because I think that's not my role.  I think that would
20  be -- that would be -- to me, that's painting outside
21  the lines of what I understand my role to be.
22    Q.  (BY MR. GIBSON)  Do you think your personal
23  opinion may have affected the conclusions that you've
24  reached in your report?
25          MR. SCHMIDT:  Objection, form.

202

1    A.  I'd say that my personal opinion is influenced
2  by my scientific opinion.
3    Q.  (BY MR. GIBSON)  So you think you are -- do
4  you think you can keep your scientific opinions
5  uninfluenced by your personal opinions?
6    A.  I try to evaluate the evidence.  That's what
7  you try to do scientifically.  So I strive for as much
8  kind of objectivity as possible in trying to weigh the
9  evidence.
10          MR. GIBSON:  Give me just a couple of
11 seconds, and I'll go off for, like, two minutes.  And
12 then we'll come back on.  Okay?
13          THE WITNESS:  Okay.
14          THE VIDEOGRAPHER:  Are we going off the
15 record?
16          MR. GIBSON:  We don't have to go off the
17 record.  It'll be very quick.
18          THE VIDEOGRAPHER:  Okay.  I just wanted
19 to clarify.
20          MR. GIBSON:  Oh, back on -- sorry.  Back
21 on the record.
22    Q   (BY MR. GIBSON)  Have you also testified in a
23 case involving Oregon State Health Science Center?
24    A.  Oh, yes.  I haven't testified, but I have
25 written a report for that case.  Thanks for reminding

203

1  me.  It's Bala v. -- what you said -- Oregon Health
2  Services University.
3    Q.  Were you hired by the plaintiff in that case?
4    A.  I was hired by the plaintiff in that case,
5  yes.
6    Q.  Did that case occur this year?
7    A.  Yes, it did.  It's still -- I mean, I wrote a
8  report.  There's not been a deposition or anything else.
9    Q.  After being re- -- having your recollection
10 refreshed with respect to Bala, any other -- do you
11 recall any additional cases besides that one that we
12 didn't discuss previously for the last -- for this year?
13    A.  Not that I can think of right now; but, again,
14 I'd be happy to go through my computer and figure that
15 one out.
16    Q.  Okay.  And, finally, I know that we -- earlier
17 today, we talked much about Footnote 20 on page 11 of
18 your report regarding the Joshi article -- I'm sorry --
19 regarding the Roth article.  And we -- specifically, I
20 was asking if you were able to identify the portion of
21 the article that supports the statement in your report
22 on page 11 that 6 studies involving 4,000 individuals
23 that included both supervisor's performance and
24 evaluations and ratings show that supervisors were more
25 likely to rate men as having higher promotion potential

204

1  than women.  And I asked if you could cite to the
2  portion of the article that supported that statement in
3  your report.  And, as I recall, you did not have that at
4  your fingertips at the time; and you said you would need
5  to have time to look at the article.  Have you looked at
6  article since we discussed that?
7    A.  I haven't.  I have not had time to really look
8  at that article, no.
9    Q.  Okay.  We can do that now.
10    A.  You want me to spend time on the -- all right.
11 Okay.
12          MR. SCHMIDT:  What exhibit number is
13 that?
14          MR. GIBSON:  That is Exhibit Number 3.
15          THE WITNESS:  Oh, sorry.  I'm looking --
16 sorry.  I looked at the wrong one.  Hold on a second.
17          MR. GIBSON:  Apologies.  Roth was Exhibit
18 Number 2, not 3.
19          THE WITNESS:  Right.
20          MR. SCHMIDT:  Exhibit 2?
21          MR. GIBSON:  Correct.
22          (Witness silently reading document.)
23    A.  There's some information in Table 1, but
24 that's not -- that's not all of it, but the
25 promotability.  And they talk about how the number of

205

1  coefficients is 8 percent of articles.  It looks like
2  it's 18 percent -- oh, I think that's -- I'm not sure
3  what that's referring to right now.  I'll have to look
4  at -- oh, percentage of variance due to the artifacts.
5  Okay.  That's not -- that's something different.
6  All right.
7          Okay.  So under -- let's see here.
8  Right.  Okay.  So I think it's under promote -- the
9  heading of Promotability, page -- what page is this --
10 page 10 of the article, the section on promotability, a
11 subset of 6 studies reported measures of performance on
12 the current job and that -- oh, K equals -- yeah, N
13 equals 4,000.  So, yeah, it's in that paragraph.
14    Q.  (BY MR. GIBSON)  I'm sorry.  Say that again.
15 Which paragraph?
16    A.  The paragraph that has the heading
17 Promotability on page 10 of the article.  It's the one,
18 two -- third paragraph down.  I read that as saying
19 there were six studies -- was it six studies -- wait.
20 Blah, blah.  A subset of six studies, and the end was
21 4,309.  That -- that's, I believe, where I'm getting
22 that information from.  I read that as six studies had
23 both promotability and performance evaluation ratings.
24    Q.  Okay.  Do you know which six studies those
25 were?

Peter Glick - 11/5/2021

206

1    A.  I don't think they identify which six studies
2  those were, but I'd have to further review to try to
3  figure that out.  But my guess is that they don't
4  identify those six studies individually.
5    Q.  Uh-huh.  Also, I just want to point out that
6  on the next page, Table 2, that shows the date of
7  publication.  They do this moder- -- I think what you
8  were talking about, I think, moderator analysis.
9    A.  Okay.  So this is on Table 2.  Okay.  Yes.
10  Date of publication.  Okay.  And what is this table?
11  Let me just see.  This is -- is this in performance
12  ratings?  Yeah, this is in job performance, where they
13  generally do not find a difference in job performance
14  ratings.
15    Q.  Just so I understand, that's the d number,
16  correct?
17    A.  So you're looking -- d would be the Cohen's d
18  in that first column.
19    Q.  What -- okay.  Looking at Table 2, what
20  variable shows the difference in job performance rating?
21    A.  The -- this -- this is -- I believe this table
22  is all about difference in job performance ratings.
23  That's -- that's what every -- everything in Column 1 is
24  about the average difference in job performance ratings.
25    Q.  And does that appear to show that the average

207

1  difference in job performance ratings is going down over
2  time?
3    A.  It shows that it's relatively small to start
4  with, and then I don't know if that's a statistically
5  significant trend.  I'd have to read further.  But the
6  trend is that it's going down over time, but the whole
7  point that I was citing at that point in the -- in my
8  report was, although there is no overall or a trivial
9  overall difference in job performance ratings, when it
10  comes to organizational rewards, those decisions don't
11  mesh with that lack of difference on performance
12  ratings.
13       In other words, women are rated as doing
14  just as well as men on the whole for the most part; but
15  they're not being given the organizational rewards.
16  They don't have a similar time analysis, I would
17  imagine, on the organizational rewards because this
18  particular meta-analysis, there were, you know, fewer
19  studies.  Only a very small subset of the studies looked
20  at promotability ratings.
21    Q.  And so those organizational rewards may have
22  been from studies from the 1960's or '70's?
23    A.  Well, I can't identify from this.  Again, I --
24  if you want to give me more time, I can see; but I
25  highly doubt that they're going to identify which

208

1  studies were the ones with the promotability ratings.
2    Q.  And so you also don't know how promot- -- the
3  effect of promotability ratings over time because they
4  don't report that, correct?
5    A.  Right.  I don't think they have enough data to
6  report that.
7    Q.  Okay.
8    A.  And just scanning through, I'm not seeing
9  anything that -- anything obvious that suggests they
10  identified what those -- you know, which studies had the
11  promotability ratings.  That's why I think the other
12  meta-analysis, the -- the Roth -- sorry -- the Joshi,
13  et al. -- the Joshi, et al. is more impressive.  It has
14  more data that looks at both evaluations and promote --
15  actual organizational award -- reward decisions, like
16  promotion, salary, and those sorts of things.
17       MR. GIBSON:  All right.  I don't believe
18  I have any further questions at this time.
19       MR. SCHMIDT:  We'll reserve our
20  questions.
21       MR. GIBSON:  Thank you very much,
22  Dr. Glick.
23       THE WITNESS:  Okay.  Thanks.  If we're
24  off the record, I just want to ask about --
25       THE VIDEOGRAPHER:  I'll take us off the

209

1  record.  My apologies.  The time is 4:02 p.m.  We're off
2  the record.
3       (Deposition adjourned at 4:03 p.m.)
4              --ooOoo--
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

210

```
1          CHANGES AND SIGNATURE
2   WITNESS NAME:          DATE OF DEPOSITION:
3   PETER GLICK, Ph.D.         November 5, 2021
4   PAGE/LINE   CHANGE          REASON
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____
```

212

```
1   STATE OF TEXAS   )
2          REPORTER'S CERTIFICATION
3       I, DEBBIE D. CUNNINGHAM, CSR, hereby certify
4   that the witness was duly sworn and that this transcript
5   is a true record of the testimony given by the witness.
6       I further certify that I am neither counsel
7   for, related to, nor employed by any of the parties or
8   attorneys in the action in which this proceeding was
9   taken.  Further, I am not a relative or employee of any
10  attorney of record in this cause, nor am I financially
11  or otherwise interested in the outcome of the action.
12      I further certify that pursuant to FRCP
13  Rule 30(f)(1) that the signature of the deponent was
14  requested by the deponent or a party before the
15  completion of the deposition and that the signature is
16  to be before any notary public and returned within 30
17  days from date receipt of the transcript.  If returned,
18  the attached Changes and Signature Page contains any
19  changes and the reasons therefore.
20      Subscribed and sworn to by me this day,
21  November 8, 2021.
22
23
24  _____
        Debbie D. Cunningham, CSR
25
```

211

```
1       I, PETER GLICK, Ph.D., have read the
2   foregoing deposition and hereby affix my signature that
3   same is true and correct, except as noted herein.
4
5   _____
6       PETER GLICK, Ph.D.
7
8   THE STATE OF _____  )
9       Before me, _____, on
10  this day personally appeared PETER GLICK, Ph.D., known
11  to me (or proved to me under oath or through
12  _____) (description of identity card or other
13  document) to be the person whose name is subscribed to
14  the foregoing instrument and acknowledged to me that
15  they executed same for the purposes and consideration
16  therein expressed.
17      Given under my hand and seal of office on
18  this _____ day of _____, _____.
19
20
21  _____
22  NOTARY PUBLIC IN AND FOR
23  THE STATE OF _____
24  My Commission Expires:_____
25
```

| | | |
|---|---|---|
| **B** | | |
| **Barbour** 2:24 | | |
| **C** | | |
| **Cawston** 2:23 | | |
| **H** | | |
| **Hughes** 2:25 | | |
| **J** | | |
| **Jody** 2:25 | | |
| **L** | | |
| **Laura** 2:24 | | |
| **P** | | |
| **Philip** 2:23 | | |