# EXHIBIT B

# EXHIBIT 1

REPORT ON SEX STEREOTYPING

IN THE MATTER OF

SAGUN TULI, M.D.

V

BRIGHAM & WOMEN'S HOSPITAL, INC. & ARTHUR DAY M.D.

Civil Action No. 1:07-cv-12338

Prepared by Peter Glick, Ph.D.

September 22, 2008

**TABLE OF CONTENTS**

I.      Background and Qualifications……………………………………………………3

II.     Type of Testimony…………………………………………………….......……..6

III.    Documents Reviewed in Preparation of this Report ………………………….....9

IV.     Summary of Opinions……………………………………………………….....10

V.      Detailed Explanation of Opinions……………………………………….……..12

VI.     Conclusion…………………………………………………………………...39

VII.    Compensation & Signature…………………………………………………… 42

VIII.   Attachment A: Curriculum Vitae……………………………………………...43

I, Peter Glick, have been retained by Margaret M. Pinkham of the law firm of Brown

Rudnick, counsel for the plaintiff, in the case of *Sagun Tuli, M.D. v. Brigham & Women's*

*Hospital, Inc. & Arthur Day, M.D.* to issue a report on the science of sex stereotyping and

discrimination.

## I.      BACKGROUND AND QUALIFICATIONS

I am the Henry Merritt Wriston Professor in the Social Sciences and a Full Professor of

Psychology at Lawrence University in Appleton, WI, having joined the faculty in 1984 shortly

after earning my Ph.D. in social psychology at the University of Minnesota. I have co-edited two

books on prejudice (one forthcoming),[1] co-authored a text on the social psychology of gender,[2]

and authored or co-authored more than 60 professional papers (peer-reviewed journal articles

and chapters in edited books), dealing with prejudice in general, but most frequently with sexism

more specifically, including comprehensive reviews of sex discrimination in the workplace.[3] My

frequent collaborator, Susan T. Fiske of Princeton University, and I were awarded the 1995

Gordon Allport Prize for the best paper of the year in the area of inter-group relations for the

development of ambivalent sexism theory and an associated measurement instrument, the

---

[1] Dovidio, J. F., Glick, P., & Rudman, L. A. (Eds.). (2005). *On the Nature of Prejudice: 50 Years After Allport*. Malden, MA: Blackwell Publishing.
  Dovidio, J. F., Hewstone, M., Glick, P. & Esses, V. M. (Eds.). (in preparation). *Handbook of Prejudice, Stereotyping, and Discrimination*. New York: Sage.

[2] Rudman, L. A., & Glick, P. (2008). The Social Psychology of Gender: How Power and Intimacy Shape Gender Relations. New York: Guilford Press.

[3] Glick, P., & Fiske, S. T. (2008). Sex discrimination: The psychological approach. To appear in: F. J. Crosby, M. S. Stockdale, and S. A. Ropp (Eds.). *Sex Discrimination in the Workplace*. Malden, MA: Blackwell.
  Rudman, L. A., Glick, P., & Phelan, J. E. (2008). From the laboratory to the bench: Gender stereotyping research in the courtroom. In E. Borgida & S. T. Fiske (Eds). *Beyond common sense: Psychological science in the courtroom* (pp. 83-101). Malden, MA: Blackwell Publishing.

Ambivalent Sexism Inventory (ASI).[4] Since its publication in 1996, the ASI has been

administered to more than 25,000 people in over 25 nations around the world.[5] Another paper

(coauthored with Amy Cuddy and Susan Fiske) received an honorable mention for the 2005-06

Allport Prize.[6]

My research is widely cited and has appeared in the top journals in social psychology as

well as in *American Psychologist*,[7] the American Psychological Association's (APA) flagship

journal (which APA claims to be the most widely cited social science journal in the world). I

have been invited to be on 5 scientific journal editorial boards and currently serve on 4 of them

(including the *Journal of Personality and Social Psychology*, an APA publication considered to

be the top journal in social psychology). My scientific contributions have been recognized by my

election as a Fellow in the largest and most prestigious organizations in psychology – the

*American Psychological Association* and the *Association for Psychological Science* (formerly the

*American Psychological Society*). I have also been honored by election as a Fellow in societies in

the areas of my research interests – the *Society for Personality and Social Psychology, Society*

*for the Psychological Study of Social Issues,* and the *Society for the Psychology of Women* – as

well as by membership (which is elected) in the *Society of Experimental Social Psychology*. I

have also been elected to leadership positions in two societies, currently serving on the executive

---

[4] Glick, P. & Fiske, S. T. (1996).  The Ambivalent Sexism Inventory: Differentiating hostile and
  benevolent sexism. *Journal of Personality and Social Psychology, 70*, 491-512
[5] Glick, P. et al. (2000). Beyond prejudice as simple antipathy: Hostile and benevolent sexism
  across cultures. *Journal of Personality and Social Psychology, 79*, 763-775.
  Glick, P. et al. (2004). Bad but bold: Ambivalent attitudes toward men predict gender inequality
  in 16 nations. *Journal of Personality and Social Psychology, 86*, 713–728.
[6] Cuddy, A. J. C., Fiske, S. T., & Glick, P. (2007). The BIAS Map: Behaviors from Intergroup
  Affect and Stereotypes. *Journal of Personality and Social Psychology, 92*, 631-648.
[7] Glick, P., & Fiske, S. T. (2001). An ambivalent alliance: Hostile and benevolent sexism as
  complementary justifications of gender inequality. *American Psychologist, 56(2),* 109-
  118.

councils of the *Society of Experimental Social Psychology* and *Society for the Psychological Study of Social Issues*. My Curriculum Vitae is attached (Attachment A).

## II.     TYPE OF TESTIMONY

I will provide "social framework" testimony[8] to inform the decision makers in this

litigation about empirically validated principles concerning the operation of sex stereotypes and

discrimination. Social psychological and industrial/organizational research provides a scientific

knowledge base that illuminates the character of stereotyping and discrimination, such as the

circumstances that elicit specific types of sex stereotyping and discriminatory behavior,

including the typical content and patterning of sex stereotypes and the forms that sexist attitudes

and behavior take. An ample, scientific research literature on sex stereotyping and discrimination

provides information that can supplement and may sometimes contradict common-sense

assumptions that decision-makers would otherwise rely upon.[9]

This report represents *social framework testimony* that aims to inform decision-makers

about relevant, scientifically validated principles of sex stereotyping and discrimination. This is

*not* the same as performing diagnostic tests of specific individuals who may have discriminated

against Dr. Tuli or a systematic investigation into the social climate at Brigham & Women's

Hospital. While one could attempt to perform such tests, their scientific integrity would be fatally

compromised when conducted within the context of a lawsuit against those individuals or the

corporation that employs them. Social scientific research into the basic principles of sex

stereotyping normally involves voluntary participants who are assured (and can rely on these

assurances) of the complete anonymity and confidentiality of their responses. It is unlikely that

researchers could obtain candid and uncensored self-reports of attitudes from employees who are

---

[8] Mohahan, J., & Walker, L. (1993). Social science research in law: A new paradigm. *American Psychologist, 6*, 465-472.

[9] Krieger, L. H. (2004). The intuitive psychologist behind the bench: Models of gender bias in social psychology and employment discrimination law. *Journal of Social Issues, 60*, 835-848.

aware that the research is related to a pending lawsuit against the organization that employs

them. Thus, concerns about scientific validity (apart from the prohibitive financial costs) do not

recommend mounting an organizational investigation using standard social scientific techniques.

In sum, this report is designed to inform the decision makers in this case about *principles

of sex stereotyping and discrimination that have been established with scientific certainty* based

on empirical methodologies that are well accepted within the field of psychology. These

principles can provide an interpretive framework for understanding the pattern of behavior

exhibited toward Dr. Tuli and therefore can aid the decision makers in a trial to make more

informed judgments. Expert testimony of this type – known as *social framework testimony* – has

been widely accepted by the courts, including the Supreme Court (e.g., in *Hopkins v. Price-

Waterhouse*, a case for which my frequent collaborator Susan T. Fiske was the stereotyping

expert).[10]

To construct this report, I reviewed a limited set of materials from the current case (e.g.,

depositions, the complaint, affidavits) to understand which aspects of the scientific literature

would be relevant to the decision-makers. However, I provide no opinions about whether or not

Dr. Tuli specifically was the victim of discriminatory treatment, leaving the decision-makers to

render this judgment. I used two selection criteria to guide the scientific information included in

this report: (a) *relevance* to questions raised in this case (e.g., Under what circumstances are

women treated differently than men at work? What forms does differential treatment, when it

occurs, typically take?) and (b) scientific quality and validity (e.g., Was the research conducted

with validated scientific methods with known error rates? Was the research peer-reviewed? Have

the findings been replicated?). I did not "cherry-pick" research with an eye toward favoring Dr.

---

[10] Price-Waterhouse v. Hopkins, 109 S. Ct. 1775 (1989).

Tuli's case, but report on findings that jointly fulfilled the *relevance* and *scientific validity* criteria described above. If readers of this report review published summaries of the research literature on prejudice and sexism, they will find that the principles and findings described here are well accepted within the scientific community of researchers.

### III.    DOCUMENTS REVIEWED IN PREPARATION OF THIS REPORT

I have reviewed the plaintiff's complaint, depositions of the plaintiff and of defendant

witnesses, and various exhibits that include: hospital memos, e-mail exchanges, notes and

summary reports by Human Resources personnel. A complete list appears below:

1.  2005 HR Notes and Summary;
2.  2007 HR Notes and Summary;
3.  Dr. Day's Evaluation of Dr. Tuli;
4.  Pinkham notes on Susan Gormley's interview of Tuli;
5.  Deposition Transcript of Janet Nally Barnes;
6.  Deposition Transcript of Dr. Arthur Day;
7.  Deposition Transcript of Susan Lovell;
8.  Deposition Transcript of Eileen Hardy;
9.  Plaintiff's Reply to Defendants' Opposition to Motion for Preliminary Injunction w/ Exhibits, specifically Exhibits 8-9;
10. Tuli Affadavit;
11. Pinkham Affadavit;
12. Tuli Complaint; and
13. Plaintiff's Preliminary Motion for Injunctive Relief

## IV. SUMMARY OF OPINIONS

**The following points have been determined to a scientific certainty and consensus:**

- People of color and women who "upset" the traditional race and gender hierarchy by attaining powerful, high status roles elicit hostile backlash (e.g., negatively biased evaluations) from prejudiced evaluators

- Due to prevailing American egalitarian norms, prejudiced actors typically disguise or rationalize discrimination based on race or gender with apparently non-discriminatory pretexts; unfair discrimination is evident, however, when identical behavior is *penalized less or rewarded more* for white men versus minority members or women

- To disguise discrimination, prejudiced evaluators choose apparently plausible nondiscriminatory pretexts involving subjective social judgments that can not easily be disconfirmed (e.g., characterizing the target individual as interpersonally "hostile")

- Prejudiced individuals actively elicit behavior they can cite as confirming their prejudices (e.g., by promoting conflict that leads to "hostile" protests from targets of prejudice)

- Sexist attitudes are strongly *ambivalent* toward women, including both antagonistic ("hostile sexism") and subjectively positive, but patronizing and discriminatory ("benevolent sexism") ideologies

- Despite different emotional tones, hostile and benevolent sexism are complementary, defining traditional, prescriptive ideals about what women *should* and *should not* be like

- Men, as compared to women, are more likely to endorse both hostile and benevolent sexist ideologies and, therefore, to engage in discrimination based on these ideologies

- Sexist ambivalence leads to more extreme responses toward women (as compared to men), alternating between *paternalistic affection* to reward women who fulfill and *hostile discrimination* to punish women who challenge sexist prescriptions; specifically:

  o Sexist evaluators evince *paternalistic affection* when women (a) defer to or support male power, (b) enact traditional female roles or ideals of feminine behavior, and/or (c) are deemed romantically attractive

  o Sexist evaluators evince *hostile discrimination* when women (a) challenge male power, (b) enact masculine roles or violate ideals of feminine behavior, and/or (c) are deemed sexually or romantically unattractive or rejecting

- People who hold sexist attitudes toward women tend also to uphold a "macho" male ideal that excuses or even celebrates "bad boy" traits – prescribing that men should behave in a dominant, assertive, and bold manner that sexists view as highly inappropriate for women

- Power leads individuals to be more likely to act on their attitudes and impulses, emboldening sexist men to discriminate (e.g., to treat women in a sexualized manner)

- General endorsement of "niceness" prescriptions for women leads even relatively non-sexist (female and male) perceivers to evaluate woman more negatively than men when women:

  o succeed in a traditionally male occupation
  o act assertively
  o criticize or correct others
  o self-promote
  o express anger

- Stereotype-based biases persist by influencing subjective interpretations of subsequent behavior (e.g., a critical comment interpreted as "hostile" rather than constructive)

- Organizational norms and practices can encourage or discourage sexist discrimination; specifically, sex discrimination is more likely:

  o In male dominated occupations and organizations
  o When workplace norms and leaders permit or encourage disrespect for women
  o When apparent consensus or a leader's opinion elicit conformity to biased views
  o When subjective criteria form the basis of evaluation
  o When nondiscriminatory policies are not aggressively enforced

# V. DETAILED EXPLANATION OF OPINIONS

## *PREJUDICE AND STEREOTYPING*

Stereotyping research is a well established, scientific field, having been systematically investigated for many decades, beginning in the 1920s and 1930s,[11] but gaining significantly more social scientific attention, with increasingly sophisticated methods of investigation. in the last 50 years.[12] The study of stereotypes (beliefs about social groups), prejudice (biased feelings toward social groups), and discrimination (differential treatment of social groups) has become a major subfield of social psychology[13] and is also an increasingly frequent topic of research among applied psychologists.[14] Stereotyping research has been conducted both in the laboratory and naturalistic field settings. Although basic principles have often first been established in the laboratory with college undergraduate participants, these principles have been shown to generalize to other populations and settings (e.g., working adults in the business world; large organizations such as the Armed Forces). For example, there is ample evidence that sex stereotyping and discrimination first shown in laboratory work with college students operate similarly among working adults and within work organizations.[15] Sex stereotyping is one of the most well-researched areas of stereotyping and discrimination over the past 30 to 40 years.[16]

---

[11] Katz, D., & Braly, K. W. (1933). Racial stereotypes of 100 college students. *Journal of Abnormal Social Psychology, 28*, 280-290

[12] Fiske, S.T. (1998). Prejudice, stereotyping and discrimination. In D. T. Gilbert, S. T. Fiske, and G. Lindzey (Eds.). *The Handbook of Social Psychology* (4th ed). New York: McGraw-Hill.

[13] *Ibid.*

[14] Smith, A. N., Brief, A. P. & Colella, A. (in press). Where the action is: Examining unfair discrimination and its causes in and around organizations. In Dovidio, J. F., Hewstone, M., Glick, P. & Esses, V. M. (Eds.). *Handbook of Prejudice, Stereotyping, and Discrimination*. New York: Sage.

[15] Glick, P., Zion, C., & Nelson, C. (1988). What mediates sex discrimination in hiring decisions? *Journal of Personality and Social Psychology, 55*, 178-186;

## RACISM AND SEXISM

Racism and sexism, both alleged in this case, are the two most well researched prejudices. They share some fundamental similarities. First, race and gender form the basis for status hierarchies, with people of color and women historically being accorded lower status than whites and men.[17] Second, these status hierarchies have historically been enforced through role segregation – denying people of color and women positions of authority, power, or leadership.[18] Prejudices act to preserve this status quo or hierarchy. Thus, prejudiced individuals show the most overt hostility toward racial/ethnic minority members and women who threaten the status hierarchy, such as activists who question the legitimacy of discriminatory practices or minorities and women who attain powerful roles previously dominated by white men; by contrast, minorities and women who "stay in their place" are tolerated or even treated affectionately (discussed at length below), especially if they occupy lower status roles that reinforce, rather than threaten, the traditional hierarchy.[19] Hostility toward people who deviate from their stereotypical roles or "place" is known as "backlash."[20]

---

Glick, P. (1991). Trait-based and sex-based discrimination in occupational prestige, occupational salary, and hiring. *Sex Roles, 25*, 351-378;

Heilman, M E. (2001). Description and prescription: How gender stereotypes prevent women's ascent up the organizational ladder. *Journal of Social Issues, 57*, 657-674;

Heilman, M. E., et al. (2004). Penalties for success: Reactions to women who succeed at male-typed gender tasks. *Journal of Applied Psychology, 89*, 416-427.

Pryor, J. B., et al. (1995). A social psychological model for predicting sexual harassment. *Journal of Social Issues, 51*, 69-84.

[16] Glick, P., & Fiske, S. T. (2008). Sex discrimination: The psychological approach. To appear in: F. J. Crosby, M. S. Stockdale, and S. A. Ropp (Eds.). *Sex Discrimination in the Workplace*. Malden, MA: Blackwell.

[17] Jackman, M. R. (1994). The velvet glove: Paternalism and conflict in gender, class, and race relations. Berkeley, CA: University of California Press.

[18] Sidanius, J., & Pratto, F. (1999). *Social dominance: An intergroup theory of social hierarchy and oppression*. Cambridge: Cambridge University Press.

[19] Jackman (1994). *Op. Cit.*;

Additionally, because general American egalitarian values define discrimination as wrong, contemporary racism and sexism is often expressed covertly with discriminators providing non-discriminatory rationales or pretexts to justify their behavior.[21] The targeting of hostility toward only some ("threatening") minority members and women aids prejudiced individuals' in their attempts to rationalize hostile discriminatory behavior as fair rather than racist or sexist (e.g., "I don't hate women, I just don't like women who try to act like men"). Because contemporary social norms frown on category-based prejudices, people do not like to conceive of themselves or to have others perceive them as prejudiced.[22] Further, in work settings, the fear of formal censure and litigation can increase the use of pretexts to obscure prejudicial hostility and discriminatory behavior.

The slipperiness of contemporary discrimination is illustrated in a "classic" experiment.[23] White participants were randomly assigned to one of four conditions representing all possible combinations of: (a) interaction with either a white or a black actor (who posed as a fellow participant) who (b) initially behaved in a pleasant or unpleasant manner. After interacting, the participant and actor took part in a "learning experiment" in which the actor ostensibly received electric shocks as punishment for incorrect answers. When the actor had initially behaved pleasantly, both black and white actors were given mild amounts of electric shock as

Glick, P., & Fiske, S. T. (2001). Ambivalent sexism. In M. P. Zanna (Ed.), *Advances in Experimental Social Psychology* (Vol. 33, pp. 115-188). Thousand Oaks, CA: Academic Press.

[20] Rudman, L. A., & Fairchild, K. (2004). Reactions to counterstereotypic behavior: The role of backlash in cultural stereotype maintenance. *Journal of Personality and Social Psychology, 87,* 157-176.

[21] Dovidio, J. & Gaertner, S. L. (Eds.), *Prejudice, discrimination, and racism.* New York: Academic Press.

[22] *Ibid.*

[23] Rogers, R. W., & Prentice-Dunn, S. (1981). Deindividuation and anger-mediated interracial aggression: Unmasking regressive racism. *Journal of Personality and Social Psychology, 41,* 63-73.

punishment. However, when the actor was initially unpleasant, participants discriminated: they delivered significantly greater shocks to the unpleasant black, but not to the similarly-behaving white actor.

This type of effect, in which people use pretexts to justify discrimination, has been replicated many times[24] and is also evident in sexist discrimination.[25] It illustrates several important points about category-based discrimination: (a) typically, hostile discrimination occurs only when there is a nondiscriminatory rationale or pretext for the behavior (e.g., "She behaved badly toward me"), (b) the pretext for discriminating often appears to be reasonable (e.g., anger toward someone who behaved unpleasantly), and (c) discrimination is evident only in the *relative difference* in treatment of a majority member as compared to a woman or minority member (i.e., an unpleasant as compared to a pleasant white male coworker might elicit mildly hostile treatment, but prejudiced perceivers show greater hostility to a similarly unpleasant black or female coworker). Thus, in determining whether a specific incident was discriminatory, decision-makers should not simply ask, for example, "Would a man have been criticized for acting as this woman did?" but rather "Would a man have been criticized *to the same degree* for acting as this woman did?"

Because prejudiced evaluators seek apparently nondiscriminatory excuses for their attitudes, they are especially likely to seize upon justifications that cannot be easily contradicted by objective evidence.[26] For example, if a minority or female coworker clearly excels at the

---

[24] Dovidio, J. & Gaertner, S. L. (Eds.), *Prejudice, discrimination, and racism* (pp. 127-163). New York: Academic Press.

[25] Uhlmann, E. L., & Cohen, G. L. (2005). Constructed criteria: Redefining merit to justify discrimination. *Psychological Science, 16,* 474-480.

[26] Tausch, N., Kenworthy, J. B., & Hewstone, M. (2007). The Confirmability and Disconfirmability of Trait Concepts Revisited: Does Content Matter? *Journal of Personality and Social Psychology, 92,* 542-556.

technical aspects of his or her job, as documented by objective measures (e.g., productivity, sales, successful resolution of cases, etc.), prejudiced perceivers may concede that the individual is highly skilled. Instead, discriminatory criticism occurs on subjective criteria that are less easily questioned, allowing the prejudiced perceiver to assert criticisms without fear of contradiction or objective disproof. As a result, discrimination tends to focus on social dimensions; e.g., "She's rude" or "She doesn't know how to interact with others."[27] The inherent "fuzziness" of such judgments makes them a "safe" way to discriminate.

Further, prejudiced individuals can help to manufacture the very social conflict they complain about through their treatment of women and minorities. Expressions of hostility breed conflict. Thus, if a prejudiced perceiver "leaks" hostility – often done in subtle ways (e.g., through nonverbal behavior),[28] they elicit behavior that "confirms" their negative expectations for women and minorities, creating a self-fulfilling prophecy.[29] That is, if Person A expresses hostility toward Person B, then B is likely to behave in a less friendly manner toward A or to protest A's behavior. Such reactions can be cited by the prejudiced perceiver as examples of the minority member or woman's "misbehavior" or "problems." Such tactics can be insidiously effective because prejudiced individuals' hostility is often veiled, for example as "jokes" or

---

Heilman, M. E., et al. (2004). Penalties for success: Reactions to women who succeed at male-typed gender tasks. *Journal of Applied Psychology, 89,* 416-427.

[27] Rudman, L. A., & Glick, P. (1999). Feminized management and backlash toward agentic women: The hidden costs to women of a kinder, gentler image of middle-managers. *Journal of Personality and Social Psychology, 77,* 1004-1010.

[28] Dovidio, J. F., Kawakami, K., Johnson, C., Johnson, B., & Howard, A. (1997). On the nature of prejudice: Automatic and controlled processes. *Journal of Experimental Social Psychology, 33,* 510-540.

[29] Snyder, M., & Swann, W. B. (1978). Hypothesis-testing processes in social interaction. *Journal of Personality and Social Psychology, 36,* 1202-1212.

Skrypnek, B. J., & Snyder, M. (1982). On the self-perpetuating nature of stereotypes about women and men. *Journal of Experimental Social Psychology, 18,* 277-291.

ostensibly "affectionate" teasing,[30] making it easier to characterize the targeted individual's protests as an "overreaction," "hypersensitivity," inability to "take a joke," and evidence of the target's "lack of social skills." In addition to these reasons, as explained at length below, features specific to sexist prejudice make it particularly likely that sexists will focus on unfair criticism of a professional woman's "social skills" or label her as "difficult to work with."

### SEXISM: A FUNDAMENTALLY AMBIVALENT PREJUDICE

While sexism and racism can each lead to hostility toward minority members and women in high status, traditionally white and male professions, sexism has qualities that distinguish it from other prejudices. In particular, ambivalence is a deeply rooted characteristic of sexism, stemming from two basic aspects of gender relations: (a) men generally possess more status and power than women, but (b) are intimately interdependent with women (due to heterosexual attraction, reproduction, and reliance on women to rear children and for domestic labor).[31] This ambivalence is captured by the saying "Can't live with them, can't live without them." To illustrate how this differs from other prejudices, one of the earliest measures of racial prejudice assessed the degree of intimacy whites would tolerate with blacks. This "social distance" scale[32] showed that mildly racist whites might be willing to have a black co-worker, but not to date or marry a black person, considered to reflect a complete lack of prejudice. Such a measure does

---

[30] Maass, A., Cadinu, M., Guarnieri, G., & Grasselli, A. (2003). Sexual harassment under social identity threat: The computer harassment paradigm *Journal of Personality and Social Psychology, 85,* 853-870.

[31] Glick, P., & Fiske, S. T. (1996). The Ambivalent Sexism Inventory: Differentiating hostile and benevolent sexism. *Journal of Personality and Social Psychology, 70,* 491-512.
   Glick, P., & Fiske, S. T. (2001). Ambivalent sexism. In M. P. Zanna (Ed.), *Advances in Experimental Social Psychology* (vol. 33, pp. 115-188). Thousand Oaks, CA: Academic Press.

[32] Bogardus, E. S. (1927). Race, friendliness, and social distance. *Journal of Applied Sociology, 11,* 272-287.

not work for sexism, which is more firmly rooted in *role segregation*[33] than spatial segregation –

a highly sexist man might not want to have female co-workers, but (if heterosexual) would

certainly be willing to date or marry a woman as opposed to a man. While a racist white might

well want to "live without" blacks, a sexist man is unlikely to suggest eliminating all interaction

with women. In extreme cases, a racist might endorse "ethnic cleansing" or race-based genocide,

but one cannot imagine that heterosexual men would endorse the complete elimination of all

women.

In other words, sexism has always accommodated a state of affairs in which men's

oppression of women has been accompanied by intimacy and affection. As a result, sexism is

inherently ambivalent.[34] *Benevolent sexism* (BS) is the subjectively positive side of sexist

ambivalence, a set of affectionate yet patronizing and discriminatory attitudes toward women as

wonderful but weak (not fully competent) creatures who require male provision and protection.

*Hostile sexism* (HS) is the subjectively negative side of sexist ambivalence, a set of overtly

demeaning attitudes toward women as a threat to men's power.[35]

While such ambivalence may seem like a psychologically contradictory state of affairs, it

is not: the positive and negative poles of sexist ambivalence are directed toward different types

of women or toward different types of female behavior.[36] Specifically, women who embrace

---

[33] Eagly, A. H. (1987). *Sex differences in social behavior: A social role interpretation.* Hillsdale, NJ: Erlbaum.

[34] Glick, P. & Fiske, S. T. (1996).  The Ambivalent Sexism Inventory: Differentiating hostile and benevolent sexism. *Journal of Personality and Social Psychology, 70*, 491-512.

[35] Glick, P., & Fiske, S. T. (2001). Ambivalent sexism. In M. P. Zanna (Ed.), *Advances in Experimental Social Psychology* (Vol. 33, pp. 115-188). Thousand Oaks, CA: Academic Press.

[36] Glick, P., Diebold, J., Bailey-Werner, B., & Zhu, L. (1997).  The two faces of Adam: Ambivalent sexism and polarized attitudes toward women.  *Personality and Social Psychology Bulletin, 23*, 1323-1334.

traditional roles and fulfill men's desires receive benevolent sexism. For example, a sexist man may exhibit paternalistic affection and protection toward a supportive wife or chivalrous solicitude toward a sexually attractive, subordinate female co-worker. By contrast, women who occupy powerful roles or are viewed as violating traditional norms of femininity (which emphasize modesty, deference, and warmth) elicit sexist hostility.

Another way to describe this complementarity is that benevolent sexism defines prescriptive ideals of how women *should* be (e.g., modest, deferent) and hostile sexism defines complementary proscriptions about how women *should not* be (e.g., assertive, powerful).[37] More specifically, hostile and benevolent sexism each encompass three domains of male-female relations: *power*, *gender stereotyping and roles*, and *intimate heterosexuality*.[38] Benevolence is directed toward women who reinforce rather than challenge men's power, who fulfill idealized positive stereotypes of femininity and enact traditional female roles, and/or who are viewed as sexually attractive and compliant. By contrast, sexist hostility occurs toward women who are viewed as challenging men's power, violating traditional ideals of femininity or "invading" roles and positions of power that "belong" to men, and/or are sexually unattractive or unavailable.

Research conducted on tens of thousands of participants in more than 25 nations shows that men who endorse hostile sexism are also likely to endorse benevolent sexism[39] – thus, sexist men are usually highly ambivalent toward women. An ambivalent sexist might protest that he

---

[37] Prentice, D. A., & Carranza, E. (2002). What women and men should be, shouldn't be, are allowed to be, and don't have to be: The contents of prescriptive gender stereotypes. *Psychology of Women Quarterly, 26,* 269-281.

[38] Glick, P., & Fiske, S. T. (2001). Ambivalent sexism. In M. P. Zanna (Ed.), *Advances in Experimental Social Psychology* (Vol. 33, pp. 115-188). Thousand Oaks, CA: Academic Press.

[39] Glick, P. et al. (2000). Beyond prejudice as simple antipathy: Hostile and benevolent sexism across cultures. *Journal of Personality and Social Psychology, 79,* 763-775.

Glick, P. et al. (2004). Bad but bold: Ambivalent attitudes toward men predict gender inequality in 16 nations. *Journal of Personality and Social Psychology, 86,* 713–728.

cannot possibly be prejudiced against women because there are women he loves, protects, and for whom he provides. Ample research reveals, however, that benevolently sexist treatment is contingent on women fulfilling a sexist conception of how women are supposed to behave.[40] Further, even though subjective feelings of affection may accompany sexist discriminators' patronizing treatment, it nevertheless harms women. An example is the tendency to give female subordinates excessive (patronizing) praise while simultaneously denying them tangible rewards (e.g., a higher salary) and opportunities (e.g., choice assignments).[41]

*Sexist ambivalence leads to extreme responses toward women*

Ambivalence produces "response amplification,"[42] more extremely positive and negative responses toward the target of ambivalence. Because women represent such a diverse group, sexist ambivalence can be directed toward different women, with benevolent sexism directed toward "types" of women viewed as upholding sexist prescriptions and hostile sexism toward female "types" viewed as violating sexist prescriptions.[43] Thus, the same ambivalent sexist who adores his supportive wife, gives his secretary flowers, and loves his kindly mother will react

---

[40] Abrams, D., Viki, G. T. N., Masser, B., & Bohner, G. (2003). Perceptions of stranger and acquaintance rape: The role of benevolent and hostile sexism in victim blame and rape proclivity. *Journal of Personality and Social Psychology, 84*, 111-125.

[41] Vescio, T. K., Gervais, S. J., Snyder, M., & Hoover, A. (2005). Power and the creation of patronizing environments: The stereotype-based behaviors of the powerful and their effects on female performance in masculine domains, *Journal of Personality and Social Psychology. 88*, 658-672.

[42] Katz, I. & Hass, R. G. (1988). Racial ambivalence and value conflict: Correlational and priming studies of dual cognitive structures. *Journal of Personality and Social Psychology, 55*, 893-905.

Katz, I., Wackenhut, J., & Hass, R. G. (1986). Racial ambivalence, value duality, and behavior. In J.F. Dovidio and S.L. Gaertner (Eds.). *Prejudice, discrimination, and racism*. San Diego: Academic Press.

[43] Eckes, T. (2002). Paternalistic and envious gender stereotypes: Testing predictions from the Stereotype Content Model. *Sex Roles, 47*, 99-114.

Glick, P., Diebold, J., Bailey-Werner, B., & Zhu, L. (1997). The two faces of Adam: Ambivalent sexism and polarized attitudes toward women. *Personality and Social Psychology Bulletin, 23*, 1323-1334.

with extreme hostility to women perceived as challenging his authority, competing with him for resources, or failing to comply with sexist ideals of femininity. Thus, the two poles of sexist ambivalence work in concert, rewarding women when they conform and punishing women when they fail to conform to sexist prescriptions.

Sexist ambivalence can also be directed toward the same woman at different times, depending on whether her behavior of the moment fits or challenges sexist prescriptions.[44] Benevolent sexism occurs when women reinforce male power (e.g., by being compliant, modest, or flattering men), embrace traditional tasks (e.g., social support), or elicit sexual attraction (e.g., attractive women who tolerate male advances). Hostile sexism occurs when women challenge male power (e.g., by stating an independent opinion or criticizing), take on nontraditional or powerful roles (e.g., takes a leadership position or succeeds in a "masculine" domain), or are deemed sexually unattractive or unavailable (e.g., refuse male advances).[45]

Because traditional sexist attitudes are so strongly rooted in differences in power and roles, sexism often revolves around complaints about a woman's social behavior, with men being permitted a much greater latitude to be assertive than women. Thus, for sexists, an aggressive man may be deemed appropriately "assertive" and as assertive women may be deemed "a bitch" because women are held to much higher standards of "niceness" and deference than men.[46]

---

[44] Hebl, M. R., King, E., Glick, P., Singletary, S. L. & Kazama, S. M. (2007). Hostile and benevolent reactions toward pregnant women: Complementary interpersonal punishments and rewards that maintain traditional roles. *Journal of Applied Psychology, 92*, 1499-1511.

[45] Glick, P., & Fiske, S. T. (2001). Ambivalent sexism. In M. P. Zanna (Ed.), *Advances in Experimental Social Psychology* (Vol. 33, pp. 115-188). Thousand Oaks, CA: Academic Press.

[46] Rudman, L. A., & Glick, P. (1999). Feminized management and backlash toward agentic women: The hidden costs to women of a kinder, gentler image of middle-managers. *Journal of Personality and Social Psychology, 77*, 1004-1010.

### *Sexist double standards support assertive behavior in men*

Sexist attitudes about women also go hand in hand with ambivalently sexist (both subjectively benevolent and subjectively hostile) attitudes about men.[47] Like ambivalent sexism toward women, however, traditional forms of hostility and benevolence toward men serve a common function – to reinforce men's greater power and traditional gender roles. Subjectively benevolent traditional beliefs praise men as heroic, independent, and courageous, as protectors and providers, reinforcing traits related to power and their traditional roles.

But subjectively negative, traditional beliefs about men also act men to reinforce their greater power and traditional roles. Specifically, *Hostility toward men* (HM) views men as "bad but bold."[48] This attitude can be illustrated by popular depictions of masculine ideals or heroes, such as the movie drifter-gunman characters perfected by Clint Eastwood – a man whose negative characteristics, such as callousness toward others, are part of what makes him powerful. Specifically, hostility toward men includes beliefs that men are less likable, but worthy of greater status and respect than women. This set of beliefs also encompasses three dimensions: power (e.g., that men can be expected aggressively to seek power and are designed for dominance), gender roles and stereotypes (e.g., that men are more self-interested than women), and sexuality (e.g., that men are sexual aggressors).[49] Although these are not flattering views of men in that such traits are disliked, they nevertheless define an admired "macho" ideal in which being liked is less important than being powerful and respected. By contrast, traditional sexism prescribes

---

[47] Glick, P., & Fiske, S. T. (1999). The Ambivalence toward Men Inventory: Differentiating hostile and benevolent beliefs about men. *Psychology of Women Quarterly, 23(3)*, 519-536.

[48] Glick, P., et al. (2004). Bad but bold: Ambivalent attitudes toward men predict gender inequality in 16 nations. *Journal of Personality and Social Psychology, 86*, 713–728.

[49] Glick, P., & Fiske, S. T. (1999). The Ambivalence toward Men Inventory: Differentiating hostile and benevolent beliefs about men. *Psychology of Women Quarterly, 23(3)*, 519-536.

that women should, above all, be likeable (e.g., put others first), rather than seek power.[50] In other words, sexist ideals for women instruct them to sacrifice power and status for affection by "putting others first," whereas sexist attitudes toward men instruct them to sacrifice being liked in favor of securing power and status by putting themselves first.

The "hostile" sexist attitude described above represents a *traditional* ideology about men. For example, both men and women in gender-traditional cultures, as compared to men and women in more egalitarian cultures, are more likely to endorse the ideology labeled *hostility toward men*.[51] Thus, traditionally-minded men are willing to say "yes, men *are* bad" but to take pride in this view of their gender. This is captured in various sayings, such as "boys will be boys," used to dismiss male "misbehavior" (e.g., hypercompetitiveness) as relatively harmless and an inevitable part of male character. Another example would be pride taken in being a "bad boy" – a fiercely independent character who violates the rules and steps on others' toes to get what he wants.

Thus, evaluators who hold traditionally sexist attitudes evince a strong double-standard in which men are permitted or even encouraged to assert themselves over others (i.e., to be a "bad boy") to secure status and power, whereas women are punished for the same behavior (i.e., for not being a "good girl"). This is not to say that "bad boy" behavior is always or completely tolerated: if it violates official rules (e.g., about what behavior is permissible in a work organization), it may elicit warnings or punishment. But if slaps on the wrist are accompanied by the equivalent of nudges and winks that communicate "it's good to be a bad boy, just don't go

---

[50] Prentice, D. A., & Carranza, E. (2002). What women and men should be, shouldn't be, are allowed to be, and don't have to be: The contents of prescriptive gender stereotypes. *Psychology of Women Quarterly, 26,* 269-281.

[51] Glick, P., et al. (2004). Bad but bold: Ambivalent attitudes toward men predict gender inequality in 16 nations. *Journal of Personality and Social Psychology, 86,* 713–728.

too far," such behaviors will not be curbed. By contrast, if a man is not assertive, sexist

evaluators are likely to characterize them as "weak" and demean them; not coincidentally, such

harassment of men typically involves epithets that "reduce" them to being female (e.g., being

labeled as "a little girl," "girly-man," or "pussy").[52] Such messages, especially from powerful

individuals, can reinforce sexist behavior in the workplace.

Furthermore, powerful (as compared to less powerful) individuals (e.g., those who have a

high status or rank in an organization) are more likely to disregard formal rules and to act on

their impulses.[53] Thus, when power combines with sexist attitudes, sexist men are even more

likely to discriminate against and to sexually harass women.[54] When sexist men who are prone to

viewing women as sexual objects are also given power over women, they show a greater

tendency to behave in sexualized ways in work environments.[55] These can include subjectively

"benevolent" behaviors such as complimenting women on their appearance or touching (e.g.,

hugging) in ways the sexist individual views as complimentary, but which undermines

professionalism.[56]

### EVEN EGALITARIAN INDIVIDUALS SOMETIMES DISCRIMINATE

Individuals who explicitly endorse highly traditional gender attitudes are most likely to

have a double-standard that tolerates or encourages assertive behavior by men while punishing

---

[52] Stockdale, M. S., Visio, M., & Batra, L. (1999). The sexual harassment of men: Evidence for a broader theory of sexual harassment and sex discrimination. *Psychology, Public Policy, and Law, 5,* 630-664.

[53] Galinsky, A. D., Gruenfeld, D. H., & Magee, J. C. (2003). From power to action. *Journal of Personality and Social Psychology, 85,* 453-466.

[54] Bargh, J. A., Raymond, P., Pryor, J. B., & Strack, F. (1995). Attractiveness of the underling: An automatic power-sex association and its consequences for sexual harassment and aggression. *Journal of Personality and Social Psychology, 68,* 768-781.

[55] Pryor, J. B., Giedd, J. L., & Williams, K. B. (1995). A social psychological model for predicting sexual harassment. *Journal of Social Issues, 51,* 69-84.

[56] Gutek, B. A. & Done, R. S. (2001). Sexual harassment. In R. K. Unger (Ed.), *Handbook for the psychology of women and gender* (pp. 367-387). New York: John Wiley & Sons, Inc.

women for similar actions. However, because gender stereotypes and roles are strongly entrenched in the general culture, even relatively more egalitarian individuals may discriminate. This can occur without explicit intentions to discriminate and even without evaluators realizing that they are discriminating.[57] Specifically, while relatively egalitarian (as compared to sexist) individuals do not evince as strongly negative reactions toward assertive women, they may still show relative disapproval when a woman as compared to a man acts assertively. Such effects often occur among female as well as male perceivers, despite women's general tendency to score lower in sexist beliefs. For example, both women and men show more negative facial reactions to women who act as group leaders than men who exhibit the exact same behaviors.[58]

Some benevolently sexist ideals of femininity are pervasively endorsed in society because they seem unobjectionable and do not fit commonplace conceptions of prejudice as hostility. In particular, even relatively egalitarian individuals tend to endorse the belief that women (more so than men) ought to be nice.[59] This belief is often more implicit than explicit; that is, not a consciously held value, but more of an automatic assumption, as revealed by reaction-time measures that assess "implicit stereotypes."[60] Such automatic associations reflect early gender socialization and repeated exposure to stereotypic depictions of women. While the idea that "women should be nice" may seem unproblematic to many people, it leads to

---

[57] Banaji, M. R., & Greenwald, A. G. (1995). Implicit gender stereotyping in judgments of fame. *Journal of Personality and Social Psychology, 68*, 181-198.

[58] Butler, D., & Geis, F. L. (1990). Nonverbal affect responses to male and female leaders. Implications for leadership evaluations. *Journal of Personality and Social Psychology, 58*, 48-59.

[59] Eagly, A. H., & Mladinic, A. (1989). Gender stereotypes and attitudes toward women and men. *Personality and Social Psychology Bulletin, 15*, 543-558.

[60] Banaji, M. R., & Hardin, C. D. (1996). Automatic stereotyping. *Psychological Science, 7*, 136-141.

Rudman, L. A., & Goodwin, S. A. (2004). Gender differences in automatic in-group bias: Why do women like women more than men like men? *Journal of Personality and Social Psychology, 87*, 494-509.

discriminatory treatment of female workers whose professional role demands behaviors that conflict with the niceness prescription. Thus, while ambivalently sexist men show the most extreme positive and negative responses toward compliant versus assertive women, other perceivers – both male and female – tend to evince subtle forms of discrimination against professional women whose roles demand that they exhibit "masculine" behaviors.[61]

Specifically, consistent with women's traditional role as homemakers,[62] women are stereotyped as more *communal* or *warm* (e.g., nurturing, nice, understanding, accommodating) than men.[63] These traits, though viewed very favorably as desirable and likeable, are (simultaneously) associated with lower status and a lack of power.[64] As noted above, men are stereotypically permitted or even expected to evince less favorable traits associated with achieving and maintaining power (e.g., arrogance, hyper-competitiveness, callousness)[65] but women are not.[66] Thus, while traditional stereotypes of women assign them subjectively favorable and likeable traits, these same traits are associated with low power, low status, and supporting (not leading) roles.

## PENALTIES FOR ASSERTIVE WOMEN

Prescriptive stereotypes that women should be nice are problematic for women who hold high status jobs in male-dominated fields because, to be successful, these roles demand behavior

---

[61] Rudman, L. A., & Glick, P. (1999). Feminized management and backlash toward agentic women: The hidden costs to women of a kinder, gentler image of middle-managers. *Journal of Personality and Social Psychology, 77,* 1004-1010.

[62] Eagly, A. H., & Steffen, V. J. (1984). Gender stereotypes stem from the distribution of women and men into social roles. *Journal of Personality and Social Psychology, 46,* 735-754; Hoffman, C., & Hurst, N. (1990). Gender stereotypes: Perception or rationalization? *Journal of Personality and Social Psychology, 58,* 197-208.

[63] Eagly, A. H. (1987). *Op. Cit.*

[64] Glick, P., et al (2004), *Op. Cit.*

[65] Glick, P., et al. (2004). *Op. Cit.*

[66] Rudman, L. A., & Glick, P. (1999). *Op. Cit.*

that conflicts with prescriptions to "act feminine."[67] Women who enact a nontraditional role elicit hostility if they violate prescriptions for feminine niceness and deference to others.[68] Because the exercise of power or enactment of a high-powered or commanding role necessarily requires violating prescriptions for female deference and niceness, women who competently perform such roles are at high risk of being viewed negatively, not in terms of their technical skills but in terms of their interpersonal demeanor.[69] In essence, the bar is higher for women than for men when it comes to how nice, modest, and humble they are supposed to be. When men enact a role requiring assertiveness, they are behaving consistently with their gender role, but when women enact such roles, they violate the feminine niceness prescription and may be viewed as difficult, rude, or interpersonally insensitive.

As noted above, this is not to say that extremely assertive behavior is always accepted in men. For example, a male manager might well be criticized for over-bearing behavior. The point is that sex discrimination occurs in terms of a relative difference: the same behavior is more likely to receive only mild criticism, be tolerated, or even celebrated when it is exhibited by a man, but not when shown by a woman.[70] The scientific research literature shows quite clearly that, even among relatively more egalitarian (not just sexist) evaluators, *women who enact the very same assertive behavior are rewarded less or penalized more than men who do so.*

The following subsections detail specific types of behavior for which women (relative to men who are described or act in an identical manner) are perceived more negatively. These include:

---

[67] Eagly, A. H. (1987). *Op. Cit.*
[68] Rudman, L. A., & Glick, P. (1999). *Op. Cit.*
[69] Heilman, M. E., & Okimoto, T. G. (2007). Averting penalties for women's success: Rectifying the perceived communality deficiency. *Journal of Applied Psychology, 92,* 81-92.
[70] Rudman, L. A., (1998). Self-promotion as a risk factor for women: The costs and benefits of counterstereotypical impression management. *Journal of Personality and Social Psychology, 74,* 629-645.

(a) mere success in a masculine fields, (b) leading in a "masculine" (i.e., assertive or autocratic) manner, (c) criticizing subordinates, (d) engaging in self-promotion, and (e) expressing anger. All of these lead to lower ratings of female (relative to similar male) leaders on interpersonal dimensions (e.g., as insufficiently warm) and greater hostility toward them.

### Mere success in a masculine field

The simple fact of having achieved power and success within a traditionally male-dominated field puts women at risk of being disliked (relative to powerful and successful men). For women, success in a masculine domain is itself a form of gender deviance. Specifically, research shows that women who attain leadership roles in male domains are generally evaluated more negatively than male leaders.[71] Similarly, when women perform especially well at a stereotypically masculine task, even though they may be viewed as competent (so long as their success is unambiguous), they are disliked (relative to a man with similar performance).[72] Others not only tend to evaluate women more negatively in such circumstances, but are more likely to take action that harms them – for example, when given the opportunity to sabotage the future performance of a competitor who succeeded in a masculine domain (by making future tasks more difficult), people (both men and women) are significantly more likely to sabotage successful women than successful men.[73]

In one study, a woman described as a corporate Vice-President who was unambiguously a "stellar performer based on sales volume, number of new client accounts, and actual dollars earned… [with her performance being in] the top 5% of all employees at this level" was

---

[71] Eagly, A. H., Makhijani, M. G., & Klonsky, B. G. (1992). Gender and evaluation of leaders: A meta-analysis. *Psychological Bulletin, 111*, 3-22.
[72] Rudman, L. A., & Fairchild, K. (2004). *Op. Cit.*
[73] *Ibid.*

perceived as competent but was disliked in comparison to a man described in the same manner.[74] These penalties for being successful and powerful occur only when the occupation is stereotypically masculine (e.g., VP of an aircraft manufacturing company), but not for occupations that are feminine or gender neutral.[75] This bias against successful women in masculine domains is exhibited by both male and female perceivers.

Research suggests that these penalties for success can potentially be mitigated if the successful woman takes special care to reassure others that she is still sufficiently "feminine" (i.e., that she retains prescribed feminine traits, such as being understanding, modest, and sensitive to others' feelings) despite her success in a masculine field.[76] Thus, not all women who are successful in male-dominated fields may be penalized in this manner. However, the more delicate balancing act demanded of female (as compared to male) leaders in masculine domains can be very difficult to achieve because demonstrating the "masculine" (e.g., assertive, aggressive, independent, critical) qualities demanded of leaders can be viewed as violating niceness prescriptions for women.

### *"Masculine" leadership style*

While mere success in a male dominated field can lead to more negative evaluations of women (as compared to men), specific behaviors that violate stereotyped prescriptions exacerbate these effects. As noted above, prescriptive stereotypes set the bar higher for women than for men when it comes to exhibiting interpersonal sensitivity and niceness. Unfortunately, one cannot always be "nice" as a leader – indeed, the traits commonly associated with leaders

---

[74] Heilman, M. E., et al. (2004), *Op. Cit.*
[75] *Ibid.*
[76] Rudman, L. A., & Glick, P. (2001). Prescriptive gender stereotypes and backlash toward agentic women. In Carli, L. L. & Eagly, A. H. (Eds.), *Journal of Social Issues, 57*, 743-762.

emphasize assertiveness and ambition (stereotypically masculine traits), rather than warmth.[77] Thus, female leaders face a dilemma. As leaders, women (like men) in powerful roles are expected to be assertive, but as women they are expected to be interpersonally warm, sensitive, and understanding. In other words, the prescriptions of the leadership role clash with the prescriptions of women's gender role (whereas men's gender role is consistent with, indeed based upon, the leadership role).[78] Thus, when women act as leaders, they are at special risk of being disliked (even if they are viewed as competent) by others because they fail to meet sex-stereotypical prescriptions of femininity.

A meta-analysis (a statistical procedure for summarizing effects across all available studies in an area of research) of over 60 studies of reactions to male and female leaders revealed a strong and consistent effect of greater dislike for and lower evaluations of female leaders who behave in a stereotypically masculine manner (i.e., who exhibit independence, assertiveness, emphasize the hierarchical structure of the leader-subordinate relationship).[79] It is important to note the specificity of this effect – female (relative to similar male) leaders are not always devalued or penalized; rather, female leaders are penalized, especially on social dimensions[80] when they "act like men" (i.e., lead in a stereotypically masculine fashion).

### Criticism of subordinates

Another function of leaders or individuals in powerful roles is the evaluation of subordinates. Subordinates, of course, like to hear positive evaluations of their performance and

---

[77] Heilman, M. E. (1983). *Op. Cit.*;
Eagly, A. H. & Mladinic, A. (1993). Are people prejudiced against women? Some answers from research on attitudes, gender stereotypes, and judgments of competence. In W. Strobe & M. Hewstone (Eds.) *European Review of Social Psychology*. New York: Wiley.
[78] Eagly, A. H., & Karau, S. J. (2002). *Op. Cit.*
[79] Eagly, A. H., et al. (1992). *Op. Cit.*
[80] Heilman et al. (2004). *Op. Cit.*

positive evaluations delivered by female leaders are consistent with prescriptive stereotypes of feminine niceness. Negative evaluations, however, can elicit defensiveness on the part of subordinates and, when delivered by female leaders, also clash with prescriptive stereotypes of feminine niceness. Research shows that when feedback delivered by a superior is favorable, male and female evaluators are perceived equally positively; however, when subordinates are criticized, they evaluate female evaluators significantly more negatively than male evaluators.[81] In other words, while people accept female (relative to male) evaluators who give them praise, they denigrate female leaders (more so than male leaders) who criticize them.

### *"Self-promoting" behavior*

To achieve a leadership role, it is typically necessary to exhibit self-confidence in one's talents and to make one's skills and successes known to others.[82] Such self-promoting behavior, however, can be perceived by others as interpersonally insensitive because it can be viewed as immodest or as implying that "I am better than you." While men are expected to brag about their successes and talents, for women self-promotion violates prescriptive stereotypes of feminine niceness and modesty. Research demonstrates that women (in comparison to men who engage in identical behaviors) who trumpet their skills and highlight their accomplishments are perceived significantly more negatively – specifically, are viewed as interpersonally insensitive, disliked, and as less desirable job candidates.[83]

---

[81] Sinclair, L., & Kunda, Z. (2000). Motivated stereotyoing of women: She's fine if she praised me but incompetent if she criticized me. *Personality and Social Psychology Bulletin, 26*, 1329-1342.

[82] Rudman, L. A., & Glick, P. (1999). *Op. Cit.*

[83] Rudman (1998). *Op. Cit.*

*Expressions of Anger*

Because anger is an assertive emotion, women are also less permitted to express it than men and more likely to be viewed as "out of control" for expressing even mild forms of anger. In a series of studies, working adults evaluated videotaped actors portraying male and female professionals of similar age, attractiveness, and ethnicity in a job interview.[84] The male and female professionals enacted identical scripts, in part describing a difficult work experience (being part of a team that lost an important account) that led them to be angry at a colleague. Participants rated the female (as compared to the male) professional who expressed anger as deserving less independence, power, status, and salary. Further, participants viewed the female (as compared to male) professional's anger as reflecting her personality, rather than being a justified reaction to the situation. Indeed, a woman who admitted anger was significantly more likely than a man to be seen as "out of control." These effects did not occur when male and female professionals expressed sadness (a nonassertive emotion) or when they did not mention their emotional response. The view that a woman (and not a man) who expresses anger is "out of control" reflects traditional stereotypes of women as more emotional (e.g., prone to mood swings) and less rational than men.[85]

## PERSISTENT EFFECTS OF BIAS ON ATTENTION AND INTERPRETATION

The negative, stereotype-based judgments described above result in: (a) biased interpretations of a targeted individual's behavior[86] and (b) more dispositional explanations of

---

[84] Brescoll, V., & Uhlmann, E. (2007). Can an angry woman get ahead? Status conferral, gender, and workplace emotion expression. Manuscript submitted for publication. Psychological Science.

[85] Prentice, D. A., & Carranza, E. (2002). What women and men should be, shouldn't be, are allowed to be, and don't have to be: The contents of prescriptive gender stereotypes. *Psychology of Women Quarterly, 26,* 269-281.

[86] Fiske, S. T. (1998). *Op. Cit.*

the target individual's actions.[87] That is, perceivers view subsequent behavior through the lens of their initial stereotype-based judgments. Thus, if a perceiver initially concludes, for example, that a female leader is being hyper-critical, he or she will be more prone to interpreting subsequent criticism as unfairly demeaning (e.g., rather than as constructive feedback). As a result, observations of ambiguous behavior (e.g., a moderate criticism that might be viewed as helpful or snide depending on interpretations of the criticizer's tone and motives) can reinforce initial negative views, making them more extreme because the perceiver has interpreted subsequent behavior as additional "evidence" in line with his or her initial impressions.[88] Additionally, these negative judgments of stereotyped individuals are likely to be attributed to the target individual's personality, therefore making the behavior seem stable and intractable, the result of a permanent character flaw.[89]

## ORGANIZATIONS CAN PERMIT OR DISCOURAGE DISCRIMINATION

Specific organizational characteristics and practices can either exacerbate or mitigate discrimination. These factors are discussed below.

### Male-dominated organizations and occupations

Discrimination is more likely when the top leadership positions in an organization are male-dominated and when there are few women (e.g., fewer than 15 or 20%) in specific workplace roles.[90] Women who occupy nontraditional roles are perceptually salient (i.e., stand

---

[87] Pettigrew, T. F. (1979) the ultimate attribution error: Extending Allport's cognitive analysis of prejudice, *Personality and Social Psychology Bulletin*, 5, 461-476

[88] Darley, J. M., Gross, P. H. (1983). A hypothesis-confirming bias in labeling effects. Journal of Personality and Social Psychology, 44, 20-33.

[89] Pettigrew, T. F. (1979). *Op. Cit.*

[90] Reskin, I., & Padavic, B. (2002). *Women and men at work* (2nd ed.). Thousand Oaks, CA: Pine Forge Press.

out) and are more likely to elicit polarized evaluations as well as to be viewed in terms of their gender (e.g., their behavior is more likely to be interpreted in light of gender stereotypes).[91] In such cases, organizations may have to be especially vigilant to the likelihood of sex discrimination in evaluations and may need to take aggressive measures (e.g., active recruitment) to increase women's representation in powerful and nontraditional roles.

### Workplace norms and leaders' attitudes

Sexist behavior is more likely in workplaces where established norms encourage or permit such behavior.[92] For example, men who might not otherwise have a predisposition to sexually demean women, can be encouraged to do so by an environment that sexualizes women.[93] When sexual images of women invade the workplace (even relatively "mild" images, such as those that appear in television beer commercials with scantily-clad models) can increase the incidence of sex discrimination and sexually harassing behavior among men (including men who do not have a prior proclivity to sexually harass).[94] Sexualized images of women "prime" men to view and treat women as sexual objects – these images, even if merely sexual and not explicitly degrading (e.g., not depicting submissive poses, violence, or overt humiliation)

---

Reskin, B. F., & Ross, C. E. (1995). Jobs, authority, and earnings among managers: The continuing significance of sex. In J. A. Jacobs (Ed.), *Gender inequality at work* (pp. 127–151). Thousand Oaks, CA: Sage.

[91] Yoder, J. D., Schleicher, T. L., & McDonald, T. W. (1998). Empowering token women leaders: The importance of organizationally legitimated credibility. *Psychology of Women Quarterly, 22,* 209-222.

[92] Crandall, C.S., Eshleman, A. & O'Brien, L.T. (2002). Social norms and the expression and suppression of prejudice: The struggle for internalization. *Journal of Personality and Social Psychology, 82,* 359-378.

[93] Rudman, L. A. & Borgida, G. (1995). The afterglow of construct accessibility: The behavioral consequences of priming men to view women as sex objects. *Journal of Experimental Social Psychology, 31,* 493-517.

Pryor, J. B., et al. (1995). A social psychological model for predicting sexual harassment. *Journal of Social Issues, 51,* 69-84.

[94] *Ibid.*

increase men's sexual arousal and bias their perceptions so that they are more likely to view women as desiring to be treated in a sexual manner (e.g., to interpret a woman's smile as a "come-on") and leads men to become less supportive of statements about gender equality.[95]

Similarly, informal workplace norms that encourage a general attitude of disrespect toward women serve to "release" discriminatory impulses and reduce suppression of unprofessional or discriminatory behavior.[96] Leaders (i.e., people who hold high ranking positions) possess particular power to shape group norms. Views expressed by individuals in positions of power or authority carry extra weight, leading subordinates to be more likely to accept these views as correct and to act in compliance with them.[97] Thus, when organizational leaders express sexist views, their behavior conveys permission to others to behave in discriminatory ways.[98]

### Conformity to biased views

Judgments biased by stereotypes gain added credence among evaluators when they lead to a perceived consensus of opinion (even though individuals may have private doubts that they fail to voice or investigate). A perceived consensus in a group or organization exerts a powerful effect over individuals' information-processing. When people believe that there is a general

---

[95]Zillman, D. & Bryant, J. (1982). Pornography, sexual callousness, and the trivialization of rape. *Journal of Communication*, 32, 10-21.

McKenzie-Mohr, D. & Zanna, M. P. (1990). Treating women as sexual objects: Look to the (gender schematic) male who has viewed pornography, *Personality and Social Psychology Bulletin, 16*, 296-308.

Pryor, J. B., et al. (1995). A social psychological model for predicting sexual harassment. *Journal of Social Issues, 51*, 69-84.

[96] Crandall, C.S., Eshleman, A. & O'Brien, L.T. (2002). Social norms and the expression and suppression of prejudice: The struggle for internalization. *Journal of Personality and Social Psychology, 82*, 359-378.

[97] Milgram, S. (1974). *Obedience to authority*. NY: Harper & Row.

[98] Crandall, et al. (2002), *Op cit.*

consensus on an issue, they tend to assume that the consensus "must be" correct,[99] preferentially

seek out information consistent with the consensus,[100] and reinterpret or dismiss information that

disconfirms the consensual view.[101] Even those who have private doubts about the correctness of

consensual views are likely to suppress those doubts and fail to air them publicly because of the

perceived general agreement with these opinions.[102] For example, one of the foundational studies

of the power of social conformity showed that when individuals were faced with a unanimous

majority of even just 3-4 others who gave an obviously wrong answer about a simple perceptual

judgment (stating which of several lines were similar in length to a target line), 75% caved in to

group pressure and gave the wrong answer on at least some trials.[103] When judgments are

subjective, group influence increases.[104] Similar effects of conformity can be obtained by even a

single authority figure because people tend to defer to authorities and accept their definition of a

situation.[105]

These biases (seeking only confirming and dismissing disconfirming information) can be

counteracted if people deliberately seek out and weigh information that might challenge

established views or reveal mistaken assumptions that contribute to those views.[106] For this to

---

[99] Cialdini, R. B. (1993). *Influence: Science and Practice* (3rd Ed.). NY: HarperCollins
[100] Snyder, M., & Swann, W. B. (1978). Hypothesis-testing processes in social interaction. *Journal of Personality and Social Psychology, 36,* 1202-1212.
[101] *Ibid.*
[102] Asch, S. E. (1955). Opinions and social pressure. *Scientific American, 193,* 31-35.
[103] *Ibid.*
[104] Cialdini, R. B. (1993). *Op. Cit.*
[105] Milgram, S. (1974). *Obedience to authority.* NY: Harper & Row.
[106] Lord, C. G., Lepper, M. R., & Preston, E. (1984). Considering the opposite: A corrective strategy for social judgment. *Journal of Personality and Social Psychology, 47,* 1231-1243.

work, organizational leaders and policies must set the tone, explicitly demanding that evaluators

seek out and weigh information that may potentially disconfirm their assumptions.[107]

### Objective versus subjective criteria for personnel evaluations

Stereotype-based bias thrives when subjectivity and ambiguity are allowed to affect

personnel evaluations, rather than focusing on objective measures of job performance.[108] This is

particularly true when decisions are based on subjective perceptions of an individual's

"interpersonal skills." As noted above, research shows that women who lead in a masculine style

are especially likely to be viewed more negatively (relative to similar men, by both female and

male evaluators) on "interpersonal skills." When evaluators base their reviews on subjective or

ambiguous information about performance (i.e., information that is open to interpretation), the

dislike directed at masculine female leaders or successful women in masculine domains is more

likely to translate into poorer performance evaluations. Biased judgments can be avoided,

however, if an employee's performance is judged according to objective criteria (e.g., sales

figures, dollars saved).[109]

### Enforcing (versus failing to enforce) non-discriminatory policies

Stereotype-based bias in personnel evaluations are mitigated when evaluators are held

accountable for making non-discriminatory judgments. Thus, the biases outlined above can be

counter-acted when organizations make equal opportunity for women and under-represented

minorities a priority. Specifically, organizations can reduce bias in the evaluation and treatment

---

[107] Janis, I. L. (2006). *Op. Cit.*

[108] Heilman, M. E., et al. (2004). Penalties for success: Reactions to women who succeed at male-typed gender tasks. *Journal of Applied Psychology, 89*, 416-427.

[109] Heilman, M. E., et al. (2004). *Op. Cit.*

of employees by explicitly promoting egalitarian values and norms,[110] holding decision-makers accountable for ensuring unbiased evaluation and compensation of employees,[111] and emphasizing (to the extent possible) using objective measures to evaluate employees' performance.[112] Conversely, failure to enforce official policies and managerial participation in the violation of those policies undermines them, sending the message that official policies are not to be taken seriously.

---

[110] Chen, S., et al. (1996). Getting the truth or getting along: Accuracy versus impression motivated heuristics and systematic processing. *Journal of Personality and Social Psychology, 71*, 262-275. Fiske, S. T., & Von Hendy, H. M. (1992). Personality feedback and situational norms can control stereotyping processes. *Journal of Personality and Social Psychology, 62*, 577-596.

[111] Tetlock, P. E. (1992). The impact of accountability on judgment and choice: Toward a social contingency model. In M. P. Zanna (Ed.). *Advances in Experimental Social Psychology* (Vol 23, pp. 331-376). San Diego: Academic Press.

[112] Heilman et al. (2004). *Op Cit.*; see also, Fiske, S. T., & Neuberg, S. L. (1990). A continuum model of impression formation: From category-based to individuating processes as a function of information, motivation, and attention. In M. P. Zanna (Ed.). *Advances in Experimental Social Psychology* (Vol 23, pp. 1-108). San Diego: Academic Press.

## IV. CONSISTENCY OF ALLEGATIONS WITH STEREOTYPING RESEARCH

As stated above, I do not draw specific conclusions as to whether Dr. Tuli was the victim of sex discrimination for two reasons. First, making this call is the role of the decision-makers in this case rather than an expert witness who gives social framework testimony. Second, it is not possible to make a judgment with "scientific certainty" about any individual "real world" case – such judgments require carefully controlled experiments (e.g., in which a male and female actor are trained to act in an identical manner, people are randomly assigned to observe either the male or female actor, and well-validated measures of observers' impressions are taken). Rather, the purpose of my testimony is to illuminate what is known about when stereotyping and discrimination are likely to occur and the forms they typically take. The decision-makers in this case must make the ultimate judgment as to whether Dr. Tuli was discriminated against.

That said, part of the purpose of my testimony is to point out where allegations are consistent or inconsistent with what is known about the operation of stereotyping and discrimination, especially toward women. I do not try to determine the credibility of the allegations nor to render an ultimate conclusion as to whether discrimination occurred. Having reviewed a significant amount of case materials, however, it is clear that Dr. Day's alleged behavior toward Dr. Tuli, as well as the ways Dr. Tuli was characterized by Dr. Day and others (e.g., as "difficult"), closely mirror the form and content that sex discrimination takes toward women who succeed in male-dominated professions and who act in the "masculine" manner those roles require. Specific examples are listed below.

Allegations about Dr. Day are consistent with what is known about sexist ambivalence: patronizing, affectionate, "romantic" or chivalrous behavior toward women who fit idealized prescriptions of femininity and defer to male authority, but hostile and demeaning behavior

toward women who challenge that authority. Consistent with benevolent sexism Dr. Day is alleged to have exhibited affectionately patronizing, unprofessional behavior toward women such as: calling female doctors by their first names while using formal titles for male doctors; referring to female doctors and nurses as "girls," using diminutives names such as "sugar," hugging female nurses, and characterizing professional disagreements with Dr. Tuli and other women as a disagreement between "lovers." These behaviors are alleged to have occurred toward female subordinates (e.g., nurses and administrative assistants) and toward Dr. Tuli when she attempted to repair her professional relationship with Dr. Day. Additionally, Dr. Day's own deposition testimony about why, in contrast to his difficulties with Dr. Tuli, he feels great affection toward Dr. Rose Du was consistent with patronizing sexist attitudes that reward women who show stereotypically feminine and compliant traits that do not challenge male authority. Dr. Day characterized Dr. Du as "quiet, very unassuming" and "sweet," noting that while she is also "perhaps the smartest person I ever met" that "you would never know it' (Day Deposition, p. 342), presumably because of the modesty she possesses.

Specific examples consistent with the operation of hostile sexism toward women who challenge male authority or opinions, general attitudes that women cannot perform a "man's" job, and overtly hostile sexualization of women include allegations that Dr. Day: failed to show respect to Dr. Tuli as compared to male colleagues by constantly and publicly questioning her medical judgments, reacted extremely negatively when his opinions were challenged by Dr. Tuli, made hostile comments (sometimes disguised as "jokes") questioning women's ability to perform surgery (e.g., "You are just a girl, are you sure you can do that?"), made hostile sexual comments (e.g., "Why don't you dance on the table?"), and characterized of Dr. Tuli as "out of control" "volatile," and in need of "anger management" for behaviors similar to those that were

tolerated in male surgeons. Allegations that Dr. Day punished male residents' "bad boy"
excesses with slaps on the wrist while reacting with extreme hostility to assertiveness by Dr. Tuli
are consistent with hostile sexist attitudes.

The descriptions of Dr. Tuli as "difficult" and the distaste both Dr. Day and others
showed for assertive or "masculine" behavior by Dr. Tuli closely mirror research findings that
women who succeed in male professions and/or who act assertively are demeaned as cold, rude,
or insensitive. As noted above, while ambivalent sexists are most likely to show such reactions,
even relatively nonsexist individuals may fall prey to this tendency. In this vein, the testimony of
Susan Lovell seems to capture what the research has shown. She testified that Dr. Tuli was never
demeaning toward support staff in the operating room, but that when Dr. Tuli acted assertively in
the OR some nurses "don't like that tone of voice…that her voice changes during surgery. They
just don't care for it, some of them" (Lovell Deposition, p. 24). Lovell further testified that the
nurses explicitly discussed their own puzzlement as to why they reacted more negatively to Dr.
Tuli as compared to similar behavior by male surgeons – "…we've had conversations about
'Why do you feel insulted more from Dr. Tuli than if it's somebody else?" (Lovell Deposition, p.
59). Asked what the answer to this question might be, Lovell stated "No one ever knows" and
went on to ask a rhetorical question central to this trial "…are we more accepting of male
surgeons" (Lovell Deposition, p. 59). This testimony is consistent with research on differing
reactions to women versus men who are assertive due to the automatic operation of sex
stereotyping, which occurs even among relatively egalitarian individuals who may be puzzled by
their own reactions since they do not intend to be discriminatory. Lovell's testimony (p. 59) that
Dr. Tuli's assertive behavior was confined to the OR and similar to the behavior of many
surgeons suggest that it occurred due to demands of the surgeon role (see the depositions of

Barnes and Hardy as well). This is consistent with the idea that Dr. Tuli experienced conflicting demands – to be "feminine" but also to be an effective surgeon that, in the context of the OR, created a "can't win" situation due to her gender – a conflict that research shows commonly to occur for women masculine domains.

In conclusion, while I make no judgments as to their credibility (since this is not part of the expert's role), the allegations made in this case are highly consistent with scientific research on the form and content of sex discrimination, as well as the circumstances in which sex discrimination typically takes place.

## VI. COMPENSATION & SIGNATURE

My rate of compensation is as follows:

- $300 per hour for review of documents and report writing

- $600 per hour for deposition and trial testimony

- Billable hours include travel time to attend depositions or trial

_(signature)_

September 26, 2008

_____          _____

Peter Glick, Ph.D.                                      Date

# VII. ATTACHMENT A: CURRICULUM VITAE

## Peter Glick
### Henry Merritt Wriston Professor in the Social Sciences

## ADDRESS

Department of Psychology
Lawrence University
PO Box 599
Appleton, Wisconsin 54912-0599
phone: (920) 832-6707
fax:    (920) 832-6962
email:  glickp@lawrence.edu

111 East Water Street, Apt 302
Appleton, Wisconsin 54911

(920) 574-3786

## EDUCATION

Graduate:

University of Minnesota
Ph.D., 1984
Specialization in Social Psychology
Supporting Program in Statistics

Undergraduate:

Oberlin College
A.B., 1979
Major in Psychology

## ACADEMIC AND ADMINISTRATIVE APPOINTMENTS

*Henry Merritt Wriston Professor in the Social Sciences*, 2007-present, Lawrence University

*Full Professor of Psychology*, 1997-present, Lawrence University

*Director of Lawrence Fellows Program*, 2004-2007 (designed and implemented a post-doctoral Fellows program with 12 Fellows per year across all academic disciplines)

*Faculty Associate to the President*, 2005-07, Lawrence University

*Director, Lawrence University London Centre*, 1998-99

*Chair of Psychology Department*, 1992-93; 1994-96, 1997; 2000-2002, Lawrence University

*Associate Professor of Psychology*, 1990 to 1997, Lawrence University

*Assistant Professor of Psychology*, 1985 to 1990, Lawrence University

## HONORS AND PRIZES

Elected as a *Fellow* in the following professional psychology organizations:

> *American Psychological Society* (2004)
> *American Psychological Association* (2004)
> *Society for Personality and Social Psychology*, Division 8 of APA (2004)
> *Society for the Psychological Study of Social Issues*, Division 9 of APA (2007)
> *Society for the Psychology of Women*, Division 35 of APA (2007)

*Gordon W. Allport Intergroup Relations Prize* for best paper on intergroup relations (awarded by the Society for the Psychological Study of Social Issues and Harvard University):

> 1995 Award for Glick, P. & Fiske, S. T. "The Ambivalent Sexism Inventory: Differentiating Hostile and Benevolent Sexism" (*Journal of Personality and Social Psychology*)

> 2005-06 Honorable Mention for Cuddy, A. J. C., Fiske, S. T., & Glick, P. "The BIAS Map: Behaviors from Intergroup Affect and Stereotypes"

Honorary Societies:

> *Phi Kappa Phi*, University of Minnesota Chapter, 1980
> *Phi Beta Kappa*, Zeta Chapter of Oberlin College, 1979

## EDITORIAL BOARD APPOINTMENTS

> *Journal of Personality and Social Psychology: IRGP* (2003-present)
> *Personality and Social Psychology Bulletin* (2002-present)
> *Psychological Inquiry* (2002-present)
> *Psychology of Women Quarterly* (2003-2008)
> *Social Issues and Interventions* book series (sponsored by SPSSI)

## EXECUTIVE COUNCIL POSITIONS IN PROFESSIONAL ORGANIZATIONS

> *Society of Experimental Social Psychology* Executive Council, 2007-2010
> *Society for the Psychological Study of Social Issues* Executive Council, 2007-2010

## PROFESSIONAL ORGANIZATION MEMBERSHIPS

> *Society for Experimental Social Psychology* (elected 1996)
> *American Psychological Society*
> *American Psychological Association*
> *Society for the Psychological Study of Social Issues*
> *Society for Personality and Social Psychology*

## VISITING AND SUMMER INSTITUTE POSITIONS

Universidad de Granada, Spain, *Consultation*, Supported by a Spanish Government grant for a week-long visit to consult and initiate research collaborations, December 2007 & June 2008.

University of Marburg and University of Bielefeld, Germany, *Summer Institute*, September 2007

Society for Social and Personality Psychology's *Summer Institute in Social Psychology*, University of Texas at Austin, July 2007. Co-instructor with Alice Eagly (Northwestern University) for 2-week session on Gender, Power, and Roles

Pontificia Universidad Católica de Chile, June 2003. Two weeks as a visiting "outstanding psychologist" (sponsored by a Chilean government grant)

University of Jena, Germany, April 2002. Research consultant for the International Graduate College (a consortium involving the University of Jena, University of Kent at Canterbury, and University of Louvain-la-neuve in Belgium)

Visiting Associate Professor, University of Massachusetts at Amherst, 1993-94

## BOOKS

Dovidio, J. F., Hewstone, M., Glick, P. & Esses, V. M. (Eds.). (in preparation). *Handbook of Prejudice, Stereotyping, and Discrimination*. New York: Sage.

Rudman, L. A., & Glick, P. (2008). *The Social Psychology of Gender: How Power and Intimacy Shape Gender Relations*. New York: Guilford Press.

Dovidio, J. F., Glick, P., & Rudman, L. A. (Eds.). (2005). *On the Nature of Prejudice: 50 Years After Allport*. Malden, MA: Blackwell Publishing.

## SPECIAL JOURNAL ISSUE

Lee, T., Fiske, S. T., & Glick, P. (Eds.). (in preparation). Special Issue on Ambivalent Sexism. *Sex Roles*.

## PEER-REVIEWED PUBLICATIONS

Glick, P. (2008). Restating the case: The benefits of diverse samples for theory development. *Psychological Inquiry, 19*, 78-83.

Glick, P., Chrislock, K., Petersik, K., Vijay, M., & Turek, A. (2008). Does cleavage work at work? Men, but not women, falsely believe in the power of cleavage to sell a weak product. *Psychology of Women Quarterly, 32*, 326-335.

Cuddy, A. J. C., Fiske, S. T., Kwan, V. S. Y., Glick, P., Demoulin, S., Leyens, J-Ph. et al. (in press). Is the Stereotype Content Model culture-bound? A cross-cultural comparison reveals systematic similarities and differences. *British Journal of Social Psychology*.

Sakallı-Uğurlu, N., Yalçın, Z. S., & Glick, P. (2007). Ambivalent sexism, belief in a just world, and empathy as predictors of Turkish students' attitudes toward rape victims. *Sex Roles, 57*, 889-895.

Cuddy, A. J. C., Fiske, S. T., & Glick, P. (2008). Warmth and competence as universal dimensions of social perception: The Stereotype Content Model and the BIAS Map. To appear in M. P. Zanna (Ed.). *Advances in Experimental Social Psychology* (Vol. 40, pp. 61-150). Thousand Oaks, CA: Academic Press.

Glick, P., Gangl, C., Gibb, S., Klumpner, S., Weinberg, E. (2007). Defensive reactions to masculinity threat: More negative affect toward effeminate (but not masculine) gay men. *Sex Roles, 57*, 55-59.

Moya, M., Glick, P., Expósito, F., De Lemus, S. & Hart, J. (2007). It's for your own good: Benevolent sexism and women's reactions to protectively justified restrictions. *Personality and Social Psychology Bulletin, 33*, 1421-1434.

Hebl, M. R., King, E., Glick, P., Singletary, S. L. & Kazama, S. M. (2007). Hostile and benevolent reactions toward pregnant women: Complementary interpersonal punishments and rewards that maintain traditional roles. *Journal of Applied Psychology, 92*, 1499-1511.

Fiske, S. T., Cuddy, A. J. C., & Glick, P. (2007). Universal dimensions of social cognition: Warmth and competence. *Trends in Cognitive Science, 11*, 77-83.

Cuddy, A. J. C., Fiske, S. T., & Glick, P. (2007). The BIAS Map: Behaviors from intergroup affects and stereotypes. *Journal of Personality and Social Psychology, 92*, 631-648.

Glick, P., Fiske, S. T., Abrams, D., Dardenne, B., Ferreira, M. C., Gonzalez, R., Hachfeld, C., Huang, L-L., Hutchison, P., Kim, H-J., Manganelli, A. M., Masser, B., Mucchi-Faina, A., Okiebisu, S., Rouhana, N., Saiz, J. L., Sakallı-Ugurlu, N., Volpato, C., Yamamoto, M., Yzerbyt, Y. (2006). Anti-American Sentiment and America's Perceived Intent to Dominate: An 11-Nation Study. *Basic and Applied Social Psychology, 38*, 363-373.

Eastwick, P. W., Eagly, A. H., Glick, P., Johannesen-Schmidt, M., Fiske, S. T., Blum, A. M. B., Eckes, T., Freiburger, P., Huang, L., Lameiras, M., Manganelli, A. M., Pek, J. C. X., Rodríguez Castro, Y., Sakalli-Ugurlu, N., Six-Materna, I., & Volpato. C. (2006). Is traditional gender ideology associated with sex-typed mate preferences? A test in nine nations. *Sex Roles, 54*, 603-614.

Glick, P., Larsen, S., Johnson, C., Branstiter, H. (2005). Evaluations of sexy women in low and high status jobs. *Psychology of Women Quarterly, 29*, 389-395.

Moya, M., Poeschl, G., Glick, P., Páez, D. Sedano, I. F. (2005) Sexisme, Masculinité-Féminité et Facteurs Culturels [Sexism, Masculinity-Femininity, and Cultural Factors], *Revue Internationale de Psychologie Sociale, 18*, 141-167.

Cuddy, A. J. C., Fiske, S. T., & Glick, P. (2004). When professionals become mothers, warmth doesn't cut the ice. *Journal of Social Issues, 4*, 701-718.

Glick, P., Lameiras, M., Fiske, S. T., Eckes, T., Masser, B., Volpato, C., Manganelli, A. M., Pek, J., Huang, L., Sakalli-Ugurlu, N., Castro, Y. R., D'Avila Pereira, M. L., Willemsen, T. M., Brunner, A., Six-Materna, I, & Wells, R. (2004). Bad but bold: Ambivalent attitudes toward men predict gender inequality in 16 nations. *Journal of Personality and Social Psychology, 86*, 713–728.

Sakalli-Ugurlu, N., & Glick P. (2003). Ambivalent sexism and attitudes toward women who engage in premarital sex in Turkey. *Journal of Sex Research, 40*, 296-302.

Moya, M., Páez, D., Glick, P., Fernández, I., & Poeschl, G. (2003). Sexismo, masculinidad-feminidad y factores culturales [Sexism, masculinity-femininity and cultural factors]. *Revista Española de Motivación y Emoción, 4*, 8-9.

Glick, P., Lameiras, M., & Castro, Y. R. (2002). Education and Catholic religiosity as predictors of hostile and benevolent sexism toward women and men. *Sex Roles, 47*, 433-441.

Glick, P., Sakalli-Ugurlu, N., Ferreira, M. C., & Aguiar de Souza, M. (2002). Ambivalent sexism and attitudes toward wife abuse in Turkey and Brazil. *Psychology of Women Quarterly, 26*, 291-296.

Fiske, S. T., Cuddy, A. J. C., Glick, P., & Xu, J. (2002). A model of (often mixed) stereotype content: Competence and warmth respectively follow from perceived status and competition. *Journal of Personality and Social Psychology, 82*, 878-902.

Rudman, L. A., & Glick, P. (2001). Prescriptive gender stereotypes and backlash toward agentic women. In Carli, L. L. & Eagly, A. H. (Eds.), *Journal of Social Issues, 57*, 743-762.

Glick, P., & Fiske, S. T. (2001). Ambivalent sexism. In M. P. Zanna (Ed.), *Advances in Experimental Social Psychology* (Vol. 33, pp. 115-188). Thousand Oaks, CA: Academic Press.

Glick, P., & Fiske, S. T. (2001). An ambivalent alliance: Hostile and benevolent sexism as complementary justifications of gender inequality. *American Psychologist, 56*, 109-118.

Glick, P., Fiske, S. T., Mladinic, A., Saiz, J, Abrams, D., Masser, B., Adetoun, B., Osagie, J., Akande, A., Alao, A., Brunner, A., Willemsen, T. M., Chipeta, K., Dardenne, B., Dijksterhuis, A., Wigboldus, D., Eckes, T., Six-Materna, I., Expósito, F., Moya, M., Foddy, M., Kim, H-J., Lameiras, M., Sotelo, M. J., Mucchi-Faina, A., Romani, M., Sakalli, N., Udegbe, B., Yamamoto, M., Ui, M., Ferreira, M. C., & López, W. L. (2000). Beyond prejudice as simple antipathy: Hostile and benevolent sexism across cultures. *Journal of Personality and Social Psychology, 79*, 763-775.

Fiske, S. T., Xu, J., Cuddy, A. J. C., & Glick, P. (1999). Respect versus liking: Status and interdependence underlie ambivalent stereotypes. *Journal of Social Issues, 55*, 473-489.

Rudman, L. A., & Glick, P. (1999). Feminized management and backlash toward agentic women: The hidden costs to women of a kinder, gentler image of middle-managers. *Journal of Personality and Social Psychology, 77*, 1004-1010.

Glick, P., & Fiske, S. T. (1999). The Ambivalence toward Men Inventory: Differentiating hostile and benevolent beliefs about men. *Psychology of Women Quarterly, 23(3)*, 519-536.

Expósito, F., Moya, M., & Glick P. (1998). Sexismo ambivalente: Medición y correlatos. *Revista de Psicología Social, 13*, 159-169.

Glick, P., Diebold, J., Bailey-Werner, B., & Zhu, L. (1997). The two faces of Adam: Ambivalent sexism and polarized attitudes toward women. *Personality and Social Psychology Bulletin, 23*, 1323-1334.

Glick, P., & Fiske, S. T. (1997). Hostile and benevolent sexism: Measuring ambivalent sexist attitudes toward women. *Psychology of Women Quarterly*, Special Issue: Measuring attitudes toward appropriate roles for men and women, *21*, 119-135.

Glick, P. & Fiske, S. T. (1996). The Ambivalent Sexism Inventory: Differentiating hostile and benevolent sexism. *Journal of Personality and Social Psychology, 70*, 491-512.

Glick, P., Wilk, K., & Perreault, M. (1995). Images of occupations: Components of gender and status in occupational stereotypes. *Sex Roles, 32*, 565-582.

Fiske, S. T., & Glick, P. (1995). Ambivalence and stereotypes cause sexual harassment: A theory with implications for organizational change. *Journal of Social Issues, 51*, 97-115.

Glick, P. (1991). Trait-based and sex-based discrimination in occupational prestige, occupational salary, and hiring. *Sex Roles, 25*, 351-378.

Glick, P., Gottesman, D., & Jolton, J. (1989). The fault is not in the stars: Susceptibility of skeptics and believers in astrology to the Barnum effect. *Personality and Social Psychology Bulletin, 15*, 178-186.

Glick, P., Zion, C., & Nelson, C. (1988). What mediates sex discrimination in hiring decisions? *Journal of Personality and Social Psychology, 55*, 178-186.

Glick, P., DeMorest, J. A., & Hotze, C. A. (1988). Self-monitoring and beliefs about partner compatibility in romantic relationships. *Personality and Social Psychology Bulletin, 14*, 485-494.

Glick, P., DeMorest, J. A., & Hotze, C. A. (1988). Keeping your distance: Group membership, personal space, and requests for small favors. *Journal of Applied Social Psychology, 18*, 315-330.

Glick, P. (1985). Orientations toward relationships: Choosing a situation in which to begin a relationship. *Journal of Experimental Social Psychology, 21*, 544-562.

Snyder, M., Berscheid, E., & Glick, P. (1985). Focusing on the exterior and the interior: Two investigations of the initiation of personal relationships. *Journal of Personality and Social Psychology, 48*, 1427-1439.

## EDITED BOOK CHAPTERS

Glick, P. & Rudman, L. A. (invited submission). Sexism. To appear in J. F. Dovidio, M. Hewstone, P. Glick, & V. M. Esses (Eds.) *Handbook of prejudice, stereotyping, and discrimination.* Sage.

Glick, P. (2008). When neighbors blame neighbors: Scapegoating and the breakdown of ethnic relations. In V. M. Esses & R. A. Vernon (Eds) *Explaining the breakdown of ethnic relations: Why neighbors kill* (pp. 123-146). Malden, MA: Blackwell Publishing.

Rudman, L. A., Glick, P., & Phelan, J. E. (2008). From the laboratory to the bench: Gender stereotyping research in the courtroom. In E. Borgida & S. T. Fiske (Eds) *Beyond common sense: Psychological science in the courtroom* (pp. 83-101). Malden, MA: Blackwell Publishing.

Glick, P., & Fiske, S. T. (2007). Sex discrimination: The psychological approach. In F. J. Crosby, M. S. Stockdale, and S. A. Ropp (Eds.). *Sex discrimination in the workplace* (pp. 155-187). Malden, MA: Blackwell Publishing.

Glick, P. (2006). Ambivalent sexism, power distance, and gender inequality across cultures. In S. Guimond (Ed.). *Social comparison processes and levels of analysis* (pp. 283-302). Cambridge: Cambridge University Press.

Glick, P. (2005). Choice of scapegoats. In J. F. Dovidio, P. Glick, & L. A. Rudman (Eds.). *On the nature of prejudice: 50 years after Allport* (pp. 244-261). Malden, MA: Blackwell Publishing.

Dovidio, J. F., Glick, P., & Rudman, L. A. (2005). Reflecting on *The Nature of Prejudice*: Fifty years after Allport. In J. F. Dovidio, P. Glick, & L. A. Rudman (Eds.). *On the nature of prejudice: 50 years after Allport* (pp. 1-15). Malden, MA: Blackwell Publishing.

Fiske, S. T., Cuddy, A. J. C., & Glick, P. (2002). Emotions up and down: Intergroup emotions result from perceived status and competition. In D. M. Mackie & E. R. Smith (Eds.), *From Prejudice to Intergroup Emotions: Differentiated reactions to social groups* (pp. 247-264). New York: Psychology Press.

Glick, P. (2002). Sacrificial lambs dressed in wolves' clothing: Envious prejudice, ideology, and the scapegoating of Jews. In L. S. Newman & R. Erber (Eds.), *Understanding genocide: The social psychology of the Holocaust* (pp. 113-142). Oxford: Oxford University Press.

Glick, P., & Fiske, S. T. (2001) Ambivalent stereotypes as legitimizing ideologies: Differentiating paternalistic and envious prejudice. In J. T. Jost & B. Major (Eds.), The *Psychology of legitimacy: Emerging perspectives on ideology, justice, and intergroup relations*, (pp. 278-306). New York: Cambridge University Press.

Glick, P., & Hilt, L. (2000). From combative children to ambivalent adults: The development of gender prejudice. In T. Eckes & M. Trautner (Eds.), *Developmental social psychology of gender*. Mahwah, NJ: Erlbaum.

Glick, P. & Fiske, S. T. (1999). Gender, power dynamics, and social interaction. In J. Lorber, M. M. Ferree, & B. Hess (Eds.), *Revisioning gender* (pp. 365-398). Newbury Park, CA: Sage.

Glick, P., & Fiske, S. T. (1999). Sexism and other "isms": Interdependence, status, and the ambivalent content of stereotypes. In W. B. Swann, Jr., L. A. Gilbert, & J. Langlois (Eds.), *Sexism and stereotypes in modern society: The gender science of Janet Taylor Spence* (pp. 193-222). Washington, D.C.: American Psychological Association.

## PUBLICATIONS FOR A GENERAL AUDIENCE

Glick, P., & Fiske, S. T. (2002). Ambivalent responses. *American Psychologist, 57*, 444-446

Glick, P., & Fiske, S. T. (2002, Winter). Perceived legitimacy and the struggle for civil rights. *Civil Rights Journal, 6(1)*, 72-74.

Glick, P. (2002, November) Isolation, interdisciplinarity, and inspiration: Doing research at a liberal arts college. *APS Observer, 15(9)*, 5, 50.

Glick, P. (1998, Fall). Why Lawrence needs scholars. *Lawrence Today*, 12-14.

Glick, P. (1987, August). Stars in our eyes. *Psychology Today*, 6-7.

Glick, P., & Cohen, P. (1987, April 15). Prejudice, human nature, and contemporary history. *Black Issues in Higher Education*, 4-6.

Glick, P. (1987, February). Help, at a distance. *Psychology Today*, 66-67.

Glick, P., & Snyder, M. (1986, May/June). Self-fulfilling prophecy: The psychology of belief in astrology. *The Humanist*, 20-25.


## ENCYCLOPEDIA ENTRIES

Glick, P. (in press). Scapegoating. Entry for the *Encyclopedia of Group Processes and Intergroup Relations.* M. Hogg & J. Levine (Eds). NY: Sage Publishing.

Glick, P. (in press). *Sexism.* Entry for the *Encyclopedia of Power*. K. Dowling (Ed.), NY: Sage Publishing.

Glick, P. (in press). *Alice H. Eagly.* Entry for the *Encyclopedia of Power*. K. Dowling (Ed.), NY: Sage Publishing.

Glick, P. (in press). *Janet T. Spence.* Entry for the *Encyclopedia of Power*. K. Dowling (Ed.), NY: Sage Publishing.

Glick, P. (in press). *Benevolent sexism.* Entry for the *Encyclopedia of Social Psychology*. R. Baumeister & K. Vohs (Eds.). NY: Sage Publishing.

Glick, P. (in press). *Sexism.* Entry for the *Encyclopedia of Social Psychology*. R. Baumeister & K. Vohs (Eds.). NY: Sage Publishing.

## SELECTED RECENT MEDIA COVERAGE

*XM Radio* (11/29/06), interview on Lisa Belkin's radio show

*Boston Globe* (11/09/06), quoted in Ellen Goodman's syndicated column, "Trumped by the gender card"

*New York Times* (11/1/06), quoted in Lisa Belkin article "The Feminine Critique"

*Fox News Channel*, (5/15/07), interviewed about my 2005 study of effects of provocative dress on workplace perceptions of women

## INVITED TALKS

Northwestern University, Kellogg School of Management, 2008
New York University, December 2007
Universidad de Granada, December 17-18, 2007
European Association of Experimental Social Psychology small group conference on
    Fundamental Dimensions of Social Judgment), June 7-9, 2007
University of Minnesota, March 2006
Stanford University, Conference on "Women and Leadership," February 2006
Yale University, Hovland Memorial Lecture, December, 2005
University of Wisconsin-Madison, Conference on "Discrimination and Prejudice in the 21st
    Century," September 2005
Miami University of Ohio, April 2005
Purdue University, February 2005
University of Western Ontario, Conference on "Why Neighbours Kill: Explaining the
    Breakdown of Ethnic Relations," June 2004
Lawrence University Senior Class Dinner (voted on by the Senior Class), May 2004
Princeton University, March 2004
Midwestern Psychological Association, March 2004
Northwestern University, November 2003
Pennsylvania State University, November 2003
Oberlin College, October 2003
XXVIII Interamerican Congress of Psychology, Santiago, Chile, August 2001
Conference on Eichmann/Arendt, Depaul University, Chicago, May 2001
University of Kentucky, Lexington, April 2001
Marquette University, October, 2001
Universidad de Vigo, Ourense, Spain, September 2000
Catholic University of Louvain-la-neuve, Belgium, March 1999
University of Massachusetts at Amherst, November 1999
European Association of Experimental Social Psychology, Oxford, July 1999
University of Amsterdam, Netherlands, March 1999
University of Granada, Spain, May 1999
University of Kent at Canterbury, England, October 1998

Conference on the Psychology of Legitimacy, Stanford University, August 1998
*Festschrift* for Janet T. Spence, University of Texas at Austin, April 1997
University of Wisconsin, Madison, 1996
Yale University, May 1994
Williams College, February 1994
University of Massachusetts at Amherst, December 1992
Midwestern Psychological Association, Chicago, May 1990

## ORGANIZATION OF CONFERENCES AND SYMPOSIA

Symposium on Paternalistic and Subtle Prejudices.
> Organizer of symposium for *Society of Experimental Social Psychology*, Chicago, October 2007; Panel included Theresa Vescio and Felicia Pratto.

Symposium on Understanding and Preventing Genocide.
> Organizer of symposium for *Society of Experimental Social Psychology*, Philadelphia, October 2006; Panel included Tom Pettigrew, Ervin Staub, and Arthur Miller.

Symposium on the 50th Anniversary of Allport's The Nature of Prejudice
> Co-organizer (with Jack Dovidio and Laurie Rudman) of symposium for the *Society of Experimental Social Psychology*, Fort Worth, Texas, October 2004; Panel included Alice Eagly, Susan T. Fiske, Miles Hewstone, Brenda Major, Bernadette Park.

Rethinking the Nature of Prejudice
> Co-organizer (with Laurie Rudman) of a small group conference of 12 top prejudice theorist/researchers, held at and funded by the *Fetzer Institute*, September 2002

The Content of Our Characterizing: Approaches to Understanding the Causes and Consequences of Stereotype Content
> *Society of Experimental Social Psychology*, Columbus, Ohio, October, 2002; Chaired and organized a panel that included Alice Eagly, John Jost, Eliot Smith, Laurie Rudman, and David Hamilton.

## SELECTED CONFERENCE PRESENTATIONS

Benevolent Sexism and Women's Reactions to Potentially Paternalistic Protectiveness
> *Society for Experimental Social Psychology*, Chicago, October 2007

The Effects of Competence and Warmth Stereotypes on Intergroup Attribution
> *European Association for Experimental Social Psychology* (Small Group Meeting), Namur (Belgium), June, 2007

Reluctant or Willing Obedience? Ideologies of Blame and Redemption in Genocide
*Society for Experimental Social Psychology*, Philadelphia, October 2006

Evaluations of Sexy Women in Low and High Status Jobs
*Association for Psychological Science*, New York, May, 2006

Ambivalent Gender Ideologies and Legitimization of Inequality
*American Psychological Association*, Washington, D.C., August, 2005

Hostility Toward Men and Benevolence Toward Women Predict Gender Inequality *Society for Personality and Social Psychology*, Austin, Texas, January, 2004

Stereotype Content and the Dynamics of Prejudice
*Society of Experimental Social Psychology*, Columbus, Ohio, October, 2002

Is Ambivalence Necessarily a State of Mental Conflict?"
*Society for Personality and Social Psychology*, Savannah, Georgia, February 2002

Crushed by the Pedestal: Benevolent Sexism and Gender Inequality Across Cultures
*Society for Personality and Social Psychology*, San Antonio, Texas, February 2001

A Taxonomy of Prejudices and the Danger of "Positive" Stereotypes
*Society for Psychological Study of Social Issues*, Minneapolis, June 2000

"Astonishing Extremes": Ambivalence Toward Women Across Cultures
*Society for Experimental Social Psychology*, St. Louis, October 1999

Allport's afterthought: Why prejudice cannot be defined as an antipathy
*Society for Experimental Social Psychology*, Toronto, October 1997

## AD HOC JOURNAL REVIEWS

*Academy of Management Review*
*Basic and Applied Social Psychology*
*British Journal of Social Psychology*
*European Journal of Social Psychology*
*Journal of Applied Social Psychology*
*Journal of Experimental Social Psychology*
*Journal of Personality*
*Journal of Personality and Social Psychology*
*Journal of Research in Personality*
*Journal of Social and Clinical Psychology*
*Journal of Social Issues*
*Law and Human Behavior*
*Legal and Criminal Psychology*

*Personality and Social Psychology Bulletin*
*Personality and Social Psychology Review*
*Political Psychology*
*Psychological Science*
*Psychology of Women Quarterly*
*Sex Roles*
*Social Justice Research*
*Social Psychology Quarterly*
*Social Psychology Review*

## GRANTS

Teagle Foundation Grant to Lawrence University, December 2005 (co-author of grant)
$100,000 grant for "A Study of the Lawrence Fellows in Liberal Arts and Sciences" to assess the degree to which the Fellows Program is achieves its goals.

SPSSI Grants-in-Aid, July, 2003
$2000 grant to help fund cross-cultural research on attitudes toward the United States

Fetzer Institute, September 2002
$10,000 and use of Fetzer's retreat for a small conference of leading researchers to "reconsider the nature of prejudice" at a time of a potential paradigm shift in theoretical conceptions of prejudice

SPSSI Grants-in-Aid
$1240 grant to help fund cross-cultural research on ambivalent sexism, July, 2000

Improvement of Psychology Laboratory Curriculum
National Science Foundation, College Science Instrumentation Program, 1987. Received $19,300 to establish a microcomputer laboratory. Coauthored with Terry Rew-Gottfried

## COURSES TAUGHT AT LAWRENCE UNIVERSITY

Social Psychology
Research Methods I & II
The Holocaust
Topics in Prejudice (Gender, Theories of Prejudice)
Industrial/Organizational Psychology
Senior Capstone

## MAJOR COMMITTEE ASSIGNMENTS AT LAWRENCE UNIVERSITY

Director of Lawrence Fellows Program (developed hiring guidelines, mentoring/development
      program, and evaluation plan for University-wide post-doctoral Fellows program)
Committee on Tenure, Reappointment, and Promotions
Committee on Academic Planning
Committee on Instruction
Committee on Honors
Chair of Building Planning Committee for Briggs Hall (erected 1997)


## EXPERT WITNESS (STEREOTYPING) LITIGATION LIST

Alma P. Navato v. St. Luke's Hospital of Kansas City, et al. (1991)
U.S. District Court, Western District of Missouri
Case Number 90-0068-CV-W-6

Kelley v. Drexel University (1994)
U.S. District Court, Eastern District of Pennsylvania
Case Number 94-CV-5336

Stephanie Adams v. Burroughs-Wellcome Company and Paul Hossenlopp (1995)
Superior Court of New Jersey
Docket Number L-411-95

Carlson et al. v. C. H. Robinson Worldwide (2003)
Hennepin County District Court
Case Number CV-02-3780 (JNE/JGL)

Shaffer v. Converge Medical, Inc (2004)
Superior Court of the State of California, Alameda County
Case Number RGO 3118693

Theresa M. Metty v. Motorola, Inc. (2006)
U.S. District Court, Northern District of Illinois – Eastern Division
Case Number 05C 4113