# EXHIBIT C

**REPORT ON STEREOTYPING AND BIAS**

**IN THE MATTER OF**

**LINDA SUSAN MULLENIX**

**V.**

**UNIVERSITY OF TEXAS AT AUSTIN**

**CIVIL NO. 1:19-cv-1203-LY**

**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TEXAS**

**AUSTIN DIVISION**

**Report prepared by Dr. Peter Glick, Ph.D.**

**June 11, 2021**

**TABLE OF CONTENTS**

I.      Background and Qualifications……………………………………………………..3

II.     Type of Testimony………………………………………………………....…….6

III.    Documents Reviewed in Preparation of this Report ……………………………11

IV.     Scientific Research on Stereotyping and Discrimination…………………….…….12

V.      Application to Current Case………………………………………………..,,,, 47

VI.     Compensation & Signature…………………………………………………… 78

VII.    Attachment: Curriculum Vitae……………………………………………...... 79

I, Peter Glick, have been retained by the law firm Wiley Walsh, PC counsel for the plaintiff, in the case of *Linda Susan Mullenix v University of Texas at Austin* to issue a report on the science of stereotyping, bias, and discrimination.

## I.      BACKGROUND AND QUALIFICATIONS

I am the Henry Merritt Wriston Professor in the Social Sciences and a Full Professor of Psychology at Lawrence University in Appleton, WI, having joined the faculty in 1985 shortly after earning my Ph.D. in social psychology at the University of Minnesota. In addition, I became a Senior Scientist with the NeuroLeadership Institute in 2018. I have co-edited two books on prejudice,[1] co-authored a text on the social psychology of gender and sexism,[2] and authored or co-authored more than 80 professional papers (peer-reviewed journal articles and chapters in edited books) on prejudice, stereotypes, and discrimination, including comprehensive reviews of sex discrimination in the workplace.[3]

My work is highly cited by other scholars, with over 40,000 citations according to *Google Scholar*, indicating my work's wide acceptance and influence in the science of stereotyping and discrimination. My work has also been recognized through scientific awards. Susan T. Fiske of Princeton University and I received the 1995 Gordon Allport Prize for the best

---

[1] Dovidio, J. F., Glick, P., & Rudman, L. A. (Eds.). (2005). *On the Nature of Prejudice: 50 Years After Allport*. Malden, MA: Blackwell Publishing.
 Dovidio, J. F., Hewstone, M., Glick, P. & Esses, V. M. (Eds.). (2010). *The SAGEHandbook of Prejudice, Stereotyping, and Discrimination*. New York: Sage.
[2] Rudman, L. A., & Glick, P. (2008). The Social Psychology of Gender: How Power and Intimacy Shape Gender Relations. New York: Guilford Press.
[3] Glick, P., & Fiske, S. T. (2008). Sex discrimination: The psychological approach. To appear in: F. J. Crosby, M. S. Stockdale, and S. A. Ropp (Eds.). *Sex Discrimination in the Workplace*. Malden, MA: Blackwell.
Rudman, L. A., Glick, P., & Phelan, J. E. (2008). From the laboratory to the bench: Gender stereotyping research in the courtroom. In E. Borgida & S. T. Fiske (Eds.) *Beyond commonsense: Psychological science in the courtroom* (pp. 83-101).Malden, MA: Blackwell Publishing.

paper of the year on inter-group relations for developing ambivalent sexism theory and an

associated measurement instrument, the Ambivalent Sexism Inventory (ASI).[4] Since its

publication in 1996, to my knowledge the ASI has been administered to hundreds of thousands

of people in more than 65 nations around the world.[5] Another paper (coauthored with Amy

Cuddy, Harvard University, and Susan Fiske, Princeton University) on the Stereotype Content

Model received an honorable mention for the 2005-06 Allport Prize.[6] In 2009, the *Harvard*

*Business Review* recognized the Stereotype Content Model as a "breakthrough idea for 2009."[7]

The Stereotype Content model is recognized as a powerful theory about how and why

stereotypes differ across various social groups, with implications for the different forms of bias

(e.g., paternalism versus contempt) that groups receive. In 2011, I received Lawrence

University's *Excellence in Scholarship* award for outstanding research contributions.

I am regularly invited to present my work at academic institutions and to wider

audiences. Recent invited talks include Harvard Business School, Harvard Kennedy School, and

a keynote address for corporate partners of Stanford University's VMWare Women's Leadership

Innovation Lab. I have been appointed, at various times, to five scientific journal editorial boards

(including the *Journal of Personality and Social Psychology*, an APA publication considered the

top journal in social psychology). Peers have recognized my scientific contributions through

election as a Fellow, including in the largest and most prestigious organizations in psychology

---

[4] Glick, P. & Fiske, S. T. (1996).  The Ambivalent Sexism Inventory: Differentiating hostile and benevolent sexism. *Journal of Personality and Social Psychology, 70,* 491-512

[5] Glick, P. et al. (2000). Beyond prejudice as simple antipathy: Hostile and benevolent sexism across cultures. *Journal of Personality and Social Psychology, 79,* 763-775.
  Glick, P. et al. (2004). Bad but bold: Ambivalent attitudes toward men predict gender inequality in 16 nations. *Journal of Personality and Social Psychology, 86,* 713–728.

[6] Cuddy, A. J. C., Fiske, S. T., & Glick, P. (2007). The BIAS Map: Behaviors from Intergroup Affect and Stereotypes. *Journal of Personality and Social Psychology, 92,* 631-648.

[7] See https://hbr.org/2009/02/breakthrough-ideas-for-2009

(the *American Psychological Association* and the *Association for Psychological Science*) as well

as more specialized societies (the *Society for Personality and Social Psychology, Society for the*

*Psychological Study of Social Issues,* and the *Society for the Psychology of Women,* and the

*Society of Experimental Social Psychology*). I have served in elected leadership positions in two

societies, the executive councils of the *Society of Experimental Social Psychology* and *Society*

*for the Psychological Study of Social Issues* and as President of the former society in 2009. My

Curriculum Vitae is attached (Attachment), which list my prior experience as an expert witness

(see final page of Vita).

## II.     TYPE OF TESTIMONY

I will provide "social framework" testimony to inform the decision makers in this case about empirically validated principles concerning the operation of stereotypes and bias that can lead to workplace discrimination via double-standards toward women as compared to men. Social psychological and organizational research provides a scientific knowledge base illuminating the forms stereotyping and discrimination take, the circumstances that elicit stereotyping and bias, and their relation to discriminatory behavior. This information can substantially supplement decision-makers' knowledge, going beyond common assumptions about how stereotypes and biases operate.[8]

The courts have generally allowed social framework testimony in which experts (a) inform juries about general, scientifically validated principles that may aid their decision-making (known as "general causation") as well as (b) illuminate where and how these principles may relate to the case at hand (known as "specific causation"). For general causation, experts review principles established with scientific certainty through empirical research using standard scientific methodologies. For specific causation, as explained below, social frameworks experts often do not apply a scientific certainty standard because it may not be possible or not feasible to conduct a rigorous study to determine whether discrimination occurred in a specific case to an individual plaintiff. In such cases, experts cannot testify with scientific certainty about whether discrimination occurred. The courts (including the U.S. Supreme Court), however, have allowed social framework experts to use their general scientific knowledge to point decision-makers to information that can help them decide whether or not discrimination occurred.

---

[8]Krieger, L. H. (2004). The intuitive psychologist behind the bench: Models of gender bias in social psychology and employment discrimination law. *Journal of Social Issues, 60*, 835-848.

In some legal cases, such as large scale class action suits, social framework experts may be able to conduct studies on an organization using standard scientific methods. For example, imagine a case in which female employees have been certified as a class and claim pay discrimination. If the organization has many thousands of employees, the expert might have a sufficiently large sample size and enough information about potential confounding variables (e.g., length of employment at the company, specific job or role, productivity statistics) that could (instead of bias) provide alternative explanations for any overall disparity. With a large sample and a certified class, the expert would potentially be able to use statistical techniques to "pick apart" or "control for" various alternative explanations for pay differences. Such a study could potentially lead to an opinion expressed with "scientific certainty."

By contrast, in cases involving individual plaintiffs who allege discrimination related to their behavior, a systematic study may not be feasible or informative. First, the potential sample size may be small, rendering statistical tests less sensitive and less able to control for potential confounding variables. For example, in the current case, the entire law faculty has about 60 tenure-track professors, with women as a numerical minority. Further, in cases involving an individual plaintiff (rather than a large class), discrimination may be highly contextual. For example, a plaintiff may have suffered sexist discrimination because she was relatively more assertive compared to female peers, who would not have received the same treatment. General comparisons (e.g., all female versus male employees) using a statistical study would not capture such targeted discrimination. Finally, funding and completing an organizational study would likely represent an undue burden on an individual plaintiff given the cost and time it would take to complete one.

When an organizational study is not feasible alternative explanations to discrimination cannot be scientifically ruled out. When scientists study discrimination using the experimental method, they create highly controlled comparisons. For example, participants might be randomly assigned to evaluate the same work product with people in different conditions being led to believe the work product was produced by a man versus a woman. Should average evaluations show a statistically significant difference across conditions, researchers can conclude that evaluators tended to discriminate. Even in such experiments, because the comparisons rely on evaluations *averaged across participants*, the researcher cannot specify whether any single individual acted in a discriminatory manner.

Real life cases do not involve such perfect comparisons (e.g., evaluators who reacted differently to *the exact same* article authored by a man versus a woman). As a result, it's not possible to pin down with scientific certainty whether a specific person experienced discrimination. Therefore, in the "specific causation" section of my report, I do not opine directly about whether Professor Mullenix experienced discrimination. Rather, I consider, whether case facts are consistent with *potential* discrimination, using my knowledge about general scientific principles to point out their relation to relevant case facts. This represents a judgment *informed by* general scientific principles but *does not in itself represent a "scientific conclusion."* In the end, the case decision-makers must decide whether alternative (non-discriminatory) explanations entirely explain the case facts or whether discrimination, at least in part, was involved.

Social framework testimony of the sort described above has been widely accepted by the courts, including the U.S. Supreme Court, such as in *Hopkins v. Price-Waterhouse*, for which my scientific collaborator Susan T. Fiske was the stereotyping expert).[9] In *Tuli v Brigham &*

---

[9] Price-Waterhouse v. Hopkins, 109 S. Ct. 1775 (1989).

*Women's Hospital*, Judge Nancy Gertner, U.S. District C ourt, denied Defendant's motion to exclude my social framework testimony on stereotyping, in which I opined about both general and specific causation. With regard to the latter, Judge Gertner noted that:

> *"Professor Glick's testimony…provides the jury with a context for considering the evidence before it… He expressly refuses to come to a conclusion about whether there has been discrimination in this case because such an opinion is for the jury and because he concludes -- appropriately -- that it is not possible to make any decision to a reasonable degree of scientific certainty about a real world case."*[10]

Judge Gertner further stated that "While defendants challenge him for not opining about the case at bar, that is in fact a strength of his testimony, not a weakness. He indicates that such an opinion is for the decisionmakers in this case, namely the jury."[11] Judge Gertner's decision defines the "guardrails" within which a social framework expert should operate, leaving the final decision up to the appropriate case decision-makers.

The current report includes separate sections corresponding to general causation (established scientific principles) and specific causation (application to the current case). The former section reviews research on stereotyping, bias, and discrimination, summarizing the current scientific consensus about how and when discrimination occurs and the forms it takes. The latter section considers how the principles reviewed in the first section can be applied to the current case while leaving the ultimate decision about whether or not discrimination occurred to the case decision-makers.

---

[10] MEMORANDUM RE: MOTION TO EXCLUDE EXPERT TESTIMONY, January 6, 2009. Judge Nancy Gertner, United States District Court for the District of Massachusetts. Civil Action no. 07cv-12338-NG, p. 4.

[11] *Ibid*, p. 9.

In sum, my report informs trial decision makers about *general principles of stereotyping, bias, and discrimination that have been established with scientific certainty* based on well accepted empirical methodologies in psychology. These principles provide an interpretive framework that may aid case decision-makers to make more informed judgments about whether or not discrimination occurred. Information I provide goes substantially beyond common-sense knowledge in several ways. For example, research reveals how bias depends on situational context (e.g., role expectations for a job), targets specific judgment dimensions (e.g., perceived warmth). Compared to common-sense knowledge, scientific research reveals a much more nuanced picture of how stereotypes and bias work, including in what circumstances and toward whom they tend to occur. Although I point out ways in which general principles can be applied to the current case and opine about where case facts are consistent with the possibility of discrimination, I expressly note that because alternative explanations cannot be ruled out, my case opinions do not carry the weight of scientific certainty. In the end, the case decision-makers must decide whether discrimination occurred.

### III.    DOCUMENTS REVIEWED IN PREPARATION OF THIS REPORT

Below is a list of documents regarding the current case that I have reviewed:

1.  Mullenix Memorandum – "Facts Supporting Discrimination and Retaliation Claims. Answers to Defendant University of Texas First Set of Interrogatories #1, #2
2.  2020 McGarity Teaching Numerical Evaluation Chart
3.  Mullenix 4969-5084: Comments on Quality of Professor Mullenix's Scholarship
4.  D-9041-9097: 2018 Salary Letters
5.  D-34065-34512: 2015-16 Salary Binder
6.  D-36286-36728: 2019-2020 Salary Binder
7.  Mullenix 5085: Fwd Fw Discuss your article on Firearms litigation
8.  Mullenix 5087-90: Fwd FW Outgunned No More
9.  Mullenix 5090-91: Fwd Fw Reuters Reporter
10. Mullenix 5093: Joe Jamail 2008
11. Mullenix 5094: Morris Atlas 2008
12. RFP 6b Barbeque of the Vanities
13. Teaching Descriptions by the Budget Committee Chart
14. Farnsworth Deposition
15. UT Corporate Representative Deposition
16. Toreki Deposition
17. Bone Deposition
18. McGarity Deposition
19. Forbath Deposition
20. Westbrook Deposition
21. Amortization Budget Memo August 2014
22. D-1748: 2019 cmte notes
23. D-2014: 2020 cmte notes
24. D5935: 2016 budget cmte deliberations
25. D-36735: 2015 cmte notes
26. D-36733: 2018 salary raise chart and cmte notes
27. Comparator #1 Bob Bone Data Worksheet
28. Comparator #3 Tom McGarity Data Worksheet
29. Comparator #4 Jay Westbrook Data Worksheet
30. D-8823: Blais secret deal sexism
31. D-14437: Why Klein not on FII
32. D-13790: Klein budget cmte complaints
33. D-36858 – Dickerson teaching award Mullenix emails
34. D-170: GEB Final
35. D-146: GEB Draft
36. KIC Document 0001 (Issacharoff Kill Letter)
37. RFP 6c Lynn Blais on Mullenix Retaliation
38. RFP 6d Blais on Gender Discrimination
39. RFP 50 BC Interviews 2018
40. RFP 59 Email Witnesses
41. **Amended Complaint**

## IV. SCIENTIFIC RESEARCH ON STEREOTYPING AND DISCRIMINATION

Scientific research on stereotyping is well established, having been systematically investigated for many decades, beginning in the 1920s and 1930s,[12] but gaining more social scientific attention, with increasingly sophisticated methods of investigation, in the last 60 years.[13] The study of stereotypes (beliefs about social groups), prejudice (biased feelings toward social groups), and discrimination (differential treatment of social groups) represents a major subfield of social psychology[14] and is an increasingly frequent topic of research among applied psychologists.[15] Stereotyping research has been conducted both in the laboratory and naturalistic field settings.[16] Basic principles first established in the laboratory have been shown to generalize to other populations and settings (e.g., working adults in the business world; large organizations such as the Armed Forces).[17] For example, laboratory research showing that women, compared to men, tend to receive equal praise for performance but are denied tangible rewards (such as

---

[12]Katz, D., & Braly, K. W. (1933). Racial stereotypes of 100 college students. *Journal of Abnormal Social Psychology, 28*, 280-290

[13]Fiske, S.T. (1998). Prejudice, stereotyping and discrimination. In D. T. Gilbert, S. T. Fiske, and G. Lindzey (Eds.). *The Handbook of Social Psychology* (4th ed). New York: McGraw-Hill.

[14]*Ibid.*

[15]Koch, A. J., D'Mello, S. D., & Sackett, P. R. (2015). A meta-analysis of gender stereotypes and bias in experimental simulations of employment decision making. *Journal of Applied Psychology, 100*, 128.

[16]Riach, P. A., & Rich, J. (2002). Field experiments of discrimination in the market place. *The economic journal, 112*(483), F480-F518.

[17] Glick, P., Zion, C., & Nelson, C. (1988).  What mediates sex discrimination in hiring decisions? *Journal of Personality and Social Psychology, 55*, 178-186;

Glick, P. (1991).  Trait-based and sex-based discrimination in occupational prestige, occupational salary, and hiring. *Sex Roles, 25*, 351-378;

Heilman, M E. (2001). Description and prescription: How gender stereotypes prevent women's ascent up the organizational ladder. *Journal of Social Issues, 57*, 657-674;

Heilman, M. E., et al. (2004). Penalties for success: Reactions to women who succeed at male-typed gender tasks. *Journal of Applied Psychology, 89*, 416-427.

Pryor, J. B., et al. (1995). A social psychological model for predicting sexual harassment. *Journal of Social Issues, 51*, 69-84.

higher pay or a promotion[18]) corresponds to findings in field studies that even though women receive similar or better performance evaluations in actual jobs, managers rate them as lower on "promotability." Specifically, in 6 studies involving over 4,000 individuals that included *both* supervisors' performance evaluations and ratings of subordinates' "promotion potential," even though women were generally rated as performing better than men, *supervisors were more likely to rate men as having higher promotion potential than women*.[19] An even more comprehensive meta-analysis (a technique that incorporates data from many, previously conducted studies) involved close to half a million workers in 142 field studies across various work settings, representing 30 years of data. This meta-analysis, which examined how organizational rewards (e.g., bonuses, raises, promotions) were actually allocated, found that even though they achieved similar performance evaluations compared to men, women were denied rewards relative to men. Specifically, *"sex differences in organizational rewards were almost 14 times larger than sex differences in performance evaluations"* (p. 1532). These disparities were stronger in jobs dominated by men and in high status roles.[20]

Stereotyping and discrimination represent complex processes that depend on situational context, organizational climate and practices, individual attitudes, and other factors. Some factors can lessen the likelihood that unfair biases will impact decisions and behavior. For

---

[18] Vescio, T. K., Gervais, S. J., Snyder, M., & Hoover, A. (2005). Power and the creation of patronizing environments: the stereotype-based behaviors of the powerful and their effects on female performance in masculine domains. *Journal of personality and social psychology*, *88*(4), 658.

[19] Roth, P. L., Purvis, K. L., & Bobko, P. (2012). A meta-analysis of gender group differences for measures of job performance in field studies. *Journal of Management*, *38*(2), 719-739.

[20] Joshi, A., Son, J., & Roh, H. (2015). When can women close the gap? A meta-analytic test of sex differences in performance and rewards. *Academy of Management Journal, 58*, 1516–1545.

example, organizations can take steps to limit bias in personnel decisions by relying on objective information and behavioral benchmarks rather than subjective opinions as well as by holding decision-makers accountable for making unbiased decisions.[21]

## SELF AND INGROUP FAVORITISM, LEADING TO OUTGROUP DISCRIMINATION

People generally show a robust self-favoring bias.[22] If you ask team members to estimate what percentage of a successful group product stemmed from their own efforts, the total will typically add up to considerably more than 100% because everyone overestimates his or her contribution.[23] When researchers ask people to indicate what percentile they think they are in (relative to peers) on desirable traits (e.g., honesty, intelligence, driving ability, most rate themselves as way above average. Often the majority of people put themselves extremely high percentiles (e.g., 80th percentile or above).[24] In their own minds, just about everybody is considerably above average. In reality, this represents an impossibility.

People extend this pervasive egocentric bias – the tendency to prefer oneself – to others with whom they share a group membership.[25] This goes beyond favoring family members (e.g., overestimating one's child's ability, providing a job to a relative) to the broader social groups with which people identify. Ample research shows that people favor groups to which they belong (ingroups) over groups to which they do not belong (outgroups). Even assigning people to temporary, trivial groups (e.g., by explicitly randomly assigning people to Group A vs Group B

[21] Koch et al. (2015), *Op cit*.

[22] Alicke, M., & Sedikides, C. (2009). Self-enhancement and self-protection: What they are and what they do. *European Review of Social Psychology, 20*, 1-48.

[23] Ross, M. (1981). Self-centered biases in attributional of responsibility: Antecedents and consequences. In E.T. Higgins, C.P. Herman, M.P. Zanna (Eds.), Social cognition: The Ontario symposium, Erlbaum, Hillsdale, NJ (1981), pp. 305-321.

[24] Alicke, M. D., & Govorun, O. (2005). The better-than-average effect. *The self in social judgment*, *1*, 85-106.

[25] Ellemers, N., & Haslam, S. A. (2011). Social identity theory. *Handbook of theories of social psychology*, *2*(2011), 379-98.

in the context of an experiment) initiates mild ingroup favoritism such that people allocate more resources to an ingroup versus an outgroup member.[26] Absent other aggravating factors, such trivial group memberships alone do not initiate outgroup hostility but ingroup favoritism (i.e., people do not seek actively to punish or oppress outgroup members but will allocate more money to an ingroup member than an outgroup member when provided the chance to do so).

However, once perceived competition or value differences enter the mix, hostility and intensified discrimination typically follow. For example, in a classic study of a boys' summer camp,[27] researchers split boys into two groups (the Eagles and the Rattlers), segregated them into different cabins, and initiated competitive games between them. The competitive structure produced hostility, such as avoiding members of the other group, using derogatory names toward the other group, and cabin raids. Later, the researchers created a series of events that required cooperation between the groups, such as working together to get a bus unstuck from the mud on a field trip. When group goals were aligned, intergroup relations improved.

When groups historically hold different degrees of power, status, and resources, those on top seek to preserve their privileges, creating a competitive structure in which prejudice and discrimination intensify.[28] Specifically, in fields where women or minority groups are underrepresented in positions of power, they are more likely to face discrimination[29] and be

---

[26] Gagnon, A., & Bourhis, R. Y. (1996). Discrimination in the minimal group paradigm: Social identity or self-interest?. *Personality and Social Psychology Bulletin*, *22*(12), 1289-1301.
  Tajfel, H. (1981). *Human groups and social categories: Studies in social psychology*. Cambridge University Press.

[27] Sherif, M. (1956). Experiments in group conflict. *Scientific American*, *195*(5), 54-59.

[28] Sidanius, J., & Pratto, F. (2001). *Social dominance: An intergroup theory of social hierarchy and oppression*. Cambridge University Press.

[29] Gorman, op cit.
  Cohen, L. E., Broschak, J. P., & Haveman, H. A. (1998). And then there were more? The effect of organizational sex composition on the hiring and promotion of managers. *American Sociological Review*, 711-727.

viewed as a "poorer fit" than men or majority group members,[30] especially for high ranking

positions.[31] Members of the dominant group tend to like, prefer, and distribute more rewards to

others in their group (e.g., an "old boys network" where men reinforce their privileges by

excluding women).[32] Thus in male-dominated organizations, evaluators tend to give preference

to same-sex individuals (e.g., be more likely to lend them "benefit of the doubt" on possible

weaknesses)[33] and impose higher performance standards on women.[34]

**DOMINANT GROUP MEMBERS USE PRETEXTS TO JUSTIFY DISCRIMINATION**

Although people commonly hold biases, they also like to think they are fair-minded and

unprejudiced rather than discriminatory.[35] When groups historically have different power,

resources, and/or status, they seek to justify the current group hierarchy as fair and legitimate,

rather than the product of discrimination. For example, dominant group members may attribute

---

[30]Eagly, A. H., & Karau, S. J. (2002). Role congruity theory of prejudice toward female leaders. *Psychological review*, *109*(3), 573.

[31]Gorman, E. H., & Kmec, J. A. (2009). Hierarchical rank and women's organizational mobility: Glass ceilings in corporate law firms. *American Journal of Sociology*, *114*(5), 1428-1474.

[32]Tajfel, H. (Ed.). (2010). *Social identity and intergroup relations*. Cambridge University Press.

Jacquemet, N., & Yannelis, C. (2012). Indiscriminate discrimination: A correspondence test for ethnic homophily in the Chicago labor market. *Labour Economics*, *19*(6), 824-832.

Gorman, E. H. (2005). Gender stereotypes, same-gender preferences, and organizational variation in the hiring of women: Evidence from law firms. *American Sociological Review*, *70*(4), 702-728.

[33]Uhlmann, E. L., & Cohen, G. L. (2005). Constructed criteria: Redefining merit to justify discrimination. *Psychological Science*, *16*(6), 474-480.

Dovidio, J. F., & Gaertner, S. L. (2000). Aversive racism and selection decisions: 1989 and 1999. *Psychological science*, *11*(4), 315-319.

[34]Gorman, E. H., & Kmec, J. A. (2007). We (have to) try harder: Gender and required work effort in Britain and the United States. *Gender & Society*, *21*(6), 828-856.

[35] O'Brien, L. T., Crandall, C. S., Horstman-Reser, A., Warner, R., Alsbrooks, A., & Blodorn, A. (2010). But I'm no bigot: How prejudiced White Americans maintain unprejudiced self-images. *Journal of Applied Social Psychology*, *40*(4), 917-946.

Dovidio, J. F., & Gaertner, S. L. (2004). *Aversive racism.* In M. P. Zanna (Ed.), *Advances in experimental social psychology, Vol. 36* (p. 1–52). Elsevier Academic Press.

the outgroup's relatively lower status as due to lower competence or lower motivation, rather than to discriminatory barriers.

Similarly, when people individually engage in discrimination, they typically do so under the psychological cover of a nondiscriminatory pretext. For example, studies show that when people evaluate job applicants, White evaluators rate a Black candidate with stellar qualifications and no weaknesses as equally hireable compared to a similar White candidate. Unambiguously stellar qualifications provide no excuse or "cover" for discrimination – to knock the candidate would seem like obvious racism. However, when White evaluators judge candidates who have significant weaknesses as well as strengths (i.e., a "mixed" or arguably mediocre candidate), discrimination occurs: evaluators give the mediocre White candidate the "benefit of the doubt" whereas they view the Black candidate's identical weaknesses as disqualifying.[36] Evaluators can point to the candidate's weaknesses as the reason for their negative judgment toward the Black candidate, providing a non-discriminatory excuse for their behavior.

In sum, people in dominant groups tend to deny discrimination and to make use of pretexts when they act in a discriminatory manner. In other words, having an apparently nondiscriminatory pretext for evaluating a woman or minority group member less positively psychologically "allows" biased individuals to act on their biases and discriminate (e.g., in personnel evaluations). The result: people deny and mask their prejudiced behaviors, making discrimination dependent on the situational context (e.g., "is there a plausible nondiscriminatory excuse I can rely on?"). Therefore, bias becomes more subtle compared to overt, unapologetic bigotry. For example, a successful woman might be derided on subjective dimensions that are

---

[36] Dovidio, J. F., & Gaertner, S. L. (2000). Aversive racism and selection decisions: 1989 and 1999. *Psychological science*, *11*(4), 315-319.

more difficult to dispute ("She's dislikeable") than on more objective dimensions (e.g., "She's bad at her job") that evidence clearly contradicts.

Further, because having a nondiscriminatory rationale "releases" people's prejudices, discrimination often involves mixed motives. For example, consider the following experiment: White participants interacted with someone they believed to be a fellow participant, but who was actually in league with the experimenter. Depending on randomly assigned condition, the actor was Black or White, with each trained to behave similarly. However, the actor's behavior varied depending on random assignment. In one condition, the actor was friendly and in the other he was rude. Subsequently, the White participants had an opportunity to determine how much shock to deliver to the actor when he made mistakes in a learning experiment. When the actors had initially behaved in a friendly way, Whites treated the Black and White actor equivalently (giving low shock levels) but when the actors had been rude, the Black (but not the White) actor was shocked more severely.[37] White participants could justify delivering greater shock based on the other person's rudeness, but the results firmly establish that they did so only toward a rude Black but not a similarly rude White person, indicating racial bias. The confederate's rudeness represented a plausible motive, but this masked (and released) discrimination.

**SEXISM: AN AMBIVALENT PREJUDICE**

Sexism is an inherently ambivalent prejudice due to two basic aspects of gender relations: (a) men generally possess more status and power than women, but (b) are intimately interdependent with women (due to heterosexual attraction, reproduction, and reliance on women to rear children and for domestic labor).[38] This ambivalence is captured by the saying "Can't live

---

[37] Rogers, R. W., & Prentice-Dunn, S. (1981). Deindividuation and anger-mediated interracial aggression: Unmasking regressive racism. *Journal of Personality and Social Psychology*, *41*(1), 63.

[38] Glick, P., & Fiske, S. T. (1996). The Ambivalent Sexism Inventory: Differentiating hostile and benevolent sexism. *Journal of Personality and Social Psychology, 70*, 491-512.

with them, can't live without them." To illustrate how this differs from other prejudices, consider one of the first racial prejudice measures used by researchers: the social distance scale.[39] This measure assessed how much intimacy Whites would tolerate with Black people. A mildly racist whites might be willing to have a Black co-worker, but not to date or marry a Black person, with the latter considered to reflect a complete lack of prejudice. Such a measure does not work for sexism, which is more firmly rooted in *role segregation*[40] than spatial segregation – a highly sexist man might not want to have female co-workers, but (if heterosexual) would certainly be willing to date or marry a woman as opposed to a man. While a racist White person might well want to "live without" Black people, a sexist man is unlikely to suggest completely eliminating interaction with women. In extreme cases, a racist might endorse race-based genocide, but one cannot imagine that heterosexual men would endorse the complete elimination of all women.

In other words, sexism has always accommodated a state of affairs in which men's oppression of women has been accompanied by intimacy and affection, making sexism inherently ambivalent.[41] *Benevolent sexism* (BS), the subjectively positive side of sexist ambivalence, is a set of affectionate yet patronizing and discriminatory attitudes toward women as wonderful but weak (not fully competent) creatures who require male provision and

---

Glick, P., & Fiske, S. T. (2001). Ambivalent sexism. In M. P. Zanna (Ed.), *Advances in Experimental Social Psychology* (vol. 33, pp. 115-188). Thousand Oaks, CA: Academic Press.

[39] Bogardus, E. S. (1927). Race, friendliness, and social distance. *Journal of Applied Sociology, 11*, 272-287.

[40] Eagly, A. H. (1987). *Sex differences in social behavior: A social role interpretation*. Hillsdale, NJ: Erlbaum.

[41] Glick, P. & Fiske, S. T. (1996).  The Ambivalent Sexism Inventory: Differentiating hostile and benevolent sexism. *Journal of Personality and Social Psychology, 70*, 491-512.

protection. *Hostile sexism* (HS), the subjectively negative side of sexist ambivalence, is a set of overtly demeaning attitudes toward women as a threat to men's power.[42]

While such ambivalence may seem like a psychologically contradictory state of affairs, it is not: the positive and negative poles of sexist ambivalence are directed toward different types of women or toward different types of female behavior.[43] Specifically, women who embrace traditional roles and fulfill men's desires receive benevolent sexism. For example, a sexist man may exhibit paternalistic affection and protection toward a supportive wife or chivalrous solicitude toward a sexually attractive, subordinate female co-worker. By contrast, women who occupy powerful roles or are viewed as violating traditional norms of femininity (which emphasize modesty, deference, and warmth) elicit sexist hostility.

Another way to describe this complementarity is that benevolent sexism defines prescriptive ideals of how women *should* be (e.g., modest, deferent) and hostile sexism defines complementary proscriptions about how women *should not* be (e.g., assertive, powerful).[44] More specifically, hostile and benevolent sexism each encompass three domains of male-female relations: *power*, *gender stereotyping and roles*, and *intimate heterosexuality*.[45] Benevolence is directed toward women who reinforce rather than challenge men's power, who fulfill idealized

---

[42] Glick, P., & Fiske, S. T. (2001). Ambivalent sexism. In M. P. Zanna (Ed.), *Advances in Experimental Social Psychology* (Vol. 33, pp. 115-188). Thousand Oaks, CA: Academic Press.

[43] Glick, P., Diebold, J., Bailey-Werner, B., & Zhu, L. (1997). The two faces of Adam: Ambivalent sexism and polarized attitudes toward women. *Personality and Social Psychology Bulletin, 23*, 1323-1334.

[44] Prentice, D. A., & Carranza, E. (2002). What women and men should be, shouldn't be, are allowed to be, and don't have to be: The contents of prescriptive gender stereotypes. *Psychology of Women Quarterly, 26*, 269-281.

[45] Glick, P., & Fiske, S. T. (2001). Ambivalent sexism. In M. P. Zanna (Ed.), *Advances in Experimental Social Psychology* (Vol. 33, pp. 115-188). Thousand Oaks, CA: Academic Press.

positive stereotypes of femininity and enact traditional female roles, and/or who are viewed as sexually attractive and compliant. By contrast, sexist hostility occurs toward women who are viewed as challenging men's power, violating traditional ideals of femininity or "invading" roles and positions of power that "belong" to men, and/or who are sexually unattractive or unavailable.

Research conducted on tens of thousands of participants in more than 25 nations shows that men who endorse hostile sexism are also likely to endorse benevolent sexism[46] – thus, sexist men are usually ambivalent toward women. An ambivalent sexist might protest that he cannot possibly be prejudiced against women because there are women he loves, provides for, and protects. Ample research reveals, however, that benevolently sexist treatment is contingent: women must conform to sexist conceptions about how women "should" behave.[47] Further, even though subjective feelings of affection accompany benevolently sexist (patronizing) treatment, these behaviors reinforce men's dominance. For example, benevolent sexists tend to give compliant or "feminine" female subordinates excessive (patronizing) praise while simultaneously denying them tangible rewards (e.g., a higher salary) and opportunities (e.g., choice assignments).[48]

[46] Glick, P. et al. (2000). Beyond prejudice as simple antipathy: Hostile and benevolent sexism across cultures. *Journal of Personality and Social Psychology, 79*, 763-775.
  Glick, P. et al. (2004). Bad but bold: Ambivalent attitudes toward men predict gender inequality in 16 nations. *Journal of Personality and Social Psychology, 86*, 713–728.
[47] Abrams, D., Viki, G. T. N., Masser, B., & Bohner, G. (2003). Perceptions of stranger and acquaintance rape: The role of benevolent and hostile sexism in victim blame and rape proclivity. *Journal of Personality and Social Psychology*, *84*, 111-125.
[48] Vescio, T. K., Gervais, S. J., Snyder, M., & Hoover, A. (2005). Power and the creation of patronizing environments: The stereotype-based behaviors of the powerful and their effects on female performance in masculine domains, *Journal of Personality and Social Psychology. 88*, 658-672.

***Sexist ambivalence leads to extreme responses toward women***

Ambivalence produces "response amplification,"[49] more extremely positive and negative responses toward targets of ambivalence. Sexist ambivalence can be directed toward different women, with benevolent sexism directed toward "types" of women viewed as upholding sexist prescriptions and hostile sexism toward female "types" viewed as violating sexist prescriptions.[50] Thus, the same ambivalent sexist who adores his supportive wife, gives his secretary flowers, and loves his kindly mother will react with intense hostility to women perceived as challenging his authority, competing with him for resources, or failing to comply with sexist ideals of femininity. Thus, the two poles of sexist ambivalence work in concert, rewarding women when they conform and punishing women when they fail to conform to sexist prescriptions.

Sexist ambivalence can also be directed toward the same woman at different times, depending on whether her behavior of the moment fits or challenges sexist prescriptions.[51] Benevolent sexism occurs when women reinforce male power (e.g., by being compliant, modest, or flattering men), embrace traditional tasks (e.g., social support), or elicit sexual attraction (e.g., attractive women who tolerate male advances). Hostile sexism occurs when women challenge

---

[49] Katz, I. & Hass, R. G. (1988).  Racial ambivalence and value conflict: Correlational and priming studies of dual cognitive structures. *Journal of Personality and Social Psychology, 55*, 893-905.

Katz, I., Wackenhut, J., & Hass, R. G. (1986).  Racial ambivalence, value duality, and behavior. In J.F. Dovidio and S.L. Gaertner (Eds.). *Prejudice, discrimination, and racism*. San Diego: Academic Press.

[50] Eckes, T. (2002). Paternalistic and envious gender stereotypes: Testing predictions from the Stereotype Content Model. *Sex Roles, 47*, 99-114.

Glick, P., Diebold, J., Bailey-Werner, B., & Zhu, L. (1997).  The two faces of Adam: Ambivalent sexism and polarized attitudes toward women.  *Personality and Social Psychology Bulletin, 23*, 1323-1334.

[51] Hebl, M. R., King, E., Glick, P., Singletary, S. L. & Kazama, S. M. (2007). Hostile and benevolent reactions toward pregnant women: Complementary interpersonal punishments and rewards that maintain traditional roles. *Journal of Applied Psychology, 92*, 1499-1511.

male power (e.g., by stating an independent opinion or criticizing), take on nontraditional or powerful roles (e.g., takes a leadership position or succeeds in a "masculine" domain), or are deemed sexually unattractive or unavailable (e.g., refuse male advances).[52]

Because traditional sexist attitudes are so strongly rooted in differences in power and roles, sexism often revolves around complaints about a woman's social behavior, with men being permitted much greater latitude to be assertive than women. Thus, for sexists, an aggressive man may be deemed appropriately "assertive" and as assertive women may be deemed "a bitch" because women are held to much higher standards of "niceness" and deference than men.[53]

**SEX STEREOTYPES**

Stereotypes are category-based expectations about others; they represent beliefs about men and women's traits rooted in historical differences in power and roles, such as men as breadwinners and women as child-rearers.[54] Although gender roles have changed, gender stereotypes have remained remarkably stable on two core dimensions: agency (i.e., assertive, ambitious) and communality (i.e., warm, nurturing).[55] Data from representative national polls from the 1940s to 2018[56] reveal that gender stereotypes continue to assign agency more to men

---

[52] Glick, P., & Fiske, S. T. (2001). Ambivalent sexism. In M. P. Zanna (Ed.), *Advances in Experimental Social Psychology* (Vol. 33, pp. 115-188). Thousand Oaks, CA: Academic Press.

[53] Rudman, L. A., & Glick, P. (1999). Feminized management and backlash toward agentic women: The hidden costs to women of a kinder, gentler image of middle-managers. *Journal of Personality and Social Psychology, 77*, 1004-1010.

[54] Rudman, L. A., & Glick, P. (2008). *The Social Psychology of Gender: How Power and Intimacy Shape Gender Relations*. New York: Guilford Press.

[55] Haines, E. L., Deaux, K., & Lofaro, N. (2016). The times they are a-changing… or are they not? A comparison of gender stereotypes, 1983–2014. *Psychology of Women Quarterly, 40*(3), 353-363.

[56] Eagly, A. H., Nater, C., Miller, D. I., Kaufmann, M., & Sczesny, S. (2019). Gender stereotypes have changed: A cross-temporal meta-analysis of US public opinion polls from 1946 to 2018. *American Psychologist*.

than women, and that the stereotype of women as more communal has actually become stronger over time. Stereotypes no longer deny overall competence (e.g., intelligence) to women, presumably due to women's increased participation in the paid workforce over the past 80 years. However, while perceived as equally intelligent to men overall, women remain stereotyped as less competent than men in occupations and on tasks that remain male dominated (e.g., mechanical skills, analytical skills, being a leader).[57]

Stereotypes reflect and function to justify and reinforce gender roles and men's greater power, which remain entrenched many organizations.[58] Gender stereotypes assign women supportive traits associated with nurturing, such as *empathetic*, *kind*, *sensitive*, as well lower status or subordinate traits such as *yielding, agreeable, emotional, impressionable, gullible, insecure,* and *naïve*. By contrast, stereotypes assign men high-power, dominance-oriented traits such as *decisive, aggressive, forceful, controlling*, *dominating*, and *arrogant* that suit them for positions of power.[59] Men are generally accorded more status and, therefore, more credibility and influence than women.[60] As reviewed below, gender stereotypes not only influence initial expectations about others – they skew how perceivers interpret and remember subsequent information via confirmation biases. Importantly, even when women manage to convince others

---

[57]Heilman, M. E., Wallen, A. S., Fuchs, D., & Tamkins, M. M. (2004). Penalties for success: reactions to women who succeed at male gender-typed tasks. *Journal of applied psychology*, *89*(3), 416.

[58]World Economic Forum (2020). Global gender gap report. Retrieved from http://www3.weforum.org/docs/WEF_GGGR_2020.pdf.

[59]Prentice, D. A., & Carranza, E. (2002). What women and men should be, shouldn't be, are allowed to be, and don't have to be: The contents of prescriptive gender stereotypes. *Psychology of women quarterly*, *26*(4), 269-281.

Rudman, L. A., Moss-Racusin, C. A., Glick, P., & Phelan, J. E. (2012). Reactions to vanguards: Advances in backlash theory. In *Advances in experimental social psychology* (Vol. 45, pp. 167-227). Academic Press.

[60] Ridgeway, C. L. (2001). Gender, status, and leadership. *Journal of Social issues*, *57*(4), 637-655.

that they do not "fit" stereotyped expectations (e.g., a woman's convinces others she is assertive rather than yielding), they face backlash due to gendered prescriptions that they "should" behave more in line with the stereotype.

In addition, people stereotype women as more emotional.[61] For example, research participants viewed a woman (but not man) who exhibited anger at work as more "out of control," leading them to recommend paying her less and according her less power.[62] The female emotionality stereotype leads people to view women as less suited to high status positions in the workplace,[63] as well as "overly sensitive" and likely to exaggerate problems they experience in the workplace.[64] Hostile sexist attitudes, which have been linked to workplace discrimination against women in male-dominated occupations,[65] explicitly include beliefs such as: "Most women interpret innocent remarks or acts as being sexist"; "Women are too easily offended"; "Women exaggerate problems they have at work"; and "When women lose to men in a fair competition, they typically complain about being discriminated against."[66] Emotionality stereotypes combine with hostile sexist beliefs to undermine women's perceived credibility when it comes to workplace complaints (e.g., about being harassed, treated unfairly, or bullied).

---

[61] Shields, S. A., & Shields, S. A. (2002). *Speaking from the heart: Gender and the social meaning of emotion*. Cambridge University Press.

[62] Brescoll, V. L., & Uhlmann, E. L. (2008). Can an angry woman get ahead? Status conferral, gender, and expression of emotion in the workplace. *Psychological Science, 19*(3), 268–275.

[63] Timmers, M., Fischer, A. H., & Manstead, A. S. R. (2003). Ability versus vulnerability: Beliefs about men's and women's emotional behaviour. *Cognition & Emotion*, *17*(1), 41–63

[64] Glick, P., & Fiske, S. T. (1996). The ambivalent sexism inventory: Differentiating hostile and benevolent sexism. *Journal of personality and social psychology*, *70*(3), 491-501.

[65] Masser, B. M., & Abrams, D. (2004). Reinforcing the glass ceiling: The consequences of hostile sexism for female managerial candidates. *Sex Roles*, *51*(9-10), 609-615.

[66] Glick & Fiske (1996), *op cit.*

**STEREOTYPES BIAS PERCEPTIONS OF OTHERS' BEHAVIOR**

Gender represents a primary category by which we classify other individuals: it's the first social category into which people are classified after (and even before) birth (e.g., the first question people typically ask about a newborn: "Is it a boy or a girl?"). Children learn to use gender to label others at an extremely young age (about a year and a half old, before awareness of other social categories such as race).[67] Both children[68] and adults[69] automatically use gender categorization to classify others; in turn, gender classification elicits well-learned stereotypes that bias expectations about the "appropriate" or expected behaviors for each gender.[70] Even when evidence contradicts a stereotype, confirmation biases influence how people interpret and remember information about others.[71] That is, biased perceivers view an individual's behavior through a distorted, stereotypical lens.

Stereotypes are more likely to affect perceptions when people make subjective judgments and when behavior or information about a person allow room for interpretation. For example, when evaluators did not have clear, objective evidence about performance, people assumed that a

---

[67] Zosuls, K. M., Ruble, D. N., Tamis-LeMonda, C. S., Shrout, P. E., Bornstein, M. H., & Greulich, F. K. (2009). The acquisition of gender labels in infancy: Implications for gender-typed play. *Developmental Psychology*, *45*(3), 688.

[68] Bennett, M., Sani, F., Hopkins, N., Agostini, L., & Malucchi, L. (2000). Children's gender categorization: An investigation of automatic processing. *British Journal of Developmental Psychology*, *18*(1), 97-102.

[69] Taylor, S. E., Fiske, S. T., Etcoff, N. L., & Ruderman, A. J. (1978). Categorical and contextual bases of person memory and stereotyping. *Journal of personality and social psychology*, *36*(7), 778.

[70] Hill, S. E., & Flom, R. (2007). 18-and 24-month-olds' discrimination of gender-consistent and inconsistent activities. *Infant Behavior and Development*, *30*(1), 168-173.

[71] Fiske, S. T. (1998). *Op. Cit.*

woman holding a high-level job in a masculine field was less competent than an identically described man.[72]

Stereotypes promote *dispositional* explanations of others' behavior.[73] Dispositional inferences are assumptions about underlying traits and motives. To illustrate, consider the difference between merely describing a person's behavior versus making an inference about *why* he or she did it: "She made a complaint about a co-worker" describes a behavior without inferring the motives for the behavior. Dispositional (i.e., personality) inferences leap to explaining "why" someone did something by making conjectures about an individual's personality. The same behavior can easily lead to more positive or more negative personality inferences. For example, one might infer that "She made a complaint because she's someone who stands up for herself" (a positive construal) versus "She made a complaint because she's arrogant and bitter" (a negative construal). Stereotypes can lead people to leap from observed behavior to negative dispositional inferences and confirmation bias then distort inferences about further behavior, falsely increasing people's certainty about initial inferences.[74]

When people use stereotypes, they fail to consider situational explanations. For example, research shows that people tend to excuse men's emotionality as situational ("He's having a bad day") while attributing the same emotional display by a woman to an underlying disposition ("She's an emotional person").[75] In two experiments, researchers presented male and female

---

[72]Heilman, M. E., Wallen, A. S., Fuchs, D., & Tamkins, M. M. (2004). Penalties for success: reactions to women who succeed at male gender-typed tasks. *Journal of applied psychology*, *89*(3), 416.

[73] Pettigrew, T. F. (1979) the ultimate attribution error: Extending Allport's cognitive analysis of prejudice, *Personality and Social Psychology Bulletin*, 5, 461-476

[74]Costabile, K. A., & Madon, S. (2019). Downstream effects of dispositional inferences on confirmation biases. *Personality and Social Psychology Bulletin*, *45*, 557-570.

[75] Barrett, L. F., & Bliss-Moreau, E. (2009). She's emotional. He's having a bad day: Attributional explanations for emotion stereotypes. *Emotion*, *9*(5), 649.

faces (one at a time) on a computer screen. The faces exhibited equivalent, moderately intense emotional expressions (e.g., sadness, fear, disgust). Each face was paired with a situational reason for the emotion (e.g., *Was yelled at by the boss*, *Just attended a family funeral*, *Heard footsteps in the dark*). Participants were more likely to attribute men's emotions to the situation (e.g., he was provoked to anger by the situation) and to conclude that women's emotions reflected her disposition (e.g., she's an angry person). These differences held across expressions of various emotions; sadness, fear, and anger.

In general, research shows that stereotype-based dispositional inferences exacerbate stereotype-confirmation processes. Specifically, once a perceiver makes an initial, stereotyped snap judgment about another person's personality (e.g., "She's emotional") they are especially likely to: (a) remember information that "fits" (rather than information that contradicts) their impressions, and (b) interpret ambiguous information about others in ways that support their initial impression.[76] By fostering inferences about personality and motives, stereotypes can produce cascading effects, biasing interpretation of subsequent encounters.[77]

In sum, stereotype effects are not absolute or impervious to reality, but operate like a "thumb on the scale" leading to biased perceptions. That is, stereotypes typically shade or bias perceptions in a manner more like augmented reality than a completely made up fantasy. People respond to "evidence" about another person, but do so in biased ways unless they take steps to guard against stereotyped inference and bias.

---

[76]*Op cit*.
[77]Fiske, S. T. (1998). *Op. Cit.*

**MEN GARNER MORE RESPECT THAN WOMEN**

High status roles are associated both with stereotypically masculine traits (e.g., ambition, assertiveness, decisiveness)[78] and with men as "role incumbents" (i.e., when asked to "think of a leader," it's likely the person who pops to mind is a man not a woman).[79] Due to gender stereotypes, people generally accord women lower status and authority than men.[80] Women in masculine fields have to disprove lower expectations due to stereotypes.[81] In work roles dominated by men, research shows that women have to work harder and perform better to prove their competence compared to men.[82]

Related to the greater respect men are accorded, men are also stereotyped as more likely to have intellectual brilliance than women. This stereotype manifests relatively early in life[83] and persists into adulthood.[84] In fields where people view intellectual brilliance as a key to success, women face stiffer barriers to succeeding and more discrimination.[85] These stereotypes can lead people to devalue women's contributions in intellectual fields and attribute any success they

---

[78]Koenig, A. M., Eagly, A. H., Mitchell, A. A., & Ristikari, T. (2011). Are leader stereotypes masculine? A meta-analysis of three research paradigms. *Psychological bulletin*, *137*(4), 616.

[79]Glick, P., Zion, C., & Nelson, C. (1988). What mediates sex discrimination in hiring decisions? *Journal of Personality and Social Psychology*, *55*(2), 178.

[80]Ridgeway, C. L. (2001). Gender, status, and leadership. *Journal of Social issues*, *57*(4), 637-655.

[81]Foschi, M. (2000). Double standards for competence: Theory and research. *Annual review of Sociology*, *26*(1), 21-42.

[82] Gorman, E. H., & Kmec, J. A. (2009). Hierarchical rank and women's organizational mobility: Glass ceilings in corporate law firms. *American Journal of Sociology*, *114*(5), 1428-1474.

[83] Bian, L., Leslie, S. J., & Cimpian, A. (2017). Gender stereotypes about intellectual ability emerge early and influence children's interests. *Science*, *355*(6323), 389-391.

[84] Storage, D., Charlesworth, T. E., Banaji, M. R., & Cimpian, A. (2020). Adults and children implicitly associate brilliance with men more than women. *Journal of Experimental Social Psychology*, *90*, 104020.

[85] Leslie, S. J., Cimpian, A., Meyer, M., & Freeland, E. (2015). Expectations of brilliance underlie gender distributions across academic disciplines. *Science*, *347*(6219), 262-265.

achieve to hard work (she's a dull grinder who keeps after it, competent but not brilliant) while having relatively inflated views of men's contributions and future potential. For example, in letters recommending female versus male applicants for faculty positions in chemistry and biochemistry, recommenders used comparatively more "standout adjectives" and ability words for men (e.g., "brilliant") and more "grindstone" words (e.g., hard-working) for women.[86]

## SEX STEREOTYPES ACT AS GENDER PRESCRIPTIONS

Sex stereotypes not only describe how men and women are *expected* to behave, but also prescribe how women and men "*should*" behave (e.g., women *should* be warm) and *should not* behave (e.g., men *should not* be weak).[87] All stereotypes are inherently *descriptive*, they define expectations about how people in a category typically behave. As noted above, descriptive stereotypes can lead to discrimination, such as when women are presumed to be less competent than men in a masculine domain. But additional forms of discrimination occur when stereotypes are also *prescriptive* (i.e., represent normative social standards specifying how men and women *ideally* ought to behave).

The following example illustrates the difference between merely descriptive versus prescriptive stereotypes: Imagine holding the stereotype that Norwegians love to ski. Meeting a Norwegian who does not ski would occasion surprise because this individual violates "ski-loving Norwegian" expectations. However, one would probably not be offended or irate because the stereotype is descriptive (i.e., an expectation), not prescriptive. By contrast, imagine a man who jumps behind his girlfriend, using her as a human shield, when a rabid dog charges. Most people

---

[86] Schmader, T., Whitehead, J., & Wysocki, V. H. (2007). A linguistic comparison of letters of recommendation for male and female chemistry and biochemistry job applicants. *Sex roles, 57*(7), 509-514.

[87] Prentice, D. A., & Carranza, E. (2002). What women and men should be, shouldn't be, are allowed to be, and don't have to be: The contents of prescriptive gender stereotypes. *Psychology of Women Quarterly, 26,* 269-281.

would probably feel extremely offended, irate, and consider him a poor excuse for a man due to the *prescriptive* stereotype that men should be brave. Now consider the reverse situation in which the woman jumps behind the man, using him as a shield. Would people feel offended by her behavior or consider her a "poor excuse for a woman?" If not, the example reveals a double standard in judgment due to prescriptive sex stereotypes.

The example above illustrates that men (not just women) are judged harshly for failing to live up to prescriptive stereotypes. However, stereotypes specifically prescribe women to be warm and helpful and forbid women from being "too assertive"; by contrast, men are not prescribed to be warm and agreeable, and are instead permitted or even encouraged to assert themselves. This occurs because prescriptive stereotypes serve to reinforce traditional gender roles (e.g., women as caregivers, men as providers) and to preserve male dominance. Thus, stereotypes prescribe men to show no weakness, be assertive, and seek status.[88] By contrast, as reviewed in detail below, women risk disapproval for these same assertive behaviors. These effects are relative. For example, when a man's behavior becomes too extreme, people might reject him as arrogant and autocratic for running roughshod over others.[89] A discriminatory double standard is revealed, however, when people reject a female leader for much milder self-assertion. In other words, the bar is set differently for men and women.

**WOMEN FACE PRESSURE TO "NURTURE" AND ACCOMMODATE OTHERS**

Gender prescriptions pressure women, but not men, to engage in extra effort at work to be nurturing, agreeable, and perform optional helping/support behaviors. Because people expect helpful, warm, and nurturing behaviors from women, women do not typically receive

---

[88]Prentice & Carranza (2002), op cit.
[89]Driskell, J. E., & Salas, E. (2005). The effect of content and demeanor on reactions to dominance behavior. *Group Dynamics: Theory, Research, and Practice*, *9*(1), 3-14.

organizational rewards for doing so (because they are merely complying with strong, gendered expectations). By contrast, when women fail to go out of their way to engage in extra help and support at work, they encounter social and organizational penalties for being "insufficiently warm" (i.e., failing to conform to stereotypic prescriptions). Specifically, research has examined what organizational psychologists term "organizational citizenship behaviors,"[90] discretionary acts such as going out of one's way to help a colleague accomplish a task outside one's job description. Altruism represents a central dimension of organizational citizenship behaviors, which include helping, nurturing, and "cheerleading" (e.g., celebrating a co-worker's accomplishments), all behaviors stereotypically prescribed for women.[91]

Research confirms that people expect women, but not men, to go out of their way to engage in extra organizational citizenship behaviors.[92] In line with this prescription, women typically engage in optional organizational citizenship behaviors more than men, but these extra contributions do not translate into higher performance evaluations for women as compared to men.[93] In two well-controlled experimental studies, one with undergraduate participants and a replication with working adults, people evaluated men and women who went out of their way to help a co-worker after hours. Evaluators read a personnel file about a target person whose name

---

[90]Organ, D. W. (1988). *Organizational citizenship behavior: The good soldier syndrome*. Lexington Books/DC Heath and Com.

[91]Organ, D. W. (1990). The motivational basis of organizational citizenship behavior. *Research in organizational behavior*, *12*(1), 43-72.

  Kark, R., & Waismel-Manor, R. (2005). Organizational citizenship behavior: What's gender got to do with it?. Organization, 12(6), 889-917.

[92]Farrell, S. K., & Finkelstein, L. M. (2007). Organizational Citizenship Behavior and Gender: Expectations and Attributions for Performance. *North American Journal of Psychology*, *9*(1).

[93]Lovell, S. E., Kahn, A. S., Anton, J., Davidson, A., Dowling, E., Post, D., & Mason, C. (1999). Does gender affect the link between organizational citizenship behavior and performance evaluation?. *Sex Roles, 41*(5-6), 469-478.

was varied between conditions to be male or female. The worker's file included an incident in which he or she either chose or chose not to voluntarily stay late (which would require missing a celebratory work dinner) to help a co-worker who needed to prepare a report for the following morning. Findings revealed that women were "… judged more negatively than men whatever they did with respect to helping behavior: When they helped, they were not awarded the high regard bestowed upon men, and when they did not help, only they, not men, paid the price in terms of performance evaluations and reward recommendations" (p. 435).[94]

In sum, due to sex stereotypes, others expect women to go out of their way to act as nurturers and helpers at work in ways that exceed their formal job role (i.e., are not part of their job description). Unlike men, when put in the effort to perform these extra behaviors, they receive no reward for doing so (it is simply expected that they will). By contrast, if they fail to go out of their way to be nurturers and cheerleaders for others, women are penalized, whereas men who behave similarly are not.

**ASSERTIVE WOMEN FACE BACKLASH**

As noted above, descriptive stereotypes set up expectations that women will be less competent in masculine domains, requiring them to work harder to prove their competence. Yet once women overcome this hurdle, they face another: The assertive actions women must take to prove their competence can be viewed as violating gender prescriptions, creating *backlash* (social and workplace penalties). Research (reviewed below) shows that a variety of assertive behaviors lead to penalties for women. These behaviors include self-promotion (e.g., talking about one's accomplishments and skills), criticizing others (e.g., pointing out a mistake),

---

[94]Heilman, M. E., & Chen, J. J. (2005). Same behavior, different consequences: reactions to men's and women's altruistic citizenship behavior. *Journal of Applied Psychology, 90*(3), 431-441.

showing anger, as assertive style (e.g., issuing commands). Further, merely succeeding in a masculine domain can trigger backlash toward women.

When women exhibit assertive behaviors they risk hostile reactions and punishment, collectively known as *backlash*.[95] A meta-analysis of 63 studies with over 7,000 participants[96] shows that perceivers (a) dislike women who exhibit assertiveness or dominance more than men who behave similarly and, consequently, (b) impose workplace penalties on dominant women (e.g., rate them as less hireable or promotable). Keep in mind that prescriptions for women and men reflect *relative* standards for each sex. For example, a man who grossly abuses power over others may elicit hostility and incur workplace penalties. However, a double standard occurs when the threshold for acceptable behavior differs for one sex compared to the other. In other words, is the same behavior accepted or only mildly punished if shown by a man, but more strongly rejected and punished when shown by a woman? Research has tested for a discriminatory double standard for dominant behaviors by painstakingly creating controlled comparisons in which researchers randomly assign participants to evaluate either a man or a woman who has been trained to exhibit identical assertive behaviors.

Research documents greater dislike for assertive women, whom people view as insufficiently warm, compared to similarly assertive men, in turn, leading to work-related discrimination.[97] These effects are driven by people's negative emotional reactions, evident not only in likeability ratings, but by facial reactions to assertive women compared to identically assertive men (among participants surreptitiously recorded so that their facial reactions could

[95] Rudman, L. A., Moss-Racusin, C. A., Glick, P., & Phelan, J. E. (2012). Reactions to vanguards: Advances in backlash theory. *Advances in Experimental Social Psychology*, *45*, 167.

[96] Williams, M. J., & Tiedens, L. Z. (2016). The subtle suspension of backlash: A meta-analysis of penalties for women's implicit and explicit dominance behavior. *Psychological Bulletin*, *142*(2), 165.

[97] Ibid

subsequently be coded by observers who did not know whether participants were reacting to a female or male leader).[98] A recent meta-analysis (a technique in which extant studies are subjected to rigorous statistical review aimed at establishing whether an effect is reliable) confirmed scientifically reliable backlash effects in perceived likeability and personnel ratings when women (compared to men) enacted verbal self-assertion.[99] Backlash manifests in a specific type of biased impression: viewing a woman as *cold and dislikeable*.[100] Studies generally find that backlash toward female leaders occurs among women as well as men, with effects being especially strong among people who support an existing gender hierarchy (i.e., more men than women in powerful roles) as fair and legitimate.[101]

The types of behaviors for which women (relative to identically described men) receive backlash include: (a) behaving in a "masculine" (i.e., assertive or autocratic) manner, (b) criticizing or correcting others, (c) engaging in self-promotion by talking about their skills and accomplishments, (d) expressing anger, (e) expressing ambition to achieve powerful roles, and (e) merely being successful in a masculine domain. I review evidence for each below.

*"Masculine" or autocratic style.* Assertive behaviors prescribed for high status roles clash with those prescribed for women.[102] To be perceived as competent in high status roles, women must show assertiveness, but a meta-analysis of over 60 studies examining reactions to male and female leaders revealed greater dislike for and lower evaluations of women (compared

---

[98]Butler, D., & Geis, F. L. (1990). Nonverbal affect responses to male and female leaders. Implications for leadership evaluations. *Journal of Personality and Social Psychology, 58,* 48-59.

[99]Williams, M. J., & Tiedens, L. Z. (2016). The subtle suspension of backlash: A meta-analysis of penalties for women's implicit and explicit dominance behavior. *Psychological bulletin, 142,* 165.

[100]Rudman et al (2012), op cit.

[101]*Ibid.*

[102] Eagly, A. H., & Karau, S. J. (2002). *Op. Cit.*

to men) who behave in stereotypically masculine, assertive ways.[103] It is important to note the specificity of this effect. Women (relative to similar men) are not *always* devalued or penalized. Rather, people penalize women, especially on social dimensions (dislike, perceiving them as insufficiently warm),[104] when they enact a high status role in an assertive (masculine) way.

***Criticism and/or Discipline.*** People generally like to hear positive feedback about themselves, whereas negative evaluations elicit defensiveness. Research shows that people are more likely to react negatively to criticism from a woman, viewing the same criticism as more unreasonable, unwarranted, and unfair when made by a woman compared to a man. These effects disappear for favorable feedback: men and women who offer similar praise are evaluated equally positively. However, when offering criticism, people view women significantly more negatively than men and rate the criticism as less justified.[105] In sum, people accept women (as well as men) who praise them, but denigrate women (more so than men) who criticize them.

***"Self-promoting" behavior.*** Self-promoting behavior represents a form of self-assertion, that can be perceived as interpersonally insensitive, immodest, and condescending (e.g., "you think you are better than me"). Although men are expected to trumpet their successes and talents, self-promotion violates prescriptive stereotypes for women. Research demonstrates that women (in comparison to identically behaving men) who highlight their skills and accomplishments (even in the context of a job interview, where such behavior is more expected) are perceived

---

[103] Eagly, A. H., et al. (1992). *Op. Cit.*
[104] Heilman et al. (2004). *Op. Cit.*
[105] Sinclair, L., & Kunda, Z. (2000). Motivated stereotyping of women: She's fine if she praised me but incompetent if she criticized me. *Personality and Social Psychology Bulletin, 26*, 1329-1342.

significantly more negatively – specifically, they are viewed as colder, dislikable, and as less desirable job candidates.[106]

*Expressing Anger.* Anger is an assertive emotion. Stereotypes prohibit women, more so than men, from expressing anger and women who do so are more likely to be viewed as "out of control" or unreasonable. In a series of studies, working adults evaluated videotaped actors portraying male and female professionals of similar age, attractiveness, and ethnicity in a job interview.[107] Using identical scripts, they described a difficult work experience (as part of a team that lost an important account), expressing anger about a colleague. Participants rated the female (as compared to the male) professional who expressed anger as deserving less independence, power, status, and salary. Further, participants viewed the female (as compared to male) professional's anger as reflecting her personality, rather than being a justified reaction to the situation. A woman who admitted anger was also more likely than a man to be seen as "out of control." These effects did not occur when male and female professionals expressed sadness (a nonassertive emotion) or when the materials did not mention their emotional response.[108]

*Seeking Power.* Women who are explicitly ambitious and want to attain power elicit backlash. For example, participants were less likely to vote for a female as compared to an identical male political candidate when they were described as power-seeking (e.g., a newspaper article characterizing the candidate as "a politician that has always had a strong will to

---

[106] Rudman et al. (2012a). *Op. Cit.*

[107] Brescoll, V., & Uhlmann, E. (2007). Can an angry woman get ahead? Status conferral, gender, and workplace emotion expression. Manuscript submitted for publication. *Psychological Science.*

[108] Prentice, D. A., & Carranza, E. (2002). What women and men should be, shouldn't be, are allowed to be, and don't have to be: The contents of prescriptive gender stereotypes. *Psychology of Women Quarterly, 26,* 269-281.

power").[109] Consistent with other backlash research, power-seeking female candidates were viewed as less warm than identical male candidates; they also evoked more "moral outrage" (e.g., contempt, anger, disgust). Both the perceived warmth deficit and moral outrage led to discrimination (lower voting preference) against the female (as compared to male) power-seeking candidate. In sum, ambitious women who seek powerful positions elicit backlash.

***Success in a Masculine Domain.*** Merely being successful in a high status, masculine domain can trigger backlash toward women. For example, in one study participants evaluated an Assistant Vice President for sales in an aircraft manufacturing company (a male-dominated industry and role). The person rated was either male or female. Researchers also varied whether there was clear evidence that the individual was a stellar performer (e.g., generated sales revenue putting the person in the top 5% in the company). Consistent with prior research on double standards for demonstrating competence, when information about performance was ambiguous, participants assumed a woman was less competent than a man. This competence deficit disappeared when the person was described as clearly being a top performer; but although the woman thereby escaped descriptive stereotypes about presumed incompetence, she elicited backlash for her counter-stereotypical success in a masculine domain. Specifically, she was rated significantly lower in warmth (e.g., more likely to be seen as "interpersonally hostile") and elicited more dislike.[110] A second study demonstrated that women were not penalized for success in a *female* domain (Assistant Vice President in Human Resources in charge of "employee assistance") but only when the job was conventionally masculine (Assistant Vice President in

[109]Okimoto, T. G., & Brescoll, V. L. (2010). The price of power: Power seeking and backlash against female politicians. *Personality and Social Psychology Bulletin*, *36*(7), 923-936.
[110]Heilman, M. E., et al. (2004). Penalties for success: Reactions to women who succeed at male-typed gender tasks. *Journal of Applied Psychology, 89*, 416-427.

charge of "financial planning").[111] Finally, a third study showed that being perceived as

dislikeable results in recommending lower salaries and fewer promotion opportunities.[112]

Subsequent research has confirmed that perceived deficits in warmth and communality led to the

discriminatory effects toward women who succeed in male domains.[113]

**Assertiveness as a 'Status Violation.'** Research suggests that backlash occurs because

assertive women are viewed as committing a "status violation" (i.e., "getting too big for their

britches").[114] Assertive women are perceived as "status incongruent" (i.e., as "acting above" their

station) and therefore a threat to the male hierarchy. Thus, even when a woman's qualifications

were described as unambiguously stellar (e.g., she received a MacArthur genius grant), if she

exhibited assertiveness (e.g., by criticizing others in her field), she was less liked and viewed as

less hireable than an identically described man.[115] Further, backlash was particularly likely to

occur from individuals who sought to justify or uphold the current *status quo* (i.e., who viewed

the current social hierarchy in which men disproportionately hold the most powerful positions as

fair and justified).[116] In sum, people who are invested in defending the current hierarchy show

stronger backlash effects against assertive women.

**Backlash and Workplace discrimination.** Does being disliked translate into workplace

discrimination?  In a field study,[117] supervisors' initial liking for subordinates (at 1 month on the

---

[111] *Ibid.*

[112] *Ibid.*

[113] Heilman, M. E., & Okimoto, T. G. (2007). Why are women penalized for success at male
tasks?: the implied communality deficit. *Journal of applied psychology*, *92*(1), 81.

[114] Rudman, L. A., Moss-Racusin, C. A., Phelan, J. E., & Nauts, S. (2012b). Status incongruity
and backlash effects: Defending the gender hierarchy motivates prejudice against female
leaders. *Journal of Experimental Social Psychology*, *48*(1), 165-179.

[115] Ibid, Study 2

[116] Ibid, Study 3

[117] Lefkowitz, J., & Battista, M. (1995). Potential sources of criterion bias in supervisor ratings
used for test validation. *Journal of Business and Psychology*, *9*(4), 389-414.

job) correlated more strongly than measures of subordinates' ability (aptitude tests) with supervisors' performance evaluations four months later. Employees' aptitude accounted for less than 10% of the variation in supervisor performance evaluations, whereas initial liking accounted for close to 50% of the variation in performance evaluations. Liking, whether at 1 month or 5 months, was the single best predictor of performance evaluations.

Given that (a) backlash leads to viewing an individual as dislikeable and difficult and (b) liking predicts workplace evaluations, it's not surprising that backlash toward assertive and successful women creates workplace penalties. Specifically, assertive women (compared to men) receive lower hiring ratings,[118] lower offers in salary negotiations,[119] lower promotion ratings,[120] poorer leadership evaluations,[121] increased risk of sexual harassment,[122] and a greater likelihood of sabotage from coworkers.[123] In other words, people who dislike assertive women act on this dislike by discriminating against them in tangible ways that adversely affect workplace outcomes. When people are given the opportunity (e.g., are put in charge of a personnel evaluation), dislike turns into discriminatory penalties and even sabotage.[124]

---

[118] Rudman, L. A. (1998). Self-promotion as a risk factor for women: the costs and benefits of counterstereotypical impression management. *Journal of personality and social psychology*, *74*(3), 629.

[119] Bowles, H. R., Babcock, L., & Lai, L. (2007). Social incentives for gender differences in the propensity to initiate negotiations: Sometimes it does hurt to ask. *Organizational Behavior and Human Decision Processes*, *103*(1), 84-103.

[120] Heilman, M. E., Wallen, A. S., Fuchs, D., & Tamkins, M. M. (2004). Penalties for success: reactions to women who succeed at male gender-typed tasks. *Journal of Applied Psychology*, *89*(3), 416.

[121] Eagly et al. (1992).*Op cit*.

[122] Berdahl, J. L. (2007). The sexual harassment of uppity women. *Journal of Applied Psychology*, *92*(2), 425.

[123] Heim, P. (1990). Keeping the power dead even. *Journal of American Medical Women's Association, 45,* 232-243.

[124] Rudman, L. A., & Phelan, J. E. (2008). Backlash effects for disconfirming gender stereotypes in organizations. *Research in organizational behavior*, *28*, 61-79.

**WOMEN WHO CONFRONT DISCRIMINATION FACE BACKLASH, RETALIATION**

People who assert themselves by complaining about instances of harassment or bias are further at risk for backlash, even when circumstances support their claim. Specifically, even when evidence strongly suggests that an individual has been discriminated against, observers tend to view people who claim they have experienced discrimination as overly sensitive "whiners."[125] As noted above, women are already stereotyped as "overly sensitive," especially by sexist indiviuals, and stereotypes prescribe women to be agreeable, rather than assertive. For these reasons, women complaints about discrimination are especially likely to be dismissed. Women who complain about harassment at work often face both *organizational minimization* (e.g., mangers discount their complaints as unsubstantiated or minimize the severity of the harassment) and interpersonal *punishment* (e.g., hostility and occupational penalties),[126] especially in male-dominated occupations.[127] In a survey of over a thousand public-sector employees, 67% of those who had vocally resisted interpersonal mistreatment from coworkers or supervisors experienced social retaliation at work (e.g., hostility, exclusion) and 36% also experienced formal workplace penalties (e.g., discipline, demotion).[128] Thus retaliation, both informal and formal for complaining about discrimination is relatively common.

Individuals directly confronted with claims that they have exhibited bias tend to react defensively, especially if they actually harbor biased attitudes (e.g., sexist beliefs). In one study,

---

[125] Kaiser, C. R., & Miller, C. T. (2001. "Stop complaining! The social costs of making attributions to discrimination." *Personality and Social Psychology Bulletin* 27, 254-263.

[126] Bergman, M. E., Langhout, R. D., Palmieri, P. A., Cortina, L. M., & Fitzgerald, L. F. (2002). The (un) reasonableness of reporting: Antecedents and consequences of reporting sexual harassment. *Journal of Applied Psychology*, *87*(2), 230.

[127] *Ibid*.

[128] Cortina, L. M & Magley, V. J. (2003). Raising voice, risking retaliation: Events following mistreatment in the workplace. *Journal of Occupational Health Psychology, 8,* 247-265.

participants imagined being confronted with accusations that they exhibited (depending on randomly assigned condition) either racial or gender bias. Individuals who had scored high on prior tests of prejudice showed greater antagonism and irritation toward the accuser. Further, male participants generally tended to dismiss and trivialize gender bias accusations.[129]

**COMPETITION AND BACKLASH TOWARD WOMEN WHO OUTPERFORM MEN**

Backlash research has often focused on people evaluating male and female targets when there is no direct competition or comparison between the evaluator and the target. In other words, in most backlash research there's nothing directly at stake for the evaluator (e.g., they are not competing with the target individual for a limited pool of rewards). As noted above, competition exacerbates hostility toward "outgroups" (this constitutes a fundamental finding in research on prejudice). More specifically, when it comes to competition across gender lines, men feel especially threatened when outperformed by women in a stereotypically masculine domain. Consider how a man who suffers a public defeat to a woman in an arm wrestling match or any other masculine sport generally feels. Research confirms that "being beat by a girl" in a masculine domain leads to backlash. Men who were told that a woman outperformed them in a masculine domain were more likely to harass and sabotage the woman when they received the chance to do so.[130]

Men, like women, experience considerable pressure to live up to stereotyped prescriptions. In men's case the core prescriptions concern being dominant, competitive, and

---

[129] Czopp, A. M., & Monteith, M. J. (2003). Confronting prejudice (literally): Reactions to confrontations of racial and gender bias. *Personality and Social Psychology Bulletin, 29*(4), 532-544.

[130] Dahl, J., Vescio, T., & Weaver, K. (2015). How threats to masculinity sequentially cause public discomfort, anger, and ideological dominance over women. *Social Psychology, 46*(4), 242.

successful.[131] In adulthood, these attributes are strongly linked with career success. As a result men prove their masculinity in adulthood through career devotion.[132] This can led men to view work as a "zero-sum" game in which co-workers represent not simply colleagues, but competitors who must be bested in a "masculinity contest."[133] Because stereotypes cast men more than women as "having what it takes" to win the contest, being outperformed by a woman represents more of a blow to the ego than being defeated by another man.[134] Therefore, the backlash women generally risk merely for being successful in masculine fields intensifies in environments in which men view themselves as competing for status and resources against coworkers. The psychological threat a successful female colleague poses can motivate efforts to sabotage her to neutralize the threat.

**EVALUATION PROCEDURES CAN MINIMIZE OR PERMIT DISCRIMINATION**

Stereotype-based bias is more likely to intrude on personnel evaluations when evaluators rely on subjective opinions (i.e., judgments that are in "the eye of the beholder") rather than objective criteria.[135] Subjective judgments involve criteria that are not clearly defined or allow substantial latitude for interpretation, allowing different evaluators to potentially come to different conclusions. For example, people may disagree in their judgments about another

---

[131] Prentice, D. A., & Carranza, E. (2002). What women and men should be, shouldn't be, are allowed to be, and don't have to be: The contents of prescriptive gender stereotypes. *Psychology of women quarterly*, *26*(4), 269-281.

[132] Cooper, M. (2000). Being the "go-to guy": Fatherhood, masculinity, and the organization of work in Silicon Valley. *Qualitative Sociology*, *23*(4), 379-405.

[133] Berdahl, J. L., Cooper, M., Glick, P., Livingston, R. W., & Williams, J. C. (2018). Work as a masculinity contest. *Journal of Social issues*, *74*, 422.

[134] Kuchynka, S. L., Bosson, J. K., Vandello, J. A., & Puryear, C. (2018). Zero-sum thinking and the masculinity contest: Perceived intergroup competition and workplace gender bias. *Journal of Social Issues*, *74*(3), 529-550.

[135] Heilman, M. E., et al. (2004). Penalties for success: Reactions to women who succeed at male-typed gender tasks. *Journal of Applied Psychology, 89*, 416-427.

person's perceived attractiveness (i.e., to the extent that "beauty is in the eye of the beholder" it represents a subjective judgment). Subjective judgments open the door to bias. For example, when evaluators judge a person's "fit" with the organization (a subjective judgment), they tend to prefer people who are in the same social categories as typical job incumbents. For example, in an audit study, experimenters sent similar résumés to law firms, but altered information hinting at the applicant's social class (e.g., extracurricular activities such as sailing and polo versus track and soccer). Law firms preferred male candidates who seemed to have high social class backgrounds over equally qualified men perceived as from a lower social class background.[136]

Therefore, organizations that wish to avoid having bias contaminate their personnel evaluations should, to the extent possible, rely on objective indicators and compare an individual's scores to carefully determined behavioral benchmarks. For example, imagine evaluating a sales representative according to dollar amount of the person's annual sales. This constitutes an objective measure – annual sales figures do not depend on evaluators' opinions, but on objective data. Unlike judging such subjective criteria as "fit" with the organization or "potential," different evaluators will not come up with different figures for annual sales. Using objective measures inhibits bias by not leaving criteria open to evaluator interpretations.

Although objective measures help to prevent biases in ratings, biases can still creep in unless evaluators use predetermined benchmarks and agree on how to weigh different criteria. Consider the annual sales measure example: even though this represents an objective measure, an evaluator charged with making a promotion decision needs to consider whether the individual's sales figures are sufficiently good to warrant promotion. Without an agreed-upon benchmark for

---

[136]Rivera, L. A., & Tilcsik, A. (2016). Class advantage, commitment penalty: The gendered effect of social class signals in an elite labor market. *American Sociological Review*, *81*(6), 1097-1131.

what constitutes sufficient sales, different evaluators would be free to come up with different criteria for what is "good enough" for promotion. Meta-analyses of promotion and salary decisions show that when free to do so, evaluators impose double standards that favor men. Even though women, on average, receive similar personnel evaluations to men, men are rewarded (promoted, given bigger salaries and bonuses) significantly more than women.[137] Developing benchmarks for comparisons helps to prevent such bias. For example, imagine that the organization decides that sales representatives who are in the top 30th percentile for annual sales deserve to be promoted. This benchmark clearly defines what is "good enough" and does not allow evaluator bias to lead to double standards for promotion decisions.

Finally, bias can also occur when evaluators are free to determine how much to weigh different criteria. For many jobs, promotion decisions involve multiple criteria (e.g., academic promotions involves assessing teaching, scholarship, grants, departmental contributions, etc.). Bias can occur when evaluators are free to adjust how they weigh each criterion. In one experiment, evaluators judged whether to hire a male or a female candidate for a male-dominated job, police chief. Each candidate's strongest and weakest qualifications were varied. Depending on random assignment, for some evaluators, the male candidate had more street experience but less education than the female candidate. For other evaluators, the candidates' strengths and weaknesses were reversed (she had more street experience, he had more education). When left to determine which criterion mattered most, evaluators chose to more heavily weigh whichever criterion favored the male candidate.[138] That is, if the male candidate excelled on street

---

[137]Joshi, A., Son, J., & Roh, H. (2015). When can women close the gap? A meta-analytic test of sex differences in performance and rewards. Academy of Management Journal, 58, 1516–1545.

[138]Uhlmann, E. L., & Cohen, G. L. (2005). Constructed criteria: Redefining merit to justify discrimination. *Psychological Science*, *16*(6), 474-480.

experience, evaluators used this criterion as a pretext for hiring him over a better educated female candidate. If the male candidate excelled on education, evaluators valued this criterion more than street smarts, using it as a pretext for preferring him. In other words, by weighing whatever the male candidate was best at as "more important," evaluators can always justify preferring a man over a woman. Organizations can prevent such shifts in which criteria an evaluator deems "most important" by standardizing how much to weigh each criterion.

In sum, to avoid biases in promotion evaluations, organizations should subscribe to the following best practices. (a) When possible, use objective measures directly tied to job performance criteria (rather than allow evaluators to make subjective judgments that allow biases to affect their interpretations). (b) Establish clear and reasonable benchmarks for comparison to prevent double standards for what constitutes success (i.e., set a consistent bar for promotion). (c) Provide clear guidance on how to weigh different criteria to prevent evaluators from adjusting how criteria are weighed to disguise discrimination.

## IV. APPLICATION TO CURRENT CASE AND OPINIONS

Social framework experts serve a specific role: educating a jury about research findings and pointing out ways that research findings may help inform their decision. Based on standard practice, the social framework expert's role has limits. Specifically, the law discourages experts from making "credibility judgments" about disputed evidence. For example, in a case hinging on conflicting testimony about whether or how a specific incident occurred, case decision-makers, not the social framework expert, must decide which witnesses they deem credible. Thus, when facts are disputed (e.g., he says one thing, she says another), consistent with the law and common practice, I will not issue judgments about who is more credible. In these instances, my opinions will be contingent on the case decision-makers' credibility judgments. For example, I will use language such as "Should the case decision-makers find allegation X credible, such behavior would be consistent with research showing Y." In other instances, facts are not disputed. For example, in the current case, documentation provides Professor Mullenix's numerical ratings on teaching evaluations – those ratings constitute facts that are not contested. Therefore, statements such as "Professor Mullenix achieved a 4.75 rating" do not require credibility judgments.

My testimony will stay within the bounds defined by Federal District Court Judge Nancy Gertner, who ruled my testimony as admissible for the following reason: it *"…expressly refuses to come to a conclusion about whether there has been discrimination in this case because such an opinion is for the jury and … it is not possible to make any decision to a reasonable degree of scientific certainty about a real world case."*[139]

---

[139] MEMORANDUM RE: MOTION TO EXCLUDE EXPERT TESTIMONY, January 6, 2009. Judge Nancy Gertner, United States District Court for the District of Massachusetts. Civil Action no. 07cv-12338-NG, p. 4.

Therefore, I will not opine with certainty about whether discrimination occurred in this case, but will point the case decision-makers toward issues to consider and note when case facts are consistent with the *possibility* that discrimination occurred (e.g., show a pattern consistent with how stereotyping and bias operate). Because alternative explanations offered by Defendant to explain their actions cannot be ruled out scientifically, case decision-makers must ultimately decide whether they believe discrimination likely did or did not occur.

Below I suggest some important principles for case decision-makers to keep in mind as they try to disentangle whether discrimination did or did not occur in the current case.

First, because people's action often reflect mixed motives, case decision-makers should understand that alternative, nondiscriminatory explanations may be partially true and coexist alongside bias. For example, an evaluator might have some legitimate concerns about the quality of a professor's scholarship, but *also* allow bias to reinforce or intensify these concerns, leading to unfair discrimination as the evaluator subtly downgrades the target person's evaluation.

Second, biased individuals typically justify their actions by citing apparently legitimate motives in an effort to deny that bias skewed their judgment. Therefore, case decision-makers should not expect biased individuals to own up to or declare biased motives, but instead to claim alternative, nondiscriminatory motivations.

Third, gender discrimination tends to be targeted and context dependent, rather than an overt, blanket discrimination against all women in all situations. As the scientific section of this report noted, women who comply with gender expectations about "how women should be" tend to elicit affection, protection, and aid (though they are simultaneously likely to be denied the same level of tangible resources, such as pay or powerful positions compared to men). By contrast, women who defy gender prescriptions (e.g., by being assertive) get slammed with

hostility, workplace penalties, and even retaliatory sabotage (whereas a man who behaved in the same way might be admired, tolerated, or at least receive less hostility and fewer penalties). Thus, while gender discrimination may manifest itself in some general patterns, such as women being paid less overall than men, more intense discrimination often targets *specific women* (not all women), such as those who exhibit behaviors that violate gender stereotypes.

Fourth, discrimination reflects *relative differences* in how people react to women and men who have similar qualifications and behave in similar ways. For example, a biased evaluator might acknowledge that Professor Mullenix was prolific in her scholarship, but downplay its quality – perhaps not as totally incompetent, but as less excellent than a better liked male colleague's work. The question for case decision-makers becomes "Would a male colleague who wrote identical articles be given a better evaluation and raise than Professor Mullenix?" Similarly, for behaviors that may be less desirable, the question is not whether a man would also be penalized for such behavior, but whether people reacted *relatively more* negatively toward Professor Mullenix than they would have toward a man who acted similarly.

Fifth, case decision-makers should remember that they need not reach their conclusion with "scientific certainty" but instead with appropriate legal certainty (e.g., "more likely than not" or whatever standard the court imposes). Imperfect comparisons between how the plaintiff and male colleagues were treated may be insufficient for achieving scientific certainty, but can help case decision-makers to decide whether, in their judgment, discrimination likely occurred.

Finally, case decision-makers should consider the context in which Professor Mullenix's behavior occurred. In the end, case decision-makers must decide the credibility of Professor Mullenix's claims that she suffered decades of discrimination, despite repeated attempts to get various UT law school Deans to address the problems. For example, she alleges that even after

UT settled her 2010 pay equity complaint they undermined her settlement by turning it into deferred compensation and that annual salary arrays for law school faculty (which UT was required to provide her after the settlement) revealed continuing discrimination (Mullenix Memorandum). If case decision-makers find these claims credible, they provide a context for understanding her continued, perhaps increasing assertiveness in criticizing the evaluation process (e.g., confronting Budget Committee members about their votes) and pursuing equity (e.g., by filing the current lawsuit).

**SPECIFIC QUESTIONS TO CONSIDER**

Research on stereotypes and discrimination suggest that the jury should consider the following critical questions:

1. Did Professor Mullenix's behavior elicit backlash and, therefore, retaliation?

2. Did backlash combined with failure at the UT Law School to institute practices that mitigate bias in decision-making result in discrimination against Professor Mullenix in annual evaluations?

**1. DID PROFESSOR MULLENIX FACE GENDER-BASED BACKLASH?**

As explained in the scientific review above, people (women as well as men) generally react negatively to assertive women compared to similarly assertive men. The common denominator: women elicit backlash for "status violations." Specifically, research established that women typically receive backlash and hostility for: (a) assertive behavior, (b) criticizing others, (c) engaging in self-promotion, (d) expressing anger, (e) showing ambition or seeking powerful roles, and (e) claiming to have been discriminated against. Both the Plaintiff (Professor Mullenix) and the main representative for the Defendant (Dean Farnsworth) seem to agree that Professor Mullenix ticked all of the boxes above.

Additionally, research shows that women can elicit backlash merely for being successful in a masculine domain and for "besting" men in such domains, sparking motivation to bring such women down a peg or two. Witnesses' opinions differ about Professor Mullenix's success (e.g., as a scholar). Case decision-makers will need ultimately to decide whether the less positive views toward Professor Mullenix's scholarship are accurate or biased due to backlash.

Note that behaviors people may generally admire in men (e.g., showing ambition, being successful) can elicit backlash toward women, leading to *relatively less enthusiastic* (even if still positive) evaluations for women. Similarly, due to backlash, behaviors that people view negatively when men exhibit them (e.g., criticizing others, expressing anger) elicit *relatively more negative* evaluations when women perform them. For both generally admired and generally disliked behaviors, research shows a general trend for people (both men and women) to perceive women (versus men) who perform them. In turn, this leads to viewing the woman as less likeable and punishing her with lower workplace evaluations and even sabotage. For example, people expect men to self-promote and to seek powerful roles, showing more tolerance or even admiration for such behavior, but penalize women for doing the same. Therefore, people might find it relatively unobjectionable if a male professor nominates himself for a Deanship, but view the same self-nomination by a woman as distasteful, selfish, or illegitimate. People may view some assertive behaviors (e.g., criticizing a colleague) as dislikable even when performed by a man, but their reactions tend to be relatively muted, whereas they tend to react with moral disgust when a woman acts the same way.

For each category of behavior described above, discrimination occurs when people impose *double standards*. This includes less positive reactions toward women and men for the same admirable achievements, as well as more hostility and punishment toward women than

toward men for less desirable behaviors. Therefore, *the question is not whether Professor' Mullenix's actions were always pleasant or desirable, but whether a man who behaved similarly would have elicited equally strong negative reactions.* In short, case decision-makers should consider whether Professor Mullenix was denied the same accolades and rewards for her successes and/or was punished more severely for less desirable behaviors than male colleagues were (or would be). Either would constitute discrimination.

**Professor Mullenix Behaved in Ways that Generally Elicit Backlash**

According to her own testimony (Mullenix Memorandum), Professor Mullenix assertively advocated for herself, lobbying for higher pay and a more powerful role at the UT law school. For example, she repeatedly pushed for membership on the Budget Committee and appointments to administrative positions (asking to be named an Associate Dean, nominating herself to replace Dean Sager). She consistently criticized the system by which resources were allocated as biased (i.e., claimed discrimination), lodging both informal and formal (a pay equity demand letter, the current lawsuit) grievances. Her 2010 pay equity complaint allegedly influenced others to pursue information about compensation that eventually brought down Dean Sager due to the improper "forgivable loan" deals he made with some faculty members to increase their compensation (Mullenix Memorandum). Dean Farnsworth testified that after the loans were exposed and Dean Sager removed from the Deanship, some faculty were "upset that Sager was gone and maybe their deal gone too…they were aggrieved that Larry Sager was no longer Dean" (Farnsworth Deposition, pp. 219-220). Professor Mullenix alleges that many of these faculty blamed her for these events because her pay equity suit had led other faculty to investigate salary data, eventually exposing Dean Sager's deals (Mullenix Memorandum).

Other behaviors by Professor Mullenix fall into categories that typically elicit backlash. Professor Mullenix publicly satirized colleagues and administrators at the UT law school in a very thinly veiled piece (*Barbeque of the Vanities*) characterizing them as pompous, vain, and biased. Further, frustrated that her past complaints and pay equity settlement, in her view, failed to end discriminatory treatment, Professor Mullenix assertively confronted members of the Budget Committee, going office to office, to ask them how they voted on her 2018 pay raise (Mullenix Memorandum). Such behaviors would likely elicit hostility had a man engaged in them, but backlash research suggests that people react more negatively toward women (versus men) who criticize or confront them.

Finally, should case-decision makers find that Professor Mullenix excelled in scholarship and/or teaching, putting her in the top tier of professors at UT's law school, they should consider whether her success represented a psychological threat to at least some male colleagues' egos. Research shows that women (compared to men) evoke backlash merely for succeeding in masculine fields and that men in particular experience ego threat when out-performed by a woman in a masculine domain. Such reactions can motivate biased evaluations designed to minimize a woman's success (e.g., viewing her scholarship as mediocre, the product of dogged determination rather than talent).

In sum, research shows that people tend to view women (more so than men) who engage in the types of behaviors Professor Mullenix exhibited as difficult and dislikeable. Further, a woman's success in a masculine field can evoke backlash, as well as competitive resentment from male colleagues, motivating attempts to disparage her accomplishments. These perceptions, in turn, can lead to biased personnel evaluations and even retaliatory attempts to undermine and sabotage a woman to reduce any ego threats she poses. Importantly, both Professor Mullenix and

the Defendant's representative (Dean Farnsworth) generally agree about what Professor Mullenix *did* (i.e., how she behaved). For example, everyone agrees that Professor Mullenix complained repeatedly about discrimination. These facts are not disputed, making credibility assessments unnecessary. What's disputed, and what case decision-makers will need ultimately to decide, is whether her behaviors led to retaliation and biased evaluations by UT colleagues, whether by Budget Committee members, Dean Farnsworth, or both.

**Did Backlash Cause Retaliation Against Professor Mullenix?**

Backlash creates hostility and moral outrage toward the targeted individual. Backlash research shows that in addition to biasing personnel evaluations, backlash can lead people to sabotage women. Professor Issacharoff's "kill letter" to the Dean at the University of Michigan law school (KIC Document 0001) represents a potential example in the current case, though case decision-makers will need ultimately to decide whether backlash or other reasons motivated the letter writer. Case decision-makers should consider why someone would, unsolicited by the potential employer, seek to undermine a disliked colleague's move to another employer, rather be happy to potentially be rid of an allegedly "difficult" colleague. It is possible the letter writer felt morally obligated to warn the other institution. Alternatively, consistent with backlash research, it is possible that backlash motivated the writer to sabotage an assertive and/or successful female colleague, preventing her from achieving any further success, thereby neutralizing the psychological threat of "being bested by a woman."

Professor Mullenix alleged that other male faculty similarly sabotaged her when other institutions showed interest in potentially hiring and that the "Issacharoff kill letter" was crafted with participation by other male faculty members in the faculty lounge (Mullenix Memorandum). If case decision-makers find these allegations credible, they would fit with a

group-based hostility leading to a shared desire to undermine Professor Mullenix. Case decision-makers will need to judge both the credibility of these allegations as well as potential motives for such behavior. However, from a psychological perspective these alleged behaviors are consistent with research showing how backlash (and the perceived threat posed by women who succeed in male-dominated fields) motivates dislike and retaliatory sabotage.

Research also establishes that backlash leads to retaliation through more negative personnel evaluations toward assertive women. If such bias occurred in the current case, it could have led to rewarding Professor Mullenix less for her performance than similar or worse performing men. However, depending on an organization's evaluation processes, such biases may be more or less likely to translate into discriminatory performance evaluations. Therefore, when considering whether backlash may have affected annual evaluations, case decision-makers should also factor in whether the evaluation process was vulnerable to allowing biases to affect decisions or guarded against this possibility. I address this issue in in the section that follows.

## 2. DID BIAS INFECT PROFESSOR MULLENIX'S ANNUAL EVALUATIONS?

Depending on their evaluation processes, organizations can help to prevent evaluators' biases from influencing personnel decisions or give biases free rein to infect decisions. Practices known to mitigate bias include using objective criteria (where possible), agreed-upon weights and clear definitions for evaluation criteria, and benchmark standards for making judgments (e.g., cutoffs for what counts as an "excellent" rating on teaching evaluations). By contrast, less structured evaluations that focus on subjective judgements and that provide little accountability through checks and balances allow bias and discrimination to affect decisions. Organizations that are serious about trying to mitigate bias do not rely on assuming unbiased evaluators, but instead seek to structure the evaluation process to make bias less likely to translate into unfair decisions.

The most effective approach involves educating evaluators (without berating, scolding, or brow-beating them) about common biases everyone tends to hold and (even more importantly) systematizing the evaluation process in ways that promote fair decision-making.

First, organizations can base decisions on more objective criteria as compared to subjective judgments that are more vulnerable to biases. For example, an employer could link a widget-maker's raise to how many widgets he or she produces (an objective measure likely to be untainted by bias), rather than to a single co-worker's (potentially biased) subjective judgment about the individual's work. Of course, performance in more complex jobs may require some subjective judgments (e.g., about work quality), but organizations can still reduce bias through practices discussed immediately below.

Second, even when subjective judgments cannot be avoided, organizations can carefully define judgment criteria to guide how judgments are made, and thereby mitigate biases in evaluations. For example, the Budget Committee could have defined criteria to guide decisions about what constitutes high quality scholarship, defining standard benchmarks for comparison. Research has shown that such systemic, structured approaches reduce bias in decision-making.

Third, systems that promote accountability for achieving fairness can mitigate evaluator bias. For example, organizational administrators can specifically track whether women regularly receive less favorable evaluations than men and, if so, investigate whether bias (compared to alternative explanations) might account for the difference. Evaluators can be reminded before they make evaluations about the possibility for biases to creep in and about the organization's commitment to achieving fairness. Knowing that checks are in place, combined with institutional endorsement of equity goals can influence evaluators to make more careful, fairer decisions.

**"We Are Not Biased, Therefore We Make Unbiased Decisions"**

In most workplaces, people don't have the opportunity to get on a committee that determines everyone's compensation, including their own. Basic human tendencies make such a system highly vulnerable to biases. Dean Farnsworth testified that he viewed the Budget Committee process as fair and untainted by problems such as members pursuing their own self-interest, coalition building (e.g., favoring friends and allies), or discrimination. His stated reasons for believing this boiled down to trust in his ability to choose faculty whom he trusts to make sound and unbiased judgments (Farnsworth Deposition, p. 225).

Dean Farnsworth's reasoning resembles a tautology: Because I trust in the people I choose, they are therefore trustworthy. Psychological research suggests Dean Farnsworth's trust may have been misplaced because people are generally motivated to: (a) pursue their own interests as well as (b) favor their friends, allies, people they like, and others with whom they share a group membership. Further research shows that even in situations that call for people to set self-favoring, ally-favoring, and group-favoring biases aside (e.g., when conducting personnel evaluations), people do not simply abandon their biases, but rather try to find legitimate-sounding pretexts that allow them to indulge their biases while claiming to be fair.

Research establishes that even highly biased individuals tend to present themselves as fair-minded. Further, people sometimes are not fully aware of their own biases. Thus, research suggests that Dean Farnsworth's opinion that his hand-picked Budget Committee members lack bias could easily be mistaken. Further, because people tend to trust others with whom they share group memberships, Dean Farnsworth's own biases could have affected his choices for Budget Committee members. For example, as noted in the scientific section of this report, people tend to

automatically accord men more respect than women. Further, people tend to stereotype men as "rational" and women as "emotional," especially if a woman questions an organization's fairness. These common biases make it problematic to rely on subjective beliefs that "we are not biased" to ensure that personnel decisions will be fair and unbiased.

Research shows that self-favoring and group-favoring tendencies intensify when significant resources (e.g., compensation) are at stake, as was the case at UT. Once a system in which some individuals have privileges and power over resource allocation becomes established, people in the dominant or powerful group tend to resist changes that would threaten the system, defending it as fair and ostracizing anyone who questions its legitimacy. Defensive tactics include and questioning the critic's motives (e.g., as self-interested, deluded, petty).

Case decision-makers may wish to imagine what would happen if some people in their workplace were given the opportunity to determine everyone's raises, with some able to repeatedly snag membership on this powerful committee. With compensation at stake, people's tendency to pursue self-interest suggests intense competition would occur as people sought to get on the committee, with coalitions forming among people who regularly served on it. People, both on and off the committee, would be tempted to make sure they were in committee members' good graces. Such behavior could range from overt "I'll scratch your back…" deals to more subtle coalition building via cozy friendships to ensure goodwill. Recall that research shows an evaluator's liking for someone predicts more favorable personnel evaluations. These problems would likely be exacerbated in a context with lingering resentments that divided colleagues.

Ultimately, case decision-makers will need to decide whether to accept Dean Farnsworth's claims about Budget Committee members being free from bias, but research suggests that bias represents an all too human trait. Further, Dean Farnsworth himself suggested

that egocentric biases, hostility, and resentments were common among the UT law faculty,

suggesting that law professors are not singularly immune from these general human tendencies.

For example, Dean Farnsworth stated in his draft memo to Galen Eagle Bull that "Professor

Mullenix is not the most difficult or most vain" of the law school professors, going on to state

that "Most faculty members are capable of being difficult or vain" (Exhibit 4, p. 8). This

statement suggests Professor Farnsworth believes most UT law faculty have an egocentric bias.

Research shows that people extend this egocentrism to include others with whom they share a

group membership or coalition, evaluating these preferred individuals more favorably and

allocating more resources to their "ingroup" than to "outgroup" members.

In addition to egocentrism, Dean Farnsworth was acutely aware that resentments were

rife among the faculty, leading to hostile in-fighting that, in turn, could bias judgments about

colleague). For example, the Dean testified that when he took over at UT law school many

faculty, especially those who had benefited from improper "loans" by Dean Sager, were

"aggrieved" (Farnsworth Deposition, pp. 219-220). Dean Farnsworth further testified that these

grievances spilled over into an email list where faculty were making "potentially quite

inflammatory" comments (Farnsworth Deposition, p. 282). The conflict was sufficiently out of

hand that alumni complained about how "people [faculty members] are throwing around hot

comments at each other" in an email list (Farnsworth Deposition, p. 283). The hostility was

apparently bad enough that Dean Farnsworth concluded he had to disable the email list entirely

(Farnsworth Deposition, p. 282), rather than (for example) simply informing faculty to cease

being publicly inflammatory. Case decision-makers should consider whether the atmosphere and

faculty tendencies Dean Farnsworth described provide confidence that there was no need to

guard against potential hostilities and biases affecting Budget Committee evaluations.

**Did Bias Infect Budget Committee Evaluations of Professor Mullenix's Teaching?**

Dean Farnsworth testified that annual teaching evaluations mainly relied on numerical student evaluation averages (Farnsworth Deposition, p. 138). Although research has found gender biases favoring men over women in student evaluations toward faculty in male-dominated fields, Professor Mullenix nevertheless scored well above average. Therefore, for teaching, an outside source (student opinion) should have anchored Professor Mullenix's evaluations on the positive side of the ledger. Consistent with this, Dean Farnsworth testified that "I admire her teaching and her commitment to her students…she cares a lot about her teaching and makes a -- makes a lot of effort to help her students learn how to think like lawyers. I appreciate that. I think it's good -- it's good for the school" (Farnsworth Deposition, p. 259).

Therefore, if discrimination occurred toward Professor Mullenix in merit compensation related to teaching, it likely would not have involved disparaging her performance as mediocre or poor. Rather, discriminatory treatment, if it occurred, would likely manifest itself in fewer superlatives in summary Budget Committee evaluations and lesser rewards compared to male colleagues and/or less assertive female colleagues who performed similarly or worse. Professor Mullenix alleges this form of discrimination, testifying that despite consistently high teaching ratings over many decades at UT's law school that (a) her pay lagged behind male peers, and (b) she received none of the school's teaching awards, which came with significant financial awards.

According to Dean Farnsworth, the Budget Committee "usually focuses mostly on their [faculty members'] numerical teaching evaluations" to assess teaching in their annual evaluations (Farnsworth Deposition, p. 138). When asked about whether student comments factored in to the committee's decision he testified that "the Budget Committee does not read them as a general rule" (Farnsworth Deposition, p. 326). Given the reliance on average student

ratings, the committee could have easily instituted benchmark standards for judging teaching. For example, the committee could have created formal cut-offs or tiers based on student numerical ratings to determine various levels of merit. For example, specific descriptors (e.g., "excellent") and merit pay increase percentages could have been explicitly linked to evaluation scores (e.g., faculty scoring between 4.0 and 4.70 receive a "good" and a specific merit increase). A benchmark system would prevent committee members' biases from affecting decisions about teaching-based compensation.

The committee failed to take this easy step and instead used subjective, qualitative descriptors (adjectives such as "good" versus "excellent") to summarize opinions about faculty members' teaching success, creating vulnerability to bias. If bias occurred, one would expect a disconnection between the "data" (student evaluation numbers) and how the committee characterized Professor Mullenix's teaching. Student evaluations might anchor committee members' conclusions (e.g., if Professor Mullenix achieved top ratings, they would be unlikely to rate her as a "poor" teacher) but bias could depress evaluations relative to men or less assertive women with similar student evaluations. Thus, case decision-makers should consider whether the Budget Committee use adjectives used less favorable adjectives to describe Professor Mulenix's versus others' teaching even when others' had similar or worse student numerical evaluation averages.

The Budget Committee's annual notes (D-1748: 2019; D-2014: 2020; D5935: 2016; 2015; D-36733: 2018) recorded both teaching evaluation numbers and the committee's overall evaluative descriptions of how they viewed some faculty members' teaching. This information, made it possible to examine how the Budget Committee described Professor Mullenix's teaching and to compare with colleagues who were accorded superlatives by the committee. If Professor

Mullenix received less superlative descriptors from the committee compared to colleagues with similar or lower student evaluation ratings, such disparities would be consistent with possible discrimination or backlash. For the notes from 2015 to 2019, I compared Professor Mullenix's student evaluation ratings and how she was described (the adjectives used) to student evaluation rating averages for faculty who were deemed "excellent" (most commonly) or given other superlatives (e.g., "great" or "terrific") as teachers. Across all years, Professor Mullenix was never described as "excellent" or the like even though others with similar or lesser ratings received this superlative.

In 2015, the committee characterized six faculty members' teaching as "excellent." These individuals achieved average student evaluation ratings of 4.675. Even though Professor Mullenix's 4.76 average exceeded the average for those deemed "excellent," the Budget Committee described her teaching as merely "good." Strikingly, in this year, Professor Mullenix received a higher rating than all but 2 of the professors labeled as "excellent" teachers.

Was 2015 an aberration? In 2016, the committee described seven faculty as "excellent" and another as "great"; these faculty averaged a 4.81 student evaluation rating. Professor Mullenix was once again characterized merely as "good" with a 4.78 rating. While this was slightly below the "excellent" group's average, the committee put three faculty members with lower ratings than Professor Mullenix in the "excellent" category.

Summary evaluations were not produced for 2017, but were in 2018. The committee characterized nine faculty as "excellent" with a 4.71 average student evaluation. Professor Mullenix, averaging a 4.73, was labeled as "strong." Case decision-makers will need to decide whether "excellent" represents a better description than "strong" (which would you prefer to

receive in an annual job evaluation?). If so, once again, Professor Mullenix was not accorded a superlative which the committee used to describe others with weaker student evaluations.

In 2019, the committee deemed five faculty members to be "excellent" or "terrific," with an average student evaluation of 4.73. Another was "highly regarded" with an evaluation of 4.76. The committee described Professor Mullenix, with a 4.81 average, as "strong." Only *one* of the faculty members deemed "excellent" had a higher rating than Professor Mullenix, yet she was not deemed "excellent" or "terrific" despite having higher student evaluations than almost all of the faculty who received such accolades.

In 2020, the committee used more varied adjectives. For Professor Mullenix, who received a 4.85 rating, the committee simply noted "courses went well." Among the faculty who received the most superlative adjectives to describe their teaching, one was labeled "outstanding" (4.90 rating), one as "talented" (based on a 4.80 rating), another as "top ten" (4.86 rating) Professor Bones was labeled as "stellar" (with a 4.77 rating), and three were labeled "great" (combined average of 4.75).  Once again, Professor Mullenix achieved student evaluations that generally matched or exceed most who received superlative adjectives, but was not accorded such a description.

Looking across the years, a general theme emerges: Even when Professor Mullenix's student evaluations clearly put her among the faculty who were seen as "excellent" or received other superlatives (e.g., "terrific"), she was never described in this manner. Rather, the committee put her as "good" to "strong" in various years, never "excellent." This held true even when her scores were better than most of her peers who received such superlatives.

One caveat: I am assuming that "good" and "strong" (which seems better than "good") represent less positive adjectives than "excellent," "terrific" or others described above. However,

because the committee failed to avail itself of systematic categories, case decision-makers will need to decide where to rank such adjectives as "excellent" versus "strong" (which would you rather receive on an evaluation?). The need for this caveat, however, reinforces the point that the committee relied on what seem to be more subjective judgments and characterizations, even though (based on Dean Farnsworth's testimony) the committee allegedly relied mainly on numerical ratings (student evaluations) to assess teaching success. Case decision-makers should consider "If adjectives used to summarize the committee's impressions deviated from student evaluation averages, what other factors influenced their impressions"? Bias represents a distinct possibility.

It is not possible to know whether Professor Mullenix's teaching would have been accorded more superlatives by the committee and would have received more recognition via awards were she less assertive. If, however, case-decision makers believe that Professor Mullenx was generally subjected to backlash, colleagues and administrators would likely have been more reluctant to recognize or celebrate her success as a teacher, leading them to downplay her success. Given the committee's alleged reliance on students' teaching ratings, mismatches between student evaluation averages and the committee's summary evaluations are particularly relevant to determining whether bias may have infected the committee's evaluations and, therefore, pay raises. In the end, case decision-makers will need to decide whether such discrepancies occurred due to gender biases or due to alternative explanations.

**Did Bias Infect Evaluations of Professor Mullenix's Scholarship?**

Scholarship represents a domain where success leads to prestige and higher compensation within a university and greater opportunity in academia more broadly, potentially bringing chances to obtain coveted positions at other institutions (and a retention package at the home

institution. Depending on whose account case decision-makers find more credible, Professor

Mullenix's scholarship was either "mediocre" (even if prolific) or highly influential and widely

respected in the wider academic community.

Dean Farnsworth fell into the former camp. He suggested that he formed his opinion

based on Budget Committee members' annual evaluations of Professor Mullenix's work.

Specifically, Dean Farnsworth characterized Professor Mullenix's scholarship as

"undistinguished" and "mediocre" (Farnsworth Deposition. p. 262), an opinion he based on

annual evaluations by faculty evaluators on the Budget Committee. In a draft of his memo to

Galen Eagle Bull (Office of Diversity and Inclusion), Dean Farnsworth wrote that "Year in and

year out, different reviewers of her scholarship agree about it. They usually find it mediocre. The

kind of scholarship they would expect from a professor at an undistinguished law school"

(Exhibit 4, p. 3), suggesting that Professor Mullenix's scholarship was below the norm for a top

law school such as UT's. He claimed that Professor Mullenix's articles were insufficiently

analytical, "very blunt in description and short on major ideas that drive forward conversations in

her field" (Farnsworth Deposition. p. 264), rather than the more analytical scholarship UT

allegedly values the most.

Other evidence, reviewed below, suggests that this negative opinion may not be

warranted given indicators of admiration for Professor Mullenix's scholarship in her field.

Further, deposition testimony suggests that Dean Farnsworth opinion is more negative than the

alleged basis for his judgments: the evaluations of Budget Committee members. But first I

address whether, like teaching evaluations, the Budget Committee's process relied on subjective

judgments and lack accountability, making it more possible for bias to occur.

*Subjectivity in scholarship evaluations.* Overall, case decision-makers face a difficult task sorting through various claims about Professor Mullenix's scholarship. However, should they conclude that she was the target of backlash from administrators and/or colleagues on the Budget Committee, research suggests these individuals would have been motivated to assess her scholarship less favorably than it deserved. Because Professor Mullenix has been relatively prolific, undeniably producing a high volume of scholarship, biased evaluations this would likely occur on more subjective dimensions, such as the perceived quality of her work. Dean Farnsworth testified that scholarship evaluations focused on quality judgments made by Budget Committee members and admitted that such judgments have a subjective component. Specifically, in a draft memo to Galen Eagle Bull (Office of Diversity and Inclusion) the Dean noted that **"**… these judgments are partly subjective. There is no avoiding this when assessing the quality of scholarship" (Exhibit 4, p. 3).

I am not arguing that scholarship evaluations should be reduced to simple "bean counting." As Dean Farnsworth testified, one cannot judge the quality and impact of a law professor's scholarship by counting how many article pages a faculty member produced in a year; rather, evaluators should focus on whether a scholar's "changes the conversation" in his or her field. I agree. But what's the best way to assess such a question? Dean Farnsworth and the Budget Committee did so by having (typically) one faculty member, who was not necessarily in the same specialty, read an individual's work and render his or her opinion on scholarship quality. In short, a single individual, who was not necessarily in the same subfield, determined annual evaluations on a central evaluation criterion. Other than the assigned evaluator, Budget Committee members typically did not read an individual's scholarship. As a result, evaluators could issue an opinion knowing that others would have little basis for disputing it, creating low

accountability and ample opportunity to indulge biases (imagine a book club discussion where only one person had read the book).

Case decision-makers should consider how exactly Budget Committee members, who were generally not experts in Professor Mullenix's field were able to accurately infer that her articles were not "driving forward conversations in her field." In academia, "the conversation" occurs in publications where scholars cite influential or important articles. If other scholars never cite someone's work, then that work is clearly not prominent or driving the conversation forward. Citation counts for articles and individual scholars are readily available and widely used by universities as more objective indicators of scholarly prominence and influence. They represent a direct, statistical measure of how much a scholar has "driven the (published) conversation" in his or her field. By contrast, an individual's judgment may be influenced by their own "tastes" and biases, including shared biases such as a dislike for an assertive female colleague.

Citation counts suggest that Professor Mullenix's prominence and influence as a scholar (among the top 10 most cited in her specialty) exceeded those of better-paid colleagues such as Professor Bone (Exhibit 6). Yet the Budget Committee failed to consider such information, preferring on an annual basis to rely on one reader's subjective opinion without any specific benchmarks or explicit criteria for these judgments. When pressed on how various criteria (e.g., the evaluator's impression that an article was more "descriptive" rather than "analytical") were weighed to determine annual scholarship evaluations, Dean Farnsworth replied that the committee did not weigh things systematically, but that he "would describe the judgment as holistic. Committee members look at the scholarship. They're interested in the quality of the scholarship. They're interested in its prominence in the field. They take all these things into

account in assessing the significance of the contribution" (Farnsworth Deposition, p. 107). But how does the committee assess "prominence in the field" when evaluators typically are not in the same field as the person being evaluated and ignore citation counts?

Case decision-makers might want to imagine how they would fee feel if a major part of their job performance and annual raise was determined by a single coworker's subjective judgment about the quality of their work. Further, imagine that this co-worker was typically not in your specialization and that your organization ignored readily available information suggesting that your work is highly regarded by people in your field. How would you feel if those annual evaluations judged your work as insufficient to merit the kind of pay raise received by others whose work was similarly highly regarded outside the organization?

***Do similar evaluations across different years and different evaluators indicate accuracy and fairness?*** Dean Farnsworth defended the accuracy of the Budget Committee's assessment of Professor Mullenix's scholarship because different committee members assigned to evaluate Professor Mullenix in different years came to similar conclusions. If different evaluators in different years agreed, their judgment must be correct. Psychological research suggests that such reasoning may be fallacious; there are several reasons why consistent evaluations that Professor Mullenix's scholarship was "mediocre" and insufficiently "analytical" may not signal independent or fair judgments. For example, consider how the consensus year to year on Professor Mullenix's teaching (good to strong) failed to match her average student teaching evaluations on which evaluations were allegedly based.

First, the law school tenured faculty represents a small community with many long-term relationships, both cozy and hostile. Should case decision-makers find Professor Mullenix's account credible, she describes an insular community with frequent interaction in the faculty

lounge where people discussed their opinions about others on the faculty (Mullenix Memorandum). In such a community, people in the "in" crowd can form a consensus about what to think about others, affecting judgments about those individuals and their work.

Second, if case decision-makers find Professor Mullenix's account credible, powerful male faculty members had long benefited monetarily from a "boy's club" coalition that excluded and discriminated against ambitious female faculty members, until Professor Mullenix's equal pay demand and the subsequent open information inquiry upset the apple cart. In such a situation, it would not be surprising for continued resentments about these events to impact judgments made by evaluators who had benefited from the former arrangement.

Third, shared gender biases that allocate more "brilliance" to men and explain women's success as being less due to "talent" and more due to being a diligent but dull "grinder" could have led multiple evaluators to downplay the quality of Professor Mullenix's scholarship or to see it as more "descriptive" rather than analytical or brilliant. Recall that research shows that gender stereotypes associate intellectual "brilliance" with men and not with women.

Therefore, agreement among different evaluators in different annual Budget Committee evaluation deliberations, does not necessarily indicate objective or fair evaluation. Shared biases and shared resentments could potentially have caused less positive evaluations toward Professor Mullenix year after year among different UT evaluators selected for the Budget Committee. Further, the following section considers whether Dean Farnsworth falsely perceived a greater consensus on the committee than there actually was.

***Did Dean Farnsworth exaggerate the perceived consensus and hold more disparaging views than the committee evaluations on which he allegedly relied?*** Testimony by individual committee members suggests that Dean Farnsworth is may have held exaggerated views about

the degree of consensus on the Budget Committee regarding Professor Mullenix's scholarship. Specifically, Professor Forbath (Forbath Deposition, p. 118) did not recall the committee characterizing Professor Mullenix's work as "mediocre" and denied that the committee made such "holistic" characterizations. Professor Bone testified that he personally did not regard Professor Mullenix as a "mediocre" scholar and could not recall committee members using such a descriptor (Bone Deposition. p. 51). Professor McGarity (McGarity Deposition, p. 77) and Professor Westbrook (Westbrook Deposition, p. 183) could not recall "mediocre" being used as a descriptor for Professor Mullenix's work by the committee. It's possible that Dean Farnsworth may have perceived a greater consensus than actually occurred.

In addition, testimony by these former Budget Committee members suggests the possibility that Dean Farnsworth may have formed more exaggerated, dispositional inferences about Professor Mullenix's scholarship than the committee members' opinions he allegedly relied on would warrant. Recall that when people use stereotypes they tend to infer make extreme, overly general inferences about a targeted individual's disposition and abilities. Unlike Dean Farnsworth claim that Professor Mullenix was the type of mediocre scholar one would expect to find at an "undistinguished institution" (Exhibit 4), Professor Westbrook testified that "My impression is that she's a good scholar" (Westbrook Deposition, pp. 180-181). He stated that this opinion was "primarily because of reports that the committee received from time to time" (Westbrook Deposition, p. 181) and from reading some of her articles on class actions, which "I thought it was good work" (Westbrook Deposition, p. 182). When Professor Bone was asked "Do you think that Professor Mullenix is a mediocre scholar?" he responded "No" and also testified that he had never heard the budget committee describe her as a mediocre scholar (Bone Deposition, p. 51). Professor Bone also testified that Professor Mullenix is generally

regarded as a "top scholar" in their shared field (Bone Deposition, p. 94). When Professor Forbath who served on the Budget Committee in 2017-18, was asked whether the Budget Committee viewed Professor Mullenix as a mediocre scholar, he replied "…it wasn't the business of the committee to make holistic assessments of colleagues" (Forbath Deposition, p. 118). Similarly, Professor McGarity generally expressed reluctance to issue a broad characterization of any faculty member's scholarship as "mediocre," testifying "I can't do that, just say overall this person's scholarship is mediocre" (McGarity Deposition, p. 75). (Other depositions of Budget Committee members were not available at the time of this report.)

Should case decision-makers agree that the responses from Budget Committee members about Professor Mullenix as a scholar were more tempered than Dean Farnsworth's characterizations, which he claims were based on Budget Committee evaluations, the question becomes "Why did Dean Farnsworth have a more extreme, more negative view?" One possibility: gender stereotypes and/or backlash may have led Dean Farnsworth to more extreme inferences than Budget Committee members' evaluations warranted. Given that Dean Farnsworth was ultimately the sole individual responsible for determining salary, any exaggerated, stereotypical inferences could have translated into compensation discrimination. But case decision-makers will need to weigh this evidence and decide for themselves.

***Is Professor Mullenix's scholarship much more highly admired by scholars in her field (outside of UT)?*** Evidence suggests scholars in her field view Professor Mullenix's scholarship with much greater admiration than Dean Farnsworth's opinions suggest. This includes citation counts that indicate prominence in her field, offers to give colloquia and hold visiting positions at prominent universities, and appreciative letters from scholars in her field, and Professor Bone's testimony in response to the question "Q: Would you include both yourself and Linda [Mullenix]

in a list of top scholars in civil procedure? A: "Oh, yes, I think so. Yes, Linda has a significant reputation in the field" (Bone Deposition, p. 94). Importantly, Professor Bone represents the individual at UT best positioned to make a judgment about the respect accorded to Professor Mullenix by other scholars in her field as he is the only other civil procedure scholar at UT's law school.

Citation counts provide an important, objective index of whether Professor Mullenix's scholarship, contrary to Dean Farnsworth opinion, developed "major ideas that drive forward conversations in her field" (Farnsworth Deposition, p. 264). The academic "conversation" occurs through published articles in which scholars cite each other. Scholarship that never gets cited by others clearly is not fueling the conversation. By contrast, being highly cited generally suggests that a scholar has developed important ideas that are driving the conversation. According to a prominent citation count index (the Leiter index) for law scholars, Professor Mullenix was a Top-Ten most cited scholar in Civil Procedure in 2010-2014 and in 2013-2017 (Exhibit 6). By contrast, Professor Bone, who Dean Farnsworth held up as an example of someone with scholarship that was much more respected by the Budget Committee (on which he repeatedly served), only received an honorable mention as a top scholar in Civil Procedure in the citation-based Leiter index for 2013-2017 (Exhibit 6).

Additionally, case decision-makers might want to consider why Professor Mullenix was offered visiting positions and considered for permanent positions at prestigious law schools (e.g., University of Michigan) if she produced scholarship of the sort expected at an "undistinguished law school" as Dean Farnsworth claimed (Exhibit 4, p. 3)? Letters and emails from various scholars (Mullenix 4969-5084) also suggest admiration from scholars outside of UT for Professor Mullenix's scholarship. Further, the content of their praise suggests that her work

makes analytical arguments that others found important to discussions in their field. Professor Miller from NYU's law school sent several letters commenting on specific pieces by Professor Mullenix. In 2019, Professor Miller praised one article by writing that "Your idea seems to offer a degree of conceptual clarity and doctrinal consistency that is lacking in some other approaches." In 2015, Professor Miller described another article as "a very insightful analysis … that, as you note, raises fundamental issues about distributive and corrective justice." In 2013, Professor Miller praises another paper as "persuasive" and a corrective "for shoddy thinking" on the topic. In 2016, he suggested that Professor Mullenix was "in line, after Professor Subrin, to be the next guru of the field."

In 2013, a former UT colleague, Sir Basil Marksinis, wrote to Professor Mullenix to say "your work has always struck me as being not just prolific but also so original that much could have been learned by me had we met more frequently while I was at UT." In 2021, Professor Lytton of Georgia State "especially liked how [in an article] you analyzed the litigation using your model of mass tort litigation." Professor Grossi at Loyola law school praised an article of Professor Mullenix's as epitomizing scholarly excellence, characterizing her work as "crystal clear, illuminating, and bold… precisely what I love in scholarship. And yet, it is so rare and so hard to find." In 2019, Professor Abernathy of Georgetown University's law school wrote to praise a recent article by Professor Mullenix, which reminded him of "how I treasure your independent voice in an era when most law professors seem like Stepford Wives of conformity."

All of these examples, along with the many invitations to speak at symposia outside of UT, suggest (like her high citation count) that Professor Mullenix's work is admired and influential in the wider academic world. Further, the specific ways in which various scholars praise her work imply that they see Professor Mullenix as an intellectual leader who makes

analytical (not just descriptive) contributions that drive the conversation in her field. Should case decision-makers find that the UT administration devalued Professor Mullenix's scholarship in comparison to how people outside the institution viewed it, the question becomes "why?" Bias represents a distinct possibility.

**Conclusion on Possible Bias in Teaching and Scholarship Evaluations**

Multiple processes related to self and group interest make people prone to engaging in biased decision-making when organizational systems permit it, all while justifying their actions as fair (e.g., merit-based). Organizations can create systems that permit versus mitigate such biases. Whether or not bias specifically infected evaluations of Professor Mullenix cannot be determined scientifically and remains something for case decision-makers to decide. However, the evaluation process at the UT law school failed to institute standard safeguards known to combat and minimize bias.

Based on Professor Mullenix's equal pay demand, the open records act that revealed improper compensation deals by Dean Sager, and a Gender Task Force Pay Equity study, UT administrators should have been aware of the need to be proactive about instituting practices known to increase objectivity and mitigate bias in evaluations.

As Dean Farnsworth himself noted, there was a hangover from the past, with some faculty who benefited from past deals upset that Dean Sager was forced out and faculty who had not benefited from such deals wary about the evaluation process. This led to acrimony among the faculty. Although Dean Farnsworth made the evaluation process less "top down" by involving the Budget Committee in all compensation decisions, evaluations still involved subjective judgments by a select group of faculty.

Although the Budget Committee relied mainly on student numerical ratings (i.e., an aggregate rating by people not on the committee) to judge teaching excellence, they failed to take the easy step of systematically linking average evaluations to summary evaluations and merit pay, instead using subjective, qualitative adjectives to describe teaching. Even though Professor Mullenix regularly received high teaching ratings that were similar to others described by the committee with superlatives such as "excellent," year in and year out, her teaching was described as merely "good" or "strong."

For scholarship, the process was even more subjective, with less accountability. Not only were there no specific benchmarks, but annual evaluations depended on a single evaluator's subjective opinion, completely insulated from opinions of outside specialists in the appropriate subfield and from a readily available indicator, citation counts. In this system, a biased evaluator could unfairly downplay or criticize an individual's scholarly contribution without any checks, balances, or accountability. Other committee members who had not read the individual's works would have no basis to question or challenge the single reader's opinions. Dean Farnsworth suggested that consensus year in and year out that Professor Mullenix's work was "mediocre" indicated that these judgments were accurate. Yet note that the adjectives the committee used to summarize Professor Mullenix's teaching year after year showed a similar consensus (good to strong), that arguably failed to correspond accurately to her actual average teaching ratings. Further, comparing Dean Farnsworth's characterizations of Professor Mullenix's scholarship as "mediocre" and at a level expected of a scholar at an "undistinguished institution" with testimony by Budget Committee members suggests the possibility that Dean Farnsworth held more extreme opinions. Given that Dean Farnsworth attributed his opinions to evaluations by the

Budget Committee, should case decision-makers view his opinions as more extreme and negative, this would be consistent with possible bias toward Professor Mullenix.

In the end, case decision-makers will need to decide whether internal evaluators were biased toward Professor Mullenix due to her assertiveness and persistent questioning of the evaluation process or whether to trust other indicators such as citation counts that paint a more favorable picture of her work. I am not an expert in Professor Mullenix's field and therefore cannot independently evaluate the quality of her scholarship. However, research suggests that relying on subjective judgments by evaluators who might potentially be biased against Professor Mullenix without seeking out external evaluations or using readily available metrics such as citation counts to evaluate her work represents a situation in which biased evaluators could readily exercise their bias.

## SUMMARY OPINION

*Scientific research suggests that behaviors similar to those Professor Mullenix exhibited typically elicit backlash, resulting in hostility that motivates retaliation and workplace penalties (e.g., lower evaluations). Colleagues' alleged behavior toward Professor Mullenix (e.g., sabotaging lateral moves) and lower evaluations of Professor Mullenix's teaching and scholarship would be consistent with backlash-motivated retaliation. Should backlash have occurred, UT's failure to institute practices known to safeguard against bias infecting personnel evaluations (relying instead on subjective judgments) made it more likely that bias would affect personnel evaluations and decisions. Evidence that the Budget Committee accorded more superlative descriptions to other faculty who had similar student teaching evaluations to Professor Mullenix is consistent with possible bias. Similarly, evidence suggesting admiration for Professor Mullenix's scholarship among scholars in her field*

*suggests the possibility that Dean Farnsworth's disparaging characterizations may be due to gender bias. However, because alternative explanations cannot be scientifically eliminated, case decision-makers will ultimately need to judge whether they believe stereotyping and backlash led to discrimination toward Professor Mullenix.*

## V. COMPENSATION & SIGNATURE

My rate of compensation is as follows:

- $400 per hour for review of documents and report writing

- $5000 per day for deposition and trial testimony

- Payment made in advance for deposition and trial testimony

_____          June 11, 2021

_____          _____

Peter Glick, Ph.D.                                              Date

## ATTACHMENT: CURRICULUM VITA

## Peter Glick, PhD.

**SUMMARY**

Peter Glick, PhD is the Henry Merritt Wriston Professor at Lawrence University and a Senior Scientist with the Neuroleadership Institute. Co-author of groundbreaking theories of prejudice and sexism, Dr. Glick's highly influential research has received over 40,000 scholarly citations. As a visiting Professor of Management and Organizations at Northwestern University, he co-designed the Kellogg School of Management's first course on diversity management. He has also taught executive education at Harvard University and developed anti-bias initiatives for Fortune 500 companies (including Airbnb). The *Harvard Business Review* recognized his *stereotype content model* (co-developed with Susan Fiske, Princeton, and Amy Cuddy, Harvard) as a "breakthrough idea for 2009." His highly cited work on *benevolent sexism* (with Susan Fiske) has revolutionized understanding of discrimination against women, receiving the Allport Prize for best paper on intergroup relations. In addition to more than 80 articles, he has co-edited or co-authored three books, including the *Sage Handbook of Prejudice*. He has testified in federal court as an expert witness on sex discrimination. Media outlets that have covered his work include the *New York Times*, *Harvard Business Review*, and *PBS NewsHour*. Website: https://faculty.lawrence.edu/glickp/

**ADDRESS**

Department of Psychology
Lawrence University                              phone: (920) 716-4195
711 E Boldt Way                                    email: glickp@lawrence.edu
Appleton, WI  54911                              web: https://faculty.lawrence.edu/glickp/

**EDUCATION**

Graduate:                        University of Minnesota
                                      Ph.D., 1984
                                      Specialization in Social Psychology
                                      Supporting Program in Statistics

Undergraduate:                 Oberlin College
                                      A.B., 1979
                                      Major in Psychology

**ACADEMIC APPOINTMENTS**

*Henry Merritt Wriston Professor in the Social Sciences,* Lawrence University, 2007-present

*Senior Scientist, Neuroleadership Institute,* 2018 to present

*Visiting Professor of Management and Organizations,* Fall 2009, Kellogg School of
Management, Northwestern University

*Full Professor of Psychology*, 1997-present, Lawrence University

*Director of Lawrence Fellows Program*, 2004-2007 (designed and implemented a post-doctoral
Fellows program across all academic disciplines)

*Faculty Associate to the President*, 2005-07, Lawrence University

*Director, Lawrence University London Centre*, 1998-99

*Chair of Psychology Department*, 1992-93; 1994-96, 1997; 2000-2002, Lawrence University

*Associate Professor of Psychology*, 1990 to 1997, Lawrence University

*Assistant Professor of Psychology*, 1985 to 1990, Lawrence University


## HONORS AND AWARDS

***Excellence in Scholarship Award***, Lawrence University, 2011. Awarded to a faculty member
who has demonstrated outstanding scholarly contributions.

***Harvard Business Review*** recognized joint research with Susan T. Fiske and Amy J. C. Cuddy
on warmth and competence as fundamental dimensions of social perception in "The *HBR*
List: Breakthrough Ideas for 2009"

***Gordon W. Allport Intergroup Relations Prize*** for best paper on intergroup relations (awarded
by the Society for the Psychological Study of Social Issues and Harvard University):

2005-06: Honorable Mention for Cuddy, A. J. C., Fiske, S. T., & Glick, P. "The BIAS
Map: Behaviors from Intergroup Affect and Stereotypes"

1995: Award for Glick, P. & Fiske, S. T. "The Ambivalent Sexism Inventory:
Differentiating Hostile and Benevolent Sexism" (*Journal of Personality and Social
Psychology*)

**Elected as President** of the *Society of Experimental Social Psychology* for 2009

**Elected as a Fellow** in the following professional psychology organizations:

> *Society for the Psychological Study of Social Issues*, Division 9 of APA (2007)
> *Society for the Psychology of Women*, Division 35 of APA (2007)
> *American Psychological Society* (2004)
> *American Psychological Association* (2004)
> *Society for Personality and Social Psychology*, Division 8 of APA (2004)

## EDITORIAL BOARD APPOINTMENTS

> *Journal of Personality and Social Psychology: IRGP* (2003-2018)
> *Personality and Social Psychology Bulletin* (2002-present)
> *Group Processes and Intergroup Relations* (2010-2013)
> *Psychological Inquiry* (2002)
> *Psychology of Women Quarterly* (2003-present)
> *Social Issues and Interventions* book series (sponsored by SPSSI; 2008)

## COUNCIL POSITIONS IN PROFESSIONAL ORGANIZATIONS

> *Society of Experimental Social Psychology* Executive Council, 2007-2010
> *Society for the Psychological Study of Social Issues* Council, 2007-2010

## VISITING AND SUMMER INSTITUTE POSITIONS

Universidad de Granada, Spain, *Consultation*, Supported by a Spanish Government grant for a 1-2 week visits to lecture, consult, and continue research collaborations, December 2007, June 2008, November 2008.

University of Marburg and University of Bielefeld, Germany, *Summer Institute*, September 2007

Society for Social and Personality Psychology's *Summer Institute in Social Psychology*, University of Texas at Austin, July 2007. Co-instructor with Alice Eagly (Northwestern University) for 2-week session on Gender, Power, and Roles

Pontificia Universidad Católica de Chile, June 2003. Two weeks as a visiting "outstanding psychologist" (sponsored by a Chilean government grant)

University of Jena, Germany, April 2002. Research consultant for the International Graduate College (a consortium involving the University of Jena, University of Kent at Canterbury, and University of Louvain-la-neuve in Belgium)

Visiting Associate Professor, University of Massachusetts at Amherst, 1993-94

## BOOKS

Rudman, L. A., & Glick, P. (2021). *The Social Psychology of Gender: How Power and Intimacy Shape Gender Relations* (2nd Ed.). New York: Guilford Press.

Dovidio, J. F., Hewstone, M., Glick, P. & Esses, V. M. (Eds.). (2010). *The Sage Handbook of Prejudice, Stereotyping, and Discrimination*. London: Sage Publications.

Dovidio, J. F., Glick, P., & Rudman, L. A. (Eds.). (2005). *On the Nature of Prejudice: 50 Years After Allport*. Malden, MA: Blackwell Publishing.

## EDITORSHIP OF SPECIAL JOURNAL ISSUES

Berdahl, J. L., Cooper, M. & Glick, P. (2018). Work as a masculinity contest. *Journal of Social Issues*, *74*(3).

Lee, T., Fiske, S. T., & Glick, P. (2010). Special Issue on Ambivalent Sexism. *Sex Roles, 62*.

## PUBLICATIONS

Glick, P. (2020). Take that detour: Unexpected influences on a research career. In King, E., Roberts, Q, & Hebl, M. (Eds.) *Perspectives on Work and Gender* (pp. 101-116). Information Age Publishing.

Glick, P. (2020). Masks and emasculation: Why some male leaders won't take COVID-19 safety precautions. *Scientific American*, *322*(2), 10.

Ramati-Ziber, L., Shnabel, N., & Glick, P. (2020). The beauty myth: Prescriptive beauty norms for women reflect hierarchy-enhancing motivations leading to discriminatory employment practices. *Journal of Personality and Social Psychology*, *119*, 317-343.

Glick, P. (2019). Gender, sexism, and the election: did sexism help Trump more than it hurt Clinton?. *Politics, Groups, and Identities*, *7*(3), 713-723.

Berdahl, J. L., Cooper, M., & Glick, P. (Nov 2, 2018). How masculinity contests undermine organizations and what to do about it. *Harvard Business Review*.

Glick, P., Berdahl, J. L., & Alonso, N. M. (2018). Development and validation of the masculinity contest culture scale. *Journal of Social Issues*, *74*(3), 449-476.

Berdahl, J. L., Cooper, M., Glick, P., Livingston, R. W., & Williams, J.C. (2018). Work as a masculinity contest. *Journal of Social Issues 74*(3), 422-448.

Diekman, A. B., & Glick, P. (2018). The role of attitudes in gender. In *Handbook of Attitudes, Volume 2: Applications* (pp. 408-428). Routledge.

Bareket, O., Kahalon, R., Shnabel, N., & Glick, P. (2018). The Madonna-Whore dichotomy: Men who perceive women's nurturance and sexuality as mutually exclusive endorse patriarchy and show lower relationship satisfaction. *Sex Roles*, 1-14.

Rudman, L. A., Glick, P., Marquardt, T., & Fetterolf, J. C. (2017). When women are urged to have casual sex more than men are: perceived risk moderates the sexual advice double standard. *Sex roles*, *77*(5-6), 409-418.

Bear, J. B., & Glick, P. (2017). Breadwinner bonus and caregiver penalty in workplace rewards for men and women. *Social Psychological and Personality Science*, *8*(7), 780-788.

Glick, P., & Raberg, L. (2017). Benevolent sexism and the status of women. In C. B. Travis & J. W. White (Eds.). *Handbook of the Psychology of Women* (pp. 363-380). Washington, DC: American Psychological Association.

Baily Wolf, E., & Glick P. (2016). Competent but cold: The Stereotype Content Model and envy in organizations. In R. H. Smith, U. Merlone, & M. Duffy (Eds). *Envy at work and in organizations*. Oxford: Oxford University Press.

Glick, P., Sakallı-Uğurlu, N., Akbaş, G., Metin Orta, I., & Ceylan, S. (2016). Why do women endorse honor beliefs? The relationship of ambivalent Sexism and Islamic religiosity to Turkish men and women's honor beliefs. *Sex Roles, 75,* 543-554.

Cuddy, A. J. C., Baily Wolf, B., Glick, P., Crotty, S., Chong, J, & Norton, M. I. (2015). Men as cultural ideals: Cultural values moderate gender stereotype content. *Journal of Personality and Social Psychology, 109,* 622-635.

Glick, P., Wilkerson, M., & Cuffe, M. (2015). Masculine identity, ambivalent sexism, and attitudes toward gender subtypes. *Social Psychology, 46,* 210-217.

Connor, R. A., Glick, P, & Fiske, S.T. (2015) Ambivalent sexism in the 21st century. For C. Sibley & F. Barlow (Eds). *Cambridge Handbook of the Psychology of Prejudice.* Cambridge University Press.

Glick, P. (2015). Victims of success. How envious prejudice foments genocidal intent and undermines moral outrage. In C. A. Small (Ed.). *The Yale Papers: Antisemitism in comparative perspective* (pp. 287-298). N.Y.: ISGAP.

Glick, P. (2014). Encouraging confrontation. *Journal of Social Issues, 70,* 779-791.

Rollero, C., Glick, P., & Tartaglia, S. (2014). Psychometric Properties of Short Versions of the Ambivalent Sexism Inventory and Ambivalence Toward Men Inventory. *TPM - Testing, Psychometrics, Methodology in Applied Psychology, 21,* 149-159.

Aranda, B., & Glick P. (2014). Expressing work devotion eliminates the motherhood penalty. *Group Processes and Intergroup Relations, 17,* 91-99.

Hart, J., Glick, P. & Dinero, R. E. (2013). She loves him, she loves him not: Attachment style as a predictor of women's ambivalent sexism toward men. *Psychology of Women Quarterly, 37*, 507-518.

Glick, P. (2013). BS at work: How benevolent sexism undermines women and justifies backlash. In *Gender and Work: Challenging Conventional Wisdom* (pp. 44-50). Boston, MA: Harvard Business School.

Glick, P., & Paluck, E. L. (2013). The aftermath of genocide: History as proximate cause. *Journal of Social Issues, 69*, 200-208.

Hart, J., Hung, J. A., Glick, P. & Dinero, R. E. (2012). He loves her, he loves her not: Attachment style as a personality antecedent to men's ambivalent sexism. *Personality and Social Psychology Bulletin, 38*,1495-1505.

Rudman, L. A., Moss-Racusin, C. A., Glick, P., & Phelan, J. E., & (2012). Reactions to vanguards: Advances in backlash theory. In P. Devine & A. Plant (Ed.). *Advances in Experimental Social Psychology* (Vol. 45, pp. 167-228) San Diego, CA: Academic Press.

Cuddy, A. J. C., Glick, P., & Beninger, A. (2011). The dynamics of warmth and competence judgments, and their outcomes in organizations. In B. M. Staw & A. Brief (Eds.). *Research in Organizational Behavior, 31*, 73-98.

Glick, P. & Fiske, S. T. (2011). Ambivalent sexism revisited. *Psychology of Women Quarterly*. 35, 530-535.

Becker, J. C., Glick, P., Ilic, M., & Bohner, G. (2011). Damned if she does, damned if she doesn't: Consequences of accepting versus confronting patronizing help for the female target and male actor. *European Journal of Social Psychology, 41*, 761-773.

DeLemus, S., Moya, M., & Glick, P. (2010). When contact correlates with prejudice: Adolescents' romantic relationship experience predicts greater benevolent sexism in boys and hostile sexism in girls. *Sex Roles, 63*, 214-225.

Glick, P. & Whitehead, J. (2010). Hostility toward men and the perceived stability of male dominance. *Social Psychology, 41,* 177-185.

Lee, T. L., Fiske, S. T., & Glick, P. (2010). Next gen ambivalent sexism: Converging correlates, causality in context, and converse causality. *Sex Roles, 62,* 395-404.

Lee, T. L., Fiske, S. T., Glick, P., & Chen, Z. (2010). Ambivalent sexism in close relationships: (Hostile) power and (benevolent) romance shape relationship ideals. *Sex Roles, 62,* 583-601.

Expósito, F., Herrera, M. C., Moya, M., & Glick, P. (2010). Don't rock the boat: Women's benevolent sexism predicts fears of marital violence. *Psychology of Women Quarterly, 34*, 20-26.

Glick, P. & Rudman, L. A. (2010). Sexism. In J. F. Dovidio, M. Hewstone, P. Glick, & V. M. Esses (Eds.) *Handbook of prejudice, stereotyping, and discrimination* (pp. 328-344). Newbury Park, CA: Sage.

Cikara, M., Lee, T. L., Fiske, S. T., & Glick, P. (2009) Ambivalent sexism at home and at work: How attitudes toward women in relationships foster exclusion in the public sphere. To appear in Jost, J. T., Kay, A. C., & Thorisdottir, H. (Eds). *Social and psychological bases of ideology and system justification* (pp. 444-462). New York: Oxford University Press.

Cuddy, A. J. C., Fiske, S. T., Kwan, V. S. Y., Glick, P., Demoulin, S., Leyens, J-Ph. et al. (2009). Is the Stereotype Content Model culture-bound? A cross-cultural comparison reveals systematic similarities and differences. *British Journal of Social Psychology, 48*, 1-33.

Glick, P. (2008). When neighbors blame neighbors: Scapegoating and the breakdown of ethnic relations. In V. M. Esses & R. A. Vernon (Eds).  *Explaining the breakdown of ethnic relations: Why neighbors kill* (pp. 123-146). Malden, MA: Blackwell.

Rudman, L. A., Glick, P., & Phelan, J. E. (2008). From the laboratory to the bench: Gender stereotyping research in the courtroom. In E. Borgida & S. T. Fiske (Eds). *Beyond common sense: Psychological science in the courtroom* (pp. 83-101). Malden, MA: Blackwell.

Glick, P. (2008). Restating the case: The benefits of diverse samples for theory development. *Psychological Inquiry, 19*, 78-83.

Cuddy, A. J. C., Fiske, S. T., & Glick, P. (2008). Warmth and competence as universal dimensions of social perception: The Stereotype Content Model and the BIAS Map. In M. P. Zanna (Ed.). *Advances in Experimental Social Psychology* (Vol. 40, pp. 61-150). Thousand Oaks, CA: Academic Press.

Glick, P., Chrislock, K., Petersik, K., Vijay, M., & Turek, A. (2008). Does cleavage work at work? Men, but not women, falsely believe in the power of cleavage to sell a weak product. *Psychology of Women Quarterly, 32*, 326-335.

Sakallı-Uğurlu, N., Yalçın, Z. S., & Glick, P. (2007). Ambivalent sexism, belief in a just world, and empathy as predictors of Turkish students' attitudes toward rape victims. *Sex Roles, 57,* 889-895.

Glick, P., Gangl, C., Gibb, S., Klumpner, S., Weinberg, E. (2007). Defensive reactions to masculinity threat: More negative affect toward effeminate (but not masculine) gay men. *Sex Roles, 57*, 55-59.

Moya, M., Glick, P., Expósito, F., De Lemus, S. & Hart, J. (2007). It's for your own good: Benevolent sexism and women's reactions to protectively justified restrictions. *Personality and Social Psychology Bulletin, 33*, 1421-1434.

Hebl, M. R., King, E., Glick, P., Singletary, S. L. & Kazama, S. M. (2007). Hostile and benevolent reactions toward pregnant women: Complementary interpersonal punishments and rewards that maintain traditional roles. *Journal of Applied Psychology, 92*, 1499-1511.

Fiske, S. T., Cuddy, A. J. C., & Glick, P. (2007). Universal dimensions of social cognition: Warmth and competence. *Trends in Cognitive Science, 11*, 77-83.

Cuddy, A. J. C., Fiske, S. T., & Glick, P. (2007). The BIAS Map: Behaviors from intergroup affects and stereotypes. *Journal of Personality and Social Psychology, 92,* 631-648.

Glick, P., & Fiske, S. T. (2007). Sex discrimination: The psychological approach. In F. J. Crosby, M. S. Stockdale, and S. A. Ropp (Eds.). *Sex discrimination in the workplace* (pp. 155-187). Malden, MA: Blackwell.

Glick, P., Fiske, S. T., Abrams, D., Dardenne, B., Ferreira, M. C., Gonzalez, R., Hachfeld, C., Huang, L-L., Hutchison, P., Kim, H-J., Manganelli, A. M., Masser, B., et al. (2006). Anti-American Sentiment and America's Perceived Intent to Dominate: An 11-Nation Study. *Basic and Applied Social Psychology, 38*, 363-373.

Eastwick, P. W., Eagly, A. H., Glick, P., Johannesen-Schmidt, M., Fiske, S. T., et al. (2006). Is traditional gender ideology associated with sex-typed mate preferences? A test in nine nations. *Sex Roles, 54*, 603-614.

Glick, P., Larsen, S., Johnson, C., Branstiter, H. (2005). Evaluations of sexy women in low and high status jobs. *Psychology of Women Quarterly, 29*, 389-395.

Moya, M., Poeschl, G., Glick, P., Páez, D. Sedano, I. F. (2005) Sexisme, Masculinité-Féminité et Facteurs Culturels [Sexism, Masculinity-Femininity, and Cultural Factors], *Revue Internationale de Psychologie Sociale, 18*, 141-167.

Glick, P. (2006). Ambivalent sexism, power distance, and gender inequality across cultures. In S. Guimond (Ed.). *Social comparison processes and levels of analysis* (pp. 283-302). Cambridge: Cambridge University Press.

Glick, P. (2005). Choice of scapegoats. In J. F. Dovidio, P. Glick, & L. A. Rudman (Eds.). *On the nature of prejudice: 50 years after Allport* (pp. 244-261). Malden, MA: Blackwell.

Dovidio, J. F., Glick, P., & Rudman, L. A. (2005). Reflecting on *The Nature of Prejudice*: Fifty years after Allport. In J. F. Dovidio, P. Glick, & L. A. Rudman (Eds.). *On the nature of prejudice: 50 years after Allport* (pp. 1-15). Malden, MA: Blackwell.

Cuddy, A. J. C., Fiske, S. T., & Glick, P. (2004). When professionals become mothers, warmth doesn't cut the ice. *Journal of Social Issues, 4*, 701-718.

Glick, P., Lameiras, M., Fiske, S. T., Eckes, T., Masser, B., Volpato, C., Manganelli, A. M., Pek, J., Huang, L., Sakalli-Ugurlu, N., Castro, Y. R., D'Avila Pereira, M. L., Willemsen, T. M., Brunner, A., Six-Materna, I, & Wells, R. (2004). Bad but bold: Ambivalent attitudes toward men predict gender inequality in 16 nations. *Journal of Personality and Social Psychology*, *86*, 713–728.

Sakalli-Ugurlu, N., & Glick P. (2003). Ambivalent sexism and attitudes toward women who engage in premarital sex in Turkey. *Journal of Sex Research, 40*, 296-302.

Moya, M., Páez, D., Glick, P., Fernández, I., & Poeschl, G. (2003). Sexismo, masculinidad-feminidad y factores culturales [Sexism, masculinity-femininity and cultural factors]. *Revista Española de Motivación y Emoción, 4,* 8-9.

Glick, P., Lameiras, M., & Castro, Y. R. (2002). Education and Catholic religiosity as predictors of hostile and benevolent sexism toward women and men. *Sex Roles, 47*, 433-441.

**Glick, P., Sakalli-Ugurlu, N., Ferreira, M. C., & Aguiar de Souza, M.  (2002). Ambivalent sexism and attitudes toward wife abuse in Turkey and Brazil.** ***Psychology of Women Quarterly, 26*, 291-296.**

Fiske, S. T., Cuddy, A. J. C., Glick, P., & Xu, J. (2002). A model of (often mixed) stereotype content: Competence and warmth respectively follow from perceived status and competition. *Journal of Personality and Social Psychology, 82*, 878-902.

Fiske, S. T., Cuddy, A. J. C., & Glick, P. (2002). Emotions up and down: Intergroup emotions result from perceived status and competition. In D. M. Mackie & E. R. Smith (Eds.), *From Prejudice to Intergroup Emotions: Differentiated reactions to social groups* (pp. 247-264). New York: Psychology Press.

Glick, P. (2002). Sacrificial lambs dressed in wolves' clothing: Envious prejudice, ideology, and the scapegoating of Jews. In L. S. Newman & R. Erber (Eds.), *Understanding genocide: The social psychology of the Holocaust* (pp. 113-142). Oxford: Oxford University Press.

Glick, P., & Fiske, S. T. (2002). Ambivalent responses. *American Psychologist, 57*, 444-446

Glick, P., & Fiske, S. T. (2002, Winter). Perceived legitimacy and the struggle for civil rights. *Civil Rights Journal, 6(1)*, 72-74.

Glick, P. (2002, November) Isolation, interdisciplinarity, and inspiration: Doing research at a liberal arts college. *APS Observer, 15(9)*, 5, 50.

Glick, P., & Fiske, S. T. (2001) Ambivalent stereotypes as legitimizing ideologies: Differentiating paternalistic and envious prejudice. In J. T. Jost & B. Major (Eds.), The *Psychology of legitimacy: Emerging perspectives on ideology, justice, and intergroup relations*, (pp. 278-306). New York: Cambridge University Press.

Rudman, L. A., & Glick, P. (2001). Prescriptive gender stereotypes and backlash toward agentic women. In Carli, L. L. & Eagly, A. H. (Eds.), *Journal of Social Issues, 57*, 743-762.

Glick, P., & Fiske, S. T. (2001). Ambivalent sexism. In M. P. Zanna (Ed.), *Advances in Experimental Social Psychology* (Vol. 33, pp. 115-188). Thousand Oaks, CA: Academic Press.

Glick, P., & Fiske, S. T. (2001). An ambivalent alliance: Hostile and benevolent sexism as complementary justifications of gender inequality. *American Psychologist, 56*, 109-118.

Glick, P., Fiske, S. T., Mladinic, A., Saiz, J, Abrams, D., Masser, B., Adetoun, B., Osagie, J., Akande, A., Alao, A., Brunner, A., Willemsen, et al. (2000). Beyond prejudice as simple antipathy: Hostile and benevolent sexism across cultures. *Journal of Personality and Social Psychology, 79*, 763-775.

Glick, P., & Hilt, L. (2000). From combative children to ambivalent adults: The development of gender prejudice. In T. Eckes & M. Trautner (Eds.), *Developmental social psychology of gender*. Mahwah, NJ: Erlbaum.

Glick, P. & Fiske, S. T. (1999).  Gender, power dynamics, and social interaction. In J. Lorber, M. M. Ferree, & B. Hess (Eds.), *Revisioning gender* (pp. 365-398). Newbury Park, CA: Sage.

Glick, P., & Fiske, S. T. (1999).  Sexism and other "isms": Interdependence, status, and the ambivalent content of stereotypes.  In W. B. Swann, Jr., L. A. Gilbert, & J. Langlois (Eds.), *Sexism and stereotypes in modern society: The gender science of Janet Taylor Spence* (pp. 193-222).  Washington, D.C.: American Psychological Association.

Fiske, S. T., Xu, J., Cuddy, A. J. C., & Glick, P. (1999). Respect versus liking: Status and interdependence underlie ambivalent stereotypes. *Journal of Social Issues, 55*, 473-489.

Rudman, L. A., & Glick, P. (1999). Feminized management and backlash toward agentic women: The hidden costs to women of a kinder, gentler image of middle-managers. *Journal of Personality and Social Psychology, 77*, 1004-1010.

Glick, P., & Fiske, S. T. (1999).  The Ambivalence toward Men Inventory: Differentiating hostile and benevolent beliefs about men. *Psychology of Women Quarterly, 23(3)*, 519-536.

Expósito, F., Moya, M., & Glick P. (1998). Sexismo ambivalente: Medición y correlatos. *Revista de Psicología Social, 13*, 159-169.

Glick, P., Diebold, J., Bailey-Werner, B., & Zhu, L. (1997).  The two faces of Adam: Ambivalent sexism and polarized attitudes toward women.  *Personality and Social Psychology Bulletin, 23*, 1323-1334.

Glick, P., & Fiske, S. T. (1997). Hostile and benevolent sexism:  Measuring ambivalent sexist attitudes toward women.  *Psychology of Women Quarterly*, Special Issue: Measuring attitudes toward appropriate roles for men and women, *21*, 119-135.

Glick, P. & Fiske, S. T. (1996). The Ambivalent Sexism Inventory: Differentiating hostile and benevolent sexism. *Journal of Personality and Social Psychology, 70*, 491-512.

Glick, P., Wilk, K., & Perreault, M.  (1995). Images of occupations: Components of gender and status in occupational stereotypes. *Sex Roles, 32*, 565-582.

Fiske, S. T., & Glick, P. (1995). Ambivalence and stereotypes cause sexual harassment: A theory with implications for organizational change.  *Journal of Social Issues, 51*, 97-115.

Glick, P. (1991). Trait-based and sex-based discrimination in occupational prestige, occupational salary, and hiring. *Sex Roles, 25*, 351-378.

Glick, P., Gottesman, D., & Jolton, J. (1989). The fault is not in the stars:  Susceptibility of skeptics and believers in astrology to the Barnum effect. *Personality and Social Psychology Bulletin, 15*, 178-186.

Glick, P., Zion, C., & Nelson, C. (1988).  What mediates sex discrimination in hiring decisions? *Journal of Personality and Social Psychology, 55*, 178-186.

Glick, P., DeMorest, J. A., & Hotze, C. A.  (1988). Self-monitoring and beliefs about partner compatibility in romantic relationships. *Personality and Social Psychology Bulletin, 14*, 485-494.

Glick, P., DeMorest, J. A., & Hotze, C. A.  (1988). Keeping your distance: Group membership, personal space, and requests for small favors. *Journal of Applied Social Psychology, 18*, 315-330.

Glick, P. (1985). Orientations toward relationships: Choosing a situation in which to begin a relationship. *Journal of Experimental Social Psychology, 21,* 544-562.

Snyder, M., Berscheid, E., & Glick, P.  (1985). Focusing on the exterior and the interior: Two investigations of the initiation of personal relationships. *Journal of Personality and Social Psychology, 48*, 1427-1439.

Glick, P. (1987, August). Stars in our eyes. *Psychology Today*, 6-7.

Glick, P., & Cohen, P. (1987, April 15). Prejudice, human nature, and contemporary history. *Black Issues in Higher Education*, 4-6.

Glick, P. (1987, February). Help, at a distance. *Psychology Today*, 66-67.

Glick, P., & Snyder, M.  (1986, May/June).  Self-fulfilling prophecy:  The psychology of belief in astrology.  *The Humanist*, 20-25.

**SELECTED RECENT MEDIA COVERAGE**

*CNN Business, Dec 2018,* on masculinity contest research

*Harvard Business Review, Nov 2018,* coauthored article on masculinity contest research

*New York Times, Nov 2018,* on psychology of anti-Semitism

*Harvard Business Review,* July 2017, on patronizing behavior toward women at work

*Boston Globe, Oct 2017,* coauthored op-ed with Amy Cuddy on gender stereotypes

*PBS NewsHour, June, 2016*, on sexism in the presidential election with interactive

**INVITED TALKS**

Stanford University (keynote, VMware Women's Innovation Lab corporate sponsors), 2018
Harvard Business School, Gender and Work Symposium, 2017
University of Leuven (KU), 2015 (keynote address and workshops)
Georgetown University McDonough School of Business, 2015
Harvard Business School, 2013
Union College, 2011
INSEAD, 2009
Kellogg School of Management, Northwestern University, 2009
Rotman School of Business, University of Toronto, 2009
Yale University, 2009
School of Management, Yale University, 2009
The Johnson School of Business, Cornell University, 2009
Hamilton College, 2009
Jones School of Management, Rice University, 2008
Kellogg School of Management, Northwestern University, 2008
New York University, 2007
Universidad de Granada,  2007
European Association of Experimental Social Psychology, 2007
University of Minnesota, 2006

Stanford University, 2006
Yale University, Hovland Memorial Lecture, 2005
University of Wisconsin-Madison, 2005
Miami University of Ohio, 2005
Purdue University, 2005
University of Western Ontario, 2004
Princeton University, 2004
Midwestern Psychological Association, Chicago, May 1990

**ANTI-BIAS TRAINING**

- ***Airbnb:*** Co-developed online anti-bias training for hosts, 2016
- ***Cognizant:*** Helped to develop anti-bias training, 2016-17)

**EXECUTIVE EDUCATION**

- ***Stanford VMWare Women's Innovation Lab keynote for corporate sponsors,*** 2018
- ***Harvard Kennedy School,*** 2017 & 2018
- ***Bayer Healthcare***, 2016
- ***Harvard Business School,*** 2014

**EXPERT WITNESS LITIGATION LIST (most recent listed first)**

Jay Gould v. Interface, Inc. United States District Court for the Northern District of Georgia, Atlanta Division.
Civil Action No.: 1:20-cv-00695-SDG-CCB (report, deposition)

Paulette Fauceglia v. University of Southern California (2020)
U.S. District Court for Central District of California
Case No. 2:19-vcv-04738-FMO-GEM (report, deposition)

Pamela Ries, EdD. v. University of Iowa (2020)
District Court of Iowa for Polk County (report)

Sejal Quayle, M.D. v. Catholic Health Initiatives Colorado, Centura Health-Mercy Regional Medical Center, Centura Health Physician Group, & Will McConnell (2020)
United States District Court for the District of Colorado
Case No. 19-cv-02175-KLM (report)

Alexandra Criscione v. UnitedHealth Group Inc., United HealthCare Services, Inc., UnitedHealth Networks, Inc., Specialized Care Services, Inc. and Optum Group, LLC (2019)
U.S. District Court for the Middle District of North Carolina, Greensboro Division
Case No. 1:18-CV-856 (report, deposition)

Deepa Soni, M.D. v. Robert Wespiser, M.D., Timothy Counihan, M.D., Berkshire Medical Center, Berkshire Faculty Services, Inc., and Berkshire Health Systems, Inc. (2019)
U.S. District Court for the District of Massachusetts
Case No. 1:16-cv-10630 (report, deposition)

Angela Gardner v. Serve 20:28, Inc.; Lincoln McIlravy; Old Capitol Hospitality, LLC; Cantilever hotels, LLC. (2018)
Iowa District Court for Johnson County
Case No. LACV078706 (report)

Stephenie R. Ruffin v Schindler Elevator Corp. (2017)
U.S. District Court for the Eastern District of Wisconsin, Milwaukee Division
Case No. 16-cv-01537 (report)

Debby DeLuca v. Sirius XM Radio, Inc. (2016)
U.S. District Court: Southern District of New York
Case No. 12-CV-08329 (report)

Kimberly A. Tornabene v. Northwest Permanente, P.C. (2016)
U.S. District Court: District of Oregon, Portland Division
Case No. 3:14-cv-01564-SI (report)

Lesley Cooney v. Missoula Spartan, LLC, Subaru of Missoula (2015)

Montana Department of Labor and Industry. Office of Administrative Hearings
Human Rights Bureau Case No. 0141016978, Hearings Case No. 1254-2015 (report)


Lynette Sherman v. Greenbrier Hotel Corporation (2010).
U.S. District Court: Southern District of West Virginia at Beckley.
Civil Action No. 09-C-1211 (report)

Sagun Tuli, M.D. v. Brigham & Women's Hospital, Inc. and Arthur Day, M.D. (2009)
U.S. District Court, District of Massachusetts; Case Number 07CV12338-NG (report, deposition,
testified in Federal Court)

Theresa M. Metty v. Motorola, Inc. (2006)
U.S. District Court, Northern District of Illinois – Eastern Division; Case Number 05C 4113
(report, deposition, testified in Federal Court)

Shaffer v. Converge Medical, Inc (2004)
Superior Court of the State of California, Alameda County; Case Number RGO 3118693 (report)

Carlson et al. v. C. H. Robinson Worldwide (2003)
Hennepin County District Court; Case Number CV-02-3780 (JNE/JGL) (report)

Stephanie Adams v. Burroughs-Wellcome Company and Paul Hossenlopp (1995)
Superior Court of New Jersey; Docket Number L-411-95 (report, deposition)

Kelley v. Drexel University (1994)
U.S. District Court, Eastern District of Pennsylvania; Case Number 94-CV-5336 (report)

Alma P. Navato v. St. Luke's Hospital of Kansas City, et al. (1991)
U.S. District Court, Western District of Missouri; Case Number 90-0068-CV-W-6 (report)