# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

| | |
|---|---|
| EVDOKIA NIKOLOVA, <br>     *Plaintiff* <br><br> v. <br><br> THE UNIVERSITY OF TEXAS AT AUSTIN, <br>     *Defendant* | § <br> § <br> § <br> §     CIVIL NO. 1-19-CV-877-RP <br> § <br> § <br> § <br> § |

## O R D E R

Before the Court are Defendant's Motion to Exclude Opinion and Testimony of Plaintiff's Expert Dr. Peter Glick (Dkt. 49), filed November 16, 2021; Plaintiff's Response to Defendant's Motion to Exclude Opinion and Testimony of Plaintiff's Expert Dr. Peter Glick (Dkt. 53), filed December 14, 2021; and Defendant's Reply in Support of its Motion to Exclude Opinion and Testimony of Plaintiff's Expert Dr. Peter Glick (Dkt. 54), filed December 21, 2021. On December 20, 2021, the District Court referred the motion and related filings to the undersigned Magistrate Judge for disposition, pursuant to 28 U.S.C. § 636(b)(1)(A), Federal Rule of Civil Procedure 72, and Rule 1(c) of Appendix C of the Local Rules of the United States District Court for the Western District of Texas.

### I.   Background

Plaintiff Evdokia Nikolova, Ph.D., is an assistant professor in the Electrical and Computer Engineering Department ("ECE Department") in the Cockrell School of Engineering at The University of Texas at Austin ("UT Austin"). In the 2015-16 academic year, Plaintiff took a "probationary extension" and "modified instructional duty" ("MID") for pregnancy and childbirth. First Am. Compl. (Dkt. 21) ¶ 15. In the 2018-19 academic year, UT Austin considered Plaintiff

for tenure and promotion. On November 20, 2018, UT Austin's Dean of the School of Engineering Sharon Wood "recommended against what she referred to as Dr. Nikolova's 'early promotion' for tenure." *Id.* ¶ 40.

After Plaintiff was denied tenure, she filed this employment discrimination lawsuit against UT Austin, alleging (1) sex and pregnancy discrimination, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.§ 2000e, and the Texas Commission on Human Rights Act ("TCHRA"), Chapter 21 of Texas Labor Code; (2) retaliation, in violation of Title VII and the TCHRA; and (3) a violation of the Equal Pay Act of 1963, 29 U.S.C. § 206(d)(1). Plaintiff alleges that UT Austin's probationary extension and MID policies "have the effect of discriminating against female assistant professors and/or those who become pregnant during their tenure review time period compared with other assistant professors." Dkt. 21 ¶ 45. Plaintiff further avers that UT Austin treated her differently and subjected her to a higher level of scrutiny than it did male assistant professors, as well as female assistant professors who had not become pregnant and had not taken probationary extension leave for pregnancy. Plaintiff complains that UT Austin also awarded tenure to other male professors in the ECE Department who had less time as working as assistant professors than Plaintiff, and applied more lenient and favorable standards to those male professors.

On July 15, 2020, UT Austin filed a partial motion to dismiss Plaintiff's TCHRA discrimination and retaliation claims under Federal Rule of Civil Procedure 12(b)(1) based on sovereign immunity, and Plaintiff's Equal Pay Act claims for failure to state a plausible claim for relief under Federal Rule of Civil Procedure 12(b)(6). Dkt. 22. On November 13, 2020, the undersigned issued a Report and Recommendation recommending that the District Court grant the motion to dismiss Plaintiff's claims under the TCHRA, but deny the motion to dismiss as to

Plaintiff's Equal Pay Act claim. Dkt. 28. The District Court adopted the Report and Recommendation and dismissed with prejudice Plaintiff's TCHRA claims. Dkt. 32.

On September 29, 2021, UT Austin filed a motion for summary judgment, arguing that the evidence is insufficient to raise a triable issue of fact on any of Plaintiff's Title VII claims. Dkt. 39. The motion for summary judgment is pending before the District Court. Jury trial in this case is set to commence on March 7, 2022. Dkt. 43.

UT Austin now moves to exclude the opinions and testimony of Plaintiff's social scientist expert, Dr. Peter Glick, under Federal Rule of Evidence 702.

## II.   Legal Standards

In *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 589 (1993), the Supreme Court held that trial judges must ensure that scientific testimony or evidence is not only relevant, but also reliable. Subsequently, Rule 702 of the Federal Rules of Evidence was amended to provide that a witness

> qualified as an expert . . . may testify . . . in the form of an opinion . . . if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

*Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004) (quoting FED. R. EVID. 702). The Rule 702 and *Daubert* analysis applies to all proposed expert testimony, including nonscientific "technical analysis" and other "specialized knowledge." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).

Under *Daubert*, expert testimony is admissible only if the proponent demonstrates that (1) the expert is qualified; (2) the evidence is relevant; and (3) the evidence is reliable. *See Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998); *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 989 (5th Cir. 1997). The overarching focus of a *Daubert* inquiry is the "validity and thus

3

evidentiary relevance and reliability—of the principles that underlie a proposed submission." *Watkins*, 121 F.3d at 989 (quoting *Daubert*, 509 U.S. at 594-95). The proponent of expert testimony bears the burden of establishing the reliability of the expert's testimony. *Sims v. Kia Motors of Am., Inc.*, 839 F.3d 393, 400 (5th Cir. 2016). Because the *Daubert* test focuses on the underlying theory on which the opinion is based, the proponent of expert testimony need not prove that the expert's testimony is correct, but rather that the testimony is reliable. *Moore*, 151 F.3d at 276. This determination of reliability includes a preliminary determination "whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93.

Trial courts ordinarily apply four factors when considering the reliability of scientific evidence: (1) whether the technique can be or has been tested; (2) whether it has been subjected to peer review or publication; (3) whether there is a known or potential rate of error; and (4) whether the relevant scientific community generally accepts the technique. *Id.* This test of reliability is flexible, and these factors "neither necessarily nor exclusively apply to all experts or in every case." *Kumho Tire*, 526 U.S. at 141.

Notwithstanding the testing of an expert's qualification, reliability, and admissibility, "the rejection of expert testimony is the exception rather than the rule." FED. R. EVID. 702 advisory committee's note to 2000 amendment. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

### III.   Analysis

Plaintiff has designated Dr. Peter Glick, a social science researcher, as an expert to provide information on stereotyping, bias, and discrimination in the workplace. Plaintiff produced Glick's

expert report on April 9, 2021,[1] and Glick was deposed on November 5, 2021.[2] Glick describes his report as follows:

> I will provide "social framework" testimony to inform the decision makers in this case about empirically validated principles concerning the operation of stereotypes and bias that can lead to workplace discrimination via double-standards toward women as compared to men. Social psychological and organizational research provides a scientific knowledge base illuminating the forms stereotyping and discrimination take, the circumstances that elicit stereotyping and bias, and their relation to discriminatory behavior. This information can substantially supplement decision-makers' knowledge, going beyond common assumptions about how stereotypes and biases operate.

Dkt. 49-1 at 7.

The majority of Glick's report discusses the social framework theory and how sex stereotypes and discrimination exist throughout society and in particular in the Science, Technology, Engineering, and Math ("STEM") fields. Specifically, Glick discusses gendered double standards, discrimination in STEM fields, discrimination and bias in students' evaluations of teachers, discrimination by female leaders in STEM, pregnancy and motherhood discrimination, discrimination due to work-life flexibility policies, how evaluation procedures can minimize or permit discrimination, and retaliation against women who complain about discrimination.

The last portion of Glick's report "considers how research on stereotyping, bias, and discrimination relates to Dr. Nikolova's case based on case documents I have reviewed." *Id.* at 41. Glick opines that "Dean Wood's "decision-making about Dr. Nikolova was consistent with bias toward pregnant women, mothers, and workplace accommodation policy use." *Id.* at 58. In addition, Glick opines that Dean Wood's gender and prior experiences could make her more likely to discriminate against Plaintiff. *Id.* at 60-61.

---

[1] Dkt. 49-1.

[2] Dkt. 49-2.

UT Austin argues that Glick's testimony should be excluded as unreliable under *Daubert* and Rule 702 because (1) his application of "social framework" analysis to this case is not based on reliable scientific methods; (2) he relied solely on information provided by Plaintiff; (3) he failed to rule out alternative explanations; and (4) his opinions will lead to prejudice and confuse the jury.

This Court previously excluded Glick's social framework opinions and testimony in another employment discrimination case after finding that his testimony was not based on reliable scientific methods and his opinions would not assist the trier of fact. *See Mullenix v. Univ. of Texas at Austin*, No. 1-19-CV-1203-LY-SH, 2021 WL 4304815, at *3-7 (W.D. Tex. Sept. 21, 2021). The Court finds that Glick's opinions and testimony in this case should be excluded for the same reasons.

### A. Glick's Application of "Social Framework" Analysis to This Case Is Not Based on Reliable Scientific Methods

In order to decide whether expert scientific testimony should be admitted, the Court first must determine whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. *Daubert*, 509 U.S. at 592.

> The subject of an expert's testimony must be "scientific knowledge." The testimony must be grounded in the methods and procedures of science and more than subjective belief or unsupported speculation. This is not to say it must be "known" to a certainty; arguably, there are no certainties in science. In order to qualify as "scientific knowledge," an inference or assertion must be derived by the scientific method.

*Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 388 (5th Cir. 2009) (cleaned up) (quoting *Daubert*, 509 U.S. at 589-90).

Glick acknowledges in his deposition testimony that his specific causation opinions are not based on scientific principles and methodology. For example, Glick acknowledges that:

> "Social frameworks experts often do not apply a scientific certainty standard because it may not be possible or not feasible to conduct a rigorous study to determine whether discrimination occurred in a specific case to an individual plaintiff. In such cases, experts cannot testify with scientific certainty about whether discrimination occurred."[3]

\* \* \*

> "Although I point out ways in which general principles can be applied to the current case and opine about where case facts are consistent with the possibility of discrimination, I expressly note that because alternative explanations cannot be ruled out, my case opinions do not carry the weight of scientific certainty."[4]

\* \* \*

> "Because alternative explanations offered by defendant to explain their actions cannot be ruled out scientifically, case decision-makers must ultimately decide whether they believe discrimination likely did or did not occur."[5]

\* \* \*

> That he cannot determine with a scientific certainty whether discrimination occurred in this case.[6]

Moreover, Glick admitted in his deposition that his specific causation opinions have not been tested, are not subjected to peer review or publication, and are not accepted by the relevant scientific community:

> Q. . . . Is there a scientific technique that supports the rendering of your judgment as to whether or not what occurred here would be consistent with potential bias and discrimination?
>
> A. So, again, I think you're asking me if the final section of my report involved doing a formal scientific study on the University of Texas and the people involved. And the answer is: No, I did not.
>
> Q. Are you aware of any scientific technique that would allow – that would support statements, the statements that are found in the – your section

---

[3] Glick Dep. (Dkt. 49-2) 69:4-18.

[4] *Id.* at 69:19-70:6.

[5] *Id.* at 70:8-19.

[6] *Id.* at 70:15-19.

>    regarding the application of this case as to whether Dean Wood's conduct was consistent with discrimination?
>
>    A. So, again, I'm applying my expertise in the scientific framework to offer avenues for the jury to consider and to make observations about the case; but that section of the report, as I made clear in the report, is not, itself, performing a scientific study. And I, therefore, resist making precise scientific conclusions as a result.
>
>    Q. And that methodology that you – or the opinions that you provide in Section V regarding application to this case are not based on methodologies that have been subject to peer review or publication; is that correct?
>
>    A. That – yes, that would be correct. I think that's basically what I was trying to say. And I think your other question was, you know, is there a method, you know, to determine, for instance, with a scientific certainty, whether discrimination occurred in a particular case. There isn't a method to do that, at least not for an individual case such as this.

Glick Dep. (Dkt. 49-2) at 199:23-201:4. Glick also acknowledged that he did not perform any studies of the Cockrell School of Engineering regarding bias or discrimination. *Id.* at 47:22-48:7; 73:9-18. Accordingly, Glick acknowledges that his opinions as to specific causation in this case are not scientific conclusions. *See E.E.O.C. v. Bloomberg L.P.*, No. 07 CIV. 8383 LAP, 2010 WL 3466370, at *15 (S.D.N.Y. Aug. 31, 2010) (rejecting similar social framework testimony where expert "[b]y his own admission . . . did not conduct a scientific study that would meet peer review standards"); *see also Van v. Ford Motor Co.,* 332 F.R.D. 249, 267 (N.D. Ill. 2019) (excluding specific causation social framework testimony where plaintiff failed to identify any reliable methodology used by expert).

In his "Application to Current Case" section of his report, Glick opines that:

>    Research on gender bias in student evaluations of teaching in STEM fields and pregnancy biases that reduce women's perceived competence and commitment suggest that Dr. Nikolova may have

8

received lower teaching ratings than similar male or non-pregnant female colleagues.[7]

In contrast to the more objective and benchmark-based approach taken by the Budget Council, Dean Wood used a subjective approach known to allow bias to affect decisions through subjective inferences and shifting standards.[8]

Dean Wood's perception that Dr. Nikolova showed decreased work commitment after pregnancy and childbirth is highly consistent with stereotypes toward pregnant women, mothers, and women who make used of workplace accommodations for family reasons. Both in terms of process (e.g., subjective interpretation) and content (inferred lack of commitment), the Dean's decision-making about Dr. Nikolova is consistent with bias toward pregnant women, mothers, and workplace accommodation policy use.[9]

Research suggests that Dean Wood's gender and prior experiences with discrimination would not serve to protect against bias against Dr. Nikolova, but rather could make discrimination more likely. Further, Dean Wood's attitude that "work life balance is a bit of a myth" is consistent with an ethos prizing work devotion that exacerbates bias against pregnant women, mothers, and women who use workplace accommodation policies for family purposes.[10]

These are the type of social framework opinions that "have elicited criticism from the very scholars" Glick relies on for his social framework analysis. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 355 n.8 (2011) (citing Monahan, Walker, & Mitchell, *Contextual Evidence of Gender Discrimination: The Ascendance of "Social Frameworks,"* 94 VA. L. REV. 1715 (2008)).

The originators of social framework science state that:

> The very idea of a social framework is to supply fact-finders with information about general social science research to provide a context or "framework" for the fact-finder to use when evaluating the evidence in a particular case. Thus, a social framework necessarily contains only general statements about reliable patterns of relations among variables as

---

[7] Dkt. 49-1 at 46.

[8] *Id.* at 54.

[9] *Id.* at 58.

[10] *Id.* at 60-61.

> discovered within social scientific research, whether communicated via jury instructions or testimony of a qualified expert, and goes no further.

*Id.* at 1745. These scholars further state that "Supreme Court's interpretations of [Rule 702] make it evident that unscientific speculation about the linkage of general research to a specific case is improper."

> There is little doubt that those experts who purport to link findings from academic studies to behaviors in particular cases do not apply the same level of intellectual rigor used to produce the empirical studies from which they extrapolate. Any attempt to link basic research findings to specific organizational settings and outcomes requires that many assessments be made about the presence and operation within the organization of variables that have been found to be important within the basic research settings. To make these assessments in a scientifically reliable way, the variables must be clearly defined, measured, and their relationships systematically tested, with the definitions, measurements, and tests reported in a transparent way so that another researcher could attempt to replicate the assessments. To qualify as scientific, a system of measurement or testing cannot be a private system that only one researcher (or expert) can apply. A scientific paper that contained only a series of descriptive conclusions and did not disclose the particular methods used and measurements taken to reach those conclusions would be promptly rejected by a scientific journal. Unfortunately, some courts have allowed experts to link social frameworks to the facts of particular cases despite the experts' failure to meet these scientific requirements.

*Id.* at 1736, 1738-39. The authors conclude: "If testimony about a specific case is to be offered by an expert, that testimony should be based on valid 'social fact' research that involves the parties before the court, rather than on subjective, unscientific extrapolation from general research conducted outside the case." *Id.* at 1749.

In *Dukes*, 564 U.S. at 359, the Supreme Court relied on this law review article to find that evidence presented by members of a putative class did not rise to the level of significant proof that Wal-Mart operated under a general policy of discrimination, as required to satisfy the commonality requirement and to permit certification of plaintiff class under Rule 23. Relying on social framework analysis, the plaintiffs' social science expert testified that Wal-Mart has a "strong

10

corporate culture," that makes it "vulnerable" to "gender bias." *Id.* at 354. The expert could not, however, "determine with any specificity how regularly stereotypes play a meaningful role in employment decisions at Wal-Mart." *Id.* At his deposition, the expert conceded "that he could not calculate whether 0.5 percent or 95 percent of the employment decisions at Wal-Mart might be determined by stereotyped thinking." *Id.* The Court did not rule on whether the expert's testimony met the *Daubert* standards because the district court had not addressed that issue at the trial level, but stated that,

> even if properly considered, [the expert's] testimony does nothing to advance respondents' case. "[W]hether 0.5 percent or 95 percent of the employment decisions at Wal-Mart might be determined by stereotyped thinking" is the essential question on which respondents' theory of commonality depends. If [the expert] admittedly has no answer to that question, we can safely disregard what he has to say. It is worlds away from "[s]ignificant proof" that Wal-Mart "operated under a general policy of discrimination."

*Id.* a 354-55. The Court further noted that the expert's "conclusions in this case have elicited criticism from the very scholars on whose conclusions he relies for his social-framework analysis." *Id.* at 354 n.8 (citing 94 VA. L. REV. 1715).

Thus, even if the underlying social science evidence on which Glick bases his opinions is reliable and accepted in the relevant scientific community, he "may not extrapolate unfounded conclusions from that evidence." *Van*, 332 F.R.D. at 267. Expert testimony should be excluded when "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Glick "may be a renowned social psychologist, but if he cannot explain how his conclusions satisfy Rule 702's requirements, then he is not entitled to give expert testimony." *Bloomberg*, 2010 WL 3466370, at *15 (internal citation and quotations omitted).

To support her argument that Glick's testimony should be permitted, Plaintiff attempts to distinguish *Dukes* and relies on *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), *superseded by statute*, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat 1071, *as recognized in Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009 (2020), and *U.S. v. Simmons*, 470 F.3d 1115 (5th Cir. 2006). Notably, both of these decisions predate *Dukes*. In addition, both cases are easily distinguishable from this one.

In *Price Waterhouse*, a female partnership candidate alleged that she was denied partnership because of her sex. 490 U.S. at 237. A social psychologist testified at trial that the partnership selection process at Price Waterhouse likely was influenced by sex stereotyping. *Id.* In finding that some of the partners' comments reflected sex stereotyping, the district court relied in part on the social psychologist's testimony. *Id.* at 255. On appeal, Price Waterhouse argued that the district court's factual conclusions were clearly erroneous and that it erred in considering the social psychologist's testimony, contending that "a social psychologist is unable to identify sex stereotyping in evaluations without investigating whether those evaluations have a basis in reality." *Id.* The Supreme Court found that Price Waterhouse had waived the argument by failing to object to the expert's testimony at trial. Thus, the Court did not address whether the expert's testimony was reliable under *Daubert*.

In *Simmons*, a criminal defendant, who had been convicted of sexual assault, argued that the government expert witness's testimony about rape victim conduct was unreliable. 470 F.3d at 1122. The expert, a licensed psychologist and a university professor of psychology who specialized in sexual violence and sexual victimization, testified that the victim's behavior following the incident, as well as her in-court testimony, were "quite consistent with that . . . of rape victims." *Id.* at 1124. The defendant argued that the research on rape necessarily is biased in favor of

believing purported victims and, therefore, no empirically valid or reliable forensic diagnostic techniques can be developed. The Fifth Circuit rejected this argument, finding that the expert's testimony was not inherently unreliable, reasoning that "naturally occurring circumstances, such as the social stigma attached to rape, may preclude ideal experimental conditions and controls." *Id.* at 1123. The court also stated that admission of the expert's testimony was consistent with the holdings of other circuits that have permitted such testimony in rape cases. *Id.* (collecting cases).

The Court finds Plaintiff's reliance on *Simmons* misplaced because this is an employment discrimination case, not a rape case. In addition, the *Simmons* court stated that: "Because there are areas of expertise, such as the social sciences in which the research, theories and opinions cannot have the exactness of hard science methodologies, trial judges are given broad discretion to determine whether *Daubert's* specific factors are, or are not, reasonable measures of reliability in a particular case." 470 F.3d at 1123 (internal quotations and citations omitted). The Court has used that broad discretion to find that Glick's opinions are not reliable in this case.[11]

### B. Glick Relied Only on Information Provided by Plaintiff

In addition, Glick's expert report is not reliable because it was based on unrepresentative data. By his own admission, Glick's opinions are based on selected documents provided to him by Plaintiff's counsel. Dkt. 49-1 at 10; Dkt. 49-2 at 58:24-59:1. Glick admitted in his deposition that he did not review UT Austin policies or procedures regarding tenure and promotion of UT faculty. Dkt. 49-2 at 61:14-62-1. Glick also admitted that he did not review the deposition of the decisionmaker in this case, Dean Wood. *Id.* at 59:10-60:16. Courts have excluded social framework expert testimony where it is based solely on information provided by the plaintiff. *See Bloomberg*, 2010 WL 3466370, at *14 (excluding social framework expert testimony and noting

---

[11] Plaintiff also relies on several cases outside of the Fifth Circuit in which courts have admitted social framework testimony. *See* Dkt. 53 at 12. This Court is bound by Supreme Court and Fifth Circuit precedent.

that relying solely on information provided by plaintiff "without independently verifying whether the information is representative undermines the reliability of his analysis"); *Childers v. Trustees of the Univ. of Pennsylvania*, No. CV 14-2439, 2016 WL 1086669, at *6 (E.D. Pa. Mar. 21, 2016) ("Much like the expert excluded in *Bloomberg*, 2010 WL 3466370, [the expert's] methodology of sifting through evidence to find passages that support the Plaintiff's theory of the case does not meet Rule 702's requirement of reliability."); *see also Munoz v. Orr*, 200 F.3d 291, 301 (5th Cir. 2000) (excluding expert testimony where expert relied on the plaintiffs' compilations of data, "which gives rise to a 'common-sense skepticism' regarding the expert's evaluation"). Accordingly, Glick's report should also be excluded on this basis.

**C.  Glick's Opinions Fail to Rule Out Alternative Explanations**

Glick admitted in his deposition that he cannot rule out other possible non-discriminatory reasons that Plaintiff was denied tenure. Dkt. 49-2 at 69:20-70:1 (acknowledging that "because alternative explanations cannot be ruled out, my case opinions do not carry the weight of scientific certainty"); 165:22-24 ("So what I'm saying is I can't rule out that, you know, [Dean Wood] would have acted the same way against a man."); 169:5-6 ("I can't rule out that -- those judgments are due to other reasons."). Courts have found expert opinions regarding bias and discrimination unreliable where the expert fails to consider other variables such as education and experience as explanations for employment decisions. *See Munoz*, 200 F.3d at 301 (affirming exclusion of expert witness where "he admitted to failing to consider other variables such as education and experience as explanations for any observed discrepancy between promotion rates and to not performing a multiple regression analysis."); *see also Tagatz v. Marquette Univ.*, 861 F.2d 1040, 1045 (7th Cir. 1988) (holding that failure to control for other explanatory variables makes an expert's table "essentially worthless").

### D. Glick's Opinions Will Not Assist the Trier of Fact

The Court further finds that Glick's testimony should be excluded because it could lead to prejudice and jury confusion. Because the majority of Glick's expert report focuses on gender stereotyping and bias throughout society, the jury may assume that such stereotyping and bias existed at UT Austin. The burden is on Plaintiff to prove that she was discriminated against because of her sex, not just that gender stereotyping or bias exists throughout society. *See E.E.O.C. v. Wal-Mart Stores, Inc.*, No. 6:01-CV-339-KKC, 2010 WL 583681, at *4 (E.D. Ky. Feb. 16, 2010) (finding testimony more prejudicial than probative where expert opined that gender stereotyping may be subconscious but identified no intentional act by defendant based on gender stereotyping). Therefore, Glick's entire report should be stricken, not just the specific causation section.

### IV. Conclusion

Based on the foregoing, the Court finds that Glick's report and testimony is unreliable and will not assist the trier of fact in this case. Accordingly, Defendant's Motion to Exclude Opinion and Testimony of Plaintiff's Expert Peter Glick (Dkt. 49) is **GRANTED** and Peter Glick's testimony and Expert Report are **EXCLUDED**.

The Court **FURTHER ORDERS** the Clerk to **REMOVE** this case from the Magistrate Court's docket and **RETURN** it the docket of the Honorable Robert Pitman.

**SIGNED** on February 14, 2022.

SUSAN HIGHTOWER
UNITED STATES MAGISTRATE JUDGE