## IN THE WESTERN DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| **EVDOKIA NIKOLOVA,** | § | |
| **Plaintiff** | § | **CIVIL ACTION** |
| | § | |
| **VS.** | § | **NO. 1:19-CV-00877-RP** |
| | § | |
| **UNIVERSITY OF TEXAS AT AUSTIN,** | § | **JURY REQUESTED** |
| **Defendant** | § | |

## PLAINTIFF'S MOTION TO MODIFY OR SET ASIDE THE ORDER STRIKING THE EXPERT TESTIMONY OF PROFESSOR PETER GLICK

TO THE HONORABLE ROBERT PITMAN:

Plaintiff Dr. Nikolova files this motion to modify or set aside one or more portions of Magistrate Hightower's Order (Dkt. 64) (the "Order") entered on February 14, 2022 striking the entire report and expert testimony of Dr. Peter Glick. This motion is timely filed pursuant to FRCP Rule 72(a) and Plaintiff shows the Court the following:

### I.    SUMMARY OF ARGUMENTS

The Order issued in this case striking the entire testimony (both research and opinions) of Dr. Peter Glick is, respectfully, clearly erroneous and contrary to law. It fails to follow Fifth Circuit precedent and other relevant decisions that hold that social science testimony of this sort is beneficial to the jury and admissible. The Order also fails to follow the fundamental principles of Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 589 (1993) that the exclusion of expert testimony should be the exception rather than the rule, and that the proper means of challenging disputed expert testimony is through "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Wal-Mart Stores v. Tex. Alcoholic Bev. Comm'n,* No. 1:15-cv-134-RP, 2017 U.S. Dist. LEXIS 230837, at *17 (W.D. Tex. 2017) at *24 (Pitman, J.).

1

The Order also mischaracterizes the nature and content of Professor Glick's report which is highly relevant to and directly part of the fact issues in this case. In addition to depriving the jury in this case of important scientific knowledge regarding discrimination that is widely accepted throughout the scientific and academic communities, the Order will be used as authority in other cases to support an unfounded across-the-board exclusion of this knowledge to the detriment of other juries and ultimately, our society. The scientific research regarding how, when and why discrimination occurs and how to stop it is important information that juries deserve to be allowed to hear, and is in complete alignment with the goals of Title VII and the laws of our country.

## II.     LEGAL STANDARDS FOR THE ADMISSIBILITY OF EXPERT TESTIMONY.

While the Order states the correct legal standards for evaluating the admissibility of expert testimony under Fed. R. Evid. 702 and *Daubert,* it does not follow those standards and applies them to the important issues in this case in an incorrect and clearly erroneous manner. As this Court (Judge Pitman) recognized in *Wal-Mart Stores v. TABC,* 2017 U.S. Dist. LEXIS 230837, at *17, "Notwithstanding the dictates of *Daubert,* the rejection of expert testimony is the exception rather than the rule. Fed R. Ev. 72. *Daubert* did not work a seachange over federal evidence law, and the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." A party who disagrees with testimony provided by an expert witness will be able to "employ the ordinary tools of the adversary process, including cross-examination and the admission of rebuttal evidence, to expose any deficiencies" in the proffered testimony. *Id.* at *24.

This Court's holding in *Walmart Stores v. TABC* is entirely consistent with the approach of the Fifth Circuit. In *Pipitone v. Biomatrix, Inc.,* 288 F.3d 239, 250 (5th Cir. 2002) the Fifth Circuit held that "[t]he fact-finder is entitled to hear [an expert's] testimony and decide whether it should accept or reject that testimony after considering all factors that weigh on credibility,

including whether the predicate facts on which [the expert] relied are accurate." Moreover, "as a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *Id.*

**III.   THE ORDER'S HOLDING THAT PROFESSOR GLICK'S REPORT ON SOCIAL FRAMEWORK IS NOT BASED ON RELIABLE SCIENTIFIC METHODS IS CLEARLY ERRONEOUS AND CONTRARY TO LAW.**

Dr. Glick's report and proposed trial testimony includes two substantive sections. The first examines the abundant peer-reviewed scientific studies and research into stereotypes, bias, discrimination and retaliation, including specifically in academia and STEM fields directly relevant to this case. The second consists of Dr. Glick's opinions and consideration regarding the application of the scientific research to this case. Dr. Nikolova moves to modify or set aside the striking of each section.

**A.   The Order Provides No Evidence or Authority That Research Section of Professor Glick's Report Is Not Based on Reliable Scientific Methods or Otherwise Should Be Excluded.**

The 14-page Order contains only two sentences that cursorily summarize the first section of Professor Glick's report regarding the scientific research relating to stereotyping, bias, and discrimination.[1] (Dkt. 64 at 5). The Order contains only one short paragraph that speaks to the legal reasoning why the first, research section of Glick's report should be stricken (as well as the second section). (*Id.* at 15). Importantly, the Order makes *no finding that the research portion of the report is not based upon reliable scientific methods.* Unquestionably this section is replete with peer-reviewed research about the "principles of stereotyping, bias, and discrimination that

---

[1] Plaintiff's Response to Defendant's Motion to Exclude (Dkt. 53) thoroughly explained both the research and opinion sections of Dr. Glick's report and briefed and responded to all of the issues raised in Defendant's motion. Plaintiff urges the Court to review Plaintiff's response. Respectfully, the Order fails to address in any meaningful way nearly all of the arguments and case law raised by Plaintiff.

have been established with scientific certainty based on well accepted empirical methodologies in psychology." (Dkt. 53-1 at 7). There is also no question that this scientific research is directly relevant to this case.

The Order's only explanation for the exclusion of the first research portion of Dr. Glick's report is as follows:

> The Court further finds that Glick's testimony should be excluded because it could lead to prejudice and jury confusion. Because the majority of Glick's expert report focuses on gender stereotyping and bias throughout society, the jury may assume that such stereotyping and bias existed at UT Austin. The burden is on Plaintiff to prove that she was discriminated against because of her sex, not just that gender stereotyping or bias exists throughout society. *See E.E.O.C. v. Wal-Mart Stores, Inc.*, No. 6:01-CV-339-KKC, 2010 WL 583681, at *4 (E.D. Ky. Feb. 16, 2010) (finding testimony more prejudicial than probative where expert opined that gender stereotyping may be subconscious but identified no intentional act by defendant based on gender stereotyping). Therefore, Glick's entire report should be stricken, not just the specific causation section.

The Order's conclusion that the research portion of the report should be excluded is clearly erroneous and contrary to law for multiple reasons.

### 1. The Fifth Circuit Has Specifically Held That Social Science Expert Testimony Is Admissible.

Initially, it should be noted that the Order completely ignored and failed to discuss or consider the numerous cases cited by Nikolova that have held that expert testimony on the scientific study of discrimination is clearly admissible, including an employment discrimination case that specifically ruled that expert social framework testimony by Dr. Glick himself was admissible. *Tuli v. Brigham & Women's Hosp., Inc.*, 592 F. Supp. 2d 208, 214-216 (D. Mass. 2009) (social framework analysis by Dr. Glick admissible in Title VII case). *See also Bowers v. NCAA*, 564 F. Supp. 2d 322, 361-62 (D.N.J. 2008) ("This is not cutting-edge science, but is instead a conventional social science approach that courts have routinely admitted as methodologically

reliable.")[2] In summarily dismissing these cases, the Order stated, "Plaintiff also relies on several cases outside of the Fifth Circuit in which courts have admitted social framework testimony. (Dkt. 53 at 12). This Court is bound by Supreme Court and Fifth Circuit precedent." (Dkt. 64 at 13). In spite of this, two pages later the Order then relies *solely* on *EEOC v. Wal-Mart Stores*, an unpublished decision from a district court in Kentucky, to support the exclusion of Professor Glick's research portion of the report. Such clear inconsistency, in and of itself, makes the Order suspect.

As discussed further *supra* in connection with the opinion section of Dr. Glick's report, the Supreme Court has ***not*** in any way held that social science or framework testimony is inadmissible or without relevance in a discrimination case. Moreover, the Order actually is *contrary* to Fifth Circuit precedent. The Fifth Circuit has specifically approved the admissibility of expert "social-science" testimony very similar to the research testimony offered by Glick.  In *United States v. Simmons*, 470 F.3d 1115, 1121-24 (5th Cir. 2006), the trial court in a sexual assault case allowed prosecutors to introduce expert testimony by a university psychology professor regarding the behaviors of victims of sexual assault. The professor provided testimony regarding the social science regarding such behavior generally (*e.g.,* non-reporting to police and feelings of shame,

---

[2] *See also Chinn v. Whidbey Pub. Hosp. Dist.*, No. C20-995 TSZ, 2021 U.S. Dist. LEXIS 216975, at *7-8 (W.D. Wash. 2021) (*citing Apilado v. N. Am. Gay Amateur Ath. All.*, No. C10-0682, 2011 U.S. Dist. LEXIS 159575, at *3-6 (W.D. Wash. 2011) ("As observed over a decade ago, ''[s]ocial framework' analysis . . . has become commonplace.'"); *Maciel v. Thomas J. Hastings Props.*, Civil Action No. 10-12167-JCB, 2012 U.S. Dist. LEXIS 204761, at *9 (D. Mass. 2012) ("Social science testimony is relevant and helpful to a jury in discrimination cases."); *Apilado*, 2011 U.S. Dist. LEXIS 159575, at *3-6, *citing Butler v. Home Depot, Inc.*, 984 F. Supp. 1257, 1264 (N.D. Cal. 1997) and Walker and Monahan, *Social Frameworks: A New Use of Social Science in Law*, 73 Va. L. Rev. 559 (1987) ("Social framework' analysis … can assist the jury's understanding of 'the causes, manifestations, and consequences of . . . stereotyping as well as the organizational circumstances which allow such stereotypes to flourish.'"); *Tyus v. Urban Search Mgmt.*, 102 F.3d 256, 263-4 (7th Cir. 1996) (error to exclude social framework testimony of professor of sociology in Fair Housing Act case); *MHANY Mgmt. Inc. v. County of Nassau*, 843 F. Supp. 2d 287, 318-319 (E.D.N.Y 2012) (urban planning expert testimony admissible regarding race euphemisms in Fair Housing Act case); *Chadwick v. WellPoint, Inc.,* 561 F.3d 38, 49 n. 14 (1st Cir. 2009) (sociological testimony admissible in Title VII case).

humiliation, and self-blame) and (similar to Glick's opinion testimony in this case) testified that the victim's behavior was "*quite consistent with that ... of rape victims*." *Id.* at 1123 (emphasis added). The defendant objected to the admission of the expert testimony on grounds similar to that relied on by the Order and claimed by Defendant UT – that the testimony was not reliable, was not based on "empirically valid or reliable forensic diagnostic techniques," and usurped the jury's role by providing testimony on the ultimate issue of whether the victim was sexually assaulted. The Fifth Circuit rejected all of these arguments. Additionally in reaching this holding, *Simmons* relied upon and *cited favorably to* a case allowing the introduction of social science testimony in a Title VII sexual harassment case: "*See Jenson v. Eveleth Taconite Co.,* 130 F.3d 1287, 1297 (8th Cir. 1997) (recognizing inherent methodological limitations in all social-science research, particularly sexual-harassment research; nevertheless, holding such expert testimony admissible), *cert. denied,* 524 U.S. 953, 118 S. Ct. 2370, 141 L. Ed. 2d 738 (1998)."

While the Order acknowledged and cited *Simmons*, its sole explanation for disregarding the Fifth Circuit's holding that social science expert testimony *is* admissible was, "this is an employment discrimination case, not a rape case." (Dkt. 64 at 13). The Federal Rules of Evidence and the *Daubert* line of cases apply to both civil and criminal cases. *United States v. Eff*, 461 F. Supp. 2d 529, 532 (E.D. Tex. 2006). Moreover, the social science testimony in *Simmons* is very similar in material respects to social science research performed relating to sex and pregnancy discrimination. The Order noted that *Simmons* found that the "social stigma attached to rape, may preclude ideal experimental conditions and controls." Similarly, Professor Glick discussed that "social desirability bias" – that people do not readily admit that they discriminated because of the social stigma attached – impacts the scientific study of discrimination and is the reason Glick and other researchers are unable to conduct an after the fact scientific experiment of the parties in a particular lawsuit. (Dkt. 53-2 at 8 (Glick Dep. 27:4-18), 9 (Glick Dep. 31:2-10), and 18 (Glick

6

Dep. at 68:16-69:3)). The Order's single conclusory statement that *Simmons* is a rape case and the case at bar is an employment discrimination case in no way explains or justifies how social science testimony is properly admitted against a criminal defendant with the risk of incarceration and constitutional rights at stake, but should be excluded against a defendant in a civil suit where only monetary damages are at stake.

Finally, the Order correctly noted that *Simmons* held that "trial judges are given broad discretion to determine whether *Daubert's* specific factors are, or are not, reasonable measures of reliability in a particular case." (Dkt. 64 at 13) (citing *Simmons* at 470 F.3d at 1123). While trial court judges do have broad discretion regarding what factors of *Daugert* are or are not reasonable or applicable in a particular case, it is contrary to and completely inconsistent with *Simmons* to hold that social science testimony should be categorically excluded across-the-board in employment discrimination cases, such as the Order did in the case at hand.

## 2. The Order Is Factually Incorrect When It Claims "the majority of Glick's expert report focuses on gender stereotyping and bias throughout society."

Contrary to the Order's statement justifying the exclusion of the research portion of Glick's report, "the majority of Glick's expert report" ***does not*** "focus[] on gender stereotyping and bias throughout society."  Professor Glick's research portion initially provides a discussion of the broader, but still highly relevant, scientific studies and data related to the psychological nature of stereotyping, bias, and discrimination. The research portion of the report then narrows to specifically address discrimination in STEM, bias in student teaching evaluations, and that female leaders in STEM also discriminate against women. The research in the report also focuses specifically on pregnancy and motherhood discrimination, discrimination for using work-life flexibility policies, evaluation procedures discrimination, and retaliation for complaining about discrimination. Unlike the more generalized nature of the report excluded in *E.E.O.C. v. Wal-Mart*

*Stores, Inc.* and relied upon by the Order, the vast majority of the research section of Glick's report in this case is from studies that are directly applicable to academia, STEM, and are core to and part of the specific fact issues in this case.[3]

3.   **The Order Fails To Acknowledge That Defendant UT Itself Affirmed The Validity of Social Science Research On Gender Discrimination In STEM And Gender Bias in Student Evaluations. This Social Science Research Is Key To And Part Of The Fact Issues In This Case.**

The Order also completely ignores and fails to address Plaintiff's evidence that Defendant UT itself *actually uses and relies on this type of research* and that some of these issues, including gender bias in student evaluations, are directly relevant to and *are part of* the fact issues in this case. This Court (Judge Pitman) in the recent order denying Defendant UT's motion for summary judgment (Dkt. 66), specifically recognized that in Plaintiff's tenure dossier, a letter of support explained that "[t]he phenomenon of lesser evaluations for women professors in male-typed disciplines is so typical that, sadly, it is almost to be expected . . . . A wealth of studies of student evaluations . . . have revealed i) systematic bias against women professors in male-typed disciplines . . . [and] 2) lack of correlation between these evaluations and educational outcomes." (*Id.* at 144). [Dean Sharon] Wood acknowledged familiarity with these studies. (Wood Dep., Dkt. 39-2, at 42)." (Dkt. 66 at 9). As Plaintiff argued in her appeals internally at UT of her tenure denial and will argue at trial, Dean Wood's use of minimal variations (1 to 3 tenths of a point) in Dr. Nikolova's student teaching evaluations, while knowing that such evaluations are generally regarded as gender biased, is itself evidence of gender discrimination.  Thus, the research portion of Glick's report is not simply a theoretical discussion, it is part of and core to the specific fact issues in this case.

---

[3] Pages 10-19 (approximately 20% of Glick's report) discuss research into bias and discrimination more generally, while pages 19 through 60 (80% of the report) focus on the specific areas, claims and defenses at issue in this case.

Additionally, Christine Julien, Associate Dean of Diversity for the School of Engineering, testified that she was aware of and has read studies relating to discrimination against women in STEM and found them to be credible, reliable information *that she uses as a part of her job*.  (Dkt. 44-1 at 290, 296-97, Ex. 13 Julien Dep 30:25-31:10; 56:21-57:8; 58:1-6). UT's Dean of the Cockell School of Engineering, Sharon Wood, was aware of research relating to discrimination against women in STEM, was familiar with at least some of the studies and reports, and had experienced the dearth of women in the field first hand. (Dkt. 44-1 at 615-18, Ex. 21, Wood Dep, 33:18-38:13; 41:21-42:3, 43:13-44:5.)[4] Dean Julien also testified that credible, reliable research shows that female professors, particularly in STEM fields, tend to receive statistically lower student teaching evaluation scores when controlling for all other factors. (Dkt. 44-1 at 290, 296-97, Ex. 13, Julien Dep 30:25-31:10; 56:21-57:8; 58:1-6). Dean Wood also acknowledged, based on her own experience at UT, that gender is among the factors that plays a role in student teaching scores and is generally regarded as having an influence on the scores. (*Id.* at 290, 296-97, 615-18). The Order completely ignores and fails to address Defendant UT's own adoption and use of this type of research, and its direct relevance to the fact issues in this case.

4. <u>**The Order Excluding Scientific Research On Women Discriminating Against Women Directly Harms and Handicaps Plaintiff .**</u>

Defendant UT will argue at trial in this case – non-scientifically – that Dean Wood is a woman and therefore would never discriminate based upon gender or pregnancy against a female colleague. Prof. Glick's expert testimony provides scientifically validated data that is critically necessary for Plaintiff Nikolova to attempt to rebut that assertion. Prof. Glick's report cites scientific studies showing that women who achieve authority or powerful positions in male-

---

[4] This is illustrated by the lack of tenured women faculty in UT's Electrical and Computer Engineering Department (49 men, 92.5% and 4 women, 7.5%) and the School of Engineering overall (174 male tenured professors (84%) and 33 females (16%)). *See* Plaintiff's Response To Defendant's Motion For Summary Judgment (Dkt. 44 at 3-4).

dominated fields including STEM tend to discriminate as much as or even more severely than men when judging junior women's work commitment. (Dkt. 53-1 at 24-28, 57-59). Reasons include that successful women in masculine fields often felt they had to work harder to overcome biases, and consequently hold junior women to a higher standards since that is what they had to do to succeed. (*Id.* at 58). This scientific evidence is particularly relevant in this case because the first person who recommended denying tenure to Dr. Nikolova (in spite of strong, overwhelming support for her tenure before) was Dean Wood. Keeping such research from the jury unfairly prejudices and handicaps Plaintiff Nikolova to the benefit of UT, for no justifiable reason. The Order fails to consider or respond to this important issue.

5. **The Order's Claim That Expert Testimony On "Gender Stereotyping And Bias Throughout Society" Should Be Excluded Because "The Jury May Assume That Such Stereotyping and Bias Existed At UT" Is Clearly Erroneous And Logically Flawed.**

The Order's only rationale for excluding the scientific research portion of Glick's report is that if testimony is allowed of "gender stereotyping and bias throughout society, the jury may assume that such stereotyping and bias existed at UT Austin. The burden is on Plaintiff to prove that she was discriminated against because of her sex, not just that gender stereotyping exists throughout society." (Dkt. 64 at 15.) This claim makes little or no sense. A court would never exclude expert testimony about the scientifically verified propensity of an action to occur (e.g. how alcohol affects the brain and makes a person intoxicated, how metal reacts under certain conditions, or how water freezes at 32 degrees) just because the party offering the testimony has the burden of proving that action happened in a particular situation. To the contrary, such expert testimony is a vital part of the evidence presented in such cases. As this Court has held, "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Wal-Mart Stores v. TABC,* 2017 U.S. Dist. LEXIS 230837 at *24.

10

Additionally, the Order's citation to *E.E.O.C. v. Wal-Mart Stores, Inc.* and its parenthetical that expert testimony was excluded as "more prejudicial than probative where expert opined that gender stereotyping may be subconscious but identified no intentional act by defendant based on gender stereotyping" is simply not at issue here. If allowed to testify regarding the application of the research to the facts of the case, Professor Glick will certainly testify about intentional actions of UT. To the extent the concern is about "implicit" or "subconscious bias," Defendant UT is free to cross examine Professor Glick to expose any such concerns or address any alleged weaknesses. Additionally, people with "implicit" or "subconscious" bias still can and often do act intentionally and discriminatorily. Having implicit or subconscious bias does not necessarily mean that a person either acts with or without a discriminatory motive. Moreover, the pattern jury instructions in discrimination cases carefully state the burden of proof as to whether discrimination is "a motivating factor" or "but-for cause" or an employment action.

Finally, the Monahan Virginia Law Review article that the Order quotes from extensively and relies upon to exclude the opinion section of Glick's report *actually endorses the introduction of social framework research testimony*: "We maintain our original conviction that 'general' social science research of high scientific validity can provide a valuable context for deciding case specific factual issues." Monahan, Walker, & Mitchell, *Contextual Evidence of Gender Discrimination: The Ascendance of "Social Frameworks,"* 94 VA. L. REV. 1715, 1718 (2008)).[5] Ultimately, for the reasons cited, the portion of the Order that strikes the first section of Glick's report as unreliable

---

[5] While the Order extensively quoted the Monahan article, it ignored the multiple cases cited by Nikolova that showed that Monahan has not been followed by multiple courts when analyzing expert reports for admission using the *Daubert* and FRE Rule 702 standards (Dkt. 53 at 15) and that the Monahan article's position has been described as a "radical" departure from the accepted application of Fed. R. Ev. 702, and that "[u]ltimately, the arguments for blanket exclusion of social framework testimony in these cases can best be understood as part of a political debate and a litigation strategy." Hart & Secunda, "A Matter Of Context: Social Framework Evidence In Employment Discrimination Class Actions," Melissa Hart & Paul M. Secunda, 78 Fordham L. Rev. 37, 53. 67 (2009). Moreover, the Monahan approach has rejected by numerous psychologists and sociologists. *Id.* at 39..

is clearly erroneous and contrary to law.

**B.** **The Second Section of Professor Glick's Report That Considers How Research on Stereotyping, Bias, and Discrimination Relates to Dr. Nikolova's Case Is Based on Reliable Scientific Methods.**

Unlike the first research portion of Dr. Glick's report, the Order attacks Glick's second section of the report head on but misses the mark by: 1) making clearly erroneous factual findings; 2) applying factually and legally distinguishable cases contrary to law; and 3) failing to apply the legal standards to Glick's report contrary to the law those standards represent.

**1.  The Order Made Clearly Erroneous Factual Findings Contrary to Law.**

The Order cites to *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 388 (5th Cir. 2009) (quoting *Daubert*, 509 U.S. at 589-90), as follows:

> The subject of an expert's testimony must be "scientific knowledge." The testimony must be grounded in the methods and procedures of science and more than subjective belief or unsupported speculation. ***This is not to say it must be "known" to a certainty***; arguably, there are no certainties in science. In order to qualify as "scientific knowledge," an inference or assertion must be ***derived by*** the scientific method.

(Dkt. 64 at 6) (emphasis added). The Order then goes on to list a series of quotes from Professor Glick's deposition and erroneously states that those deposition quotes are Professor Glick "acknowledge[ing] … that his specific causation opinions are not based on scientific principles and methodology." (*Id.* at 6).

The Order's representation is clearly erroneous because nowhere in Glick's deposition testimony or in his report does he acknowledge, admit, or otherwise testify that his expert opinions in the second section are not based on scientific principles or commonly used by experts in social framework applying the research to the facts of the case as an accepted methodology in his field. Quite to the contrary, Glick's report assures that his "specific role [is] educating decision-makers about research findings related to the case" by following the "***standard practice***, [where] the social framework expert points out lines of inquiry for decision-makers, suggesting where case facts are

consistent with research findings, but leaves the final decision about the case to the jurors." (Dkt. 53-1 at 40).

Glick's deposition testimony is equally consistent that the methodology he used in applying the research to the facts of this case is generally accepted in the field as well as in courts.[6] The Order erroneously asserted that Glick's deposition testimony "admitted … that his specific causation opinions have not been tested, are not subjected to peer review or publication, and are not accepted by the relevant scientific community." (Dkt. 64 at 7). In the next paragraph the Order also finds that Professor Glick "acknowledged that he did not perform any studies of [UT Austin] regarding bias or discrimination" and "acknowledges that his opinions as to specific causation in this case are not scientific conclusions." (*Id.*) However, Professor Glick's testimony when reviewed in context does not make these admissions or acknowledgements, but rather explains that it is essentially impossible to conduct an "after the fact" peer-review type study because of "social desirability biases" (among other reasons) to determine to a scientific certainty whether a defendant in a specific legal case discriminated against a particular plaintiff. (Dkt. 53-2 at 18 (Glick Dep at 67:8-69:18)). *See also Simmons*, 470 F.3d at 1122 (social stigma precludes ideal experimental conditions regarding sexual harassment). Glick's acknowledgment of this fact is not a short coming or a weakness of his expert report, but instead it is an approach that has been lauded by Courts and a reason his testimony *is admissible.* Glick does not invade the province of

---

[6] (Dkt.53-2, 51:1-25 (including: "My understanding is that this is a legal case; and that is the rendering of an expert opinion, again, **rooted in the science of discrimination from somebody who's an expert** in it. I believe that **other colleagues who were similarly rooted and understand this research would come to similar conclusions**, right?")); (Dkt.53-2, 52:1-8 ("**Q.** And you mentioned that you have served as an expert in the Gould v. Interface case. **A.** Correct.  Yes, I did. **Q.** In that report did you include a section in that report called **Application to the Case** or a similar type of section where you sought to apply social science to the facts of that case? **A. Yes, I did.**")); and (Dkt.53-2, 53:4-14 ("**I've done, I don't know, maybe two dozen cases.** My testimony, others have challenged -- you know, tried to get my testimony excluded.  The opposing side has tried to get my testimony excluded; and with the exception of the case that you're well aware of that was a recent case, my testimony has not been excluded.  And, in fact, in a **federal court in Boston the judge excluded other experts but denied the motion to exclude me and specifically praised the way in which I structured my report and drew my conclusions, which is similar to the way I did it in this case**."))

the jury but rather advises the jury about the "context for considering the evidence before it, as opposed to a roadmap to a particular outcome." (Dkt. 53-1 at 40), (quoting Federal District Court Judge Nancy Gertner in *Tuli*, 592 F. Supp. 2d at 211).

As the Supreme Court has recognized, expert witnesses may permissibly link general research data to the facts in a particular case, noting that "trained experts commonly extrapolate from existing data." *General Electric Co. v. Joiner*, 522 U.S. 136, 146-47 (1997). Moreover, in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 148-49 (1999), the court recognized that "[e]xperts of all kinds tie observations to conclusions through the use of what Judge Learned Hand called 'general truths derived from … specialized experience.' And whether the specific expert testimony focuses upon specialized observations, the specialized translation of those observations into theory, a specialized theory itself, or the application of such a theory in a particular case, the expert's testimony often will rest 'upon an experience confessedly foreign in kind to [the jury's] own.'"

2.  **The Order Cites to Factually and Legally Distinguishable Cases Thus Resulting in Findings That Are Clearly Erroneous and Contrary to Law.**

The Order relies heavily on *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) (Dkt. 64 at 9-12) and essentially holds that *Dukes* is controlling, stating "This Court is bound by Supreme Court and Fifth Circuit precedent." (Dkt. 64 at 13). However, *Dukes* is not controlling and is *easily distinguishable* from the case at hand. Moreover, the Order simply states that "Plaintiff attempts to distinguish *Dukes*," (Dkt. 64 at 12) but then does not address in any way the distinctions Plaintiff raised.

In *Dukes,* the Supreme Court considered whether "social framework" testimony *alone* was sufficient to certify "one of the most expansive class actions ever" consisting of 1.5 million members. To certify a class, the Court explained that the plaintiff must meet the "commonality"

requirement by providing "*[s]ignificant proof* that an employer operated under a general policy of discrimination." (*Id.* at 353, emphasis added.) However, the Court found that "*[t]he only evidence* of a 'general policy of discrimination' respondents produced was the testimony of Dr. William Bielby, their sociological expert. Relying on 'social framework' analysis, Bielby testified that Wal-Mart has a 'strong corporate culture,' that makes it 'vulnerable' to "gender bias." (*Id.* at 353-54).

*Dukes* is radically different from the facts in the case at hand and the purpose for which Glick's testimony is being offered. *Dukes* absolutely *does not hold* that social framework testimony is inadmissible in employment discrimination suits, rather that it was insufficient *by itself* to support class certification in a massive class action. Additionally, the portion of *Dukes* regarding calculations of how often discriminatory motivation were used in decisions (i.e., .05 to .95) play no role in Professor Glick's report and opinions since his social framework report does not seek, intend, or is required to draw conclusions of causation and therefore no calculations of exactness of causation are at issue.[7] Additionally, *Dukes* did *not* rule on whether the expert's testimony met the Rule 702/*Daubert* standards because the district court had not addressed that issue at the trial level. (*Id.* at 354-55).[8] Thus, *Dukes* is not controlling and in no way compels or even supports the exclusion of Glick's testimony.

The Order also relies on *E.E.O.C. v. Bloomberg L.P.*, No. 07 CIV. 8383 LAP, 2010 WL

---

[7] The Order refers to the second section of Glick's report as the "causation section." (Dkt. 64 at 6-8, 15) However, this nomenclature misrepresents Glick's report and opinions, since nowhere in his report does he use the term "causation" or "causal." To the contrary, Glick takes great pains to communicate his refusal to opine on causation, since that is the jury's province. (Dkt. 53-1).

[8] In contradictory fashion, the Order uses this exact same factor (no Daubert /Rule 702 consideration in district court) as the *sole* reason to distinguish and disregard *Price Waterhouse v. Hopkins, 490 U.S. 228 (1989), superseded on other grounds by statute, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat 1071, as recognized in Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media, 140 S. Ct. 1009 (2020).* *Price Waterhouse* relied heavily on social science expert testimony as part of its holding and recognized such testimony that it can be important and useful in discrimination cases. *Id.* at 236, 255.

3466370, at *15 (S.D.N.Y. Aug. 31, 2010). In addition to being a non-binding unpublished case from outside the Fifth Circuit, *Bloomberg* is distinguishable from the facts in the case at hand in numerous respects. In *Bloomberg,* the expert looked through the record and picked out stereotype evidence and elected not to include "disconfirming instances" and did not explain his methodology or any specific methodology. Glick explained his methodology and which is the standard practice in his field and has been approved by multiple courts as meeting the *Daubert* and Rule 702 standards. There is absolutely no evidence that Glick rejected or refused to consider any "disconfirming" evidence and instead, the documents provided to Glick included documents were the core documents in this case in Dr. Nikolova's tenure decision. The documents were prepared by UT Austin representatives as well as Dr. Nikolova.  Additionally, neither UT Austin nor the Order have explained why not reviewing any particular document would somehow render Glick's opinions suspect.

The Order also cites *Van v. Ford Motor Co.,* 332 F.R.D. 249, 267 (N.D. Ill. 2019), however, *Van* is another class certification case in which the expert was "extrapolate[ing] unfounded conclusions from that evidence," when "there is simply too great an analytical gap between the data and the opinion proffered" and the expert did not "identify *any* reliable methodology used by [the expert]." *Id.* The Order also stated that Professor Glick "may not extrapolate unfounded conclusions from that evidence." (Dkt. 64 at 11(citing to *Van* at 267)). However, Professor Glick carefully refrained from making any causation conclusions, which is the jury's job, and therefore did not attempt to bridge any "too great" analytical gap.

The Order also cites to *Mullenix v. Univ. of Texas at Austin, No. 1-19-CV-1203-LY-SH, 2021 WL 4304815, at *3-7 (W.D. Tex. Sept. 21, 2021),* however, *Mullinex* is not controlling and is significantly different from the present case. Importantly, the issue was not raised and *Mullenix* gave no consideration to whether the research portion, as opposed to the opinion section, of Dr.

Glick's report is admissible. Additionally, while *Mullinex* cited *Simmons,* it did *not* acknowledge or consider the substance of the Fifth Circuit's decision and its approval of the admission of social science testimony. *Mullinex* also did not consider, as raised in the present case, that Defendant UT has affirmed its reliance on social science research regarding discrimination and bias and that the social science research was actually raised as part of Nikolova's underlying tenure case, and thus is the subject of fact issues in the case.  The *Mullinex* report and opinion was also broader and did not focus on the specific discrimination issues in STEM, women discriminating against women, pregnancy discrimination and stereotypes and other issues narrowly tailored to Nikolova's case.

In a recently decided opinion in a discrimination case, *Chinn v. Whidbey Pub. Hosp. Dist., No. C20-995 TSZ, 2021 U.S. Dist. LEXIS 216975, at \*7-8 (W.D. Wash. 2021),* the court admitted all of the social science expert's testimony relating to the research, but deferred ruling until trial on the extent to which the expert "will be permitted to opine on the ultimate issues of fact." 2021 U.S. Dist. LEXIS 216975, at \*9. While all of Glick's testimony easily passes scrutiny under *Daubert* and Rule 702, Plaintiff respectfully requests the Court allow Glick to testify about the social science research, and defer any further rulings till the time of trial.

3. **Professor Glick Relied Upon Appropriate Information And The Order Does Not Provide Evidence Or Analysis That The Report Is Unreliable Based On The Information Relied Upon. At Most, This Is An Issue For Cross Examination, Not Striking.[9]**

The Order holds that Professor Glick's opinion portion of the report is unreliable "because it was based on unrepresentative data." (Dkt. 64 at 13). However, experts should be excluded only if their testimony is so fundamentally unsupported that it cannot possibly help the factfinder. *Viterbo v. Dow Chemical Co.,* 826 F.2d 420, 422 (5th Cir. 1987). As this Court (Judge

---

[9] This portion of the Order only applies to the second section, since the documents related to this case played no role in the research contained in the first section of Professor Glick's report.

Pitman) has held, "Generally, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." (citing *Viterbo*, 826 F.2d at 422). In *Crankshaw*, Judge Pitman held that expert witness testimony offered by a defendant in an employment discrimination suit regarding the plaintiff's job search and employment opportunities was admissible in spite of claims that the opinions were not based on any reliable foundation or methodology. *Id.* Judge Pitman held that "the proper way for [Plaintiff] to challenge [the expert's] opinion is through cross-examination, the presentation of evidence, and careful instruction regarding the burden of proof for Defendants' mitigation defense." (*Id.* citing *Daubert,* 509 U.S. 596).

Additionally, "Courts have found no basis for exclusion when experts were challenged for failing to take into account certain data. *See e.g., Moss v. Ole S. Real Estate, Inc.,* 933 F.2d 1300, 1306-07 (5th Cir. 1991); *Matador Drilling Co.,* 662 F.2d at 1199; *Hartley,* 310 F.3d 1054, 1061 (8th Cir. 2002); *Cummings v. Standard Register Co.,* 265 F.3d 56, 65 (2nd Cir. 2001)." *Browning v. Sw. Research Inst.*, No. SA-05-CA-0245-FB, 2006 U.S. Dist. LEXIS 98612, at *6 (W.D. Tex. 2006). "Thus, where an expert provides evidentiary support and reasoning for his assumptions, even if the other party disagrees with those assumptions, "these challenges are best left to proper cross examination." *Id.*

The Order notes that Glick did not review "the policies and procedures regarding tenure and promotion of UT faculty" or the deposition of Dean Wood. However, the Order makes no attempt to explain how not reviewing such documents makes the report unreliable.[10] Glick reviewed in detail the actual tenure process and documents relating to Dr. Nikolova's tenure

---

[10] Citing *Moss v. Ole South Real Estate, Inc.,* 933 F.2d 1300, 1307 (5th Cir. 1991); *Matador Drilling Co. v. Post,* 662 F.2d 1190, 1199 (5th Cir. 1981); *Hartley v. Dillard's, Inc.,* 310 F.3d 1054, 1061  (8th Cir. 2002); *Cummings v. Standard Register Co.,* 265 F.3d 56, 65 (2nd Cir. 2001)).

decision.  These include Nikolova's complete tenure dossier – the exact same set of documents reviewed by the President and President's Committee to make its tenure determination. They include Dean Wood's written statement in which she offers the specific reasons that allegedly were the reasons she recommended against the denial of tenure for Nikolova, the Department Chair's Assessment, the multiple written assessments of the Budget Council, the votes of the College of Engineering's P&T committee as well as external reviewers.  The evidence reviewed also includes the complete notes reflecting the interviews and words offered by Dean Wood and Chair Tewfik explaining their decisions as part of the review of the tenure decision by UT's own "CCAFR committee," as well as all of the documents reviewed by the CCAFR committee, the CCAFR committee's report, and President Fenves' response to the Committee's decision. Glick did not review depositions as those had not been taken at the time his report was due. Even if the substance of the documents provided by Dr. Nikolova were substantively questionable or negatively impactful on Professor Glick's opinions, which has not been supported or established by evidence, that would not render Professor Glick's opinions unreliable and instead would only be issues for cross examination.

4.     **The Nature Of Professor Glick's Report Does Not Require The Ruling Out Of Alternative Explanations. Amounting To At Most An Issue For Cross Examination Not Striking[11]**

The Order cites to two cases, *Munoz*[12] and *Tagatz*[13], to support its holding that Professor Glick's expert opinion was unreliable because he did not rule out alternative explanations. However, both of these cases: 1) do not involve social framework expert testimony, and 2) instead involved statistical analysis, which actually requires ruling out alternative explanations.  To clarify,

---

[11] As with the previous section of the Order relating to the documents reviewed, this portion of the Order also only applies to the second section of Professor Glick's report..
[12] *Munoz v. Orr*, 200 F.3d 291, 301 (5th Cir. 2000)
[13] *Tagatz v. Marquette Univ.*, 861 F.2d 1040, 1045 (7th Cir. 1988)

Professor Glick's report involves no statistical or regression analyses as part of his expert opinions and thus, these cases are simply not talking about the issues raised by Glick's report in the case at hand.

Moreover, as discussed above, a strength of the opinion portion of Glick's report is that it does not make any definitive conclusion (which is for the jury) but rather raises various factors that a jury may consider when considering the case. *Tuli,* 592 F. Supp. 2d at 211, 214-16.  Glick readily admits and would tell the jury that he cannot rule out alternative explanations and is not making a finding that discrimination did occur.  As this Court (Judge Pitman) held in *Md. Cas. Co. v. Acceptance Indem. Ins. Co.*, No. A-08-CA-697 RP, 2009 U.S. Dist. LEXIS 140347, at *8 (W.D. Tex. 2009), an expert's admission that he "cannot with certainty testify" about the main issue in the lawsuit relating to cause of alleged faulty swimming pool construction, "is a matter going to the weight of his opinion and is thus for the jury to decide."

For all of the important reasons cited in this motion, Plaintiff Dr. Nikolova moves this Court modify or set aside the Order striking Professor Glick's expert testimony. Glick's report and testimony is highly important in this case, credible, reliable, directly related to specific fact issues, and will aid the jury as they consider this case.

<div style="margin-left:40%">

Respectfully submitted,

CREWS LAW FIRM, P.C.
701 Brazos, Suite 900
Austin, Texas 78701
(512) 346-7077
(512) 342-0007 (Fax)
schmidt@crewsfirm.com


By:   /s/   Robert W. Schmidt
Robert W. Schmidt
State Bar No. 17775429
Joe K. Crews
State Bar No. 05072500

</div>

Robert Notzon
The Law Office of Robert Notzon
Texas Bar No. 00797934
1502 West Avenue
Austin, Texas 78701
(512) 474-7563
(512) 852-4788 facsimile

**ATTORNEYS FOR PLAINTIFF**

**CERTIFICATE OF CONFERENCE**

I certify that on February 25, 2022, I discussed the foregoing Motion with Ben Dower, counsel

for Defendant. Defendant's counsel indicated he was OPPOSED to this Motion.

_/s/    Robert W. Schmidt_

**CERTIFICATE OF SERVICE**

I hereby certify that on February 21, 2022, this document was served pursuant to Federal
Rules of Civil Procedure on counsel for Defendants at the following address:

Benjamin L. Dower
Assistant Attorney General
Office of the Attorney General of Texas
General Litigation Division
P.O. Box 12548
Capitol Station,
Austin, Texas 78711-2548
Fax (512) 320-0667
benjamin.dower@oag.texas.gov

_/s/    Robert W. Schmidt_