UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| EVDOKIA NIKOLOVA | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CASE NO. 1:19-cv-00877-RP |
| | § | |
| UNIVERSITY OF TEXAS AT AUSTIN, | § | |
| Defendant. | § | |

## PLAINTIFF'S MOTION FOR JUDGMENT

TO THE HONORABLE JUDGE ROBERT PITMAN:

### I. Introduction.

On March 11, 2022, the jury returned a verdict for Plaintiff Dr. Evdokia Nikolova, finding that Defendant the University of Texas discriminated against her on the basis of sex and pregnancy by failing to award her tenure in February 2019. (Dkt. 95). The jury found that Plaintiff Nikolova's past compensatory damages are $1,000,000.00. *Id.* The jury found Dr. Nikolova's future compensatory damages are $2,000,000.00. *Id.* The jury found that Dr. Nikolova's back pay damages were $50,000.00. *Id.* The jury did not consider front pay damages, which is an equitable remedy determined by the Court. *Reneau v. Wayne Griffin & Sons, Inc.* 945 F.2d 869, 870 (5th Cir. 1991). Dr. Nikolova moves the Court for an entry of judgment on the jury verdict, including an award of past and/or future compensatory damages, back pay, prejudgment interest on back pay, and front pay.[1]

### II. The Jury's Determination of Compensatory Damages Is Supported By The Evidence And Should Be Affirmed In This Court's Judgment, Modified In Accordance With Statutory Caps.

The jury found that Plaintiff Nikolova's past compensatory damages were $1,000,000.00 and that future compensatory damages were $2,000,000.00. (Dkt. 95). UT Austin pled and Dr.

---

[1] Plaintiff will file a separate motion for attorneys' fees and costs.

Nikolova recognizes that a cap applies for compensatory damages under Title VII.  Because UT Austin employs more than 500 people, the applicable cap is $300,000:

> The sum of the amount of compensatory damages awarded under this section for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, . . . under this section shall not exceed . . . in the case of a respondent who has more than 500 employees . . . $300,000.

42 U.S.C. § 1981a(b)(3)(D). The Fifth Circuit has held that this cap applies to cap all compensatory (or punitive damages) per plaintiff. *Black v. Pan Am Labs., L.L.C.*, 646 F.3d 254, 264 (5th Cir. 2011).

Dr. Nikolova provided ample evidence at trial to support the jury's verdict on compensatory damages including Dr. Nikolova's testimony[2] and her husband's testimony that established physical manifestations of her emotional distress including insomnia, lethargy/inability to move, to work and do other normal daily activities. Their testimony and evidence also established that Dr. Nikolova had suicidal ideations, experienced an immense loss of self-esteem and questioned her fundamental self-worth because of the denial of tenure and the loss of her life-long dream of teaching and research. The testimony regarding Dr. Nikolova's depression that resulted from UT's denial of tenure to Dr. Nikolova also included detailed descriptions of the impacts her depression had on her marriage, her career (past, current, and future), and her relationships with her children. A professional colleague, Dr. Jenifer Welch, also that she observed Dr. Nikolova's depression and loss of self-worth.

Moreover, supporting evidence at trial also included the fact that Dr. Nikolova sought and obtained treatment from multiple medical and mental health providers and was forced to apply for

---

[2] Plaintiff's counsel has requested a copy of the trial transcript for Dr. Nikolova and may supplement or amend this motion concerning Dr. Nikolova's testimony if appropriate or necessary after receipt and review of the transcript.

and received medical leave from UT Austin because of UT's discriminatory denial of tenure. Because of the serious emotional and physical damage caused by UT Austin, Dr. Nikolova was forced to take a semester-long leave under the Family and Medical Leave Act ("FMLA") and a reasonable accommodation for leave without pay for one year.[3] Dr. Nikolova provided UT Austin with medical documentation that substantiated her medical and mental health conditions which UT Austin reviewed, relied upon, and determined were appropriate to grant Dr. Nikolova's medical leave requests. *See e.g.* Plaintiff's Trial Exhibits 211, 212, and 230. Substantial evidence was also presented in the testimony of Dr. Nikolova, her husband and Dr. Welch regarding the significant damage to her reputation, both within and outside of UT Austin, including that the denial of tenure caused her to be isolated at UT and negatively affected her reputation in the academic community. The evidence is far more than sufficient to support the damage done to Dr. Nikolova and accordingly, Dr. Nikolova respectfully moves for judgment on the jury's verdict of compensatory damages in the amount of $300,000.[4] *See e.g. Klebe v. Univ of TX Health Science Center San Antonio,* 450 Fed. Appx. 394 (5th Cir. 2011) (affirming jury verdict of $300,000 in compensatory damages); *Jackson v. Host Int'l, Inc.*, 426 F. App'x 215, 225 (5th Cir. 2011) (affirming $200,000 in past compensatory, $100,000 in future compensatory); *Green v. Adm'rs of the Tulane Educ. Fund*, 284 F.3d 642, 650-51 (5th Cir. 2002) (affirming jury verdict of $300,000 in compensatory damages); *Wilson v. Monarch Paper*, 939 F.2d 1138 (5th Cir. 1991) (affirming $847,359.15 compensatory damages in age and intentional infliction of emotional distress case);

---

[3] This leave was in addition to and not related to Dr. Nikolova's pregnancies.

[4] It is unclear from the caselaw whether it is necessary for the Court to attribute the compensatory damages as past or future. To the extent it is necessary to make such a characterization, Plaintiff suggests that the Court attribute $250,000 to past compensatory damages and $50,000 to future compensatory damages or in whatever manner the Court determines within its discretion to most fully support the jury's verdict and intent to award full damages to Plaintiff in light of the evidence admitted/presented at trial.

*Kruezer v. City of Hous.*, 231 F. App'x 333 (5th Cir. 2007) (unpublished) (per curium) affirming *Kreuzer v. City of Hous.*, No. H-03-5073 (S.D. Tex. Aug. 15, 2005) (Doc. # 207); *Gamboa v. Henderson*, No. 99-20965, 2000 U.S. App. LEXIS 39076 (5th Cir. 2000) (affirming $300,000 compensatory damage award).[5]

III.   **The Jury's Determination of Back Pay Is Supported By The Evidence And Should Be Affirmed In This Court's Judgment, Together With Prejudgment Interest.**

The jury found that Dr. Nikolova's back pay damages are $50,000.00 (Dkt. 95), which is approximately the amount of damages calculated by Dr. Nikolova's economist expert, Dr. Thomas Glass.[6] The jury's award is supported by Dr. Glass's testimony that Dr. Nikolova's back pay damages – the difference in what she would have made had she been granted tenure versus what she actually made – up until the time of trial, were $44,500. Ex. A, Glass Test. 10:6-17. Charts showing Dr. Nikolova's damages as calculated by Dr. Glass, were introduced into evidence as Plaintiff's Trial Exhibit 238, and are attached to this motion as **Exhibit B**.[7] UT Austin introduced a chart produced by its expert witness, Donald Deere, that estimated that Dr. Nikolova's back pay damages for the academic year beginning 9/1/2021 are $48,700. Defendant's Trial Exhibit 50, page 4, attached to this motion as **Exhibit C**. Because the jury's award of $50,000 is consistent with the testimony and evidence admitted at trial, Dr. Nikolova respectfully moves for entry of judgment on the jury's verdict of $50,000.00 in back pay damages.

---

[5] The compensatory damage caps in Title VII were enacted in 1991. Decisions affirming verdicts under those caps should also be considered in light of and adjustments taken into account for inflation.

[6] Dr. Glass is a certified public accountant and economist who has testified on economic damages in numerous employment law matters for approximately forty years. **Exhibit A**, Glass Trial Testimony Transcript, 2:22-3:7.

[7] Dr. Nikolova's backpay award is also supported by UT salary documents showing the salary of tenured professors, Plaintiff's Trial Exhibit's 200-203, and Plaintiff's W-2 forms admitted into evidence as Plaintiff's Trial Exhibits 206-210.

Dr. Nikolova is also entitled to interest on back pay damages. In *Peques v. Mississippi State Employment Service*, 899 F.2d 1449, 1453 (5th Cir. 1990). When a federal statute is silent on the rate of prejudgment interest, courts look to state law for guidance. *See Hansen v. Cont'l Ins. Co*., 940 F.2d 971, 984-85 (5th Cir. 1991) *abrogated on other grounds by CIGNA Corp v. Amara*, 563 U.S. 421 (2011). Here, the Texas Finance Code states that prejudgment interest should be calculated at "the prime rate as published by the Board of Governors of the Federal Reserve System on the date of computation." Tex. Fin. Code § 304.003(a),(c)(1). The current prime rate is 3.5%. *See* https://www.federalreserve.gov/releases/h15 (listing Bank prime loan rate of 3.5%) (last visited on April 27, 2022). Finally, "District courts generally should calculate interest on back pay and past damages based on the date of the adverse action." *Thomas v. Tex. Dep't of Crim.Justice*, 297 F.3d 361, 372 (5th Cir. 2002). Here, the date of the adverse action was in the spring of 2019, however, as Dr. Glass testified, the salary change had Dr. Nikolova been granted tenure would not have taken place until September 1, 2019. Thus, the calculation of prejudgment interest on back pay damages should date back to (begin on) September 1, 2019.

Applying the above, the simple daily interest rate on the backpay award of $50,000 is calculated by multiplying $50,000 by the prime interest rate of .035 and then dividing the result by the number of days in a year, or 365: $50,000 x .035 = $1750.00 ÷ 365 = $4.79 per day.  The total amount of prejudgment interest is then calculated by multiplying the daily interest of $4.79 per day by the number of days since September 1, 2019 until the date judgment is entered. For example, if judgment is entered on June 1, 2022, the number of days would be 1004. Thus, total prejudgment interest through June 1, 2022 is $4,809.16. Dr. Nikolova respectfully moves for judgment on the jury's verdict of prejudgment interest through the date of judgment.

**IV.**     **Front Pay Damages Are Supported By The Evidence At Trial Should Be Included In This Court's Judgment.**

"Front pay is awarded to compensate the plaintiff for lost future wages and benefits." *Shirley v. Chrysler First, Inc.*, 970 F.2d 39, 44 (5th Cir. 1992), *Rutherford v. Harris County*, 197 F.3d 173, 188 (5th Cir. 1999). While many employment law cases consider "reinstatement" in a termination scenario as a potential remedy for a discriminatory discharge, this case involves the denial of promotion with tenure. Accordingly, the two potential remedies would be for the Court to order that Dr. Nikolova be awarded or "instated" with tenure at UT Austin, or be awarded front pay to compensate her for future damages resulting from UT's discriminatory denial tenure. *See e.g. Julian v. City of Hous.,* 314 F.3d 721, 728-29 (5th Cir. 2002*), Rutherford v. Harris County,* 197 F.3d 173, 188-89 (5th Cir. 1999). The Court must first determine whether "instatement" into the promotion is feasible. *Julian,* 314 F.3d at 728-729. Even if the parties agree that instatement/reinstatement is not feasible, the Fifth Circuit has required district courts to adequately articulate their reasons for finding instatement/reinstatement to be infeasible and for considering an award of front pay instead. *Id.*

Here, a court-ordered promotion of tenure is not feasible for multiple reasons.  Initially, instatement with tenure is not appropriate because of the discord and antagonism between the parties. *See Goldstein v. Manhattan Indus., Inc.,* 758 F.2d 1435, 1449 ("discord and antagonism between the parties would render reinstatement ineffective as a make-whole remedy"). Dr. Nikolova offered evidence that since she opposed discrimination at UT Austin, UT Austin retaliated against her including giving her a negative annual performance review (which is used as a basis for salary and raises) as well as an unfavorable teaching review. *See* Plaintiff's Trial Exhibits 195, 196, 197 and 187. Dr. Nikolova put forth evidence in the testimony of Dr. Christine Julien, who is now an Associate Dean in the Cockrell School of Engineering and was previously

a friend of Dr. Nikolova, who stopped all one-on-one contact with Dr. Nikolova after Dr. Nikolova openly opposed discrimination at UT Austin. Dr. Julien received her promotion to her Dean position one week after Dr. Nikolova filed suit against UT Austin.

Additionally, Dr. Nikolova put forth evidence that the Chair of the Electrical and Computer Engineering Department, Ahmed Tewfik,[8] initially strongly supported Dr. Nikolova's promotion with tenure, but during trial Chair Tewfik (in a change of his position - falsely) characterized Dr. Nikolova's tenure case as "weak" and also testified that Dr. Nikolova only received the support she did from the ECE Department because she is a woman. Chair Tewfik's duplicitous change of position and sexist, discriminatory statement to the effect that she only got to where she is because she is a woman was intensely, professionally, and personally harmful to Dr. Nikolova.

Moreover, as discussed above, working at UT Austin became toxic to Dr. Nikolova's health as a result of Defendant's discriminatory (and retaliatory) conduct. Dr. Nikolova was forced to request a semester-long leave under FMLA and take a year of leave without pay (in 2021-22) as a reasonable accommodation because of the extremely serious negative impact on her health of working at UT Austin. Additionally, Dean Sharon Wood, who was a key proponent of discriminatorily denying Dr. Nikolova's tenure and a focus of Dr. Nikolova's complaints at trial has now been promoted as UT Austin's Provost, the second most powerful position at the university. Provost Wood would certainly have power over Dr. Nikolova's future at UT Austin. Additionally, after multiple years of conflict and litigation, the discord and adversity between the parties makes Court-ordered promotion with tenure equitably unfeasible.

---

[8] While Tewfik testified he is no longer the chair of the ECE Department, his many years as the department's chair is evidence that he will continue to be an influential and prominent member of the ECE Department.

Finally, throughout trial, UT Austin argued that tenure is essentially a "job for life" and a "serious commitment" for many, many years that the university only awards to those assistant professors who it deems qualified and deserving. The potential of Court-ordered tenure for Dr. Nikolova when UT Austin deemed her to not meet the tenure standards is a recipe for a lifetime of conflict and distrust between both parties.

When court-ordered instatement or promotion is not feasible, the Court generally should award front pay. *Bogan v. MTD Consumer Grp., Inc.*, 919 F.3d 332, 336 (5th Cir. 2019). In *Bogan,* the Fifth Circuit, reversed and remanded a district court that failed to award either reinstatement or front pay, and summarized prior precedent in this area as follows:

> Our caselaw contemplates that one form of prospective relief will ordinarily be appropriate when it is requested. We have often said that the trial court's remedial discretion in this area involves the *selection between* reinstatement and front pay. The typical "either/or" nature of this remedial choice is also seen in our statement that "if reinstatement is not feasible, front pay is the appropriate award." In discussing another federal employment statute (the retaliation provision of the Fair Labor Standards Act), Judge Wisdom went so far as to say that "it is impossible for us to imagine cases when a denial of both reinstatement and reimbursement would be justified."

*Id.* (emphasis original, quotations and citations omitted).

Front pay is not an element of compensatory damages subject to the statutory cap; it is awarded in lieu of reinstatement. *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 848, 854 (2001). Calculations of front pay cannot be totally accurate because they are prospective and necessarily speculative in nature. *Reneau,* 945 F.2d at 870; *Deloach v. Delchamps, Inc.*, 897 F.2d 815, 822 (5th Cir. 1990); *Burns v. Tex. City Refining*, *Inc.,* 890 F.2d 747, 753 n.4 (5th Cir. 1989). Courts must employ intelligent guesswork to arrive at the best answer. *Reneau,* 945 F.2d at 870; *Deloach,* 897 F.2d at 822.

In awarding front pay, courts consider the length of prior employment, the permanency of the position held, the nature of work, the age and physical condition of the employee, and the possible

consolidation of jobs and the myriad other non-discriminatory factors which could validly affect the possible employment relationship. *Reneau*, 945 F.2d at 871.

In this case, Dr. Nikolova produced ample evidence supporting an award of front pay. One of the most important factors supporting front pay in this case is that had UT Austin not discriminatorily denied Dr. Nikolova tenure, she would have likely had a "job for life" as UT's own witnesses testified that the granting of tenure makes it extremely difficult to terminate a professor and UT Austin considers it a career-long commitment. Professor John Valvano also testified that it was difficult to terminate a tenured professor at UT Austin.  As the Fifth Circuit has noted, "[i]f the court awards front pay for the remainder of the plaintiff's working life, it must presume the plaintiff would have remained in the defendant's employ all during that time." *Burns v. Tex. City Ref.*, 890 F.2d 747, 753 n.4 (5th Cir. 1989). Such a presumption in this case is entirely reasonable and supported by the evidence. Additionally, at the time of trial, Dr. Nikolova had been employed by Defendant UT Austin for eight years, a significant amount of time that further supports the award of front pay extending through her career.

Additionally, Dr. Nikolova provided credible evidence that she would work as a professor until at least age 70. Dr. Nikolova testified that working as a professor in this field was her passion and a lifelong dream and that she wanted to work as long as possible, at least until age 70. She also testified that many of the professors with whom she worked were significantly older, in their 70s and 80s. Department Chair Tewfik testified that there were multiple tenured professors working at UT in their 70s and that he also intended to work as long as possible. Moreover, after the elimination of a compulsory retirement age in university settings, where tenure ensures continued employment barring some malfeasance, it is common for tenured professors to continue work well past age 65.  As a recent law review journal article on the subject notes:

Over the past decades, the age composition of university faculty has shifted substantially, leading to what has been called the "graying" of faculty and academic research. These trends have been documented in a variety of fields, including in engineering, medicine, the humanities, and the sciences. Researchers have found significant increases in the average age of faculty, declines in rates of faculty retirement, and shifts in the distribution of research dollars to older faculty. The National Institutes of Health, for example, predicted that by 2020 grantees over the age of 68 would outnumber those under 38.

Daniel E. Ho, Oluchi Mbonu, and Anne McDonough, "Mandatory Retirement and Age, Race, and Gender Diversity of University Faculties," *American Law and Economics Review*, Volume 23, Issue 1, Spring 2021, p. 2-3 (citations omitted). Dr. Nikolova's economic expert, Dr. Glass, also explained that while 65.6 is the average retirement age determined by data from the Department of Labor, it is common for PhDs to work beyond age 65, noting that he, himself, was 79 years old and just now retiring. Ex. 1, Glass Test. 6:12-22. Thus, front pay until age 70 is very conservative considering the evidence admitted and presented at trial in this case.

### A. Front Pay Scenario "1":[9] Dr. Nikolova Obtains Tenure in 2023.

Dr. Nikolova's economic expert, Dr. Glass, testified to and offered three potential scenarios for an estimate of front pay based on the evidence at trial. Ex. A, Glass Test. 10:6-18, 12:2-16, 12:22-13:1-24; Ex. B, Plaintiff's Trial Exhibit 236. [10] The first scenario assumed that Dr. Nikolova will obtain tenure on September 1, 2023. Under this scenario, Dr. Glass calculated that UT Austin's discriminatory denial and delay of tenure would impact Dr. Nikolova throughout her career and

---

[9] The scenario numbers 1, 2, and 3 used in this motion correspond to the numbers used in the chart showing Dr. Nikolova's front pay damages. *See* Ex. B, Plaintiff's Trial Exhibit 238.

[10] Dr. Nikolova's front pay damages are supported by Dr. Glass' testimony as well as UT salary documents showing the salary of tenured professors, Plaintiff's Trial Exhibit's 200-203, and Plaintiff's W-2 forms admitted into evidence as Plaintiff's Trial Exhibits 206-210.

that if she worked until age 70, the economic damages adjusted for the "time value" of money would be $311,505. *Id.* [11] [12]

While this scenario is arguably the most "conservative" in terms of the amount of money, it is also arguably the least likely. After UT Austin discriminatorily denied Dr. Nikolova tenure, UT Austin, including the ECE Department in which Nikolova worked, began to view Dr. Nikolova differently and more negatively. After this lawsuit was filed and Dr. Nikolova opposed discrimination, the ECE Department gave Dr. Nikolova an unflattering annual performance evaluation for the 2018-19 academic year. Plaintiff's Trial Exhibit 196. In spite of the fact that earlier that same year the ECE Department voted 32 to 1 in favor of her tenure, the department's

---

[11] If Dr. Nikolova is tenured in 2023 and worked until age 65.6, the front pay damages would be $274,001.00 Ex. B, Plaintiff's Trial Exhibit 236.

[12] UT Austin's expert speculated that if Plaintiff were awarded tenure on 9/1/23, Plaintiff would receive higher raises than her coworkers such that she would "catch up" with professors promoted before her. At trial, this was referred to as the "helicopter analogy," suggesting that an employee is "picked up" from a given salary, moved ahead over others, and "dropped" at a higher salary. Deere's theory was contrasted against Plaintiff's expert Dr. Glass who used an "escalator analogy" which suggests that when comparing an employee's salary to a coworker who makes a higher salary, barring some unusual event, the salaries will normally rise at similar rates such that differences between salaries will likely remain as time goes on, resulting in a continued loss over time. Dr. Deere acknowledged that his application of the "helicopter theory" to the facts of the case at trial was anecdotal and not based on any numerical or statistical study of the salaries at UT. **Exhibit D**, Deere Trial Testimony 43:18-25. Moreover, the salary chart used by Defendant at trial, Ex. C, Defendant's Trial Exhibit 62, shows that all tenured faculty do not "catch up" and make the same salary as those promoted before them. Rather, salaries of tenured professors in the ECE Department in 2019 ranged from a high of $285,179 to a low of $115,3222. Dr. Deere also referred generally to Bureau of Labor "statistics" for "displaced workers" suggesting that "over half" of all unemployed employees "catch up" to the salary they otherwise would have earned in the job that they previously lost. Dr. Deere acknowledged, however, that the statistics are labor-force-wide and provided no evidence that the statistics were applicable to a specific profession, in this case university professors. *Id.* at 31:23-32:7 Additionally, Defendant and Deere provided no evidence that Dr. Nikolova would somehow fall within the percentage of employees who actually "caught up." Additionally, the statistics relied on only related to "displaced employees" who "lost or left jobs because their plant or company closed or moved, there was insufficient work for them to do, or their position or shift was abolished." https://www.bls.gov/news.release/disp.nr0.htm. The statistics do not apply to the present situation involving a university professor who suffered a discriminatory tenure denial.

evaluation characterized Dr. Nikolova's service to the department as "relatively low" and her grant funding as "modest." *Id*. Similarly, UT Austin's Engineering School's Associate Dean, Christine Julien, gave Dr. Nikolova an unflattering peer teaching review. Plaintiff's Trial Exhibits 186 & 187.[13] Given the intense scrutiny that UT Austin applies to tenure candidates, as testified to by UT Austin's witnesses including former UT president Greg Fenves and now Provost Wood, such unflattering performance evaluations would almost certainly lead to a negative tenure outcome for Dr. Nikolova. Additionally, Chair Tewfik's testimony at trial that he perceived Dr. Nikolova's 2018-19 tenure application as "weak" further supports the position that the chances of Dr. Nikolova being awarded tenure in 2023 are even more less likely than in 2019. Additionally, since the denial of tenure, Dr. Nikolova testified that she has had to take both FMLA leave and leave without pay for the past year, which hurt her productivity. If UT Austin, including Dean Wood (now Provost Wood), Associate Dean Julian, and Chair Tewfik viewed Dr. Nikolova's tenure application as insufficient in 2019, the evidence is strong that that Dr. Nikolova's application in 2023 will be viewed far less favorably.

Additionally, Dr. Nikolova presented compelling evidence that UT's denial of tenure ruined her chances of employment and tenure at other universities. Dr. Nikolova testified that after UT Austin denied her tenure, she applied for tenure track/tenured jobs at numerous other universities – including lower-tiered institutions than UT Austin – and was unable to find other employment or even get interviews with any of those universities she applied to in the United States. Plaintiff's Trial Exhibit 213 contains application and/or rejection emails from some

---

[13] Literally the only positive comment was that "The instructor's questions were clear and audible and she used her voice and body language to include the entire classroom even though she was technically interacting with the single speaker." This is compared with performance reviews prior to her 2018-19 tenure application which described Dr. Nikolova as an "excellent lecturer and teacher," an "outstanding young professor," "very effective," "very organized, and giving the students "strong motivation." Plaintiff's Exhibit 21.

(approximately 16) of the universities to which Dr. Nikolova applied, although she applied to many more.[14] Dr. Nikolova also produced the testimony of Dr. Welch, a senior tenured professor in Dr. Nikolova's field who works at Texas A&M University and who has served on numerous hiring committees and has been asked to evaluate the candidacy of numerous tenure candidates over her nearly 30 year career as a professor. Dr. Welch testified that being denied tenure at a university is considered a "red flag" and a negative that hurts a professor's chance of obtaining a position at another university. She also testified that Dr. Nikolova's field of theoretical computer engineering is much more limited, competitive, and difficult to obtain a position in compared to other areas of engineering. Additionally, Dr. Nikolova produced evidence at trial that typically an assistant professor is considered for tenure in or about their 6th year as an assistant professor. Dr. Nikolova presently has been an assistant professor for eleven years, which will also absolutely be seen as a "red flag" by other universities.

**B. Front Pay Scenario "3": Dr. Nikolova Does Not Find Substantially Equivalent Employment.**

Because there is significant evidence that it is more probable than not that Dr. Nikolova will *not* obtain tenure at UT or at another university (and a complete lack of evidence that Dr. Nikolova *will* receive tenure in the Fall of 2023), Dr. Nikolova provided calculations of front pay under two additional scenarios. Because UT Austin has an "up or out" policy (Plaintiff's Trial Exhibit 60), unless UT awards Dr. Nikolova tenure, she will necessarily be forced "out" and terminated by UT after her probationary period ends, which presently is estimated to happen after the 2023-24 school year. Thus, the denial of tenure will result in termination and loss of employment for Dr. Nikolova at that time. Thus, Dr. Glass provided calculations of front pay for

---

[14] Defendant UT Austin did not present any evidence of or otherwise raise at trial the affirmative defense that Plaintiff failed to mitigate her damages.

the scenario assuming Dr. Nikolova is not able to obtain "substantially equivalent" employment and another scenario in which Dr. Nikolova finds other employment at the rate of an assistant professor.

The United States Supreme Court and the Fifth Circuit have clearly held that "a Title VII claimant has no obligation to accept employment that is not substantially equivalent to her prior employment in order to minimize damages." *Sellers v. Delgado Coll.*, 902 F.2d 1189, 1191 (5th Cir. 1990) *cert. denied*, 498 U.S. 987 (1990) ("*Sellars III*"), (*citing Ford Motor Co. v. EEOC,* 458 U.S. 219, 231 & n.15 (1982) and *Sellers v. Delgado Community College*, 839 F.2d 1132 (5th Cir. 1988) ("*Sellers II*")). "Substantially equivalent employment" for purposes of Title VII has been defined as "employment which affords virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status as the position from which the Title VII claimant has been discriminatorily terminated." *Sellers II,* 839 F.2d at 1138; *Sellers III,* 902 F.2d at 1193; *Patterson v. P.H.P. Healthcare Corp.*, 90 F.3d 927, 936 (5th Cir. 1996); *Vaughn v. Sabine Cty.*, 104 F. App'x 980, 984 (5th Cir. 2004). A Title VII claimant "need not go into another line of work, accept a demotion, or take a demeaning position." *Ford Motor Co.*, 458 U.S. at 231; *Sellers II,* 839 F.2d at 1136.

Because Dr. Nikolova produced at trial substantial evidence that she would not obtain tenure at UT, would not be able to obtain a tenured position at another university, has been unable to receive even an interview as an assistant professor at lower-level institutions, and is not required to mitigate her damages by obtaining other dissimilar (and lesser) employment, Dr. Nikolova is entitled to the full damage to her career caused by Defendant UT Austin. Dr. Nikolova's expert, Dr. Glass, testified that if Dr. Nikolova were unable to find substantially equivalent employment,

her front pay damages would be $4,901,286 to the age of 70.[15] Ex. A, Glass Trial Testimony 12:22-14:7. Ex. B, Plaintiff's Trial Exhibit 236. While the amount is large, it accurately reflects the real damage caused by Defendant UT Austin's illegal discriminatory actions.[16]

It should be noted that although Dr. Deere attempted to testify that Dr. Nikolova should have no trouble obtaining replacement employment, he actually admitted to no expertise in that area, that his report did not make any such finding, and that he had no evidence to support that assertion. Ex. D, Deere Trial Test. 32:8-22, 38:8-40:8, 42:7-11.

C. **Front Pay Scenario "2": Dr. Nikolova's Front Pay Damages Are Offset By Salary At Rate of Assistant Professor.**

Finally, Dr. Nikolova's expert Dr. Glass also testified to and offered a front pay calculation assuming that Dr. Nikolova would continue making a similar salary as an assistant professor for the rest of her career. Ex. A, Glass Trial Test. 12:2-16. Because Dr. Nikolova cannot continue as an assistant professor at UT Austin permanently because of the "up or out" policy, Dr. Glass explained that the calculation of front pay in this scenario is simply a stand-in for Dr. Nikolova mitigating[17] her losses with a comparable-paying job to that of an assistant professor. *Id.* Under this scenario, Dr. Nikolova's front pay damages to age 70 are $620,196.[18] Ex. B, Plaintiff's Trial

---

[15] Plaintiff's front pay damages till age 65.6 assuming she is unable to find substantially equivalent employment are $3,978,294. Plaintiff's Exhibit 236.

[16] Other courts have awarded and affirmed large front pay verdicts that extended for numerous years including where the plaintiff was unable to find substantially equivalent employment. *See e.g. Cummings v. Standard Register Co.,* 265 F.3d 56, 66 (1st Cir. 2001) (upheld a front-pay award for 14 years where the plaintiff was unable to find comparable work despite substantial effort); *Mota v. Univ. of Tex. Houston Health Sci. Ctr.,* 261 F.3d 512, 527 (5th Cir. 2001) (upheld a front-pay award for 15 years for a resident alien, an untenured professor at a Texaspublic university who suffered retaliation and sexual harassment, was not fired, and had to take a lower-paying job); and *Tyler v. Bethlehem Steel Corp.,* 958 F.2d 1176, 1189 (2d Cir. 1992) (upheld a front-pay award for the remaining 17 years of the plaintiff's work life).

[17] As noted above, Defendant UT Austin did not put forth evidence or present to the jury the affirmative defense that Dr. Nikolova failed to mitigate damages, and the evidence is to the contrary that she clearly has.

[18] Plaintiff's front pay damages till age 65.6 assuming an offset with a job paying comparable to

Exhibit 238. Because Dr. Nikolova is not obligated to accept or continue in a position that is inferior to the position for which she was discriminatorily denied, however, this estimate underestimates Dr. Nikolova's actual front pay damages but was put forth as a possible alternative for consideration by the Court.

Ultimately, Dr. Nikolova respectfully asks the Court to use its judgment to award the front pay amount supported by the evidence and that most fairly compensates her the damage caused by Defendant UT Austin's discriminatory actions.

## V.   **Dr. Nikolova Will Pay A Large Fraction Of The Entire Amount Awarded As Income Tax.**

All compensation awarded to Dr. Nikolova, including compensatory damages, in this case will be subject to federal income tax. *Johnston v. Harris County Flood Control Dist.*, 869 F.2d 1565, 1580 (5th Cir. 1989). Significantly, the entire award will be taxed at the highest rate. Dr. Nikolova will pay far more in income taxes for the lump sum than she would have paid if UT Austin had not discriminated against her, and Dr. Nikolova's regular income had continued to be taxed at a lower rate year by year. The increased tax liability is an additional loss that UT Austin will indirectly inflict on Dr. Nikolova. Ironically, prevailing in court will cost Dr. Nikolova even if the Court awards full economic damages.

## VI.   **Conclusion.**

For the reasons set forth herein, Plaintiff Dr. Nikolova respectfully requests that the Court enter a judgment on the verdict, together with awards of compensatory damages, backpay, prejudgment interest, front pay, post-judgment interest[19] and any other relief to which Dr. Nikolova is entitled.

---

what she made as an assistant professor are $620,196. Ex. B, Plaintiff's Trial Exhibit 238.

[19] Postjudgment interest is calculated using the weekly average 1-year constant maturity (nominal) Treasury yield, as published by the Federal Reserve System for the calendar week

Respectfully submitted,

CREWS LAW FIRM, P.C.
701 Brazos, Suite 900
Austin, Texas 78701
(512) 346-7077
(512) 342-0007 (Fax)
schmidt@crewsfirm.com


By: /s/ Robert W. Schmidt
Robert W. Schmidt
State Bar No. 17775429
Joe K. Crews
State Bar No. 05072500

/s/ Robert Notzon
Robert Notzon
The Law Office of Robert Notzon
Texas Bar No. 00797934
1502 West Avenue
Austin, Texas 78701
(512) 474-7563
(512) 852-4788 facsimile

**ATTORNEYS FOR PLAINTIFF**


## <u>CERTIFICATE OF CONFERENCE</u>

I hereby certify that on April 28, 2022, I conferred with counsel for Defendant UT Austin, which opposes this motion.

By: /s/ Robert W. Schmidt

---

preceding. 28 U.S.C. § 1961. Source:http://www.federalreserve.gov/releases/h15/update/

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 28, 2022, this document was served pursuant to Federal Rules of Civil Procedure on counsel for Defendant through the Court's electronic filing system at the following address:

Benjamin L. Dower
Assistant Attorney General
Amy S. Hilton
Assistant Attorney General
Office of the Attorney General of Texas
General Litigation Division
P.O. Box 12548
Capitol Station,
Austin, Texas 78711-2548
Fax (512) 320-0667
benjamin.dower@oag.texas.gov
amy.hilton@oag.texas.gov

By:  /s/  Robert W. Schmidt