```
 1                 UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF TEXAS
 2                       AUSTIN DIVISION

 3    EVDOKIA NIKOLOVA           ) Docket No. A 19-CA-877 RP
                                 )
 4    vs.                        ) Austin, Texas
                                 )
 5    UNIVERSITY OF TEXAS        )
      AT AUSTIN                  ) March 10, 2022
 6

 7         TRANSCRIPT OF TRIAL TESTIMONY OF THOMAS GLASS
              BEFORE THE HONORABLE ROBERT L. PITMAN
 8

 9    APPEARANCES:

10    For the Plaintiff:        Mr. Robert W. Schmidt
                                 Crews Law Firm, P.C.
11                               701 Brazos Street, Suite 900
                                 Austin, Texas 78701
12
                                 Mr. Robert S. Notzon
13                               Law Office of Robert Notzon
                                 1502 West Avenue
14                               Austin, Texas 78701

15    For the Defendant:        Mr. Benjamin L. Dower
                                 Ms. Amy S. Hilton
16                               Texas Attorney General's Office
                                 300 West 15th Street
17                               Austin, Texas 78701

18

19    Court Reporter:           Ms. Lily Iva Reznik, CRR, RMR
                                 501 West 5th Street, Suite 4153
20                               Austin, Texas 78701
                                 (512)391-8792
21

22

23

24

25    Proceedings reported by computerized stenography,
      transcript produced by computer-aided transcription.
```

<table>
<tr><td></td><td>1</td><td>MR. SCHMIDT:  We call, your Honor, Tom Glass</td></tr>
</table>

1      MR. SCHMIDT:  We call, your Honor, Tom Glass

00:00:01  2  to the witness stand.

00:00:27  3      MR. DOWER:  Your Honor, before this witness

00:00:29  4  starts testifying, can we ensure that our expert who's

00:00:31  5  going to be providing rebuttal is present?

00:00:33  6      THE COURT:  Sure.  Sir, before you take a

00:00:35  7  seat, can you please raise your right hand to be sworn.

00:00:38  8      THE CLERK:  You do solemnly swear or affirm

00:00:38  9  that the testimony which you may give in the case now

00:00:38  10  before the Court shall be the truth, the whole truth,

00:00:45  11  and nothing but the truth?

00:00:45  12      THE WITNESS:  I do.

00:00:45  13      THE COURT:  Please be seated.  You can go

00:00:56  14  ahead and start the preliminaries if you want his name

00:00:57  15  and credentials.

00:01:00  16    THOMAS GLASS, called by the Plaintiff, duly sworn.

00:01:00  17         <u>DIRECT EXAMINATION</u>

00:01:01  18  BY MR. SCHMIDT:

00:01:01  19  Q.  Would you introduce yourself to the jury?

00:01:03  20  A.  My name is Tom Glass.  Thomas Glass.

00:01:07  21  Q.  And can you tell us a little bit about yourself?

00:01:09  22  A.  I have a Bachelor's Degree in Business.  I stayed

00:01:16  23  long and got a Master's Degree in Accounting.  Later in

00:01:18  24  life, I went back and got a Master's Degree and a Ph.D.

00:01:22  25  in Economics.  I've been a Certified Public Accountant

00:01:27  1   since 1967 and I have -- I've practiced accounting for

00:01:35  2   many years and actually just did my last tax return last

00:01:39  3   year.  And I have been doing this kind of work

00:01:45  4   increasingly since the late 1980s.  I've testified in

00:01:50  5   about 125 cases.  I've been hired in over 500 cases.

00:01:58  6   And the kind of testimony I'm giving today is indicative

00:02:03  7   of the type of testimony I've given quite often.

00:02:07  8       Q.   So Dr. Glass, Ph.D., correct?

00:02:09  9       A.   Yes.

00:02:10  10       Q.   All right.  And if I'm just a shorthand guy,

00:02:15  11   you're a numbers guy; is that right?

00:02:16  12       A.   I am a number cruncher, yes.

00:02:21  13       Q.   Okay.  So we've asked you to look at the issues

00:02:26  14   in this case.  Not issues but the numbers in this case

00:02:29  15   and provide -- actually, what have we asked you to do?

00:02:34  16       A.   Yes.  You asked me to take a look and make

00:02:38  17   certain assumptions about Dr. Nikolova's compensation in

00:02:43  18   the future, and what it was likely going to be, and what

00:02:46  19   it would be under several different scenarios.

00:02:50  20       Q.   And I believe there might also be issues not only

00:02:53  21   in the future but in the past, some backpay?

00:02:56  22       A.   Yes.  Yes.

00:02:57  23       Q.   Okay.

00:02:58  24       A.   Since she was denied tenure, yes.

00:03:00  25       Q.   Okay.  And so, can you explain, what is the

| | | |
|---|---|---|
| 00:03:04 | 1 | process that you use?  How do you do this? |
| 00:03:06 | 2 | A.  Well, we use a -- what I call a "but for" |
| 00:03:12 | 3 | analogy.  But for the action that she complains about, |
| 00:03:16 | 4 | what is likely to happen in the past and in the future, |
| 00:03:21 | 5 | and what's the difference between what she could have |
| 00:03:23 | 6 | made had she been granted tenure in 2019.  First is what |
| 00:03:30 | 7 | she's likely going to make as a result of being denied |
| 00:03:33 | 8 | tenure. |
| 00:03:35 | 9 | Q.  And how do you come up with these numbers?  How |
| 00:03:38 | 10 | do you figure that out? |
| 00:03:38 | 11 | A.  Well, we know what she was actually making at the |
| 00:03:42 | 12 | time that she was denied tenure.  We know what a |
| 00:03:48 | 13 | similarly situated colleague of her was making after he |
| 00:03:51 | 14 | was granted tenure in 2019.  And then, the Social |
| 00:03:58 | 15 | Security Administration Board of Trustees has to make |
| 00:04:02 | 16 | long-term projections about the health of the Social |
| 00:04:05 | 17 | Security system, and they've got a board of trustees -- |
| 00:04:09 | 18 | a board of actuaries who project what increases in pay |
| 00:04:16 | 19 | is going to be actually for the next 75 years.  So they |
| 00:04:20 | 20 | have a -- and it's well thought of in the economic |
| 00:04:26 | 21 | community as a fairly accurate predictor of what |
| 00:04:33 | 22 | salaries are going to be. |
| 00:04:34 | 23 | So we take the salaries that she was making in |
| 00:04:37 | 24 | 2019 and we take the salary that the tenured professor |
| 00:04:40 | 25 | was making in 2019, and then, we increase those by what |

00:04:44  1   the Social Security Administration says the average

00:04:48  2   increase for all American workers is going to be for

00:04:51  3   each year till her projected retirement; and then, we

00:04:57  4   sum all those up and do some magic and put numbers on a

00:05:02  5   piece of paper.

00:05:02  6       Q.  And by magic, you're talking about crunching

00:05:06  7   data?

00:05:06  8       A.  Crunching data.  The one thing I haven't talked

00:05:09  9   about is, if she is -- if the jury decides she's

00:05:16  10  entitled to damages, she will be paid that money today

00:05:18  11  or in the near future, instead of the money getting paid

00:05:22  12  out to her over her next 30 or 40 years.  And so, to

00:05:30  13  know that she would be able to invest those moneys and

00:05:33  14  earn interest on that, we do a process called

00:05:37  15  discounting.  And we use interest rates on a safe

00:05:43  16  investment, which we use United States treasury bonds,

00:05:49  17  and we discount that money back to what's called present

00:05:52  18  value.

00:05:53  19          Such that if you put all that money that

00:05:57  20  you're going to give her into a savings account, she

00:06:00  21  would be able to draw out the amount of money that we're

00:06:02  22  projecting that she would lose over the next several

00:06:05  23  years.

00:06:06  24      Q.  So if I'm understanding you correctly, $100,000

00:06:12  25  now is different than $100,000 paid out over the course

00:06:16  1   of time.

00:06:17  2      A.   Right.   If you want somebody to be able to get

00:06:19  3   $100,000 in 10 years, you don't give them $100,000

00:06:24  4   today.   You give them a lesser amount of money so that

00:06:26  5   they can take that 100 -- that 90,000 and invest it and

00:06:32  6   at the end of 10 years, it will be $100,000.

00:06:35  7      Q.   So it's reduced for the time value of money?

00:06:37  8      A.   Exactly.

00:06:38  9      Q.   Okay.   And so, talk with us about are there any

00:06:46  10  other factors you take into account in this case?   Is

00:06:48  11  there -- retirement play a role in this?

00:06:51  12     A.   Well, the Department of Labor publishes

00:06:55  13  statistics on how long a person of a particular sex and

00:07:03  14  education and age is likely going to work in the future.

00:07:05  15  So, for instance, Dr. Nikolova at the time of her denied

00:07:12  16  tenure, based upon her age and education that she has a

00:07:17  17  Ph.D., she had a work life expectancy to age 65.6.   In

00:07:25  18  other words, the average person in that category of

00:07:29  19  demographics would work until they were 65.6.   She has

00:07:34  20  expressed an interest of working until age 70, which is

00:07:40  21  very, very common for Ph.D.s.

00:07:42  22         I'm 79 years old and I'm still working.   So I

00:07:46  23  have made alternative computations, one to age 65.6 and,

00:07:52  24  secondly, to age 70.

00:07:54  25     Q.   Okay.   Let's offer into exhibit the next number

00:08:03  1  that we're at is Plaintiff's Exhibit 238, I believe.

00:08:18  2          MR. DOWER:  So you're going to be offering.

00:08:19  3          MR. SCHMIDT:  The charts.

00:08:20  4          MR. DOWER:  The new charts -- I don't think

00:08:22  5  -- I might have missed it, but I don't think you've

00:08:24  6  covered -- laid the foundation for changes.

00:08:29  7          MR. SCHMIDT:  Okay.

00:08:29  8          MR. DOWER:  Can you just lay that foundation

00:08:32  9  first?

00:08:33  10     Q.  (BY MR. SCHMIDT) Dr. Glass, in this lawsuit, you

00:08:39  11  provided an expert report some months or possibly years

00:08:44  12  ago, correct?

00:08:44  13     A.  I did.

00:08:45  14     Q.  And today, because that report was based on a

00:08:49  15  trial date, you're calculating the damages up to the

00:08:53  16  date of trial, correct?

00:08:54  17     A.  Right.  And the primary difference, 99 percent of

00:08:59  18  the difference between my report of last year and my

00:09:02  19  report of this year is that the interest rates that

00:09:06  20  we're talking about that I've used for discounting have

00:09:09  21  gone substantially up, which reduces her damages because

00:09:13  22  she's -- it reduces the amount of money that you would

00:09:17  23  have to give her today to pay out the money in future.

00:09:21  24     Q.  But also, at the time that you submitted that

00:09:24  25  report, I think there was a different trial date that

00:09:26   1   was earlier in time?

00:09:28   2      A.   Right.

00:09:28   3      Q.   And so, you've also extended it out to meet

00:09:31   4   today's trial date?

00:09:32   5      A.   That's correct.

00:09:32   6      Q.   Okay.   So with that, we would offer Plaintiff's

00:09:38   7   Exhibit 236.

00:09:39   8                   THE COURT:   Any objection?

00:09:40   9                   MR. DOWER:   Well, your Honor, what he just

00:09:46  10   said I don't think was accurate.   I think the numbers

00:09:49  11   have actually gone up, not down, just looking at the

00:09:52  12   comparison between the two charts.   But can you ask him

00:10:02  13   what the other one percent was?   He said 99 percent.

00:10:05  14                   MR. SCHMIDT:   I think he said it was the

00:10:07  15   different -- the interest rate, different kind of --

00:10:09  16      Q.   (BY MR. SCHMIDT) Dr. Glass, part of the change in

00:10:12  17   this is that it's updated to this trial, correct?

00:10:14  18      A.   Yes.

00:10:14  19      Q.   And then, you also mentioned that there was

00:10:17  20   another change that you've made because of a change in

00:10:20  21   interest rates?

00:10:21  22      A.   Right.

00:10:22  23      Q.   Can you explain that?

00:10:23  24      A.   Interest rates have increased since, I think,

00:10:28  25   June of 2020 is when I -- '21 is when I produced my

00:10:34  1   original report.  Interest rates have increased, and

00:10:36  2   therefore, the present value of the future losses has

00:10:39  3   gone down.  And I think the numbers are down from what

00:10:47  4   my earlier report is, but if not, I can explain that.

00:10:50  5      Q.  Well, it may be down for that reason, but then,

00:10:52  6   they're up because it's a longer period of time.  Does

00:10:56  7   that make sense?

00:10:56  8      A.  Yes.

00:10:57  9          MR. DOWER:  Mr. Schmidt, if you'll agree to

00:11:01  10  do the same redactions you did on 236, I will not

00:11:05  11  object.

00:11:09  12          MR. SCHMIDT:  Yes.  And I think this is

00:11:11  13  redacted.

00:11:13  14          MR. DOWER:  Not the one you gave me.  No

00:11:29  15  objection.

00:11:29  16          THE COURT:  All right.  So admitted.  Thank

00:11:31  17  you.

00:11:31  18     Q.  (BY MR. SCHMIDT) Okay.  So do you have a copy of

00:11:35  19  your report?

00:11:35  20     A.  I do.

00:11:36  21     Q.  Okay.  So I'm going to put up -- let me put up

00:11:54  22  the charts and have you go through them.  Does that make

00:11:56  23  sense to you?

00:11:57  24     A.  Yes.

00:11:57  25     Q.  Okay.  This is a chart that you've compiled to

00:12:06   1   talk about the economic damages in this case; is that

00:12:10   2   right?

00:12:10   3       A.   Yes.

00:12:10   4       Q.   And can you walk us through what -- how you

00:12:15   5   calculated those damages and what they are?

00:12:16   6       A.   Okay.   The -- I show here, this is the to age

00:12:24   7   65.6.   And I show the three different scenarios that we

00:12:30   8   were talking about, and what we're talking about here is

00:12:34   9   the difference between what she would have made had she

00:12:39  10   been granted tenure in 2019.   And then, the scenario No.

00:12:47  11   1 is the tenure was not granted on September 1, 2019,

00:12:53  12   but assuming that tenure would be granted, effective

00:12:57  13   9-10-2023, four years later.   And I show that the

00:13:02  14   differences in what she would have made had she been

00:13:04  15   granted tenure and what she will make if she's granted

00:13:09  16   tenure in 9-1-2023, to the date of trial, her lost is

00:13:16  17   $44,500.   The future losses are 274,001, and so, her

00:13:24  18   total losses would be $318,501.

00:13:31  19           Now, the scenario number two --

00:13:33  20       Q.   Before you go there, can you explain if her

00:13:36  21   losses to date of trial are 44,500, how do you project

00:13:42  22   future losses?

00:13:43  23       A.   Then the future losses, I take the amounts of

00:13:47  24   money that she was -- would be making in 2023 and I,

00:13:52  25   again, project out at the Social Security

00:13:55  1  Administration's rate of increase, and then, I used the

00:13:58  2  discount rates we're talking about and I add all those

00:14:02  3  up, and they come up to 274,000.

00:14:06  4      Q.   But I guess even more fundamental question -- and

00:14:11  5  I'm not a math guy -- is that so she gets tenure two

00:14:15  6  years late in her career.  Is it your -- can you

00:14:20  7  explain, then, why getting tenure two years late in your

00:14:23  8  career will then cause losses into the future?

00:14:27  9      A.   Well, I think most of us would have experience

00:14:30  10  with lots of different things that you just don't get

00:14:35  11  caught up.  If your neighbor got a raise last year and

00:14:40  12  you don't get a raise till next year, is there any

00:14:43  13  reason to believe that you would ever catch up to him?

00:14:47  14  He will continue to get raises and you will continue to

00:14:50  15  get raises.  So there's no reason to believe that you're

00:14:56  16  going to catch up.  A marathon runner that gets a mile

00:14:59  17  head start, there's no reason to believe that you would

00:15:02  18  ever catch up to that marathon runner, if y'all are both

00:15:06  19  kind of equal kind of people, you're going to stay

00:15:08  20  behind.

00:15:09  21      Q.   Okay.  So getting -- not getting a promotion two

00:15:14  22  years, you know, late or two years early will impact the

00:15:18  23  amount of money you get throughout the rest of your

00:15:21  24  career?

00:15:21  25      A.   Absolutely.

00:15:21  1      Q.   Okay.  So go ahead.

00:15:24  2      A.   And then, the second scenario was assuming no

00:15:27  3  tenure is ever granted but she continues at the salary

00:15:32  4  level of an assistant professor, and that means that --

00:15:38  5  and the university's not going to let her continue as an

00:15:41  6  assistant professor forever.  It's an up or out kind of

00:15:48  7  situation:  Either you get granted tenure or you go

00:15:50  8  somewhere else.  But we're just -- I'm using the salary

00:15:56  9  of an assistant professor that's the level of money that

00:15:58  10  she would make for test of her career.

00:16:00  11             So in that case, you have the same losses to

00:16:03  12  the date of trial, 44,501, but her future losses are

00:16:08  13  substantially more because the salary as an assistant

00:16:13  14  professor is substantially less than that of an

00:16:16  15  associate professor.  So that's 508,000 for a total of

00:16:20  16  552.

00:16:22  17      Q.   Okay.  So again, her losses to the date of trial

00:16:26  18  of not getting that -- the raise that you get as an

00:16:30  19  assistant professor is 44,500, but then, it's going to

00:16:33  20  impact her into the future to the tune of around

00:16:36  21  500,000.  Go ahead with scenario three.

00:16:40  22      A.   Then the third assumption -- and this is kind of

00:16:43  23  a tricky one.  Assuming that no tenure is ever granted

00:16:47  24  and she terminates on August 31, 2023, when she doesn't

00:16:53  25  get tenure next year, and she finds no substantially

00:16:58    1    equivalent employment, again, her losses to the date of

00:17:02    2    trial are 44,500.  The future losses in this case, the

00:17:08    3    assumption is she doesn't have any earnings after 2023.

00:17:13    4         So you've got a big number of 3,978,000 and for a

00:17:20    5    total losses of 4,022,000.  Now, that is a kind of a

00:17:27    6    wild assumption because nobody is not going to work

00:17:31    7    after age -- after 2023.  But I was asked to do this on

00:17:37    8    the basis that the court could determine if she is not

00:17:42    9    able to find substantially equivalent employment, if she

00:17:45   10    has to go out and be a greeter at Wal-Mart, do we even

00:17:50   11    consider that, those earnings if she's not able to

00:17:54   12    consider substantially equivalent employment.

00:17:57   13         And I'm not up here to have any opinion

00:18:00   14    about whether that's correct or not.  I'll let the

00:18:03   15    lawyers.

00:18:04   16    Q.  So the idea would be if you are a professor and

00:18:08   17    your job is essentially ruined and you won't be able to

00:18:11   18    be a professor in another year, then are you, you know

00:18:17   19    -- do you then have to take something less?

00:18:19   20    A.  Right.

00:18:19   21    Q.  And, you know, and so, if you don't have to take

00:18:23   22    something less, that would be the numbers; is that

00:18:26   23    right?

00:18:26   24    A.  That's correct.

00:18:26   25    Q.  Take a lower type of job.

00:18:36  1          You've also done a separate calculation.  This is

00:18:42  2   on page 2 of this exhibit.  And can you explain that?

00:18:49  3      A.  And all I could tell you is, I've added four

00:18:52  4   years, four-point-something years to that to take the

00:18:55  5   losses out to age 70.  So the losses to the date of

00:18:58  6   trial are identical.  The future losses are somewhat

00:19:03  7   hard and the some total losses are somewhat higher.

00:19:07  8      Q.  Okay.  And just we're not going to go into it,

00:19:10  9   but to show the jury, this is.

00:19:18  10     A.  These are my year-by-year calculations of how

00:19:23  11  these different scenarios work.

00:19:25  12     Q.  Okay.  And this is the actual data and the

00:19:28  13  calculations?

00:19:29  14     A.  Yes.

00:19:29  15     Q.  Applying interest rates, those kinds of things;

00:19:32  16  is that right?

00:19:33  17     A.  Yes.

00:19:33  18     Q.  And you've got those --

00:19:34  19     A.  They'll put you -- if you have insomnia, this

00:19:36  20  will put you to sleep in a hurry.

00:19:39  21     Q.  Okay.  So just before I let you go, I believe

00:19:50  22  that the defendants, U.T., have an economist similar to

00:19:57  23  you.  Certainly not as good as you.  I'm joking.  That's

00:20:00  24  a joke -- who will be making some criticisms of your

00:20:05  25  report and challenging some things in your report.

00:20:07   1       A.   He's going to hurt my feelings a lot if he does.

00:20:10   2       Q.   Okay.   What is your response to the criticism

00:20:14   3   that you believe he'll make?

00:20:15   4       A.   Well, I've looked at them briefly, and I know one

00:20:20   5   of his comments was, I didn't use market rates of

00:20:22   6   interest.   Well, I did use market rates of interest.

00:20:26   7   I've looked them up yesterday and they're the current

00:20:30   8   rates that those are being paid on United States

00:20:33   9   treasury bonds mature out for the next 40 or 50 years.

00:20:38  10       Another one was, he didn't like the fact that I

00:20:41  11   didn't let her catch up.   We talked about that a minute

00:20:44  12   ago.   He says eventually, she's going to catch up to the

00:20:48  13   guy that was granted tenure four years before, but

00:20:51  14   that's just not right.   You are at a place where you

00:20:56  15   are, and unless one of you screws up, y'all are both

00:20:59  16   going to keep going up the salary ladder.   And I can't

00:21:03  17   really remember anything substantive else that he

00:21:06  18   complained about.

00:21:07  19       Q.   All right.   Your Honor, Mr. Glass, I have no

00:21:11  20   further questions.   Pass the witness.

00:21:22  21                     CROSS-EXAMINATION

00:21:22  22   BY MR. DOWER:

00:21:33  23       Q.   Dr. Glass, while I'm getting set up here, do you

00:21:35  24   remember, we had a trial together a few years ago?

00:21:39  25   Actually, it was in 2018?

00:21:41   1      A.   I don't recall.

00:21:41   2      Q.   You don't recall.  I must not have been memorable

00:21:45   3   then.   Well, I'll just represent to you, I have a

00:21:48   4   Bachelor of Science in Economics, and talking to you is

00:21:54   5   like the only time I ever get to use it.  So I'm going

00:21:56   6   to enjoy our conversation very much.

00:22:19   7           So let's start with your scenario one.  I'll

00:22:25   8   go ahead and pull it up on the computer so that we're

00:22:30   9   both looking at it.  Okay.  I can zoom in a little bit,

00:22:51  10   but do you see this as your scenario one?

00:23:00  11      A.   Okay.

00:23:00  12      Q.   All right.  So just want to make sure I

00:23:04  13   understand what you did.  So scenario one assumes that

00:23:08  14   she's granted tenure on September 1st, 2023, correct?

00:23:12  15      A.   Yes.

00:23:12  16      Q.   And so, you calculate the difference between what

00:23:17  17   she is making to what you believe that she would be

00:23:21  18   making if she -- if she had received tenure, correct?

00:23:28  19   If she had received tenure in February of 2019.

00:23:31  20      A.   Okay.  Just let me say that the base case is that

00:23:34  21   she was granted -- that she would have been granted

00:23:37  22   tenure in 2019.  And then, scenario one is, she didn't

00:23:43  23   get granted tenure in 2019, but would get granted tenure

00:23:48  24   in 2023.

00:23:50  25      Q.   Okay.  Thank you for that.  That's much clearer

00:23:53   1    than what I said.  So on August 31st, 2020, your base

00:23:58   2    case is your assumption about what she would have made

00:24:03   3    had she received tenure back in February of 2019.

00:24:08   4        A.   That's right.   She would have been making one

00:24:11   5    thirty-five-hundred if she'd been granted tenure.  She's

00:24:14   6    not going to be making but 114 because she didn't get

00:24:17   7    tenure.

00:24:17   8        Q.   So the difference between -- I guess the amount

00:24:20   9    of money that you project her getting as a result of

00:24:23   10   tenure is $16,000 more or less?

00:24:27   11       A.   Yes.  15,861.  Yes.

00:24:30   12       Q.   So $15,000, it's, what, roughly ten percent of

00:24:35   13   the salary?

00:24:37   14       A.   Never was good with numbers, but that sounds

00:24:39   15   right.

00:24:41   16       Q.   And you got the bump, your projection of how much

00:24:46   17   her salary would go up, from another faculty member,

00:24:51   18   correct?

00:24:51   19       A.   From another what?

00:24:52   20       Q.   From another faculty member?

00:24:53   21       A.   Yes.

00:24:54   22       Q.   And so, the plaintiffs provided you with that

00:24:59   23   faculty member and that number, correct?

00:25:00   24       A.   That's correct.

00:25:01   25       Q.   And you don't know whether that's representative

00:25:03    1    of how much of a bump people would generally get, right?

00:25:09    2    A.   I do not know that.

00:25:10    3    Q.   Could be more?

00:25:12    4    A.   Could be.

00:25:13    5    Q.   And presumably, the plaintiff's counsel only

00:25:15    6    picked a cheap one, right?

00:25:17    7    A.   Yes.

00:25:17    8    Q.   And so, then, at some point under scenario one,

00:25:22    9    you have her actually getting tenure on September 1st,

00:25:26    10    2023, correct?

00:25:27    11    A.   Yes.

00:25:28    12    Q.   And so, if we assume that that brings her up with

00:25:33    13    a peer in the department who got tenured the same time

00:25:37    14    she did, then that would close the damages.

00:25:43    15    A.   No, because of the four-year lag.  I mean, the

00:25:47    16    person that got tenure in 2019 will have gotten

00:25:53    17    substantial raises before 2023.

00:25:57    18    Q.   And your --

00:25:58    19    A.   But she's not going to start off at that same

00:26:00    20    level.  She's going to.

00:26:01    21    Q.   Why do you believe that?

00:26:07    22    A.   I don't have any reason not to believe that.  If

00:26:10    23    it's somebody that has been promoted four years before

00:26:12    24    me, if I get promoted to that same job, I've got to

00:26:17    25    believe that because of their experience in that job,

00:26:20  1   they will have achieved raises over and above what I'm

00:26:26  2   going to start out in.

00:26:26  3       Q.  All right.  And if you had at -- you didn't look

00:26:29  4   at U.T.'s, like, historical data, correct?

00:26:32  5       A.  Yes.

00:26:32  6       Q.  Okay.  And if you had looked at that data, we

00:26:37  7   could determine whether or not U.T. is one of the

00:26:39  8   unusual employers that will bring you right on par with

00:26:44  9   people, regardless of when they got tenure.

00:26:47  10      A.  I don't know that.

00:26:48  11      Q.  Okay.

00:26:55  12      A.  What you're trying to tell me is that all

00:26:57  13  associate professors are paid the same amount of money.

00:27:00  14      Q.  If it were true that associate professors are

00:27:04  15  effectively paid, you know, within one percent of each

00:27:08  16  other and that it's not correlated with the time they

00:27:10  17  got tenure, then if that were true, then the losses are

00:27:14  18  cut off at the point at which she gets tenure.

00:27:16  19      A.  I think that would be true, yes.

00:27:22  20      Q.  Okay.  And just because I recognize economic

00:27:29  21  jargon is confusing and I spent four years struggling

00:27:33  22  with it as an undergraduate, just to use your metaphor,

00:27:36  23  your metaphor was a runner that if someone else got a

00:27:40  24  head start, you're not going to catch up even if you get

00:27:43  25  the promotion, right?

| | | |
|---|---|---|
| 00:27:44 | 1 | A.   That was my metaphor. |
| 00:27:47 | 2 | Q.   Right.  So if U.T. -- it's going to be clunky, |
| 00:27:50 | 3 | but if U.T. got a helicopter and picked up someone from |
| 00:27:53 | 4 | the racetrack and plopped them right next to that other |
| 00:27:56 | 5 | person who got, you know, tenured before them such that |
| 00:27:59 | 6 | they were on the same place on the racetrack, then the |
| 00:28:02 | 7 | damages are just, you know, for the time before tenure's |
| 00:28:07 | 8 | granted. |
| 00:28:07 | 9 | A.   And you're going to take that same helicopter and |
| 00:28:10 | 10 | pick everybody up and move them all up to where they all |
| 00:28:13 | 11 | cross the finish line at the same time. |
| 00:28:15 | 12 | Q.   Every time they get a bump from assistant to |
| 00:28:18 | 13 | associate or associate to full? |
| 00:28:19 | 14 | A.   Yeah.  If they've got that helicopter, you're |
| 00:28:22 | 15 | right. |
| 00:28:25 | 16 | Q.   So scenario one had two permutations, and the |
| 00:28:36 | 17 | only difference between them is the work life expectancy |
| 00:28:40 | 18 | -- whether or not she would work till 65 and some change |
| 00:28:43 | 19 | versus 70. |
| 00:28:44 | 20 | A.   Yes. |
| 00:28:44 | 21 | Q.   You're not offering an opinion about which of |
| 00:28:47 | 22 | those is more likely? |
| 00:28:49 | 23 | A.   No. |
| 00:28:50 | 24 | Q.   And you're not -- so then, your scenario two is |
| 00:28:54 | 25 | based on her working as an assistant professor for the |

00:28:59   1   rest of her career?

00:29:01   2       A.   At the salary level as an assistant professor for

00:29:05   3   the rest of her career.

00:29:06   4       Q.   And so, you understand that she can't work as an

00:29:09   5   assistant professor at U.T. for the rest of her career

00:29:11   6   because of the up-or-out system, but this scenario

00:29:14   7   assumes that it's the equivalent in terms of pay.

00:29:17   8       A.   Yes.

00:29:18   9       Q.   Now, let's say -- you know, because you're a

00:29:24   10   damages guy, so the jury's only talking about this if

00:29:27   11   they find for Dr. Nikolova on the -- her claims,

00:29:32   12   correct?

00:29:32   13       A.   Right.

00:29:32   14       Q.   All right.   So let's just assume that and

00:29:35   15   obviously I'm not conceding anything.   Let's assume

00:29:37   16   that.   What happens if the jury awards the money under

00:29:42   17   scenario two and then, U.T. gives her tenure in a few

00:29:45   18   years?

00:29:45   19       A.   She's just got a windfall.

00:29:47   20       Q.   Yeah.   So everything -- all of the rest of that

00:29:50   21   money is, as you said, just pure windfall.   It is money

00:29:53   22   she's going to get basically a double recovery, right?

00:29:56   23       A.   Yeah.

00:29:56   24       Q.   And under scenario three, it's an even bigger

00:30:02   25   windfall, right?

00:30:03   1   A.   Absolutely.

00:30:04   2   Q.   In fact, it's almost $4 million windfall.

00:30:07   3   A.   Yes.

00:30:14   4   Q.   I'll pass the witness.

00:30:20   5         THE COURT:   Anything else, Mr. Schmidt?

00:30:23   6         MR. SCHMIDT:   Yes.   Couple of quick

00:30:24   7   questions.

00:30:24   8               RE-DIRECT EXAMINATION

00:30:24   9   BY MR. SCHMIDT:

00:30:30   10   Q.   First of all, Dr. Glass, on Mr. Dower's

00:30:42   11   helicopter analogy, is the assumption that he's asking

00:30:49   12   you to make is that all U.T. professors make the same

00:30:52   13   salary?

00:30:52   14   A.   Yes.

00:30:53   15   Q.   So that no one else -- there's no change in

00:30:57   16   salaries.   Everybody all stays constant.   Once you

00:30:59   17   become a professor, you all make the same salary,

00:31:01   18   there's no raises, no nothing over the next --

00:31:03   19   A.   Well, everybody gets equivalent raises, too, I

00:31:07   20   guess, is what he's kind of saying.

00:31:09   21   Q.   But under this situation, for you to ever catch

00:31:11   22   up, you know, under normal real life situation, if I

00:31:18   23   make $100,000 now and somebody else makes $150,000 now,

00:31:23   24   the only way -- and then, next year, we get a raise and

00:31:27   25   I get 125 and he gets or she gets 175, there's still

00:31:32   1   going to be that gap that keeps going, correct?

00:31:35   2        A.   Yes.   But he's trying to say that she's going to

00:31:40   3   get promoted to the same salary level that a four-year

00:31:44   4   associate professor is going to make whenever she gets

00:31:47   5   tenure, and that's what I just don't think is going to

00:31:50   6   happen.

00:31:50   7        Q.   Right.   So she'll get -- she's not going to get

00:31:54   8   promoted to the salary level of somebody up there.

00:31:57   9        A.   Right.

00:31:57  10        Q.   On this windfall situation, if we are only asking

00:32:00  11   the jury to look at the backpay damages up through the

00:32:04  12   date of trial, there's not a windfall.

00:32:07  13        A.   That's correct.

00:32:08  14        Q.   Okay.   Thank you very much.   No further

00:32:10  15   questions.

00:32:13  16             THE COURT:   Anything further, Mr. Dower?

00:32:15  17             MR. DOWER:   No, your Honor.

00:32:16  18             THE COURT:   Thank you, sir.   You may step

00:32:17  19   down.

00:32:18  20             THE WITNESS:   Thank you.   Thank y'all for

00:32:21  21   listening.

          22

          23

          24

          25

# EXHIBIT  B

**Dr. Nikolava's Losses**

**Projected Retirement at Age 65.6**

**Losses to Age 65.6**

| Scenario | Losses to Date of Trial | Future Losses | Total Losses | |
|---|---|---|---|---|
| 1.  Tenure was not granted on 9/1/2019, but assuming Tenure is granted effective 9/1/2023 | (44,500) | (274,001) | (318,501) | Attachment 1 |
| 2.  Assuming no Tenure is ever granted, but she continues as Assistant Professor | (44,500) | (508,016) | (552,516) | Attachment 2 |
| 3.  Assuming no Tenure is ever ganted and she terminates 8/31/2023, and finds no substantially equivalent employment | (44,500) | (3,978,294) | (4,022,794) | Attachment 3 |

**Dr. Nikolava's Losses**

**Projected Retirement at Age 70**

Losses to Age 70

| Scenario | Losses to Date of Trial | Future Losses | Total Losses | |
|---|---|---|---|---|
| 1.  Tenure was not granted on 9/1/2019, but assuming Tenure is granted effective 9/1/2023 | (44,500) | (331,505) | (376,005) | Attachment 1 |
| 2.  Assuming no Tenure is ever granted, but she continues as Assistant Professor | (44,500) | (620,196) | (664,697) | Attachment 2 |
| 3.  Assuming no Tenure is ever ganted and she terminates 8/31/2023 and finds no substantially equivalent employment | (44,500) | (4,901,286) | (4,945,787) | Attachment 3 |

# EXHIBIT C

**Table 1.** ██████████████████████████

| ID | Gender | Date Joined Faculty | Extension Year | First Prob. Year | Second Prob. Year | Third Prob. Year | Fourth Prob. Year | Fifth Prob. Year | Years in Rank | Accelerated Tenure Review? |
|---|---|---|---|---|---|---|---|---|---|---|
| ns22375 | Male | 1/16/2011 | 2015 | 2011-2012 | 2012-2013 | 2013-2014 | 2014-2015 | **2016-2017*,** | 6.5 | **No** |
| ad32385 | Male | 7/1/2011 | 2014 | 2011-2012 | 2012-2013 | 2013-2014 | **2015-2016*** | 2016-2017** | 6 | **No** |
| vj239 | Male | 9/1/2011 | 2015 | 2011-2012 | 2012-2013 | 2013-2014 | 2014-2015 | **2016-2017*,** | 6 | **No** |
| Dr. Nikolova | Female | 1/1/2014 | 2015 | 2014-2015 | **2016-2017*** | 2017-2018 | 2018-2019** | | 5.5 | **Yes** |

**\* Previous year does not count for probationary period because of extension**

\*\* Year considered for tenure

DEFENDANT'S
EXHIBIT

**50**

**Table 2.** ███████████████████████████████████████████████

| Population | Gender | Department Committee Recommends For Tenure | | | College Committee Recommends For Tenure | | | College Committee Recommends Against Tenure | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Total | Denied Tenure | % Denied Tenure | Total | Denied Tenure | % Denied Tenure | Total | Granted Tenure | % Granted Tenure |
| Decisions prior to | Women | 20 | 2 | 10.0% | 17 | 1 | 5.9% | 3 | 2 | 66.7% |
| 2018-2019 | Men | 63 | 7 | 11.1% | 58 | 4 | 6.9% | 6 | 2 | 33.3% |
| All Decisions, except | Women | 24 | 2 | 8.3% | 21 | 1 | 4.8% | 3 | 2 | 66.7% |
| Dr. Nikolova | Men | 73 | 7 | 9.6% | 68 | 4 | 5.9% | 6 | 2 | 33.3% |
| All Decisions | Women | 25 | 3 | 12.0% | 22 | 2 | 9.1% | 3 | 2 | 66.7% |
| | Men | 73 | 7 | 9.6% | 68 | 4 | 5.9% | 6 | 2 | 33.3% |

Notes:

1) There are a total of 102 cases for which the Department and College recommendations were provided, 87 of these were prior to 2018-2019.

2) The Department Commmittees recommended denying tenure in four cases, all prior to 2018-2019 and all were denied tenure.

3) The College Committee recommended a "Tie" in three cases, all prior to 2018-2019 and all were denied tenure.

**Table 3.** ████████████████████████

| Gender | Decisions prior to 2018-2019 | | | All Decisions, except Dr. Nikolova | | | All Decisions | | | All Decisions + Those Who Left Prior to Tenure Review | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total | Tenured | % Granted Tenure | Total | Tenured | % Granted Tenure | Total | Tenured | % Granted Tenure | Total | Tenured | % Granted Tenure |
| Women | 21 | 18 | 85.7% | 25 | 22 | 88.0% | 26 | 22 | 84.6% | 30 | 22 | 73.3% |
| Men | 66 | 56 | 84.8% | 76 | 66 | 86.8% | 76 | 66 | 86.8% | 90 | 66 | 73.3% |

**Table 4.** ███████████████████████████████

| | | | |
|---|---|---|---|
| Date of Tenure Denial | 9/1/2019 | | |
| Date of Tenure | 9/1/2023 | | |
| Employer Contribution to Retirment | 7.5% | | |

| Expected Future Salaries as of: | 9/1/2019 | 9/1/2023 |
|---|---|---|
| Base Case: Tenured on 9/1/2019 | $129,500 | $149,314 |
| Scenario 1: Tenured on 9/1/2023 | $114,639 | $146,665 |

| | |
|---|---|
| Promotion increase | 16.35% |
| Within-Rank Growth | 4.86% |
| Catch-up growth | 0.63% |

| Year Starting | Growth/ Expected Growth | Base Case | Scenario 1 | Loss | Retirement Contribution | Total Loss | Discount Factor | Present Value |
|---|---|---|---|---|---|---|---|---|
| 9/1/2019 | | $129,500 | $114,639 | ($14,861) | ($1,115) | ($15,976) | 100.00% | ($15,976) |
| 9/1/2020 | 0.00% | $129,500 | $114,639 | ($14,861) | ($1,115) | ($15,976) | 100.00% | ($15,976) |
| 9/1/2021 | 4.86% | $135,794 | $120,210 | ($15,583) | ($1,169) | ($16,752) | 99.98% | ($16,748) |
| 9/1/2022 | 4.86% | $142,393 | $126,053 | ($16,341) | ($1,226) | ($17,566) | 99.76% | ($17,524) |
| 9/1/2023 | 4.86% | $149,314 | $146,665 | ($2,649) | ($199) | ($2,847) | 99.06% | ($2,820) |
| 9/1/2024 | 4.86% | $156,570 | $154,713 | ($1,857) | ($139) | ($1,996) | 97.75% | ($1,951) |
| 9/1/2025 | 4.86% | $164,180 | $163,203 | ($977) | ($73) | ($1,050) | 95.83% | ($1,006) |
| 9/1/2026 | 4.86% | $172,159 | $172,159 | $0 | $0 | $0 | 93.55% | $0 |
| | | | | | | **Total Lost Compensation** | | **($72,001)** |

| 1 | UNITED STATES DISTRICT COURT |
| | WESTERN DISTRICT OF TEXAS |
| 2 | AUSTIN DIVISION |

```
 1                 UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF TEXAS
 2                        AUSTIN DIVISION

 3   EVDOKIA NIKOLOVA           ) Docket No. A 19-CA-877 RP
                                )
 4   vs.                        ) Austin, Texas
                                )
 5   UNIVERSITY OF TEXAS        )
     AT AUSTIN                  ) March 10, 2022
 6

 7        TRANSCRIPT OF TRIAL TESTIMONY OF DONALD DEERE
              BEFORE THE HONORABLE ROBERT L. PITMAN
 8

 9   APPEARANCES:

10   For the Plaintiff:         Mr. Robert W. Schmidt
                                Crews Law Firm, P.C.
11                              701 Brazos Street, Suite 900
                                Austin, Texas 78701
12
                                Mr. Robert S. Notzon
13                              Law Office of Robert Notzon
                                1502 West Avenue
14                              Austin, Texas 78701

15   For the Defendant:         Mr. Benjamin L. Dower
                                Ms. Amy S. Hilton
16                              Texas Attorney General's Office
                                300 West 15th Street
17                              Austin, Texas 78701

18

19   Court Reporter:            Ms. Lily Iva Reznik, CRR, RMR
                                501 West 5th Street, Suite 4153
20                              Austin, Texas 78701
                                (512)391-8792
21

22

23

24

25   Proceedings reported by computerized stenography,
     transcript produced by computer-aided transcription.
```

|          |    |                                                      |
|----------|----|------------------------------------------------------|
|          | 1  | THE COURT:  Mr. Dower.                                |
| 00:00:01 | 2  | MR. DOWER:  Yes, your Honor.  Defendant              |
| 00:00:19 | 3  | calls Donald Deere.                                  |
| 00:00:43 | 4  | THE COURT:  Good afternoon, sir.  Before             |
| 00:00:45 | 5  | taking a seat, if I could get you to raise your right|
| 00:00:47 | 6  | hand to be sworn.                                    |
| 00:00:48 | 7  | THE CLERK:  You do solemnly swear or affirm          |
| 00:00:48 | 8  | that the testimony which you may give in the case now|
| 00:00:48 | 9  | before the Court shall be the truth, the whole truth,|
| 00:00:54 | 10 | and nothing but the truth?                           |
| 00:00:54 | 11 | THE WITNESS:  I do.                                  |
| 00:00:55 | 12 | THE COURT:  Feel free to take off your mask          |
| 00:00:57 | 13 | if you're comfortable doing so.                      |
| 00:01:02 | 14 | DONALD DEERE, called by the Defendant, duly sworn.   |
| 00:01:02 | 15 | DIRECT EXAMINATION                                    |
| 00:01:02 | 16 | BY MR. DOWER:                                         |
| 00:01:04 | 17 | Q.  Good afternoon, Dr. Deere.                        |
| 00:01:08 | 18 | A.  Good afternoon.                                   |
| 00:01:11 | 19 | Q.  Can you start out by introducing yourself to the |
| 00:01:13 | 20 | jury, please?                                        |
| 00:01:14 | 21 | A.  Sure.  My name is Donald Deere.  I have a Ph.D.  |
| 00:01:18 | 22 | in Economics from Massachusetts Institute of Technology. |
| 00:01:22 | 23 | I was on the faculty at Texas A & M University in    |
| 00:01:25 | 24 | economics for 24 years, the last 17 with tenure.  I  |
| 00:01:29 | 25 | retired from that and I now do economic consulting on a |

| | | |
|---|---|---|
| 00:01:33 | 1 | full or sometimes part-time basis. |
| 00:01:35 | 2 | Q.  And were you retained in this case on behalf of |
| 00:01:43 | 3 | U.T. Austin? |
| 00:01:43 | 4 | A.  I was. |
| 00:01:44 | 5 | Q.  And to do what? |
| 00:01:45 | 6 | A.  To respond to the reports of both Dr. Thompson |
| 00:01:50 | 7 | and Dr. Glass, and to provide my own assessment of the |
| 00:01:54 | 8 | statistical issues involved -- involving the claims of |
| 00:01:59 | 9 | Dr. Nikolova with regard to tenure and, also, to provide |
| 00:02:02 | 10 | my own assessment of the damages if it were the case |
| 00:02:07 | 11 | that the jury found for Dr. Nikolova. |
| 00:02:10 | 12 | Q.  And do you believe that your professional |
| 00:02:13 | 13 | experience and background in economics and statistics |
| 00:02:17 | 14 | equip you to make those opinions? |
| 00:02:19 | 15 | A.  I do. |
| 00:02:19 | 16 | Q.  At this point, we would tender Dr. Thompson as an |
| 00:02:24 | 17 | expert in labor economics and statistics. |
| 00:02:27 | 18 |           MR. NOTZON:  He can't because that's Dr. |
| 00:02:29 | 19 | Deere. |
| 00:02:30 | 20 |           MR. DOWER:  I'm sorry.  What did I -- |
| 00:02:31 | 21 |           THE COURT:  Dr. Thompson. |
| 00:02:33 | 22 |           MR. DOWER:  I'm sorry. |
| 00:02:34 | 23 |           MR. NOTZON:  No objection. |
| 00:02:36 | 24 |           MR. DOWER:  I'm living in the past |
| 00:02:37 | 25 | obviously. |

| | | |
|---|---|---|
| 00:02:38 | 1 | THE WITNESS:  It's okay. |
| 00:02:39 | 2 | Q.  (BY MR. DOWER) So sorry, Dr. Deere.  All right. |
| 00:02:42 | 3 | Well, with that, I want to pick up where we left off, |
| 00:02:48 | 4 | which was talking about -- well, where we left off. |
| 00:02:53 | 5 | Where we left off with Dr. Glass when we were talking |
| 00:02:57 | 6 | about that his scenario one.  And his -- what is his |
| 00:03:05 | 7 | scenario one -- I'll bring it up just a moment.  What is |
| 00:03:46 | 8 | his scenario one based on? |
| 00:03:48 | 9 | A.  Well, his scenario one is -- assumes that given |
| 00:03:54 | 10 | Dr. Nikolova did not receive tenure in 2019 that she |
| 00:03:58 | 11 | would, instead, receive tenure in 2023.  And he |
| 00:04:02 | 12 | calculates the -- essentially the difference in earnings |
| 00:04:05 | 13 | between those two scenarios:  One, she was tenured in |
| 00:04:11 | 14 | '19 and continued on.  The other, she would be not |
| 00:04:15 | 15 | tenured in '19 but tenured in 2023 and continue on.  And |
| 00:04:19 | 16 | I believe this scenario one is to the age of about 65, |
| 00:04:24 | 17 | her expected work life based on the sources that Dr. |
| 00:04:28 | 18 | Glass cited. |
| 00:04:30 | 19 | Q.  And I'm going -- or what assumption -- and you |
| 00:04:34 | 20 | heard him testify here today, correct? |
| 00:04:36 | 21 | A.  Yes. |
| 00:04:37 | 22 | Q.  What assumption did he make about her salary |
| 00:04:41 | 23 | after she is granted tenure on September 1st, 2023? |
| 00:04:47 | 24 | A.  Well, he essentially assumes that salaries would |
| 00:04:50 | 25 | be like an escalator.  You know, you're -- tenure's |

| | | |
|---|---|---|
| 00:04:54 | 1 | delayed two or three years, so you're on a step two or |
| 00:04:58 | 2 | three below.  And then, from then on, you're just always |
| 00:05:01 | 3 | below.  And so, that's -- in a nutshell, I'd say that's |
| 00:05:07 | 4 | his assumption. |
| 00:05:08 | 5 | Q.  I'm going tos show you Defendant's Exhibit 62. |
| 00:05:15 | 6 | This is data for salary in the Cockrell School of |
| 00:05:20 | 7 | Engineering going back as far as back as 2009 to 2010. |
| 00:05:26 | 8 | Do you see this? |
| 00:05:26 | 9 | A.  I do.  Sort of. |
| 00:05:28 | 10 | Q.  All right.  Let me zoom in a little bit. |
| 00:05:30 | 11 | A.  There you go.  That's a little better. |
| 00:05:32 | 12 | Q.  So what are in the -- is in the left-hand column? |
| 00:05:40 | 13 | A.  The names of faculty is in column A. |
| 00:05:43 | 14 | Q.  And the column B? |
| 00:05:48 | 15 | A.  That's their -- it says faculty rank, but that's, |
| 00:05:51 | 16 | you know, professor, assistant professor, associate |
| 00:05:53 | 17 | professor as of the end of the academic year spring |
| 00:05:56 | 18 | 2019. |
| 00:05:57 | 19 | Q.  And then, column C? |
| 00:06:00 | 20 | A.  The date that their Ph.D. was awarded. |
| 00:06:03 | 21 | Q.  Column D? |
| 00:06:04 | 22 | A.  The year since. |
| 00:06:05 | 23 | Q.  Okay.  And this skips ahead for ease of reference |
| 00:06:11 | 24 | but -- and then, what are columns -- I guess, just |
| 00:06:15 | 25 | column O and then on? |

00:06:16   1      A.   Those are salaries for those particular

00:06:19   2   individual faculty members for those particular academic

00:06:23   3   years.

00:06:23   4      Q.   And do you see that the numbers are color-coded?

00:06:27   5   We've got red, we've got green and we've got black?

00:06:31   6      A.   Yes.  I see that.

00:06:32   7      Q.   Okay.  So I'm going to cut to the chase and do

00:06:37   8   you see this -- it's called a legend that tells us what

00:06:41   9   the color-coding means?

00:06:42  10      A.   Yes.

00:06:42  11      Q.   Okay.  And so, can you just explain or put on the

00:06:47  12   record what the different colors mean?

00:06:49  13      A.   So the font that would be black would be

00:06:52  14   someone's salary while they're an assistant professor.

00:06:55  15   The font green would be -- faculty member's salary while

00:06:59  16   that person was an associate professor.  Red would be

00:07:01  17   the font for the salary while that person was a

00:07:03  18   professor.  And purple would be the font while that

00:07:07  19   person was both a professor and a chair of their

00:07:10  20   department.

00:07:12  21      Q.   And so, for example, if we were to look at

00:07:19  22   someone -- let's do one of the more recent ones like Dr.

00:07:31  23   Ranjuit Gharpurey.  And I apologize if I'm messing that

00:07:33  24   up.  Do you see that that doctor went from green to red

00:07:42  25   between academic years 2013 to '14 and then, academic

| | | |
|---|---|---|
| 00:07:45 | 1 | years '14 to '15? |
| 00:07:47 | 2 | A.  Yes. |
| 00:07:47 | 3 | Q.  And so, what does that signify to you? |
| 00:07:50 | 4 | A.  Could you go back down to the bottom?  I read it. |
| 00:07:54 | 5 | Yeah, that green to red is associate professor to |
| 00:07:58 | 6 | professor. |
| 00:07:59 | 7 | Q.  Okay.  And so, just to take an example, so then |
| 00:08:06 | 8 | what would -- I'm going to call him Dr. G just to avoid |
| 00:08:17 | 9 | me butchering his name.  What would it signify to go |
| 00:08:20 | 10 | from green to red between these two salaries? |
| 00:08:23 | 11 | A.  To be promoted from associate professor to full |
| 00:08:26 | 12 | professor. |
| 00:08:26 | 13 | Q.  Okay. |
| 00:08:27 | 14 | A.  Or to professor. |
| 00:08:28 | 15 | Q.  And if we go down a couple cells, we see Dr. |
| 00:08:34 | 16 | Garg.  Do you see that? |
| 00:08:36 | 17 | A.  Yes. |
| 00:08:36 | 18 | Q.  And what is his salary in 2014 to '15? |
| 00:08:41 | 19 | A.  $128,479. |
| 00:08:44 | 20 | Q.  And then -- and how long had he been a full |
| 00:08:50 | 21 | professor to the extent we can tell? |
| 00:08:53 | 22 | A.  At least, what, five, six -- he's in at least his |
| 00:08:56 | 23 | sixth year because he's got red font all the way back to |
| 00:08:59 | 24 | the first year of visible. |
| 00:09:01 | 25 | Q.  And so, it could be even farther back than that. |

00:09:04  1    A.  Yes.

00:09:04  2    Q.  Okay.  And so, he's making roughly $28,000 -- or,

00:09:11  3  excuse me, $128,000 in 2014-'15, correct?

00:09:17  4    A.  Yes.  128,479 to be exact.

00:09:21  5    Q.  Okay.  And then, Dr. G is -- he is promoted to a

00:09:30  6  full professor as of that year for the first time,

00:09:33  7  correct?

00:09:35  8    A.  Yes.  Appears that way.

00:09:37  9    Q.  Yes.  And what is his salary?

00:09:39  10   A.  128,370.

00:09:43  11   Q.  And so, what is the difference between these two

00:09:46  12  roughly?

00:09:48  13   A.  $109.

00:09:50  14   Q.  Out of -- and so, that's -- what would you put

00:09:52  15  that just roughly in percentage terms?

00:09:55  16   A.  One-tenth of one percent.

00:09:57  17   Q.  Okay.  And so, from this -- so from this specific

00:10:01  18  example, and we can look at some others, how does that

00:10:04  19  work -- how does that fit with the escalator that he

00:10:09  20  were on?

00:10:10  21   A.  That suggested that you can jump up steps.  As

00:10:15  22  you said, Professor G on row 34 is promoted years later

00:10:21  23  than Professor Garg on row 36, but in 2014-15, the year

00:10:26  24  that the first Professor G is promoted, they're making

00:10:30  25  virtually the identical salaries.

00:10:32   1      Q.   Let's look at some associate professors.  So, for

00:10:37   2   example, so Nan Sun goes from black to green between the

00:10:48   3   years 2016-'17 to '17-'18, correct?

00:10:51   4      A.   Yes.

00:10:51   5      Q.   And so, remind us, what does that signify?

00:10:55   6      A.   That's the promotion from assistant professor to

00:10:57   7   associate professor, and I would almost be certain

00:11:01   8   that's also with tenure.

00:11:02   9      Q.   And so, what are those -- what jump was

00:11:07  10   associated with that?

00:11:08  11      A.   Well, it's an almost $11,000 jump, around 10

00:11:13  12   percent.

00:11:13  13      Q.   Okay.  And so, that puts Dr. Sun at 119K more or

00:11:22  14   less.

00:11:22  15      A.   119,240.  Yes.

00:11:26  16      Q.   Thank you.  And so -- and that's actually more

00:11:28  17   than some of the other assistant -- or that's actually

00:11:33  18   more than some of the other associate professors,

00:11:35  19   correct?

00:11:36  20      A.   Yes.  On rows -- the one you highlighted are 65,

00:11:41  21   row 66, row 67, those three individuals were promoted a

00:11:46  22   few years earlier, and they're making less in 2017-'18

00:11:50  23   than is Dr. Sun.

00:11:53  24      Q.   And I don't want to be accused of cherry-picking.

00:11:56  25   So is there another example that we could look at right

00:12:01  1  now that similarly emphasizes this point?

00:12:05  2      A.  Well, you happen to have highlighted row 61.

00:12:10  3  Yes.  Dr. Dimakis is promoted effective '15-'16, goes

00:12:16  4  from 101,0 50 to 112,100.  And that 112,000 is virtually

00:12:23  5  identical to the several green rows below it for people

00:12:26  6  who were promoted one or more years earlier.

00:12:31  7      Q.  And so, looking at these examples, and I think

00:12:34  8  there's still others but I won't belabor the point, were

00:12:38  9  you in the courtroom when I used my rather clumsy

00:12:41  10  helicopter analogy?

00:12:43  11      A.  I was.

00:12:43  12      Q.  Okay.  So what did you understand that analogy to

00:12:46  13  mean?

00:12:46  14      A.  Well, I think you were suggesting that this is --

00:12:49  15  what you see here is possible.  In other words, that

00:12:53  16  it's not like you -- your promotion comes two years

00:12:56  17  later, so you're forever behind the people who were

00:12:59  18  promoted two years before.  This suggests that you're

00:13:03  19  promoted two years later and you're paid virtually

00:13:06  20  identically to the people who were promoted one or two

00:13:09  21  or three years earlier.

00:13:10  22      Q.  So was Dr. Glass' assumption about how U.T.

00:13:15  23  structures their promotions correct based on this

00:13:19  24  empirical data?

00:13:21  25      A.  Well, this certainly is a counterexample

00:13:24   1   inconsistent with that assumption, I would say.

00:13:26   2       Q.   And this is specific to the -- these are Cockrell

00:13:31   3   School of Engineering professors, correct?

00:13:32   4       A.   Faculty, yeah.   These are actually assistant to

00:13:35   5   associate, but yes.

00:13:36   6       Q.   Let's take a step back, then, and talk about Dr.

00:13:44   7   Thompson and we'll come back to Dr. Glass.   So talking,

00:13:52   8   then, about Dr. Thompson, I'm going to show you the

00:13:58   9   reports or the charts that he had and then, we can talk

00:14:01  10   about them.   So I'm showing you Plaintiff's Exhibit 237.

00:14:08  11       Were you in the courtroom when Dr. Thompson

00:14:10  12   testified?

00:14:11  13       A.   I was.

00:14:13  14       Q.   Could you tell us, what does his table 1 reflect?

00:14:22  15       A.   His table 1 is a comparison of the percentage of

00:14:32  16   female assistant professors who are reviewed early for

00:14:33  17   tenure compared to the percentage to male assistant

00:14:36  18   professors who were reviewed early for tenure.

00:14:39  19       Q.   Do you agree that this testimony has bearing on

00:14:43  20   Dr. Nikolova's case?

00:14:45  21       A.   No.

00:14:46  22       Q.   Well, why not?

00:14:47  23       A.   Well, this table, and as Dr. Thompson testified,

00:14:51  24   shows that to the percentage of women who went up early

00:14:55  25   is noticeably lower, statistically significantly lower

00:14:58  1    than the percentage of men who were put up early.  But

00:15:02  2    Dr. Nikolova went up early so, you know, her -- nothing

00:15:08  3    prevented her from going up early.  So the fact that

00:15:10  4    this is showing that at least some women went up -- were

00:15:14  5    less likely to go up early, it doesn't seem to apply to

00:15:16  6    her.

00:15:22  7         Q.  Let's move on then to tables 2 and 3.  Again,

00:15:28  8    these are not your tables.  These are Dr. Thompson's

00:15:30  9    tables.  What do you recall of his testimony about these

00:15:36  10   two tables?

00:15:38  11        A.  Well, table 2 was -- again, these are votes of

00:15:42  12   the departmental, what's called the budget committee or

00:15:47  13   -- I'm not sure the C stands for committee, but the

00:15:50  14   budget group, the people in the department -- the other

00:15:53  15   faculty in the department who were making a -- reviewing

00:15:55  16   and making a recommendation, a vote whether to -- in

00:15:58  17   favor of tenure or not.  And, you know, this shows that

00:16:02  18   those who receive a heavy, very high fraction of the

00:16:06  19   vote are quite likely to get tenure, and those who

00:16:09  20   receive lower fraction of the vote don't get tenure.  Or

00:16:13  21   flipping it around, the ones who don't get tenure didn't

00:16:16  22   get as many votes as the ones who do get tenure.

00:16:18  23        Q.  In your opinion, does this testimony and this

00:16:22  24   data have any bearing on the question of whether U.T.

00:16:25  25   Austin discriminated against Dr. Nikolova on the basis

00:16:27   1   of pregnancy or sex?

00:16:28   2       A.   No, because this table, there's nothing on here

00:16:32   3   about gender, or sex, or pregnancy.   It's just -- it's

00:16:38   4   about the votes and whether you get -- whether

00:16:42   5   promotions are denied or made.

00:16:45   6       Q.   And so, looking at this, can we infer anything

00:16:50   7   about why U.T. Austin did not grant early tenure to Dr.

00:16:54   8   Nikolova in 2019?

00:16:56   9       A.   I don't think so.

00:16:57  10       Q.   And do you know whether women are included in

00:17:01  11   this data?

00:17:02  12       A.   They are.   In fact, in table 3, those 62 that got

00:17:07  13   100 percent vote, again, this is from the college

00:17:09  14   committee, and again, 100 percent of those were given

00:17:14  15   tenure.   This is, again, before Dr. Nikolova's case, 16

00:17:20  16   of those 62 are women.   So there's plenty of women in

00:17:22  17   those data who are 100 percent vote and also get tenure.

00:17:28  18       Q.   Well, I should take a step back.   Did you review

00:17:32  19   the same data that Dr. Thompson reviewed in forming

00:17:37  20   these opinions?

00:17:37  21       A.   Yes.

00:17:38  22       Q.   Okay.   And so, when you say, you know, that the

00:17:41  23   women were included in that 13, what is that based on?

00:17:47  24       A.   I didn't say the 13.   I said the 62.

00:17:49  25       Q.   Excuse me.   The 62.   I apologize.

| | | |
|---|---|---|
| 00:17:51 | 1 | A.  Sixteen of the 62 are women.  The 13, I'm not -- |
| 00:17:55 | 2 | I don't recall the gender breakdown there, but the |
| 00:17:57 | 3 | relevant point, I think, is because, you know, Dr. |
| 00:18:02 | 4 | Thompson pointed out that before you know Dr. Nikolova's |
| 00:18:05 | 5 | case, 62 out of 62 who got 100 percent vote got tenure. |
| 00:18:09 | 6 | You know, he likened it to the sun coming up in the |
| 00:18:12 | 7 | morning. |
| 00:18:13 | 8 | Q.  Do you agree with that? |
| 00:18:13 | 9 | A.  Well, 62 out of 62 is 100 percent.  I'll give you |
| 00:18:17 | 10 | that.  But there's a lot of women in there.  So I |
| 00:18:21 | 11 | understand Dr. Nikolova, disappointed and shocked that |
| 00:18:26 | 12 | she didn't get tenure, but this doesn't suggest that it |
| 00:18:28 | 13 | was -- gender was the cause. |
| 00:18:29 | 14 | Q.  Well, let's talk about the data that you looked |
| 00:18:32 | 15 | at and your statistics.  So I want to move on from Dr. |
| 00:18:36 | 16 | Thompson's tables unless there's anything you'd like to |
| 00:18:39 | 17 | add about this before I move on. |
| 00:18:42 | 18 | A.  No, sir. |
| 00:18:43 | 19 | Q.  Okay. |
| 00:18:43 | 20 | A.  You're driving. |
| 00:18:46 | 21 | Q.  Let's go, then, to your data.  So first of all, |
| 00:19:12 | 22 | did you generate table two of Defendant's Exhibit 50? |
| 00:19:16 | 23 | A.  Yes, I did. |
| 00:19:16 | 24 | Q.  Okay.  And so, help us understand.  Walk us |
| 00:19:20 | 25 | through what this table reflects. |

00:19:23    1      A.   Sure.   There are three pairs of rows.   We'll

00:19:26    2    start with the first two up at the top that say the

00:19:28    3    population there.   So that's decisions prior to

00:19:31    4    2018-'19.   That was the same group that Dr. Thompson

00:19:36    5    focused on with those 62 votes.   Or, you know, the 62,

00:19:41    6    100 percent votes.   And what I've done here is one row

00:19:44    7    for women, one row for men.   And I've got three sets of

00:19:48    8    columns where I report then a number of people and then,

00:19:53    9    a percentage of what happened to them.

00:19:54   10      So the first set of columns there, department

00:19:57   11    committee recommends for tenure.   And so, what I'm

00:20:01   12    looking at there is, given the department recommended

00:20:04   13    for tenure, the normal cases get tenure, so the question

00:20:08   14    is, how often did someone not get tenure despite the

00:20:11   15    fact that their department recommended them for tenure?

00:20:14   16    And so, there were 20 cases there for women that where

00:20:20   17    the department recommended for tenure, and of those, 22

00:20:24   18    women were denied tenure.   This is again before Dr.

00:20:27   19    Nikolova's case.

00:20:27   20      Q.   How many women were denied tenure?

00:20:29   21      A.   Two.

00:20:30   22      Q.   Oh, two.   Thank you, sir.

00:20:32   23      A.   And that two out of 20 is the ten percent you see

00:20:34   24    in the percent denied tenure column.

00:20:36   25      Q.   Okay.   So 20 went up, two were denied and

00:20:41  1   that's --

00:20:42  2       A.  If I may.  Twenty were recommended.  There were

00:20:45  3   more that went up.  There's a footnote there that the

00:20:47  4   department committee recommended nine -- tenure in four

00:20:50  5   cases.  All four were denied tenure.  Ultimately, those

00:20:54  6   aren't really interesting and don't tell you anything.

00:20:56  7   So these are the ones that tell you something where the

00:20:59  8   final decision differed from what the department

00:21:02  9   recommended.

00:21:02 10       Q.  Thank you for correcting me.  Okay.  And so,

00:21:06 11   then, what about the men for department committee

00:21:10 12   recommends for tenure?

00:21:11 13       A.  Right.  And the comparison -- there were 63 men,

00:21:13 14   so a little over three times as many that were

00:21:17 15   recommended by the department, and a total of seven of

00:21:20 16   those 63 were ultimately denied tenure.  And so, that

00:21:24 17   rate of denial or percentage denied is 11.1 percent and

00:21:28 18   that -- it's slightly bigger than but it's not

00:21:31 19   statistically different from the 10 percent for women.

00:21:34 20   So there's no statistical difference here in the

00:21:38 21   fraction of women and men who are denied tenure amongst

00:21:42 22   those women and men who were recommended for tenure by

00:21:44 23   their department.

00:21:47 24       Q.  Okay.  So then, let's stick with this row -- or,

00:21:52 25   excuse me, this column for now.  So that was for

00:21:55   1   decisions prior to 2018 to '19.  And then, next you do

00:21:58   2   it again; this time, all decisions, except for Dr.

00:22:02   3   Nikolova.  Why rerun it that way?

00:22:05   4       A.  Well, I rerun it with more decisions to take it

00:22:08   5   through all the data we had.  And I specifically exclude

00:22:13   6   Dr. Nikolova, who is included in the last row, I'll say,

00:22:15   7   but is out of this row.  And the idea is, if something

00:22:23   8   bad happens to you and you say it's because of your

00:22:26   9   gender, well, we know something bad happened to you and

00:22:29   10  we know what your gender is, but the issue of whether

00:22:31   11  the causation is gender, you want to look at other

00:22:35   12  people who share that characteristic with you, all

00:22:38   13  women.  And what I've done here is just take Dr.

00:22:41   14  Nikolova out of it to see how does it look for all women

00:22:44   15  but her.  And then, I'm going to put her back in so that

00:22:47   16  we look at all women together.  But that's sort if the

00:22:50   17  idea to get an idea of, well, what was it like for

00:22:51   18  everyone else with regard to gender.

00:22:52   19      Q.  And so, looking at that data, what did you

00:22:55   20  determine?

00:22:57   21      A.  It's the same process.  You know, there were more

00:22:59   22  who were recommended for tenure.  It's exactly the same

00:23:03   23  numbers who were denied, the two and the seven.  So the

00:23:06   24  percentages are somewhat lower.  Again, the 8.3 percent

00:23:09   25  of the 24 women, excluding Dr. Nikolova, were denied and

00:23:14   1   9.6 percent of the 73 men were denied.  And again, the

00:23:18   2   8.3 percent and the 9.6 percent is not statistically

00:23:23   3   different.  So there's -- again, that comparison there

00:23:26   4   provides no evidence that gender is related to the

00:23:30   5   tenured decision, given the department's recommendation.

00:23:33   6       Q.  When you say not statistically significant or no

00:23:36   7   statistical difference, can you just break that down in

00:23:38   8   sort of common basic English?  What does that mean?

00:23:41   9       A.  Well, yeah.  I mean, if you had -- the easiest

00:23:47   10   thing to think about is flipping a coin, okay?  You've

00:23:50   11   got six coins and you're going to flip them, you expect

00:23:53   12   three heads and three tails, but you're not really

00:23:55   13   surprised if you get two heads and four tails or four

00:23:58   14   heads and two tails.  And so, there's a little bit of

00:24:01   15   luck involved.  And so, when we compare statistics, we

00:24:04   16   want to say, well, you know, I don't want to say they're

00:24:07   17   different if it's just kind of random chance.  However,

00:24:10   18   if you flip six coins and all six are heads or all six

00:24:13   19   are tails, that's kind of surprising.  That happens, you

00:24:16   20   know, well less than five percent of the time and so --

00:24:19   21       Q.  Can you make sure you're speaking into the mic.

00:24:22   22       A.  Sure.  If you flip it six times and you get all

00:24:27   23   heads or all tails, that's pretty unlikely.  And in

00:24:30   24   fact, that's so unlikely, you would -- from based on

00:24:32   25   that evidence, you would say, well, I'm not so sure

00:24:35  1   that's a fair coin, that it really is a 50/50 coin.

00:24:38  2       So that's what we're doing with statistical

00:24:42  3   significance is we say, I look at the process as if it

00:24:45  4   were neutral and with respect to in this case gender.

00:24:47  5   And then, you say, well, how did it come out?  Did it

00:24:50  6   come out pretty much even, in which case we go, well,

00:24:53  7   there's no evidence that it was related to gender?  Or

00:24:55  8   did it come out that women were treated much, much

00:24:57  9   better or women had much, much better outcomes or much,

00:25:02  10  much worse outcomes, then we would say, well, the

00:25:02  11  evidence suggests there's something going on unrelated

00:25:05  12  to gender.  And here, we're on the side of there's

00:25:07  13  really no difference.  If anything, it's higher for

00:25:11  14  women, but that's really nothing.  That's just again

00:25:13  15  like the two heads and a four tails.

00:25:15  16       So that's what I mean.  Is that -- are you

00:25:19  17  good?

00:25:19  18  Q.   I liked it.  Now, what about if there's only a

00:25:24  19  very, very small -- I don't know whether I'm using the

00:25:27  20  word "population" correctly, but what if you only had,

00:25:30  21  for example, two women that went up in a period of five

00:25:35  22  years because, let's say, we were only looking at one

00:25:38  23  department, and so, there was a very small population of

00:25:41  24  data.

00:25:42  25  A.   Sometimes you don't have enough data to be able

00:25:46  1    to say anything.  In other words, if you had very, very,

00:25:49  2    very few women to go up for tenure, you really wouldn't

00:25:52  3    be able to say something about women.  You could say

00:25:55  4    something about those two women.  So it's like with the

00:25:56  5    coins.  If you only had two and you flip them both and

00:25:59  6    you happen to get two heads, you're still not that

00:26:01  7    surprised.  You just don't have enough coins -- enough

00:26:04  8    flips of that coin to decide whether you think it's fair

00:26:07  9    or not.  So you need more information.  And so, if you

00:26:12  10   don't have enough information, it can be difficult to

00:26:16  11   find any statistical significance.

00:26:18  12       Q.  All right.  Let's move on, then, to the last row

00:26:24  13   in this department committee recommends for tenure

00:26:28  14   analysis.

00:26:29  15       A.  Sure.  And again, this is all decisions, so it's

00:26:32  16   one more decision includes Dr. Nikolova's case.  And so,

00:26:35  17   there's, you know, one more woman recommended by the

00:26:37  18   department, and one more woman who is denied tenure

00:26:40  19   ultimately.  So the row for women is 25 and with three

00:26:45  20   denied for 12 percent denial rate, compared to the men's

00:26:49  21   row the same as above, 73 men -- 79, 9.6.  Now the 12

00:26:54  22   percent is bigger than the 9.6, but it's not

00:26:57  23   statistically different.  Again, this is kind of the

00:26:59  24   four heads, two tails kind of case.

00:27:01  25       Q.  So then, next you looked at it -- what do the

| | | |
|---|---|---|
| 00:27:07 | 1 | statistics look like if the college committee recommends |
| 00:27:11 | 2 | for tenure.  Is that correct? |
| 00:27:12 | 3 |     A.   Yes.  It's a similar kind of idea, but now I |
| 00:27:16 | 4 | looked at it both ways.  You'll see the first set -- the |
| 00:27:19 | 5 | middle set of columns there for the college is the |
| 00:27:21 | 6 | college recommends for tenure and then, how often did |
| 00:27:26 | 7 | the university ultimately deny.  And then, the other |
| 00:27:31 | 8 | side of that reverse, which is the last -- the last set |
| 00:27:38 | 9 | of columns is the college committee recommends against |
| 00:27:41 | 10 | tenure, but the university granted it, anyway, okay?  So |
| 00:27:47 | 11 | both kinds of -- the university doesn't agree with the |
| 00:27:51 | 12 | college.  That's the point here.  And how does that |
| 00:27:53 | 13 | relate to or how does that compare with gender? |
| 00:27:57 | 14 |             And again, it's the same set of comparisons. |
| 00:28:00 | 15 | The first row is going to be prior to Dr. Nikolova's |
| 00:28:03 | 16 | case.  The second case is all cases except her.  And the |
| 00:28:05 | 17 | last row is including her case.  And the pattern in the, |
| 00:28:10 | 18 | you know, the university denied when the college |
| 00:28:12 | 19 | committee recommends for tenure, it's, you know -- let |
| 00:28:17 | 20 | me just do the -- first row is 17 women recommended for, |
| 00:28:21 | 21 | one denied, so that's 5.9 percent.  Comparison, 58 men |
| 00:28:26 | 22 | recommended, four denied, 6.9 percent.  So again, the |
| 00:28:30 | 23 | 5.9 and the 6.9 are not identical, but they're close |
| 00:28:34 | 24 | enough that we say there's no evidence it's -- you know, |
| 00:28:36 | 25 | it's not statistically significant related to gender. |

00:28:40  1          When we look at all decisions except Dr.
00:28:43  2   Nikolova, very similar pattern, you know, 5.9 percent
00:28:46  3   denial rate for men, 4.8 percent, a lower denial rate
00:28:50  4   for women, but again, no statistical difference.  When
00:28:52  5   we add Dr. Nikolova's case, you know, she's one out of
00:28:54  6   22 women, she is denied.  So that raises that percentage
00:28:58  7   a noticeable amount to 9.1 percent, two out of 22 women
00:29:01  8   and for men, four out of 68 men.  And so, the 9.1
00:29:05  9   percent for women is higher than the 5.9, but it is not
00:29:09  10  statistically significantly higher.  So there's, you
00:29:12  11  know, from the statistician point of view, those data do
00:29:17  12  not provide evidence that gender was related to or
00:29:21  13  significantly at least related to the reversal of the
00:29:26  14  college's recommendation.
00:29:29  15      Q.  So that was for the -- when the college committee
00:29:31  16  recommends for tenure.  What about when they recommend
00:29:34  17  against tenure?
00:29:35  18      A.  When they recommend against tenure, it doesn't
00:29:37  19  happen as often, but the university also doesn't always
00:29:40  20  take that recommendation.  So you can see there -- all
00:29:43  21  the rows are the same because, you know, Dr. Nikolova
00:29:48  22  didn't affect this column.  She was recommended and, in
00:29:51  23  fact, all the decisions after -- her case and after also
00:29:55  24  don't affect it.  It's a grand total of nine that were
00:29:58  25  -- where the college committee recommended against,

00:30:01  1   three women and six men, and of those three women, the

00:30:06  2   university reversed it and granted tenure in two of the

00:30:09  3   three cases.  And for the six men, it also granted

00:30:13  4   tenure in two of the six cases.  So the percentages are

00:30:15  5   66 and 33, two thirds and one third.  But again, this is

00:30:20  6   back to your question earlier, it's such a small sample.

00:30:24  7   We only have nine cases.  We just don't have an

00:30:26  8   ability -- even though 33 and 66 look like they're a

00:30:29  9   long way apart, you know, it's just really, you know,

00:30:31  10  one or two people.  So it's still not statistically

00:30:34  11  significantly different.

00:30:37  12       So the bottom line on this whole table is, there

00:30:40  13  is no statistical evidence for a relationship between

00:30:44  14  gender and the tenure decision given the department

00:30:48  15  and/or the college's recommendation.

00:30:50  16  Q.  And why did you even look at the college and

00:30:55  17  department committees at all?

00:30:57  18  A.  Well, this is playing off of Dr. Thompson's

00:31:01  19  table, you know, his tables 2 and 3 were about votes at

00:31:06  20  these committees, right?  And so, you know, she was

00:31:11  21  recommended by her department and she was recommended by

00:31:14  22  the college but ultimately didn't get it, so, you know,

00:31:16  23  we want to see if that is gender related.  I was doing

00:31:23  24  the gender comparison that Dr. Thompson did not do.

00:31:28  25  Q.  Well, let's go, then, to your third chart or your

00:31:31  1   third table.  What does this reflect?

00:31:35  2       A.   It's a little bit broader.  It's just looking at

00:31:41  3   the tenure decision.  Ignores -- as you suggested,

00:31:44  4   ignores whether the department or the college

00:31:47  5   recommended or not.  It's just asking bottom line:  What

00:31:49  6   fraction of women get tenure?  What fraction of men get

00:31:52  7   tenure?  And so, does it -- this is now the groups are

00:31:56  8   going across the page.  The first comparison there is,

00:31:58  9   again, prior to Dr. Nikolova's case.  There were 21

00:32:02  10  women considered, 18 tenured.  There were 66 men

00:32:07  11  considered, 56 tenured.  And those two percentages are

00:32:11  12  very, very close.  85.7.for women and 84.6 percent for

00:32:16  13  men are the percentages granted tenure.  The women

00:32:19  14  slightly bigger than the men but, again, no statistical

00:32:21  15  difference.

00:32:23  16      Q.   And then, the next column.

00:32:25  17      A.   The next column includes all the decisions,

00:32:29  18  excluding Dr. Nikolova, consistent with the way I'd

00:32:34  19  broken it down before, 22 of 25 women are -- extends to

00:32:38  20  the full-time period, 22 of 25 women were granted

00:32:41  21  tenure; that's 88 percent.  Sixty-six of 76 men granted

00:32:45  22  tenure; that's 86.8 percent.  Again, very similar

00:32:49  23  numbers.  No statistical difference.

00:32:52  24          And then, the last one includes Dr. Nikolova so

00:32:55  25  the number of women considered goes up -- you've gotta

00:33:00  1   scoot it over a little bit more.  There we go.  The

00:33:04  2   number of -- okay.  All decisions, this is the third

00:33:08  3   column.  The number of women considered there, the 26 is

00:33:11  4   one more than the 25.  That's Dr. Nikolova.  And so, 22

00:33:15  5   out of 26 is 84.6 percent.  And the 66 out of 76 for men

00:33:20  6   is 86.8 percent.

00:33:22  7        So again, now the women's number is slightly

00:33:25  8   lower than the men's, but there's a not a statistical

00:33:27  9   difference between those two.  You know, the data don't

00:33:30  10  support a conclusion that gender is related to the

00:33:35  11  granting of tenure.

00:33:36  12     Q.  And what about this last column, all decisions

00:33:40  13  plus those who left prior to tenure review?

00:33:43  14     A.  Yeah.  This looks a little bit broader because --

00:33:46  15  you know, I haven't seen any of the testimony, really,

00:33:48  16  other than the experts, but there's universities

00:33:52  17  typically have a thing, a third-year review.  And also,

00:33:54  18  as you're working through tenure, you can be -- it can

00:33:59  19  be suggested that may be you should find someplace else

00:34:02  20  to teach.

00:34:03  21        So to the extent that women were encouraged or --

00:34:08  22  to leave or were told at the third-year review, it's not

00:34:11  23  going well and they left, the tenure numbers could look

00:34:13  24  good for women because all the ones who weren't going to

00:34:15  25  get tenure left earlier.  So this puts everybody in the

00:34:18  1   pot who comes in the door as an assistant professor and

00:34:21  2   says when you start out as an assistant, I want to know

00:34:23  3   what happens to you.  You either get tenure or you

00:34:25  4   don't.

00:34:26  5        Some of the ones who don't left before they were

00:34:28  6   denied.  Some of the ones who don't were denied.  But

00:34:31  7   it's a broader comparison and would not be affected by

00:34:35  8   any differential decisions to leave early or being

00:34:39  9   encouraged to leave early.  And so, in that case, you

00:34:41  10  know, it's a little more expanded pool, right?  There's

00:34:44  11  30 total women, 90 total mean, exactly three to one.

00:34:48  12  And the percentage ultimately tenured, whether they were

00:34:50  13  -- the ones who weren't tenured were, again, they denied

00:34:53  14  or left is 22 women and 66 men.  That's also exactly

00:34:58  15  three to one.

00:34:58  16       So in this particular case, and this includes Dr.

00:35:02  17  Nikolova, the percentages are identical, the fraction of

00:35:06  18  women and the fraction of men who came in the door as

00:35:08  19  assistant professors in this time period, the same

00:35:12  20  percentages were ultimately granted tenure by the

00:35:16  21  University of Texas.

00:35:28  22  Q.   Anything else you want to tell us about table 3

00:35:32  23  before I move on?

00:35:33  24  A.   No.

00:35:33  25  Q.   Okay.  All right.  Now, I think we've moved on

| | | |
|---|---|---|
| 00:35:39 | 1 | from Dr. Thompson now to address Dr. Glass' testimony, |
| 00:35:44 | 2 | and we already talked a little bit about this.  But what |
| 00:35:47 | 3 | did you do in computing her -- Dr. Nikolova's damages |
| 00:35:52 | 4 | model? |
| 00:35:54 | 5 |     A.   Again, Dr. Glass had three scenarios.  I |
| 00:35:59 | 6 | basically took his first scenario and did it somewhat |
| 00:36:03 | 7 | differently.  That's the one where she -- instead of |
| 00:36:06 | 8 | getting tenure in September -- effective September 1, |
| 00:36:09 | 9 | 2019 her, tenure would be -- becomes effective September |
| 00:36:13 | 10 | 1st, 2023.  So, you know, year and a half from now.  And |
| 00:36:17 | 11 | that she works until about age 65 and so, that's -- I |
| 00:36:25 | 12 | took his scenario one and I -- you'll notice there for |
| 00:36:28 | 13 | the row with the base case if you can sort of highlight |
| 00:36:31 | 14 | that up under expected future salaries near the top. |
| 00:36:50 | 15 | The data at the top says denied tenure September 1st, |
| 00:36:54 | 16 | '19.  Alternative assumption date of tenure is going to |
| 00:36:57 | 17 | be 9-1-2023.  I adopted the same assumption as Dr. Glass |
| 00:37:02 | 18 | for the employee contribution to retirement |
| 00:37:05 | 19 | seven-and-a-half percent.  So now, the base case had she |
| 00:37:08 | 20 | been tenured September 1st, 2019, I have her with a |
| 00:37:13 | 21 | salary of 129,500.  And then, I have her salary in that |
| 00:37:20 | 22 | case that would have -- by September 1st of 2023, I have |
| 00:37:24 | 23 | that her salary would have grown to 149,314 by September |
| 00:37:31 | 24 | 1st of 2023, had she received tenure in September of |
| 00:37:35 | 25 | '19. |

00:37:36  1        And Dr. Glass used a number of 130,500.  I used a

00:37:41  2   thousand dollars less than that.  His number actually

00:37:44  3   comes from the salary of a particular faculty member

00:37:47  4   promoted at that particular time.  I think it's a Dr.

00:37:51  5   Tiwari.  And if you look, the increase that Dr. Nikolova

00:37:55  6   would have received to get to the 129,5 would have been,

00:38:00  7   as I note two rows below, 16.35 percent, which is larger

00:38:04  8   than every other promotional increase we see in the data

00:38:07  9   from the Cockrell School of Engineering, except for one.

00:38:09  10  Most of the promotional increases are around 10, 11

00:38:13  11  percent.

00:38:13  12       Q.  So just to be clear, you looked at multiple

00:38:16  13  professors who were promoted from assistant to associate

00:38:19  14  and looked at how much a percentage increase they

00:38:22  15  experienced.

00:38:22  16       A.  Yes.  And as I said, most of the time, that was

00:38:25  17  between -- close to 12 percent.  Between 10 and 12

00:38:27  18  percent and -- but I looked, you know, Professor Tiwari

00:38:32  19  made about $4,000 more than Nikolova in 2018, and if you

00:38:38  20  looked in, you know, the lack of escalator, the data we

00:38:41  21  were looking at a minute ago, you could see that there

00:38:43  22  was a tendency to get pretty close to people's pay that

00:38:48  23  were all promoted at the same time.  We didn't focus on

00:38:50  24  that, but it's also in those data.

00:38:52  25            So I saw several other cases or at least a couple

00:38:55  1   of other cases where people promoted the same year who

00:38:57  2   were paid differently as assistants made within a

00:39:00  3   thousand dollars of each other as associates, but didn't

00:39:03  4   make exactly the same.  So that's what I did for Dr.

00:39:05  5   Nikolova.  I assumed it would get to 129,5, within a

00:39:09  6   thousand dollars of Professor Tiwari.  So that's where

00:39:11  7   the 129,5 comes, and I note that it's a 16.35 percent

00:39:15  8   increase over her prior year salary, which, as I said,

00:39:19  9   is larger than every other promotional increase in those

00:39:22  10  data, except for one.

00:39:23  11      Q.  So you're doing a similar elevator but the gap

00:39:27  12  starts out pretty small, and then, it closes over a

00:39:30  13  period of time or how would you --

00:39:31  14      A.  Well, I wouldn't do that.  I would say -- so I

00:39:36  15  assume that had she gotten tenure, it was 129,5.  That's

00:39:39  16  what she would have had when she was tenured.  The row

00:39:42  17  right below that is, she didn't get tenure, so her

00:39:45  18  salary was actually 114,639 that it, in fact, was.

00:39:49  19  Okay.  And now, I think what we want to do is, we can

00:39:53  20  switch to the bottom so we can look at it year by year

00:39:56  21  so there -- so the first row there September 1st, '19,

00:40:03  22  that's the 129,5 had she received tenure.  And her

00:40:08  23  actual salary, given she did not receive tenure,

00:40:11  24  114,639.  And then, that year, virtually everyone in

00:40:17  25  school got a zero percent increase.  That was, I think,

00:40:20  1   COVID issues and all.  Also, that was a raise pull that

00:40:25  2   year, folks.  There wasn't one essentially.

00:40:25  3       Q.  There wasn't an estimate.  At this point, you're

00:40:27  4   looking at the actual data.

00:40:28  5       A.  I'm looking at the actual data under scenario

00:40:31  6   one, yes.  Her actual salary was, again, the same the

00:40:34  7   next year as virtually everyone's in the college was.

00:40:36  8   And so, in the "but for" case, had she been tenured and

00:40:40  9   moved to 129,5, I assumed, well, you know, again, you

00:40:43  10  would not have gotten an increase -- she would not have

00:40:45  11  gotten an increase that year.

00:40:47  12          And then, for each of the subsequent years, the

00:40:51  13  growth and the base case is 4.86 percent, and that's

00:40:55  14  actually higher than Dr. Glass assumed, but that's the

00:40:58  15  average within rank increase in the data that you and I

00:41:01  16  looked at a minute ago.  And so, the average annual

00:41:05  17  increase -- not counting the 19200.  That would have

00:41:08  18  pulled it down.  But in the other years, it was about a

00:41:10  19  4.86 percent increase.  So I said that's about on

00:41:13  20  coverage how your salary goes up when you don't get a

00:41:16  21  promotion.

00:41:16  22          And so, that's what we're doing until, you

00:41:20  23  know, you can see few rows down for September 1st, 2023,

00:41:27  24  so there, Dr. Nikolova gets about a $20,000 increase,

00:41:32  25  okay, from 126 to 146.  That's the promotion in this --

| | | |
|---|---|---|
| 00:41:37 | 1 | in the new world.  The assumption is, she will be -- or |
| 00:41:40 | 2 | these calculations are made assuming that she receives |
| 00:41:43 | 3 | tenure and promoted to associate professor September 1st |
| 00:41:47 | 4 | of 2023.  And that's back to that 16.35 percent |
| 00:41:51 | 5 | increase.  So I used the same percentage increase that I |
| 00:41:53 | 6 | had used before. |
| 00:41:54 | 7 | And then, you'll note, you can see it right |
| 00:41:57 | 8 | at the top of the page there, it says catch-up growth. |
| 00:42:01 | 9 | So the top of the screen.  I'm sorry.  It was there. |
| 00:42:11 | 10 | See where it says within rank row 4.86 percent and then, |
| 00:42:15 | 11 | catch-up growth, .63 percent.  That is the amount of |
| 00:42:21 | 12 | growth that I assume she experiences over the 24 -- over |
| 00:42:26 | 13 | the subsequent three years to catch her up to where she |
| 00:42:29 | 14 | would have been. |
| 00:42:30 | 15 | So if you look at the last row on the table |
| 00:42:32 | 16 | at the bottom, September 1st of 2026, I have her earning |
| 00:42:38 | 17 | 172,159.  If she had received tenure back in '19 and I |
| 00:42:43 | 18 | have also have her catching up to that same spot if she |
| 00:42:48 | 19 | receives tenure in 2023.  And so, part of the reason for |
| 00:42:53 | 20 | my assuming the catch-up is, as you said, if you look in |
| 00:42:57 | 21 | the data, it's not an escalator-type world.  It's also |
| 00:43:01 | 22 | the case that there's a substantial amount of data. |
| 00:43:05 | 23 | And this was what I cited in my report from |
| 00:43:08 | 24 | the Bureau of Labor Statistics.  Every two years, they |
| 00:43:12 | 25 | survey what's called displaced workers, people who have |

| | | |
|---|---|---|
| 00:43:15 | 1 | lost a job, and they look at whether those people are |
| 00:43:18 | 2 | reemployed, and if they're reemployed, how much they're |
| 00:43:20 | 3 | earning relative to the job they left.  And within three |
| 00:43:24 | 4 | years -- because the average is from one to three years. |
| 00:43:27 | 5 | Within three years, over half of the individuals who are |
| 00:43:31 | 6 | reemployed are now earning what they otherwise would |
| 00:43:36 | 7 | have earned on the job that they lost. |
| 00:43:39 | 8 | And so, there's evidence more generally |
| 00:43:42 | 9 | besides just U.T.'s faculty data that Dr. Nikolova would |
| 00:43:46 | 10 | be likely to catch up.  And moreover, suppose Dr. |
| 00:43:54 | 11 | Nikolova got fed up with U.T. and left.  Go to another |
| 00:43:57 | 12 | university, get tenure there, get paid in a very similar |
| 00:44:01 | 13 | way, one would think.  So, you know, there is a market |
| 00:44:06 | 14 | there.  People do leave universities and go to other |
| 00:44:09 | 15 | universities and so -- |
| 00:44:11 | 16 | MR. NOTZON:  Objection, your Honor.  This is |
| 00:44:12 | 17 | well beyond his expertise.  He didn't cite it in his |
| 00:44:16 | 18 | report.  There's no scientific basis for it. |
| 00:44:18 | 19 | THE COURT:  It's not in his report? |
| 00:44:20 | 20 | MR. DOWER:  I'm not sure off the top of my |
| 00:44:22 | 21 | head, your Honor.  If it's just -- |
| 00:44:23 | 22 | THE WITNESS:  Not really. |
| 00:44:24 | 23 | MR. DOWER:  Okay.  Well, then, we'll -- |
| 00:44:26 | 24 | THE WITNESS:  Sorry. |
| 00:44:27 | 25 | THE COURT:  It's okay. |

00:44:29  1   Q.   (BY MR. DOWER)  Okay.  Anything more that you'd

00:44:37  2   like to -- well, actually, we should probably talk a

00:44:39  3   little bit about some of these other columns.  So can

00:44:42  4   you just explain like what does the loss column reflect?

00:44:46  5   A.   The loss is the difference between the base case

00:44:48  6   and the scenario.  So that represents the amount of

00:44:51  7   money that Dr. Nikolova would have earned had she -- or

00:44:55  8   the estimated amount of money she would have earned had

00:44:57  9   she received tenure in '19, compared to now receiving it

00:45:00  10  in 2023.

00:45:01  11  Q.   Is this for the year in which it appears in the

00:45:05  12  row?

00:45:05  13  A.   Yes.  So in that -- for the year starting 9-1-19,

00:45:11  14  it was a little under 15,000.  Exactly the same next

00:45:16  15  year because no raises were given anywhere.  And then, a

00:45:18  16  little bit larger and a little bit larger and it drops

00:45:20  17  down and then, shrinks to zero.

00:45:22  18  Q.   And why does it drop so dramatically?

00:45:24  19  A.   Well, it drops so dramatically September 1st,

00:45:28  20  2023 because that's the assumption as Dr. Glass made

00:45:34  21  that she receives tenure at that point and is promoted

00:45:36  22  to associate professor.

00:45:40  23  Q.   Real quick, going back up, this says date of

00:45:43  24  tenure denial September 1st, 2019, but we've heard

00:45:47  25  testimony that the decision was made in February.  Why

00:45:50  1  use September 1st?

00:45:50  2      A.  That's when it would have taken effect.  So the

00:45:55  3  date at which the deny tenure would have been effective

00:45:58  4  is probably a better way to say that.

00:46:00  5      Q.  And so, I noticed your total loss is the sum of

00:46:04  6  loss in retirement contribution.  What does that mean?

00:46:07  7      A.  Well, the retirement contribution is that

00:46:09  8  seven-and-a-half percent because the University of Texas

00:46:13  9  faculty have a -- they actually have one of two.  They

00:46:17 10  have a retirement system that the university contributes

00:46:19 11  to and Dr. Glass' assumption that I adopt it was that

00:46:24 12  seven-and-a-half percent.  So the loss --

00:46:26 13  seven-and-a-half percent of the loss column is put in

00:46:29 14  the retirement contribution column.  So that's also a

00:46:32 15  loss.  And then, adding those two together, the loss and

00:46:35 16  the lost retirement contribution is -- gives the total

00:46:39 17  loss in dollars for each of the years.

00:46:42 18      Q.  So you're not shortchanging her the retirement

00:46:44 19  stuff.

00:46:45 20      A.  No.

00:46:46 21      Q.  And what about the discount factor?  What's that?

00:46:50 22      A.  Well, that is very similar to what Dr. Glass

00:46:54 23  talked about is, you know, $100,000 or any amount of

00:46:57 24  money in a couple of years is not worth the same as the

00:47:00 25  amount of money now because there are interest rates.

00:47:03   1   As he explained quite well, if you want somebody to have

00:47:06   2   100,000 in five years, you give them something less than

00:47:08   3   that, they invest it, it grows at the interest rate, in

00:47:12   4   five years, they've got $100,000.

00:47:14   5          So when you're calculating what it's worth today

00:47:18   6   of what money in the -- for those payments that she's

00:47:20   7   going to miss in the future, you do the reverse of that.

00:47:23   8   You sort of pull it -- you shrink it by how much the

00:47:27   9   interest is that would have been earned, and that's what

00:47:28   10  the discount factor is.  It's based on interest rates

00:47:32   11  and, you know, those discount factors are based on --

00:47:38   12  they're actually -- there's a market for what's called

00:47:42   13  strip securities from the U.S. Treasury.

00:47:44   14         You can take a treasury bond with interest coupon

00:47:46   15  payments, physically strip those two apart, and you can

00:47:50   16  -- essentially there's a market for -- I want to have

00:47:53   17  $10,000 paid to me in November of 2024, well, there's a

00:47:56   18  market for that.  And whatever the price is for $10,000

00:47:59   19  in November 2024, you say okay, that's what we're going

00:48:02   20  to count as $10,000 is worth today.

00:48:04   21         So my discount factors are based on the market

00:48:08   22  prices at the time I wrote my report for moneys in the

00:48:13   23  future effectively.

00:48:15   24     Q.   And so, your total lost compensation, can you

00:48:21   25  just sort of summarize, what does that reflect?

00:48:23   1        A.   Well, that takes the yearly losses in the fourth

00:48:27   2    column, the first red column, adds to them the lost

00:48:30   3    retirement contribution, takes the total loss,

00:48:34   4    multiplies those by the discount factor to take -- bring

00:48:37   5    those to present value.  So effectively, that's going to

00:48:39   6    take moneys in the future and shrink them a little bit.

00:48:43   7    And then, it's going to add all -- the present value of

00:48:47   8    all those annual losses and that gives a total loss of

00:48:51   9    just over $72,000.

00:48:52  10        Q.   So this is -- so this is your estimate of the

00:48:57  11    lost compensation given this scenario and then, how much

00:49:02  12    that would be worth if she were to get the money today

00:49:06  13    effectively.

00:49:06  14        A.   Yes.

00:49:24  15        Q.   Do you have any other comments or response to Dr.

00:49:27  16    Glass' scenario one?

00:49:30  17        A.   No.

00:49:31  18        Q.   Okay.  Well, so we don't have a chart for it, but

00:49:35  19    for Dr. Glass' scenario two, do you believe that --

00:49:39  20        A.   I'm sorry.  Can I change my answer?

00:49:41  21        Q.   Sure.

00:49:42  22        A.   Because remember Dr. Glass' scenario one and two

00:49:46  23    sub-scenarios to 65 and to 70.  For -- there's catchup,

00:49:51  24    it's not going to matter.  But in his assumption where,

00:49:54  25    you know, you're on an escalator and you never catch up,

00:49:58  1   it matters -- as you could see, it matters whether you

00:50:00  2   take it to 65 or you take it to 70.  And I hope I am as

00:50:04  3   in as good a shape as he is when I'm his age, but most

00:50:07  4   people don't work to 70, not even necessarily most

00:50:11  5   faculty.  There are tables from -- as he cites in his

00:50:13  6   report that calculate expected remaining work life by

00:50:16  7   education and age and gender, and that is, as he

00:50:20  8   reports, 65 or 65 and change years for Dr. Nikolova.

00:50:25  9       So I don't -- even if you believe that there was

00:50:28  10  the escalator problem that there's a gap that's going to

00:50:31  11  last forever, I think it would stop at age 65, not at

00:50:35  12  age 70.

00:50:35  13      Q.  If Dr. Nikolova said that she wants to work to

00:50:38  14  70, does that change that opinion at all?

00:50:41  15      A.  No.  I don't think so.  I mean, I understand --

00:50:43  16      Q.  Why not?

00:50:44  17      A.  I understand and people say things.  And one of

00:50:46  18  the aspects -- it's just based on statistics and life

00:50:49  19  spans and what the observed behavior of people of those

00:50:54  20  ages and those education levels and those genders, so

00:50:57  21  it's a population average.  Doesn't mean she couldn't,

00:50:59  22  but it means that, you know, sort of the likely or

00:51:02  23  expected outcomes is 65 years.

00:51:05  24      Q.  Anything about -- anything else about scenario

00:51:10  25  one?

00:51:10    1      A.   No.

00:51:10    2      Q.   Okay.   If you change your answer again, just let

00:51:14    3  me know.   So scenario two for Dr. Glass was that Dr.

00:51:20    4  Nikolova continues in a nontenured position at U.T.

00:51:23    5  Austin.   Do you have an opinion about whether Dr. Glass

00:51:26    6  understates or overstates Dr. Nikolova's earning losses

00:51:30    7  in that scenario?

00:51:31    8      A.   Well, I think he understates them.   I mean, as he

00:51:34    9  admitted, you know, she couldn't stay in an untenured

00:51:37   10  position at U.T.   That's against the rules.   But she

00:51:40   11  could move on somewhere else.   Well, if she's going to

00:51:42   12  move on somewhere else, you know, if you're worthy of

00:51:45   13  tenure at U.T., you can certainly -- that's a really

00:51:47   14  good school.   You're worthy of tenure in a lot of place.

00:51:50   15  She would move on presumably --

00:51:50   16           MR. NOTZON:   Objection.   Your Honor, again,

00:51:53   17  opining as a labor expert and that's not what he's here

00:51:57   18  to do.

00:51:57   19           THE COURT:   Is that in your report, by any

00:51:58   20  chance, Doctor?

00:52:00   21           THE WITNESS:   I made some reference to it.

00:52:05   22  I just stand by the -- sorry.

00:52:08   23           MR. DOWER:   I thought it was in his report,

00:52:10   24  but I could be wrong.

00:52:11   25           MR. NOTZON:   Whether it's in his report or

00:52:12  1   not, he's not a labor expert.  He has no evidence or

00:52:17  2   expertise and the employability of a professor at

00:52:21  3   another university.

00:52:22  4          MR. DOWER:  I tendered him as an expert in

00:52:23  5   labor economics and didn't get an objection.

00:52:26  6          MR. NOTZON:  Economics, but not whether or

00:52:28  7   not employability at another university --

00:52:30  8          THE COURT:  Okay.  Since it's disputed as to

00:52:32  9   whether it's in the report, let's just move beyond.

00:52:35  10  Q.  (BY MR. DOWER) Okay.  To the best of your

00:52:38  11  recollection, is there anything that's contained in your

00:52:40  12  report about Dr. Glass' scenario two that you'd like to

00:52:45  13  explain to the jury?  If you want to refresh your

00:52:48  14  recollection, I can hand you a copy of your report.

00:52:51  15  A.  Sure.  I would just read the sentence from my

00:53:35  16  report, if I may.  Under Dr. Glass' scenario two,

00:53:41  17  further, even if Dr. Nikolova could continue at U.T.

00:53:43  18  Austin after being denied tenure in 2023, it seems

00:53:46  19  likely that her earnings could be higher from a tenured

00:53:49  20  position at another university than from a nontenured

00:53:51  21  position at U.T. Austin.

00:53:55  22         MR. NOTZON:  Your Honor, my objection stands

00:53:57  23  as to the employability and the likelihood.  He makes

00:54:03  24  the assumption that she goes and gets another job based

00:54:07  25  -- and I'll cross him on the fact that there's no

00:54:09  1   evidence behind that.  That's fine.  But not to testify

00:54:12  2   about that likelihood or the ease with which she can be

00:54:16  3   reemployed.

00:54:18  4          MR. DOWER:  I think this sentence that's in

00:54:21  5   the report is what his testimony is.

00:54:23  6          THE COURT:  As long as he's sticking to his

00:54:25  7   report, you'll have the opportunity to cross-examine him

00:54:27  8   on whatever he's saying.

00:54:29  9          MR. NOTZON:  Thank you, your Honor.

00:54:30  10     Q.  (BY MR. DOWER) Finally, Dr. Deere, to the extent

00:54:38  11  it's in the report, do you have any response to Dr.

00:54:43  12  Glass' scenario three in which Dr. Nikolova leaves U.T.

00:54:46  13  Austin on August 31st, 2023 and then, just has zero

00:54:51  14  income thereafter?

00:54:53  15     A.  I just note that Dr. Glass admits that that was,

00:54:57  16  quote, an unlikely, unquote, scenario.

00:55:02  17     Q.  Pass the witness.

00:55:09  18                    CROSS-EXAMINATION

00:55:09  19  BY MR. NOTZON:

00:55:10  20     Q.  Good afternoon, Dr. Deere.

00:55:12  21     A.  Hi.

00:55:13  22     Q.  So I take it from your report this is only the

00:55:16  23  third case you've been working in the last four years?

00:55:19  24     A.  No.

00:55:20  25     Q.  Well, you only list two other cases in your

00:55:24  1  appendix.

00:55:24  2      A.   That's testimony, right?

00:55:26  3      Q.   Okay.  And which party did you work for in those

00:55:31  4  two cases?  You didn't list that.  Did you work for the

00:55:35  5  plaintiff or the defendant?

00:55:37  6      A.   In the AJP Oil Company case, I worked for the

00:55:41  7  plaintiff.  In the state of Texas case, I worked for the

00:55:43  8  defense.

00:55:44  9      Q.   Okay.  And the --

00:55:46  10     A.   No, no, no.  Actually, I'm sorry, I worked for

00:55:48  11  the state of Texas.  So plaintiffs in both cases.

00:55:50  12     Q.   Okay.  And neither those were employment cases?

00:55:57  13     A.   That is correct.

00:55:58  14     Q.   Okay.  And you've been doing this for how long,

00:56:03  15  testifying as an expert in court?

00:56:07  16     A.   Well.

00:56:09  17     Q.   Fifteen years?

00:56:10  18     A.   The first testimony, yeah, 15 or so years ago.

00:56:14  19  I've worked in -- you know, in this doing the consulting

00:56:16  20  work for like 31.  But probably the first time I

00:56:21  21  testified would have been, I don't know, around 2005.

00:56:24  22  That's probably reasonable, 2007.

00:56:26  23     Q.   And you heard Dr. Glass has been doing this for

00:56:29  24  over 40 years?

00:56:30  25     A.   Yes.

00:56:30  1    Q.   And on the -- sticking with Glass and then, we'll

00:56:36  2    go back to Dr. Thompson.   Isn't it true, you don't have

00:56:41  3    any evidence of how reemployable Dr. Nikolova would be

00:56:45  4    in another university, correct?

00:56:47  5    A.   Well, she changed universities once already,

00:56:49  6    right?

00:56:51  7    Q.   Sir, you don't have any evidence, any scientific

00:56:54  8    evidence, any literature that you use to be able to

00:56:58  9    testify about the likelihood of her reemployability in

00:57:01  10   her current circumstances, do you?

00:57:04  11   A.   No.

00:57:09  12   Q.   And the unemployed data that you refer to

00:57:11  13   differs, depending on the field of the employment,

00:57:15  14   correct?

00:57:18  15   A.   I'm not --

00:57:19  16   Q.   The labor statistics you talked about?

00:57:21  17   A.   Well --

00:57:22  18   Q.   About the people that are unemployed and when

00:57:24  19   they get reemployed?

00:57:25  20   A.   That covers the workforce -- all the workforce.

00:57:29  21   So that includes people who are doing quite different

00:57:32  22   things, yes.

00:57:32  23   Q.   Okay.   So it's an aggregate one number?

00:57:35  24   A.   Yes.

00:57:36  25   Q.   Okay.   So there may be differences for university

00:57:41   1   professors?

00:57:43   2       A.   Certainly could be.   Yes.

00:57:44   3       Q.   And your catchup growth assumption there is -- is

00:57:48   4   there any scientific or economic basis?

00:57:53   5       A.   Well, I would think that --

00:57:54   6       Q.   Or is it an arbitrary number?

00:57:57   7       A.   Well, three years is from the Department of Labor

00:58:02   8   Statistics.

00:58:03   9       Q.   The catchup?

00:58:04   10      A.   Period of the catchup.   I split the growth

00:58:06   11  equally over the three years.

00:58:08   12      Q.   Okay.

00:58:10   13      A.   And I would also point to the -- you know, the

00:58:12   14  data in college that showed people, you know, aren't

00:58:16   15  stuck on an escalator.

00:58:17   16      Q.   Okay.

00:58:18   17      A.   Necessarily.

00:58:19   18      Q.   Yeah, that's -- that data you looked at that you

00:58:22   19  said kind of the helicopter scenario or the

00:58:25   20  anti-escalator evidence, that's anecdotal, right?

00:58:30   21  That's you just kind of looked around, but you didn't

00:58:32   22  actually do a numerical study or a statistical study of

00:58:35   23  the salaries at U.T., correct?

00:58:39   24      A.   The stuff we did online here, yes.   It was just

00:58:43   25  picking up some examples.   That's true.

00:58:45  1    Q.  All right.  And moving on to Dr. Thompson.  Isn't

00:59:02  2  it true that the process for early tenure review that

00:59:10  3  you discussed, you criticized Dr. Thompson because the

00:59:14  4  decision to go up early was in part the faculty

00:59:19  5  member's.  Do you recall that criticism in your report?

00:59:22  6    A.  Yes.

00:59:23  7    Q.  Okay.  And you had access to Professor Tewfik's

00:59:27  8  deposition as part of your review in your report.

00:59:30  9    A.  I think so.  Yes.

00:59:31  10    Q.  And were you here for the testimony of Professor

00:59:35  11  Tewfik or --

00:59:36  12    A.  No.

00:59:36  13    Q.  Dr. Fenves?

00:59:37  14    A.  No.

00:59:38  15    Q.  Okay.  Well, were you aware that Professor Tewfik

00:59:43  16  in his deposition testified that to go upwardly --

00:59:47  17          MR. DOWER:  I'm going to object to the

00:59:49  18  hearsay and assume facts not in evidence.  That

00:59:51  19  deposition transcript is not in evidence.

00:59:52  20          MR. NOTZON:  I'm questioning him on what he

00:59:54  21  relied on as he reported in his report.  That he has

00:59:57  22  that deposition.

00:59:59  23          THE COURT:  You can ask the question.

01:00:00  24          MR. NOTZON:  Thank you.

01:00:02  25    Q.  (BY MR. NOTZON) And Professor Tewfik, at page 77,

01:00:08   1   line 4 to 78, line 5, says that the basis for going

01:00:15   2   forward has to be with the approval of the budget

01:00:19   3   council of the department.  Are you aware of that?

01:00:22   4       A.  I don't doubt it.

01:00:23   5       Q.  Okay.  Well, so the employee can want all they

01:00:28   6   want, but the gatekeeper is the budget council, correct?

01:00:31   7       A.  That sounds right.  I mean, I presume.

01:00:34   8       Q.  So your criticism of Dr. Thompson, you can't say

01:00:39   9   that this is a different disparate treatment because the

01:00:42  10   faculty member has to choose.  Well, that eliminates the

01:00:47  11   fact that the gatekeeper's actually the budget council,

01:00:51  12   correct?

01:00:52  13       A.  I would think a faculty member could, one, ask to

01:00:58  14   be and another one, a faculty member could probably ask

01:01:00  15   not to be --

01:01:00  16       Q.  That's true --

01:01:03  17       A.  -- and that might keep the gatekeeper from going

01:01:05  18   forward.

01:01:06  19       Q.  That's true.

01:01:06  20       A.  To that's kind of what I meant.

01:01:08  21       Q.  And there could be a disparate impact on the

01:01:10  22   women in that scenario, and the numbers that Dr.

01:01:15  23   Thompson talked about discuss that.  Let me ask a

01:01:18  24   followup question.

01:01:19  25           You say that Dr. Thompson has not presented

01:01:22  1   this jury any evidence that assures them that gender was

01:01:30  2   a factor in this case, correct?

01:01:32  3       A.   I didn't say it like that.  I said that gender

01:01:35  4   was related to the tenure decision.

01:01:36  5       Q.   And you also are not presenting any evidence to

01:01:39  6   this jury that gender wasn't, correct?

01:01:46  7       A.   I'm not sure how you would do that, so no.

01:01:49  8       Q.   You would agree with me?

01:01:51  9       A.   I just said no.  I'm not presenting that kind of

01:01:53  10  evidence.

01:01:53  11      Q.   And do you understand that Dr. Nikolova is not

01:02:01  12  saying that she was denied the ability to go up early

01:02:07  13  and she's not saying that she was -- that all women are

01:02:10  14  denied the ability to go up early.  They're just having

01:02:12  15  a different experience and they're retarded -- the way

01:02:16  16  that her allegation is that women are retarded in their

01:02:21  17  likelihood of going up early and then, when they go up

01:02:24  18  early, they have a worse experience than the men.

01:02:27  19          So the granularity of that allegation is

01:02:35  20  important in her claims.  Do you understand that?

01:02:36  21      A.   I don't.  I don't recollect that granularity from

01:02:42  22  the complaint.  I just remember the complaint saying

01:02:44  23  that it was, you know, denied tenure on the basis of

01:02:46  24  gender and pregnancy.

01:02:48  25      Q.   But your analysis discounts that and lumps her in

01:02:53  1   with all women that went up for tenure and say, look at

01:02:58  2   this, it's just the general numbers without relevance to

01:03:01  3   her specific experience in making it similarly situated

01:03:06  4   to her and what she experienced.  Do you see that?

01:03:12  5       A.  All of the women who were assistant professors

01:03:15  6   and all the men who were assistant professors and went

01:03:17  7   up to tenure are in the analysis I looked at.

01:03:20  8       Q.  Do you also understand that when you equate, when

01:03:24  9   you say everybody that's recommended for tenure, that

01:03:27  10  means every vote that's 51 percent or more, 51 to 100

01:03:32  11  percent are lumped in together so that you eliminate the

01:03:37  12  value of the relative vote difference, a weak vote

01:03:41  13  versus a strong vote.  You eliminate that in your

01:03:45  14  analysis.  Do you understand that?

01:03:45  15      A.  Well, I mean.

01:03:46  16      Q.  Yes or no?

01:03:48  17      A.  No.

01:03:49  18      Q.  Okay.  And you kept saying this is not

01:03:57  19  statistically important or this is not statistically

01:04:00  20  significant, but you actually didn't do any

01:04:03  21  statistically significance tests.

01:04:05  22      A.  Yes, I did.

01:04:07  23      Q.  Where are your -- you didn't do any regressions.

01:04:10  24  You didn't -- you just did simple percentages, correct?

01:04:16  25      A.  No.

01:04:16  1        Q.   In your table 2?

01:04:40  2        A.   One sentence in here:  Again, none of the

01:04:42  3   differences are statistically significant.  So I made a

01:04:45  4   statistical significance test.

01:04:48  5        Q.   How did you do that test?

01:04:50  6        A.   I did a two-by-two comparison with the Fisher's

01:04:54  7   exact test.

01:04:55  8        Q.   And what's your R squared on that?

01:04:57  9        A.   R squared is irrelevant to that test.  R square's

01:05:00  10  from a regression.  This isn't a regression context.

01:05:03  11       Q.   And so, what level significance are you -- did

01:05:06  12  you calculate?

01:05:07  13       A.   Well, the cutoff for statistical significance is

01:05:11  14  five percent.  These numbers are well above five

01:05:13  15  percent.  I don't recall what they were, but they were

01:05:16  16  nowhere near five percent.  They need to be below five

01:05:20  17  percent for statistical significance.

01:05:21  18       Q.   But at the end of the day, you have nothing that

01:05:30  19  removes the implication of Dr. Thompson's report that no

01:05:38  20  one had the same experience that Dr. Nikolova had at the

01:05:42  21  University of Texas in the statistical analysis that he

01:05:47  22  provided, correct?

01:05:48  23       A.   I think that's correct.  Her experience was

01:05:50  24  unique.  Not shared by others over gender either.

01:05:56  25       Q.   And you understand she's also claiming pregnancy

01:06:00  1   and not just gender.

01:06:01  2       A.  Yes.  There were other pregnant women, as well.

01:06:05  3   Right.

01:06:05  4       Q.  You didn't account for that in your statistic,

01:06:08  5   did you?

01:06:08  6       A.  Dr. Thompson didn't do anything with that.  I saw

01:06:10  7   no need to respond.

01:06:11  8       Q.  That would be a no.  You didn't do anything?

01:06:13  9       A.  That would a no.  Yes, sir.

01:06:15  10      Q.  I'll pass the witness.

01:06:18  11                   RE-DIRECT EXAMINATION

01:06:18  12  BY MR. DOWER:

01:06:27  13      Q.  Earlier, you testified about the effect that

01:06:32  14  small population sizes -- population in the statistical

01:06:36  15  sense has on statistical significance.  Do you remember

01:06:40  16  testifying about that?

01:06:41  17      A.  Yes.

01:06:42  18      Q.  And so, if you look at candidates with a high

01:06:45  19  degree of granularity, what does that do to the number

01:06:48  20  of people you're looking at?

01:06:51  21      A.  Well, it seems like you would be slicing the data

01:06:56  22  to a very small -- compartmentalizing into small pieces

01:07:01  23  that would be difficult to say much statistically.

01:07:04  24      Q.  And if you look at it with the highest level of

01:07:10  25  granularity, wouldn't you be looking at the candidate's

01:07:12  1    credentials?

01:07:15  2         A.   Yes.

01:07:17  3         Q.   And so, does that just take us out of this data

01:07:19  4    altogether and back to their -- you know, an actual

01:07:23  5    comparison between the strengths of the dossiers?

01:07:26  6                   MR. NOTZON:   Objection, your Honor.   This is

01:07:27  7    not part of his report.   It's not statistical analysis.

01:07:31  8                   MR. DOWER:   It's in direct response to the

01:07:33  9    cross, your Honor.

01:07:33 10                   THE COURT:   I'll allow it.

01:07:35 11         A.   Well, yeah.   You'd still take account of who got

01:07:37 12    tenure and who didn't, and who was a woman and who

01:07:39 13    wasn't, and who took a leave, or who was pregnant, or

01:07:41 14    whatever, and who wasn't.   So those facts wouldn't

01:07:45 15    change, but the data you would bring to explain them

01:07:46 16    would be a much richer set.   It would include the tenure

01:07:50 17    dossiers, research records, grant funding, service

01:07:53 18    records, teaching records, and the like.   Yeah.

01:07:56 19         Q.   (BY MR. DOWER) Earlier, you were asked about

01:08:07 20    whether or not anyone else had the experience of Dr.

01:08:12 21    Nikolova in Dr. Thompson's data about the promotion and

01:08:15 22    tenure committee vote.   Do you remember being asked

01:08:18 23    about that?

01:08:18 24         A.   Yes.

01:08:18 25         Q.   Was Dr. Nikolova uniquely a woman amongst all of

01:08:23   1   the population of data?

01:08:25   2        A.   She was not the only woman.  No.

01:08:26   3        Q.   And was she uniquely pregnant amongst all the

01:08:31   4   population of data?

01:08:32   5        A.   Not given the number of -- I don't really know

01:08:36   6   who was pregnant, but given the number of people what

01:08:38   7   had a probationary extension who were women.

01:08:40   8        Q.   So just looking at Dr. Thompson's statistics, can

01:08:43   9   you infer anything one way or the other about whether

01:08:46  10   the thing that sets Dr. Nikolova apart is pregnancy or

01:08:50  11   gender as opposed to maybe a weakness in her

01:08:53  12   application?

01:08:55  13        A.   No.

01:08:56  14        Q.   Pass the witness.

01:08:58  15                        RE-CROSS EXAMINATION

01:08:59  16   BY MR. NOTZON:

01:08:59  17        Q.   And you can't say that it was the weakness of her

01:09:02  18   application either, can you?

01:09:03  19        A.   No, I cannot.

01:09:05  20                  THE COURT:  Thank you, sir.  You may step

01:09:06  21   down.

01:09:08  22                  THE WITNESS:  Thanks.

01:09:10  23                  THE COURT:  Next witness.

01:09:12  24                  MR. DOWER:  The witness can step down, your

01:09:14  25   Honor.  We pass.

1                          *  *  *  *  *  *

2

3    UNITED STATES DISTRICT COURT   )

4    WESTERN DISTRICT OF TEXAS      )

5

6        I, LILY I. REZNIK, Certified Realtime Reporter,

7    Registered Merit Reporter, in my capacity as Official

8    Court Reporter of the United States District Court,

9    Western District of Texas, do certify that the foregoing

10   is a correct transcript from the record of proceedings

11   in the above-entitled matter.

12       I certify that the transcript fees and format comply

13   with those prescribed by the Court and Judicial

14   Conference of the United States.

15       WITNESS MY OFFICIAL HAND this the 30th day of March,

16   2022.

17

18                              ~~~~~~~~~~~~~~~~~~~~~~~~
                                *LILY I. REZNIK, CRR, RMR*
19                              *Official Court Reporter*
                                *U.S. District Court*
20                              *Austin Division*
                                *501 West 5th Street,*
21                              *Suite 4153*
                                *Austin, Texas 78701*
22                              *(512)391-8792*
                                *SOT Certification No. 4481*
23                              *Expires:  1-31-23*

24

25