IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| EVDOKIA NIKOLOVA, § | |
| *Plaintiff,* § | |
| § | |
| v. § | Civil Action No.: 1:19-CV-00877 |
| § | |
| UNIVERSITY OF TEXAS AT AUSTIN, § | |
| *Defendant.* § | |

### DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR JUDGMENT

TO THE HONORABLE JUDGE ROBERT PITMAN:

Defendant The University of Texas at Austin ("UT Austin") responds to Plaintiff's Motion for Judgment ("Plaintiff's Motion") as follows.

### ARGUMENTS & AUTHORITIES

**A.   UT Austin agrees that the statutory cap of $300,000 for compensatory damages applies.**

Plaintiff's Motion acknowledges that compensatory damages for a defendant that employs more than 500 people are capped at $300,000 and that this cap applies to all compensatory damages per plaintiff. Dkt. #99, 2 (citing 42 U.S.C. § 1981a(b)(3)(D); *Black v. Pan Am Labs., L.L.C.*, 646 F.3d 254, 264 (5th Cir. 2011)). UT Austin agrees that the cap on compensatory damages applies to the cumulative sum of both past and future pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, and damage to reputation. *See* Dkt. #95, 2.

**B.   UT Austin agrees that the amount awarded for back pay and benefits should not exceed $50,000.**

The jury awarded $50,000 in back pay wages and benefits from September 1, 2019, to March 11, 2022. Dkt. #95, 2. Without agreeing with the verdict or conceding any other points of error that have been preserved for appeal, UT Austin agrees that the amount awarded in the

1

judgment for back pay and benefits should not exceed $50,000, plus the prejudgment interest calculated using the prime rate as published by the Board of Governors of the Federal Reserve System beginning September 1, 2019, to the date of the judgment.

**C.    The Court should decline to award front pay or, in the alternative, award no more than the sum calculated by Dr. Deere.**

Plaintiff also asks the Court to award front pay. "Although courts have defined 'front pay' in numerous ways, front pay is simply money awarded for lost compensation during the period between judgment and reinstatement or in lieu of reinstatement." *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 846 (2001). The same is true for an "instatement" case involving a failure to promote. *Julian v. City of Houston, Tex.*, 314 F.3d 721, 728–29 (5th Cir. 2002). The decision to award front pay damages "is governed by the district court's discretion and is not always appropriate." *Floca v. Homcare Health Servs. Inc.*, 845 F.2d 108, 112 (5th Cir. 1988). As a general rule, "[f]ront pay is awarded to meet the goal of Title VII to make whole the victim of discrimination." *Id.* It is "determined through 'intelligent guesswork' whereby an estimation is made of the value of the prospective lost earnings that are likely to accrue between the date of judgment and the time when the victim of discrimination can assume her new position." *Reynolds v. Octel Commc'n Corp.*, 924 F. Supp. 743, 748 (N.D. Tex. 1995). "[A]lthough [the Fifth Circuit] will generally accord 'wide latitude' to the district courts in the determination of front pay, [the Circuit] ha[s] also emphasized that such awards must be carefully crafted to avoid a windfall to the plaintiff." *Palasota v. Haggar Clothing Co.*, 499 F.3d 474, 491 (5th Cir. 2007) (quoting *Deloach v. Delchamps, Inc.*, 897 F.2d 815, 822 (5th Cir. 1990)).

Fifth Circuit precedent "contemplates that one form of prospective relief will ordinarily be appropriate when it is requested." *Bogan v. MTD Consumer Group, Inc.*, 919 F.3d 332, 336 (5th

Cir. 2019). If reinstatement is not feasible, front pay is typically appropriate. *Id.* Here, Plaintiff argues that "a court-ordered promotion of tenure is not feasible for multiple reasons." Dkt. #99, 7. In support, Plaintiff contends that UT Austin retaliated against her after she complained about discrimination. Dkt. #99, 6–7. But Plaintiff dropped her retaliation claims during the trial before UT Austin's case-in-chief. UT Austin never presented its evidentiary rebuttal to the accusations of retaliation because Plaintiff did not even attempt to meet her burden of proof.

Plaintiff cannot abandon her retaliation claims at trial and then invoke them after trial to inflate her damage award. Nonetheless, UT Austin agrees that a court order granting Dr. Nikolova tenure is inappropriate for reasons unrelated to her unproven accusations. But Dr. Nikolova is not entitled to the large front-pay award she requests.

As an initial matter, the Court may—and should—decline to award front pay. Dr. Nikolova currently stands to receive a compensatory damages award of $300,00—the maximum sum available under Title VII. *See* 42 U.S.C. § 1981a(b)(3)(D). A compensatory damage award in an amount equal to or less than $300,00 has led other courts to decline to award front pay. *See*, *e.g.*, *Miller v. Tex. Alco. Bev. Comm'n*, No. A-21-CV-00204-JRN, 2022 WL 2078033, at *1–2 (N.D. Tex. June 9, 2022) (declining to award front pay after jury had already awarded plaintiff $125,000 in future compensatory damages); *Reynolds*, 924 F. Supp. at 747-48 (declining to award front pay in light of plaintiff's "large award of compensatory and punitive damages," which was capped at $300,000); *Nassar v. Univ. of Tex. Sw. Med. Ctr.*, No. 3:08-CV-1337-B, 2010 WL 3633631, at *3 (Sept. 16, 2010) (declining to award front pay where "the jury awarded substantial compensatory damages," even though "the jury's verdict was reduced by the statutory cap"). It also bears emphasizing that when President Fenves declined to grant Dr. Nikolova tenure in 2019, he chose

*not* to give her a terminal appointment. Accordingly, Dr. Nikolova may still receive promotion and tenure when her case is reviewed on the normal timetable, *i.e.*, before her up-or-out year. *E.g.*, Dkt. #39, 2.

If the Court decides to award front pay, however, it should decline Plaintiff's request for a multi-million-dollar windfall. *See* Dkt. #99, 10–13. Plaintiff's Motion presents three front-pay scenarios based on the testimony of her damages expert, Dr. Thomas Glass. *Id.* at 10–16. Dr. Glass's Scenario 1 assumes that Dr. Nikolova receives tenure effective September 1, 2023, but that her salary never "catches up" to what it would have been had she been promoted effective September 1, 2019. *Id.* at 10–13. Dr. Glass's Scenario 2 assumes that Dr. Nikolova remains employed in a position that pays comparable to an assistant professor until age 70, such that her front pay would represent the difference between that sum and a similar projection based on the salary she would have received had she been given tenure effective September 1, 2019. *Id.* at 15–16. Dr. Glass's Scenario 3 assumes that Dr. Nikolova never works another day in her life and compels UT Austin to pay a lump-sum representing the income she would have received over the course of an entire career as a tenured professor, notwithstanding Dr. Nikolova's current status as an assistant professor. *See id.* at 13–15. Dr. Glass's trial testimony demonstrates why the Court should not base a front pay award on either Scenario 2 or 3:

> Q. What happens if the jury awards the money under scenario two and then, U.T. gives her tenure in a few years?
> A. She's just got a windfall.
> Q. Yeah. So everything – all the rest of that money is, as you said, just pure windfall. It is money she's going to get basically a double recovery, right?
> A. Yeah.
> Q. And under scenario three, it's an even bigger windfall, right?
> A. Absolutely.

>   Q.   In fact, it's [an] almost $4 million windfall.
>   A.   Yes.

Exhibit C, 21:16–22:3.

A court's "intelligent guesswork" in awarding front pay "must be carefully crafted to avoid a windfall to the plaintiff." *Palasota*, 499 F.3d at 491; *see also Deloach*, 897 F.2d at 823; *E.E.O.C. v. E.I.*, 480 F.3d 724, 732 (5th Cir. 2007). "[T]he loss of a prospective benefit that either may not ultimately be earned, or that may be actually earned and collected in full in the future, would go beyond making plaintiffs[] whole for the unlawful discrimination they suffered. It would provide a windfall bonus.'" *Bourdais v. New Orleans City*, 485 F.3d 294, 300–01 (5th Cir. 2007) (quoted with approval in *Miller v. Raytheon Co.*, 716 F.3d 138, 146–47 (5th Cir. 2013)). Similarly, here, Plaintiff asks the Court to award a front pay based on the unwarranted assumption that she will never obtain tenure at UT Austin or any other institution. Requiring UT Austin to pay her a lump-sum equivalent of almost three decades of future work as a tenured professor[1] would result in an enormous windfall. *See, e.g.*, *Miniex v. Hous. Housing Auth.*, 400 F. Supp.3d 620, 652-53 (S.D. Tex. 2019) (reducing the jury's front pay award from $600,000 to $216,861, which compensated the plaintiff as though she remained employed by defendant for four years after the date of her termination); *Soto v. LCS Corr. Servs., Inc.*, No. 2:12-CV-130, 2013 WL 4012627, at *6 (S.D. Tex. Aug. 5, 2013) (award 12 months of front pay and concluding that "the evidence does not support a 60-month award of front pay" where "Plaintiff should be able to find substitute work with some effort," even though "Defendant's actions damaged Plaintiff's reputation and

---

[1] Working from September 1, 2019 to December 31, 2048. *See* Plaintiff's Trial Exhibit 236, cited in Plaintiff's Motion (Dkt. #99, 15 n.15).

handicapped Plaintiff's ability to obtain employment in the law enforcement or security industry in Plaintiff's geographic area").

Scenarios 2 and 3 are particularly inappropriate given that Dr. Nikolova is currently employed as an assistant professor at UT Austin because UT Austin declined to issue her a terminal appointment in February 2019. Throughout this litigation, UT Austin has continued to approve Dr. Nikolova's requests for modified instruction duties (waiving the usual teaching requirements) and probationary extensions. *See*, *e.g.*, Defendant's Trial Exhibits 43–44.[2] Indeed, but-for her ongoing requests for probationary extensions, Dr. Nikolova would have gone up for tenure in her up-or-out year in Academic Year 2020–21 and might already have tenure now. *See id.* Even then-Dean Wood, upon whom Dr. Nikolova focused most of her accusations at trial, said in her 2018 assessment letter that "[i]f this were an up-or-out case, I would likely agree with the recommendation of the Promotion and Tenure committee [to grant tenure]." Defendant's Trial Exhibit 25.[3] The Court should not award damages based on speculation that UT Austin will unlawfully deny Dr. Nikolova tenure in the future because that would be an adverse employment action for which Dr. Nikolova could bring an independent lawsuit seeking damages. In other words, Dr. Nikolova should not receive front pay based on the mere possibility that she will improperly be denied tenure in the future when that event may never occur and, if it did occur, she would be entitled to seek damages for it in a future lawsuit.

---

[2] Defendant's Trial Exhibit 43 is attached to this response as Exhibit E; Defendant's Trial Exhibit 44 is attached to this response as Exhibit F.
[3] Defendant's Trial Exhibit 25 is attached to this response as Exhibit G.

Any front pay the Court awards should not exceed $71,001. That number is based primarily on the expert testimony of Dr. Donald Deere and his calculations;[4] the concessions made by Dr. Thomas Glass during his cross-examination;[5] and ten years of salary data for assistant, associate, and full professors within the Electrical and Computer Engineering ("ECE") Department.[6]

As Dr. Deere explained at trial, his calculation started with a similar premise as Dr. Glass's Scenario 1. Exhibit A, 27:5–7. As with Dr. Glass's Scenario 1, Dr. Deere assumed that instead of obtaining tenure on September 1, 2019, Dr. Nikolova obtained tenure on September 1, 2023. *Id.* at 26:7–17. He also shared Dr. Glass's assumption that Dr. Nikolova's employee contribution to retirement would be 7.5%. *Id.* at 27:17–19. One way in which Dr. Deere differed from Dr. Glass related to the amount of her hypothesized salary increases accompanying the two hypothetical promotions (one in the alternative history in which Dr. Nikolova was promoted to Associate Professor in 2019, the other in the hypothesized future in which she is promoted to Associate Professor in 2023). *See id.* at 27:19–11.

1. **Year Starting September 1, 2019**

    a.   BASE CASE (PROMOTION EFFECTIVE SEPT. 1, 2019)

Dr. Glass's hypothesized post-2019-promotion salary was $130,500. Exhibit A, 28:1. Dr. Deere noted that this number came from the salary of a faculty member (Dr. Tiwari) who was

---

[4] The transcript of Dr. Deere's trial testimony is attached to this response as Exhibit A. His calculations are contained within Defendant's Trial Exhibit 50, which is attached to this response as Exhibit B.

[5] The transcript of Dr. Glass's trial testimony is attached to this response as Exhibit C.

[6] Defendant's Trial Exhibit 62 is attached to this response as Exhibit D. This exhibit is a Microsoft Excel spreadsheet that, when accessed in that software program, contains additional features such as sorting the columns. These additional features are lost when the file is converted to a PDF file. As such, in addition to the PDF version that UT Austin files with this response, the native ".xlsx" file will be provided to the Court.

promoted to Associate Professor in 2019 but who made $4,000 more than Dr. Nikolova in the preceding year. *Id.* 28:4–24. Seeing in the historic data (Defendant's Exhibit D) that UT Austin's practice was to keep same-rank salaries "within a few thousand dollars of each other as associates" but not "exactly the same," Dr. Deere projected that Dr. Nikolova would have had post-2019-promotion salary of $129,500, slightly less than Dr. Tiwari's (but closing their 2018 salary gap from $4,000 to $1,000). *Id.* at 28:16–29:5. Dr. Deere also noted that his projection would still amount to a 16.35% increase, a larger percentage increase than for every other promotion in the dataset except for one.[7] *Id.* at 29:6–10.

          b.        SCENARIO 1 (PROMOTION EFFECTIVE SEPT. 1, 2023)

Meanwhile, Dr. Nikolova's actual salary for the year starting September 1, 2019, was $114,639, so Dr. Deere used that number for his Scenario 1 projection (in which Dr. Nikolova will be promoted effective September 1, 2023). Exhibit A, 29:16–18.

**2.    Year Starting September 1, 2020**

In the year starting September 1, 2020 (the year that the pandemic began), the historic data showed that virtually everyone in the Cockrell School of Engineering received a zero-percent increase in salary, so Dr. Deere assumed that would have been true for Dr. Nikolova had she been promoted effective September 2019. Exhibit A, 29:24–30:11. For both the Base Case and Scenario 1, the salary is unchanged for the year starting September 1, 2020.

---

[7] Indeed, while not quite as favorable to Dr. Nikolova as the number used by Dr. Glass, Dr. Deere's number is still more generous than the typical raise accompanying a promotion from Assistant Professor to Associate Professor. *See* Defendant's Exhibit D (showing 10% raise for Dr. Akinwande's promotion to Associate Professor effective in 2015, a 10.9% raise for Dr. Dimakis's promotion to Associate Professor effective in 2015, a 10% raise for Dr. Sun's promotion to Associate Professor effective 2018, a 10% raise for Dr. Janapa Reddi's promotion effective 2018, and an 8% raise for Dr. Kwasinski's promotion effective 2013).

3. **Years Starting September 1, 2021–2022**

For these two years, Dr. Deere projected that the growth in the base case is a 4.86% increase, the average within-rank increase based on the historic salary data (not including the stagnant year of 2020). Exhibit A, 30:12–21. This percentage increase is actually higher than the percentage that Dr. Glass used in his projection. *Id.* The number reflects, on average, how much an ECE Department faculty member's salary goes up in a year in which they do not receive a promotion (again, removing the outlier year of 2020). *Id.* at 30:19–21.

4. **Year Starting September 1, 2023**

    a. BASE CASE (PROMOTION EFFECTIVE SEPT. 1, 2019).

For the base case, Dr. Deere continued his 4.86 percentage annual increase in salary, as Dr. Nikolova has already been promoted.

    b. SCENARIO 1 (PROMOTION EFFECTIVE SEPT. 1, 2023)

For Scenario 1, Dr. Deere projected what Dr. Nikolova's salary would be if she were promoted effective September 1, 2023. Exhibit A, 30:22–25. Dr. Deere projected that she will receive approximately a $20,000 raise accompanying her promotion, raising her salary from $126,053 to $146,665. *See id.*; Exhibit B, 4. This projected raise applies the same 16.35% increase that Dr. Deere previously used in his Base Case (in which Dr. Nikolova was promoted effective September 1, 2019). Exhibit A, 31:1–6. As previously discussed, 16.35% is on the high end of raises accompanying promotions from assistant to associate professor (which are typically closer to 10%). *See supra* 2 n.7.

5. **Years Starting September 1, 2024–26**

The question of whether a salary disparity would persist indefinitely is the principal divide between Dr. Glass's Scenario 1 and Dr. Deere's calculation. Dr. Glass's model assumes that a

salary gap would persist for the rest of Dr. Nikolova's career because—metaphorically speaking—a runner with a head start would retain their lead indefinitely. Exhibit C, 19:20–20:1.[8] Dr. Glass rejected the hypothesis that associate professors are paid a similar amount and that pay gaps between faculty of the same rank are not based on temporal differences in when that professor was promoted. Exhibit C, 19:14–19. Dr. Glass conceded that, if pay disparities do not persist past the point of promotion, Dr. Nikolova's losses (future pay) would disappear when she is promoted to Associate Professor if she obtains tenure on September 1, 2023 in Scenario 1. *Id.* When Dr. Glass assumed an indefinite pay disparity, he reached that assumption without reviewing the historical data. *Id.* at 19:3–5.

Dr. Deere did review the historic data regarding faculty salaries. Exhibit A, 31:19–22. The salary information for the ECE Department supports Dr. Deere's "catch-up" hypothesis. *See* Exhibit C. Pay differences between faculty members are not linked with promotion year. *See id.* Put another way, the salary of an assistant professor promoted to an associate professor is not doomed to lag behind his or her peers, as Dr. Glass's assumption supposes. While associate professors are not all paid the exact same amount, it simply is not empirically true that an assistant professor who is promoted later invariably make less than his or her peers. *See id.* Pay disparities based on the timing of promotion, if any, tend to disappear relatively quickly. *See id.* This is what Dr. Deere concluded after looking at data that Dr. Glass admitted that he did not review. *Compare* Exhibit A, 31:19–22, *with* Exhibit C, 19:3–5.

---

[8] This is also reflected in Plaintiff's Trial Exhibit 236, which Plaintiff's Motion did not attach as evidence in support of their motion.

Dr. Deere's conclusion is also supported more broadly by the labor market data. As he explained:

> Every two years, [the Bureau of Labor Statistics] survey what's called displaced workers, people who have lost a job, and they look at whether those people are reemployed, and if they're reemployed, how much they are learning relative to the job they left. And within three years—because the average is from one to three years[—] over half of the individuals who are reemployed are now earning what they otherwise would have earned on the job that they lost.

Exhibit A, 31:23–32:7.

Dr. Deere's calculation does assume that a some pay disparity would exist between the base case and Scenario 1, a gap of a few thousand dollars, but projects that the gap would close by 2026. *See* Exhibit B, 4.

### 6.   Calculating the Present Value

The only input into Dr. Deere's calculation that has not yet been discussed in this brief is the discount factor. *See* Exhibit B, 4. The discount factor is a way of calculating the present value of money based on interest rates. *See* Exhibit A, 34:21–35:13. As both Dr. Glass and Dr. Deere explained, a sum of money awarded today is worth more than the same sum awarded later. *Id.* The discount factor is a means of calculating the present value of money. *Id.* And based on everything described above—the calculation of the annual salaries in both the base case and scenario 1, the retirement contributions, and the discount factor—Dr. Deere calculated that the total lost compensation that Dr. Nikolova would experience comparing the alternative history in which she was promoted effective September 1, 2019 with the hypothetical future in which she is promoted effective September 1, 2023, is $72,001. *See* Exhibit A, 35:24–36:14.

Dr. Deere's calculations are reflected in Table 4, which was part of Defendant's Trial Exhibit 50, reprinted below:

| Table 4. | ███████████████████ | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Date of Tenure Denial | 9/1/2019 | | | | | | | |
| Date of Tenure | 9/1/2023 | | | | | | | |
| Employer Contribution to Retirment | 7.5% | | | | | | | |
| | | | | | | | | |
| Expected Future Salaries as of: | 9/1/2019 | 9/1/2023 | | | | | | |
| Base Case: Tenured on 9/1/2019 | $129,500 | $149,314 | | | | | | |
| Scenario 1: Tenured on 9/1/2023 | $114,639 | $146,665 | | | | | | |
| | | | | | | | | |
| Promotion increase | 16.35% | | | | | | | |
| Within-Rank Growth | 4.86% | | | | | | | |
| Catch-up growth | 0.63% | | | | | | | |

| Year Starting | Growth/ Expected Growth | Base Case | Scenario 1 | Loss | Retirement Contribution | Total Loss | Discount Factor | Present Value |
|---|---|---|---|---|---|---|---|---|
| 9/1/2019 | | $129,500 | $114,639 | ($14,861) | ($1,115) | ($15,976) | 100.00% | ($15,976) |
| 9/1/2020 | 0.00% | $129,500 | $114,639 | ($14,861) | ($1,115) | ($15,976) | 100.00% | ($15,976) |
| 9/1/2021 | 4.86% | $135,794 | $120,210 | ($15,583) | ($1,169) | ($16,752) | 99.98% | ($16,748) |
| 9/1/2022 | 4.86% | $142,393 | $126,053 | ($16,341) | ($1,226) | ($17,566) | 99.76% | ($17,524) |
| 9/1/2023 | 4.86% | $149,314 | $146,665 | ($2,649) | ($199) | ($2,847) | 99.06% | ($2,820) |
| 9/1/2024 | 4.86% | $156,570 | $154,713 | ($1,857) | ($139) | ($1,996) | 97.75% | ($1,951) |
| 9/1/2025 | 4.86% | $164,180 | $163,203 | ($977) | ($73) | ($1,050) | 95.83% | ($1,006) |
| 9/1/2026 | 4.86% | $172,159 | $172,159 | $0 | $0 | $0 | 93.55% | $0 |
| | | | | | | **Total Lost Compensation** | | **($72,001)** |

## PRESERVING ERROR

UT Austin continues to disagree with the manner in which jury selection occurred, as set forth in its objection to excluding jurors who are not fully vaccinated. *See* Dkt. #75. The jury selection process resulted in the systemic and deliberate exclusion of a distinctive group: those who have not been fully vaccinated for COVID-19. There are well-known correlations between COVID-19 vaccination status and other distinctive characteristics, such as political affiliation (Republican versus Democrat) and residency (urban versus rural).[9] The deliberate exclusion of the under-vaccinated resulted in a jury venire that did not contain a fair cross section of the community located within the Austin Division of the Western District of Texas. *See* Dkt. #75-5 (identifying the vaccination rates of residents within Texas counties). The Court has already ruled on this issue

---

[9] *See, e.g.*, Albrecht, D. Vaccination, politics and COVID-19 impacts. *BMC Public Health* 22, 96 (2022) at https://doi.org/10.1186/s12889-021-12432-x (last accessed June 14, 2022); Sun Y, Monnat SM. Rural-urban and within-rural differences in COVID-19 vaccination rates. J Rural Health. 2021; 37:1–7 at https://onlinelibrary.wiley.com/doi/full/10.1111/jrh.12625 (last accessed June 14, 2022).

twice and UT Austin does not mean to try the Court's patience by re-urging that which has already been addressed. But all arguments presented in this response remain subject to UT Austin's ongoing contention that the trial in this case did not comport with the Seventh Amendment. *See Duren v. Missouri*, 439 U.S. 357, 364 (1979); *cf. Thiel v. S. Pac. Co.*, 328 U.S. 217, 221 (1946) (holding that it is unlawful to "deliberately and intentionally exclude[] from the jury lists all persons who work for a daily wage").

## PRAYER

Dr. Nikolova is not entitled to a windfall. Given the significant amount of compensatory damages Dr. Nikolova is already poised to receive, the Court should decline to award front pay. Alternatively, any front pay the Court awards should not exceed $72,001.

Respectfully submitted,

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**GRANT DORFMAN**
Deputy First Assistant Attorney General

**SHAWN COWLES**
Deputy Attorney General for Civil Litigation

**CHRISTOPHER D. HILTON**
Chief for General Litigation Division

*/s/ Benjamin L. Dower*
**BENJAMIN L. DOWER**
Deputy Chief for the General Litigation Division
Texas State Bar No. 24082931
benjamin.dower@oag.texas.gov
Attorney-in-Charge

**AMY S. HILTON**
Assistant Attorney General
Texas State Bar No. 24097834
amy.hilton@oag.texas.gov

Office of the Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2120 / Fax (512) 320-0667

**COUNSEL FOR UT AUSTIN**

### CERTIFICATE OF SERVICE

I hereby certify that on June 20, 2022, a true and correct copy of the foregoing document was served via the Court's ECF system to all counsel of record.

*/s/ Benjamin L. Dower*
**BENJAMIN L. DOWER**
Deputy Chief for the General Litigation Division