```
 1                  UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF TEXAS
 2                        AUSTIN DIVISION

 3   EVDOKIA NIKOLOVA            ) Docket No. A 19-CA-877 RP
                                 )
 4   vs.                         ) Austin, Texas
                                 )
 5   UNIVERSITY OF TEXAS         )
     AT AUSTIN                   ) March 10, 2022
 6

 7        TRANSCRIPT OF TRIAL TESTIMONY OF DONALD DEERE
              BEFORE THE HONORABLE ROBERT L. PITMAN
 8

 9   APPEARANCES:

10   For the Plaintiff:         Mr. Robert W. Schmidt
                                 Crews Law Firm, P.C.
11                               701 Brazos Street, Suite 900
                                 Austin, Texas 78701
12
                                 Mr. Robert S. Notzon
13                               Law Office of Robert Notzon
                                 1502 West Avenue
14                               Austin, Texas 78701

15   For the Defendant:          Mr. Benjamin L. Dower
                                 Ms. Amy S. Hilton
16                               Texas Attorney General's Office
                                 300 West 15th Street
17                               Austin, Texas 78701

18

19   Court Reporter:             Ms. Lily Iva Reznik, CRR, RMR
                                 501 West 5th Street, Suite 4153
20                               Austin, Texas 78701
                                 (512)391-8792
21

22

23

24

25   Proceedings reported by computerized stenography,
     transcript produced by computer-aided transcription.
```

DEFENDANT'S
EXHIBIT

**A**

| | | |
|---|---|---|
| | 1 | THE COURT:  Mr. Dower. |
| 00:00:01 | 2 | MR. DOWER:  Yes, your Honor.  Defendant |
| 00:00:19 | 3 | calls Donald Deere. |
| 00:00:43 | 4 | THE COURT:  Good afternoon, sir.  Before |
| 00:00:45 | 5 | taking a seat, if I could get you to raise your right |
| 00:00:47 | 6 | hand to be sworn. |
| 00:00:48 | 7 | THE CLERK:  You do solemnly swear or affirm |
| 00:00:48 | 8 | that the testimony which you may give in the case now |
| 00:00:48 | 9 | before the Court shall be the truth, the whole truth, |
| 00:00:54 | 10 | and nothing but the truth? |
| 00:00:54 | 11 | THE WITNESS:  I do. |
| 00:00:55 | 12 | THE COURT:  Feel free to take off your mask |
| 00:00:57 | 13 | if you're comfortable doing so. |
| 00:01:02 | 14 | DONALD DEERE, called by the Defendant, duly sworn. |
| 00:01:02 | 15 | DIRECT EXAMINATION |
| 00:01:02 | 16 | BY MR. DOWER: |
| 00:01:04 | 17 | Q.  Good afternoon, Dr. Deere. |
| 00:01:08 | 18 | A.  Good afternoon. |
| 00:01:11 | 19 | Q.  Can you start out by introducing yourself to the |
| 00:01:13 | 20 | jury, please? |
| 00:01:14 | 21 | A.  Sure.  My name is Donald Deere.  I have a Ph.D. |
| 00:01:18 | 22 | in Economics from Massachusetts Institute of Technology. |
| 00:01:22 | 23 | I was on the faculty at Texas A & M University in |
| 00:01:25 | 24 | economics for 24 years, the last 17 with tenure.  I |
| 00:01:29 | 25 | retired from that and I now do economic consulting on a |

00:01:33  1   full or sometimes part-time basis.

00:01:35  2       Q.  And were you retained in this case on behalf of

00:01:43  3   U.T. Austin?

00:01:43  4       A.  I was.

00:01:44  5       Q.  And to do what?

00:01:45  6       A.  To respond to the reports of both Dr. Thompson

00:01:50  7   and Dr. Glass, and to provide my own assessment of the

00:01:54  8   statistical issues involved -- involving the claims of

00:01:59  9   Dr. Nikolova with regard to tenure and, also, to provide

00:02:02  10  my own assessment of the damages if it were the case

00:02:07  11  that the jury found for Dr. Nikolova.

00:02:10  12      Q.  And do you believe that your professional

00:02:13  13  experience and background in economics and statistics

00:02:17  14  equip you to make those opinions?

00:02:19  15      A.  I do.

00:02:19  16      Q.  At this point, we would tender Dr. Thompson as an

00:02:24  17  expert in labor economics and statistics.

00:02:27  18               MR. NOTZON:  He can't because that's Dr.

00:02:29  19  Deere.

00:02:30  20               MR. DOWER:  I'm sorry.  What did I --

00:02:31  21               THE COURT:  Dr. Thompson.

00:02:33  22               MR. DOWER:  I'm sorry.

00:02:34  23               MR. NOTZON:  No objection.

00:02:36  24               MR. DOWER:  I'm living in the past

00:02:37  25  obviously.

00:02:38  1          THE WITNESS:  It's okay.

00:02:39  2     Q.  (BY MR. DOWER) So sorry, Dr. Deere.  All right.

00:02:42  3  Well, with that, I want to pick up where we left off,

00:02:48  4  which was talking about -- well, where we left off.

00:02:53  5  Where we left off with Dr. Glass when we were talking

00:02:57  6  about that his scenario one.  And his -- what is his

00:03:05  7  scenario one -- I'll bring it up just a moment.  What is

00:03:46  8  his scenario one based on?

00:03:48  9     A.  Well, his scenario one is -- assumes that given

00:03:54  10  Dr. Nikolova did not receive tenure in 2019 that she

00:03:58  11  would, instead, receive tenure in 2023.  And he

00:04:02  12  calculates the -- essentially the difference in earnings

00:04:05  13  between those two scenarios:  One, she was tenured in

00:04:11  14  '19 and continued on.  The other, she would be not

00:04:15  15  tenured in '19 but tenured in 2023 and continue on.  And

00:04:19  16  I believe this scenario one is to the age of about 65,

00:04:24  17  her expected work life based on the sources that Dr.

00:04:28  18  Glass cited.

00:04:30  19     Q.  And I'm going -- or what assumption -- and you

00:04:34  20  heard him testify here today, correct?

00:04:36  21     A.  Yes.

00:04:37  22     Q.  What assumption did he make about her salary

00:04:41  23  after she is granted tenure on September 1st, 2023?

00:04:47  24     A.  Well, he essentially assumes that salaries would

00:04:50  25  be like an escalator.  You know, you're -- tenure's

| | | |
|---|---|---|
| 00:04:54 | 1 | delayed two or three years, so you're on a step two or |
| 00:04:58 | 2 | three below.  And then, from then on, you're just always |
| 00:05:01 | 3 | below.  And so, that's -- in a nutshell, I'd say that's |
| 00:05:07 | 4 | his assumption. |
| 00:05:08 | 5 | Q.  I'm going tos show you Defendant's Exhibit 62. |
| 00:05:15 | 6 | This is data for salary in the Cockrell School of |
| 00:05:20 | 7 | Engineering going back as far as back as 2009 to 2010. |
| 00:05:26 | 8 | Do you see this? |
| 00:05:26 | 9 | A.  I do.  Sort of. |
| 00:05:28 | 10 | Q.  All right.  Let me zoom in a little bit. |
| 00:05:30 | 11 | A.  There you go.  That's a little better. |
| 00:05:32 | 12 | Q.  So what are in the -- is in the left-hand column? |
| 00:05:40 | 13 | A.  The names of faculty is in column A. |
| 00:05:43 | 14 | Q.  And the column B? |
| 00:05:48 | 15 | A.  That's their -- it says faculty rank, but that's, |
| 00:05:51 | 16 | you know, professor, assistant professor, associate |
| 00:05:53 | 17 | professor as of the end of the academic year spring |
| 00:05:56 | 18 | 2019. |
| 00:05:57 | 19 | Q.  And then, column C? |
| 00:06:00 | 20 | A.  The date that their Ph.D. was awarded. |
| 00:06:03 | 21 | Q.  Column D? |
| 00:06:04 | 22 | A.  The year since. |
| 00:06:05 | 23 | Q.  Okay.  And this skips ahead for ease of reference |
| 00:06:11 | 24 | but -- and then, what are columns -- I guess, just |
| 00:06:15 | 25 | column O and then on? |

00:06:16  1      A.   Those are salaries for those particular

00:06:19  2   individual faculty members for those particular academic

00:06:23  3   years.

00:06:23  4      Q.   And do you see that the numbers are color-coded?

00:06:27  5   We've got red, we've got green and we've got black?

00:06:31  6      A.   Yes.  I see that.

00:06:32  7      Q.   Okay.  So I'm going to cut to the chase and do

00:06:37  8   you see this -- it's called a legend that tells us what

00:06:41  9   the color-coding means?

00:06:42  10     A.   Yes.

00:06:42  11     Q.   Okay.  And so, can you just explain or put on the

00:06:47  12   record what the different colors mean?

00:06:49  13     A.   So the font that would be black would be

00:06:52  14   someone's salary while they're an assistant professor.

00:06:55  15   The font green would be -- faculty member's salary while

00:06:59  16   that person was an associate professor.  Red would be

00:07:01  17   the font for the salary while that person was a

00:07:03  18   professor.  And purple would be the font while that

00:07:07  19   person was both a professor and a chair of their

00:07:10  20   department.

00:07:12  21     Q.   And so, for example, if we were to look at

00:07:19  22   someone -- let's do one of the more recent ones like Dr.

00:07:31  23   Ranjuit Gharpurey.  And I apologize if I'm messing that

00:07:33  24   up.  Do you see that that doctor went from green to red

00:07:42  25   between academic years 2013 to '14 and then, academic

00:07:45   1   years '14 to '15?

00:07:47   2       A.   Yes.

00:07:47   3       Q.   And so, what does that signify to you?

00:07:50   4       A.   Could you go back down to the bottom?  I read it.

00:07:54   5   Yeah, that green to red is associate professor to

00:07:58   6   professor.

00:07:59   7       Q.   Okay.  And so, just to take an example, so then

00:08:06   8   what would -- I'm going to call him Dr. G just to avoid

00:08:17   9   me butchering his name.  What would it signify to go

00:08:20   10   from green to red between these two salaries?

00:08:23   11       A.   To be promoted from associate professor to full

00:08:26   12   professor.

00:08:26   13       Q.   Okay.

00:08:27   14       A.   Or to professor.

00:08:28   15       Q.   And if we go down a couple cells, we see Dr.

00:08:34   16   Garg.  Do you see that?

00:08:36   17       A.   Yes.

00:08:36   18       Q.   And what is his salary in 2014 to '15?

00:08:41   19       A.   $128,479.

00:08:44   20       Q.   And then -- and how long had he been a full

00:08:50   21   professor to the extent we can tell?

00:08:53   22       A.   At least, what, five, six -- he's in at least his

00:08:56   23   sixth year because he's got red font all the way back to

00:08:59   24   the first year of visible.

00:09:01   25       Q.   And so, it could be even farther back than that.

00:09:04  1    A.   Yes.

00:09:04  2    Q.   Okay.  And so, he's making roughly $28,000 -- or,

00:09:11  3    excuse me, $128,000 in 2014-'15, correct?

00:09:17  4    A.   Yes.  128,479 to be exact.

00:09:21  5    Q.   Okay.  And then, Dr. G is -- he is promoted to a

00:09:30  6    full professor as of that year for the first time,

00:09:33  7    correct?

00:09:35  8    A.   Yes.  Appears that way.

00:09:37  9    Q.   Yes.  And what is his salary?

00:09:39  10   A.   128,370.

00:09:43  11   Q.   And so, what is the difference between these two

00:09:46  12   roughly?

00:09:48  13   A.   $109.

00:09:50  14   Q.   Out of -- and so, that's -- what would you put

00:09:52  15   that just roughly in percentage terms?

00:09:55  16   A.   One-tenth of one percent.

00:09:57  17   Q.   Okay.  And so, from this -- so from this specific

00:10:01  18   example, and we can look at some others, how does that

00:10:04  19   work -- how does that fit with the escalator that he

00:10:09  20   were on?

00:10:10  21   A.   That suggested that you can jump up steps.  As

00:10:15  22   you said, Professor G on row 34 is promoted years later

00:10:21  23   than Professor Garg on row 36, but in 2014-15, the year

00:10:26  24   that the first Professor G is promoted, they're making

00:10:30  25   virtually the identical salaries.

00:10:32  1    Q.  Let's look at some associate professors.  So, for

00:10:37  2    example, so Nan Sun goes from black to green between the

00:10:48  3    years 2016-'17 to '17-'18, correct?

00:10:51  4    A.  Yes.

00:10:51  5    Q.  And so, remind us, what does that signify?

00:10:55  6    A.  That's the promotion from assistant professor to

00:10:57  7    associate professor, and I would almost be certain

00:11:01  8    that's also with tenure.

00:11:02  9    Q.  And so, what are those -- what jump was

00:11:07  10   associated with that?

00:11:08  11   A.  Well, it's an almost $11,000 jump, around 10

00:11:13  12   percent.

00:11:13  13   Q.  Okay.  And so, that puts Dr. Sun at 119K more or

00:11:22  14   less.

00:11:22  15   A.  119,240.  Yes.

00:11:26  16   Q.  Thank you.  And so -- and that's actually more

00:11:28  17   than some of the other assistant -- or that's actually

00:11:33  18   more than some of the other associate professors,

00:11:35  19   correct?

00:11:36  20   A.  Yes.  On rows -- the one you highlighted are 65,

00:11:41  21   row 66, row 67, those three individuals were promoted a

00:11:46  22   few years earlier, and they're making less in 2017-'18

00:11:50  23   than is Dr. Sun.

00:11:53  24   Q.  And I don't want to be accused of cherry-picking.

00:11:56  25   So is there another example that we could look at right

00:12:01  1   now that similarly emphasizes this point?

00:12:05  2       A.  Well, you happen to have highlighted row 61.

00:12:10  3   Yes.  Dr. Dimakis is promoted effective '15-'16, goes

00:12:16  4   from 101,0 50 to 112,100.  And that 112,000 is virtually

00:12:23  5   identical to the several green rows below it for people

00:12:26  6   who were promoted one or more years earlier.

00:12:31  7       Q.  And so, looking at these examples, and I think

00:12:34  8   there's still others but I won't belabor the point, were

00:12:38  9   you in the courtroom when I used my rather clumsy

00:12:41  10  helicopter analogy?

00:12:43  11      A.  I was.

00:12:43  12      Q.  Okay.  So what did you understand that analogy to

00:12:46  13  mean?

00:12:46  14      A.  Well, I think you were suggesting that this is --

00:12:49  15  what you see here is possible.  In other words, that

00:12:53  16  it's not like you -- your promotion comes two years

00:12:56  17  later, so you're forever behind the people who were

00:12:59  18  promoted two years before.  This suggests that you're

00:13:03  19  promoted two years later and you're paid virtually

00:13:06  20  identically to the people who were promoted one or two

00:13:09  21  or three years earlier.

00:13:10  22      Q.  So was Dr. Glass' assumption about how U.T.

00:13:15  23  structures their promotions correct based on this

00:13:19  24  empirical data?

00:13:21  25      A.  Well, this certainly is a counterexample

00:13:24   1   inconsistent with that assumption, I would say.

00:13:26   2       Q.   And this is specific to the -- these are Cockrell

00:13:31   3   School of Engineering professors, correct?

00:13:32   4       A.   Faculty, yeah.   These are actually assistant to

00:13:35   5   associate, but yes.

00:13:36   6       Q.   Let's take a step back, then, and talk about Dr.

00:13:44   7   Thompson and we'll come back to Dr. Glass.   So talking,

00:13:52   8   then, about Dr. Thompson, I'm going to show you the

00:13:58   9   reports or the charts that he had and then, we can talk

00:14:01  10   about them.   So I'm showing you Plaintiff's Exhibit 237.

00:14:08  11       Were you in the courtroom when Dr. Thompson

00:14:10  12   testified?

00:14:11  13       A.   I was.

00:14:13  14       Q.   Could you tell us, what does his table 1 reflect?

00:14:22  15       A.   His table 1 is a comparison of the percentage of

00:14:32  16   female assistant professors who are reviewed early for

00:14:33  17   tenure compared to the percentage to male assistant

00:14:36  18   professors who were reviewed early for tenure.

00:14:39  19       Q.   Do you agree that this testimony has bearing on

00:14:43  20   Dr. Nikolova's case?

00:14:45  21       A.   No.

00:14:46  22       Q.   Well, why not?

00:14:47  23       A.   Well, this table, and as Dr. Thompson testified,

00:14:51  24   shows that to the percentage of women who went up early

00:14:55  25   is noticeably lower, statistically significantly lower

00:14:58  1   than the percentage of men who were put up early.  But

00:15:02  2   Dr. Nikolova went up early so, you know, her -- nothing

00:15:08  3   prevented her from going up early.  So the fact that

00:15:10  4   this is showing that at least some women went up -- were

00:15:14  5   less likely to go up early, it doesn't seem to apply to

00:15:16  6   her.

00:15:22  7       Q.  Let's move on then to tables 2 and 3.  Again,

00:15:28  8   these are not your tables.  These are Dr. Thompson's

00:15:30  9   tables.  What do you recall of his testimony about these

00:15:36 10   two tables?

00:15:38 11       A.  Well, table 2 was -- again, these are votes of

00:15:42 12   the departmental, what's called the budget committee or

00:15:47 13   -- I'm not sure the C stands for committee, but the

00:15:50 14   budget group, the people in the department -- the other

00:15:53 15   faculty in the department who were making a -- reviewing

00:15:55 16   and making a recommendation, a vote whether to -- in

00:15:58 17   favor of tenure or not.  And, you know, this shows that

00:16:02 18   those who receive a heavy, very high fraction of the

00:16:06 19   vote are quite likely to get tenure, and those who

00:16:09 20   receive lower fraction of the vote don't get tenure.  Or

00:16:13 21   flipping it around, the ones who don't get tenure didn't

00:16:16 22   get as many votes as the ones who do get tenure.

00:16:18 23       Q.  In your opinion, does this testimony and this

00:16:22 24   data have any bearing on the question of whether U.T.

00:16:25 25   Austin discriminated against Dr. Nikolova on the basis

00:16:27  1   of pregnancy or sex?

00:16:28  2       A.   No, because this table, there's nothing on here

00:16:32  3   about gender, or sex, or pregnancy.   It's just -- it's

00:16:38  4   about the votes and whether you get -- whether

00:16:42  5   promotions are denied or made.

00:16:45  6       Q.   And so, looking at this, can we infer anything

00:16:50  7   about why U.T. Austin did not grant early tenure to Dr.

00:16:54  8   Nikolova in 2019?

00:16:56  9       A.   I don't think so.

00:16:57  10      Q.   And do you know whether women are included in

00:17:01  11  this data?

00:17:02  12      A.   They are.   In fact, in table 3, those 62 that got

00:17:07  13  100 percent vote, again, this is from the college

00:17:09  14  committee, and again, 100 percent of those were given

00:17:14  15  tenure.   This is, again, before Dr. Nikolova's case, 16

00:17:20  16  of those 62 are women.   So there's plenty of women in

00:17:22  17  those data who are 100 percent vote and also get tenure.

00:17:28  18      Q.   Well, I should take a step back.   Did you review

00:17:32  19  the same data that Dr. Thompson reviewed in forming

00:17:37  20  these opinions?

00:17:37  21      A.   Yes.

00:17:38  22      Q.   Okay.   And so, when you say, you know, that the

00:17:41  23  women were included in that 13, what is that based on?

00:17:47  24      A.   I didn't say the 13.   I said the 62.

00:17:49  25      Q.   Excuse me.   The 62.   I apologize.

00:17:51   1       A.   Sixteen of the 62 are women.   The 13, I'm not --

00:17:55   2   I don't recall the gender breakdown there, but the

00:17:57   3   relevant point, I think, is because, you know, Dr.

00:18:02   4   Thompson pointed out that before you know Dr. Nikolova's

00:18:05   5   case, 62 out of 62 who got 100 percent vote got tenure.

00:18:09   6   You know, he likened it to the sun coming up in the

00:18:12   7   morning.

00:18:13   8       Q.   Do you agree with that?

00:18:13   9       A.   Well, 62 out of 62 is 100 percent.   I'll give you

00:18:17   10   that.   But there's a lot of women in there.   So I

00:18:21   11   understand Dr. Nikolova, disappointed and shocked that

00:18:26   12   she didn't get tenure, but this doesn't suggest that it

00:18:28   13   was -- gender was the cause.

00:18:29   14       Q.   Well, let's talk about the data that you looked

00:18:32   15   at and your statistics.   So I want to move on from Dr.

00:18:36   16   Thompson's tables unless there's anything you'd like to

00:18:39   17   add about this before I move on.

00:18:42   18       A.   No, sir.

00:18:43   19       Q.   Okay.

00:18:43   20       A.   You're driving.

00:18:46   21       Q.   Let's go, then, to your data.   So first of all,

00:19:12   22   did you generate table two of Defendant's Exhibit 50?

00:19:16   23       A.   Yes, I did.

00:19:16   24       Q.   Okay.   And so, help us understand.   Walk us

00:19:20   25   through what this table reflects.

00:19:23  1    A.   Sure.   There are three pairs of rows.   We'll

00:19:26  2  start with the first two up at the top that say the

00:19:28  3  population there.   So that's decisions prior to

00:19:31  4  2018-'19.   That was the same group that Dr. Thompson

00:19:36  5  focused on with those 62 votes.   Or, you know, the 62,

00:19:41  6  100 percent votes.   And what I've done here is one row

00:19:44  7  for women, one row for men.   And I've got three sets of

00:19:48  8  columns where I report then a number of people and then,

00:19:53  9  a percentage of what happened to them.

00:19:54  10          So the first set of columns there, department

00:19:57  11  committee recommends for tenure.   And so, what I'm

00:20:01  12  looking at there is, given the department recommended

00:20:04  13  for tenure, the normal cases get tenure, so the question

00:20:08  14  is, how often did someone not get tenure despite the

00:20:11  15  fact that their department recommended them for tenure?

00:20:14  16  And so, there were 20 cases there for women that where

00:20:20  17  the department recommended for tenure, and of those, 22

00:20:24  18  women were denied tenure.   This is again before Dr.

00:20:27  19  Nikolova's case.

00:20:27  20    Q.   How many women were denied tenure?

00:20:29  21    A.   Two.

00:20:30  22    Q.   Oh, two.   Thank you, sir.

00:20:32  23    A.   And that two out of 20 is the ten percent you see

00:20:34  24  in the percent denied tenure column.

00:20:36  25    Q.   Okay.   So 20 went up, two were denied and

00:20:41   1    that's --

00:20:42   2        A.   If I may.   Twenty were recommended.   There were

00:20:45   3    more that went up.   There's a footnote there that the

00:20:47   4    department committee recommended nine -- tenure in four

00:20:50   5    cases.   All four were denied tenure.   Ultimately, those

00:20:54   6    aren't really interesting and don't tell you anything.

00:20:56   7    So these are the ones that tell you something where the

00:20:59   8    final decision differed from what the department

00:21:02   9    recommended.

00:21:02   10       Q.   Thank you for correcting me.   Okay.   And so,

00:21:06   11   then, what about the men for department committee

00:21:10   12   recommends for tenure?

00:21:11   13       A.   Right.   And the comparison -- there were 63 men,

00:21:13   14   so a little over three times as many that were

00:21:17   15   recommended by the department, and a total of seven of

00:21:20   16   those 63 were ultimately denied tenure.   And so, that

00:21:24   17   rate of denial or percentage denied is 11.1 percent and

00:21:28   18   that -- it's slightly bigger than but it's not

00:21:31   19   statistically different from the 10 percent for women.

00:21:34   20   So there's no statistical difference here in the

00:21:38   21   fraction of women and men who are denied tenure amongst

00:21:42   22   those women and men who were recommended for tenure by

00:21:44   23   their department.

00:21:47   24       Q.   Okay.   So then, let's stick with this row -- or,

00:21:52   25   excuse me, this column for now.   So that was for

00:21:55   1   decisions prior to 2018 to '19.  And then, next you do

00:21:58   2   it again; this time, all decisions, except for Dr.

00:22:02   3   Nikolova.  Why rerun it that way?

00:22:05   4        A.   Well, I rerun it with more decisions to take it

00:22:08   5   through all the data we had.  And I specifically exclude

00:22:13   6   Dr. Nikolova, who is included in the last row, I'll say,

00:22:15   7   but is out of this row.  And the idea is, if something

00:22:23   8   bad happens to you and you say it's because of your

00:22:26   9   gender, well, we know something bad happened to you and

00:22:29  10   we know what your gender is, but the issue of whether

00:22:31  11   the causation is gender, you want to look at other

00:22:35  12   people who share that characteristic with you, all

00:22:38  13   women.  And what I've done here is just take Dr.

00:22:41  14   Nikolova out of it to see how does it look for all women

00:22:44  15   but her.  And then, I'm going to put her back in so that

00:22:47  16   we look at all women together.  But that's sort if the

00:22:50  17   idea to get an idea of, well, what was it like for

00:22:51  18   everyone else with regard to gender.

00:22:52  19        Q.   And so, looking at that data, what did you

00:22:55  20   determine?

00:22:57  21        A.   It's the same process.  You know, there were more

00:22:59  22   who were recommended for tenure.  It's exactly the same

00:23:03  23   numbers who were denied, the two and the seven.  So the

00:23:06  24   percentages are somewhat lower.  Again, the 8.3 percent

00:23:09  25   of the 24 women, excluding Dr. Nikolova, were denied and

00:23:14  1   9.6 percent of the 73 men were denied.  And again, the

00:23:18  2   8.3 percent and the 9.6 percent is not statistically

00:23:23  3   different.  So there's -- again, that comparison there

00:23:26  4   provides no evidence that gender is related to the

00:23:30  5   tenured decision, given the department's recommendation.

00:23:33  6       Q.  When you say not statistically significant or no

00:23:36  7   statistical difference, can you just break that down in

00:23:38  8   sort of common basic English?  What does that mean?

00:23:41  9       A.  Well, yeah.  I mean, if you had -- the easiest

00:23:47  10  thing to think about is flipping a coin, okay?  You've

00:23:50  11  got six coins and you're going to flip them, you expect

00:23:53  12  three heads and three tails, but you're not really

00:23:55  13  surprised if you get two heads and four tails or four

00:23:58  14  heads and two tails.  And so, there's a little bit of

00:24:01  15  luck involved.  And so, when we compare statistics, we

00:24:04  16  want to say, well, you know, I don't want to say they're

00:24:07  17  different if it's just kind of random chance.  However,

00:24:10  18  if you flip six coins and all six are heads or all six

00:24:13  19  are tails, that's kind of surprising.  That happens, you

00:24:16  20  know, well less than five percent of the time and so --

00:24:19  21      Q.  Can you make sure you're speaking into the mic.

00:24:22  22      A.  Sure.  If you flip it six times and you get all

00:24:27  23  heads or all tails, that's pretty unlikely.  And in

00:24:30  24  fact, that's so unlikely, you would -- from based on

00:24:32  25  that evidence, you would say, well, I'm not so sure

00:24:35  1    that's a fair coin, that it really is a 50/50 coin.

00:24:38  2        So that's what we're doing with statistical

00:24:42  3    significance is we say, I look at the process as if it

00:24:45  4    were neutral and with respect to in this case gender.

00:24:47  5    And then, you say, well, how did it come out?  Did it

00:24:50  6    come out pretty much even, in which case we go, well,

00:24:53  7    there's no evidence that it was related to gender?  Or

00:24:55  8    did it come out that women were treated much, much

00:24:57  9    better or women had much, much better outcomes or much,

00:25:02  10   much worse outcomes, then we would say, well, the

00:25:02  11   evidence suggests there's something going on unrelated

00:25:05  12   to gender.  And here, we're on the side of there's

00:25:07  13   really no difference.  If anything, it's higher for

00:25:11  14   women, but that's really nothing.  That's just again

00:25:13  15   like the two heads and a four tails.

00:25:15  16        So that's what I mean.  Is that -- are you

00:25:19  17   good?

00:25:19  18   Q.  I liked it.  Now, what about if there's only a

00:25:24  19   very, very small -- I don't know whether I'm using the

00:25:27  20   word "population" correctly, but what if you only had,

00:25:30  21   for example, two women that went up in a period of five

00:25:35  22   years because, let's say, we were only looking at one

00:25:38  23   department, and so, there was a very small population of

00:25:41  24   data.

00:25:42  25   A.  Sometimes you don't have enough data to be able

00:25:46   1   to say anything.  In other words, if you had very, very,

00:25:49   2   very few women to go up for tenure, you really wouldn't

00:25:52   3   be able to say something about women.  You could say

00:25:55   4   something about those two women.  So it's like with the

00:25:56   5   coins.  If you only had two and you flip them both and

00:25:59   6   you happen to get two heads, you're still not that

00:26:01   7   surprised.  You just don't have enough coins -- enough

00:26:04   8   flips of that coin to decide whether you think it's fair

00:26:07   9   or not.  So you need more information.  And so, if you

00:26:12   10   don't have enough information, it can be difficult to

00:26:16   11   find any statistical significance.

00:26:18   12       Q.  All right.  Let's move on, then, to the last row

00:26:24   13   in this department committee recommends for tenure

00:26:28   14   analysis.

00:26:29   15       A.  Sure.  And again, this is all decisions, so it's

00:26:32   16   one more decision includes Dr. Nikolova's case.  And so,

00:26:35   17   there's, you know, one more woman recommended by the

00:26:37   18   department, and one more woman who is denied tenure

00:26:40   19   ultimately.  So the row for women is 25 and with three

00:26:45   20   denied for 12 percent denial rate, compared to the men's

00:26:49   21   row the same as above, 73 men -- 79, 9.6.  Now the 12

00:26:54   22   percent is bigger than the 9.6, but it's not

00:26:57   23   statistically different.  Again, this is kind of the

00:26:59   24   four heads, two tails kind of case.

00:27:01   25       Q.  So then, next you looked at it -- what do the

| 00:27:07 | 1 | statistics look like if the college committee recommends |
| 00:27:11 | 2 | for tenure.  Is that correct? |
| 00:27:12 | 3 | A.  Yes.  It's a similar kind of idea, but now I |
| 00:27:16 | 4 | looked at it both ways.  You'll see the first set -- the |
| 00:27:19 | 5 | middle set of columns there for the college is the |
| 00:27:21 | 6 | college recommends for tenure and then, how often did |
| 00:27:26 | 7 | the university ultimately deny.  And then, the other |
| 00:27:31 | 8 | side of that reverse, which is the last -- the last set |
| 00:27:38 | 9 | of columns is the college committee recommends against |
| 00:27:41 | 10 | tenure, but the university granted it, anyway, okay?  So |
| 00:27:47 | 11 | both kinds of -- the university doesn't agree with the |
| 00:27:51 | 12 | college.  That's the point here.  And how does that |
| 00:27:53 | 13 | relate to or how does that compare with gender? |
| 00:27:57 | 14 | And again, it's the same set of comparisons. |
| 00:28:00 | 15 | The first row is going to be prior to Dr. Nikolova's |
| 00:28:03 | 16 | case.  The second case is all cases except her.  And the |
| 00:28:05 | 17 | last row is including her case.  And the pattern in the, |
| 00:28:10 | 18 | you know, the university denied when the college |
| 00:28:12 | 19 | committee recommends for tenure, it's, you know -- let |
| 00:28:17 | 20 | me just do the -- first row is 17 women recommended for, |
| 00:28:21 | 21 | one denied, so that's 5.9 percent.  Comparison, 58 men |
| 00:28:26 | 22 | recommended, four denied, 6.9 percent.  So again, the |
| 00:28:30 | 23 | 5.9 and the 6.9 are not identical, but they're close |
| 00:28:34 | 24 | enough that we say there's no evidence it's -- you know, |
| 00:28:36 | 25 | it's not statistically significant related to gender. |

00:28:40  1           When we look at all decisions except Dr.
00:28:43  2   Nikolova, very similar pattern, you know, 5.9 percent
00:28:46  3   denial rate for men, 4.8 percent, a lower denial rate
00:28:50  4   for women, but again, no statistical difference.  When
00:28:52  5   we add Dr. Nikolova's case, you know, she's one out of
00:28:54  6   22 women, she is denied.  So that raises that percentage
00:28:58  7   a noticeable amount to 9.1 percent, two out of 22 women
00:29:01  8   and for men, four out of 68 men.  And so, the 9.1
00:29:05  9   percent for women is higher than the 5.9, but it is not
00:29:09 10   statistically significantly higher.  So there's, you
00:29:12 11   know, from the statistician point of view, those data do
00:29:17 12   not provide evidence that gender was related to or
00:29:21 13   significantly at least related to the reversal of the
00:29:26 14   college's recommendation.
00:29:29 15      Q.  So that was for the -- when the college committee
00:29:31 16   recommends for tenure.  What about when they recommend
00:29:34 17   against tenure?
00:29:35 18      A.  When they recommend against tenure, it doesn't
00:29:37 19   happen as often, but the university also doesn't always
00:29:40 20   take that recommendation.  So you can see there -- all
00:29:43 21   the rows are the same because, you know, Dr. Nikolova
00:29:48 22   didn't affect this column.  She was recommended and, in
00:29:51 23   fact, all the decisions after -- her case and after also
00:29:55 24   don't affect it.  It's a grand total of nine that were
00:29:58 25   -- where the college committee recommended against,

00:30:01  1  three women and six men, and of those three women, the

00:30:06  2  university reversed it and granted tenure in two of the

00:30:09  3  three cases.  And for the six men, it also granted

00:30:13  4  tenure in two of the six cases.  So the percentages are

00:30:15  5  66 and 33, two thirds and one third.  But again, this is

00:30:20  6  back to your question earlier, it's such a small sample.

00:30:24  7  We only have nine cases.  We just don't have an

00:30:26  8  ability -- even though 33 and 66 look like they're a

00:30:29  9  long way apart, you know, it's just really, you know,

00:30:31  10 one or two people.  So it's still not statistically

00:30:34  11 significantly different.

00:30:37  12     So the bottom line on this whole table is, there

00:30:40  13 is no statistical evidence for a relationship between

00:30:44  14 gender and the tenure decision given the department

00:30:48  15 and/or the college's recommendation.

00:30:50  16 Q.  And why did you even look at the college and

00:30:55  17 department committees at all?

00:30:57  18 A.  Well, this is playing off of Dr. Thompson's

00:31:01  19 table, you know, his tables 2 and 3 were about votes at

00:31:06  20 these committees, right?  And so, you know, she was

00:31:11  21 recommended by her department and she was recommended by

00:31:14  22 the college but ultimately didn't get it, so, you know,

00:31:16  23 we want to see if that is gender related.  I was doing

00:31:23  24 the gender comparison that Dr. Thompson did not do.

00:31:28  25 Q.  Well, let's go, then, to your third chart or your

00:31:31  1   third table.  What does this reflect?

00:31:35  2      A.  It's a little bit broader.  It's just looking at

00:31:41  3   the tenure decision.  Ignores -- as you suggested,

00:31:44  4   ignores whether the department or the college

00:31:47  5   recommended or not.  It's just asking bottom line:  What

00:31:49  6   fraction of women get tenure?  What fraction of men get

00:31:52  7   tenure?  And so, does it -- this is now the groups are

00:31:56  8   going across the page.  The first comparison there is,

00:31:58  9   again, prior to Dr. Nikolova's case.  There were 21

00:32:02  10  women considered, 18 tenured.  There were 66 men

00:32:07  11  considered, 56 tenured.  And those two percentages are

00:32:11  12  very, very close.  85.7.for women and 84.6 percent for

00:32:16  13  men are the percentages granted tenure.  The women

00:32:19  14  slightly bigger than the men but, again, no statistical

00:32:21  15  difference.

00:32:23  16     Q.  And then, the next column.

00:32:25  17     A.  The next column includes all the decisions,

00:32:29  18  excluding Dr. Nikolova, consistent with the way I'd

00:32:34  19  broken it down before, 22 of 25 women are -- extends to

00:32:38  20  the full-time period, 22 of 25 women were granted

00:32:41  21  tenure; that's 88 percent.  Sixty-six of 76 men granted

00:32:45  22  tenure; that's 86.8 percent.  Again, very similar

00:32:49  23  numbers.  No statistical difference.

00:32:52  24         And then, the last one includes Dr. Nikolova so

00:32:55  25  the number of women considered goes up -- you've gotta

00:33:00  1    scoot it over a little bit more.  There we go.  The

00:33:04  2    number of -- okay.  All decisions, this is the third

00:33:08  3    column.  The number of women considered there, the 26 is

00:33:11  4    one more than the 25.  That's Dr. Nikolova.  And so, 22

00:33:15  5    out of 26 is 84.6 percent.  And the 66 out of 76 for men

00:33:20  6    is 86.8 percent.

00:33:22  7        So again, now the women's number is slightly

00:33:25  8    lower than the men's, but there's a not a statistical

00:33:27  9    difference between those two.  You know, the data don't

00:33:30  10   support a conclusion that gender is related to the

00:33:35  11   granting of tenure.

00:33:36  12   Q.  And what about this last column, all decisions

00:33:40  13   plus those who left prior to tenure review?

00:33:43  14   A.  Yeah.  This looks a little bit broader because --

00:33:46  15   you know, I haven't seen any of the testimony, really,

00:33:48  16   other than the experts, but there's universities

00:33:52  17   typically have a thing, a third-year review.  And also,

00:33:54  18   as you're working through tenure, you can be -- it can

00:33:59  19   be suggested that may be you should find someplace else

00:34:02  20   to teach.

00:34:03  21       So to the extent that women were encouraged or --

00:34:08  22   to leave or were told at the third-year review, it's not

00:34:11  23   going well and they left, the tenure numbers could look

00:34:13  24   good for women because all the ones who weren't going to

00:34:15  25   get tenure left earlier.  So this puts everybody in the

00:34:18 1  pot who comes in the door as an assistant professor and
00:34:21 2  says when you start out as an assistant, I want to know
00:34:23 3  what happens to you.  You either get tenure or you
00:34:25 4  don't.
00:34:26 5        Some of the ones who don't left before they were
00:34:28 6  denied.  Some of the ones who don't were denied.  But
00:34:31 7  it's a broader comparison and would not be affected by
00:34:35 8  any differential decisions to leave early or being
00:34:39 9  encouraged to leave early.  And so, in that case, you
00:34:41 10 know, it's a little more expanded pool, right?  There's
00:34:44 11 30 total women, 90 total mean, exactly three to one.
00:34:48 12 And the percentage ultimately tenured, whether they were
00:34:50 13 -- the ones who weren't tenured were, again, they denied
00:34:53 14 or left is 22 women and 66 men.  That's also exactly
00:34:58 15 three to one.
00:34:58 16       So in this particular case, and this includes Dr.
00:35:02 17 Nikolova, the percentages are identical, the fraction of
00:35:06 18 women and the fraction of men who came in the door as
00:35:08 19 assistant professors in this time period, the same
00:35:12 20 percentages were ultimately granted tenure by the
00:35:16 21 University of Texas.
00:35:28 22    Q.  Anything else you want to tell us about table 3
00:35:32 23 before I move on?
00:35:33 24    A.  No.
00:35:33 25    Q.  Okay.  All right.  Now, I think we've moved on

00:35:39    1    from Dr. Thompson now to address Dr. Glass' testimony,

00:35:44    2    and we already talked a little bit about this.  But what

00:35:47    3    did you do in computing her -- Dr. Nikolova's damages

00:35:52    4    model?

00:35:54    5        A.   Again, Dr. Glass had three scenarios.  I

00:35:59    6    basically took his first scenario and did it somewhat

00:36:03    7    differently.  That's the one where she -- instead of

00:36:06    8    getting tenure in September -- effective September 1,

00:36:09    9    2019 her, tenure would be -- becomes effective September

00:36:13   10    1st, 2023.  So, you know, year and a half from now.  And

00:36:17   11    that she works until about age 65 and so, that's -- I

00:36:25   12    took his scenario one and I -- you'll notice there for

00:36:28   13    the row with the base case if you can sort of highlight

00:36:31   14    that up under expected future salaries near the top.

00:36:50   15    The data at the top says denied tenure September 1st,

00:36:54   16    '19.  Alternative assumption date of tenure is going to

00:36:57   17    be 9-1-2023.  I adopted the same assumption as Dr. Glass

00:37:02   18    for the employee contribution to retirement

00:37:05   19    seven-and-a-half percent.  So now, the base case had she

00:37:08   20    been tenured September 1st, 2019, I have her with a

00:37:13   21    salary of 129,500.  And then, I have her salary in that

00:37:20   22    case that would have -- by September 1st of 2023, I have

00:37:24   23    that her salary would have grown to 149,314 by September

00:37:31   24    1st of 2023, had she received tenure in September of

00:37:35   25    '19.

| | | |
|---|---|---|
| 00:37:36 | 1 | And Dr. Glass used a number of 130,500.  I used a |
| 00:37:41 | 2 | thousand dollars less than that.  His number actually |
| 00:37:44 | 3 | comes from the salary of a particular faculty member |
| 00:37:47 | 4 | promoted at that particular time.  I think it's a Dr. |
| 00:37:51 | 5 | Tiwari.  And if you look, the increase that Dr. Nikolova |
| 00:37:55 | 6 | would have received to get to the 129,5 would have been, |
| 00:38:00 | 7 | as I note two rows below, 16.35 percent, which is larger |
| 00:38:04 | 8 | than every other promotional increase we see in the data |
| 00:38:07 | 9 | from the Cockrell School of Engineering, except for one. |
| 00:38:09 | 10 | Most of the promotional increases are around 10, 11 |
| 00:38:13 | 11 | percent. |
| 00:38:13 | 12 | Q.  So just to be clear, you looked at multiple |
| 00:38:16 | 13 | professors who were promoted from assistant to associate |
| 00:38:19 | 14 | and looked at how much a percentage increase they |
| 00:38:22 | 15 | experienced. |
| 00:38:22 | 16 | A.  Yes.  And as I said, most of the time, that was |
| 00:38:25 | 17 | between -- close to 12 percent.  Between 10 and 12 |
| 00:38:27 | 18 | percent and -- but I looked, you know, Professor Tiwari |
| 00:38:32 | 19 | made about $4,000 more than Nikolova in 2018, and if you |
| 00:38:38 | 20 | looked in, you know, the lack of escalator, the data we |
| 00:38:41 | 21 | were looking at a minute ago, you could see that there |
| 00:38:43 | 22 | was a tendency to get pretty close to people's pay that |
| 00:38:48 | 23 | were all promoted at the same time.  We didn't focus on |
| 00:38:50 | 24 | that, but it's also in those data. |
| 00:38:52 | 25 | So I saw several other cases or at least a couple |

00:38:55  1   of other cases where people promoted the same year who

00:38:57  2   were paid differently as assistants made within a

00:39:00  3   thousand dollars of each other as associates, but didn't

00:39:03  4   make exactly the same.  So that's what I did for Dr.

00:39:05  5   Nikolova.  I assumed it would get to 129,5, within a

00:39:09  6   thousand dollars of Professor Tiwari.  So that's where

00:39:11  7   the 129,5 comes, and I note that it's a 16.35 percent

00:39:15  8   increase over her prior year salary, which, as I said,

00:39:19  9   is larger than every other promotional increase in those

00:39:22  10  data, except for one.

00:39:23  11      Q.  So you're doing a similar elevator but the gap

00:39:27  12  starts out pretty small, and then, it closes over a

00:39:30  13  period of time or how would you --

00:39:31  14      A.  Well, I wouldn't do that.  I would say -- so I

00:39:36  15  assume that had she gotten tenure, it was 129,5.  That's

00:39:39  16  what she would have had when she was tenured.  The row

00:39:42  17  right below that is, she didn't get tenure, so her

00:39:45  18  salary was actually 114,639 that it, in fact, was.

00:39:49  19  Okay.  And now, I think what we want to do is, we can

00:39:53  20  switch to the bottom so we can look at it year by year

00:39:56  21  so there -- so the first row there September 1st, '19,

00:40:03  22  that's the 129,5 had she received tenure.  And her

00:40:08  23  actual salary, given she did not receive tenure,

00:40:11  24  114,639.  And then, that year, virtually everyone in

00:40:17  25  school got a zero percent increase.  That was, I think,

00:40:20  1  COVID issues and all.  Also, that was a raise pull that

00:40:25  2  year, folks.  There wasn't one essentially.

00:40:25  3     Q.  There wasn't an estimate.  At this point, you're

00:40:27  4  looking at the actual data.

00:40:28  5     A.  I'm looking at the actual data under scenario

00:40:31  6  one, yes.  Her actual salary was, again, the same the

00:40:34  7  next year as virtually everyone's in the college was.

00:40:36  8  And so, in the "but for" case, had she been tenured and

00:40:40  9  moved to 129,5, I assumed, well, you know, again, you

00:40:43 10  would not have gotten an increase -- she would not have

00:40:45 11  gotten an increase that year.

00:40:47 12          And then, for each of the subsequent years, the

00:40:51 13  growth and the base case is 4.86 percent, and that's

00:40:55 14  actually higher than Dr. Glass assumed, but that's the

00:40:58 15  average within rank increase in the data that you and I

00:41:01 16  looked at a minute ago.  And so, the average annual

00:41:05 17  increase -- not counting the 19200.  That would have

00:41:08 18  pulled it down.  But in the other years, it was about a

00:41:10 19  4.86 percent increase.  So I said that's about on

00:41:13 20  coverage how your salary goes up when you don't get a

00:41:16 21  promotion.

00:41:16 22          And so, that's what we're doing until, you

00:41:20 23  know, you can see few rows down for September 1st, 2023,

00:41:27 24  so there, Dr. Nikolova gets about a $20,000 increase,

00:41:32 25  okay, from 126 to 146.  That's the promotion in this --

00:41:37  1   in the new world.  The assumption is, she will be -- or

00:41:40  2   these calculations are made assuming that she receives

00:41:43  3   tenure and promoted to associate professor September 1st

00:41:47  4   of 2023.  And that's back to that 16.35 percent

00:41:51  5   increase.  So I used the same percentage increase that I

00:41:53  6   had used before.

00:41:54  7             And then, you'll note, you can see it right

00:41:57  8   at the top of the page there, it says catch-up growth.

00:42:01  9   So the top of the screen.  I'm sorry.  It was there.

00:42:11  10  See where it says within rank row 4.86 percent and then,

00:42:15  11  catch-up growth, .63 percent.  That is the amount of

00:42:21  12  growth that I assume she experiences over the 24 -- over

00:42:26  13  the subsequent three years to catch her up to where she

00:42:29  14  would have been.

00:42:30  15            So if you look at the last row on the table

00:42:32  16  at the bottom, September 1st of 2026, I have her earning

00:42:38  17  172,159.  If she had received tenure back in '19 and I

00:42:43  18  have also have her catching up to that same spot if she

00:42:48  19  receives tenure in 2023.  And so, part of the reason for

00:42:53  20  my assuming the catch-up is, as you said, if you look in

00:42:57  21  the data, it's not an escalator-type world.  It's also

00:43:01  22  the case that there's a substantial amount of data.

00:43:05  23            And this was what I cited in my report from

00:43:08  24  the Bureau of Labor Statistics.  Every two years, they

00:43:12  25  survey what's called displaced workers, people who have

00:43:15  1   lost a job, and they look at whether those people are

00:43:18  2   reemployed, and if they're reemployed, how much they're

00:43:20  3   earning relative to the job they left.  And within three

00:43:24  4   years -- because the average is from one to three years.

00:43:27  5   Within three years, over half of the individuals who are

00:43:31  6   reemployed are now earning what they otherwise would

00:43:36  7   have earned on the job that they lost.

00:43:39  8            And so, there's evidence more generally

00:43:42  9   besides just U.T.'s faculty data that Dr. Nikolova would

00:43:46 10   be likely to catch up.  And moreover, suppose Dr.

00:43:54 11   Nikolova got fed up with U.T. and left.  Go to another

00:43:57 12   university, get tenure there, get paid in a very similar

00:44:01 13   way, one would think.  So, you know, there is a market

00:44:06 14   there.  People do leave universities and go to other

00:44:09 15   universities and so --

00:44:11 16            MR. NOTZON:  Objection, your Honor.  This is

00:44:12 17   well beyond his expertise.  He didn't cite it in his

00:44:16 18   report.  There's no scientific basis for it.

00:44:18 19            THE COURT:  It's not in his report?

00:44:20 20            MR. DOWER:  I'm not sure off the top of my

00:44:22 21   head, your Honor.  If it's just --

00:44:23 22            THE WITNESS:  Not really.

00:44:24 23            MR. DOWER:  Okay.  Well, then, we'll --

00:44:26 24            THE WITNESS:  Sorry.

00:44:27 25            THE COURT:  It's okay.

00:44:29    1    Q.   (BY MR. DOWER)  Okay.   Anything more that you'd
00:44:37    2  like to -- well, actually, we should probably talk a
00:44:39    3  little bit about some of these other columns.   So can
00:44:42    4  you just explain like what does the loss column reflect?
00:44:46    5    A.   The loss is the difference between the base case
00:44:48    6  and the scenario.   So that represents the amount of
00:44:51    7  money that Dr. Nikolova would have earned had she -- or
00:44:55    8  the estimated amount of money she would have earned had
00:44:57    9  she received tenure in '19, compared to now receiving it
00:45:00   10  in 2023.
00:45:01   11    Q.   Is this for the year in which it appears in the
00:45:05   12  row?
00:45:05   13    A.   Yes.   So in that -- for the year starting 9-1-19,
00:45:11   14  it was a little under 15,000.   Exactly the same next
00:45:16   15  year because no raises were given anywhere.   And then, a
00:45:18   16  little bit larger and a little bit larger and it drops
00:45:20   17  down and then, shrinks to zero.
00:45:22   18    Q.   And why does it drop so dramatically?
00:45:24   19    A.   Well, it drops so dramatically September 1st,
00:45:28   20  2023 because that's the assumption as Dr. Glass made
00:45:34   21  that she receives tenure at that point and is promoted
00:45:36   22  to associate professor.
00:45:40   23    Q.   Real quick, going back up, this says date of
00:45:43   24  tenure denial September 1st, 2019, but we've heard
00:45:47   25  testimony that the decision was made in February.   Why

00:45:50  1    use September 1st?

00:45:50  2      A.   That's when it would have taken effect.  So the

00:45:55  3    date at which the deny tenure would have been effective

00:45:58  4    is probably a better way to say that.

00:46:00  5      Q.   And so, I noticed your total loss is the sum of

00:46:04  6    loss in retirement contribution.  What does that mean?

00:46:07  7      A.   Well, the retirement contribution is that

00:46:09  8    seven-and-a-half percent because the University of Texas

00:46:13  9    faculty have a -- they actually have one of two.  They

00:46:17 10    have a retirement system that the university contributes

00:46:19 11    to and Dr. Glass' assumption that I adopt it was that

00:46:24 12    seven-and-a-half percent.  So the loss --

00:46:26 13    seven-and-a-half percent of the loss column is put in

00:46:29 14    the retirement contribution column.  So that's also a

00:46:32 15    loss.  And then, adding those two together, the loss and

00:46:35 16    the lost retirement contribution is -- gives the total

00:46:39 17    loss in dollars for each of the years.

00:46:42 18      Q.   So you're not shortchanging her the retirement

00:46:44 19    stuff.

00:46:45 20      A.   No.

00:46:46 21      Q.   And what about the discount factor?  What's that?

00:46:50 22      A.   Well, that is very similar to what Dr. Glass

00:46:54 23    talked about is, you know, $100,000 or any amount of

00:46:57 24    money in a couple of years is not worth the same as the

00:47:00 25    amount of money now because there are interest rates.

00:47:03  1  As he explained quite well, if you want somebody to have

00:47:06  2  100,000 in five years, you give them something less than

00:47:08  3  that, they invest it, it grows at the interest rate, in

00:47:12  4  five years, they've got $100,000.

00:47:14  5       So when you're calculating what it's worth today

00:47:18  6  of what money in the -- for those payments that she's

00:47:20  7  going to miss in the future, you do the reverse of that.

00:47:23  8  You sort of pull it -- you shrink it by how much the

00:47:27  9  interest is that would have been earned, and that's what

00:47:28  10 the discount factor is.  It's based on interest rates

00:47:32  11 and, you know, those discount factors are based on --

00:47:38  12 they're actually -- there's a market for what's called

00:47:42  13 strip securities from the U.S. Treasury.

00:47:44  14      You can take a treasury bond with interest coupon

00:47:46  15 payments, physically strip those two apart, and you can

00:47:50  16 -- essentially there's a market for -- I want to have

00:47:53  17 $10,000 paid to me in November of 2024, well, there's a

00:47:56  18 market for that.  And whatever the price is for $10,000

00:47:59  19 in November 2024, you say okay, that's what we're going

00:48:02  20 to count as $10,000 is worth today.

00:48:04  21      So my discount factors are based on the market

00:48:08  22 prices at the time I wrote my report for moneys in the

00:48:13  23 future effectively.

00:48:15  24 Q.  And so, your total lost compensation, can you

00:48:21  25 just sort of summarize, what does that reflect?

00:48:23  1     A.  Well, that takes the yearly losses in the fourth

00:48:27  2  column, the first red column, adds to them the lost

00:48:30  3  retirement contribution, takes the total loss,

00:48:34  4  multiplies those by the discount factor to take -- bring

00:48:37  5  those to present value.  So effectively, that's going to

00:48:39  6  take moneys in the future and shrink them a little bit.

00:48:43  7  And then, it's going to add all -- the present value of

00:48:47  8  all those annual losses and that gives a total loss of

00:48:51  9  just over $72,000.

00:48:52  10     Q.  So this is -- so this is your estimate of the

00:48:57  11  lost compensation given this scenario and then, how much

00:49:02  12  that would be worth if she were to get the money today

00:49:06  13  effectively.

00:49:06  14     A.  Yes.

00:49:24  15     Q.  Do you have any other comments or response to Dr.

00:49:27  16  Glass' scenario one?

00:49:30  17     A.  No.

00:49:31  18     Q.  Okay.  Well, so we don't have a chart for it, but

00:49:35  19  for Dr. Glass' scenario two, do you believe that --

00:49:39  20     A.  I'm sorry.  Can I change my answer?

00:49:41  21     Q.  Sure.

00:49:42  22     A.  Because remember Dr. Glass' scenario one and two

00:49:46  23  sub-scenarios to 65 and to 70.  For -- there's catchup,

00:49:51  24  it's not going to matter.  But in his assumption where,

00:49:54  25  you know, you're on an escalator and you never catch up,

00:49:58  1  it matters -- as you could see, it matters whether you

00:50:00  2  take it to 65 or you take it to 70.  And I hope I am as

00:50:04  3  in as good a shape as he is when I'm his age, but most

00:50:07  4  people don't work to 70, not even necessarily most

00:50:11  5  faculty.  There are tables from -- as he cites in his

00:50:13  6  report that calculate expected remaining work life by

00:50:16  7  education and age and gender, and that is, as he

00:50:20  8  reports, 65 or 65 and change years for Dr. Nikolova.

00:50:25  9       So I don't -- even if you believe that there was

00:50:28  10  the escalator problem that there's a gap that's going to

00:50:31  11  last forever, I think it would stop at age 65, not at

00:50:35  12  age 70.

00:50:35  13    Q.  If Dr. Nikolova said that she wants to work to

00:50:38  14  70, does that change that opinion at all?

00:50:41  15    A.  No.  I don't think so.  I mean, I understand --

00:50:43  16    Q.  Why not?

00:50:44  17    A.  I understand and people say things.  And one of

00:50:46  18  the aspects -- it's just based on statistics and life

00:50:49  19  spans and what the observed behavior of people of those

00:50:54  20  ages and those education levels and those genders, so

00:50:57  21  it's a population average.  Doesn't mean she couldn't,

00:50:59  22  but it means that, you know, sort of the likely or

00:51:02  23  expected outcomes is 65 years.

00:51:05  24    Q.  Anything about -- anything else about scenario

00:51:10  25  one?

00:51:10 1    A.   No.

00:51:10 2    Q.   Okay.  If you change your answer again, just let

00:51:14 3  me know.  So scenario two for Dr. Glass was that Dr.

00:51:20 4  Nikolova continues in a nontenured position at U.T.

00:51:23 5  Austin.  Do you have an opinion about whether Dr. Glass

00:51:26 6  understates or overstates Dr. Nikolova's earning losses

00:51:30 7  in that scenario?

00:51:31 8    A.   Well, I think he understates them.  I mean, as he

00:51:34 9  admitted, you know, she couldn't stay in an untenured

00:51:37 10 position at U.T.  That's against the rules.  But she

00:51:40 11 could move on somewhere else.  Well, if she's going to

00:51:42 12 move on somewhere else, you know, if you're worthy of

00:51:45 13 tenure at U.T., you can certainly -- that's a really

00:51:47 14 good school.  You're worthy of tenure in a lot of place.

00:51:50 15 She would move on presumably --

00:51:50 16         MR. NOTZON:  Objection.  Your Honor, again,

00:51:53 17 opining as a labor expert and that's not what he's here

00:51:57 18 to do.

00:51:57 19         THE COURT:  Is that in your report, by any

00:51:58 20 chance, Doctor?

00:52:00 21         THE WITNESS:  I made some reference to it.

00:52:05 22 I just stand by the -- sorry.

00:52:08 23         MR. DOWER:  I thought it was in his report,

00:52:10 24 but I could be wrong.

00:52:11 25         MR. NOTZON:  Whether it's in his report or

00:52:12  1  not, he's not a labor expert.  He has no evidence or

00:52:17  2  expertise and the employability of a professor at

00:52:21  3  another university.

00:52:22  4          MR. DOWER:  I tendered him as an expert in

00:52:23  5  labor economics and didn't get an objection.

00:52:26  6          MR. NOTZON:  Economics, but not whether or

00:52:28  7  not employability at another university --

00:52:30  8          THE COURT:  Okay.  Since it's disputed as to

00:52:32  9  whether it's in the report, let's just move beyond.

00:52:35  10  Q.  (BY MR. DOWER) Okay.  To the best of your

00:52:38  11  recollection, is there anything that's contained in your

00:52:40  12  report about Dr. Glass' scenario two that you'd like to

00:52:45  13  explain to the jury?  If you want to refresh your

00:52:48  14  recollection, I can hand you a copy of your report.

00:52:51  15  A.  Sure.  I would just read the sentence from my

00:53:35  16  report, if I may.  Under Dr. Glass' scenario two,

00:53:41  17  further, even if Dr. Nikolova could continue at U.T.

00:53:43  18  Austin after being denied tenure in 2023, it seems

00:53:46  19  likely that her earnings could be higher from a tenured

00:53:49  20  position at another university than from a nontenured

00:53:51  21  position at U.T. Austin.

00:53:55  22          MR. NOTZON:  Your Honor, my objection stands

00:53:57  23  as to the employability and the likelihood.  He makes

00:54:03  24  the assumption that she goes and gets another job based

00:54:07  25  -- and I'll cross him on the fact that there's no

00:54:09  1   evidence behind that.  That's fine.  But not to testify

00:54:12  2   about that likelihood or the ease with which she can be

00:54:16  3   reemployed.

00:54:18  4            MR. DOWER:  I think this sentence that's in

00:54:21  5   the report is what his testimony is.

00:54:23  6            THE COURT:  As long as he's sticking to his

00:54:25  7   report, you'll have the opportunity to cross-examine him

00:54:27  8   on whatever he's saying.

00:54:29  9            MR. NOTZON:  Thank you, your Honor.

00:54:30  10       Q.  (BY MR. DOWER) Finally, Dr. Deere, to the extent

00:54:38  11  it's in the report, do you have any response to Dr.

00:54:43  12  Glass' scenario three in which Dr. Nikolova leaves U.T.

00:54:46  13  Austin on August 31st, 2023 and then, just has zero

00:54:51  14  income thereafter?

00:54:53  15       A.  I just note that Dr. Glass admits that that was,

00:54:57  16  quote, an unlikely, unquote, scenario.

00:55:02  17       Q.  Pass the witness.

00:55:09  18                      CROSS-EXAMINATION

00:55:09  19  BY MR. NOTZON:

00:55:10  20       Q.  Good afternoon, Dr. Deere.

00:55:12  21       A.  Hi.

00:55:13  22       Q.  So I take it from your report this is only the

00:55:16  23  third case you've been working in the last four years?

00:55:19  24       A.  No.

00:55:20  25       Q.  Well, you only list two other cases in your

00:55:24   1    appendix.

00:55:24   2        A.   That's testimony, right?

00:55:26   3        Q.   Okay.  And which party did you work for in those

00:55:31   4    two cases?  You didn't list that.  Did you work for the

00:55:35   5    plaintiff or the defendant?

00:55:37   6        A.   In the AJP Oil Company case, I worked for the

00:55:41   7    plaintiff.  In the state of Texas case, I worked for the

00:55:43   8    defense.

00:55:44   9        Q.   Okay.  And the --

00:55:46  10        A.   No, no, no.  Actually, I'm sorry, I worked for

00:55:48  11    the state of Texas.  So plaintiffs in both cases.

00:55:50  12        Q.   Okay.  And neither those were employment cases?

00:55:57  13        A.   That is correct.

00:55:58  14        Q.   Okay.  And you've been doing this for how long,

00:56:03  15    testifying as an expert in court?

00:56:07  16        A.   Well.

00:56:09  17        Q.   Fifteen years?

00:56:10  18        A.   The first testimony, yeah, 15 or so years ago.

00:56:14  19    I've worked in -- you know, in this doing the consulting

00:56:16  20    work for like 31.  But probably the first time I

00:56:21  21    testified would have been, I don't know, around 2005.

00:56:24  22    That's probably reasonable, 2007.

00:56:26  23        Q.   And you heard Dr. Glass has been doing this for

00:56:29  24    over 40 years?

00:56:30  25        A.   Yes.

00:56:30  1    Q.   And on the -- sticking with Glass and then, we'll

00:56:36  2    go back to Dr. Thompson.  Isn't it true, you don't have

00:56:41  3    any evidence of how reemployable Dr. Nikolova would be

00:56:45  4    in another university, correct?

00:56:47  5    A.   Well, she changed universities once already,

00:56:49  6    right?

00:56:51  7    Q.   Sir, you don't have any evidence, any scientific

00:56:54  8    evidence, any literature that you use to be able to

00:56:58  9    testify about the likelihood of her reemployability in

00:57:01  10   her current circumstances, do you?

00:57:04  11   A.   No.

00:57:09  12   Q.   And the unemployed data that you refer to

00:57:11  13   differs, depending on the field of the employment,

00:57:15  14   correct?

00:57:18  15   A.   I'm not --

00:57:19  16   Q.   The labor statistics you talked about?

00:57:21  17   A.   Well --

00:57:22  18   Q.   About the people that are unemployed and when

00:57:24  19   they get reemployed?

00:57:25  20   A.   That covers the workforce -- all the workforce.

00:57:29  21   So that includes people who are doing quite different

00:57:32  22   things, yes.

00:57:32  23   Q.   Okay.  So it's an aggregate one number?

00:57:35  24   A.   Yes.

00:57:36  25   Q.   Okay.  So there may be differences for university

00:57:41  1  professors?

00:57:43  2      A.  Certainly could be.  Yes.

00:57:44  3      Q.  And your catchup growth assumption there is -- is

00:57:48  4  there any scientific or economic basis?

00:57:53  5      A.  Well, I would think that --

00:57:54  6      Q.  Or is it an arbitrary number?

00:57:57  7      A.  Well, three years is from the Department of Labor

00:58:02  8  Statistics.

00:58:03  9      Q.  The catchup?

00:58:04  10     A.  Period of the catchup.  I split the growth

00:58:06  11  equally over the three years.

00:58:08  12     Q.  Okay.

00:58:10  13     A.  And I would also point to the -- you know, the

00:58:12  14  data in college that showed people, you know, aren't

00:58:16  15  stuck on an escalator.

00:58:17  16     Q.  Okay.

00:58:18  17     A.  Necessarily.

00:58:19  18     Q.  Yeah, that's -- that data you looked at that you

00:58:22  19  said kind of the helicopter scenario or the

00:58:25  20  anti-escalator evidence, that's anecdotal, right?

00:58:30  21  That's you just kind of looked around, but you didn't

00:58:32  22  actually do a numerical study or a statistical study of

00:58:35  23  the salaries at U.T., correct?

00:58:39  24     A.  The stuff we did online here, yes.  It was just

00:58:43  25  picking up some examples.  That's true.

00:58:45  1    Q.  All right.  And moving on to Dr. Thompson.  Isn't

00:59:02  2  it true that the process for early tenure review that

00:59:10  3  you discussed, you criticized Dr. Thompson because the

00:59:14  4  decision to go up early was in part the faculty

00:59:19  5  member's.  Do you recall that criticism in your report?

00:59:22  6    A.  Yes.

00:59:23  7    Q.  Okay.  And you had access to Professor Tewfik's

00:59:27  8  deposition as part of your review in your report.

00:59:30  9    A.  I think so.  Yes.

00:59:31  10    Q.  And were you here for the testimony of Professor

00:59:35  11  Tewfik or --

00:59:36  12    A.  No.

00:59:36  13    Q.  Dr. Fenves?

00:59:37  14    A.  No.

00:59:38  15    Q.  Okay.  Well, were you aware that Professor Tewfik

00:59:43  16  in his deposition testified that to go upwardly --

00:59:47  17        MR. DOWER:  I'm going to object to the

00:59:49  18  hearsay and assume facts not in evidence.  That

00:59:51  19  deposition transcript is not in evidence.

00:59:52  20        MR. NOTZON:  I'm questioning him on what he

00:59:54  21  relied on as he reported in his report.  That he has

00:59:57  22  that deposition.

00:59:59  23        THE COURT:  You can ask the question.

01:00:00  24        MR. NOTZON:  Thank you.

01:00:02  25    Q.  (BY MR. NOTZON) And Professor Tewfik, at page 77,

01:00:08 1    line 4 to 78, line 5, says that the basis for going

01:00:15 2    forward has to be with the approval of the budget

01:00:19 3    council of the department.  Are you aware of that?

01:00:22 4        A.  I don't doubt it.

01:00:23 5        Q.  Okay.  Well, so the employee can want all they

01:00:28 6    want, but the gatekeeper is the budget council, correct?

01:00:31 7        A.  That sounds right.  I mean, I presume.

01:00:34 8        Q.  So your criticism of Dr. Thompson, you can't say

01:00:39 9    that this is a different disparate treatment because the

01:00:42 10   faculty member has to choose.  Well, that eliminates the

01:00:47 11   fact that the gatekeeper's actually the budget council,

01:00:51 12   correct?

01:00:52 13       A.  I would think a faculty member could, one, ask to

01:00:58 14   be and another one, a faculty member could probably ask

01:01:00 15   not to be --

01:01:00 16       Q.  That's true --

01:01:03 17       A.  -- and that might keep the gatekeeper from going

01:01:05 18   forward.

01:01:06 19       Q.  That's true.

01:01:06 20       A.  To that's kind of what I meant.

01:01:08 21       Q.  And there could be a disparate impact on the

01:01:10 22   women in that scenario, and the numbers that Dr.

01:01:15 23   Thompson talked about discuss that.  Let me ask a

01:01:18 24   followup question.

01:01:19 25            You say that Dr. Thompson has not presented

01:01:22  1  this jury any evidence that assures them that gender was

01:01:30  2  a factor in this case, correct?

01:01:32  3      A.  I didn't say it like that.  I said that gender

01:01:35  4  was related to the tenure decision.

01:01:36  5      Q.  And you also are not presenting any evidence to

01:01:39  6  this jury that gender wasn't, correct?

01:01:46  7      A.  I'm not sure how you would do that, so no.

01:01:49  8      Q.  You would agree with me?

01:01:51  9      A.  I just said no.  I'm not presenting that kind of

01:01:53  10  evidence.

01:01:53  11      Q.  And do you understand that Dr. Nikolova is not

01:02:01  12  saying that she was denied the ability to go up early

01:02:07  13  and she's not saying that she was -- that all women are

01:02:10  14  denied the ability to go up early.  They're just having

01:02:12  15  a different experience and they're retarded -- the way

01:02:16  16  that her allegation is that women are retarded in their

01:02:21  17  likelihood of going up early and then, when they go up

01:02:24  18  early, they have a worse experience than the men.

01:02:27  19          So the granularity of that allegation is

01:02:35  20  important in her claims.  Do you understand that?

01:02:36  21      A.  I don't.  I don't recollect that granularity from

01:02:42  22  the complaint.  I just remember the complaint saying

01:02:44  23  that it was, you know, denied tenure on the basis of

01:02:46  24  gender and pregnancy.

01:02:48  25      Q.  But your analysis discounts that and lumps her in

01:02:53  1  with all women that went up for tenure and say, look at

01:02:58  2  this, it's just the general numbers without relevance to

01:03:01  3  her specific experience in making it similarly situated

01:03:06  4  to her and what she experienced.  Do you see that?

01:03:12  5      A.  All of the women who were assistant professors

01:03:15  6  and all the men who were assistant professors and went

01:03:17  7  up to tenure are in the analysis I looked at.

01:03:20  8      Q.  Do you also understand that when you equate, when

01:03:24  9  you say everybody that's recommended for tenure, that

01:03:27  10  means every vote that's 51 percent or more, 51 to 100

01:03:32  11  percent are lumped in together so that you eliminate the

01:03:37  12  value of the relative vote difference, a weak vote

01:03:41  13  versus a strong vote.  You eliminate that in your

01:03:45  14  analysis.  Do you understand that?

01:03:45  15      A.  Well, I mean.

01:03:46  16      Q.  Yes or no?

01:03:48  17      A.  No.

01:03:49  18      Q.  Okay.  And you kept saying this is not

01:03:57  19  statistically important or this is not statistically

01:04:00  20  significant, but you actually didn't do any

01:04:03  21  statistically significance tests.

01:04:05  22      A.  Yes, I did.

01:04:07  23      Q.  Where are your -- you didn't do any regressions.

01:04:10  24  You didn't -- you just did simple percentages, correct?

01:04:16  25      A.  No.

01:04:16  1      Q.   In your table 2?

01:04:40  2      A.   One sentence in here:  Again, none of the

01:04:42  3  differences are statistically significant.  So I made a

01:04:45  4  statistical significance test.

01:04:48  5      Q.   How did you do that test?

01:04:50  6      A.   I did a two-by-two comparison with the Fisher's

01:04:54  7  exact test.

01:04:55  8      Q.   And what's your R squared on that?

01:04:57  9      A.   R squared is irrelevant to that test.  R square's

01:05:00 10  from a regression.  This isn't a regression context.

01:05:03 11      Q.   And so, what level significance are you -- did

01:05:06 12  you calculate?

01:05:07 13      A.   Well, the cutoff for statistical significance is

01:05:11 14  five percent.  These numbers are well above five

01:05:13 15  percent.  I don't recall what they were, but they were

01:05:16 16  nowhere near five percent.  They need to be below five

01:05:20 17  percent for statistical significance.

01:05:21 18      Q.   But at the end of the day, you have nothing that

01:05:30 19  removes the implication of Dr. Thompson's report that no

01:05:38 20  one had the same experience that Dr. Nikolova had at the

01:05:42 21  University of Texas in the statistical analysis that he

01:05:47 22  provided, correct?

01:05:48 23      A.   I think that's correct.  Her experience was

01:05:50 24  unique.  Not shared by others over gender either.

01:05:56 25      Q.   And you understand she's also claiming pregnancy

01:06:00  1   and not just gender.

01:06:01  2       A.  Yes.  There were other pregnant women, as well.

01:06:05  3   Right.

01:06:05  4       Q.  You didn't account for that in your statistic,

01:06:08  5   did you?

01:06:08  6       A.  Dr. Thompson didn't do anything with that.  I saw

01:06:10  7   no need to respond.

01:06:11  8       Q.  That would be a no.  You didn't do anything?

01:06:13  9       A.  That would a no.  Yes, sir.

01:06:15  10      Q.  I'll pass the witness.

01:06:18  11                    RE-DIRECT EXAMINATION

01:06:18  12  BY MR. DOWER:

01:06:27  13      Q.  Earlier, you testified about the effect that

01:06:32  14  small population sizes -- population in the statistical

01:06:36  15  sense has on statistical significance.  Do you remember

01:06:40  16  testifying about that?

01:06:41  17      A.  Yes.

01:06:42  18      Q.  And so, if you look at candidates with a high

01:06:45  19  degree of granularity, what does that do to the number

01:06:48  20  of people you're looking at?

01:06:51  21      A.  Well, it seems like you would be slicing the data

01:06:56  22  to a very small -- compartmentalizing into small pieces

01:07:01  23  that would be difficult to say much statistically.

01:07:04  24      Q.  And if you look at it with the highest level of

01:07:10  25  granularity, wouldn't you be looking at the candidate's

| | | |
|---|---|---|
| 01:07:12 | 1 | credentials? |
| 01:07:15 | 2 | A.  Yes. |
| 01:07:17 | 3 | Q.  And so, does that just take us out of this data |
| 01:07:19 | 4 | altogether and back to their -- you know, an actual |
| 01:07:23 | 5 | comparison between the strengths of the dossiers? |
| 01:07:26 | 6 | MR. NOTZON:  Objection, your Honor.  This is |
| 01:07:27 | 7 | not part of his report.  It's not statistical analysis. |
| 01:07:31 | 8 | MR. DOWER:  It's in direct response to the |
| 01:07:33 | 9 | cross, your Honor. |
| 01:07:33 | 10 | THE COURT:  I'll allow it. |
| 01:07:35 | 11 | A.  Well, yeah.  You'd still take account of who got |
| 01:07:37 | 12 | tenure and who didn't, and who was a woman and who |
| 01:07:39 | 13 | wasn't, and who took a leave, or who was pregnant, or |
| 01:07:41 | 14 | whatever, and who wasn't.  So those facts wouldn't |
| 01:07:45 | 15 | change, but the data you would bring to explain them |
| 01:07:46 | 16 | would be a much richer set.  It would include the tenure |
| 01:07:50 | 17 | dossiers, research records, grant funding, service |
| 01:07:53 | 18 | records, teaching records, and the like.  Yeah. |
| 01:07:56 | 19 | Q.  (BY MR. DOWER) Earlier, you were asked about |
| 01:08:07 | 20 | whether or not anyone else had the experience of Dr. |
| 01:08:12 | 21 | Nikolova in Dr. Thompson's data about the promotion and |
| 01:08:15 | 22 | tenure committee vote.  Do you remember being asked |
| 01:08:18 | 23 | about that? |
| 01:08:18 | 24 | A.  Yes. |
| 01:08:18 | 25 | Q.  Was Dr. Nikolova uniquely a woman amongst all of |

01:08:23  1  the population of data?

01:08:25  2      A.  She was not the only woman.  No.

01:08:26  3      Q.  And was she uniquely pregnant amongst all the

01:08:31  4  population of data?

01:08:32  5      A.  Not given the number of -- I don't really know

01:08:36  6  who was pregnant, but given the number of people what

01:08:38  7  had a probationary extension who were women.

01:08:40  8      Q.  So just looking at Dr. Thompson's statistics, can

01:08:43  9  you infer anything one way or the other about whether

01:08:46  10  the thing that sets Dr. Nikolova apart is pregnancy or

01:08:50  11  gender as opposed to maybe a weakness in her

01:08:53  12  application?

01:08:55  13     A.  No.

01:08:56  14     Q.  Pass the witness.

01:08:58  15               RE-CROSS EXAMINATION

01:08:59  16  BY MR. NOTZON:

01:08:59  17     Q.  And you can't say that it was the weakness of her

01:09:02  18  application either, can you?

01:09:03  19     A.  No, I cannot.

01:09:05  20               THE COURT:  Thank you, sir.  You may step

01:09:06  21  down.

01:09:08  22               THE WITNESS:  Thanks.

01:09:10  23               THE COURT:  Next witness.

01:09:12  24               MR. DOWER:  The witness can step down, your

01:09:14  25  Honor.  We pass.

```
 1                         *  *  *  *  *  *

 2

 3    UNITED STATES DISTRICT COURT   )

 4    WESTERN DISTRICT OF TEXAS      )

 5

 6       I, LILY I. REZNIK, Certified Realtime Reporter,

 7    Registered Merit Reporter, in my capacity as Official

 8    Court Reporter of the United States District Court,

 9    Western District of Texas, do certify that the foregoing

10    is a correct transcript from the record of proceedings

11    in the above-entitled matter.

12       I certify that the transcript fees and format comply

13    with those prescribed by the Court and Judicial

14    Conference of the United States.

15       WITNESS MY OFFICIAL HAND this the 30th day of March,

16    2022.

17

18                              ~~~~~~~~~~~~~~~~~~~~~~~~
                                LILY I. REZNIK, CRR, RMR
19                              Official Court Reporter
                                U.S. District Court
20                              Austin Division
                                501 West 5th Street,
21                              Suite 4153
                                Austin, Texas 78701
22                              (512)391-8792
                                SOT Certification No. 4481
23                              Expires:  1-31-23

24

25
```