```
1              UNITED STATES DISTRICT COURT
               WESTERN DISTRICT OF TEXAS
2                    AUSTIN DIVISION

3  EVDOKIA NIKOLOVA          ) Docket No. A 19-CA-877 RP
                             )
4  vs.                       ) Austin, Texas
                             )
5  UNIVERSITY OF TEXAS       )
   AT AUSTIN                 ) March 10, 2022
6

7       TRANSCRIPT OF TRIAL TESTIMONY OF THOMAS GLASS
           BEFORE THE HONORABLE ROBERT L. PITMAN
8

9  APPEARANCES:

10 For the Plaintiff:        Mr. Robert W. Schmidt
                             Crews Law Firm, P.C.
11                           701 Brazos Street, Suite 900
                             Austin, Texas 78701
12
                             Mr. Robert S. Notzon
13                           Law Office of Robert Notzon
                             1502 West Avenue
14                           Austin, Texas 78701

15 For the Defendant:        Mr. Benjamin L. Dower
                             Ms. Amy S. Hilton
16                           Texas Attorney General's Office
                             300 West 15th Street
17                           Austin, Texas 78701

18

19 Court Reporter:           Ms. Lily Iva Reznik, CRR, RMR
                             501 West 5th Street, Suite 4153
20                           Austin, Texas 78701
                             (512)391-8792
21

22

23

24

25 Proceedings reported by computerized stenography,
   transcript produced by computer-aided transcription.
```

DEFENDANT'S
EXHIBIT

**C**

| | | |
|---|---|---|
| | 1 | MR. SCHMIDT:  We call, your Honor, Tom Glass |
| 00:00:01 | 2 | to the witness stand. |
| 00:00:27 | 3 | MR. DOWER:  Your Honor, before this witness |
| 00:00:29 | 4 | starts testifying, can we ensure that our expert who's |
| 00:00:31 | 5 | going to be providing rebuttal is present? |
| 00:00:33 | 6 | THE COURT:  Sure.  Sir, before you take a |
| 00:00:35 | 7 | seat, can you please raise your right hand to be sworn. |
| 00:00:38 | 8 | THE CLERK:  You do solemnly swear or affirm |
| 00:00:38 | 9 | that the testimony which you may give in the case now |
| 00:00:38 | 10 | before the Court shall be the truth, the whole truth, |
| 00:00:45 | 11 | and nothing but the truth? |
| 00:00:45 | 12 | THE WITNESS:  I do. |
| 00:00:45 | 13 | THE COURT:  Please be seated.  You can go |
| 00:00:56 | 14 | ahead and start the preliminaries if you want his name |
| 00:00:57 | 15 | and credentials. |
| 00:01:00 | 16 | THOMAS GLASS, called by the Plaintiff, duly sworn. |
| 00:01:00 | 17 | <u>DIRECT EXAMINATION</u> |
| 00:01:01 | 18 | BY MR. SCHMIDT: |
| 00:01:01 | 19 | Q.  Would you introduce yourself to the jury? |
| 00:01:03 | 20 | A.  My name is Tom Glass.  Thomas Glass. |
| 00:01:07 | 21 | Q.  And can you tell us a little bit about yourself? |
| 00:01:09 | 22 | A.  I have a Bachelor's Degree in Business.  I stayed |
| 00:01:16 | 23 | long and got a Master's Degree in Accounting.  Later in |
| 00:01:18 | 24 | life, I went back and got a Master's Degree and a Ph.D. |
| 00:01:22 | 25 | in Economics.  I've been a Certified Public Accountant |

00:01:27  1   since 1967 and I have -- I've practiced accounting for

00:01:35  2   many years and actually just did my last tax return last

00:01:39  3   year.  And I have been doing this kind of work

00:01:45  4   increasingly since the late 1980s.  I've testified in

00:01:50  5   about 125 cases.  I've been hired in over 500 cases.

00:01:58  6   And the kind of testimony I'm giving today is indicative

00:02:03  7   of the type of testimony I've given quite often.

00:02:07  8       Q.   So Dr. Glass, Ph.D., correct?

00:02:09  9       A.   Yes.

00:02:10  10      Q.   All right.  And if I'm just a shorthand guy,

00:02:15  11  you're a numbers guy; is that right?

00:02:16  12      A.   I am a number cruncher, yes.

00:02:21  13      Q.   Okay.  So we've asked you to look at the issues

00:02:26  14  in this case.  Not issues but the numbers in this case

00:02:29  15  and provide -- actually, what have we asked you to do?

00:02:34  16      A.   Yes.  You asked me to take a look and make

00:02:38  17  certain assumptions about Dr. Nikolova's compensation in

00:02:43  18  the future, and what it was likely going to be, and what

00:02:46  19  it would be under several different scenarios.

00:02:50  20      Q.   And I believe there might also be issues not only

00:02:53  21  in the future but in the past, some backpay?

00:02:56  22      A.   Yes.  Yes.

00:02:57  23      Q.   Okay.

00:02:58  24      A.   Since she was denied tenure, yes.

00:03:00  25      Q.   Okay.  And so, can you explain, what is the

| | | |
|---|---|---|
| 00:03:04 | 1 | process that you use?  How do you do this? |
| 00:03:06 | 2 | A.  Well, we use a -- what I call a "but for" |
| 00:03:12 | 3 | analogy.  But for the action that she complains about, |
| 00:03:16 | 4 | what is likely to happen in the past and in the future, |
| 00:03:21 | 5 | and what's the difference between what she could have |
| 00:03:23 | 6 | made had she been granted tenure in 2019.  First is what |
| 00:03:30 | 7 | she's likely going to make as a result of being denied |
| 00:03:33 | 8 | tenure. |
| 00:03:35 | 9 | Q.  And how do you come up with these numbers?  How |
| 00:03:38 | 10 | do you figure that out? |
| 00:03:38 | 11 | A.  Well, we know what she was actually making at the |
| 00:03:42 | 12 | time that she was denied tenure.  We know what a |
| 00:03:48 | 13 | similarly situated colleague of her was making after he |
| 00:03:51 | 14 | was granted tenure in 2019.  And then, the Social |
| 00:03:58 | 15 | Security Administration Board of Trustees has to make |
| 00:04:02 | 16 | long-term projections about the health of the Social |
| 00:04:05 | 17 | Security system, and they've got a board of trustees -- |
| 00:04:09 | 18 | a board of actuaries who project what increases in pay |
| 00:04:16 | 19 | is going to be actually for the next 75 years.  So they |
| 00:04:20 | 20 | have a -- and it's well thought of in the economic |
| 00:04:26 | 21 | community as a fairly accurate predictor of what |
| 00:04:33 | 22 | salaries are going to be. |
| 00:04:34 | 23 | So we take the salaries that she was making in |
| 00:04:37 | 24 | 2019 and we take the salary that the tenured professor |
| 00:04:40 | 25 | was making in 2019, and then, we increase those by what |

00:04:44  1    the Social Security Administration says the average

00:04:48  2    increase for all American workers is going to be for

00:04:51  3    each year till her projected retirement; and then, we

00:04:57  4    sum all those up and do some magic and put numbers on a

00:05:02  5    piece of paper.

00:05:02  6        Q.   And by magic, you're talking about crunching

00:05:06  7    data?

00:05:06  8        A.   Crunching data.  The one thing I haven't talked

00:05:09  9    about is, if she is -- if the jury decides she's

00:05:16  10   entitled to damages, she will be paid that money today

00:05:18  11   or in the near future, instead of the money getting paid

00:05:22  12   out to her over her next 30 or 40 years.  And so, to

00:05:30  13   know that she would be able to invest those moneys and

00:05:33  14   earn interest on that, we do a process called

00:05:37  15   discounting.  And we use interest rates on a safe

00:05:43  16   investment, which we use United States treasury bonds,

00:05:49  17   and we discount that money back to what's called present

00:05:52  18   value.

00:05:53  19            Such that if you put all that money that

00:05:57  20   you're going to give her into a savings account, she

00:06:00  21   would be able to draw out the amount of money that we're

00:06:02  22   projecting that she would lose over the next several

00:06:05  23   years.

00:06:06  24       Q.   So if I'm understanding you correctly, $100,000

00:06:12  25   now is different than $100,000 paid out over the course

00:06:16  1    of time.

00:06:17  2        A.   Right.   If you want somebody to be able to get

00:06:19  3    $100,000 in 10 years, you don't give them $100,000

00:06:24  4    today.   You give them a lesser amount of money so that

00:06:26  5    they can take that 100 -- that 90,000 and invest it and

00:06:32  6    at the end of 10 years, it will be $100,000.

00:06:35  7        Q.   So it's reduced for the time value of money?

00:06:37  8        A.   Exactly.

00:06:38  9        Q.   Okay.   And so, talk with us about are there any

00:06:46  10   other factors you take into account in this case?   Is

00:06:48  11   there -- retirement play a role in this?

00:06:51  12       A.   Well, the Department of Labor publishes

00:06:55  13   statistics on how long a person of a particular sex and

00:07:03  14   education and age is likely going to work in the future.

00:07:05  15   So, for instance, Dr. Nikolova at the time of her denied

00:07:12  16   tenure, based upon her age and education that she has a

00:07:17  17   Ph.D., she had a work life expectancy to age 65.6.   In

00:07:25  18   other words, the average person in that category of

00:07:29  19   demographics would work until they were 65.6.   She has

00:07:34  20   expressed an interest of working until age 70, which is

00:07:40  21   very, very common for Ph.D.s.

00:07:42  22       I'm 79 years old and I'm still working.   So I

00:07:46  23   have made alternative computations, one to age 65.6 and,

00:07:52  24   secondly, to age 70.

00:07:54  25       Q.   Okay.   Let's offer into exhibit the next number

| | | |
|---|---|---|
| 00:08:03 | 1 | that we're at is Plaintiff's Exhibit 238, I believe. |
| 00:08:18 | 2 | MR. DOWER:  So you're going to be offering. |
| 00:08:19 | 3 | MR. SCHMIDT:  The charts. |
| 00:08:20 | 4 | MR. DOWER:  The new charts -- I don't think |
| 00:08:22 | 5 | -- I might have missed it, but I don't think you've |
| 00:08:24 | 6 | covered -- laid the foundation for changes. |
| 00:08:29 | 7 | MR. SCHMIDT:  Okay. |
| 00:08:29 | 8 | MR. DOWER:  Can you just lay that foundation |
| 00:08:32 | 9 | first? |
| 00:08:33 | 10 | Q.  (BY MR. SCHMIDT) Dr. Glass, in this lawsuit, you |
| 00:08:39 | 11 | provided an expert report some months or possibly years |
| 00:08:44 | 12 | ago, correct? |
| 00:08:44 | 13 | A.  I did. |
| 00:08:45 | 14 | Q.  And today, because that report was based on a |
| 00:08:49 | 15 | trial date, you're calculating the damages up to the |
| 00:08:53 | 16 | date of trial, correct? |
| 00:08:54 | 17 | A.  Right.  And the primary difference, 99 percent of |
| 00:08:59 | 18 | the difference between my report of last year and my |
| 00:09:02 | 19 | report of this year is that the interest rates that |
| 00:09:06 | 20 | we're talking about that I've used for discounting have |
| 00:09:09 | 21 | gone substantially up, which reduces her damages because |
| 00:09:13 | 22 | she's -- it reduces the amount of money that you would |
| 00:09:17 | 23 | have to give her today to pay out the money in future. |
| 00:09:21 | 24 | Q.  But also, at the time that you submitted that |
| 00:09:24 | 25 | report, I think there was a different trial date that |

| | | |
|---|---|---|
| 00:09:26 | 1 | was earlier in time? |
| 00:09:28 | 2 | A.   Right. |
| 00:09:28 | 3 | Q.   And so, you've also extended it out to meet |
| 00:09:31 | 4 | today's trial date? |
| 00:09:32 | 5 | A.   That's correct. |
| 00:09:32 | 6 | Q.   Okay.  So with that, we would offer Plaintiff's |
| 00:09:38 | 7 | Exhibit 236. |
| 00:09:39 | 8 | THE COURT:  Any objection? |
| 00:09:40 | 9 | MR. DOWER:  Well, your Honor, what he just |
| 00:09:46 | 10 | said I don't think was accurate.  I think the numbers |
| 00:09:49 | 11 | have actually gone up, not down, just looking at the |
| 00:09:52 | 12 | comparison between the two charts.  But can you ask him |
| 00:10:02 | 13 | what the other one percent was?  He said 99 percent. |
| 00:10:05 | 14 | MR. SCHMIDT:  I think he said it was the |
| 00:10:07 | 15 | different -- the interest rate, different kind of -- |
| 00:10:09 | 16 | Q.   (BY MR. SCHMIDT) Dr. Glass, part of the change in |
| 00:10:12 | 17 | this is that it's updated to this trial, correct? |
| 00:10:14 | 18 | A.   Yes. |
| 00:10:14 | 19 | Q.   And then, you also mentioned that there was |
| 00:10:17 | 20 | another change that you've made because of a change in |
| 00:10:20 | 21 | interest rates? |
| 00:10:21 | 22 | A.   Right. |
| 00:10:22 | 23 | Q.   Can you explain that? |
| 00:10:23 | 24 | A.   Interest rates have increased since, I think, |
| 00:10:28 | 25 | June of 2020 is when I -- '21 is when I produced my |

| | | |
|---|---|---|
| 00:10:34 | 1 | original report.  Interest rates have increased, and |
| 00:10:36 | 2 | therefore, the present value of the future losses has |
| 00:10:39 | 3 | gone down.  And I think the numbers are down from what |
| 00:10:47 | 4 | my earlier report is, but if not, I can explain that. |
| 00:10:50 | 5 | Q.  Well, it may be down for that reason, but then, |
| 00:10:52 | 6 | they're up because it's a longer period of time.  Does |
| 00:10:56 | 7 | that make sense? |
| 00:10:56 | 8 | A.  Yes. |
| 00:10:57 | 9 | MR. DOWER:  Mr. Schmidt, if you'll agree to |
| 00:11:01 | 10 | do the same redactions you did on 236, I will not |
| 00:11:05 | 11 | object. |
| 00:11:09 | 12 | MR. SCHMIDT:  Yes.  And I think this is |
| 00:11:11 | 13 | redacted. |
| 00:11:13 | 14 | MR. DOWER:  Not the one you gave me.  No |
| 00:11:29 | 15 | objection. |
| 00:11:29 | 16 | THE COURT:  All right.  So admitted.  Thank |
| 00:11:31 | 17 | you. |
| 00:11:31 | 18 | Q.  (BY MR. SCHMIDT) Okay.  So do you have a copy of |
| 00:11:35 | 19 | your report? |
| 00:11:35 | 20 | A.  I do. |
| 00:11:36 | 21 | Q.  Okay.  So I'm going to put up -- let me put up |
| 00:11:54 | 22 | the charts and have you go through them.  Does that make |
| 00:11:56 | 23 | sense to you? |
| 00:11:57 | 24 | A.  Yes. |
| 00:11:57 | 25 | Q.  Okay.  This is a chart that you've compiled to |

| | | |
|---|---|---|
| 00:12:06 | 1 | talk about the economic damages in this case; is that |
| 00:12:10 | 2 | right? |
| 00:12:10 | 3 | A.  Yes. |
| 00:12:10 | 4 | Q.  And can you walk us through what -- how you |
| 00:12:15 | 5 | calculated those damages and what they are? |
| 00:12:16 | 6 | A.  Okay.  The -- I show here, this is the to age |
| 00:12:24 | 7 | 65.6.  And I show the three different scenarios that we |
| 00:12:30 | 8 | were talking about, and what we're talking about here is |
| 00:12:34 | 9 | the difference between what she would have made had she |
| 00:12:39 | 10 | been granted tenure in 2019.  And then, the scenario No. |
| 00:12:47 | 11 | 1 is the tenure was not granted on September 1, 2019, |
| 00:12:53 | 12 | but assuming that tenure would be granted, effective |
| 00:12:57 | 13 | 9-10-2023, four years later.  And I show that the |
| 00:13:02 | 14 | differences in what she would have made had she been |
| 00:13:04 | 15 | granted tenure and what she will make if she's granted |
| 00:13:09 | 16 | tenure in 9-1-2023, to the date of trial, her lost is |
| 00:13:16 | 17 | $44,500.  The future losses are 274,001, and so, her |
| 00:13:24 | 18 | total losses would be $318,501. |
| 00:13:31 | 19 | Now, the scenario number two -- |
| 00:13:33 | 20 | Q.  Before you go there, can you explain if her |
| 00:13:36 | 21 | losses to date of trial are 44,500, how do you project |
| 00:13:42 | 22 | future losses? |
| 00:13:43 | 23 | A.  Then the future losses, I take the amounts of |
| 00:13:47 | 24 | money that she was -- would be making in 2023 and I, |
| 00:13:52 | 25 | again, project out at the Social Security |

00:13:55  1   Administration's rate of increase, and then, I used the

00:13:58  2   discount rates we're talking about and I add all those

00:14:02  3   up, and they come up to 274,000.

00:14:06  4      Q.  But I guess even more fundamental question -- and

00:14:11  5   I'm not a math guy -- is that so she gets tenure two

00:14:15  6   years late in her career.  Is it your -- can you

00:14:20  7   explain, then, why getting tenure two years late in your

00:14:23  8   career will then cause losses into the future?

00:14:27  9      A.  Well, I think most of us would have experience

00:14:30  10  with lots of different things that you just don't get

00:14:35  11  caught up.  If your neighbor got a raise last year and

00:14:40  12  you don't get a raise till next year, is there any

00:14:43  13  reason to believe that you would ever catch up to him?

00:14:47  14  He will continue to get raises and you will continue to

00:14:50  15  get raises.  So there's no reason to believe that you're

00:14:56  16  going to catch up.  A marathon runner that gets a mile

00:14:59  17  head start, there's no reason to believe that you would

00:15:02  18  ever catch up to that marathon runner, if y'all are both

00:15:06  19  kind of equal kind of people, you're going to stay

00:15:08  20  behind.

00:15:09  21     Q.  Okay.  So getting -- not getting a promotion two

00:15:14  22  years, you know, late or two years early will impact the

00:15:18  23  amount of money you get throughout the rest of your

00:15:21  24  career?

00:15:21  25     A.  Absolutely.

| | | |
|---|---|---|
| 00:15:21 | 1 | Q.  Okay.  So go ahead. |
| 00:15:24 | 2 | A.  And then, the second scenario was assuming no |
| 00:15:27 | 3 | tenure is ever granted but she continues at the salary |
| 00:15:32 | 4 | level of an assistant professor, and that means that -- |
| 00:15:38 | 5 | and the university's not going to let her continue as an |
| 00:15:41 | 6 | assistant professor forever.  It's an up or out kind of |
| 00:15:48 | 7 | situation:  Either you get granted tenure or you go |
| 00:15:50 | 8 | somewhere else.  But we're just -- I'm using the salary |
| 00:15:56 | 9 | of an assistant professor that's the level of money that |
| 00:15:58 | 10 | she would make for test of her career. |
| 00:16:00 | 11 | So in that case, you have the same losses to |
| 00:16:03 | 12 | the date of trial, 44,501, but her future losses are |
| 00:16:08 | 13 | substantially more because the salary as an assistant |
| 00:16:13 | 14 | professor is substantially less than that of an |
| 00:16:16 | 15 | associate professor.  So that's 508,000 for a total of |
| 00:16:20 | 16 | 552. |
| 00:16:22 | 17 | Q.  Okay.  So again, her losses to the date of trial |
| 00:16:26 | 18 | of not getting that -- the raise that you get as an |
| 00:16:30 | 19 | assistant professor is 44,500, but then, it's going to |
| 00:16:33 | 20 | impact her into the future to the tune of around |
| 00:16:36 | 21 | 500,000.  Go ahead with scenario three. |
| 00:16:40 | 22 | A.  Then the third assumption -- and this is kind of |
| 00:16:43 | 23 | a tricky one.  Assuming that no tenure is ever granted |
| 00:16:47 | 24 | and she terminates on August 31, 2023, when she doesn't |
| 00:16:53 | 25 | get tenure next year, and she finds no substantially |

00:16:58  1    equivalent employment, again, her losses to the date of

00:17:02  2    trial are 44,500.  The future losses in this case, the

00:17:08  3    assumption is she doesn't have any earnings after 2023.

00:17:13  4         So you've got a big number of 3,978,000 and for a

00:17:20  5    total losses of 4,022,000.  Now, that is a kind of a

00:17:27  6    wild assumption because nobody is not going to work

00:17:31  7    after age -- after 2023.  But I was asked to do this on

00:17:37  8    the basis that the court could determine if she is not

00:17:42  9    able to find substantially equivalent employment, if she

00:17:45  10   has to go out and be a greeter at Wal-Mart, do we even

00:17:50  11   consider that, those earnings if she's not able to

00:17:54  12   consider substantially equivalent employment.

00:17:57  13        And I'm not up here to have any opinion

00:18:00  14   about whether that's correct or not.  I'll let the

00:18:03  15   lawyers.

00:18:04  16   Q.  So the idea would be if you are a professor and

00:18:08  17   your job is essentially ruined and you won't be able to

00:18:11  18   be a professor in another year, then are you, you know

00:18:17  19   -- do you then have to take something less?

00:18:19  20   A.  Right.

00:18:19  21   Q.  And, you know, and so, if you don't have to take

00:18:23  22   something less, that would be the numbers; is that

00:18:26  23   right?

00:18:26  24   A.  That's correct.

00:18:26  25   Q.  Take a lower type of job.

| | | |
|---|---|---|
| 00:18:36 | 1 | You've also done a separate calculation.  This is |
| 00:18:42 | 2 | on page 2 of this exhibit.  And can you explain that? |
| 00:18:49 | 3 | A.  And all I could tell you is, I've added four |
| 00:18:52 | 4 | years, four-point-something years to that to take the |
| 00:18:55 | 5 | losses out to age 70.  So the losses to the date of |
| 00:18:58 | 6 | trial are identical.  The future losses are somewhat |
| 00:19:03 | 7 | hard and the some total losses are somewhat higher. |
| 00:19:07 | 8 | Q.  Okay.  And just we're not going to go into it, |
| 00:19:10 | 9 | but to show the jury, this is. |
| 00:19:18 | 10 | A.  These are my year-by-year calculations of how |
| 00:19:23 | 11 | these different scenarios work. |
| 00:19:25 | 12 | Q.  Okay.  And this is the actual data and the |
| 00:19:28 | 13 | calculations? |
| 00:19:29 | 14 | A.  Yes. |
| 00:19:29 | 15 | Q.  Applying interest rates, those kinds of things; |
| 00:19:32 | 16 | is that right? |
| 00:19:33 | 17 | A.  Yes. |
| 00:19:33 | 18 | Q.  And you've got those -- |
| 00:19:34 | 19 | A.  They'll put you -- if you have insomnia, this |
| 00:19:36 | 20 | will put you to sleep in a hurry. |
| 00:19:39 | 21 | Q.  Okay.  So just before I let you go, I believe |
| 00:19:50 | 22 | that the defendants, U.T., have an economist similar to |
| 00:19:57 | 23 | you.  Certainly not as good as you.  I'm joking.  That's |
| 00:20:00 | 24 | a joke -- who will be making some criticisms of your |
| 00:20:05 | 25 | report and challenging some things in your report. |

00:20:07  1    A.  He's going to hurt my feelings a lot if he does.

00:20:10  2    Q.  Okay.  What is your response to the criticism

00:20:14  3  that you believe he'll make?

00:20:15  4    A.  Well, I've looked at them briefly, and I know one

00:20:20  5  of his comments was, I didn't use market rates of

00:20:22  6  interest.  Well, I did use market rates of interest.

00:20:26  7  I've looked them up yesterday and they're the current

00:20:30  8  rates that those are being paid on United States

00:20:33  9  treasury bonds mature out for the next 40 or 50 years.

00:20:38  10        Another one was, he didn't like the fact that I

00:20:41  11  didn't let her catch up.  We talked about that a minute

00:20:44  12  ago.  He says eventually, she's going to catch up to the

00:20:48  13  guy that was granted tenure four years before, but

00:20:51  14  that's just not right.  You are at a place where you

00:20:56  15  are, and unless one of you screws up, y'all are both

00:20:59  16  going to keep going up the salary ladder.  And I can't

00:21:03  17  really remember anything substantive else that he

00:21:06  18  complained about.

00:21:07  19    Q.  All right.  Your Honor, Mr. Glass, I have no

00:21:11  20  further questions.  Pass the witness.

00:21:22  21                    CROSS-EXAMINATION

00:21:22  22  BY MR. DOWER:

00:21:33  23    Q.  Dr. Glass, while I'm getting set up here, do you

00:21:35  24  remember, we had a trial together a few years ago?

00:21:39  25  Actually, it was in 2018?

00:21:41  1   A.   I don't recall.

00:21:41  2   Q.   You don't recall.  I must not have been memorable

00:21:45  3   then.  Well, I'll just represent to you, I have a

00:21:48  4   Bachelor of Science in Economics, and talking to you is

00:21:54  5   like the only time I ever get to use it.  So I'm going

00:21:56  6   to enjoy our conversation very much.

00:22:19  7        So let's start with your scenario one.  I'll

00:22:25  8   go ahead and pull it up on the computer so that we're

00:22:30  9   both looking at it.  Okay.  I can zoom in a little bit,

00:22:51 10   but do you see this as your scenario one?

00:23:00 11   A.   Okay.

00:23:00 12   Q.   All right.  So just want to make sure I

00:23:04 13   understand what you did.  So scenario one assumes that

00:23:08 14   she's granted tenure on September 1st, 2023, correct?

00:23:12 15   A.   Yes.

00:23:12 16   Q.   And so, you calculate the difference between what

00:23:17 17   she is making to what you believe that she would be

00:23:21 18   making if she -- if she had received tenure, correct?

00:23:28 19   If she had received tenure in February of 2019.

00:23:31 20   A.   Okay.  Just let me say that the base case is that

00:23:34 21   she was granted -- that she would have been granted

00:23:37 22   tenure in 2019.  And then, scenario one is, she didn't

00:23:43 23   get granted tenure in 2019, but would get granted tenure

00:23:48 24   in 2023.

00:23:50 25   Q.   Okay.  Thank you for that.  That's much clearer

00:23:53  1    than what I said.  So on August 31st, 2020, your base

00:23:58  2    case is your assumption about what she would have made

00:24:03  3    had she received tenure back in February of 2019.

00:24:08  4        A.   That's right.   She would have been making one

00:24:11  5    thirty-five-hundred if she'd been granted tenure.  She's

00:24:14  6    not going to be making but 114 because she didn't get

00:24:17  7    tenure.

00:24:17  8        Q.   So the difference between -- I guess the amount

00:24:20  9    of money that you project her getting as a result of

00:24:23  10   tenure is $16,000 more or less?

00:24:27  11       A.   Yes.  15,861.  Yes.

00:24:30  12       Q.   So $15,000, it's, what, roughly ten percent of

00:24:35  13   the salary?

00:24:37  14       A.   Never was good with numbers, but that sounds

00:24:39  15   right.

00:24:41  16       Q.   And you got the bump, your projection of how much

00:24:46  17   her salary would go up, from another faculty member,

00:24:51  18   correct?

00:24:51  19       A.   From another what?

00:24:52  20       Q.   From another faculty member?

00:24:53  21       A.   Yes.

00:24:54  22       Q.   And so, the plaintiffs provided you with that

00:24:59  23   faculty member and that number, correct?

00:25:00  24       A.   That's correct.

00:25:01  25       Q.   And you don't know whether that's representative

```
00:25:03   1   of how much of a bump people would generally get, right?
00:25:09   2       A.  I do not know that.
00:25:10   3       Q.  Could be more?
00:25:12   4       A.  Could be.
00:25:13   5       Q.  And presumably, the plaintiff's counsel only
00:25:15   6   picked a cheap one, right?
00:25:17   7       A.  Yes.
00:25:17   8       Q.  And so, then, at some point under scenario one,
00:25:22   9   you have her actually getting tenure on September 1st,
00:25:26  10   2023, correct?
00:25:27  11       A.  Yes.
00:25:28  12       Q.  And so, if we assume that that brings her up with
00:25:33  13   a peer in the department who got tenured the same time
00:25:37  14   she did, then that would close the damages.
00:25:43  15       A.  No, because of the four-year lag.  I mean, the
00:25:47  16   person that got tenure in 2019 will have gotten
00:25:53  17   substantial raises before 2023.
00:25:57  18       Q.  And your --
00:25:58  19       A.  But she's not going to start off at that same
00:26:00  20   level.  She's going to.
00:26:01  21       Q.  Why do you believe that?
00:26:07  22       A.  I don't have any reason not to believe that.  If
00:26:10  23   it's somebody that has been promoted four years before
00:26:12  24   me, if I get promoted to that same job, I've got to
00:26:17  25   believe that because of their experience in that job,
```

00:26:20   1   they will have achieved raises over and above what I'm

00:26:26   2   going to start out in.

00:26:26   3       Q.   All right.   And if you had at -- you didn't look

00:26:29   4   at U.T.'s, like, historical data, correct?

00:26:32   5       A.   Yes.

00:26:32   6       Q.   Okay.   And if you had looked at that data, we

00:26:37   7   could determine whether or not U.T. is one of the

00:26:39   8   unusual employers that will bring you right on par with

00:26:44   9   people, regardless of when they got tenure.

00:26:47  10       A.   I don't know that.

00:26:48  11       Q.   Okay.

00:26:55  12       A.   What you're trying to tell me is that all

00:26:57  13   associate professors are paid the same amount of money.

00:27:00  14       Q.   If it were true that associate professors are

00:27:04  15   effectively paid, you know, within one percent of each

00:27:08  16   other and that it's not correlated with the time they

00:27:10  17   got tenure, then if that were true, then the losses are

00:27:14  18   cut off at the point at which she gets tenure.

00:27:16  19       A.   I think that would be true, yes.

00:27:22  20       Q.   Okay.   And just because I recognize economic

00:27:29  21   jargon is confusing and I spent four years struggling

00:27:33  22   with it as an undergraduate, just to use your metaphor,

00:27:36  23   your metaphor was a runner that if someone else got a

00:27:40  24   head start, you're not going to catch up even if you get

00:27:43  25   the promotion, right?

00:27:44   1    A.   That was my metaphor.

00:27:47   2    Q.   Right.  So if U.T. -- it's going to be clunky,

00:27:50   3    but if U.T. got a helicopter and picked up someone from

00:27:53   4    the racetrack and plopped them right next to that other

00:27:56   5    person who got, you know, tenured before them such that

00:27:59   6    they were on the same place on the racetrack, then the

00:28:02   7    damages are just, you know, for the time before tenure's

00:28:07   8    granted.

00:28:07   9    A.   And you're going to take that same helicopter and

00:28:10   10   pick everybody up and move them all up to where they all

00:28:13   11   cross the finish line at the same time.

00:28:15   12   Q.   Every time they get a bump from assistant to

00:28:18   13   associate or associate to full?

00:28:19   14   A.   Yeah.  If they've got that helicopter, you're

00:28:22   15   right.

00:28:25   16   Q.   So scenario one had two permutations, and the

00:28:36   17   only difference between them is the work life expectancy

00:28:40   18   -- whether or not she would work till 65 and some change

00:28:43   19   versus 70.

00:28:44   20   A.   Yes.

00:28:44   21   Q.   You're not offering an opinion about which of

00:28:47   22   those is more likely?

00:28:49   23   A.   No.

00:28:50   24   Q.   And you're not -- so then, your scenario two is

00:28:54   25   based on her working as an assistant professor for the

00:28:59   1   rest of her career?

00:29:01   2       A.   At the salary level as an assistant professor for

00:29:05   3   the rest of her career.

00:29:06   4       Q.   And so, you understand that she can't work as an

00:29:09   5   assistant professor at U.T. for the rest of her career

00:29:11   6   because of the up-or-out system, but this scenario

00:29:14   7   assumes that it's the equivalent in terms of pay.

00:29:17   8       A.   Yes.

00:29:18   9       Q.   Now, let's say -- you know, because you're a

00:29:24  10   damages guy, so the jury's only talking about this if

00:29:27  11   they find for Dr. Nikolova on the -- her claims,

00:29:32  12   correct?

00:29:32  13       A.   Right.

00:29:32  14       Q.   All right.  So let's just assume that and

00:29:35  15   obviously I'm not conceding anything.  Let's assume

00:29:37  16   that.  What happens if the jury awards the money under

00:29:42  17   scenario two and then, U.T. gives her tenure in a few

00:29:45  18   years?

00:29:45  19       A.   She's just got a windfall.

00:29:47  20       Q.   Yeah.  So everything -- all of the rest of that

00:29:50  21   money is, as you said, just pure windfall.  It is money

00:29:53  22   she's going to get basically a double recovery, right?

00:29:56  23       A.   Yeah.

00:29:56  24       Q.   And under scenario three, it's an even bigger

00:30:02  25   windfall, right?

00:30:03  1    A.   Absolutely.

00:30:04  2    Q.   In fact, it's almost $4 million windfall.

00:30:07  3    A.   Yes.

00:30:14  4    Q.   I'll pass the witness.

00:30:20  5          THE COURT:  Anything else, Mr. Schmidt?

00:30:23  6          MR. SCHMIDT:  Yes.  Couple of quick

00:30:24  7    questions.

00:30:24  8                    RE-DIRECT EXAMINATION

00:30:24  9    BY MR. SCHMIDT:

00:30:30  10   Q.   First of all, Dr. Glass, on Mr. Dower's

00:30:42  11   helicopter analogy, is the assumption that he's asking

00:30:49  12   you to make is that all U.T. professors make the same

00:30:52  13   salary?

00:30:52  14   A.   Yes.

00:30:53  15   Q.   So that no one else -- there's no change in

00:30:57  16   salaries.  Everybody all stays constant.  Once you

00:30:59  17   become a professor, you all make the same salary,

00:31:01  18   there's no raises, no nothing over the next --

00:31:03  19   A.   Well, everybody gets equivalent raises, too, I

00:31:07  20   guess, is what he's kind of saying.

00:31:09  21   Q.   But under this situation, for you to ever catch

00:31:11  22   up, you know, under normal real life situation, if I

00:31:18  23   make $100,000 now and somebody else makes $150,000 now,

00:31:23  24   the only way -- and then, next year, we get a raise and

00:31:27  25   I get 125 and he gets or she gets 175, there's still

| | | |
|---|---|---|
| 00:31:32 | 1 | going to be that gap that keeps going, correct? |
| 00:31:35 | 2 | A.  Yes.  But he's trying to say that she's going to |
| 00:31:40 | 3 | get promoted to the same salary level that a four-year |
| 00:31:44 | 4 | associate professor is going to make whenever she gets |
| 00:31:47 | 5 | tenure, and that's what I just don't think is going to |
| 00:31:50 | 6 | happen. |
| 00:31:50 | 7 | Q.  Right.  So she'll get -- she's not going to get |
| 00:31:54 | 8 | promoted to the salary level of somebody up there. |
| 00:31:57 | 9 | A.  Right. |
| 00:31:57 | 10 | Q.  On this windfall situation, if we are only asking |
| 00:32:00 | 11 | the jury to look at the backpay damages up through the |
| 00:32:04 | 12 | date of trial, there's not a windfall. |
| 00:32:07 | 13 | A.  That's correct. |
| 00:32:08 | 14 | Q.  Okay.  Thank you very much.  No further |
| 00:32:10 | 15 | questions. |
| 00:32:13 | 16 | THE COURT:  Anything further, Mr. Dower? |
| 00:32:15 | 17 | MR. DOWER:  No, your Honor. |
| 00:32:16 | 18 | THE COURT:  Thank you, sir.  You may step |
| 00:32:17 | 19 | down. |
| 00:32:18 | 20 | THE WITNESS:  Thank you.  Thank y'all for |
| 00:32:21 | 21 | listening. |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |