UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| EVDOKIA NIKOLOVA | § | |
|  Plaintiff, | § | |
| | § | |
| V. | § | CASE NO. 1:19-cv-00877-RP |
| | § | |
| UNIVERSITY OF TEXAS AT AUSTIN, | § | |
| Defendant. | § | |

## PLAINTIFF'S MOTION FOR JUDGMENT

TO THE HONORABLE JUDGE ROBERT PITMAN:

Defendant the University of Texas at Austin does not contest Plaintiff Dr. Evdokia Nikolova's motion for compensatory damages, back pay, or interest. The sole question before the Court is on the issue of front pay. On the issue of whether "instatement" or Court-ordered tenure is an appropriate remedy in lieu of front pay, Defendant agrees with Dr. Nikolova's position (for unstated reasons) that such a remedy is not appropriate.[1] Thus, the sole issue is whether to award any front pay and if so, how much.[2]

### A. Front pay is absolutely appropriate and required by Fifth Circuit precedent in this case.

Defendant first argues that absolutely no front pay should be awarded this case because the jury decided that Dr. Nikolova should receive a large amount ($3 million) for compensatory damages. Defendant's argument is completely at odds with Fifth Circuit precedent and common sense. The Fifth Circuit has clearly and unequivocally held that either front pay or

---

[1] Even if the parties agree that instatement/reinstatement is not feasible, the Fifth Circuit has required district courts to adequately articulate their reasons for finding instatement/reinstatement to be infeasible and for considering an award of front pay instead. *Julian v. City of Hous.,* 314 F.3d 721, 728-29 (5th Cir. 2002).

[2] Front pay is an equitable remedy and "a court's equitable power is reviewed on appeal for abuse of discretion. An error of law or application of an incorrect legal standard rises to that level. But the factual findings that underlie the decision to grant or deny relief are reviewed only for clear error." *Bogan v. MTD Consumer Grp., Inc.*, 919 F.3d 332, 335-36 (5th Cir. 2019) (citations omitted).

instatement/reinstatement should be awarded in the usual case.[3] *Bogan v. MTD Consumer Grp., Inc.*, 919 F.3d 332, 336 (5th Cir. 2019).

The three district court cases cited by Defendant are easily distinguishable. Most importantly, *none* involved a tenure track professor in a highly competitive and small field being illegally and discriminatorily denied tenure, a protected "job for life," as UT Austin itself characterized tenure at trial. In *Reynolds v. Octel Comms. Corp.*, 924 F. Supp. 743, 746 (N.D. Tex. 1995) (no appellate history) the district court made the unusual decision to deny front pay because of the jury's award of *punitive damages.* The two unpublished district court opinions are also clearly inapposite. In *Miller v. Tex. Alcoholic Bev. Comm'n*, No. A-21-CV-00204-JRN, 2022 U.S. Dist. LEXIS 103052, at *3-4, 2022 WL 2078033, at *1–2 (W.D. Tex. 2022) the court provided no justification or explanation of its reasoning to deny front pay. The court simply cited the factors to be considered in awarding front pay, including the length of employment, the permanency of the position held, the nature of work, the age and physical condition of the employee (all of which strongly support an award of front pay in Dr. Nikolova's situation) and stated they did not support an award of front pay. *Id.* In *Nassar v. Univ. of Tex. Sw. Med. Ctr.,* No. 3:08-CV-1337-B, 2010 U.S. Dist. LEXIS 97772, at *8, 2010 WL 3633631 (N.D. Tex. 2010), the district court declined to award front pay for reasons not applicable here, including the fact that the plaintiff had never worked for one of the defendants and thus the "length of prior employment and the permanency of the position held" factored against front pay.[4]

---

[3] *Bogan,* 919 F.3d at 337, noted there were only two situations and cases that might support a possible decision to not award front pay not applicable here: one where there was evidence of serious employee misconduct (not the case here); and a second in which the trial court awarded substantial *punitive damages* (also not the case here).

[4] The trial court's denial of front pay was appealed in *Nassar,* however, the Fifth Circuit explicitly did not rule on the issue because the case was remanded for reconsideration of monetary damages in light of a finding of insufficient evidence to support the jury's verdict on constructive discharge.

Additionally, the jury's finding that Dr. Nikolova should receive $2 million in future compensatory damages is actually evidence that weighs *in favor* of a significant award of front pay. The jury sat through a week of trial, including detailed evidence about the nature of harm done to Dr. Nikolova and her career potential. The jury, of course, was unaware of the caps imposed by law, but solely on the merits of the case and the evidence before them found that $2 million dollars in the future was warranted because of Dr. Nikolova's UT's illegal and discriminatory denial of tenure.

**B. <u>At a bare minimum, front pay assuming Dr. Nikolova gets tenure in 2023 ("Scenario 1") is appropriate.</u>**

Defendant argues that if front pay is to be awarded at all, it must be with the assumption that Dr. Nikolova will obtain tenure in 2023, because anything else would be too speculative. That argument is incorrect, not supported by the evidence in this case and will be addressed in the following sections of this Reply. However, if front pay is awarded with the assumption that Dr. Nikolova obtains tenure in 2023, Defendant argues that the Court should follow the "helicopter" theory of Defendant's expert, Dr. Donald Deere. That theory posits that in 2026, three years after Dr. Nikolova's hypothetical tenure date, Dr. Nikolova's salary "catches up" and will be paid the same amount as if she had been granted tenure in 2019. That theory has essentially no evidentiary support and is flawed and misleading.

**1. <u>The Bureau of Labor Statistics Do Not Support Defendant's "Helicopter" or "Catch Up" Theory.</u>**

Regarding the Bureau of Labor statistics that Dr. Deere relied upon for his helicopter or "catch up" theory, in addition to the arguments made in Plaintiff's Motion for Judgment (Dkt. 99 at p. 11, FN 12,[5] the statistics are also ambiguous and do not indicate whether the salary of the

---

[5] The data is labor-force-wide (such as including manual laborers, etc.), not applicable to a university professor who was denied tenure and only consider *"displaced employees" who "lost or left jobs because their plant or company*

workers who obtained subsequent employment was equal to or above the salary they *actually made at the time they lost their job*, or, as the correct standard is here, *the salary that they would have made accounting for salary increases* had they not been terminated because of plant or company closure etc. The labor statistics also do not indicate whether the worker obtained a job in the same field or switched occupations, which is important in this case because an employee who is illegally discriminated against is not required to take a new job unless it is "affords virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status as the position from which the Title VII claimant has been discriminatorily terminated." *Sellers v. Delgado Community College*, 839 F.2d 1132, 1138 (5th Cir. 1988).

Moreover, Dr. Deere's reliance on this labor statistic data is wrong because the data only surveys workers who lost their job "between January 2017 and December 2019" and who were reemployed by December 2020, a *one year* to *three year* period.  However, in this case, Deere uses this data to assert that if tenured in 2023, Dr. Nikolova would be making the same salary in three more years (2026) *as if she had been tenured seven years earlier in 2019*. Suggesting that Dr. Nikolova will catch up to the salary she would have made had she been tenured *seven years earlier* is significantly different that a generic worker who lost a job and gets a new position *one to three* years later.

    **2.**   <u>**UT's Salary Data Does Not Support the "Helicopter" or "Catch Up" Theory and Actually Supports Dr. Glass' "Escalator" Model.**</u>

Defendant's Response makes this same misleading mistake/argument when it claims that Dr. Deere's helicopter or catch-up theory is supported by the historic UT salary data in the ECE Department, specifically the salary chart in Defendant's Trial Exhibit 62, attached to Defendant's

---

*closed or moved, there was insufficient work for them to do, or their position or shift was abolished.*"
https://www.bls.gov/news.release/disp.nr0.htm.

Response as Exhibit D (Dkt 102-4). Defendant's Response (Dkt. 102, p. 10) generically cites to this salary chart without any mention of the specific data or examples to support Deere's "anecdotal"[6] observations. In fact, the salary data ***does not support*** Deere's/Defendant's claim that if Dr. Nikolova were tenured in 2023, in three more years (2026) she would be making the same salary as if she had been tenured *seven years earlier* in 2019. For the salary data to support Deere's theory, one would compare the salary of a tenured professor at a given point in time to the salary of a professor who was tenured *seven years earlier* to see if they are making the same or similar salary. However, Deere specifically acknowledged that the anecdotal examples reviewed at trial were comparing salaries of someone tenured at a given point in time to the salaries of a professor tenured only *two or three years* before:

> A. Well, I think you were suggesting that this is -- what you see here is possible. In other words, that it's not like you -- your promotion comes *two years* later, so you're forever behind the people who were promoted *two years* before. This suggests that you're promoted *two years* later and you're paid virtually identically to the people who were promoted one or *two or three years* earlier.

Defendant's Response Ex A (Dkt 102-1) 10:14-21.

A correct review of the salary data actually supports Dr. Nikolova's position and that of her expert Dr. Thomas Glass,[7] that the salaries don't "catch up," but rather move in the same general maner as if two people were on an escalator (the "escalator" model). For example, the UT data shows that Dr. Nan Sun was first tenured in 2017-18 and was paid $119,240. (Dkt 102-4) Similarly, Dr. Vijay Janapa Reddi was also tenured in 2017-18 and was paid $120,450. *Id.*  Dr. Christine

---

[6] Deere admitted that the examples of the UT data discussed at trial were anecdotal that he did not do any numerical or statistical analysis of the salary differences at UT or in the chart. *See* Plaintiff's Motion for Judgment (Dkt. 99) at p. 11, FN 12.

[7] Dr. Glass's tables were mistakenly referred to in Plaintiff's Motion for Judgment as "Plaintiff's Trial Exhibit 238" when in fact they were Plaintiff's Trial Exhibit 236. Additionally, Plaintiff's counsel inadvertently failed to include the detailed calculations that were part of the full exhibit. The correct Plaintiff's Trial Exhibit 236 is attached to this reply as **Exhibit E.**

Julien was tenured seven years earlier in 2010-11 and was paid $141,656 in 2017-18. *Id.*[8] Dr.

Mohit Tiwari, who went up for tenure at the same time as Dr. Nikolova and began his tenured

position in 2019-20 was paid $130,500. Plaintiff's Trial Exhibits 203 and 225**.** Drs. Seth Bank and

Emanuel Tutuc were tenured in 2012-13, seven years earlier than Dr. Tiwari, and were both paid

$156,832 in 2019-20, significantly more than Tiwari. *Id.* and Dkt 102-4. Dr. Constantine

Caramanis was also tenured in 2012-13 (seven years before Tiwari) and was paid $150,117 in

2019-20. Dr. *Id.* Mattan Erez, was also tenured 2012-13 and was paid $147,982 in 2019-20, again,

significantly more than Tiwari. *Id.*[9]

3. **Dr. Glass' estimate of front pay losses assuming Dr. Nikolova obtains tenure in 2023 (Scenario 1) is conservative. The Court should use Defendant's own evidence and expert testimony and a higher projected rate of increase in salary if the Court uses Scenario 1.**

Dr. Glass used the salary that Dr. Mohit Tiwari was awarded after he first obtained tenure

in 2019-20 as a basis for his calculations in "Scenario 1" that assumes Dr. Nikolova will obtain

tenure in 2023. The selection of Dr. Tiwari and his salary was reasonable given that Dr. Nikolova

and Dr. Tiwari started at UT the same academic year.[10]  Additionally, Dr. Nikolova had worked

two and a half more years as an assistant professor (at Texas A&M), had more experience and was

further along on her "tenure clock" than Dr. Tiwari. Additionally, as the evidence at trial

established, Dr. Tiwari and Dr. Nikolova's records when they went up for tenure were comparable.

Thus, the use of Tiwari's initial tenure salary as a starting point to calculate front pay damages is

supported by the evidence and is reasonable.[11]

---

[8] Dr. Sarfraz Khurshid was also tenured in 2010-11, seven years before Drs. Sun and Janapa Reddi, and was paid $127,575 in 2017-18, still significantly higher than Sun and Janapa Reddi.
[9] Dr. Ali Yimaz was tenured 2012-13 and was paid $133,244 in 2019-20, closer to Tiwari's 2019-20 salary but still more.
[10] Dr. Tiwari started in the fall of 2013-14. Dr. Nikolova started in the spring of 2013-14.
[11] Dr. Tiwari's salary at the time of tenure was $130,500. Defendant's expert Deere used a comparable number of $129,500 as a basis for calculating front pay damages.

For his calculations on the projected rate of increase in salary, Dr. Glass used the Social Security Administration's board of trustees/actuaries, which is "well thought of in the economic community as a fairly accurate predictor of what salaries are going to be." Glass Trial Transcript, Plaintiff's Response Ex. A (Dkt. 99-1, 4:14-22 ) These numbers ranged from 4.44% to 3.44%, with the average for future salary increases 3.66%. Plaintiff's Ex. E.

As noted in Defendant's Response (Dkt. 102, p. 9), Defendant's expert Dr. Deere used a significantly higher number than Glass for projecting increases in compensation, a 4.86% increase, which Defendant explains is "the average within-rank increase based on the historic salary data (not including the stagnant year of 2020). . . . The number reflects, on average, how much an ECE Department faculty member's salary goes up in a year in which they do not receive a promotion[12] (again, removing the outlier year of 2020)." (Dkt. 102, p. 9). Based on UT's own evidence and the testimony and calculations of its own expert Deere that 4.86 percent is the average rate of increase for UT ECE faculty, it is completely reasonable (and presumably even more accurate) to calculate Dr. Nikolova's front pay salary increases and damages under Scenario 1 using 4.86%. Dr. Glass has recalculated his projection of damages using UT's average rate of increase (4.86%) (**Exhibit F**) and has determined that the total amount of front pay damages under Scenario 1 is $562,303[13] if Dr. Nikolova worked to age 70 as the evidence supports. If the Court determines front pay is appropriate under Scenario 1, Plaintiff respectfully asks the Court to use this calculation and number, as it is fully supported by the evidence in this case.

C. **The evidence fully supports Scenarios 2 and 3 that Dr. Nikolova will not be awarded tenure at UT or a comparable university in the future.**

---

[12] As Defendant notes, the rate of increase is significantly higher in years in which a faculty member receives a promotion. (Dkt. 102, p. 8)

[13] Using the more conservative but less accurate Social Security rate of growth, the amount of front pay damages under Scenario 1 is $331,505.

Defendant argues that Plaintiff's estimate of damages using the assumption that Plaintiff will not obtain tenure at UT (or another comparable top tier university) (Scenarios 2 and 3) is speculative, would amount to a "windfall," and should not be used as a basis for an award of front pay. (Dkt 102, p. 4-6). Defendant's arguments ignore the substantial evidence in this unique case that strongly supports the reasonable assumption that Plaintiff will not be able to obtain a substantially similar tenured position at UT or another top tier university in her highly specialized, competitive and small field of theoretical computer engineering.

First, Defendant incorrectly inserts into these scenarios that they require speculation that UT Austin will "unlawfully deny" Dr. Nikolova tenure in the future.[14] While it is absolutely possible that Defendant will illegally retaliate/discriminate against Dr. Nikolova in the future by denying tenure, the scenarios do not require that Defendant will act "unlawfully" in the future. It is also possible that UT Austin could identify "legitimate, non-discriminatory/retaliatory" reasons for the tenure denial. While UT Austin cites the statement Dean Wood (now *Provost* Wood) in her assessment in 2018 that if this were an "up or out" case, she would "likely" agree with the recommendations for tenure, Dean Wood specifically stated in 2018 that Dr. Nikolova should not apply for tenure for two more years [her "up or out year"] so she would have time to make the necessary improvement to obtain tenure, in spite of her already strong record.[15]   According to Defendant, Dr. Nikolova needed to obtain even more grants, have even better student teaching scores, have an even better publication record (according to President Fenves), and show an even greater "upward trajectory" in her up or out year than she had shown at the time she applied for

---

[14] Defendant suggests that if that were to happen, Dr. Nikolova's remedy would be to bring another lawsuit seeking damages in the future. Suggesting that Dr. Nikolova should live in a perpetual state of litigation and go through yet another exhausting lawsuit against UT Austin is absolutely untenable, not relevant to the issue of front pay, cynical and frankly outrageous.

[15] Plaintiff's Trial Exhibit 110.

tenure in 2018.[16] As Dr. Nikolova recognized at the time, such requirements for future tenure would be almost impossible to meet. Defendant has also apparently not backed away from this position after this trial. In a public statement following the trial in this case, Defendant stated that "The university stands by its arguments made in this case before the court."[17]

Dr. Nikolova credibly testified that after the denial of tenure she fell into a serious depression that prevented her from working (or even taking care of her children) and required her to take extended, unpaid leave.[18] Since the tenure denial and with the significant leave, Dr. Nikolova's productivity has understandably suffered. Getting the support of colleagues, which is crucial to obtain tenure, will also certainly be difficult in any future tenure attempt.[19] Based on all of this, together with UT giving Dr. Nikolova the most negative (or at best lukewarm) performance and teaching reviews of her career, Dr. Nikolova credibly testified that her chances of obtaining tenure at UT Austin in the future are "nil."[20]

The evidence in this case regarding Plaintiff's future tenure prospects is more than sufficient to award front pay on the assumption that Dr. Nikolova will not obtain tenure at UT or any other top tier university similar to UT Austin in her extremely small, specialized field.[21] The cases Defendant cites regarding the denial or reduction of front pay awards are all distinguishable.

---

[16] As Dr. Nikolova explained, it was similar to asking a marathon runner who finishes a race to continue sprinting even faster after reaching the finish line. Trial Transcript of Dr. Jenifer Welch and Dr. Nikolova, attached as **Exhibit G,** 74:17-75:5.

[17] **Exhibit H**, Austin American Statesman, 3/15/22, "Jury awards $3 million to UT engineering professor in pregnancy, sex discrimination suit," citing UT spokesperson Eliska Padilla.

[18] *Id.* at 74:13-79:7. *See also.* Plaintiff's Trial Exhibits 211, 212, and 230.

[19] Ex. I, 120:24-121:12. Counsel for Nikolova reached out to numerous tenured UT faculty members as well as some external reviewers who were previously on record as strongly supporting Dr. Nikolova and her tenure application. Almost all were unwilling to speak favorably on behalf of Dr. Nikolova in this matter, several suggesting their views about Dr. Nikolova seem to have changed after the denial of tenure or that they were afraid of retaliation if they publicly supported her.

[20] *Id.* at 84:18-85:3.

[21] After the tenure denial, Dr. Nikolova applied to approximately 50 colleges and universities in the US and internationally. She did not even obtain a single interview from a US institution. *Id.* 74:8-12. Plaintiff's Trial Ex. 213.

Again, none involve a tenure track professor being denied tenure a "job for life" in a highly specialized, narrow field, with uncontradicted, credible evidence that the plaintiff will not be able to obtain tenure because of the damage done by the Defendant. *Bourdais v. New Orleans City*, 485 F.3d 294, 301 (5th Cir. 2007) found that a district court did not abuse its discretion by denying front pay in the form of pension benefits that required plaintiffs to continue working for defendant (in an at-will job) for 20 years.[22] *Miniex v. Hous. Hous. Auth.*, 400 F. Supp. 3d 620, 652-53 (S.D. Tex. 2019) found that an assumption that an at-will employee would remain employed for eight years and underemployed was not supported by the evidence. Again, the present case is significantly different as it involves tenure and a "job for life." *Soto v. LCS Corr. Servs.*, No. 2:12-CV-130, 2013 U.S. Dist. LEXIS 110033, at *16-17, 2013 WL 4012627 (S.D. Tex. 2013) involved an (at-will) law enforcement officer. Moreover, there is simply no evidence in Dr. Nikolova's case, unlike in *Soto* that "Plaintiff should be able to find substitute work with some effort." To the contrary, there is significant evidence (including from Dr. Nikolova and Dr. Welch) that Dr. Nikolova will not be able to find any future tenure or tenure track position in a highly competitive career that she began working towards when she was 10 years old.

Finally, Defendant sarcastically and misleadingly states that Scenario 3 "assumes that Dr. Nikolova never works another day in her life." (Dkt 102, p. 4). In truth, the scenario correctly assumes that under well-established Fifth Circuit case law, she is only expected to take a job that is "substantially equivalent" and "affords virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status as the position from which the Title VII claimant has been discriminatorily terminated." *Sellers II*, 839 F.2d at 1138. In this case, Dr. Nikolova made an intense effort to find substantially equivalent employment but was

---

[22] *Miller v. Raytheon Co.*, 716 F.3d 138, 146-47 (5th Cir. 2013) simply held that an award of pension benefits was properly considered front pay rather than back pay.

unsuccessful. The evidence is strong that the impact of Defendant's illegal discrimination has foreclosed Dr. Nikolova's chances of obtaining tenure at another top tier university similar to UT Austin.

Respectfully submitted,

CREWS LAW FIRM, P.C.
701 Brazos, Suite 900
Austin, Texas 78701
(512) 346-7077
(512) 342-0007 (Fax)
schmidt@crewsfirm.com


By: /s/ Robert W. Schmidt
Robert W. Schmidt
State Bar No. 17775429
Joe K. Crews
State Bar No. 05072500

/s/ Robert Notzon
Robert Notzon
The Law Office of Robert Notzon
Texas Bar No. 00797934
1502 West Avenue
Austin, Texas 78701
(512) 474-7563
(512) 852-4788 facsimile

**ATTORNEYS FOR PLAINTIFF**


## CERTIFICATE OF SERVICE

I hereby certify that on July 7, 2022, this document was served pursuant to Federal Rules of Civil Procedure on counsel for Defendant through the Court's electronic filing system at the following address:

Benjamin L. Dower
Assistant Attorney General
Amy S. Hilton
Assistant Attorney General
Office of the Attorney General of Texas
General Litigation Division
P.O. Box 12548

Capitol Station,
Austin, Texas 78711-2548
Fax (512) 320-0667
benjamin.dower@oag.texas.gov
amy.hilton@oag.texas.gov

By:  /s/  Robert W. Schmidt