UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

EVDOKIA NIKOLOVA ) Docket No. A 19-CA-877 RP
)
vs. ) Austin, Texas
)
UNIVERSITY OF TEXAS )
AT AUSTIN ) March 10, 2022

TRANSCRIPT OF TRIAL TESTIMONY OF
JENNIFER WELCH AND EVDOKIA NIKOLOVA
BEFORE THE HONORABLE ROBERT L. PITMAN

APPEARANCES:

For the Plaintiff: Mr. Robert W. Schmidt
Crews Law Firm, P.C.
701 Brazos Street, Suite 900
Austin, Texas 78701

Mr. Robert S. Notzon
Law Office of Robert Notzon
1502 West Avenue
Austin, Texas 78701

For the Defendant: Mr. Benjamin L. Dower
Ms. Amy S. Hilton
Texas Attorney General's Office
300 West 15th Street
Austin, Texas 78701

Court Reporter: Ms. Lily Iva Reznik, CRR, RMR
501 West 5th Street, Suite 4153
Austin, Texas 78701
(512)391-8792

Proceedings reported by computerized stenography, transcript produced by computer-aided transcription.

JENNIFER WELCH, called by the Plaintiff, duly sworn.

DIRECT EXAMINATION

BY MR. SCHMIDT:

Q. Can you please introduce yourself to the jury?

A. Yes. My name is Jennifer Welch, and I am a professor of computer science and engineering at Texas A & M University.

Q. Okay. And how long have you been a professor of engineering?

A. Almost -- well, at A & M, I've been there almost 30 years, and before that, I was at another institution for three years.

Q. Okay. And are you a full professor there?

A. Yes, I'm a full professor.

Q. Do you have an official title?

A. Yes. Professor and then, also what's called the regents professor and Chevron professor, too, it's a professorship.

Q. Okay. And how do you know Dr. Nikolova?

A. So she was a colleague of mine at A & M for about two-and-a-half years in the early 2010s. Yeah. And then, after she left to go to U.T., we kind of stayed in touch periodically.

Q. Okay. And in your role as a full professor at Texas A & M, can you talk a little bit what you have done in

08:45:00 terms of recruiting candidates, interviewing candidates,
08:45:03 that kind of thing?

08:45:03 A. Sure. Yeah. So I was actually on the search
08:45:07 committee when we hired Dr. Nikolova. So I've been on
08:45:10 search committee for quite a few years. I've been on our
08:45:14 departmental promotion and tenure committee for probably
08:45:17 about 20 years. I've been on our College of Engineering's
08:45:21 promotion and tenure committee maybe like five or six
08:45:25 years. And I've also been asked to write letters of
08:45:28 reference for people going up for tenure or for promotion
08:45:31 to full professor kind of in the U.S. and also
08:45:35 internationally quite a few times.

08:45:37 Q. Okay. And in your opinion, based on your experience,
08:45:43 how many years again have you been doing this?

08:45:45 A. You mean just generally being a professor? Or.

08:45:48 Q. In the situation where you talking about the
08:45:51 recruiting, interviewing.

08:45:52 A. Yeah, probably 20 years.

08:45:54 Q. Okay. What is the impact if a candidate you're
08:46:02 searching, looking at has been denied tenure at another
08:46:06 university?

08:46:06 A. Yeah. Well, I would say that it's kind of a red
08:46:10 flag. It's definitely not a good thing because it makes
08:46:14 -- kind of you wonder, like, is there really something
08:46:17 wrong with your scholarship that maybe didn't -- isn't

08:46:20 apparent in their actual application, or they may be like
08:46:25 a problem person, or something like that. So it's not a
08:46:28 great thing.
08:46:29 Q. Okay. It certainly doesn't make it easier for them
08:46:38 to get a job if they have --
08:46:39 A. No.
08:46:40 Q. -- been denied tenure?
08:46:41 A. No. Definitely doesn't make it easier. I mean, it's
08:46:44 not impossible. Certainly I know people who have gotten
08:46:47 tenure after -- at one -- were hired at one place and
08:46:50 gotten tenure after being denied at another place. But I
08:46:54 think it makes it more difficult, especially if you're
08:46:54 going to try to kind of stay at the same level of
08:46:56 university.
08:46:58 Q. So you might be able to get a job at a lower-ranked
08:47:02 university but it's going to be a --
08:47:02 A. That would be easier, I would say, than getting
08:47:05 another job at a similar university from where you were
08:47:08 turned down for tenure.
08:47:09 Q. And you're roughly in the same subject area of
08:47:13 electrical and computer engineering as Dr. Nikolova. Is
08:47:17 that accurate --
08:47:17 A. Right. Yeah. So we're both in kind of theoretical
08:47:21 computer science. And computer science is sometimes
08:47:23 spread between different departments like at A & M, I'm in

08:47:26 the computer science and engineering department as she
08:47:29 was. And then -- but there's a lot of overlap between
08:47:32 that and then, electrical and computer engineering
08:47:35 departments.

08:47:35 Q. And are the jobs in the theoretical area of computer
08:47:42 science and electrical engineering science, are those
08:47:46 plentiful and easy to come by or are they hard?

08:47:49 A. Yeah. So in general, I mean, there is a good job
08:47:51 market for computer science professors, but the subareas
08:47:53 do make a difference. So theory typically is quite a bit
08:47:58 harder to get a job in than I would say whatever's like
08:48:00 the current popular thing, like now it's machine learning
08:48:03 and AI, and so forth. So yeah, so theory's kind of always
08:48:07 been harder.

08:48:08 Q. Okay. You're aware that Dr. Nikolova applied for
08:48:14 tenure at U.T. and was denied?

08:48:15 A. Yes.

08:48:16 Q. And did you ever get a chance to see Dr. Nikolova's
08:48:20 dossier?

08:48:21 A. Yes, I did.

08:48:22 Q. She provided it to you after she was denied?

08:48:25 A. She did.

08:48:25 Q. And what did you think of her dossier when you saw
08:48:29 it?

08:48:29 A. I thought she had a very strong case. I mean, she

08:48:31 had really excellent and, in fact, impactful papers. She had letters from -- very positive letters from top people in the field. She had a really good teaching activities and evaluations and service and funding and, you know, kind of from my perspective, really a complete package to be successful.

08:48:55 Q. And I understand just to be clear, you're at A & M, and so, you don't necessarily apply the same processes and stuff as Texas Tech -- Texas Tech. Excuse me, sorry, folks. University of Texas.

08:49:08 A. Yes. That's true. It's not the same university, the same department, but I feel like I'm pretty familiar with generally what's expected, having written letters of recommendation for -- as I said, for people going up for tenure promotion around the country and around the world, and I think it would be pretty similar.

08:49:26 Q. Okay. So that's right. So you -- I think they sometimes call them external letters --

08:49:32 A. Yes.

08:49:33 Q. And so, you are asked to review candidates in your field and write external letters and evaluate whether or not they meet the standards for tenure?

08:49:41 A. Correct.

08:49:42 Q. Okay. And you and Dr. Nikolova are -- I guess you call yourselves friends? Professional friends?

A. Yes. Uh-huh. Yes.
Q. You knew Dr. Nikolova obviously before she had tenure -- or before she was denied tenure at U.T. Can you describe just what she was like, what's her -- just describe what she's like in terms of her enthusiasm, her attitude, who she is as a person.
A. Yeah. So to me, it seemed like before this event happened, she was a very kind of positive person, had a lot of enthusiasm for what she was doing, very kind of, you know, positive outlook on where things were going, and then afterwards, I mean, I felt like this is based on seeing her a couple of times and kind of quite a number of phone calls that she just seemed like very, very depressed, like it really kind of shook her sense of self-worth and just seemed to be like really, really unhappy and depressed. Yeah.
Q. I don't have any further questions. Thank you.
A. Okay.

CROSS-EXAMINATION

BY MS. HILTON:
Q. Good morning, Dr. Welch.
A. Good morning.
Q. Good morning. You never worked at U.T.; is that right?
A. I have never worked at U.T. That's correct.

Q. Okay.

A. Let me back that up. I was a student worker when I was undergraduate there, but I'd never worked in a professional capacity.

Q. You've never been a professor there.

A. Correct.

Q. Okay. You've never been part of their tenure view process?

A. No, I have not.

Q. And you're not responsible for assessing her teaching research and service at U.T. with respect to U.T. granting tenure?

A. That's correct.

Q. Okay. And you're friends with Dr. Nikolova, right?

A. Yes. Uh-huh.

Q. And after she was denied early tenure, you tried to help her get a position at A & M; is that right?

A. Yeah. She said she was kind of interested and so, I was -- I brought that to the attention of the search committee.

Q. Okay. And you wanted to get her a position that would be tenure on arrival, correct?

A. Uh-huh. Yes.

Q. And that would mean that Dr. Nikolova wouldn't have to go through the tenure process, correct?

A. Well, it was some kind of a -- kind of an expedited tenure process. The problem was, at that time, it was being changed by our provost, and so, it was kind of a little bit of a moving target is what was going on. But initially the idea would be that --

Q. Thank you, Dr. Welch. You've answered my question. Thank you. I appreciate it. We're just on a time crunch, so I appreciate it. Thank you.

And when you were corresponding with Dr. Nikolova about this potential position at A & M, Dr. Nikolova told you that she was not in a huge rush to get tenure, correct?

A. Honestly, I don't actually recall one way or the other about that. I'm sorry.

Q. Your Honor, may I approach the witness?

THE COURT: You may.

MR. SCHMIDT: Your Honor, may we approach?

THE COURT: Yes.

(At the bench, on the record.)

MS. HILTON: This is produced by plaintiff.

MR. SCHMIDT: It's not sworn to, correct?

MS. HILTON: Correct.

MR. SCHMIDT: And so, what's your intention?

MS. HILTON: I'm just going to move it into evidence. I'm not impeaching her with it. I'm just going

to lay the foundation.

MR. SCHMIDT: Okay.

MS. HILTON: Yeah.

Q. (BY MS. HILTON) Thank you for your patience, Dr. Welch.

A. Yeah. No problem.

Q. I'm going to hand you this and ask you a couple of questions about it. Dr. Welch, do you recognize the document I put in front of you as an e-mail chain between you and Dr. Nikolova?

A. Yeah. I mean, I have to admit, I didn't memorize everything I wrote here, but I'm sure I did.

Q. Is that your e-mail address Welch@cse.tamu.edu?

A. Yes.

Q. It's dated June 27, 2019?

A. Yes.

Q. Your Honor, at this time, I You would move to admit -- I think this will be Defendant's Exhibit 65.

THE COURT: Any objection?

MR. SCHMIDT: Your Honor, this was not offered up as an exhibit. It's never been provided to us until -- I mean, it's a document that we produced, but it's never been offered as an exhibit.

THE COURT: Okay.

MR. SCHMIDT: And I don't think at this point,

08:55:56 it's considered rebuttal evidence because I don't know
08:55:58 that there's anything to be rebutted.
08:56:03 THE COURT: Okay. I'll admit the Exhibit 66.
08:56:06 MS. HILTON: And, your Honor, I apologize. It
08:56:07 should be Defendant's 66.
08:56:52 Q. (BY MS. HILTON) Okay. Dr. Welch, so I'm looking at
08:56:59 this e-mail in the middle of the page that ends in 4356.
08:57:03 A. Uh-huh.
08:57:04 Q. And it's an e-mail from Dr. Nikolova that says, if
08:57:08 you look in the second line, while I'm not in a huge rush
08:57:11 and can wait for a year or so on a tenure decision, do you
08:57:14 see that?
08:57:14 A. Yes, I do.
08:57:15 Q. I read that correctly?
08:57:23 A. Yes. Uh-huh.
08:57:24 Q. Thank you. And so, did Dr. Nikolova, did she follow
08:57:32 through with this?
08:57:34 A. I'm sorry. I don't understand. What do you mean did
08:57:37 she follow through with it?
08:57:38 Q. Did you follow through? Did she ever apply for a
08:57:41 position at A & M?
08:57:42 A. Yes, she did.
08:57:43 Q. She did.
08:57:44 A. Uh-huh. Yes.
08:57:46 Q. And did she tell you at U.T. that she was able to go

up again at U.T.?

A. Yes.

Q. Okay. No further questions, your Honor.

MR. SCHMIDT: Actually, I have no further questions.

THE COURT: Okay. Thank you. You may step down and you're free to go. Your next witness.

MR. SCHMIDT: Yes, your Honor. We call to the stand the plaintiff in this case, Dr. Evdokia Nikolova.

THE COURT: Raise your right hand to be sworn.

THE CLERK: You do solemnly swear or affirm that the testimony which you may give in the case now before the Court shall be the truth, the whole truth, and nothing but the truth?

THE WITNESS: Yes, I do.

THE COURT: You're free to remove your mask during your testimony.

EVDOKIA NIKOLOVA, called by the Plaintiff, duly sworn.

DIRECT EXAMINATION

BY MR. SCHMIDT:

Q. Hello, Dr. Nikolova. Could you introduce yourself to the jury?

A. Yes. My name is Evdokia Nikolova.

Q. And, Dr. Nikolova, can you tell the jury a little bit about your background?

08:59:31 A. Sure. I'm originally from Bulgaria. I grew up there. I moved out of the country when I was 17 to study abroad. I studied for two years in Canada, then came to the U.S. for my college degree, and I stayed here ever since.

08:59:46 Q. You were here during my opening. What was your life like in Bulgaria? I don't want to spend a lot of time on this, but what was your life like in Bulgaria?

08:59:58 A. Sure. I was born in '79, so that was under communist -- Bulgaria communism fell apart in '89 when I was 10 years old. So I grew up in communism essentially in an apartment building. It was kind of concrete like projects in the U.S. would be a small two-room apartment with my family of five. We lived my dad, my mom, my brother, myself and my grandmother. We all lived in kind of those two rooms.

09:00:21 Q. Okay. And what were your interests as a young child?

09:00:29 A. I was a shy child and I -- early on, I figured out I loved math, and later on, I figured out I love dancing. Those were sort of the two passions.

09:00:40 Q. Okay. Did you have any interest in -- you're talking about dancing, but why don't we go to the math first. In math, how did you spend your time -- how did that -- trying to figure out how to ask you this question. How did you express your interest in math?

A. Sure. So I think since grade four, which is when I was about ten years old, I started doing extra preparation. I was told there are these math competitions and there will be a neat thing to attend and I believed math. And so, I started attending sort of like an extra curricular activity outside of school, extra sort of a math club. So I spent essentially every Saturday morning from, I don't know, 8:00 or 9:00 in the morning until 12:00 or 1:00 solving kind of hard math problems that are, you know, to prepare us for those math competitions.

Q. Okay. And then, outside of work -- I mean, outside of school, personal interests, you mentioned dancing. Did you have any other personal interests or things that were interesting to you?

A. Sure. I mean, I loved American music and -- at that time, I didn't speak English, so I would kind of sing along with made-up words. I love Dolly Parton. I discovered her, I think, around the time I was about, I don't know, nine or 10 years old, and I thought -- I was just so mesmerized with her that I bought every cassette tape that I could find of her and other country singers.

Q. And books, did you read books?

A. Sure. Yeah. I was a shy child, but my escapes, I used to love reading books and I used to love reading about the wild west and Native Americans.

Q. You said Louis L'Amour?
A. I recently discovered Louis L'Amour. As a child, I read another author.
Q. Okay. So I want to take you to today or to at least present day. Actually, let me just go through this. So after you-- you're in Bulgaria. How do you get ultimately to the United States and to where we are today?
A. So it was hard. One thing is that Bulgaria is quite a bit poorer than the United States, so people don't generally have money to just move abroad. And so, one source of -- one avenue is getting scholarships. So I applied when I was, I think, 16 years old, I applied -- I learned of and I applied for a scholarship to study abroad, which was to study in Canada for two years. And there was a nationwide competition. They were giving out five scholarships for the entire country. And I was very fortunate, I came in No. 3, I think, at that time. So I got one of those five scholarships and I went to study Canada.
Q. And then, from Canada?
A. From Canada I applied -- so Canada was essentially like the last two years of high school. And so, in my second year in Canada, I started applying for -- I knew that I would apply for colleges in the United States. I applied -- I happened to only apply to Harvard at that

09:03:44 time because at that time, they were starting the system of early admissions for college, and for early admissions, you could only pick one school to apply to. So I chose Harvard and I was very fortunate that I got in under early admission. So I didn't even have to apply to other colleges afterwards.

09:04:00 Q. And while you were at school, could you pay for school with your family and just, you know.

09:04:08 A. I never could have dreamed of paying for school. I didn't even -- to me, like tuition at that time, I think, was tuition and board -- room and board was 41,000 per year. To me, that was just a number that I couldn't even relate because it was just so big. It was like a science fiction.

09:04:25 Q. So how did you go to Harvard then?

09:04:28 A. So again, a very fortunate thing about Harvard at the time. I know many colleges paid attention to the students' financial situation. And so if you had money to pay, you were more likely to get in, but Harvard said we are not going to do that. We are not going to look at people's financial situation. We'll just admit blind.

09:04:47 And after our admissions, we would just work with every admitted student to ensure that they can attend. And so, I had to submit a financial declaration for my family's financial status. We had to write down how much

09:04:59 their salaries are and so on. And then, Harvard reviewed that. There was a field which said -- I remember that because we struggled with it and it said how much can your family afford to continue to your tuition at Harvard? And we felt very embarrassed about it because I think salaries at that time for my parents were about, I don't know, two or $300 per month maybe, and it was a struggle to just put any -- I mean, it was a struggle to put any amount more than zero. But we felt that it would be a very embarrassing to just put zero.

09:05:30 And so, we put $200 per year and Harvard came back, having reviewed the application, and said we've determined that you know, your family contribution will be zero. That point, I felt like I hit the jackpot because I wouldn't incur these additional financial burden on my family.

09:05:46 Q. Okay. That's fantastic. So you got loans and scholarships; is that correct?

09:05:50 A. Yes. They provided a combination of loans and scholarships to cover my tuition.

09:05:55 Q. And I'm just going to move us a little fast because I want to get to some stuff. So you went from there to where?

09:06:00 A. So from Harvard, I applied to graduate school. I applied to applied to multiple schools around the country.

09:06:06 Q. At Harvard, did you get just your bachelor's degree or what did you do?

09:06:10 A. I got two degrees for the four years I was there. So the scholarships and loans that I got covered four years, but I was lucky to get some extra credits, and they said, well, you can either graduate in three years or you can get an additional master's degree in four years. And so I chose that option. So I graduated in four years with both a bachelor's degree and master's degree.

09:06:34 Q. And I'm going to -- while you were at Harvard, how hard did you work?

09:06:41 A. Probably the hardest in my life. I took really so a lot of math classes and science classes that were -- and economics, as well, which had weekly assignments. And so, the normal course load would be four courses per semester. At times, I took five because I felt like I needed to sort of -- to succeed, I need to go even, you know, the extra mile. And in the times when I took five courses, I basically had an assignment due every day of the week on average, and I felt like I cannot even afford to go to a party on a Friday night, two hours. I have to think really hard whether I can afford to take those two hours extra out of my study time because I just felt that I didn't have enough time to just go and finish all these assignments.

09:07:29 And I remember one of those semesters where I had a math assignment due for abstract Algebra course every Friday morning at 9:00 a.m., and I just didn't have any time to study before Thursday night just because I had all these other previous assignments due before that time. So I would start it sometime in the evening and pull an all-nighter pretty much the entire semester. And if I slept one or two hours at night, I considered it lucky.

09:07:57 Q. Okay. And then, from there, you went to where? What school?

09:08:01 A. From there, I got -- well, I got admitted into multiple Ph.D. programs. I chose to attend the one at MIT, but then, I was able to defer it for one year because at Harvard, also at the same time I had been applying for a scholarships and I was -- I received a scholarship to go and study for one year at Cambridge University in England. And so, I did that first and then, came back to continue with my Ph.D. program at MIT.

09:08:28 Q. Okay. And then, from -- you graduated with your Ph.D. from MIT?

09:08:33 A. That's correct.

09:08:33 Q. And you mentioned -- throughout this whole trial, they've been talking about theoretical computer engineering. What is theoretical computer engineering?

09:08:44 A. Theoretical computer science. It's theoretical

computer science. It's basically the most mathematical branch of computer science. It's sort of like studying the math behind the computer, the math that's necessary to make the computer to work.

Q. And do you have any examples of how that applies to real life?

A. I mean, sure. So in theoretical computer science, there are also multiple areas, and the area that I work on is algorithms and algorithms are pervasive, you know, in many everyday life situations. So, for example, if you have a -- you know, a new phone, you pull up your phone, a GPS map and you want to go from A to B, and you want to find the best route, this is an example of an algorithm computing the best route for you. So you need an algorithm in order to write a computer program that will solve this problem.

Q. Okay. It's fascinating to me. I was a liberal arts major, so I don't understand much about math. I'm going to move on.

You worked at Texas A & M; is that right?

A. That's right.

Q. And then, you came to the University of Texas, correct?

A. That's right.

Q. And when you were applying at the University of

Texas, did you speak with Dr. Tewfik -- first of all, were you recruited to come to apply at University of Texas?

A. Yes, I was.

Q. And by -- do you remember by who?

A. Yes. By Professor Constantine Caramanis.

Q. All right. While you were interviewing at University of Texas, did you have any discussions with the chair of the ECE department about how your time at Texas A&M would count?

A. Yes, I did. He told me that regardless of prior faculty experience with another institution, it's U.T.'s normal process to offer everyone a five-year contract. When I say -- so when I say five year, I mean after five years, you will be evaluated for tenure. I don't know whether the actual number counting is like seven maybe.

But he implied that they give this tenure offer which sort of resets the tenure clock, the time that you need to do in order to go up for tenure. But it was also -- so it was just standard to receive that kind of offer because they give it to everybody. But that just simply offers flexibility to the candidate because they can still go up on their normal timeline that begin at their prior university, and this longer sort of runaway just gives more flexible in case.

Q. Did he say that the time at Texas A & M University

would be counted towards -- would be considered counted when you went up for tenure?

A. Yes, definitely so.

Q. Did he talk at all about a higher bar?

A. No. I never heard him mention anything about a higher bar.

Q. So you began at U.T. I'd like to -- and you worked at U.T. and we know obviously a lot of about what happened. I want to -- yesterday, when the dean was testifying, ultimately, I think she mentioned something about that you went up technically early. Actually she said you didn't go up technically early. How many years had you worked at U.T. or worked as a professor total at the time that you went up for tenure at U.T.?

A. Yeah. I remember that really well because I had done two-and-a-half years at Texas A & M, and the standard is to do five years before you're considered for tenure. So when I came to U.T. Austin, my expectation had been that I would do about two-and-a-half years at U.T. Austin before I'm considered for tenure.

But then, I started receiving mixed messages about going up. Somebody said to me, oh, actually, if you go up now, you will be considered early and early candidates are subject to a higher bar. And I became very confused and I didn't want to go through that higher bar.

I just wanted to be considered under a normal bar. And so, I thought okay, I would wait. And then, others started telling me, well, but it's also really important for you to graduate a Ph.D. student. And so, I thought okay, maybe I should wait further.

So after four and a half years at U.T., which is two years after I had expected to be going up for tenure, after four and a half years, I had that graduated Ph.D. student, and I felt okay, now I have everything in the package that's necessary. And so, I went up for tenure after four and a half years at U.T., which is almost five, almost at their normal sort of timeline that they give candidates.

So in total, I had been four and a half years at U.T., two and a half years at Texas A & M, so that's seven years having been assistant professor, so I went up.

Q. Can you pull up Plaintiff's Exhibit 1. So this is the dean's letter and on the very first page, she spells out how many years you've been working as an assistant professor, and if you count that out, that's seven years, correct?

A. That's right.

Q. Okay. Now, I don't want to spend tons of time, but I want to kind of get to some of the key points here. But in 2015, you were -- you ended up going to what's

something called the Simons Institute?

A. The Simons Institute For Theoretical Science. It's called the Simons Institute For Theoretical Computer Science. It's an institute. It's on the UC Berkeley campus in Berkeley, California whose purpose is to promote research in theoretical computer science and related fields, collaboration and then, the public visibility of such research.

Q. Is it a big deal to go to the Simons?

A. It is a big deal. The director of the Simons Institute is a Turing Award winner Professor Karp at the time. We spoke yesterday that the Turing Award is the equivalent of the Nobel Prize for computer science. So there's only -- I don't know. I may be wrong now but only 20 or so, maybe a little more people. Very few people in the world that have this honor. And he was specifically put as a director in order to interact the most elite, the world class researchers in the field. He was succeeded afterwards by a woman Shafi Goldwasser, who also was a Turing Award winner as a director.

Q. Okay. I think you -- weren't you the only non-tenured professor that got to or be an organizer?

A. So I went twice in 2015 and in 2018. In 2019, I went -- in 2015, I went as an invited researcher. In 2018, I went as a core organizer, which is sort of the higher

09:16:03 status because as a core organizer, I was able to invite researchers myself to come to the program.

09:16:09 Q. And just very quickly in the dean's letter, I believe it's on page 2, the dean talks about that you went to the Simons Institute in fall of 2015. And then, she talks about that in the spring of 2016, you took MID, modified instructional duty.

09:16:32 Can you just tell us very briefly what is modified instructional duty.

09:16:36 A. My understanding it is the policy to get teaching relief so to not teach for one semester for the purpose of giving birth to a child and it's not -- it's not a leave but you're basically -- you write a document of what work you will do in lieu of you not teaching that semester.

09:16:57 Q. Are you still doing other aspects of your job, research?

09:17:00 A. Yes.

09:17:01 Q. So you don't get -- it's not a free semester off. You have to work?

09:17:05 A. Correct.

09:17:06 Q. But you just don't have to teach?

09:17:07 A. Correct.

09:17:07 Q. And you were having your baby ultimately. Had your baby in March of 2016, right?

09:17:12 A. Correct.

09:17:13 Q. That would have been right in middle of the semester?
09:17:15 A. Correct.
09:17:15 Q. Okay. And so, did you have any arrangements before 09:17:20 you went -- you know, before you had your baby, what were 09:17:22 you going to do in March of 2016 in terms of teaching?
09:17:26 A. So I had requested an unbalanced teaching load. 09:17:30 Typically we teach one course per semester, which is 09:17:32 usually one undergraduate course one semester and one 09:17:36 graduate course the next semester in the academic year. 09:17:39 But frequently, before my time and less frequently after 09:17:45 but people would request an unbalanced teaching load, 09:17:47 which is to shift the teaching to just one of the 09:17:50 semesters. So instead of one one, it becomes two zero. 09:17:53 So I had requested to teach both of my classes in the 09:17:57 spring semester to enable me to attend the program in the 09:18:00 Simons Institute at Berkeley, which is a semester-long 09:18:04 program.
09:18:04 Q. When you found out then that you were pregnant, did 09:18:07 you then right and MID for that spring semester, did you 09:18:11 intend to somehow get out of teaching two courses with the 09:18:15 MID?
09:18:16 A. Not at all. So I was really embarrassed about it. 09:18:20 Well, first of all, I found out that I was pregnant, it 09:18:23 was an unplanned pregnancy. I found out I was pregnant, I 09:18:27 think, around July or August of 2015, and at that time, I

even questioned whether I should be going to the Simons Institute because I didn't -- I'd been told just the year before, I'd gone to a fertility doctor, and she told me it would be very unlikely for me to become pregnant. And so, it made me very sad and I felt well that's life, and I just have to carry on.

And so, when I found out that I was pregnant, I was ecstatic and I didn't want to take any chances of a miscarrying, and I didn't know anything about it, so I didn't know whether a plane trip may somehow detriment the baby. I spoke to a friend of mine, should I cancel this huge honor Simons Institute, he said no, no. I think you'll be fine. And so, I went and subsequently I told my chair -- I waited for the three-month mark to tell my chair because I know there's a high chance of miscarriage in the first three months. The three-month mark where I felt the risk had become lower, I had the call with my chair and I said listen, you know, I am pregnant so I will not be able to teach and I felt really embarrassed about it because I realized instead of the one course teaching relief, now I will not be able to teach both classes that I was scheduled to teach that spring and I offered him to kind of make up for it the following semester when I will be able to teach.

Q. To teach another course?

09:19:45 A. To teach an additional course that following semester, instead of one, I will teach two. And he kindly didn't, you know, give me that extra teaching assignment.

09:19:55 Q. Okay. And so, when the dean says here that you anticipated an assignment, you were scheduled to teach two classes, however, she became pregnant in the fall of 2016 and assigned modified instructional duties. Was there any intent to get out of teaching two classes?

09:20:15 A. Absolutely not. As I said, I felt really embarrassed about it.

09:20:20 Q. Okay. In spring of 2016, you had your first child, correct?

09:20:28 A. Correct.

09:20:29 Q. What's his name?

09:20:30 A. Julian, a boy.

09:20:31 Q. Okay. Did you continue working after you had Julian?

09:20:35 A. Yes, I did.

09:20:36 Q. Can you talk a little bit about what it was like working as a tenured professor and having a newborn child?

09:20:46 A. I just want to be really official. I think this is something -- I kind of envy -- honestly, I envied mothers before I had a baby myself because I had heard that mothers become really, really efficient at their jobs and I really wanted to become more efficient. You know, everyone talks about work smart and I felt I really wished

to be more efficient, and I basically I kind of -- a baby, you have no other choice because you have too many things to do as a mother. You kind of learn how to multitask how to do things really efficiently.

So I sort of became extremely efficient afterwards and I just continued -- you know, some people say work hard, play hard. For me, it was work hard, family hard. You know, work as intensively and productively as I could during the hours that I was away that we had childcare so that I could then focus on my baby when I was at home.

In fact, I actually had at some point in the beginning we had a baby-sitter and I would tell her to, you know, come to my office to bring the baby when I had to nurse the baby. So I was in my office and you know, I specifically -- at that, point, my office was very basic. Just basically a chair and a desk and at that point I brought a sofa because I felt that it will, you know, be easier for nursing the baby that way.

Q. What about is it part of your job doing conferences, going around the world, I mean, how did you deal with travel and with Julian, having Julian?

A. Yes. So in the spring -- sorry, the fall of 2015, the first time I had gone to such a long program at Simons Institute, I was hugely thrilled that the director of the

09:22:27 institute, the Turing Award winner Professor carp invited me to be on the organizing team for spring 2018, three years from that time, the next research program. And he said, well, we also are going to have an organizing workshop where the organizers kind of meet and get together, invite other speakers to sort of hash out and plan for how that semester is going to go in 2018.

And he wanted that meeting to take place, that workshop to take place in 2016 and I felt a little awkward at that point, and I said, well, you know, I just have to tell you, I'm pregnant and I'll be giving birth in March of 2016. So I'm afraid I wouldn't be able to travel immediately after. I think I heard that maybe you have to wait for three months before you put the baby on the flight so as not to somehow detriment the baby. And I -- just given that, I said I think the earliest I will be able to travel will be around the June timeframe. And he was very kind to sort of make the schedule -- to schedule that workshop in order to comply with my wish to be able to come with my baby for the workshop.

Q. Okay. And we don't have time to go into all of this, but did you continue then to work with Julian and go to conferences? Talk about that just very quickly.

A. Yes. Julian had been -- we were joking with my husband. Until the time Julian was two years old, he had

been on 30 flights because we just took him everywhere. I took him and, you know, whenever my husband could come, you know, he would come really with my family, with us. And so if Jimmy, my husband, couldn't come, my father would come with me to help take care of the baby while I was attending the professional meetings, giving a lecture myself.

Q. So you took him on 30 -- joking, you know, 30-ish flights around the country, I think you believed?

A. Around the world, I took him to Chile when he was seven months old because I had a collaboration with somebody at University of Chile.

Q. And so you worked hard. I don't want to say this -- did you work hard and still take care of Julian and incorporate him into your life?

A. Absolutely, yes.

Q. Okay. I'd like to pull up -- after you had Julian after you had your first baby, one of the contentions here in this lawsuit is from the dean is that your productivity declined. And so, I'd like to have us look at your CV. Exhibit 10. And okay. If you can go to the next page. I'm just going to go through this very quickly here and service. This shows your service that you did, correct?

A. Correct.

Q. And it shows it's reverse chronological order. Start

at bottom but it shows in 2014, you were on the admissions committee, correct?
A. Correct.
Q. But then after you had Julian, your service was actually quite a lot higher?
A. Yeah. That's correct.
Q. You are in the junior faculty hiring committee?
A. Yes.
Q. Three times?
A. Yeah.
Q. And is that an easy thing to do?
A. This is probably one of the most intensive committees.
Q. Okay. Let's move on to your journals or next page. Okay. So publications. What is your understanding about the importance of publications at a college like U.T.?
A. My understanding was always that the publications and the quality of the research are the top criterion for being awarded tenure or promotion. So I worked really, really hard to have strong research to publishing the best possible journals and conference venues.
MS. HILTON: I'm sorry to interrupt, but your Honor, this is not in the native document, these annotations.
MR. SCHMIDT: These are our markings on this

09:26:33 document and we're using as demonstrative. It is Exhibit
09:26:37 10 and it is only being used as a demonstrative.
09:26:42 MS. HILTON: Okay. So this is not -- you're not
09:26:44 admitting this as new exhibit.
09:26:46 MR. SCHMIDT: No. It's just simply
09:26:53 demonstrative.
09:26:55 Q. (BY MR. SCHMIDT) If you look at these documents,
09:26:58 that's something that we wrote on it to help kind of make
09:27:00 this make sense to people. So if you look on this is page
09:27:06 3 of your dossier and/or your CV rather. And before you
09:27:17 had Julian, it's kind of cut off, but you had how many
09:27:22 publications?
09:27:23 A. Before Julian, so you are here in the journal
09:27:27 publications.
09:27:27 Q. Oh, journal publications?
09:27:29 A. There are two sections, general and conference and in
09:27:31 my field, the conference publications are the primary
09:27:33 vehicle for disseminating information. They are
09:27:36 conferences that are really prestigious and incredibly
09:27:40 competitive to get into. So if you want to scroll down,
09:27:43 it will be more, you know, sort of obvious with conference
09:27:48 proceedings.
09:27:49 MS. HILTON: Mr. Schmidt, your Honor, I think for
09:27:52 this to be a proper demonstrative, this information has to
09:27:54 be testified to by the witness herself, and then, the

09:27:57 attorney can make whatever annotations Mr. Schmidt would like to make. But I think U.T. Austin's going to have to object to this because this hasn't been testified to by Dr. Nikolova.

09:28:05 THE COURT: Do you have that exhibit in its native form?

09:28:09 MR. SCHMIDT: Yes.

09:28:09 THE COURT: Do you mind questioning off of that?

09:28:12 MR. SCHMIDT: Yes. That's fine.

09:28:22 Q. (BY MR. SCHMIDT) Okay. So if you can enlarge that a bit on the publications. So if you start at -- on your publications and the journals, how many journal publications did you have after you had Julian?

09:28:38 A. These are -- so I had Julian in 2016 March, so you will see that J2 was from 2014. So I had one journal publication before Julian was born and I had two journal publications after Julian was born.

09:28:55 Q. Let's go up to conferences. You just said conferences?

09:28:58 A. Correct.

09:28:58 Q. Are an important part of?

09:29:00 A. The primary part.

09:29:02 Q. Okay. And so, let's look at your conference publications before you had Julian. Go ahead and -- so you started actually at --

09:29:14 A. So I just want to walk you and the jury through there. The conferences are divided into three main time periods. The time period before I became a professor and then, the time period after I became a professor. The time period after I became a professor was divided further into two. Before coming to U.T. So my time period at Texas A & M and then, the time period after coming to U.T.

So if you want to scroll down, you will see further at the bottom of the page, you'll see in rank meaning in rank as assistant professor at Texas A & M and so, we started C13. This is where I guess the counting will be.

Q. Okay.

A. We could do -- I mean, there is -- inevitably, there are variations in the publication count from year to year, so we can take an average per year. I didn't do the math for, you know, before becoming an assistant professor, but actually, I guess we can do it right now on the spot if you want to.

Q. No, no. Let's go to when you were ranked at U.T.

A. So in rank at U.T., so the way that -- there are multiple ways to count them. We can count them by academic year or sometimes people list them by calendar year. Let's say, by academic year so you will have to bear in mind at U.T., I started in January of 2014. So

09:30:44 that was in the middle of the '13-'14 academic year. So '13-'14 academic year, I believe I had only that one general publication I mentioned earlier before Julian was born. So I had one paper for that academic year and then in '14-'15, I had C-19 and C-20. So two papers in the '14-'15 academic year. And then, in the '15-'16 academic year, it was C-21, C-22 and C-23.

So you need o look at the end of this publication which gives you the date and the dates are -- you know, the academic year is considered to be from September 1st of the first year to August 31st of the following year. So this is sort of the academic year counting because you count the full 12 months.

And so, that was, I think, one and then two and three. So let's say you can say two on average two per year on average before I had Julian. So if you want to scroll to the next page, I think we have counted up to C-23. So now C-24, if you go up the top, C-24, this now belongs to the '17-'18 academic year. And if you go all the way down, you will see, I believe, that C-24 through C-30, I believe these are seven conference papers that all appeared in the '17-'18 academic year.

So if you notice, there was one year that sort of disappeared there because there was a delay. From the time you submit the paper to the time it appears in the

09:32:30 conference proceedings, there's, you know, a six-month delay, sometimes, you know, maybe one year delay if it bounces off of a few different conferences. Sometimes the paper is -- well, more often than not the paper is rejected and then, you have to resubmit to another conference.

09:32:46 Anyway, there was a slight delay after Julian was born so there's a time lag after Julian is born to, you know, the publications. But basically work was happening and then, the publications appeared. They just all happened to appear in the '17-'18 academic year. But if you take those seven papers and let's say you divide by two years after Julian was born, you know, four --

09:33:07 Q. So after Julian was born, how many papers did you have published?

09:33:12 A. After Julian was born, I believe it's seven conference papers and nine -- sorry, seven conference papers and two general papers so there was nine. And so, for over two year period so that's roughly four, four and a half per year.

09:33:29 Q. So is that an increase in your publication record after Julian was born?

09:33:32 A. It was definitely an increase in my publication. If you remember from the two average per year to four, four and a half per year is definitely an increase.

09:33:40 Q. Okay. And then, on grants. One of the issues is that your grant funding wasn't as good. I'd like to pull up Exhibit 78. Plaintiff's Exhibit 78. Do you recall receiving a grant -- or when did you receive a grant in -- after Julian was born?

09:34:10 A. I received the grant in -- I'm reading off of the date here, it's 2017. So I must have worked on the grant application in 2016, right after Julian was born.

09:34:24 Q. So you sent an e-mail to object Ahmed Tewfik on June 23, 2017 saying that you -- preliminary good news from the NSF. It's not final yet, but this was a grant that you had applied for and you were getting -- you also ended up getting it, correct?

09:34:43 A. Correct.

09:34:44 Q. And it's from the National Science Foundation?

09:34:46 A. Correct.

09:34:46 Q. Is that a prestigious thing to get grants from the National Science Foundation?

09:34:50 A. Yes. It's the -- yeah, I would say among the most prestigious, yes.

09:34:55 Q. Okay this is one year before you're going up for tenure and how much approximately was that grant?

09:35:00 A. About $480,000.

09:35:02 Q. Okay. So the one year before you're going up for tenure, you're getting a grant of close to $500,000?

09:35:08 A. Correct. Actually, the total grant was $800,000, but then, we split it because I had a co -- I was the PI, the principal investigator, and I had a co-PI. So he had requested the 40 percent share of the grant and so I got -- my share was 480,000.

09:35:24 Q. And let's move on. Before you went up for tenure, were there any signs from the dean or anybody that you were -- shouldn't go up for tenure?

09:35:46 A. No. Nobody ever told me don't go up for tenure.

09:35:50 Q. And did you have -- do you understand your case was actually presented to the dean in the spring of 2016 -- I'm sorry, 2018, before you went up for tenure?

09:36:02 A. Yes.

09:36:03 Q. Explain to me how or explain to the jury how that happened.

09:36:07 A. Yes. My chair walked me through the process of the milestones of what happens when somebody's going up for tenure and there is going to be the prep work. So the behind the scenes that happens before you submit your official tenure dossier. So I submitted my official tenure dossier, all the documents in June prior to the academic year in which I was to be evaluated. But before June, the entire spring and I was even into the fall, there was preparatory work. I had to fill out the dean summary sheet. My chair asked me to prepare some other

09:36:41 document which we call the leadership document. He told
09:36:43 me that he's going to meet with the dean to informally
09:36:48 discuss my case.
09:36:50 Q. And let me ask you, so he does meet with the dean?
09:36:54 You prepare these documents and the documents that you
09:36:57 prepared have a good summary of your record at that point?
09:37:00 A. Correct. So they are --
09:37:01 Q. Let me just ask you. I want to try to target it to a
09:37:05 few specific things just to keep us moving. We just have
09:37:08 -- you know, I want to make sure we use efficiently on our
09:37:11 time. Sorry. There's a lot to say. I wish could let you
09:37:15 tell your story, you know, for a long time. We want to be
09:37:18 respectful of the jury's time.
09:37:19 When Dr. Tewfik met with the dean and is
09:37:27 presenting this to her, he presents to the dean your
09:37:31 record essentially, correct?
09:37:32 A. Correct.
09:37:33 Q. And that includes your publications, your teaching,
09:37:36 your funding, correct?
09:37:37 A. Correct.
09:37:38 Q. And what was the word that you got when Dr. Tewfik
09:37:43 came back and told you about what the dean's reaction was?
09:37:47 A. He told me that the dean was neutral.
09:37:50 Q. Okay.
09:37:51 A. And he told me that she had questioned some of my

research publications.

Q. What did he say was the issue about the publications?

A. I think the issue was, she was not familiar with the publication venues that I was publishing in and she questioned whether they are competitive or prestigious, something to that effect.

Q. And what did Dr. Tewfik say about that?

A. He, himself, was not familiar with my material, so he couldn't alleviate her concern at that time.

Q. Did he say that if we can explain to her that these are prestigious publications at prestigious conferences, that that should help?

A. Yes. Correct.

Q. Okay. And were they in prestigious conferences? I mean, are your publications, your conference publications, are they in prestigious areas?

A. Yes. I always aim for the most prestigious and the most competitive possible venues that have the highest visibility in my research areas.

Q. And was there any question at that point that you got back from the dean that the dean had questions about your grants?

A. No.

Q. Any questions at all about your teaching?

A. No.

09:39:03 Q. Okay. I want to move on. Actually, I might be going back a touch. As you're going up for tenure, there's something that we've learned comes into play called the probationary extension. You took a probationary extension back in the year that you had Julian; is that right?
09:39:25 A. That's right.
09:39:26 Q. And did you understand that -- you talked to Dr. Tewfik about that?
09:39:32 A. When I told Dr. Tewfik that I was pregnant with Julian, my first child, and he told me oh, there is this thing, the probationary extension and, you know, I strongly encourage you to take it, which means that the runaway gets extended by one year to when you need to -- you, know, it will be the final up or out year to submit your tenure documents.
09:39:54 And I was very surprised by that because arriving at U.T., I never expected to wait the full five years before I'm considered for tenure. So then why add another one to that and I said well, why. I shouldn't need that. I don't expect to wait until the end. And he said no, no, no. You should take it. You should take it. And he just strongly advocated for me to -- encouraged me to take it, and I just didn't question his reasoning. I felt he knows best as chair and there's just administrative procedures and I just said okay.

09:40:24 Q. Did he indicate that it could hurt you if you took
09:40:28 the probationary extension?
09:40:29 A. No. On the contrary. His reasoning was that it can
09:40:31 only help me but not hurt me.
09:40:33 Q. Okay. And so, there is a thing that has come -- this
09:40:40 goes along with probationary extension, something called a
09:40:42 recission of the probationary extension; is that right?
09:40:45 A. That's correct.
09:40:45 Q. And what was your understanding about if you wanted
09:40:48 to rescind it, what was your understanding about when you
09:40:51 had to do that?
09:40:53 A. So I honestly at the time, it was a blur. I didn't
09:40:57 really have a very clear understanding of the rescinding
09:40:59 process. I know that I did sign a document which was the
09:41:03 U.T. formal document where I officially accepted this
09:41:07 extension. And I saw language after the fact in the
09:41:12 process of this lawsuit that I had signed that there was
09:41:15 -- I can rescind up the until February 1st of the year
09:41:19 prior to going up for tenure. So I signed off on that.
09:41:22 Honestly, I hadn't really read it carefully at the time,
09:41:24 so I didn't really have a very clear understanding of it.
09:41:27 Q. Okay. But the understanding that you have now is
09:41:29 that you had to rescind it by February before the year
09:41:32 that you go up for tenure?
09:41:33 A. Correct.

09:41:34 Q. And I wanted to just have you pull up Exhibit 43, Plaintiff's Exhibit 43 and page 4. Did you understand another colleague of yours that was going up for tenure at the same time had also taken a probationary extension and it's Dr. Tiwari?
09:41:52 A. I honestly didn't keep track of what other people did.
09:41:54 Q. But you know now that Dr. Tiwari also did?
09:41:57 A. I now know that he did.
09:41:58 Q. Okay. And by the way, Dr. Tiwari, did he start the same year as you?
09:42:02 A. He started one semester before me. So I joined in January 2014, he joined in September of 2013.
09:42:09 Q. Okay. So one semester before. And you had two years more experience than Dr. Tiwari?
09:42:13 A. Correct.
09:42:14 Q. I don't want to spend much time on this at all, but if you go to page 4, at the bottom of the page, it says -- this is Dr. Tiwari's paperwork similar to what you said, it says that he's supposed to rescind no later than February 1sst, prior to the fall promotion review, correct?
09:42:38 A. Correct.
09:42:38 Q. And that's what you understood, you know, as we look at this now?

09:42:41 A. Correct.

09:42:42 Q. Okay. So if you can go to page 7 on this document, 09:43:04 there is an e-mail that starts from Sonya Shaffer to Dr. 09:43:08 Tewfik and says that Tiwari had a pregnancy -- sorry, a 09:43:13 probationary extension and his case will be considered 09:43:17 early unless he revokes the extension and date on this is 09:43:21 May 21, correct?

09:43:24 A. Correct.

09:43:25 Q. And that's after the February deadline, right?

09:43:27 A. Correct.

09:43:27 Q. And then, Tewfik says that he -- that it had to be 09:43:44 done in February. Do you see that?

09:43:46 A. Correct.

09:43:48 Q. And then -- basically then, the next e-mail says yes, 09:43:59 absolutely. He asked if it can be still rescinded and 09:44:05 someone at the dean's office commented and said -- I'm 09:44:08 sorry, Carmen is at the provost office, but this is being 09:44:12 conferred to Dr. Tewfik by the dean's office. It says 09:44:16 yes, he can rescind the extension, and if you scroll up, 09:44:25 Dr. Tiwari -- Dr. Tewfik then sends to Mohit, which is Dr. 09:44:31 Tiwari, saying would you submit -- send me an e-mail 09:44:36 indicating desire to rescind your probationary extension. 09:44:39 This will allow us to submit your package on time as 09:44:43 opposed to early. Do you see that?

09:44:45 A. Correct.

Q. Go up one more. Somewhere in here, I think it's at very last page, but somewhere he does rescind his pregnancy extension. Is that what this document shows you?
A. Yes.
Q. And this is in May after the deadline, correct?
A. It's dated July 5. That's way into the -- yeah. That's after -- yeah. That's after the sort of tenure process started.
Q. Right. And nobody presented that to you, did they?
A. No.
Q. And Dr. Tewfik, Chair Tewfik, he knew that you also had taken a probationary extension, correct?
A. Correct.
Q. And the dean's office knew that you'd also taken a probationary extension, correct?
A. Correct.
Q. But nobody advised you to rescind it, correct?
A. Correct.
Q. And nobody let you rescind it after the deadline.
A. Correct. If I may, I noticed something in the document. Is it possible to scroll down to the bottom where Ahmed tells Mohit for the first time to -- so at the top, if you can zoom into the top where hi Sonya, okay. Ahmed writes this to Sonya. He said if he can revoke the

extension, he will do so, otherwise like in other cases, we had in previous years, this will be a technically early case. So to me, that indicates that Ahmed didn't think much of this rescinding or not rescinding, so he felt it was just a technicality.

Q. And so, he didn't -- yeah. Exactly. So having the probationary extension, it's nice to rescind it if they tell you to rescind it, but it wasn't going to be something that should change the way they review your file; is that correct?

A. No. Correct.

Q. Okay. I want to move on. So during your tenure process, you have your second child Alizta?

A. Correct.

Q. And around that time, I anticipate the Defendants U.T. are going to raise some issues about after you'd had your child, did you have any conflicts, I guess, with Dr. Tewfik about after you had your child?

A. We had -- yeah, we had a minor back and forth. So basically I worked really hard to submit all my tenure documents and it came before the official deadlines later in the summer because I knew that Alitza, my second child, was due June 30. She was actually born two and a half weeks early on June 13 and I really hurried -- I worked really hard to get all my paperwork, all the documents

09:47:23 necessary for the tenure and promotion process before she was born. And so I did that. I asked multiple times whether my documents were complete or if anything else was needed. And so, I kind of went in to give birth with a peace of mind that I was done on my end with the process.

And at some point, Ahmed, August 2nd, there was an e-mail he sent me where, you know, he criticized me for not taking e-mail because some corrections had been requested from me and I wasn't on top of e-mail, or after Alizta was born. And so, after that e-mail, then I just became on top. I realized that, you know, some corrections may be needed on my end and I need to monitor my e-mail more closely. So I became on top of it after that e-mail.

Q. Was there also some criticism of you having Jimmy, your husband, your fiance at the time, and your students helping you on your dossier?

A. Yes. Correct.

Q. And had they been helping you on anything substantive on your dossier?

A. No. They couldn't have because I knew the substance. I knew the contents. I had my students, my Ph.D. students help me with some minor technical formatting like changing page, margins and so long to fit, you know, four pages and three lines into four pages on the Microsoft Word

documents. It was just technical issues.
Q. Did you know that there was any prohibition on that?
A. No.
Q. Okay. After that, Dr. Tewfik submits his chair's letter. I think you saw that and -- correct?
A. Correct.
Q. Did that chair's letter at the time seem supportive of you?
A. I'm sorry, which letter are you --
Q. The chair's letter recommending you for tenure.
A. Oh, for tenure, yes.
Q. Okay. And he'd also -- I think we saw an e-mail earlier in the trial where he's thanking you for your great contributions to department. Did you get the impression that he was supportive of you going up for tenure?
A. Yes, for sure.
Q. Did he ever tell you your tenure case was weak before you went up for tenure, that it was borderline, anything like that?
A. No. On the contrary, he told me each time that the votes were strong in the department and that -- yeah.
Q. And I know obviously then you learned that the dean decided or recommended to deny tenure, correct?
A. Correct.

09:49:39 Q. Do you remember how you found out about that?
09:49:41 A. Yes. I found out in a phone conversation with my chair, Ahmed Tewfik, right after Thanksgiving that year.
09:49:48 Q. Okay. And at some point, there's been some discussion I think Dr. Tewfik said that after that, he advised you or strongly advised you to consider withdrawing your tenure case. Is that true?
09:50:01 A. No. No. That was absolutely not true.
09:50:04 Q. What did he say?
09:50:05 A. He said we need to think of what to do. We need to think as in I and him need to think what to do. And he told me there are two options from there. One option is to withdraw in which case, my tenure process will get withdrawn -- my entire dossier will get withdrawn and not go through further consideration. And the other option will be to write a rebuttal to the dean's assessment, providing clarifying facts and correcting any mistakes that she may have made in her assessments.
09:50:34 Q. And is that route that you went?
09:50:36 A. That's the route that I went.
09:50:37 Q. And that's the rebuttal that we looked at yesterday, Exhibit 2. We don't have it -- need to pull it up, but you did write a rebuttal, correct?
09:50:47 A. Correct.
09:50:48 Q. And you responded to the dean's -- the issues that

she had raised?

A. Correct.

Q. And was it your understanding that U.T. was -- who did you provide the rebuttal then to?

A. I spoke with Carmen Shockley from, I believe, the provost office, who informed me of the process. There was an official process. He told me there was a December 15 deadline to submit such a rebuttal so that it becomes part of the official tenure dossier by the president and I submitted -- when I finished the rebuttal, I e-mailed it to Carmen and then Wood.

Q. Okay. Was it your understanding that this dossier then would be reviewed by the president and placed in your tenure dossier?

A. Yes.

Q. I'd like to pull up Defendant's Exhibit 48. And this is according to the defendant's and we've been told on the case, this is your tenure dossier and it's how many pages? I think it's like 126 pages. And we've gone through this dossier together and is your rebuttal included anywhere in that dossier?

A. So I requested a copy of my dossier at the end of February --

Q. I'm talking about the dossier that U.T. is saying is your official dossier right here. Does your rebuttal

appear in that official dossier?

A. I believe it does.

Q. I think you're wrong about that. There's a lot of pages and a lot of paperwork here, but if it's the case that your tenure dossier -- your rebuttal is not in your dossier, your official dossier, is that -- how would you feel about that?

A. Huge concern.

Q. Okay. Because the rebuttal is what you respond to the dean and it's what the president's supposed to read before your case is decided, correct?

A. Correct.

Q. Okay. And the jury can look through it and we can -- you know, maybe after break, we can look through it, as well. But we've gone through it and I don't believe it's in your dossier. We talked yesterday that there was also a letter from another Turing prize winner Manuel Blum that that did not get included in your dossier either?

A. Correct.

Q. Even though that was sent to the president and to the dean and to Chair Tewfik, other people, correct?

A. Correct.

Q. Now, at the time that you're going up for tenure and after Dean Wood has recommended, did you believe and feel that you felt that Chair Tewfik was supporting you, he

09:53:29 helped you with your rebuttal, correct?
09:53:31 A. Yes. Correct.
09:53:31 Q. I'd like to pull up -- and after you were rejected or
09:53:35 the dean was recommending your rejection, did you think
09:53:39 about trying to organize the department to get some
09:53:42 departmental support for you?
09:53:44 A. Well, yes. I reached out for help for my rebuttal
09:53:51 since I didn't have the experience, and I wanted other
09:53:53 people to kind of bounce off ideas for me, what you are
09:53:56 doing including in your rebuttal. I got a lot of help
09:53:59 from professor Brian Evans, who kind of went over several
09:54:02 revisions of my rebuttal and offered language changes.
09:54:07 And then later in January, I asked my unofficial
09:54:12 monitor Sanjay Shakkottai whether he thinks maybe the
09:54:16 department can organize a petition on my behalf to show
09:54:18 the department strong support for President Fenves.
09:54:21 Q. And so, you'd gotten very strong support, correct?
09:54:24 A. Correct.
09:54:25 Q. Okay. And so Exhibit 114, at the very bottom, last
09:54:35 page. This is you writing to Sanjay or is this you
09:54:46 writing to Sanjay and saying I've been thinking about it
09:54:49 and if we did a petition and we sent it to the ECE says
09:54:56 it's a strong case and we have -- send that to the
09:55:00 president, that that is something that you think might
09:55:03 help. Is that what you were asking him?

09:55:04 A. Yes.

09:55:05 Q. And then so go up. So Sanjay at the very bottom of that page sends it to Chair Tewfik. I just received this note from Eddie, any thoughts? And if you can scroll down here. Chair Tewfik then sends -- does it show that Chair Tewfik sends that e-mail with the thoughts about the petition to Dean Wood? Do you see that? It says hi Sharon.

09:55:38 A. Yes, I do.

09:55:39 Q. And does it show in there that I believe I've convinced my colleagues that this will be detrimental to the department, won't be supported by many and useless since there's no information and the process needs to unfold. Do you see that?

09:55:55 A. I see that.

09:55:56 Q. Okay. And then, Dean Wood, what's her response?

09:56:00 A. She says thanks Ahmed. The process needs to unfold. No decisions have been made.

09:56:05 Q. So while he's acting like he's helping you, in fact, he's quelching the idea, he's convincing the colleagues to not send a petition, to not reach out to the president to show that -- you know, show that there's lots of support for you in the department?

09:56:22 A. That's right.

09:56:22 Q. So I want to move on to when you get the decision

09:56:27 that you are denied tenure, this is in February -- was it
09:56:33 in February of 2019?
09:56:35 A. I believe it was around February 16, 2019. Yeah.
09:56:40 Q. And you got the letter from Dean Wood that I think
09:56:44 it's Exhibit. I don't know the number right now. But in
09:56:47 that letter it says teaching is -- is it correct -- what
09:56:50 did you understand that letter to say that the issues with
09:56:53 the president's committee were?
09:56:54 A. To me, my understanding that the president had
09:56:57 essentially sided with the dean's assessment and pointed
09:56:59 out that there were issues with my teaching and funding
09:57:01 and therefore that's why they had not given me tenure.
09:57:04 Q. And is that what's in the letter? That's what's
09:57:07 basically conveyed in the letter?
09:57:08 A. Yes.
09:57:08 Q. I want to ask you to talk a little bit about your
09:57:11 teaching. How did you feel about teaching?
09:57:16 A. I felt like I went into this job, this line of work
09:57:20 because I love teaching. I loved it since I was a child.
09:57:23 My father was a high school teacher of mathematics, and he
09:57:27 used to tutor students on the side, provide a little bit
09:57:29 of extra income for the family. And at some point, he had
09:57:32 more students than he can handle, so he would, you know,
09:57:35 send some of them to me. As a ten-year-old, I was already
09:57:39 kind of working part-time and making some money tutoring

students in math and I loved it. I just really loved it. I felt so empowered that I can help other people understand where they struggle to understand more difficult material and to me, it was easy.

And so I went into this job, I knew I had to get a Ph.D. in order to teach in the college level. That was my understanding at least and I went into this job because I loved teaching and when I was getting -- I had my colleague, David Soloveichik was another assistant professor that co-taught that course with me, he was hired after me. He received tenure last year before me and he -- the first time we taught the course together, the first time that he was teaching the course, he used to come to every of my lectures. And I was just thrilled when I once went to visit him and his wife at their home, they invited us for dinner, my family, and his wife told me, oh, every time David comes after one of your lectures, he says it is amazing. And I was just like so touched to hear something I thought was so sweet. I loved teaching and I did my best at teaching. Always prepared a lot for it.

Q. I want to direct you in the dean's letter, she criticizes your teaching statement and from that, is it your understanding then that she said that you don't -- you're not in line with the commitments and philosophy of teaching in the Cockrell School of Engineering, correct?

A. Correct.

Q. From a couple of little statements in your teaching?

A. Correct.

Q. I want to look at your teaching statement. This is what she is talking about and just point out some of the different things that are in your teaching statement. You talk about in here at the top, my love for teaching very early while teaching mathematics to fellow students. Talk about a continued -- I'm just going to point to some of these. Continued looking for ways to address these challenges, as a course instructor at Texas A & M, at U.T., it talks about -- you've talked about this, your teaching style. Just very quickly show what this is.

A. Yeah. I mean, I show how I write about my teaching style and my teaching philosophy. I recognize that some students -- I always want -- I really care very deeply for the students to understand what I teach, and so, I do my very best. I'm teaching through much -- you know, one of the hardest classes in the ECE curriculum undergraduate algorithms, which is taught at the higher levels at the junior, senior typically students that are taking my class. And it's heavily mathematical and a lot of the ECE majors as you heard Professor Valvano testify, I believe on Monday, he said you know, a lot of them are programmers who don't like math. They expect to just go and program

and have fun in the class and so, they come and they get a reality shock that it's not what they wanted. And so, I really want very hard to convince them that this is fun material, you know, that it's really nice. And I do my best to make it easy for them to understand the material via examples via kind of relating the material to real-world applications.

So I do my very best to reach out to all the students. I really care to reach out to students. And I know that some students are silent in class, not everyone feels comfortable asking questions, and so, I always lecture and I look at everyone trying to kind of read their facial expressions and to see whether I was able to connect to them or, you know.

Q. Yeah. We already heard -- you know, we did hear from one of your students. So this is your teaching statement that the dean is reading and do you communicate your passion for teaching in this teaching statement that the dean is looking at?

A. That was my -- I feel that I did to the best of my efforts.

Q. And I'm just -- again, I'll point to different things. You talk about just what you said, pay close attention to the students. The bottom it says I try to motivate and spark -- this is Plaintiff's Exhibit 6, by

10:01:43 the way. I try to motivate and spark interest in
10:01:47 theoretical conversations. There's a lot of places in
10:01:55 your teaching statement where you really do -- I mean I
10:01:59 guess I'm asking you. Are there places in your teaching
10:02:04 statement says your goal is to motivate them?
10:02:08 A. Yes.
10:02:09 MS. HILTON: I'm sorry to interrupt again, but,
10:02:10 your Honor, this is another demonstrative that again, Dr.
10:02:14 Nikolova needs to testify to this before counsel
10:02:16 highlights it and displays it to the jury.
10:02:19 THE COURT: Do you have the original?
10:02:21 MR. SCHMIDT: I do.
10:02:21 THE COURT: That would be preferable.
10:02:23 MR. SCHMIDT: I apologize. I didn't understand
10:02:27 that rule.
10:02:29 Q. (BY MR. SCHMIDT) Throughout your teaching statement,
10:02:32 if you read the teaching statement Exhibit 6, do you feel
10:02:37 like you communicated that you care about your students,
10:02:39 you care about your course?
10:02:41 A. I feel that I did. Yeah. That was what I wanted to
10:02:44 convey.
10:02:46 Q. And were you ever told that your responsiveness to
10:02:53 students was bad or that was a concern of yours?
10:02:55 A. No. No one ever told me that.
10:02:58 Q. And in the statement, did you put that in the

statement that you tried to respond to students?

A. Yes.

Q. I want to move on to again after you were denied tenure, there was a discussion about meeting with the dean. Do you recall that?

A. Yes, I do.

Q. And were you told that the dean was going to come and ask to meet with you?

A. Yes.

Q. And did you refuse to meet with the dean?

A. So Ahmed just told me as a matter of fact that -- he told me on Saturday morning, February 16, I think around that time, that the president has recommended to not promote, and he just told me as a fact that the dean will be coming on Monday, that following Monday if I think around 2:30, he said, in the afternoon to just tell me about the decision. And I said okay.

And then later, I kind of thought more about it and I said Ahmed, I do not want to meet with the dean. And he said I understand. You know, do you mind if I meet with her to get the gist of what happened in your case and I said absolutely. Please do.

Q. And is that what's reflected here in this text, it says I don't want to meet with the dean and Ahmed says that's perfectly okay and I understand. Is that right?

10:04:26 A. That's right.
10:04:26 Q. If Dr. Tewfik had said no, Dr. Nikolova, you should meet with the dean, would you have done that?
10:04:32 A. Oh, yes.
10:04:33 Q. Okay. Again, after you were denied tenure and you get the final letter denying, you know, this letter denying tenure, do you then start working on ways to see if we can get this decision changed?
10:04:51 A. Yes. I just -- yeah, I felt very strongly that I had not gotten a fair decision, especially in light of the rebuttal that I had worked really hard to clarify any facts or misunderstandings. And so, I sent that to my colleagues in the department who write it and they said this is such a strong rebuttal, it's very factual, we don't understand why the decision was the way it went in your case.
10:05:18 And so, I just worked really hard to -- through the professors, I was informed that I had to appeal the decision. I focused on that for about a month, I think. There was a deadline from February 16 to March 25, a little over a month to when I had a deadline to submit a request for a consideration.
10:05:39 Q. And did you submit a request for reconsideration?
10:05:42 A. I submitted the request to CCAFR.
10:05:45 Q. Well, there's two, right?

10:05:46 A. Yeah. Correct. So there's two. I submitted two things, a request for CCAFR and then, a request for reconsideration for president to reconsider his decision.

10:05:55 Q. Is there a way to just show the witness the document that's not been admitted? Can we do that on mine?

10:06:04 THE CLERK: It should -- they should not see it now.

10:06:07 MR. SCHMIDT: It's Plaintiff's Exhibit 32.

10:06:46 Q. (BY MR. SCHMIDT) Is that the request for reconsideration that you presented to -- so, Dr. Nikolova, is this the request for reconsideration that you wrote to Dr. Fenves?

10:07:26 A. Yes, it is.

10:07:27 Q. President Fenves and we'd move to -- move this in for admission, your Honor?

10:07:32 MS. HILTON: Your Honor, we object to hearsay based on this is offered for the truth of the matter asserted.

10:07:36 THE COURT: Okay. Overruled. Go ahead.

10:07:38 Q. (BY MR. SCHMIDT) Thank you. So this is a letter that you wrote to President Fenves asking him to reconsider, correct?

10:07:46 A. Correct.

10:07:47 Q. And let's go ahead and show. And if you'll see this document is how many pages long? Eighty-three pages long;

10:07:59 is that right?
10:07:59 A. That's right.
10:08:00 Q. And that some of that's attachments to the document and the document itself is the letter, if you go to scroll -- it's like 15 pages or so.
10:08:14 A. I think more than that.
10:08:15 Q. And what do you present -- and actually go to the first page of the document. What is that, can you just read the very first line here of the letter?
10:08:36 A. The first line? President Fenves, I had the privilege of interviewing with you in the summer of 2013 while you were dean of engineering.
10:08:46 Q. And so did you try to approach this in a -- what was your intent here when you were sending this?
10:08:53 A. I just really wanted to address this in the most professional way possible and to get the -- sort of a fair objective review of my case.
10:09:07 Q. Okay. And I don't want to spend the time doing it right now, but did you present in this document evidence that you felt you were being treated differently because you were a woman and because of your pregnancy?
10:09:20 A. Yes.
10:09:21 Q. And did you provide evidence comparing your case to other cases?
10:09:26 A. Yes.

10:09:27 Q. And where you thought you had comparable or sometimes better records than male professors and a female professor who had been given tenure?
10:09:35 A. Yes.
10:09:36 Q. Okay. And did you ever hear anything back from U.T. in regards to this letter?
10:09:43 A. No.
10:09:45 Q. You also did an appeal to this -- did you also do an appeal -- you started to mention it before -- to a committee at U.T.?
10:09:54 A. Correct. Yes.
10:09:55 Q. And what is that -- what's that committee called? What's the short name?
10:09:58 A. The short name is CCAFR.
10:10:01 Q. That's all right.
10:10:02 A. Please don't ask me.
10:10:04 Q. It's a long acronym. But was it your understanding that they review tenure decisions?
10:10:11 A. My understanding is that they review for irregularities during the tenure review.
10:10:23 Q. You appealed to them?
10:10:25 A. I did appeal to them.
10:10:27 Q. And, your Honor, if we could block the screen for the jury.
10:10:35 THE CLERK: It's blocked.

10:10:37 Q. (BY MR. SCHMIDT) Dr. Nikolova, is this your appeal to the CCAFR committee?
10:10:41 A. Yes, it is.
10:10:42 Q. Your Honor, we'd move to admit this into evidence.
10:10:44 MS. HILTON: Your Honor, same objection to hearsay and to relevance.
10:10:49 THE COURT: Okay. Overruled as to relevance and you can -- I'll acknowledge your hearsay objection.
10:10:59 Ladies and gentlemen of the jury, the exhibit that you're about to see is not being offered to prove that the things contained within that exhibit are true but for other purposes. So admitted.
10:11:10 Q. (BY MR. SCHMIDT) Right. So go ahead and we'll just show that to the jury. And so, this is your appeal to the CCAFR committee, correct?
10:11:23 A. Yes.
10:11:23 Q. And you raised the concerns and in this letter, do you also raise concerns about gender and pregnancy discrimination?
10:11:32 A. Yes.
10:11:34 Q. And do you again -- how do you do it? Are you angry and shouting and yelling at them or you do you do it --
10:11:41 A. No. I just try to do it in the most objective way possible presenting facts about my case and about comparable cases that received tenure.

10:11:49 Q. And let's go to the CCAFR decision very quickly. Was
10:12:08 this their response?
10:12:11 A. Yes.
10:12:15 Q. And go to page 7 or 8. Recommendations down there.
10:12:37 At the very top. There it talks about denial of tenure
10:13:20 raise concerns relating to gender and pregnancy. Do you
10:13:24 see that?
10:13:24 A. Yes, I do.
10:13:25 Q. And this is the CCAFR committee's review of it,
10:13:29 correct?
10:13:29 A. Correct.
10:13:29 Q. And they say we strongly recommend that the ECE
10:13:32 department work with vice provost Gordon to conduct a
10:13:36 substantial review of gender equity which is fairness
10:13:39 equality, potential discrimination diversity and inclusion
10:13:43 in the department and it says that could include a review
10:13:47 of the comparative materials compiled by the candidate
10:13:49 which would not possible for the committee to thoroughly
10:13:53 consider in the time available for our review.
10:13:57 A. Yes.
10:13:58 Q. Is it your understanding? Did you ever hear that
10:14:00 they did, that U.T. investigated in response to the CCAFR
10:14:03 complaint?
10:14:03 A. No.
10:14:04 Q. How did that make you feel that they're not

10:14:07 investigating this?
10:14:10 A. It made me feel really disillusioned with the U.T.
10:14:16 process that they don't -- if they hear of potential
10:14:21 discrimination, they -- rather than investigating it, they
10:14:25 just try to stonewall you and cover it up.
10:14:31 Q. Okay. I want to go to -- after the decision itself
10:14:43 to deny tenure, did you talk to people in your department
10:14:47 and communicate to your department that your decision had
10:14:50 been denied?
10:14:52 A. Yes.
10:14:53 Q. Was that in an e-mail?
10:14:55 A. Yes. I sent an e-mail to the entire department, all
10:14:58 the faculty in the department stating what the decision
10:15:03 was. I wanted everybody's input to understand what
10:15:11 happened because I felt like there was a big gap in my own
10:15:13 understanding. I was shocked and puzzled and just I did
10:15:17 not understand how it came to that decision. So I wanted
10:15:20 for my own understanding and to also understand how to go
10:15:23 forward with my future at U.T. to get a better
10:15:28 understanding.
10:15:38 Q. We have Plaintiff's Exhibit 120 and if you can scroll
10:15:41 to the next page. Okay. Is this the letter that -- the
10:15:50 e-mail that you sent out?
10:15:51 A. Yes.
10:15:53 Q. And again, I don't have time, the jury can read this

if they'd like to later, but it says I feel compelled to address the elephant in the room and share with you the outcome of my promotion, outcome of any tenure case to not promote. You say, while successful cases are celebrated, unsuccessful ones are not even mentioned and there are -- they're only discussed in a secretive manner. I do not wish that to be the case with mine and perhaps an open discussion can improve our understanding of just what exactly happened and why.

I'm not going to read it all but go to the bottom. There you raise some concerns about gender discrimination; is that right?

A. That's right.

Q. And what do you say there?

A. Would you like me to read it or just recap?

Q. Just recap.

A. It made me think, I never in my life up to that point had wanted to see discrimination if you know what I mean. I never really thought of myself as being a woman in engineering. I thought of myself as being a scientist in engineering. So I never really thought of my gender in the process, but at that point, it kind of started to hit me that, anecdotally, I had heard my colleagues, my female colleagues talk about issues they had had and I started connecting the dots and I realized that my case was not

successful. The previous female faculty that had gone up for tenure in the department was about five years prior to my case. Her case had also not been successful, and she had gone up for tenure right after having had a baby. And then, the previous female case before that was another five years prior, and in that case, it was professor Christin Julian who was the only woman among a number of male colleagues that had gone up for tenure and she told me that everybody in her cohort had been going up for tenure one year early. So after four years of being an assistant professor and so she looked around and said, well, what's going on, everyone around me is going up early, should I go as well and she was told no. She should wait.

And so my understanding was that she felt kind of bitter about it. Why was she delayed one year extra over her colleagues and so collecting dots, I realized that well maybe there is a pattern that female faculty in the department are struggling. They are either not being able to go through the process successfully or if they are, they are delayed and so their careers lag. Career progression.

Q. Dr. Nikolova, just going to speed this up here, it says anecdotally, it's my impression that women in this department have a longer time to advance if they pass

through that hurdle at all. Each case has its reasons no doubt. Perhaps there is no evidence of discrimination but nevertheless, food for thought. Good luck to the remaining few women in the department.

A. Correct.

Q. So you weren't necessarily ready to say discrimination, discrimination?

A. No. I did not want to say discrimination because I didn't know legally what the legal definition is and what the legal evidence for the -- I'm a mathematician so I know what mathematical evidence is but I didn't know what the legal evidence is. So I didn't want to just throw out there without having the facts of what had happened. But I wanted to throw it out there as a concern.

Q. And I want to just point to a few quick pages if you can go to page 1 of that same e-mail of the same exhibit. At the top it says -- this is an e-mail from John Valvano who we saw recently testified here in this case. You see his e-mail, it says the response from the -- after you sent this e-mail out, did you get feedback from the department?

A. I got a lot of feedback from the department. I got a lot of responses and I realized also it was a pattern that I had really hoped for.

MS. HILTON: Your Honor, could we approach,

please.

(At the bench, on the record.)

MS. HILTON: Your Honor, this is a motion in limine. This is the second time she's testified to pattern in this courtroom to the motion.

MR. SCHMIDT: I apologize. I'll instruct her not to do that.

THE COURT: Thank you.

Q. (BY MR. SCHMIDT) Dr. Nikolova, just generally what kind of response -- I just want to know about the response from the department, was it positive? What did you get back from the department?

A. It was overwhelmingly supportive for me and a number of people expressed shock, unhappiness just generally.

Q. I don't want to belabor the point. Again we're trying to move quickly. I feel rude interrupting you but let me keep going. Page 1, that was a response from John Valvano. And he as we know, he was very supportive of you. Go to page 81. We'll move on but in this set of Plaintiff's Exhibit 120 is where you get lots of positive approval from the department; is that correct?

A. Yes.

Q. E-mails saying that they don't agree with the decision, that your case seemed like a slam dunk, is that correct?

10:22:11 A. That's right.

10:22:16 Q. You're needed in the department. I've only heard 10:22:19 positive things about you. If you go through, we can 10:22:22 perhaps get the technology going, we'll make it work. But 10:22:28 -- and these are from both tenured professors and just all 10:22:31 the levels of different professors, correct?

10:22:33 A. Yes.

10:22:34 Q. Okay. Let's move on. You know Dr. Nikolova, after 10:22:41 you had the rejection at U.T., the tenure denial, did you 10:22:47 start looking for other jobs?

10:22:51 A. So I was told my Brian Evans that it would help a 10:22:55 request for reconsideration if I have another job offer 10:22:58 from another university to put pressure on the university, 10:23:01 but it was too late in that cycle to get a job offer from 10:23:06 elsewhere because to apply for jobs, it's like it takes an 10:23:09 entire academic year to apply for jobs and be interviewed. 10:23:13 You have to assemble an extensive application with 10:23:16 multiple documents the deadlines.

10:23:18 Q. I don't mean to interrupt you but you wanted to -- 10:23:20 you were not happy about not getting tenure, correct?

10:23:23 A. Absolutely.

10:23:23 Q. And so you were thinking about leaving and going -- 10:23:27 finding another job, correct?

10:23:28 A. Sure. Yeah.

10:23:29 Q. But also let's back up from that. Did you also after

10:23:33 you didn't get tenure, did you keep trying to work hard -- did you work hard? What did you do in terms of staying at U.T. and working and doing your work? What --

10:23:42 A. Sure. I mean I --

10:23:44 MS. HILTON: Objection. Leading.

10:23:45 Q. (BY MR. SCHMIDT) What did you do after your denial of tenure regarding working at U.T.?

10:23:51 A. Sure. I mean, my work continued because I had the research group of students to support and mentor and guide through the research process. We had publications. We had research work in progress that had to make it to publications. So I focused on getting those appeals to the president and to the committee and after that I just continued with my work.

10:24:11 Q. And did you work hard?

10:24:12 A. Yes.

10:24:14 Q. Worked hard on grants?

10:24:16 A. I worked even harder than I had worked before the tenure decision.

10:24:19 Q. Did you work hard to improve your teaching?

10:24:21 A. Yes, I did.

10:24:22 Q. Okay. And you also applied for other jobs, correct?

10:24:25 A. Yes, I did.

10:24:26 Q. And what was the result of your job search?

10:24:31 A. It was incredibly disappointing. Yeah, that's the

way I think the real world hit me that it's not all a matter of hard work. And no matter how hard you work, once I realized it was you're stained as other people had been telling me. Once the word gets out that you're denied for tenure you're stained and you lose your reputation in the professional community and other employers are really unwilling to give you jobs.

And so I applied very extensively to about 50 different universities, most of them in the United States but some in Europe as well, and I did not get any jobs. I did not even get called for an interview in any U.S. university.

Q. Okay. And after this, did you -- what was your -- after going through this, after getting denied jobs that you were seeking, the job applications, how were you emotionally?

A. My -- so I focused to work really hard so I -- you probably heard an analogy in the opening remarks that the tenure -- the probationary period leading up to tenure is like a marathon. People work really, really hard get all the papers out, the teaching, get all their documents in order or the service to please the university, you know, to get a successful decision. So it was like a marathon.

And I felt like when I was denied and told to go up again in two years, it became like a sprint for me

because now I only had one year from the time I got the decision to the time I would have had to resubmit my tenure documents. I was like oh my God, I have no time, and it was like literally like sprinting at the end of a marathon. And I hadn't really paid much attention to my mental state, but I realized that sprinting and all those negative outcomes, you know, despite all my even harder work really kind of started breaking me mentally.

So I have gone through several therapists. I'm still working with a therapist and I kind of -- the semester after -- it took a while for it all to kind of hit me to catch up with me, but I think around like January to 2021, so two years after I kind of went to a really deep hole mentally where I started for the first time contemplating suicide, and I said, oh my God, I can't believe this is happening to me. And at that time, I have a gap between two therapists because one therapist hadn't been quite a good fix.

So it was on my list to find another therapist. And I just searched so hard to find another therapist right at that time, I didn't have another therapist so finally I found one I think in March of 2021 that I've been working with since and he's been amazing. But that that just really hit me and I came to understand how people who contemplate suicide and commit suicide kind of

-- it kind of clicked. I started understanding how they feel prior to that. I never understood. I was just always such a positive person with such a positive outlook on life, I never saw in that glass half empty or half full. To me, it was always half full and never dwelled on the negative things life. I just always was anchored in the positive and I was looking out and thinking of the positive. And at that time, I just -- it was something that was stronger than me. I just didn't really have control and I felt all my God, I really need professional help badly.

I start looking for a psychiatrist. I said should I be starting on antidepressant pills? It took a while. It took me six months to find a psychiatrist because that I guess with the pandemic a lot of people were experiencing issues, mental health issues and all the psychiatrists have really, really long wait times to get in.

Q. This is important. I'd like you to talk about or can you talk to the jury about what your days were like after you sunk into this hole.

A. A lot of days, I would just -- first of all, I was exhausted. It just stayed with me and it just got worse and worse. I just was physically exhausted as if someone has tied stones to my arms, to my legs, to my back and

just every movement was so difficult. And I would -- any verbal, I guess I'd became so sensitized that any verbal criticism that came to me one form or another, be the slightest criticism like a sharp remark was just like really knocked me out. And I would just need to go and lie in bed and often I would just lie in bed and crying and I had my kids there. Another unplanned pregnancy that I'm happy that it happened, but it happened in the most difficult time. I gave birth to my third child in September of 2019, and so at the time that the worst kind of hit me, I had three very small children, two toddlers and a baby, and they wanted to interact with me. We were in the pandemic, everyone was working from home, so I was constantly you know, at home. The kids were at home and they were just constantly, you know, look for me, look out for momma, momma, can you do this, can you do this, momma, momma, momma, momma. And I felt so bad that I just was exhausted, I couldn't really attend to their wishes and I felt really bad saying -- most often I would just close myself in the bedroom in my house where I was alone so that the kids don't come up, you know, asking me for things and I feel additionally bad for not being able to attend to them.

Q. How did that make you feel as a mother?

A. Awful. Awful. I felt so inadequate.

10:30:53 Q. What about your husband? How did things go with Jimmy?

A. Really badly. So divorce was even discussions multiple times. He himself was having a hard time seeing me in that state and in hindsight now, I see that I was essentially taking out all the anger and the hurt and the disappointment from, you know, my career and my profession onto my family because they were the only one around to take it. So I couldn't go and scream at these offices say, why did you do there to me. So I could just take it out on my family, but at the time I didn't recognize that. So it was misplaced anger. Misplaced hurt. The slightest thing they would do, you know, that wasn't quite just the sharp remarks back and forth, escalated discussions to where you know, I remember a conversation with my husband, I think it was around April of 2021. I said you know, I don't think I love you anymore. I don't think we should be together anymore because to me in my mind, I was relating the pain to my environment, to my family situation because I just couldn't -- that was what was around me. So I just took that pain to mean that me and my husband are just not -- you know, the relationship is not working out and we shouldn't be together anymore because just every day felt so painful to get through it. It was just constantly fights and you know constantly

10:32:43 discussions, who should change the baby's diapers. Is it me? I'm so tired. Can you please do it. I'm tired of doing all these things. You should pick up your share of the housework. You should pick up your share of the childcare responsibilities, its too much for me. And it just went back and forth back and forth and just yeah, it just felt too painful.

10:33:07 Q. What did it feel like in terms of your career? What did you feel had happened to your career?

10:33:16 A. I felt like my career had been on this high speed train that just crashed and I'm still trying to make sense of it. I'm still trying to understand why. What did I do wrong that led to that crash. I just never saw any signs of it beforehand. I never had any warning signs.

10:33:41 Q. What does it feel to you to have had that crash? What has the impact of this been on you personally, yourself, your self-esteem?

10:33:51 A. I think I have just -- I internalized a lot of it in the process. I usually my personality is never to point fingers at other people. I always look for the blame. Take responsibility for what happens to me and I take the blame to be mine. And so I internalized a lot of those criticisms. I said well, I guess I wasn't just good enough. My teaching score was 3.9 and I should have been -- you know probably if I just put more effort and more

time into teaching, maybe it would have been 4.0, maybe or 4.1. Maybe it wouldn't have raised those flags for the dean.

Q. Do you believe that that would have changed things?

A. I don't know. I just -- I mean it's like.

Q. This is all that's going on in your head.

Dr. Nikolova, you had talked about that even from a young age, you wanted to be a teacher and teach and you've started working very hard early on. Can you talk a little bit about what you feel this has done to your dreams and to who you are?

A. I feel like it's completely erased everything that I've worked for for the last, I would say -- I'm 43 now. I totally have been going through this math competitions and doing these extra preparations since I was ten years old. So it's been like I feel like it's been 33 years of work leading up to, you know, like gymnasts in Olympic sports, people start training when they're a very young child. For a career like, that, I feel like, you know, these 33 years are sort of like going to waste and I have to start all over again.

Q. While you were going through all of this, you ended up taking some -- did you end up taking leave from U.T.?

A. I did. My therapist advised me that I should take some time off either to -- he felt the environment --

10:35:55 well, in our discussions, he suggested the environment at
10:35:59 U.T. had been real toxic for me after the decision because
10:36:04 while initially, my colleagues had been extremely
10:36:08 supportive, some of those colleagues after the decision
10:36:11 had realigned themselves with --

10:36:14 MS. HILTON: Your Honor, may we approach?

10:36:19 (At the bench, on the record.)

10:36:20 MS. HILTON: She's testifying to hearsay right
10:36:22 now. They could have called her therapist. I would just
10:36:27 like to object to this.

10:36:28 MR. SCHMIDT: Well, she can talk about -- okay.
10:36:31 I'll have her stop talking about the therapist.

10:36:38 MS. HILTON: Your Honor, could we get an
10:36:39 instruction from the jury about that, please. About
10:36:41 previous testimony.

10:36:42 THE COURT: Sure. So the witness just referred
10:36:45 to what someone else said. In this case, it was her
10:36:48 therapist and that's what we call hearsay and that is that
10:36:51 someone who's not here in court. And so, I'll ask you to
10:36:56 the extent that she has testified about what someone else
10:36:58 who's not here in court said that you're to disregard any
10:37:03 statements to that effect.

10:37:04 Q. (BY MR. SCHMIDT) Dr. Nikolova, when you were applying
10:37:08 for leave, did your therapist and your medical providers
10:37:13 provide documentation to U.T. -- I don't want to get into

the substance of it, but did they provide documentation that you needed -- to justify you taking the leave?

A. Yes, he did.

Q. And did U.T. review that documentation and grant you the leave?

A. He submitted to the office of disability at U.T. and yes, I was granted the leave.

Q. Okay. In terms of how this situation, the denial of tenure hit you -- did it hit you any way physically?

A. Yeah. I mean, I mentioned I was exhausted all the time. I developed back pain, which initially I felt was related to my pregnancies. Somehow part of it may have been, but part of it is still persisting and my chiropractor has mentioned to me that he's recently --

MS. HILTON: Your Honor --

Q. (BY MR. SCHMIDT) Don't go into what your chiropractor said.

A. I'm sorry.

Q. But what's your understanding of what this is related to? What's your understanding?

A. I was told --

MS. HILTON: Your Honor, this is calling for medical opinion.

MR. SCHMIDT: No. It's her understanding what she's experienced and what she's talked with her doctors

about.

MS. HILTON: That's hearsay.

MR. SCHMIDT: She's not saying what they're stating, she's talking about her understanding.

THE COURT: You can ask her about her experiences.

Q. (BY MR. SCHMIDT) What is your experience about this after going to see doctors and chiropractors? Do you relate this to the denial of tenure?

A. Yes, I do.

Q. Has it affected you in other ways physically, eating, you know?

A. Sure. Yeah, I mean at times, I wouldn't have the energy to prepare a meal for myself. So I wouldn't eat just because I just -- I couldn't get out of bed to eat. At times, my husband would bring me a meal to bed. At times, not. I didn't even have the energy to ask for help. So if I had energy, I which would ask him for help, but if I didn't, I just lay there in bed. Yeah.

Q. Okay. Is there anything positive that you feel has come out of this situation?

A. I don't know but being sort of having the happy gene, I felt I like I was born with a happy gene. I want to believe in positive things. I want to believe there is a silver lining in everything. So I really hope that what

comes out of this will be a serious wake-up call for U.T. and for other academic institutions where there is such a small proportion of women to the overall of women faculty that the very serious issues of discrimination that are pervasive and they tend to pile up and until -- you know, usually you don't have lawsuits over small things, but small things add up and you only get to see something very extreme like in my case, I was denied tenure and my career has essentially crashed. You only get to hear, you know, something -- when something so serious happens. But there's so many other things that happen constantly and we learned the very sort of catchy term yesterday, the motherhood penalty. I say it light as day now. This is what I have suffered. In my case, it was very extreme. In other cases, it was, you know, perhaps a delayed promotion for one year or two years, but it piles up over time.

Q. Do you think you'll ever get tenure at U.T.?

A. At this moment, no.

MS. HILTON: Objection, your Honor. It calls for speculation.

THE COURT: You can ask about her belief.

Q. (BY MR. SCHMIDT) What do you believe -- I'm sorry, your Honor, I could ask about?

THE COURT: Her belief.

10:41:18 Q. (BY MR. SCHMIDT) What do you believe are your prospects for getting tenure?
10:41:21 A. My belief is that my chances at this point are nil.
10:41:28 Q. Your Honor, I have no further questions. Thank you.
10:41:30 THE COURT: Okay. Thank you.
10:41:31 Ladies and gentlemen, we are going to now take our first 20-minute break of the day. Let's call this 10:15, and if I could get you to be back in the jury room and ready to go at five after 11:00, we'll resume testimony then. You recall your instructions.
10:42:12 (Jury not present.)
10:42:13 THE COURT: We'll be in recess.
10:42:15 (Recess.)
11:05:32 THE COURT: Ready?
11:06:06 (Jury present.)
11:06:07 THE COURT: Dr. Nikolova, if you could resume the stand.

11:07:06 CROSS-EXAMINATION

11:07:06 BY MS. HILTON:
11:07:17 Q. Good afternoon, Dr. Nikolova.
11:07:18 A. Good afternoon.
11:07:19 Q. You testified earlier that when you were at Harvard, you worked the hardest you'd ever worked, right?
11:07:28 A. Yes.
11:07:28 Q. You skipped parties.

A. Many times, I skipped parties, yes.
Q. You devoted yourself to your studies.
A. Yes.
Q. You couldn't do both.
A. I did both at times, but I was very conscious of the time.
Q. That's an example of what Dean Wood mentioned in her interview, isn't it? That you can't do everything.
A. You could save it.
Q. You make choices about how to spend your time?
A. I absolutely made choices.
Q. And that had nothing to do with you being a woman.
A. No.
Q. Or having children.
A. No.
Q. I want to talk to you pretty briefly. I know the jury's heard a lot this week about the tenure process. You went up for tenure in the 2018-2019 academic year; is that right?
A. Yes.
Q. And that was after less than six years at U.T.
A. Yes.
Q. And you understand that an up or out -- a tenure case is an up or out case if the professor has six years in probationary service, right?

A. Yes.
Q. So you'd agree that when you went up, you were not in up or out year.
A. Yes.
Q. But you can go up again in your out or out year.
A. Yes.
Q. But you're choosing not to.
A. I don't understand your question.
Q. Sure. Well, let me show you what's been previously admitted as Plaintiff's Exhibit 112. Excuse me, 110. Okay. And this is an e-mail from you, dated February 19th, correct?
A. Correct.
Q. And you write, I do not intend to go through another tenure process at U.T., right?
A. Yes.
Q. And this is one day after you learn of the president's decision?
A. You could say four days after, but yeah. Right after, yeah.
Q. Okay. So you decided then that you weren't going to go up.
A. At that time, that was my response.
Q. So you suffered a setback.
A. I suffered a setback? Much more than a setback, but

yes.
Q. You could still go up for tenure?
A. Yes.
Q. And sort of like you mentioned, conference papers that got rejected and you would resubmit.
A. Yes.
Q. Right? Dean Wood offered -- you know you had an opportunity to meet with Dean Wood after the decision, correct?
A. Yes.
Q. And you chose not to.
A. Yes.
Q. You testified earlier that you wanted the facts, right?
A. Yes.
Q. But you chose not to meet with Dean Wood about the decision, right?
A. Yes.
Q. And you testified earlier that you sent an e-mail to the department, remember that, about the elephant in the room?
A. Yes.
Q. So you testified that you sent an e-mail to the department because you wanted to figure out what was going on, right?

11:10:53 A. Yes.
11:10:54 Q. But respectfully, Dr. Nikolova, the department wouldn't know what happened, right?
11:11:02 A. Some of them may know. I don't know what people knew, so I wanted to find out.
11:11:08 Q. But Dean Wood would know, right, because she met with the president and president's committee?
11:11:13 A. Yes. You're right.
11:11:14 Q. And you chose not to meet with her.
11:11:16 A. Yes.
11:11:17 Q. Let's talk really quick about probationary extensions. There's been testimony, but just to clarify, you understand that you can extend the runway of your up or out year by requesting a probationary extension, right?
11:11:36 A. Yes.
11:11:37 Q. And you did that before you went up for tenure?
11:11:39 A. Yes.
11:11:40 Q. Okay. And you were aware that you could rescind it.
11:11:44 A. Yes. I signed a document that I could rescind it.
11:11:47 Q. And not only that, but because Dr. Tewfik had told you that you could rescind it, correct?
11:11:58 A. I know that I testified in my deposition that he told me that. At this time, I don't recall if he used the word "rescind."
11:12:05 Q. Okay. So your testimony is different today than it

was at your deposition?
A. I reviewed my deposition and I was thinking about it whether he actually said that very same sentence. I don't recall.
Q. But you would agree even if you had extended your probationary extension, you still would go up for tenure early.
A. Yes.
Q. And earlier, Mr. Schmidt showed -- was talking to you about Professor Tiwari, remember that?
A. Yes.
Q. And about his rescission of his probationary extension, right?
A. Yes.
Q. But Dr. Tiwari was at U.T. for his entire service, years of service, correct?
A. Yes.
Q. He did not work at a previous institution, right?
A. Yes.
Q. And his rescission put him in this up or out year, correct?
A. Yes.
Q. And yours would not have?
A. Yes.
Q. In fall 2015, you were at the Simons Institute; is

11:13:12 that right?
11:13:12 A. Yes.
11:13:13 Q. And you testified that's when you had an unbalanced
11:13:15 teaching load?
11:13:15 A. Yes.
11:13:16 Q. And then, but you were paid full salary from U.T.
11:13:21 A. Yes.
11:13:21 Q. And in the following semester in the spring 2016, you
11:13:26 were on modified instructional duties, correct?
11:13:28 A. Yes.
11:13:28 Q. And again, you're still paid full salary by U.T.,
11:13:35 correct?
11:13:35 A. Yes.
11:13:35 Q. When you're on modified instructional duties, all it
11:13:38 means is that you're not expected to teach classes, right?
11:13:40 A. Yes.
11:13:41 Q. And that's reflected in the policy, it's modified
11:13:45 instructional duties, right?
11:13:46 A. Yes.
11:13:47 Q. And in the spring of 2016, you were on modified
11:13:54 instructional duties because you had a newborn?
11:13:57 A. I'm sorry. Can you tell me the time?
11:14:00 Q. Yes. In spring 2016, when you were on modified
11:14:03 instructional duties, that was because you had a newborn
11:14:05 child, right?

11:14:06 A. Yes.
11:14:06 Q. And you know with a newborn, it's pretty difficult to teach a regularly scheduled class; is that right?
11:14:13 A. Yes.
11:14:13 Q. And so, your instructional duties were accommodated for that, right?
11:14:18 A. Yes.
11:14:18 Q. And that's because you were working on research at that time, that semester?
11:14:25 A. Yes.
11:14:26 Q. So you're just working on research on your own schedule, right?
11:14:30 A. Yes.
11:14:31 Q. As opposed to a class with a set schedule.
11:14:33 A. Yes.
11:14:34 Q. Modified instructional duties are not maternity leave, right?
11:14:41 A. Yes.
11:14:41 Q. Maternity leave is separate from modified instructional duties?
11:14:45 A. Yes.
11:14:46 Q. And you took modified instructional duties again in the spring of 2020; is that right?
11:14:58 A. Yes.
11:14:59 Q. And your request for those -- for that modified

11:15:03 instructional duties is, you were supposed to develop
11:15:06 course material for a new graduate course; is that right?
11:15:08 A. Yes.
11:15:09 Q. But as of your deposition in June of 2021, over a
11:15:14 year later, you hadn't completed that work; is that right?
11:15:16 A. Yes.
11:15:17 Q. Dr. Nikolova, when you go up for tenure, you're
11:15:25 evaluated on teaching research and service, right?
11:15:27 A. Yes.
11:15:27 Q. And you're evaluated at multiple levels.
11:15:30 A. Yes.
11:15:31 Q. We've heard a lot of testimony about dossiers this
11:15:36 week. That's a large compilation of documents that the
11:15:39 candidate puts together for their review, right?
11:15:43 A. Yes.
11:15:45 Q. And each level is relying on that dossier and
11:15:48 evaluating the case, right?
11:15:49 A. Yes.
11:15:51 Q. Isn't it true that you rushed drafting that dossier
11:15:55 and putting it together?
11:15:57 A. I would not use the word "rushed." I worked really
11:16:02 hard to get it done before my second child was born.
11:16:05 Q. You sort of self-imposed an earlier deadline than
11:16:11 when the university had set for it to be due, right?
11:16:13 A. Yes.

Q. And you received inquiries about your dossier?
A. Yes.
Q. And you were unresponsive for weeks.
A. Yes.
Q. And when you finally responded, you didn't respond, it was your fiance at the time, Mr. Horn?
A. Yes.
Q. And it wasn't an e-mail that was giving U.T. the information it was looking for, right? It was directing your students to take care of it?
A. Yes.
Q. And it was Mr. Horn telling the students what to do with your dossier?
A. He wrote the e-mail on my behalf. Yes.
Q. And the tasks that were delegated to your students were very time-consuming, right?
A. Some tasks were time-consuming, yes.
Q. Has that always been your testimony? You testified at your deposition that they were very time-consuming tasks, right?
A. Yes. Some tasks were, yes.
Q. Didn't the department chair have to get involved to tell you not to use your students to put together your dossier?
A. The e-mail from my department chair on August 2nd

11:17:26 told me that.

11:18:05 Q. Dr. Nikolova -- your Honor, may we approach?

11:18:08 THE COURT: Yes.

11:18:14 (At the bench, on the record.)

11:18:15 MS. HILTON: There's a motion in limine on Mr. 11:18:20 Horn's work and his employment. And so, there's already 11:18:25 been testimony about his interaction with the dossier. I 11:18:28 would like to ask about the publications that they have 11:18:33 together and the amount of hours. She testified at her 11:18:35 deposition about the number of hours that he was spending 11:18:37 working for her, and so, I think that's relevant.

11:18:44 She's brought in the case about gender 11:18:46 stereotypes, and I think him working for her and doing 11:18:49 work on her behave and his -- her access to him and him 11:18:52 helping her is relevant.

11:18:55 MR. SCHMIDT: I don't think it has anything to do 11:18:57 with the tenured decision. The dean didn't have any 11:19:01 consideration of any of this -- none of these e-mails that 11:19:05 they're talking about ever went up to the dean. The dean 11:19:08 doesn't -- they've collaborated. He's an engineer by 11:19:13 background and so, they have collaborated. But what does 11:19:15 that have to do with this tenure decision?

11:19:17 MS. HILTON: Well, I think it has to do with the 11:19:19 stereotype -- the theory of the case that y'all have put 11:19:22 forward that she's unable to do work and was unproductive

11:19:26 because of the pregnancy is not shown out by the --
11:19:29 MR. SCHMIDT: That's not what we --
11:19:30 MS. HILTON: -- publications.
11:19:32 MR. SCHMIDT: She was productive because of the
11:19:36 pregnancy.
11:19:36 THE COURT: I think that's a little attenuated,
11:19:38 so I'm not going to let you go into --
11:19:40 MS. HILTON: Okay.
11:19:52 Q. (BY MS. HILTON) Dr. Nikolova, when you submitted your
11:19:55 dossier, there was information that wasn't included in it;
11:20:01 is that right?
11:20:02 A. I'm sorry. Can you repeat the question, please?
11:20:05 Q. Yeah. Absolutely. In your rebuttal to the dean's
11:20:10 assessment, you write about reasons that your teaching
11:20:14 scores were lower, right?
11:20:17 A. Yes.
11:20:18 Q. You mentioned dealing with morning sickness?
11:20:21 A. Yes.
11:20:21 Q. Pregnancy?
11:20:22 A. Yes, I did.
11:20:24 Q. That's information you could have included in your
11:20:27 teaching statement when you submitted the dossier,
11:20:29 correct?
11:20:29 A. Yes.
11:20:33 Q. Another thing that you've taken issue with in the

dean's assessment is not responding to student evaluations, right?
A. Yes.
Q. And -- but isn't it true that in your -- you thought that a student -- let me just show you the document. I'm showing you what's been admitted as Plaintiff's Exhibit 1 and I'm on page 2 here. And looking at this paragraph, the dean writes, in their comments, the students did complain about grading of the programming assignments, but they also provided extensive comments about how the classes could be improved. One undergraduate student even provided a comprehensive recommendation for revising the syllabus for EE360C. Dr. Nikolova did not address these comments in her teaching statement. I read that correctly?
A. Yes.
Q. And wasn't your reaction to this that you thought the idea of revising the syllabus was dumb?
A. No. And I addressed it in my rebuttal.
Q. Okay. I'm going to show you an exhibit that has not been admitted. Dr. Nikolova, would it refresh your recollection if I were to show you an e-mail that you drafted to yourself that was a draft about your rebuttal?
A. Sure.
Q. Your Honor, may I approach?

THE COURT: You may.
A. Okay. Yeah. I apologize. You're right.
Q. (BY MS. HILTON) Thank you.
A. Do you mind if I see -- I just don't recall. I just want to see the document to remember the context.
Q. Sure.
A. Yeah, it's an e-mail to myself dated --
Q. That's okay. I was just asking you to refresh --
A. You're right. I'm sorry.
Q. Thank you. Dr. Nikolova, you testified earlier about your recruitment from Texas A & M, correct?
A. Yes.
Q. And you testified that Dr. Tewfik said that you could go up early?
A. Yes.
Q. And you did go up early, right?
A. Yes.
Q. Dr. Tewfik didn't promise an outcome, right?
A. Correct.
Q. And at the time that you went up early, you were aware of the three possible outcomes, correct?
A. I'm not -- no. In fact, my understanding when I was going up was that there would be two possible outcomes.
Q. Okay. Later on, did you become aware from Carmen Shockley that the president could either do not promote, a

11:24:41 terminal appointment, or grant tenure?
11:24:43 A. Yes.
11:24:44 Q. So you could have gotten a terminal appointment?
11:24:47 A. Yes.
11:24:47 Q. Which would have ended your employment with U.T.
11:24:50 A. Yes.
11:24:50 Q. But you didn't get that, correct?
11:24:52 A. Correct.
11:25:05 Q. Dr. Nikolova, you testified earlier that you were shocked about the tenure decision, right?
11:25:11 A. Yes.
11:25:11 Q. And that you wanted to gain an understanding of what happened.
11:25:15 A. Yes.
11:25:16 Q. And I believe we've already established this, but you determined not to meet with the dean, correct?
11:25:22 A. Yes.
11:25:22 Q. And to this day, you've never talked to Dean Wood about her letter, correct?
11:25:27 A. Correct.
11:25:28 Q. Or the reasons in it.
11:25:29 A. Correct.
11:25:30 Q. You're aware that if you felt like you were being discriminated against based on sex or pregnancy, you could have reported it to The Office of Inclusion and Equity at

that time, right?
A. I was told by Brian Evans that -- I believe I was told that I can file some kind of grievance, and he may have told me about the Office of Diversity, Equity and Inclusion. I'm not -- I don't completely recall. I just know that I did not -- I chose not to go that route.
Q. You decided not to do that.
A. Yes.
Q. Let's talk about some of the evaluations you received over the years at U.T. Shortly before you applied for tenure, you went up for your third-year review, correct?
A. Yes.
Q. And that's supposed to be the review that happens, you know, halfway to tenure, right?
A. Yes.
Q. But in your case, since you came up early, it wound up happening just months before?
A. Yes.
Q. And the third-year review committee had some recommended areas for improvement, correct?
A. I believe so. Yes.
Q. But you requested that they remove those.
A. Yes.
Q. And so, you asked for corrections until it was satisfactory to you.

11:27:05 A. I asked for corrections and then, they came back with revision and I was fine with the revision.
11:27:15 Q. And after you went up for tenure, you had a peer teaching evaluation, correct?
11:27:21 A. Yes.
11:27:22 Q. And Dr. Christine Julian conducted that review?
11:27:27 A. Yes.
11:27:27 Q. And she noted some areas for improvement, right?
11:27:32 A. Yeah, I believe so. Yeah.
11:27:34 Q. And there was an exchange back and forth where you asked for her to take those -- remove those areas, as well, right?
11:27:45 A. The exchange was not exactly -- yes, it was in that period, but I'm not sure that I asked her to remove every suggestion for improvement that she made.
11:27:54 Q. But she did make changes at your request?
11:27:57 A. Yes.
11:27:57 Q. And then, another review you received was a faculty annual review, right?
11:28:05 A. Yes.
11:28:05 Q. And they rated you as having meet expectations, right, meeting expectations?
11:28:14 A. Which year are you referring to?
11:28:15 Q. Oh, the 2018-2019 review that was conducted in 2020.
11:28:22 A. Yes.

Q. And so, they rated you as meets expectations.
A. Yes.
Q. And you disagreed with that.
A. Yes.
Q. And so, you asked to change that one, as well.
A. Yes.
Q. Dr. Nikolova, you testified earlier that you had no negative feedback and so the tenure decision was a shock, right?
A. Yes.
Q. But all the negative feedback's been erased.
A. I'm sorry?
Q. All the negative feedback's been erased.
A. No, I don't think that's fair.
Q. Well, let's talk about teaching. As a part of your job as a professor, you're responsible for grades, correct?
A. Correct.
Q. And sometimes students would ask for a change to their grade, right?
A. Yes.
Q. And you would deny those requests.
A. Sometimes.
Q. And you denied it because it wasn't fair to those students?

11:29:35 A. Yes.
11:29:40 Q. Dr. Nikolova, after the president's decision, you didn't want to meet with dean but you -- you would have been happy to meet with President Fenves, right?
11:29:52 A. Yes.
11:29:52 Q. And that's because he's the one who has authority to give you tenure, right?
11:29:56 A. Yes.
11:30:03 Q. I want to ask you a little bit about the effect of the tenure decision. You testified with Mr. Schmidt earlier that two years after the decision, you went to a really dark place, right?
11:30:20 A. And so, that would have been -- that was February of 2021. Yes.
11:30:25 Q. And you know that's -- you said you were working from home because of the pandemic, right?
11:30:32 A. Yes.
11:30:32 Q. And February 2021 is after you gave birth to your third child?
11:30:37 A. Yes.
11:30:37 Q. And you working from home because of COVID.
11:30:41 A. Yes.
11:30:42 Q. And I mean, it's a year into the pandemic, I mean, rough on everybody, right?
11:30:48 A. Yes. More so some people than on others.

11:30:53 Q. And let me show you what's been previously admitted as Plaintiff's Exhibit 26. Thank you for your patience. Sorry about that. I'm sorry, I misspoke, it's Defendant's 26, not Plaintiff's 26.

11:32:10 Is this a text message that you sent to Dr. Tewfik?

11:32:15 A. Yes, it is.

11:32:16 Q. Okay. And it says, you know, it would not help to withdraw and resubmit next year due to a, redacted, your child's name, birth. I anticipate a dip in my productivity metrics in this next academic year. I read that correctly?

11:32:33 A. Yes.

11:32:34 Q. And so, you're not saying here that you anticipate a drop in productivity based on the application of stereotypes, right?

11:32:46 A. I'm sorry. I did not understand your question.

11:32:48 Q. Sure. You're not saying in this text message that you think that you're going to have a dip in productivity because stereo typically, women who have children are less productive, right? That's not what you're saying here.

11:33:04 A. I did not mention anything about stereotypes in this text message.

11:33:12 Q. Dr. Nikolova, you testified earlier with Mr. Schmidt that you believe that you have a nil chance at getting

tenure again at U.T., right?
A. At this point, yes.
Q. But there's a new president at U.T., right?
A. Yes.
Q. And a new dean in the College of Engineering?
A. I believe so. Yes.
Q. And a new chair of the department, right?
A. Correct.
Q. I pass the witness.

RE-DIRECT EXAMINATION

BY MR. SCHMIDT:
Q. Dr. Nikolova, regarding your not meeting with the dean, again, Dr. Tewfik said it would be fine. He understood why you didn't want to meet?
A. Yes.
Q. Words to that effect. But he did meet with the dean, correct?
A. Yes.
Q. And then, he reported back to you what had been said?
A. Yes.
Q. And if we can look at Plaintiff's Exhibit 110. And go to the, middle, Tuesday, February 19 at 10:20. Bottom there, that paragraph after he had met with the dean; is that right?
A. Yes.

11:34:46 Q. And he says the dean didn't elaborate on what's in the letter and said what's in the letter is very clear. The new information is the dean advises against trying next year so she suggested you should keep going for another two years, correct?
11:34:59 A. Correct.
11:35:00 Q. And waiting at least for one more year to take care of the research sustainability issues and improve teaching scores. Do you see that?
11:35:10 A. Yes.
11:35:11 Q. So that's what was in that letter, correct?
11:35:16 A. Correct. The two factors for denial, yes.
11:35:20 Q. And there's nothing in this letter and nothing in the e-mail, the dean didn't say anything at all about improving journal publications that the president felt your journal publications weren't appropriate, correct?
11:35:31 A. Correct.
11:35:32 Q. Okay. Done with that. You mentioned you can collaborate with some other researchers here at U.T. Is that the other thing?
11:35:42 A. Correct.
11:35:44 Q. Counsel for U.T. had talked about if you had rescinded your pregnancy extension or probationary extension, that you still wouldn't be in your up or out year, correct?

A. Correct.
Q. But did the dean say anything -- did the probationary extension -- based on what you understood from this case, did that have anything to do with why you were technically early and how there's a higher bar for you? Kind of convoluted questioning. Are you following it?
A. No. I lost you.
Q. Okay. Fair enough. When you had the probationary extension, that made you two years early according to the dean's logic, correct?
A. Correct.
MS. HILTON: Objection. Leading.
THE COURT: Go ahead.
Q. (BY MR. SCHMIDT) If you had rescinded your probationary -- did the dean say anything about there being a higher bar that's even higher if you're more than -- depending on how many years early you are? Does that make sense?
A. Yes. I didn't have that knowledge prior to submitting my tenure documents, but I did see that in the CCAFR interview that the dean gave to the CCAFR committee.
Q. So basically if I'm understanding this correctly is what the dean said is that because you were two years early, because you didn't rescind that probationary extension, you needed to be even better than if you'd just

been one year early, right?
A. That's correct. That's what I learned subsequently.
Q. And so, she's saying -- so she is, first of all, holding you to a higher bar because you didn't extend the pregnancy extension, correct?
A. Correct.
Q. Okay. And if you hadn't rescinded it, then maybe the bar wouldn't be quite as high?
A. Correct. And I feel that she additionally held me to a higher bar where she in the last exhibit you showed in the summary of Ahmed of his meeting with the dean, she advised specifically for me to not go up that immediate following academic cycle but wait for -- skip one and wait two, two additional years in order to go up for tenure. So she basically specifically was saying that I should use extra time to kind of make sure I do all the extra work I was told I need to do before I go for tenure. So I took that to mean that I am given even a higher load because I had been pregnant.
Q. Let me ask you this. Defendant's counsel for U.T. had asked you about the dossier and stated the dossier -- I think you responded that the dossier is something that you put together?
A. Yeah, that's the part of -- the accurate would have been that part of the dossier I put together and there is

a part that others worked on.

Q. You put together your statement, your CV?

A. Correct.

Q. But a lot of the dossier is work that's totally outside your knowledge, correct?

A. That's correct, including external letters.

Q. Again, there was criticism of you that you were having your students work on your dossier and were they doing any substantive work?

A. No, they weren't.

Q. Pull up Exhibit 92. Pull up Plaintiff's Exhibit 92. And in the middle, it says -- this is during the tenure review process, correct?

A. Correct.

Q. And during this process, the -- Jilda is the woman that's helping everyone who's going up in the tenure process in the promotion process. Is she the one that's helping people fix their dossiers and get them in technical form?

A. Correct.

Q. And so, she -- is this correct? I'm just trying to move this on here. But she had sent and e-mail out asking for some changes. Is that what your understanding is?

A. Correct.

Q. And another professor at U.T. who's also going

11:40:05 through the promotion process says Jilda, thank you but I
11:40:08 will not trouble you with this matter. I will ask my
11:40:11 admin since I'm now traveling and have limited access and
11:40:15 zero computer the next two days?
11:40:17 A. Correct.
11:40:18 Q. So other people are also asking other people for
11:40:20 assistance, not just you?
11:40:21 A. Correct.
11:40:21 Q. And again, did you know there was anything wrong with
11:40:24 having your students help you?
11:40:26 A. No, I didn't.
11:40:27 Q. And just for purposes are your students being paid
11:40:30 while they're helping you?
11:40:30 A. Yes.
11:40:32 Q. It's like a work study student -- I know you're
11:40:35 graduate higher level, but in my world, it was what we
11:40:38 called work study. I'm old.
11:40:43 Also counsel for defendant said that you didn't
11:40:47 raise pregnancy in your original teaching statement, that
11:40:53 didn't offer that out as an excuse for your teaching
11:40:56 scores, correct?
11:40:56 A. Correct.
11:40:57 Q. Why didn't you put that in your original -- in your
11:41:01 teaching statement? This is what goes in your dossier,
11:41:03 right?

11:41:03 A. Right. My understanding and I learned subsequently that I've been wrong, but my understanding was that I should only include professional reasons and not personal reasons in my teaching statement.

11:41:16 Q. Well, did you think your teaching scores and your teaching needed an explanation that I'm pregnant at that point?

11:41:24 A. No. I didn't think so because my mentor Sanjay had specifically told me that my teaching scores would not be an issue.

11:41:33 Q. Well, and also, isn't it true that your teaching scores in the class that they're criticizing you for that you were the third highest instructor that has taught that particular class?

11:41:45 A. Correct.

11:41:45 Q. So were you -- how many people were you higher than in that particular class if we're just comparing people who teach that class? And I think we looked at this yesterday, but of those people who taught that class and who weren't just lecturers, the lower level but of tenured and assistant tenure track professors, do you know how many people like that were below you?

11:42:09 A. Yes. We looked at that yesterday. I don't know if the jury remembers, will remember, but we saw a list of teaching scores with all the instructors who had taught

the class he had received since 2005. From that list, I was -- I have the third highest teaching scores out of the 13 instructors and I believe we heard an objection that some lecturers were included in that list. So I went back and I counted that there were three lecturers on that list or three lectures had lower scores than mine. So if those were removed, instead of out of 13, I would have been the third out of 10, 10 that are tenure track faculty.

Q. So there were a number of tenured professors, tenured track professors that you were still higher ranking coarse in your teaching class?

A. Correct. I was only behind two full professors who also were native English speakers.

Q. Okay. And I don't think -- I'm happy to admit it but my Exhibit 107, did you want to admit that?

MS. HILTON: No.

Q. (BY MR. SCHMIDT) You you were being questioned about an exhibit that hasn't been admitted into court but where you said something that it was a dumb idea to go to the students?

A. Yeah.

Q. Let me pull that up for you look at. Take a look at that e-mail. Do you see the date that was written?

A. The December 1st, 2018.

MS. HILTON: Object, your Honor. I think this is

11:43:52 either like improper refreshing, but she can't just read
11:43:57 off of the document and testify to it. She can refresh
11:44:01 her recollection.

11:44:01 Q. (BY MR. SCHMIDT) Okay. Yeah, can you refresh?

11:44:03 THE COURT: Fine.

11:44:04 MR. SCHMIDT: I'm just identifying it for her
11:44:06 and, you know, I can offer it into --

11:44:10 THE COURT: Yeah.

11:44:11 MR. SCHMIDT: Why don't we go ahead and offer it
11:44:13 into evidence.

11:44:14 MS. HILTON: I'm going to object to that because
11:44:16 it's hearsay.

11:44:17 MR. SCHMIDT: It's her writing her own thoughts
11:44:20 about this whole situation.

11:44:21 THE COURT: Overruled.

11:44:22 MR. SCHMIDT: It's not being offered for truth of
11:44:24 the matter asserted, anyway.

11:44:25 THE COURT: Overruled and admit it.

11:44:27 Q. (BY MR. SCHMIDT) Okay. So if we can pull that up.
11:44:33 So do you see when this was written, December 1st, 2018.
11:44:37 That's just a day or two after you had gotten the denial
11:44:43 by the dean, correct?

11:44:44 A. That's right.

11:44:45 Q. And it's at 12:36 a.m., correct?

11:44:48 A. That's right.

Q. And if you scroll, I think there's even a few more where you're sending these e-mails to yourself in the middle of the night, correct?
A. That's right.
Q. Thinking about it, trying to figure out what was going on, right?
A. Yeah.
Q. And that e-mail to yourself, you write that -- I can't even find where it is in the document, but you said something to the effect that that was a dumb idea. This is you pondering and thinking about all this stuff in middle of the night?
A. That's right.
Q. Day after you'd learned that you'd been denied.
A. That's right. And I'll clarify because there is hi Ahmed. So I was drafting an e-mail to Ahmed, but I was aware that it was not a published e-mail and I never would have, you know, gotten a document out in a professional setting that contained the word "dumb." So I apologize but yeah, that was a draft to myself that I was preparing to send to my chair.
Q. Okay. And counsel for U.T. asked that -- pointed out that you didn't go to the OAE and file a complaint, correct?
A. That's right.

11:45:55 Q. But did you think going to the top person at U.T. and
11:45:59 asking for, you know, pointing of these things out, what
11:46:03 did that -- would that have any significance to you?
11:46:06 A. Yes. Basically I considered my avenues for appealing
11:46:10 the decision. I was informed that there were four
11:46:14 different avenues. Two of them to me seemed like the
11:46:19 constructive way to get a fair reconsideration of my
11:46:23 tenure and dossier, to get the decision possibly reversed.
11:46:28 So at that time, I didn't have an interest in complaining,
11:46:32 you know, just raising a discrimination flag and saying
11:46:35 oh, no, you know, we should immediately like go after U.T.
11:46:39 I really just wanted to get tenure, and so, I chose those
11:46:43 avenues that were most likely to give me tenure. The
11:46:46 other two avenues, if I recall, were going to the omnibus
11:46:52 office at U.T. And I guess the fourth one would have been
11:46:56 fighting a grievance.
11:46:58 Q. And I will point out -- let's pull up your request
11:47:01 for reconsideration letter, Plaintiff's Exhibit 32. And
11:47:07 go to the second page. On the page 3, footnote No. 3. Or
11:47:33 5. Footnote No. 5. Did you put into the letter that if
11:47:38 they're not going to reverse the decision, says in the
11:47:41 event you decline to reverse the decision, I respectfully
11:47:44 request this request for reconsideration be considered to
11:47:47 invoke all other grievance or appeal procedures available
11:47:51 in U.T. policies and procedures including, and you cite

some other policies about a grievance panel.

So you were -- again, why were you going to the president?

A. That's right. Because I felt that he was the only person that had the power to overturn -- to reverse his decision.

Q. And the defendants talked to you about in your third year review, you had asked for some corrections to be made.

A. Yes.

Q. And pull up Plaintiff's Exhibit 80 in the middle paragraph there. Have you seen this before? Or let me ask you. This is an -- Ananth? Is that his name?

A. Yeah.

Q. Was he the leader of your third year view?

A. It seems like it for this -- from this e-mail.

Q. And in here, he's explaining they revised it, right?

A. Correct.

Q. At the time the earlier version was written, the committee were not aware that she was being put up for tenure and promotion, a promotion and tenure. Normally there is enough runway time between the third year view and being put up for promotion that some of the suggestions made in the third year -- were made in the third year review were met. It was in that spirit that

11:49:14 these suggestions now removed were made. And then it says
11:49:20 I request that you please inform Evdokia of this. The
11:49:25 committee is very supportive of her and her contributions.
11:49:28 Do you see that?
11:49:29 A. Yes, I do.
11:49:30 Q. So basically if there had been something negative in
11:49:33 your third year review at the time you were going up,
11:49:36 would that have been a problem?
11:49:37 A. Yes. I fear that would be.
11:49:40 Q. And would you have had time to even correct those by
11:49:42 the time you went up?
11:49:43 A. Well, as it happens, I actually had corrected their
11:49:47 review, so it wasn't just a baseless removal of some
11:49:50 suggestion. It was based on facts that I had
11:49:52 subsequently.
11:49:53 Q. That's right. In fact, around the time you'd gotten
11:49:55 some additional publications?
11:49:57 A. Correct.
11:49:58 Q. And then, they also said you had asked for some
11:50:03 corrections on the review by Dr. Christine Julian, a peer
11:50:07 teaching review?
11:50:08 A. Correct.
11:50:09 Q. And when did you -- when did that review take place?
11:50:13 Was that after the elephant in the room e-mail?
11:50:15 A. It was several months after the tenure decision.

Q. And was -- did you feel like that was a fair performance -- teaching evaluation?
A. No, I did not.
Q. And can you explain like what was the problem with why that wasn't a good -- just briefly about the nature of the class and were you even teaching the class?
A. Sure. So the peer-teaching evaluation was done very late in the spring semester, following the tenure denial that I received. It was, I believe, around early May, which is when the students are anxious, they are tired from the semester, they are wrapping up, they are starting to move final projects and studying for final exams. Their final exams are looming and so they're not as engaged in the class.

And I believe part of the criticism in the review was that the students were not so engaged in class, and I felt it was not fair because we were at the point in the class with the last two week of graduate classes, this is a time where they give presentations. And so, it was not a standard lecture where I was standing up in front of the class teaching. It was a student giving presentation for much of the class and then, we had a discussion with the students.

So I just felt it was not representative of my teaching. And also being down so late in the semester, it

wasn't representative of the student engagement they way it had been as an average over the semester.

Q. As I understand and I looked at these documents, but is it true that for much of the class, you weren't even teaching the class, that was the presentation by the student?

A. It was presentation -- yeah, student presentation.

Q. And so, you asked that that be taken into account.

A. Yes, I did.

Q. And you'd asked for corrections in the annual evaluation. Was that also after this lawsuit?

A. It was one year after the lawsuit was filed.

Q. And again, did you believe that the -- let me just ask you, do you believe that the criticism or the way the evaluation was written was fair and credible and accurate?

A. Absolutely not.

Q. Okay. And then, finally, defendants have shown this several times, Defendant's Exhibit 26. Let's go ahead and pull that up. This is the text message where you were talking to -- I guess the point I want to make, defendants had read this exhibit partway through the text but they -- let's go down. They read the first part of it, but if you go down to the bottom, the part that they haven't read is in the -- you say while in the past, why don't you read that part where it says while in?

11:53:57 A. While in the past academic year, I actually had a peak in performance with five top venue publications and seven publications total, relative to an average of three-four in prior years.

11:54:12 Q. Okay. So you know, when they're saying that your performance is declined, you were -- you know, we've looked at the publications. I didn't perhaps do it -- on your CV. If you look at that, your, publications had actually increased?

11:54:30 A. Correct.

11:54:30 Q. And then, finally, about whether to go up for tenure again or what your chances are for going up for tenure again, they mentioned there's a new president and a new dean, correct?

11:54:42 A. Correct.

11:54:42 Q. But Dean Wood -- Dean Wood is also still -- she's gotten a promotion, correct?

11:54:49 A. Correct.

11:54:49 Q. And she's the provost now?

11:54:50 A. Correct.

11:54:51 Q. And she's going to be involved in any tenure decision?

11:54:55 A. Correct.

11:54:56 Q. And then, also, all of your colleagues that are in the ECE committee -- or ECE department?

11:55:04 A. Correct.
11:55:05 Q. Do you feel like you were treated -- I don't want to get into -- let me back up. As far as getting letters from people outside of the professional academic community, do you feel your denial of tenure will make that harder to get letters from professionals out in the academic community?
11:55:24 A. Very much so.
11:55:25 Q. Do you think this has hurt your reputation and is going to make it harder for you to get the support that you would need?
11:55:32 A. Absolutely.
11:55:33 Q. Okay. And, Dr. Nikolova, you know, when talking about your career, how long did you want to be a professor and teach and work?
11:55:46 A. I mean, it was a dream. I just always thought, you know, what is the next step? What is the next, you know, step up in my career, and I was very much looking forward to develop, develop as a researcher, develop as, you know, an academic, as a very highly recognized and respected professor in my field.
11:56:06 Q. Well, did you think you were going to be doing this for a lifetime?
11:56:08 A. Sure. I mean, as I mentioned at Simons, I really looked up to the director the Turing winner, Professor

Karp was age 83, 84, I believe at the time that he was the director and invited me to be a work -- you know, semester co-organizer.

Q. And so, I mean, I don't know if you know how long you plan to work, but did you plan to, you know, continue working for, you know -- are you going to retire right when you're 65 and quit? Or what was your intention?

A. I would have liked to continue. I would like to continue working as long as I felt productive.

Q. Okay. I have no further questions. Thank you.

RE-CROSS EXAMINATION

BY MS. HILTON:

Q. Dr. Nikolova, Mr. Schmidt just showed you looking at Plaintiff's Exhibit 110 and there's an e-mail down here from Dr. Tewfik, right?

A. Yes.

Q. And he's talking about what information he got from the dean after he met with her, right?

A. Yes.

Q. Okay. This is the meeting that he goes because you don't want to go, right?

A. Yes.

Q. Would agree with me that a conversation would give you a lot more information than an e-mail, right?

A. No.

11:58:19 Q. You wouldn't agree that you would get a lot more information from a dialog than two bullet points?
11:58:24 A. No.
11:58:25 Q. Okay. So you don't think that in a conversation with a back and forth, you know, you ask questions, get feedback, you think this is the same thing?
11:58:33 A. I think that summarized the most important points. Yes.
11:58:36 Q. But you don't know that because you didn't have a conversation.
11:58:39 A. That's correct.
11:58:40 Q. You testified that there were certain things in your dossier that were outside your knowledge, correct?
11:58:57 A. Correct.
11:58:58 Q. Did you -- so you just didn't know the process?
11:59:04 A. Beyond what was required of me, I wasn't fully aware of the additional things in my dossier. Correct.
11:59:11 Q. Okay. And I mean, when you went up for tenure, you didn't know anything about the budget council, right?
11:59:17 A. I did not. Correct.
11:59:18 Q. And so, I mean, did you just never read the promotion and tenure guidelines?
11:59:26 A. I read a very long checklist, yeah, that was -- I'm not sure it was part of the guidelines. It was a checklist of documents that I was supposed to submit.

Q. Okay. Let me show you Defendant's Exhibit 4. This is a 21-page guideline for promotion. Did you read this document?

A. Either read it or skimmed over it.

Q. And to be clear, this is -- this is the process you need to follow when you're applying for lifetime appointment, right?

A. Yes.

Q. Dr. Nikolova, would it affect your analysis of the likelihood of you getting tenure at U.T. again if Dean Wood recused herself from your tenure case?

A. No.

Q. Mr. Schmidt asked you questions about --

A. I'm sorry. Can you repeat the question?

Q. Yes. I'm asking you, you testified that even though there's a new president, new dean, new chair, new pyramid, that you still believe that you have a decreased chance of getting tenure at U.T. because Dean Wood is still at U.T., right? That was your testimony?

A. My testimony is that I have a significantly decreased chance of getting tenure at U.T., period.

Q. So okay. It doesn't impact your analysis of that Dean Wood would not -- if she were not involved at all in your tenure process in your next time up.

A. I think I have a -- I think I would have a decreased

12:01:36 chance of -- significantly decreased chance to get tenure
12:01:40 and probably even more so decreased if Dean Wood is part
12:01:45 of the process, but the level of reduction, I cannot, you
12:01:48 know, mathematically estimate.
12:01:50 Q. Well, so what I'm asking is a little bit more
12:01:52 specific is, if she recuses herself, if she is not part of
12:01:56 the process, how does that impact your evaluation of your
12:02:00 chances for success?
12:02:01 A. I still think that I have a significantly decreased
12:02:04 chance of getting tenure.
12:02:05 Q. Mr. Schmidt asked you about your faculty annual
12:02:11 reviews. And I want to ask you, isn't it true in the '15
12:02:16 to '16 academic year, you got a meets expectations review?
12:02:20 A. I think I did. Yes.
12:02:21 Q. And again, in academic year '17-'18, you got a meets
12:02:27 expectation evaluation.
12:02:28 A. I will take your word for it because I don't remember
12:02:30 what I got every year.
12:02:32 Q. Would you like to look at it?
12:02:34 A. If you want to.
12:02:39 Q. So this is Defendant's Exhibit 53 and here you are
12:02:44 right here and this is for the academic year 2017 -- or
12:02:50 '18-'19 and it says meets expectations, correct?
12:02:54 A. Yeah.
12:02:55 Q. And so, you got meets expectation in '15-'16. Meets

12:03:02 expectations in '17-'18. So meets expectation in '18-'19 was nothing new.
12:03:05
12:03:12 A. So first of all, I thought you were showing me that
12:03:14 -- I thought you were showing me the meets expectation for
12:03:16 '17-'18. The '18-'19, we discussed, so I'm aware of it.
12:03:21 Q. Sure. So here's your '15-'16 meets expectations,
12:03:27 right?
12:03:28 A. Correct.
12:03:29 Q. Okay. Dr. Nikolova, the possible evaluations for
12:04:02 these faculty annual reviews are exceeds expectations,
12:04:06 meets expectations, and not meeting expectations, correct?
12:04:11 A. Correct.
12:04:15 Q. I have no further questions. Pass the witness.
12:04:19 RE-DIRECT EXAMINATION
12:04:19 BY MR. SCHMIDT:
12:04:28 Q. I have just a couple of quick questions.
12:04:30 Dr. Nikolova, you got a meets expectations in
12:04:35 2015 and 2016 according to -- and I think that's a fact,
12:04:39 according to the documents that counsel was just. Did you
12:04:44 have anything going on with you personally that year?
12:04:47 A. Yeah, I gave birth to my first child.
12:04:50 Q. And then, you also got a meets expectations in
12:04:54 2017-'18. Was there something in that year that?
12:04:59 A. I gave birth to my second child, Alitza.
12:05:03 Q. So the years that you gave birth are the years you

12:05:05 got meets expectations.

12:05:07 A. Correct.

12:05:08 Q. Thank you. No further questions.

12:05:10 THE COURT: Anything further, Ms. Hilton?

12:05:18 MS. HILTON: One moment, your Honor. No further

12:05:42 questions, your Honor.

12:05:42 THE COURT: Thank you. You may step down.

12:05:44 Your next witness.

(End of requested portion.)

* * * * * *

UNITED STATES DISTRICT COURT )
WESTERN DISTRICT OF TEXAS)

I, LILY I. REZNIK, Certified Realtime Reporter, Registered Merit Reporter, in my capacity as Official Court Reporter of the United States District Court, Western District of Texas, do certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

I certify that the transcript fees and format comply with those prescribed by the Court and Judicial Conference of the United States.

WITNESS MY OFFICIAL HAND this the 28th day of April, 2022.

Lily Iva Reznik

~~~~~~~~~~~~~~~~~~~~~~~
*LILY I. REZNIK, CRR, RMR*
*Official Court Reporter*
*United States District Court*
*Austin Division*
*501 West 5th Street,*
*Suite 4153*
*Austin, Texas 78701*
*(512)391-8792*
*SOT Certification No. 4481*
*Expires: 1-31-23*
~~~~~~~~~~~~~~~~~~~~~~~