UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| EVDOKIA NIKOLOVA §<br>  Plaintiff, §<br> §<br>V. §<br> §<br>UNIVERSITY OF TEXAS AT AUSTIN, §<br>  Defendant. § | CASE NO. 1:19-cv-00877-RP |

**PLAINTIFF'S MOTION TO AMEND JUDGMENT TO INCLUDE FRONT PAY**

TO THE HONORABLE JUDGE ROBERT PITMAN:

In accordance with the Court's order entering judgment (Dkt. 106), Fed. R. Civ. P. 59(e) and 54 (and any another applicable rules), Plaintiff Evdokia Nikolova ("Dr. Nikolova") files this Motion to Amend Judgment to Include Front Pay. Dr. Nikolova respectfully requests and moves for the Court to award front pay as follows:

**I.   Title VII Requires That a Plaintiff Who Has Been Discriminated Against Be "Made Whole."**

The Supreme Court has made clear that:

It is . . . the purpose of Title VII to *make persons whole for injuries suffered on account of unlawful employment discrimination*. This is shown by the very fact that Congress took care to arm the courts with full equitable powers. For it is the historic purpose of equity to secure complete justice. Where federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief. Title VII deals with legal injuries of an economic character occasioned by racial or other antiminority discrimination. The terms "complete justice" and "necessary relief" have acquired a clear meaning in such circumstances. Where . . . discrimination is concerned, *the district court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future*. And where a legal injury is of an economic character, the general rule is, that when a wrong has been done, and the law gives a remedy, *the compensation shall be equal to the injury*. The latter is the standard by which the former is to be measured. *The injured party is to be placed, as near as may be, in the situation he would have occupied if the wrong had not been committed.*

1

*Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418-19, 95 S. Ct. 2362, 2372 (1975) (emphasis added). This is frequently referred to as the "make whole" purpose of Title VII. *See id., Armstrong v. Turner Indus.*, 141 F.3d 554, 560 (5th Cir. 1998). "Under the 'make whole' remedial theory, a court's first task is to determine the injuries caused by discrimination that require judicial relief. In other words, the court must ascertain in what way the plaintiff is not 'whole.'" *Armstrong* 141 F.3d at 560.

"Front pay is awarded to meet the goal of Title VII to make whole the victims of discrimination." *Floca v. Homcare Health Servs., Inc.*, 845 F.2d 108, 112 (5th Cir. 1988). It should be awarded if it will help meet the goals of Title VII. *Id.* "Front pay . . . is intended to compensate the plaintiff for wages and benefits [s]he would have received from the defendant employer in the future if not for the discrimination." *Julian v. City of Hous.*, 314 F.3d 721, 729 (5th Cir. 2002).

## II. UT Austin's Recent Recommendation For Tenure and Salary Increase Does *Not* Place Dr. Nikolova In The Same Position She Would Be In Had UT Austin Not Discriminatorily Denied Her Tenure In 2019.

As noted in Dr. Nikolova's Advisory to the Court Regarding Plaintiff's Motion for Judgment and Front Pay (Dkt. 105), on July 15, 2022, Defendant University of Texas at Austin ("UT Austin") provided Dr. Nikolova a letter in which the current UT Austin president, Jay Hartzell, stated that he had "decided to recommend to the Board of Regents that you be promoted to associate professor with tenure effective September 1, 2022. Your nine-month salary will be increased effective the same day to $132,000 . . ." (Dkt. 105-1)[1] While at first blush this notice of

---

[1] Interestingly, the UT Austin president stated that the decision was in response to a detailed letter sent to the former UT president, Greg Fenves, on March 25, 2019, more than three years earlier and well before this lawsuit was filed. In the letter, which was the subject of significant testimony at trial, Dr. Nikolova raised concerns of sex and pregnancy discrimination, provided

2

a recommendation for tenure and a salary increase might arguably seem to end the necessity of front pay (and Plaintiff expects UT Austin to make that argument), it does not.

Notably, as of the filing of this motion two months after President Hartzell's letter, the University of Texas Board of Regents has still not voted to approve tenure. This is in spite of the fact that the Board met on August 24-25, 2022, more than a month after the letter was sent; and over five months after the jury verdict in this case.

Moreover, even assuming the Board does eventually approve the recommendation for tenure for Dr. Nikolova at the $132,000 salary rate stated in the letter, UT's belated action does not make Dr. Nikolova "whole" or put her in the same position economically she "would have occupied if the wrong had not been committed." *See Albemarle*, 422 U.S. at 418-19. This is the case for multiple reasons set out in this motion and in the supplemental expert report of economist Dr. Tom Glass (who testified at trial), wherein he calculated Dr. Nikolova's front pay damages to a reasonable economic probability. Exhibit 1, Glass Supplemental Report.

### III. UT Austin's Discrimination Caused Dr. Nikolova Severe Depression Which Forced Her To Take Leave Without Pay Through September 2023, Resulting in 1.5 Years of Lost Front Pay/Economic Damages.

First, Dr. Nikolova has been on leave without pay since the jury verdict and will continue to be on leave without pay through September 1, 2023 because of severe depression caused by UT Austin's illegal discrimination. Thus, Dr. Nikolova will suffer approximately a year and a half of total lost income and economic damage. As Dr. Nikolova testified at trial, UT Austin's illegal and discriminatory denial of tenure had a devasting emotional impact that caused her to spiral into a severe depression and forced her to take unpaid leave in the Spring of 2021. *See* Nikolova Trial

---

detailed comparisons of her record to that of others who had been awarded tenure, and urged UT Austin to reconsider its preliminary decision to deny her tenure. Plaintiff Trial Exhibit 32. UT Austin never replied to that letter, until after vigorously fighting this lawsuit and a jury deciding that UT Austin had discriminated against Dr. Nikolova due to her gender and pregnancy.

Testimony at 75:9-76:18, 78:1-81:4, 81:23-82:14, and 83:7-84:17; Exhibit 2, Declaration of Dr. Evdokia Nikolova, ¶ 4. The depression worsened and on the advice of her mental health providers, Dr. Nikolova was forced to request a reasonable accommodation and go on leave without pay for the 2021-2022 academic year. *Id.* Although the trial and verdict of the jury was extremely important to Dr. Nikolova, she still remains severely depressed and unable to work because of UT Austin's discriminatory denial of tenure and the resulting damage that was done to her career, dreams and aspirations. Ex. 2. ¶ 5. After the trial, on the advice of her psychologist, because of her ongoing depression caused by UT Austin's actions against her, Dr. Nikolova was forced to request an additional leave of absence without pay for the 2022-23 school year. *Id.*, Exhibit 3, Emails between Nikolova and UT Austin re Leave. UT Austin agreed to Dr. Nikolova's request. Thus, from the date of the verdict through September 1, 2023, Dr. Nikolova will sustain a complete loss of salary (or "front pay") caused by UT Austin's illegal discriminatory actions.

Moreover, if Dr. Nikolova is to be made "whole" and put in the same position she would be in had UT Austin not discriminatorily denied her tenure in 2019 as Title VII directs, her lost salary economic damages, both for her time on leave without pay through September 1, 2023, as well as in future years, should *not* be calculated at the annual nine-month salary of $132,000 stated by UT Austin in its recent letter (Dkt. 105-1). Rather, the actual salary and resulting damages should be calculated based on *what she would be paid had she been granted tenure in 2019*. That number is actually easy to determine with reasonable certainty by looking at the salary that was awarded to a colleague and comparator from her same department, Electrical and Computer Engineering ("ECE"), Dr. Mohit Tiwari, who went up for and received tenure at the exact same time that UT Austin discriminatorily denied Dr. Nikolova tenure.[2]

---

[2] Dr. Tiwari is the most similarly situated comparator to Dr. Nikolova for salary purposes. He started as an Assistant Professor at UT Austin in the fall of 2013-14. Plaintiff's Trial Exhibit 146.

4

At the time Dr. Tiwari received tenure on September 1, 2019, UT Austin paid him $130,500 for the 9-month academic year. Defendant's expert, Dr. Donald Deere, testified that he calculated the average rate that an ECE Department faculty member's salary goes up in a year in which they do not receive a promotion to be 4.86% per year, removing the outlier academic year of 2020-21 during Covid when no professors received a salary increase. (*See* Dkt. 102, p. 9, Dkt. 102-1, 30:19-21). Applying this rate of increase and not including an increase in the Covid year 2020-21, Dr. Glass has conservatively calculated that Dr. Tiwari's salary 9/1/22 for the 9-month academic year of 2022-23 is $143,493[3] (compared with $132,000 for Dr. Nikolova). Thus, had UT Austin not illegally discriminated against Dr. Nikolova and had granted her tenure at the same time as Dr. Tiwari in 2019, her salary would reasonable be expected to be the same as Dr. Tiwari's, $143,493 for the 9-month academic year of 2022-23.[4] Using this number, which represents what would make Dr. Nikolova whole and put at the same level as if UT Austin had not discriminated against her and illegally denied her tenure in 2019, Dr. Glass has calculated that Dr. Nikolova's economic front pay damages for lost compensation (based on a 9-month academic year) because of leave

---

Dr. Nikolova started at UT Austin in the spring of 2013-14. Plaintiff's Trial Exhibit 10. Moreover, Dr. Nikolova arguably had better qualifications given the fact that she had two more years of experience than Tiwari as an Assistant Professor prior to arriving at UT. P's Trial Exhibits 10 and 146.

[3] Adding in UT's retirement contributions (which Defendant's expert Deere also considered to be an appropriate element of damages, Dkt. 102-1, 34:5-15), Dr. Tiwari's total nine-month compensation for the 2022-23 academic year is $154,972.)

[4] Multiple cases discuss that a court should award either front pay *or* instatement, including *Bogan v. MTD Consumer Grp., Inc.*, 919 F.3d 332, 336 (5th Cir. 2019) cited in Plaintiff's Motion for Judgment. (Dkt. 99) In this case, Defendant's award of tenure and raise of salary to $132,000 is *not* the same as a Court awarded remedy of instatement for multiple reasons. First, the $132,000 salary UT Austin decided upon is significantly below the salary of Dr. Tiwari, the most accurate comparator possible and a partial gage of what Dr. Nikolova would have been paid had UT Austin not illegally discriminated against her. Additionally, UT Austin's apparent promotion was not a remedy awarded by this Court, so front pay is still necessary to "make whole" Dr. Nikolova.

without pay caused by Defendant UT Austin through 9/1/23 (when she is able to return to work) is **$219,768**.

IV. **UT Austin's Illegal Denial Of Tenure Will Continue To Negatively Impact Dr. Nikolova's Pay and Result In Economic Damages Throughout Her Career.**

In addition to the front pay damages relating to Dr. Nikolova's leave without pay attributable to UT Austin's illegal actions, Dr. Nikolova will continue to suffer ongoing economic damages throughout her career, in spite of UT Austin's recent apparent award of tenure and salary increase. This was referred to at trial and in Plaintiff's Motion for Judgment (*see* Dkt. 99 at page 11) as the "escalator analogy."  As Dr. Glass explained at trial, "If your neighbor got a raise last year and you don't get a raise till next year, is there any reason to believe that you would ever catch up to him? He will continue to get raises and you will continue to get raises. So there's no reason to believe that you're going to catch up. A marathon runner that gets a mile head start, there's no reason to believe that you would ever catch up to that marathon runner, if y'all are both kind of equal kind of people, you're going to stay behind." Glass Trial Testimony Dkt. 99-1 11:11-20. That difference in salaries creates a lasting salary differential and damages that in a reasonable probability will continue over Dr. Nikolova's career. *Id.* 11:11-25.

Starting with the new salary of $132,000 for Dr. Nikolova for the 2022-23 9-month academic year[5] compared to the salary of $143,493 for her ECE comparator, Dr. Tiwari, Dr. Glass calculates that Dr. Nikolova's total damages – the difference in what she will be paid versus what

---

[5] Defendant's own economic expert projected that if Dr. Nikolova were tenured on September 1, 2023, her salary would be $146,665 versus Dr. Nikolova's new salary of $132,000 on September 1, 2022. Dkt. 102 at 9, Dkt. 102-1 30:22-25. If UT were to increase Dr. Nikolova's salary in 2023 (which is completely improbable given she is on leave without pay and UT Austin has not given Nikolova a single raise since being on leave without pay in the spring of 2021, except for this time after the trial), using Defendant's expert's 4.86 percent average annual rate of increase, on September 1, 2023, Dr. Nikolova's salary would be $138,415, well below what Defendant's expert projected her salary would/should be.

6

she would have been paid had UT Austin not illegally denied her tenure – projected to age 65.6 years old (the average retirement age) are **$665,434**[6] and to 70 years old (Dr. Nikolova's expected retirement age testified to and supported at trial)[7] are **$767,070.**[8] Because UT Austin characterized tenure at trial as essentially a "job for life," calculating the economic impact on Dr. Nikolova's salary to her expected retirement is absolutely reasonable and clearly supported by the evidence. *See* Dkt. 99, 9-10.

> **V.      Dr. Nikolova's Actual Lost Salary Damages Should Be Based On Salary Being Paid For 12-Months (Which It Actually Was) Versus the More Conservative 9-Month Calculations.**

Finally, Dr. Glass's damage estimates previously provided in Plaintiff's Motion for Judgment (Dkt. 99) and in the preceding sections of this motion were based only on the salary Dr. Nikolova and her comparator are paid during the 9-month academic year. This method significantly underestimates Dr. Nikolova's damages because, in fact, as Dr. Nikolova explains in her declaration (Exhibit 2 at ¶ 7), she and essentially all ECE professors are actually paid by UT Austin for a full 12 months. Professors at UT Austin with grant funds (which included Dr. Nikolova and her comparator, Dr. Tiwari) receive an additional three-month summer salary that is paid to professors by UT Austin out of the professor's grant funds.

The amount of this summer salary is determined by taking the 9-month salary number, dividing it by 9 to come up with a monthly amount, and then that monthly amount is paid for each of the three summer amounts. *Id.* For example, if Dr. Nikolova's 9-month salary for 2022-23 academic years is $132,000, her monthly salary would be $14,666.67.[9] Assuming she were able

---

[6] This number includes **$219,768** for leave without pay through 9/1/23 and the "escalator" salary differential of **$445,666** through age 65.6**.**
[7] See Motion for Judgment (Dkt. 99) pp. 9-10.
[8] This number includes **$219,768** for leave without pay through 9/1/23 and the "escalator" salary differential of **$547,302** through age 70**.**
[9] $132,000 divided by 9 = $14,666.67 per month.

to work in the summer of 2023, she would be paid that monthly amount by UT Austin from her grant funds for each of the three summer months totaling $44,000 additional pay,[10] and making her actual annual compensation $176,000.[11] Dr. Nikolova's W-2s for 2014 through 2019 confirm that UT Austin paid her the additional summer salary compensation. Plaintiff's Trial Exhibits 206-210. If this summer compensation is included in the lost damage calculations, Dr. Glass calculates that Dr. Nikolova's total damages – the difference in what she will make versus what she would have made had UT Austin not illegally discriminated against her – are **$870,915** to age 65.6 and **$1,003,921** to age 70.

### VI. Dr. Nikolova will suffer additional future economic damages as a result of UT Austin's illegal and discriminatory denial of tenure that are difficult to quantify.

As Dr. Nikolova explains in her Declaration, in addition to the concrete, reasonably certain and predictable calculations of Dr. Glass regarding the difference in salary that she will lose as a result of UT Austin's discriminatory denial of tenure (even with UT Austin's recent apparent grant of tenure and salary increase, Dr. Nikolova will suffer additional economic losses into the future that are difficult to quantify. Because of her inability to work and the decline in her productivity because of UT Austin's discriminatory tenure denial and her resulting depression, Dr. Nikolova's research and publications have been essentially put on hold. Even when she is able to return to work it will take significant time (years) to restart her research, publish, and regain the position in the academic community that she had before the denial of tenure—if it is possible at all. This will make it harder for her to obtain merit raises at UT Austin and will make it essentially impossible for her to obtain a job at another university for the foreseeable future. There are numerous other negative future economic damages that are difficult or impossible to quantify. While Dr. Nikolova

---

[10] $14,666.67 x 3 = $44,000.01.
[11] $132,000 + $44,000 = $176,000.

does not expect the Court to award specific damages for these unquantifiable negative economic impacts, it is important to note because it supports the reasonableness of those damages that can be easily quantified.

I.      **Conclusion.**

For the reasons set forth herein, Dr. Nikolova respectfully requests that the Court amend its judgment (Dkt. 106) and enter an award of front pay in the amount of **$767,070** at a minimum. This amount is the lost compensation ("front pay") reflecting the difference between what Dr. Nikolova *would have earned* in her tenured position *if UT Austin had not discriminatorily denied her tenure* and she retires at age 70, versus what she is now reasonable calculated to make because of Defendant's illegal discrimination, using conservative 9-month salary calculations. Additionally, Dr. Nikolova respectfully requests the court to consider awarding front pay based on a 12-month salary calculation, in the range of **$870,915** to age 65.6 and **$1,003,921** to age 70. Dr. Nikolova also respectfully requests any other relief the Court deems appropriate and to which Dr. Nikolova is entitled under the law.

        Respectfully submitted,

        CREWS LAW FIRM, P.C.
        701 Brazos, Suite 900
        Austin, Texas 78701
        (512) 346-7077
        (512) 342-0007 (Fax)
        schmidt@crewsfirm.com

        By: /s/ Robert W. Schmidt
        Robert W. Schmidt
        State Bar No. 17775429
        Joe K. Crews
        State Bar No. 05072500

        /s/ Robert Notzon
        Robert Notzon
        The Law Office of Robert Notzon

Texas Bar No. 00797934  
1502 West Avenue  
Austin, Texas 78701  
(512) 474-7563  
(512) 852-4788 facsimile  

**ATTORNEYS FOR PLAINTIFF**

**CERTIFICATE OF CONFERENCE**

I hereby certify that I conferred with counsel for Defendant UT Austin on September 16, 2022, and Defendant opposes this motion.

By: /s/ Robert W. Schmidt

**CERTIFICATE OF SERVICE**

I hereby certify that on September 16, 2022, this document was served pursuant to Federal Rules of Civil Procedure on counsel for Defendant through the Court's electronic filing system at the following address:

Amy S. Hilton  
Assistant Attorney General  
Office of the Attorney General of Texas  
General Litigation Division  
P.O. Box 12548  
Capitol Station,  
Austin, Texas 78711-2548  
Fax (512) 320-0667  
amy.hilton@oag.texas.gov

By: /s/ Robert W. Schmidt